FISHERMEN'S DOCK COOPERATIVE,
INC. OF POINT PLEASANT BEACH,
NEW JERSEY et al., Plaintiffs,

v.

Ronald H. BROWN, Defendant.

Civ. A. No. 2:94cv338.

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 4, 1994.

Nunc Pro Tunc Oct. 28, 1994.

Waverley Lee Berkley, III, McGuire, Woods, Battle & Boothe, Norfolk, VA, Stanley M. Brand, David E. Frulla, Brand & Lowell, Washington, DC, for plaintiffs Fishermen's Dock Co-op., of Point Pleasant Beach, NJ, Belford Seafood Co-op. of Belford, NJ, Wanchese Fish Co. of Virginia, North Carolina and Massachusetts, and Seafarers Intern. Union.

George M. Kelley, III, U.S. Attys. Office, Norfolk, VA, Charles W. Brooks, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, Joel G. MacDonald, U.S. Dept. of Commerce, National Oceanic and Atmospheric Admin., Office of Gen. Counsel, Gloucester, MA, for defendant Ronald H. Brown, Secretary of Commerce.

## OPINION AND ORDER

DOUMAR, District Judge.

Plaintiffs bring this action challenging the 1994 commercial catch quotas for summer flounder set by the Secretary of Commerce, Ronald H. Brown, and his designees, and asking that the quota be set aside. For the reasons discussed below, this Court finds that the plaintiffs' request should be GRANTED; accordingly, the 1994 commercial catch quota is invalidated to the extent that it deviates downward from the figure reached using the best scientific information available, which was 19.05 million pounds for 1994.

### Factual Background

Plaintiffs are a coalition of owners and operators of fishing vessels from up and down the Eastern Seaboard and organizations representing them.[1] Plaintiffs brought

---

1. Plaintiff Wanchese Fish Company of Virginia, North Carolina, and Massachusetts owns or operates forty boats in North Carolina, thirty boats in Virginia, and thirty boats in Massachusetts and employs more than 400 fisherman and approximately 500 shore workers. Plaintiff Fishermen's Dock Cooperative, Inc. of New Jersey represents twenty fishing vessel owners and opera-

tors having between them seventeen vessels and employing more than fifty fishermen and fifteen shore-side employees. Plaintiff Belford Seafood Co-operative of New Jersey has sixty vessels and eighty fishermen. Plaintiff Seafarers International Union of North America, which is headquartered in Maryland, represents fishermen in

this action against the Honorable Ronald H. Brown, Secretary of the Department of Commerce (the "Secretary"), in his official capacity, pursuant to the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* (the "Magnuson Act") seeking review of the 1994 commercial catch quota for the summer flounder fish species (the "1994 quota").

Congress passed the Magnuson Act in 1976 to regulate fishery resources in federal waters off the coasts of the United States. 16 U.S.C. § 1801(b). Under the Magnuson Act, Regional Fishery Management Councils promulgate fishery management plans ("FMPs") which regulate fishing within their respective regions. 16 U.S.C. § 1852(h). The fishery management plans must be consistent with the seven national standards for fishery conservation and management set forth at 16 U.S.C. § 1851.[2] Fisheries off the Atlantic Coast are managed by three different councils: the New England, Mid–Atlantic, and South Atlantic Fishery Management Councils. 16 U.S.C. § 1852(a)(1)–(3). These three councils, in conjunction with the Atlantic States Marine Fisheries Commission ("ASMFC"), prepared what the parties refer to as "Amendment 2," a body of regulations under which the summer flounder quotas were set. 50 C.F.R. § 625.20.

Amendment 2 requires that the Summer Flounder Monitoring Committee ("SFMC") review a number of factors[3] "to determine the allowable levels of fishing and other restrictions necessary to result in a fishing mortality rate of 0.53 for the year 1994, and using that information, recommend a commercial quota to the Demersal Species Committee of the Mid–Atlantic Fishery Management Council ("MAFMC" or "Council") and to the ASMFC. 50 C.F.R. § 625.20(b)(1). Final approval of the FMP is reserved for the Secretary of Commerce; he must examine the plan to determine whether it is consistent with the National Standards, the Magnuson Act, and other applicable law. 16

---

Massachusetts and New Jersey. Compl. at ¶¶ 6–9.

**2.** 16 U.S.C. § 1851(a) sets forth the National Standards. It reads in relevant part:

(a) **In general.** Any fishery management plan prepared, and any regulation promulgated to implement any such plan ... shall be consistent with the following national standards for fishery conservation and management.

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

16 U.S.C. § 1851(a). The statute also calls for the Secretary of Commerce to establish advisory guidelines based on these standards to assist in the development of fishery management plans. 16 U.S.C. § 1851(b).

**3.** The factors that the Summer Flounder Monitoring Committee must review before making a quota recommendation to the Demersal Species Committee of the ASMFC include:

(1) commercial and recreational catch data;

(2) current estimates of fishing mortality;

(3) stock status;

(4) recent estimates of recruitment;

(5) virtual population analysis results;

(6) levels of noncompliance by fishermen or individual states;

(7) impact of size/mesh regulations;

(8) sea sampling and winter trawl survey data, or, if sea sampling data are unavailable, length frequency information from the winter trawl survey and mesh selectivity analyses;

(9) impact of gear other than otter trawls on the mortality of summer flounder

(10) any other relevant information.

50 C.F.R. § 625.20(a).

U.S.C. § 1854(a). If the Secretary (or the Regional Director of the National Marine Fisheries Service ("NMFS"), on behalf of the Secretary) does not notify the Council that he disapproves of the FMP, the plan takes effect after publication in the Federal Register and after 95 days have elapsed from the time of receipt. 16 U.S.C. § 1854(b)(1)(A). Alternatively, the FMP takes effect if the Secretary (or Regional Director of NMFS) notifies the Council in writing that he does not intend to disapprove of the plan between 60 and 95 days after receipt. 16 U.S.C. § 1854(b)(1)(B).

After accumulating and analyzing scientific information about the factors set forth at 50 C.F.R. § 625.20, the SFMC provided the Council with three potential quota figures for meeting a fishing mortality rate of 0.53 in 1994: the geometric mean (19.05 million pounds)[4], one standard deviation above the mean, and one standard deviation below the mean (16.005 million pounds). The Council set the 1994 summer flounder commercial catch quota at 16.005 million pounds, one standard deviation below the geometric mean. 59 Fed.Reg. 10587 (1994).

Plaintiffs contend that the 1994 commercial quota recommendation made by defendant's designees as required by Amendment 2, and accepted by the defendant, violated National Standard 2 of the Magnuson Act, 16 U.S.C. § 1851(a)(2). Specifically, plaintiffs claim that defendant's designees failed to use the best scientific information available to them in a number of areas when setting the 1994 quotas, and instead substituted their own arbitrary and overly conservative estimates of recruitment, stock size, and discard mor-

tality, then arbitrarily deviated from the figure reached using these estimates. Moreover, plaintiffs contend that defendant's designees completely disregarded other available scientific information, including commercial catch indices and sea surface temperature. As a result, plaintiffs claim that the 1994 quota is arbitrary and capricious. *See* 16 U.S.C. § 1855(d). Defendant counters that the information used in setting the quota was the best scientific information available at the time the quota was set. Further, defendant claims that the estimates utilized in creating the quota were derived directly from the data and based on the opinions and analyses of the scientists involved in the 16th Summer Assessment Workshop, the meeting at which the summer flounder data is presented and subjected to peer review. Therefore, defendant contends, the 1994 commercial catch quota was not arbitrary and capricious.

Plaintiffs also argue that the meetings at which these decisions were made were not open to the public, as required by 16 U.S.C. § 1852(j).[5] Plaintiffs contend that the process systematically excluded the opinions and input of commercial fishermen, and discouraged them from attending the meetings at which the quotas were set. Defendant counters that his designees complied with the guidelines for conducting business at council and committee meetings.

*Procedural Background*

Plaintiffs brought what appears to have been a similar suit during the summer of 1993 in the United States District Court for

---

**4.** Plaintiffs contend that the geometric mean quota would have been approximately 19 million pounds. The figure 19.05 million pounds was derived by taking the total quota at the geometric mean, 31.75 million pounds, and multiplying that number by 60%, the amount of the quota allotted to commercial fishermen. *See* Administrative Record ("AR") at 83.

**5.** 16 U.S.C. § 1852(j) reads in relevant part:

(2) The following guidelines apply with respect to the conduct of business at meetings of a Council, and of the scientific and statistical committee and advisory panels of a Council:

 (A) Unless closed in accordance with paragraph (3), each regular meeting and each

emergency meeting shall be open to the public....

(C) Timely public notice of each regular meeting and each emergency meeting, including the time, place, and agenda of the meeting, shall be published in local newspapers in the major fishing ports of the Council's region (and in other major fishing ports having a direct interest in the affected fishery) and such notice may be given by such other means as will result in wide publicity. Timely notice of each regular meeting shall also be published in the Federal Register.

(D) Interested persons shall be permitted to present oral or written statements regarding the matters on the agenda at meetings....

the District of Columbia challenging the 1993 flounder quota (the "1993 suit"). The District Court was unable to hear the parties' cross motions for summary judgment in the 1993 suit until December 14, 1993, and at that time found the matter moot because the effective period of the 1993 quota was to expire on December 31, 1993. The court dismissed the suit without prejudice and instructed plaintiffs that if they brought any challenges to later summer flounder quotas in the District of Columbia, the court would consider those challenges related to the 1993 suit so that the judge familiar with the facts and law could hear them. Plaintiffs have appealed the court's ruling that the 1993 suit was moot.

Plaintiffs filed the present suit in this court on April 5, 1994. On June 3, 1994, defendant filed an Answer and a Motion and Memorandum in Support to Transfer Venue to the United States District Court for the District of Columbia. On June 14, 1994, plaintiffs filed a Memorandum in Opposition to defendant's Motion and a Motion to Expedite Consideration of this Case pursuant to 16 U.S.C. § 1855(b)(4),[6] on the grounds that the effective period of the quota expires on December 31, 1994. On July 12, 1994, the Court denied defendant's Motion to Transfer Venue and granted plaintiffs' Motion to Expedite Consideration of the case.

Counsel for both sides entered a Joint Motion to Submit Case on Cross Motions for Summary Judgment on July 26, 1994. Both parties filed their Motions for Summary Judgment on August 15, 1994. On September 12, 1994, the Court heard oral argument on the motions, and on September 19, 1994, the Court denied both Motions for Summary Judgment and ordered the parties to prepare to try the issue of whether defendant's designees used the best scientific information available in setting the 1994 summer flounder quota. Trial commenced on October 17, 1994.

*Findings of Fact*

1. Quota setting is an imperfect process. It appears to the Court that despite the enormous number of tables generated and the amount of scientific information presented, the scientists are still far from certain about such things as stock size, recruitment and the like. The problem with attempting to make these determinations is that scientific data as to certain environmental factors is simply not available; therefore, scientists can only guess as to the impact environmental factors will have on the fishery in any given year. To the extent that good scientific information on many of these factors exists, the scientists have that information; however, the monitoring of environmental factors could be much better. In many instances, the best scientific information available appears to be whatever information the scientists have collected.

2. Generally, the Court finds that the information utilized by the scientists was deficient in several areas. However, the Court also finds that plaintiffs have been unable to show how other information would affect any of the results or the quota setting process.

3. It appears to the Court that the geometric or arithmetic mean used in any particular situation was chosen so as to generate the most conservative result in the quota setting process. Defendant's designees failed to consistently utilize geometric versus arithmetic means, and in each instance chose the one which would cause the most conservative result, thus reducing the amount of harvestable fish.

4. Defendant's designees failed to show the specific areas where the New England Fisheries Science Center (NEFSC) survey, the main survey relied upon by the defendant's designees in compiling various data on the fishery, was taken; i.e., what quadrants of the fishery were covered by the survey. This problem is relevant because defendant's designees rejected commercial surveys in favor of the information garnered from the NEFSC survey. However, both the fishermen and the scientists testified that to obtain an understanding of the entire fishery, it would be necessary to examine the offshore

---

**6.** "Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way." 16 U.S.C. § 1855(b)(4).

areas, which are incorporated in the commercial surveys and would provide a more comprehensive assessment of the fish in the offshore area. Moreover, the Court finds the NEFSC survey underinclusive because, as testimony showed, it covered the northern areas of the fishery, near the Woods Hole, Massachusetts, starting point, very comprehensively, but did not adequately survey the southern parts of the fishery, which stretches as far south as the southern border of North Carolina.

5. Defendant's designees failed to incorporate measures of sea surface temperature available from the NEFSC survey into the abundance indices derived from the survey. Incorporating this information would have improved the precision of the indices and, accordingly, the precision of the stock size estimates. Moreover, fishermen testified that they utilize sea surface temperature to find summer flounder; although the fishermen are not scientists, it is certainly in their interests to know where the fish are. However, plaintiffs failed to show how considering sea surface temperature would actually impact upon the quota or the information obtained from the NEFSC survey.

6. Defendant's designees estimated discard mortality at 100%, despite a recommendation in the Summer Flounder Advisory Report that the discard mortality rate be set at 80% (AR at 169), despite other surveys indicating mortality rates as low as 6%, and despite the testimony of fishermen that the assumptions used in setting the rate were not based on the actual experiences of fishermen. The scientists appeared unfamiliar with the customs of the fishermen, and in this case, the Court finds that the fishermen are a more reliable source of information than the scientists. This Court finds that a 100% discard mortality rate does not reflect the best scientific information available. Again, however, the plaintiffs cannot show what impact a lower discard mortality rate would have had on the quota. The Court accepts the testimony of plaintiffs' expert, Dr. Hester, and rejects the testimony of defendant's designee Dr. Gabriel, and finds that using a 100% mortality rate lowered the quota for 1994, although it is not clear by

how much, or whether that figure would substantially change the quota.

7. Defendant's designees used 0.20 as the estimate for natural mortality rates. Plaintiffs argue that defendant's designees could have used 0.27 or 0.28 as the rate of natural mortality. Plaintiffs' expert testified, however, that the use of 0.20 was common in these analyses, although he felt that it was preferable to use 0.27 or 0.28. It is unclear to the Court how and by how much the substitution of 0.27 or 0.28 for 0.20 would have changed the quota ultimately set by defendant's designees. Accordingly, the Court finds that the use of 0.20 is commonly accepted as the best scientific information.

8. Defendant's designees used an estimate of recruitment (the measure of how many fish are added to the stock in a given year) for both age 0 and age 1 fish that was one standard deviation below the geometric mean. As a result of using these estimates, the quota was set sixteen percent below the level which would have resulted from the use of the geometric mean estimates. AR at 83. Contrary to the action taken in 1994, in setting both the 1993 and 1995 quotas, the Council used the geometric mean for estimating recruitment of age–0 fish. In the 1995 quota process, however, staff recommended use of the figure one standard deviation below the mean. That recommendation was rejected by the Demersal Species Committee of the MAFMC, which used the geometric mean figure of recruitment. The Court finds that the geometric mean gave a sufficiently conservative result, as it was more probable than not (59% probable) that the target fishing mortality of 0.53 would be reached and not exceeded using the geometric mean.

9. The SFMC presented the Council with three possible quota levels for 1994: the geometric mean, one standard deviation above and one standard deviation below. The Council chose to implement the figure one standard deviation below the mean, 16.005 million pounds, rather than the geometric mean figure of 19.05 million pounds. Using this figure gave the Council an 81% chance of meeting the target fishing mortality of 0.53 for 1994. Using the geometric mean would have given the Council a 59%

chance of meeting the 0.53 requirement. Obviously, choosing one standard deviation above the mean was never considered, as using that figure would have decreased the probability of meeting 0.53 to beneath 50%. The Council chose to use one standard deviation below the mean despite its awareness at the time the quota was set that use of the geometric mean in 1993 had produced a projected target fish mortality of 0.48 for that year, 0.05 below the mandated target fish mortality.

10. Throughout the quota setting process, public input was not encouraged but rather discouraged. Defendant's designees did not desire to consider the opinions and experiences of commercial fishermen relevant in analyzing factors for the quota setting process.

*Standard of Review*

Judicial review under the Magnuson Act is governed by 16 U.S.C. § 1855(b), which authorizes judicial review to the extent permitted by 5 U.S.C. § 701 *et seq.*, the Administrative Procedure Act. Specifically, regulations promulgated by the Secretary may be overturned only if the court finds them to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 16 U.S.C. § 1855(b)(1)(B) (adopting the standards of 5 U.S.C. § 706(2)(A)—(D)); *see also Kramer v. Mosbacher,* 878 F.2d 134, 136 (4th Cir.1989).

■ Given these parameters, agency decisions are entitled to an almost insurmountable degree of deference. "In short, the Secretary has broad discretion in promulgating regulations to implement the [FMP] and the Court may only consider 'whether this discretion was exercised rationally and consistently with the standards set by Congress....'" *Southeastern Fisheries Ass'n v. Mosbacher,* 773 F.Supp. 435, 439 (D.D.C. 1991), citing *Louisiana v. Baldridge,* 538 F.Supp. 625, 628 (E.D.La.1982) and *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977); *C & W Fish Co. v. Fox,* 931 F.2d 1556, 1562

(D.C.Cir.1991); *Parravano v. Babbitt,* 837 F.Supp. 1034, 1042 (N.D.Cal.1993). The Secretary's actions are presumed valid; accordingly, the Court cannot simply substitute its judgment for the Secretary's. *Washington Crab Producers, Inc. v. Mosbacher,* 924 F.2d 1438, 1441 (9th Cir.1991); *National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. 210, 219 (D.D.C.1990). Instead, the court must find that the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious. *Organized Fishermen of Florida, Inc. v. Franklin,* 846 F.Supp. 1569, 1573 (S.D.Fla.1994); *Southeastern Fisheries Ass'n v. Mosbacher,* 773 F.Supp. at 439; *National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. at 219.

*Analysis*

■ Before beginning this analysis, it is important to recall the twin goals of the Magnuson Act: conservation of fishery resources and promotion of commercial and recreational fishing. According to Congress, one of its purposes in passing the Magnuson Act was "to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(3); *see also* 16 U.S.C. § 1851(a)(1) ("Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery."). Any analysis of the process that culminated in the 1994 commercial fishing quota must be undertaken with these dual objectives in mind.

**1. Notice Requirements**

■ Although the Federal Advisory Committee Act, 5 U.S.C. app. § 5 *et seq.*, does not apply to the meetings of the Committees or Councils authorized by the Magnuson Act, the Act itself contains public notice requirements. 16 U.S.C. § 1852(j) states in relevant part:

(2) The following guidelines apply with respect to the conduct of business at meetings of a Council, and of the scientific and statistical committee or advisory panels of a Council:

(A) Unless closed [due to national security concerns], each regular meeting and each emergency meeting shall be open to the public. . . .

(C) Timely public notice of each regular meeting and each emergency meeting, including the time, place, and agenda of the meeting, shall be published in local newspapers in the major fishing ports of the Council's region (and in other major fishing ports having a direct interest in the affected fishery) and such notice may be given by such other means as will result in wide publicity. Timely notice of each regular meeting shall also be published in the Federal Register.

(D) Interested persons shall be permitted to present oral or written statements regarding the matters on the agenda at meetings.

This requirement has gone largely unexamined by courts. *But see Washington Crab Producers, Inc. v. Mosbacher,* 924 F.2d at 1448 (rejecting a challenge to the public comment process based on plaintiffs' failure to raise a concrete objection to the process).

However, the public notice requirements of the Magnuson Act are analogous to those found in the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. § 5 *et seq.* Although the Magnuson Act specifically exempts the FMP creation process from FACA's requirements, the Act itself imposes substantially similar requirements.[7] For that reason, the cases on remedies for violations of FACA are instructive. In *Alabama–Tombigbee Rivers v. Department of Interior,* the United States Court of Appeals for the Eleventh Circuit upheld a permanent injunction against the use of an advisory committee report in determining whether the Alabama sturgeon was an endangered species because the committee had not complied with FACA's requirements. 26 F.3d 1103, 1107 (11th Cir. 1994). The Court noted that "[p]ublic observation and comment must be contemporane-

ous to the advisory committee process itself. . . . If public commentary is limited to retrospective scrutiny, the Act is rendered meaningless." *Id.* at 1106. Similarly, the court in *Association of American Physicians & Surgeons v. Clinton,* 813 F.Supp. 82, 94 (D.D.C.1993), *rev'd* on other grounds, 997 F.2d 898 (D.C.Cir.1993), stated,

While it may be true that plaintiffs will have other opportunities to affect the course of the legislation, FACA's purpose is also to open—contemporaneously—to the light of public scrutiny the workings of advisory committees subject to FACA.

Therefore, there is precedent supporting the idea that the failure to comply with public notice requirements is sufficient to restrain and indeed, overturn, executive agency action.

Defendant's designees have submitted sufficient proof of compliance with 16 U.S.C. § 1852(j)'s requirements on publication of meeting times and places to satisfy the Court. There was never a question that the SFMC, Demersal Species Committee and MAFMC meetings were advertised in the Federal Register. However, defendant's designees have also submitted affidavits of publication of the September 1, 1993, SFMC meeting and the September 28–30, 1993, Demersal Species Committee and MAFMC meetings for papers in major port cities along the Atlantic Coast, including Asbury Park, New Jersey; Salisbury, Maryland, Newport News, Virginia; various locations in New York; Atlantic City, New Jersey; Providence, Rhode Island (September 1 meeting only); and Norfolk, Virginia. Additionally, defendant's designees have submitted the mailing lists for the Council newsletter, which contains members of the press and private citizens, and the mailing list for SAW meetings, which includes members of the press and private citizens. Also, defendant's designees have provided the Court with copies of the NEFSC newsletter, "Research

---

7. 5 U.S.C. app. § 10 states in relevant part,

(a)(1) Each advisory committee meeting shall be open to the public. . . .

(3) Interested persons shall be permitted to attend, appear before, or file statements with any advisory committee, subject to such reasonable

rules or regulations as the Director [Administrator] may prescribe.

5 U.S.C. app. § 10(d) further states that meetings within the purview of any of the ten exemptions of 5 U.S.C. § 552b(c) may be closed to the public.

Highlights," and its mailing list, which again contains members of the press, private persons, and fisheries. These publications discuss the outcome of the SAWs, but apparently do not announce the meetings.

The Court is still skeptical as to the willingness of staff to include the public in the quota setting process, however. At best, staff paid lip service to the requirements of the Magnuson Act. In the instances that information about meetings was disseminated, it was not widely published; staff response to public inquiries as to the advertisements was discouraging. When members of the public contacted Director John Bryson about attending the Summer Flounder Monitoring Committee Meeting, at which the calculations for setting the quota were discussed and quota recommendations were developed, they were told that public input was inappropriate at that level, despite the willingness of those persons to attend. AR at 102; *see also* AR at 173 (Bryson told the public that the SFMC meeting wasn't participatory, and that they should attend the Demersal Species Committee meeting). Although the Court is suspicious as to how "open" these meetings actually are, and believes that input from non-scientists is rarely considered, the Court finds that defendant's designees have complied with the notice and advertising requirements of 16 U.S.C. § 1852(j).

## 2. National Standard 2

16 U.S.C. § 1851(a)(2) states, "Conservation and management measures shall be based on the best scientific information available." Scientific information, as defined by 50 C.F.R. § 602.12(b)(1), includes biological, ecological, economic and social data. That information need not be absolutely comprehensive. 50 C.F.R. § 602.12(b) explains that "[t]he fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP." Further, the regulations provide for differences in the information. "If there are conflicting facts or opinions relevant to a particular point, a Council may choose among them, but should justify the choice." 10 C.F.R. § 602.12(b)(1). Information obtained after the FMP is created should be incorpo-

rated wherever possible, but the FMP need not be reformulated based on new information unless the information points to changes in the fishery that are so drastic as to warrant revising the management objectives or measures. 50 C.F.R. § 602.12(b)(2).

Reviewing courts have been reluctant to find that the best scientific information available was not utilized. *See Northwest Environmental Defense Center v. Brennen,* 958 F.2d 930, 936 (9th Cir.1992); *Washington Crab Producers,* 924 F.2d at 1448–49; *Southeastern Fisheries Ass'n,* 773 F.Supp. at 442; *National Fisheries Institute,* 732 F.Supp. at 220. In the one case in which a court found that the Secretary failed to use the best scientific information available, the court held that although the Secretary was entitled to reject the Pacific Fishery Management Council's recommendation, "the particular manner by which the Secretary chooses to address the problem must have some support in the Administrative Record...." *Parravano v. Babbitt,* 837 F.Supp. at 1046. The court noted the absence of justifications for the Secretary's choice in the administrative record. *Id.* The Magnuson Act, according to the court, "ensure[s] that such ... decisions are adequately explained and based on the best scientific evidence available—and not simply a matter of political compromise." *Id.* at 1047.

This Court is not a scientist. It will not substitute its own opinions about scientific methods for those of the scientists comprising the Summer Flounder Monitoring Committee. *See, e.g., Washington Crab Producers,* 924 F.2d at 1441. What this Court will do, however, is determine whether the decisions made by the MAFMC on behalf of defendant are so devoid of support in the administrative record as to be arbitrary and capricious. Plaintiffs bear a heavy burden in this regard. They cannot only show that defendant's designees could have used other methods or considered other factors. They must also show how and by how much using the "better" scientific information would have changed the 1994 commercial catch quota, if the Court is to find the quota arbitrary and

capricious.[8] Each disputed figure or process will be discussed in turn.

### A. Arithmetic v. Geometric Means

■ Defendant's designees alternated in their use of geometric and arithmetic means, depending on the figure being calculated. Geometric means, according to defendant's designees, are used when the arithmetic mean will not give the most common value because of the presence of outliers, very high or low values which distort the end result. The geometric mean applies a transformation to the data which brings the mean closer to the most frequently observed value in the data than the arithmetic mean would. Plaintiffs' expert agreed that the geometric mean is used to reduce uncertainty in data, and used the geometric mean figure to analyze discard rates based on the data in the administrative record.

While the Court accepts this rationale for the use of geometric versus arithmetic means, it is clear to the Court that the decision to use a particular type of mean was based on achieving the most conservative and conservationist results. However, plaintiffs have failed to show why using the arithmetic mean in assessing recruitment and quota values would have constituted the best scientific information available. Moreover, plaintiffs have offered no evidence of the impact that substituting the arithmetic for the geometric mean in either of these calculations would have had on the 1994 commercial catch quota. Accordingly, the Court finds that defendant's designees were not arbitrary and capricious in using the geometric rather than the arithmetic mean to make the recruitment and quota size calculations.

### B. Failure to Use Commercial Catch Indices

■ Plaintiffs contend that defendant's designees completely excluded commercial catch indices from their quota setting analyses. In creating the virtual population analy-

sis ("VPA"), the set of calculations from which stock size is estimated, defendant's designees did not include commercial catch indices, and instead used only the state surveys, which were not shown to be offshore surveys, and two NEFSC trawl surveys. The failure to include commercial catch indices in the VPA, plaintiffs argue, meant that defendant's designees lacked information as to fish in the offshore areas. Defendant's designees admit that they excluded commercial indices from the VPA, but contend that because commercial catch data was incorporated in the catch-at-age matrix, which also went into quota calculations, including the commercial indices would have given the commercial catch information double weight.

There is no doubt that the commercial catch indices are a good source of information about offshore abundance of summer flounder. Fishermen follow the fish; the commercial catch indices encompass the areas where fishermen have discovered the richest sources of summer flounder. Intuitively, it seems that the inclusion of this information could only have given the scientists a more complete picture of the fishery.

Nonetheless, plaintiffs have again been unable to show the actual effect that the inclusion of the commercial catch indices would have had on the quota levels. Accordingly, the Court cannot find that the failure to include this information in the VPA was arbitrary and capricious.

### C. Sea Surface Temperature

■ The Court heard testimony, both from experts and from fishermen, that sea surface temperature is relevant to assessing stock abundance levels of summer flounder. The fishermen testified that sea surface temperature definitely has an effect on where summer flounder are found, and stated that summer flounder seem to be most abundant at the 50 to 60 degree range of sea surface temperature. Plaintiffs' expert testi-

---

**8.** The Court is aware that plaintiffs are hampered in this effort by their inability to re-run defendant's designees' equations incorporating their own proposed figures. This Court does not expect an exact numerical accounting of what the impact of using other, better scientific informa-

tion would be. Nonetheless, plaintiffs shoulder the substantial burden of giving the court some concrete indication of how and by how much the quotas would change if different information were used.

fied further that it is standard practice in taking sea surveys to include environmental factors such as sea surface temperature, and that the NEFSC surveys routinely measure this variable. Defendant's designees countered that because the NEFSC trawl surveys cover the entire summer flounder fishery on the Atlantic Coast, the surveys control for the range of temperatures in which the summer flounder can be found. Temperature does not have to be considered as an independent variable because it is already incorporated in the surveys' other measures.

Ultimately, the Court is again presented with the same question: how would incorporating sea surface temperature affect the summer flounder 1994 commercial catch quota? Plaintiffs allege that including this variable would have improved the precision of the abundance estimates derived from the VPA, in which the NEFSC data was used. Plaintiffs do not explain, however, how or by how much the quota would have been changed if sea surface temperature had been considered. Therefore, the Court cannot find that the excluded sea surface temperature was the best scientific information available; thus, defendant's failure to include that information was not arbitrary and capricious.

### D. Discard Mortality

■ Defendant's designees used a 100% estimate of discard mortality in calculating the quota; in other words, defendant's designees assumed that all fish caught and discarded by fishermen would die. However, evidence in the record rebuts this assumption. The Summer Flounder Advisory Report, which was reviewed by the SFMC, recommended using an 80% estimate of discard mortality.[9] AR at 169. Moreover, the SFMC considered a study suggesting that discard mortality might be as low as 6%, although the proponent of that study recognized that the study was far from conclusive and that "more research is warranted." AR at 107. Defendant's designees also based their discard mortality rate on assumptions about how fishermen were discarding fish.

Defendant's designees testified that fishermen used a board with a nail driven through it (known as a "pick") to pick up fish and throw them overboard, nailing the fish in the head so as not to damage the meat. However, the fishermen testified that often they use a device like a pushbroom, with a board in the place of the brush, to push fish overboard, which poses less trauma to the fish. Additionally, the fishermen indicated that the pick used in picking fish is the size of a hypodermic needle rather than a nail, and that fish are usually picked through the tail rather than in an area that would do great damage to the fish. It is clear from the testimony of the fishermen, which the Court accepts, that the scientists have based the 100% discard mortality on erroneous assumptions.

There was conflicting trial testimony as to how a lower estimate of discard mortality would have affected the quota. Predictably, defendant's designees asserted that lowering the discard mortality would ultimately have lowered the quota, and plaintiffs' expert testified that lowering discard mortality estimates would have increased the quota. The Court accepts the testimony of the plaintiffs' expert in this regard. Once again, however, plaintiffs failed to give the Court a concrete answer as to the effect that incorporating a lower estimate of discard mortality would have on the quota. Consequently, the Court finds that the use of a 100% discard mortality rate was arbitrary and capricious, but did not substantially affect the quota.

### E. Natural Mortality

■ Defendant's designees hold the rate of natural mortality constant at 0.20 for the purposes of the quota setting equations. Even plaintiffs' expert acknowledged in his testimony that the use of 0.20 as the natural mortality rate is a common approach in VPAs. However, plaintiffs' expert contended that the better approach would be to use 0.27 or 0.28 as the natural mortality rate because it took into account sex and age differentia-

---

**9.** There was testimony at trial from defendant's designees that lowering discard mortality to 80% would have had a negligible affect on the quota. The Court has not considered any information outside of that offered at trial in determining whether the discard mortality figure was the best scientific information available.

tions among summer flounder. Defendant's designees explained that they rejected the use of 0.27 or 0.28 because although the method used for arriving at those numbers may be sound, the data used to reach those results was either unavailable or unreliable. Again, the parties differed as to what effect the use of the slightly higher natural mortality rate would have on the quota.

Plaintiffs cannot simply substitute their judgment for that of defendant's designees as to what is the better procedure for estimating natural mortality is. Plaintiffs have the affirmative burden of showing both why the figure used by defendant's designees is not the best scientific information available, and why either of the figures propounded by plaintiffs is the best scientific information available. Because plaintiffs have failed to carry that burden, the use of 0.20 as the rate of natural mortality is not arbitrary and capricious.

### F. Recruitment

■ For age 0 fish, three numbers were generated to estimate recruitment for setting the 1994 quota: the geometric mean (33.8 million), one standard deviation above the mean (50.4 million) and one standard deviation below the mean (22.7 million). Similarly, for age 1 fish, three numbers were generated: the geometric mean (32.9 million), one standard deviation above the mean (41.3 million), and one standard deviation below the mean (24.4 million). The defendant's designees opted to use the figure one standard deviation below the mean in estimating recruitment for the 1994 quota. It is interesting to note that in setting both the 1993 and 1995 quotas, the Council chose to use the geometric mean figure of recruitment (although in the 1995 quota setting process, staff recommended that the Council use the figure one standard deviation below the mean and the Council rejected that recommendation). Defendant's designees defend this choice as reflecting both the assessment information and the SFMC, Demersal Species Committee and Council's concerns about not being able to meet the target fish mortality rate of 0.53.

Both parties agree that the use of recruitment estimates one standard deviation below the mean caused the quota to be set sixteen percent below the level where it would have been set had the geometric means for age 0 and age 1 fish recruitment been used (16.005 million pounds v. 19.05 million pounds). The Court finds that the use of figures one standard deviation below the mean was arbitrary and capricious. The use of a figure one standard deviation below the mean was chosen not because it was the best scientific information available, but solely because it increased the percentages of reaching not a balanced result but a result which protected the summer flounder stock to the detriment of the fishermen.

The Court is not critical of the Committee and the Council's desire to conserve the summer flounder resource; conservation is a laudable goal. But Congress, in the Magnuson Act, expressed a desire to balance conservation against the rights of commercial and recreational fishermen. It is clear that the "standard deviation," whether one, one and one-half or whatever figure was substituted, was picked to place a scientific name on what was plainly an unbalanced decision. By arbitrarily choosing levels of recruitment just to conserve the stock, the Council neglected to balance the goals of the Act. This is an arbitrary choice which is not supported by the best scientific evidence available and therefore, cannot stand.

### G. Standard Deviations In Choosing the Quota

The Court has found for the most part that defendant's designees used the best scientific information available in arriving at quota figures presented to the Council, despite the reservations expressed by the Court as to some of those figures. Using that information, the SFMC presented three potential quota levels to the Council: the geometric mean, and one standard deviation both above and below the mean. The Council chose to implement a quota one standard deviation below the geometric mean, resulting in a quota of 16.005 million pounds rather than a quota of 19.05 million pounds, a sixteen percent difference. Defendant's designees ex-

plained that using the lower figure increased the probability of reaching 0.53, the target fishing mortality for 1994, from 59% at the geometric mean to 81% with the lower figure.

This Court finds that the Council's decision to implement a quota one standard deviation below the geometric mean failed to utilize the best scientific information available, and therefore was arbitrary and capricious. The geometric mean figure resulted from analyzing all of the best scientific information available, the information upon which the Council must rely by law. At the time of setting the 1994 quota, it was then projected that the 1993 quota, which was set at the geometric mean with no "deviation," would result in a fishing mortality of 0.48. This was 5% more conservative than the goal of the Act for 1993. Deviating from the geometric mean in setting the 1994 quota was not using the best scientific information available; by using the standard deviation the Council rejected the figure obtained by the best scientific information, the geometric mean, and opted for a lower figure. If this theory were followed, the Council could have chosen any standard deviation below the mean—one-half, one, two, or ten, as long as the Council increased its chances of achieving the goal. The choice itself is arbitrary and capricious because it rejects the figure derived from the best scientific information in favor of another figure altogether. It was not a balanced decision. It was a decision based not on science but on the sole goal of lowering the amount of fish taken from the stock.

Fishery management plans must balance the importance of conservation against support for commercial and recreational fishermen. Weighing the balance grossly in favor of conservation necessarily means harming fishermen, which was not Congress' expressed purpose when implementing the Magnuson Act.

The Court's decision that choosing one standard deviation below the mean is arbitrary and capricious is supported by the 1993 and the 1995 quotas, both of which were set using the geometric mean figure. In setting the quotas for 1993 and 1995, the Council seems to have recognized that basing its choice on the best scientific information avail-

able means balancing the goals of the Act and setting the quota at the figure arrived at by utilizing the best scientific information available.

In setting the 1994 quota, the quota in question, the defendant's designees have used a statistical term to justify an arbitrary and capricious choice. Clothing the arbitrary choice to deviate downward from the figure generated by the best scientific information available by using the term "standard deviation" is merely semantics and is in no way scientific. This they cannot do within the parameters of the Magnuson Act. Moreover, this arbitrary and capricious deviation clearly abandons Congress' goal of balancing conservation and fishing interests. Accordingly, this Court finds that pursuant to 16 U.S.C. §§ 1851(a)(2) and 1855(b) the 1994 summer flounder quota is invalid to the extent of the deviation from the geometric mean of the commercial catch quota. The commercial catch quota which was contested herein should be reset using the figure derived from the best scientific information available—19.05 million pounds, the geometric mean, replacing the quota set at one standard deviation below the mean, or 16.005 million pounds.

### *Conclusion*

The defendant and his designees rejected the best scientific information available at the time the quota was set in establishing the 1994 summer flounder quota. To the extent that the commercial fishing quota was less than the geometric mean figure of 19.05 million pounds, the defendant and his designees acted arbitrarily and capriciously and the quota must be invalidated. Accordingly, this Court finds in favor of plaintiffs and ORDERS that the 1994 summer flounder commercial catch quota be invalidated to the extent that it is less than 19.05 million pounds. This action is remanded to the Department of Commerce for resetting of the quota in a manner consistent with this opinion.

**IT IS SO ORDERED.**

**BROADNAX MILLS, INC., Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF VIRGINIA, Defendant.**

Civ. No. 3:94CV603.

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 8, 1994.

Michael Randolph Shebelskie and George H. Gromel, Jr., Hunton & Williams, and Virginia H. Hackney, Richmond, VA, for Brodnax Mills, Inc.

Roscoe Connell Roberts, Blue Cross/Blue Shield, Richmond, VA, and Richard C. Titus, Raleigh, NC, for Blue Cross and Blue Shield of Virginia.

## *MEMORANDUM*

MERHIGE, District Judge.

This matter is before the Court on the plaintiff's motion to remand, pursuant to 28 U.S.C. § 1447(c). For the reasons set forth below, the Court will deny the motion.

### I.

In 1978, the plaintiff established a fully insured health benefit plan for its employees. Because the plaintiff was unfamiliar with administering such a plan, it sought advice regarding plan administration and "the availability of, and the need for, insurance to provide ... reasonable protection from liability under the [plan]." Motion for Judgment ¶ 4. Since adopting the plan, the plaintiff has relied on the defendant for such advice.

The plan was, until August 1, 1989, fully insured by the defendant. On that date, the plan was converted to a self-insured plan. The plaintiff and the defendant concomitantly entered into an administration services only agreement ("ASO Agreement"). Pursuant to this agreement, the plaintiff agreed to pay premiums into an operating account managed by the defendant in exchange for the provision of various claims services. The monthly payments made by the plaintiff consisted of funds contributed by both the plaintiff and the plaintiff's employees. Receipts and charges were recorded by the defendant in the operating account. If, at the termination of the contract, the sum of claims paid plus administrative and other fees exceeded the amount of premiums paid, the plaintiff

owed such an amount to the defendant, plus interest.

The ASO Agreement was renewed in subsequent years. In connection with the 1991–92 ASO Agreement, the plaintiff procured from the defendant an excess risk insurance policy with specific stop loss insurance. This policy limited the plaintiff's liability for claims paid in excess of $60,000.00 per year per participant as the plaintiff was reimbursed for claims exceeding such amount. The policy did not, however, provide any limit on the plaintiff's *overall* liability for operating account deficits. Motion for Judgment ¶ 22. The plaintiff contends that the defendant "did not inform Broadnax ... about the existence of, or the need for, any additional insurance to protect Broadnax against liability for a large deficit in the operating account." *Id.* at ¶ 23.

The ASO Agreement was renewed for the 1992–93 contract year after the defendant's review of the plaintiff's historical and projected claims levels.[1] Once again, the agreement did not provide for *aggregate* stop loss insurance for 1992–93. During that year, an unusually large number of claims were submitted by plan participants. As a result, the operating account showed a deficit of $240,000.00 at the end of the contract year. According to the plaintiff, the account would have shown a surplus of approximately $52,347 if the defendants had recommended and provided aggregate stop loss insurance.

The plaintiff also alleges that the defendants failed to explain a provider payment differential provision that was contained in the ASO Agreement. Specifically, the plaintiff claims that the defendant obtained discounts from various health care providers and that the 1992–93 deficit, as reported in the operating account, fails to account for these discounts which allegedly amounted to $48,952.27. The plaintiff states that this amount represents "undisclosed fees ... that were improperly and unfairly imposed" owing to the defendant's failure to explain the meaning of the ASO Agreement's provider payment differential provision. Motion for Judgment ¶¶ 44–45.

Finally, the plaintiff charges that the defendant failed to explain that, under the ASO Agreement, the plaintiff was liable "for all claims incurred but not reported prior to the termination of the ASO Agreement," and that terminal liability limit insurance was available to protect the plaintiff against potential "excessive terminal liability." Motion for Judgment ¶¶ 49–50. Because it was unaware that such insurance was available, the plaintiff alleges that it is now liable for an undetermined amount of claims submitted after the ASO Agreement expired on July 31, 1994.

On these allegations, the plaintiff filed a six count motion for judgment in the Circuit Court of Mecklenberg County on August 1, 1994. The motion for judgment contains state law causes of action including breach of contract, negligence, breach of fiduciary duty, promissory estoppel, negligent misrepresentation and constructive fraud. The motion for judgment nowhere mentions the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Nevertheless, the defendants filed a notice of removal on August 18, 1994, basing removal on federal question jurisdiction assertedly created by ERISA. The plaintiffs moved to remand the matter to state court on September 19, 1994.

## II.

■ In order for removal jurisdiction to exist, a federal court must have "original jurisdiction." 28 U.S.C. § 1441(a). Original jurisdiction exists where the plaintiff's cause of action arises under the Constitution or federal law. *See* 28 U.S.C. § 1331. Whether or not an action "arises under" federal law is generally determined by the "well pleaded complaint" rule. *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vac. Trust for S. Cal.*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). As articulated by the Supreme Court,

---

1. This review is allegedly designed to ascertain projected insurance needs and recommend the insurance necessary to protect against "commer-

cially unreasonable risks" arising under the plan. Motion for Judgment ¶ 26.

whether a case is one arising under the Constitution or a law or treaty of the United States ... must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose. *Franchise Tax Bd.*, 463 U.S. at 10, 103 S.Ct. at 2846 (*quoting Taylor v. Anderson*, 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218 (1914)). In the instant case, the complaint nowhere mentions ERISA or any other federal law. Rather, it asserts state law causes of action based on the defendant's advice, or lack thereof, regarding insurance and certain discounts related to the plaintiff's health benefits plan.

 The plaintiff asserts that the absence of a federal law on the face of the complaint is alone sufficient to remand the action to state court. The Court does not agree as it is well settled that removal jurisdiction may nevertheless be established under the "complete preemption" doctrine. Pursuant to this doctrine, a federal court will have jurisdiction, regardless of the complaint's contents, where Congress has "so completely preempt[ed] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546–47, 95 L.Ed.2d 55 (1987); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 107 S.Ct. 2425, 2430, 96 L.Ed.2d 318 (1987). In such cases, the complaint is "deemed to arise under federal law" and remand is "impermissible." *Richmond v. American Systems Corp.*, 792

F.Supp. 449, 453, 455 (E.D.Va.1992). Because a general preemption defense is insufficient to establish removal jurisdiction, *Taylor*, 481 U.S. at 63, 107 S.Ct. at 1546, complete preemption requires more than an assertion of "federal occupation of the pertinent area of the law." *Richmond*, 792 F.Supp. at 456 (*citing Taylor*, 481 U.S. at 63, 107 S.Ct. at 1546). Where ERISA is cited as the jurisdictional basis, complete preemption exists where the plaintiff's claim is displaced by ERISA's preemption provision, 29 U.S.C. § 1144, and falls within ERISA's civil enforcement provision. 29 U.S.C. § 1132. *Taylor*, 481 U.S. at 64–67, 107 S.Ct. at 1546–48 (complete preemption exists because cause of action was preempted by ERISA and fell squarely within § 1132).[2]

### III.

 The "touchstone of the federal district court's removal jurisdiction is ... the intent of Congress." *Taylor*, 481 U.S. at 66, 107 S.Ct. at 1547. ERISA is the body of federal law regulating employer provided benefit plans.[3] The law is designed to achieve uniformity in the regulation of pension plans and to "promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 88, 103 S.Ct. 2890, 2895, 77 L.Ed.2d 490 (1983).

The ERISA statutory scheme relies heavily on the civil enforcement and preemption provisions to attain Congress' underlying objectives. ERISA's preemption provision reads, in pertinent part: "[T]he provisions of this subchapter ... shall supersede any and

**2.** In certain situations, a court examining a remand motion may conclude that a claim is preempted based on § 1144 alone. For example, in *Richmond*, it was not possible for the plaintiffs' claims to fall within the ERISA civil enforcement provisions because the plaintiffs, minority shareholders of the defendant corporation, did not have standing under those provisions. Thus, in considering whether to exercise its discretionary remand powers, the court concluded that preemption would have to come from ERISA's preemption provision, if anywhere. In this vein, the court concluded that the claims did not sufficiently "relate to" ERISA to be preempted under § 1144. 792 F.Supp. at 456. In contrast, the *Taylor* plaintiff, a plan *beneficiary* suing to recover benefits, had standing and his com-

plaint clearly fell within ERISA's civil enforcement provisions. The *Taylor* Court concluded that the claim was completely preempted and removal was proper because ERISA preempted the claim and because it was Congress' clear intent "to make suits brought by participants or beneficiaries federal questions for the purposes of federal court jurisdiction." 481 U.S. at 66, 107 S.Ct. at 1547. As set forth in this memorandum, the Court determines that the instant matter falls within the *Taylor* complete preemption analysis.

**3.** It is uncontested that the plaintiff's plan is covered by ERISA. *See* 29 U.S.C. § 1002(1).

all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). This section

was intended to ensure that plans and sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between states and the Federal Government. Otherwise, the inefficiencies could work to the detriment of plan beneficiaries.

*Ingersoll–Rand v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (citations omitted).

■ The civil remedies provision creates several discrete causes of action and identifies the parties who have standing to bring an action under that section.[4] This section reflects a "careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987). These provisions provide the "exclusive remedy for rights guaranteed under ERISA." *Ingersoll–Rand,* 498 U.S. at 144, 111 S.Ct. at 485.

### IV.

■ Under the preemption provision, the critical inquiry is whether or not the state cause of action "relates to" the plaintiff's health benefits plan. In order to achieve the policies underlying ERISA, the preemption clause is generally read expansively and a state cause of action will be

found to "relate to" an ERISA plan "if it has a connection with or reference to such a plan." *Dist. of Columbia v. Greater Washington Bd. of Trade,* — U.S. —, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992); *accord Tri-State Machine, Inc. v. Nationwide Life Ins. Co.,* 33 F.3d 309, 312 (4th Cir.1994).

The provision, however, is not free of limitations. "Some state actions may affect employee benefit plans in too tenuous, remote or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. As set forth in *Richmond,* 792 F.Supp. at 457, several principles have evolved from the cases addressing this limitation on preemption.

First, state laws involving the exercise of traditional state authority are less likely to be preempted than state laws regulating areas not traditionally left to the state. Second, a state law is more likely to relate to a benefit plan, and thus be preempted, if it affects relations among principal ERISA entities (the employer, the plan, the plan fiduciaries, and the beneficiaries). When it affects relations among principal ERISA entities and an outside party, or between two outside parties, a state law is less likely to be preempted. Third, preemption is less likely to occur where the effect of a state law of general application on an ERISA-covered plan is merely incidental.[5]

*Id.* at 457–58 (citations omitted).

The plaintiff asserts that the suit does not "relate to" ERISA. In support of this contention, the plaintiff states that the subject matter of the suit, stop-loss insurance, is not

---

4. 29 U.S.C. § 1132 provides, in pertinent part:

A civil action may be brought—
 (1) by a participant or beneficiary—
 (A) for the relief provided for in subsection (c) of this section [concerning requests to the administrator], or
 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
 (2) by the Secretary, or by a participant, beneficiary, or fiduciary for appropriate relief under section 1109 of this title [breach of fiduciary duty];
 (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates

any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.
29 U.S.C. § 1132(a).

5. These principles served as the basis for the recent holding that certain provisions of Virginia worker's compensation law do not "relate to" ERISA plan. *See Employers Resource Management Co., Inc. v. James,* 853 F.Supp. 920, 929 (E.D.Va.1994) (state laws did not impact primary administrative functions of the plan, such as disclosure, funding, reporting, vesting and enforcement).

a plan asset, and that they are suing the defendant only in its capacity as an insurance broker for improper advice concerning such insurance.

 This argument fails to account for several critical facts. To begin, the defendant was not merely a third party insurer.[6] To the contrary, the ASO agreement makes clear that the defendant was the administrator and servicer, as well as the insurer, of the plaintiff's plan. *See* Answer, Exhibit 1, ASO Agreement ("The Company agrees to administer the benefits afforded Participants as set forth herein. . . ."). In this capacity, the defendant, among other responsibilities, determined the extent to which participants and beneficiaries were covered and, in this regard, applied plan assets to pay for services rendered by health care providers. This involvement in plan operations elevates the defendant's status above that of mere insurer. Indeed, as set forth below, the defendant, like the plaintiff, was a plan fiduciary. Where a dispute involves "principal ERISA entities," it is more likely to "relate to" the plan and be preempted. *Richmond,* 792 F.Supp. at 457.

Moreover, the plaintiff's claims implicate the primary administrative functions of the plan. *See Martori Bros. Dists. v. James–Massengale,* 781 F.2d 1349 (9th Cir.) *cert. denied* 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986) ("state law is preempted if it regulates the matters regulated by ERISA: disclosure, funding, reporting, vesting and enforcement"); *Employers Resource Management Co., Inc. v. James,* 853 F.Supp.

920, 929 (E.D.Va.1994) (same); *see also Tri–State Machine, Inc.,* 33 F.3d at 309 (sundry claims "essentially concerning" claims processing and mismanagement related to the plan). While a stop-loss policy insuring the sponsor of a plan is not ordinarily considered a plan asset, *see Thompson v. Talquin Bldg. Prod. Co.,* 928 F.2d 649, 653 (4th Cir.1991) (purpose of stop-loss policy was "to protect Talquin from catastrophic losses," not pay benefits to participants), the allegedly inadequate insurance policy at issue was purchased, in part, with funds contributed by plan *participants.* Defendant's Memorandum in Opposition to Remand Motion at 11. Accordingly, any challenge to the defendant's advice regarding the procurement of stop-loss insurance translates into a challenge to the defendant's management, administration and disposal of plan assets for the simple reason that the employee's contributions became assets of the plan upon receipt of such funds by the defendant. *See* 29 C.F.R. 2580.412–5.[7] Likewise, the assertion that the defendant failed to credit the plaintiff's account with provider discounts directly involves the defendant's duty to report and disclose accurately and truthfully the financial status of the health benefits plan. This conclusion is reflected in the plaintiff's allegations that the defendant was to "deduct from the operating account only those claims expenses that [the defendant] had actually paid on behalf of [plan] participants," that the defendant failed to abide by this duty and that the defendant "has therefore not actually paid claims in the amounts represented in

6. The plaintiff proposes that any claims involving self-funded plans and stop loss insurance do not "relate to" ERISA as such claims involve only concurrent third party contracts. To support this proposition, they rely on *Consumer Benefit Ass'n of the United States v. Lexington Ins. Co.,* 731 F.Supp. 1510 (M.D.Ala.1990). In *Consumer Benefit,* the court held that a state law claim under a reinsurance policy was not preempted because reinsurance contracts are collateral, third party business relationships pursuant to which ERISA plan participants have no legal rights under Alabama law. The facts of *Consumer Benefit* differ in some significant respects from the facts giving rise to the instant matter. Importantly, the insurer in *Consumer Benefit* was an independent third party, unlike the defendant in the case before the Court who is also intimately involved with the administration of the plaintiff's

plan. Moreover, the *Consumer Benefit* plaintiff, unlike the plaintiff in the case at bar, made no allegations concerning provider discounts, claims that involve plan reporting and disclosure requirements. For these reasons, the Court declines to follow the court's conclusion in *Consumer Benefit.*

7. The fact that employee contributions, in part, funded the plaintiff's policy also distinguishes the instant matter from the narrow factual scenario addressed in the Department of Labor Advisory Opinion cited by the plaintiff as support for the proposition that stop-loss policies covering the employer are not plan assets. *See* DOL Advisory Opinion 92–02A (January 17, 1992) (employer represented that employee contributions were not required by the medical benefit plan).

its [account] statements." Motion for Judgment ¶¶ 43–44. In other words, the plaintiff challenges the application of plan assets and alleges that the defendant has misrepresented its plan disclosures. Thus, the plaintiff's claims challenge the defendant's handling of essential plan functions and "relate to the plan in the common sense meaning of that phrase." *Tri–State Machine, Inc.*, 33 F.3d at 312.

Finally, the facts set forth above make it clear that any resolution of the plaintiff's claims cannot occur without reference to the plan and its governing documents, including the ASO Agreement.[8] "The existence of [the plaintiff's] plan is a critical factor in establishing liability...." *Ingersoll–Rand*, 498 U.S. at 140, 111 S.Ct. at 483. The plaintiff can recover only after proving, *inter alia*, that its insurance was inadequate to cover liabilities flowing directly from the plan. The calculation of such liabilities can only be accomplished by referencing the plan accounting statements and other plan documents. As regards the plaintiff's other allegations, recovery is possible only upon a showing that the defendant, in administering the plan, failed to be forthright about reporting and disclosing provider discounts or disclosing the availability of terminal liability limit insurance. Again, such a showing is possible only by reviewing plan documents and financial statements. "Because the court's inquiry must be directed to the plan, this judicially created cause of action 're-late[s] to' an ERISA plan." *Id.*

On this record, the Court concludes that the plaintiff's causes of action "relate to" the health benefit plan. This does not end the inquiry, however. To determine whether or not the plaintiff's claim is completely preempted under the facts presented, the Court must turn its attention to the preemptive effect of ERISA's civil remedies provi-

sions. *Taylor*, 481 U.S. at 63, 107 S.Ct. at 1546.

## V.

The ERISA civil enforcement provision provides several causes action. *See* 29 U.S.C. 1132, *supra* n. 4. The relevant cause of action in the instant matter reads as follows: "A civil suit may be brought by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 [breach of fiduciary duty]." 29 U.S.C. § 1132(a)(2). In order to fall within § 1132(a)(2), both the plaintiff and the defendant in the instant matter must be fiduciaries. *See Great Coastal Express, Inc. v. Blue Cross and Blue Shield of Virginia*, 782 F.Supp. 302 (E.D.Va.1992) (denying motion to remand because both parties' fiduciaries and claims preempted under § 1132).[9]

Pursuant to ERISA,

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Moreover, "to state a cause of action under section 502(a)(2), 29 U.S.C. § 1132(a)(2), it is not sufficient for [the defendant] to generally be a fiduciary, it must have had fiduciary responsibilities with regard to the specific issues in the suit." *Great Coastal*, 782 F.Supp. at 306 (*citing Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, *cert. denied* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990)).

▮▮▮ In the instant matter, both the plaintiff and the defendant fall within ERISA's definition of "fiduciary." This conclusion is inescapable upon a reading of the ASO

---

8. There is no doubt that the ASO agreement is one of the fundamental documents governing the operational aspects of the plaintiff's health benefits plan. Indeed, the extent to which the plaintiff's employees could receive benefits was determined solely by the defendant under the terms and conditions of the ASO Agreement. *See* Answer, Exh. 1, ASO Agreement X.B at 39.

9. The parties must both be fiduciaries because (1) only defendant fiduciaries may be sued under this provision; and (2) the plaintiff is neither a participant nor a beneficiary of the health benefit plan, and will thus have standing only if it is a fiduciary. *See* 29 U.S.C. § 1132(a)(2).

Agreement. As regards the defendant, it was vested with the discretionary authority to administer and manage the plan and its assets.[10] The plaintiff argues, however, that the defendant was not acting in its fiduciary capacity with respect to the issues raised in the complaint. The Court, however, has heretofore stated is disagreement with this position. As previously noted, the defendant was exercising its control over the disposal and management of plan assets when it allegedly failed to procure, or advise the plaintiff to procure, additional stop-loss insurance with plan assets under its control.[11] Moreover, there is little doubt that the defendant was exercising administrative discretion in its handling of provider discounts in so far as such discounts touch upon core plan functions, such as reporting and disclosure.

The plaintiff, too, is a fiduciary.[12] Indeed, it was the plaintiff's responsibility to establish and maintain the plan. The plaintiff was also entrusted with employee funds for remittance to the defendant, along with any employer contributions, in the form of monthly payments to the operating account. Moreover, the plaintiff exercised its discretion in hiring the defendant as insurer and co-fiduciary of the plan. Finally, the plaintiff had the authority to determine participant eligibility, Answer, Exh. 1, ASO Agreement § II.A at 12, and terminate the plan upon thirty days notice. *Id.* § X.D at 39.

From the foregoing, it is clear that both parties are fiduciaries and that the plaintiff is asserting a cause of action under the civil enforcement provisions of ERISA. In such cases, "the federal courts will have exclusive jurisdiction over the plaintiff's claims."

*Great Coastal,* 782 F.Supp. at 307; *accord Taylor,* 481 U.S. at 64–67, 107 S.Ct. at 1546–48.

## VI.

The record before the Court establishes that the plaintiff's claims are preempted by ERISA and fall within ERISA's civil enforcement provisions. On this basis, the Court concludes that the plaintiff's state law claims are completely preempted by ERISA. Accordingly, the plaintiff's motion to remand this matter to state court will be denied.

**Patsy A. McFARLANE, Plaintiff,**

v.

**SECRETARY OF the AIR FORCE, Defendant.**

**Civ. A. No. 94 CV 692–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 16, 1994.

---

10. For example, the defendant had the sole discretion to determine the extent to which a participant was entitled to benefits. Answer, Exh. 1, ASO Agreement § X.B at 39. It also had the discretion to amend or terminate the ASO Agreement. *Id.* at § X.D.

11. Moreover, as indicated by the defendant, several courts have held that insurance brokers are fiduciaries under ERISA. *See Brink v. DaLesio,* 496 F.Supp. 1350 (D.Md.1980) *rev'd in part on other grounds,* 667 F.2d 420 (4th Cir.1981); *Reich v. Lancaster,* 843 F.Supp. 194 (N.D.Tex. 1993). These cases differ from the instant matter in that the insured party in each case was the plan itself; thus, the policies were plan assets.

Nevertheless, given that plan assets are, in fact, at issue in the instant matter, albeit in a somewhat different form, the conclusion of the *Brink* court bears upon this Court's analysis:

> [I]t is apparent that responsibility for important decisions pertaining to the scope of insurance coverage and the selection of carriers were delegated to [the broker]. In order to afford plan participants and beneficiaries the protection that Congress intended, insurance consultants such as [the broker] must be held to fiduciary standards.

496 F.Supp. at 1375.

12. Nowhere does the plaintiff deny that it is a fiduciary, as defined at 29 U.S.C. § 1002(21)(A).

Guy J. Ferrante, King and Everhard, P.C., Falls Church, VA, for plaintiff.

Helen F. Fahey, U.S. Atty., Rachel C. Ballow, Asst. U.S. Atty., Alexandria, VA, and Major Carla S. Walgenbach, Office of the Judge Advocate Gen., Gen. Litigation Div., Arlington, VA, for defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

This is an appeal from a decision of the Air Force Board for Correction of Military Records ("the Board") denying as untimely Patsy McFarlane's application for correction of her late husband's military records. At issue is whether Ms. McFarlane's application was filed "within three years after [s]he discover[ed] the error or injustice" in the military record, as required by 10 U.S.C. § 1552(b).

### I.

Ms. McFarlane is the widow of Colonel Larimer C. McFarlane, a career Air Force officer who died in 1984. As a member of the armed services, Colonel McFarlane was eligible to participate in the Survivor Benefit Plan (the "Plan"), an annuity program designed to provide financial security for a servicemember's spouse after the member's death. *See* 10 U.S.C. §§ 1447–60. Participation in the Plan at the maximum level is automatic for a servicemember who is married or has dependent children at the time of retirement, unless before that time the member affirmatively elects to reduce the annuity payments or opt out of the Plan altogether. In the event a servicemember makes either of these elections, the spouse must be notified of the election and informed of its effects on his or her financial future. 10 U.S.C. §§ 1448(a)(6)(C), 1455.[1]

Prior to his retirement on January 1, 1976, Colonel McFarlane elected to reduce the amount of retired pay that he would contribute to the Plan. Specifically, he executed a Survivor Benefit Plan Election Certificate ("Election Certificate") on December 11, 1975 that changed the base annuity amount to be withdrawn from his monthly retired pay from the maximum level of approximately $1500.00 to the reduced amount of $300.00.[2] Yet, contrary to the Plan's requirements, the Air Force never notified Ms. McFarlane of her husband's reduced election.[3] And although Ms. McFarlane signed her name as a witness to her husband's signature on the Election Certificate, she

---

**1.** At the time of Colonel McFarlane's retirement, the Plan required spousal notification of the election and counseling regarding its effects. 10 U.S.C. §§ 1448(a)(3)(A), 1455 (1975). Under the current version of the Plan, the spouse must also consent to the election. 10 U.S.C. § 1448(a)(3)(A) (1992).

**2.** Although Plan elections become irrevocable upon retirement, 10 U.S.C. § 1448(a)(4), Congress created an open enrollment period between October 1, 1981 and September 30, 1982 that allowed military retirees who were participating in the Plan at less than the maximum level to increase the amount of the annuity. Pub.L. No. 97–35, 95 Stat. 383 (Aug. 13, 1981), *as amended by* Pub.L. No. 97–252, 96 Stat. 753 (Sept. 8, 1982). Importantly, an increased election would become effective only if the retiree lived at least

two years after making the new election. Colonel McFarlane took advantage of this opportunity on September 8, 1982 by executing a form to increase the base amount of the spousal annuity to $1,500.00. This never became effective because Colonel McFarlane did not survive the requisite two years. The record is devoid of any evidence regarding whether Ms. McFarlane participated in or was aware of her husband's 1982 decision to attempt to increase the annuity election.

**3.** Although the Board does not explicitly concede this point, the Air Force has no evidence that notice was given or that counselling occurred. By contrast, Ms. McFarlane has affirmatively stated under oath that she was neither notified nor counseled regarding her husband's election of reduced benefits under the Plan.

stated in support of her application to the Board that "[a]t the time of my husband's retirement, I had no knowledge of the Survivor Benefit Plan or what he was doing in that regard." (P. McFarlane Decl., Admin.R. at 25). Precisely when Ms. McFarlane actually discovered that she was receiving less than the maximum annuity payment is unclear from the record. What is clear is that Ms. McFarlane did not learn of the Air Force's obligation to have notified her of the election until 1990, when an informal meeting with other armed forces widows brought the notification requirement to her attention. Shortly thereafter, in June 1991, she submitted to the Board an application to correct her husband's reduced annuity election. Arguing that the reduced annuity payments were in error given the lack of spousal notification and counseling, Ms. McFarlane requested that her husband's records be changed to reflect participation in the Plan at the maximum level.[4] The Board rejected the application, contending that it "was not filed within three years after the alleged error or injustice was discovered, or reasonably could have been discovered, as required by [10 U.S.C. § 1552]." (Admin.R. at 13). Ms. McFarlane now appeals this decision, contending that her application was timely since she did not actually discover the error until 1990, when she first learned of the Air Force's obligation to have notified her of her husband's reduced annuity election. The Board counters that Ms. McFarlane discovered the error, or reasonably should have discovered the error, back in 1975, when she witnessed her husband's signature to the Election Certificate, or, at the latest, in 1984, when she began receiving the reduced annuity payments. On these opposing grounds, both parties have moved for summary judgment.

**4.** Ms. McFarlane currently receives a monthly annuity of $351.00 under the Plan. Correction of her husband's records to reflect the maximum level of participation would increase her Plan benefits to $1530.00 per month. (Admin.R. at 40). If Ms. McFarlane is ultimately successful in her claim, she will be required to reimburse the Air Force for the excess amount that would have been withheld from Colonel McFarlane's retired pay had he elected the maximum level of partic-

## II.

Analysis properly begins with a statement of the appropriate standard of review. This case is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–06. Under the APA, courts may overturn the Board's decision only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. § 706(2)(A). *See also, Voge v. Secretary of the Navy,* No. 93–2346, slip op. at 3, 1994 WL 474837, at *1, 1994 U.S.App. LEXIS 23956, at *3 (4th Cir. Sept. 2, 1994) (unpublished); *Mickens v. United States,* 760 F.2d 539, 541 (4th Cir. 1985) (also may overturn Board decision if not supported by "substantial evidence"), *cert. denied,* 474 U.S. 1104, 106 S.Ct. 889, 88 L.Ed.2d 923 (1986). The question presented, then, is whether the Board's denial of Ms. McFarlane's correction application as untimely was arbitrary, capricious, or contrary to law.

## III.

At the outset, it is worth noting that the Air Force's failure to notify and counsel Ms. McFarlane regarding her husband's Plan election nullifies the election and gives rise to a claim for reinstatement of maximum annuity benefits. In a string of cases involving service widows who were not notified of their husbands' elections to opt out of the Plan, the Court of Claims and its successor, the Federal Circuit, have held that such an election is not binding on the surviving spouse unless the statutory notice requirement was satisfied. *See, e.g., Barber v. United States,* 230 Ct.Cl. 287, 676 F.2d 651, 657 (1982); *Trone v. United States,* 230 Ct. Cl. 904, 1982 WL 25268 (1982); *Kelly v. United States,* 826 F.2d 1049 (Fed.Cir.1987). *See also, Dean v. United States,* 10 Cl.Ct. 563 (1986).[5] This sound conclusion gives sub-

ipation in the Plan. This amount does not appear in the administrative record.

**5.** Courts, in reaching this conclusion, noted that Congress' purpose in enacting the spousal notification provisions of §§ 1448 and 1455 was to ensure that surviving military spouses were not "unknowingly [ ] left in a situation of great hardship because a retiree, for one reason or another, did not join the program or otherwise provide an adequate annuity for his dependents." H.R.Rep.

stance to the notification and counseling requirements, which otherwise might be effectively ignored. Thus, the Air Force acted contrary to law when it accepted and gave effect to Colonel McFarlane's Election Certificate without having notified Ms. McFarlane of the election or counseled her regarding its effects. Had Ms. McFarlane known of her husband's election and had she been apprised of its consequences, she would have had the opportunity to confer with her husband and possibly influence this important decision. And even had Colonel McFarlane decided nonetheless to limit his participation in the Plan, Ms. McFarlane would then have had the opportunity to plan for her financial future in light of the election. By failing to provide Ms. McFarlane with notification and counseling, the Air Force violated a clear statutory mandate, thereby invalidating Colonel McFarlane's reduced annuity election.[6] Thus, if her application for correction of her husband's military records is timely, Ms. McFarlane would be entitled to reinstatement of the annuity payments at the maximum rate.

No. 481, 92d Cong., 1st Sess., at 8–9, *quoted in Barber*, 676 F.2d at 656. Accordingly, as the Court of Claims has noted, the purpose of the notification and counseling requirements is to "give both parties the opportunity to discuss and reconsider together the decision to withdraw from the plan before retirement [is] effected." *Barber*, 676 F.2d at 658.

**6.** The Board argues that if Ms. McFarlane had *actual* notice from any source of her husband's reduced election before the time of his retirement, the Air Force's breach of its statutory duty would be harmless. Not so, for even if Colonel McFarlane had told Ms. McFarlane of the reduced election, thereby giving her actual notice, the Air Force would not be relieved of its duty to notify and counsel her regarding the consequences of the election. In enacting the notification provisions, Congress not only sought to ensure that the spouse received notice of a reduced election but also "wishe[d] responsibility clearly placed on administrative officers to see that *full counseling* ha[d] been provided as to the effect on survivors" of the reduced election. H.R.Rep. No. 481, 92d Cong., 1st Sess., at 8–9, *quoted in Barber*, 676 F.2d at 657 (emphasis added). It is important to note, then, that even if Ms. McFarlane had received actual notice from any source before the time of her husband's retirement, she would have had a claim for reinstatement of benefits owing to the absence of counseling by the Air Force. In that event, however, her claim would now be time barred. *See infra* part IV.

## IV.

 The pivotal issue, therefore, is the timeliness of Ms. McFarlane's application. With respect to applications for correction of military records, Congress has provided that "[t]he Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1).[7] And Congress has also made clear that ordinarily, "[n]o correction may be made ... unless the claimant or his heir or legal representative files a request for the correction within three years after he discovers the error or injustice." § 1552(b). Thus, an applicant for correction of military records whose request is not made within this three year period loses the right to have the substance of his or her claim resolved. But all is not lost if an application is untimely, for the Board still "may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice." § 1552(b).[8]

**7.** This provision goes on to state that, with limited exceptions, "such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department." § 1552(a)(1). The Air Force Board for Correction of Military Records is such a board.

**8.** The administrative record reflects that, in rejecting Ms. McFarlane's application as untimely, the Board also determined that in its view, excusing the untimely filing would not be in the interest of justice. The Board now argues that the Court lacks jurisdiction to review its decision not to excuse an untimely filing. Specifically, it claims that since the words "in the interest of justice" do not provide a meaningful standard for review, "agency action [has been] committed to agency discretion by law," thereby rendering judicial review unavailable. 5 U.S.C. §§ 701(a), 702. *See also, Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). In this regard, it is worth noting that several courts that have considered this issue agree with the Board's position. *See Ortiz v. Secretary of Defense*, 842 F.Supp. 7 (D.D.C.1993); *Ballenger v. Marsh*, 708 F.2d 349 (8th Cir.1983); *Kendall v. Army Bd. for Correction of Military Records*, 996 F.2d 362 (D.C.Cir.1993). The contrary view, which also claims judicial support, is more compelling. Thus, on its face, § 1552(b) does not preclude judicial review. Nor is meaningful review precluded, since courts can review the agency's decision under the familiar "abuse

■ This statutory scheme, applied to the instant case, means that Ms. McFarlane's application to the Board was timely only if she filed it within three years of when she first discovered the "error or injustice." And the "error or injustice" she seeks to correct is the Air Force's enforcement of Colonel McFarlane's reduced annuity election without having first notified Ms. McFarlane of the reduction and counseled her regarding its effects on her financial future. Thus, Ms. McFarlane discovered the "error or injustice" whenever she first learned that the annuity she was receiving was less than the maximum survivor annuity.[9] At that time, she would be in possession of all the facts constituting the "error or injustice" in her husband's military record. Because the administrative record does not disclose precisely when Ms. McFarlane learned for the first time that she was receiving, or would receive, less than the maximum survivor benefits, the Board on remand must conduct further factual inquiry to determine whether the application is timely.

## V.

Seeking to avoid this result, the Board contends that the proper inquiry for time bar purposes is when the alleged error or injustice was discovered, *or reasonably could have been discovered.* (Admin.R. at 13). Under this standard, the Board argues, Ms. McFarlane either actually discovered or reasonably could have discovered the error or injustice at the time of Colonel McFarlane's retirement on January 1, 1976, since she had previously witnessed her husband's signature on the Election Certificate. The Board evidently found persuasive its advisory opin-

ion's[10] statement that "[it] is not reasonable to conclude [Ms. McFarlane] was unaware of the actual election or its possible ramifications" since "[she] signed the decedent's election form as a witness." (Admin.R. at 28).

■ This argument fails for two reasons. First, the Board erred in importing a reasonableness standard into the date of discovery of the error or injustice. The Supreme Court has made clear that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Section 1552(b) permits correction of a military record if an application is made "within three years after [the applicant] discovers the error or injustice." The plain language of this statutory provision indicates that the limitations period begins to run upon the applicant's *actual* discovery of the error or injustice. Nowhere does the statutory language suggest that the date of discovery should turn on when a *reasonable* person, rather than the applicant herself, would have found the mistake. Nor is this one of those "rare cases" where application of the literal terms of the statute would "produce a result demonstrably at odds" with Congressional intent. The Board has pointed to no evidence in the statute or its legislative history to suggest that Congress meant anything other than what it said. Therefore, it was contrary to law for the Board to import a

of discretion" standard. *Cf. Townsend v. Secretary of the Air Force,* No. 90–1168, slip op. at 2, 1991 WL 232063 at *2 (4th Cir. Nov. 12, 1991) (unpublished); *Mullen v. United States,* 19 Cl.Ct. 550 (1990); *Allen v. Card,* 799 F.Supp. 158 (D.D.C.1992). In any event, the disposition of this matter by remand renders it unnecessary to reach this issue.

9. Conceivably, Ms. McFarlane might have learned that she would be receiving less than full survivor benefits before January 1, 1976, the date of Colonel McFarlane's retirement. In that event, she would be deemed to have discovered the error or injustice on the date of her hus-

band's retirement. That date was the date the election became effective and hence the Air Force's deadline for providing notice and counseling. Before that date, there would have been no error or injustice in effect for Ms. McFarlane to discover.

10. To aid in its resolution of Ms. McFarlane's application, and pursuant to 32 C.F.R. § 865.27(b) (1994), the Board requested and received an advisory opinion from the Retiree Activities Branch of the Headquarters Air Force Military Personnel Center. The advisory opinion recommended denial of Ms. McFarlane's application.

"reasonable person" test into § 1552(b),[11] and the statute of limitations on Ms. McFarlane's claim runs only from the time that she actually discovered that she was receiving a reduced annuity.[12]

The second flaw in the Board's argument appears in its claim that Ms. McFarlane's signature as a witness on the Election Certificate demonstrates that she was actually aware of the reduced election before her husband retired. A "witness" to a document is defined as "[a] person attesting the genuineness of [a] signature to [a] document by adding his signature." BLACK'S LAW DICTIONARY 1604 (6th ed. 1990). Similarly, a "subscribing witness" is someone who "witnesses or attests the signature of a party to an instrument, and in testimony thereof subscribes his own name to the document." BLACK'S LAW DICTIONARY at 1427. As these definitions make clear, the role of a witness to a document is to verify that the person executing the document is indeed the person he or she purports to be. To accomplish this, the witness need not read the document nor familiarize himself with its contents or subject matter. *See* 79 Am.Jur.2d *Wills* § 274 (1975) (stating that "[i]t is not essential

to the validity of a will that it be read over to the witnesses thereto, or that they know its contents" and noting that where publication is not required, witnesses need not even know the document they are signing is a will). Thus, the fact that Ms. McFarlane signed her name as a witness on the Election Certificate does not establish that she knew or understood that Colonel McFarlane was electing to reduce her survivor annuity benefits, and it was error for the Board to so conclude.[13] This is especially true given Ms. McFarlane's unrebutted declaration that at the time of her husband's retirement, she was unfamiliar with the Plan and was unaware of her husband's actions or elections in that regard. (P. McFarlane Decl., Admin.R. at 25).

The Board next contends that, as a matter of law, Ms. McFarlane must have known of the reduction in annuity benefits when she began to receive them in 1984. In so arguing, the Board relies principally upon *Dean v. United States*, 10 Cl.Ct. 563, 568–69 (1986), *Hart v. United States*, 910 F.2d 815, 818 (Fed.Cir.1990), and *Warren v. United States*, 4 Cl.Ct. 552, 556, *aff'd*, 746 F.2d 1489

11. In support of its position, the Board cites several cases involving other statutes of limitations in which courts have looked to when a reasonable person would have known of an injury or breach of duty. *See, e.g., United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Portis v. United States*, 483 F.2d 670 (4th Cir.1973). These cases are not analogous, for they involve interpreting statutes of limitations that run from the date that a cause of action accrues, not the date that an individual discovers an error or injustice. The Board also cites for support *Kendall v. Army Bd. for Correction of Military Records*, 996 F.2d 362, 364–65 (D.C.Cir.1993) and *Evans v. Marsh*, 835 F.2d 609, 611 (5th Cir.1988), cases in which the Board had earlier determined that the error or injustice "was, or with reasonable diligence should have been, discovered" more than three years before. The Board's reliance on these cases is misplaced, for in neither case was the issue squarely presented or decided. In both cases, the panel opinion does nothing more than recount the Board's use of the standard in the recitation of facts.

12. Although the relevant inquiry is what *Ms. McFarlane* knew and when she knew it, the Board may have to consider what a reasonable person would have known in order to establish what Ms. McFarlane herself knew. That is, if the evidence shows that Ms. McFarlane was not

aware that she was receiving a reduced survivor annuity until 1991, the three year limitations period would not begin to run until that date, however unreasonable her earlier lack of knowledge may have been. But if direct evidence of Ms. McFarlane's knowledge is inconclusive, then the best evidence of what and when Ms. McFarlane knew may well be circumstantial, that is, what reasonable people in her situation would have known. *See, e.g., United States v. Jones*, 797 F.2d 184, 187 (4th Cir.1986) (government may rely on circumstantial evidence to prove knowledge).

13. This conclusion comports with common experience and elemental fairness. It is common experience for persons to witness their spouse's signature on documents, and it is equally common for these witnesses not to read or know the contents of the documents apart from the spouse's signature. And this is appropriate in light of the common understanding that a witness' function is limited to validating a signature. Witnesses are not on notice that they must read or familiarize themselves with the contents of the documents. Given this, it would be unfair to charge a person with knowledge of a document when his or her sole function was to witness a signature.

(Fed.Cir.1984), cases in which courts concluded that the applicant for survivor benefits' claim arose, at the latest, at the time of the servicemember's death. These cases are distinguishable and do not control the disposition of the instant case. In *Hart* [14] and *Warren*, [15] the courts applied a six year statute of limitations that ran not from the date that the individual discovered an error or injustice, but from the date that the cause of action accrued. The cause of action accrued when benefits were erroneously denied (*i.e.,* at the time of the retiree's death), not when the plaintiff discovered the error. And although the court in *Dean* applied the same statute of limitations that is at issue in the instant case, the plaintiff's spouse in *Dean* had elected out of the Plan altogether. Thus, it was logical for the court to conclude that the plaintiff there had discovered the erroneous reduction in benefits when, after her husband's death, she received no benefits at all. By contrast, Ms. McFarlane began receiving monthly annuity payments, albeit at a reduced rate, shortly after Colonel McFarlane died. Unlike the plaintiff in *Dean,* therefore, it is certainly possible that Ms. McFarlane believed she was receiving the maximum amount of annuity benefits. Thus, the date of Colonel McFarlane's death is not automatically the date of discovery in this case.

## VI.

Ms. McFarlane's position is also at odds with the conclusion reached here. She contends that the "error or injustice" was the Air Force's failure to notify and counsel her regarding the reduced election, a failure she insists she could not have discovered until she learned of the Air Force's legal duty to do so. In her view, it is irrelevant when she first learned that her husband reduced her survivor annuity benefits because she could not have known that the reduction was erroneous or unjust until she knew that the Air Force had a duty to notify and counsel her prior to enforcing the election. Under this reasoning, the three year limitations period on her application would not have commenced until 1990, when she first learned of the statutory notice and counseling requirements.

■■■ This argument confuses discovery of an error or injustice with discovery of one's legal rights and remedies. Put another way, Ms. McFarlane knew all of the facts constituting the error or injustice whenever she learned that she was receiving reduced annuity benefits without prior notice or counseling, even though she may not yet have known that those facts gave rise to a legal claim. While the § 1552(b) clock does not begin to tick until the individual discovers the error or injustice, its ticking does not await the individual's discovery of the law. *See Dean,* 10 Cl.Ct. at 569 (stating that the applicant "was bound to know the statutory requirements surrounding the Survivor Benefit Plan and to take appropriate action to ascertain whether they had been satisfied"). [16]

---

**14.** In *Hart,* the plaintiff did not apply for correction of her husband's military records through the Board, but rather sued the government directly for the annuity in the Court of Claims. Thus, the three year statute of limitations in § 1552(b), running from "discovery of the error or injustice," was not applied. Rather, the court relied upon the six year statute of limitations under the Tucker Act, 28 U.S.C. § 1491, running from accrual of the cause of action. *Hart,* 910 F.2d at 817.

**15.** *Warren* is entirely inapposite, as it does not involve a claim for survivor annuity benefits under the Plan. Rather, the plaintiff in *Warren* sought annuity benefits from the United States Post Office, where the deceased had worked, based upon the claim that the deceased had been mentally incompetent to apply for the requested benefits. 4 Cl.Ct. at 555.

**16.** *Cf. Richards v. Fairfax County School Bd.,* 798 F.Supp. 338 (E.D.Va.1992) ("[i]gnorance of the legal right to sue does not generally prevent the limitations period from running"), *aff'd,* 7 F.3d 225 (4th Cir.1993); *Harbor Ins. Co. v. Urban Constr. Co.,* 990 F.2d 195, 201 n. 7 (stating that in Texas, "the statute of limitations for reformation [of contract] begins to run from the actual discovery of the error or omission. Accrual of the cause of action 'does not await the plaintiff's recognition that he has grounds for a lawsuit.'") (citing *Arabian Shield Dev. Co. v. Hunt,* 808 S.W.2d 577, 583 (Tex.Ct.App.1991)); *Sexton v. United States,* 832 F.2d 629 (D.C.Cir.1987) (even when government's negligence stemmed from failure to act, plaintiff "need only undertake a reasonably diligent investigation to determine whether a cause of action may lie").

**414**

Ms. McFarlane is correct to point out that unlike many statutes of limitations, § 1552(b) turns on discovery of an error or injustice, not accrual of a cause of action. Yet, this observation does not end the matter, for it seems equally clear that the relevant "discovery" is the applicant's discovery of the facts underlying her claim, not her discovery of the law.[17] Nothing in § 1552(b) suggests otherwise.

### VII.

In summary, the Air Force committed legal error in failing to notify and counsel Ms. McFarlane regarding her husband's limited participation in the Plan. As a result, Colonel McFarlane's reduced election must be voided if Ms. McFarlane's application for the correction is timely. Whether Ms. McFarlane's application is timely depends upon the date on which she first learned that she was receiving reduced annuity benefits under the Plan, which date does not clearly appear in the current record. Therefore, this matter is **REMANDED** to the Board to conduct whatever further factual inquiry may be appropriate to determine when Ms. McFarlane first learned she was receiving a reduced annuity. Should the Board find the application to be untimely, it is further directed to determine whether the untimeliness should be excused "in the interest of justice."[18]

**CARBON FUEL COMPANY, Plaintiff,**

v.

**USX CORPORATION, et al., Defendants, Third–Party Plaintiffs, and Counterclaimants,**

v.

**CARBON FUEL COMPANY, et al., Third–Party Defendants and Counterdefendants.**

Civ. A. No. 2:93–1073.

United States District Court, . S.D. West Virginia, Charleston Division.

Nov. 4, 1994.

---

17. It is worth noting that there is a clear distinction between the "injustice," the discovery of which commences the three year limitations period under § 1552(b), and the "interest of justice" standard to be used by the Board in determining whether to excuse an untimely filing under § 1552(b). While the former refers to something found in the military record that is said to be unjust, the latter is the standard that governs the Board's discretion to excuse late applications. Among the matters relevant to the application of this standard are the circumstances surrounding the applicant's untimely filing. This noted, the Court expresses no opinion on any aspect of this issue, including whether an applicant's ignorance of the military's legal obligations toward her would support excusing the untimely filing "in the interest of justice."

18. Although the Board previously determined that excusing the untimeliness of Ms. McFarlane's application would not be "in the interest of justice," that determination was based at least in part on erroneous considerations, such as the legal effect of witnessing a signature to a document. As a result, if on remand the application is determined to be untimely, the Board should reconsider whether to excuse the untimeliness "in the interest of justice."

James K. Brown, Jackson & Kelly, Charleston, WV, Larry L. Roller, Chesapeake, WV, for Carbon Fuel Co.

Charles L. Woody, Paula L. Durst, Spilman, Thomas & Battle, Charleston, WV, J. Michael Jarboe, Jared H. Meyer, USX Corp., Law Dept., Pittsburgh, PA, for USX and U.S. Steel Min. Co., Inc.

Robert B. King, Stephen B. Farmer, King, Allen & Arnold, Charleston, WV, Anthony J. Polito, Polito & Smock, Pittsburgh, PA, for Consolidation Coal.

E. Forrest Jones, Jr., Albertson & Jones, Charleston, WV, Gregory B. Robertson, Matthew J. Calvert, Hunton & Williams, Richmond, VA, for Arch Minerals, Arch Minerals of Ky., and Old Ben Coal Co.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is the joint motion to dismiss filed by Third–Party Defendants Arch Mineral Corp., Old Ben Coal Co., and Consolidation Coal Co. The Third–Party Defendants argue the Court does not have jurisdiction over the counterclaim and the joinder of them was improper. Also pending is Plaintiff's motion to sever pursuant to Rule 21, Federal Rules of Civil Procedure. For reasons that follow, the motions are **DENIED**.

### I

Carbon Fuel Company initiated this action seeking a declaratory judgment against the Defendants, USX Corp and U.S. Steel Mining Co., Inc., a wholly owned subsidiary of USX ("USX Defendants"). Carbon contends the USX Defendants are contractually bound to honor certain obligations of Carbon under the Coal Industry Retirees Health Benefits Act, 26 U.S.C. § 9701, et seq. ("Coal Act"). Carbon contends the USX Defendants entered into a settlement agreement with it in 1982 whereby the USX Defendants agreed to assume Carbon's obligations under an earlier, multiemployer National Bituminous Coal Wage Agreement ("NBCWA") between the

Bituminous Coal Operators Association, Inc. ("BCOA") and the United Mine Workers of America ("UMWA"). The NBCWA included provisions for the payment of health benefits for union miners from certain funds into which the NBCWA signatories paid. The NBCWA benefit funds were later incorporated within the Combined Benefit Fund created under the Coal Act.[1] 26 U.S.C. § 9702(a)(2). Carbon contends the USX Defendants are liable for its payment obligations to the Combined Benefit Fund through their 1982 settlement agreement.

The USX Defendants counterclaimed for declaratory judgment against Carbon and the three Third–Party Defendants. The USX Defendants contend Arch, Old Ben, and Consolidated, the Third–Party Defendants, were parties to separate and unrelated settlement agreements with them, whereby the Third–Party Defendants agreed to assume certain obligations of the USX Defendants under the applicable NBCWAs. As noted above, the NBCWA health benefit funds were incorporated within the Combined Benefit Fund under the Coal Act. *Id.* The USX Defendants seek a declaratory judgment with respect to the application and impact of the 1992 Coal Act on the contractual obligations undertaken in accordance with the successorship provisions of the NBCWA. The USX Defendants contend they are entitled to declaratory judgment against Arch, Old Ben, and Consolidated, the Third–Party Defendants, if Carbon is entitled to declaratory judgment against them for its obligations to the Combined Benefit Fund.

The Third–Party Defendants moved to dismiss the USX Defendants' counterclaims for lack of jurisdiction and improper joinder. Carbon separately moved to sever its claim against the USX Defendants from the USX Defendants' counterclaim against the Third–Party Defendants.

### II

■ Issues of subject matter jurisdiction and joinder should be reviewed. Because

---

**1.** For a more richly detailed discussion of the history and development of the NBCWA benefit funds and the Coal Act *see Barrick Gold Explora-* *tion, Inc. v. Hudson,* 823 F.Supp. 1395 (S.D.Ohio 1993).

claims joined under the permissive joinder allowable by Rule 13(b), Federal Rules of Civil Procedure, must have an independent basis for jurisdiction, this Court's subject matter jurisdiction shall be discussed first. *Sue & Sam Mfg. Co. v. B–L–S Const. Co.,* 538 F.2d 1048, 1051 (4th Cir.1976). *See Painter v. Harvey,* 863 F.2d 329 (4th Cir. 1988).

## A

The Third–Party Defendants contend this Court does not have subject matter jurisdiction over the counterclaim. Because the Third–Party Defendants and the USX Defendants are all Delaware corporations, the Third–Party Defendants argue diversity is not complete among the parties. 28 U.S.C. § 1332(c)(1). That issue can be ignored. This Court has subject matter jurisdiction over the USX Defendants' counterclaim through federal question jurisdiction. 28 U.S.C. § 1331.

The counterclaim ultimately concerns whether the USX Defendants or the Third–Party Defendants are liable for payment of retired miners' health care premiums to the Combined Benefit Fund through separate agreements required by the successorship provisions of the NBCWA. The Coal Act does not appear to create a federal cause of action for disputes concerning the payment of premiums to the Combined Fund. In its section on the assignment of eligible beneficiaries the Coal Act explicitly states "[n]othing in this section shall preclude the right of any person to bring a separate civil action against another person for responsibility for assigned premiums, notwithstanding any prior decision by the Secretary." 29 U.S.C. § 9706(f)(6). However, the Coal Act also provides "[t]he Combined Fund shall be—(A) a plan described in section 302(c)(5) of the Labor Management Relations Act, 1947 (29 U.S.C. 186(c)(5)), (B) an employee welfare benefit plan within the meaning of section 3(1) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002(1))." 26 U.S.C. § 9702(a)(3)(A) & (B).

■ The Labor Management Relations Act of 1947 ("LMRA") applies to the counterclaim since it calls for an interpretation of the Coal Act and the successorship provisions of the NBCWA. The NBCWA, an agreement between a union and multiple employers, provided the basic requirements for successorship in the separate settlement agreements approved between the USX Defendants and the Third–Party Defendants. As such, applying the provisions of the Coal Act to the settlement agreements requires an interpretation of the requirements of the NBCWA.

Section 301 of the LMRA provides "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). Under § 301, "an application of state law is pre-empted ... only if such application requires the interpretation of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 413, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988). *See Martin Marietta Corp. v. Maryland Comm'n on Human Relations,* 38 F.3d 1392, 1396 (4th Cir.1994) (Section 301 provides federal court jurisdiction over contract disputes); *McCormick v. AT & T Technologies, Inc.,* 934 F.2d 531, 535 (4th Cir.1991) (en banc) (The question in preemption analysis is whether resolution of the cause of action requires interpretation of a collective bargaining agreement.), *cert. denied,* —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 813 (1992); *Shiveley v. Tri–State Greyhound Park,* 724 F.Supp. 421 (S.D.W.Va.1989) (Haden, C.J.). Accordingly, this Court has jurisdiction because this case involves the interpretation of a collective bargaining agreement.

■ Additionally, the Employee Retirement Income Security Act of 1974 ("ERISA") provides "[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described

in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a). "The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3).

A broad preemption from the effects of state law is granted to ERISA plans through § 1144(a). "Congress used the words 'relate to' in § 514(a) [§ 1144(a)] in their broad sense." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 96–97, 103 S.Ct. at 2900 (footnote omitted). By the preemption of state laws that relate to their operation, ERISA plans are therefore established as an "area of exclusive federal concern." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981).[2]

Since the Combined Fund is established as an ERISA plan, it qualifies for the protection from interfering state laws provided to all ERISA plans. Additionally, since the counterclaim requires an interpretation of the NBCWA, a collectively-bargained labor contract, the jurisdiction of the federal courts is imposed through the LMRA. The federal courts then are the prime forum for redress of grievances relating to the operation of the Combined Benefit Fund and this, too, demonstrates subject matter jurisdiction over the counterclaim.

B

The Third–Party Defendants also contend they were improperly joined. This Court concludes the Third–Party Defendants were joined properly under Rule 13 and Rule 20,

Federal Rules of Civil Procedure, which allow permissive joinder of parties.

Generally, "[a] pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(b). Persons other than the parties to the original action may be made parties to the counterclaim. Fed.R.Civ.P. 13(h). "All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a).

"Under [Rule 20(a)] joinder of parties-defendant is governed by the concepts of 'same transaction' and 'common questions of law or fact.'" *Rumbaugh v. Winifrede Railroad Co.,* 331 F.2d 530, 537 (4th Cir.1964) (footnote omitted), *cert. denied,* 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341 (1964). "The 'transaction or occurrence' test of [Rule 20] 'would permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary.' ... Further, the rule should be construed in light of its purpose, which 'is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.'" *Saval v. BL Ltd.,* 710 F.2d 1027, 1031 (4th Cir.1983) (per curiam) (quoting *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1332–33 (8th Cir.1974)).

In defining the word transaction in a similar context the Supreme Court has stated it "is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon

---

**2.** However, as this Court recently stated in *Fox v. General Motors Corp.,* 863 F.Supp. 302, 303–04 (S.D.W.Va.1994) (footnote omitted),

the Supreme Court has noted also that '[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan.' *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100, n. 21 [103 S.Ct. 2890, 2901, n.

21, 77 L.Ed.2d 490] (1983). Additionally, '[i]f a State creates no prospect for conflict with a federal statute, there is no warrant for disabling it from attempting to address uniquely local social and economic problems.' *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 19 [107 S.Ct. 2211, 2221, 96 L.Ed.2d 1] (1987) (footnote omitted).

their logical relationship." *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926) (evaluating equity rule 30). In the context of permissive joinder, the transaction involved in the counterclaim is not required to be the same transaction on which the original claim was based. The facts between the claim and the counterclaim need not be precisely identical. *Sue & Sam Mfg. Co. v. B–L–S Const. Co.,* 538 F.2d 1048, 1051 (4th Cir.1976). In the instant counterclaim, the enactment of the Coal Act and its effect on the USX Defendants' existing contractual obligations forms the series of logically related transactions on which the counterclaim is based.

Common issues of law are involved in the counterclaim. Each separate settlement agreement will require the interpretation of the NBCWA. To interpret the provisions of the NBCWA properly will require also an interpretation of the Coal Act to determine its effects upon signatory companies' obligations.

Based on the common issues of law and the series of transactions from which the counterclaim arose, the exercise of permissive joinder over the Third–Party Defendants is proper.

### III

Carbon has moved to sever based on Rule 21, Federal Rules of Civil Procedure, arguing the joinder of its declaratory judgment action with the USX Defendants' against the Third–Party Defendants is improper.

■ A court has broad discretion in ruling on a requested severance under Rule 21. *Jonas v. Conrath,* 149 F.R.D. 520, 523 (S.D.W.Va.1993) (Haden, C.J.). This Court has stated

> [w]hile *Rule* 21 is silent on the standard applicable for determining misjoinder, courts have uniformly held that parties are misjoined when they fail to satisfy either of the preconditions for permissive joinder set forth in Rule 20(a). . . . Thus, misjoinder is present, and severance appropriate, when the claims asserted by or against the joined parties do not arise out of the same

transaction or occurrence or do not present some common questions of law or fact. *Id.* (emphasis in original) (internal quotations omitted).

■ As discussed above, the Third–Party Defendants have been properly joined in this action. The claims asserted arise out of the same series of transactions and common questions of law exist as to each claim. "Denying the motion to sever will serve judicial economy and promote the just, speedy and inexpensive determination of this action." *Id.* at 523–24 (footnote omitted). Given the expediency of trying the Plaintiff's claim for declaratory action along with the Counterclaim for declaratory action, this Court denies the Plaintiff's motion to sever.

### IV

This Court has subject matter jurisdiction over the counterclaim. The Third–Party Defendants were properly joined under the permissive joinder provided in Rule 13 and Rule 20, Federal Rules of Civil Procedure. Therefore, this Court **DENIES** the Third–Party Defendants' motion to dismiss and **DENIES** the Plaintiff's motion to sever.

**Eva FAULKNER and William E. Faulkner, Plaintiffs,**

v.

**CAROWINDS AMUSEMENT PARK, Defendant.**

No. 1:94–0252.

United States District Court, S.D. West Virginia, Bluefield Division.

Nov. 7, 1994.

Hobert F. Muncey, Jr., Katz, Kantor & Perkins, WV, for plaintiffs.

Lawrence E. Morhous, Brewster, Morhous & Cameron, WV, for defendant.

## OPINION

FABER, District Judge.

### I. Statement of the Case

In April of 1992 the plaintiffs, Eva Faulkner and William E. Faulkner, who are husband and wife, took their children to Carowinds Amusement Park near Charlotte, North Carolina, for a family outing. While standing in the viewing area for the "Whitewater Falls" ride with her infant daughter in her arms, Eva Faulkner saw a huge wave of water crash through a barrier and come toward her. The Complaint charges that, in attempting to evade this water, Eva Faulkner slipped on the slick floor and fell back-

wards, striking her head and sustaining serious and permanent injuries.

The Faulkners live in Princeton, Mercer County, West Virginia. They brought this civil action, naming Carowinds Amusement Park as the sole defendant[1], and basing jurisdiction on diversity of citizenship. The defendant was served with process pursuant to West Virginia Code, § 56-3-33, the State's "long-arm" statute.

Defendant filed the instant motion to dismiss, challenging the jurisdiction of this court and asserting that venue in this district is improper. In support of its motion, defendant has filed the affidavits of Nelson Schwab, III, President of Theme Parks, Inc., a North Carolina corporation, and Garry R. Bickett, who was at the time of Eva Faulkner's accident, Vice–President of Marketing for King's Entertainment Company, a North Carolina corporation. These affidavits establish the following: During April of 1992, Carowinds Amusement Park was owned by King's Entertainment Company, which subsequently changed its name to Theme Park Associates, Inc. Neither King's Entertainment Company nor Theme Park Associates, Inc., regularly does or solicits business, or engages in any other persistent course of conduct in West Virginia, nor does either derive substantial revenue from goods used or consumed or services rendered in West Virginia. Neither King's Entertainment nor Theme Park Associates, Inc., uses or possesses any real property in the State of West Virginia, nor has either corporation contracted to insure any person, property, or risk located within the State of West Virginia. The overwhelming majority of the patrons of Carowinds Amusement Park are residents of North Carolina and South Carolina. According to attendance surveys taken on a daily basis while the park is in operation, approximately one percent of Carowinds' patrons come from the State of West Virginia. As a result of the very limited patronage from West Virginia, Carowinds does not engage in any regular marketing or solicitation activities in that state and did no advertising in

any media in West Virginia during 1992. The only marketing activities conducted in West Virginia during 1992 were carried out by the Group Sales Department which mailed some information to schools, churches, and other organizations regarding discounts available in connection with group visits to Carowinds, and caused one or more personal visits to be made by a group sales representative to such organizations in West Virginia. These occasional mailings and infrequent visits constituted the full extent of Carowinds' marketing activities in West Virginia during 1992.

In opposition to the motion to dismiss, the plaintiffs filed the affidavit of Eva Faulkner, which establishes the following: Eva Faulkner is a member of a Baptist church in Princeton, West Virginia, where she serves on various committees, including committees whose responsibilities deal primarily with the church youth. In the late Fall of 1993, or early Spring of 1994, her church received an unsolicited advertisement from Carowinds Amusement Park offering special group rates for churches. As a member of that church, having received the unsolicited advertisement and offer to visit Carowinds at a special rate, and relying thereon, she and her husband made a conscious decision to be part of a church group accepting the invitation and offer of a special discount rate. Payment for the tickets required by Carowinds for the group discount package was forwarded to Carowinds at its address in Charlotte, North Carolina, and, upon receipt of the payment by Carowinds for the tickets, the admission tickets and other information were forwarded to the Baptist Church in Princeton by Carowinds. Eva Faulkner also states that she is aware, from inquiring of other churches and school organizations, that Carowinds sends similar offers to such groups on a regular basis, year after year.

Apparently, the Faulkners returned to Carowinds in late 1993 or early 1994 in response to a church group solicitation, notwithstanding the accident which precipitated this action. The plaintiffs submitted with

---

1. Defendant has not objected to being sued under the name "Carowinds Amusement Park," although defendant's correct name, as explained below, is Theme Park Associates, Inc. If this action were to proceed, the misnomer could, of course, be corrected.

Eva Faulkner's affidavit copies of an advertising circular and a letter directed to "Dear Youth Coordinator" from Larry McFadden, Summer Fun Youth Days Coordinator for Carowinds. These materials relate to a Christian music festival which apparently took place in April of 1994, some two years after Eva Faulkner's accident. The court notes that the plaintiffs do not contend that they visited Carowinds in April of 1992 with their family in response to a church group solicitation by Carowinds.

## II. *Issue Presented*

The sole issue before the court upon the motion to dismiss is whether the defendant had sufficient contacts with the State of West Virginia to support this court's jurisdiction over it under the long-arm statute. Since the jurisdictional question is, in the court's view dispositive, defendant's objection to venue has not been considered.

## III. *The Standard for Summary Judgment*

Since matters outside the pleadings have been presented to, and not excluded by, the court, the motion to dismiss is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Federal Rules of Civil Procedure, Rule 12(b).

Summary judgment is appropriate only when, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Miller v. Leathers,* 913 F.2d 1085 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). A fact is deemed "material" if proof of its existence or non-existence would affect the disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The entry of summary judgment is, upon motion, mandated against a party who fails to make a showing sufficient to establish the existence of an essential element of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The federal courts are courts of limited jurisdiction, possessing power only over cases entrusted to them by Congress consistent with the requirements of the Constitution. *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). The party who invokes the jurisdiction of a federal court must demonstrate that such jurisdiction exists. Charles A. Wright, *The Law of Federal Courts,* § 7, p. 27 (5th ed. 1994). Indeed, the federal courts are presumed to lack jurisdiction over a particular case until it is demonstrated that jurisdiction is present. *Turner v. Bank of North America,* 4 Dall. 8, 1 L.Ed. 718 (1799). If a federal court's jurisdiction is challenged, the burden is upon the party invoking such jurisdiction to demonstrate affirmatively that jurisdiction exists. *McNutt v. General Motors Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

Accordingly, to survive defendant's motion, the plaintiff must make at least a *prima facie* showing that jurisdiction is proper under the West Virginia long-arm statute.

## IV. *Discussion*

In approaching the jurisdictional question presented, the court is mindful of the fundamental principle that the United States is a union of sovereign states; the powers of one state may not be exercised so as to infringe upon the rightful prerogatives of another. The United States Court of Appeals for the Fourth Circuit reconfirmed this principle only a few weeks ago when it said: "[M]odern principles of personal jurisdiciton do not, and indeed under the Constitution could not, reorder the separate sovereignties of the states. A state's jurisdictional power remains territorial, within its boundaries over persons, properties and *activities* there." *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 943 (4th Cir.1994) (published).

Thus, while physical presence of a party within a state's boundaries is not in all cases necessary to support jurisdiction within that state over that party, some substitute for physical presence *within the forum state's boundaries* is required. Here, we have within West Virginia only the limited marketing activities of Carowinds described above, and, thus, the critical inquiry becomes: are those

limited marketing activities a sufficient foundation to support the exercise of jurisdiction over Carowinds? The court concludes that they are not.

It is often said that resolution of a question of jurisdiction over a non-resident defendant in a diversity case is a two-step inquiry. The court must first determine whether the state long-arm statute confers jurisdiction and then ask whether exercise of that jurisdiction is consistent with the constitutional mandates of due process. *English & Smith v. Metzger,* 901 F.2d 36, 38 (4th Cir. 1990). The West Virginia long-arm statute has been held to reflect a legislative intent to permit the exercise of jurisdiction over the non-resident defendant to the fullest extent consistent with the Due Process Clause of the Fourteenth Amendment. *Harman v. Pauley,* 522 F.Supp. 1130, 1135 (S.D.W.Va. 1981). Since the statute permits exercise of *in personam* jurisdiction to the limits of the Fourteenth Amendment, the normal two-step inquiry merges into one and the court is confronted solely with the constitutional issue. *Ellicott Machine Corp. v. John Holland Party Ltd.,* 995 F.2d 474, 477 (4th Cir. 1993).

Following the lead of the United States Supreme Court in *Helicopteros Nacionales De Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), the Fourth Circuit Court of Appeals has drawn a distinction between "general jurisdiction" and "specific jurisdiction." When the court takes jurisdiction over a suit that arises out of the defendant's specific activities in the forum state, it exercises specific jurisdiction; when the court exercises jurisdiction over a suit that does not arise out of the defendant's activities in the forum state, the jurisdiction is called general jurisdiction. *Nichols v. G.D. Searle & Co.,* 991 F.2d 1195, 1199 n. 2 (4th Cir.1993).

Looking at specific jurisdiction first, it seems clear that the plaintiffs have failed to establish any link between Carowinds' marketing and solicitation activities in West Virginia and their original trip to the amusement park in April of 1992 when Eva Faulkner was injured. The fact that she took a later trip in 1993 or 1994 in response to such advertising and solicitation is, at best, a factor to be considered on the question of general jurisdiction. Plaintiffs' own evidence fails to make a connection between Carowinds' West Virginia activities, limited as they were, and the specific trip to North Carolina during which Eva Faulkner was injured. Accordingly, the court concludes that the plaintiffs have failed to fulfill their burden of establishing a *prima facie* case to support the exercise of specific jurisdiction.

Significantly greater contacts are required between the defendant and the forum state to support the exercise of general jurisdiction than are necessary when jurisdiction is specific. *Nichols v. G.D. Searle & Co., supra,* at 1199. In fact, when the jurisdiction is general, the contacts are required to be "fairly extensive." *Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d 745, 748 (4th Cir.), *cert. denied,* 404 U.S. 948, 92 S.Ct. 271, 30 L.Ed.2d 265 (1971). The relationship between the Faulkners and Carowinds is analogous to the relationship between the parties in *Nichols* and *Ratliff* wherein the United States Court of Appeals for the Fourth Circuit failed to find a sufficient nexus to warrant the exercise of jurisdiction.

In *Nichols,* the defendant manufacturer of intrauterine devices was held to lack sufficient minimum contacts in Maryland for the exercise of general jurisdiction in spite of the fact that that manufacturer had between seventeen and twenty-one promotional representatives and two district managers in the state and kept automobiles, samples and promotional materials there. In *Ratliff,* a defendant drug company had qualified to do business in South Carolina, had appointed a resident agent for service of process there, and had five "detailmen" who lived in South Carolina and promoted defendant's products through personal contacts with doctors and pharmacists throughout the state. A second drug company named as a defendant in *Ratliff* had no representatives in South Carolina, but had mailed promotional literature to some 650 South Carolina doctors on its mailing list and sent mail solicitations to dealers and wholesalers in South Carolina. In both cases, the plaintiffs were allegedly injured by

ingestion or use of the defendants' products, and, yet, the Fourth Circuit held that the defendants' advertising and solicitation alone did not constitute the type of "continuous corporate operation" within the forum state that justifies the exercise of general jurisdiction over the non-resident defendant.

Consistent with *Nichols* and *Ratliff*, it seems clear that the promotional and marketing activities of Carowinds, established by the affidavits filed in this case, are insufficient to support the exercise of general jurisdiction by this court. Carowinds' contacts with West Virginia are less extensive than contacts of defendants with the forum states in *Nichols* and *Ratliff*.

The most recent decision of the United States Court of Appeals for the Fourth Circuit involving the exercise of *in personam* jurisdiction under long-arm statutes, *Lesnick, supra* at 945–46, sets forth a two-part test to be applied in such cases as follows:

> We hold the test to be applied in considering the reach of personal jurisdiction inquires whether (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into consideration such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental social policies.

*Id.*

*Nichols* and *Ratliff* teach us that, upon facts and circumstances such as those presented in this case, the first part of the *Lesnick* test is not met. This is certainly true in a case such as the present which depends upon concepts of "general" rather than "specific" jurisdiction. In such a case, to create "a substantial connection to the

forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections" of its laws, the plaintiff must engage in activities far more extensive than mail solicitations accompanied by an occasional visit to the forum state by a group sales representative. Since the plaintiffs have failed part one of the *Lesnick* test, it is unnecessary to proceed to the more specific inquiries called for in part two of that test.

### V. Conclusion

The court concludes that it lacks jurisdiction over the person of the defendant in this case.

A judgment order consistent with this Opinion shall be entered today dismissing this action without prejudice to plaintiffs' right to refile it in a forum where jurisdiction exists.[2]

**David BERGER, Petitioner/Movant**

v.

**UNITED STATES of America, Respondent.**

Cr. A. No. 2:93–00102.
Civ. A. No. 2:93–1192.

United States District Court,
S.D. West Virginia,
at Charleston.

Nov. 9, 1994.

---

2. This court is informed that the statute of limitations which would be applicable if this action were refiled in North Carolina is Section 1–

52(16) of the General Statutes of North Carolina which provides for a three-year period after the accident within which the case must be brought.

David Berger, pro se petitioner.

United States Atty., Charleston, WV, for respondent.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

By motion brought pursuant to Title 28, United States Code, section 2255, movant David Berger seeks to vacate, set aside or correct the sentence imposed on September 15, 1993, following his plea of guilty to a charge of conspiracy to distribute heroin. Berger challenges the calculation of his criminal history points under the sentencing guidelines. He alleges that it was inappropriate to charge him with two points for a 1988 conviction under Title 18, United States Code, section 922(g)(1), as being a "felon in possession of a firearm." It is his contention that his civil rights had been restored following the felony conviction underlying the firearm charge, rendering the firearm conviction invalid. He thus maintains that the two points assessed for the firearm violation should be subtracted from his criminal history and that his sentence should be reduced to reflect that adjustment. The result of such an adjustment is that the movant would fall in criminal history category I rather than II, so that his guideline sentencing range for the heroin conspiracy conviction would be six to twelve months instead of eight to fourteen months. The movant was sentenced to one year and one day.

### I. Background

By memorandum order entered on May 31, 1994, the court concluded on the reasoning of *United States v. Maybeck*, 23 F.3d 888 (4th Cir.1994), that Berger could attack his sentence in this section 2255 action under the "actual innocence" exception to the "cause and prejudice" requirement ordinarily imposed when a defendant, following a guilty plea, seeks review in a collateral proceeding of an error in sentencing to which no contemporaneous objection was made and from which no direct appeal was taken.[1] The court further held that Berger would be entitled to a modification of his sentence if he could demonstrate that he was "actually in-

nocent" of the 1988 firearm conviction because his civil rights had been restored by the State of West Virginia prior to the time of the firearm violation. Mem.Order of May 31, 1994, at 5–6. Thereafter, a hearing was conducted for the purpose of determining that issue.

The felony conviction underlying Berger's 1988 section 922(g)(1) conviction as a felon in possession of a firearm was a 1982 State of West Virginia conviction for unlawful wounding. On that charge, Berger was placed on probation for a period of three years. His probation sentence expired on November 15, 1985. At the hearing held in this action, Berger conceded that the only writing he received from the state following the completion of his sentence on the unlawful wounding conviction was a letter advising that his probationary period had expired as of November 15, 1985. The government contended that Berger could not demonstrate that his civil rights had been restored in the absence of a writing to that effect. Berger maintained to the contrary that, notwithstanding the lack of a writing stating his civil rights were restored, those rights were automatically restored by operation of state law on completion of his sentence and there were no restrictions on his right to possess a firearm.

### II. Discussion

■ The firearm offense which resulted in Berger being assessed with a two-point criminal history at the 1993 sentencing under challenge in this action was based on Title 18, United States Code, section 922(g)(1), which makes it a federal crime for any person convicted of a felony to possess a firearm. 18 U.S.C. § 922(g). The section 922(g)(1) violation cannot, however, be predicated on a previous felony conviction for which a person's civil rights have been restored, unless the restoration "expressly provides that the person may not ship, transport, possess or receive firearms."[2] § 921(a)(20); *United*

---

1. In *Maybeck*, the Fourth Circuit Court of Appeals held that notwithstanding the failure to show cause for procedural default and resulting prejudice, section 2255 permitted a collateral attack on a sentence based on classification as a career offender if defendant was "actually innocent" of one of the predicate convictions on

which that classification was based. *Maybeck*, 23 F.3d 888.

2. Section 921(a)(20) states in pertinent part:
 Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not

*States v. Metzger,* 3 F.3d 756, 758 (4th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1374, 128 L.Ed.2d 50 (1994). In other words, section 921(a)(20) excludes from consideration under section 922(g)(1) those felony convictions for which a defendant has had his civil rights restored, if, in addition, his firearm privileges are not restricted.[3] *United States v. Hassan El,* 5 F.3d 726, 733 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1374, 128 L.Ed.2d 50 (1994); *United States v. Clark,* 993 F.2d 402, 405 (4th Cir. 1993).

■ The term "civil rights" denotes those rights accorded an individual by virtue of his citizenship in a particular state and is generally deemed to include "the right to vote, the right to hold public office, and the right to serve on a jury." *Hassan El,* 5 F.3d at 734 (citing *United States v. Cassidy,* 899 F.2d 543, 549 (6th Cir.1990)); *see also Metzger,* 3 F.3d at 758 (quoting *Cassidy,* 899 F.2d at 549). To render a prior conviction unavailable for consideration in accordance with the civil rights restoration provision of section 921(a)(20), the restoration of rights need not be complete, "but it must be substantial." *Metzger,* 3 F.3d at 758 (citing *Cassidy,* 899 F.2d at 549; *Clark,* 993 F.2d at 405); *see Hassan El,* 5 F.3d at 734 (discussing § 921(a)(20) in the context of the armed career criminal enhancement provisions of 18 U.S.C. § 924(e)).

■ In determining whether a person's civil rights have been restored, courts must look to the whole law of the state. *Metzger,* 3 F.3d at 758 (citing *United States v. McLean,* 904 F.2d 216, 218 (4th Cir.), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990)). Consequently, for states having no general restoration of rights statutes for criminal offenders and no procedure for the affirmative act of issuing certificates of discharge restoring rights on completion of the sentence imposed, the determination is to be based on other state laws addressing specific civil rights. *Hassan El,* 5 F.3d at 734 (looking to Maryland statutes governing the right to vote and the right to sit on a jury after a criminal conviction); *Metzger,* 3 F.3d at 758–59 & n. 3 (looking to Michigan statutes governing the rights to vote, hold public office and serve on a jury, and, in addition, Michigan Court Rules applicable to for-cause challenges to a prospective juror).

■ A determination that state law prohibits or creates a significant barrier to a defendant's performance of jury service precludes a finding that there has been a substantial restoration of his civil rights such that the restoration provisions of section 921(a)(20) are satisfied. *Hassan El,* 5 F.3d at 734; *Metzger,* 3 F.3d at 758–59; *accord United States v. Essig,* 10 F.3d 968, 976 (3d Cir.1993). Accordingly, a section 922(g) firearm conviction may not be avoided where the right to perform jury service has not been restored. *Metzger,* 3 F.3d at 759. As will be seen, under West Virginia law, Berger's right to serve on a jury has not been restored and he is precluded from taking advantage of the restoration provisions of section 921(a)(20).

## A. Requirement of an Affirmative Act

West Virginia, like Maryland and Michigan, the states whose laws were subject to

---

be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

3. The court observes that in 1988, it was unlawful for any person in the state to carry a dangerous or deadly weapon on his person without having a license to do so. W.Va.Code § 61–7–1 (1984 Repl.Vol. & 1988 Cum.Supp.) (amended in 1989 at § 61–7–3 to prohibit the carrying of a concealed deadly weapon without a license). There was no prohibition against a convicted felon having a firearm in his possession until July 7, 1989, when section 61–7–7, prohibiting a felon from possessing a firearm, took effect. The 1989 amendment followed a 1986 amendment to the Constitution of West Virginia, which guarantees a person "the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use." W.Va. Const. art. III, § 22. Berger's 1988 conviction was simply for possession of a firearm, which, as distinguished from the unlicensed carrying of a dangerous or deadly weapon on his person, was not unlawful at the time. Thus, it cannot be said that there was a state-imposed restriction on Berger's privilege of possessing a firearm at the time he was convicted of the federal crime of being a felon in possession of a firearm.

review in *Hassan El* and *Metzger*, has no statutory provision for the restoration of civil rights for criminal offenders. Nor does West Virginia furnish certificates of discharge referencing the restoration of civil rights to criminal offenders who have completed service of probationary sentences under judicial supervision, although it routinely provides certificates of that nature to persons who are incarcerated in a state penal institution as a part of their sentence even though there appears to be no statutory basis for doing so.[4]

All but one of the circuit courts of appeals considering the question have concluded that section 921(a)(20) does not require an affirmative act to restore civil rights before the conviction is excluded from the section 922(g) offense.[5] *United States v. Hall*, 20 F.3d 1066, 1068–69 (10th Cir.1994) (no affirmative act required if state law restores civil rights automatically); *United States v. Glaser*, 14 F.3d 1213, 1218 (7th Cir.1994) (where no formal notice of civil rights restoration given, question is determined by reference to state statutes); *United States v. Thomas*, 991 F.2d 206, 213 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 607, 126 L.Ed.2d 572 (1993) (rights "reinstated automatically by operation of law ... are no less 'restored' than are such rights that have been resurrected by an 'affirmative act of the state' "); *United States v. Dahms*, 938 F.2d 131 (9th Cir.1991) (restoration need not be by an affirmative act or a general restoration statute, but can be auto-

matic by operation of the statutes dealing with the specific civil rights revoked upon conviction).

In seeming agreement, the Fourth Circuit Court of Appeals makes no reference to an affirmative restoration requirement in either *Hassan El* or *Metzger*. Instead, finding no affirmative act, the court in both cases simply proceeds to analyze the whole law of the state. Had the court found an affirmative act necessary, the cases could have been decided on that basis alone, but they were not. Indeed, the Fourth Circuit Court of Appeals has stated that even when there is a certificate restoring civil rights, the court must nonetheless "look 'to the whole of state law' and not just simply to the face of a certificate restoring to a defendant his civil rights."[6] *Clark*, 993 F.2d at 403 (citing *United States v. McLean*, 904 F.2d 216, 218 (4th Cir.), *cert. denied*, 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990)).

■ The court accordingly concludes that Berger's lack of a writing stating that his civil rights have been restored without restriction of his firearms privilege is not determinative of the issue. The court instead looks to the whole of West Virginia law to determine whether the civil rights identified by the Court of Appeals for the Fourth Circuit in *Metzger* and *Hassan El* were automatically restored to Berger on completion of his sentence in 1985. As an initial step, it is helpful to review two opinions of the West

---

**4.** West Virginia does not statutorily provide for the automatic restoration of civil rights on discharge from confinement and the basis for the issuance of certificates of discharge containing a statement that all civil rights are thereby restored is unclear. Perhaps the practice emanates from a 1972 opinion of the West Virginia Attorney General addressed to the Director, Public Institutions Commission, Division of Corrections, which, it will be seen, mistakenly concludes that a convicted felon's rights of citizenship are immediately restored once he is no longer in legal custody.

**5.** To the contrary is the First Circuit Court of Appeals, which has held that the restoration of civil rights, like a pardon or expungement, requires an affirmative act. *United States v. Ramos*, 961 F.2d 1003, 1008–10 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 364, 121 L.Ed.2d 277 (1992).

**6.** In an earlier case, *United States v. Haynes*, 961 F.2d 50 (4th Cir.1992), the Fourth Circuit Court of Appeals looked only to the certificate of discharge in stating that the defendant's civil rights were restored by the State of West Virginia when he was discharged from parole. *Id.* at 51. It must be noted, however, that the issue before the court in *Haynes* was not whether the defendant's civil rights had been restored, but whether his firearms privilege was restricted by reason of West Virginia's subsequently enacted statute making it a misdemeanor for a convicted felon to possess a firearm. *Id.* at 52. Consequently, the court's failure to look beyond the certificate of discharge in *Haynes* is not at odds with the above-quoted statement in *Clark*. Indeed, the court recognized in *Haynes* that by examining West Virginia's firearms statute, it was looking beyond the certificate of discharge to the whole of the state's laws. *Id.* at 53.

Virginia Attorney General which are relied on by Berger for the proposition that all of his civil rights were automatically restored by operation of state law on completion of his state court sentence.

Berger relies primarily on a July 11, 1972, opinion in which the attorney general was asked to determine whether a convict, once discharged from parole, "can automatically and instantaneously be restored his rights as a citizen." 55 Op.Att'y Gen. 3 (1972). The opinion examines § 3–1–3 of the West Virginia Code, which provides that no person "who is under conviction of ... felony ... shall be permitted to vote ... while such disability continues," together with the West Virginia Supreme Court of Appeals' interpretation of that provision in *Osborne v. County Court*, 68 W.Va. 189, 69 S.E. 470 (1910). On the reasoning of *Osborne*, the opinion concludes that when a parolee is discharged, he is "no longer 'under conviction' ... [h]is disability has been removed, and therefore, he should be considered to be one who has full rights of citizenship, including, for example, the right to vote." 55 Op.Att'y Gen. at 4–5. The opinion does not discuss either the right to hold public office or the right to serve on a jury. Consequently, it does not provide support for a finding that any civil right other than the right to vote is automatically restored on discharge from parole.

Berger also cites a 1965 opinion of the attorney general, 51 Op.Att'y Gen. 182 (1965), addressing a convicted felon's right to serve on a jury. The opinion, issued on February 1, 1965, concludes in pertinent part that "[a]s soon as the convicted person has served his full term of imprisonment, ... he ... may serve as a juror." *Id.* at 186. The apparent basis for the statement is the decision of the West Virginia Supreme Court of Appeals in *Webb v. County Court*, 113 W.Va. 474, 168 S.E. 760 (1933), which is quoted by the attorney general. 51 Op.Att'y Gen. at 184. It is stated in *Webb* that a felon who has served his sentence "is not disqualified from jury service." *Webb*, 168 S.E. at 761. West Virginia Code 1931, § 52–1–1, is cited as authority for that statement.

A review of West Virginia statutes governing jury service demonstrates that for the period of time commencing at least in 1923 and continuing to 1945, "persons convicted of infamous crimes" were merely exempt from serving on juries. *See e.g.,* West Virginia Code of 1932, § 52–1–2. "Exemption" was not deemed to be "disqualification" from service nor ground for challenge. *State v. Beale*, 104 W.Va. 617, 141 S.E. 7, 11 (1927). In 1945, the statute was amended. The amendment exempted certain persons, as had the earlier version of the statute, and added a provision that certain persons "shall be disqualified from serving on juries." Among those disqualified were "persons convicted of infamous crimes." W.Va.Code § 52–1–2 (1945 Supp. to W.Va.Code of 1943). The disqualification of "persons convicted of infamous crimes" remained in 1957 amendments to § 52–1–2. *See* W.Va.Code § 52–1–2 (1960 Cum.Supp. to W.Va.Code of 1955). It was also retained in 1988, W.Va.Code § 52–1–8, when comprehensive amendments to Chapter 52 were enacted. The disqualification continues to be a part of § 52–1–8 in its current form.

From the above review, it is seen that when *Webb* was decided in 1933, a convicted felon was not disqualified from service after completion of his sentence. However, by the time the attorney general issued his opinion in 1965, the statute governing jury service had been amended and "persons convicted of infamous crimes" were "disqualified," not merely "exempted" from service. The opinion of the attorney general, which did not take the statutory amendment into account, is accordingly discredited.

Having concluded that Berger's reliance on the referenced opinions of the attorney general is misplaced, the court proceeds to examine the balance of West Virginia law to determine whether his civil rights were restored by operation of law.

## B. *Right to Vote*

The Constitution of West Virginia and a corresponding statute provide that "no person ... who is under conviction of ... felony ... shall be permitted to vote while such disability continues." W.Va. Const. art. IV, § 1; W.Va.Code § 3–1–3. Based on the words "under conviction" and "while such

430

disability continues," the West Virginia Supreme Court of Appeals has held that disfranchisement does not continue after the punishment has been served. *Osborne v. Kanawha County Court,* 68 W.Va. 189, 69 S.E. 470 (W.Va.1910); *see also* 55 Op.W.Va. Att'y Gen. 3 (1972); 51 Op.Att'y Gen. 182 (1965). On the basis of *Osborne,* it is apparent that Berger's right to vote was restored when his probationary sentence expired in 1985, approximately three years before he was charged under section 922(g)(1) as being a felon in possession of a firearm.

### C. *Right to Hold Public Office*

Turning to the right of its citizens to hold public office, it is seen that the Constitution of West Virginia prohibits any person "who has been ... convicted of bribery, perjury or other infamous crime" from serving in the West Virginia legislature, W.Va. Const. art. VI, § 14, if the conviction for the identified crime is under the laws of West Virginia, as distinguished from the laws of other jurisdictions, *Isaacs v. Board of Ballot Comm'rs,* 122 W.Va. 703, 12 S.E.2d 510 (1940). A felony is an infamous offense. *State v. Maynard,* 170 W.Va. 40, 289 S.E.2d 714, 718 (1982). The West Virginia Supreme Court of Appeals has stated in dicta that "ex-convicts" are thus precluded from serving in the state legislature. *Webb v. County Court of Raleigh County,* 113 W.Va. 474, 168 S.E. 760, 761 (1933); *see also* 51 Op.Att'y Gen. 182 (1965).

A person convicted of bribery or attempted bribery of a State of West Virginia executive, judicial officer or member of the legislature "in order to influence him, in the performance of any of his official or public duties" and any officer or legislator who demands or receives anything of value "for the performance of his official or public duties, or for refusing or failing to perform the same, or for any vote or influence" is constitutionally and statutorily permanently disqualified from holding any office in West Virginia. W.Va. Const. art. VI, § 45; W.Va.Code § 61–5A–9.

In addition, no person convicted of a felony by any court in or out of the State of West Virginia may, "while such conviction remains unreversed, be elected or appointed to any office under the laws" of West Virginia.

W.Va.Code § 6–5–5. The statutory phrase "remains unreversed" is construed to disqualify a person from holding public office only until he has paid the full penalty of the law. *Webb,* 168 S.E. at 760; *see also Nibert v. Carroll Trucking Co.,* 139 W.Va. 583, 82 S.E.2d 445, 452 (1954), (Lovins, J., concurring) (citing *Webb,* 168 S.E. 760).

Inasmuch as Berger's 1985 conviction was not for bribery or attempted bribery of a public official, it did not permanently disqualify him from holding any public office in the state. Nor, having completed his sentence, is he barred from holding public office under the provisions of West Virginia Code § 6–5–5. Having been convicted of a felony under the laws of West Virginia, he is, however, constitutionally prohibited from serving in the legislature of this state.

### D. *Right to Serve on a Jury*

By statute, a person who "has been convicted of perjury, false swearing or other infamous offense," is disqualified from jury service in the courts of West Virginia. W.Va.Code § 52–1–8. A felony is an infamous offense. *Maynard,* 289 S.E.2d at 718. The disqualification contains no limitation similar to that used in the constitutional and statutory provisions governing the right to vote and the right to hold public office. That is, it is not limited to the period of time that the person is "under conviction," or that his "conviction remains unreversed," or that the "disability continues." Nor has the disqualification ever been interpreted by the West Virginia Supreme Court of Appeals as ceasing to exist after the convicted person has served his sentence. Consequently, the court finds that Berger's right to serve on a jury in the State of West Virginia was permanently lost as a result of his unlawful wounding conviction in 1982.

### III. *Conclusion*

As earlier stated, the Fourth Circuit Court of Appeals held in *Hassan El* that the loss of the right to sit on a jury, standing alone, "precludes a finding of a substantial restoration of civil rights necessary to satisfy § 921(a)(20)." *Hassan El,* 5 F.3d at 734. Here, Berger's state felony conviction in 1982

not only permanently disqualified him from serving on a jury but also forever barred him from holding the public office of state legislator. The loss of those rights compels the court to conclude under the reasoning of *Hassan El* and *Metzger* that Berger's civil rights were not substantially restored by automatic operation of the laws of West Virginia when his probationary sentence expired on November 15, 1985.

Berger thus cannot be found "actually innocent" of that offense. The two-point criminal history assessment based on the 1988 section 922(g)(1) firearm conviction was properly included in the sentencing guidelines calculation used in sentencing Berger in 1993 on the offense of conspiracy to distribute heroin. This action to vacate, set aside or correct that sentence is properly denied.

It is accordingly **ORDERED** that movant's motion, brought pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct the sentence imposed by this court on September 15, 1993, be, and the same hereby is, denied.

---

**Paula L. SAYRE, Plaintiff,**

v.

**GENERAL NUTRITION CORPORATION, et al., Defendants.**

Civ. A. No. 2:92–0444.

United States District Court,
S.D. West Virginia,
Charleston Division.

Nov. 16, 1994.

James B. Lees, Jr., Hunt, Lees, Farrell & Kessler, Charleston, WV, for plaintiff.

Fazal A. Shere, P. Michael Pleska, Bowles, Rice, McDavid, Graff & Love, Arden J. Curry, II, Pauley, Curry, Sturgeon & Vanderford, Charleston, WV, Richard W. Hulbert, Cleary, Gottlieb, Steen & Hamilton, New York City, Richard deC. Hinds, Sara D. Schotland, Matthew D. Slater, Cleary, Gottlieb, Steen & Hamilton, Washington, DC for defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending before the Court is the Defendants' motion for summary judgement contending the Plaintiff's claim is time-barred by the two-year statute of limitations embodied in W.Va.Code § 55–2–12(b). For reasons that follow, the Defendants' motion is

**GRANTED.** Oral argument is unnecessary and the motion for such is **DENIED.**

## I

■ A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The standard used to determine whether a motion for summary judgment should be granted or denied was stated recently by our Court of Appeals:

A moving party is entitled to summary judgment "if the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S.

317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.* *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). *Accord Riffe v. Magushi,* 859 F.Supp. 220, 222, n. 1 (S.D.W.Va.1994); *Cornell v. General Electric Plastics,* 853 F.Supp. 221, 225–26 (S.D.W.Va. 1994); *Thomas v. Shoney's, Inc.,* 845 F.Supp. 388, 389–90 (S.D.W.Va.1994) (Haden, C.J.).

## II

The facts are undisputed. In 1983, on the recommendation of a friend, the Plaintiff began taking L-tryptophan to help her sleep. She bought her last bottle of L-tryptophan in November 1989. After she moved to Ohio in 1985, the Plaintiff bought L-tryptophan products from a General Nutrition Center store in Vienna, West Virginia, retail stores in West Virginia and Ohio owned by Rite–Aid and Revco, Swisher & Loshe Pharmacy in Pomeroy, Ohio, and The Farmacy in Athens, Ohio.

Prior to November 1989, the Plaintiff had been experiencing significant health problems including choking, a burning sensation in her spine, and extreme pain in her hips. On November 13, 1989, the Plaintiff saw a NBC Nightly News television report covering a federal investigation of an outbreak of a new illness, later called eosinophilia myalgia syndrome (EMS), which had been linked to L-tryptophan by the Centers for Disease Control and the Food and Drug Administration.[1] The NBC report also stated that fed-

---

1. In 1993, the Food and Drug Administration reported

EMS is a systemic connective tissue disease characterized by eosinophilia (an increase in one type of the white blood cells), myalgia (severe muscle pain), and cutaneous (skin) and neuromuscular manifestations. This illness, which occurred in epidemic fashion in the United States in the summer and fall of 1989, is associated with the use of dietary supplements containing L-tryptophan. To date, more than 1,500 cases, including 38 deaths, have met the Centers for Disease Control (CDC)

case surveillance definition of the disease, although the true incidence of the disorder is thought to be much higher.

FDA first learned about problems with L-tryptophan in 1989, following a report from New Mexico about four cases of an illness manifested by myalgia and eosinophilia, in which the common denominator appeared to be the use of L-tryptophan. FDA subsequently issued a strong public warning on November 11, 1989, to discontinue the use of L-tryptophan. On November 17, 1989, in conjunction with CDC, FDA requested a nationwide recall of all over-

eral health officials had warned that the "risks of taking L–Tryptophane far outweigh any benefits. They are urging that stores stop selling it, and that if people have any at home they stop using it."[2]

After viewing the report, the Plaintiff wrote on November 14, 1989 to Dr. Huntwork, a rheumatologist who had treated her previously. She wrote "I have been taking L–Tryptophane 500 mg to help me sleep, but I heard on television last night it causes some disease effecting (sic) the muscles. Do you know anything about this?" The Plaintiff gave the letter to Dr. Huntwork but never questioned him on her self-prescribed use of L-tryptophan. The Plaintiff concluded L-tryptophan was not the cause of her medical problems and continued to take L-tryptophan until her supply was exhausted.

In May, 1990, the Plaintiff read a magazine article on the problems L-tryptophan was causing. Then she wrote three other treating physicians, again questioning the possibility of a link between her symptoms and L-tryptophan. The first medical diagnosis giv-

en Plaintiff that L-tryptophan was the source of her problems was made on April 20, 1993 by Dr. Virginia Stein to Mrs. Sayre.

The Plaintiff consulted an attorney in February 1992 and filed this action on May 15, 1992. Her case and claim was transferred for discovery and related pretrial matters to the District of South Carolina by the Panel on Multidistrict Litigation (MDL Panel) on July 23, 1992. On September 18, 1992, the case was removed from the active docket of this Court pending action in the District of South Carolina. The case was returned to this Court by the MDL Panel on March 16, 1994 and reopened here on May 3, 1994.

### III

■ Here, Defendants moved for summary judgment, arguing Plaintiff's claim is time-barred by the statute of limitations. Under the discovery rule, Defendants contend the Plaintiff should have discovered the connection between her symptoms and her self-prescribed use of L-tryptophan when she first viewed the NBC news report. On the

---

the-counter dietary supplements containing 100 mg or more of L-tryptophan. The agency also issued an Import Alert to detain all foreign shipments of L-tryptophan. On March 22, 1990, the recall was extended to all marketed products containing added manufactured L-tryptophan because of a case of EMS in a patient consuming less than 100 mg daily.... The net effect of the recall and import alert was a ban on the oral supplement forms of L-tryptophan because virtually all of the raw material used to formulate U.S. products was imported.

Regulation of Dietary Supplements, 58 Fed.Reg. 33,690, 33,696 (1993) (references omitted).

2. Because of the importance of the explicitness and unique urgency of the warning which NBC reported to the analysis of this case, the entire report is reproduced for context:

Tom Brokaw, anchor: Tonight U.S. health officials are investigating reports that a widely used diet supplement may cause a deadly blood disease. It has struck people in at least nine states. The most serious outbreak, in New Mexico. NBC's science correspondent Robert Bazell.
Robert Bazell reporting: In health food stores around the country today workers were either removing L–Tryptophane from the shelves or posting warnings. Physicians believe they have discovered an outbreak of a serious new illness among people who have taken the commonly-used food supplement.

Joy Hunter: I started out with a, actually just a headache, and it's just progressed to the point where I'm really quite tired now.
Bazell: Joy Hunter has the illness. The symptoms include a high count of a certain type of white blood cell, severe muscle pain, coughing, and rashes. There have been no confirmed deaths, but doctors say the illness could be life threatening. There have been 50 confirmed cases, but at state health departments across the country and at the Centers for Disease Control, reports of new cases were pouring in today. And officials believe there are hundreds and probably thousands.
L–Tryptophane is a natural substance in the body. People take it in large doses to help go to sleep or to help relieve premenstrual syndrome. Both the Centers for Disease Control and the Food and Drug Administration are investigating. So far, the investigation has found that almost everyone with the illness has taken L–Tryptophane, usually in high doses. But there is no single brand or manufacturer that seems to be responsible.
Federal health officials say that until they figure out what is causing the illness, the risks of taking L–Tryptophane far outweigh any benefits. They are urging that stores stop selling it, and that if people have any at home they stop using it. Robert Bazell, NBC News, New York.
*NBC Nightly News* (NBC television broadcast, Nov. 13, 1989).

other hand, Plaintiff contends she did not discover the connection until May 1990, when she read the magazine article on L-tryptophan or until April 1990, when her symptoms were diagnosed as EMS. Despite its strong concerns against discouraging people from seeking proper medical diagnosis and treatment, the Court holds Plaintiff reasonably should have discovered the connection between her symptoms and L-tryptophan in November 1989 when she was so informed by the NBC telecast.

The Court exercises its diversity jurisdiction in this case. 28 U.S.C. § 1332. The parties agree the two-year statute of limitations provided by W.Va.Code § 55–2–12(b) applies, as well as the discovery rule developed for product liability cases by the Supreme Court of Appeals of West Virginia in *Hickman v. Grover*, 178 W.Va. 249, 358 S.E.2d 810 (1987). *See Cecil v. Airco, Inc.*, 187 W.Va. 190, 416 S.E.2d 728 (1992) (per curiam). However, the specific product liability discovery rule of *Hickman* has been subsumed within the general discovery rule developed by the Court in *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992).

In *Cart,* the West Virginia Court ended its practice of extending the discovery rule on a case-by-case to new factual scenarios. Instead, the Court developed a discovery rule generally applicable to all torts [3] stating "a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs; under the 'discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." *Syl. pt. 1, Cart,* 188 W.Va. 241, 423 S.E.2d 644 (1992). However, the Court cautioned

> [t]he 'discovery rule,' then, is to be applied with great circumspection on a case-by-case basis only where there is a strong showing by the plaintiff that he was *prevented* from knowing of the claim at the time of the injury. The general rule is

that mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of the statute of limitations. In order to benefit from the rule, a plaintiff must make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship.

188 W.Va. at 245, 423 S.E.2d at 648 (emphasis in original) (footnotes omitted).[4]

After developing the generally applicable discovery rule in *Cart,* West Virginia's highest court acknowledged the second prong of the general rule would include the specific rule the Court had previously created for product liability cases. The Court opined "[i]n the products liability area, lack of comprehension of injury includes (1) that the plaintiff has been injured, (2) the identity of the maker of the product, and (3) that the product has a causal relation to the injury." *Cart,* 188 W.Va. at 245, 423 S.E.2d at 648, n. 14 (quoting *Syl. pt. 1, Hickman v. Grover,* 178 W.Va. 249, 358 S.E.2d 810 (1987)). Thus, the *Hickman* product liability discovery rule was incorporated into the second prong of the *Cart* test.

The first and third prongs of the general discovery rule are inapplicable to this case. There is no allegation of fraudulent concealment by the Defendants nor is this a situation showing an extreme hardship sufficient to activate the discovery rule. Only the second element of the general rule is applicable in this case: whether the Plaintiff was unable to comprehend her injury.

As noted, applying the second prong of the general discovery rule in a product liability case requires the analysis of the factors set forth in *Hickman v. Grover:* "[T]he statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) the identity of the maker of the

---

3. "The 'discovery rule' is generally applicable to all torts, unless there is a clear statutory prohibition of its application." *Syl. pt. 2, Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992).

4. The Court also cautioned that "by declaring the *existence* of a 'discovery rule' we do not eviscerate the statute of limitations: the statute of limi-

tations will apply unless the handicaps to discovery at the time of injury are great and are largely the product of the *defendant's* conduct in concealing either the tort or the wrongdoer's identity." *Cart,* 188 W.Va. at 245, 423 S.E.2d at 648 (emphasis in original).

product, and (3) that the product had a causal relation to his injury." 178 W.Va. at 252, 358 S.E.2d at 813. In this case, the Plaintiff has not disputed she knew she was injured or that she knew the identity of the Defendants as marketers of L-tryptophan. Only the third aspect of the *Hickman* test is in dispute. The question remaining, then, is when did the Plaintiff know, or by the exercise of reasonable diligence should have known, L-tryptophan had a "causal relation to [her] injury." The Court concludes that the plaintiff, by the exercise of reasonable diligence, should have known that L-tryptophan had a causal relation to her injury when she saw the warning reported by NBC on November 13, 1989.

In concluding that the Plaintiff should have known of the connection between L-tryptophan and her medical condition in November, 1989, the Court does not imply that a medical diagnosis is never required for the statute of limitations to run under the discovery rule. The urgent and complete notice the Plaintiff received, however, weighs against the strong countervailing concern to require a separate medical diagnosis. Here, the Plaintiff was not following a physician's direction when she chose to self-administer L-tryptophan or a prescription as she continued to take L-tryptophan after seeing the urgent and strongly-worded warning. Rather, she alone decided to ingest L-tryptophan to alleviate her sleeping problems. No doctor-patient relationship was established with respect to the L-tryptophan. She self-prescribed her use and, as such, the decision whether to continue taking L-tryptophan was hers, based on what she knew about the drug. The news telecast warning was too strong for this Court to ignore. As the Supreme Court of Appeals of West Virginia noted in *Slack v. Kanawha*

*County Housing,* 188 W.Va. 144, 150, 423 S.E.2d 547, 553 (1992) (quoting *Spitler v. Dean,* 148 Wis.2d 630, 638, 436 N.W.2d 308, 311 (1989)): "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach."[5]

## IV

The Defendants' motion for summary judgment is **GRANTED.** The plaintiff should have known of the causal connection between her self-prescribed L-tryptophan use and her medical condition in November, 1989. The Plaintiff's claim is time-barred by application of the two-year statute of limitations provided in W.Va.Code § 55–2–12(b). The case is **DISMISSED** and stricken from the docket of this Court.

The Clerk is directed to send a copy of this Order to counsel of record.

Joann **HURST,** Plaintiff,

v.

**ST. MARY'S HOSPITAL OF HUNTINGTON, INC.,** Defendant.

**Civ. A. No. 3:94–0115.**

United States District Court, S.D. West Virginia, Huntington Division.

Nov. 16, 1994.

---

5. For a similar case and result *see Townley v. Norfolk & Western Ry. Co.,* 887 F.2d 498 (4th Cir.1989). In *Townley,* our Court of Appeals held that the statute of limitations began to run under the discovery rule when Townley read a notice encouraging railroad workers to apply for black lung benefits and he began a series of correspondence seeking information to apply for black lung benefits. The Court of Appeals held that

> [a]lthough Townley claims he was not aware he suffered from black lung until his condition

was diagnosed in 1984, his own testimony reveals that in 1980 his condition had manifested itself to such an extent that he began corresponding with the railroad in an attempt to obtain the necessary information to apply for black lung benefits.... Even if Townley truly did not believe he had black lung in 1980, it is obvious from his actions that he possessed sufficient information that he knew, or should have known, that he had been injured by his work with the railroad.

*Id.* at 501.

Dwight J. Staples, Henderson, Henderson & Staples, Huntington, WV, for plaintiff.

Michael J. Farrell and Charlotte A. Hoffman, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, WV, for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendant's motion for summary judgment. Defendant contends Plaintiff has failed to make a *prima facie* case of either age or handicap discrimination. Defendant further argues several incidents of alleged discrimination are barred by the two

year statute of limitations. Plaintiff contends she has made a showing of both age and handicap discrimination sufficient to withstand the motion for summary judgment, and that her allegations of discrimination arising outside the two year limitation are actionable based upon the theory of "continuous violations."

The standard used to determine whether a motion for summary judgment should be granted or denied has been stated by our Court of Appeals:

"A moving party is entitled to summary judgment 'if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

"A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986). In considering a motion for summary judgement, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255 [106 S.Ct. at 2513–14]. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* [498 U.S. 1109], 111 S.Ct. 1018 [112 L.Ed.2d 1100] (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]. A mere scintilla of evidence supporting the case is insufficient. *Id.*" *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994), *and cert. denied,* —

U.S. —, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994).

*Accord Cornell v. General Electric Plastics,* 853 F.Supp. 221, 225–26 (S.D.W.Va.1994) (Haden, C.J.); *Thomas v. Shoney's Inc.,* 845 F.Supp. 388, 389–90 (S.D.W.Va.1994) (Haden C.J.). The Court has considered the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits furnished.

## I.

### CONTINUOUS VIOLATION

Plaintiff filed her complaint on January 24, 1994. The parties concur the statute of limitations for these claims is two years. Plaintiff has identified eight instances of alleged discrimination. Six of the alleged discriminatory incidents occurred outside the limitation period. Defendant contends those six alleged incidents are time barred. Plaintiff asserts they are not time-barred because they constitute a "continuous violation" of discrimination laws.

■ Plaintiff is correct in asserting that a "continuous violation" may toll the limitation period. A continuous violation occurs most often where an employer's conduct constitutes systematic discrimination through a pattern of discrimination over time. For example, a continuous violation will occur in cases where an employee has been discriminated against in regard to pay. In those cases, the violation continues with the payment of each paycheck. *Bazemore v. Friday,* 478 U.S. 385, 395–97, 106 S.Ct. 3000, 3006–07, 92 L.Ed.2d 315 (1986).

■ On the other hand, "isolated and completed acts against a particular individual are not within the [continuous violation] rule." *White v. Federal Express Corp.,* 729 F.Supp. 1536, 1551 (E.D.Va.1990), *aff'd,* 939 F.2d 157 (4th Cir.1991), *citing De Medina v. Reinhardt,* 444 F.Supp. 573, 576 (D.D.C. 1978). A continuous violation may not be constituted of discrete, sporadic or inconsistent acts. *EEOC v. Peterson, Howell & Heather, Inc.,* 702 F.Supp. 1213, 1226 (D.Md. 1989). A fine summary of the continuous violation theory was stated in *Garvey v.*

*Dickinson College,* 775 F.Supp. 788, 801 (M.D.Pa.1991):

"[The continuous violation] theory allows [an employee] to pursue a Title VII claim for discriminatory conduct which began outside the limitations period if she can demonstrate that the conduct alleged is part of an on-going practice or pattern of discrimination effected by the employer. To rely on this theory, the [employee] must prove that a violation occurred within the limitations period and that such violation is 'reasonably related' to prior discriminatory acts alleged. Isolated or sporadic incidents of discrimination, even if intentional, are not sufficient to establish the requisite pattern. [The employee] must also show that the continuing [discrimination] was sustained and consisted of more than incidents of a trivial nature. Nor is it sufficient to show only that the [employee] suffered a loss within the limitations period as a result of the prior discriminatory acts." (citations omitted).

*See Christman v. American Cyanamid,* 92 F.R.D. 441, 448 (N.D.W.Va.1981) (Haden, J.), *quoting, Patterson v. American Tobacco Co.,* 586 F.2d 300, 304–05 (4th Cir.1978) (a continuous violation involves a continuing pattern or practice of discrimination). *See also* 4 Joseph G. Cook & John L. Sobieski, Jr., *Civil Rights Actions* ¶ 21.16[D].

■ The six alleged incidents of discrimination asserted by the Plaintiff to have occurred outside the limitation period do not constitute anything more than "isolated and completed acts against a particular individual[.]" The Court also concludes those alleged incidents of discrimination bear no reasonable relationship to the alleged acts occurring within the statutory period. Therefore, those incidents are time barred and not actionable.

## II.

## AGE DISCRIMINATION

To prevail on its motion for summary judgment in regard to the age discrimination claim the Defendant must show an absence of evidence to support Plaintiff's claim; Plaintiff may then show issues of triable facts remain to be adjudicated. In *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1314–15 (4th Cir.1993), the Court of Appeals described the burdens of proof in an age discrimination case:

"The ADEA makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's age.' To establish a claim, a plaintiff must prove, with reasonable probability, that but for the age of the plaintiff, the adverse employment decision would not have been made. Age must have been a determining factor in the employment decision. The burden of proof of an age discrimination claim may be satisfied, as with other types of discrimination claims, by direct evidence or by circumstantial evidence under a method of proof established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* scheme, once the plaintiff proves a prima facie case of discrimination, the burden of proving a legitimate explanation shifts to the defendant. If the defendant articulates a legitimate nondiscriminatory explanation which, if believed by the trier of fact, would support the conclusion that discrimination was not a determining factor in the adverse employment decision, the presumption created by the prima facie case 'drops from the case,' and the plaintiff bears the ultimate burden to prove that the defendant intentionally discriminated against the plaintiff. In meeting the ultimate burden the plaintiff may offer proof that the defendant's explanation was a mere pretext."

"To establish a prima facie case of age discrimination under the ADEA with circumstantial evidence, the plaintiff must prove a set of facts which would enable the fact-finder to conclude with reasonable probability that *in the absence of any further explanation,* the adverse employment action was the product of age discrimination." (Emphasis in original; citations omitted).

To make a *prima facie* case of age discrimination, plaintiff must show the following:

" '(1) That he or she is a member of a protected class;

(2) That the employer made an adverse decision concerning the plaintiff; and

(3) That, but for his or her protected status, the adverse decision would not have been made.' " *Southern v. Emery Worldwide*, 788 F.Supp. 894, 897 (S.D.W.Va. 1992) (Haden, C.J.), *citing, Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986).

■ The Court concludes Plaintiff has failed to make a *prima facie* case of age discrimination. Although Plaintiff is a member of a protected class, there is simply no evidence to show any adverse treatment was accorded due to her age. Defendant's motion for summary judgment in regard to Plaintiff's age discrimination claim is therefore **GRANTED**.

### III.

### HANDICAP DISCRIMINATION

Plaintiff's claim of handicap discrimination is apparently based upon an alleged violation of the West Virginia Human Rights Act, W.Va.Code § 5–11–1, *et seq.* The criteria for proving a *prima facie* case of handicap discrimination was stated by the West Virginia Supreme Court of Appeals in *Syllabus* Point 2 of *Teets v. Eastern Associated Coal Corp., Federal No. 2*, 187 W.Va. 663, 421 S.E.2d 46 (1992) (*per curiam*):

" 'A handicapped person claiming employment discrimination under *W.Va.Code*, 5–11–9 [1981], must prove as a *prima facie* case that such a person (1) meets the definition of "handicapped," (2) possesses the skills to do the desired job with reasonable accommodations and (3) applied for and was rejected from the desired job.

The burden then shifts to the employer to rebut the claimant's *prima facie* case by presenting a legitimate, nondiscriminatory reason for such person's rejection. An example of such a legitimate, nondiscriminatory reason is that a person's handicap creates a reasonable probability of a materially enhanced risk of substantial harm to the handicapped person or others.' Syl. pt. 2, *Ranger Fuel Corp. v. Human Rights Comm'n*, 180 W.Va. 260, 376 S.E.2d 154 (1988)."

*See Syllabus* Points 2 and 3, *Morris Memorial Convalescent Nursing Home, Inc. v. West Virginia Human Rights Comm'n*, 189 W.Va. 314, 431 S.E.2d 353 (1993).

Plaintiff contends she meets the legal definition of handicapped due to a combination of "insomnia, upper respiratory infection, discomfort in her back, fibromyalgia, depression and other physical and psychological disorders." Plaintiff's Complaint at 2. In the instant case Defendant has not argued Plaintiff does not meet the definition of handicapped. For the purposes of this motion, the Court will assume Plaintiff has met the definition of handicapped.[1]

■ Plaintiff has also presented evidence that she could perform her job with reasonable accommodation. She was denied transfer to a temporary "part-time" position although her physician stated she could perform her regular job duties on a part-time basis. Defendant argues transfer to part-time is not the type of reasonable accommodation it was obliged to make. Defendant thus argues no part time position was available. Reasonable accommodation for a handicapped employee, however, includes job modifications such as reassigning or transferring the handicapped employee to a part-time work schedule. *West Virginia Code of State Rules* § 77–1–4.5.2.[2]

---

1. In *Teets, supra*, 187 W.Va. at 668, 421 S.E.2d at 51, the Court relied on the definition of handicapped found in Title 77 of the *West Virginia Code of State Rules*. Therein, a handicapped person is defined as one who: "has a mental or physical impairment which substantially limits one or more of a person's major life activities; or [h]as a record of such impairment; or [i]s regarded as having such impairment." *W.Va. C.S.R.* § 77–1–2.1.

2. Section 4.5 of the *W.Va.C.S.R.* states as follows:

"4.5 An employer shall make reasonable accommodation to the known physical or mental impairments of qualified handicapped applicants or employees where necessary to enable a qualified handicapped person to perform the essential functions of the job. Reasonable accommodations include, but are not limited to:

**440**

■ The Court concludes Plaintiff meets the second and third prongs of the *prima facie* test. She has presented evidence she can perform her job with reasonable accommodation (through modification of her work schedule to part-time) and has applied for and been denied a transfer. Thus, Defendant's motion for summary judgment on Plaintiff's handicap discrimination claim is **DENIED.**

## IV.

## CONCLUSION

Based upon the foregoing, Defendant's motion for summary judgment is **DENIED IN PART** on the handicap discrimination claim and **GRANTED IN PART** on the age discrimination claim.

The Clerk is directed to send a copy of this Order to counsel of record.

**George Rogers CLARK, Jr., et al.**

v.

**EXXON CORPORATION.**

**Civ. A. No. 94–124–B–1.**

United States District Court, M.D. Louisiana.

Nov. 9, 1994.

4.5.1 Making faculties used by handicapped employees, including common areas used by all employees such as hallways, restrooms, cafeterias and lounges, readily accessible to and usable by handicapped workers;

4.5.2 Job modification, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and similar actions;

4.5.3 Alteration of the amount or methods of training; and

4.5.4 The preparation of fellow workers for the handicapped employee, to obtain their understanding of the handicapped limitations and their cooperation in accepting other reasonable accommodations for the handicapped employee.

4.5.4.a. Reasonable accommodation does not require an employer to:

4.5.4.a.1. Eliminate the essential functions of a job;

4.5.4.a.2. Include assignment to a new or different job;

4.5.4.a.3. Reassign the employee to another position in order to provide her/him with work she/he can perform;

4.5.4.a.4. Assign an essential part of a job to another person."

Thomas R. Pittenger, Baton Rouge, LA, for plaintiff.

Robert H. Wood, Jr., New Orleans, LA, for Exxon Corp.

Musa Rahman, Baton Rouge, LA, for Louisiana Workers' Compensation Corporation, intervenor-plaintiff.

### RULING ON MOTION FOR SUMMARY JUDGMENT

RIEDLINGER, United States Magistrate Judge.

This matter is before the court on a motion for summary judgment filed by the defendant, Exxon Corporation.[1] The motion is opposed by the plaintiffs George Rogers Clark, Jr. and Sylvia Clark.[2]

Plaintiff filed this action to recover compensatory damages[3] resulting from personal injuries suffered by George Rogers Clark, Jr. Defendant removed the case and then moved for summary judgment based on Louisiana's statutory employer defense, LSA–R.S. 23:1032; 23:1061.A. Defendant argued that it is immune from tort liability under the state's worker's compensation law because of its status as the plaintiff's statutory employer. Defendant contended that the contract work being performed by Clark at the Exxon chemical plant, for his employer C.M. Penn and Sons, Inc., was part of Exxon's "trade, occupation, or business." Since under section 23:1061.A. it was liable for any worker's compensation benefits, it is entitled to the immunity from suit provided by section 23:1032. In support of its motion Exxon relied upon a statement of undisputed facts, the contract between it and C.M. Penn,[4] affidavits of J. Steven Bailey[5] and Raju P. Hajare,[6] and excerpts from the depositions of the plaintiff and William G. Hamby.[7] Exxon accepted as true for purposes of the motion the plaintiff's description of the accident. Record document number 19, p. 2.

Plaintiff agreed that the "integral relation" test must be applied and conceded that removal and treatment of OXO/Plasticizer Unit waste water bears an integral relationship to the trade, business or occupation of Exxon.

---

1. All parties have consented to proceed before the magistrate judge. Record document numbers 7, 8 and 23.

2. As a matter of convenience, this ruling will refer to the plaintiffs in the singular. The intervenor also opposes Exxon's motion and adopted the plaintiffs' memorandum in opposition. Record document number 27.

3. Plaintiff has moved to amend the complaint to assert a claim for punitive damages under Louisiana Civil Code Article 2315.3, arguing that the recent Louisiana Supreme Court decision in *Billiot v. B.P. Oil Company,* —— So.2d —— (La.S.Ct. No. 93–C–1118, September 29, 1994), 1994 WL 529063 (La.), permits a claim for such damages even though compensatory damages may not be recoverable because of the exclusionary rule of the Worker's Compensation Act. This ruling will not address the motion to amend.

4. Defendant's Exhibit 1A.

5. Defendant's Exhibit 1. Bailey is employed by Exxon as contracts and planning supervisor for the Exxon chemical plant. He had supervisory responsibility over the contract between Exxon and C.M. Penn and attested to the authenticity of the copy of the contract attached to his affidavit as Exhibit 1A.

6. Defendant's Exhibit 2. Hajare was an engineer employed at the Exxon chemical plant on the date of the accident, February 9, 1993. At the time he had supervisory duties in the OXO/Plasticizer Unit and investigated the accident.

7. Hamby was employed by C.M. Penn and was designated as its representative at the Rule 30(b)(6) deposition. Hamby gave deposition testimony concerning the contract between C.M. Penn and Exxon and events surrounding the accident. Defendant's Exhibit 4, pp. 8–21.

Record document number 26, p. 5. However, the plaintiff argued that the integral relationship analysis requires consideration of all the facts of each individual case, and that there are certain facts not brought out by Exxon that lead to the conclusion that a majority of the work being performed by C.M. Penn at the time of the accident did not fall within Exxon's trade, business or occupation.

The relevant facts are undisputed. On the date of the accident there existed a contract between the plaintiff's employer and Exxon. Plaintiff's Exhibit 1; defendant's Exhibit 1A. The contract was dated July 15, 1990 and replaced an existing contract dated September 27, 1984. The contract was a continuous one and in effect until cancelled by either party on 30 days prior written notice. Article 1 provided that the work to be performed was "collection and transportation of hazardous and non-hazardous waste in Owner's facilities in the Baton Rouge, Louisiana area." The next article of the contract set out the "independent contractor" relationship between Exxon and C.M. Penn,[8] and Article 14 required C.M. Penn to maintain worker's compensation insurance for all of its employees.

The work of Exxon's chemical plant is to manufacture various petrochemical products, one of which is plasticizers. Part of the manufacturing process of plasticizers occurs at the OXO/Plasticizer Unit where the plaintiff was dispatched to collect and transport waste water. The contract work performed by C.M. Penn in February was necessitated by the scheduled maintenance of the aerosol unit which is part of the OXO/Plasticizer Unit. The waste water from the unit was normally carried to the treatment facility by a two-inch pipeline. However, part of the scheduled maintenance of the aerosol unit was to work on the pipeline and it had to be out of operation. The OXO/Plasticizer Unit operates continuously. In order for the unit to operate, waste water must be continuously removed for treatment and replaced with fresh water. Once the maintenance of the aerosol unit and pipeline was completed the pipeline was put back in service and the tank trucks were no longer needed to transport waste water.[9]

On February 9, 1993, pursuant to the contract, C.M. Penn supplied a tractor, tank truck and Clark to collect and transport non-toxic, non-hazardous waste water from Exxon's OXO/Plasticizer Unit to the Advanced Water Treatment Plant inside the facility. When the plaintiff arrived with the tank truck one of Exxon's employees asked the plaintiff to climb on top of the truck to insert the hose, and later another Exxon employee asked the plaintiff to climb back on top to check the loading of the waste water into the tank. When the plaintiff lifted the dome underneath which the hose was resting, the hose came out and sprayed the water on the plaintiff. Plaintiff lost his balance, slipped off the tank and fell to the ground.

■ In this motion for summary judgment[10] the relevant facts are undisputed, but the parties dispute the legal conclusion to be drawn from those facts. The legal determi-

---

8. Plaintiff conceded in his opposition memorandum that Exxon may not waive its statutory employer defense by agreeing with an employer that the employer is an independent contractor. *See,* Plaintiffs' memorandum, record document number 26, p. 6.

9. In opposition to Exxon's summary judgment, the plaintiff relied upon excerpts of his own deposition, a copy of the contract (with attachments), Hajare's affidavit and excerpts of the deposition of Hamby. Plaintiff did not submit a statement of material facts as to which there exists a genuine issue for trial pursuant to ULLR 2.10M.

10. Summary judgment is only appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279–80, n. 6 (5th Cir.1991). In response the nonmoving party must identify specific evidence in the record which demonstrates that there is a material fact issue concerning an essential element of its case for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law identifies which facts are material and in this diversity case the court must apply Louisiana's worker's compensation law on statutory employer.

nation must be guided by Louisiana's law on statutory employer status. The "integral relation" test must be applied to determine whether the principal has engaged a contractor to perform work that is part of the principal's trade, business or occupation. *Morgan v. Gaylord Container Corp.*, 30 F.3d 586 (5th Cir.1994); *Thompson v. Georgia Pacific Corp.*, 993 F.2d 1166, 1168 (5th Cir. 1993).[11] Thus, to determine whether C.M. Penn's work is a part of Exxon's trade, business or occupation, the court asks whether the contract work being performed is "integral or essential" to Exxon's trade, business or occupation. *Id.*

Plaintiff conceded that the removal and treatment of the OXO/Plasticizer Unit waste water bears an integral relationship to the trade, business or occupation of Exxon. Since it is undisputed that the task the plaintiff was performing at the time was necessary for the removal and treatment of that water, the only reasonable conclusion is that the contract work was integral or essential to Exxon's trade, business or occupation.

The relevant facts viewed in the larger context of the contract itself do not result in a different conclusion. The contract stated that the work to be performed was the collection and transportation of hazardous and non-hazardous waste in Exxon's facility. That is exactly what the plaintiff was doing at the time of the accident. The fact that Exxon had a continuous contract for the performance of this type of work is further evidence that the work the plaintiff was engaging in at the time of his injury was essential to Exxon's business—the manufacture of plasticizers and other petrochemical products.

Plaintiff contended that the majority of the work being performed by C.M. Penn at the time of the accident did not fall within Exxon's trade, business and occupation. Plaintiff attempted to rely on the affidavit of Hajare to support an assertion that C.M. Penn's

trucks were only needed every 12 to 16 months. Hajare's affidavit cannot fairly be interpreted as affirmative evidence of how often C.M. Penn's trucks were used for the collection and transportation of waste. His statement was clearly made in reference to the need to use the tank trucks for scheduled maintenance of the aerosol unit. Other than relying on the statements of Hajare, the plaintiff did not come forward with any evidence to support his contention that the majority of the work being performed by C.M. Penn at the time of the accident was not an integral part of Exxon's trade, business or occupation.

Plaintiff also argued that there are undisputed facts which warrant a finding that Exxon is not a statutory employer: Exxon's employees were responsible for the loading and unloading of the water into the tank; plaintiff was on top of the tank truck assisting with the loading against Exxon's company policy; and C.M. Penn and its employees were "simply in the business of providing trucks and tank-trailers for the transportation of waste materials." First, the plaintiff's characterization of the work to be performed under the contract is not consistent with the plain wording of the document. Again, the contract states that the work is to provide collection and transportation of waste in Exxon's facilities. Second, accepting as true the plaintiff's statements that Exxon employees were responsible and should have been the ones to go on top of the truck does not change the result. Whether or not the plaintiff was supposed to be where he was at the time of the accident is immaterial. It does not change the fact that the plaintiff was doing exactly what an Exxon employee would have been doing, or the fact that the contract work being done—collection and transportation of waste water so that the OXO/Plasticizer Unit could produce plasticizers—was essential to Exxon's business of petrochemical production.[12]

---

11. In 1989 the Louisiana Legislature amended section 23:1061 to overrule *Berry v. Holston Well Serv., Inc.*, 488 So.2d 934 (La.1986), and this marked the return to the integral relation test. *Thompson*, 993 F.2d at 1168.

12. Plaintiff also argued that the fact that the contract provided for C.M. Penn to be responsible for worker's compensation insurance should be one of the factors taken into consideration. *See, Salmon v. Exxon Corp.*, 824 F.Supp. 81, 86 (M.D.La.1993); Defendant's Exhibit 1A, Art. 14. *Salmon* and the Louisiana decisions cited in foot-

Under Louisiana law, LSA–R.S. 23:1061.-A., Exxon was the statutory employer of Clark and is entitled to tort immunity under LSA–R.S. 23:1032. Because there exists no genuine issue of material fact Exxon is entitled to summary judgment as a matter of law.

Accordingly, the motion for summary judgment by the defendant, Exxon Corporation, is granted.

**LLECO HOLDINGS, INC., et al.**

v.

**OTTO CANDIES, INC., et al.**

**Civ. A. No. 93–1840.**

United States District Court,
E.D. Louisiana.

Nov. 4, 1994.

note 34 of that opinion offer no guidance as to how the factor should be considered in this case because they all involved situations where the principal had agreed to provide worker's compensation insurance. Consideration of this undisputed fact would not change the result here. It does not change the scope of the contract work or the tasks being performed by the plaintiff at the time of the accident pursuant to that contract. Viewing all these facts the most reasonable conclusion remains that the defendant engaged C.M. Penn to perform work that was an integral part of its business.

Donald Richard Abaunza, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA, for plaintiffs Nerco Oil & Gas Inc., Agip Petroleum Co. Inc., LLECO Holdings Inc.

George Alexander Weller, Deutsch, Kerrigan & Stiles, New Orleans, LA, for defendant Otto Candies Inc.

## MEMORANDUM OPINION

LIVAUDAIS, District Judge.

This matter was tried on August 22, 1994, before the Court without a jury. Having heard testimony on the issues before the Court and having considered the evidence, the pre-trial and post-trial memoranda submitted by the parties, the record and the applicable law, the Court will enter judgment in favor of plaintiffs LLECO Holdings, Inc., and Agip Petroleum Co. and against Defendant Otto Candies, Inc.

## BACKGROUND

LLECO Holdings, Inc., and Agip Petroleum Co. (hereinafter, collectively, "plaintiffs") are co-lessees of federal mineral lease OCS–G 6663, covering Vermilion Block 109 on the Outer Continental Shelf. LLECO is the operator of the property, and the Vermilion 109 platform is located on the property. On November 7, 1992, there were three working, natural gas wells on the platform.[1] On that date an allision occurred between the M/V Hatty Candies, owned by defendant Otto Candies, Inc. (hereinafter "Candies") and the Vermillion 109 Platform.

The allision caused damage to the platform both above and below the water line, necessitating the wells to be shut-in so the platform could be repaired. Well A–2 was shut-in for a total of 31 days, Well A–4 for a total of 50 days and A–5 for a total of 42 days during

the months of November and December 1992 and January and April 1993.

Nerco Oil & Gas, Inc., whose assets were later purchased by LLECO, and Agip filed suit on June 4, 1993, alleging admiralty jurisdiction and alleging that they were co-owners of the Vermilion Platform 109. Nerco and Agip alleged that the M/V Hatty Candies, her owners and operators were the sole cause of the allision, causing Nerco and AGIP damages. These alleged damages included costs of repair, loss of use, deferred production, lost production and other economic losses totalling approximately $1.7 million.

Candies answered, admitting admiralty jurisdiction, admitting that an allision occurred and admitting that certain damages occurred as a result of the allision. However, Candies denied all other allegations.

LLECO then moved to be substituted as the party-in-interest for Nerco after acquiring Nerco's stock. The motion was granted as unopposed.

Prior to trial plaintiffs and Candies stipulated that in exchange for payment by Candies of $910,000 to plaintiffs, plaintiffs settled their claims for the following items of damage: "Physical damage to the Vermilion 109 platform, increased plugging, abandoning and refurbishment costs associated with Vermilion 109, increased operating costs for Vermilion 109, plaintiffs' increased internal overhead, and any claim for prejudgment interest associated with these elements of plaintiffs' claim."[2] In the stipulation, the plaintiffs reserved their right to pursue "the remaining element of their claim, including specifically their claim for loss caused by the downtime resulting to Vermilion 109" as a result of the allision. The plaintiffs further stipulated that any award they might receive on this remaining claim for damages "must reflect a reduction for operating expenses since they have settled their claim in that respect." Additionally, the parties stipulated that, if any award was based on plaintiffs' net in-

---

1. Two other wells had been drilled, but one was a "dry hole" and one only produced for a short time.

2. The stipulation was admitted into evidence at trial as Defendant's Exhibit 15.

come model, the award must reflect a reduction of $97,920 from gross revenues.[3]

The issues at trial were three-fold:

1) whether plaintiffs are entitled to receive the entire net income that was lost while the three wells were shut down, or whether plaintiffs are limited to recovery of the present value of the net income that was lost;

2) whether plaintiffs' recovery had to be reduced by any royalty interest allegedly owed to the Minerals Management Service (hereinafter "MMS"); and,

3) whether plaintiffs are entitled to prejudgment interest on any award for lost income while the wells were shut-in.

Because the parties' testimony was tailored to respective legal theories of recovery as set forth in Fifth Circuit cases, the Court believes it worthwhile to review first the law relative to recovery of lost income from wells shut-in following allisions. This is followed by a summary of the trial testimony and then an analysis of the law as applied to the evidence in this case. In the analysis, the Court will also address the royalty and prejudgment interest issues.

## APPLICABLE LAW

The Fifth Circuit first addressed the issue of damages for lost profits from a well following an allision between a vessel and a platform in *Continental Oil Co. v. SS Electra*, 431 F.2d 391 (5th Cir.1970). On April 8, 1964, the SS Electra struck a platform on which there were two wells in production. *Id.* "There was no damage to the wells and no loss of oil, but the platform was so badly wrecked that production was halted." *Id.*

The defendants agreed to pay "90% of the provable damages." *Id.* The agreement was consummated as to the physical damages to the platform, but the parties could not agree on damages resulting from the suspension of production from the wells. *Id.* Meanwhile, the platform was destroyed by a

hurricane, and the parties stipulated that if reconstruction had proceeded, the wells would have been back in production after 130 days. *Id.* After the hurricane, the two wells previously in production were abandoned, but in 1966 the platform owners drilled into reservoirs previously tapped by the two wells as well as others that could have been tapped from the damaged/destroyed platform. *Id.*

A commissioner determined that plaintiffs' damages consisted of interest on a net production figure of $60,000, and the district court approved that amount. *Id.* at 392. The Fifth Circuit reversed. *Id.* at 393.

The court of appeals found that plaintiffs were entitled to their net profit of $60,000 and that this did not represent a double recovery, even though the oil was not lost. *Id.* at 392–93.

> The oil companies do not claim for lost oil or damage to oil as an asset. Their suit is for damages suffered as a consequence of the collision of the ship with the platform. Profit on oil production is simply one means of measuring the damages suffered. The plaintiffs have lost the use of their capital investment in lease, platform and producing wells for 130 days during which that investment was tied up without return. The fact that the same amount of profit can be made at a later time with the same investment of capital by removing from the ground a like quantity of oil at the same site does not alter the fact that plaintiffs are out of pocket on 130 days use of their investment.

*Id.* at 392.

The Fifth Circuit found that this concept of loss fit "squarely within the basic doctrine for marine collision of *restitutio in integrum*, as applied in many comparable situations." *Id.* Quoting *The Potomac*, 105 U.S. 630, 631, 26 L.Ed. 1194 (1881), the court of appeals compared the situation in *Electra* to that of a "vessel laid up for repairs." *Electra*, 431 F.2d at 392.[4]

> In order to make full compensation and indemnity for what has been lost by the collision, *restitutio in integrum*, the owners of the injured vessel are entitled to recover for loss of her use, while laid up for repairs. When there is a market price for such use, that price is the test

---

**3.** Defendants also agreed in the stipulation to pay the $910,000 settlement amount on or before thirty days after August 8, 1994.

**4.** The court of appeals quoted the following from *The Potomac:*

However, the Fifth Circuit left the hatch open, arguably, for at least one if not more than one theory of damages in vessel/platform allision cases. In a footnote, the court of appeals stated: "We need not consider whether lost profit or *a fair return on investment* is a better measure.... The only evidence before us is of lost profit. The shipowner has not asserted that the profit is excessive but has stood on the erroneous theory that profits are not recoverable at all, only interest on profits." *Id.* at 393 (emphasis added).

The Fifth Circuit revisited *Electra* in *Bolivar County Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306 (5th Cir.1978). In that case a barge had broken away from a tow and had collided with a dredge, damaging the dredge and making it inoperable for ten days while it was repaired. *Id.* at 1307. The dredge's owner sought recovery for cost of repair and replacement and loss of use. *Id.* On summary judgment, the district court held that plaintiff was entitled to recover for property damage only. *Id.* The Fifth Circuit affirmed. *Id.*

While the dredge was idle, the plaintiff supplied its customers with gravel from its existing stockpile, and the stockpile was replenished to the same level as prior to the collision within one month of the dredge's return to normal operations. *Id.* "There is no evidence that the plaintiff lost any sales, revenues, or potential customers, nor is there any evidence that it incurred any increased operating expenses." *Id.*

Plaintiff relied on *Electra* for its argument that it was entitled to damages for loss of use, arguing that it was "entitled to recover the net income it would have earned on the gravel it would have produced during the 10 days the dredge was inoperable." *Id.* at 1308. The Fifth Circuit rejected this argument.

The short answer to this argument is that, unlike the oil companies in [*Electra*], the plaintiff is not out of pocket anything by virtue of the lost production time. In [*Electra*], the oil companies were worse off after the accident than they had been before—they were 130 days behind in their production than what they would have otherwise been. Although they could eventually extract all the oil beneath the platform that it was profitable to extract, they would have to "stay on the site 130 days longer, with investment in place" in order to do so. The idling of their production for 130 days thus resulted in a tangible and concrete loss—the use for 130 days of the amount of the investment that was tied up in the platform. That is not the case here, however.

*Id.* at 1308–09.

The court found that because the gravel company was "apparently ... able to produce more than it could sell," it made up for lost production time. *Id.* at 1309. It was in the same position as if the accident had not occurred. *Id.* "Furthermore, it has not shown that the effort required to replenish the stockpile would have resulted in any expenses over what it would have otherwise incurred." *Id.*

Of even more importance for the present case is footnote 3 in *Bolivar County Gravel,* where the court of appeals stated:

In [*Electra*], we did not hold that the loss was directly translatable into lost profits on 130 days worth of production. Rather, we stated that:

We need not consider whether lost profit or a fair return on investment is a better measure.... The only evidence before us is of lost profit....

*Id.,* n. 3. The court continued with the remainder of footnote 3 in *Electra* quoted completely above.

Although unpublished and of no precedential value per the Local Rules of the Fifth

---

of the sum to be recovered. Where there is no market price, evidence of the profits that she would have earned if not disabled is competent; but from the gross freight must be deducted so much as would in ordinary cases be disbursed on account of her expenses in earning it; in no event can more than the net

profits be recovered by way of damages; and the burden is upon the libellant to prove the extent of the damages actually sustained by him.

*Electra,* 431 F.2d at 392, quoting *The Potomac,* 105 U.S. at 631, 632.

Circuit,[5] the court of appeals' decision in *GEO–1966, Inc. et al. v. Shell Oil Company et al.*, No. 88–3433 (5th Cir. October 19, 1989) is at least instructive in that it reversed the district court's reliance on *Electra*, again noting the limitation of the *Electra* holding by its footnote 3. *Id.* at 11–12. The court noted that the defendant had presented evidence establishing damages on a "fair-market-return-on-investment formula" and believed "this is a more equitable basis for determining this element of damages in this case." *Id.* at 13.[6]

■ Thus, it is clear that in this Circuit the "net profits" method of calculating damages employed in *Electra* is not the only method that can be used. Calculation of damages based on "fair return on investment" also is appropriate. With this in mind, the Court reviews the evidence presented at trial.

### TRIAL TESTIMONY

Three witnesses testified. The first, William Hahne, an engineer with LLECO, testified as a fact witness as to the history of the platform and the wells at issue. He also testified that two of the wells, A–2 and A–5, appeared to be partial "water-drive" wells and that the third, A–4, appeared to meet the description of a "water-drive" well.[7]

Hahne also testified that plaintiffs were operating and selling gas from the wells at full capacity when the wells were shut-in and that plaintiffs had no excess capacity to make up for the gas not produced when the wells were shut-in. Further, he testified that plaintiffs established a smaller reserve for each field from which the three wells produced after the allision.

Finally, Hahne testified that MMS, which was entitled to royalties pursuant to the lease of the field where the wells were located, had not been paid royalties during the shut-in period because there had been no revenue. Additionally, he testified that MMS had not made a claim for royalties. He further stated that he did not know whether MMS would make such a claim on any damages awarded for lost revenue during the shut-in period.

Plaintiffs' expert, Cheryl Collarini, testified as a reservoir and petroleum engineer and a petroleum economist. She stated that she was asked to estimate the value of production shut-in as a result of the casualty and, in doing so, reviewed the monthly production histories of the wells as well as gas prices. She opined that the gross production value lost during the shut-in period was $863,938.00 and the net value after deducting operating expenses was $766,018.00. Her opinion was based on the lost-profit method employed in *Electra*, and her calculation consisted of multiplying the amount of shut-in production from the three wells by her calculation of the price of gas. Her net calculations figure made no deduction for any royalty burden to MMS; neither did she offer any opinion on whether plaintiffs would owe such a royalty.

Collarini also testified that when waterdrive wells are shut-in, the water continues to move up in the reservoir until the pressure

---

**5.** United States Court of Appeals for the Fifth Circuit, Local Rule 47.5

**6.** Also cited to the Court were two district court decisions, but both are distinguishable from the present case. In the first case, another section of this court found *Electra* to be applicable in a case involving an allision between a barge and a well, but that well was then plugged and abandoned. *Mobil Oil Exploration & Producing Southeast, Inc. v. Rebstock Towing Co. et al.*, C.A. No. 86–4532 c/w C.A. No. 87–456 and 86–4686 (E.D.La. December 12, 1988) (McNamara, J.) The wells in this case were not plugged and abandoned.

The second case is *PG & E Resources Offshore Co. et al. v. Zapata Gulf Marine Corp. et al.*, C.A. No. G–94–208 (S.D.Tex., Galveston Div., May 4, 1994), wherein the district court applied a "fair market return on investment" or "present value approach" instead of the *Electra* method. *Id.* at 8, 15. However, this Court does not find *PG & E* to be applicable because, unlike the present case, neither party in *PG & E* presented evidence on damages based on *Electra*. *PG & E*, at 8. As will be shown, plaintiffs in this case relied exclusively on *Electra* for their theory of recovery.

**7.** This witness testified that most reservoirs of gas in the Gulf of Mexico were driven by water. According to the testimony of plaintiff's expert, this means that when wells are drilled into reservoirs, water underlying the gas supplies the pressure to force the gas out of the well. Defendant's expert also testified as to another type of well, a "depletion-drive" well.

between the water and the gas in the reservoir equalizes, causing a loss in reserves of gas. In effect, the water rises such that less gas can be recovered. She testified that she was fairly certain that in regard to wells A–2 and A–5, there had been a loss of reserves, although there was limited information in regard to these wells to quantify such a loss in reserves. In support of this opinion, for example, she noted that in regard to well A–5 there was a severe drop in gas production following the allision, relying on Plaintiffs' Exhibit 7. She did not calculate the reserves, however. She testified on cross-examination that, although plaintiffs were not making a claim for reserves, she was giving her opinion in order to test the assumptions made by defendant's expert in his model for calculating damages.[8]

Finally, Collarini testified, in anticipation of defense testimony, that a discount figure of seven percent, representing the prime rate of interest plus one percent, was not an appropriate measure of return on investment. Instead, because these wells are what she described as "low-risk" wells, she testified that higher figures of 18 to 25 percent (or even higher) are more appropriate discount rates.

The defendant's expert, Bill R. Hise, testified with expertise in petroleum engineering, reservoir engineering, and economics of those fields. He stated that he was first contacted in July 1993 and was asked to determine the damage from the wells being shut-in. He reviewed numerous documents in reaching his calculations, although he agreed with the gas prices used by plaintiffs' expert in her calculations.

Hise testified that in this case only an interruption of production had occurred. As a result, he devised a method to calculate damages which he stated would put the lease operator in the same position had the casualty not occurred. This method was based on the use of present value. Hise determined the present value of future income from the three wells had no casualty occurred and also

determined the present value of future income in view of the casualty. According to Hise, the difference between those two present values represented a proper measure of damages for a case where an interruption of production had occurred, not a total cessation of production as a result of a casualty.

On both direct and cross-examination, Hise testified that his method was not the same as the fair-return-on-investment method "but it gets to the same place." In essence, according to Hise, his methods compensates the plaintiffs for the delay in their return on investment.

Hise also testified that all three wells at issue also fit his model of a declining gas well where production is shifted forward "uniformly" over time. He opined that there was no deterioration of capacity of wells A–2 and A–5, the water-drive wells, as a result of being shut-in after the casualty such that they were unable return to production at their pre-casualty rates. Hise testified that, in regard to well A–2, he based this opinion on the shut-in tubing pressures, although he agreed with plaintiffs' expert that these were the least reliable indicators. He testified, however, that these were the only pressures available for comparison. In regard to well A–5, Hise testified that this well "made water" before the accident and the fact that it "made" a slight bit more water after the accident did not change his opinion that the well's capacity to produce was not lost.

In regard to the reservoir from which gas was taken by well A–4, Hise testified that this was a "classic depletion-drive reservoir," not a water-drive reservoir. He believed that the production of this well had come back after the casualty in January 1993 "reasonably" to where it had been in December 1992 and that there had been no deterioration of the well's capacity to produce as a result of its being shut-in.

Using these opinions, Hise formulated his damage calculation.[9] Hise first calculated the number of days off of production for each well as well as the estimated rate of produc-

---

8. Additionally, in plaintiffs' opposition memorandum to defendant's motion in limine, plaintiffs state that they do not make a claim in this suit for lost reserves. (Document 29.)

9. See Defendant's Exhibit 19.

tion had the wells been in production instead of being shut-in. Hise then figured the amounts of gas and condensate not produced by each well during the shut-in period, making two adjustments to this calculation. First, Hise adjusted his figures downward for any small amounts of production from each well during the shut-in periods. Second, he adjusted the figures downward again for the amount of royalty for gas and condensate due to the MMS. He testified that he calculated the royalty to be 16⅔ percent based on the lease.

Using the gas and condensate prices employed by plaintiffs' expert, Hise then multiplied his adjusted, or net, volumes of gas and condensate times the prices for gas and condensate. Hise then took the total figure for delayed net revenue for each well and, using a discount factor of 7 percent, which he testified was the prime rate plus one percent, discounted the delayed net revenue over his estimate of the remaining life of each well. He testified that he calculated the remaining life of each well from reports provided by plaintiffs as well as his own analysis of production reports from documents available to the public in regard to MMS lease production. Thus, Hise's calculation of the loss from the wells in present value of delayed net revenue was $48,324. He also testified that, using discount rates of 18 percent and 25 percent, which rates Collarini testified were more accurate in terms of return on investment in oil and gas production, his figure of present value of delayed net revenue would rise to $113,013 or $140,987, respectively.

On cross-examination, Hise agreed that the calculation of plaintiffs in regard to deferred production volumes was reasonable and that, as shown, he had no quarrel with Collarini's price assumptions.

He also agreed that his calculation of total delayed revenue net of royalty would increase, prior to discounting, to approximately $904,000 from approximately $754,000 if the royalty percentage were not factored in. This figure was approximately $40,000 more than Collarini's estimate of total delayed net revenue of approximately $863,000. He testified that he knew of one case where MMS had made a demand for royalty on an award of damages for deferred production.

Hise further testified that he did not figure the loss of reserves in this case for each well but only estimated the remaining life of the wells.

Finally, Hise testified that any type of rise in pressure in a water-drive reservoir, including the shut-in of a well, can make a reservoir susceptible to loss, but the degree to which the loss occurs depends on the circumstances involved.

## ANALYSIS

### A. Damages

■ Considering *Electra* and its progeny and, further, considering the evidence presented, the Court credits the method and testimony of defendant's expert in most respects. First, the Court finds credible Hise's testimony that his method and the fair-return-on-investment method reach the same end point, such that Hise's method is worthy of consideration under *Electra*. As defendant's expert points out, this is not a case where the wells were ultimately abandoned. The Court agrees that this is a case of deferred production, where the methodology employed by Hise, although not a fair-return-on-investment method, adequately and properly achieves the damages plaintiffs are due in this case.

However, the Court accepts Hise's analysis with two exceptions, for which adjustments must be made.

First, the Court disagrees with Hise's inclusion in his figures of the 16⅔ percent MMS lease royalty. Hise testified that he knew of one case where MMS has made a claim on an award for damages. Further, adjusting the damage award downward for the royalty percentage would not prevent MMS from pursuing plaintiffs for the lease royalty, either factually or legally, because MMS is not a party to this suit. If MMS would make a claim for royalty on a damage award, plaintiffs would not be protected by res judicata for MMS is not a party to this lawsuit. *See Nilsen v. Moss Point*, 701 F.2d 556, 559 (5th Cir.1983) (*en banc*) (one of requirements for

res judicata is parties must be identical in both suits). Therefore, in the interest of justice, the Court declines to decrease any damages due to plaintiffs by an amount equal to the royalty interest.

The second exception is that the Court rejects Hise's use of a seven percent figure as being too low and inconsistent with achieving the appropriate fair return on investment. Instead, the Court accepts Collarini's testimony that discount rates of 18 or 25 percent are more appropriate in figuring a fair return on investment for plaintiffs and concludes that the 25 percent figure is proper.

Thus, with these exceptions in mind, the Court accepts Hise's methodology of calculating damages. The methodology should be revised such that Hise's present value of delayed net revenue should not include any MMS royalty and should be calculated at a discount rate of 25 percent.

B. Prejudgment interest

■ Prejudgment interest is appropriate in this matter. The award of prejudgment interest "is the rule rather than the exception in maritime cases" unless peculiar circumstances exist. *Reeled Tubing, Inc. v. M/V Chad G,* 794 F.2d 1026, 1028 (5th Cir. 1986).

> Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claims exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff.

*Id.* Such circumstances do not exist here. The only one of these circumstances that arguably could apply is the last one, but the damages award in this case is not due so much to plaintiffs' overvaluing the case as it is to the Court's decision to adopt one of two rival recovery theories. Indeed, the Court believes that prejudgment interest, calculated from the date of loss, properly compensates plaintiffs and is consistent with the fair-return-on-investment theory.

Further, this Court finds that prejudgment interest should be calculated at a rate to be determined in accord with 28 U.S.C. § 1961. Again, the Court believes that such a rate is consistent with awarding plaintiffs' damages in accord with a fair return on their investment. *Reeled Tubing,* 794 F.2d at 1029–30.

### CONCLUSION

Based on the foregoing, the Court holds that plaintiffs are entitled to damages in an amount to be determined according to the analysis of defendant's expert, as adjusted upward by deleting any factor for the MMS royalty and by using a discount rate of 25 percent.

As stated, in reaching this decision, the Court is mindful not only of *Electra* but also the court of appeals' notation that lost profits are not necessarily the "better measure" of damages. As revised by the Court, the defendant's method achieves the "better measure" and satisfies that goal more adequately than the net lost-profit method proposed by plaintiffs. Additionally, the award of prejudgment interest aids in reaching the goal described in *Electra* as *restitutio in integrum.*

The parties are directed to submit an agreeable form of judgment to be entered consistent with this opinion. Such submission shall in no way necessarily constitute acquiescence in this opinion or prejudice any party from exercising any right of appeal.

Jack L. SIMMS, Jr. and Sue Simms

v.

**UNITED STATES of America.**

**Civ. A. No. 92–1121.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Nov. 8, 1994.

Jerre Lloyd, Lake Charles, LA, for plaintiffs.

Robert E. Dozier, U.S. Dept. of Justice Tax Div., Washington, DC, for defendant.

## MEMORANDUM RULING

EDWIN F. HUNTER, Jr., Senior District Judge.

 In 1983–1984, plaintiffs, Jack L. and Sue Simms, filed refund claims for taxable years ending December 31, 1977, 1978, and 1979. The refunds were based on carryback investment tax credits allegedly accrued in tax years 1980 and 1981.[1] The Internal Revenue Service ("I.R.S.") has no record of

receiving the refund requests, and consequently, no action was ever taken. On June 15, 1992, plaintiffs filed suit in federal court. After a series of continuances and extensions of time, the government filed its motion for summary judgment which is presently before the court.

### Discussion

 The United States is immune from suit pursuant to sovereign governmental immunity, except to the extent immunity is expressly waived by statute. *Lehman v. Nakshian,* 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981); *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Alabama,* 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941); *United States v. Shaw,* 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940). The United States can only be sued by its permission, and according to the procedures established by Congress. *Lehman,* 453 U.S. at 160, 101 S.Ct. at 2701. The government has waived its sovereign immunity from taxpayer refund suits under the following limited circumstances:

(a) The district courts shall have original jurisdiction, concurrent with the United States' Claims Court, of:

(1) Any civil action against the United States for the recovery of internal revenue tax alleged to have been erroneously or illegally assessed or collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws; ...

28 U.S.C. § 1346(a)(1);

(a) **No Suit Prior to Filing Claim for Refund.**—No suit or proceeding shall be maintained in court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collect-

---

**1.** The claimed refunds total $11,072.00: $3,119.00 in 1977; $4,213.00 in 1978; and $5,872.00 in 1979.

ed, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422(a).

Furthermore, § 6511(a) of the Internal Revenue Code requires that a claim for refund or overpayment of income taxes must be filed within three (3) years from the date the pertinent return was filed, or within two (2) years from the time the tax was paid, whichever comes later. For carryback claims, taxpayers are allowed three (3) years "after the time prescribed by law for filing the return (including the extension thereof) for the taxable year of the unused credit" which results in the carryback. 26 U.S.C. § 6511(d)(4)(A). For the 1977 carryback to be considered timely, the Simms had until April 15, 1984, to file a refund claim. For the 1978 and 1979 carrybacks, the Simms had until April 15, 1985, to file their claims. Plainly, if the Simms did not file their claims with the I.R.S. prior to April 15, 1984, or April 15, 1985, respectively, we do not have subject matter jurisdiction. *Zernial v. United States,* 714 F.2d 431, 433–434 (5th Cir. 1983) (the timely filing of an administrative claim for refund is a jurisdictional requirement for maintaining a refund action in district court). The party who evokes the district court's jurisdiction bears the burden of showing that the refund claim was timely filed. *United States v. Rochelle,* 363 F.2d 225, 231 n. 11 (5th Cir.1966).[2]

The United States contends through affidavits, that the I.R.S. office never received plaintiffs' claims for refund before or after the 1984–85 deadline. Conversely, the Simms submit personal affidavits, and the affidavits of their accountants, stating that the claim forms were prepared and mailed to the I.R.S. prior to expiration of the prescriptive period.

The government argues that 26 U.S.C. § 7502 is the only statutory vehicle whereby plaintiffs' claims can be proven to have been filed timely with the I.R.S.[3] The government further argues that since the claims were never *delivered* to the I.R.S., they cannot relate back to the postmark date.

Section 7502 applies in situations where a return or refund is mailed prior to the deadline, but not delivered to the I.R.S. until after the deadline. Plaintiffs' affidavits do not address whether the refunds were *delivered* or even *received* by the I.R.S. The affidavits merely state that the refund claims were mailed, and that petitioners were never notified by the I.R.S. that they had not been delivered.

Since plaintiffs possess no evidence that the refunds were delivered to the I.R.S., they rely upon an interpretation of section 7502 espoused by the Eighth and Ninth Circuits which presumes delivery upon proof of the date of postmark. *Anderson v. United States,* 966 F.2d 487, 491–2 (9th Cir.1992); *Estate of Wood v. Commissioner,* 909 F.2d 1155 (8th Cir.1990). In *Anderson,* the Ninth Circuit relied upon *Rosenthal v. Walker,* 111 U.S. 185, 193–94, 4 S.Ct. 382, 386–87, 28 L.Ed. 395 (1884), for the rule that upon proof of timely mailing, it is presumed that the document reached its destination, and was received by the person to which it was addressed. However, *Rosenthal,* was a suit between private parties. In *United States v. Lombardo,* 241 U.S. 73, 76, 36 S.Ct. 508, 509,

---

**2.** We note that the United States brought this issue to the court's attention by way of a motion for summary judgment. However, this issue addresses whether we have subject matter jurisdiction over this case. It will be treated as a motion to dismiss. *Navios Corp. v. National Maritime Union,* 236 F.Supp. 657 (E.D.Pa.1964), *affirmed,* 359 F.2d 853 (3d Cir.), *cert. denied,* 385 U.S. 900, 87 S.Ct. 205, 17 L.Ed.2d 132 (1966).

**3.** 26 U.S.C. § 7502(a) provides,
 **(a) General Rule.—**
 **(1) Date of Delivery.**—If any return, claim, statement, or other document required to be filed, or any payment required to be made, within a prescribed period or on or before a prescribed date under authority of any provision of the Internal Revenue laws is, after such period or such date, delivered by the United States mail to the agency, officer, or office with which such return, claim, statement, or other document is required to be filed, or to which such payment is required to be made, the date of the United States postmark stamped on the cover in which said return, claim, statement, or other document, or payment, is mailed shall be deemed to be the date of delivery or the date of payment, as the case may be.

**454**

60 L.Ed. 897 (1916), a case against the government, the Supreme Court held that a paper is not "filed" until, "it is delivered to the proper official and by him received and filed. Anything short of delivery would leave the filing a disputable fact ..." *Lombardo, supra.* Similarly, the Fifth Circuit generally requires physical delivery of the claim for filing to be complete. *Emmons v. Commissioner,* 898 F.2d 50, 51 (5th Cir.1990); *Phinney v. Bank the Southwest National Asso.,* 335 F.2d 266, 268 (5th Cir.1964); *Chasar v. I.R.S.,* 733 F.Supp. 48, 49 (N.D.Tex.1990). Moreover, in *Wood,* and *Anderson,* the taxpayers testified as to the exact date of timely filing, unlike here. *Wood* and *Anderson* ignore the plain language of section 7502 requiring *delivery* of the return or refund claims to the I.R.S. We join, instead, the Second and Sixth Circuits in upholding the requirement that taxpayers produce evidence of delivery to the I.R.S. *Deutsch v. Commissioner,* 599 F.2d 44, 46 (2d Cir.1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Miller v. United States,* 784 F.2d 728, 730 (6th Cir.1986); *Surowka v. United States,* 909 F.2d 148, 149–151 (6th Cir.1990); *Washton v. United States,* 13 F.3d 49 (2d Cir.1993). There is no such evidence here. Plaintiffs simply cannot establish timely filing, and consequently, jurisdiction is lacking.

This decision is a close one. It is a harsh rule which requires taxpayers to ensure that their returns or refund claims are delivered to, and received by, the Internal Revenue Service. Under this rule, taxpayers, to protect themselves, are required to send their claims or refunds to the I.R.S., via certified or registered mail. Perhaps if the I.R.S. more widely disseminated the requirement of proof of delivery, similarly situated taxpayers would be spared the hardship reflected in this case.

The United States' Motion for Summary Judgment, more appropriately styled, a Motion to Dismiss for Lack of Subject Matter Jurisdiction, is GRANTED.

THUS DONE AND SIGNED.

*JUDGMENT*

In accordance with today's memorandum ruling, it is ORDERED, ADJUDGED, and DECREED, that all claims alleged by plaintiffs, JACK L. SIMMS, JR. and SUE SIMMS, against defendant, the UNITED STATES OF AMERICA, be, and they are, hereby DISMISSED, for lack of subject matter jurisdiction.

THUS DONE AND SIGNED.

**Lizzie E. WILLIAMS, and Children on Behalf of Luther WILLIAMS, Deceased, Plaintiffs,**

v.

**JACKSON STONE COMPANY, et al., Defendants.**

**Civ. A. No. 3:92–CV 86(L).**

United States District Court, S.D. Mississippi, Jackson Division.

Aug. 5, 1994.

Firnist J. Alexander, Jr., and Gail Wright Lowery, Lowery & Castilla, Jackson, MS, for plaintiffs.

Mark C. Carlson, McCoy, Wilkins, Stephens & Tipton, Walter J. Brand, George R. Fair, Watkins & Eager, and Robert C. Boyd, Boyd & Akin, Jackson, MS, for Jackson Stone Co.

Paul V. Ott, Daniel, Coker, Horton & Bell and Kenna L. Mansfield, Jr., Wells, Wells, Marble & Hurst, Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the separate motions of defendants Jackson Stone Company (Jackson Stone) and Home Life Insurance Company (Home Life) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs Lizzie Williams and children, on their own behalf and on behalf of Luther Williams, deceased, have filed a response and the court, having considered the parties' memoranda of authorities, together with attachments,[1] concludes that the motion of Home Life should be granted and the motion of Jackson Stone should be denied.

Luther Williams was employed by Jackson Stone from 1967 to 1981. During this period, Jackson Stone provided its employees group medical, disability and life insurance coverage through a policy with Home Life. Luther Williams was a covered beneficiary under this policy and had designated his wife, Lisa Etta (Lizzie) Williams, as his life insurance beneficiary. In February 1981, Luther Williams was diagnosed with Alzheimer's disease, which rendered him unable to work. His employment with Jackson Stone was subsequently terminated on approximately June 30, 1981. He passed away in January 1991, and shortly thereafter, on March 22, 1991, Lizzie Williams secured claim forms from Jackson Stone and submitted a claim for life insurance benefits to Home Life. By letter dated June 7, 1991, Home Life denied the claim on the basis that Mr. Williams' coverage under the policy had ceased upon the termination of his employment, and that he, therefore, was not covered by the policy at the time of his death.

On January 14, 1993, plaintiffs filed this action *pro se* in the Circuit Court of Hinds County, Mississippi, alleging that defendants had fraudulently denied payment of insurance benefits under the Home Life policy and seeking to recover "hospital, medical, nursing home, disability insurance, and life insurance" benefits alleged to have been wrongly denied by defendants. Plaintiffs further sought damages for their alleged emotional distress.[2] Defendants timely re-

---

1. The court previously issued an opinion in this matter granting defendants' motions for summary judgment. Plaintiffs thereafter moved for reconsideration and the court, by order dated May 17, 1994, granted plaintiffs' request and vacated its earlier opinion. Plaintiffs were permitted to file an amended response to defendants' motions for summary judgment and defendants were given the opportunity to file appropriate rebuttals. The briefing having been completed, the court may now reevaluate defendants' motions for summary judgment.

2. The substantive allegations of their complaint were set forth in two paragraphs, as follows:

We the family of the late Luther Williams, make use of said mentioned above Defendant Jackson Stone Co. and Home Life Insurance, for fraudulent denied of said deceased Luther Williams' medical and life insurance benefits which caused an undue state of said deceased plaintiff and family members deep under poverty level condition, mental stress, pain and suffering; causing poor health and medical care to the deceased and a financial undue

moved the case on the basis that plaintiffs' putative state claims were preempted by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002 *et seq.*

In their motion for summary judgment, defendants contend that plaintiffs' claims are preempted by ERISA and that, on the facts of record, plaintiffs have no grounds for recovery under ERISA, or under the terms of Home Life's policy. Home Life argues, more specifically, that plaintiffs are precluded from recovering plan benefits since neither Mr. Williams, nor anyone on his behalf, complied with policy provisions for extending or converting coverage following the termination of his employment. In its motion, Jackson Stone asserts that it can have no liability for plan benefits since it was merely Mr. Williams' employer and not the insurer, and that consequently, it is not a proper defendant in this suit.

 The court would agree that summary judgment was in order if plaintiffs' position in this action was simply that defendants wrongly declined to pay benefits claimed to be due and owing under the terms of the plan.[3] Only full-time employees were eligible for coverage under Home Life's policy, which declared that the coverage there-

under would terminate automatically on "the date employment terminates, the date the employee ceases to be in a class eligible for coverage, or on the last day of the period for which the employee makes a premium contribution." The plan did provide a conversion privilege for employees whose health and life coverage ended because their employment was terminated, and further provided for an extension of life insurance during a period of total disability without the requirement of premium payments. However, it is undisputed that Luther Williams did not, either before or after the termination of his employment in June 1981, take the steps required to convert his health coverage or to extend his life insurance coverage.[4] The policy also included a disability benefit payable during periods of total disability upon the employee's furnishing due proof of disability. Mr. Williams, though, did not file a claim for disability coverage. Having failed to take the necessary steps to secure disability payments, or to convert or extend his life and health coverage following his termination, Mr. Williams was entitled to no further health, disability or life insurance benefits in accordance with the terms of the plan. Plaintiffs, therefore, may not recover plan benefits.[5] However, that does not necessari-

---

strain to wife and children, in baring the cost and suffering of the deceased.

We the family seek $3,006,000 for unpaid hospital medical, nursing home, disability insurance, and life insurance that was fraudulent denied by Jackson Stone Co., and Home Life Insurance over a period of 10 years, in which the deceased suffered from the date of disability, leaving the work-place of Jackson Stone Co., until Death 1–12–91, in which said deceased had paid for such insurance by payroll deduction to said mentioned Home Life Insurance Co.

3. Indeed, at a time when the court misperceived this to be plaintiffs' position, it granted summary judgment for defendants and ordered dismissal of plaintiffs' complaint. It has since been made clear that there is more to plaintiffs' claim.

4. Home Life required that an employee, in order to secure conversion of his health and life coverage, submit an application and pay a premium for a converted policy within 31 days of termination of employment. An employee could continue his life insurance during a period of total disability without the payment of premiums if he provided proof of continuing disability to Home Life each year of his disability.

5. Plaintiffs argue that Home Life waived any right to assert Mr. Williams' failure to adhere to these policy requirements as a basis for refusing payment since Home Life knew or should have known of his disability. They maintain that since Home life received and paid a claim for medical expenses associated with the January 1981 hospitalization during which Mr. Williams was diagnosed with Alzheimer's disease, then Home Life thereby became aware of Mr. Williams' disability. They then reason that because Home Life knew or should have known of his disability, it thus waived all other policy provisions regarding conversion, and notice and proof of Mr. Williams' disability. Plaintiffs have cited no authority for this position, and the court finds that their argument lacks merit as a matter of fact and law. There is no proof that Home Life was aware of the extent of Mr. Williams' illness, and even if there were such proof, it does not follow that merely by acquiring such knowledge, Home Life somehow waived the express provisions of its insurance policy. Waiver is by definition "the intentional or voluntary relinquishment of a known right," *Black's Law Dictionary,* 6th Ed. p. 1580 (1990), and there is absolutely no indication that Home Life surrendered any of its rights under the policy.

458

ly mean that they are foreclosed from recovery in this action, for plaintiffs contend that Mr. Williams' failure to take such actions as were required for securing disability payments or for converting and/or extending his health and life coverage was caused by a false representation by a Jackson Stone employee, Dan Gill, to the effect that Mr. Williams had no coverage available to him under the policy.

### JACKSON STONE [6]

In her deposition, Mrs. Williams explained that in early 1981, upon learning that her husband had Alzheimer's disease and would no longer be able to work, she contacted Jackson Stone and spoke with Dan Gill. According to Mrs. Williams, when she advised Gill that Mr. Williams' doctor had said that her husband would no longer be able to work, Gill asked that she furnish a statement from the doctor confirming this information, which she did. Mrs. Williams related that she expressly asked Gill at or about that time whether there were "any kind of benefits that [were] due," or that "[her] husband could get." Gill, she states, told her no. He told her only that she would be receiving a life insurance policy in the mail that would be "paid up for life," and advised her to put that policy in a safe place so that she would have insurance when Mr. Williams died. He never told her, though, that her husband had disability coverage, or that he had a right upon termination of his employment to convert his medical coverage to an individual policy, nor did he mention that the life insurance coverage he had referenced would be paid up for life only if she complied with

certain conditions. To the contrary, according to Mrs. Williams, he led her to believe that the life insurance was "paid up for life" without any action on her part,[7] and explicitly misrepresented the true facts of her husband's available coverages under the plan.[8]

Mrs. Williams explained that after these conversations with Gill in early 1981, she had no further communication with Jackson Stone or with Home Life about her husband's coverage because,

I wouldn't have had no reason to call, you know, to talk to nobody because they told me when he come out of the hospital that his insurance was—he couldn't use it no longer ... So it wasn't no reason for me to, you know, get in contact with them for nothing until he died.... [L]ike I said, Mr. Gill told me that it wasn't anything, you know, for to be gotten. So I wouldn't have no reason to keep worrying them....

And though she acknowledged that she and her husband did not continue paying premiums for his insurance coverage, she stated:

We couldn't pay no premium because, like I'm saying, Jackson Stone was the one that set up everything. Only thing I could do was go by what Mr. Gill told me, that it wasn't anything and that the policy that I would get through the mail would be paid up for life. And that's all I had to hold on to was the insurance policy that—his life insurance.[9]

Plaintiffs submit that in failing to convey accurate information concerning Mr. Williams' insurance coverage, Jackson Stone breached its fiduciary duty and is liable to respond in damages equivalent to those bene-

**6.** Although some common issues are raised by defendants, since some different issues are presented regarding the potential liability of the respective defendants, the court addresses their motions separately.

**7.** Coincidentally, within a few weeks after her conversation with Gill, Mrs. Williams did receive a life insurance policy from an American States Insurance Company, which she assumed was the policy to which Gill had referred. So she put it in a safe place, as he had instructed, and presented it to the funeral home when Mr. Williams died. She was told, however, that the policy was "no good." She then turned to Jackson Stone, who advised her that the company knew nothing

about that insurer and had never offered that coverage.

**8.** The court would observe that Jackson Stone denies plaintiffs' allegations, but has offered no contrary proof.

**9.** The court notes that it appears from the record that after Mr. Williams' diagnosis with Alzheimer's disease in January 1981, he never again spoke with or communicated in any form with anyone at Jackson Stone, nor did he communicate with Home Life. Mrs. Williams indicated that she was the one who spoke with Gill, not her husband, because by that time, Mr. Williams was "already sick."

fits which would have been payable under the policy had Mr. Williams converted and extended his coverages, together with damages for emotional distress.

■■■ Defendants argue initially that plaintiffs' complaint must be dismissed since ERISA governs this action and plaintiffs have alleged only state law claims. It seems clear that the group insurance plan in question is an employee welfare benefit plan covered under ERISA.[10] It appears equally clear that plaintiffs' claims are preempted by ERISA. ERISA's preemption provision, 29 U.S.C. § 1441, is extremely broad, extending to "any and all state laws insofar as they may now or hereafter *relate to* any employee benefit plan" covered by ERISA. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) (emphasis added). *See also Lee v. E.I. DuPont de Nemours & Co.,* 894 F.2d 755 (5th Cir.1990) (even state laws only indirectly affecting employee benefit plans may be preempted by ERISA); *Goodman v. S & A Restaurant Corp.,* 756 F.Supp. 966, 968 (S.D.Miss.1990) ("Congress intended that the field of employee benefit plans be regulated exclusively by federal law") (citing *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236 (5th Cir.1990)). As the Court explained in *Shaw,* ERISA preemption encompasses any state law that has a "connection with or reference to" an employee benefit plan. *Shaw,* 463 U.S. at 97, 103 S.Ct. at 2900. In the case at bar, plaintiffs' state law claim has "a connection with or reference to" Jackson Stone's employee benefit plan since the damages

plaintiffs seek, at least in part, consist of life, health and disability benefits that would have been payable under the Home Life policy but for Gill's alleged breach. A determination of the total amount of any such damages would necessitate reference to the policy. *See Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1294 (5th Cir.1989) (state law claim preempted since damages would consist of pension benefits to have been received but for alleged breach); *Haggard v. Armstrong Rubber Co.,* 767 F.Supp. 119 (M.D.La.1991) (claim preempted since computation of damages would require reference to plan); *see also Christopher v. Mobil Oil Corp.,* 950 F.2d 1209, 1220 (5th Cir.1992) (state law fraud claim preempted due to its link to ERISA plan); *Lee v. E.I. DuPont de Nemours & Co.,* 894 F.2d 755, 757 (5th Cir.1990) (state law fraud and misrepresentation claims, in addition to contractual claims, preempted). Contrary to defendants' position, however, the fact that plaintiffs have alleged only state law claims does not necessarily require that the court dismiss their complaint. Rather, once the court concludes that the claims are preempted, the court is to recharacterize them as claims arising under ERISA. *Degan v. Ford Motor Co.,* 869 F.2d 889, 893 (5th Cir.1989) (preemptive effect of ERISA effectively recharacterizes state law claims into actions arising under federal law); *see also Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (same).

■■■ Jackson Stone argues that, as a matter of law, plaintiffs have no claim against it

---

**10.** Plaintiffs, in fact, have admitted that the plan is covered by ERISA. Even without their admission, however, the court would conclude that the plan is an ERISA employee welfare benefit plan. *See* 29 U.S.C. § 1132. Whether a particular plan qualifies as an employee welfare benefit plan under ERISA depends on "whether a plan (1) exists; (2) falls within the safe harbour provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer or intending to benefit employees." *Meredith v. Time Ins. Co.,* 980 F.2d 352, 355 (5th Cir.1993). To resolve whether a plan exists, the court must "determine whether from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Dono-*

*van v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (quoted in *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236 (5th Cir. 1990)). Here, a plan clearly exists. The intended benefits are set forth in the policy; the class of beneficiaries consists of Jackson Stone employees and their dependents; the premiums were funded in part by Jackson Stone with the remainder being paid through payroll deductions; and a procedure was in place for filing claims. The plan also satisfies the primary elements of an ERISA "employee benefit plan" in that it was established by Jackson Stone for the purpose of providing medical, accident, disability and death benefits to its employees. 29 U.S.C. § 1002(1). Finally, the plan falls within the Department of Labor's safe harbour provision, 29 C.F.R. § 2510.3–1(j).

under ERISA for breach of a fiduciary duty since ERISA does not grant participants and/or beneficiaries a private right of action for compensatory relief based on an alleged breach of fiduciary duty.[11] In other words, it contends that plaintiffs' state law claim cannot be recharacterized and found viable under ERISA since ERISA does not recognize such a cause of action. In the court's opinion, this argument lacks merit.

ERISA's civil enforcement provision, 29 U.S.C. § 1132, provides as follows:

A civil action may be brought—

 (1) by a participant or beneficiary—

. . . . .

 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan.

Section 1109, to which subsection (2) refers, addresses liability for breach of fiduciary duty, and provides that,

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary, which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Jackson Stone argues that plaintiffs' claim for breach of fiduciary duty is not among those authorized by § 1132(a)(2) or (3), and that it must therefore be dismissed. As support for its position, Jackson Stone relies on *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), in which the Court held that an individual plan participant or beneficiary may not file suit for damages for breach of fiduciary duty under § 1109 or § 1132(a)(2). The Court concluded that any recovery under that section inures to the benefit of the plan as a whole, not to the benefit of the participant or beneficiary asserting the claim, *Russell,* 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985), and explained that in adopting § 1109, ERISA's draftsmen were concerned not with protecting the rights of the individual participant or beneficiary, but were instead "primarily concerned with the possible misuse of plan assets, and with remedies which would protect the entire plan." *Id.* at 141, 105 S.Ct. at 3090. The Court was "persuade[d] that Congress did not intend that section to authorize any relief except to the plan itself." *Id.* at 144, 105 S.Ct. at 3091.

Jackson Stone submits that plaintiffs' claim for breach of fiduciary duty runs afoul of *Russell,* as plaintiffs obviously seek individual relief for their own personal benefit rather than for the benefit of the plan, and that consequently, their claim must be dismissed. In the court's opinion, however, while *Russell* does compel the conclusion that plaintiffs may not maintain this action under § 1132(a)(2), *Russell* is not dispositive on the question of the viability of plaintiffs' claim.

In *Corcoran v. United Healthcare, Inc.,* 965 F.2d 1321, 1335 (5th Cir.1992), the Fifth Circuit observed that while the *Russell* Court had held that extracontractual damages were not available under § 1109(a) or § 1132(a)(2), the Court's consideration had been confined to whether the damages the plaintiff had sought could be recovered under those particular provisions; the Court had no occasion

---

**11.** The principal argument advanced by Jackson Stone in support of its motion for summary judgment is that it cannot be liable for benefits under the plan since it is not the insurer, but rather was

merely the employer. Inasmuch as the court has concluded that plaintiffs are not entitled to recover plan benefits *per se,* the court finds it unnecessary to reach this argument.

to consider whether the damages requested were available under § 1132(a)(3), which provides a cause of action for plan participants or beneficiaries seeking "other appropriate equitable relief" to redress violations of ERISA. *Corcoran*, 965 F.2d at 1335. The *Corcoran* court recognized that "a plan beneficiary certainly may sue under § 502(a)(3) for a breach of the fiduciary duties set forth in [29 U.S.C. § 1104]." [12] The issue, though, was whether § 1132(a)(3) permitted recovery of compensatory damages for such a breach. While the court did not definitively decide that issue, concluding only that the damages therein sought for emotional distress and mental anguish were not recoverable, it suggested implicitly that some types of compensatory damages are available for a breach of fiduciary duties under the category of "other appropriate equitable relief." The court stated:

> "The characterization of equitable relief as encompassing damages necessary to make the plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation.... Trusts allow for monetary damages as make-whole relief, providing that a beneficiary has "the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust" or "of pursuing a remedy which will put him in the position he would have been if the trustee had not committed the breach of trust."

*Corcoran*, 965 F.2d at 1336 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–11, 109 S.Ct. 948, 954–55, 103 L.Ed.2d 80 (1989) (Brennan, J., concurring)).

In this case, as in *Corcoran*, plaintiffs may not recover damages for their emotional distress for Jackson Stone's alleged breach of fiduciary duty. However, in the court's opinion, to the extent that they seek damages consisting of the benefits to which they would have been entitled "if [Jackson Stone] had not committed the breach of trust," *Corcoran*, 965 F.2d at 1336, § 1132(a)(3) provides a basis for recovery.[13] *See Christopher v. Mobil Oil Corp.*, 149 F.R.D. 539, 549 (E.D.Tex. 1993) ("While certainly damages for emotional distress and punitive damages would not be available to Plaintiffs [alleging claim for breach of fiduciary duty under § 1132(a)(3) ], other 'make-whole' relief is apparently available according to *Corcoran*."); *Lawrence v. Jackson Mack Sales, Inc.*, 837 F.Supp. 771, 789 (S.D.Miss.1992) (recovery of such extra-contractual damage as would be available under law of trusts to place plaintiff in position she occupied prior to alleged fiduciary breaches recoverable under § 1132(a)(3)). The court thus rejects Jackson Stone's contention that ERISA provides no means of monetary redress for the benefit of individual plan participants or beneficiaries for breaches of fiduciary obligations respecting their ERISA plans. There remain, however, the questions of whether plaintiffs have presented sufficient evidence of Jackson Stone's status as a fiduciary with respect to the plan to withstand Jackson Stone's motion, and if so, whether the evidence they have presented creates a question of fact on the issue of breach of its duties as a fiduciary.

■ Jackson Stone denies plaintiffs' contention that it is a "fiduciary" within the meaning of ERISA with respect to any part of the plan at issue, and submits that there is

---

**12.** Section 1104 provides, in pertinent part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and beneficiaries; ...
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.

**13.** Defendants argue that plaintiffs have no arguable claim for damages relating to the health coverage since Mrs. Williams admitted in her deposition testimony that she did not incur any hospitalization expenses after Mr. Williams ceased his employment with Jackson Stone. However, Mrs. Williams testified that she did incur medical expenses in the form of charges for doctors' services and defendants have not shown that such expenses were not covered by the Home Life group policy or that they would not have been covered by a converted individual policy.

"no evidence whatsoever" in the record which supports plaintiffs' contention. ERISA defines the term "fiduciary" to include "a person (i) [who] exercises any discretionary authority or discretionary control respecting management of such plan ... or (ii) ... has any discretionary authority or discretionary responsibility in the administration of such plan." Here, whereas Jackson Stone has presented no evidence concerning its relationship to the plan, Mrs. Williams has testified at length concerning Jackson Stone's role in the administration of its ERISA plan. And according to Mrs. Williams, from the perspective of its employees, Jackson Stone was heavily involved in administering the plan. She stated that she could not submit claims to Home Life for payment, but rather was required to go through Jackson Stone. She explained,

> "[E]verything that's done for employees have to come through Jackson Stone. They can't file a claim on their own. Jackson Stone have to file it; and if Jackson Stone don't file it, they don't get anything.... That's the way they got it set up. My husband couldn't file a claim. He couldn't file a claim to Home Life Insurance. Jackson Stone would have to do it.... [T]hat's the way it was. Even a doctor bill, it had to be sent to Jackson Stone. They had to pay it.... Jackson Stone was the one that set up everything."

Mrs. Williams' testimony in this regard is uncontroverted and, in the court's opinion, would be sufficient without more to establish Jackson Stone as a plan fiduciary. There is further evidence, though, which also suggests this conclusion. The plan is not particularly illuminating as to Jackson Stone's status with reference to the various aspects of plan administration. But it does specifically direct that Jackson Stone be consulted by participants for information concerning their rights and entitlement to benefits upon termination of their employment.[14] Considering this fact, together with Mrs. Williams' testimony, the court concludes that Jackson Stone's argument that it is entitled to summary judgment because of the absence of proof of its status as a fiduciary is without merit.

■ Manifestly, the conduct charged by plaintiffs, i.e., that Jackson Stone provided false and misleading information to Mrs. Williams concerning the availability of coverage for Mr. Williams, would amount to a breach of Jackson Stone's duty as a fiduciary. *See Drennan v. General Motors Corp.,* 977 F.2d 246, 251 (6th Cir.1992) ("A fiduciary must give complete and accurate information in response to a participant's questions...."); 29 U.S.C. § 1104(a). Jackson Stone argues, though, that even if plaintiffs' allegations about Gill's misrepresentations are accepted as true, plaintiffs still cannot prevail because they are estopped to deny knowledge of the provisions of Home Life's policy, including those provisions delineating a participant's right to convert or extend coverage. Mrs. Williams testified that she had received a plan booklet describing the provisions of Home Life's policy and in fact produced such a document at her deposition.[15] Jackson Stone submits that because this information was made available to them, Mr. and Mrs. Williams should have been aware of the proper steps for filing a claim for disability benefits, and for converting their health coverage and extending Mr. Williams' life insurance coverage. It contends, therefore, that plaintiffs "cannot credibly deny knowledge of the contents of the insurance booklet, or maintain that the extent of their knowledge and understanding of the policy was required to come from Jackson Stone." In the court's opinion, however, the language of the plan significantly undermines Jackson Stone's position.

Under the heading "Termination of Employee Insurance," the plan states, in relevant part:

> a small booklet which she identified as being the type of booklet that her husband received from Jackson Stone. Luther Williams, her son, identified that particular booklet produced by his mother as the document he had found in his parents' home after his father's death.

---

14. This provision is discussed further, *infra* at p. 462–463.

15. Mrs. Williams admitted in her deposition that from time to time, her husband brought home insurance booklets from work and she produced

Your insurance under a Coverage will automatically terminate on the earliest of these dates:

—the date your employment terminates. (Your employment terminates when you cease active, full-time work—unless the Policy provides otherwise. *If you cease work for any reason, consult your employer immediately to determine what benefits or rights, if any, may be available to you under the Policy.*) (emphasis added).

Plaintiff has presented evidence, which at this time is unrefuted, that as soon as she learned that her husband would no longer be able to work, she immediately consulted Jackson Stone to determine what benefits or rights, if any, may have been available to Mr. Williams under the policy. Given that she did precisely what was contemplated and specifically directed by the policy, Mrs. Williams may indeed "credibly ... maintain that the extent of [her] knowledge and understanding of the policy was required to come from Jackson Stone." Further, because the policy conferred upon Jackson Stone the duty to advise participants of their available "benefits or rights, if any" upon termination of employment, Jackson Stone can hardly reasonably contend that upon Mrs. Williams' explicit inquiry, *as directed by*

*the policy,* it was not obligated to provide her with accurate information concerning the "benefits and rights" that "may [have been] available" to Mr. Williams under the policy.[16] Its failure to do so, if proven, would constitute a breach of its fiduciary duty for which damages may lie.[17]

■ ERISA provides the applicable statute of limitations for any "action ... with respect to a fiduciary's breach of any responsibility, duty, or obligation" under the provisions governing fiduciaries, as being the earlier of:

(1) six years after (A) the date of the last action which constituted a part of the breach of violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach of violation, or

(2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach of violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach of violation was filed with the Secretary under this title;

*except that in the case of fraud or concealment, such action may be commenced not*

16. Jackson Stone contends that the representations claimed by plaintiff to have been false and misleading were not false at all at the time they were made in February 1981 since Mr. Williams was not entitled to convert or extend his coverages until such time as he was terminated, and since his employment was not actually terminated until June 1981. However, while Mr. Williams may have remained an employee on the company's records until June 1981, it would appear under the terms of the policy that for purposes of his insurance coverages, his employment terminated in January 1981. Again, the policy states that an employee's employment terminates when he "cease[s] active full-time work." It is undisputed that Mr. Williams never returned to work after January 1981 and thus that he "cease[d] active full-time work" in January 1981.

17. The facts of this case bring to mind those cases in this circuit which have held that oral modifications to an employee benefit plan governed by ERISA cannot form a basis for a breach of contract claim, and that claims of promissory or equitable estoppel based on such oral modifications are not actionable under ERISA. *See*

*Williams v. Bridgestone/Firestone, Inc.,* 954 F.2d 1070, 1072 (5th Cir.1992); *Rodrigue v. Western & Southern Life Ins. Co.,* 948 F.2d 969 (5th Cir. 1991); *Degan v. Ford Motor Co.,* 869 F.2d 889 (5th Cir.1989); *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290 (5th Cir.1989). In the court's opinion, that line of cases is not applicable here. In each of those cases, unlike this one, the employee sought benefits which had been orally promised when, in fact, the terms of the written plan did not provide for such benefits. The Fifth Circuit has explained that to allow causes of actions based on such modifications would be inconsistent with ERISA's writing requirement, which is intended to "protect[ ] the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan." *Rodrigue,* 948 F.2d at 971 (citing *Cefalu,* 871 F.2d at 1296) (written instrument clause designed to prevent collusive or fraudulent side agreements between employers and employees which might threaten stability and solvency of plan). Moreover, there is nothing in any of those cases to indicate that the plans under scrutiny actually directed the employees to ask their employer or insurer about their available coverage in the event of a given occurrence.

*later than six years after the date of discovery of such breach or violation.*

29 U.S.C. § 1113 (emphasis supplied). As plaintiffs' claim is predicated on Gill's alleged fraud, then their claim was required to have been brought within six years after "the date of discovery of such breach or violation." In the court's opinion, although defendants have asserted that plaintiffs' claim is time barred, neither has presented evidence to substantiate this position and therefore, plaintiffs' claim is not subject to dismissal at this time on the basis of an expired limitations period.

## HOME LIFE

 Plaintiffs contend that Home Life is liable to the same extent as Jackson Stone for Gill's alleged misrepresentations concerning Mr. Williams' coverage. There is no evidence, however, to establish a basis for recovery against Home Life for Jackson Stone's alleged breach of its fiduciary obligations. ERISA prescribes certain circumstances in which "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan," as follows:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105. None of these circumstances are present in the case at bar. Plaintiffs do not contend that any failure by Home Life to fulfill its fiduciary obligations under § 1104(a) enabled Jackson Stone to breach a fiduciary duty. And plaintiffs have

not alleged, nor have they undertaken to prove that Home Life had any knowledge of Gill's alleged statements to Mrs. Williams at or near the time they were made. Indeed, plaintiffs apparently agree that Home Life knew nothing of any conversations between Gill and Mrs. Williams until after this suit was filed. Consequently, Home Life can have no liability for any breach by Jackson Stone of its fiduciary duty and the claims against Home Life will be dismissed.

## CONCLUSION

Based on the foregoing, it is ordered that defendant Home Life's motion for summary judgment is granted. It is further ordered that the motion of defendant Jackson Stone for summary judgment is denied.[18]

SO ORDERED.

Clifton DAVIS, Plaintiff,

v.

**YAZOO COUNTY WELFARE DEPARTMENT,**
Defendant.

Civ. A. No. 5:88–cv–55WS.

United States District Court,
S.D. Mississippi,
Western Division.

Nov. 8, 1994.

---

**18.** The court would note before closing that the plaintiffs in this cause are still proceeding on the same *pro se* complaint they originally filed. *See supra* n. 2. Plaintiffs are hereby directed to file an amended complaint within ten days of the entry hereof clarifying the nature of their claims and the basis or bases upon which relief is sought. The court considers that all parties herein would agree that the original pleading is certainly inartful, and that it does not accurately reflect the nature of plaintiffs' true complaint, and did not do so even when filed.

**465**

James P. Brantley, Jackson, MS, for plaintiff.

Robert E. Sanders, Mississippi Atty. General's Office, Jackson, MS, for defendant.

## MEMORANDUM OPINION

WINGATE, District Judge.

Tried on its merits to this court sitting without a jury on an earlier date, this lawsuit is again before this court pursuant to a "remand for reconsideration" ordered by the United States Court of Appeals for the Fifth Circuit. Previously, this court, after having received testimony and documentary evidence, found for the plaintiff on his claim of

sex discrimination under Title VII[1] of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, as amended. Aggrieved by this court's finding, the defendant, Yazoo County Welfare Department, appealed. Thereafter, the Fifth Circuit filed its written opinion in *Davis v. Yazoo County Welfare Dept.*, 942 F.2d 884 (5th Cir.1991), wherein it voiced concern whether this court had mistakenly weighed the conflicting evidence. The Fifth Circuit panel then asked this court to take a second look at the evidence in light of several observations made by the panel. This court has taken that second look, having now the benefit of the entire written record, and concludes that its initial holding was in error for the reasons which follow. Accordingly, this court now reverses itself and finds for the defendant.

So that the reader will understand this reversal of positions,[2] this opinion will be divided into three sections. In the first section, this court will set out in full the bench opinion it rendered at the close of all the evidence. In the second section, this court will submit pertinent quotes from the Fifth Circuit's opinion which highlight their concern with various aspects of this court's bench opinion. In the third and final section, this court will address the concerns of the Fifth Circuit and then explain why, upon reconsideration, this court now feels obliged to reverse its holding.

## I. THE BENCH OPINION

Set out below is this court's full bench opinion delivered at the close of the evidence and after closing arguments of the parties:

----------

THE COURT: Good afternoon. There were requests for the Court to consider its

1. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 provides as follows:

(a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any

individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

2. While this circumstance is an extraordinary one for this court, this court subscribes to the view that all men and women, being fallible, will make mistakes. A greater mistake is not to appreciate this simple observation. And, a still larger mistake, perhaps an unforgivable one, is to allow pride and ego to cloud judgment and restrain corrective action.

rulings on various pieces of evidence, and the Court adheres to all its earlier rulings on the evidentiary questions. So those exhibits which are marked for identification will remain for identification.

Before the Court is Plaintiff's complaint in which he alleges a cause of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e–2 as amended for race and sex discrimination. Specifically, the Plaintiff alleges that he was not hired for various positions with the Defendant, and that Defendants' reasons for refusing to hire the Plaintiff were rooted in sex and race discrimination.

Plaintiff is a 36 or 35 year old black male and was 33 years old when he sought four separate positions with the Defendant, the Yazoo County Welfare Department located in Yazoo County, Mississippi. The people hired to fill the positions were two black females and two white females. The Plaintiff alleges that he was well qualified for the positions and as well or more qualified through experience, education, training than the persons hired for the positions.

Tried to the Court sitting without a jury, the Court now issues its bench opinion pursuant to Rule 52, Federal Rules of Civil Procedure.

On July 24, 1987, the Plaintiff applied with the Defendant for a job as child support enforcement officer. The Plaintiff was considered for this position but the Defendant ultimately hired Dorothy McCoy, a black female. The position of child support enforcement officer is established by the Mississippi State Personnel Board. The job requires that the individuals selected help establish paternity and court orders of support. At the time of Plaintiff's application, the minimum requirements for eligibility for the position were a bachelors degree from an accredited college or university or above, a high school diploma, or its G.E.D. equivalent, allowing for the substitution of related experience.

The Plaintiff additionally was considered for three vacancies in the position of eligibility worker. These vacancies were ultimately filled by Janice Reed, Gloria Owens, and Sammie Stuart. Reed, Owens, and Stuart are respectively a white female, a black female, and a white female. The position of eligibility worker also was established by the Mississippi State Personnel Board. The job requires that the person holding the position establish initial and continuing eligibility for the programs administered by the Welfare Department, including such programs as Public Assistance, A.F.D.C., Food Stamps, and Medicaid. The educational prerequisites for the eligibility worker position are as follows: Successful completion of two years or more of college, 60 or more semester hours in an accredited college or university with no substitutions.

According to testimony, additional skills needed are: one, knowledge of correct English usage and the ability to present ideas clearly and concisely; two, some knowledge of recognized principles, practices, and procedures of public assistance and food assistance; three, ability to learn regulations and policies or assistance programs through experience and in-service training; four, ability to deal tactfully with others, to use good judgment in evaluating situations, and in decision making; and, five, ability to plan and to organize work.

Defendant denies that it has practiced any discrimination in these instances and contends that its hiring decisions were based purely upon the compatible credentials of the applicants. Defendant has offered a number of reasons why the office chose not to hire the Plaintiff. According to Ms. Blain, the director, she was unimpressed with the condition of Plaintiff's application, with the white-outs therein, and with Plaintiff's bearing and appearance during the interview. She stated that during the interview Plaintiff slouched and kept on dark sunglasses.

Ms. Blain further testified that all four hirees acquitted themselves in a manner superior to that of the Plaintiff. According to Ms. Blain, the four hirees expressed themselves better, displayed more enthusiasm, and showed a greater affinity for following instructions and handling detailed applications. Ms. Blain's conclusions, based upon the above, are mostly subjective. So, Ms. Blain has pointed to some objective criteria

in addition. Relative to such a showing, she has sought to contrast the experienced histories of the involved persons, seeking to show that her choice was motivated by non-discriminatory factors.

In the absence of other evidence, this Court might be persuaded by this testimony. However, there's a crucial piece of evidence which undermines this entire structure of proof and convinces this Court to find for the Plaintiff.

Plaintiff testified in a telephone conversation Ms. Blain had offered him a job as child support enforcement officer. Plaintiff testified that he telephoned Ms. Blain upon a message allegedly communicated to his sister from Ms. Blain. Plaintiff stated that in this telephone conversation with Ms. Blain she had offered him the job, which he accepted, and told him when to report to work. Plaintiff's sister, Ms. Hazel B. Davis, corroborated much of Plaintiff's account.

Ms. Blain disagreed with their account. She claims that she but called to advise Plaintiff that he was under consideration. Then, she says, on the very next day she wrote Plaintiff a rejection letter. The Court fails to understand under Ms. Blain's version why she would need to call Plaintiff to offer this encouragement when she had testified that during the interview phase she found him wanting in posture and lacking in neatness and detail.

Confronted with this quandary, as well as with the credible testimony of Plaintiff and his sister, the Court must accept Plaintiff's version of the circumstances of the telephone call. Having accepted this vital piece of Plaintiff's evidence, the Court cannot also accept Ms. Blain's testimony that she initially rejected him as a likely candidate for hire. Rather, this piece of evidence indicates that Ms. Blain was impressed with Plaintiff's credentials and later decided not to hire him upon further reflection.

Now there has been testimony from Ms. Kathy Bowden that she was Plaintiff's eligibility worker, that she formed an adverse opinion whether Plaintiff could perform the job as an eligibility worker, and that upon discovering his application for such that she communicated her opinion on the subject to Ms. Blain. The Court recognizes that the Court's focus here is on the Defendants' state of mind, whether the Defendant was actuated by discriminatory animus, and that as such should the Court discern a motive other than a discriminatory one, that such motive could serve to insulate the Defendant from liability.

In *Wright v. Western Electric Company, Inc.*, found at 664 F.2d 959, 964 (5th Cir. 1981), the Court addressed this particular point and stated there:

This evidence was clearly sufficient as a matter of law to rebut the presumption of discrimination raised by Plaintiff's prima facie case. Even if Western Electric (here the Defendant) was incorrect in their assessment of Mr. Wright's capabilities, if the company acted on this belief in making their decision not to hire Mr. Wright. And not on the basis of an impermissible factor such as race, there would be no racial discrimination.

Ms. Bowden's testimony could have been viewed under this jurisprudence, that is, whether her opinion influenced Ms. Blain not to hire the Plaintiff. But, the Court is unable to bestow this impact to Ms. Bowden's testimony. Ms. Bowden testified that she shared her opinion with Ms. Blain at Plaintiff's first interview which would have been in August of 1987. This date would have been before Ms. Blain made the September telephone call to Plaintiff. Hence, the Court discounts any impact such unsolicited advice might have had on Ms. Blain's decision not to employ the Plaintiff.

The Defendant also showed that few men had ever worked at the Yazoo County Welfare Department, and that for most of the last five years only one male had been continuously employed there in the work force between 24 and 34 persons. This male, a supervisor, is not in the clerical pool as would have been Plaintiff, had Plaintiff been hired in any one of the slots that he sought.

Under Title VII, a failure to hire an individual because of that person's race, color, religion, sex, or national origin is forbidden. The statute also makes it unlawful for an employer to limit, segregate, or classify its employees in any way which would deprive

or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee. Discrimination need not be the sole reason for an adverse employment decision. No more is required to be shown than that discrimination was a "but for" cause. *McDonald v. Santa Fe Trail Transportation Company,* 427 U.S. 273, 282 Note 10, 96 S.Ct. 2574, 2580 Note 10, 49 L.Ed.2d 493 (1976); *Walsdorf v. Board of Commissioners for the East Jefferson Levee District,* 857 F.2d 1047, 1052 (5th Cir.1988). The Court in *Walsdorf v. Board of Commissioners for the Eastern Jefferson Levee District,* 857 F.2d at 1052, further stated:

> Many factors can, and often do, influence the actions of employers. An employment decision can be motivated by legitimate, illegitimate, and illegal considerations all at the same time. An employer's action does not violate Title VII simply because a discriminatory motive plays some part in an employment decision. In this circuit, the forbidden motive must be a "significant factor."

So to make out a prima facie case of sex discrimination or race discrimination, the Plaintiff must establish four things: one, that he belongs to a group protected by Title VII; two, that he applied for and was qualified for a job for which applicants were being sought; three, that he was rejected; and, four, that after he was rejected the employer continued to seek applicants with similar qualifications. *Walker v. Jim Dandy Company,* 638 F.2d 1330, 1333 (5th Cir.1981); and also see *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

It is clear that the Plaintiff, a black male, is a member of a protected class. The Plaintiff not only applied for one position for which he was qualified but applied for four positions for which he was qualified and for which applicants were being sought. It is further clear that the Plaintiff was qualified for each of the positions and, as a matter of fact, was more qualified than one or two of the women hired. At the time the Plaintiff applied for a position with the Yazoo County Welfare Department, he held a B.S. Degree in Criminal Justice with approximately 30 hours in sociology and also held a paralegal certificate.

Moreover, his past employment history included extensive work as a youth counselor. The Plaintiff was rejected for all of the positions for which he applied. After being rejected, the positions were filled by female members who had similar qualifications and, as stated, in some instances somewhat less qualifications than that of the Plaintiff.

It is clear that in September, 1987, the Plaintiff was in fact offered a position as a child support enforcement officer and was advised that he would start work in that position on October 1, 1987. The Plaintiff then received a letter rejecting him for this position. Later the Defendant filled this position with a female applicant. So it is evident that Plaintiff established a prima facie case of discrimination which created a presumption that the Defendant had discriminated against the Plaintiff on the basis of his sex. *Walsdorf v. Board of Commissioners for the East Jefferson Levee District,* 857 F.2d at 1051.

Once the Plaintiff has established a prima facie case under the standards set forth in *McDonnell Douglas,* supra, the burden shifts to the Defendant to articulate some legitimate nondiscriminatory reason for having rejected the Plaintiff. In this matter, the Defendant had the production burden of articulating some reason other than a preference for females over males which might have justified its employment decision. If the Defendant meets this burden, the Plaintiff must then show that the articulated reason was a mere pretext for discrimination.

The Defendant through the testimony of Ms. Blain searched in vain to offer a legitimate nondiscriminatory reason for having failed to hire the Plaintiff for any of the four positions for which he applied. It became evident to the Court that Ms. Blain's rationale for not hiring the Plaintiff was no more than a pretext for discrimination.

In the pretrial order, the Defendant stated that it intended to show that Plaintiff had falsified information on his application form. Apparently, Defendant hoped to show that

Plaintiff's work history at the Mississippi Department of Corrections from which Plaintiff was fired and later reinstated was inaccurate. Defendants' proof on this point fell far short of the mark. Defendant neither showed that the work history was false, in view of Plaintiff's testimony that after a lawsuit he was reinstated to all benefits and lost time, nor did Defendant show that it had relied on any such view of Plaintiff's application in rejecting him.

Defendant also sought to make much of the various omissions in Plaintiff's application. For instance, Ms. Blain stated that Plaintiff neglected to include his college grade point average. Yet, some of the other applicants were guilty of the same omission, a point glossed over by Ms. Blain.

Hence, the Court finds that sex played a motivating factor in Ms. Blain's decision and in the Defendants' decision not to hire the Plaintiff. Accordingly, the Court finds for the Plaintiff and against the Defendant. The Court further finds that the Plaintiff has not been employed by the Defendant and thus it is necessary for the Court to order the Defendant to place the Plaintiff in any available position. The Court further finds that the Plaintiff is entitled to back pay, unpaid fringe benefits, and other costs and expenses including attorney fees due the Plaintiff as a result of the unlawful acts of the Defendant.

So ordered, this day, the 28th day of February, 1990.

----------

## II. QUESTIONS POSED BY THE FIFTH CIRCUIT

The Fifth Circuit specifically questions this court's decision to credit the testimony of Clifton Davis and his sister over the contradictory testimony of Thalia Blain with regard to two telephone conversations. The Fifth Circuit states:

> The crucial piece of evidence referred to by the district court concerned two telephone conversations—one between Blain and Davis' sister; the other between Blain and Davis. Davis' sister testified that on September 8, Blain called, asked for Davis who was not at home, and left a message "that he ha[d] the child support job" and

should "come by or call [Ms. Blain] as soon as possible." Davis testified that upon receipt of this message, he called Blain. She was not in, so he called again on the morning of September 9. According to his testimony, when he reached Blain on September 9, she stated: "oh, yeah, Clifton, we looked at your application, we seen that you already gone by the school and got your paralegal certificate and we want you to know that we have already considered you for the position of child enforcement officer and you got the job, come in on the ... first of October."

> According to Blain's testimony, she called Davis in order to find out whether he desired a separate interview for the child support enforcement position. As she explained: "I had interviewed him—I called him to tell him that I had received his child support enforcement officer position [application], and the purpose of my talking with him was to see whether or not he wanted to come back for another interview or whether or not the first interview would stand." She stated that in her conversation with him on September 10, she told him "that he would be given consideration without having to have another face-to-face interview." On September 11, Blain sent a rejection letter to Davis. As she stated, she thought that she had made a fair assessment of the situation, because she "gave [Davis' application] serious thought between the two time periods involved."

*Davis,* 942 F.2d at 886.

According to the Fifth Circuit's opinion, this court made a credibility determination based upon an erroneous perception that a logical inconsistency existed in Blain's testimony, The Court stated further that:

> ... in describing the "crucial piece of evidence" on which it relied, the district court referred to a logical inconsistency between Blain's account of her own words in the September 10 telephone conversation and her subsequent actions. As the court stated:

> > [Ms. Blain] claims that she but called to advise Plaintiff that he was under consideration. Then, she says, on the very

next day she wrote Plaintiff a rejection letter. The Court fails to understand under Ms. Blain's version why she would need to call Plaintiff to offer this encouragement when she had testified that during the interview phase she found him wanting in posture and lacking in neatness and detail.

The court infers from this perceived inconsistency that the purpose for the phone call must have been to offer Davis the position, and that her initial impressions of him at the interview must have been—contrary to her testimony—rather favorable. Thus, the court concludes that Blain must have been "impressed with Plaintiff's credentials and later decided not to hire him upon further reflection," implying that illegitimate considerations caused Blain to change her mind.

*Davis,* 942 F.2d at 887.

The Fifth Circuit concluded that this court had clearly erred by failing to acknowledge or account for Blain's testimony that the purpose of her call to Clifton Davis was to determine whether he wanted to go through another interview. The Court concluded its assessment of this court's findings with the following observation:

> We agree that if Blain had indicated in testimony that the essential purpose of her call was to advise Davis that he was still under consideration, as the district court suggests, and we, like the district court, accepted that testimony arguendo, this would raise doubts as to the credibility of her earlier assertions that she was unimpressed by his interview. In other words, it would be questionable that Blain would call Davis merely to "offer ... encouragement," when she knew that among the many factors that she would consider in making her final evaluation was a relatively unfavorable interview. In that case, we would certainly defer to the credibility determination of the district court.
>
> We recognize that the district court is in a unique position to assess credibility. In making our decision, however, we have access to the transcript, which the district court generally does not have in making its decision. After a careful review of the transcript, we do not agree that a logical inconsistency exists between what Blain actually testified to—that she called regarding the issue of a second interview—and her unfavorable impression as to certain aspects of Davis' candidacy. In stating that "she but called to advise Plaintiff that he was under consideration" and "to offer this encouragement," the district court appears in our view to have either overlooked or misapprehended a critical part of Blain's testimony. Although Blain indeed testified that she told Davis that he was under consideration, the reason for her call, as she also stated, was to find out whether he wanted another interview. We find nothing illogical or inconsistent about a prospective employer calling a job candidate (about whom the employer has some reservations) regarding the possibility of a second interview when that candidate is entitled as a matter of procedure to such interview.

*Davis,* 942 F.2d at 885–86.

The Fifth Circuit raises other evidentiary concerns in support of its view of this case including the statistical comparison between the number of males applying for work with the Yazoo County Welfare Department and the number actually hired; the poor condition of Clifton Davis' application; his comportment during his interview with Ms. Blain; and the apparently superior qualifications of the persons who were hired for the positions in question.

Therefore, pursuant to the Fifth Circuit's directive, this court has reviewed its decision in light of the transcript of testimony. Additionally, this court conducted a status conference wherein counsel for the respective parties presented their arguments of fact and law in response to the Fifth Circuit's opinion.

## III. *THE FRESH LOOK*

Having taken a fresh look at the evidence in light of the Fifth Circuit's observations, this court now recognizes that it erred. While the court adheres to its previous factual findings, the court cannot abide by its earlier-reached conclusion that these findings lead to a conclusion of sex discrimination.

This court still holds that plaintiff was qualified for the position. This court is still convinced that plaintiff could have performed the job chores demanded. He had the requisite education, and more. During the trial, the defendant questioned plaintiff's communication skills. A reader of the record transcript might be inclined to entertain similar doubts. The trial transcript is in many respects unkind to plaintiff's mastery of grammar. Upon reading the trial transcript, this court was surprised at the different impression conveyed by plaintiff's transcript words vice his in-court testimony. Perhaps this difference is explained by the fact that plaintiff speaks with a slight lisp. Or perhaps by the animation, emotion and speed of his verbal outpourings. Regardless, this court is yet convinced that plaintiff's education and communicative skills met the minimum requirements for the jobs in issue.

This court is also still convinced that Blain telephoned plaintiff on September 10, 1987, and offered him the position of Child Support Enforcement Officer. Blain testified that she called merely to ask plaintiff whether he wanted a second interview. This court was thoroughly unimpressed with this explanation, and still is. While the Fifth Circuit seems to give this explanation some weight, this court does not. Blain testified at trial that plaintiff's first interview had been most distressing, that he had slouched in his seat, worn dark non-prescription eyeglasses the entire time and had turned in an application that was neither neat nor correctly completed. To this court's eye, Blain appeared to be a no-nonsense administrator who would disdain the repeat performance of futile, frustrating acts. Having allowed him an earlier non-productive interview, she had no reason to call his home in diligent search of him for a second frustrating and disrespectful interview. This court did not see Blain as someone who having suffered an unpleasant interview would rush to give the applicant a second chance.

On the other hand, plaintiff's testimony, notwithstanding the minor contradiction with his sister's testimony relative to the first time Blain called, had the ring of truth. As the Fifth Circuit correctly observed in its detailed opinion, the district court is in the better position to weigh credibility. Rule 52(a), Federal Rules of Civil Procedure; *Anderson v. City of Bessemer City*, 470 U.S. 564, 572–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The Fifth Circuit had before it only the words of plaintiff. This court had both. Sometimes it happens that dry, lifeless words on silent parchment fail to convey the emotionalism and excitement of the utterance from which credibility may be gleaned. Plaintiff's testimony on the Blain telephone call had these qualities of believability. The court vividly recalls plaintiff's uncontained excited testimony on the matter, detailing his tremendous thrill at the job offer, and how with unabashed joy he revealed the good news to every family member and friend he could contact. And, further, this court was persuaded by plaintiff's demeanor and could feel his pain as he sadly and pitifully described his hurt at receiving the rejection slip from defendant the next day.

This court carefully weighed and compared the in-court testimony of Blain and the plaintiff. Earlier, this court found for plaintiff on this point, and this court still does. This court then adheres to its earlier finding that, as plaintiff testified, Blain telephoned him on September 10, 1987, and offered him the position of Child Support Enforcement Officer.

But, now comes the problem with the court's earlier conclusion that all of this signaled sex discrimination. In its earlier bench opinion, this court essentially concluded that since Blain lied about the September 10, 1987, telephone call to plaintiff, that her decision later to withdraw the job offer to plaintiff was rooted in sex discrimination. Earlier, this court simply disbelieved Blain's testimony and determined that her motive for misrepresentation had to be an effort to mask her discriminatory conduct. While this reaction could be true, this logical leap without the benefit of more evidence has problems.

This court is convinced that Blain did indeed telephone and offer plaintiff a job position. But, Blain's withdrawal of the offer does not necessarily point to sex discrimination. First of all, if Blain had a mind to

discriminate against plaintiff on account of his male sex, one wonders why she would call and offer him the position on September 10, 1987. In other words, if Blain had a prejudice against hiring male workers and did not want to employ him for that reason, why would she have called him and offered him a position as this court has found that she did, when she theoretically could have rejected him simply on the interview and condition of the application form?

Next, Blain's change of heart about plaintiff's fitness for the job position does not necessarily point to discrimination. *Lamphere v. Brown University*, 875 F.2d 916, 923 (1st Cir.1989). Again, this court is proceeding on its conclusion that Blain telephoned and offered plaintiff the position. This court is convinced that Blain, for some reason, changed her mind. But, this court cannot say that this subsequent mind change was activated or attended by a discriminatory intent. Kathy Bowden, an Eligibility Worker with the Yazoo County Welfare Department who previously had taken plaintiff's application for welfare benefits, testified that she had approached and advised Blain that she had doubted plaintiff had the requisite communicative skills for the position. Blain testified that she found plaintiff's application and interview unsatisfactory. Blain had a number of other qualified candidates to consider. Perhaps Blain merely rethought her decision to hire plaintiff and upon reflecting upon any or all of these factors simply decided to reject her earlier decision. What is clear, however, is that this court cannot connect Blain's telephone offer of a job to plaintiff on September 10, 1987, and that of the subsequent, next-day rejection by any bridge of discrimination.

This court obviously has no lens which peer into the human mind to discern how and why decisions are made. Instead, the court must rely upon objective evidence which purports to reveal these matters. Here, plaintiff had the proof burden to show that Blain's decision not to hire him was motivated by discriminatory concerns. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Montgomery v. Brookshire*, 34 F.3d 291 (5th Cir.1994). The plaintiff has convinced this court that his qualifications for the position were equal to or better than his competitors. The plaintiff has persuaded the court that Blain initially offered him the position. But, plaintiff has not shown that Blain's decision to withdraw the offer was tainted by unlawful discriminatory motives. And, under the evidence, this court simply cannot find support in the record for such a conclusion.

As earlier mentioned, this court initially found for plaintiff in its earlier bench opinion. Having studied the trial transcript and having re-examined the basis for its earlier decision, this court finds that it must reverse itself. While this court is yet convinced that all the pieces of this puzzle have not been assembled, still those portions thus far presented do not show a picture of sex discrimination clear enough to satisfy plaintiff's proof burden. This court's verdict is for the defendant.

**SO ORDERED AND ADJUDGED.**

**Robert SLAVIK, Individually, Tammy Slavik, Individually, and Robert and Tammy Slavik as Next Friend of Kurtis Slavik**

v.

**DR. PEPPER BOTTLING CO. OF TEXAS EMPLOYEE WELFARE BENEFIT PLAN and Dr. Pepper Bottling Co. of Texas, and Third Party Administrators.**

Civ. A. No. 4:93–CV–144–K.

United States District Court,
N.D. Texas,
Fort Worth Division.

Aug. 31, 1994.

474

Josephine Garrett, Joseph Sudderth, Daniel Barrett, Fielding Barrett & Taylor, Fort Worth, TX, for plaintiffs.

Mark French, McDonald Sanders, et al., Fort Worth, TX, for defendant Dr. Pepper Bottling Co.

Michael Forshay, Mark Nastri, Butler & Binion, Dallas, TX, for defendant third party administrators.

### SUMMARY JUDGMENT MEMORANDUM ORDER

BELEW, District Judge.

Pending before the Court are motions for summary judgment and or Fed.R.Civ.P. 12(b)(6) dismissal filed by Dr. Pepper and the Slaviks. The Benefits Plan has agreed, by stipulation entered on June 30, 1994, to be bound by the Court's decision of these Motions.

After careful review of the parties motions, arguments, authorities and law, it is the considered opinion of the Court that Plaintiffs' Motion for Summary Judgment should be granted in part, denied in part and that the Defendants' Motion for Summary Judgment should be granted in part, denied in part.

ERISA[1] suits, like the one before the Court, are often difficult, not so much because the substantive law is complex, but because the facts underlying the cases are often wrenching. The court is usually faced with the prospect of denying insurance or pension benefits to someone who desperately needs them because of cold, hard actuarial

1. Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(1).

decisions backed by the muscle of super-statute ERISA.[2]

## I. *SUMMARY JUDGMENT STANDARD*

To prevail on a summary judgment motion under Fed.R.Civ.P. 56(c), a movant must show that it is entitled to a judgment as a matter of law because there are no genuine issues of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) and *Slaughter v. Southern Talc Co.,* 949 F.2d 167, 170 (5th Cir.1991). A material fact is one that "might affect the outcome of the suit" under the governing substantive law. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. A movant shows that no genuine issues of material fact exist when it demonstrates that a rational fact finder could not decide the issue in favor of the non-movant after considering the record as a whole. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In ruling on this motion, the Court will look at the full record, including the pleadings, depositions, answers to interrogatories, admissions on file, as well as any affidavits or other evidence attached to the summary judgment motion. *Adams v. Williams,* 836 F.2d 958, 961 (5th Cir.1988) and Fed.R.Civ.P. 56(c). The Court will draw all reasonable inferences from the underlying facts in the light most favorable to the non-movant and any doubt will be resolved in its favor. *Eastman Kodak Co. v. Image Technical Serv., Inc.,* — U.S. —, —, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) and *Resolution Trust Corporation v. Sharif–Munir–Davidson Development Company,* 992 F.2d 1398, 1401 (5th Cir.1993). The Court's function is not, however, to "weigh the evidence and determine the truth of the matter," rather the Court's inquiry is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or is the matter so one-sided that one party must prevail as a matter of law." *Liberty Lobby,*

477 U.S. at 249, 251–52, 106 S.Ct. at 2510, 2511–12.

The movant's burden of proof depends on the movant's litigation proof burdens. "[I]f the movant bears the burden of proof on an issue, whether because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986).

If the non-movant bears the burden of proof on the issue, the movant is entitled to summary judgment if it can show that the non-movant has failed, after adequate discovery, to sufficiently establish each and every element essential to its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990), *cert. denied,* — U.S. —, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993).

Once the moving party has made its initial showing, non-movant must come forward with competent evidence creating a genuine fact issue. *Matsushita,* 475 U.S. at 585, 106 S.Ct. at 1355 and *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2514. In order to avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Rule 56(e) requires that the non-moving party "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514.

## II. *FACTUAL BACKGROUND*

Kurtis Slavik was run over by his school bus on January 8, 1992, grievously injuring the eight year old boy. Kurtis' father, Robert Slavik is an employee of the Dr. Pepper Bottling Company of Texas. Kurtis is an insured beneficiary under his father's policy with the Dr. Pepper Employee Medical and Dental Benefits Plan (the "Plan") which, the

---

**2.** The Court notes that "[a] hyperbolic wag is reputed to have said that ERISA stands for 'Everything Ridiculous Imagined Since Adam.'"

*Florence Nightingale Nursing Service v. Blue Cross,* 832 F.Supp. 1456, 1457 (N.D.Ala.1993).

parties agree, covers Kurtis and his injuries. Kurtis' medical bills total over $150,000 and continue to rise.

The Dr. Pepper Employee Medical and Dental Benefits Plan is a self-funded employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA). *See* 29 U.S.C. § 1002(1) (1988). Dr. Pepper is the Plan administrator and admits it is a Plan fiduciary.

The conflict that drives this case is simple: who is entitled to how much of Kurtis' tort claim against the school district and others in state court litigation.[3] It is clear that Kurtis' injuries are covered by the Plan, but Dr. Pepper, acting according to what it thinks is the correct interpretation of its Plan, refuses to pay his medical expenses until the Slaviks execute an "acknowledgement," or agreement, subrogating Kurtis' entire tort claim to the Plan. While Kurtis' escalating medical bills already exceeding $150,000, his tort claim recovery against the school district is capped at $100,000 by the Texas Tort Claims Act. Tex.Civ.Prac. & Rem.Code Ann. § 101.023(b). Dr. Pepper, as Plan administrator, wants all of that $100,000, or at least refuses to pay any of Kurtis' medical bills until the Slaviks sign a subrogation agreement acknowledging that the Plan is entitled to subrogation against any and all money Kurtis collects from the school district and other defendants, regardless of whether paid for medical expenses, pain and suffering, compensation if Kurtis is found to be sterile, or any other non-medical expense compensation.

While the facts underlying this suit are easily determinable, the legal denouement is complex.

## III. THE LEGAL STANDARDS—AN INTRODUCTION TO THE ISSUES

The governing law is complex, raising numerous sub-issues that must be resolved before the Court may address the underlying question of who gets the money from the school district and other tort defendants.

Each party has filed a summary judgment motion, claiming the law entitles it to the Court's decision. The parties agree that the issues presented are more appropriately settled by motion, saving both their clients the cost of proceeding to trial and saving this Court's trial docket space. The parties are duly thanked for their consideration.

### A. The Slavik and Dr. Pepper Summary Judgment Motions

The Plan is a self-funded insurance plan. 29 U.S.C. § 1002(1). ERISA, by its own terms, preempts all state laws, unless aimed at regulating insurance companies. 29 U.S.C. § 1144(a). ERISA preemption extends to state common law as well as statutes. 29 U.S.C. § 1144(c)(1).

Under the statute, self insured employee benefits plans are deemed not to be banks, insurance companies or investment companies for the purposes of state regulation of employee welfare benefits devices. 29 U.S.C. § 1144(b)(2)(A & B) and *FMC Corporation v. Holliday,* 498 U.S. 52, 61, 111 S.Ct. 403, 409, 112 L.Ed.2d 356 (1990) (preempting Pennsylvania statute denying subrogation rights to self-funded employee welfare benefits plans). Accordingly, the Plan and its subrogation clause are not subject to regulation by Texas statute or common law.

As stated above, the dispute between the Slaviks and the Defendants in this case revolves around whether the Slaviks are required by the Plan to execute a subrogation agreement as a condition precedent to Kurtis' medical bills being paid. If the subrogation agreement must be executed prior to payment of Kurtis' medical bills, the next question is how broad are the Plan's subrogation rights or rather are the Plan's subrogation rights limited to Kurtis' recovery for medical expenses or is the Plan entitled to all the money Kurtis may recover in state court, whether received as compensation for pain and suffering, *et cetera,* or as medical expenses. These questions hinge on interpretation of the Plan itself. While *FMC Corporation, supra,* removed self-funded plans like

---

**3.** *Robert Slavik, et al v. Grandbury Independent School District, et al,* Cause No. 92249–G, pending in the 355th District Court of Hood County, Texas.

Dr. Pepper's from state regulation, the Court will apply generally accepted contract and subrogation principles to interpret the Plan.

Now the Court turns to the issues surrounding Dr. Pepper's interpretation of the Plan and what deference the Court should give to Dr. Pepper's interpretation.

### (1) *What is the Standard of Review?*

■ "Consistent with established principles of trust law ... a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to construe the terms of the plan." *Firestone v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Wildbur v. ARCO Chemical Co.,* 974 F.2d 631, 636 (5th Cir.1992); and *Batchelor v. Intern. Broth. of Elec. Wkrs. Local,* 877 F.2d 441, 442 (5th Cir.1989). If the administrator is given discretion by the plan, the Court must apply an abuse of discretion standard.[4] *Bruch,* 489 U.S. at 113, 109 S.Ct. at 956; *Wildbur,* 974 F.2d at 636.

■ "Discretionary authority cannot, however, be implied; an administrator has no discretion to determine eligibility or interpret the plan unless the plan language expressly confers such authority on the administrator." *Cathey v. Dow Chemical Co. Medical Care Program,* 907 F.2d 554, 558 (5th Cir.1990), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991).

■ The parties have briefed the issue of discretion at great length, but the Fifth Circuit has no iron-clad test to determine whether the Plan conveys discretion on the administrator. Rather a reviewing court is to "read the plan as a whole to determine, if in [the court's judgment] it satisfies the [*Bruch* ] criteria." *Wildbur* 974 F.2d at 836–37. There are no "magic words required" to

convey discretion, rather the plan must express the administrator's independent and final authority to construe plan terms and to determine benefits eligibility. *Id.* The Court is entitled to review the Plan's language *de novo* to determine whether any discretion has been conveyed to Dr. Pepper. *Cathey,* 907 F.2d at 558.

■ The Plan provides that the administrator, Dr. Pepper, has the "authority to control and manage the operation and administration of the plan." Plan, 1. Dr. Pepper also has the power "to amend the plan, to determine its policies, ... and exercise general administrative authority over them." *Id.* "The administrator has the sole authority and responsibility to review and make decisions on all claims to benefits hereunder." *Id.* In another portion the Plan grants Dr. Pepper the "authority to control and manage the operation and administration of the Plan." Plan, 17. Finally, the Plan provides that Dr. Pepper shall decide appeals from decisions of the Plan supervisor. Plan, 48.

Reviewing these provisions of the Plan, the Court is convinced that the Plan vests Dr. Pepper with the authority to interpret the benefits plan.

However, an unfunded, self-insured, plan like Dr. Pepper's, where the party who ultimately decides whose claims should be paid is the same party who is paying those claims,[5] presents a situation different from the norm. Here, the fox seems to be guarding the henhouse, especially after the Supreme Court removed any semblance of state law regulation from the Plan in *FMC Corporation, supra.*

The solution to this problem lies in *Bruch* where the Supreme Court noted that "if a

---

**4.** The Court uses the "abuse of discretion" label to describe how it reviews Dr. Pepper's decision to deny the Slaviks' benefits. The Fifth Circuit has determined that for the purposes of reviewing plan administrator's decisions, the terms "abuse of discretion" and "arbitrary and capricious" (used by the Supreme Court in *Bruch*) are interchangeable. *Wildbur,* 974 F.2d at 635 n. 7.

**5.** The Court acknowledges that Third Party Administrators "cut checks" for the Plan. However-

er, in granting TPA's Motion for Summary Judgment, the Court found that TPA was not the Administrator of the Plan as defined by ERISA. TPA did not have discretionary authority to set policy. Rather TPA paid, or did not pay, whomever Dr. Pepper designated. Therefore, it is a fair statement of the situation confronting the Court to say that Dr. Pepper was controlling the purse strings as well as dictating policy.

benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" 498 U.S. at 115, 111 S.Ct. at 469 (quoting, *Restatement (Second) of Trusts*, § 187, Comment d (1959)).

While it does not appear the Fifth Circuit has addressed this conflict of interest issue, the Fourth Circuit has in *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80 (4th Cir.1993). In *Doe*, the court held that an administrator, acting under a conflict of interest, is not entitled to an abuse of discretion standard of review—relying on *FMC Corporation* and 29 U.S.C. § 1104(a)(1)(A) (fiduciary must operate Plan solely in the interest of the participants and beneficiaries). *Doe*, 3 F.3d at 86, and *see also Restatement (Second) of Trusts*, § 170(1). As stated in *Bruch*, a conflict of interest should be considered when determining whether Dr. Pepper has abused its discretion in denying Kurtis Slaviks benefits.

This Court adopts this lessened standard of review as appropriate in this case. Therefore, the Court must review Dr. Pepper's decision to withhold paying Kurtis' medical bills until the Slaviks sign a total subrogation agreement against an abuse of discretion standard, mindful of any possible conflict of interest.

*(2) Did Dr. Pepper Abuse its Discretion?*

The test to determine whether Dr. Pepper has abused the Plan's discretion is two pronged. First, the Court must determine the legally correct interpretation of the Plan. *Wildbur*, 974 F.2d at 637. Then, the Court must then determine whether Dr. Pepper's decision was an abuse of discretion. *Id.*

*(a) Is Dr. Pepper's Interpretation Correct?*

In answering the question of what is the correct interpretation of the Plan, the Court is directed to consider:

(1) whether the administrator has given the Plan a uniform construction;

(2) whether the interpretation is consistent with a fair reading of the Plan; and

(3) any unanticipated costs resulting from different interpretations of the Plan.

*Wildbur*, 974 F.2d at 637–38, *citing, Jordan v. Cameron Iron Works, Inc.*, 900 F.2d 53, 56 (5th Cir.), *cert. denied*, 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990).

The terms of the Plan at issue are on page 35 of the Plan in the Subrogation and Third Party Liability paragraphs.[6]

■ Dr. Pepper considers the Plan's subrogation acknowledgement form to be a con-

---

**6.** The terms of the Plan at issue are:

*SUBROGATION.* Subrogation is the Company's limited right to be substituted for a Covered Person in a claim for damages for willfully or negligently caused injuries. If payment is made for services on behalf of a Covered Person under this Plan, the Company, to the extent of such payment, shall be subrogated to all rights of recovery which the Covered Person, or the Covered Person's representative, may have against any other party or liability insurer. The Covered Person shall do whatever is reasonably needed to secure the Company's rights, and shall do nothing to damage such rights.

*THIRD PARTY LIABILITY.* If a Covered person has medical charges:

(1) as a result of the negligence or intentional acts of a third party; and

(2) the Covered person makes a claim for benefits under the Plan for such charges;

the Covered Person (or legal representative of a minor or incompetent) must agree in writing to repay the Company from any amount of money received by the Covered Person from the third party (or its insurer).

The repayment will be to the extent of the benefits paid by the Plan, but will not exceed the amount of the payment received by the covered Person from the third party (or its insurer). The reasonable expenses, such as lawyers' fees and court costs, incurred in obtaining payment from the third party, may be deducted from the repayment to the Plan.

The repayment agreement will be binding upon the Covered Person (or legal representative of a minor or a incompetent) whether or not:

(1) the payment received from the third party (or its insurer) is the result of:

(a) a legal judgment;

(b) an arbitration award;

(c) a compromise settlement; or

(d) any other arrangement.

(2) the third party (or its insurer) has admitted liability; or

(3) the medical charges are itemized in the third party payment.

Plan, p. 35.

dition precedent to payment of any claim.[7] Of course, contractual conditions precedent are an unfavored contract device and must be included as express terms of the contract. *Royal Bank of Canada v. Beneficial Leasing Corp.*, 1992 WL 167339, *4 (S.D.N.Y.) ("It is a basic principle that a condition precedent will be found only where the contract unambiguously expresses the parties' intent to create such a condition") (citations omitted).

### [1] Has Dr. Pepper Been Consistent?

■ While it may be true that foolish consistencies are the hobgoblins of little minds,[8] the Court is instructed that if Dr. Pepper has consistently interpreted the Plan, the Court must weigh that in the administrator's favor. *Wildbur*, 974 F.2d at 637–38.

Dr. Pepper's employee responsible for managing the benefits plan is Thomas J. Taszarek. Mr. Taszarek was deposed at length about his and Dr. Pepper's construction of the Plan's terms. Mr. Taszarek has testified that he has required over fifty beneficiaries to sign subrogation agreements, or every time a third party may have been responsible for the injuries claimed by a Plan beneficiary.[9]

Mr. Taszarek's consistency, along with the Plan's language requiring that a written subrogation agreement be executed, are evidence that Dr. Pepper's interpretation is correct under the *Wildbur*, 974 F.2d at 637–38.

### [2] Is Dr. Pepper's interpretation a fair reading of the Plan?

In making a review of the Plan's language, the Court notes two passages with particular relevance to this inquiry. First, the Court notes the Plan's language stating that

"if payment is made for services for services on behalf of a Covered Person under this Plan, the Company, to the extent of such payment, **shall be** subrogated to all rights of recovery ..." (emphasis added). Plan, p. 35.

That language indicates that payment of benefits is the trigger for Dr. Pepper's subrogation rights, regardless of whether or not any subrogation agreement or acknowledgement is signed by the Slaviks.

Second, the Court notes that the Plan's Third Party Liability section where the Plan **expressly** requires a written subrogation agreement as a benefits condition if a third party is liable for the Covered Person's injuries, but does not clearly state that provision of a satisfactory subrogation agreement is a condition precedent to payment of benefits.

If a Covered Person has medical charges:

(1) as a result of the negligence or intentional acts of a third party; and

(2) the Covered Person makes a claim for benefits under the Plan for such charges;

the Covered Person (or legal representative of a minor or incompetent) must agree in writing to repay the Company from any amount of money received by the Covered Person from the third party (or its insurer).

Plan, p. 35.

While it is clear from reading these two provisions that the Slaviks' tort claims would be and are subrogated to the Plan, this language leaves two ambiguities for the Court to resolve. First, does the Plan require the Slaviks to sign a subrogation agreement, satisfactory to Dr. Pepper, **before** Dr. Pepper will pay the bills it concedes it owes. Second, how broad are the Plan's subrogation rights.

Turning to the first issue, it is clear that the Plan does not clearly state that provision of a satisfactory subrogation agreement is a condition precedent of payment of benefits. Rather the Plan states that the Dr. Pepper **"shall be subrogated"** *when* the Slaviks' claims are paid. Further down the page, the

---

7. Def.Resp. to Pl.'s Mot. for Sum.J., Ex. # 3, Depo. of Juel Sabot, p. 59, 11.22–24.

8. "A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines. With consistency a great soul has simply nothing to do."—Ralph Waldo Emerson.

9. Dr. Pepper's Mot. for Summ.J., Declaration of Thomas J. Taszarek of December 10, 1993, ¶ 13.

Plan states that the Slaviks must execute a written subrogation form. However, nowhere in this language does the Plan establish, with required particularity, a condition precedent.[10]

Second, Dr. Pepper argues that the language of the subrogation agreement requires that the Plan receive first money from any settlement or judgment Kurtis receives from the state court defendants.

A brief recitation of some of the basic tenets of subrogation law will be helpful before beginning the analysis of the Plan's "Third Party Liability" section.

The Fifth Circuit has recently visited the area of subrogation in *Oss v. United Services Automobile Ass'n*, 807 F.2d 457 (5th Cir. 1987). While *Oss* treated the provisions of a Texas auto insurance policy, the general principles of subrogation law the court enunciated are appropriately applied to this case.

In *Oss*, the court held that

the right of subrogation is ordinarily exercised in one of two ways. If the insurer pays benefits that partially compensate the insured and the tortfeasor subsequently pay the insured an amount that makes the total received by the insured greater than its actual loss, the insurer may recover the benefits paid by claiming the **surplus** amount. In this way, subrogation prevents a double recovery—unjust enrichment—by the insured. Alternatively, after an insurer has fully compensated the insured, it may sue the tortfeasor directly to recover its outlay. The tortfeasor, then does not become the unintended beneficiary of the insurance contract.

807 F.2d at 458–49 (citations omitted) (emphasis added).

It is clear from this passage, alone, that Dr. Pepper is trying to extend the reach of the Plan's subrogation clause beyond its legal grasp. However, the *Oss* court clearly and unequivocally adopted the "make whole" doctrine of subrogation. In addressing the subrogation clause at issue in that case, the court held that

"the subrogation clause would not be regarded, even by a careful and intelligent reader, as qualifying the basic promise to pay, and to give it that effect is to enforce provisions of drafted by the insurer that are inherently deceptive." This is good reason for holding that the '[subrogation] clause must be subordinated to the basic insurance promise' and **that the insurer should not "recover sums received by the insured from the tort source until the insured has been fully indemnified."** (emphasis added)

*Oss* at 460, *quoting* G. Palmer, *Law of Restitution*, § 23.14, at 434 & n. 13 and 432–33 (1978).[11] Further support of the make whole doctrine is found in the Fifth Circuit's reiteration of the

well settled rule that, when the insured's losses, including the costs and expenses of collection, exceed the amounts paid by the tortfeasor and the insurer, there is no double recovery and the insurer is not entitled to a share of the insured's compensation.

*Oss*, 807 F.2d at 460, *citing, Ortiz v. Great Southern Fire & Casualty Ins. Co.*, 597 S.W.2d 342, 343 (Tex.1980) and *Propeck v. Farmers' Mutual Ins. Ass'n*, 65 S.W.2d 390, 390 (Tex.Civ.App.1933, no writ).[12]

Dr. Pepper's Plan does not expressly establish a condition precedent by its language.

---

10. The Court has found examples of employee benefits plans containing subrogation agreement conditions precedent. *See, e.g., Preze v. Board of Trustees*, 1992 WL 38398, *1, 3 (N.D.Ill.1992) (plan containing express condition precedent—"no benefits will be paid on such claims unless the eligible employee or eligible employee's defendant executes a written subrogation agreement in a form satisfactory the Trustee.") and *Metro Health Systems v. United Furniture Workers Ins. Fund*, 1991 WL 325161, *1 (N.D.Ohio 1991) (plan containing express condition precedent—"A failure to execute or honor this assignment may result in the denial of future payments of claims").

11. *See, also Guy v. Southeastern Iron Worker's Welfare Fund*, 877 F.2d 37, 39 (11th Cir.1989), *citing Couch on Insurance*, 2d 16 § 60.50 (1983) ("It is a general principle of subrogation law that an insured who has settled with a third-party tortfeasor is liable to the insurer-subrogee only for the *excess* received over the total amount of his loss amount of his loss.")

12. The Court notes that the *Oss* court refers to state law in this passage, and that *FMC Corporation v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), immunized the Plan from

Accordingly, the Court finds that the make whole doctrine is the appropriate principle guiding Dr. Pepper's subrogation rights in this case. Additionally, the Plan's own terms indicate that the Plan will only be reimbursed from tort settlement funds designated as paid for medical expenses—"[t]he repayment agreement will be binding upon the Covered Person (or the legal representative of a minor or incompetent) whether or not: (3) the medical charges are itemized in the third party payment." Therefore, the Court finds that Dr. Pepper's interpretation of the breadth of the Plan's subrogation rights is incorrect.

In light of the Plan's failure to expressly establish a subrogation clause with required particularity, and Dr. Pepper's incorrect interpretation of the breadth of their subrogation rights as a self insurer, the Court holds Dr. Pepper has incorrectly interpreted the terms of the Dr. Pepper Bottling Company of Texas Employee Welfare Benefits Plan.

[3] Would there be any unanticipated expenses to the Plan?

As the Court has determined that Dr. Pepper's interpretation of the Plan is incorrect regardless of any unanticipated costs, the Court will advance to the next step in this analysis.

(b) *Is it an Abuse of Discretion?*

█ The fact that Dr. Pepper has incorrectly interpreted the term of the Plan does not conclusively establish an abuse of discretion. *Batchelor,* 877 F.2d at 445. However, an incorrect interpretation is strong evidence of an abuse of discretion. *Id.* As the Court has held that Dr. Pepper's interpretation is incorrect, the Court must now determine whether or not Dr. Pepper's incorrect interpretation is an abuse of discretion. This test is three part as well. The Court is directed to consider the following factors:

(1) the internal consistency of the Plan under Dr. Pepper's interpretation;

(2) any relevant regulations formulated by the appropriate administrative agencies; and

any state law regulation. However, the Court holds that these generally accepted principles are

(3) the factual background of the determination and any inferences of lack of good faith.

*Wildbur,* 974 F.2d at 638, *citing Batchelor,* 877 F.2d at 445–48.

However, in light of the Court's prior determination that Dr. Pepper was acting under a conflict of interest, will weigh that conflict as an element of the abuse of discretion standard.

[1] Is the Plan internally consistent under Dr. Pepper's interpretation?

█ The Plaintiff has made no complaint that Dr. Pepper, as administrator, has created internal inconsistencies in the Plan by its interpretation. In examining the parties' stances in this litigation, the Court cannot help but come to the conclusion that but for the dispute over the breadth of the Plan's subrogation rights, and whether the subrogation agreement is a condition precedent, there are no internal inconsistencies under Dr. Pepper's interpretation of the Plan.

[2] Has Dr. Pepper complied with relevant regulations formulated by the appropriate administrative agencies?

ERISA preempts any state regulation of unfunded, self insured employee benefits plans. *FMC Corporation, supra.* Therefore, the Plan is relieved from complying with any Texas statute or regulation.

There have been no allegations by the Plaintiff that the Defendants have failed to abide by the numerous federal regulations governing the day to day operation of an ERISA plan, such as filing Plan descriptions, providing Plan summaries to beneficiaries, *et cetera.*

Therefore, the Court finds that the Dr. Pepper has complied with all relevant regulations.

[3] Are there any inferences of lack of good faith in the factual background of the determination?

Dr. Pepper admits that Kurtis' injuries are covered by the terms of the Plan. Dr. Pep-

appropriately applied to the facts of this case.

per is also aware that the Slavik family has endured great financial hardship as a result of Dr. Pepper's refusal to pay these benefits. Dr. Pepper is also aware that the Grandbury ISD's liability is capped, by statute at $100,-000.00. The Court notes that Dr. Pepper has obtained umbrella coverage for the Plan to pay any benefits exceeding $100,000.00. The Court notes that Kurtis' medical bills exceeded $150,000.00 at the time of the Court's settlement conference held on February 28, 1994. The Court also notes that Dr. Pepper has attempted, or is currently attempting, to intervene in the Slaviks' state court suit in an apparent effort to prevent the Slaviks from compromising Dr. Pepper's subrogation rights.

Dr. Pepper has repeatedly stated that its sole interest in refusing to pay Kurtis' medical bills is to protect its subrogation rights. As the *Oss* court stated, subrogation rights arise either by contract or equitably. The Plan, itself contains a contractual provision granting Dr. Pepper subrogation rights in the Slaviks' state court action. It appears that Dr. Pepper has attempted to exercise those rights by intervention. Further, Dr. Pepper could have secured its right to subrogation by merely paying Kurtis' benefits.[13]

Instead, operating under a conflict of interest, Dr. Pepper refused to pay those benefits in an attempt to extort an improperly broad subrogation agreement from the Slaviks.

While the Fifth Circuit has not addressed the issue of an ERISA plan refusing to pay admittedly due benefits, pending the resolution of a subrogation, the *Oss* court addressed the topic under Texas insurance law and found it an abuse of discretion for an insurer to so withhold benefits. 807 F.2d at 460.

Further, the Eleventh Circuit has addressed the situation presented to the Court—an ERISA plan refusing to pay benefits pending a subrogation agreement—and held it arbitrary and capricious for an insurer to withhold benefits, which the insurer acknowledges it should cover, pending the resolution of an uncertain subrogation dispute. *Guy v. Southeastern Iron Worker's Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989). The subrogation agreement in that case was very similar to Dr. Pepper's—"The covered persons shall pay over to the [fund] all amounts recovered by suit, settlement or otherwise from any third person or his insurer to the extent of benefits provided hereunder." *Guy,* 877 F.2d at 38. The Court holds that it is appropriate to apply this standard to the case before it.

In light of the foregoing, the Court finds that Dr. Pepper has abused its discretion, pursuant to in denying benefits owed to Kurtis Slavik under its employee benefits plan.

### B. *What to do With the Slaviks' Remaining Claims?*

The Court holds that the Slaviks' claims for intentional infliction of severe emotional distress[14] and interference with credit reputation[15] are preempted by ERISA. *See Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983); *Corcoran v. United Healthcare, Inc.,* 965 F.2d 1321 (5th Cir.1992); and *Lee v. E.I. DuPont de Nemours,* 894 F.2d 755, 758 (5th Cir.1990).

Accordingly, the Court grants the Defendants' Motion for Summary Judgment on these claims.

### C. *What is the Remedy?*

As the Court has found that the Plan Administrator has abused its discretion in operating the Plan, the Court enters the following Orders:

IT IS ORDERED, ADJUDGED AND DECREED, pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and § 1132(a)(3), that the Plaintiffs in this cause are entitled to the immediate payment of Kurtis Slavik's medical bills currently due and owing under the terms of the Dr. Pepper Bottling Company of Texas Employee Welfare Benefits Plan.

---

13. Appropriately, the Court of Appeals has held that there is no functional distinction in the operation of equitable or contractual subrogation. *Oss,* 807 F.2d at 460.

14. Fourth Amended Complaint, ¶ IV.

15. Fourth Amended Complaint, ¶ V.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, pursuant to the Court's authority to interpret the Plan under 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3) and 1104(a)(1)(D), that Dr. Pepper's, and the Plan's, rights of subrogation are subordinated to Kurtis Slavik's rights of recovery and that Dr. Pepper and the Plan are not entitled to subrogation to Kurtis Slavik's rights of recovery against the third party tortfeasors until Kurtis Slavik has been made·whole by complete compensation for his injuries. ·

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, pursuant to 29 U.S.C. § 1132(g)(2), that the Defendants pay the Plaintiffs' attorney fees and costs incurred in this cause of action. Plaintiffs' counsel is directed to submit to the Court an itemized accounting of the fees and costs incurred in prosecuting this cause. This itemization is to be filed no later than 4:30 pm, September 16, 1994.

Finding no indication that Dr. Pepper's actions are part of a larger and systematic breach of fiduciary duties, the Court DENIES Plaintiffs' request that Dr. Pepper be dismissed as Plan Administrator.[16]

Additionally, pursuant to *Mertens v. Hewit*, — U.S. —, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), the Court declines to award monetary damages against the Defendants.

## IV. *CONCLUSION*

After finding that the Defendant, Dr. Pepper, had abused its discretion in the operation and interpretation of the Dr. Pepper Bottling Company of Texas Employee Welfare Benefits Plan, the Court orders the Defendants to pay the Plaintiffs benefits due under the terms of the Plan.

Further, the Court enters a declaratory judgment subordinating the Defendants' equitable and contractual subrogation rights to those of Kurtis Slavik, ordering that the Plan not recover any subrogation until such time as Kurtis Slavik is fully compensated by the third party tortfeasors.

Accordingly, Plaintiffs' Motion for Summary Judgment is granted in part, denied in part.

Defendants' Motion for Summary Judgment is granted in part, denied in part.

IT IS SO ORDERED.

### *JUDGMENT ON DECISION BY THE COURT*

This action came on for consideration by the Court, Honorable David O. Belew, Jr., District Judge, presiding, and the issues having been duly heard and considered a decision having been rendered by Order entered this same day,

It is hereby IT IS ORDERED, ADJUDGED AND DECREED, pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and § 1132(a)(3), that the Plaintiffs in this cause are entitled to the immediate payment of Kurtis Slavik's medical bills currently due and owing under the terms of the Dr. Pepper Bottling Company of Texas Employee Welfare Benefits Plan.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, pursuant to the Court's authority to interpret the Plan under 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3) and 1104(a)(1)(D), that Dr. Pepper's, and the Plan's, rights of subrogation are subordinated to Kurtis Slavik's rights of recovery and that Dr. Pepper and the Plan are not entitled to subrogation to Kurtis Slavik's rights of recovery against the third party tortfeasors until Kurtis Slavik has been made whole by complete compensation for his injuries.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, pursuant to 29 U.S.C. § 1132(g)(2), that the Defendants pay the Plaintiffs' attorney fees and costs incurred in this cause of action. Plaintiffs' counsel is directed to submit to the Court an itemized accounting of the fees and costs incurred in prosecuting this cause. This itemization is to be filed no later than 4:30 pm, September 16, 1994.

Finding no indication that Dr. Pepper's actions are part of a larger and systematic breach of fiduciary duties, the Court DE-

---

16. Fourth Amended Complaint, ¶ 21.

NIES Plaintiffs' request that Dr. Pepper be dismissed as Plan Administrator.

Additionally, pursuant to *Mertens v. Hewit,* —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), the Court declines to award monetary damages against the Defendants.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Slaviks' claims for intentional infliction of severe emotional distress and interference with credit reputation are preempted by ERISA.

IT IS SO ORDERED.

### In re John COCKRUM, Applicant.

### No. 6:93cv230.

United States District Court,
E.D. Texas,
Tyler Division.

Aug. 5, 1994.

Alan Bernard Rich and Lawrence Ray Lassiter, Dallas, TX, Jeffrey Dworkin, Austin, TX, for applicant.

John Jacks, Asst. Atty. Gen., Atty. Gen.'s Office, Austin, TX, for state.

## MEMORANDUM OPINION

JUSTICE, District Judge.

### I. *Background*

John Cockrum, the applicant, presents to this court a troubling and unusual, although not unique, case. Cockrum was convicted of capital murder in a Texas court and sentenced to death. He appealed his conviction and filed an unsuccessful application for the writ of habeas corpus in the state system. He then filed an application for the Great Writ before this court. Soon after filing that application, however, he decided that he no longer wanted to challenge his conviction and sentence. In the first of many letters to the court, the applicant requested that his application be withdrawn, that he be permitted to dismiss his attorneys, and that the death penalty be imposed swiftly. On July 16, 1993, this court held a hearing to determine how to proceed under these unusual facts, and determined that a full evidentiary hearing should be held to determine the applicant's competency to waive further review of his conviction and sentence. The competency hearing was held on April 11–12, 1994, and continued on July 5–6, 1994. At every stage of the proceedings, the applicant himself was given a full opportunity to question the witnesses and present evidence and testimony on his own behalf, independent of his attorneys.

■ The appropriate standard for determining competency in this situation requires answering the following questions:

(1) Is the person suffering from a mental disease or defect?

(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding this legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

*Rumbaugh v. Procunier,* 753 F.2d 395, 398 (5th Cir.), *cert. denied,* 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985); *see also Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 1506–07, 16 L.Ed.2d 583 (1966) (per curiam). For the reasons set out below, it is found that Cockrum is not competent to waive further review of his conviction and sentence. Accordingly, the merits of his application for the writ of habeas corpus shall be reviewed.

The experts who testified at trial regarding the applicant's competency, under the standard set forth above, based their evaluations on the applicant's history, as well as personal interviews of varying lengths. The applicant's tragic personal history was universally viewed as critical to a determination of his current competency to waive further review. Although some of the details are disputed, the basic outline of his traumatic life is well established. His father was an alcoholic police officer who became violent when intoxicated, physically abusing the applicant, his sisters, and his mother. At a very early age—nine or ten years old—the applicant began using illegal drugs and continued to do so until he was arrested on the charges for which he was ultimately sentenced to death. At the age of fifteen, he allegedly set fire to his school and was confined to a state correctional facility for boys. His family situation did not improve when he returned home at the age of sixteen. When the applicant was seventeen, he shot his father during one of his father's drunken, abusive episodes. A few weeks later, his father died of his wounds. Before he died, the applicant's father told authorities that the shooting was an accident; therefore, the applicant never faced criminal charges arising from the shooting. However, it is clear that the shooting had a profound impact on the applicant. His drug abuse escalated, and he attempted suicide at least twice. He married and had one daughter, but his marriage failed. Eventually, he became addicted to methamphetamines. During one episode of acute methamphetamine intoxication, he allegedly murdered a convenience store clerk during a robbery—the crimes for which he has been sentenced to death.

A total of four mental health experts testified regarding the applicant's competency to

waive further review of his conviction and sentence. The first to testify was Richard Pesikoff, M.D., a psychiatrist appointed by the court to examine the applicant and determine the applicant's competency. Dr. Pesikoff diagnosed the applicant as suffering from dysthymia, a persistent, mild depression lasting more than two years. He also stated that the applicant had in the past suffered from drug abuse and antisocial personality disorder. Dr. Pesikoff noted that the applicant did not suffer from any additional psychological disorders, such as post-traumatic stress disorder ("PTSD"), and has no current suicidal thoughts. George Leventon, M.D., Dr. Pesikoff's associate and fellow psychiatrist, testified to conclusions similar to Dr. Pesikoff's, as embodied in their joint report. Drs. Pesikoff and Leventon also concluded that the applicant's mental condition did not prevent him from understanding his current legal position and options, nor did it prevent him from making a rational choice with respect to whether to waive further review of his conviction and sentence.

The applicant's counsel called two experts regarding the applicant's competency. Faye Sultan, Ph.D. a clinical psychologist, diagnosed the applicant as suffering from dysthymia, post-traumatic stress disorder ("PTSD"), and some, but not all, of the symptoms of a delusional thought disorder. Although Dr. Sultan agreed that the applicant was able to understand his position and options, she concluded that he was not able to make a rational choice among those options. Stuart Grassian, M.D., a psychiatrist, also diagnosed Cockrum as suffering from PTSD, and concluded that he is incompetent to terminate his pursuit of legal remedies.

The court also had significant opportunity to directly observe the applicant. The applicant questioned almost every witness presented during the hearings, and also testified twice in his own behalf. He was composed, coherent, courteous, and intelligent. He behaved appropriately in the courtroom, although he displayed almost no emotion throughout the proceedings. While he did not appear extremely alert, his questions and statements showed that he paid close attention to the proceedings.

## II. *Existence and Type of Mental Disease or Defect* [1]

■ Regardless of the differing conclusions of the experts respecting the applicant's competency to waive further review under the *Rumbaugh* standard, they agreed on a wide range of points. First, there was universal agreement that the applicant suffers from at least one mental disease or disorder, namely dysthymia, a chronic mild depression. Although there is much superficial disagreement over whether the applicant suffers from post-traumatic stress disorder ("PTSD"), the actual area of controversy is a narrow one. All experts agreed that the applicant's fatal shooting of his father was a stressor significant enough to cause PTSD.[2] It is undisputed that up until at least the late 1980s, the applicant displayed many of the symptoms of PTSD. Dr. Leventon agreed that the applicant could very well have suffered from PTSD in the past, but disagreed with the other experts' opinions that he suffers from it currently.[3] Dr. Pesikoff found no symptoms of PTSD in his interview with the applicant in December of 1993 and, when questioned about possible PTSD in the past, noted that most PTSD patients are cured.[4] In contrast, Dr. Sultan noted that the applicant displayed many symptoms of PTSD during her interviews with the applicant in early

1. Although the *Rumbaugh* test uses the phrase "mental disease or defect," *Rumbaugh* purported to follow the controlling United States Supreme Court precedent *Rees v. Peyton*, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506–07, 16 L.Ed.2d 583 (1966), which articulated this first prong as encompassing the existence of a "mental disease, *disorder*, or defect." (emphasis added).

2. The experts also agreed that being on death row and various instances of childhood abuse at the hands of his father might also qualify as sufficient stressors. However, almost all of the applicant's other symptoms of PTSD clearly point back to his father's death as the primary stressor.

3. Record, April 11, 1994, at 122. In some instances, the record contains separate volumes for morning and afternoon sessions on the same day. In such instances, the morning session shall be denoted "A" and the evening session "B".

4. Record, April 11, 1994, at 72.

1992. In addition, Dr. Grassian expressed a view contrary to that of Dr. Pesikoff, to the effect that PTSD, although treatable, is a lifelong illness, at least for the applicant.[5]

Resolving such disputes is always difficult for the court, which is not an expert in such matters. However, several factors point to the conclusion that the applicant currently suffers from PTSD. The record clearly reflects ample symptoms before 1990 upon which a diagnosis of PTSD could have been made. The applicant was amnesic about the events, had recurring nightmares, intrusive thoughts, and flashbacks. The applicant reported such symptoms to Dr. Sultan as late as 1992, when she also personally observed other symptoms such as hypervigilance, avoiding thought about the trauma, and restricted affect, *e.g.*, lack of outward signs of a range of emotions.[6] One of the symptoms of PTSD—restricted affect—was displayed by the applicant throughout these hearings.[7] Other symptoms, such as a strong desire to avoid having his father's life and death discussed, are obvious in the applicant's letters to this court and others.[8] Finally, having concluded that the applicant suffered from PTSD in the past, it is highly unlikely that he is now cured, even if such a cure were common, since he has received minimal psychological and no medical/psychiatric treatment for his condition.[9] Thus it was proved, by a preponderance of the evidence, that the applicant suffers from depression and PTSD resulting from his killing of his father.

### III. *Ability to Understand Situation and Consequences of Actions*

■ The experts agree that, despite whatever mental difficulties the applicant has, he is able to understand his situation and the consequences of his actions. These observations comport with the court's observations as well. The applicant understands that failure to pursue habeas corpus relief will result directly in his death; indeed, it is obvious that this is the ultimate result he seeks. The applicant understands that even if he is guilty, he may have valid bases for appealing his sentence of death.[10] He has accurately informed the court that, "I know I could continue with my appeals with new lawyers, a new petition, or even pro se." [11]

### IV. *Ability to Make a Rational Choice Among Alternatives*

Because the applicant suffers from mental disorders which do not affect his knowledge of his alternatives or the effects of his choices, the dispositive question determining his competency to waive further review is whether or not his mental disorders prevent

---

5. Record, July 5, 1994(A), at 44.

6. Record, April 12, 1994, at 73–98. Dr. Sultan's observations are not inconsistent with those of Drs. Pesikoff and Leventon; the applicant could have displayed symptoms in his interviews with Dr. Sultan but not Drs. Pesikoff and Leventon. Moreover, the court agrees with Dr. Sultan's assessment that the applicant has intentionally suppressed symptoms of PTSD in order to facilitate his goal of being allowed to waive further review of his sentence. Record, April 12, 1994, at 87. This presents significant difficulties in diagnosis, as all the experts agreed that diagnosis of PTSD is based significantly on self-reported symptoms. Record, April 11, 1994, at 62–70, 141–42. *See* Section IV.5, *infra*.

7. The court carefully observed the demeanor of the applicant during these hearings, both when he was actively involved in questioning or testifying, and as he sat observing the activities of others. He retained the same expression, volume, and intensity throughout, regardless of whether the testimony was favorable to him or implied that he was incompetent, whether the witness agreed or disagreed with him. One witness, Dr. Ingle, engaged the applicant in a religious discussion on a topic of obvious interest and importance to the applicant that had a profoundly moving effect on everyone in the courtroom with the exception of the applicant. Although not an expert in psychology or psychiatry, and realizing that the courtroom environment may be intimidating, especially to a prisoner, the court found the applicant's impassivity striking.

8. Letters of July 28, 1992, December 13, 1993, April 28, 1994 (stating that he does not want to talk about his father or the past); Letters of July 28, 1992, July 29, 1992, December 22, 1992 (requesting that nothing about his father be discussed in the application for the writ).

9. Record, July 5, 1994(A), at 32, 44–45.

10. Record, July 16, 1993, at 26.

11. Letter of December 13, 1993. *See also* Record, July 16, 1993, at 26.

him from making a rational choice among his alternatives. This inquiry, like all inquiries into mental state, is extremely difficult; reliance on experts is essential. However, the credible experts disagree in the instant case; Drs. Pesikoff and Leventon concluded that the applicant's "mental condition does not prevent him from making a rational choice in determining what he wishes his legal course of action to be,"[12] while Drs. Sultan and Grassian found the applicant's thought process facially irrational, since they believe that his decision to abandon his appeals does not flow logically from the reasons he gives for his position.

Any evaluation of the applicant's rationality with respect to this particular decision must begin with the Pesikoff/Leventon report, since they are the court-appointed independent experts, and likewise because they set forth what they believe are the rational bases for the applicant's decision to waive further review. The report lists eight reasons:

1. His attorneys violated his trust by claiming that he is innocent.

2. His attorneys violated his trust by putting lies in the application about his abusive father—specifically that his father was an "every day abuser."

3. His attorneys lied about the way he killed his father, claiming that it was an accident which occurred when they were in close physical proximity when, in fact, Cockrum was across the room from his father when he shot him.

4. His trial and appeals were fair. Further proceedings hold out the likelihood only of delay rather than reversal. An application for the writ which contained no falsehoods would have no chance for success.

5. Frivolous appeals like his hurt the chances of inmates with non-frivolous appeals.

6. It is a waste of state money to continue litigating this case.

7. Dragging out the process hurts his family, especially his daughter.

8. He believes in capital punishment.

### 1. *Attorneys' Lies*

The first three reasons are all related in that they express the applicant's anger and disappointment with his attorneys for allegedly lying to him and putting facts which he considered to be untrue in his application for the writ of habeas corpus. This is obviously the primary motivation for the applicant's decision to abandon further legal review of his case. The first time the applicant was given the opportunity to address this court, he stated that he wanted to waive further review because of the lies his attorneys had brought before both state and federal courts on his behalf.[13] Later, the applicant informed the court that, after he decided to waive further proceedings, "I got complete peace with God about my decision to drop my appeals, because I had gave my attorneys two different opportunities to file a petition that was honest and right, and they lied to me, and they denied me that right both times."[14] The applicant's overriding obsession with his attorneys' alleged lies was abundantly displayed in the applicant's final address to this court; he discoursed for over an hour, creating over thirty-five pages of transcript, with a minute examination of every untruth the applicant believes has been placed in his application for the writ, or elsewhere, by his attorneys.[15] Dr. Pesikoff agreed, stating that "the lawyers' behavior really caused the termination, I think, of his pursuit [of further legal remedies]."[16]

These explanations for the applicant's decision are irrational, not only because his actions are not a logical response to the perceived problem, but also because his sincerity in claiming that his attorneys' statements are untrue is highly suspect. The applicant's anger at his attorneys for allegedly lying to him and putting perceived untruths in the

---

12. Pesikoff/Leventon Report 2.

13. Record, July 16, 1993, at 19.

14. Record, July 6, 1994(A), at 70.

15. *See also* Letters of December 13, 1993.

16. Record, April 11, 1994, at 16.

application for the writ is not a rational basis for him to waive further review of his death sentence. Dr. Grassian explained well why such a reason is irrational: "If you don't like your attorneys, you don't kill yourself as a result; you change attorneys. You don't die because you don't like your attorneys; you change attorneys. So, there's something psychotic about choosing to die because you don't like what your attorneys do." [17] The attorneys' supposed lack of candor thus cannot be a rational basis for waiving legal review.

This reason collapses further when the individual facts which the applicant claims are lies are examined in detail. The lies about which the applicant complains the most are those relating to his family, specifically his father's death, which he claims his attorneys promised would not be put in the writ application. However, the evidence does not indicate that the applicant's attorneys lied; to the contrary, they wrote the application to correspond very closely to the applicant's requested language on this obviously sensitive topic. The applicant wrote to one attorney, Larry Lassiter:

> I've given alot of thought about the mitigating part of the writ & this is the way & only way I will approve of it being in there. ["]Don Cockrum Johnny's dad was an alcoholic & when he drank he was very abusive towards his family. He was this way most of Johnny's life, with frequent beatings upon Johnny's mother two sisters & himself. In 1976 after Johnny & his father had had an argument which ended up in Johnny's bedroom with Don Cockrum beating Johnny Johnny picked up a 22 rifle & shot his father. For 6 weeks Don Cockrum lived in intensive care at Wadley hospital, but then died of Kidney failure. Johnny went through the rest of his life, never forgiving himself for his Dad's death & turning to drugs & alcohol to not have to deal with what was eating him up inside. This tragic event effected Johnny's life very much & should be considered as mitigating factors (evidence).["] Larry this is not exactly word for word the way I expect

you to write what I have said, but I do not want it taken out of text. Nothing added, nothing taken away. All the other that Joe put in about my mother & the rest of my family I want left out completely. You want to know something, ask me not my family. I know my mother loves me & would do most anything to keep me alive.[18]

The language used in the application filed with the court is very similar, and does not provide any basis for the applicant's accusation against his attorneys:

> John Cockrum's father, Don Cockrum, was a prominent and respected man and a peace officer for most of his adult life. Throughout John's youth, his father served alternately as an Investigator for the State Liquor Board, New Boston Police chief for many years, Bowie County Deputy Sheriff, and Investigator for the Red River County Attorney. Don Cockrum was also an alcoholic. Alcohol cost him his job at the Liquor Board, just as it did at the New Boston Police Department. In 1974, Don Cockrum admitted himself to Wadley Regional Medical Center for treatment of his alcoholism, but the course of the disease was too far advanced, and he drank to excess for the rest of his life....

> When he drank, Don Cockrum had the capacity for extraordinary violence and regularly beat his wife and children....

> ....

> [On June 26, 1978], Donald Cockrum was again intoxicated. He became violent, with insults escalating into pushing and shoving, and finally into uncontrolled violence. John Cockrum, who was not home when the argument started, arrived home in the midst of this commotion. John went inside and confronted his father.

> As the altercation continued, John retreated into his bedroom where, cornered by his father, he grabbed a .22 cal. rifle and warned his father to stay way. Amidst a scene of pure chaos, the two men stood on opposite sides of the bed, shouting at each other. In the struggle and confusion, the gun discharged, striking Don Cockrum in the chest.

**17.** Record, July 5, 1994(A), at 58.

**18.** Letter of February 19, 1994.

... After six weeks in intensive care, Don Cockrum died in the hospital on July 16, 1976 of kidney failure....[19]

There is simply no basis for the applicant's claims that the application contains untruths, when he is the source of the information himself. Moreover, some of the "lies" which he claims are in the application are simply not there. For example, the applicant complained to Dr. Pesikoff that his lawyers "violated his trust by painting his father as an all-bad person, a daily abuser, making him out to [be] a horrendous man rather than painting the full picture of a man with multiple assets and liabilities."[20] As the passage quoted above indicates, the application does note several of the elder Cockrum's positive qualities. The applicant also told Dr. Pesikoff, "that they wrote that he was in the process of pushing his father when he accidentally shot his father; when, in fact, he was across the room."[21] Once again, reading the above-quoted section of the application reveals that the applicant's complaint is unsound; the application specifically states that the applicant and his father were on opposite sides of a bed when the shooting occurred.

Several additional examples show that the applicant's claims that his attorneys have lied are unfounded, in that the attorneys' "lies" come from the applicant himself. For example, the applicant objected to the "lie" which the application contained when it stated that he turned to drugs at an early age "to satisfy his unmet psychological needs and escape the torture of his environment."[22] He testified

that this was untrue. Rather, he turned to drugs because he "liked to get high; it wasn't to escape anything."[23] Yet, in the February 19, 1993, letter to Larry Lassiter, quoted above, the applicant stated that he "turn[ed] to drugs & alcohol to not have to deal with what was eating him up inside."[24]

The applicant objected to the application's negative description of the facility in which he was imprisoned as a youth. He testified that he never saw or was the victim of any abuse at the facility, and that he was even taken on a pleasant field trip to Mexico.[25] Yet he told Dr. Sultan that the conditions inside this facility were "horrible," a description which stuck in Dr. Sultan's mind, since she thought it striking that a victim of such great childhood abuse would find conditions at the facility worse than conditions at home.[26] The applicant told Dr. Pesikoff that his father "at times held a gun to his head."[27] Prison records similarly reveal that the applicant reported that his father woke him up with a gun pointed at his head and played "Russian Roulette" with him. But, the applicant denied that his father ever threatened him with a gun.[28] The applicant testified that the statement in the application that he "frequently placed himself in harm's way, absorbing the blows otherwise meant for another," was a lie.[29] Yet the Pesikoff/Leventon report notes that the applicant:

> made a conscious decision at eleven years of age that, when his father was incapacitated it fell on his shoulders to act as the 'man of the house' and deflect his father's

**19.** Application ¶¶ 96–97, 115–17.

**20.** Record, April 11, 1994, at 16.

**21.** Record, April 11, 1994, at 17.

**22.** Application ¶ 98.

**23.** Record, July 6, 1994(A), at 75.

**24.** In addition, during the applicant's lengthy final statement to the court, he repeated at least three times that the application was inaccurate in that it stated that he began using drugs at the age of nine, rather than ten, and that it misstated his age when he began using particular types of drugs and began injecting drugs. Record, July 6, 1994(A), at 74–75, 81–82; Record, July 6, 1994(B), at 9–10. None of these trivial discrep-

ancies has any relevance to the substance of the application, and the applicant's obsessive insistence that they were "lies" put in the application by his attorneys to secure a reversal of his death sentence is further evidence of a defective mental process in this area.

**25.** Record, July 6, 1994(A), at 77–79.

**26.** Record, April 12, 1994, at 45–46.

**27.** Record, April 11, 1994, at 13.

**28.** Record, July 6, 1994(B), at 13–15.

**29.** Record, July 6, 1994(A), at 73–74. *See* Application ¶ 97.

outbursts towards himself and away from other members of his family. He did this passively, enduring emotional and physical abuse at the hands of his father including at one point his father threatening him with a gun.[30]

Dr. Sultan also reported that the applicant "actually put himself physically in the way of his sister and his mother being assaulted." [31]

It is clear from these examples alone, that the sincerity and accuracy of the applicant's accusations against his attorneys is highly questionable. Even if this were a valid cause for complaint by the applicant, his reaction to it is irrational. He has been informed, and apparently understands on a cognitive level, that he may discharge his attorneys and proceed either with other counsel or *pro se;* nevertheless, he declines to do so. Therefore, this most important basis which the applicant claims for his decision to waive further review is irrational. This irrationality is highlighted in the applicant's own letters, which imply that he does not want information about his father included in the application, regardless of its veracity.[32]

### 2. *No Chance for Success*

The next three reasons stated in the Pesikoff/Leventon report are all related, in that they depend on the applicant's own assessment that the chances for obtaining any result other than a delay in his execution date are extremely dim. This leads the applicant to waive further review, inasmuch as it is his apprehension that pursuing such relief solely for the purpose of delay is unjustified, harms people with legitimate bases for appeals, and wastes state funds.

It is obvious, and conceded by the experts and the applicant alike, that he lacks the expertise to evaluate the chances of success of any particular application for the writ. The underlying basis for the applicant's belief that he has no possibility of obtaining meaningful relief relates back to his perception that his attorneys lied in the application for the writ. Dr. Pesikoff noted that the applicant inferred that, since his attorneys put so many lies in the application, an application without lies would be devoid of merit and have no chance for success.[33] Dr. Leventon noted that in the applicant's mind, "there's no—no chance that the writ will be successful, if it's, as he puts it, an honest writ." [34] This rationale thus founders since, as noted above, the applicant's accusations that the application contains lies are not substantiated, but, rather, are contradicted by the applicant's own statements.

More importantly, even if every statement labeled a lie by the applicant were removed from the application for the writ, a number of the application's most compelling arguments for relief would remain completely unaffected.[35] The tremendous inferential leap which the applicant thus makes—that because the application filed on his behalf contains lies, no application without lies could possibly be meritorious—is irrationally broad and does not fit the facts of the instant case. In reality, the applicant, like virtually all applicants for the writ of habeas corpus, has insufficient knowledge and expertise to determine his chances for success, and must rely heavily on the advice of experts to make this determination. Moreover, the evidence indicates that the only experts to advise him on this subject have informed the applicant

---

30. Pesikoff/Leventon Report 2.

31. Record, April 11, 1994, at 169.

32. Letters of July 28 & 29, 1992.

33. Record, April 11, 1994, at 29–31.

34. Record, April 11, 1994, at 104. *See also* Letter of April 28, 1993 ("The realness that I will be executed in the future without me dropping my appeals is pretty sure, maybe years from now, but sure. I'm not going to wait any longer than I have to.").

35. In making this statement, the court expresses no opinion on the ultimate merit of any of the claims in the application. Rather, it simply notes that the application's claims regarding, for example, prosecutorial misconduct, failure to change venue, selection of biased jurors, and jury misconduct, are totally independent of the facts which the applicant contends are untrue; the likelihood of success of these claims is unaffected by the alleged "untruthfulness" of the application.

that his chances of success are reasonable.[36] The applicant has provided no rational basis for disagreeing with this expert opinion and forming his own contrary view.

### 3. *The Suffering of the Applicant's Family*

The applicant has repeatedly stated that one of his reasons for waiving further legal remedies is the continued suffering which his family, especially his daughter, endures from his uncertain future. Concern for the well-being of loved ones may certainly be a rational reason for taking certain action. However, there is no indication on the record that his family is suffering or that the applicant's execution would ease their suffering. Although the applicant was given every opportunity to present evidence, neither he, his attorneys, nor the state attempted to call any of his family members to testify. Additionally, in the February 19, 1993, letter to Larry Lassiter, quoted at length above, the applicant wrote a contrary statement: "I know my mother loves me & would do most anything to keep me alive." In light of this contrary evidence, the absence of any direct evidence that the applicant's assessment of his family's wishes is accurate, and the presence of other illegitimate reasons given by the applicant for forsaking legal remedies, the applicant's claims that he wants to allow himself to be executed in order to ameliorate his family's suffering cannot be credited.

### 4. *The Applicant's Belief in Capital Punishment*

Finally, the Pesikoff/Leventon report notes that the applicant wants to drop his appeals, by reason of his belief in the death penalty. However, belief in the death penalty as an abstract principle cannot, standing alone, justify the applicant's actions. Rather, he must also believe that he, as a specific individual, deserves the death penalty. Although it may

be rational in certain circumstances for an individual to conclude, based on his own acts and culpability, that he deserves the death penalty, the evidence demonstrates that the applicant has a different reason for wanting to die. This evidence, described in detail below, indicates that the applicant's desire to be executed stems from the guilt he feels from his killing of his father, as well as the mental disorders resulting from that event.

It is common for victims of child abuse to psychologically react by idealizing and glorifying their abusers while simultaneously devaluing themselves.[37] Cockrum himself fell into this pattern early.[38] These feelings were dramatically exacerbated when the applicant fatally shot his father who, mortally wounded, saved the applicant from the specter of criminal prosecution by informing the authorities that the shooting was accidental.[39] The applicant's feelings regarding his father's life and death led directly, by the applicant's own admission, to at least two attempts at suicide.[40]

Drs. Pesikoff and Leventon concluded that the applicant no longer suffers from any suicidal thoughts.[41] However, Drs. Sultan and Grassian describe a broader range of self-destructive behavior, which Dr. Grassian termed "passive suicide," and which they maintain has been a life-long pattern for the applicant, continuing through his present desire to waive further review of his death sentence.[42] This pattern includes his passively receiving his father's physical abuse in order to spare other family members, massive drug abuse resulting in multiple hospitalizations, daredevil driving on a motorcycle that resulted in at least one severe injury, and his current decision to waive habeas corpus review. At one point, the applicant even formed a detailed escape plan, including the self-destructive proviso that, "if I did get caught I would not allow them to bring me

**36.** Record, July 16, 1993, at 26–27.

**37.** Record, July 5, 1994(A), at 24–25, 34.

**38.** Pesikoff/Leventon Report 2; Record April 11, 1994, at 174; Record July 5, 1994(A), at 34–35.

**39.** Record April 11, 1994, at 174–75.

**40.** Record July 6, 1994(B), at 8.

**41.** Pesikoff/Leventon Report 5; Record April 11, 1994, at 91, 103–108.

**42.** Record, April 11, 1994, at 175, 186–88; Record, July 5, 1994(A), at 29–30, 39, 56, 62–63; Record, July 5, 1994(B), at 25.

back to death row." [43] In addition, the applicant participated in at least three hunger strikes while in prison and overtly threatened suicide in prison on June 30, 1989—a threat authorities took seriously in light of his psychological history.

The applicant's history and actions indicate that his belief that he deserves the death penalty stems from a mental disease—post-traumatic stress disorder—which resulted from his killing his father. For this reason, it must be rejected as a rational basis for waiver of legal review. In addition to the evidence cited by Drs. Sultan and Grassian above, the applicant's own letters to this court indicate a suicidal mentality that relates back to his relationship with his father, rather than to the crime for which he was sentenced to die. "Yes in the flesh people of this world those attorneys brought it all back up about my dad.... That's why I never want to talk about it and want it all over." [44]

## V. Conclusion

The detailed analysis above is not intended to imply that any habeas corpus applicant who wishes to waive further review of his sentence must present a reason for that decision which meets with a court's approval. Such an analysis is necessary in this case, by reason of the findings that the applicant does suffer from both depression and post-traumatic stress disorder, and that experts disagreed over whether these disorders prevented the applicant from making a rational choice regarding his legal options. The detailed analysis has demonstrated that none of the reasons given by the applicant is an accurate and rational basis for the applicant's decision, leading to the conclusion that the applicant is unable to make a rational choice in this area. Instead, the evidence amply illustrates that the applicant's decision is part of a pattern of self-destructive behavior which has its roots in the severe physical abuse the applicant received as a child at the hands of his father, and which was exacerbated immeasurably when the applicant fatally shot his father.

The fact that the experts reached different conclusions in the instant case is not the result of inadequacies on their part or on the part of their science. Rather, the record indicates that the applicant has been single-mindedly pursuing a course towards self-destruction for over two years. As noted before, the applicant is intelligent, and has done everything in his power to ensure that this court will permit him to withdraw his application for the writ of habeas corpus. In pursuit of that end, the applicant has changed his statements, positions, actions, and attitudes repeatedly. Most of these changes and contradictions have already been noted. One more may complete the picture.

The applicant steadfastly refuses to be labeled a psychiatric patient. He testified at length that while in prison he saw a psychiatrist for the sole purpose of securing effective medication for his severe headaches. He further stated that he was taken off psychiatric status at his psychiatrist's suggestion, since he was not truly a psychiatric patient. [45] However, Drs. Pesikoff and Grassian testified, and the applicant's prison records reflect, that he was taken off psychiatric status at his own request and against the advice of his doctors, who had diagnosed him with several psychiatric disorders, including depression. [46] To avoid being labeled a psychiatric patient, the applicant even dissembled to prison authorities twice, telling prison evaluators that he had never been hospitalized for psychiatric reasons and had never attempted suicide. He now admits the contrary. [47] The applicant's strong desire not to be labeled as mentally ill, combined with his even stronger desire to destroy himself, leads the court to agree with Dr. Sultan that the applicant "has become very schooled in the symptoms that he has been accused of hav-

**43.** Letter of December 13, 1993.

**44.** Letter of April 28, 1994.

**45.** Record, July 6, 1994(B), at 19–21.

**46.** Record, April 11, 1994, at 48; Record, July 5, 1994(B), at 12.

**47.** Record, July 16, 1993, at 23; Record, July 6, 1994(B), at 8.

ing.... [He] is working very, very hard to appear normal and healthy."[48]

The applicant is incompetent to waive the habeas corpus review of his conviction and sentence, in that he suffers from mental disorders which prevent him from making a rational decision on this issue. The court remains sensitive to the applicant's desire for a speedy resolution of his application for the writ of habeas corpus, and will attempt to resolve the substantive issues as rapidly as possible without sacrificing accuracy.

**In re John COCKRUM, Applicant.**

**No. 6:93cv230.**

United States District Court,
E.D. Texas,
Tyler Division.

Aug. 25, 1994.

Alan Bernard Rich and Lawrence Ray Lassiter, Dallas, TX, Jeffrey Dworkin, Austin, TX, for applicant.

John Jacks, Atty. Gens. Office, Austin, TX, for State.

## ORDER

JUSTICE, District Judge.

Through a letter dated August 22, 1994, counsel for the applicant, Alan B. Rich, Esquire, expressed an interest in having the court appoint a "next friend" to direct the habeas corpus proceedings on behalf of the applicant. This request stems from the court's August 5, 1994, order which found the applicant incompetent to dismiss further habeas corpus proceedings.

This court is presented with a novel issue: When an applicant is judged incompetent, so that he is not competent to dismiss his habeas corpus proceedings, what person can be appointed to prosecute his claims? Guidance is shed on this case by examining the classic "next friend" scenario where a prisoner does not wish to seek habeas corpus relief and another seeks to do so on his behalf.

In *Whitmore v. Arkansas,* 495 U.S. 149, 163, 110 S.Ct. 1717, 1727, 109 L.Ed.2d 135 (1990), the Supreme Court discussed "next friend" standing in the context of habeas corpus. The Court held that there are two firmly rooted prerequisites for "next friend" standing. *Id.* First, there must be an adequate explanation of why the real party in interest cannot appear in his own behalf to prosecute the action. *Id.* Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he

48. Record, April 12, 1994, at 87.

seeks to litigate and must have some significant relationship with the real party in interest. *Id.* at 163–64, 110 S.Ct. at 1727–28. "These limitations on the 'next friend' doctrine are driven by the recognition that 'it was not intended that the writ of habeas corpus should be availed of, as matter of course, by intruders or uninvited meddlers, styling themselves next friends.'" *Id.* at 164, 110 S.Ct. at 1727–28.

In the case of the applicant, this court found an adequate explanation as to why the applicant cannot appear in his own behalf; the court found applicant is incompetent to do so. *Memorandum Opinion,* 867 F.Supp. 484, August 4, 1994. As such, this court is required to explore only the second prerequisite. In making this decision, the court must determine who is truly dedicated to the best interest of the applicant and who has a significant relationship with the applicant. *See Whitmore,* 495 U.S. at 163–64, 110 S.Ct. at 1727–28. *Whitmore,* however, does not expound upon what constitutes the required dedication to the best interest of the real party in interest, nor what constitutes a significant relationship. *See id.* Moreover, there is very little case law that addresses these criteria.

Then–Justice Rehnquist in *Lenhard v. Wolff,* 443 U.S. 1306, 1310, 100 S.Ct. 3, 5, 61 L.Ed.2d 885 (1979), addressing what persons are eligible to serve as "next friend," stated "from a purely technical standpoint a public defender may appear as 'next friend' with as much justification as the mother of [the prisoner]." Additionally, in *Davis v. Austin,* 492 F.Supp. 273, 275 (N.D.Ga.1980), which is cited favorably by the Court in *Whitmore,* the court held that neither an ordained minister, nor the first cousin of the prisoner qualified as "next friend." *Id.* at 275–76. The court based this determination on the lack of contact between the would-be "next friends" and the prisoner. *Id.* More importantly, however, the *Davis* court recognized that a prisoner's public defender could qualify as "next friend." *Id.*

In accordance with the law as stated above, it is found that Rich, appointed counsel of the applicant, should be appointed "next friend" of the applicant for the purposes of pursuing the writ of habeas corpus pending before this court. Rich has demonstrated to the court that he is truly dedicated to the best interest of the applicant. This is evidenced by the fact that Rich, who is representing the applicant *pro bono,* challenged the applicant's competency when he sought to forego further review of his conviction and sentence. Moreover, there is no indication that he is merely an opponent to the death penalty using the applicant to further a political agenda. *Cf.* 492 F.Supp. at 275. It does not appear that the applicant is a pawn being manipulated on a chess board larger than his own case for the purpose of undermining the death penalty. *See Lenhard v. Wolff,* 443 U.S. at 1312, 100 S.Ct. at 6.

Also, Rich has a significant relationship with the applicant. He has acted on behalf of the applicant before this court since the petition for the Great Writ was filed on April 16, 1993. Moreover, Rich contested the applicant's competency to dismiss further habeas corpus proceedings, which resulted in the August 4, 1994, order finding applicant incompetent for the habeas corpus proceedings.

Rich's relationship with the applicant is at least as significant as the usual relationship between trial counsel and their client. As such, there is no reason to distinguish between appointed counsel for a habeas corpus proceeding and a public defender appointed to defend the accused in the state system. Appointed counsel in preparing the application for habeas corpus entails at least as much contact between an applicant and counsel as does the preparation for trial and direct appeals.

Thus, the indication that appointed trial counsel possesses the necessary criteria to be "next friend" leads to the conclusion that appointed habeas corpus counsel, too, possesses the criteria to be appointed "next friend." [1] For these reasons, it is found that

---

1. This discussion assumes that the "public defenders" referred to in *Davis* and *Lenhard* are trial counsel and/or counsel on direct appeal. If, on the other hand, the "public defenders" referred to are appointed Habeas Corpus counsel, then the issue at hand has directly been spoken on.

Rich is not "an intruder[ ] or uninvited meddler[ ]" and, therefore, should be appointed "next friend" for the pending habeas corpus proceedings. *See* 495 U.S. at 164, 110 S.Ct. at 1727. Accordingly, it is

**ORDERED** that Alan B. Rich, Esquire, be appointed "next friend" of applicant, John Cockrum for the purposes of pursuing the writ of habeas corpus before this court. As such, he shall act in the best interest of the applicant in directing the habeas corpus proceedings before this court. Further, it is

**ORDERED** that, not later than October 31, 1994, counsel for the applicant shall file amendments, if any, to the application for the writ of habeas corpus previously filed with this court. Not later than November 30, 1994, counsel for the respondent shall file a response to the application, as amended. A hearing on the merits of the application for the writ of habeas corpus shall be held at 10:00 a.m., January 3, 1995, before the undersigned judge at Tyler, Texas. Further, it is

**ORDERED** that the deadlines established in the August 4, 1994 order of this court shall be, and are hereby, found to be moot.

**Aaron J. HUNTER, Plaintiff**

v.

**CITY OF BEAUMONT,
et al., Defendants.**

**No. 1:94–CV–0421.**

United States District Court,
E.D. Texas,
Beaumont Division.

Oct. 6, 1994.

tention in violation of 42 U.S.C. § 1983. Plaintiff alleges that Defendants, Judge Lupe Flores (Flores), Judge Cheryl Cooper (Cooper), Beaumont Mayor Evelyn Lord, Beaumont City Councilman David Moore, and Beaumont city attorneys Pamela Ener (Ener) and Lane Nichols (Nichols), conspired to selectively prosecute him for allegedly violating local zoning ordinances and threatening to kill Judge Cooper. He also maintains that Defendants failed to follow established procedures when issuing warrants for his arrest.

Defendants, understandably confused by Plaintiff's somewhat disjointed complaint, request a more definite statement and ask this court to order Plaintiff to file an amended complaint.

This court finds that four of the Defendants, Flores, Cooper, Nichols, and Ener, are entitled to absolute immunity and that Plaintiff may not pursue a § 1983 action against the remaining Defendants until his underlying convictions are reversed. Accordingly, the action against Flores, Cooper, Nichols and Ener is dismissed with prejudice on the ground of absolute immunity and the action against the remaining Defendants is dismissed with prejudice on the ground that no such action exists unless a plaintiff's conviction is reversed, expunged or called into question.

### Background [1]

Plaintiff owns a business in Beaumont, Texas. In the Spring of 1994, Plaintiff's business was cited for 16 violations of local building codes. His case was pending before Judge Flores. He failed to appear at the appointed time and place and a warrant was issued for his arrest. Plaintiff was arrested and released on bond. He apparently also had dealings with Judge Cooper (whether Judge Cooper was involved in the building code violation action is unclear). Plaintiff, apparently dissatisfied with the way Judge Cooper handled his case, allegedly threatened to kill her. A warrant was issued and

Aaron Hunter, pro se.

Joseph P. Sanders, Asst. City Atty., Beaumont, TX, for defendants.

### MEMORANDUM OPINION

COBB, District Judge.

Plaintiff, Aaron Hunter, initiated this suit pro se to recover damages for alleged unconstitutional prosecution, conviction, and/or de-

---

1. This is the best the court can do. Plaintiff's complaint falls far short of a model statement of the facts.

he was arrested. The cases were prosecuted by Ener and Nichols.

Plaintiff now claims that he was selectively chosen for prosecution (presumably due to his race) in violation of his Fourteenth Amendment rights.

### Discussion

■ This court begins by acknowledging Defendant's concern that it is difficult to separate Plaintiff's general disgruntlement from allegations which, if true, could form the basis of a cognizable action. The Supreme Court, however, requires that greater tolerance be given to papers filed by pro se litigants. A pro se litigant's pleadings are to be construed liberally. *Boag v. McDougall,* 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1981); *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). With this in mind, the court notes that although Plaintiff does not specifically assert a § 1983 violation for unconstitutional prosecution, conviction, and/or detention, this cause of action could exist if all of the facts alleged by Plaintiff are true.

### A.

■ This court must resolve any questions regarding absolute immunity before it entertains Plaintiff's § 1983 claims. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (absolute immunity is a threshold question); *Boyd v. Biggers,* 31 F.3d 279 (5th Cir.1994).

■ "Judicial officers are entitled to absolute immunity from claims for damages arising out of acts performed in the exercise of their judicial discretion." *Boyd v. Biggers,* 31 F.3d 279 (5th Cir.1994) (citing *Graves v. Hampton,* 1 F.3d 315, 317 (5th Cir.1993). A plaintiff can only overcome judicial immunity by demonstrating that the jurist's actions are of a nonjudicial nature or that the actions were taken in the complete absence of jurisdiction. *Mireles v. Waco,* 502 U.S. 9, 112 S.Ct. 286, 288, 116 L.Ed.2d 9 (1991). "A judges acts are judicial in nature if they are 'normally performed by a judge' and the parties affected 'dealt with the judge in his judicial capacity.'" *Boyd v. Biggers,* 31 F.3d

279 (5th Cir.1994) (quoting *Mireles,* 502 U.S. at ——, 112 S.Ct. at 288). Judge Flores and Judge Cooper are joined in this lawsuit because they presided over cases in which Mr. Hunter was a defendant. Any improper actions by Judge Flores or Judge Cooper are therefore cloaked in absolute immunity. Accordingly, the claims against Judge Flores and Judge Cooper are dismissed with prejudice.

■ Criminal prosecutors also enjoy absolute immunity from claims arising out of their presentation of the state's case. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The immunity extends from the decision to initiate prosecution to all actions taken that move the case through the judicial process. *Graves,* 1 F.3d at 318. Plaintiff's sole claim against Ener and Nichols is that they maliciously singled him out for prosecution. Such accusations, even if true, are within the ambit of prosecutorial absolute immunity. The actions against Nichols and Ener are therefore dismissed with prejudice.

### B.

The Supreme Court recently held in *Heck v. Humphrey,* —— U.S. ——, ——, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994), that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus."

■ Plaintiff fails to make a showing that any tribunal has cast the slightest doubt upon the propriety of either of his convictions. Until the underlying convictions are reversed, expunged, or declared invalid, no § 1983 *action will lie.*

■ *Heck* also holds that a § 1983 action for an unconstitutional conviction or imprisonment does not even arise until the underlying conviction or imprisonment is called into

question. *Heck*, —— U.S. at ——, 114 S.Ct. at 2374. Plaintiff therefore faces no statute of limitations problem and there is no need to hold this action in abeyance pending the appeal of his state conviction. *Stephenson v. Reno*, 28 F.3d 26, 27 (5th Cir.1994). Instead, this court must dismiss Plaintiff's suit against the remaining Defendants with prejudice. *Stephenson*, 28 F.3d at 28; *see also Graves*, 1 F.3d at 319 (dismissal with prejudice proper if claim has *no* arguable basis in law).[2]

## ORDER

Before the court is the Plaintiff's Original Complaint. For the reasons set out above, this court is of the opinion that the Plaintiff's case should be should be DISMISSED with prejudice.

William E. SPAULDING, III, Petitioner,

v.

James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

Civ. A. No. H–93–591.

United States District Court,
S.D. Texas.

Dec. 6, 1993.

---

**2.** Plaintiff is free to re-file this suit if his § 1983 action ever arises. That is, if his conviction is ever reversed, expunged or called into question. Of course, Judge Flores, Judge Cooper, Ener and Nichols cannot be named as defendants in any subsequent suit as their immunity is absolute.

David B. Gerger, Federal Public Defender, Houston, TX, for petitioner.

Sharon Stowers, Texas Atty. General's Office, Austin, TX, for respondent.

## FINAL JUDGMENT

HUGHES, District Judge.

1. The court adopts the memorandum and recommendation of the United States magistrate judge signed September 10, 1993.

2. The corroborating evidence of Spaulding's guilt that was not considered by the disciplinary hearing officer is properly considered as evidence that the officer's decision was not manifestly unjust. Even without considering that evidence, the hearing satisfied constitutional standards.

3. William E. Spaulding, III's petition for a writ of habeas corpus is denied.

4. Final judgment is entered for James A. Collins.

### *MEMORANDUM AND RECOMMENDATION*

CRONE, United States Magistrate Judge.

I. *Introduction.*

William E. Spaulding, III ("Spaulding"), an inmate in the Texas Department of Criminal Justice, Institutional Division ("TDCJ"), challenges the April 8, 1991, decision of a prison disciplinary hearing officer finding him guilty of attempting to escape by originating and possessing a forged court order. This order purported to award Spaulding 861 additional days of good time credit, leading to his early release from prison. Upon finding Spaulding guilty, the disciplinary hearing officer assessed punishment of 1–15 days of solitary confinement, loss of 1,460 days of good time credit, and demotion from Trusty Class III to Line Class III. Transcript of Disciplinary Hearing, April 8, 1991 ("D.H."), Evidentiary Hearing, August 18, 1993 ("E.H."), Ex. F at 25–26. The 1,460 days of good time credit

ultimately were restored. E.H. at 76. Due to Spaulding's demotion to line status, however, he was ineligible for the accrual of good time at the same rate as when he was a trusty. His mandatory release date, therefore, was extended from December 13, 1994, to May 27, 1995. Collins' Post–Evidentiary Hearing Brief at 2. On the disciplinary record, the disciplinary hearing transcript, the tape recording of the disciplinary hearing, the evidentiary hearing and the submissions of the parties, this court recommends that Spaulding's petition for writ of habeas corpus be denied and that final judgment be entered for Collins.

## II. *Procedural History.*

Spaulding appealed the adverse decision of the disciplinary hearing officer through the grievance process afforded by the TDCJ. The decision was sustained at each of the three levels of the grievance procedure by the warden, the regional director, and the deputy director, respectively. Because this case involves a prison disciplinary action, it is not reviewable by the state courts and is properly brought by federal habeas corpus petition to this court. This court held an evidentiary hearing on August 18, 1993, where both parties offered testimony and introduced evidence addressing the issues raised by Spaulding's petition for habeas corpus.

## III. *Claims.*

Spaulding claims that the disciplinary process deprived him of both procedural and substantive due process in violation of the Fourteenth Amendment to the United States Constitution. Specifically, he complains of the following:

A. insufficient notice of the charges against him;

B. exclusion from the hearing;

C. not being allowed to question the informant;

D. not being given a copy of the order during the hearing;

E. not being allowed to present evidence; and

F. no reliable evidence of guilt.

In his pre-hearing brief, Spaulding also complained that the hearing officer was not neutral and detached because the investigative officers participated in the deliberations. This claim is omitted from Spaulding's post-hearing brief, and his counsel advised the court he was no longer advancing it.

## IV. *Analysis.*

### A. *Findings of Fact.*

1. Spaulding was notified of the charges against him at 11:00 a.m., April 4, 1991, by his counsel substitute, E.H. Oliver ("Oliver"). D.H. at 1; Disciplinary Record ("D.R.") at 45; E.H. at 12, 14.

2. He received a copy of the disciplinary report, which contains a description of the offense. D.H. at 1. The report states:

On the date and time above, and at Alfred D. Hughes Unit, Inmate Spaulding, William E., III, TDCJ–ID No. 297304, did attempt to escape by originating a document that if successful would have ordered TDCJ/ID and S.O. Woods to give him, inmate Spaulding # 297304, 861 days good time credit giving him a early release from TDCJ/ID, being the document was tampered with and the Judge Charles F. Campbell Jr.'s signature was forged and the document was drawn up illegally. Major R.E. Thompson contacted Judge Campbell and the Judge did confirm that it was illegal and that his name was forged. This act is a felony in that it could fall under possession of a forged document Penal Code 32.21 or tampering with a government document Penal Code 32.10. See attached copy of court document. Major R.E. Thompson obtained possession of this document and through reliable informants learned that inmate Spaulding did originate and possess the document.

D.R. at 46.

3. This description of the offense gives adequate details to permit Spaulding to understand the charges and marshal facts in his defense, even without a copy of the forged order being furnished him.

4. Spaulding's contention that he was not permitted to see the order prior to the hear-

ing is not borne out by the record. The disciplinary record contains an affidavit executed by Spaulding on April 8, 1991, which reads, *inter alia:*

> I, William E. Spaulding, III, TDCJ/ID No. 297304, do hereby state under penalty of perjury, *that the document which has been produced in TDCJ/ID Disciplinary Report No. 910045069,* purported to be a Court Order bearing the name of said William E. Spaulding, III, TDCJ/ID No. 297304, and allegedly signed by someone other than Hon. Judge, (sic) Charles F. Campbell, was not executed by me, William E. Spaulding, III, TDCJ/ID No. 297304, and that I have *no recollection or knowledge of ever seeing this document prior to being served with Disciplinary Report No. 910045069 on 4/4/91 by Substitute Counsel Bill Oliver.*

*Id.* at 60 (emphasis added).

5. Spaulding offered this affidavit as documentary evidence at the disciplinary hearing. D.H. at 2. The page following the affidavit in the record is a copy of the forged order, which suggests that it was initially attached to the affidavit. D.R. at 61.

6. Spaulding's review of the order is further confirmed by Oliver's notes of his interview of Spaulding on April 4, 1991, where he recorded that Spaulding stated, "I don't know where this comes from or who sent it—I've never seen it before." *Id.* at 87.

7. Contrary to Spaulding's contentions, it is apparent that he at least saw a copy of the forged order on April 4, 1991, four days before the hearing, in ample time to understand the charges, marshal facts in his defense, and challenge the order at the hearing.

8. At the evidentiary hearing, Parker confirmed that a copy of the order was admitted into evidence at the hearing. E.H. at 40. She stated that Spaulding could have asked to see it during the hearing and it would have been furnished to him at that time. *Id.* at 40–42.

9. Contrary to Spaulding's assertions, the disciplinary hearing officer made a specific written finding that Spaulding "was excluded during the testimony of witnesses requested and the A/O [accusing officer] due to security risk to inmates involved." D.R. at 45.

10. The potential security risk is confirmed by additional portions of the disciplinary record furnished the court on August 18, 1993 (Docket Entry # 32). In inter-office communications dated April 3, 1991, two correctional officers reported they heard Spaulding say that there might be "three dead people" if "he found out who snitched on him." The officers stated that Spaulding mentioned the names of three inmates—"Oil Can," Jesse, and Carter—in this regard. Inmate Carter is the librarian who testified at the disciplinary hearing. D.H. at 7–12. In his Motion for Leave to Traverse (Docket Entry # 12), Spaulding identified inmates Harry Harrison and Jesse Ivey as the persons whom he believed to be the informants. At the evidentiary hearing, the disciplinary hearing officer, Captain Deborah Parker ("Parker"), testified that Harrison's nickname is "Oil Can." E.H. at 38.

11. Other testimony at the evidentiary hearing supports Parker's determination that permitting Spaulding to remain would have entailed a security risk, as does information submitted to this court *in camera.* E.H. at 17–19.

12. In accordance with TDCJ policy, Spaulding's counsel substitute, Oliver, remained throughout the proceeding. *Id.* at 24.

13. Spaulding was not excluded during the entire hearing. He was permitted to make opening and closing statements and to submit a substantial amount of documentary evidence, including his affidavit, legal briefs, and questions for cross-examination. D.H. at 1–7, 20–26; D.R. at 48–66, 69–84; E.H. at 11, 13.

14. Spaulding's request for a fellow inmate, Herbie Carter ("Carter"), to testify on his behalf was granted, as well as his requests for the presence of Major Thompson ("Thompson") and Captain Herron ("Herron"). D.H. at 1, 7; D.R. at 45.

15. The transcript of the disciplinary hearing discloses that the informant was named on seven occasions during the proceeding. In addition, Thompson gave some

details that might have narrowed down the field of potential informants. D.H. at 12–19.

16. Even if Thompson's testimony proved not to be revealing in other respects, the hearing officer who made the decision to exclude Spaulding could not have known this in advance. All testimony concerning the confidential informant reasonably could have been expected to lead to exposure of his identity.

17. Parker, the hearing officer, complied with the Rulebook by noting in the record that Spaulding "wanted informants—denied—security risk." D.R. at 45.

18. When cross-examination of the informants was mentioned at the disciplinary hearing, Parker replied, "As I stated earlier the informants will not be allowed at the hearing due to security risks." D.H. at 22.

19. Testimony of witnesses at the evidentiary hearing supported Parker's decision not to permit Spaulding to question the informant. At the evidentiary hearing, Parker explained that any questioning of the informant could have led to establishing his identity, even if the questioning had been by telephone. E.H. at 17–19, 34, 43–45, 51.

20. Although the informant was named at the disciplinary hearing, Thompson did not disclose the cell block in which the informant lived, where he worked, or for what offense he was serving time. *Id.* at 25, 60.

21. Any meaningful cross-examination could not have been conducted by Spaulding's counsel substitute alone. Spaulding did not provide Oliver with any questions for cross-examination of the informants. D.H. at 22. At the hearing, Spaulding admitted that he had prepared no questions and stated that he could not "really think of any questions to ask the informants" except for some limited inquiries, which potentially would have led to revealing their identity. *Id.*

22. For cross-examination to have been effective, Oliver would have been required to inform Spaulding of the informant's answers to generate further questions. Yet, this would have served to reveal the identity of the informant, raising the potential of retaliation. E.H. at 43.

23. There was no documentary evidence produced or witness called concerning handwriting analysis because no handwriting analysis had been performed.

24. Parker denied Spaulding's request that he be permitted to pay for handwriting analysis, commenting that the unit did not perform such analyses. D.H. at 23–24.

25. At the evidentiary hearing, Parker explained that she denied Spaulding's request for a handwriting expert because such witnesses are not allowed. E.H. at 19. She further commented that the evidence would not have been particularly relevant because Spaulding could have prevailed upon a fellow inmate to sign the order on his behalf. *Id.* at 33, 36. At the time, Spaulding's job at the prison was the cleaning and upkeep of the softball fields, which allowed him to walk unescorted throughout the unit, giving him unsupervised access to a number of inmates. *Id.* at 9.

26. Spaulding's request for handwriting analysis differs from the typical situation where documentary evidence or a witness with knowledge of relevant facts already exists. Spaulding was requesting that he be permitted to retain an expert witness from outside the prison system with no prior knowledge of the facts. The expert would have been required to examine the order, compare the handwriting on the order with that of Spaulding and an undisclosed number of fellow inmates, formulate an expert opinion, and testify about his conclusions.

27. The disciplinary hearing officer alone made the determination of Spaulding's guilt; the other witnesses had already departed at that time. *Id.* at 32–33, 35–36, 56–57.

28. The evidence against Spaulding did not come strictly from a confidential source. The evidence relied upon by Parker in finding Spaulding guilty included "the officer's report, the charging officer's statement taped during the hearing, as well as Major Thompson's statement on tape during the hearing, and confidential information taken during the exclusion of the accused, as well as documentary evidence of the document and letter from Judge Campbell stating that the docu-

ment bearing the signature was a forgery." D.H. at 25.

29. At the disciplinary hearing, Herron pointed out that the informant was not the total basis for the case, but that the evidence included the document itself, which bore a forged signature as verified by the judge, along with Spaulding's name and number, and awarded the additional good time solely to him. *Id.* at 19.

30. At the disciplinary hearing, Thompson named the informant on a number of occasions, stating that he had approached Thompson with the order and requested assistance in obtaining good time credit. *Id.* at 12–13. According to Thompson, Spaulding had told the informant that Spaulding had filed the order and received the extra good time. *Id.* The informant related to Thompson that he had given the order to a friend who took it to the "writ room" to look it up in the law books to see if the information that was sent to the court was there, but he could not find it. *Id.* at 13.

31. When questioned about the reliability of the informant, Thompson stated, "At the time they brought it to me I had no reason to doubt whether or not they were reliable or not." *Id.* at 12. He later testified, "At the time I had no reason to doubt what he was telling me." *Id.* at 13. He also indicated that the information was not brought to him "in a snitching type way," but rather as a request for assistance. *Id.* at 12.

32. The testimony of inmate Carter, Spaulding's own witness, corroborates Thompson's testimony concerning the informant. Carter's rather obtuse description of the events that occurred in the prison library is consistent with what the informant told Thompson about attempting to verify that Spaulding had actually received good time credit as reflected in the order. *Id.* at 7–11.

33. The informant's reliability is corroborated by the fact that he was attempting to obtain advice about obtaining good time credit based on the order, not attempting to inform on another inmate.

34. Information presented to the court *in camera*, when coupled with other information in the record, corroborates Thompson's testimony about the role of the informant in this matter.

35. At the evidentiary hearing, Parker testified that she relied upon Thompson's testimony and his determination that the named informant was a reliable person. E.H. at 19. She also stated that she found further evidence of reliability in the manner in which the order was brought to Thompson's attention, *i.e.*, as asking for assistance rather than informing on Spaulding. *Id.* at 19, 44.

36. At the evidentiary hearing, Thompson reiterated the circumstances under which he learned of the order and the fact that he had no reason not to believe the informant. *Id.* at 54–55, 64–65. Both Parker and Thompson noted that only Spaulding's name appeared on the order and no one else would have benefitted from it. *Id.* at 33, 37, 66.

37. Thompson testified at the evidentiary hearing that he had known the informant for nine years, he was aware of no grudges between the informant and Spaulding, the informant was not known for being a snitch, the informant had never lied to him before, he had a reputation for being reliable, he received no reward for the information, and he had never provided information to support a disciplinary hearing in the past. *Id.* at 55–56.

38. The informant's testimony is corroborated by the order itself. As pointed out by Herron, Parker, and Thompson, the order bore only Spaulding's name, and he was the only person who stood to benefit from the terms of the order. D.H. at 19; E.H. at 33, 37, 66.

39. The manner in which the order is written lends strong support for the contention that Spaulding prepared it. The order is replete with spelling and punctuation errors, many of which are rather idiosyncratic, that are repeated throughout Spaulding's submissions to the disciplinary hearing officer, the disciplinary review officers, and this court.

40. The word "occurred" is misspelled "occured" in the order, the word "received" is misspelled "recieved," and the word "pled" is misspelled "plead." D.R. at 61. Spauld-

ing makes the same spelling errors in his submissions. D.R. at 1, 2, 3, 14, 15, 17, 29, 31, 33, 54, 55, 58; Docket Entry #2 & E.H., Ex. B at 3; E.H. at 85–87.

41. The order recites the date as the "6th. day of October, 1990," with a period placed after the day of the month. D.R. at 61. This unique punctuation style is likewise seen in various documents Spaulding submitted at the disciplinary hearing. *Id.* at 49, 51, 53, 57, 59. At the evidentiary hearing, Spaulding admitted that he commonly wrote dates in this manner. E.H. at 83–84.

42. Typed under the signature line of the order is "Judge, Charles F. Campbell, Jr." D.R. at 61. At the evidentiary hearing, Spaulding conceded that he generally placed a comma following a person's title. E.H. at 84. This unusual manner of punctuation is also reflected in the disciplinary record, including Spaulding's affidavit, and in submissions to the court where Spaulding writes "Judge, Campbell" or "Judge, Charles F. Campbell." D.R. at 55, 59, 60; Docket Entry #2 & E.H., Ex. B at 3, 5, 6, 11. In Spaulding's brief in support of his petition for habeas corpus, where he ostensibly quotes the body of the disciplinary report, Spaulding twice inserts commas between "Judge" and "Charles," which do not appear in the original disciplinary report. *Compare* E.H., Ex. B at 3; D.R. at 46.

43. Spaulding entitles the order "Ex Parte, William Ellsworth Spaulding, III." D.R. at 61. In his petition for habeas corpus and his supporting brief, he similarly places a comma in a citation, *"Ex Parte, Brager."* See Docket Entry #1, & E.H., Ex. A at 8; Docket Entry #2 & E.H., Ex. B at 1. At the evidentiary hearing, Spaulding admitted that he commonly cited cases containing the *ex parte* notation in this fashion. E.H. at 83.

44. In order for a fellow inmate to have effected the forgery, extensive familiarity with Spaulding's writing style would have been required. If Spaulding refused to do legal work for the informants, as Spaulding claims, they would have had little opportunity to acquire such familiarity.

45. Spaulding claims that the informants went to the unit law library and used information gleaned from Spaulding's reported criminal cases to prepare the order. Docket Entry #1 & E.H., Ex. A at 6–7; Docket Entry #2 & E.H., Ex. B at 10–11. Spaulding's own witness, Carter, does not support this version of the events. According to Carter's testimony, various inmates came to the law library with the forged order already in hand to determine if Spaulding had received the good time credit awarded him in the order. D.H. at 7–11.

46. The reported decisions concerning Spaulding do not contain the information recited in the order. *See Ex parte Spaulding,* 687 S.W.2d 741 (Tex.Crim.App.1985); *Spaulding v. State,* 656 S.W.2d 538 (Tex. App.—Corpus Christi 1983, pet. ref'd); *Ex parte Spaulding,* 612 S.W.2d 509 (Tex.Crim. App.1981). For example, according to the letter from Roy E. Greenwood, Spaulding's former counsel, No. 9566, as reflected in the order, is the correct number for Spaulding's Victoria County conviction. E.H., Ex. E at 5. Yet, it does not appear in the reported decisions.

47. In order to be awarded good time credit under the Prison Management Act, as the order purports to do, Spaulding would have been required to alter his criminal history because his first conviction was for aggravated rape, which disqualified him from receiving the extra good time credit. *See Ex parte Spaulding,* 612 S.W.2d at 509; E.H. at 84–85. Spaulding had a motive to state in the order that his first offense was robbery, not aggravated rape, in order to benefit from the extra good time awarded in the order.

48. There is no credible testimony linking Jesse Ivey to the order. Also, as stated by Thompson at the evidentiary hearing, knowing that an inmate had been convicted of forgery would make a difference only if the order had that inmate's name on it, not Spaulding's. E.H. at 66.

49. A copy of the order was not found among Spaulding's possessions. It was not actually transmitted to prison authorities in order to obtain good time credit.

### B. *Conclusions of Law.*

■ 1. Spaulding's claims must be analyzed in the context of the prison setting. As

the Supreme Court recognized in *Wolff v. McDonnell*, 418 U.S. 539, 561, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974), prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." Lawful imprisonment makes unavailable to an inmate many of the rights and privileges afforded an ordinary citizen due to the needs and exigencies of the institutional environment. *Id.* at 555, 94 S.Ct. at 2974.

2. Prisoners are entitled, however, to the protections of the Due Process Clause of the Fourteenth Amendment. *Id.* at 556, 94 S.Ct. at 2974. They may not be deprived of life, liberty, or property without due process of law. *Id.*

3. Because prison disciplinary proceedings are not part of a criminal prosecution, the full panoply of rights due a defendant in such proceedings does not apply. *Id.* Instead, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. *Id.*

4. Where, as here, the state provides a right to good time credit for satisfactory behavior while in prison, which may be forfeited only for certain offenses, the prisoner's interest constitutes a "liberty" interest under the Fourteenth Amendment. *See Disciplinary Rules and Procedures for Inmates* ("Rulebook"), E.H., Ex. C; *Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975; *Gibbs v. King*, 779 F.2d 1040, 1044 (5th Cir.), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986).

5. An inmate charged with an offense that would deprive him of good time credit is entitled to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that his rights are not arbitrarily abrogated. *Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975; *Gibbs*, 779 F.2d at 1044.

6. A prison's failure to follow its own procedural rules is an independent violation of due process, even if the rules and regulations provide protection beyond that which is constitutionally required. *Ruiz v. Estelle*, 503 F.Supp. 1265, 1356 (S.D.Tex.1980).

7. In *Wolff*, the Supreme Court set out minimum requirements of procedural due process that must be accorded prisoners:
- written notice of the claimed violation at least twenty-four hours in advance of the inmate's appearance at a disciplinary hearing;
- a written statement of the factfinders as to the evidence relied upon and the reason for disciplinary action taken, unless the exclusion of certain items of evidence is necessary for personal or institutional safety reasons;
- an opportunity to call witnesses and present documentary evidence in defense when permitting the inmate to do so would not be unduly hazardous to institutional safety or correctional goals.

*Wolff*, 418 U.S. at 563–67, 94 S.Ct. at 2978–80; *Smith v. Rabalais*, 659 F.2d 539, 542 (5th Cir.1981), *cert. denied*, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982).

8. The TDCJ Rulebook incorporates these requirements and contains additional safeguards of prisoners' rights, including those mandated in *Ruiz*. *See* Rulebook at 6–12; *Ruiz*, 503 F.Supp. at 1358–59.

9. Within these parameters, however, federal courts accord prison officials the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order. *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir.1990); *Gibbs*, 779 F.2d at 1044.

10. The adequacy of notice hinges upon whether it is sufficiently detailed to allow the inmate to understand the charges and to marshal the facts in his defense. *Wolff*, 418 U.S. at 564, 94 S.Ct. at 2978; *Freitas v. Auger*, 837 F.2d 806, 809 (8th Cir.1988); *see also* Rulebook § IV(A).

11. The notice of the charges Spaulding received comports with the demands of due process, as it complies both

with the requirements of *Wolff* and the TDCJ Rulebook. Spaulding's claim of insufficient notice of the charges is without merit.

12. Spaulding's due process argument with regard to not being given a copy of the forged order during the hearing is without basis.

13. *Wolff* is silent on whether an inmate may be excluded from a disciplinary hearing. In *Wolff,* however, the Court recognizes:

> The reality is that disciplinary hearings and the imposition of sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonism on the important aims of the correctional process.

418 U.S. at 562, 94 S.Ct. at 2978.

14. TDCJ rules permit exclusion if "hearing the evidence will jeopardize the life and safety of persons or the security and order of the institution," as long as the unit disciplinary hearing officer provides written reasons in the record for the accused inmate's absence during any portion of the hearing. Rulebook §§ VI(A), (E)(2).

15. Merely because Thompson was a correctional officer rather than an inmate does not automatically give Spaulding a right to remain during his testimony. As noted in *Wolff,* "Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting.... Although the dangers posed by cross-examination of known inmate accusers, or guards, may be less, the resentment which may persist after confrontation may still be substantial." 418 U.S. at 562, 568–69, 94 S.Ct. at 2977, 2981.

16. It is appropriate to defer to the hearing officer's judgment that it was necessary to exclude Spaulding in order to preserve internal order and discipline and to maintain institutional security. *See Hewitt,* 459 U.S.

at 472, 103 S.Ct. at 871; *Rabalais,* 659 F.2d at 544.

17. Spaulding's exclusion from portions of the hearing did not violate his due process rights.

18. Under *Wolff,* an inmate facing disciplinary proceedings is allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. 418 U.S. at 566, 94 S.Ct. at 2979.

19. TDCJ rules contemplate an inmate presenting documentary evidence. Rulebook § VI(B)(3). TDCJ rules also permit an inmate to call witnesses "unless the unit disciplinary officer decides that the testimony of such witnesses is likely to jeopardize the life or safety of persons or the security and order of the institution." *Id.* at § VI(B)(4).

20. If witnesses are denied, written reasons must be provided in the record for the unit disciplinary hearing officer's decision. *Id.* Similarly, if confrontation and cross-examination of the inmate's accusers, if requested, is denied, the hearing officer must make a written statement of the reasons for denial. *Id.* at § VI(E)(5).

21. Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but the explanation may either be made part of the disciplinary record or presented later in court if the deprivation of a liberty interest is challenged on that basis. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196, 85 L.Ed.2d 553 (1985).

22. Spaulding asserts that cross-examination of the informant into when, where, and how the order was obtained would have been highly relevant because in the same way it could have revealed the identity of the informant, it could have eliminated Spaulding as a suspect by showing he was not at that location at that time. Much the same argument was rejected in *Rabalais.* There, the only witness, a guard, testified that based on information provided by a confidential informant, inmate Smith was a major narcotics dealer on the trusty yard. 659 F.2d at 541.

The witness consistently refused to reveal the informant's name or any information which he claimed would have revealed his identity, *i.e.*, dates, places, times, persons involved, number of alleged sales witnessed, description of drugs. *Id.* Smith complained that because he was unable to elicit any more facts about the charge, he could not properly present alibi witnesses or opposing evidence. *Id.* at 541–42. Just as in the instant case, the court in *Rabalais* noted the exceptional nature of the information requested:

> [A]ll facts, which under the particular circumstances of this case could lead to the unwarranted identification of the confidential informant—with possible fatal consequences to him—were likewise the very facts needed by Smith to determine if he could establish an alibi for the time, place or date.

*Id.* at 544. The court upheld the actions of the prison officials, finding that they had not abused their discretion in refusing to require the guard to provide Smith the specific information requested. *Id.*

23. Confrontation and cross-examination present great hazards to institutional interests, as there is considerable potential for havoc inside the prison walls. *Wolff*, 418 U.S. at 567, 94 S.Ct. at 2980. If an inmate "proposes to examine an unknown fellow inmate, the danger may be the greatest, since the disclosure of the identity of the accuser, and the cross-examination which will follow, may pose a high risk of reprisal within the institution." *Id.* at 568, 94 S.Ct. at 2981.

24. In *Baxter v. Palmigiano*, 425 U.S. 308, 321–22, 96 S.Ct. 1551, 1559–60, 47 L.Ed.2d 810 (1976), the Supreme Court reaffirmed that the right to call witnesses in prison disciplinary proceedings is a limited one and refused to extend the scope of required confrontation and cross-examination. "Mandating confrontation and cross-examination, except where prison officials can justify their denial on one or more grounds that appeal to judges, effectively preempts the area that *Wolff* left to the sound discretion of prison officials." *Id.* at 322, 96 S.Ct. at 1560.

25. Mandating that Spaulding be given the right to question the informant would impermissibly impinge upon an area left to the sound discretion of prison officials. There is no evidence that in this case, prison officials abused their discretion.

26. Spaulding's due process claim based upon a denial of confrontation and cross-examination rights fails.

27. Handwriting evidence would have been of limited value because Spaulding could have prevailed upon another inmate to forge the judge's name on his behalf.

28. No decision called to this court's attention requires prison officials to accede to an inmate's request for a third-party expert witness.

29. The Supreme Court has repeatedly held that inmates do not "have a right to either retained or appointed counsel in disciplinary hearings." *Baxter*, 425 U.S. at 315, 96 S.Ct. at 1556; *Wolff*, 418 U.S. at 570, 94 S.Ct. at 2981. It would be anomalous to accept Spaulding's position and find that an inmate has a constitutional right to an expert witness at a disciplinary hearing, when he has no right to counsel.

30. In *Wolff*, the Supreme Court recognized that prison officials must of necessity have the discretion to keep the hearing within reasonable limits. *Id.* at 566, 94 S.Ct. at 2979; *see also Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871; *Bell*, 441 U.S. at 547, 99 S.Ct. at 1878.

31. The Court observed in *Wolff*:

> Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.

418 U.S. at 566–67, 94 S.Ct. at 2980.

32. Spaulding's contention that his due process rights were abridged when he was denied the opportunity to present expert handwriting analysis is without merit.

33. Spaulding's contention that the hearing officer was not neutral and detached because the investigative officers participated in the deliberations is without basis.

34. In *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985), the Supreme Court held that the requirements of due process are satisfied if some evidence supports the decision by prison officials to revoke good time credits. The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Id.* at 455–56, 105 S.Ct. at 2774.

35. If there are some facts or "any evidence at all" in support of the action taken, the decision of prison officials must stand. *Gibbs,* 779 F.2d at 1044; *Stewart v. Thigpen,* 730 F.2d 1002, 1005–06 (5th Cir.1984); *Rabalais,* 659 F.2d at 545.

36. The disciplinary determination must not be arbitrary or capricious, but a reviewing court may not substitute its judgment for that of prison authorities. *Stewart,* 730 F.2d at 1005; *Rabalais,* 659 F.2d at 545; *Wilwording v. Swenson,* 502 F.2d 844, 851 (8th Cir.1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 835, 42 L.Ed.2d 843 (1975).

37. In *Hill,* the Supreme Court expressly declined to adopt a more stringent standard as a constitutional requirement, noting that revocation of good time credits is not comparable to a criminal conviction and neither the amount of evidence necessary to support the conviction, nor any other standard greater than "some evidence" applies in this context. *Hill,* 472 U.S. at 456, 105 S.Ct. at 2774.

38. Under TDCJ rules, an inmate may not be charged with a disciplinary infraction if the sole evidence is that provided by a confidential inmate informant. E.H., Ex. D at 1.

39. An inmate informant's testimony must be corroborated by evidence from other sources. *Id.; see also Freitas,* 837 F.2d at 810.

40. If he had known that the order was not genuine, the informant's admitted intention of using a similar order to obtain good time credit would have been a declaration against his penal interest. *See Id.* at 811; *McCollum v. Williford,* 793 F.2d 903, 906 (7th Cir.1986).

41. In support of Spaulding's contention that the informant was not shown to be reliable, he cites cases from other circuits and lower courts that hold that the disciplinary hearing officer must make independent findings of an informant's reliability on the record. Spaulding cites no Supreme Court or Fifth Circuit cases that impose this stringent requirement. Even in those circuits that require such a determination, the court may allow prison officials' justifications for having considered an informant's testimony as reliable to be presented to the court *in camera. See Taylor v. Wallace,* 931 F.2d 698, 702 (10th Cir.1991), citing *Ponte,* 471 U.S. at 497–99, 105 S.Ct. at 2196–97; *Freitas,* 837 F.2d at 811; *McCollum,* 793 F.2d at 906.

42. Through its review of the confidential information, "the court may determine that the facts contained therein make it inherently reliable and, therefore, that the committee implicitly adopted the credibility determination made by the prison investigator." *Taylor,* 931 F.2d at 702; *accord McCollum,* 793 F.2d at 906; *Dawson v. Smith,* 719 F.2d 896, 899 (7th Cir.1983).

43. In *Rabalais,* the Fifth Circuit found sufficient indicia of reliability and upheld the decision of prison officials, where the testifying witness refused to divulge the names of the informants, but testified that he knew them, that they had firsthand knowledge, and that he had used them in the past. 659 F.2d at 546.

44. Under the method approved in *Rabalais,* there is ample support in this case for the hearing officer's implicit finding of reliability of the informant, although it may approach the "outer contours of the prison discipline due process rule." *Id.*

45. The court notes that it would be preferable for the hearing officer to make explicit findings of reliability on the record and for testimony concerning the reliability of informants to be developed in greater detail at the disciplinary hearing. This would obviate

the need for time-consuming and expensive evidentiary hearings on this issue.

■ 46. An inquiry into the reliability of informants may be diminished or even satisfied where there is corroborating physical evidence of the information provided. *Kyle v. Hanberry,* 677 F.2d 1386, 1391 (11th Cir. 1982).

47. The court cannot dismiss as mere coincidence the consistency between the spelling and idiosyncratic punctuation errors in the order and in Spaulding's submissions. The court finds the order to be compelling corroborating evidence of Spaulding's guilt.

48. Spaulding's alternative explanation for the creation of the order is without basis and lends further support to the notion that Spaulding prepared it.

49. The court discounts the notion that, as Spaulding claims, a fellow inmate forged the order to make it look like Spaulding did it to get back at him for refusing to do legal work for the inmate.

50. The court rejects Spaulding's proffered explanation of the manner in which the other inmates obtained the information to be placed in the order because it is not supported by the facts.

51. The court finds unpersuasive Spaulding's argument that if he had prepared the order he would not have misstated his criminal history. Due to the aggravated nature of Spaulding's actual first offense, he would not have been entitled to the good time credit granted in the order. Tex.Code Crim.Proc. art. 42.12 § 3g(a); D.R. at 31, 63, 66.

52. Spaulding's argument that Jesse Ivey, one of the inmates whom he believes to be an informant, was convicted of forgery, is of no weight, as there is no evidence linking Ivey to the order.

53. Because a copy of the forged order was not found among Spaulding's possessions and it had not actually been transmitted to prison authorities does not diminish the substantial evidence linking Spaulding to the forged order; it may have been intercepted before it reached its intended destination.

54. "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board. Instead, due process in this context requires only that there be some evidence to support the findings made in the disciplinary hearing." *Hill,* 472 U.S. at 457, 105 S.Ct. at 2775.

■ 55. There is more than adequate evidence to support the finding of Spaulding's guilt made by the disciplinary hearing officer.

56. Spaulding's claim of no reliable evidence of guilt must be rejected.

## V. *Conclusion.*

This court finds that in the instant case, Spaulding's due process rights were not violated and there is sufficient evidence to support the finding of guilt. Thus, Spaulding is not entitled to federal habeas corpus relief. Accordingly, this court recommends that Spaulding's petition for writ of habeas corpus be denied and that final judgment be entered for Collins.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties. Under Fed.R.Civ.P. 72, the parties have ten days from receipt to file specific, written objections to the Memorandum and Recommendation. Failure to file objections may lead to dismissal of the habeas corpus petition and bars attack on the factual findings on appeal. The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208–1010. Copies of the objections must be mailed to the opposing parties and to the chambers of the magistrate judge, P.O. Box 610070, Houston, Texas 77208.

Signed in Houston, Texas, on this the 10th day of September, 1993.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Plaintiff,

v.

Fred J. BENSON, John J. Koldus, III, Daniel C. Pfannstiel, Robert A. Lacey, Robert W. Siegert, Jr., H.K. Odom, Dale Sawyer, Chris Sawyer, the Unknown Heirs of Joe Sawyer, Louise J. King as Independent Executrix of the Estate of Luther G. Jones, Alvin B. Wooten, James C. Smith, Britton L. Rice, Gary D. Guest, Chalon Jones, Morris F. Hamilton, Jr., Jack W. Lester, Nathan R. Hines, M. Patrick Siegert, Bill Youngkin, and Donna R. Davis, Defendants.

Civ. A. No. H–93–640.

United States District Court,
S.D. Texas,
Houston Division.

March 3, 1994.

514

Bobby Nick Turner, F.D.I.C., Dallas, TX, for F.D.I.C.

Eugene B. Wilshire, Jr., Wilshire Scott Halbach & Dyer, Houston, TX, for Fred J. Benson, John J. Koldus, Daniel C. Pfannstiel, Robert A. Lacey, Robert W. Siegert, Jr., Dale Sawyer, Chris Sawyer, The Unknown Heirs of Joe Sawyer, Louise J. King, Alvin B. Wooten, James C. Smith, Britton L. Rice, Gary D. Guest, Chalon Jones, Morris F. Hamilton, Jr., Nathan R. Hines, M. Patrick Siegert, Donna R. Davis, M.K. Odom, Jr., Jack W. Lester, Jr.

Bill Youngkin, pro se.

Maureen Powers, Asst. Atty. Gen., Finance Div., Austin, TX, for Dan Morales.

## ORDER

HARMON, District Judge.

Pending before the Court in the above referenced action against twenty-two former directors and officers of the University National Bank of College Station, Texas ("UNB"), a federally insured national bank that failed, and against the heirs [1] of two deceased directors for damages arising out of alleged negligence, gross negligence, negligence per se, and breach of duties of obedience, care, and loyalty are the following motions:

(1) A motion to dismiss, or, alternatively for partial summary judgment from Director Defendants Fred J. Benson, John Koldus III, Louise King, Nathan R. Hines, Jack W. Lester, H.K. Odom, Daniel Pfannstiel, Alvin Price, Britton Rice, Patrick Siegert, Robert W. Siegert, Jr., James Connor Smith, Joe Stanley Stephen, and Alvin Wooten (instrument # 29);

(2) Supplemental motion of Defendant Britton Rice for summary judgment (# 43), which incorporates # 29;

(3) Motion of Defendant Bill Youngkin to dismiss, or, alternatively, for summary judgment (# 44), which also incorporates # 29;

(4) Motion to dismiss, or, alternatively, motion for partial summary judgment, or, alternatively, for more definite statement from Defendants Gary D. Guest, Donna R. Davis, M.L. Cashion, Morris F. Hamilton, Robert A. Lacey, and Oliver Bishop (# 48), also incorporating # 29; and

(5) Rule 12 motion of the Sawyer Defendants or, alternatively, motion for summary judgment (# 50), incorporating limitations challenge of # 29.

The Court initially addresses the motions to dismiss for failure to state a claim, or, alternatively, for partial summary judgment on the grounds that all claims based on events prior to March 8, 1988 are barred by Texas' two-year statute of limitations. Tex. Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986); *FDIC v. Nathan,* 804 F.Supp. 888, 892 (S.D.Tex.1992). The last two motions contain some of the same challenges.

First Defendants argue generally that the claims against them are barred by the Texas business judgment rule,[2] which is a substan-

---

**1.** The Federal Deposit Insurance Corporation sues the heirs (Chris Sawyer, Dale Sawyer, and Louise Jones King) of two deceased officers, Joe Sawyer and Luther Jones, because during the relevant period of alleged misconduct, the Texas Pacific Indemnity Company provided coverage for directors and officers of UNB under an Executive Liability and Indemnity Policy, which became an asset of the officers' estates.

**2.** The business judgment rule is defined in *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 721 (5th Cir.1984) as "a corporate director who acts in good faith without corrupt motive will not be held liable for mistakes of business judgment that damage corporate interests." *Gearhart* quotes *Cates v. Sparkman,* 73 Tex. 619, 11 S.W. 846 (1889), for the standard for judicial intervention:

[I]f the acts or things are or may be that which the majority of the company have a right to do, or if they have been done irregularly, negligently, or imprudently, or are within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved, these would not constitute such a breach of duty, however unwise or inexpedient such acts

might be, as would authorize interference by the courts at the suit of a shareholder.
*Id.*
The Texas Supreme Court in *Cates* further stated a rule recognized and applied in later Texas cases:

The breach of duty or conduct of officers and directors which would authorize, in a proper case, the court's interference in suits of this character is that which is characterized by *ultra vires,* fraudulent, and injurious practices, abuse of power, and oppression on the part of the company or its controlling agency clearly subversive of the rights of the minority, or of a shareholder, and which, without such interference, would leave the latter remediless.
11 S.W. at 849.
Defendants urge that the business judgment rule is a substantive rule of law that shields them as corporate directors from liability for their actions because they were not personally interested in the challenged transactions and did not act fraudulently or contrary to their lawful authority. *FDIC v. Brown, et al.,* 812 F.Supp. 722 (S.D.Tex.1992) (Lake, J.); *RTC v. Holmes, et al.,* C.A. No. H–92–0753, 1992 WL 533256 (S.D.Tex. Aug. 7, 1992) (Lake, J.); *RTC v. Norris, et al.,* 830 F.Supp. 351 (S.D.Tex.1993) (Rosenthal, J.).

tive rule of law requiring pleading and proof to avoid its reach, as well as being a defense to negligence actions. Specifically they maintain that Count One, breach of the duty of obedience by *ultra vires* acts, fails to plead any *ultra vires* acts and alleges no actionable participation in any of the stated banking transgressions by the former directors and members of the loan committee in approving, ratifying, or permitting loans that allegedly violated federal laws and regulations for banking institutions. They urge that the FDIC has failed to allege actual knowledge by the directors at the time they approved the loans that the loans did not comply with the laws or regulations or participation in these alleged illegal acts or that such actions exceeded their authority. They maintain that while their conduct in approving and ratifying loans may have been negligent, it was not *ultra vires,* i.e., beyond their corporate power, and that their conduct is therefore protected by the business judgment rule. The directors and members of the loan committee clearly had the authority to ratify or approve loans submitted to them by officers and employees of the bank, almost all after the loans had been consummated and funded, and their failure to monitor the latters' preparation of loans does not subject them to personal liability. Furthermore, the fact that an act is illegal does not make it *ultra vires.* Nor are they grossly negligent for "abdicating" their duties, insist Defendants, because as the amended complaint charges, they acted: they permitted without questioning certain corporate transactions and actively approved the loans. *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); *Brown,* 812 F.Supp. at 726. Defendants insist that even if the complaint had alleged an *ultra vires* act, no claim was stated because the FDIC has failed to plead any negligence by the directors that led to violation of a statute and damage that was proximately caused by that negligence.

Defendants contend that the remaining counts also fail to state a claim. Count Two's claim of breach of the fiduciary duty of loyalty fails to state a claim because there are no charges that any former director was adversely "interested" as to UNB. Counts Three and Four, alleging negligent and grossly negligent breach of a director's duty of care, fail to state claims because voting to approve extensions of credit in the ordinary course of board meetings is protected by the business judgment rule and as a matter of law does not constitute gross negligence. They insist there are no facts alleged to support gross negligence. Count Five for negligence per se fails to state a claim again because such a claim is still a negligence action precluded by the business judgment rule and because the directors, unlike UNB, did not lend money, were not regulated, and lacked the legal capacity to violate the lending laws.

Second, Defendants contend that the claims were time-barred before Plaintiff the Federal Deposit Insurance Corporation ("the FDIC") took over the insolvent bank[3] and therefore the FDIC, as an assignee of UNB, cannot assert them. They insist that Texas law does not recognize the adverse domination doctrine, which tolls the statute of limitations where there is domination of a corporation by wrongdoers. Furthermore, given that the purpose of the adverse domination doctrine is protection of the shareholders of a corporation from the hidden acts of fraudulent management, they argue that there was no adversity here after January 1, 1986 because the board of directors of the single shareholder, University Bancorporation, Inc. ("Bancorp"), which acquired one hundred percent of the common stock of UNB, effective as of January 1, 1985, was virtually identical to UNB's board of directors and therefore the shareholder had full knowledge of the alleged wrongdoing after the acquisition.

---

**3.** The FDIC explains, with documentary evidence, that the Office of the Comptroller of Currency declared UNB insolvent and appointed the FDIC as Receiver ("the receiver") on March 8, 1990. Subsequently, pursuant to a purchase and assumption agreement, a number of UNB's assets were sold and transferred to another bank. The remaining assets, including all claims against the officers and directors, were sold and transferred to the FDIC in its corporate capacity, which brings this suit.

Defendants further assert that because one hundred percent of the common stock of UNB was sold at a fair price on December 31, 1984, all claims against officers and directors for alleged nonfeasance and malfeasance that occurred before the sale are barred by the *"Bangor Punta* Doctrine," which precludes claims by a corporation or its successors in interest against the officers and directors for acts that occurred prior to a fair value sale of all of the corporation's common stock. *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). Texas has adopted this doctrine. *Advanced Business Communications, Inc. v. Myers,* 695 S.W.2d 601, 605–06 (Tex.App.— Dallas 1985, no writ). The rationale of the doctrine is that permitting new shareholders to receive the benefits of claims against management for prior acts would permit a windfall to the purchasers because the price they would have paid for the shares of stock would have already been deflated because of the wrongdoing. *Id.,* 417 U.S. at 711–13, 94 S.Ct. at 2583–84. The presumption is that the new owners paid a decreased value for the shares of stock because their value was reduced by the wrongful acts. *Id.*

## STANDARDS OF REVIEW

In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), before any evidence has been submitted, the district court's task is limited. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. *Id.* The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. *Griffith v. Johnston,* 899 F.2d 1427, 1432–33 (5th Cir. 1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *Lawal v. British Airways, PLC,* 812 F.Supp. 713, 716 (S.D.Tex.1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to

relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

The movant seeking a federal summary judgment initially must inform the court of the basis for its motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.,* 812 F.2d 219, 222 (5th Cir.1987). The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed.R.Civ.P. 56(c). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The non-moving party may not rest on mere allegations or denials in its pleadings but must produce affirmative evidence and specific facts. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15. It meets this burden only if it shows that "a reasonable jury could return a verdict for the non-moving party." *Id.* at 254, 106 S.Ct. at 2513. A mere scintilla of evidence will not preclude granting of a motion for summary judgment. *Id.* at 252, 106 S.Ct. at 2512. All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Once the burden of proof has shifted to the non-movants, they "must do more that simply show that there is

some metaphysical doubt as to the material facts." *Id.* 475 U.S. at 586, 106 S.Ct. at 1356.

In its amended complaint, the FDIC has specifically questioned thirteen loan transactions with allegedly intentional[4] approval or ratification by the board of directors and the loan committee on which Defendants, although sitting at different times, continually formed a majority. It has further alleged that the statute of limitations on each loan was tolled by the adverse domination doctrine until the Receiver took over the failed UNB.

Extensive briefing was filed in this suit developing the arguments for dismissal and dealing with evolving case law. Since the record speaks for itself, the Court will not attempt to review all the arguments but rather will present its conclusions and cite authority for them.

■ The FDIC first challenges Defendants' characterization of itself as simply the assignee of UNB. The Receiver took over the failed institution pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), under which it not only stepped into UNB's shoes, but it also acquired the rights of the bank's creditors, depositors, and shareholders. In turn, the FDIC in its corporate capacity acquired through its purchase and assumption agreement all the rights, powers, privileges and authorities of the Receiver, its assignor, pursuant to § 1823(d)(3)(A). Moreover under section 1.3 of that agreement, any excess recovery on those assets, including claims against the officers and directors, would be funneled back to the Receiver and would inure to the benefit of the institution's depositors and creditors under the distribution scheme established by 12 U.S.C. § 1821(d)(11) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989. Thus the FDIC in its corporate capacity has powers that are much broader than those of the failed UNB. *FDIC v. Wheat,* 970 F.2d 124 (5th Cir.1992); *Fidelity & De-*

*posit Co. of Md. v. Conner,* 973 F.2d 1236 (5th Cir.1992).

■ Nevertheless the FDIC, as the assignee of the Receiver and successor to UNB, brings this suit for negligence and breach of fiduciary duty, not only as a derivative shareholder or depositor, but also on behalf of the institution UNB as its subrogee against its former officers and directors. *FDIC v. Wheat,* 970 F.2d 124, 130 (5th Cir. 1992); *Fidelity & Deposit Company of Maryland v. Conner,* 973 F.2d 1236, 1241 (5th Cir.1992).

### LIMITATIONS AND THE DOCTRINE OF ADVERSE DOMINATION

■ First the Court addresses the complex issue of limitations raised in this action. The FDIC in its corporate capacity stepped into the shoes of the Receiver here; if the bank was time-barred from suing on any of the alleged wrongful acts of the officers and directors, so are the Receiver and the FDIC Corporate. The applicable statute of limitations for the FDIC's claims of negligence, gross negligence, negligence per se, and breach of fiduciary duties,[5] all of which sound in tort, is two years under Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986). *F.D.I.C. v. Dawson,* 4 F.3d 1303, 1307 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994); *Holmes, supra.* If the claims would have been timebarred at the time that the corporation is acquired by a United States agency, the claims cannot be revived by that acquisition. *Guaranty Trust Co. v. United States,* 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938). *See also Randolph v. RTC,* 995 F.2d 611, 619 (5th Cir.1993), *cert. denied sub nom. Beeson v. Phillips, King and Smith,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994) (FIR-REA's federal statute of limitations, 12 U.S.C. § 1821(d)(14) does not revive stale state law claims acquired by the FDIC); *RTC v. Seale,* 13 F.3d 850 (5th Cir.1994). If, when the FDIC–Receiver acquires the claim,

---

**4.** "... [T]he actions of the defendants ... were so reckless as to be considered intentional."

**5.** In Texas breach of fiduciary duty and gross negligence sound in tort and are subject to the

two-year statute of limitations cited. *Russell v. Campbell,* 725 S.W.2d 739, 744 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

it is not time-barred by the applicable state statute of limitations, the federal statute of limitations in FIRREA for claims brought by the FDIC will preempt the state statute at that time and will begin to run. *Dawson,* 4 F.3d at 1307; *F.D.I.C. v. Howse,* 736 F.Supp. 1437, 1444 (S.D.Tex.1990). Title 12 U.S.C. § 1821(d)(14). The federal statute permits the Receiver to bring suit in tort with the longer of "(I) the three-year period beginning on the date when the claim accrues; or (II) the period applicable under State law." The claim accrues on the date the FDIC is appointed receiver or when the FDIC discovers the alleged wrongdoing. Here the only threshold issue [6] is whether the state limitations period had expired before the Receiver was appointed and took over the failed bank. *See, e.g., F.D.I.C. v. Shrader & York,* 991 F.2d 216, 220–27 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *Howse,* 736 F.Supp. at 1440.

■ UNB was declared insolvent and the Receiver appointed on March 8, 1990. Therefore the two-year Texas statute of limitations for tort began to run on March 8, 1988, and all claims arising from acts occurring prior to that date would time-barred unless there is reason to toll the statute of limitations. Claims of violation of federal statutes and regulations are subject to the four-year statute of limitations, now codified as Texas Civil Practice & Remedies Code § 16.051. *Corsicana National Bank v. Johnson,* 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919). The FDIC's first amended original complaint charges the former offices and directors with wrongful acts involving numerous loans dating back as far as 1984; indeed only one was made after March 8, 1988. Usually limitations begins to run against an action against directors of a corporation for malfeasance or nonfeasance from the time the wrongs complained of were perpetrated. *Dawson,* 4 F.3d at 1308. The Texas rule is that the tort statute of limitations begins to run when the tort is committed unless there has been fraudulent concealment or unless a statute exists to the contrary. *Id.* at 1312.

■ The FDIC argues that limitations did not expire because the statute should be tolled by the equitable doctrine of adverse domination and raises fact issues regarding tolling of limitations to preclude summary judgment on at least some of its claims.

■ Contrary to Defendants' representations, Texas does recognize the adverse domination doctrine for purposes of equitable tolling of limitations. In *Dawson* the Fifth Circuit held that Texas follows the "majority test" approach to the adverse domination doctrine, under which the plaintiff need show not that the wrongdoers totally dominated the corporation, but only that the majority of voting board members were culpable wrongdoers during the period for which the plaintiff seeks to toll the statute. 4 F.3d at 1310. The rationale behind application of the doctrine would be to preclude the culpable majority from continuing to operate the corporation, dominate the nonculpable members, and control sources of information and funding in a manner that would prevent action being taken against them. In other words, the FDIC here would have to show that the majority of approving board members, represented by Defendants here, were wrongdoers from the earliest loan in 1984 until March 8, 1988.

Defendants argue that the doctrine of adverse domination is inapplicable here because there is no adversity: since the board of directors of the single shareholder Bancorp was the same board that controlled UNB, the shareholder was fully informed of all acts of UNB's officers and directors. The FDIC responds that this situation, where wrongdoers will not bring an action against themselves, is precisely the target of this equitable doctrine. The board of Bancorp could not reasonably be expected to sue UNB's officers and directors because they were one and the same, and both self-interested. *See Holmes, supra.* As keepers of the public trust, the wrongful acts of directors of a national bank injure depositors, creditors, the Bank Insurance Fund, and ultimately the public. The FDIC notes that a shareholder cannot ratify a transaction that violates a statute or public policy. *Matter of Safety*

---

**6.** The FDIC filed suit three years exactly after UNB failed and the Receiver was appointed.

*International, Inc.*, 775 F.2d 660 (5th Cir. 1985); *Pruitt v. Westbrook*, 11 S.W.2d 562 (Tex.Civ.App.—Fort Worth 1928, no writ).

The Fifth Circuit has recognized the application of the doctrine of adverse domination in favor of government appointed receivers suing directors of failed banks, although the appellate court has also concluded that the doctrine does not apply to mere negligence. *Dawson*, 4 F.3d at 1312. This Court agrees that by apparent admission by Defendants of the virtual identity of the UNB and Bancorp boards of directors and FDIC's summary judgment evidence relating to the sale of UNB stock, the FDIC has raised a fact issue as to whether the doctrine of adverse domination tolls limitations in this action.

■ The Fifth Circuit has ruled that when the Texas statute of limitations applies, the Texas law of adverse domination, not federal equitable tolling principles, would control the tolling issue in pre-receivership events. *Dawson*, 4 F.3d at 1309; *Seale, supra.* Furthermore, as noted, the Fifth Circuit has indicated that it does not believe that Texas courts would extend the "very narrow doctrine" of adverse domination to cases in which the wrongdoing would consist of mere negligence because such a broad application would eliminate limitations bars in nearly all cases involving a corporation's actions against its own directors. *Id.* at 1312. Instead it determined that Texas courts would restrict the tolling by adverse domination to those claims against directors and officers who have been active participants in wrongdoing, concealment, or fraud that actively injures the corporation, and not apply it to claims against directors and officers who have been merely negligent, e.g., who have failed to exercise every precaution or who have failed to investigate. *Id.* Thus FDIC's simple negligence claims prior to March 8, 1988 would be barred.[7]

To determine whether the doctrine of adverse domination might toll limitations on claims other than negligence, the question, as indicated, is whether the FDIC can show that the majority of the board of directors was more than negligent in failing to supervise the loans and was actively involved in *ultra vires* conduct or fraudulent concealment of wrongdoing, so as to avoid the business judgment rule. *Id.* at 1312–13. The FDIC's pleadings document the uncontroverted compositions of the loan committee and the boards of directors of UNB at the time each loan was consummated, approved, and extended and indicate that Defendants, though different ones at different times, were in the majority during the period in question.

### COUNT ONE—ULTRA VIRES

■ Count One alleges that Defendants intentionally or recklessly breached their duty of obedience and engaged in *ultra vires* acts by approving and/or ratifying and/or permitting loans that violated federal laws and regulations, including 12 U.S.C. § 84, 12 U.S.C. § 375b, 12 C.F.R. § 215, 18 U.S.C. § 215, 12 U.S.C. § 29, 12 U.S.C. § 60, and 12 U.S.C. § 1972. Therefore Defendants are liable under 12 U.S.C. § 1972.

Regarding Count One, the FDIC argues that the business judgment rule does not bar its negligence claims and that, even if the rule did apply, the FDIC has adequately pleaded *ultra vires* acts by Defendants by alleging that after regulatory agencies had issued Reports of Examinations and a consulting firm provided a report critical of earlier loans' noncompliance with statutes and regulations, Defendants continued the approval or ratification of loans that violated banking laws and regulations and public policy to move beyond the ambit of the business judgment rule. *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707, 721 (5th Cir.1984). The FDIC concludes that from the reports Defendants knew or should have known that they were approving loans that violated federal statutes and regulations. Selections of these reports are included in an affidavit submitted by Defendant Siegart. The FDIC argues that its complaint alleging that "the actions of the defendants involved

---

7. Defendants Guest, Davis, Cashion, Hamilton, Lacey, and Bishop move to dismiss or for partial summary judgment on Count Three's negligent breach of director duty of care, Count Five's negligence per se, and generally all breach of duty of ordinary care claims on the basis of Texas H.B. 1076. This issue will be discussed later.

in this transaction were so reckless as to be considered intentional" meets the definition of "knowing" in *Corsicana*, 251 U.S. at 71–72, 40 S.Ct. at 84: if the director "deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional.' "

The FDIC further argues that the business judgment rule functions only as a defense to a negligence or breach of duty action brought by shareholders against a bank officer or director. *Wheat*, 970 F.2d at 130–31 & n. 13.[8] The FDIC maintains that the application of the business judgment rule and other common business defenses to directors and officers of banking corporations is restricted because of the banking officials' unusual responsibility and heightened common-law and statutory duty to the public to use good faith, prudence, care, and diligence, which require a higher standard of care. *See, e.g., Wheat*, 970 F.2d at 128–30, *citing Seale v. Baker*, 70 Tex. 283, 289, 7 S.W. 742, 744 (1888). The FDIC further theorizes that the business judgment rule only protects bank directors and officers in derivative shareholder suits, but not in suits brought by the corporation, here by the FDIC on behalf of the bank. It cites no authority for the distinction that it makes.

 This Court finds that the Texas business judgment rule does not function simply as a defense to claims of negligence or breach of fiduciary duty by corporate directors. *Brown*, 812 F.Supp. at 724; *Holmes, supra; Norris, supra*. As stated by Judge Lake and Judge Rosenthal, the Texas business judgment rule is a substantive rule of law that requires of the FDIC both pleading and proof to avoid its reach. *Id.* This Court also concurs with Judge Lake that the FDIC's unsupported contention that in Texas a higher standard should apply to the conduct of bank officers and directors and that the business judgment rule applies only to suits brought against them on behalf of the shareholders in their own interest, and not to

actions brought on behalf of the bank, is not persuasive. *Brown*, 812 F.Supp. at 724 n. 2. The FDIC's main authority, *Wheat*, did not hold that the business judgment rule is limited to a defense in a negligence or breach of fiduciary action against a corporate director but merely approved of a jury instruction on such a defense. In that case the defendant director was found liable because he had a personal interest in approving an inadequately secured loan. There is no indication of he raised the business judgment rule before the case was submitted to the jury. The Circuit approved of a defensive instruction providing that

> You are instructed that a director or officer of a bank shall not be liable for claims against him if, in the discharge of his duties, he exercised ordinary care and acted in good faith and honestly exercised his best business judgment within the limits of the actual authority of his position with the bank.

> A director or officer of a bank shall not be held liable for an honest mistake of judgment if he acted with due care, in good faith, and in furtherance of a rational business purpose.

970 F.2d at 130–31 and n. 13. Moreover, the FDIC's theory would require the Court to conclude that *Wheat* overturned *Gearhart*, in contravention of the Fifth Circuit's long-standing rule that only an *en banc* court, not a panel, can overturn an earlier panel's ruling. *Ford v. United States*, 618 F.2d 357, 361 (5th Cir.1980).

 To avoid the protective shield of the business judgment rule, for Count One the FDIC must show that the acts of the directors and officers were *ultra vires*, or tainted by fraud, or a complete abdication of duty in order to pursue any negligence claims not barred by limitations. Under Texas law *ultra vires* acts are "acts beyond the scope of the powers of a corporation as defined by its charter or the laws of the state of incorporation." *Gearhart*, 741 F.2d at 719.

---

**8.** The business judgment rule is embodied in *Wheat* as a jury instruction: "A director or officer of a bank shall not be held liable for an honest mistake of judgment if he acted with due care, in good faith, and in furtherance of a rational business purpose." 970 F.2d at 131, n. 13.

Approving or ratifying loans brought to a director by officers or employees of the bank is clearly within a director's authority. The failure to supervise loan officers is not an *ultra vires* act. Moreover the business judgment rule will protect a director even if the acts are *ultra vires;* the acts must be grossly negligent or a complete abdication of the director's responsibility for liability to attach. *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); *Jewell v. Sal–O–Dent Laboratories, Inc.,* 69 S.W.2d 544 (Tex.Civ.App.—Eastland 1934, writ ref'd). The duty of obedience requires a director to avoid committing "illegal acts," a term which includes "violation of a specific statute." *Gearhart,* 741 F.2d at 719. To impose liability on a disinterested director for *ultra vires* acts of the bank's officers and employees, a plaintiff must plead and prove, even where an act is illegal, that the director knew of or took part in it. *Briggs v. Spaulding,* 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891); *Fitzpatrick v. FDIC,* 765 F.2d 569, 577 (6th Cir.1985); *King v. Ballard,* 643 S.W.2d 457 (Tex.App.—Eastland 1982), *rev'd in part on other grounds,* 652 S.W.2d 767 (Tex.1983); *Sutton v. Reagan & Gee,* 405 S.W.2d 828 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.). *See also* Ubelaker, *Director Liability Under the Business Judgment Rule,* 35 S.W.L.J. 775, 782 (1981). A director who is grossly negligent and completely abdicates his responsibility and fails to exercise his judgment as a director is also not protected by the business judgment rule. *Joy,* 692 F.2d at 886 (rule does not apply to cases "in which the corporate decision ... results from an obvious and prolonged failure to exercise oversight or supervision.").

In essence the FDIC contends that the regulators' bank examination reports and the minutes of the meetings of the board of directors expose "the pattern of the Defendants [*sic* ] conduct over an extended period of time and the indifference with which the Defendants carried out their duties as directors of the bank. The Reports of Examination reflect that University National Bank was rife with insider loan abuse [that could] not occur without either the active or passive involvement of the board of directors."

FDIC's Response at 24, instrument # 47. The directors allegedly allowed officers of UNB to make and fund insider loans without first obtaining the approval of the board of directors, as required by law. Indeed the FDIC contends that the loans were in excess of the legal lending limit of the bank and therefore could not be approved by the board.

While the FDIC makes many conclusory allegations, it has not submitted proof of knowing or active participation in fraud, concealment, regulatory violations, or other illegal activity amounting to more than negligence by the director Defendants. *See generally Dawson,* 4 F.3d at 1311–12; *Seale, supra.* Nor does it support its claims of nonfeasance and abdication. This Court finds that the business judgment rule precludes any of FDIC's claims for simple negligence that were not already barred by limitations. Thus far the FDIC has fail to show with specific factual proof that Defendants knowingly committed acts outside the scope of their authority or that they participated in acts that they knew were illegal at the time.

### COUNT TWO: BREACH OF FIDUCIARY DUTY OF LOYALTY

Regarding Count Two, the FDIC contends that Defendants were self-interested controlling shareholders, officers, and directors who breached their fiduciary duty of loyalty to UNB in taking actions beneficial to themselves rather than to the bank. Furthermore the FDIC maintains that the board of directors of Bancorp, virtually the same as that of UNB, was necessarily self-interested. Those involved allegedly delayed, ignored or concealed recognition of improper loans by entering into imprudent new loan transactions with new borrowers. Several of the directors are alleged to have obtained loans from UNB and Defendants approved each other's loans allegedly without regard to creditworthiness or to the bank's interests and in violation of insider loan statutes and regulations.

For a plaintiff to recover damages on behalf of a corporation from an interested director, the plaintiff must plead

and prove (1) that the conduct of the director was outside the judgment and discretion that the rule is designed to protect or (2) that the director had a personal interest in the transactions at issue. *Norris, supra.* To be "interested," a director must (1) profit from a transaction with the corporation or usurp a corporate opportunity, (2) buy or sell corporate assets, (3) transact business on behalf of the corporation with another company of which he is also a director or with which the director is significantly financially associated, or (4) transact business for the corporation with a family member. *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 719 (5th Cir.1984).

The FDIC asserts that the control of the corporation by the directors and/or shareholders makes them "interested", as does some Defendants' guarantee of the debt assumed by Bancorp. It alleges that some challenged transactions reflect attempts by Defendants to delay, ignore or conceal the recognition of loan losses. Again the FDIC is long on allegations but short on evidence. However, it does request an opportunity for discovery here.

### COUNT THREE: NEGLIGENT BREACH OF DUTY OF CARE

■■■■■ "[T]he duty of care requires a director to be diligent and prudent in managing the corporation's affairs." *Gearhart,* 741 F.2d at 720. Count Three's claim for negligent mismanagement alleges that Defendants, in permitting the making of the loans at issue in violation of the bank's lending policies and without questioning the propriety of the regulatory compliance of the loans, failed to exercise any reasonable business judgment and breached their duty to oversee and manage the bank's assets and to conducts its business affairs with that degree of care, skill, diligence, prudence, and good faith that ordinarily would be exercised by prudent directors in like circumstances.

Defendants contend, and the Court agrees, that this claim is barred before March 8, 1988 by limitations and subsequently by the business judgment rule.

### COUNT FOUR: GROSSLY NEGLIGENT BREACH OF DUTY OF CARE

■■■■ As a general rule, claims for gross negligence are not barred by the business judgment rule in Texas. *Brown,* 812 F.Supp. at 725, citing *Cates,* 73 Tex. at 622, 11 S.W. at 849 ("injurious practices, abuse of power, and oppression of the part of the company or its controlling agency clearly subversive to the rights of the minority, or a shareholder" are not protected by the business judgment rule) and *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 920 (Tex.1981) (gross negligence is defined as "entire want of care"); *Norris, supra.*

Defendants argue that Count Four fails to state a claim because no duty is owed by Defendants to the shareholders, depositors, creditors, and insurance fund but only to UNB, because the conclusory allegation lacks factual support, and because directors are not responsible for determining regulatory compliance on a loan by loan basis. They emphasize that there is no allegation that the loan was funded after the directors learned that the loan officers had failed to comply with regulations, and mere failure to question is not even negligence.

The FDIC alleges that the examination reports and the minutes of the board of directors reveal a pattern of misconduct over years and the indifference with which they carried out their duties to UNB. Again the FDIC fails to provide factual proof of anything that could constitute more than negligence.

### COUNT FIVE: NEGLIGENCE PER SE

■■■ Defendants insist that no claim has been stated because Defendants in their capacity as directors cannot personally violate lending statutes and regulations that are imposed on banks. Banks lend the money, the bank is the regulated entity, and therefore only banks can violate the statute. *Karle v. National Fuel Gas Distribution Corp.,* 448 F.Supp. 753, 767 (W.D.Pa.1978). Even if Defendants participated in the violation, they are protected by the business judgment rule because such a violation is still negligence. Again, directors are not liable for statutory violations unless they "knowingly violate or

**524**

knowingly permit" others to violate the statutes. 12 U.S.C. § 93(a).

The FDIC has alleged but has not submitted proof of knowing violation of statutes and regulations that amounts to more than negligence.

### BANGOR PUNTA DOCTRINE

■ The Court agrees with the FDIC that the equitable *Bangor Punta* doctrine, which is based on unjust enrichment, does not apply here. The FDIC notes, with a supporting affidavit, that the sale of the assets of the failed UNB will not satisfy the creditors' or depositors' claims, no less the shareholder's, and that there will be no windfall to the FDIC if it succeeds and recovers damages from Defendants for losses they caused to UNB; instead the amount the FDIC as insurer will have to pay would be reduced, to the advantage only of taxpayers, and under section 3.1 of the contract of sale the FDIC would distribute more funds to depositors and creditors, who or which would recover more on their claims. *See also* 12 U.S.C. § 1821(d)(11)(A); *Meyers v. Moody,* 693 F.2d 1196 (5th Cir.1982) (*Bangor Punta* inapplicable where principal beneficiaries of any recovery would be corporation creditors and not shareholders), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983); *FSLIC v. Reeves,* 816 F.2d 130 (4th Cir. 1987); *FSLIC v. Williams,* 622 F.Supp. 132 (D.Md.1985). The FDIC submits an affidavit supporting its claim that there will be no distribution to the shareholders. Furthermore, the FDIC characterizes the "sale" of stock at the end of 1984 as a transfer of stock, 67% of which was controlled by individual Defendants beforehand, not to a new shareholder, but to a holding company also controlled by Defendants, at a price controlled by them, in order to shift their debt obligations to Bancorp. Essentially the FDIC claims that Defendants were dealing with themselves and that the sale was not an arms length transaction at a fair price. The FDIC questions, for example, the transfer to Bancorp of the controlling shareholders' presale debt in acquiring 16,863 additional shares in anticipation of the transaction, a debt which the holding company was soon

unable to service. FDIC maintains that because Defendants Stephen and Siegert were interested parties, their affidavits supporting the fairness of the purchase price should be disregarded. Furthermore the FDIC requests time for discovery, to which it is clearly entitled, to investigate the factual basis of their opinions. The FDIC also points out that Defendants have failed to show how the effect of their wrongdoing was factored into calculation of the price of the stock. Moreover the FDIC submits documents in support of its contention that the price of the stock was based on fatally flawed earnings projections through 2004.

After reviewing the record and the applicable law, in summary the Court concludes that the FDIC's negligence claims prior to March 8, 1988 are barred by limitations because the adverse domination doctrine does not apply to such claims. Moreover all negligence claims are precluded by the Texas business judgment rule unless the FDIC provides sufficient proof in support of its conclusory allegations to demonstrate something more than negligence and to avoid the rule's protective shield. Accordingly the Court

**ORDERS** that all simple negligence claims are dismissed as a matter of law. Therefore Defendants' assertion that the negligence claims are barred by Texas H.B. No. 1076, which clarifies the law in effect, corroborates and reiterates the Court's ruling. Because the Court has determined that negligence claims are barred, they are no longer part of this suit and the Attorney General is granted leave, if he so desires, to move to dismiss the state's intervention to defend the constitutionality of the statute as moot in this case.

As for allegations of self-interest, knowing participation in wrongdoing, fraud, concealment, abdication, and violations of statutes and regulations, although the FDIC has failed to submit proof to raise a genuine issue of material fact to preclude summary judgment, it is entitled to reasonable time for discovery on these matters. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Fano v. O'Neill,* 806 F.2d 1262, 1266 (5th Cir.1987).

Therefore at this time the Court

**ORDERS** that Defendants' motions for summary judgment (# 29, 43, 44, and 48) on

potential non-negligence claims are DE-NIED but grants leave to Defendants to reurge them after discovery ends on June 11, 1994. The Court

**ORDERS** the FDIC to file by June 18, 1994 an amended complaint deleting all simple negligence claims and all claims for which it has or in reasonable probability will have no proof. Defendants may then move, without further briefing, for reconsideration of their motions for summary judgment. The FDIC shall file a timely response with supporting documentary evidence. Defendants may file a reply within ten days of being served with the response.

Finally, the Sawyer Defendants, heirs of officer Joe Sawyer, move for summary judgment because they claim that the estate was insolvent and the heirs received no assets. Citing appropriate legal authority, the FDIC responds that it has alleged as an asset of the estate, discovered after the estate administration had closed, the executive liability and indemnity insurance policy coverage, noted earlier, which would have passed to the heirs. The FDIC is not contending that the heirs are personally liable, but sues them as personal representatives of the decedent to establish his liability as a prerequisite of recovery under the policy. The Sawyers have not replied. Accordingly their motion for summary judgment on the grounds that the estate was insolvent is **DENIED.**

Lee **KERN**, et al., Plaintiffs

v.

**JEPPESEN SANDERSON, INC.,**
et al., Defendants.

Civ. A. Nos. H–93–3065,
G–93–601 and G–93–610.

United States District Court,
S.D. Texas,
Houston Division.

June 13, 1994.

Michael John Maloney, Fisher Gallagher & Lewis, Houston, TX, for Lee Kern, Dianne Kern, Hilda Pokhrel, James Gwin, Jr., Reginald George Duhig, and William E. Nordmann, Sr.

Charles F. Krause, San Antonio, TX, for A.M. Driessen, and Th. A.A. Driessen Voorhout.

Richard H. Caldwell, Mayor Day Caldwell & Keeton, Houston, TX, James M. Fitzsimons, Mendes & Mount, New York City, for Jeppesen Sanderson Inc., Jeppesen & Co. GMBH, The Times Mirror Co. and Sundstrand Avionic Systems.

Jacques E. Soiret, Kirtland & Packard, Los Angeles, CA, Thad T. Dameris, Vinson & Elkins, Houston, TX, for Airbus Industrie GIE, AVSA S.A.R.L. and AINA Holdings Inc.

Thad T. Dameris, Vinson & Elkins, Houston, TX, for Airbus Service Co., Inc.

Michael V. Powell, Locke Purnell Rain Harrell, Dallas, TX, for Aerospatiale Societe Nationale Industrielle.

## MEMORANDUM AND ORDER

NORMAN W. BLACK, Chief Judge.

This is a wrongful death/products liability case which consists of three consolidated cases arising out of two separate airplane crashes. One involved a Pakistan International Airlines ("PIA") flight from Pakistan to Nepal that occurred on September 28, 1992. The other crash occurred on July 31, 1992, and involved a Thai Airways International ("TAI") commercial flight between Bangkok and Nepal. Both crashes occurred northeast of Kathmandu, Nepal. The Government of Nepal investigated both crashes and concluded they were caused by pilot error.

Plaintiffs claim to be citizens of Canada, France, Germany, Great Britain, Israel, Japan, Korea, Nepal, the Netherlands, New Zealand, Norway, Pakistan, Spain, California, and several other states. None of the victims were residents of Texas or had any apparent connection with this state.

The Airbus Defendants are Airbus Industrie GIE ("AI"), AVSA S.A.R.L., ("AVSA"), Airbus Services Co., Inc. and AINA Holdings. Plaintiffs filed an unopposed motion to dismiss all of these Defendants except for AI which was granted. AI is a French entity with its principal place of business in Toulouse, France. Plaintiffs allege AI designed, tested, certified, manufactured, assembled, marketed, and sold the aircraft. Defendant Aeroformation ("AeF") is a French entity with its principal place of business in Blagnac, France. Plaintiffs contend AeF trained the pilots that operated the TAI aircraft.

The pilots allegedly used approach charts manufactured by one of the Jeppesen Defendants. Jeppesen & Co., GmbH is a German company. Jeppesen Sanderson, Inc. is a Delaware corporation with its principal place of business in Colorado. Both airplanes were equipped with a Ground Proximity Warning System (GPWS) manufactured by Defendant Sundstrand Corp. which was sued incorrectly as Sundstrand Avionic Systems, a Division of Sundstrand Aerospace (a Group of Sundstrand Corporation). Sundstrand Corp. is a Delaware Corporation with its principal place of business in Illinois.

In November 1987 AVSA sold an Airbus A310–304 C model aircraft, manufacturer's serial No. 438, registration No. HS–TID, to WardAir Canada, Inc. in France. The aircraft was designed, assembled and tested by AI prior to November 1987. From November 1987 to May 1990, this plane was operated by WardAir and Canadian International. It was then operated by TAI on lease from Blenheim Aviation from 1990 until the crash in 1992.

From 1990 through July 1992 the aircraft was operated and maintained by TAI in Thailand and a Certificate of Airworthiness was issued by the Thai Civil Aviation Authority. The pilots were trained by TAI in Thailand. Tickets for the fatal crash were purchased in either Thailand or Nepal. All documents relating to the design, manufacture and assembly of the airplanes are in France. Records concerning the training and testing of the pilots and the maintenance of the aircraft are in Thailand.

The second plane was an Airbus A300–B4 2C model aircraft, manufacturer's serial No. 025, registration No. AP–BCP. In 1977 AI sold it to Defag–Deutsche Flugzeugvermietungs AG & Co KG ("Defag") in France. Defag then sold the plane to Hapag–Lloyd Fluggesellschaft mbH ("Hapag–Lloyd"). In April 1986, Hapag–Lloyd sold the aircraft to PIA which owned, maintained, and operated it until the crash.

A Certificate of Airworthiness was issued by the Pakistan Civil Aviation Authority. Pilots were trained by PIA in Pakistan and tickets for the fatal flight were purchased in either Pakistan or Nepal. All documents relating to the design, assembly, and sale of the aircraft or the training and testing of the pilots are located in Pakistan. This is also true of the maintenance records. Documents relating to the official government investigation of the crash are located in France and Nepal.

Eyewitnesses to both of the crashes and the subsequent rescue operations are in Nepal as is the wreckage of both aircraft. Many of the documents relating to the airplanes, crashes and Defendants are in French.

Plaintiffs have thrown a little bit of everything into their complaints. Although these cases were consolidated early in the litigation, several attorneys continue to treat them as separate cases. Numerous motions are pending. They include Defendants' motions to dismiss, for more definite statement, and for summary judgment as well as Plaintiffs' motion to remand. Since the cases have been consolidated, the Court takes the position that any motion filed in one of the consolidated cases will be treated as if it was filed in all applicable situations.

*Subject Matter Jurisdiction*

**Foreign Sovereign Immunities Act**

The first issue that must be addressed is whether this Court has jurisdiction over the litigation and the various parties. The Airbus Defendants contend removal was proper and that this Court has jurisdiction pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* because AI is a "foreign state" within the meaning of the FSIA. The removal statute provides that

Any civil action brought in a State court against a foreign state as defined in section 1603(a) ... may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending....

28 U.S.C. § 1441(d).

According to section 1603

> (a) a "foreign state" includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state....
>
> (b) An "agency or instrumentality of a foreign state" means any entity—
>
> > (1) which is a separate legal person, corporate or otherwise, and
> >
> > (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> >
> > (3) which is neither a citizen of a State or the United States ... nor created under the laws of any third country.

As a result, the foreign state has an absolute right of removal to the federal courts. 28 U.S.C. § 1441(d). "It enables foreign states, at their option, to avoid any local bias or prejudices possibly inherent in state court proceedings and also to avoid trial by jury." *In re Delta America Re Insurance Co.*, 900 F.2d 890, 893 (6th Cir.), *cert. denied sub nom., Wright v. Arion Insurance Co.*, 498 U.S. 890, 111 S.Ct. 233, 112 L.Ed.2d 193 (1990). The FSIA is interpreted broadly. *See Nolan v. Boeing Co.*, 919 F.2d 1058 (5th Cir.1990), *cert. denied*, 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991).

The issue in this case is whether AI has met the requirements of § 1603(b)(2). This Court must determine whether a majority of the ownership of AI was owned by foreign states during the relevant period. The parties differ as to when the wrongful conduct occurred. Plaintiffs contend it is the dates of the plane crashes while Defendants allege it was the date they sold the airplanes and relinquished control over them. Plaintiffs base their argument on their interpretation of the phrase "the act complained of" and argue this was when the deaths occurred. Since 50% of AI is no longer owned by sovereign entities, Plaintiffs contend it should be denied immunity. However, the negligent acts alleged against AI deal with the design and manufacture of the aircraft.

The "potential sensitivity of actions against foreign states" is still a concern even after the majority of the entity is no longer owned by a foreign state. *Cargill International S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir.1993). If this were not the case, a foreign state could enjoy immunity at the time of the alleged wrongful conduct, but then lose it through reorganization. When reorganizing it would have to continually consider whether a stale claim could be revived in the United States. It has long been the rule that immunity is not lost when a government's interest is later transferred to private ownership. *See In re The Western Maid*, 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299 (1922).

The PIA aircraft was manufactured prior to May 1977. AI has not been in the chain of custody, ownership, or regular maintenance of the aircraft since that date. The von Lachner Declaration shows that in May 1977 France owned 47.80% and Spain 2.76% of AI.

AI designed and assembled the TAI aircraft prior to November 1987. According to the von Lachner Declaration, this aircraft was never returned to AI nor was AI in the chain of custody, ownership or regular maintenance of this plane after that date. Von Lachner states that in November 1987, the composition of AI was 37.88% the government of France, 3.03% the government of Spain and 16.97% the government of Germany.

Plaintiffs argue that pooling has never been recognized by either Congress or the Fifth Circuit and rely exclusively on *Linton v. Airbus Industrie*, 794 F.Supp. 650 (S.D.Tex.1992). However, in that opinion Judge Kent states that "every court that has considered the issue [of pooling several foreign state interests] has approved this type of pooling." *Id.* at 651. He further states that "[i]n the Court's view ... it does not do too much violence to either the plain language or the spirit of FSIA to hold that foreign states may pool their interests in an entity for purposes of determining whether that entity is a foreign state under FSIA." *Id.* at 652. In *Linton* the Court ultimately determined that the FSIA did not apply but that was because it found that the pooling entity itself must be a FSIA sovereign. For the FSIA to apply in *Linton* the German interest had to be included; but, the ownership interest held by the German govern-

ment was through Deutsche Airbus GmbH. The Court found this was not a foreign state for purposes of the FSIA, and as a result the 50% threshold was not met. This issue is not presented in this case. Furthermore, the *Linton* case focused on the construction of Airbus in 1989, not 1977 or 1987.

The FSIA allows the removal of "any civil action" against a foreign state. *Nolan v. Boeing Co.*, 919 F.2d at 1064. It "extend[s] federal court subject matter jurisdiction over the entire action in which the foreign state is a party, rather than simply over the 'claims' in that action which are specifically asserted against the foreign state." *Id.*

■■■ Based on the above, the Court finds that AI is a sovereign entity. It is therefore entitled to immunity unless one of the statutory exceptions applies. *Saudi Arabia v. Nelson,* —— U.S. ——, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted. *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 293–94 (S.D.N.Y.1987). However, the ultimate burden of persuasion remains with the alleged foreign sovereign. *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n. 6 (5th Cir.1989). Plaintiffs have failed to meet their burden. They argue that AI, if found to be a sovereign entity, is not entitled to sovereign immunity based on exceptions to the FSIA. However, they make only this conclusory statement and fail to develop their argument.

Plaintiffs' also argue that "public record information about the Airbus Defendants' ownership" shows that AI is not owned by foreign states. The sworn testimony of von Lachner, Pinet and Mourey is uncontroverted. Furthermore, the "public records" upon which Plaintiffs rely are unverified, from unrelated sources and from several different years. They are also hearsay. The Court concludes that this allegation lacks merit.

**Federal Question**

■■ An issue has also been raised as to whether a federal question exists. The reso-lution of Plaintiffs' state law claims turn on how several U.S. treaties are construed. Plaintiffs' wrongful death and survival actions are governed by Tex.Civ.Prac. & Rem. Code Ann. § 71.031 (Vernon 1986) which deals with incidents occurring out of state. It states:

(a) an action for damages for the death ... of a citizen of this state, ... or of a foreign country may be enforced in the courts of this state, although the wrongful act, ... causing the death ... takes place in a foreign state or country, if:

(3) in the case of a citizen of a foreign country, the country has equal treaty rights with the United States on behalf of its citizens.

If no treaty exists or if Plaintiffs contend they are not relying on a treaty, they lack standing to sue. *See, e.g., Dow Chemical Company v. Alfaro,* 786 S.W.2d 674, 675 n. 2 (Tex.1990) *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991). If there is a treaty, its construction permits removal based on federal question jurisdiction. *See Hidalgo County Water Control and Improvement District No. 7 v. Hedrick,* 226 F.2d 1, 6 (5th Cir.1955) *cert. denied,* 350 U.S. 983, 76 S.Ct. 469, 100 L.Ed. 851 (1956). Plaintiffs must then show there are specific provisions in the treaty which guarantee the particular litigation rights being asserted. *See Alfaro,* 786 S.W.2d at 675 n. 2. In addition, when deciding if such rights exist, the Court must construe treaties of the United States. As a result, the Court finds there is federal subject matter jurisdiction over Plaintiffs' claims. The fact that Plaintiffs artfully pleaded their case and do not specifically refer to any federal claim or law is irrelevant. *Eitmann v. New Orleans Public Service, Inc.,* 730 F.2d 359, 365 (5th Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

There is also federal question jurisdiction because Plaintiffs' claims raise questions of foreign relations which are incorporated into federal common law. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 425, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). The fact that foreign countries are not specifically named in the lawsuit is immaterial. All of

the consolidated cases involve foreign-built aircraft, flown by foreign airlines, over foreign airspace, that crashed in a foreign country. The interest these foreign sovereigns have in regulating their aircraft, airlines and airspace outweighs any interest the United States may have in applying its own air safety regulations to these Defendants. "[E]very State has complete and exclusive sovereignty over the airspace above its territory." Convention on International Civil Aviation, article 1. They also control the standards for safety and airworthiness within their country. *Id.* at article 38. Since the interests of foreign countries in this litigation are substantial, there is federal question jurisdiction. *Grynberg Production Corporation v. British Gas, p.l.c.*, 817 F.Supp. 1338, 1353–54 (E.D.Tex.1993).

### Diversity jurisdiction

■ Finally, Defendants argue that their removal was proper because there is complete diversity pursuant to 28 U.S.C. § 1332(a)(3). This statute bestows jurisdiction in a federal district court if the citizen of one state sues citizens of another state or a foreign state. *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 828, 109 S.Ct. 2218, 2220, 104 L.Ed.2d 893 (1989). There must be complete diversity among the properly sued domestic parties and a legitimate controversy must exist among the citizens who are parties to the lawsuit. *Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 420 (5th Cir.1982). It appears that Plaintiffs are citizens of California as well as several other states and foreign countries. Defendants are citizens of Colorado, Germany, France, Delaware, Virginia and Illinois.

■ Plaintiffs argue that there is no diversity jurisdiction because The Times Mirror Company ("TMC") is a Delaware corporation with its principal place of business in Los Angeles. Defendants contend it was fraudulently joined and that there is no reasonable basis for imposing liability on this entity. Removal based on diversity is proper if joinder of the non-diverse party was fraudulent. *Villar v. Crowley Maritime Corp.*, 780 F.Supp. 1467, 1475 (S.D.Tex.1992), *aff'd*, 990 F.2d 1489 (5th Cir.1993), *cert. de-*

*nied,* —— U.S. ——, 114 S.Ct. 690, 126 L.Ed.2d 658 (1994).

■ A nominal party is one who is neither necessary nor indispensable to the action. *Farias v. Bexar County Board of Trustees for Mental Health & Mental Retardation Services*, 925 F.2d 866, 871 (5th Cir.) *cert. denied,* —— U.S. ——, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991). Plaintiffs assert that TMC along with Jeppesen & Co. GmbH and Jeppesen Sanderson, Inc. produced the air navigation approach charts used by the flight crews, and argue that the charts were defective thus causing the crashes.

TMC contends it does not design, produce or sell approach charts such as the ones utilized in the fatal crashes. This is verified by the O. Jean Williams affidavit. Plaintiffs counter by arguing that the alter-ego theory applies and that TMC, Jeppesen & Co., GmbH and Jeppesen Sanderson, Inc are one in the same. Although the relationship between these corporations is that of parent and subsidiary, the evidence shows that they have observed corporate formalities and operate their businesses as separate and distinct entities. There is absolutely no evidence that the activities of TMC have anything to do with the events giving rise to this lawsuit. Based on the above the Court finds that TMC is a nominal party and that it was fraudulently joined. Therefore, this party must be disregarded and the removal upheld.

■ After the Airbus Defendants filed their Notices of Removal a third-party action was filed against Aerospatiale Societe Nationale Industrielle ("Aerospatiale"). It made a special appearance in state court and also filed a Notice of Removal. Contrary to Plaintiffs' beliefs, multiple removals are permitted. *See Albonetti v. GAF Corporation–Chemical Group*, 520 F.Supp. 825, 828 (S.D.Tex.1981).

■ The removal of Aerospatiale was also timely. First, Aerospatiale could not have filed its Notice of Removal before it was sued. *See generally Jones v. Houston Independent School District*, 979 F.2d 1004, 1007 (5th Cir.1992). Second, it is undisputed that Aerospatiale is a French sovereign corporate entity and entitled to immunity. Further-

more, when removal is based on the FSIA, the period for removal can be enlarged. 28 U.S.C. § 1446(d).

Plaintiffs contend the third-party petitions were fraudulent and filed only to create federal jurisdiction where none would otherwise exist. This is absurd. As demonstrated above there is federal jurisdiction over this matter on numerous alternative grounds. Even if Aerospatiale were dismissed this Court would retain jurisdiction over the remaining claims.

### Personal Jurisdiction

■ Now that the Court has determined it has subject matter jurisdiction over this litigation it must now ascertain whether it has personal jurisdiction over the various defendants. It is well established that if a court has no jurisdiction over a defendant, that defendant has an unqualified right to have an order entered granting its motion to dismiss. *Read v. Ulmer*, 308 F.2d 915 (5th Cir.1962). When faced with a motion to dismiss for lack of personal jurisdiction filed pursuant to Rule 12(b)(2), Fed.R.Civ.P., a plaintiff must do more than merely allege that jurisdiction exists. It must carry its burden by establishing facts to show that jurisdiction has been properly invoked. *See e.g., Lacovara v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.*, 551 F.Supp. 601, 602 (E.D.Pa.1982).

■ A test has been established by the United States Supreme Court to determine if a nonresident defendant is subject to a district court's jurisdiction. The court must consider whether the nonresident defendant purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In addition, maintenance of suit in a particular forum must not offend "traditional notions of fair play and substantial justice." *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (citation omitted). This ensures that defendants are not subject to the unreasonable burden of defending themselves in a distant and inconvenient forum. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980).

■ The initial inquiry must be whether Defendants have purposely established minimum contacts with the State of Texas. Minimum contacts can result in either general or specific jurisdiction. General jurisdiction refers to a suit which does not arise from the nonresident defendant's contacts with the forum, and is asserted only over defendants who maintain continuous and systematic contacts in a particular state. *Hall v. Helicopteros Nacionales De Columbia, S.A.*, 638 S.W.2d 870 (Tex.1982), *rev'd on other grounds*, 466 U.S. 408, 415, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). Since the forum state has no direct interest in the litigation a greater level of contacts is required. *Id.*

■ Specific jurisdiction refers to claims which arise out of or relate to a defendant's contacts with the forum. In such cases it is the "relationship among the defendant, the forum, and the litigation" upon which jurisdiction is based. *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977). In specific jurisdiction cases a single act may be sufficient to support jurisdiction. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir.1987). A defendant's conduct in connection with the State of Texas must be such that it should reasonably anticipate being haled into a Texas court. *Holt Oil and Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir.1986) (citations omitted). In addition, the Court must decide if the traditional notions of fair play and substantial justice will be offended if the suit is maintained in Texas. *Shaffer*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579. In determining personal jurisdiction the Court must make its decision based on the totality of the circumstances. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).

■ After carefully considering the facts and evidence presented, it is clear there is no specific jurisdiction. This litigation does not arise out of any contacts of any defendant with Texas. The lawsuit has been filed by citizens of foreign countries and of other

states. Plaintiffs' contend the crashes were the result of alleged defects in the air navigation approach chart, the ground proximity warning system and the aircraft. The Airbus A300 aircraft in question was not designed, manufactured, assembled or sold in the United States. This is also true of the approach charts used in these flights and the ground proximity the warning systems in question. Plaintiffs have failed to allege any connection between Texas and the production or sale of these particular items.

Since specific jurisdiction does not exist in this case, the Court will only address the issue of general jurisdiction as it relates to each individual defendant.

**Airbus Industrie GIE and Aeroformation**

Although the Court has concluded that Airbus Industrie, G.I.E. ("AI") and Aeroformation ("AeF") qualify as foreign sovereigns it will also address their alternative argument that exercising personal jurisdiction over these entities would violate the due process clause. AI is a French entity whose principal place of business is Blagnac, France. It coordinates and supervises the design, fabrication, assembly, and testing of Airbus model airplanes. It markets and sells aircraft directly to non-North American purchasers.

AeF is a French legal entity which provides operational training to purchasers of Airbus aircraft outside the United States. It was sued only by the Plaintiffs in the crash involving the TAI flight. Although Plaintiffs contend AeF trained and certified the pilots on the flight that crashed, the Pinet declaration shows Aeroformation had absolutely no connection with either the aircraft involved or the certification of the pilots on that particular flight.

■■■■ To establish general jurisdiction over AI or AeF their activities in Texas must be regular, systematic, or continuous. *Perkins,* 342 U.S. at 445, 72 S.Ct. at 418. The level of contact in this situation must be substantial. *Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1362 (5th Cir.1990). The cases dealing with general jurisdiction emphasize that there is no jurisdiction if the nonresident defendants have no regular place

of business, are not licensed to do business in the forum state, and do not have systematic and continuous contacts with the forum state. *See, e.g., Helicopteros Nacionales,* 466 U.S. at 416, 104 S.Ct. at 1872; *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1330–31 (9th Cir.1984), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985); *Congoleum Corp. v. DLW Aktiengesellschaft,* 729 F.2d 1240, 1242–43 (9th Cir.1984).

These Defendant's rely heavily on *Bearry v. Beech Aircraft Corporation,* 818 F.2d 370 (5th Cir.1987). In that case survivors of parties injured in a plane crash also brought a products liability action against the manufacturer of the plane, Beech Aircraft Corporation ("Beech"). Beech was a Delaware corporation with its principal place of business in Kansas. It had no telephone listing or bank account, nor did it own real estate, pay taxes or permanently assign employees or directors to work in Texas. *Bearry,* 818 F.2d at 372. However, over a five-year period, Beech hired approximately 300 marketing employees in Kansas who were assigned to a nationwide marketing campaign. They sold millions of dollars worth of merchandise to dealers in Texas, one of which was a wholly owned subsidiary of Beech. *Id.* Nevertheless, the Fifth Circuit found that Beech's Texas contacts were not the "continuous and systematic contacts on which general jurisdiction could be based." *Id.* at 375.

■■■■ As in *Bearry,* the declarations of von Lachner, Mourey, and Pinet show neither AI nor AeF have regular or continuous and systematic contacts with Texas. Neither are organized under Texas law nor have they been registered to do business in Texas. They have no office, plant or facility of any kind nor real or personal property in Texas. They are not chartered or licensed to do business here and do not have any employees or representatives in Texas. Finally they do not have telephone listings, bank accounts or any physical assets in this state.

■■■■ Furthermore, even if there were sufficient contacts in Texas, this Court's exercise of jurisdiction over these Defendants would offend traditional notions of fair play and substantial justice. *International Shoe,*

326 U.S. at 316, 66 S.Ct. at 158. The burden that would be imposed on AI and AeF to defend themselves in Texas would be considerable. "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal,* 480 U.S. at 114, 107 S.Ct. at 1033. The burden is of particular significance if, as here, the defendant did little to reach out to the "forum state." *Insurance Co. of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1272 (9th Cir.1981).

It would be hard for Plaintiffs to dispute the fact that Texas' interest in this lawsuit is slight. None of the events giving rise to this litigation occurred here and the only real tie with Texas is that this is where Plaintiffs' attorneys are located. Where plaintiffs are residents of another state and all the witnesses and evidence are found elsewhere, plaintiffs have no distinct interest in the forum. *Bearry,* 818 F.2d at 377. This dispute would be resolved more efficiently in Europe, Nepal, Thailand or Pakistan where the events took place and the evidence and witnesses are located. *See Brand v. Menlove Dodge,* 796 F.2d 1070 (9th Cir.1986). In addition any of these forums would have a much stronger interest in this lawsuit. "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi,* 480 U.S. at 115, 107 S.Ct. at 1034 (citation omitted). After careful consideration, the Court concludes that it lacks personal jurisdiction over both AI and AeF.

**Jeppesen & Co., GmbH and Jeppesen Sanderson, Inc.**

Like AI and AeF, the Jeppesen Defendants rely primarily on *Bearry.* Jeppesen & Co's contacts with Texas were much less significant than those of Beech. Jeppesen & Co., GmbH is a German corporation. It has no office, telephone listing, real or personal property, bank account or employees in Texas. Its employees do not come here on business, it does not pay taxes in Texas and it does not advertise its services or products in this state. Unlike Beech it does not have a subsidiary in Texas and its services can only be used in Europe, Africa, the North Atlantic, and Asia.

Jeppesen Sanderson, Inc. is a Delaware corporation with its principal place of business in Colorado. It is not registered to do business in Texas. Plaintiffs contend it acted in concert with Jeppesen & Co., GmbH and the Times Mirror in the production and selling of the approach chart used by the flight crew during the flight of the Pakistani airliner. Plaintiffs argue that an alleged defect in the chart caused the crash. The affidavit of William H. Barlow states that Jeppesen Sanderson has no telephone listing, real or personal property, office, bank account, employees, officers, or directors in Texas. It does not pay taxes in Texas nor does it have a subsidiary here. Jeppesen Sanderson does advertise nationally, but these advertisements are not specifically targeted to the Texas market.

Both Jeppesen Co. GmbH and Jeppesen Sanderson are owned by the Times Mirror. Plaintiffs believe Jeppesen Sanderson and Jeppesen & Co., GmbH are engaged in a joint venture or are the alter-egos of one another and that they jointly publish a record of changes in their charts. These arguments are supported by four unverified exhibits which Plaintiffs refer to as "public records." These do not constitute appropriate evidence and consist of inadmissible hearsay under Fed.R.Evid. Rule 802. Even if this evidence was considered, it shows the fallacy of Plaintiffs' contentions. The documents relate primarily to the Times Mirror which does not design, produce or sell aeronautical charts. The sales figure does not reflect aeronautical chart revenue, but rather that of the Times Mirror which is a separate entity. Plaintiffs have failed to produce any evidence of sales in Texas by either Jeppesen & Co., GmbH or Jeppesen Sanderson. The allegation that these entities are the alter-egos of one another or that Jeppesen & Co., GmbH is a wholly owned subsidiary of Jeppesen Sanderson is controverted by the Barlow affidavit. Plaintiffs have failed to present any evidence to support its "jurisdiction facts."

■ Plaintiffs also argue that the Times Mirror, Jeppesen Sanderson and Jeppesen Co., GmbH placed "a product in the stream of commerce for distribution to all states." The stream-of-commerce theory relates to specific rather than general jurisdiction, and applies only when the injury occurs in the forum state. *See World–Wide,* 444 U.S. at 297, 100 S.Ct. at 567; *Irving v. Owens–Corning Fiberglas Corporation,* 864 F.2d 383, 388 (5th Cir.), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989); *Bearry,* 818 F.2d at 375.

To establish general jurisdiction Plaintiff must show that the defendant continuously and systematically conducted business activities in the forum. *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 438, 72 S.Ct. 413, 414, 96 L.Ed. 485 (1952). Plaintiffs have not made any specific allegations that these Defendants have conducted continuous and systematic business activities in this state. There are a few allegations directed at the Times Mirror, but since this Court has dismissed it as a nominal party these assertions need not be addressed. Intercorporate relationships are irrelevant.

■ The Court finds that it would be unfair and unreasonable to exercise personal jurisdiction over either Jeppesen & Co., GmbH or Jeppesen Sanderson. Texas has no interest in Plaintiffs' claims against these Defendants and the due process clause limits the ability of states to decide a case in which they lack a legitimate interest. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). An obscure interest in the dispute is inadequate. *See World–Wide,* 444 U.S. at 299, 100 S.Ct. at 568; *Bearry,* 818 F.2d at 377. There is simply no reason to litigate the dispute against these Defendants in Texas.

### Sundstrand Corporation

■ Sundstrand Corporation ("Sundstrand") is a Delaware corporation with its principal place of business in Illinois. Plaintiffs have accused it of manufacturing and distributing a defective Ground Proximity Warning system ("GWPS").

Sundstrand contends this Court lacks personal jurisdiction over it because its contacts with Texas are not continuous and systematic. Like the Jeppesen Defendants, AI and AeF, Sundstrand's argument is based predominately on *Bearry.* There is no evidence that Sundstrand has a manufacturing facility, warehouse or office in Texas, or that any of its employees are located here. It does not have any real or personal property or bank accounts in Texas. Like Beech, Sundstrand sells under contract terms, FOB Point of Origin, which means there are no sales in Texas. However, Sundstrand's position differs from Beech's because Sundstrand does have an agent for service of process and is registered to do business in Texas. However, these facts are of little importance in a jurisdictional analysis. *Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 183 (5th Cir. 1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 1047, 122 L.Ed.2d 356 (1993).

While Sundstrand has a presence in Texas, the affidavit of Gary Hedges shows it does not regularly conduct business in this state. Where a corporation "exercise[s] its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states," it will not be subject to jurisdiction in those forums. *Bearry,* 818 F.2d at 375–76.

Plaintiffs' fundamental jurisdictional argument is that as a leading supplier of proprietary aerospace systems and components, it must have products on virtually every commercial, military, commuter and business aircraft produced in the world. They submit documents showing the amount of Sundstrand's total yearly sales. On this evidence alone, they infer that Sundstrand must have actively distributed its product in Texas. This argument falls under the stream-of-commerce theory. As explained above, this theory is inapplicable when making a general jurisdiction analysis.

Second, Plaintiffs contend that a district office of Sundstrand, doing business as Sundstrand Aerospace, is located in Arlington, Texas. This allegation is supported only with inadmissible hearsay evidence. According to the declaration of Gary Hedges, this is in fact an office of Sundstrand Service Cor-

poration, a wholly owned subsidiary of Sundstrand. The evidence shows that Sundstrand has no office or employees in Texas. Accordingly, the Court finds that the claims against Sundstrand should be dismissed for lack of personal jurisdiction.

### Failure to Join an Indispensable Party

■ As an alternative ground for dismissal Defendants make a strong argument that this case should be dismissed for failure to join indispensable parties pursuant to Fed. R.Civ.P. 19(b). Defendants contend that both PIA and TAI, owners of the planes that crashed, should have been named as Defendants. Pursuant to Rule 19, Fed.R.Civ.P. a party is indispensable if complete relief cannot be accorded to the present parties "in equity and good conscience" without their presence in the lawsuit. *Id.*

A Rule 19 analysis is controlled by practical and objective considerations. *Lone Star Industries, Inc. v. Redwine,* 757 F.2d 1544, 1552 (5th Cir.1985). PIA and TAI owned and operated the aircraft in question and had a duty to maintain, inspect and keep the planes in good working order. The pilots were employees of PIA and TAI and according to the declaration of von Lachner, pilot error was the proximate cause of both crashes.

In *Whyham v. Piper Aircraft Corp.,* 96 F.R.D. 557, 560–61 (M.D.Pa.1982), the Court considered a similar fact scenario and concluded that the owners of the aircraft were necessary parties. However, joinder was not possible due to a lack of personal jurisdiction. The Court then applied the Rule 19(b) analysis to decide whether in equity or good conscience the action should continue or be dismissed. It found that the manufacturer, as well as the owners, all risked being prejudiced by the action proceeding without the joinder of the airlines, and that there was no way to "adequately protect them from the prejudice such a judgment could generate." *Id.* at 562. The Court further found that "one dispositive action ... [would] eliminate multiple suits concerning liability and ... serve judicial economy." *Id.* Finally, the court reached the conclusion that the plaintiff would have an adequate remedy in Scotland.

"Although Plaintiff may not be able to rely on a strict liability theory, and although [his] potential damage award may be smaller, there is no danger that [he] will be deprived of any remedy or treated 'unfairly.' " *Id.* (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)).

Like Piper, Defendants argue that the sole cause of the crashes was negligence by the owners and operators. If PIA and TAI are not parties to this litigation, Defendants risk being prejudiced and possibly forced to pursue a second action against PIA and TAI for indemnity or contribution. The liability issue may also be decided inconsistently. Because the Court believes PIA and TAI are indispensable parties, this case must be dismissed and adjudicated in a forum that will eliminate multiple suits and serve judicial economy.

### Forum non conveniens

■ Defendants final alternative argument for dismissal is based upon the doctrine of *forum non conveniens.* The purpose of this doctrine is to ensure that the location of the trial is convenient for both the litigants and the Court. As a result a Court can refuse to exert its jurisdiction when the convenience of the parties and the court and the interests of justice indicate an alternative forum would be more beneficial.

■ The Supreme Court has established a two-step process that a district court must follow when evaluating a motion filed pursuant to this doctrine. *Gulf Oil Corporation v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). First, the Court must find an adequate alternative forum in which to try the case. *Id.* If one exists, it must then consider various private and public interest factors in determining the appropriateness of a *forum non conveniens* dismissal. *Id.*

To satisfy the first prong, Defendants must be "amenable to process" in another jurisdiction. *Id.* at 508, 67 S.Ct. at 843. It is not necessary that this alternative forum provide all the remedies and benefits that may be available in an American court, so long as they do not amount to no remedy at all.

*Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. at 265. The Airbus Defendants argue that the case should be tried in France and that French product liability law is more strict toward manufacturers than American product liability law. *See* Butterworths, European Product Liability, at 103–122 (1992). Several other alternative forums also exist. The most logical would be Nepal, where the crash occurred. Pakistan, Thailand, Germany, Great Britain, the Netherlands and Spain are also possible forums. All have a closer connection with this case than the United States.

Both the private and public interest factors weigh in favor of dismissal. All of the evidence in this suit, including witnesses, are in countries and states other than Texas. The airplanes were designed and manufactured in France. Most of the witnesses reside in France, Thailand, Pakistan, Germany or Nepal. Texas is clearly not a convenient forum for these fact witnesses. In addition, these crucial witnesses are outside this Court's subpoena power and the costs for willing witnesses to attend the trial would be astronomical.

Furthermore, this is not a local controversy. None of the passengers on either flight were Texas residents. "[A] community having no relation to the litigation," should not be forced to bear "the burden of jury duty" in a case with no connection with Texas. *Gahr Developments of Panama, Inc. v. Nedlloyd Lijnen, B.V.,* 723 F.2d 1190, 1192 (5th Cir.1984) (citations omitted). A burden would also be placed on the Court's docket which would frustrate local litigants who wish to have their cases heard. *Id.*

In addition, since the crash occurred in Nepal, the flights originated in Thailand or Pakistan, the aircraft was designed, assembled, and sold in France, and operated by pilots trained outside the United States, a Texas conflict of laws analysis would then yield to the application of French law or the law of another country. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984). Any deference to Plaintiffs' choice of forum is eliminated when one examines the obvious unjustified burden that would be imposed on the judicial system of this state. *See Villar*

*v. Crowley Maritime Corp.,* 780 F.Supp. at 1485. Accordingly, it is

ORDERED that Plaintiffs' motion to remand (entry 10) is DENIED. It is further

ORDERED that Defendant Jeppesen & Co. GMBH's motion to dismiss (entry 16) is GRANTED. It is further

ORDERED that Defendant Jeppesen Sanderson, Inc.'s motion to dismiss (entry 18) is GRANTED. It is further

ORDERED that the motion to dismiss of The Times Mirror Co. (entry 20) is GRANTED. It is further

ORDERED that Defendant Sundstrand Corp.'s motion to dismiss (entry 27) is GRANTED. It is further

ORDERED that the Airbus Defendants' motions to dismiss (entries 29 & 35) are GRANTED. It is further

ORDERED that the Airbus Defendants' motions for more definite statement (entries 29 & 35) are DENIED. It is further

ORDERED that the Airbus Defendants' motion for summary judgment is DENIED as these parties have been dismissed. It is further

ORDERED that Plaintiffs' motion to strike Aerospatiale's removal notice and to remand (entry 38) is DENIED. It is further

ORDERED that Plaintiff's motion to dismiss the third party petition of the Airbus Defendants (entry 38) is DENIED.

Plaintiffs may file this litigation in a more convenient forum. Any motion filed in any one of the consolidated cases is considered to have been filed in all of the cases, if applicable.

John CONWAY and Jeanne Conway,

v.

SAUDI ARABIAN OIL COMPANY
and Aramco Services Co.

Civ. A. No. C–93–149.

United States District Court
S.D. Texas,
Corpus Christi Division.

Aug. 4, 1994.

Wilson Calhoun, Meredith, Donnell & Abernethy, Corpus Christi, TX, for plaintiff.

Robert Ellison Meadows, Sewell & Riggs, Houston, TX, for defendant.

### AMENDED ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JACK, District Judge.

On this date, came on to be heard Defendants Saudi Arabian Oil Company ["Saudi Arabian"] and Aramco Services Company ["Aramco"] Motion for Summary Judgment and the Plaintiff's Response to Defendant's Motion for Summary Judgment.

### I. JURISDICTION

This cause of action is in federal court as a result of a removal pursuant to 28 U.S.C. § 1441(d), § 1446, §§ 1602 *et seq.*

### II. FACTS

Plaintiff, John Conway, entered into negotiations with Defendants. On or about June 3, 1991, John Conway accepted a conditional employment offer with Saudi Arabian made to him by their authorized agent Aramco. Plaintiffs allege that prior to acceptance Aramco recruiter, Dottie Hunter, indicated to them that John Conway would be assigned to Ras–Tanura. Plaintiffs desired this site because it is located on the water and would enable them to enjoy various watersports. In addition to the offer letter, John Conway had to sign SAUDI ARAMCO Terms and Conditions of Employment ["the agreement"]. Aramco also gave them a compensation worksheet that estimated expenses for the listed site of Ras–Tanura.

Plaintiffs argue that they relied on Defendants promise that they would be located in Ras–Tanura. Based on this reliance, they took several steps which they maintain have left them severely disadvantaged. They sold their car and boat below market value, they prepared their house for leasing, Jeanne Conway quit her job, John Conway turned down an offer for another job and they made several purchases as well as taking other measures in preparation for their life in Saudi Arabia.

While Plaintiffs made such preparations, Defendants informed them they would be assigned to Abqaiq. Plaintiffs maintain that although they greatly preferred Ras–Tanura, John Conway would accept assignment at Abqaiq since it was also on the water. By mid-August of 1991, Plaintiffs had substantially met all of the conditions in the offer letter and agreement. Plaintiffs planned to leave for Saudi Arabia at the end of August. On August 13, 1991, Defendants informed John Conway that his location had been changed from Abqaiq to Udhailayah. (Defs.' Mot. for Summ.J.Ex. A–8). Plaintiffs objected to this location as very remote with none of the services and amenities that either Ras–Tanura or Abqaiq had to offer. When Defendants did not reconsider the assignment site, John Conway withdrew from taking substantive steps towards moving to Saudi Arabia to work for Defendants. (Defs.' Mot. for Summ.J.Ex. A–9). Eventually, the contract was terminated when John Conway refused to work for Saudi Arabian in Udhailayah. (Defs.' Mot. for Summ.J.Ex. A–10).

## III. CAUSES OF ACTION

In a motion for summary judgment, the moving party has the burden to establish that there is "no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986). The Court must view all inferences from the evidence in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511.

■ (1) *Breach of Contract.* The Fifth Circuit has established that the "interpretation of a contract is a question of law." *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1413 (5th Cir.1993); *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir.1992); *Kimbell Foods, Inc. v. Republic Nat'l Bank*, 557 F.2d 491 (5th Cir.1977). When a contract is unambiguous, the court must give legal effect to parties' expressed intentions. *Ideal Lease Service, Inc. v. Amoco Prod. Co., Inc.*, 662 S.W.2d 951, 953 (Tex.1983); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727–28 (Tex.1981). Furthermore, mere disagreement about contract terms and obligations between the parties establishes neither ambiguity regarding the contract nor a question of fact for the jury. *D.E.W., Inc.*, 957 F.2d at 199.

■ On or about May 15, 1991, D.J. Hunter sent a letter to John Conway offering him a position with Saudi Arabian Oil. (Defs.' Mot. for Summ.J.Ex. A–1). This letter clearly stated that it was a conditional offer by Defendants to Plaintiff. The offer of employment was with the company generally and did not specify a particular location. Moreover, the letter even indicated that assignment outside of Saudi Arabia was a possibility. Plaintiff had a number of conditions he had to meet before he could assert rights under the contract. At the bottom of the letter, Plaintiff accepted the offer without attempting to make any changes or additions to the terms. Therefore, his acceptance re-

quired that he meet the stated conditions in their entirety to establish a binding contract. For the purpose of this motion, we assume that Plaintiffs had successfully completed or were on their way to completing the conditions in the offer letter. When negotiations are in writing, the existence of a valid acceptance is a question of law for the court to determine. *Gilbert v. Pettiette*, 838 S.W.2d 890, 893 (Tex.Ct.App.—Houston 1992); *Associated Tabulating Serv. Inc. v. Olympic Life Ins. Co.*, 414 F.2d 1306 (5th Cir.1969).

■ In addition to the terms in the offer, he also was required to return the agreement after reading and agreeing to these additional terms. (Defs.' Mot. for Summ.J.Ex. A–3). When a "set of documents executed at the same time, with the same purpose and in the course of the same transaction, [courts should] construe the agreements together." *Calpetco 1981*, 989 F.2d at 1412; *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex.1984); *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex.1981). This document, therefore, became incorporated into the contract between the two parties. The agreement indicates that Plaintiff was an "at will" employee. Even Plaintiffs acknowledge that they had an "at will" employment contract. (Resp. to Defs.' Mot. for Summ.J. ¶ 27). Moreover, the agreement states that "[a]ny such change, representation or agreement altering these terms and conditions of employment must be in writing and signed by" either the company president, the chief executive officer or a vice president. (Defs.' Mot. for Summ.J.Ex. A–3 ¶ 7). Plaintiffs offer no written evidence regarding the assignment of a specific location by one of these required officers.

Plaintiffs further argue that the compensation worksheet indicated that they would be assigned to Ras–Tanura. (Pls.' Mot. for Summ.J.Ex. 2). The offer letter discusses the purpose of this estimated compensation worksheet as "to provide an estimate of the *net* monthly compensation you will receive with SAUDI ARAMCO in Saudi Arabia." (Defs.' Mot. for Summ.J.Ex. A–1 at 1) (emphasis in original). Defendants gave Plaintiffs this worksheet in order to indicate the

average monthly expenses and compensation and is not determinative of the site where Plaintiffs would be assigned. The Supreme Court long ago established that "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P.J. Carlin Constr. Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916); *Ralston Purina Co. v. Barge Juneau & Gulf Caribbean Marine Lines, Inc.,* 619 F.2d 374, 375 (5th Cir. 1980). Thus, the worksheet is only effective insofar as it establishes an estimation of living expenses that Plaintiffs could expect while working in the Middle East. *Ralston Purina,* 619 F.2d at 375–76; *Hill & Combs v. First Nat'l Bank of San Angelo, Texas,* 139 F.2d 740, 742 (5th Cir.1944). The argument that the worksheet is dispositive of the exact location assignment is unpersuasive since in the next sentence of the offer letter, Defendants indicate that assignment could be outside of Saudi Arabia.

■ Furthermore, Plaintiffs argue that Defendants and their agents implied and stated orally that they would be stationed at Ras–Tanura. "Where the meaning of the contract is plain and unambiguous, a party's construction is immaterial." *Sun Oil,* 626 S.W.2d at 732. Moreover, the agreement signed by John Conway specifically precluded any written or oral alterations so that the agreement and the offer letter "constitute[d] the sole agreement between [Conway] and the Company relating to [his] employment." (Defs.' Mot. for Summ.J.Ex. A–3 ¶ 9). Lastly, Texas law disfavors oral agreements altering the rights of parties to a written employment contract. *McCamy v. Gen. Elec. Supply Corp.,* 185 F.2d 944 (5th Cir.1950); *Rayburn v. Equitable Life Assurance Soc'y Of The United States,* 805 F.Supp. 1401, 1407 (S.D.Tex.1992). *See also Harville Rose Serv. v. Kellogg Co.,* 448 F.2d 1346 (5th Cir.1971), *cert. denied,* 405 U.S. 987, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972). Oral evidence under the parole evidence rule is only admissible to clarify parties' intentions when the writing is ambiguous. *McDaniel v. California–Western States Life Ins. Co.,* 181 F.2d 606 (5th Cir.1950); *Humble Oil & Refining Co. v. Mullican,* 144 Tex. 609, 192 S.W.2d 770

(1946). Since the written documents are not ambiguous, Plaintiffs' oral evidence is inadmissible.

■ As far as damages incurred by Jeanne Conway, she has no privity of contract with Defendants. "[P]rivity of contract is an essential element of recovery in an action based on contractual theory." *Republic Nat'l Bank v. Nat'l Bankers Life Ins. Co.,* 427 S.W.2d 76, 79 (Tex.Civ.App.—Dallas 1968); *George v. Hall,* 371 S.W.2d 874 (Tex. 1963). Nothing in the offer letter or the agreement establishes privity between Jeanne Conway and Defendants. She did not sign either document. Furthermore, she cannot assert that she is a third-party beneficiary since nothing in the terms of the contract indicate that she is the beneficiary. *B & C Constr. Co. v. Grain Handling Corp.,* 521 S.W.2d 98, 101 (Tex.Civ.App.—Amarillo 1975); *Republic Nat'l Bank,* 427 S.W.2d at 79. Therefore, Jeanne Conway has no separate and distinct claim for breach of contract.

Lastly, Plaintiffs assert that both the offer letter and the agreement were written by Defendants. Therefore, the documents must be "generally construed most strictly against its author." *Republic Nat'l Bank of Dallas v. Northwest Nat'l Bank of Fort Worth,* 578 S.W.2d 109, 115 (Tex.1978). Despite this principle of Texas law as well as the inference established in Plaintiffs' favor under *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. at 2513, the documents succinctly define the agreement between the parties in such a way that a reading would indicate that Plaintiffs had no offer for a specific location and that terms of the contract could be changed only through a specific process. It is possible that John Conway breached the contract since he refused to move to Udhailayah. Thus, Defendants did not breach any contractual obligations owed to Plaintiffs.

■ (2) *Tortious Breach of Contract.* Texas law generally does not award damages for tortious breach of contract. In order to recover under this claim, Plaintiffs must establish both a willful tort and a breach of contract. *Life Ins. Co. Of Virginia v. Murray Inv. Co.,* 646 F.2d 224, 228 (5th Cir.1981), *reh'g granted in part* 651 F.2d 1090 (5th

Cir.1981), *cert. denied* 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982); *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901 (Tex. 1986); *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742 (Tex.1986). *See also Boelens v. Redman Homes, Inc.,* 748 F.2d 1058 (5th Cir.1984), *reh'g denied* 759 F.2d 504 (5th Cir.1985); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986). Therefore, "if the act complained of constitutes *both* a breach of contract and a willful tort, exemplary damages are recoverable." *Life Ins. Co. Of Virginia,* 646 F.2d at 228. Moreover, the Texas Supreme Court has ruled that there must be "at least one finding of an independent tort with accompanying actual damages" in order to obtain punitive damages. *Texas Nat'l Bank,* 717 S.W.2d at 903; *Jim Walter Homes,* 711 S.W.2d at 618. Plaintiffs argue that Defendants had "a common law duty to perform with care, skill and reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe such a duty is a 'tort,' as well as a breach of contract." (Resp. to Defs.' Mot. for Summ.J. ¶ 16). *See Montgomery Ward v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508 (1947). Plaintiffs offer no evidence of an independent tort committed by Defendants. Given this contract and the attention given to Plaintiffs' needs in order to move to the Middle East, there is no evidence that Defendants have breached a duty under the law. Lastly, because Jeanne Conway does not have privity of contract, she cannot sue in tort for any breach. *B & C Constr. Co.,* 521 S.W.2d at 102. Since Defendants did not breach their contract with John Conway and Plaintiffs did not allege that Defendants committed an independent tort, the claim for tortious breach of contract cannot stand.

(3) *Promissory Estoppel and Detrimental Reliance.* Plaintiffs argue that even if there was no breach by Defendants, Plaintiffs relied to their detriment based on the belief that they would be assigned to a certain location within Saudi Arabia. In the belief that they would be going to Ras–Tanura, Plaintiffs maintain that they took several measures, including sold their boat and car at less than market value, Jeanne Conway quit her job, John Conway turned down an-

other promising job prospect, prepared their house to be leased and purchased goods in preparation to live in Saudi Arabia. (Pls.' Resp. to Defs.' Mot. for Summ.J. at 9–10). "Under Texas law, a plaintiff urging estoppel must prove that (1) the defendant made a promise, (2) which the defendant should reasonably expect would induce action or forbearance on the part of the plaintiff, (3) which does in fact induce the action or forbearance, and (4) which must be enforced to prevent injustice." *Crenshaw v. Gen. Dynamics Corp.,* 940 F.2d 125, 128 (5th Cir. 1991); *F.D.I.C. v. Royal Park No. 14, Ltd.,* 2 F.3d 637 (5th Cir.1993); *English v. Fischer,* 660 S.W.2d 521 (Tex.1983); *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934 (Tex.1972). Plaintiffs offer no credible proof that a promise was made. Moreover, any promise by Defendants, in light of all the evidence would be too vague and illusory to support a claim for promissory estoppel. *Gillum v. Republic Health Corp.,* 778 S.W.2d 558 (Tex.Ct.App.—Dallas 1989). Plaintiffs cannot argue promissory estoppel in order to avoid compliance with the parole evidence rule. *Stavert Properties, Inc. v. RepublicBank of Northern Hills,* 696 S.W.2d 278, 282 (Tex.Ct.App.—San Antonio 1985).

■ Since the promise Plaintiffs want to enforce was in conjunction with a valid contract, they cannot assert promissory estoppel. *Pasadena Assocs. v. Connor,* 460 S.W.2d 473, 481 (Tex.Civ.App.—Houston 1970); *Prince v. Miller Brewing Co.,* 434 S.W.2d 232, 240 (Tex.Civ.App.—Houston 1968). When a plaintiff has a valid contract, such as the one in this action, the contract cannot be ignored so that a plaintiff can assert a claim for reliance damages. *Pasadena Assocs.,* 460 S.W.2d at 481; *Prince,* 434 S.W.2d at 240. Even Plaintiffs maintain that the offer letter was a contract. (Resp. to Defs.' Mot. for Summ.J. ¶ 12(2). Nowhere in the contract is Plaintiff, John Conway, guaranteed a specific job site. Therefore, any other damages that Plaintiffs claim pursuant to detrimental reliance cannot be asserted.

■ (4) *Negligent Misrepresentation.* In order to assert a claim of negligent misrepresentation under Texas law, a plaintiff must

establish that the defendant "in the course of his business, profession in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Richter, S.A. v. Bank of America Nat'l Trust & Sav. Ass'n,* 939 F.2d 1176, 1185 (5th Cir. 1991) (quoting *Rosenthal v. Blum,* 529 S.W.2d 102, 104 (Tex.Civ.App.—Waco 1975)), *reh'g denied* 962 F.2d 9 (5th Cir.1992); *Federal Land Bank Ass'n Of Tyler v. Sloane,* 825 S.W.2d 439 (Tex.1991). Since they have no justifiable reason to have relied upon any assertions made to them, Plaintiffs cannot succeed in their claim for negligent misrepresentation. *Granader v. McBee,* 23 F.3d 120 (5th Cir.1994).

After the movant for a motion for summary judgment has met its burden, it is then incumbent upon the non-movant to show that disputed issues of fact remain. *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990). In response, the non-movant must go beyond the pleadings and by "affidavits or by the 'depositions, answers to interrogatories, and admission on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(e)). Plaintiffs have failed to meet this burden.

Therefore as a matter of law, Defendants' Motion for Summary Judgment is hereby GRANTED for the reasons discussed above. Plaintiffs cause of action is hereby DISMISSED with prejudice.

ORDERED.

Curtis WEEKS, Petitioner,

v.

James A. COLLINS, Director, Institutional Division, Texas Department of Criminal Justice, Respondent.

No. 93–3708.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 11, 1994.

545

David Healey, Arnold, White & Durkee, Houston, TX, Steven Alan Reiss, Weil Gotshal & Manges, New York City, for petitioner.

S. Michael Bozarth, Atty. General's Office, Charles Albert Palmer, Asst. Atty. Gen., for respondent.

### *MEMORANDUM AND ORDER*

GILMORE, District Judge.

Pending before this Court are cross-motions for summary judgment on Petitioner's application for federal habeas relief. Petitioner, who had tested positive for human immunodeficiency virus (HIV), was convicted of attempted murder for spitting on a prison guard. Because of two prior felony convictions, punishment was enhanced and assessed at confinement for life. The judgment of the trial court was affirmed in *Weeks v. State,* 834 S.W.2d 559 (Tex.App.—Eastland 1992, pet. refused).

The Petitioner has advanced two grounds for habeas review. First, the Petitioner asserts that the State unconstitutionally failed to prove an essential element of the crime of attempted murder, because at trial there was

no evidence establishing that spitting by an HIV-infected person "tends to" cause death, as required by Texas law. Second, the Petitioner contends that the trial court's charge to the jury was constitutionally inadequate under the fourteenth amendment's due process clause.

With regard to the first ground, the Petitioner has alleged that the State failed to demonstrate that Petitioner's act of spitting on the prison guard when Petitioner was HIV-positive tended but failed to effect the commission of the intended offense, the prison guard's death. Petitioner first asserts that the State offered no proof that Petitioner's saliva contained HIV. Petitioner further asserts that the State also failed to establish that even had Petitioner's saliva contained HIV, his act of spitting on the prison guard would tend to transmit the virus.

■ A central focus of the Petitioner's allegation is that the state courts applied an incorrect legal standard to the last element of the attempt statute. The statute reads that

> [a] person commits an offense, if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended.

Tex.Penal Code Ann. § 15.01(a) (Vernon 1994). Petitioner argues that Texas law requires defendant have a proven capability to accomplish the intended offense, but that the state courts erroneously required only some mere theoretical possibility.

The Texas Court of Appeals states the prosecution's burden was to show that the Petitioner "committed an act, which amounted to more than mere preparation, that could have caused the death of the complainant but failed to do so." *Weeks v. State*, 834 S.W.2d 559, 561 (Tex.App.—Eastland 1992). Petitioner believes that this is a misapprehension

of the elements of the offense.[1] After reviewing the arguments of the parties as well as the appellate opinion confirming the conviction, this Court finds the words "could have" and "tends to" have been used interchangeably in this instance, and the Court of Appeals did not by its use of the word "could" intend to minimize or diminish the requirements of that element. Moreover, this circuit has also analyzed the "tends" element by inquiring whether a certain consequence "could" result from certain conduct. *See Alexander v. McCotter*, 775 F.2d 595, 598 (1985) (testimony that the lug wrench "could be" used to kill a person). Accordingly, the Court finds that the state courts did not apply the wrong standard to the "tends" element by requiring proof that Petitioner's act could have caused the death of the prison guard.

■ When reviewing the sufficiency of the evidence to support a criminal conviction, the critical inquiry is whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 317–20, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560 (1979). This inquiry does not permit this Court to substitute its view of the evidence for that of the factfinder; rather the Court must determine whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319–20, 99 S.Ct. at 2789; *Alexander*, 775 F.2d 595 (1985). To make such an assessment, the reviewing court refers to the substantive elements of the criminal offense as defined by state law. *Alexander*, 775 F.2d at 598. Where the state appellate court has thoughtfully reviewed the constitutional sufficiency of the evidence, its determination of that issue is entitled to great weight. *Jackson*, 443 U.S. at 322 n. 15, 99 S.Ct. at 2791 n. 15; *Callins v. Collins*, 998 F.2d 269 (5th Cir.

---

1. It should be noted that during the trial the Defendant requested an instruction on "tends" which was refused, and offered several definitions in this summary judgment motion. Petitioner defines "tend" to require, at a minimum, that his act not be so incompatible with effecting the intended offense as to make the offense virtually impossible of achievement.

Petitioner asserts that under Texas law, the 'tends' element requires a showing of a *proven capability* and tendency to accomplish the attempted offense, or the *ability* to carry out the offense, or that the act occurred under such circumstances as are *reasonably calculated* to produce death[.]

1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1993).

■ Applying the *Jackson* standard, this Court finds that a rational trier of fact could have found beyond a reasonable doubt that the prosecution proved every element of the offense of attempted murder including the last element which is the subject of Petitioner's complaint here. Among the facts the jury could have reasonably considered in determining that Petitioner's act of spitting tended but failed to cause death are: (1) on the date of the offense, Petitioner was in an advanced stage of infection, HIV–4; (2) a certain number of HIV-positive patients will have the virus growing in their saliva; (3) there is a greater possibility of the virus being present in saliva if blood were in the saliva; (4) blood would more likely be in saliva if Defendant needed dental work or had just eaten; (5) shortly before the spitting incident, Defendant had eaten lunch; (6) Defendant had been to the dentist two months prior to the incident and needed additional dental work; (7) expert testimony that the virus could be transmitted through saliva, especially where saliva comes in contact with the mucous membrane; (8) the spit hit the prison guard in the face and got up inside his nose; (9) the nose is lined by a mucous membrane.

The Petitioner requests the Court take judicial notice of information contained in the Texas Register related to the transmission of AIDS.[2] The Court has reviewed that evidence and finds that it cannot take judicial notice of it because the evidence is not capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned as contemplated in Rule 201 of the Texas Rules of Criminal Evidence. .

While the evidence was highly controverted, there is sufficient evidence in the record to meet the *Jackson* standard. Simply because there are no known cases of a person contracting the virus by being deliberately spat on by an HIV-infected person does not mean that the appellate court's review of other methods of salivary transmission are inappropriate or reflect an erroneous review of the elements of attempted murder in this case.

The Court has also reviewed the opinions of numerous other courts that have grappled with the controversy surrounding the transmission of HIV and is mindful of the fact that the question of salivary transmission has been answered negatively in some of those venues. However, despite the Court's own personal concern about this conviction, after reviewing the evidence presented at trial, the Court is unable to say that the evidence was so lacking in credibility or probative value that when viewed in the light most favorable to the prosecution, no reasonable trier of fact could have reached the same conclusion. *Jackson*, 443 U.S. at 319–20, 99 S.Ct. at 2789.

■ In his second point of error, Petitioner challenges the sufficiency of the jury charge and argues that the trial judge's charge to the jury was constitutionally inadequate, when considered in the context of the entire trial, because it negated the prosecution's burden to prove the "tends" element beyond a reasonable doubt. Petitioner asserts that throughout his trial, the prosecutor and the trial judge led the jury to believe that the state did not have to prove that this form of transmission is possible. Petitioner further asserts that, in charging the jury on how to apply the law to the facts, the court omitted the crucial "tends" element.

2. The full text of the language cited by the Petitioner reads:
COMMENT: Concerning § 97.140(B)(3)(b), relating to Counseling and Testing for State Employees Exposed to HIV on the Job, one commenter recommended need for clarification regarding the issue of biting or being bitten. RESPONSE: Biting and being bitten is not considered as an exposure to HIV because without visible blood present, saliva does not

contain quantities of the virus large, enough to cause infection after exposure. If a bite or being bitten has caused the transfer of blood or other body fluids containing a high concentration of the virus between two individuals, then the exposure could lead to infection. Each biting incident should be reviewed by appropriate medical personnel to determine if an exposure has taken place.

█ There are four elements that must be established to prove attempted murder. They are (1) a person (2) with the specific intent to commit murder (3) does an act amounting to more than mere preparation, which (4) tends, but fails to effect the commission of murder. *Weeks v. State*, 834 S.W.2d 559, 561 (Tex.App.—Eastland 1992). Each of these elements must be proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 315–16, 99 S.Ct. at 2787; *In re Winship*, 397 U.S. 358, 361–62, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970). That is, not only must the prosecutor establish intent beyond a reasonable doubt, but must also establish the "tends" element beyond a reasonable doubt as well. Therefore, it is inappropriate for the prosecutor to tell the jury that he does not have to offer proof on an essential element of the crime; to argue to the jury, as he did here, for example, that:

"[Transmission of HIV through saliva] is not necessarily an element of the case. I hope everybody realizes that after voir dire. We don't have to prove to you beyond a reasonable doubt that transmission in this form is possible. The question is his intent."

Or, further that:

"We are dealing with the subject of AIDS, how its transmitted, and basically the State has to prove beyond a reasonable doubt that the person charged, Curtis Weeks, intentionally and with the specific intent to cause the death of an individual, spit on Ronald Alford, who is a guard out at TDC, and he intended to kill him by doing that act when he was infected with HIV at the time. Does Everybody understand that? It doesn't say anywhere there that the State has to prove how the disease is transmitted or what the probability of getting AIDS is in this way or anything like that."

The Petitioner's issue is whether the charge was constitutionally adequate when considered in the context of the entire trial, including these statements. The trial court instructed the jury that:

A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails, to effect the commission of the offense intended. Such is an attempt to commit an offense.

\*　　\*　　\*　　\*　　\*　　\*

Now, if you find from the evidence beyond a reasonable doubt that on or about the 8th day of June, 1988, in Walker County, Texas, the defendant, Curtis Weeks, did *attempt* to cause the death of Ronald Alford with specific intent to kill Ronald Alford, by intentionally spitting on the said Ronald Alford, while defendant was infected with human immunodeficiency virus; and you further find beyond a reasonable doubt that the defendant, in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause, then you will find the defendant guilty of attempted murder, as charged in the indictment.

█ The charge must be read as a whole; each paragraph of the charge cannot be read in isolation in an effort to establish that all of the elements were not presented to the jury. When confronted with assertions of deficiencies in the jury charge the reviewing court considers the entire charge as well as the arguments made to the jury. *U.S. v. Chagra*, 807 F.2d 398, 402 (5th Cir.1986). The inquiry is whether in the context of the true trial scene the jury was given incorrect instructions. *Id.* In *Chagra*, the court found, after reviewing the charge as a whole and in the context of trial, and focusing on defense counsel's summation of the government's burden, that the charge adequately stated the government's burden.

In this case, despite the prosecutor's repeated, inappropriate and incorrect references to not having to prove the "tends" element, the charge, read as a whole and in the context of the entire trial proceedings, adequately stated the government's burden to prove beyond a reasonable doubt the "tends" element of the crime. Although the application paragraph of the charge does not specifically address the "tends" element, the court adequately incorporated such element

in the definition of "attempt". Moreover, as in *Chagra*, whatever uncertainty there may have been from the charge alone, defense counsel's summation, without objection from the prosecution or correction from the court, specifically stated the prosecution's burden to prove the "tends" element beyond a reasonable doubt. The trial court properly charged the jury on all elements of attempted murder.

Having carefully considered the motions and the arguments of the parties, and reviewed the applicable law, the Court concludes there was sufficient evidence by which a jury could reasonably find all elements of attempted murder beyond a reasonable doubt. The Court further concludes that there was no error in the charge given to the jury. Accordingly, the Court

ORDERS that Respondent's motion for summary judgment (Docket Entry # 4) is granted. Petitioner's cross-motion for summary judgment (Docket Entry # 1) is therefore denied.

**WALTER OIL & GAS CORPORATION,**
**Plaintiff**

v.

**NS GROUP, INC., Newport Steel Corporation and Wilson Supply Company, Defendants.**

Civ. A. No. G–94–230.

United States District Court,
S.D. Texas,
Galveston Division.

Oct. 26, 1994.

Steven Lynn Roberts, Fulbright & Jaworski, Houston, TX, for Walter Oil and Gas Corp.

Stephen J. Butler, Thompson Hine & Flory, Cincinatti, OH, for Newport Steel Corp.

Jess Homer Hall, Jr., Liddell Sapp Zivley Hill & LaBoon, Houston, TX, for Wilson Supply Co.

*ORDER*

KENT, District Judge.

Before the Court is Defendant NS Group, Inc. and Defendant Newport Steel Corporation's (hereinafter collectively referred to as "Newport") Motion to Dismiss, or in the alternative, Motion for Partial Summary Judgment under Fed.R.Civ.P. 56(c). For the reasons stated below, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Furthermore, Defendants' Motion for Partial Summary Judgment is DENIED.

## I. Background

Plaintiff Walter Oil & Gas Corporation (hereinafter "WOGC") is a Texas corporation, with its principal place of business located in Houston, Texas. On June 16, 1993, WOGC ordered pipe for an offshore pipeline from Defendant Wilson Supply Company (hereinafter "Wilson"), a retailer and distributor of tubular goods and other steel products. Wilson, in turn, ordered the pipe from Newport and NS Group, Inc. a manufacturer of tubular goods and other steel products.

On June 16, 1993, Newport sent an order acknowledgement form to Wilson. It was a standard form issued by Newport which confirmed the price and specifications of the pipe, and which contained the terms and conditions of sale between Newport and Wilson. Newport expressly warranted to Wilson that the pipe would be "free from defects in material and workmanship and according to agreed specifications." Newport excluded all other warranties:

> THERE IS NO IMPLIED WARRANTY BY THE SELLER FOR FITNESS OF PURPOSE OR OTHERWISE.

Additionally, Newport's order acknowledgement limited any liability that Newport might have for breach of its warranty to replacement of the pipe or refund of the purchase price:

> Seller's liability under the warranty shall be limited to refund or replacement. In no event shall Seller's liability exceed the purchase price paid to Seller, nor shall Seller be liable for labor or consequential damages.

On July 9, 1993, Newport shipped the pipe from its mill in Newport, Kentucky, to Wilson in Houston, Texas. Wilson transferred the pipe to Pearland, Texas for coating. On August 4, 1993, the pipe was transferred from Pearland to Orange, Texas, for transit offshore. Wilson charged WOGC $123,359.40.

The contract between Wilson and WOGC limited the warranties given by Wilson to WOGC:

> AS TO ALL MATERIALS SOLD HEREUNDER, WHETHER OR NOT MANUFACTURED BY WILSON, WILSON DISCLAIMS ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE
> . . .

The contract also restricted WOGC's remedy, in the event of a defect in the pipe, to replacement of the pipe:

> . . . Wilson will furnish new parts without charge, FOB point of manufacture, to replace any parts which, within the War

ranty Period, Wilson's investigation shows were defective ... WILSON SHALL NOT BE LIABLE FOR SPECIAL OR CONSEQUENTIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY OUT OF OR IN CONNECTION WITH THE USE OF MATERIALS MANUFACTURED BY OR SOLD BY WILSON.

Additionally, paragraph 2 of the Wilson–WOGC contract contained the following provision:

> Any materials or related parts, not manufactured by Wilson *are guaranteed only in accordance with the manufacturer's guaranty,* and then only to the extent that Wilson agrees to present Customer's claim to the manufacturer for adjustment. (emphasis added).

Plaintiff did not allege any contact whatsoever between Newport and WOGC concerning the purchase and sale of the pipe. However, Plaintiff asserts that at the time it purchased the pipe from Wilson, it did not know from what company Wilson purchased the pipe, nor what company manufactured the pipe. There was no written material supplied by Newport to accompany the pipe, and there was no written material on the pipe itself that would serve to identify Newport as the manufacturer. Furthermore, there was no direct disclaimer of any warranty or limitation of remedies communicated by Newport to WOGC. After the pipe was delivered, WOGC arranged for OPI International, Inc. (hereinafter "OPI") to install the pipe as an underwater pipeline, offshore, in the Gulf of Mexico. Upon completion of the pipeline installation, a hydrostat pressure test was conducted by OPI. During the test, the pipeline lost pressure. Divers with Cal Dive International (hereinafter "Cal Dive") inspected the pipeline, and found leakage within a section of the pipe. This section of pipe was then removed and replaced, and the pipe was retested. Again, the pipeline lost pressure, and Cal Dive discovered another leakage within a different section of the pipe. This second section of pipe was also removed. Testing of the two sections of removed pipe revealed that the welds of the seams of the pipe were defective. Plaintiff alleges that neither it, OPI, nor Cal Dive caused damage to the pipe. Rather, Plaintiff contends that the defect in the welds had its origin in the manufacturing process and subsequent testing procedures at Newport's facility in Newport Kentucky.

Soon after discovering the defect in the pipe, WOGC made demand on Newport to rectify the situation, but Newport refused. As a result, WOGC purchased pipe of an identical grade from another manufacturer. Plaintiff WOGC alleges that it has sustained substantial expense in replacing the pipeline. Plaintiff also alleges lost profits because of the delay caused by the necessity of replacing the pipeline.

Plaintiff has filed a three-count Complaint under the Outer Continental Shelf Lands Act. In Count One, WOGC asserts a claim against Wilson and Newport under the Uniform Commercial Code (UCC), alleging that they breached express and implied warranties regarding the quality of the pipe. Count Two alleges that Wilson and Newport Steel breached contracts with WOGC "to supply pipe of a particular grade and quality ..." Finally, WOGC asserts a negligence claim against Newport based on its manufacturing and testing of the pipe.

Subsequently, Defendants Newport Steel Corporation and NS Group, Inc., filed the present Motion to Dismiss these aforementioned claims. Plaintiff, in its Response, has conceded that it has no cause of action against Newport for breach of express warranty, breach of contract, or negligence. These claims are therefore DISMISSED WITH PREJUDICE.

Therefore, the sole cause of action remaining for this Court's consideration is Plaintiff's claim against Newport for breach of implied warranty with regard to the quality of the pipe. It is in regard to that sole claim that the Court considers Defendants' Motion to Dismiss or for Partial Summary Judgment.

## II. Standard of Review

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is material if its resolution in favor of one party

might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. In other words, summary judgment should not be granted if the evidence indicates that a reasonable fact-finder could find in favor of the non-moving party. *Id.* See also *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In ruling on a Motion for Summary Judgment, the court must accept the evidence of the non-moving party and draw all justifiable inferences in his favor. Credibility determinations, weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. *Anderson v. Liberty Lobby, supra*, 477 U.S. at 255, 106 S.Ct. at 2513.

Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the non-moving party to establish the existence of a genuine issue for trial. *Matsushita, supra*, 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987). Where the moving party has met its Rule 56(c) burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita, supra*, 475 U.S. at 596–97, 106 S.Ct. at 1361 (quoting Fed. R.Civ.P. 56(e)) (emphasis in original).

As mentioned above, this action was brought pursuant to the Outer Continental Shelf Lands Act (hereinafter "OCSLA"), 43 U.S.C. §§ 1331, 1333. Section 1333 of OCSLA provides in pertinent part:

(1) The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: Provided, however, that mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf ...

Two issues are presented for this Court's examination. First, under OCSLA, what law should be applied: Federal common law or state law (and if state law, the law of which state)? Second, assuming a choice of law has been made, does the Plaintiff state a claim for a breach of implied warranty under that law?

### III. Choice of Law

#### A. Federal or State Law?

Defendants urge that § 1333(a)(2)(A) of OCSLA provides that state law applies to the extent it is consistent with Federal law. Federal law, according to the Defendant necessarily *includes* Federal common law. Plaintiff, on the other hand, maintains that

§ 1333(a)(2)(A) provides that State law·applies so long as it is consistent with Federal statutory and regulatory law, exclusively. The Plaintiff argues that under § 1333(a)(2)(A), the consistency or inconsistency of Federal common law is irrelevant to the application of state law.

The principal case in determining what law applies under OCSLA is *Rodrigue v. AETNA*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). In ascertaining what law applies, *Rodrigue* instructed lower courts to apply the law of the adjacent state "to the extent that these [state laws] are applicable and not inconsistent with other Federal laws." *Id.* at 357, 89 S.Ct. at 1838.

This issue of whether state law is inconsistent with Federal law is critical. At least one Federal Court has held that *U.S. v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), established a Federal common law which preempts the application of state law. *Doucet v. Gulf Oil Co.* (No. 82-4818) (E.D.La. May 16, 1984). In that case, the suit involved an indemnification clause which allowed a party to indemnify itself against its own negligence. Under Louisiana law, such a clause would have been invalid. Based on the authority of *U.S. v. Seckinger, supra*, the Court held that Federal common law allowed this type of indemnification. Under *Rodrigue* the Court held the Louisiana statute was inconsistent with Federal law and had to give way.

■ This Court respectfully interprets *Seckinger* differently. *Seckinger* involved a Federal construction contract. The contract concerned a government project and was entered into by the government pursuant to the authority of a governmental statute. The *Seckinger* contract was purely federal in nature, and it is doubtful to this Court that *Seckinger* can be read to fashion a general Federal common law rule for the interpretation of purely private contracts. There is ample authority within the Fifth Circuit to support this Court's view. *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir.

1986), *cert. denied*, 479 U.S. 872, 107 S.Ct. 247, 93 L.Ed.2d 171 (1986); *Greer v. Services, Equipment and Engineering, Inc. v. Marine Offshore Catering Company Inc.*, 593 F.Supp. 1075, 1077 (E.D.Tex.1984); *Hebert v. Kerr-McGee Corporation et al.*, 618 F.Supp. 767, 768 (W.D.La.1985). After a careful reading of § 1333(a)(2)(A), as well as relevant Federal case law interpreting this statute, this Court has determined that the phrase "other Federal laws" in § 1333(a)(2)(A) refers not to Federal common law, but rather to Federal statutory law. *See Hebert, supra* at 768; *Frazier v. Columbia Gas Development Corp.*, 596 F.Supp. 429, 430–31 (W.D.La.1984). This Court understands *Rodrigue* to indicate that state law will almost always apply under OCSLA. *See Greer, supra*, at 1077; *Chevron Oil Company v. Huson*, 404 U.S. 97, 103–04, 92 S.Ct. 349, 353–54, 30 L.Ed.2d 296 (1971).

### B. Texas or Kentucky State Law?

Having decided that state law should apply, it becomes necessary to determine which state's substantive law governs. *Rodrigue* mandates that the law of the adjacent state, in this case Texas, applies. The Defendants have made an argument that in applying Texas law, this Court should apply Texas' conflicts of law rules for contracts. Defendants argue that Texas' conflicts rules would require that Kentucky's substantive law should apply because the contract has little connection with Texas.[1] However, while enticing on common sense grounds, this argument must legally fail. In *Chevron Oil Company v. Huson, supra*, the Supreme Court held that a State's conflict of law rules have *no* relevance in an OCSLA case when a Federal court is applying adjacent state law as surrogate Federal law. *See Chevron*, 404 U.S. at 102–02, 92 S.Ct. at 353–54. *Chevron* noted that a Federal court applying state law under OCSLA was "not ... applying the state law of another forum in the usual sense," *Id.*, but making the state law become "federal law federally enforced." *Id.*

1. The Court believes this argument has some merit. Newport's only contract in this transaction was negotiated and made in Kentucky; Newport performed its obligations under the contract in Kentucky; and Newport has is domicile, residence, place of incorporation and place of business in Kentucky.

■ Since Texas is the adjacent state, Texas substantive law must be applied as surrogate Federal law. *See also Wooton v. Pumpkin Air, Inc.,* 869 F.2d 848 (5th Cir. 1989).

Defendants argue that the rule in *Wooton* applies only in the context of personal injury actions due to the "special relationship" between offshore workers and the state from which they commute. *Wooton, supra* at 851. However, Defendants are mistaken in their attempt to limit the application of *Wooton.* In *Union Texas Petroleum Corp. v. PLT Engineering,* 895 F.2d 1043, 1050 (5th Cir. 1990), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990), a commercial contract dispute involving a subsea gathering line on the outer Continental Shelf, the Fifth Circuit cited and applied the principle established in *Wooton.* Therefore, this Court finds that Texas substantive law must be applied as surrogate Federal law.

## IV. Does the Plaintiff State a Claim for Breach of Implied Warranty under Texas Substantive Law?

■ Defendants assert that there is no Texas authority which addresses the precise question of whether a commercial buyer may maintain an implied warranty action for purely economic losses against a remote manufacturer with whom the buyer is not in privity. This Court is not persuaded by Defendants' argument. In *Nobility Homes of Texas, Inc. v. Shivers,* 557 S.W.2d 77 (Tex. 1977), the Texas Supreme Court ruled that a consumer has a viable breach of implied warranty action against a manufacturer regardless of the lack of privity. Defendants contend that *Nobility Homes* applies only to ordinary consumers and not to commercial consumers like the Plaintiff. This Court is not persuaded by this proposition. In *Clark v. DeLaval Separator Corp.,* 639 F.2d 1320, 1322 (5th Cir.1981), the Court applied *Nobility Homes* to a case involving a breach of implied warranty claim by a commercial buyer against a manufacturer and held that no privity was necessary. Furthermore, *Nobility Homes* contains an extensive analysis of the pertinent sections of the Texas Uniform Commercial Code, Tex.Bus. & Comm.Code

Ann. (1967). The relevant sections of the Code are those pertaining to the implied warranty of merchantability (§ 2.314) and the implied warranty of fitness for a particular purpose (§ 2.315). Section 2.314 explains that a seller impliedly warrants that goods are merchantable if they are, "fit for the ordinary purposes for which such goods are used...." Tex.Bus. & Comm.Code Ann. § 2.314(b)(3) (1967). After careful analysis of § 2.314(b)(3), the Texas Supreme Court in *Nobility Homes* held "... that a manufacturer can be responsible, without regard to privity, for the economic loss which results from his breach of the Uniform Commercial Code's implied warranty of merchantability." *Nobility Homes, supra,* at 81. This language does not distinguish between a private consumer and a commercial consumer. In fact, the only section in Article II of the Code that relates to any type of consumer is the definition of "Buyer" in § 2.103(a)(1), which states: " 'Buyer' means a person who buys or contracts to buy goods." This Court finds that Plaintiff WOGC is a "Buyer" within this definition, and therefore WOGC may avail itself of the protections afforded by § 2.314. Thus, this Court finds that the Defendants owed the Plaintiff an implied warranty of merchantability.

■ Defendants further argue that even if an implied warranty existed, Defendants have effectively disclaimed that warranty, or in the alternative have limited Plaintiff's remedies to a refund of the purchase price of the pipe. In support thereof, Defendants assert that the warranty disclaimer by Defendant Wilson, the seller of the pipe, is sufficient to disclaim any implied warranty by Defendants Newport, simply because Wilson's disclaimer mentioned the manufacturer's warranty, citing *Larsen Leasing, Inc. v. S.M.E. Leasing,* 1988 U.S.Dist. LEXIS 17963 (W.D.Mich. Jan. 25, 1988). This Court is unpersuaded by Defendants' reference to this unreported decision which applies Michigan law. Furthermore, the Court in that case relied on a construction of § 2–318 of the Uniform Commercial Code which provides, under Michigan law, that a disclaimer by the manufacturer in a contract of sale between the manufacturer and the wholesaler or retailer is effective as against the ultimate user, regardless

555

of whether the ultimate user was informed of the disclaimer. However, Texas has not adopted § 2–318, and therefore, that is not the law of Texas.

 Rather, this Court relies upon *Clark v. DeLaval Separator Corp., supra,* 639 F.2d 1320, 1323–24 (5th Cir.1981). In that case, the Fifth Circuit held that a retailer's disclaimer is not effective to disclaim warranties by the manufacturer unless the manufacturer's disclaimer is included in the materials supplied by the manufacturer to the consumer, or the manufacturer is joined as a disclaiming seller in the contract between the retailer and the consumer, or is "an expressed third-party beneficiary of a disclaimer in the retailer's contract that explicitly disclaims any implied warranties by the manufacturer." *Id.* *Clark* did not hold that the manufacturer's warranty is disclaimed merely because the manufacturer was mentioned in the retailer's disclaimer. The retailer's disclaimer must *explicitly* disclaim any implied warranties by the manufacturer. Wilson's disclaimer did not *explicitly* disclaim any implied warranties by Newport. Instead, the disclaimer simply stated that the goods were "guaranteed only in accordance with the manufacturer's guarantee." Furthermore, the information printed on the pipe itself said nothing at all about warranty or damage disclaimers. Therefore, this Court finds that Newport failed to effectively disclaim or in any way limit its implied warranty of merchantability.

Finally, the Court finds that the evidence indicates that a reasonable fact-finder could find in favor of the non-moving party, here Plaintiff WOGC. Therefore, Summary Judgment is also factually inappropriate in this case.

### V. Conclusion

For the reasons stated above, Plaintiff's claims for breach of express warranty, breach of contract, and negligence are **DISMISSED WITH PREJUDICE.** Defendants' Motion to Dismiss, or for Partial Summary Judgment as regards Plaintiff's claim of breach of implied warranty of merchantability is **HEREBY DENIED.** With regard to the issues of breach of express warranty, breach of contract, and negligence, **THIS IS A FINAL JUDGMENT.** The parties are **HEREBY ORDERED** to file nothing further on these issues before this Court, particularly including motions to reconsider and the like. The parties are invited to submit the matter to the United States Court of Appeals for the Fifth Circuit, as appropriate, in due course. The parties are ordered to bear their own costs incurred herein to date. The Plaintiff's claim of breach of implied warranty of merchantability remains pending, subject to docket control deadlines now in effect.

IT IS SO ORDERED.

Debra Barfield **MASTERS, Individually, as Next Friend of Autumn Sheree Masters, a Minor, and as Representative of the Estate of Barney Nathan Masters, Deceased, Misty Hope Masters, Myron G. Masters, Sr., Margie Masters, and the Estate of Barney Nathan Masters, Deceased,**

v.

**SWIFTSHIPS FREEPORT, INC.**

Civ. A. No. G–94–471.

United States District Court, S.D. Texas, Galveston Division.

Nov. 17, 1994.

Jimmy Williamson, Houston, TX, for plaintiff.

Yancey White, White, Huseman, Pletcher & Powers, Corpus Christi, TX, for defendant.

### ORDER GRANTING MOTION TO REMAND

KENT, District Judge.

This is a wrongful death action brought against Swiftships Freeport, Inc. ("Swiftships") pursuant to the Texas Wrongful Death Statute, § 71.002 *et seq.*, and the Texas Survival Statute, § 71.021, of the Texas Civil Practice & Remedies Code. Plaintiff Debra Barfield Masters ("Masters") originally filed this action in the 149th Judicial District Court of Brazoria County, Texas. Defendant then removed the case to this Court pursuant to 28 U.S.C. § 1441(b), claiming that Plaintiff's claims are preempted by the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, and that a federal question therefore exists. Before the Court now are Defendant's Motion to Dismiss and Plaintiff's Motion to Remand. For the reasons stated below, the Court finds that Plaintiff's Motion to Remand should be **GRANTED** because this Court does not have subject matter jurisdiction over the case, and there is no diversity between the parties. Thus, Defendant's Motion to Dismiss is rendered **MOOT.**

Barney Nathan Masters was killed on September 15, 1993, when the clips on a crane broke and caused an exhaust stack from a ship to swing loose and strike him in the head. Mr. Masters was the foreman at Swiftships' shipyard, where he was working at the time of the accident. Although the parties in this case dispute the question of whether or not Mr. Masters was a longshoreman or an "employee" at the time of the accident, it is undisputed that he was at all

times engaged in the trade of a ship repairer. Based on their varying perceptions of the underlying facts of this case, Plaintiff claims that whether or not Mr. Masters is an "employee" for the purposes of the LHWCA is a crucial factor in deciding whether or not the LHWCA applies to this case, while Defendant claims that the LHWCA clearly preempts any state-law claims the Plaintiff may have. The Court finds both parties' arguments in this case to be utterly irrelevant, because whether the LHWCA applies to this dispute or not, this Court does not have jurisdiction over the case.

Defendant's argument that this case has been properly removed to federal court because the LHWCA preempts Plaintiff's state-law claims is absurd on its face, and the Court is genuinely troubled as to how any such claim could be made in good faith. This Court has written at length on the proper application of the preemption doctrine to state-law claims. *See Brown v. Crop Hail Management, Inc.*, 813 F.Supp. 519 (S.D.Tex.1993) (Kent, J.). In *Brown*, this Court clearly and explicitly outlined the proper steps for determining whether or not a federal statute preempts state law, and in doing so, the Court fully discussed the Fifth Circuit's holding that the LHWCA does *not* completely preempt wrongful death actions. *See id.* at 523–27 (discussing *Aaron v. National Union Fire Insurance Co.*, 876 F.2d 1157 (5th Cir.1989), *cert. denied sub nom.*, *American Home Insurance Group v. Aaron*, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990)). As this Court pointed out, "the Fifth Circuit concluded that the LHWCA failed each part of this [preemption] test" and that removal of a wrongful death action on LHWCA grounds was improper. *Brown, supra*, 813 F.Supp. at 523–24.

Thus, in removing the instant case to this Court—and in contesting Plaintiff's Motion to Remand—the Defendant has ignored the clear case authority of both this Court and the Fifth Circuit, and it has not argued any good faith modification or extension of this authority, which is *absolutely* binding on Defendant. While the Court is not willing to find at this time that Defendant has taken these steps in *bad* faith, it does find that

Defendant's actions have been frivolous, and the Court is deeply troubled both by the waste of resources on its part and the expense imposed on the Plaintiff by Defendant's utterly groundless removal of this case. The Court can only conclude that Defendant has acted either in complete ignorance of the binding law in this matter or has chosen to disregard that law. In either case, Defendant is warned that this Court does not sit to hear frivolous or ignorant claims; it exists to administer justice between the parties before it, and to accomplish that difficult task, the Court relies on the learning and good faith of those who come before it. Having one of the largest civil dockets in the country, this Court can expect—or tolerate—no less.

Obviously, the claims and procedural posture of this case are virtually identical to those of *Aaron*, in which the Plaintiff brought a wrongful death claim action in state court for the death of a longshoreman. The Defendant removed the case to federal court, claiming that the LHWCA controlled the claim and that federal question jurisdiction was thus created. In a long and scholarly opinion, the Fifth Circuit explicitly rejected Defendant's arguments, holding instead that the LHWCA did *not* preempt the Plaintiff's state-law claims and that, as a result, the federal court had no jurisdiction over such claims.

In its analysis, the Fifth Circuit relied on two basic lines of argument that are equally applicable to the case currently before this Court. First, the Circuit pointed out that, because the Plaintiff had raised no federal question in its state-court Complaint, the well-pleaded complaint rule prevented the Defendant from removing the case merely by raising a defense that invoked a federal issue; a Plaintiff's properly-pleaded Complaint governs the jurisdictional issues at stake in a suit, and if no federal claim is raised on the face of the complaint, there is no federal jurisdiction. *Id.* at 1160. As in *Aaron*, Plaintiff Masters raised no federal claims in her Original Petition to the state court in this case. (See Plaintiff's Original Petition, Plaintiff's Response to Defendant's Motion to Dis-

miss, Exhibit A). Instead, she has stated only the state-law claims cited above.

The fact that Swiftships' Answer invokes the LHWCA and its provision that it is the exclusive remedy for injuries occurring under it is no argument against the well-pleaded complaint rule. *See* 33 U.S.C. § 905(a). In *Aaron*, the Circuit stated in the clearest possible terms that when the preemptive power of the LHWCA is asserted by a Defendant as a defense to a Plaintiff's claim, it will not overcome the well-pleaded complaint rule. *Aaron, supra,* 876 F.2d at 1166. Instead, "[t]he LHWCA is, in this case, nothing more than a statutory defense to a state-court cause of action—the classic circumstance of non-removability." *Id.*

■ Secondly, the Circuit also stated that the LHWCA does not permit removal of cases like the one before this Court because it does not thoroughly preempt state law in circumstances like those found in *Aaron* or in the instant case. The Court concluded that a federal statute does not completely preempt state law for the purposes of removal jurisdiction unless it meets a three-part test. First, the federal statute must provide a civil enforcement provision that creates a federal cause of action that both replaces and protects the same interests as the preempted state law cause of action. Second, the federal statute must provide a specific jurisdictional grant to the federal courts to enforce the cause of action created by that federal statute. Finally, there must be a clear congressional intent to make the preempted state claims removable to federal court. *See Rheams v. Bankston, Wright & Greenhill,* 756 F.Supp. 1004, 1009 (W.D.Tex.1991) (reciting the three elements of the *Aaron* test for determining whether complete preemption exists).

■ Based on these considerations, the Circuit determined that the LHWCA would not allow a Plaintiff to bring a wrongful death action in federal court because the federal statute contains no civil enforcement provision. Thus, the LHWCA does not create a cause of action in either state or federal courts for claims like those found in *Aaron* or the current case before this Court. *Id.* at 1164. In addition, the legislative history of

the LHWCA does not indicate that Congress ever intended it to completely preempt state law. *Id.* For all these reasons, therefore, the LHWCA does not create federal removal jurisdiction in a case originally brought as a wrongful death action.

Thus, it is irrelevant to the remand question in this case whether the LHWCA applies or not. If it does not apply, the very basis of Defendant's removal argument is rendered void, and remand is required; if it does apply, the *Aaron* ruling clearly mandates that the LHWCA is insufficient to create removal jurisdiction. The Court, therefore, expresses no opinion on the applicability of the LHWCA in this case, and Defendant's Motion to Dismiss is therefore rendered **MOOT**. Instead, it decides that Swiftship's claim that the LHWCA creates proper removal jurisdiction under 28 U.S.C. § 1441(b) is incorrect, and the Plaintiff's Motion to Remand is **GRANTED** because this Court does not have subject matter jurisdiction.

■ In addition, having found that Defendant's removal and opposition to Plaintiff's Motion for Remand are frivolous and utterly groundless, the Court also **ORDERS** that attorney's fees in the amount of $500 be paid by Defendant to Plaintiff. *See Sidag Aktiengesellschaft v. Smoked Foods Products Co., Inc.,* 854 F.2d 799, 801 (5th Cir.1988) (stating that "before attorney's fees may be granted to a party there must be a showing the case was prosecuted in bad faith, frivolous [sic], or for oppressive reasons."). In granting this award, the Court estimates that the Plaintiff has spent three to four hours preparing its Motion to Remand at an hourly billing rate of approximately $150 per hour. Of course, the Court will allow Defendant to contest the amount awarded, but in that event, the Court will also consider an *upward* adjustment if Plaintiff can demonstrate by means of the factors and documentation required in this Circuit that a greater amount is due. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). Defendant is to pay the amount awarded within thirty days of the date this Order is entered, and the Court will retain plenary jurisdiction over this case to enforce its Or-

der by means of any contempt proceedings that may be required. In addition, the Court **ORDERS** that Defendant pay to Plaintiff all taxable costs of court incurred in seeking remand to the state court in this matter.

Thus, the Court hereby **REMANDS** the above-captioned case to the 149th Judicial District Court of Brazoria County, Texas for want of subject matter jurisdiction. In doing so, the Court expressly refuses to rule on Defendant's Motion to Dismiss or on any issue other than remand raised by the parties in this case. Instead, all such determinations are expressly left for the decision of the state court. It is further **ORDERED** that the parties file no further pleadings in this Court, including motions to reconsider and the like. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the courts of the State of Texas, as may be appropriate in due course.[1] Any relief not specifically granted herein is **DENIED**.

**IT IS SO ORDERED.**

**DONE.**

Tim **MILLIRON** and Local 191, National
Association of Government
Employees, Plaintiffs,

v.

**LOUISVILLE & JEFFERSON COUNTY
METROPOLITAN SEWER
DISTRICT, Defendant.**

Civ. A. No. C94–0538–L(H).

United States District Court,
W.D. Kentucky,
At Louisville.

Nov. 16, 1994.

---

**1.** *See* 28 U.S.C. § 1447(d) (denying appellate review of a remand order based on lack of subject matter jurisdiction).

Herbert L. Segal, J. Christopher Sanders, Segal, Isenberg, Sales, Stewart, Cutler & Tillman, Louisville, KY, for plaintiffs.

Schuyler J. Olt, Lawrence J. Zielke, Charles F. Merz, Pedley, Ross, Zielke & Gordinier, Louisville, KY, for defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This case is before the Court on Plaintiffs' motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Plaintiffs claim that Defendant terminated Plaintiff Milliron's employment because of his participation in union activities as Metropolitan Sewer District President of the Local 191, in violation of his First Amendment right of association. Plaintiffs ask the Court to reinstate Plaintiff immediately to his position as an employee at MSD and to enjoin Defendant from interfering with the free association rights of Local 191 and its members.

This case addresses the delicate interplay between Plaintiff Milliron's First Amendment right of free association and Defendant's legitimate right to impose appropriate employee discipline and control. The Court cannot find that any other court has considered these same issues under such difficult facts. The Court's decision reflects that difficulty and the importance of each party's rights under these circumstances. For the reasons set forth herein, the Court will grant in part Plaintiff Milliron's request for a preliminary injunction.

## I.

Defendant hired Plaintiff as a truck driver in June 1992. He became president of the Local 191 union in May, 1994. Plaintiff contends that Defendant terminated him on October 31, 1994 because of his participation and leadership in union activities.

As a union leader, Plaintiff actively pursued employee interests in grievances and lawsuits against Defendant. When the MSD Board rejected a mediator's recommendation to reinstate union member R.G. Thompson in July, 1994, Plaintiff filed on the union's behalf, a class action lawsuit challenging the termination, on August 31, 1994. On October 10, 1994, Plaintiff filed an employee grievance when MSD Maintenance Director David Johnson turned off the telephone located in the Local 191 office on the company premises. On October 17, 1994, Plaintiff filed yet another lawsuit alleging that Defendant and David Johnson, in particular, had a policy of intimidating employees to dissuade them from accepting union representation at disciplinary conferences. Plaintiff also requested a meeting with Kentucky Labor Cabinet mediator Larry Roberts to discuss Defendant's

intimidation of union members that occurred during the investigation of the grievance.

Plaintiff asserts that Defendant exhibited hostility to his union activities by treating him differently than other employees in similar circumstances. For example, he says that on August 10, 1994, Defendant imposed a one-day disciplinary suspension on Plaintiff for his involvement in a verbal altercation with two other employees, but took no action against the two others. On October 19, 1994, Defendant management employee Kenny Morton, following David Johnson's orders, ejected Plaintiff from the MSD building on Seventh Street while Plaintiff was conducting union business with another manager's permission. On October 26, 1994, David Johnson ejected Plaintiff from a class of potential trainees for promotion, while other employees of Plaintiff's same or lower classification were permitted to remain. Plaintiff filed employee grievances about each event, describing his treatment as harassment of the union and union officials.

Up to this point, the facts are susceptible to various conclusions about who was responsible for the building animus between Plaintiff and various MSD officials. Plaintiff initiated many of the disputes, some of questionable validity. Defendant responded with numerous petty slights of its own. The Court need not establish blame in order to conclude that bad blood on both sides affected Plaintiff's relationship with Defendant.

What happened next was all too predictable. A seemingly innocent series of events exploded out of control, culminating in Defendant terminating Plaintiff. On October 28, Defendant held a Halloween costume party for its employees in its main offices at 3:30 in the afternoon. In preparation for the party, Plaintiff purchased a "Fred Flintstone" costume during his lunch break. Though he tried on the costume after his lunch break, no one complained. His supervisor ended the workday around 2:40 that afternoon. The shift does not end until 4:00; however, employees occasionally change into their personal clothes and relax earlier in the afternoon after completing their duties for the day. Plaintiff returned to the 7th Street facility, changed out of his uniform and into his costume.

Defendant management employee Walter Strecker saw Plaintiff in the "dress" and demanded that he change back into his uniform. When Plaintiff protested, Strecker threatened Plaintiff with a written warning, which never was issued. Plaintiff was never able to explain his reason for wearing the costume. Both Strecker and Plaintiff overreacted. Plaintiff assumed that Strecker was harassing him unfairly. Although Strecker unquestionably was within his rights by asking Plaintiff to change clothes, the manner in which he did so was unfortunate. The misunderstanding escalated into an argument and a test of wills. If the matter had ended at this point, neither Plaintiff's termination nor this lawsuit would have followed.

The following Monday, Defendant held an investigatory hearing about Plaintiff's conduct. Plaintiff continued to argue with the managers that he was being harassed and unfairly treated. As it turns out, Plaintiff's continued refusal to bend to Defendant's will was the crucial circumstance in Defendant's decision to terminate his employment. The same day, Defendant notified Plaintiff that he was discharged for insubordination and violation of Defendant's Code of Conduct for Employees.

Plaintiff then met with Strecker, Johnson, and Gordon Holsclaw. While discussing the termination decision, Johnson told Plaintiff that Plaintiff had taken the wrong approach towards his union activities. Johnson also said that Plaintiff should not have singled out Johnson in the class action grievance. Holsclaw and Johnson agreed that Defendant previously had not encountered so much trouble with the union. No previous union presidents had filed two lawsuits against the company as Plaintiff had. Soon after, Plaintiff brought this cause of action. He and Local 191 now seek a preliminary injunction.

## II.

Local 191 is not a proper plaintiff in this case. An association such as a union has no standing to raise the issue of deprivation of freedom of speech because that constitutional guarantee is personal in nature and

can only be urged by individual persons. *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 514, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (holding that only natural persons are entitled to the privileges and immunities of Section 1 of the Fourteenth Amendment); *International Ladies Garment Workers' Union, AFL et al. v. Seamprufe Inc. et al.,* 121 F.Supp. 165, 167 (E.D.Okla.1954); *Local 309, United Furniture Workers of America, C.I.O., et al. v. Gates, et al.,* 75 F.Supp. 620, 623 (N.D.Ind. 1948); The First Amendment violations alleged here are personal to Milliron. Therefore, the Court recognizes jurisdiction over Milliron, the individual plaintiff, but dismisses Local 191, the association plaintiff.

### III.

■ To determine whether Plaintiff's claim for a preliminary injunction is proper, the Court must consider four factors: (1) whether the plaintiff has a substantial probability of success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985). The factors are not prerequisites that must be satisfied; rather, they are considerations to be balanced that guide the discretion of the court. *Id.* at 1229; *In re Eagle–Picher Industries, Inc.,* 963 F.2d 855, 859 (6th Cir.1992) (citation omitted).

■ To succeed on the merits, Plaintiff must show that his union-related association or speech is constitutionally protected and that it was a substantial or motivating factor in Defendant's decision to fire him. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). His speech or association is protected if it addresses a matter of public concern and the employer has no overriding state

interest in efficient public service that would be undermined by the speech or association. *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 1687–88, 75 L.Ed.2d 708 (1983); *Boals v. Gray,* 775 F.2d 686, 692 (6th Cir. 1985). Plaintiff has shown that his association with the union involves a matter of public concern because his actions as union president extend beyond internal labor relations at MSD. His union association addresses the public issue of the rights of employees to organize and thus bargain from a position of strength with management.

■ The burden then shifts to Defendant to show that it has an overriding state interest in efficient public service that would be undermined by Plaintiff's union association. Ultimately, Defendant must show that Plaintiff's termination would have taken place absent the protected conduct. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Meyers v. City of Cincinnati,* 934 F.2d 726, 729 (6th Cir.1991); *Ratliff v. Wellington Exempted Vil. Sch. Bd. of Ed.,* 820 F.2d 792, 795 (6th Cir.1987). Defendant argues that Plaintiff was fired because of his insubordinate behavior, not his exercise of his First Amendment rights. As an employer, Defendant correctly contends, it must have the authority to discipline its employees and thus manage the conduct of its business.

■ The Court must balance the particular competing interests raised by Plaintiff's First Amendment claim. *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691–92. This balance requires full consideration of the government's interest, as an employer, in the effective and efficient fulfillment of its responsibilities to the public, weighed against the employee's interests, as a citizen, in commenting upon matters of public concern. *Id.* at 142, 103 S.Ct. at 1687.[1] In striking the balance,

---

1. This balancing accommodates the public employer's roles as a provider of public services and a government entity bound by the constraints of the First Amendment. *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987).

 On the one hand, public employers are employers, concerned with the efficient function

of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, "the threat of dismissal from public employment is … a potent means of inhibiting speech." *Pickering v. Board of Education,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811 (1968). Vigi-

courts should consider the manner, time, and place of the employee's expression and the context in which the dispute arose.[2] *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899.

## IV.

 In this case, the balance favors Plaintiff's interests in union-related association and speech. The right of an employee to espouse, lead, and carry out lawful union activities is a paramount public concern. Accordingly, an employer who disciplines an employee solely in retaliation for his membership in and support of a union violates that employee's First Amendment rights. *Boals*, 775 F.2d at 693. That is not our case. Defendant's actions, however, were substantially the result of hostility toward the activities of the union and Plaintiff, its president. Indeed, discharge seems to be an extreme sanction for one incident of insubordination. Though Plaintiff's over-sensitivity to anti-union sentiment and his rank insubordination and belligerence at the investigatory hearing clearly entitle Defendant to impose some punishment, the incident in all likelihood would not have escalated into a termination of employment had another employee been involved or had Plaintiff not actively pursued union claims. Defendant's displeasure with Plaintiff's aggressive leadership of the Local 191 substantially contributed to that result.

The Court notes, however, that Defendant MSD has a strong and legitimate interest in disciplining its employees, regardless of whether those employees are union members or union leaders. Unquestionably, Defendant has a right to impose sanctions here; perhaps for Plaintiff's violation of the employee dress code, but especially for his vehemently insubordinate and uncooperative behavior toward his superiors. The Court's decision today does not diminish that right. Had Defendant merely suspended Milliron, even for a significant period of time, the result here would be different.

In striking the proper balance here, the Court must fairly consider the circumstances in their full context. In this light, it becomes clear that but for Plaintiff's union association and the hostility surrounding it on all sides, he would not have been terminated. Defendant and its managers exhibited insensitivity and hostility toward Plaintiff's union activities on several occasions before Plaintiff was fired. In the Court's view, the comments of Defendant's officials in the aftermath of Plaintiff's termination further demonstrate their bias and its effect on their actions. Because these specific circumstances escalated the dispute and tipped the balance on Defendant's ultimate action against Plaintiff, Plaintiff's interest in freedom of association outweighs Defendant's interest in such an extreme disciplinary action. Consequently, Plaintiff has a substantial likelihood of succeeding on the merits of this case.

 The first element being satisfied, we must then consider whether the injunction will save the plaintiff from irreparable injury. An award of monetary damages and reinstatement to his position after a trial on the merits is not an adequate remedy for a deprivation of First Amendment rights. The loss of First Amendment rights, even for minimal periods of time, constitutes irreparable injury sufficient to justify injunctive relief. *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989). Therefore, Plaintiff has satisfied this element as well.

 The relief Plaintiff seeks would not harm others. No one has alleged that Plaintiff's union advocacy or his behavior upset the working environment at MSD through either physical violence or verbal disruption. The Court has reaffirmed Defendant's right to impose appropriate employee sanctions. Accordingly, voiding the sanction of termination would not unfairly harm other employees or managers or MSD.

lance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because supervisors disagree with the content of the employee's speech. *Id.*

2. In this case, the Court's balancing is unusually difficult because Plaintiff's union association affected the dispute, but did not cause it initially. Moreover, Plaintiff's association with the union did not affect Defendant's legitimate goals.

Lastly, the public interest would be served by issuing a preliminary injunction in this case. Clearly the public has a strong interest in protecting employees' freedom of speech and association in the workplace. Unions are particularly important because they advocate employee views in negotiations with company management. Employees must be free to participate in union activities without fear of reprisal or discriminatory treatment from their employers.

By its action today, the Court acts only to void Defendant's action that exceeded the constitutional balance. Plaintiff's reinstatement is one immediate consequence of the Court's action. Another is Defendant's right to reconsider the disciplinary proceedings against Plaintiff. The Court has acknowledged Defendant's right to impose a more appropriate sanction. Finally, the Court finds no need or justification for any other injunctive relief that Plaintiff has requested.[3]

The order accompanying this memorandum opinion will grant Plaintiff Milliron's motion for a preliminary injunction and dismiss Plaintiff Local 191 from the case.

### ORDER

This case is before the Court on Plaintiffs' motion for a preliminary injunction. The Court having thoroughly reviewed the matter, having issued a Memorandum Opinion, and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff Milliron's motion for a preliminary injunction reinstating him to his position at MSD be SUSTAINED, subject to the qualifications set forth in the Memorandum Opinion. All other relief requested is denied.

IT IS FURTHER ORDERED that the complaint of Plaintiff Local 191 is DISMISSED with prejudice.

**SAILOR MUSIC, No Thought Music, Perren–Vibes Music, Inc., Polygram International Publishing, Inc., Brockman Music, Jasperilla Music Co., MCA, Inc., Zappo Music, Basically Gasp Music and Bob–A–Lew Songs, Plaintiffs,**

v.

**IML CORPORATION, Geraldine Bensmiller and Alfred R. Bensmiller, Defendants.**

No. 94–CV–71172–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 10, 1994.

---

3. Plaintiff had requested that the injunction be posted at MSD's offices.

Cynthia Thomas, Detroit, MI, for plaintiffs.

George F. Borgelt, Dearborn Heights, MI, for defendants.

### ORDER[1]

JULIAN ABELE COOK, Jr., Chief Judge.

This case involves claims of infringement of copyrights and arises under the Copyright Act, 17 U.S.C. § 501, *et seq.* The Plaintiffs are members of the American Society of Composers, Authors, and Publishers (AS-CAP)[2], to which they have granted a non-exclusive right to license non-dramatic public performances of their copyrighted musical compositions. The Defendant, IML Corporation (IML), is a Michigan corporation whose principal shareholders are the Defendants, Geraldine Bensmiller and Alfred R. Bensmiller.

In January 1990, IML opened "Marilyn's on Monroe" (Marilyn's), a bar and grill which offers live disc-jockey music and a dance floor to the general public. Shortly after "Marilyn's" opened, the ASCAP representatives and the Bensmillers engaged in a series of written and oral communications between February 1990 and November 1990, all of which related to the acquisition of an ASCAP license for the business. However, the Bensmillers refused ASCAP's entreaties to obtain an ASCAP license that would apply to "Marilyn's."[3]

Nearly three years later, ASCAP, believing that the Bensmillers had been playing copyrighted material without its authorization, sent two of its representatives, Kenneth Adams and James Vanhecke, to "Marilyn's" on December 4–5, 1993 to conduct an investigation. Both of them confirmed their suspicions and concluded that "Marilyn's" was playing copyrighted material without authorization.[4]

Shortly thereafter, ASCAP presented its findings and conclusions to the management

1. This Order ratifies an Order that was given orally by the Court at the conclusion of a hearing on October 25, 1994. To the extent that there are any inconsistencies between the two Orders, the instant written Order shall prevail.

2. ASCAP has more than 55,000 members. It licenses thousands of music users, including radio and television networks, commercial radio and television stations, restaurants, nightclubs, and other establishments whose owners desire to perform or play lawfully copyrighted musical compositions in the ASCAP repertoire. When such entities refuse to obtain a license from AS-CAP and perform or play copyrighted material, they infringe upon the copyright interests of the ASCAP's members who have a cause of action for the infringement activity. *See generally Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

3. In April 1992, "Marilyn's," through the efforts of Mrs. Bensmiller, submitted an application for an ASCAP license which bore a material alteration to the printed fee structure in the form. As a result, ASCAP rejected the altered application and returned it, as well as the accompanying remittance of $121.00, to her.

4. Adams and Vanhecke have submitted affidavits in which they assert that five ASCAP songs were played at "Marilyn's" on the nights of December 4–5, 1993: (1) Jet Airliner, (2) Reunited, (3) Stuck on You, (4) Your Mama Don't Dance, and (5) Jacob's Ladder. The Adams and Vanhecke affidavits consisted of the handwritten notes that had been written by them while they were at "Marilyn's," as well as a formal ASCAP report that was based on the content of the notes. The two affidavits support the Plaintiffs' contention that these identified songs are copyrighted material which belong to ASCAP's members.

of "Marilyn's," along with its proposal that the Bensmillers pay the fee for the three year period when the business was operated without an ASCAP license. The offer was rejected. As a result, the Plaintiffs filed the present cause of action on March 25, 1994, in which they charged the Defendants with five counts of copyright infringement and sought (1) an injunctive order that would prohibit "Marilyn's" from any further infringement upon their copyrights and upon all other copyrights in the ASCAP repertoire, (2) statutory damages in the amount of $10,000 (i.e, $2,000 for each alleged copyright violation), and (3) costs and attorney's fees in the sum of $4,185.[5] On September 14, 1994, the Plaintiffs filed a motion for summary judgment, contending that there are no genuine issues of a material fact in this controversy. FED.R.CIV.P. 56. As of this date, none of the Defendants have submitted any opposition pleadings to the pending motion.

## ANALYSIS

Under Federal Rule of Civil Procedure 56, a summary judgment is to be entered if the moving party demonstrates the absence of all genuine issues of a material fact, and if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In making this evaluation, a court is authorized to examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. *Boyd v. Ford Motor Company,* 948 F.2d 283 (6th Cir.1991). If this burden is met by the moving party, the failure of the non-moving party to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial...." will mandate the entry of a summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### 1. Copyright Infringement

In the present cause, the Plaintiffs have submitted substantial evidence which supports their allegations that five copyrighted songs were played at "Marilyn's" on the night of December 4–5, 1993. No genuine issue of a material fact remains as to these allegations inasmuch as the Defendants have neither produced any evidence to rebut them nor denied their validity.

Beyond proving that the performance of copyrighted songs had occurred, the Plaintiffs must establish the following elements of copyright infringement: (1) the originality and authorship of the compositions involved (2) compliance with the formalities of the Copyright Act, (3) ownership of copyrights, (4) performance of compositions for profit, and (5) unauthorized performance. *See, e.g., Blendingwell Music, Inc. v. Moor–Law, Inc.,* 612 F.Supp. 474 (D.Del.1985); *Almo Music Corp. v. 77 East Adams, Inc.,* 647 F.Supp. 123 (N.D.Ill.1986); *Little Mole Music v. Spike Inv., Inc.,* 720 F.Supp. 751 (W.D.Mo. 1989); *Flyte Tyme Tunes v. Miszkiewicz,* 715 F.Supp. 919 (E.D.Wis.1989).

In the present case, the Plaintiffs have demonstrated that the performance of the compositions was unauthorized by ASCAP and was done for commercial purposes and profit by the Defendants. Moreover, they have demonstrated compliance with the first three elements of copyright infringement by submitting copies of copyright registration certificates for the five songs at issue. *Id.* at 921. Hence, there is no question that the Plaintiffs have satisfied all of the elements of copyright infringement.

### 2. Remedies

#### a. Vicarious Liability

A corporate officer may be held vicariously liable under the Copyright Act when:

---

5. This request is based upon the following computation:

| | |
|---|---|
| 25 attorney hours at $135.00/per hour | $3,375 |
| Costs in filing, xerox, messengers, etc. | $ 810 |
| Subtotal | $4,185 |

(1) the officer personally participated in the actual infringement; or (2) the officer derived financial benefit from the infringing activities as either a major shareholder in the corporation, or through some other means such as receiving a percentage of the revenues from the activity giving rise to the infringement; or (3) the officer used the corporation as an instrument to carry out a deliberate infringement of copyright; or (4) the officer was the dominant influence in the corporation, and determined the policies which resulted in the infringement; or (5) on the basis of some combination of the above criteria.

*Marvin Music Co. v. BHC Limited Partnership*, 830 F.Supp. 651, 654–55 (D.Mass.1993) (general manager of club, and president of corporation which was general partner of limited partnership that owned and operated club, was jointly liable for copyright infringements); *see also Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Assoc., Inc.*, 423 F.Supp. 341, 344 (D.Mass. 1976), *aff'd*, 554 F.2d 1213 (1st Cir.1977).

■ There is no doubt that the Bensmillers should be personally liable for the claimed copyright infringements inasmuch as they, as the sole owners of IML, derived financial benefit from the infringing activities that occurred at "Marilyn's." Moreover, the record clearly identifies Mrs. Bensmiller as the dominant influence in IML, as well as the officer who determined the policies and practices at "Marilyn's" which resulted in the deliberate copyright infringement of the AS-CAP material. She, who had owned another bar (to wit, "The Old Detroit") which had held an ASCAP license, understood the need for such a license and knew, or should have known, that the utilization of ASCAP materials without a license would be in violation of the copyright laws.[6] Furthermore, there is uncontradicted evidence that Mrs. Bensmiller told ASCAP for three consecutive years that neither IML nor "Marilyn's" would acquire an ASCAP license, despite having received many warnings that the unauthorized use of the music would constitute an infringement upon the Plaintiffs' copyright interests.

Thus, it is clear that she was an active agent in the copyright infringement which followed.

Similarly, Mr. Bensmiller, although a more passive actor in the management of "Marilyn's," must be held as responsible for the copyright infringement as his wife. He not only derived financial benefits from the unauthorized use of subject ASCAP material in his capacity as the half owner of IML, but also, as a general manager of "Marilyn's," was responsible for the policy of neglect which resulted in the infringement of the Plaintiffs' copyright interests.

Accordingly, IML and the Bensmillers are determined to be jointly and severally liable for the copyright violations which took place at "Marilyn's" on December 4–5, 1993.

b. *Injunctive Relief*

■ The Copyright Act provides that "any court having jurisdiction of a civil action arising under this title may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Moreover, courts generally grant permanent injunctions once liability has been established if there is a "substantial likelihood of further infringement." *Pedrosillo Music, Inc. v. Radio Musical, Inc.*, 815 F.Supp. 511, 516 (D.P.R.1993). Permanent injunctions are typically granted when there is evidence of an unlawful encroachment upon any musical composition that has been licensed through ASCAP because of the strong probability that unlawful performances of other copyrighted material will occur. *See, e.g., Marvin Music Co.*, 830 F.Supp. at 655.

■ This Court is satisfied that there is a substantial likelihood of further copyright infringement by the management of "Marilyn's." This dance bar continues to operate without an ASCAP license, utilizes numerous disc-jockeys and live performers who independently select the music to be played at "Marilyn's," and does not maintain any policy which is designed to control its musical

---

**6.** At some time between 1990 and 1993, Mrs. Bensmiller attempted to obtain an ASCAP license at a discounted rate. This lends credence to the Plaintiffs' assertion that she was aware of her obligation to secure a license in order to lawfully utilize copyrighted materials. *See supra* note 2.

scores. Moreover, despite three years of warnings by ASCAP, IML permitted the copyright infringements to take place at "Marilyn's." Under such circumstances, this Court is convinced that the issuance of an injunction which will prohibit the Defendants from utilizing any musical composition in ASCAP's repertoire without authorization is appropriate.

### c. *Statutory Damages*

Under the Copyright Act, a copyright owner may recover an award of statutory damages "in a sum of not less than $500 or more than $20,000 as the court considers just...." for each infringement. 17 U.S.C. § 504(c)(1). This rule is also designed to discourage wrongful conduct. *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952).

■ In determining statutory damages, courts are urged to consider two main factors; namely, (1) the expenses saved and profits reaped by the Defendants in connection with the infringement—also expressed as the deterrent value of the award—and (2) the wilfulness of the infringement. *See, e.g., Marvin Music Co.*, 830 F.Supp. at 656; *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 914 (D.Conn.1980).

■ In the present case, the Plaintiffs seek an award of $2,000 per infringement.[7] In support of their request, they have provided this Court with a survey of statutory awards throughout the country, all of which indicate that the courts typically award three times the amount of a properly purchased license for each infringement.[8] Typically, these "treble" damages range from $1,500 to $5,000 per infringement. *See, e.g., Coleman v. Payne*, 698 F.Supp. 704, 709 (W.D.Mich. 1988) ($5,000 per infringement); *Brockman Music v. Miller*, 1990 Copyright Law Decisions (CCH) P 26,602, 1990 WL 132486 ($1,500 per infringement); *Panther Music Corp. v. York–Oxbow Enterprises, Inc.*, Case

No. 93–CV–72043–DT (E.D.Mich. January 31, 1994) ($2,500 per infringement).

This Court finds that the requested statutory damages of $2,000 per infringement is adequate inasmuch as the record makes it clear that the copyright violations resulted from the deliberate indifference of the "Marilyn's" management toward the copyright laws. In addition, the requested statutory damages are in line with the prevailing case law of awarding more than the value of ASCAP's license fees. Moreover, the requested relief properly accounts for the expenses that were "saved" by the Defendants (e.g., the license fee), while leaving an adequate margin to account for the profits reaped by them in connection with the unauthorized use of copyrighted music and to serve the deterrence purpose of the Copyright Act.

### d. *Costs and Attorney's Fees*

■ The Copyright Act grants courts the discretion to award costs and attorney's fees to the prevailing party in a copyright infringement action. 17 U.S.C. § 505. In determining whether an award of costs and attorney's fees is warranted, courts may consider whether (1) a complex or novel issue of law justified the litigation of the case, (2) the defendants attempted to avoid the infringement, and (3) the act of infringement was innocent. *Boz Scaggs Music*, 491 F.Supp. 908.

■ In the instant cause, none of these factors weigh in favor of the Defendants. Their infringement was blatant. The Defendants, despite having had prior experience in dealing with ASCAP, simply chose to disregard the Plaintiffs' rights to the copyrighted material. Additionally, they refused ASCAP's multiple offers to forego litigation in exchange of their payment of ASCAP's dues. Thus, they have forced the Plaintiffs to engage lawyers, incur legal fees, and resort to the courts to enforce their rights. Significantly, the Defendants have failed to present any facts which mitigate their serious infraction. These circumstances demonstrate that

---

7. In 1993, Marilyn's would have had to pay $602 for an ASCAP license. Thus, the requested relief of $2,000 per infringement adequately approximates three times that amount.

8. The purpose of this de facto treble rule is to put defendants "on notice that it costs less to obey the copyright laws than to violate them." *Music City Music v. Alfa Foods, Ltd.* 616 F.Supp. 1001, 1003 (E.D.Va.1985).

they have engaged, and will continue to engage, in a pattern of deliberate indifference toward the Plaintiffs' rights. Hence, it is evident to this Court that costs and attorney's fees should be granted.

Based on the foregoing, the Plaintiffs' Motion for Summary Judgment shall be granted. In addition, they are directed to submit a proposed order to the Court, which shall be consistent with this opinion, within a period of ten (10) days from this date.

IT IS SO ORDERED.

**John H. LOVELL, Plaintiff,**

v.

**The UNITED STATES DEPARTMENT OF the TREASURY, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, Defendant.**

**No. 5:93–CV–106.**

United States District Court,
W.D. Michigan.

June 7, 1994.

Bernard F. Finn, Sinas, Dramis, Brake, Boughton, McIntyre & Reisig, P.C., Lansing, MI, for plaintiff.

Daniel M. LaVille, Asst. U.S. Atty., Michael H. Dettmer, U.S. Atty., Grand Rapids, MI, for defendant.

### OPINION

ENSLEN, District Judge.

The matter before the Court is the parties' cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff is a convicted felon who seeks removal of the prohibition against firearms ownership imposed on him pursuant to 18 U.S.C. § 922. Because there are no disputed questions of material fact, the issue they present is properly resolved on summary judgment.

On May 26, 1987, plaintiff pled guilty to use of a communication facility in the distri-

bution of cocaine, and possession of cocaine with intent to distribute. Plaintiff began using cocaine following a snowmobile accident, which resulted in severe injuries and depression. Plaintiff's wife also began using cocaine. Plaintiff states that his cocaine use ended around 1980, and between 1984 and 1986 he received psychiatric care to address his depression. Plaintiff's Response of May 17, 1994, Affidavit of John Lovell.[1] According to the AUSA who prosecuted plaintiff's case, they were not heavy dealers, but users trying to support their habit. No weapon or violence was used in plaintiff's procurement of cocaine.

Plaintiff was sentenced to five years probation and 400 hours of community service, but was released from probation on January 8, 1990, after approximately two and a half years. On March 6, 1992, plaintiff applied to the Bureau of Alcohol, Tobacco and Firearms ("ATF") for reinstatement of his legal access to firearms, in accord with 18 U.S.C. 925(c). In his application letter, plaintiff explained that he planned to retire in the Upper Peninsula, and would like to regain the right to hunt. He further stated that he used to have a collection of guns which he would like to pass on to his son when the time comes.

After conducting interviews and gathering evidence, the ATF field office which conducted the investigation recommended approval of plaintiff's request. The request was approved at the next two levels of review, but the fourth officer to review the request recommended that it be denied. In the "comments" section of the August 10, 1992, recommendation, the OPS officer states:

> I recommend denial—too soon after heavy cocaine use and physiatric [sic] care to determine if capable—convicted of distributing cocaine, much more serious than use, not addressed in report, next time we need arrest reports.

The final reviewing officer concurred with these comments, stating that "Lovell has not had enough time to demonstrate that he has fully recovered from the use of cocaine and physiatric [sic] treatment."

Plaintiff's request was ultimately denied. After his application was denied on a request for reconsideration, plaintiff filed this appeal.

 The standard ATF was to apply in considering plaintiff's application is supplied by 18 U.S.C. § 925(c). That section instructs that applications are to be granted when the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant would not be likely to act in a manner dangerous to public safety and granting the application would not be contrary to the public interest. The standard of review this Court must apply to the ATF decision requires me to analyze whether the decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accord with the law. *E.g., Bradley v. Bureau of Alcohol, Tobacco and Firearms,* 736 F.2d 1238, 1240 (8th Cir.1984) (discussing 5 U.S.C. § 706 (1976)).

██ Plaintiff argues that the denial was not in accord with law because it relied solely on the amount of time which passed, and not on the criteria outlined by § 925(c)—the circumstances surrounding the disability and the applicant's reputation and record.

I disagree. The length of time which has passed between conviction and application is properly considered as a circumstance regarding the disability, or a circumstance regarding the applicant's record.

Plaintiff incorrectly concludes that because a reviewing officer cited one fact in support of the officer's conclusion, which was contrary to a field officer's recommendation, he or she "disregarded" all other facts. Instead, the reviewing officer viewed the facts through a different lens. In this case, the reviewing officer's perspective was that while all reports seemed to be favorable, in that officer's estimation, given a conviction for cocaine distribution, it was too early to rely on them.

---

1. According to plaintiff's affidavit, the investigative report's assertion that plaintiff received psychiatric care since his conviction to help him through his depression is incorrect. Administrative Record at 20, Report at 2. Plaintiff's affidavit states that he stopped receiving treatment for depression in 1986.

I hasten to add that I completely agree with one of plaintiff's assertions: psychiatric care is not something one needs to "get over." Seeking therapy is a responsible and mature response to a crisis, and any suggestion in the officer's comments to the contrary are offensive and have been disregarded by this Court.

However, it is not arbitrary or capricious for ATF to take into consideration past or present mental states such as depression, and to require that reviewing agents feel confident that the problem has been conquered. According to plaintiff, in this case he had two problems—depression, which led to his drug use, and drug addiction. I am pleased and impressed to see that he appears to have walked a straight and healthy path since the date of his conviction. However, the fact that ATF wanted to see that path continue further before it restored plaintiff's ability to use weapons is not arbitrary and capricious.

I find that it is not arbitrary or capricious for ATF to decide that two and a half years after termination of probation is not enough time to be confident that the positive pattern of behavior of a former drug addict and distributor will last a lifetime. Therefore, there is no need for an evidentiary hearing to resolve the conflict between the administrative record and plaintiff's affidavit concerning when his psychiatric care ceased, or to consider whether exclusion of new evidence that plaintiff's psychiatric treatment ceased before his conviction must be considered by this Court. That evidence is not material to my decision.

I am acutely aware of the message plaintiff seems to have taken from this denial—your rehabilitation efforts are not good enough. I fear the consequence of such a discouraging message, because it is exactly the opposite of what plaintiff deserves. Plaintiff's efforts, and successes, appear to be exemplary. Were the decision mine to make in the first instance, given all the information I have before me, I might have reached the same conclusion as the field agent. However, it is not.

The Bureau of Alcohol, Tobacco and Firearms has the difficult and critically important job of keeping guns out of the hands of felons who might use them irresponsibly, and I cannot find that the ATF decision to deny plaintiff's application for relief from disability was an abuse of discretion or otherwise not in accord with the law. Therefore, plaintiff's motion for summary judgment in his favor will be denied, and defendant's motion for summary judgment in its favor will be granted.

The BABCOCK & WILCOX COMPANY, Plaintiff,

v.

ARKWRIGHT–BOSTON MANUFACTURING MUTUAL INSURANCE COMPANY, et al., Defendant.

No. 91–CV–987.

United States District Court, N.D. Ohio, Eastern Division.

Aug. 3, 1992.

574

Matthew J. Hatchadorian, Stephen J. Petras, Jr., Vorys, Sater, Seymour & Pease, Cleveland, OH, Duke W. Thomas, Vorys, Sater, Seymour & Pease, Columbus, OH, for plaintiff.

William H. Baughman, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Robert D. Archibald, Charles H. Bragg, McNeal, Schick, Archibald & Biro, Cleveland, OH, Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, White & Williams, Philadelphia, PA, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for Arkwright–Boston Mfg. Mut. Ins. Co.

William H. Baughman, Jr., Ronald A. Rispo, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Robert D. Archibald, Charles H. Bragg, McNeal, Schick, Archibald & Biro, Cleveland, OH, Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, White & Williams, Philadelphia, PA, Robert E. Salmon, Stacy A. Broman, Meagher & Geer, Minneapolis, MN, for St. Paul Mercury Ins. Co.

Ralph D. McBride, Lisa G. Zummo, Bracewell & Patterson, Houston, TX, Richard E. Guster, Thompson, Hine & Flory, Akron, OH, Gardner Thornton, Citadel Ins. Co., Houston, TX, for Citadel Ins. Co.

Alan S. Kopit, Arthur M. Kaufman, Mark E. Staib, Hahn, Loeser & Parks, Cleveland, OH, for Travelers Indem. Co.

Robert D. Archibald, McNeal, Schick, Archibald & Biro, Cleveland, OH, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for American Intern. Marine Agency.

William H. Baughman, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Robert D. Archibald, Charles H. Bragg, McNeal, Schick, Archibald & Biro, Cleveland, OH, Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, E. Douglas Sederholm, Barbara S. Zellner, White & Williams, Philadelphia, PA, Robert E. Salmon, Meagher & Geer, Minneapolis,

MN, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for Allianz Ins. Co.

Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, E. Douglas Sederholm, Barbara S. Zellner, John F. Glowacki, White & Williams, Philadelphia, PA, for Ins. Co. of North America.

Nicholas J. Milanich, Reminger & Reminger, Cleveland, OH, Thomas J. Quinn, William J. Cleary, Mendes & Mount, New York City, for Underwriters at Lloyd's London, English & American Ins., C.A. Parr, Caryl Vaughn Gibbs, Indemnity Marine Assurance Co.

Paul A. Rose, Deborah K. Urban, Sheila E. Noonan, Brouse & McDowell, Akron, OH, C. Gordon Starling, Jr., Gerard T. Gelpi, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, LA, for Creole Ins. Co., Ltd.

Robert D. Archibald, McNeal, Schick, Archibald & Biro, Cleveland, OH, William F. Scully, Reminger & Reminger, Cleveland, OH, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for American Home Assurance Co.

Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Nicholas J. Milanich, Reminger & Reminger, Cleveland, OH, Dermot S. McGlinchey, James M. Garner, Martha M. Young, McGlinchey, Stafford & Lang, New Orleans, LA, E. Douglas Sederholm, Barbara S. Zellner, Linda S. Harowitz, White & Williams, Philadelphia, PA, for Ins. Co. of North America (UK) Ltd.

William J. Kraus, Kraus & Kraus, Cleveland, OH, Rockne L. Moseley, Janet M. Ahern, Moseley & Associates, New Orleans, LA, for McDermott, Inc.

## ORDER

SAM H. BELL, District Judge.

Presently before the court in the above-captioned cause is a motion in limine by plaintiff, The Babcock & Wilcox Company (B & W), for a determination of which state law, in the absence of a choice of law by the parties, is to be applied in construing a disputed term of B & W's liability insurance contract with defendant insurers. Plaintiff contends that, under the "more significant relationship" analysis adopted by Ohio courts, Ohio law should be applied. Defendants have filed a brief in opposition in which they contend that, under the same analysis, Louisiana law should be applied.

*BACKGROUND*

The present action involves a dispute over liability insurance coverage for asbestos-related claims arising from B & W's design, manufacture, sale, and service of boilers. Sales of the B & W boilers relevant to the present litigation were made on a nationwide and worldwide scale. Claims against B & W for exposure to asbestos during the relevant time period of 1979–80 were likewise filed throughout the United States and the world.

B & W is a corporation organized under the laws of Delaware. While at the time of contracting certain of its corporate offices had been relocated from New York to Louisiana, B & W's principal place of business was and remains Ohio, where the majority of its management, manufacture, and design operations are conducted, where the major portion of its employees reside, and where the bulk of its assets are located.

None of the defendant insurers has its place of incorporation or its principal place of business in either Louisiana or Ohio. Most of the defendant insurers, however, have obtained certificates of compliance with the insurance laws of Ohio and are licensed to conduct insurance business in the state.

In 1978, B & W became a subsidiary of J. Ray McDermott & Company (McDermott), a Louisiana-based corporation. While its nominal headquarters became located in Louisiana, B & W retained its separate corporate identity, and continued its major operations in Ohio. The responsibility for securing B & W's 1979–80 liability insurance coverage shifted to McDermott. Through its authorized Texas-based insurance broker, Adams & Porter Associates Inc., McDermott secured a multiple-layer comprehensive liability insurance policy for 1979–80 with defendant insurers on behalf of all its subsidiaries. However, specific and separate terms of coverage for B & W were individually considered and provided for in the otherwise gener-

al insurance contract. The contract did not include any choice of law provision.

Subject to McDermott's approval, Adams & Porter negotiated the terms of the insurance contract with defendant insurers. Negotiations took place primarily in Texas, New York, and England. The defendant insurers ultimately executed the insurance policy at their respective offices, none of which was located in Louisiana or Ohio. The executed policy was assembled by Adams & Porter at its Texas office and delivered to McDermott at its New Orleans, Louisiana, office. Premiums on the policy were paid out of McDermott's office to Adams & Porter in Texas, which then distributed the proportionate shares of the premiums to the defendant insurers at their respective offices.

While B & W's parent corporation, through its authorized agent, obtained this secondary excess liability insurance coverage for B & W in the amount of 17.5 million dollars, B & W retained its own separate primary comprehensive general liability policy with Travelers Insurance Company in the amount of two million dollars, and a first layer of excess coverage with Creole Insurance Company Limited in the amount of $500,000. There is no dispute over the fact that the primary coverage with Travelers has been exhausted; B & W and Creole agree that the Creole first-layer excess coverage has likewise been exhausted and paid out in full. Defendants contend, however, that the first layer of excess coverage with Creole has not been exhausted, and that they are therefore not obligated to reimburse B & W for any claims paid.

The central point of dispute between the parties is the construction of the term "occurrence" as it is used in the secondary excess liability insurance contract with defendant insurers, and in the primary excess liability insurance contract between B & W and Creole. Although neither party offers any analysis of the respective constructions of this term under the laws of Ohio and Louisiana, the parties are in apparent agreement that the legal construction of this term would differ significantly depending upon which state's law is applied, and that the choice of the applicable law would be virtual-

ly dispositive of the respective rights of the parties under the contract.

The scope of coverage of the insurance contract with defendant insurers is as follows:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to pay on behalf of the Assured all sums which the Assured shall be obligated to pay by reason of their liability imposed upon the Assured by Federal, State, and Municipal or other qualified authority or in respect of such liabilities assumed by the Assured under contract or agreement, for "property damage" and "personal injuries", as defined herein resulting from an "occurrence" as defined herein.

The definition of the term "occurrence" is the same in both the contract with defendant insurers and the contract with Creole:

> The term "Occurrence", whenever used herein, shall mean any happening or series of happenings, arising out of or due to one event taking place during the term of this contract in respect to all the Assured's operations.

Generally, there are three varying approaches taken by courts in construing the term "occurrence" under such a liability insurance policy. See Annotation, *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount per Accident or Occurrence*, 64 ALR4th 668 (1988). Of relevance herein are two of these approaches, which respectively look to either the cause or to the effect of injury to determine the number of occurrences for purposes of liability coverage.

B & W urges a construction of "occurrence" that defines it in terms of the underlying *cause* of the multiple asbestos-related injuries and resulting claims. Thus, as there was but one occurrence that caused the asbestos-related claims against B & W—the design and manufacture of asbestos-containing boilers—the total amount of money paid out in disposing of the numerous resulting claims is aggregated to determine whether the policy limits of the Creole primary excess

liability coverage have been exhausted, and the threshold of defendant insurers' secondary excess liability coverage has been reached. This approach to construing "occurrence" is taken by the vast majority of courts. *Id.; Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374, 379 (6th Cir.1984). For present purposes the court will presume, in the absence of any analysis of this issue by the parties, and in view of B & W's stance on the issue presently before the court, that Ohio law is in keeping with this majority approach.

Defendant insurers, on the other hand, espouse the minority view that "occurrence" is to be construed in terms of the ultimate *effect,* thus rendering each individual injury or claim a separate occurrence. Under this construction, defendant insurers' obligation to pay on any one of these claims is not triggered until liability for that claim exceeds the $500,000 policy limits of the Creole policy. Because the typical asbestos-related claim is allegedly disposed of for about $10,000, this would mean that defendant insurers would not be obligated to pay on any of the claims. For the reasons stated above, the court will presume that Louisiana law supports defendant insurers' construction of "occurrence". The court would note, however, that Louisiana courts are apparently in conflict over which approach to take. See 64 ALR4th at 674, 680–81.

## CHOICE OF LAW PRINCIPLES

In a diversity action, the district court is obliged to apply the choice of law rules of the state in which it sits. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Boyd v. LaMaster,* 927 F.2d 237 (6th Cir.1991). This court must therefore apply Ohio choice of law rules.

For the present action, the determinative Ohio choice of law rules are set forth in *Nationwide Mut. Ins. Co. v. Ferrin,* 21 Ohio St.3d 43, 487 N.E.2d 568 (1986), and *Gries Sports Enterprises, Inc. v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807 (1984), cert. denied 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985). Ohio choice of law rules mandate that the law of the state with the more significant relationship to the contract should govern disputes arising from it. *National Union Fire Ins. v. Watts,* 963 F.2d 148 (6th Cir.1992). To determine which state has the more significant relationship to the contract, Ohio law has adopted the test set forth in the Restatement (Second) of Conflict of Laws, Section 188. *Macurdy v. Sikov & Love, P.A.,* 894 F.2d 818, 822 (6th Cir.1990); *Ferrin, supra; Modell, supra.*

Section 188 states, in relevant part:

(2) In the absence of an effective choice of law by the parties, * * * the contacts to be taken into account in applying the principles of [Section] 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

The plain language of Restatement (Second) of Conflict of Laws Section 188, as adopted by Ohio case law, requires the court to consider the Section 188 factors in applying the general principles enunciated in Restatement (Second) of Conflict of Laws Section 6 to determine the law applicable to an issue. *Watts, supra.* Section 6 sets forth:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability, and uniformity of result; and

(g) ease in the determination and application of the law to be applied.

As to the application of the above principles, the parties are not in dispute. The parties are in dispute, however, over whether under Ohio conflict of laws principles this court may apply the provisions of a related Restatement section, Section 193, and the comments thereto. Section 193 reads:

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in [Section] 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Comment *b* to Section 193 provides that "The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state." Where no principal location of the risk can be determined, Comment *a* to Section 193 requires that the governing law be determined by application of the general principles set forth in Section 188.

Comment *f* to Section 193 deals specifically with "multiple risk" insurance policies of the type at issue in the present case. Comment *f* states, in part:

*Multiple risk policies.* A special problem is presented by multiple risk policies which insure against risks located in several states. A single policy may, for example, insure dwelling houses located in states X, Y, and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate the special statutory forms of the several states involved. Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X. * * *

The principles governing the federal courts' determination of state law are summarized in *Grantham and Mann v. American Safety Products,* 831 F.2d 596, 608–609 (6th Cir.1987):

In diversity cases, the federal courts must apply state law "in accordance with the then controlling decision of the highest state court." * * * If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the "majority" rule, what the state's highest court would decide if faced with the issue. * * * Nevertheless, although a decision by a lower state court is not controlling where the highest state court has not spoken, * * * the decision of "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." * * * (Citations and emphases omitted).

## ANALYSIS

Plaintiff urges this court to find that Section 193, which emphasizes the principal location of the insured risk as the primary factor in determining the controlling law, would be adopted by Ohio courts if they were presented with the issue herein. Plaintiff further contends that, under Section 193, Ohio is the state with the more significant relationship with respect to the construction of the terms of the liability insurance contract because Ohio is the principal location of the insured

risk, i.e., the situs of the major portion of the operations and assets of Babcock & Wilcox.

Defendant insurers contest the assertion that Ohio is the principal location of the insured risk. Defendants contend that Section 193 cannot be applied in the present case because no Ohio court has as yet adopted it, and indications are that Ohio courts would not adopt it; alternatively, defendants contend that Section 193 is inapplicable to the present facts by its own terms. Ultimately, defendants argue that the application of the principles enumerated in Section 6 and Section 188 mandates a finding that Louisiana law is controlling, in that Louisiana was the principal place of contracting, and because the goals of uniformity and predictability will be best served by application of Louisiana law.

### Location of the Insured Risk

■ Our first inquiry is to determine whether or not Ohio is the principal location of the insured risk in the present case. If not, then the question of whether or not Ohio courts would adopt Section 193 would be rendered moot, as our analysis in that case would be confined to the application of the principles set forth in Section 6 and Section 188. See, e.g., *General Acc. Ins. Co. v. Insurance Co. of North America* (1990), 69 Ohio App.3d 52, 590 N.E.2d 33; *Compagnie des Bauxites v. Argonaut–Midwest Ins.*, 880 F.2d 685, 690 (3rd Cir.1989); *Sandefer Oil & Gas v. AIG Oil Rig of Texas, Inc.*, 846 F.2d 319, 324 (5th Cir.1988).

Plaintiff's theory is that the "insured risk" in the present contract is the risk of loss to the insured, i.e., the risk of depletion of the insured's assets as a result of liability for claims made against it. Under this view, since Ohio is the principal location of the insured's assets, Ohio is therefore the principal location of the insured risk.

Although B & W cites no cases where "insured risk" is expressly construed in this manner, it finds some support for this approach through extrapolation of the language and holdings in a handful of cases: *Republic–Franklin Ins. Co. v. Progressive Casualty Ins. Co.* (1976), 45 Ohio St.2d 93, 95, 341 N.E.2d 600 ("A liability insurance policy is written for the protection of the insured."); *Eagle–Picher Industries v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 248 (1st Cir.1987) (Ohio law applied in insurance coverage dispute over asbestos-related claims because the question of whether an Ohio manufacturer "is entitled to reimbursement, and to what extent, for the many millions of dollars in claims paid as a result of injuries caused by its products is of major concern to the state in which the business is domiciled."); *Unigard Security Ins. Co. v. North River Ins. Co.*, 762 F.Supp. 566, 589 (S.D.N.Y.1991) ("In the mass tort context, the state where the insured is located has been held to be the state having the greatest interest in the application of its law concerning insurance coverage.").

Defendants contend, on the other hand, that the "insured risk" is the risk of claims being made against the insured. Since claims for asbestos-related injury have arisen against B & W nationwide and worldwide, and since the contract explicitly provides coverage for the insured regardless of the geographical location of the claim, there is no one state that can be regarded as the principal location of the insured risk. In support of this construction, defendants cite several cases, the chief ones being *General Acc. Ins. Co., supra; Compagnie des Bauxites, supra;* and *Sandefer Oil & Gas, supra.* As with the cases cited by plaintiff, none of these cases expressly construe "insured risk" in the manner proposed; at best, these cases implicitly presume without any analysis of the issue that the situs of the insured risk is determined by where the injury occurred and/or the claim was filed.

The equation of "insured risk" with claims made appears appropriate enough where one of the issues is the insurer's duty to defend against claims wherever they may arise. See, e.g., *General Acc. Ins. Co., supra.* However, such an approach has little value in the present case, where the contract expressly states that the insurers "shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured ...". Under the terms of the present contract, rather than an obligation to defend

against claims, the insurers have "the right and shall be given the opportunity" to involve themselves in the defense of claims that may affect their interests. In such event, their only obligation is to "cooperate" in the defense of claims against the insured.

The ultimate issue herein is whether the insured is entitled to coverage for claims that allegedly continue to be filed and for reimbursement of funds already expended in payment of claims against it, i.e., whether it is entitled to protection and restoration of its assets. In this context, and where there is no duty to defend, the fact that claims have been filed in numerous jurisdictions, and the fact that performance under the contract has no geographical limitations, are largely irrelevant.

Essentially, the only performance by the insurers that is called for by the contract is to pay, to the "Assured which sustains the loss", all sums for which that insured becomes liable as a result of the occurrences covered in the contract. Thus, the true subject matter of the contract is the protection of the assets of each individual insured. The risk insured against for B & W is not the risk of claims being made against B & W, but the risk of claims being paid for by B & W and the resulting depletion of its assets. Therefore, the principal location of the insured risk insofar as B & W is concerned is the principal location of that insured's assets—Ohio.

### Application of Section 193

Defendants assert that Section 193 should not be applied in the present case because the Supreme Court of Ohio has implicitly rejected application of Section 193 in *Ferrin, supra.* However, the court finds no support for this contention in that case. There is simply no basis for defendants' claim that the Supreme Court of Ohio "passed over the opportunity" to adopt Section 193 in *Ferrin* by virtue of its application therein of Section 188 to determining the governing law for a contract of liability insurance. There is no mention of Section 193 in that case, no indication that the parties ever raised the issue of its applicability, and not even so much as a hint that the court considered it in any way. As B & W aptly points

out, there would have been no need in *Ferrin* to consider the applicability of Section 193, as the same result would have been reached in that case through application of either Section 193 or Section 188.

Defendants further contend that no Ohio court has as yet applied or followed Section 193. This contention is also without merit. While the appellate court in *General Acc. Ins. Co., supra,* decided the choice of law issue under the principles of Section 188, it did so because of the particular facts of that case, i.e., there was no principal location of the insured risk. Although the court rejected the contention that Maryland law should be held to be controlling under Section 193, there was no objection to nor rejection of Section 193 in principle. Indeed, the court's language and analysis makes it clear that it actually *followed* Section 193 in determining the governing law in that case. After quoting extensively from Section 193 and Section 188, and then stating that it was "[a]pplying the foregoing", the court determined whether or not there was a principal location of the insured risk and, having found none, turned to an analysis under the more general principles of Section 188. The court's analysis was thus in accordance with the precepts of Section 193, Comment *a.*

Next, defendants argue that, even if Ohio courts would follow Section 193, it is inapplicable to the present case by its own terms. Defendants point out that Section 193 requires that there be 1) a principal location of the insured risk; 2) an understanding between the parties as to the principal location of the insured risk; and 3) no other state with a more significant relationship to the transaction and the parties under the principles stated in Section 6.

We have already determined that there is a principal location of the insured risk insofar as B & W is concerned, and that is Ohio. The question of whether Louisiana has a more significant relationship to the transaction and the parties with respect to the contested issue will be discussed more fully *infra;* for present purposes, however, we state our conclusion that Louisiana does not have the more significant relationship under the principles stated in Section 6.

As for the remaining factor, the understanding of the parties as to the principal location of the insured risk, defendants err in regarding this as requiring, in effect, a mutual understanding that is tantamount to an express agreement on the issue. Virtually identical language in Comment *c* to Section 193 and Comment *e* to Section 188 shows that the understanding spoken of is to be loosely construed: "... it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract." Restatement (Second) of Conflict of Laws, Section 193, Comment *c*.

Defendants also take issue with Comment *f* to Section 193, regarding multiple risk policies. Defendants claim that the "divide the risks" approach to such policies of Comment *f*, which suggests that the law of the principal location of each individual insured risk should control in the determination of insurance disputes regarding that risk, would violate the principles of Section 6 regarding consideration for certainty, predictability, and uniformity of result, and the justified expectations of the parties in that regard. A similar viewpoint is expressed in dicta in *Westinghouse Electric Corp. v. Liberty Mutual Ins. Co.*, 233 N.J.Super. 463, 559 A.2d 435 (A.D. 1989), upon which defendants primarily rely:

> * * * [W]hen comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insurer has bought and what the insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the policy coverage. * * * In our view, the notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectations of the parties but also the common understanding of the commercial community. It also seems to us anomalous, in conflict of law terms, to suggest that more than one body

of law will apply to a single contract. The theme running through the federal mega-coverage cases is the assumption not only that state law will determine whose insurance law will govern the coverage dispute but also that it will be a single state's law chosen in accordance with applicable conflict principles of the forum. * * *

*Id.*, 559 A.2d at 442. Defendants cite a handful of federal district court cases that have cited this language from *Westinghouse* in reaching similar conclusions. See *Potomac Electric Power Co. v. California Union Ins. Co.*, 777 F.Supp. 968 (D.D.C.1991); *National Starch and Chemical Corp. v. Great American Ins. Co.*, 743 F.Supp. 318 (D.N.J.1990); *CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 739 F.Supp. 710 (D.R.I.1990).

The relevance of these cases to the present action is questionable, in that B & W is not advocating the application of the laws of numerous states depending on where the claims arose, which is at the heart of the controversy in these cases. Rather, B & W's argument is consistent with their rulings in its emphasis on the application of the law of a single state, and in its assertion that the law of the insured's principal place of business, i.e., the principal location of the insured risk, be applied.

Furthermore, defendants' reliance on *Westinghouse* in support of this argument is also questionable, as the same appellate court that decided *Westinghouse* later criticized and rejected its reasoning. See *Johnson Matthey Inc. v. Pennsylvania Manufacturers' Assoc. Ins. Co.*, 250 N.J.Super. 51, 593 A.2d 367 (A.D.1991); *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Assoc. Ins. Co.*, 254 N.J.Super. 43, 603 A.2d 61 (A.D. 1992). As stated by the court:

> In *Johnson Matthey*, we explained our disagreement with *Westinghouse*. In short, we concluded that nationwide uniformity of policy interpretation was an illusory goal, not truly achievable or necessarily preferable. If it is associated with the place of contract, it is associated with an arbitrary and usually irrelevant choice which [section] 193 of the *Restatement* discards.

Site-specific uniformity, on the other hand, is achievable, and represents a choice of the law of the jurisdiction that is most concerned with the outcome.

*Gilbert Spruance, supra,* 603 A.2d at 64. The court went on to make the following observation, which is most pertinent to the present claim of concern for certainty, predictability, and uniformity of result:

If the parties to an insurance contract truly prize uniform interpretation of multistate insurance policy language, they can frequently achieve it by expressing a choice of law in the contract. * * * Their failure to express such a choice tends to show that uniform interpretation was not a conscious goal of the contracting parties.

*Id.* at 64–65.

In any event, there is little danger of nonuniform interpretation of the contract through application of Comment *f* of Section 193 in the present case, as we have already rejected the contention that the place of the insured risk in the present case is wherever the claims arose. Comment *f* is useful and relevant for our present purposes insofar as it lends support for a separate consideration of B & W's insurance coverage apart from that of the parent corporation and the other subsidiaries. Such an approach is entirely consistent with—and all but expressly called for by—the terms of the contract itself, which throughout treats B & W separately and individually, while for the most part treating the remaining insureds collectively.

Defendants point out that in *Westinghouse,* et al, it is the law of the principal place of business of the corporate parent that is held to be controlling. To the extent that this is accurate, however, it appears to be the result of coincidence, reached through the requisite case-by-case weighing of all relevant factors, rather than the result of a determination as a matter of law that the law of the principal place of business of the corporate parent is controlling in a dispute between its corporate subsidiary and their common insurer. Under the present facts and circumstances, B & W is better regarded as the separate corporation that it is, and McDermott, its corporate parent, is better regarded merely as B & W's agent for purposes of procuring its individualized insurance policy.

The court finds plaintiff's analysis of the question of whether Ohio courts would adopt and follow Section 193 to be persuasive. There is no inherent conflict between Section 193 and Sections 6 and 188. Rather, under the scheme of the Restatement (Second), Sections 189 through 197 are essentially subsections of Section 188, and act as models for the application of the principles of Section 188 to particular types of contracts:

* * * These contracts are given special attention because it is considered possible to state with respect to each that, in the absence of an effective choice of law by the parties, a particular contact plays an especially important role in the determination of the state of the applicable law. * * *

Introductory Note to Title B of Chapter Eight, Restatement (Second) of Conflict of Laws. Where Section 6 states general principles applicable to all issues of choice of law, and Section 188 states general principles applicable to choice of law issues regarding contracts, Sections 189–197 state specific principles applicable to particular types of contracts. Thus, these sections together form a continuous and harmonious scheme for the analysis of choice of law questions regarding contract disputes.

The court can find no justification for concluding that Ohio courts, having adopted Sections 6 and 188, would reject the application of their integrally related subsections if faced with factual situations where they would be applicable. The court therefore finds that Ohio courts would adopt and apply Section 193 under the facts of the present case.

### Analysis Under Sections 6 and 188

 Even if Ohio courts would for some reason reject the application of Section 193 under the present facts, an analysis of these facts under Sections 6 and 188 yields the same result—that Ohio law should control the resolution of the present dispute.

Of the factors listed in Section 6, the most pertinent to the present inquiry are subsections (2)(b) and (c), which prescribe an examination and balancing of the relative policies

of the forum state and other interested states in the determination of the issue in dispute. Comment *f* to Section 6 states that "In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." While Ohio's interests in the resolution of this dispute are substantial, Defendants fail to present any correspondingly significant interests on the part of Louisiana that would compel the application of its law.

As established earlier, subsections (2)(d) and (f), regarding the expectations of the parties and the uniformity of result, are of little weight in the present case.

Under subsection (2)(g), the court should take into consideration the ease in determination and application of the law to be applied. The court has not had the benefit of any analyses or arguments regarding the ultimate issue of the construction under Ohio and Louisiana law of the term "occurrence". A preliminary inquiry, however, indicates that neither state has as yet definitively ruled on this issue. Since the courts in Louisiana are apparently in conflict, see 64 ALR4th 668, the determination of Louisiana law on this issue poses some difficulties. We have found no Ohio cases that have directly addressed the present issue, although at least one Ohio appellate court has adopted the general principle that the term "occurrence" in a liability insurance contract should be construed broadly and liberally in favor of extending coverage to the insured. *Buckeye Union Ins. Co. v. Liberty Solvents and Chemicals Co.* (1984), 17 Ohio App.3d 127, 132, 477 N.E.2d 1227. Although this in itself is not conclusive of Ohio law on this issue, it is persuasive precedent. Thus, the factor of the ease of determination of the law to be applied tends to favor Ohio.

Turning to the more specific factors listed in Section 188, we find that these also favor application of Ohio law. Of greatest significance is subsection (d), the location of the subject matter of the contract. Comment *e* to Section 188 makes it clear that the "subject matter" of the contract is equated with the "insured risk", in accord with the principles of Section 193.

Subsection (e) lends further support to the conclusion that Ohio is the state with the more significant contacts. None of the defendant insurers has any significant contact with either Louisiana or Ohio in terms of domicile, residence, place of incorporation, or principal place of business, although most of the insurers are authorized to conduct insurance activities in both states. While B & W's place of incorporation is Delaware, and while it maintains a nominal residence in Louisiana, its domicile, principal residence, and principal place of business is in Ohio.

As used in the Restatement, "the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect ...". Comment *e* to Section 188, Restatement (Second) of Conflict of Laws. Assuming, as defendants suggest, that the ultimate delivery of the contract to McDermott in Louisiana was the last act necessary to make the contract binding, then Louisiana would be the place of contracting. However, Comment *e* to Section 188 places this factor in proper perspective:

Standing alone, the place of contracting is a relatively insignificant contact. To be sure, in the absence of an effective choice of law by the parties, issues involving the validity of a contract will, in perhaps the majority of situations, be determined in accordance with the local law of the state of contracting. In such situations, however, this state will be the state of the applicable law for reasons additional to the fact that it happens to be the place where occurred the last act necessary to give the contract binding effect. The place of contracting, in other words, rarely stands alone and, almost invariably, is but one of several contacts in the state. Usually, this state will be the state where the parties conducted the negotiations which preceded the making of the contract. Likewise, this state will often be the state of the parties' common domicil as well. By way of contrast, the place of contracting will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract, such as when a letter of acceptance is mailed in a railroad station in the course of an interstate trip.

While Ohio may still adhere in theory to the general principle that the law of the state where the contract is made governs interpretation of the contract, see *Ferrin, supra,* 21 Ohio St.3d at 44, 487 N.E.2d 568, the adoption of Section 188 dictates that this general principle is applicable only when no other significant factors outweigh the place of contracting. Such is not the case here.

In the present case, assuming that Louisiana is the place of contracting, this factor stands alone as the only significant contact with Louisiana. There is no common domicile between B & W and any of the defendants. Although some consultations regarding negotiations may have taken place between McDermott in Louisiana and Adams & Porter in Texas, negotiations were conducted primarily in states and fora other than Louisiana or Ohio. Comment *e* makes it clear that, under such circumstances, the place of negotiations is likewise of little significance:

> The place where the parties negotiate and agree on the terms of their contract is a significant contact. Such a state has an obvious interest in the conduct of the negotiations and the agreement reached. This contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone.

Lastly, the place of performance, subsection (c) to Section 188, is of no bearing in the present case. The only performance at issue herein is defendants' duty to pay B & W under the terms of the contract. In this day of computerized banking and electronic transfers, the place where payment is to be made or received is of little, if any, real significance.

In sum, an analysis of the present facts under Sections 6 and 188 leads to the conclusion that Ohio is the state with the more significant contacts, and that Ohio law should control the resolution of the present dispute.

*Constitutionality of Applying Ohio Law*

Defendants' final objection to the application of Ohio law is that it would be unconstitutional, because Ohio allegedly has no "... significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818, 105 S.Ct. 2965, 2978, 86 L.Ed.2d 628 (1985). Based on our analysis above, the court finds no merit in this contention.

*CONCLUSION*

The court finds that Ohio is the state with the more significant contacts with the parties and issues raised in the present case, and that therefore Ohio law will be applied.

IT IS SO ORDERED.

***ORDER***

On August 3, 1992, the court issued an order determining the law to be applied in interpreting the insurance contract at the heart of the above-captioned case. The court agreed with plaintiffs argument that Ohio law should govern. Defendants now ask this court to revisit this issue through a motion to reconsider. (Docket # 184.) Plaintiff filed a response and defendants replied thereto.

Motions to reconsider are rarely meritorious.

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. *Such problems rarely arise and the motion to reconsider should be equally rare.*

*Above the Belt, Inc. v. Mel Bohannon Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983) (emphasis added).

Defendants' motion does not raise sufficient grounds to merit reconsideration. The court examined a considerable amount of evidence in ruling on the original motion and has not been persuaded that the law has changed or that it misapprehended or misunderstood the defendants' arguments. Recon-

sideration is not merited. Defendants' motion is DENIED.

IT IS SO ORDERED.

Linda P. DITTO, Plaintiff,

v.

MONSANTO COMPANY,
et al., Defendants.

Nos. 5:91CV0722, 1:91CV1019.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 19, 1993.

Maurice L. Heller, Sr., Nurenberg, Plevin, Heller & McCarthy, Cleveland, OH, Joseph C. Kohn, Martin J. D'Urso, Kohn, Nast & Graf, Arnold E. Cohen, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Linda P. Ditto.

Thomas M. Parker, Lori L. Siwik, Roetzel & Andress, Akron, OH, for Monsanto Co.

John Sunderland, Julie D. Vannatta, Thompson, Hine & Flory, Columbus, OH, for ENSR.

Alton L. Stephens, Jr., Paul J. Schumacher, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, for Ohio Transformer Corp. and Controlled Power Corp.

## *MEMORANDUM OF OPINION*

### I. INTRODUCTION

MANOS, District Judge.

On April 19, 1991, Linda P. Ditto, plaintiff, filed Case No. 5:91CV0722 in federal court on behalf of her deceased husband, Robert V. Ditto ("Ditto"), against Monsanto Company, SunOhio n/k/a ENSR ("ENSR"), Ohio Transformer Corporation, and Controlled Power Corporation, defendants. On the same day she filed identical claims against these defendants in the Court of Common Pleas for Stark County. On May 24, 1991, the Stark County case was removed and docketed in this court as Case No. 1:91CV1019. For purposes of this memorandum and order both actions are considered together.

Linda Ditto claims that her deceased husband, Robert, was exposed to dielectric insulating fluids containing polychlorinated bi-

phenyls ("PCBs") from July 1979 until August 1988. Ditto worked at ENSR as a field mechanic, and later as a warehouse mechanic, using systems designed to remove PCBs from electrical transformers. ENSR serviced transformers—owned by electrical companies and others—which contained PCB dielectric fluids made by Monsanto, the sole manufacturer. Linda Ditto alleges that Robert Ditto contracted acute non-lymphocytic myelomonocytic leukemia from exposure to PCB's and died from complications of the disease.

On November 6, 1991, defendant ENSR was dismissed, with prejudice, by stipulation of the parties. On September 22, 1992, the plaintiff voluntarily dismissed, with prejudice, defendants Ohio Transformer Corporation and Controlled Power Corporation.

On September 18, 1992, defendant Monsanto Company filed its motion for summary judgment. For the following reasons, the motion for summary judgment is granted.

## II. FACTS

### 1. Background of PCBs

The parties stipulate that before the 1930's, the most common dielectric fluid used in electrical distribution systems was mineral oil. However, mineral oil is highly flammable and explosions could result from the failure of electrical equipment containing the oil. As a result, the use of mineral oil equipment carried an unacceptable risk.

In the early 1930's, the electrical equipment industry developed dielectric fluids containing PCBs as an alternative to mineral oil. PCBs do not conduct electricity and are fire and explosive resistant. In 1933 the United States government awarded patents to electrical equipment manufacturers, and in 1935 the National Electrical Code [1] permitted the use of PCBs in electrical equipment.

In 1935 Monsanto began to manufacture and sell dielectric fluids made pursuant to the specifications of the patents held by the electrical equipment manufacturers. The fluids contained PCBs.

Between 1935 and 1977 commercial mixtures of PCB dielectric fluids were manufactured by Monsanto and several foreign companies. Monsanto was the sole manufacturer of PCBs in the United States.

The fluids were sold in *bulk*, and were packaged and shipped in railroad cars, tank trucks and 55 gallon drums. Purchasers received warnings and handling instructions which cautioned against skin or clothing contact with PCBs or prolonged breathing of PCB vapors. Beginning in 1971, Monsanto supplied its customers with PCB Material Safety Data Sheets which it periodically updated.

Electrical equipment manufacturers, Monsanto's customers, sold or leased electrical equipment containing PCB dielectric fluid. Many pieces of the equipment were used in those locations where the fire and explosive resistant qualities of PCBs were desired by the ultimate purchaser or required by state or local fire codes.

Monsanto contends that it delivered the PCB dielectric fluids to its customers in bulk form. Monsanto's customers then sealed the appropriate amount of the fluid into metal casings, meant to be unsealed only by experienced personnel, and placed them in the transformers. The transformers were then sold to and serviced by customers of Monsanto's customer.

Monsanto states it had no control over the fluids after they reached its customer. It also states it had no control over safety communications concerning PCBs between its customer and the purchaser or servicer of the customer's equipment, and no way by which to know who might ultimately be exposed to the PCBs by servicing the transformers.

### 2. Health Issues Concerning PCBs and Continued Use

The parties further stipulate that the records, reports and other exhibits submitted by them indicate that in the late 1960's, environmental researchers reported evidence of the

1. The National Electrical Code is an advisory code resulting from the efforts of the insurance and electrical industries and architectural interests. It has been widely accepted and serves as the basis for many state and municipal electrical codes.

presence of PCBs in various environmental samples. Reports of adverse health effects following an incident in Japan in which individuals had accidentally ingested rice oil contaminated with PCBs were sent to Monsanto and, at this same time, Monsanto was cooperating with government research and conducting its own studies on PCB toxicity.

In February, 1970, Monsanto issued letters to its PCB dielectric fluid customers alerting them to the potential hazards of PCB exposure and recommending that they notify the equipment purchasers and servicers about the health and safety issues. The letter also stated that Monsanto would not be in contact with the ultimate consumers of the fluids and that it was relying on its customers to contact them.

In January, 1972, Monsanto ceased manufacturing and selling PCBs for any application except dielectric fluids for use in totally enclosed electrical systems.

Health concerns heightened in the mid–1970's and numerous studies were undertaken. However by 1988 researchers could pinpoint no demonstrable chronic health effects in humans, with the exception of chloracne.

### 3. The Regulation of PCBs

The parties exhibits show that by the 1970's the electrical equipment industry, including manufacturers and users, had more than forty years of experience and knowledge in the operation, use and servicing of equipment containing PCB dielectric fluids. In addition, they had experience with employees who handled PCB dielectric fluids and had prepared bulletins and material safety data sheets on the toxicity of PCBs.

The parties submitted exhibits indicating that from 1971 to 1974, Monsanto, electrical equipment manufacturers, electrical utilities, electrical equipment service companies, the EPA, the U.S. General Services Administration, the Tennessee Valley Authority, the U.S. Department of Agriculture, the U.S. Department of the Army, and others served on a committee to develop the American National Standards Institute's ("ANSI") standards for the safe use, maintenance, and disposal of PCB materials used in electrical

equipment. The ANSI standards included specific safety precautions for handling PCBs, and labeling requirements for tankcars, drums and cans to transport PCBs. Monsanto states, and the plaintiff does not contest, that it followed all the guidelines concerning the regulations and warnings as to PCBs.

In 1971 five departments of the executive branch of the federal government established an Interdepartmental Task Force on PCBs. Monsanto, the electrical equipment manufacturers, and others submitted information regarding the risks and benefits of PCBs at the request of the Task Force.

The Task Force made several findings and concluded that PCBs should be "restricted to essential or non-replaceable uses which involve minimal direct human exposure since they can have adverse effects on human health" but that the "use of PCBs should not be banned entirely."

In 1974 the U.S. Occupational Health and Safety Administration ("OSHA") adopted regulations establishing permissible exposure levels for humans. All employers handling PCBs were required to abide by the OSHA regulations in their places of employment.

In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601, *et seq.,* to regulate the use of industrial chemicals, including PCBs. The EPA stated that PCBs used in a totally enclosed manner "will not present an unreasonable risk of injury to human health or the environment."

### 4. SunOhio/ENSR and PCBs

SunOhio/ENSR states that at all times relevant to this action it was an entity engaged in the business of designing and building rigs to remove PCBs and other contaminants from transformer oil and also in the business of using the rigs for removing PCBs and other contaminants from the oil. SunOhio [2] was formed in 1976 as a partnership between Ohio Transformer Corporation, a transformer repair company, and Sun Company, a manufacturer of transformer dielectric fluids.

---

**2.** ENSR purchased SunOhio in 1988.

It further states, and the plaintiff does not contest, that it was formed to develop technology which would destroy PCBs, present as a result of contamination, in mineral oil transformer fluids, and to service potentially contaminated transformers. PCBs were not intended for use in mineral oil transformers. However, mineral oil transformers could become contaminated with PCBs when third parties used the same equipment to service both PCB transformers and mineral oil transformers.

In early 1979, in response to the Environmental Protection Agency ("EPA") regulations concerning PCBs, SunOhio/ENSR developed a mobile "PCBX" process to destroy PCBs in the transformer mineral oils.[3] In September 1979, a commercial-scale prototype reactor was constructed and tested. Using this mobile technology ENSR was hired as an independent contractor by owners of the electrical equipment to service mineral oil transformers contaminated with PCBs and reduce the PCB content of the oil to levels below the EPA PCB limits.

### 5. Robert V. Ditto

The parties stipulate that on April 21, 1989, Robert V. Ditto died of acute myelomonocytic leukemia and that prior to his death he had been employed by ENSR from July 1, 1979 to August 4, 1988. He worked in three capacities during his employment: 1.) he performed substation field service work from a mobile unit which traveled to sites requested by customers; 2.) he performed repair and maintenance of transformers at the substation; and, 3.) he was employed in the warehouse to maintain ENSR's equipment, including those potentially containing PCBs. Ditto was never employed by Monsanto.

From July 1979 until January 1981, Ditto worked in the field service department in a mobile service unit called a reclamation rig. The reclamation rig was sent into the field as needed and performed oil reclamation to destroy PCBs in mineral oil transformers. ENSR serviced only mineral oil based transformers but knew that it was possible that the mineral oil could become contaminated with PCBs.

That the owner or ENSR would do tests on the transformer to determine the level, if any, of PCBs in the transformer fluid, indicates that these companies were aware of the potential hazards of contamination of the mineral oil by PCBs. Safety equipment was supplied to Ditto by ENSR for his use when working on the mineral oil transformers.

In late 1980 or early 1981 Ditto continued to perform maintenance and repair work on transformers, but was no longer assigned to the mobile unit. Plaintiff states that Ditto regularly used all the safety equipment supplied to him by ENSR.

In 1982 Ditto was transferred to the warehouse division of ENSR and devoted about 25% of his time to maintenance work on PCBX rigs. He worked in the warehouse until 1988 and continued to use the safety equipment provided.

The plaintiff concedes that the possibility of exposure to PCBs through Ditto's employment was always expected, and that Ditto used the protective safety equipment supplied by ENSR. She also states that ENSR provided Ditto with information available on PCBs from the manufacturers.

In its motion for summary judgment, Monsanto states that:

1.) Plaintiff cannot prevail on her negligence and strict liability for failure to warn claims because Monsanto is a bulk supplier of dielectric insulating fluids containing PCBs to a sophisticated user, ENSR, and that therefore Monsanto had no duty to warn Ditto of the danger of PCBs.

2.) Plaintiff cannot prevail on her strict liability for defective design claim because Monsanto did not design the PCB dielectric fluids.

3.) Plaintiff cannot prevail on her strict liability claims under the consumer expectation test because Ditto's working with PCBs was not beyond his consumer expectation and he was so warned by his employer.

---

**3.** The PCBX process runs transformer mineral oil contaminated with PCBs through a closed-loop continuous circulation system until the PCBs in the oil are destroyed. The PCBX process does not service PCB transformers, only mineral oil transformers.

4.) Monsanto owed no duty to Ditto who was an employee of ENSR, an independent contractor engaging in potentially hazardous activities for profit.

5.) Plaintiff cannot prevail on her breach of warranty claims because Ditto was not in privity of contract with Monsanto, and a claim of breach of implied warranty merges with her strict liability claims.

## III. THE STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) sets forth the standard for granting a motion for summary judgment. It states in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .

This standard has been explained by the U.S. Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson* the Court set out the requisites needed to show there is no genuine issue as to a material fact. The Court stated:

> [a]s to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson* at 248, 106 S.Ct. at 2510.

The Court also held that "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

Regarding the existence of a genuine issue of material fact, the Court held that summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, the Court also noted that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. The nonmoving party has the burden of producing the evidence, and the "mere existence of a scintilla of evidence in support of the plaintiffs' position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512. If evidence is not presented, summary judgment is appropriate.

■ Once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586, 106 S.Ct. at 1335. However, any inferences from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* at 587, 106 S.Ct. at 1356.

In *Celotex* the Court explained that the nonmoving party must designate specific facts showing a genuine issue for trial. Summary judgment is appropriate if a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex* at 322, 106 S.Ct. at 2552. The moving party is not required to prove the absence of a genuine issue of fact, even with respect to an issue on which the nonmoving party bears the burden of proof. *Id.* at 325, 106 S.Ct. at 2554. "Instead ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

The *Celotex* Court also stated the "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses", *Id.* at 323–24, 106 S.Ct. at 2553, and that the summary judgment procedure should not be regarded as a "disfavored procedural shortcut" but should be viewed as "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inex-

pensive determination of every action.'" *Id.* at 327, 106 S.Ct. at 2555.

A thorough examination of all the evidence presented in this case indicates that there is no material issue as to the following facts: 1.) Monsanto warned its customers of the dangers inherent in exposure to PCBs, 2.) Monsanto's customers knew of the risks of PCBs and participated in government studies and committees designed to deal with the problem of PCB exposure, 3.) Ditto never worked for Monsanto or for a customer of Monsanto, and, 4.) Ditto died of myelomonocytic leukemia.

## IV. ANALYSIS

### 1. Bulk Supplier/Sophisticated User Defense

Plaintiff, Linda Ditto, claims that Monsanto was negligent and is strictly liable because of its failure to warn Ditto of the hazards of the PCBs contained in the mineral oil transformers. Monsanto claims that it had no duty to Ditto because it is a bulk supplier and ENSR is a sophisticated user of the product supplied.[4]

The Restatement (Second) of Torts § 388 states:

**Chattel Known to be Dangerous for Intended Use**

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Comment "n" to this section advises that the manufacturer's duty to warn may be discharged by providing information of the dangerous properties of the product to intermediaries, such as Monsanto's customers, *provided* Monsanto could reasonably rely on its customers to communicate the information to the ultimate users of the product or those who will be exposed to it.

Comment "n" also states that it is impossible to set forth any set of rules which automatically determine in advance whether one supplying the chattel has satisfied the duty to those who are to use it by informing the intermediary. However, the comment notes that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." Restatement (Second) of Torts, comment "n".

Although most negligence actions are resolved by submission to a jury, "it would be a mistake to conclude summary judgment is never appropriate in a negligence action." *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.1984) (quoting *Croley v. Matson Navigation Company*, 434 F.2d 73 (5th Cir.1970)).

■ The bulk supplier/sophisticated user doctrine has been recognized in Ohio, *Adams, supra;*[5] *Adkins v. GAF Corp.*, 923 F.2d 1225 (6th Cir.1991); *Smith v. Walter C. Best, Inc.*, 927 F.2d 736 (3rd Cir.1990) (following Ohio law), and can form the basis of a defense to a claim of strict liability in tort for failure to adequately warn of dangers inherent in a product.

---

**4.** The Ohio Supreme Court has recognized that the standard imposed upon the defendant in a strict liability claim based on inadequate warning is the same as that imposed by a negligence claim with the same basis. *Crislip v. TCH Liquidating Co.*, 52 Ohio St.3d 251, 556 N.E.2d 1177 (1990).

**5.** While the district court concluded that *Adams* was not a true "sophisticated purchaser" case, because, unlike this case, warnings were provided by the supplier to the employer, the commentaries have categorized the case as one involving the sophisticated purchaser defense. *See,* Note, *Failures to Warn and the Sophisticated User Defense,* 74 Va.L.Rev. 579, 605 (1988).

■ Monsanto claims it is a bulk supplier because it shipped its product in railroad cars, tank trucks and 55 gallon drums. The bulk seller doctrine applies when a product is sold in bulk to purchasers which then repackage [6] the product or incorporate it into another product as a component. *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

■ Plaintiff claims that Monsanto cannot qualify as a bulk supplier because it shipped its product in 55 gallon drums which Ditto may have used. However, the bulk supplier doctrine applies to manufacturers which ship in containers smaller than tank cars or trucks. *See Cohen v. Steve's Ice Cream*, 737 F.Supp. 8 (D.Mass.1990) (bulk supplier doctrine applied to manufacturer who sold a chemical in 50–gallon drums).

The plaintiff further claims that some of the 55 gallon drums used by SunOhio, and perhaps therefore Ditto, to collect waste from the clean up of spills may have been Monsanto's drums and should have had warning labels, but she offers no evidence that Monsanto or the electrical equipment manufacturers ever shipped any drums of dielectric fluids directly to SunOhio. The exhibits indicate that the fluids were shipped to the electrical equipment manufacturers who sealed them in the transformers.

Monsanto claims that its customers were sophisticated users. They were manufacturers of electrical equipment which repackaged Monsanto's product into their equipment which was sold to their customers.

From the affidavits, depositions, government reports, and internal memoranda from a variety of companies filed as exhibits to the defendant's motion for summary judgment and the plaintiff's brief in opposition to the motion, the facts indicate that Monsanto's customers were intermediaries on which Monsanto could rely to warn the ultimate users of the PCBs. They as well as Monsanto were knowledgeable about the risks of PCBs, had participated with Monsanto and others in studies of, and were members of committees related to, PCB toxicity and human health risks. In addition, they had knowledge of the federal government's guidelines as to the handling, destruction and disposal of PCBs, and were required to abide by the OSHA regulations as to PCBs in their workplaces.

The exhibits indicate that Monsanto knew its customers and knew that they, as well as it, were well aware of the dangers of PCBs. Monsanto supplied its customers with Material Safety Data Sheets which were periodically updated. It also wrote to its customers putting them on notice that Monsanto would not contact the ultimate users of its product and that it expected them to do so. Monsanto complied with the government's warning regulations for PCBs and knew that its customers must also comply.

Pursuant to the holding of the *Adams* court, the exhibits establish that Monsanto was a bulk supplier, and the electrical equipment manufacturers were sophisticated users who "repackaged" Monsanto's product for use in their product.

The "pivotal inquiry in determining whether [the bulk supplier/sophisticated user] defense is available is a fact-specific evaluation of the reasonableness of the supplier's reliance on the third party to provide the warning." *Adkins* at 1230. Plaintiff asserts that this defense always raises a question of fact for the jury because of the "reasonableness" standard. However, this is not reflective of the case law in this Circuit. In *Adams* the court applied the bulk supplier/sophisticated user defense and granted summary judgment for the defendant.

The *Adams* court granted a bulk supplier of a liquid chemical summary judgment upon a finding that it had no duty to warn the employees of its purchaser. The court held that the supplier had no duty to warn the purchaser's employees because the purchaser knew of the chemical's dangers and had exclusive control over its employees and the chemical after delivery.

---

**6.** Plaintiff presents no evidence that Monsanto's product was not "repackaged" by the electrical equipment manufacturers.

The court also held that there was no evidence that the defendant was familiar with the facility where the plaintiff was exposed, that it could have placed warnings on the product, or that it did not warn its own customers. *Id.* at 1231.

Under the holding in *Adams,* Monsanto had no duty to warn the employees of SunOhio/ENSR. The electrical equipment manufacturers which sealed the PCBs in the equipment, and SunOhio/ENSR which serviced the equipment, knew of the dangers of PCBs, the manufacturers had exclusive control over the fluids and their employees after Monsanto delivered the product, and Monsanto's customers had a duty to warn the ultimate user of the dangers of servicing their product, the transformers.[7]

In addition, the exhibits submitted by both parties indicate that Monsanto knew the dielectric fluids containing the PCBs were "repackaged" and sealed in the transformers by the electrical equipment manufacturers prior to sale or servicing of the transformers. Monsanto had no way to put a warning on the product, no way by which to know or become familiar with who purchased or serviced the equipment, and no way by which to know for whom Ditto worked or the conditions under which he serviced the electrical equipment.

Because it was reasonable for Monsanto to rely on its customers, the electrical equipment manufacturers, to relay appropriate warnings to the ultimate purchasers of the electrical equipment, the bulk supplier/sophisticated user defense is available to it.

As a result, Monsanto owed no duty to Ditto to warn him of the potential dangers of PCBs when servicing transformers using SunOhio's PCBX system, and Ditto cannot prevail on the theory of negligence and strict liability for failure to warn.

### 2. Strict liability

Ohio Rev.Code Ann. § 2307.75 states, in part:

[A] product is defective in design ... if either of the following applies:

(1) When it left the control of its manufacturer, the foreseeable risks associated with its design ... exceeded the benefits associated with that design ...;

(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner....

(E) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by a characteristic of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

(F) A product is not defective in design or formulation if at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce.

Ohio Rev.Code Ann. § 2307.75.

### a. Defective Design or Formulation

Strict liability in tort rests on proof of a defect in the design of a product if it is not "of good and merchantable quality, fit and safe for ... [its] ordinary intended use." *Lonzrick v. Republic Steel Corp.,* 6 Ohio St.2d 227, 218 N.E.2d 185 (1966). In order to establish a prima facie case, the plaintiff has to specifically identify a defect and prove that the defect was the proximate cause of the injury. *State Farm Fire & Casualty Co. v. Chrysler Corp.,* 37 Ohio St.3d 1, 523 N.E.2d 489 (1988).

Liability does not arise simply because the defendant manufactured the product which allegedly caused injury to the

---

7. In fact, Monsanto had ceased PCB sales prior to Ditto's employment at SunOhio/ENSR and could not have known that SunOhio/ENSR would develop its PCBX system to decontaminate mineral oil.

plaintiff. *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424 N.E.2d 568 (1981).

■ The parties agree that in 1933, patents were issued to electrical equipment manufacturers to manufacture dielectric fluids containing PCBs. Monsanto entered the business in 1935 and made the fluids for the manufacturers pursuant to the specifications in the patent.

The product was designed and formulated to be exactly what Monsanto manufactured— dielectric fluid containing PCBs—and was fit for its specific, intended use.

The plaintiff does not assert any design defect in the dielectric fluids and does not assert that there was an alternative design or formulation of the dielectric fluids which would have been fit for the fluids' intended use.

### b. Consumer Expectation test.

"A product is defective under Ohio law if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Delk v. Holiday Inns, Inc.*, 545 F.Supp. 969, 971 (S.D.Ohio 1982). "The design of a product cannot be held defective or unreasonably dangerous ... unless the product is being used in an intended or reasonably foreseeable manner." *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 472 N.E.2d 707, 711 (1984). "Furthermore, a manufacturer need not anticipate all uses to which its product may be put, to guarantee that the product is incapable of causing injury in all its possible uses." *Id.* (citing *Lonzrick*, 218 N.E.2d 185 (Ohio 1966)).

The plaintiff concedes that Ditto was at all times aware of the intended use of SunOhio's PCBX system and the potential presence of PCBs when working with the system. Ditto did not use PCBs, he used the SunOhio PCBX system designed to destroy PCBs in mineral oil.

Monsanto did not produce the PCBX system or the mineral oil containing PCBs. The PCBX system was sealed, and specific instructions for techniques to be followed in the event of contact with the oil were clearly spelled out to SunOhio's customers.

Ditto's employer was also not a consumer of PCBs. A portion of his job was to operate a rig designed to remove PCBs from contaminated mineral oil. Monsanto could not reasonably foresee that SunOhio would invent a rig to remove PCBs from contaminated mineral oil and had no way by which to know who might possibly come into contact with PCBs through the contaminated oil.

The plaintiff, however, contends that Monsanto had a duty to warn about the dangerousness of PCBs under the consumer expectation theory of recovery. Viewing the facts in the light most favorable to the plaintiff, there are no facts alleged to show Ditto's employer was a "consumer" or "user" of PCBs, or that Monsanto could have anticipated the "use" to which SunOhio put its product.

### 3. SunOhio as an Independent Contractor.

■ The plaintiff and Monsanto agree that SunOhio was an independent contractor and was an expert service company in the business of handling electrical equipment containing dielectric fluids with PCBs. Ditto was an employee of SunOhio, not Monsanto.

In *Wellman v. East Ohio Gas Co.*, 160 Ohio St. 103, 113 N.E.2d 629, 632 (1953), the Ohio Supreme Court held that the independent contractor, not the utility, was liable for the plaintiff's injuries because the contractor knew the condition of danger which resulted in plaintiff's injury. The plaintiff in this case states that this holding means that the contractor must know the exact danger to which the individual is exposed, in this case leukemia. In the absence of such knowledge by the contractor, the manufacturer is liable for the plaintiff's injuries unless it seeks him or her out and gives specific warnings.

■ However, this is not a proper reading of Ohio law. *Wellman* holds that the entity employing an independent contractor has no duty to the contractor's employees when the contractor undertakes work involving "real or potential dangers." *Id.* 113 N.E.2d at 630. Summary judgment is appropriate, under *Millhouse v. General Tire and Rubber Co.*, 9 Ohio App.3d 203, 459 N.E.2d

623, 625 (1983), when the independent contractor is "very familiar" with the pertinent dangers.

From the exhibits attached to its motion Monsanto has shown that SunOhio was "very familiar" with the pertinent dangers. SunOhio provided many pages of detailed written instructions concerning how to conduct oneself when exposure to PCBs had occurred.

There is no dispute that Ditto knew from the outset of his employment that he would be working with toxic and dangerous chemicals, that SunOhio supplied him with safety equipment which he used, and that SunOhio gave him verbal and written instructions on how to handle the electrical equipment. Plaintiff also concedes that Ditto knew the fluids could be carcinogenic.

On these facts, Monsanto cannot be held liable for injuries to employees of SunOhio, an independent contractor hiring individuals to work with toxic and potentially harmful chemicals.

### 4. Breach of Warranty

Finally, plaintiff claims that the PCB dielectric fluids were defective because they did not conform to representations made by Monsanto. For plaintiff to establish a claim of breach of warranty in tort she must allege and prove 1.) the existence, nature and extent of the express warranty issued by Monsanto, 2.) that Ditto relied on the warranty, 3.) that the warranty was breached and 4.) that Ditto's injuries were proximately caused by the breach of warranty. *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965); *Miles v. Kohli & Kaliher Associates, Ltd.*, 917 F.2d 235 (6th Cir.1990).

A claim of breach of implied warranty is virtually indistinguishable from strict liability in tort. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977). Implied warranty in tort claims merge with strict liability claims. *Id.*

The plaintiff offers no evidence to indicate that Monsanto made any representations regarding PCBs or PCB dielectric fluids to Ditto. There can be no claim of breach of express warranty because the plaintiff does not allege facts sufficient to establish that there was any express warranty.

The breach of warranty claim must be a breach of implied warranty which merges with her strict liability claim, and for which, as stated above, summary judgment is appropriate.

### V. CONCLUSION

For the foregoing reasons, Monsanto is entitled to summary judgment on all the plaintiff's claims. Accordingly, Monsanto's motion for summary judgment is granted.

IT IS SO ORDERED.

**UNITED STATES of America, et al., Plaintiffs,**

v.

**CITY OF TOLEDO, Defendant.**

**No. 3:91CV7646.**

United States District Court, N.D. Ohio, Western Division.

March 31, 1994.

See also, 867 F.Supp. 598.

Verne K. Armstrong, Office of the U.S. Atty., Toledo, OH, Steven D. Ellis, Lisa A. Cherup, Kurt F. Zimmerman, Dept. of Justice, Environmental Enforcement Section, Washington, DC, Constance Ann Snyder, Meister, Ayers & Meister, Toledo, OH, for the U.S.

Margaret A. Malone, Office of the Atty. Gen., Columbus, OH, Joan R. Kooistra, Susan E. Ashbrook, Office of the Asst. Atty. Gen., Environmental Enforcement Section, Columbus, OH, for the State of Ohio.

Charles R. McElwee, Van Carson, Squire, Sanders & Dempsey, Cleveland, OH, Keith A. Wilkowski, City of Toledo, Dept. of Law, Toledo, OH, for the City of Toledo.

## MEMORANDUM AND ORDER

JOHN W. POTTER, Senior District Judge:

This is an action under federal and state anti-pollution statutes in which the State of Ohio Environmental Protection Agency (State EPA) seeks to recover civil penalties for the defendant City of Toledo's alleged violations of its National Pollution Discharge Elimination Systems Permit (NPDES Permit). Pending are cross-motions for summary judgment. For the reasons that follow, the State EPA's cross-motion will be granted in part and denied in part, and the City's motion will be granted in part and denied in part.

When the United States Environmental Protection Agency instituted this suit, the State of Ohio was a defendant. On motion of the State EPA, the parties were realigned so that the State EPA became a plaintiff. At that point, the State EPA's cross-claim against the City became a complaint.

■ The State EPA asserts its claims against the City pursuant to 33 U.S.C. § 1365, which authorizes citizen suits. Section 1365(g) states that " 'citizen' means a person, or persons having an interest which is or may be adversely affected." The term "person" is defined in § 1362(5) to include states.

Despite the unambiguous clarity of these provisions, the City seeks summary judgment on the basis that the State is not a "citizen" (i.e., not a "person") capable of maintaining a citizen suit under the Clean Water Act. The City dismisses straightforward declarations that states are citizens for purposes of maintaining an action under the Act by the Supreme Court, *United States Dept. of Energy v. Ohio*, — U.S. —, —, 112 S.Ct. 1627, 1634, 118 L.Ed.2d 255 (1992); First Circuit, *Massachusetts v. United States Veterans' Admin.*, 541 F.2d 119, 121 n. 1 (1st Cir.1976); and Seventh Circuit in *Illinois v. Outboard Marine Corp.*, 619 F.2d 623, 631 (7th Cir.1980), because they are dicta. *See also Nat'l Wildlife Federation v. Ruckelshaus*, 99 F.R.D. 558, 560 (D.N.J.1983) ("it is well settled that a state is a citizen within the meaning of this section and thus authorized to bring suit"). *Contra, California v. Dep't of Navy*, 631 F.Supp. 584, 587 (N.D.Cal. 1986); *United States v. City of Hopewell*, 508 F.Supp. 526, 528 (E.D.Va.1980).

The legislative history of § 1365 raises questions about whether a state is a citizen and thus able to maintain a citizen's action against a polluter; however, the plain words of the statute are clear and unambiguous: "citizens" can bring such actions, and states are "citizens."

The State's present position is that it is maintaining this action under § 1365(b)(1)(B), which excuses it from not having given the prior notice to the alleged violator required by § 1365(b)(1)(A). In other words, the State views itself as an intervening party participating in a civil action "to require compliance" with the requirements of the Act and the City's NPDES Permit.

■ The Court agrees with the City that a citizen-intervenor under § 1365(b)(1)(B) can only seek remedies for ongoing violations of federal law and not civil penalties for past violations. *See Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); *Outboard Marine*, 619 F.2d at 631. Thus, to the extent that the State, like the United States, seeks abatement in the form of injunctive relief which is requested by both parties, the State can maintain its federal causes of action.

■ In order to survive summary judgment, the State must present evidence that demonstrates either (1) that violations continued on or after the date the complaint was filed, or (2) that a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. *Allen County Citizens for the Environment v. BP Oil Co.*, 762 F.Supp. 733, 739 (N.D.Ohio 1991), *aff'd*, No. 91–3698, 1992 WL 138410, 1992 U.S.App. LEXIS 14906 (6th Cir. June 18, 1992).

In view of the Court's determination that the State can assert federal law claims only to the extent that abatement is sought, the City is entitled to summary judgment with regard to the State's fourth claim (relating to lack of properly certified manager) and its fifth claim (alleging failures to report in October and December, 1988, and failures to report supplemental monitoring results from July 5, 1988 through December 26, 1989).

The State's other claims have alleged continuing violations which are supported by evidence that violations have occurred since the State intervened in 1991. (Doc. 148, Affidavit of Elizabeth Wick.) As to those claims, the City's motion for summary judgment shall be granted with regard only to the prayer for civil penalties under federal law; that motion shall, however, be overruled with regard to the State's demand for injunctive relief.

 The City seeks dismissal of the state claims on the basis that this Court should decline to exercise its supplemental (i.e., pendent) jurisdiction. The City's request is not well taken.

 A federal court has discretion to exercise its supplemental jurisdiction when at least one federal claim of substance and pendent state claims share a common nucleus of operative fact. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Kayser–Roth Corp. v. Textile Workers Union*, 479 F.2d 524, 526 (6th Cir.), *cert. denied*, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). Although the portion of the State's complaint that alleges federal claims has been cut down, it has not been eliminated. The pendent state claims are substantially congruent with the claims brought by the United States. Discovery has been extensive, and apparently has been unimpeded by the presence of the pendent state claims. Final resolution of all matters in dispute will more likely be accomplished if the State is allowed to continue with its pendent claims against the City. Therefore, the motion to dismiss the State's other federal and all the state claims, to the extent that the motion is based on the proposition that an intervenor can only seek relief vis-a-vis ongoing federal claims, will accordingly be denied.

Rulings on the State's summary judgment motions as to essentially equivalent claims in the complaint by the United States are being filed contemporaneously with this Memorandum & Order. Those rulings are incorporated in this Order so that the State EPA's motion will be: (1) granted as to the first (federal) and sixth (state) claims (effluent violations); (2) denied as to the second (federal) and seventh (state) claims (bypass violations); (3) granted as to the third (federal) and eighth (state) claims (monitoring and reporting violations); (4) granted as to the ninth (state) claim (uncertified plant management); (5) granted as to the tenth (state) claim (reporting violations).

The City's motion for summary judgment shall be granted except insofar as the State EPA's federal claims for relief are limited to abatement of continuing violations. The City's motion for summary judgment as to the second (federal) and seventh (state) claims, (the bypass claims) must be denied due to the existence of disputes of material fact and the movant's failure to show that it is entitled to judgment as a matter of law, the same grounds for denial of plaintiffs' motions on the same claims.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that defendant City's motion for summary judgment is denied as to all claims except its federal claims four and five; and it is

FURTHER ORDERED that plaintiff State of Ohio's motion for summary judgment is granted as to all claims except federal claims four and five relating to non-continuing violations, federal claim two, and state claim seven relating to bypass violations.

UNITED STATES of America, et al., Plaintiffs,

v.

CITY OF TOLEDO, Defendant.

No. 3:91CV7646.

United States District Court, N.D. Ohio, Western Division.

March 31, 1994.

See also, 867 F.Supp. 603.

Verne K. Armstrong, Holly Taft Sydlow, Office of the U.S. Atty., Toledo, OH, Steven D. Ellis, Lisa A. Cherup, Kurt F. Zimmerman, Dept. of Justice, Environmental Enforcement Section, Washington, DC, and

Constance Ann Snyder, Meister, Ayers & Meister, Toledo, OH, for the U.S.

Margaret A. Malone, Office of the Atty. Gen., and Joan R. Kooistra, and Susan E. Ashbrook, Office of the Asst. Atty. Gen., Environmental Enforcement Section, Columbus, OH, for Ohio, State of.

Charles R. McElwee, Van Carson, Squire, Sanders & Dempsey, Cleveland, OH, and Keith A. Wilkowski, City of Toledo Dept. of Law, Toledo, OH, for Toledo, City of.

## MEMORANDUM AND ORDER

JOHN W. POTTER, Senior District Judge.

This is an action brought by the United States Environmental Protection Agency (EPA) and the Ohio Environmental Protection Agency (State EPA) against the City of Toledo (City). The complaint alleges that discharges of various pollutants from the City's Bay View Wastewater Treatment Plant October 1, 1986 through April 30, 1991, exceeded limits imposed by permits issued by the State EPA, and thus, the Federal Clean Water Act, 33 U.S.C. § 1251, et seq.

The EPA has filed a motion for partial summary judgment (Doc. 69), to which the City has responded (Doc. 84), and the plaintiff has replied (Doc. 94). Defendant has also filed a surreply (Doc. 106) and the State EPA has filed a memorandum supporting the EPA's motion (Doc. 99).

For the reasons that follow, the motion will be granted.

### 1. Factual Background

In order to discharge pollutants, the City was required to obtain permits under the National Pollutant Discharge Elimination System (NPDES). Those permits, which were issued by the State EPA pursuant to the Clean Water Act, set effluent limits (i.e., limitations on the extent of pollution discharge).

The NPDES permits also require self-monitoring and periodic Discharge Monitoring Reports (DMRs), which, under the system established in this case, were known as Monthly Operating Reports (MORs). The reports must be signed by a qualified person who certifies that information being reported is true, accurate, and complete. 40 C.F.R. § 122.22. In this case, the MORs were filed with the State EPA.

Plaintiff's complaint is based on a comparison of the MORs with the terms and conditions of the NPDES permits. In response to plaintiffs' contention that such comparison shows nearly 200 violations during the period covered by the complaint, the City asserts: (a) the time frames used by the EPA to determine whether violations occurred is inconsistent with the time frames used by the City in its MORs and the State EPA, which reviewed and responded to the MORs; (b) genuine disputes of fact exist about the accuracy of the MORs in light of errors in measurement and defects in the measuring equipment; (c) genuine factual disputes exist with regard to the City's "upset" defense.

In its reply (and, to some extent, in its original memorandum), plaintiff successfully addresses each of these contentions. In addition, as the plaintiff points out, the City has at no point denied that violations occurred.

### 2. Legal Issues

#### a. Time Frames

The NPDES permits provide that compliance is evaluated in the context of seven day and thirty day periods. The City contends that these straightforward requirements have been misapplied by the plaintiff and that such misapplication creates a genuine dispute of material fact concerning the plaintiff's claim that the City has violated the substantive terms and conditions of the permits.

With regard to the seven day period, the permits provide, in pertinent part, that the " '*7–day load limitation*' is the total discharge by weight during *any* 7–day period" (emphasis supplied) and the " '*7–day concentration limitation*' means the arithmetic average of all the determinations of daily concentration limitation made during *the* 7 day period" (emphasis supplied).[1] The thirty day

---

1. "Load" based limitations are the actual quantity by weight of a particular pollutant discharged during a specified period. Such limitations are generally expressed in terms of kilograms per

periods are similarly defined (i.e., by reference to "any" thirty day period).

When compiling its list of violations, the plaintiff began its "seven day" review with the report covering October 1, 1986, so that the first seven day period ran through October 7, 1986; the second seven day period went from October 8 through October 15, 1986; the third period ran from October 16 through October 23, 1986; the fourth period covered October 23 through October 30, 1986; and the fifth period encompassed October 31 through November 6, 1986.

In its dealings with the State EPA, to which the City was reporting, it would start a new seven day period on the first of each month. Thus, except in February, there would be days left over that were not covered by the City's seven day periods.

To compute thirty day periods, the plaintiff used the method used by the City in its reports to the State EPA. Those reports (and, thus, plaintiff's determination of violation of thirty day limits) were based on a calendar month, rather than intervals of exactly thirty days.

The City makes much of plaintiff's "manipulative" manner of applying the seven day time frame and the fact that different degrees of violation, and in some instances, no violations, would be found to have occurred if its approach, as endorsed by the State EPA's acquiescence as the reports were being filed, were followed.

In view of the differences resulting from the distinct time frames, the City claims that there is a genuine dispute of material fact that forecloses summary judgment; namely, what is the "correct" time frame.

The Court disagrees with the City's premise and its conclusion. First, neither time frame is necessarily incorrect. The permit expressly refers to "any" seven day (and "any" thirty day) period. In light of that express term, the plaintiff clearly could make its computations as it did. Second, this is not a dispute of fact; it is a disagreement that is amenable to a ruling of law.

■ Third, and perhaps most important, the City has not shown that, even if the dispute about the appropriate seven day time frame is one of fact, it is a *material* fact. It is not a material fact because, despite the vigor and length with which the City asserts its position, the City has made no contention whatsoever that the number of violations would change, much less change significantly, if plaintiff used the wrong method in making its computations.

■ The sole case cited by the City in support of its contention, *Northwest Environmental Defense Ctr. v. Unified Sewerage Agency of Washington County*, No. 88–1128–FR, 1989 WL 81608 (D.Or. July 7, 1989), is neither on point nor persuasive. That decision is not on point because the terms of the permit in that case differed from the terms of the permit in this case. It is not persuasive because the court in that case fails to recognize that the determination of the meaning of a permit's terms is a matter of law, not of fact. Thus, even if there is a dispute about an ambiguous term, that term remains unaltered by such dispute, and it is for the court, not a jury, to adjudicate that dispute. That decision is likewise unpersuasive because its holding (that differing methods of computation foreclosed summary judgment) is unaccompanied by any explanation of the reasons for that holding.

Thus, even if that decision were not distinguishable, it would not be controlling or authoritative. The Court concludes, accordingly, that there is no genuine dispute of material fact with regard to the violations of the seven-day concentration limitations.

Plaintiff is willing to accept the City's method of computing seven day loading averages and abandon its original method of computing violations of thirty day averages and thirty day concentration and loading limitations and has recharacterized its "not to exceed" violations.

A revised list of violations has been submitted by the plaintiff in its reply to the

---

day (Kg/day). "Concentration" based limitations refer to the strength of the pollutant in a discharge. Such limitations are generally expressed in terms of milligrams per liter (mg/l). Load is a function of the concentration times the total flow for the particular day.

City's response to the motion for partial summary judgment. The Court finds that there is no genuine dispute about any of these violations, and the plaintiff, accordingly, is entitled to summary judgment as to the facts asserted in that exhibit.

### b. Sampling Error Defense

■ The City asserts that there is a genuine dispute of material fact with regard to much of the data reflected in its MORs, because of its belief that such data was not accurate as reported. Thus, it argues, summary judgment cannot be granted. As the plaintiff points out, to the extent that there is a dispute about the accuracy of the data, that dispute relates only to 16 of the 191 violations alleged by the plaintiff.

The affidavit submitted in support of the claim of inaccuracy (Doc. 84, Exh. A, Attachment H40) is, as plaintiff contends, conclusory and speculative. The fact that equipment was found to have been operating improperly on one day does not necessarily mean that it performed inadequately at any earlier time; the affiant's suggestion that such was the case is, without a substantially stronger basis for his opinion, speculative.

■ Even where concurrently obtained samples from other testing devices showed different values, it is appropriate, in the Court's view, to accept the reported values as the accurate value. There is no indication that the City treated them as otherwise prior to this lawsuit. The City was required to certify the accuracy of the data in its MOR. *See* 40 C.F.R. § 122.22. Its post-hoc rationalization, presented in the form of an unsubstantiated, speculative affidavit, contradicts the prior certifications and, in the Court's opinion, does not meet the requirement of Fed.R.Civ.P. 56(e) that evidence offered in support of an opposition to summary judgment be admissible.

Where a permittee gathers inconsistent data, it should resolve any inconsistency as soon as possible. If it does not do so, and reports a higher value, it should not be heard later to dispute the accuracy of its own work and reports. Certainly, last minute speculation of the sort set forth in the City's affidavit fails to create a genuine issue of material

fact concerning the sixteen violations that it seeks to call into question.

The more appropriate time for asserting such error is, in the Court's view, during the penalty phase. If at that point there appears to be a firm basis for concluding that the reading as reported was substantially inaccurate and if there is an acceptable explanation for the failure to have complied with the requirement of making accurate reports, that factor can be taken into consideration when deciding whether a penalty should be imposed.

The policy of speedy determination and adjudication of violations would hardly be well served if claims such as those made by the City were sufficient to deflect plaintiff's motion for summary judgment. As have several others, this Court concludes that the City's insufficiently supported claims of inaccurate readings and reports do not create a genuine issue of material fact. *See, e.g., Atlantic States Legal Foundation v. Al Tech Specialty Steel Corp.*, 635 F.Supp. 284, 289 (N.D.N.Y.1986); *Student Public Interest Research Group, Inc. v. P.D. Oil & Chemical Storage, Inc.*, 627 F.Supp. 1074, 1089 (D.N.J. 1986).

### c. Upset Defense

■ Plaintiff asserts that the "upset defense" set forth in 40 C.F.R. § 122.41(n)(1) is unavailable to defendant. An upset is defined in the regulation as: "an exceptional incident in which there is unintentional and temporary noncompliance with the technology based permit effluent limitations because of factors beyond the reasonable control of the permittee." *Id.*

To prevail on its upset defense, the City must show: (a) occurrence of an upset and identification of its cause; (b) proper operation of the facility at the time; (c) appropriate notice to the regulating authority; and (d) compliance with required remedial measures. 40 C.F.R. § 122.42(n)(3).

As plaintiff points out, the City has not shown which violations are attributable to upsets, much less the cause for those incidents. It likewise has not shown that the plant was operating properly at the time of the alleged, but unspecified upsets. There is

no indication in the City's materials that it provided the requisite notice to the State EPA.

The claim of upset(s) cannot, accordingly, defeat the plaintiff's motion for partial summary judgment.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that plaintiff's motion for partial summary judgment be, and the same hereby is, granted.

**UNITED STATES of America, et al., Plaintiffs**

**v.**

**CITY OF TOLEDO, Defendant.**

**No. 3:91CV7646.**

United States District Court, N.D. Ohio, Western Division.

March 31, 1994.

605

Verne K. Armstrong, Holly Taft Sydlow, Office of the U.S. Atty., Toledo, OH, Steven D. Ellis, Lisa A. Cherup, Kurt F. Zimmerman, Dept. of Justice, Environmental Enforcement Section, Washington, DC, and Constance Ann Snyder, Meister, Ayers & Meister, Toledo, OH, for the U.S.

Margaret A. Malone, Office of the Atty. Gen., and Joan R. Kooistra, Susan E. Ashbrook, Office of the Asst. Atty. Gen., Environmental Enforcement Section, Columbus, OH, for Ohio, State of.

Charles R. McElwee, Van Carson, Squire, Sanders & Dempsey, Cleveland, OH, and Keith A. Wilkowski, Dept. of Law, Toledo, OH, for Toledo, City of.

## MEMORANDUM AND ORDER

JOHN W. POTTER, Senior District Judge:

This is a suit by the United States Environmental Protection Agency (EPA) and State of Ohio Environmental Protection Agency (State EPA) against the City of Toledo in which plaintiffs allege that the City's Bay View Waste Water Treatment Plant has been operated in violation of the Federal Clean Water Act, 33 U.S.C. § 1251 et seq.

Pending is plaintiff EPA's Second Motion for Partial Summary Judgment on Liability (Doc. 122). For the reasons that follow, the motion, which relates to claims added by the

plaintiff's amended complaint, shall be denied in part and granted in part.

The counts to which this motion relates allege that the City has: (a) violated effluent limits prescribed by its 1991 National Pollution Discharge Elimination System (NPDES) Permit; (b) improperly, and in violation of its 1985 Modified and 1991 Permits, bypassed untreated and partially treated sewage; (c) in violation of the 1985 and 1985 Modified Permits failed to comply with sampling and reporting requirements; and (d) for several years did not have a properly certified plant manager, despite mandates in the 1985 Modified and 1991 Permits that the plant be under such management.

Filed herewith is a Memorandum and Order granting plaintiff's first Motion for Partial Summary Judgment, relating to the claims in plaintiff's original complaint 867 F.Supp. 598. To the extent that rulings in the Memorandum and Order are pertinent with regard to the pending motion, they are incorporated by cross-reference.

### A. Exceedences

Plaintiff asserts that effluent limits contained in the 1991 NPDES Permit were exceeded as set forth in Exhibit L (Doc. 122, Exh. L). That list shows that limits for ammonia were exceeded on eighty-six occasions, toxicity twice, and zinc once.

The City does not dispute the accuracy of the data contained in the list or that the limits of its permit were exceeded. It contends, however, that compliance was excused by the Director of the State EPA in a document entitled Director's Final Findings and Orders (DFFO) issued on May 31, 1991 (Doc. 142, Exh. G, Attachment 7). There appears to be no dispute between the parties that, if the DFFO is controlling, rather than requirements of the NPDES Permit, the plaintiff is not entitled to summary judgment.

Plaintiff argues that the DFFO "is merely an administrative enforcement decision issued by the State [that] does not modify or change the permit in any way and has no legal effect on any efforts the United States may make to enforce the terms of the Permit." (Doc. 122 at 20.)

The City, in response, argues: (a) the DFFO "suspended" the limitations imposed by the NPDES Permit and that such suspension was permissible under Ohio Rev.Code § 6111.03(H); (b) pursuant to 33 U.S.C. § 1319(g)(6)(A)(iii), issuance of the DFFO preempts the EPA's present enforcement efforts; and (c) the plaintiff is equitably estopped from asserting its claims (Doc. 142 at 7–20).

Plaintiff, in reply: (a) asserts the supremacy of the permit over any alteration by the State EPA absent compliance with applicable provisions of and procedures provided by the Code of Federal Regulations; (b) finds no authority in Ohio Rev.Code § 6111.03(H) to suspend a provision of the NPDES Permit; and (c) disputes the availability or applicability of the doctrine of equitable estoppel.

The Court finds defendant's contentions without merit. As argued by the plaintiff, the EPA retains authority to enforce the provisions of federal law whenever the agency determines that such actions are necessary in order to enforce the Clean Water Act: "Nothing in this section [NPDES] shall be construed to limit the authority of the [EPA] Administrator to take action pursuant to Section 1319 [Enforcement] of this title." 33 U.S.C. § 1342(i). Under 33 U.S.C. § 1319(a)(1), (3), the EPA can institute judicial action whenever the Administrator finds a violation of the Act.

One effect of these provisions is to ensure that state agencies, for whatever reason, do not directly or indirectly defeat implementation of the provisions of the Clean Water Act. To accomplish that purpose, the EPA must have the authority and ability to respond to violations of the Act (i.e., violations of a NPDES Permit), even though such violations have been sanctioned by a state agency. *United States v. Lowell*, 637 F.Supp. 254, 257 (N.D.Ind.1985).

In light of the supremacy of federal law in this area, a state cannot suspend the operation of the terms and conditions of a NPDES Permit without following appropriate procedures. *United States v. Ohio Edison Co.*, 725 F.Supp. 928 (N.D.Ohio 1989); *United States v. Sharon Steel Corp.*, 30

Env't. Rep. 1778 (N.D. Ohio 1989) (Doc. 122, Exh. Y); *United States v. City of Bedford,* No. C85–2897 (N.D. Ohio July 14, 1988) (Doc. 122, Exh. Y). Contrary to the City's contentions, the Court does not find authority for the proposition that a DFFO constitutes a basis for suspension of a Permit's conditions in Ohio Rev.Code § 6111.03(H)(4). This absence of specific authority is noteworthy in light of the specific provisions of 40 C.F.R. § 124.5 (Modification, Revocation, and Reissuance, or Termination of Permits).

■ To the extent that the City claims that the plaintiff's claims are barred by operation of 33 U.S.C. § 1319(g)(6)(A)(iii), which bars actions for civil penalties where the State has issued a final order that is not subject to further judicial review and the violator has paid a penalty assessed under that section, the Court finds that provision to be inapplicable. There is no evidence in the record that a penalty was assessed or paid. Thus, § 1319(g)(6)(A)(iii) does not bar this action.[1]

■ The City's contentions regarding equitable estoppel are likewise unavailing. The elements of equitable estoppel were set forth by the Sixth Circuit in *Apponi v. Sunshine Biscuits, Inc.* 809 F.2d 1210, 1217 (6th Cir. 1987):

(1) conduct or language amounting to a representation of material facts; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend the representation to be acted on or act such that the party asserting the estoppel has a right to believe it so intended; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must detrimentally and justifiably rely on the representation.

The City's principal contention is that, once having been granted the exception by the DFFO, it was entitled to rely on that document and should not now be held accountable for its actions.

Both parties note that, in order to give rise to equitable estoppel, the City must show that the plaintiff engaged in "affirmative misconduct." *See United States v. Guy,* 978 F.2d 934, 937 (6th Cir.1992). Although the City has developed a record of systemic indifference to the situation caused to permit holders by the EPA's failure to clarify the lawfulness of reliance on DFFOs, the Court does not find that this meets the demanding standard of *affirmative* misconduct.

To establish such misconduct in the context of this litigation, the City would, in the Court's opinion, have to show that from the outset or very shortly thereafter the EPA knew that the City was not in compliance, affirmatively caused the City to believe that its actions were lawful so far as the EPA was concerned, and anticipated that it would institute legal action of the sort presently before the Court.

■ Although the doctrine of equitable estoppel may be used in circumstances of deliberate and egregious misconduct where a governmental agency has acted affirmatively, it is not available where the agency has simply acted in an indifferent, passive, or negligent manner. The record in this case shows, at worst, inaction on the part of the EPA and State EPA, despite awareness of the circumstances and the risks that they posed for the City and similarly situated permit holders. That inaction was not, however, purposefully undertaken to cause harm or injury to the City. It reflects, rather, the difficulties encountered by the agencies as they sought to resolve complex regulatory and policy issues.

Litigants seeking to impose estoppel against the government carry a heavy burden, and courts are "very reluctant" to apply estoppel doctrines in such cases. *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 474 (6th cir.1988). This is especially so when the action upon which the opposing party asserts estoppel was taken by the government in its sovereign rather than proprietary role. *Housing Authority of Elliott County v. Bergland,* 749 F.2d 1184, 1190 (6th cir.1984).

---

1. It appears that the City agrees. In its surreply, the city purports to withdraw its "possible defense based on § 309(g)(5)(A)(iii) [sic] of the

Clean Water Act." The Court assumes that the intended reference was to 33 U.S.C. § 1319(g)(6)(A)(iii).

At the very minimum, estoppel must rest upon affirmative misconduct of the government. *State Bank of Fraser v. United States,* 861 F.2d 954, 961 (6th cir.1988).

No doubt exists that USEPA exercises sovereign rather than proprietary powers when enforcing the CWA. Moreover, the only USEPA misconduct identified by MPC in its brief is "indifference and inaction amounting to affirmative misconduct." This does not qualify as a sufficient allegation or demonstration of affirmative misconduct given MPC's heavy burden. *Bergland,* 749 F.2d at 1190. Mere inaction by USEPA in the face of known NPDES permit violations is not affirmative misconduct upon which equitable estoppel will lie. *Amoco Oil Co.,* 580 F.Supp. [1042] at 1050. [W.D.Mo.1984]. *Accord, United States v. Louisiana–Pacific Corp.,* 682 F.Supp. 1122, 1139–41 (D.Colo.1987) (Clean Air Act).

*United States v. Menominee,* 727 F.Supp. 1110, 1121–22 (W.D.Mich.1989).

■ The City's good faith reliance on the DFFO and the reasonableness of its belief that it was complying with the law, which should be presumed at this point, are not a defense to the plaintiff's complaint and motion for summary judgment. They are, however, factors that may well weigh heavily in the City's favor when consideration is given to the penalty, if any, to impose on the City for its exceedences. *Ohio Edison,* 725 F.Supp. at 933–34. Plaintiff's motion for summary judgment with regard to its claim for exceedences will be granted.

## B. Bypasses

Plaintiff alleges that since January, 1987 the City has on approximately 218 occasions discharged raw or partially treated sewage. Such discharge is called a bypass. Plaintiff alleges that the bypasses were not permitted under the City's NPDES Permit. In addition, plaintiff also alleges that, with regard to bypasses before August 8, 1991, the City failed to provide timely notice of the bypass incidents as required by the Permit.

■ The applicable regulation regarding the bypass issues raised by plaintiff's motion for partial summary judgment provides:

*Prohibition of Bypass.* (i) Bypass is prohibited, and the [EPA] Director may take enforcement action against a permittee for bypass, unless:

(A) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

(B) There were no feasible alternatives to the bypass . . . and

(C) The permittee submitted notices as required under paragraph (m)(3) of this section.

40 C.F.R. § 122.41(m)(4). As pointed out by the plaintiff, this provision is written in the conjunctive, so that a bypass can result in civil penalty unless it was unavoidable, there were no feasible alternatives, and appropriate notice was provided.

### i. Notice

■ By regulation, notice of an "anticipated" bypass is to be provided, if possible, at least ten days prior to the bypass. 40 C.F.R. § 122.41(m)(3). If the bypass is "unanticipated," § 122.41(*l*)(6) requires oral notice within twenty-four hours of awareness of the bypass; follow-up written notice must be submitted within five days thereafter.

As noted, no notices were filed as to any bypasses before the incident of August 8, 1991. According to the City, its officials were unaware of the need to provide notice because they believed the need for bypassing was generally known and had been communicated in its Permit modification application submitted in 1989. As a result of such "notice," the City contends that all of bypasses were "anticipated."

This is a strained interpretation of the structure for notice established by the regulations. According to the City, mere passing mention that bypasses will be occurring "to exercise more control and reduce solids 'washouts' that were common during heavy rainstorms," fulfilled the mandate of providing advance notice of "unanticipated" bypasses.

It did not. To the extent that that reference provided any notice to the State EPA, it was merely that bypasses of an indefinite number would occur at unknown times and be of an indeterminate volume and unpredictable environmental significance. In other words, that "notice" merely informed the State EPA that the City anticipated that it would experience unanticipated bypasses.

Were the City's reading of the regulation accurate, it would have the effect of abrogating the regulatory scheme. By the simple device of an obscure comment in their application materials, permittees would relieve themselves of ever having to provide specific notice of unanticipated bypasses. Without the prompt notice envisioned by the regulations, the agency's ability to fulfill its oversight function could be impaired significantly, and the risk of environmental injury would be enhanced, rather than deterred.

The Court concludes that, as a matter of law, the "notice" given by the City in its Permit modification materials does not constitute the notice of unanticipated bypasses envisioned by the applicable regulations. Plaintiff's motion for summary judgment on this issue is well taken.

### ii. Unavoidable Bypasses

Plaintiff contends that, whenever a bypass occurred during a day on which the plant treats less than its average daily design capacity of 130 million gallons, such bypass could not have been "unavoidable" as required by 40 C.F.R. § 122.41(m)(4)(i) if civil penalty is to be avoided.

The City, in response, asserts that storms create the need to bypass. It has submitted evidence, albeit conclusory, that the bypasses resulting in this lawsuit were "only a last resort to avoid equipment damage, flooding of the citizens' basements, losing plant biomass ... [and] causing adverse effects to the plant." (Doc. 142, Exh. N at 104.) Plaintiff replies that this conclusory allegation is not sufficient to create a genuine dispute about the necessity for the bypasses.

The lawfulness of any bypass should depend on its particular circumstances. Plaintiff's blanket approach does not take any of the potential or possible circumstances into account; it seeks a fact-specific adjudication on the basis of a mechanistic and undeviating formula. Absent a showing that such an approach has been taken and upheld in other cases, the Court finds considerable merit in the City's responsive (though hypothetical) example and discussion. Because plaintiff's mechanistic approach is flawed, it has failed to show that it is entitled to judgment as a matter of law.[2] That failing is not overcome by the sheer number of bypass incidents. Though that number raises concerns, those concerns do not, in turn, rise to the level of material facts about each of the incidents. And, moreover, the City's response, despite its conclusory quality, suffices to create an issue of disputed and material fact about the extent to which the bypasses were or were not justified under the regulatory scheme.

Plaintiff's motion for summary judgment with regard to the lawfulness of the bypasses at issue will be denied without prejudice to renew such motion when and as a more substantial factual basis for doing so is established.

### C. Monitoring and Reporting

Plaintiff alleges that from March, 1988, until November, 1992, the City violated its obligation to monitor and report about certain pollutants. According to the plaintiff, there were approximately 1,368 such violations. (Doc. 122, Exh. U.)

The Permits require monthly reports to the State EPA and prescribe the contents of the reports. The City does not dispute that accuracy of the data on which the plaintiff makes its claim.

To the extent that no data was given, the violation is clear and plaintiff is entitled to summary judgment.

In the other instances, information was provided, but it was not the information

---

2. By this ruling, the Court is not resolving the parties' dispute about the allocation of the burden of proof. Rather, the ruling is based on the fact that the plaintiff has failed thus far to show that there are undisputed material facts which entitle it to judgment as a matter of law on the issue of the lawfulness of the bypasses.

called for by the Permit. The information that was provided in lieu of the information that was supposed to have been provided amount to codes which indicated that data was lost, equipment was out of service, data was not valid, or a sample was not taken.

The Court agrees with plaintiff that the reason for the failure to report the requisite information is not a defense to its claim of noncompliance. Those reasons are matters for mitigation of the penalty, if any, to be imposed as a result of the failure to report essential information. *See Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 (4th Cir.1988).

The Court concludes, accordingly, that the plaintiff is entitled to summary judgment on the issue of noncompliance with the reporting requirement.

### D. Uncertified Operator

■■■ It is undisputed that the requirement in the Permits that the plant's manager be certified by the State EPA as a Class IV Wastewater Treatment Works Operator was violated until June 10, 1992. The only dispute relates to the beginning of the period for which the plaintiff may seek penalties.

The claim based on the failure to employ a certified operator was first asserted in the amended complaint. Plaintiff argues that the claim relates back to the date of filing of the original complaint. The City disagrees, and argues that the issue of the lack of a certified operator is a new claim based on different facts than those alleged in the original complaint. If so, then, pursuant to Fed. R.Civ.P. 15(c), the new claim does not relate back to the date of the original complaint. *See, e.g., Koon v. Lakeshore Contractors*, 128 F.R.D. 650, 653 (W.D.Mich.1988), *aff'd*, 889 F.2d 1087 (6th Cir.1989).

The Court agrees with the City that this is a new claim and should not relate back to the date of the original complaint. The original complaint alleges deficiencies in the operation of the plant, not in the status of the plant's principal operator. There is no essential or even apparent causal connection between the circumstances giving rise to the original complaint and the lack of State EPA certification.

Because there is no nexus between the claims in the original complaint and the claim based on the lack of proper certification, that claim does not relate back to the original filing date.

The Court also concludes, however, that the claim relates back to the date on which leave was sought to file the amended complaint. *Mayes v. AT & T Info. Systems*, 867 F.2d 1172, 1173 (8th Cir.1989). The period for which penalties may be imposed commences, accordingly, on November 15, 1987.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that plaintiff's second motion for partial summary judgment be denied as to the claim alleging unlawful bypasses and granted as to all other claims; and it is

FURTHER ORDERED that this cause be set for a status pretrial before Magistrate Judge James G. Carr.

**Paul OLSZONICKI, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 1:91cv2096.**

United States District Court,
N.D. Ohio.

May 12, 1994.

Daniel R. McCarthy, Charles P. Royer, Mark B. Cohn, McCarthy, Lebit, Crystal, and Heiman, Cleveland, OH, for plaintiffs.

Annette G. Butler, Asst. U.S. Atty., Cleveland, OH, Thomas R. Jones, U.S. Dept. of Justice, Tax Div., Washington, DC, for defendant.

### ORDER

BATTISTI, District Judge.

Before this Court are Plaintiffs' Motion for Summary Judgment and Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment. For the foregoing reasons this Court grants Plaintiffs' Motion for Summary Judgment.

### FACTS

Plaintiff, Paul Olszonicki graduated from high school in 1933. He has no other formal education (Depo. of Paul Olszonicki at 7). Plaintiff Ann Olszonicki was forced to quit school before completing the tenth grade, and she has no other formal education (Depo. of Ann Olszonicki at 4). Paul Olszonicki was diagnosed with diabetes in 1961 or 1962 (Depo. of Paul Olszonicki at 12). This condition impaired his eyesight, resulting in laser treatments and the use of a magnifying glass (*Id.* at 19). He also suffers from a loss of hearing (*Id.* at 14).

In 1946, Plaintiffs went into business with Mr. Olszonicki's brother, opening Olson's Market, a grocery store. They sold the grocery store in 1963 and purchased a bar, Hank's Cafe, seven apartments and four stores in East Cleveland. They sold the bar in 1975 and the remaining property in 1978 (*Id.* at 8–11).

In 1963, on the recommendation of their attorney, Plaintiffs hired Anthony Novak to prepare and file their business and personal tax returns. Novak was registered as a certified public accountant in the State of Ohio from September 8, 1960 until his death on March 14, 1992, and specialized in liquor owners' taxes (*Id.* at 16). Novak primarily dealt with Mr. Olszonicki since Mrs. Olszonicki was not involved in the day to day operation of the business. Due to Mr. Olszonicki's poor eyesight and his trust for Novak, he signed the documents Novak told him to sign (*Id.* at 18–19). Mrs. Olszonicki generally signed documents without reading them because she also trusted Novak (Depo. of Ann Olszonicki at 10).

Between 1963 and 1978, while relying on Novak as their accountant, Plaintiffs did not experience any problems with their federal tax returns.[1] In 1975, Plaintiffs sold their interest in Hank's Cafe, and in 1978 they sold the apartments and stores. At that time, Social Security benefits were Plaintiffs' only source of income, other than the gain from the sale of property. In 1979, Mr. and Mrs. Olszonicki went to the office of the Internal Revenue Service, where they were told that they were not required to file tax returns since they did not have enough earned income (Depo. of Paul Olszonicki at 19–20).

---

1. Plaintiffs did, however, have a problem with one state tax return which required that they pay "a little more state tax" (Depo. of Paul Olszonicki at 19).

Paul Olszonicki was hospitalized in 1977 due to a foot ailment. While recuperating, he entered into a conversation with a gentleman who was knowledgeable about gold and silver and who gave Plaintiff several investment tips (*Id.* at 21–22). Paul Olszonicki relied on the advice, and between 1975 and 1980 invested nearly $75,000 in silver and silver bullion through a Canadian investment company with ties to the Foreign Commerce Bank in Switzerland. (Depo. Paul Olszonicki at 23). In 1980, Plaintiffs sold their investment in silver for $1,315,000, generating a profit of $1,235,000 (*Id.* at 25). Novak arranged for the transfer of the proceeds from the sale of the silver to Germany, and represented to Plaintiffs that $84,000 was paid as tax in Germany in connection with the transaction. On the advice of Novak, Plaintiffs agreed to lend $1,000,000 to Novak's cousins Kazimir and Sonja Mavko in Germany in return for two cognovit notes yielding eight percent interest (*Id.* at 28). The cognovit notes were signed by Anthony Novak on behalf of Inter–Mercat Company. One note was for $750,000 and the other was for $250,000 (*Id.* at 36–38).

Novak assured Plaintiffs they would be paying German tax and would not be required to pay federal income tax in the United States (Depo. of Paul Olszonicki at 39). Each year from 1980 until 1987, Novak delivered nearly $50,000 in cash to Plaintiffs as payment of interest on the million dollar loan. He told them that taxes had been withheld, and that no United States federal tax was due (Depo. of Paul Olszonicki at 39–40).

In 1986, Plaintiff Mrs. Olszonicki contacted her niece, who is an attorney, and told her of Plaintiffs' investment and that Plaintiffs were not filing United States federal tax returns. The niece suggested Plaintiffs contact their attorney, who in turn recommended Daniel R. McCarthy, a Cleveland attorney specializing in federal income taxation. Upon the advice of McCarthy, Plaintiffs filed amended returns (Depo. of Paul Olszonicki at 53). In doing so, Plaintiffs paid $1,106,153 in tax, interest and penalties to the United States government.

On June 28, 1990, Plaintiffs brought an action under 28 U.S.C. § 1340 for a refund of penalties paid by them for the years 1980 through 1987, totalling $198,670.68 plus interest, attorney fees and costs.

On April 6, 1993, Plaintiffs filed a Motion for Summary Judgment pursuant to Federal Rule 56 in which they contend that they reasonably relied on the advice of Novak that they were not required to file federal income tax returns.

In its Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, Defendant United States argues that the motion must be overruled because the case hinges on the credibility of Paul Olszonicki, and that his credibility is an issue of fact which precludes the granting of summary judgment. Additionally, Defendant avers that Plaintiffs' motion should be denied pursuant to Rule 56(f) because Defendant sought additional affidavits to resolve the issue of the Olszonicki's credibility. On March 3, 1993, Tom Jones, an attorney with the United States Department of Justice, spoke to Kazimir Mavko who stated that he would respond in writing if the United States sent him a letter (Declaration of Thomas R. Jones ¶ 10). The United States wrote to Kazimir Mavko on March 9, 1993 requesting information about the business and assured the Court that the return letter from Germany would arrive by the 19th of May (Memorandum in Opposition to Plaintiff's Motion for Summary Judgment at 5). Defendant, however, failed to obtain an affidavit from Sonja or Kazimir Mavko prior to the oral argument held on December 16, 1993, and has failed to offer any additional evidence that would support its contention that Paul Olszonicki lacks credibility (Tr. 12/16/93 Hearing on Motion for Summary Judgment).

## LEGAL ANALYSIS

The granting of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.* In considering a motion for summary judgment, the court must view all facts and inferences in a light most favorable to the nonmoving party. *Sims v. Memphis Processors, Inc.,* 926 F.2d 524, 526–27 (6th Cir.1991).

"The moving party has the burden of showing the absence of any genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action." *Harris v. Adams,* 873 F.2d 929, 931 (6th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "If this burden is met, the nonmoving party must present 'significant probative evidence' showing that genuine, material factual disputes remain to defeat summary judgment." *Sims,* 926 F.2d at 526 (citations omitted). The nonmoving party is required "to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)).

The substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Here, Section 6651 of the Internal Revenue Code sets forth the penalties and the exceptions to the penalties for failing to file a return or to pay income tax. 26 U.S.C. § 6651(a). Section 6651(a) states in pertinent part:

(a) Addition to the Tax—In case of failure—

(1) to file any return required under authority of subchapter A of Chapter 61 (other than part III thereof), subchapter A of Chapter 51 (relating to distilled spirits, wines, and beer), or a subchapter A of Chapter 52 (relating to tobacco, cigars cig-

arettes, and cigarette papers and tubes), or of subchapter A of Chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), *unless it is shown that such failure is due to reasonable cause and not due to willful neglect,* there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

(2) to pay the amount shown as tax on any return specified in paragraph (1) on or before the date prescribed for payment of such tax (determined with regard to any extension of time for payment), *unless it is shown that such failure is due to reasonable cause and not due to willful neglect,* there shall be added to the amount shown as tax on such return 0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

*Id.* (emphasis added).

■ In order to avoid the imposition of penalties under this section, the substantive law provides that the taxpayer must prove that the failure to file was "due to reasonable cause," and that the failure did not result from "willful neglect." *United States v. Boyle,* 469 U.S. 241, 245, 105 S.Ct. 687, 690, 83 L.Ed.2d 622 (1985) (quoting I.R.C. § 6651(a)(1)). In *Boyle,* the Court defined "willful neglect" as "a conscious, intentional failure or reckless indifference." *Id.* at 245–246, 105 S.Ct. at 690. (citing *Orient Inv. & Finance Co. v. Commissioner,* 166 F.2d 601, 602 (1948)); *Hatfried, Inc. v. Commissioner,* 162 F.2d 628, 634 (CA3 1947); *Janice Leather Imports Ltd. v. United States,* 391 F.Supp. 1235, 1237 (S.D.N.Y.1974); *Gemological Inst. of America, Inc. v. Riddell,* 149 F.Supp. 128, 131–132 (S.D.Cal.1957).

According to Treasury Regulations, "reasonable cause" exists when a taxpayer "exer-

**614**

cised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship ... if paid on the due date." 26 C.F.R. § 301.6651(c)(1). "[W]hether the elements that constitute 'reasonable cause' are present in a given situation is a question of fact, but what elements must be present to constitute 'reasonable cause' is a question of law." *Roberts v. Commissioner*, 860 F.2d 1235, 1241 (5th Cir.1988) (citing *Boyle*, 469 U.S. at 249 n. 8, 105 S.Ct. at 692 n. 8).

■ The advice of an accountant or attorney pertaining to whether a client should file a tax return concerns an issue of law. *United States v. Boyle*, 469 U.S. 241, 250, 105 S.Ct. 687, 692, 83 L.Ed.2d 622 (1984). It is reasonable for a taxpayer to rely on the advice of an accountant regarding an issue of law. *Id.* at 251, 105 S.Ct. at 692–93. As noted by the Supreme Court in *Boyle:*

Courts have frequently held that "reasonable cause" is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken (citations omitted).... When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. (Citation Omitted) "Ordinary business care and prudence" do not demand such actions.

*Id.* 250–251, 105 S.Ct. at 692–93 (1984).

The Fifth Circuit addressed the issue of "reasonable cause" in *Denenberg v. United States,* 920 F.2d 301 (5th Cir.1991) *cert denied,* — U.S. —, 112 S.Ct. 53, 116 L.Ed.2d 30 (1991) summarizing the case law and separating the cases into four distinct categories:

(1) The taxpayer's reliance on an agent to comply with a fixed and unambiguous statutory deadline for filing returns does not constitute "reasonable cause for delay." (citations omitted)

(2) The taxpayer's reliance on his agent to ascertain the correct filing date for returns does not constitute "reasonable cause" for delay. (citations omitted)

(3) The taxpayer's reliance on the advice of his agent that he need not meet a return filing deadline (or file a return at all) *because no taxes are due does* not constitute "reasonable cause" for delay. (citations omitted)

(4) The taxpayer's reliance on the advice of his accountant or tax attorney that no return is due *does* constitute "reasonable cause" for delay. (emphasis in original) (citing *Boyle,* 469 U.S. at 250 [105 S.Ct. at 692]; *Fleming v. United States,* 648 F.2d 1122, 1129 (7th Cir.1981); *United States v. Kroll,* 547 F.2d 393, 395–96 (7th Cir.1977); *Commissioner v. American Ass'n of Eng'rs Employment, Inc.,* 204 F.2d 19, 21 (7th Cir.1953); *Burton Swartz Land Corp. v. Commissioner,* 198 F.2d 558, 560 (5th Cir.1952); *Haywood Lumber & Mining Co. v. Commissioner,* 178 F.2d 769 (2d Cir.1950); *Orient Inv. & Fin. Co. v. Commissioner,* 166 F.2d 601 (D.C.Cir.1948); *Hatfried v. Commissioner,* 162 F.2d 628 (3d Cir.1947); *Estate of DiPalma v. Commissioner,* 71 T.C. 324, 327 [1978 WL 3249] (1978).

*Denenberg,* 920 F.2d at 303–304.

■ The instant dispute falls within the framework of the fourth category. It must therefore be determined whether there are any genuine issues of material fact relating to the reasonableness of Plaintiff's reliance on the advice of their accountant Anthony Novak.

Defendant argues that the granting of summary judgment would be inappropriate because of questions raised concerning the credibility of Mr. Olszonicki. It relies on the proposition that a judge may not make credibility determinations when ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106

S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). However, Defendant must present sufficient evidence to support its contention that an issue of credibility exists. *Anderson* teaches that:

> [b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Id.* at 247–248, 106 S.Ct. at 2510 (emphasis in original). Here, the quantity and quality of evidence presented by the Defendant in its response to Plaintiffs' Motion for Summary Judgment would not enable a jury to return a verdict in its favor.

In *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988), the Court of Appeals of the Tenth Circuit recognized the need for a defendant to respond to a motion for summary judgment with evidence, not mere speculation:

> In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial (citations omitted). "The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party. The litigant must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful."

*Id.* at 794; (quoting *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2nd Cir.1980)).

Defendant states that "[c]ounsel for the United States has not found an unequivocal statement in the depositions indicating that Mr. Novak told the Olszonickis they did not have to file federal income tax returns." (Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment at 7–8). The record is clear that Anthony Novak did indeed advise Plaintiffs that no federal income tax returns were due regarding the sale of silver and the interest payments on the cognovit notes. According to statements made by Mr. Olszonicki at his deposition, Anthony Novak told Plaintiffs that no United States tax was due as a result of the silver transaction, but that a 30 percent German tax was due for the transfer of the money from Switzerland to Germany (Depo. of Paul Olszonicki at 31).

Q What, if anything, did Tony tell you about the United States taxes that would have to be paid or not paid on the transfer of this money?

A He said by paying the German tax, there'd be no troubles.

Q Did you believe him?

A Yes.

Q Did he tell you that—anything about the actual filing of a tax return in the United States?

A No. No, he says, by paying the tax in Germany, there'd be no tax due here.

(Depo. of Paul Olszonicki at 38–39).

In addition, regarding the cognovit notes, Anthony Novak prepared documents for the Olszonickis relating to the funds invested in the German company and taxes paid (Deposition P. Olszonicki at 43, 44) and told Mr. Olszonicki that the interest payments he received were "net of German taxes." (Depo. of Paul Olszonicki at 46).

Q And did he tell you why you received less than you would ordinarily be entitled to based upon an eight percent return?.

A He said the taxes and the expense of sending the money here were deducted.

Q And did he tell you anything about what American taxes had to be paid on the eight percent interest payments?

A He said, by paying that German tax, there'd be no tax trouble here.

(Depo. of Paul Olszonicki at 40).

Q All right. Were you told by Mr. Novak that the interest—that the interest payments you received were net of German taxes?

A Yes.

Q Let's exclude for a moment your—whatever money you made as a result

of interest payment on this loan to Intermercat or to whoever you loaned it to. Excluding that money, during the years 1980 to 1987, were you required to file a federal income tax return?

A According to Tony, it was taken care of.

(Depo. of Paul Olszonicki at 46).

In an attempt to gain evidence to support its attack on the credibility of Mr. Olszonicki, Defendant made a request pursuant to Rule 56(e) that this Court deny Plaintiffs' Motion for Summary Judgment, or, in the alternative, provide Defendant with additional time to come forward with the affidavit of Kasimir Mavko setting forth evidence relating to the transaction in Germany. To date, no affidavit has been filed in this Court despite assurances made by Defendant. (Memorandum in Opposition to Motion for Summary Judgment at 5).

Defendant, in its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, implies, without a factual basis, that Plaintiff, acting in concert with Anthony Novak, attempted to defraud the United States out of income taxes which were properly due to the United States Government. (Memo. in Opposition to Plaintiff's Motion for Summary Judgment at 9) However, Defendant offers no evidence to support this contention.

Defendant also argues that *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir.1990) is inapplicable. In *Heasley*, the court, focusing on the inexperience, limited knowledge about investing, and the level of education of the plaintiffs, held that the plaintiffs had established reasonable cause to rely on the advice of their accountant. *Id.* at 385. The Olszonickis come from similar backgrounds. They both received limited education and were advanced in age.[2] In addition, Mr. Olszonicki is in poor health and suffers from impairments of his hearing and sight. In light of *Heasley*, it was reasonable for Plaintiffs to rely on the

advice of their accountant based on their age, education and health.

In 1979, after they sold the bar, the Olszonickis went to the IRS and were told they did not have to file an income tax return (Depo. of Paul Olszonicki at 46).

Q Now, what about—assuming—let's leave that aside. Did you have any other income which would have required you to file, you and your wife to file a federal income tax return?

A Just Social Security.

Q And did you inquire about whether you had to file an income tax return?

A That's when she went to see her niece.

Q Did you ever actually go to the IRS and ask them whether you had to file an income tax return?

A We went there in '79 after we sold the bar and the building, and they told us we don't have to file tax . . .

(Deposition of Paul Olszonicki at 46–47). Defendant implies that since Plaintiffs contacted the Internal Revenue Service in 1979 regarding the sale of the building that they should have also contacted agents of the Internal Revenue Service between 1980 and 1986 regarding the interest payments made on the cognovit notes. (Tr. Hearing on Motion for Summary Judgment 12/16/1993 at 7–8). This type of corroboration is not required. "To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place." *United States v. Boyle*, 469 U.S. 241, 251, 105 S.Ct. 687, 692–93, 83 L.Ed.2d 622 (1984) (citing *Haywood Lumber & Mining Co. v. Commissioner*, 178 F.2d 769, 771 (CA2 1950).

Defendant has failed to bring forward factual evidence to support its attack on the credibility of Plaintiff Mr. Olszonicki. It's objection is therefore overruled, and Plaintiffs' Motion for Summary Judgment is

---

**2.** Although Defendant argues that Plaintiffs made sophisticated investments in silver, the record reflects that Paul Olszonicki made the investments in silver on the advice he received while in the hospital. Additionally, if the Olszonicki's were sophisticated investors it appears unlikely they would have waited until their investment in silver fell from a high value of $5 million to $1.4 million before selling it. (Deposition of Paul Olszonicki at 24).

granted. Accordingly, judgment shall be entered refunding the penalties paid by Plaintiffs for the years 1980 through 1987 totalling $198,670.68 plus interest, attorney fees and costs.

IT IS SO ORDERED.

Nicholas FEDERSPIEL, et al., Plaintiffs,

v.

OHIO REPUBLICAN PARTY STATE CENTRAL COMMITTEE, et al., Defendants.

Civ. No. 1–94–450.

United States District Court, S.D. Ohio, Western Division.

Nov. 10, 1994.

618

Thomas W. Condit, Condit & Dressing, Cincinnati, OH, for plaintiffs.

Scott W. Spencer, Columbus, OH, for Ohio Republican Party State Cent. Committee.

Mark Christian Bissinger, Frederick Michael Erny, Dinsmore & Shohl, Cincinnati, OH, Powell McHenry, Proctor & Gamble, Cincinnati, OH, Powell McHenry, Dinsmore & Shohl, Cincinnati, OH, for Hamilton County Republican Party.

*ORDER*

SPIEGEL, District Judge.

This matter is before the Court on Defendant Ohio Republican Party's motion to dismiss (doc. 11) and a motion by Defendant Hamilton County Republican Party to dismiss (doc. 12). The Plaintiffs responded to the motion (doc. 14) and the Ohio Republican Party replied (doc. 15). The Court then heard oral argument regarding these motions on October 27, 1994.

After careful consideration of the facts and issues, this Court believes that the Defendants' motion to dismiss is correct. While we sympathize with the Platform Republicans' desire to be heard, their remedy is not to be found in this Court. The proper place for intra-party political disputes to be aired is in the public forum and not within confines of America's courts. Accordingly, we hereby GRANT Defendants' motions and ORDER this case be DISMISSED.

## BACKGROUND

The Plaintiffs, a faction of the Republican Party known as "Platform Republicans," filed this action pursuant to 42 U.S.C. § 1983 alleging that the Defendants' handling of certain internal elections violated their Fourteenth Amendment right to Due Process and Equal Protection of the Laws and their First Amendment right to Free Speech and Freedom of Association. First Amended Complaint (hereinafter "Complaint") (doc. 10). In light of these serious allegations and the complex issues they raise regarding the proper role of the Federal Judiciary and the political parties of America, this Court performed a detailed inquiry into the facts of the case as well as the structure of the Republican Party.

### 1. Structure of the Republican Party

The two main committees of the Hamilton County Republican Party are the Central Committee and the Executive Committee. The Central Committee consists of one member from each election precinct. Republican Constitution (hereinafter "Constitution"), Art. III sec. 1 (1986). Each member is elected for two years by a direct vote of the Party members from his or her precinct. *Id.;* Ohio Rev.Code Ann. § 3517.02 (Anderson, 1988).

Members-elect of the Central Committee, who upon election become voting members, meet between six and fifteen days after the election. The time and place are designated by the retiring chairman of the Central Committee. At this meeting the Committee elects its Chairman, Vice–Chairman, Treasurer and Secretary. The Central Committee then retains the power to fill any vacancies which may occur in such offices. Constitution, Art. III sec. 2.

The Chairman of the Central Committee then calls meetings of the committee to elect members of the Executive Committee. One week after the election of the Executive Committee, the outgoing Executive Committee Chairman calls a meeting of the new Executive Committee to elect a Chairman and Vice–Chairman. Any member of the Executive Committee is eligible for election. Constitution, Art. IV sec. 2.

Once elected the Executive Committee exercises all of the powers of the Hamilton County Republican Party between meetings of the Central Committee. Constitution, Art. IV sec. 3. The Executive Committee may fill any vacancies of party officers, but at the next Central Committee meeting any such actions must be ratified. Constitution, Art. IV sec. 7. Additionally, the Executive Committee can fill any vacancies that occur due to the death or withdrawal prior to election of a Republican Candidate, and select a replacement for a Republican Incumbent upon his or her death or resignation. Constitution, Art. IV sec. 8; Ohio Rev.Code Ann. §§ 3513.30 and 3513.31 (Anderson, 1988).

Finally, if more than one group claims to be the rightful County Central or Executive Committee, each group shall file a list of officers pursuant to Ohio Rev.Code § 3517.06 with the Republican state Central Committee. Ohio Rev.Code § 3517.05 (Anderson, 1988). The state Central Committee must then meet within thirty days of filing to determine which committee shall be recognized as the rightful Central or Executive Committee. *Id.*

## 2. The Dispute Between the Parties

The Plaintiffs, Platform Republicans, allege that the Hamilton County Republican Party through its Central Committee has tremendous power to determine who will be elected in Cincinnati. In fact, in their complaint they state that "[t]he Republican Party has been absolutely dominant in Hamilton County government dating back at least forty years, enjoying a virtual monopoly in most major county offices and most judicial seats during that period." Complaint at 4.

Additionally, the Plaintiffs allege that in order to be heard in Hamilton County, Ohio, or the United States, one must be in either the Democratic or Republican Party. The Plaintiffs further maintain that the two parties hold the only five seats on the Hamilton County Board of Elections, and thus, have complete power to choose what outside entity should tabulate the election results. Complaint at 5. Without citation of authority, the Plaintiffs claim that the judicial branch and the executive branch of the State of Ohio have found that the current computerized voting system lacks adequate safeguards. Complaint at 6.

On March 30, 1989, the Plaintiffs assert that they acted in accordance with the Hamilton County Republican Party Constitution and held a meeting whereby they amended the Republican Constitution. The amendment they allegedly enacted permits a secret ballot on any question upon a motion by one member of the Central Committee, which is seconded by three others. The Republican Party has not recognized this amendment, but the Plaintiffs allege it has been certified by the Secretary of State. Complaint at 9.

The Plaintiffs further allege irregularities in the 1990, 1992 and 1994 election of Central Committee officers and Executive Committee members. Specifically, in 1994 the Plaintiffs maintain that the Party failed to use a secret ballot when electing members, and elected members in such a way that they could not insure only "duly elected Central Committee members were voting on the floor, and it failed to conduct verifiable vote counts." Complaint at 11.

After adjournment of this meeting, one of the Platform Republicans approached the podium, stated that the entire meeting had been invalid due to violations of the Party Constitution, and recalled the meeting to order. A secret ballot was held and a different slate of Party officers and Executive Committee members was elected. The Platform Republicans then filed their list in accordance with Ohio Rev.Code §§ 3517.05 and 3517.06. The state Central Committee then decided that the original list of officers was valid, and denied recognition of the Platform Republicans list of committee officers. From this, the current dispute arises.

## STANDARD OF REVIEW

■ A motion to dismiss for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6) must be viewed in the light most favorable to the party opposing the motion. *Great Lakes Steel v. Deggendorf,* 716 F.2d 1101, 1105 (6th Cir.1983). The court must accept as true all allegations in the well pleaded complaint under attack. *Id.* The court may grant the motion only "if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988); *Balderaz v. Porter,* 578 F.Supp. 1491, 1494 (S.D.Ohio 1983).

## DISCUSSION

As we begin our analysis, it is imperative that we proceed with caution and detail, because we are dealing in an area where judicial restraint is of the utmost importance. As the United States Supreme Court has previously emphasized in a political delegate case,

> Judicial intervention in this area traditionally has been approached with great caution and restraint. It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-

party disputes as to which delegates shall be seated.

*O'Brien v. Brown*, 409 U.S. 1, 4, 92 S.Ct. 2718, 2720, 34 L.Ed.2d 1 (1972).

The Plaintiffs filed this case pursuant to 42 U.S.C. § 1983. In order to bring an action under 42 U.S.C. § 1983, the Plaintiffs must allege that the Defendants 1) acted under the color of state law and 2) deprived the Plaintiffs of some right or privilege secured by the constitution or laws of the United States. *Banchy v. Republican Party of Hamilton County*, 898 F.2d 1192, 1194 (6th Cir.1990); *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982). Thus, the threshold inquiry is whether a party acts under the color of state law when it elects its officers.

"In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required by the Fourteenth Amendment." *Kohn*, 457 U.S. at 838, 102 S.Ct. at 2769–70 (quoting *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966)). Therefore, in order for the Plaintiffs to survive the Defendants' 12(b)(6) motion to dismiss, they must first allege a set of facts that shows there was "state action."

The inquiry must begin by determining if there is a sufficiently close nexus between the *state* and the *challenged action* of the political party so that the action of the latter may be fairly treated as that of the state itself. *Jackson v. Metropolitan*, 419 U.S. 345, 351, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974). Three Supreme Court cases, *Jackson, Kohn* and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), provide a framework within which we may analyze the issue of "state action." In order to elucidate this framework, this Court will examine each of those three cases.

In *Jackson*, the Plaintiff brought suit against a private utility company under 42 U.S.C. § 1983 when it terminated her electric service without notice, a hearing, or an opportunity to pay any amount found due. 419 U.S. at 347–48, 95 S.Ct. at 451–52. The utility company was highly regulated by the State of Pennsylvania. *Id.* at 346, 95 S.Ct. at 451. The Supreme Court stated that the fact

the company is highly regulated and may have been granted monopoly status does not necessarily convert its actions to those of the state. *Id.* at 350–52, 95 S.Ct. at 453–54.

The Plaintiffs further argued that the utility performed an essential public service, and therefore, it was performing a "public function." A company, however, performs a "public function" only when it exerts powers exclusively reserved to the State. *Id.* at 352, 95 S.Ct. at 454. Pennsylvania courts had previously rejected the contention that a utility company was performing a "public function" and, in accord with those findings, the Supreme Court found that the utility company was not performing a "public function." *Id.* Finally, the Supreme Court found that the utility company and the State were not sufficiently intertwined to make the utility's acts "state action" even though the state authorized the utility's termination procedures. *Id.* at 354, 358, 95 S.Ct. at 455, 457.

In *Blum*, the Plaintiffs, Medicaid patients, challenged decisions of nursing homes that discharged or transferred patients without an opportunity to be heard. 457 U.S. 991, 995–97, 102 S.Ct. 2777, 2781–82. The nursing homes were reimbursed by the state for any costs associated with the Medicaid patients. *Id.* at 994, 102 S.Ct. at 2780–81. The Supreme Court held that funding and regulation of the nursing homes did not make the nursing homes' actions attributable to the state. *Blum*, 457 U.S. at 1011, 102 S.Ct. at 2789. The High Court reasoned that there was no coercion by the state nor was there a sufficiently close nexus between the state and the challenged procedures in order to make the discharge or transfer state action. *Id.* at 1004, 102 S.Ct. at 2785–86.

Finally, in *Kohn* a teacher brought suit against a private high school for firing her after she spoke out against school policies, alleging that the school fired her in violation of her First Amendment rights. *Kohn*, 457 U.S. at 834–35, 102 S.Ct. at 2767–68. Although the high school was private, it received most of its funding from public sources and was regulated by public authorities. Nevertheless, the Supreme Court held that "the school's receipt of public funds does

not make the discharge decisions acts of the State." *Id.* at 840, 102 S.Ct. at 2771. Furthermore, while a committee of the state had to validate the school's hiring decisions, such regulations were not "sufficient to make a decision to discharge, made by private management, state action." *Id.* at 842, 102 S.Ct. at 2771–72. In conclusion, the High Court stated that while there is no doubt the school is serving a public function by educating students, that alone does not make the entity's actions those of the state. *Id.*

■ These Supreme Court decisions indicate three criteria that a court may apply to determine if the action in question is attributable to the state. First, if the State has exercised "coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." *Blum,* 457 U.S. at 1005, 102 S.Ct. at 2786 (citing *Jackson,* 419 U.S. at 353, 95 S.Ct. at 454–55). Second, when heavy regulation of the actor exists, there must be "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* at 1004, 102 S.Ct. at 2786. Finally, in the "public function" area there can be state action if the private group is serving a public function that has been traditionally "the *exclusive* prerogative of the state." *Kohn,* 457 U.S. at 842, 102 S.Ct. at 2772 (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. at 455). If none of these elements are present, there is no state action and this case must be dismissed.

■ The Plaintiffs first allege that the Republican Party of Ohio is empowered by Ohio Rev.Code § 3517.05 to "arbitrarily choose between one or more groups claiming leadership of the County Central Committee." Complaint, ¶ 21 (doc. 10). Specifically, the Plaintiffs allege that the Party conducted its election of officers in a manner that was unverifiable and in violation of its own constitution. Therefore, after the Party elections, the Plaintiffs attempted to recall the meeting and hold a new election, whereby they elected a new slate of officers. The Party then had two slates of officers, and pursuant to Ohio Rev.Code § 3517.05 the State Central Committee chose the first slate as the Party's officers. The Plaintiffs claim that the State's authorization of the State Central Committee's power to choose, makes the Committee's actions "state action."

■ We disagree with the Plaintiffs' contention that this authorization makes the Committee's acts those of the state. As noted in *Kohn* and *Blum,* regulation alone does not make the actions of the regulated party state action. *Kohn,* 457 U.S. at 841, 102 S.Ct. at 2771 ("[S]tate regulation, even if extensive and detailed, did not make a utility's action state action."); *Blum,* 457 U.S. at 1011, 102 S.Ct. at 2789 (funding and regulation of a private entity does not necessarily make that entity's actions "state action"). Moreover, the authorization to resolve internal party disputes does not make the Party and State intertwined, such that actions of the Party are "state action."

■ If the State were to put its weight on which faction the Party must choose then an issue of "state action" could exist. *See Jackson,* 419 U.S. at 357, 95 S.Ct. at 457 ("Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so "state action" for purposes of the Fourteenth Amendment."). The Plaintiffs, however, have presented no evidence that the State either overtly or covertly encouraged the choice of the Republican Party State Central Committee. Ohio Rev. Code § 3517.05 only authorizes a party to resolve internal disputes. Even without this statute, the Republican Party would have the right to choose between two competing factions as to which one will represent its Party. *See Eu v. San Francisco Democratic Central Committee,* 489 U.S. 214, 224, 109 S.Ct. 1013, 1020–21, 103 L.Ed.2d 271 (1989) ("[a] political party has a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences.") (internal citations omitted).

■ Therefore, if this Court intervened in this dispute, it would risk treading upon such rights. Similarly, this Court should not substitute its judgment for that of the Party.

The fact that a political party risks and often realizes internal friction does not justify intrusion by a court or state; "[p]resumably a party will be motivated by self-interest and not engage in acts or speech that run counter to its political success." *Id.* at 228, 109 S.Ct. at 1022. While it may not be politically expedient to alienate an important part of the party, that is within each party's prerogative.

Furthermore, it is essential to their member's constitutional rights of free association that political parties be able to resolve intra-party disputes on their own. *See Eu v. San Francisco Democratic Central Committee,* 489 U.S. 214, 224, 109 S.Ct. 1013, 1020–21, 103 L.Ed.2d 271 (1989) ("Freedom of Association means ... that a political party has the right to identify the people who constitute the association, and to select the standard bearer who best represents the party's ideologies and preferences.").[1] Therefore, the Party's choice in how to resolve its own disputes must be respected by this Court, even if that choice means that the Party conducts elections of its officers in a haphazard manner. For all of the reasons discussed above, these actions by the Republican Party cannot be construed as "state action," and consequently, this aspect of the Plaintiffs' claim is not cognizable.

Next, the Plaintiffs allege that Ohio Rev. Code § 305.02 empowers the County Central Committee to perform a public function by filing vacancies of county offices. The Sixth Circuit has already decided this exact issue in *Banchy v. Republican Party of Hamilton County,* 898 F.2d 1192, 1195 (6th Cir.1990). In *Banchy,* the Platform Republicans sued the Republican Party complaining that they were denied the opportunity to vote for their ward chairmen as provided for in the Republican Constitution. *Id.* at 1193. Rather than dispute the merits, the Republican Party volunteered to hold new elections. *Id.* at 1194. The Platform Republicans then proceeded to seek attorney's fees under 42 U.S.C. § 1988.

The Court of Appeals for the Sixth Circuit found that there was no "state action," and thus, the Plaintiffs could not collect attorney fees. The Court of Appeals also indicated that the Central Committee is elected by each precinct, and thus, election of different members is the best way to change their decisions. *See Id.* at 1194–95. It is presumed that each member represents his or her constituents' best interests within the Party, and thus, the people who are appointed to replace the vacancies are favored by the majority. This is the democratic process at work.

 Furthermore, while some of the duties of the Central Committee, including replacing incumbents, may be interpreted as "state action", that in turn does not make all of its acts state action. *Id.* ("When engaging in party activities, such as electing ward chairmen, distinct from their official governmental duties, the members of the Central Committee do not continue to act under color of state law merely because they have some governmental duties.") The Plaintiffs are complaining about the election of internal officers in this case. While some of the actions they take when elected, may be interpreted as "state action," that does not make everything they do nor the process of their election "state action." More specifically, the fact that the Central Committee fills vacancies has nothing to do with the Plaintiffs' complaint of alleged improprieties in the election of Party officers. Intra-party elections of officers is not "state action." *Banchy,* 898 F.2d at 1196 (quoting *Lynch v. Torquato,* 343 F.2d 370, 372 (3d Cir.1965) ("the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices or the filling of these offices state action."); *California Republican Party v. Mercier,* 652 F.Supp. 928, 934 (C.D.Cal.1986) ("the filling of [a party office] is not state action or under color of state law")). Additionally, in order

---

**1.** After the Supreme Court's decision in *Eu,* it remains questionable whether the State can prescribe how a political party resolves its internal disputes. As the Supreme Court stated, "[a] state may enact laws to prevent the disruption of the political parties from without, but not, as in this case, laws to prevent the parties from taking internal steps affecting their own process for selection of candidates." *Eu,* 489 U.S. at 227, 109 S.Ct. at 1022; *see also Banchy v. Republican Party of Hamilton County,* 898 F.2d 1192, 1195 (6th Cir.1990).

to find "state action" there must be a sufficient nexus between the alleged act and the state. *Jackson, supra,* 419 U.S. at 351, 95 S.Ct. at 453–54. The officers' day to day duties of running the Republican Party do not meet this test.

In their complaint the Plaintiffs also allege that "[t]he Hamilton County Republican Party routinely engages *off duty* City of Cincinnati police officers and/or Hamilton County Sheriff's deputies to provide security and/or threaten to intervene in this political dispute." Complaint, ¶ 23 (emphasis added). The fact that a political party uses a security force does not make its actions "state action." People often use security personnel at their functions to keep things calm and civilized. The fact that they were off duty police officers exemplifies that they are a security force. Even if they were on duty, however, the Republican Party or anyone else could call them to expel trespassers, stop crimes or prevent disturbances. That in fact is a police officer's job.[2] Calling the police or a security force to a function does not make that function "state action."

Additionally, the Plaintiffs claim that "the Hamilton County Republican Party's shared control of the Hamilton County Board of Elections constitutes an intimate nexus between the Party and the County government." Complaint, ¶ 25. More specifically, they assert that when absentee ballots were sent out for the Republican primary, enclosed was an endorsement of a particular candidate. Simply alleging that the Republican Party sends out fliers endorsing candidates does not tie the state to the action. The Supreme Court has repeatedly held that the inquiry must be whether a sufficiently close nexus exists between the *state* and the *challenged action,* not the particular actor. *Jackson,* 419 U.S. at 351, 95 S.Ct. at 453–54. In this case, the Plaintiffs fail to allege that the State "is intimately involved in the challenged private conduct to

become attributable to the State for purposes of 1983 action," *Bier v. Fleming,* 717 F.2d 308, 311 (6th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1283, 79 L.Ed.2d 686 (1984), because they have alleged only that the Republican Party has endorsed candidates in the primaries and nothing more.

Assuming, however, that the State authorizes parties to send out endorsements of candidates along with the absentee ballot, this Court would be inclined to find "state action."[3] Even if there was "state action," however, we cannot find that it resulted in a violation of the Plaintiffs' rights. The Supreme Court has held that a political party has a First Amendment right to endorse candidates in its primaries, when it feels the candidate is worthy of election. *Eu,* 489 U.S. at 224, 109 S.Ct. at 1020 ("Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association."). Hence, allowing parties to send out endorsements along with the absentee ballot is not unconstitutional. Nowhere do the Plaintiffs allege that they were denied the opportunity to send out an endorsement of their candidates. As long as everyone is given access to the mailings and the State is not choosing which messages can be sent out, there is no constitutional violation. Accordingly, the Plaintiffs have failed to state an actionable First Amendment violation.

Finally, the Plaintiffs alleged that "the Hamilton County Republican Party has effectively monopolized the Hamilton County Government for the past forty years, so that election of the Hamilton County Republican Party is tantamount to the election of the Hamilton County Government." Complaint, ¶ 24. In their allegations, they analogize this case to the Supreme Court's White Primary Cases. *See Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (holding that a party which chooses the eventual county representative in their primary cannot deny African Americans the opportunity to vote

---

2. Even if the police officers came to a meeting and violated a person's civil rights, that would not be "state action" on behalf of the party. Of course, the police officer's actions would be "state action" under § 1983, but that would not automatically make the Republican Party's meeting and the Party's actions "state action."

3. The Plaintiffs, however, have failed to allege sufficient facts for this Court to find that the State did in fact allow the Republican Party to send out these fliers.

for or against that person in the only election that matters); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (holding that a party can not deny African Americans the opportunity to vote in primaries); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (striking down a regulation that gave the party the power to describe voting qualifications, which led to denial of opportunity to vote for African Americans); *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927) (striking down a statute that barred African Americans from voting).

The Plaintiffs place most of their emphasis on the High Court's splintered decision in *Terry v. Adams.* In *Terry,* the High Court held that the 'Jaybird Association,' a private, all-white political club that controlled the Texas Democratic Party, so dominated the election process through its private primary that African–Americans were effectively disenfranchised. 345 U.S. at 463–66, 73 S.Ct. at 810–12. This disenfranchisement in the primary process was effectively total disenfranchisement because election of a candidate in the primary was a fortiori election of the eventual representative of the county. *Id.* at 469, 73 S.Ct. at 813. Although the High Court attributed the Jaybirds' actions to the state, the eight-member majority could reach no consensus on the basis for the finding of state action. Justice Black, however, announced the most important part of the case: "[t]he Jaybird primary [had] become an integral part, indeed the only effective part of the elective process that determines who shall rule and govern in the county." *Id.* at 469, 73 S.Ct. at 813.

As, the Sixth Circuit has already held the White Primary Cases are "easily distinguishable" from actions such as these. *Banchy,* 898 F.2d at 1196. Unlike the Democratic candidates in *Terry,* Hamilton County Republican candidates still face a tough challenge from the Democrats before being elected.[4] Therefore, the Republican Primary does not automatically dictate who will eventually win the election.

 Even if there was "state action", the Plaintiffs have not alleged they were denied the right to vote. In fact, they voted and lost. This is substantially different from not being allowed to vote at all, as was the fate of the African Americans in the White Primary Cases. In *Smith v. Allwright, supra,* the Supreme Court held that since primaries were an integral part of the election process, African–Americans must be allowed to vote in it in order to secure their constitutional right to ballot access. *Smith,* 321 U.S. at 664–65, 64 S.Ct. at 765. Unlike the disenfranchised voters in the White Primary Cases, the Platform Republicans have not been denied the opportunity to vote within their Party or at the elections. The fact that they may have lost against the popular current of the Party is not something this Court can or should rectify. The proper forum to decide the Platform Republican's case is the crucible of public debate. Should their ideas withstand such examination, a remedy far beyond the power of this Court is assured.

In conclusion, the Plaintiffs have failed to show: 1) that a sufficiently close nexus exists between the State and the challenged actions; 2) that the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state; or 3) that the Republican Party is serving a public function that has been traditionally the exclusive prerogative of the state. Even in the instances where "state action" may exist, the Plaintiffs have failed to show that their rights have been violated. Consequently, this case should be dismissed.

### CONCLUSION

Accordingly, we hereby GRANT Defendants' motions to dismiss (docs. 11 and 12), and thus, ORDER the case to be dismissed.

SO ORDERED.

---

4. In oral argument, the Plaintiffs asked this Court to take judicial notice of the fact that there are two parties in Hamilton County. Hamilton County, however, continues to be unique in that a third-party called the Charterites has had some

success in past elections. Whether there are two, three or more choices, however, this case is distinguishable from *Terry* where there was only one.

Willie L. JONES, Plaintiff,

v.

UNITED STATES DRUG ENFORCE-
MENT ADMINISTRATION et al.,
Defendants.

Civ. A. No. 3:91–0520.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 14, 1993.

E.E. (Bo) Edwards, III, Edwards & Sim-
mons, Nashville, TN, for plaintiff.

Michael L. Roden, Office of the U.S. Atty., Nashville, TN, for defendants.

### MEMORANDUM

WISEMAN, District Judge.

This case is now before the court on plaintiff's application for attorneys' fees. Because Mr. Jones is a prevailing party on a claim substantially related to his civil rights claims, and because the DEA collaborated with police officers who were acting under the color of state law when Mr. Jones' civil rights were violated, the court concludes that an award of fees pursuant to 42 U.S.C. § 1988 is in order.

### I

The facts of this case have twice been set out before and thus will not be belabored here. *See Jones v. U.S. Drug Enforcement Admin.*, 801 F.Supp. 15 (M.D.Tenn.1992) (*Jones I*); *Jones v. U.S. Drug Enforcement Admin.*, 819 F.Supp. 698 (M.D.Tenn.1993) (*Jones II*). Most pertinent to this proceeding is the ultimate conclusion reached as to the merits of the case: the government failed to meet its burden of proving probable cause for the institution of forfeiture proceedings and so Mr. Jones' funds were to be returned to him. *See Jones II*, 819 F.Supp. at 724. As a result of this ruling, Mr. Jones now seeks attorney fees in the sum of $117,595 under either the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, or the Equal Access to Justice Act, 28 U.S.C. § 2412. If the court sees fit to award fees, the government requests additional time to respond to the specific amount of fees requested by plaintiff.

### II

*A. Fees Under § 1988*

■ Section 1988 of Title 42 of the U.S.Code provides that:

[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other

than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C.A. § 1988(b) (West Supp.1993). To be a "prevailing party" within the meaning of this statute, a party need not necessarily win on the civil rights claim. Rather, "[i]f the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of some kind." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791–92, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). To cross this threshold, "at a minimum, ... the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* at 792, 109 S.Ct. at 1493.

Mr. Jones filed, as part of his complaint against the DEA and its affiliated officers, a claim under 42 U.S.C. § 1983 alleging that his currency had been seized and forfeited in violation of his Fourth, Fifth, and Fourteenth Amendment rights. Therefore, Mr. Jones initiated an action specifically enumerated within § 1988 as a compensable action, and thus he may be entitled to reasonable attorneys' fees under § 1988 if he proves he prevailed on significant issue that achieved some of the benefits contemplated by filing this § 1983 claim, and if he proves this victory altered the legal relationship between himself and the defendants.

■ Mr. Jones has amply proven his case. Clearly Mr. Jones prevailed on significant issues related to his § 1983 claims. The court, in both *Jones I* and *Jones II*, repeatedly made statements to the effect that the Drug Interdiction unit officers, and the DEA as approver of these officers' actions, had violated Mr. Jones' constitutional rights. Most notably in *Jones II*, the court explicitly declared that "officers of the Drug Interdiction Unit (DIU) seized [Mr. Jones'] currency in violation of his Fourth Amendment rights...." *Jones II*, 819 F.Supp. at 700. Moreover, the court found that Mr. Jones' was frisked in violation of the Fourth Amendment and that Mr. Jones' was seized in violation of the Fourth Amendment when Mr. Jones was asked to accompany the offi-

cers to the DIU office. *See id.* at 717–19. Each of these findings was crucial to the final determination that the government lacked probable cause for its forfeiture suit against Mr. Jones. *Id.* at 723. Thus in *Jones II* alone, Mr. Jones' constitutional claims under § 1983 were addressed, resolved in his favor, and were important to the ultimate resolution. Most importantly, Mr. Jones achieved at least some, if not all, of the benefits he hoped to achieve by filing his § 1983 claim when he was refunded his currency.[1]

■ The ordered return of wrongfully forfeited funds clearly satisfies the "alteration of legal relationship" requirement. The government lost funds; Mr. Jones regained his funds. The change in relationship could not be clearer. Contrary to the government's contention, a substantive change in relationship between the parties occurred due to the court's § 1983–related rulings. Mr. Jones received more than just a declaratory judgment that his Fourth Amendment rights had been violated. Mr. Jones received $9,000 that had been illegally seized.

With regard to *Jones I*, issues significantly related to the § 1983 claims were also resolved, and this resolution altered the relationship of the parties. The court found that the DEA acted arbitrarily, capriciously, and in abuse of its discretion in rejecting Mr. Jones' *in forma pauperis* petition and in refusing to waive its bond requirement for a forfeiture hearing. *Jones I,* 801 F.Supp. at 28. Accordingly, the summary forfeiture proceedings were inappropriate and a full hearing was in order. The court found that the DEA had abused its discretion under its own regulations, and so the constitutional questions need not be reached. *Id.* Nevertheless, it was clear that Mr. Jones' had prevailed under his Administrative Procedures Act ("APA") claim on the same set of facts crucial to his due process claims.

Moreover, the relief achieved through the APA claim was partially identical to that sought through the constitutional claims—a hearing on the seizure and forfeiture (i.e., due process before property is permanently taken). It is just such situations for which the liberal "prevailing party" definition was intended, for Congress recognized that courts often will not reach constitutional issues when cases can be resolved without doing so. *See Texas State Teachers Ass'n,* 489 U.S. at 790, 109 S.Ct. at 1492.

The result in *Jones I,* like that result in *Jones II,* altered the relationship of the parties. Whereas before the court's decision, Mr. Jones had no further rights to contest the forfeiture, after the court's decision Mr. Jones' bond requirement was waived and a hearing on the forfeiture was set. This relief was more than nominal. Waiver of the bond requirement alone (the bond would have been $900) was of significant benefit to Mr. Jones, and the right to a hearing on the forfeiture gave Mr. Jones a right he previously had lost—the right to seek return of his $9,000. *Cf. Krichinsky v. Knox County Schs.,* 963 F.2d 847, 850 (6th Cir.1992) (to meet the "alteration of relationship" standard, changes in behavioral relationships between the parties, and not just monetary changes, suffice).

Under both *Jones I* and *Jones II,* Mr. Jones prevailed on issues that achieved much of the benefit he sought through institution of his § 1983 claims. Moreover, success on these issues led to a significant change in the legal relationship of the contesting parties. Therefore, an award of attorney fees is within the discretion of the court under 42 U.S.C. § 1988.

■ Notwithstanding this conclusion, the question remains as to who may be made to pay these fees. Ordinarily the U.S. government and its agencies are not liable for

---

**1.** That the forfeiture hearing was conducted pursuant to this court's authority under the Administrative Procedures Act is largely irrelevant to the ultimate question of fees, for the plaintiff clearly achieved some of the results intended by his institution of the § 1983 suit and the constitutional violations alleged under § 1983 were crucial to such success. The factual bases for the APA and § 1983 claims were so intertwined, indeed they were identical in almost all respects, such that these claims were sufficiently related to trigger the *Texas State Teachers Ass'n* test. *See Texas State Teachers Ass'n,* 489 U.S. at 789, 109 S.Ct. at 1492 (common core of facts to legal claim makes necessary an analysis of " 'the degree of success obtained' " to determine fee awards under § 1988 (citation omitted)).

§ 1983 damages due to their sovereign immunity, but this immunity may be removed for purposes of fees under § 1988 if a body of the federal government collaborated with state actors to deprive a citizen of her constitutional rights.[2] *See, e.g., Merritt v. Mackey,* 932 F.2d 1317, 1323 (9th Cir.1991); *Martin v. Heckler,* 773 F.2d 1145, 1153 (11th Cir.1985) (noting the consistency across circuits of this view). The state actors must have played some significant role in the action to award fees against the federal government on the basis of this state action. *See Merritt,* 932 F.2d at 1323.

■ In this case, the court specifically ruled that the agents involved in the forfeiture and seizure were state actors. *See Jones I,* 801 F.Supp. at 21 ("Under the test announced in *West* [*v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ], … the officers acted under color of state law when they interrogated the plaintiff and seized his currency."). Moreover, the role of the officers in the case was crucial. The officers aided in the seizures that formed the basis of the subsequent forfeiture. Without the actions of these state actors, this case would never have arisen. As to the DEA's involvement with these state actors, the court noted that these officers "acted at the direction of the DEA and in furtherance of its goals." *Id.* This is perhaps the paradigm case of state-federal collaboration. The officers possessed their authority solely by virtue of state law but exercised this authority to advance federal goals. Clearly the DEA and the state officers collaborated, and this collaboration led to the constitutional violations documented above. The DEA has waived its sovereign immunity with regard to attorney fees in this case.

*B. Fees Under the Equal Access to Justice Act*

Given the foregoing conclusion, the question of fees under the Equal Access to Jus-

tice Act ("EAJA") need not be addressed. It is worth pointing out, however, that fees under this statute would also be in order.

■ The EAJA provides for fee awards against the U.S. "[e]xcept as otherwise specifically provided by statute" and "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C.A. § 2412(d)(1)(A) (West Supp. 1993). None of these exceptions apply here. First, there is no statute specifically barring such an award. Second, the court has made clear that the government was not substantially justified in its positions in either *Jones I* or *Jones II.* With regard to the denial of Mr. Jones' bond waiver application, the court stated that "[t]he DEA's decision [to deny plaintiff's application] affronts established, relevant standards for indigence. *Jones I,* 801 F.Supp. at 27. With regard to the seizure of Mr. Jones' money, the court stated that this was " 'a forfeiture proceeding [started] in bad faith with wild allegations based on the hope that something [would] turn up to justify [the] suit.' " *Jones II,* 819 F.Supp. at 716 (citation omitted).

Finally, there is no injustice to an award of fees in this case. Certainly the court had reservations about the truthfulness of Mr. Jones at various points in the proceeding and wondered about the secret purpose of Mr. Jones, *see id.* at 723, but likewise the court had considerable questions about the conduct and quality of decision-making of the government. The government initiated a property seizure on nothing more than mere suspicion and then prolonged the case by its recondite reasoning with respect to denial of the bond waiver. This difficulty and tenacity by the government, in a case where the government had only a minimal interest in the bond and in the face of little valid evidence of wrongdoing on Mr. Jones' part, no doubt worked a great hardship on Mr. Jones and his family.

**2.** This proposition derives from 28 U.S.C. § 2412(b), which provides that the U.S. Government, its agencies, or its officials acting in their official capacities shall be liable for fees and expenses to the same extent any other party would be liable under the terms of any statute specifically providing for such an award. In

order for another party to be liable under 42 U.S.C. § 1983, and thus the government liable for attorney fees under 42 U.S.C. § 1988 via 28 U.S.C. § 2412(b), there must have been state action. *See Rodriguez v. Handy,* 873 F.2d 814, 817 (5th Cir.1989).

At best, each side's unattractive characteristics cancel one another out. No party to this suit was pristine.[3]

A fee award would be appropriate under EAJA, as well as under § 1988. To the extent such awards make the federal government more prudent in its forfeiture proceedings, these awards serve a very important purpose given the possibility of abuse that exists in our current forfeiture laws. *See Jones II*, 819 F.Supp. at 724 (discussing the "dangerous potentiality for abuse extant in the forfeiture scheme").

### III

Fees shall be awarded against the defendants pursuant to 42 U.S.C. § 1988. This statute provides for a granting of reasonable attorney fees. The government contests the reasonableness of the approximately $117,000 requested by the plaintiff and asks for an extension of time in which to address the question of reasonable fees. In support of its request, the government claims that it has not had time to gain expert opinion on this question but is in the process of doing so. Most likely the government has put investigation of this matter on hold until resolution of the question of whether any fees are appropriate. Accordingly, an extension of time is appropriate, and an extension of 45 days shall be granted to give the government sufficient time to contest the amount of such fees. An Order in accord shall issue.

### ORDER

For the reasons stated in the accompanying Memorandum, the plaintiff's application for attorneys' fees is hereby PARTIALLY GRANTED in that the plaintiff's right to fees under 42 U.S.C. § 1988 against all defendants is established. The court withholds judgment at this time as to the exact amount of fees that shall be awarded. The defendants are given 45 days from the date of entry of this Order to contest the amount of

fees claimed by plaintiff, in which time plaintiff may offer a rebuttal to any response.

IT IS SO ORDERED.

In the Matter of COLORADO SPRINGS AIR CRASH, Consolidated Pretrial Proceeding.

No. 93–C–5959.

United States District Court,
N.D. Illinois,
Eastern Division.

July 21, 1994.

---

**3.** This analysis of the lack of injustice of a fee award applies equally to a fee award under 42 U.S.C. § 1988. Thus, there are no special circumstances that would render an award of fees unjust under § 1988, either. *See Martin v. Heckler*, 773 F.2d 1145, 1149 (11th Cir.1985) (discussing this exception under § 1988).

James Michael Kuhn, U.S. Attorney's Office, Chicago, IL.

Charles A. Hornewer, Hinshaw & Culbertson, Chicago, IL.

Michael Rowe Feagley, Lucia Nale, Mayer, Brown & Platt, Chicago, IL.

Mary Jo Smerz, Lowrey & Smerz, Ltd., Chicago, IL.

Kevin P. Durkin, Corboy, Demetrio & Clifford, P.C., Chicago, IL.

Stephen P. Kenney, Lord, Bissell & Brook, Chicago, IL.

John W. Adler, Adler, Kaplan & Begy, Chicago, IL.

Donald J. Nolan, Law Offices of Donald J. Nolan, Chicago, IL.

Keith Gerrard, Thomas J. McLaughlin, Perkins Coie, Seattle, WA.

Richard F. Schaden, Schaden, Lampert & Lampert, Broomfield, CO.

Andrew Dilk, F.A.A., Washington, DC.

Colleen L. Conlin, U.S. Dept. of Justice; Torts Branch, Civ. Div., Washington, DC.

Brian Murphy, Hofeld & Schaffner, Chicago, IL.

Gregory D. Hanley, Brooks, Cahill & Hanley, Chicago, IL.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Before this court are briefs discussing the choice-of-law issues implicated by the United States' Motion for a Determination of Good Faith Settlement. The government's deceptively innocuous motion raises the complex issue of whether the government's settlement with the plaintiffs is subject to good faith review under Illinois law, Colorado law, or the law of some other state. Choice of law determinations in mass tort cases are always tedious. Our burden is increased unnecessarily when—as in this case—the parties fail to address directly the conflict fueling the controversy and fail to candidly discuss the substantive law of the relevant states.

The parties focused their briefs on the law of contribution, *ie.* which state's law should apply the defendants' contribution claims against the government. A review of Washington, Illinois and Colorado's contribution statutes shows that there is no real conflict pertaining to contribution; all three states' statutes protect settling defendants from contribution actions, if the settlement was made in good faith.[1] 740 ILCS 100/2; RCWA 4.22.060; C.R.S. 13–50.5–105. If contribution were the real matter at issue, there would be no true conflict, and we could proceed with our determination of whether the government's settlements with the plaintiffs were in good faith.

However, the settlement agreements also raise the issue of whether the remaining defendants' share of liability will be reduced by the government's proportionate share of liability, or by the actual amount paid in settlement. On this issue, there is a true conflict between the substantive law of the three states with an interest in this litigation.

■ Colorado limits the damages paid by a defendant to the defendant's proportionate share of the total liability. C.R.S. 13–21–111.5(1). Any award received by a plaintiff must be reduced by the *proportionate* share of that award attributable to settling defendants. C.R.S. 13–50.5–105(1)(a).

---

1. Washington's statute requires a "reasonable" settlement rather than a "good faith" settlement. Our review of Washington case law shows that there is no substantive difference between Washington's "reasonable" standard and Illinois' "good faith" standard. *Glover for Cobb v. Tacoma General Hospital,* [98 Wash.2d 708] 658 P.2d 1230, 1235 (Wash.1983) (no one factor should control determination of whether settlement was reasonable); *Ruffino v. Hinze,* 181 Ill.App.3d 827, 831 [130 Ill.Dec. 542, 537 N.E.2d 871] (1st Dist.1989) (Illinois courts have refused to empha-size any one factor in determining whether "settlement in a fair and *reasonable* amount has been reached.") (emphasis added). Also, Washington law requires a "hearing" on the reasonableness of the settlement. The Washington Supreme Court deliberately left the question of what constitutes a "hearing" to the discretion of trial courts. *Glover,* 658 P.2d at 1236, f.n. 3. We believe that the Illinois procedures for determining whether the settlement is in good faith satisfies Washington's statutory requirements.

■ Illinois holds joint tortfeasors jointly and severally liable, unless a tortfeasor is less than 25% responsible for the plaintiff's injuries. 735 ILCS 5/2–1117. Illinois law reduces a co-defendant's liability by the *actual* amount of any settlement the plaintiff has reached with another defendant. 740 ILCS 100/2; *Tragarz v. Keene Corp.*, 980 F.2d 411, 431 (7th Cir.1992); *Henry by Henry v. St. John's Hosp.*, 138 Ill.2d 533, 541, 150 Ill.Dec. 523, 563 N.E.2d 410 (1990), *cert. den.* 499 U.S. 976, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991).

■ Contrary to Boeing's representation, Washington's law is similar to that of Illinois. In Washington, a defendant is generally only severally liable for its joint torts. When, as here, the claimant is in no way responsible for his own injuries, Washington holds tortfeasors jointly and severally liable. RCWA 4.22.070(1)(b); *Washburn v. Beatt Equipment Co.*, 120 Wash.2d 246, 840 P.2d 860, 886 (1992). Boeing shamefully failed to include in its discussion this exception to Washington's general rule, despite the exception's direct applicability to the facts in this case.[2] Rather than discuss Washington's statute, the plaintiff's gave an accurate litigant the defendants' procedural misdeeds. While we understand and share the plaintiffs' frustrations, we cannot excuse their failure to notice a significant statute.

Finally, as in Illinois, the plaintiff's award will be reduced by the *actual* amount paid by a settling defendant, not the settling defendant's proportionate share of fault. RCWA 4.22.060(2).

The Washington statute also differs from the Illinois statute in that Washington law applies joint and several liability only to tortfeasors against whom *judgment* has been entered; Illinois has no such restriction. Thus, there appears to be a conflict between the laws of these two states. A rational plaintiff in Washington, however, will agree not to enforce a judgment against a settling joint tortfeasor. This puts a rational plaintiff in Washington in the same position as a plaintiff in Illinois who releases a settling defendant from liability. In the end, the effect of settlement on the remaining defendants is the same under either state's regime: the non-settling defendant's liability to the plaintiff will be reduced by the *actual* amount paid in settlement. *Washburn*, 840 P.2d at 887; *Berard v. Eagle Air Helicopter Inc.*, 257 Ill.App.3d 778, 780, 195 Ill.Dec. 913, 915, 629 N.E.2d 221, 223 (1994). There is no true conflict between the law of Illinois and the law of Washington, as they apply in this case.

### *Which State's Law Applies*

■ Since the issue of joint and several liability is not related to the claims arising from the Federal Tort Claims Act, that statute's choice of law provision is of no interest here.[3] The effect of the government's settlement on the remaining defendants is based on plaintiffs claims against those defendants. *See* Boeing's Brief at p. 11. Since this court has supplemental jurisdiction over those claims, we will apply the choice of law rules of the forum state, Illinois. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Ashmore v. Northeast Petroleum Div. of Cargill, Inc.*, 843 F.Supp. 759, 772 (D.Me. 1994). As a practical matter, we found no significant difference in the choice-of-law rules of Colorado and Illinois. Both employ the Restatement (Second) approach. Indeed, Colorado choice-of-law cases cite to Illinois authority. *See e.g. In re Air Crash Disaster at Stapelton Intern. Airport Denver Colo. on Nov. 15, 1987,* 720 F.Supp. 1445 (D.Colo. 1988).

### *Illinois' Choice of Law*

■ Illinois has adopted the Restatement (Second) Choice of Law as its method of

**2.** While the statute actually requires a determination by a trier of fact that the plaintiff was in no way responsible for his own injuries, we find it inconceivable, and Boeing has not argued, that the decedents were in anyway contributorily negligent. The plaintiffs here therefore satisfy RCWA 4.22.070(1)(b).

**3.** We also note that the government could have moved to dismiss the claims against it for substantive reasons and removed itself from this case on a Rule 12 motion. In other words, this court's jurisdiction under the Federal Torts Claims Act is tenuous at best.

resolving conflicts of law issues. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970). Under the Restatement approach, we must apply the law of the state with the most significant relationship to the particular matter at issue. *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 611 (7th Cir.1981), *cert. den.*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981).

■ The "most significant relationship" is measured by two sets of criteria. The first consists of the following general factors, listed in order of importance:

 (a) the needs of the interstate system;

 (b) relevant policies of the forum;

 (c) relevant policies of other interested states;

 (d) the protection of justified expectations;

 (e) the basic policies underlying the particular field of law;

 (f) certainty, predictability and uniformity in result; and

 (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6; *In re Air Crash*, 644 F.2d at 611–612. We must consider these principles in light of the following relevant contacts: (1) the place of the injury; (2) the place of the misconduct; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; (4) the place where the relationship between the parties is centered. Restatement (Second) of Conflict of Laws § 145; *In re Air Crash*, 644 F.2d at 612.

The Seventh Circuit has also adopted the principle of depeçage for choice-of-law questions. Depeçage is the "process of applying the rules of different states on the basis of the precise issue involved." *Id. See also, International Administrators, Inc. v. Life Ins. Co. of North America*, 753 F.2d 1373, 1376, f.n. 4 (7th Cir.1985) ("The choice of law is not made for all issues; the trend is to decide the applicable law for each issue separately.") This principal is particularly useful in personal injury cases, like the instant one, where there are many theories of liability and where there are multiple parties from different states. The "precise issue in-

volved" here is how the government's settlement effects the liability of the non-settling defendants and the sole question we must address, then, is which state's law concerning joint and several liability applies in this case.

### *Relevant Contacts*

■ The majority of the decedents lived in Colorado. Most of the plaintiffs are residents of Colorado. Colorado is also the place of injury. *See* Boeing's Brief at p. 1. Defendant Boeing has its principal place of business in Washington and Washington is the place of Boeing's misconduct. *See* Boeing's Brief at p. 12. Defendant United has its principal place of business in Illinois. *See* Exhibit A to Plaintiff's Brief. United's misconduct occurred either in Illinois (where the flight began and where United has its principal maintenance facility) or Colorado (where the plane was negligently operated). *Id.*, Boeing's Brief at p. 1. The relationship between United and the decedents is focused in Colorado, since the decedents boarded and were scheduled to deplane in Colorado. *See* Boeing's Brief at p. 6, f.n. 1; *Stapleton*, 720 F.Supp. at 1451, *citing, Bryant v. Silverman*, 146 Ariz. 41, 703 P.2d 1190, 1195 (1985). Since the decedents boarded a Boeing plane in Colorado and planned to travel within the state on the Boeing plane, we find that Colorado is also the focus of the relationship between the plaintiffs and Boeing.

Thus, Colorado, Illinois and Washington all have some contact with either the parties or the claims at issue. The only relevant contacts, however, are those which pertain to the particular issue of whether the defendants should be subject to joint and several liability.

■ The application of joint and several liability serves two general purposes. First, it acts as a deterrent by making a defendant liable for all of the consequences of its negligence, even if the defendant's negligence was not the only cause of the injury. Prosser, *Law of Torts*, Ch. 8, § 47, pp. 297–98 (1971). Second, it encourages settlement when, as in this case, settling defendants are protected by statute from an action for contribution. The remaining defendants are encouraged to

settle their claims with the plaintiff, in order to avoid facing a large damage award which is only mitigated by the *actual* amount of the plaintiff's settlements with the other tortfeasors.

### A. Relevant Contacts for Deterrence.

We find that the principal place of business is the most significant contact for the question of whether applying joint and several liability will deter negligent behavior. States have a significant interest in controlling the behavior of companies domiciled within their borders. Colorado itself has found that a corporation's principle place of business is more relevant to deterring negligence than the site of the injury, even when the injury occurred in Colorado:

> While Colorado has an interest in regulating the conduct of corporations entering its jurisdiction to do business, it (sic) *interest in air safety is somewhat lessened when a foreign corporation attempts to shield itself from the more onerous laws of its home state by seeking refuge under Colorado law.*

*Stapleton,* 720 F.Supp. at 1453 (emphasis added) (citations omitted). Holding a defendant corporation accountable to its principal place of business "serves choice of law interests in certainty, predictability and expectation." *Id.* The Seventh Circuit also recognized the importance of applying the law of a corporate defendant's principal place of business, when, as here, the defendant corporations do business in many states.

> If courts held that the place of 'conduct' had the critical interest in punitive damages and that the place of corporate headquarters had no interest in punitive damages, then litigation would center around exactly where activities and decisions occurred. The practical effect of such a holding would be to require extensive examinations of numerous employees and to require complex investigations into the precise locations of many areas of corporate decision. Corporations seeking to avoid potential punitive damages would be encouraged to structure decisions so that no specific locus for a major decision would

ever be proved to have occurred in a 'punitive' state.

*In re Air Crash,* 644 F.2d at 613–14. Although the Seventh Circuit was discussing punitive damages, we believe the instant case is analogous because, like punitive damages, joint and several liability serves as a deterrent to corporate defendants.

None of the other contacts listed in § 145 are relevant to the particular matter at issue. The situs of the injury is generally fortuitous in air crash cases. *In re Air Crash,* 644 F.2d at 612. Although there was a flight segment which took place entirely within the state of Colorado, the alleged negligence of Boeing and United could have resulted in an accident anywhere along the plane's interstate flight.

Also, the site of the misconduct, while it may be important for deterrence in general, is less relevant for that purpose where defendants operate in many states. In any event, the places of the misconduct of Boeing and United are also the locations of their principle places of business; the location of misconduct merely supports applying the law of the principal place of business in this case.

The remaining contacts discussed by the Restatement are with Colorado, but we do not find them particularly relevant to our issue. The decedents resided in Colorado, but Colorado's statute on joint and several liability does not protect the interests of the plaintiffs. Colorado is also the focus of the parties' relationship, but we find that this contact is outweighed by the interests of Washington and Illinois.

Here, then, applying Illinois law to Boeing and United furthers certainty, predictability and uniformity in result. Also, neither party can object that it could have "expected" a different result, since each voluntarily chose as its principal place of business a forum in which it would be subject to joint and several liability. Finally, since joint and several liability is the traditional method of apportioning liability among joint tortfeasors, it will be "easier" for this court to determine and apply joint and several liability to this case. Since there is no real conflict, we will apply the law of the forum. *International Administrators,* 753 F.2d at 1376, f.n. 4.

## B. Encouraging Settlement.

We must also consider the four § 145 contacts in light of the "relevant policies of the forum." Restatement (Second) of Conflict of Laws § 6. Here, Illinois has an express interest in encouraging settlement of cases pending in its court systems.[4] This purpose would be frustrated by the application of a proportionate share settlement bar rule.

One purpose behind the Illinois Contribution Act is to encourage settlement. *Ziarko v. Soo Line Railroad,* 161 Ill.2d 267, 204 Ill.Dec. 178, 641 N.E.2d 402 (1994). Indeed, encouraging settlement is an express interest of Illinois courts and of the Illinois statute. *Ripplinger v. Quigley,* 231 Ill.App.3d 1002, 1009, 173 Ill.Dec. 552, 597 N.E.2d 260 (1992) (holding that common law rule which did not allow plaintiff to re-file voluntarily dismissed complaint after defendant failed to perform settlement agreement would discourage settlement and rule therefore invalid).

We believe that joint and several liability (when coupled with immunity from contribution actions for settling defendants) encourages settlement of disputes. *See generally,* Easterbrook, Landes & Posner, "Contribution Among Antitrust Defendants," 23 J.Law & Econ. 331, 362–364. Under a regime like that of Colorado, there is no incentive for defendants to settle cases, because the defendants will only *ever* be liable for their *pro rata* share of liability (plus the litigation costs). Under the Illinois system, once one defendant settles, there is a marked increase in the pressure on the other defendants to settle, in order to avoid liability for the bulk of a damage award.

Finally, no other state has any significant interest in encouraging the settlement of this case or in the distribution of post-verdict liability. "In general, it is fitting that the state whose interests are most deeply affected should have its local law apply." Restatement, of Conflict of Laws § 6 at p. 14. *See also First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,* 631 F.Supp. 1029, 1033 (S.D.N.Y.1986) (the

law of the forum should apply to question of whether non-settling defendants' liability is reduced by the settling defendant's proportionate share of liability or the actual amount).

"[T]he [Illinois Contribution] Act clearly evidences a legislative intent to encourage settlements in tort litigation and promote judicial economy." *Nguyen v. Tilwalli,* 144 Ill.App.3d 968, 972, 99 Ill.Dec. 183, 495 N.E.2d 630 (1986). This is a significant policy of the forum which, when coupled with the other significant contacts Illinois has with this case, compels the application of Illinois' contribution statute in this case.

### *Conclusion*

The government's motion for a good faith finding under Illinois law raised the question of whether the non-settling defendants would be allowed the benefit of Colorado's proportionate fault regime. Because Colorado's contacts with the particular issue of how to apportion post-verdict liability are of minimal significance, we will not apply Colorado's contribution act in this case. Because there is no true conflict between the law of Washington and the law of Illinois on this particular issue and because Illinois has an express interest in encouraging settlements which would be furthered by applying its own law in this case, we will apply the Illinois Contribution Act to the government's settlement with the plaintiffs and hold the defendants jointly and severally liable for the consequences of their negligence.

The parties are instructed to submit briefs, with exhibits, on the issue of whether the government's settlement with the plaintiffs was in good faith, in accordance with the Illinois Contribution Act and cases promulgated thereunder. 740 ILCS 100/1 *et seq.*

---

**4.** In addition to the fact that we are a federal court sitting in Illinois, there is a serious question of whether this case will be remanded to Illinois state court, if we find the settlements were made in good faith.

Carmelo MELENDEZ, Plaintiff,

v.

ILLINOIS BELL TELEPHONE
COMPANY, Defendant.

No. 90 C 5020.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 15, 1994.

John H. Hager, Elaine K.B. Siegel, Hager & Siegel, P.C., Chicago, IL, for plaintiff.

Hubert O. Thompson, Henry I. Thomas, Carney & Brothers, Ltd., Chicago, IL, for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

The plaintiff Carmelo Melendez ("Melendez") brought this action on August 8, 1990. In his Third Amended Complaint [1], the plaintiff alleged that the defendant, Illinois Bell Telephone Company ("Illinois Bell"), had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e *et seq.*, and the Civil Rights Act of 1871, 42 U.S.C. Sec. 1981. More specifically, the plaintiff alleges discriminatory hiring practices on the part of the defendant through the use of a preemployment examination.

Following a trial in September of 1993 on the Section 1981 claim, the jury returned a verdict in favor of the defendant. This court entered judgment on September 9, 1993 for the Section 1981 claim and later amended judgment on December 8, 1993.[2] The plaintiff initially filed a motion for a new trial which was subsequently withdrawn on February 11, 1994.[3] (Pl.Reply, p. 1). The Title VII claims are bench issues [4] on which the court has yet to rule.

At issue for the purposes of this opinion is the binding effect of the jury's verdict on the Section 1981 claim as to the remaining Title

1. The Third Amended Complaint is dated September 13, 1993. The court gave the plaintiff leave to file the Third Amended Complaint during the jury trial on the Section 1981 claim with the direction that the claims of equitable relief be stricken without prejudice and reasserted at the close of trial. (Tr. at 20, 23).

2. The amended judgment corrected the "final judgment" form which had inadvertently been entered previously.

3. The written withdrawal of the motion contained an agreement on the part of the plaintiff

that he would not reassert the motion. (Pl.Reply, p. 1).

4. The Seventh Circuit has held that provisions of the Civil Rights Act of 1991, Pub.L. No. 102–166, section 101, 105 Stat. 1071 (1991) do not apply retroactively to questions of this sort. *Mozee v. American Commercial Marine Service Company,* 963 F.2d 929, 938–939 (7th Cir.1992), *cert denied* —— U.S. ——, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992).

VII claims brought under the theories of disparate treatment and disparate impact.[5]

## I. Subject Matter Jurisdiction

■ The defendant raises an initial matter in asserting that this court lacks subject matter jurisdiction to resolve the Title VII claims because the plaintiff is not entitled to backpay and does not seek reinstatement. (Def.Ans.Third Amend.Comp., 2nd Aff.Def. and Post-hrg. brief, p. 8 n. 4). It is noteworthy that the defendant does not cite any case law in support of this proposition.

There is nothing in the provision which covers relief available under the statute which suggests that these factors are determinative of the court's subject matter jurisdiction. See 42 U.S.C. Section 2000e–5(g). Moreover, with respect to the remedy of reinstatement, given that the position for which the plaintiff applied, Manager, Urban Affairs, has been abolished reinstatement is not an option. (Def.Sum. of Case, p. 6).

Similarly, the determination of whether the plaintiff is entitled to backpay will be made following the hearing on the disparate impact claim. Whether or not the plaintiff is entitled to such an award is not the deciding factor of the court's subject matter jurisdiction. See *Mustafa Al–Alamin v. Gramley*, 926 F.2d 680 (7th Cir.1991) (federal courts possess broad but not limitless powers to remedy constitutional violations, however, as an initial matter, the federal court must find that a constitutional violation exists).

■ This court has considerable, though not unlimited, discretion to remedy discriminatory practices under Title VII:

Where an employer has engaged in a pattern or practice of unlawful discrimination, affirmative and mandatory relief is required to ensure full enjoyment of the right to equal employment opportunity. 42 U.S.C. sec. 2000e–6(a). In such cases, the court has not only the power but the duty both to enjoin future discrimination and as far as possible to require the elimination of the continuing effects of past discrimination.

*U.S. v. City of Chicago*, 411 F.Supp. 218, 242 (N.D.Ill.1976) [J. Marshall]; See *Philbin v. General Electric Capital Auto Lease, Inc.*, 929 F.2d 321, 323 (7th Cir.1991) (Title VII is remedial legislation which must be construed liberally).

The plaintiff has requested relief which the court has discretion to award if it finds that the plaintiff's claim has merit and the court deems the relief appropriate.[6] Therefore, the plaintiff's entitlement to backpay, which has yet to be determined by the court, and his failure to request reinstatement do not affect this court's subject matter jurisdiction.

Rather, jurisdiction is conferred upon this court pursuant to 42 U.S.C. Section 2000e–5(f) and 28 U.S.C. Section 1343. Section 2000e–5(f)(3) of Title 42 provides in relevant part that:

Each United States district court and each United States court of a place subject to

---

5. A complete recital of the facts is not necessary for the resolution of the issue addressed in this opinion but will be provided in the Findings of Fact and Conclusions of Law which will be issued following the hearing on the Title VII disparate impact claim.

6. As relief the plaintiff requests:
(a) a declaratory judgment that the BSAT examination discriminates against Hispanic applicants in violation of Title VII, 42 U.S.C. Sec. 2000e *et seq.*
(b) backpay in the amount of $16,666.00
(c) an order that defendant Illinois Bell Telephone Company, its officers, agents, servants, employees and all persons and organizations in active concert or participation with them are permanently enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any applicant

or potential applicant for employment in first-level management positions at Illinois Bell, because of such individual's sex, race, color, or national origin, and specifically from:
(1) Using the BSAT preemployment examination; and
(2) Using any qualifications, tests, standards or procedures for the purpose of hiring applicants for employment in first-level management positions at Illinois Bell, which are not validated as job-related, and which exclude Hispanics from employment opportunities in ratios disproportionate to the exclusion of whites;
(d) Attorneys' fees and costs; and
(e) Such other and further relief as this Court may deem just and equitable.
(Pl.Post-hrg, Mem. pp. 27–28).

the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office ...

Given that the plaintiff alleges that the unlawful employment practice was committed in Illinois [7], pursuant to the above section, this court has jurisdiction.

In further support of this conclusion, Section 1343 of Title 28 provides that the district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

With that preliminary issue resolved, the court now considers the preclusive effect of the jury's verdict on the Section 1981 claim with respect to the plaintiff's Title VII claims.

## II. Statute of Limitations

■ As a second threshold issue, the defendant asserts that the plaintiff's Title VII claims are barred in whole or in part by the applicable statute of limitations.[8] (Def.Ans.Third Amend.Comp., p. 9). The defendant raises this as its First Affirmative Defense [9] to the Third Amended Complaint but offers no argument as to the applicability of this defense to the Title VII claims. (Def.Ans.Third Amend.Comp., p. 9).

■ Section 2000e–5(e) [10] governs the limitations periods for Title VII claims and provides, *inter alia*, that the limitations period for filing with the EEOC is 180 days in states without their own agencies to which employment discrimination complaints can be directed. 42 U.S.C. sec. 2000e–5(e). For "deferral" states such as Illinois, however, which have their own agencies with the authority to administer these complaints, the period is extended 300 days. See *Poindexter v. Northrop Corp.*, 728 F.Supp. 1362 (N.D.Ill.1990).

■ In order for the plaintiff's Title VII claims to be timely, the alleged discrimination must have taken place within the 300 days prior to the filing of the EEOC charge.[11] Mr. Melendez filed his charge with

---

7. See Third Amended Complaint.

8. The defendant first asserted this defense in its Answer which was filed October 29, 1990.

9. The statute of limitations defense must be raised as an affirmative defense in order to be preserved. See *McMahon v. Eli Lily & Co.*, 774 F.2d 830, 836–837 (7th Cir.1985).

10. The statutory text provides in pertinent part:
A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred or within thirty days after receiving notice that the State or local agency has terminated the proceedings under State or local law whichever is earlier
...
42 U.S.C. Sec. 2000e–5(e).

11. It should be noted that filing requirements of Title VII are not jurisdictional. See *Elbaz v. Congregation Beth Judea, Inc.*, 812 F.Supp. 802 (N.D.Ill.1992) [J. Aspen]. As the Supreme Court has noted:
a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to

the EEOC on December 21, 1988 (Third Amend.Comp., Count II, para. 3). If the court accepts September 25, 1988, which is the date the plaintiff states that he was notified that he was ineligible for the position for which he applied because he had "failed" the BSAT, as the date the claim was ripe for filing then it is evident that Mr. Melendez is well within the EEOC filing deadlines. (Def.Ans.Third Amend.Comp., para. 17). In addition, the EEOC issued to the plaintiff a right to sue letter which was date stamped July 2, 1990. The letter granted him 90 days upon its receipt to file an action in the Federal District Courts. The plaintiff filed suit on August 8, 1990 within the 90 day deadline.

Therefore, Mr. Melendez's Title VII claims were timely filed.

## III. Failure to State A Claim

As its third affirmative defense, the defendant asserts that the plaintiff has failed to state a claim upon which relief may be granted arguing that:

the test in question, the BSAT, has been validated pursuant to the EEOC's Uniform Guidelines on Employee Selection Procedures and is a reliable predictor of success in entry-level general management jobs, including the job for which the Plaintiff applied.

(Def.Ans., Third Aff. Def. p. 9).[12]

The issue of whether the BSAT has been validated pursuant to EEOC guidelines is one more properly treated during the hearing on the disparate impact claim. It is one of the elements that the parties must address in the presentation of arguments and thus, is not a bar to a hearing on the claim.

## DISCUSSION

The plaintiff has brought two claims under Title VII; One under the theory of disparate treatment and another under the theory of disparate impact. (Pl.Post-hrg.Mem., p. 1).

■ In general, a Title VII plaintiff can utilize either the disparate impact theory or the disparate treatment theory of discrimination. See 42 U.S.C. Section 2000e et seq. Under the disparate impact approach, a violation is established where an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group and which cannot be justified as serving a legitimate business goal of the employer. 42 U.S.C. Section 2000e et seq.; See Griggs v. Duke Power Co., 401 U.S. 424, 426, 431, 91 S.Ct. 849, 851, 853, 28 L.Ed.2d 158 (1971) (Title VII proscribes "not only overt discrimination but also practices that are fair in form but discriminatory in practice"); see also E.E.O.C. v. Chicago Miniature Lamp Works, 947 F.2d 292 (7th Cir.1991).

Under the disparate treatment theory, a violation is demonstrated when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion. 42 U.S.C. Sections 2000e et seq., 2000e-2(a).

Although Mr. Melendez does not specifically state in his Third Amended Complaint that he is asserting a Title VII claim under both the disparate impact and disparate treatment theories, the allegations throughout the complaint support claims under both theories. In particular, with respect to the disparate impact claim, the plaintiff asserts in paragraph 19 of the section entitled "The Wrong" that:

In connection with his application for employment at the Company, Mr. Melendez suffered discrimination on account of his hispanic ethnicity and Puerto Rican origin because the BSAT selects applicants for hire in a racial pattern significantly different from that of the pool of applicants.

---

suit in federal court, but a requirement that like a statute of limitations, is subject to waiver, estoppel, and equitable tolling ...
... The provision specifying the time for filing charges with the EEOC appears as an entirely separate provision, and it does not speak in any way to the jurisdiction of the district courts.

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393–394, 102 S.Ct. 1127, 1132–33, 71 L.Ed.2d 234 (1982).

**12.** The defendant first asserted this as a defense in its Answer which was filed October 29, 1990.

The BSAT disqualifies substantially disproportionate numbers of hispanics.

(Third Amend.Compl., "The Wrong", para. 19).

The other supporting paragraphs of the disparate impact claim include 2, 13, and 20 of Count II. (Third Amend.Comp.). In addition, the plaintiff does specifically state that he is asserting a claim under the disparate impact theory in his Summary of Plaintiff's Position filed on January 6, 1993.

Therefore, the court will address both the disparate treatment and disparate impact claims.

### A. Title VII–Disparate Treatment Theory

■ It is a well-settled rule that when Section 1981 and Title VII claims are tried together a jury's verdict binds the judge on factual issues common to both claims. *McKnight v. General Motors Corporation,* 973 F.2d 1366, 1370 (7th Cir.1992), *cert denied,* —— U.S. ——, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993); *Daniels v. Pipefitters' Association Local Union 597,* 945 F.2d 906, 923 (7th Cir.1991) (citing *McKnight v. General Motors Corporation,* 908 F.2d 104, 112–113 (7th Cir.1990) ("McKnight II")); *Artis v. Hitachi Zosen Clearing, Inc.,* 967 F.2d 1132, 1137 (7th Cir.1992); *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1293–1294 (7th Cir.1987); *Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1421 (7th Cir.1986).

■ To prevail on a disparate treatment claim, a Title VII plaintiff must prove that he was a victim of intentional discrimination. *Young In Hong v. Children's Memorial Hospital,* 993 F.2d 1257 (7th Cir.1993), *cert denied* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994); *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1250 (7th Cir.1990). The law is well-established in this circuit that the methods of order of proof applicable to Section 1981 and Title VII claims are identi-

cal. *Hong,* 993 F.2d at 1266, n. 7 (citing *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563 (7th Cir.1989); *North v. Madison Area Association for Retarded Citizens Development Centers Corp.,* 844 F.2d 401, 408 (7th Cir.1988); *Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1307 (7th Cir.1985); *Mason v. Continental Illinois National Bank,* 704 F.2d 361, 364 (7th Cir.1983).

■ Therefore, as the plaintiff concedes[13], the jury's verdict is binding and preclusive as to the Title VII disparate treatment claim. In accordance, the court so holds.

With that matter resolved, the court will now turn to address the Title VII claim brought under the theory of disparate impact.

### B. Title VII–Disparate Impact Theory

The preclusive effect of the jury's verdict on the disparate impact claim presents a more difficult issue to resolve given that neither the Supreme Court nor the Seventh Circuit has provided much guidance.

In its post-hearing brief, the defendant makes several arguments which in general assert that the jury's verdict on the Section 1981 claim is binding and precludes the court's further consideration of the disparate impact claim. The court finds these arguments unpersuasive and will address them in turn.

■ First, the defendant argues that because the plaintiff failed to request the court to require the jury to return a "special written finding on each issue of fact," he cannot now request the court to make specific findings relevant to his Title VII claims. (Def. Post-hrg.Mem., p. 6). Relying on F.R.C.P. 49(a), the defendant further maintains that the plaintiff is "deemed to have waived his right to a jury trial and findings on the specific factual issues." (Def.Post-hrg.Mem., p. 6).[14]

---

13. See Plaintiff's Post-hrg.Mem., p. 1 and Supp. Post-hrg.Mem., p. 2.

14. Fed.Civ.Proc.Rule 49(a) governs special verdicts and interrogatories and provides:

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In the event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the

There is well-established precedent that claims brought under Section 1981 are legal in nature and triable to a jury on demand whereas claims brought under Title VII are equitable and therefore, triable to the bench. *Handy Button Machine Co.*, 817 F.2d at 1293 (7th Cir.1987); See e.g. *Daniels*, 945 F.2d at 909. In the case at bar, only the Section 1981 claim was presented before the jury. It follows that the plaintiff was not required to submit questions regarding the specific elements of the disparate impact claim to the jury because that claim was to be tried by the court. Indeed, the plaintiff had no right to a jury trial on his Title VII claims. *Handy Button*, 817 F.2d at 1293. Therefore, F.R.C.P. 49(a) does not preclude the court from conducting a separate hearing as to the disparate impact claim.

Second, the defendant maintains that the jury verdict in its favor suggests that: (1) the jury rejected the testimony of the plaintiff's expert, (2) the jury decided that Dr. Fred Bryant[15] was not an expert qualified to testify in the area of employment testing, (3) the jury rejected Dr. Bryant's testimony that the BSAT[16] was not valid and (4) the plaintiff presented no credible evidence of "lessor discriminatory alternatives that were as effective as the BSAT." (Def.Post-hrg. brief, p. 6).

The defendant further maintains that because the assessment of the credibility of witnesses comes under the purview of the jury, the court must presume that the jury found that the plaintiff's evidence was not credible; and therefore, the court cannot consider it in rendering a decision on the disparate impact claim.

The court disagrees. The credibility of the witnesses falls within the purview of the fact-finder. With respect to those factual elements of the disparate impact claim which were not found by the jury, the court is the trier of fact. Further, at this juncture, the defendant's contentions as to what the jury's verdict suggests in terms of the specific elements of the disparate impact claim are too speculative for the court to base its ruling on. While the defendant's assertions that the court may not second guess the jury's determinations of the credibility of witnesses are well-taken, it is important to bear in mind that the jury did not render a verdict on the disparate impact claim. Therefore, the presence of a jury's verdict on the Section 1981 claim does not foreclose the plaintiff's opportunity to present evidence sufficient to support his disparate impact claim at a hearing.

Instead, the implications of the jury's verdict can more easily be determined by comparing the elements of the Section 1981 claim with those of the disparate impact claim. The critical element in a Section 1981 claim is a showing of intentional discrimination. *East v. City of Chicago*, 719 F.Supp. 683 (N.D.Ill.1989) [J. Shadur] (claim under Section 1981 requires showing of an intent to discriminate which involves the rights enumerated in the statute); *Randle*, 876 F.2d at 568; *North*, 844 F.2d 401, 408; *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 510–511 (7th Cir.1986); *Mason*, 704 F.2d at 364. *Watson v. Pathway Financial*, 702 F.Supp. 186 (N.D.Ill.1988) [J. Marovich].

With respect to the disparate impact claim, 42 U.S.C. Section 2000e–2(a)[17] defines as an

---

several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or if it fails to do so, it

shall be deemed to have made a finding in accord with the judgment on the special verdict.

**15.** Dr. Bryant offered expert testimony on behalf of the plaintiff.

**16.** Basic Scholastic Aptitude Test or Bell System Ability Test (Def.Post-hrg. brief, p. 6).

**17.** Title 42 U.S.C. Section 2000e–2(a) provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate

unfair employment practice an employer's discrimination against any individual with respect to hiring or the terms and conditions of employment because of such individual's race, color, religion, sex or, national origin; or to limit, segregate, or classify his employees in ways that would adversely affect any employee because of the employee's race, color, religion, sex or national origin. See *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

■■■■■ The specific elements of a pre–1991 disparate impact claim require that a complaining party: (1) identify the specific employment practice that is allegedly responsible for any observed statistical disparities *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827 (1988); (2) show that the challenged practice has a significant disparate impact on employment opportunities for whites and nonwhites *Wards Cove,* 490 U.S. at 642, 658, 109 S.Ct. at 2115, 2125; and (3) demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack [18] *Wards Cove,* 490 U.S. at 657, 109 S.Ct. at 2124. If the plaintiff satisfies these burdens of proof, then the case shifts to the employer to offer a business justification for the employment practice. *Wards Cove,* 490 U.S. at 658, 109 S.Ct. at 2125. The business justification stage of disparate impact case consists of two components: (1) a consideration of the justifications an employer offers for his use of these practices; and (2) the availability of alternative practices to achieve the same business ends, with less racial impact. *Wards Cove,* 490 U.S. at 658, 109 S.Ct. at 2125 (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

■■■■ As distinct from a Section 1981 claim, a plaintiff who brings a disparate impact claim need not prove discriminatory in-

tent. *Wards Cove,* 490 U.S. at 645–646, 109 S.Ct. at 2118–2119; *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Council 31 AFSCME v. Ward,* 978 F.2d 373, 378 (7th Cir.1992); *Gilty,* 919 F.2d 1247, 1254 (7th Cir.1990).

A comparison of the elements required under each claim suggest that in issuing a verdict in favor of the defendant on the Section 1981 claim, the jury was stating that it found no intentional discrimination on the part of the defendant. It is equally evident, that the elements of the disparate impact claim remain to be considered.

■■■■ The defendant next argues that the rule which asserts that a general verdict gives rise to a presumption that the factual issues have been resolved in favor of the prevailing party (see *Wassell v. Adams,* 865 F.2d 849, 855 (7th Cir.1989); *Geldermann, Inc. v. Financial Management Consultants, Inc.,* 785 F.Supp. 1296, 1298 (N.D.Ill.1992) [J. Sharp] ) requires the court to enter judgment in favor of the defendant on the disparate impact claim because the jury's verdict on the Section 1981 claim was in its favor. (Def.Post-hrg.Mem., p. 5). The court disagrees. To accept the defendant's logic would be tantamount to denying the plaintiff any kind of hearing on his Title VII disparate impact claim. The jury was not asked to decide the Title VII disparate impact claim; and a decision was not rendered as to that claim. Therefore, it is the court's task to evaluate the evidence specific to it.

■■■■ Similarly, the plaintiff goes too far in asserting that the jury verdict has "no effect" on this court's determination of the disparate impact claim. (Supp.Post-hrg., p. 3). This proposition is contrary to established precedent which states that the judge is bound as to the common factual issues between the Section 1981 and Title VII claims. At this point it would be useful to draw a distinction

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or oth-

erwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**18.** This is the causation component of a Title VII plaintiff's prima facie case. *Wards Cove,* 490 U.S. at 656–657, 109 S.Ct. at 2124–2125.

between the preclusive effect of the jury's verdict and the preclusive effect of the fact-finding of the jury as to the issues common to the legal and equitable claims. There may be factual issues that are common to both the Section 1981 and the disparate impact claim, and to that extent the court is bound by those issues, the elements of proof for each claim, however, are different; and therefore, the jury's verdict does not preclude the court from conducting a separate hearing on the disparate impact claim and entering findings of fact and conclusions of law thereto.

There are some Seventh Circuit cases which support this approach. For example, in the first, *Daniels v. Pipefitters' Association Local Union No. 597*, 945 F.2d 906 (7th Cir.1991) *cert denied,* —— U.S. ——, 112 S.Ct. 1514, 117 L.Ed.2d 651 (1992), a welder filed suit against his union alleging multiple legal theories and claiming relief under, *inter alia*, Section 1981 and Section 2000e–2 of Title VII. The Section 1981 claim was tried before a jury which rendered a verdict in the plaintiff's favor and awarded him compensatory and punitive damages. The district court then held a bench trial on the Title VII claim and also entered judgment in favor of the plaintiff. On appeal, the union argued that the district court's decision should be reversed because the judge did not make independent findings of fact but instead relied upon the jury's verdict on the Section 1981 and fair representation claims. *Daniels*, 945 F.2d at 923. In particular, the union challenged the evidentiary basis for the district judge's ruling that the union violated Title VII due to the disparate impact of its hiring practices on blacks.[19] *Daniels*, 945 F.2d at 923. After reasserting its position that the jury's fact-finding on issues common to the jury and judge-tried claims is dispositive, the Seventh Circuit noted that:

> [a]lthough the district court adopted the jury's findings of fact, it made additional findings of its own sufficient to support liability under a theory of disparate impact.

*Daniels*, 945 F.2d at 923.

In affirming the district court's decision, the Seventh Circuit emphasized that the trial court credited the testimony of a statistical expert who testified in support of the plaintiff's claim of disparate impact. *Daniels*, 945 F.2d at 923–924.

Applying this approach to the instant set of facts, the court's ruling in *Daniels* suggests that this court can and should make separate findings of fact in ruling upon the disparate impact claim. See *Snider v. Consolidation Coal Co.*, 973 F.2d 555 (7th Cir. 1992) (To the extent that the factual issues differ from the section 1981 claim, the court may enter independent findings of fact and conclusions of law as to the disparate impact claim).

As in *Daniels*, the trial court in *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132 (7th Cir.1992) conducted separate bench and jury trials for the resolution of the equitable and legal claims respectively. In *Artis*, the plaintiff, a journeyman engine lathe operator, brought suit against his employer under Section 1981 and Title VII under a theory of disparate treatment. The jury rendered a verdict in favor of the plaintiff on the Section 1981 claim and awarded compensatory and punitive damages. Following the jury trial, the district court reconsidered its initial decision to allow the failure to recall claim to go to the jury under Section 1981 and vacated the jury's verdict. *Artis*, 967 F.2d at 1135. After holding a bench trial on the Title VII claims, the district court found for the defendant on the Title VII claim which alleged that the defendant failed to train him. *Artis*, 967 F.2d at 1135. The court, however, ruled in favor of the plaintiff on the failure to recall claim and awarded reinstatement, backpay, prejudgment interest, attorney's fees and costs. *Artis*, 967 F.2d at 1135.

The defendant appealed the decision on the Title VII failure to recall claim arguing that there was insufficient evidence to support the ruling and the judge relied improperly on the vacated jury verdict. *Artis*, 967 F.2d at 1135. On appeal, the court found that the district judge followed the jury's

---

**19.** It is important to note however, that the issue of inconsistency between the jury's and the court's ruling was not present because both were in favor of the plaintiff.

verdict on the failure to recall claim and did not comply with Fed.Civ.Proc.Rule 52(a) which requires a judge to make independent findings of fact and conclusions of law. *Artis,* 967 F.2d at 1137.

The court then considered whether the district judge's failure to enter findings of fact and conclusions of law was proper noting that the trial judge did not indicate any disagreement with the jury's verdict on the failure to recall claim but instead commented that it was supported by the evidence. *Artis,* 967 at 1137–1138. The court further stated that a judge should continue to be bound by a jury's findings even if the verdict is vacated "so long as the underlying factfinding is not impugned." *Artis,* 967 F.2d at 1138; See *Bailey v. Northern Indiana Public Service,* 910 F.2d 406 (7th Cir.1990). In adhering to this rule, the court reasoned that, since the jury had already heard the Title VII claim, had rendered a verdict on that claim and the underlying fact-finding remained intact, the district court judge was bound by that verdict; consequently, entering separate findings of fact and conclusions of law would only "rubber stamp" the decision as to a claim that was already decided. *Artis,* 967 F.2d at 1138. Indeed, if the trial judge had found for the defendant on the Title VII failure to recall claim this would in all likelihood be deemed as a verdict inconsistent with the one the jury had previously rendered on that same claim; an outcome the rule is designed to prevent. Such a result would, as the Seventh Circuit notes, "demonstrate the judge's disrespect for the jury's factfinding function." *Artis,* 967 F.2d at 1138.

With respect to the case at bar, however, the Title VII disparate impact claim was never submitted to the jury. While it is clear that the jury's fact-finding on issues common to the Section 1981 claim and the Title VII disparate impact claim are binding on this court, the verdict itself is not binding on the claim since all of the elements have not been considered. Indeed, a ruling can only be made after additional facts relevant to the disparate impact claim have been determined. Thus, the defendant is premature in making the argument that the court's hearing of the disparate impact claim would contravene the rule of avoiding inconsistent verdicts (Def.Response Post-hrg.Mem., p. 7) since neither a verdict nor a ruling on the disparate impact claim has been rendered.[20] Following this line of reasoning, there is no previous verdict as to this claim which could be characterized as being inconsistent with any subsequent ruling made by the court on the claim of disparate impact.

Therefore, the court finds that the defendant's arguments lack merit and are insufficient to alter this court's conclusion that a hearing on the disparate impact claim is warranted. In addition, the court will provide accompanying findings of fact and conclusions of law in compliance with Fed.Civ.Proc. Rule 52(a).[21]

### CONCLUSION

The court holds that the affirmative defenses asserted in the defendant's Answer to the Third Amended Complaint are insufficient to bar the plaintiff's Title VII claims. The jury's verdict in favor of the defendant on the Section 1981 claim, however, precludes the court from further considering the Title VII disparate treatment claim. There-

---

**20.** In any event, the *Artis* case does not address the issue of whether a jury's verdict on a Section 1981 claim binds the court on the disparate impact claim in a manner that precludes the court from ruling in favor of the party who lost on the Section 1981 claim. The Title VII claims in *Artis* were brought under the theory of disparate treatment.

**21.** F.R.C.P. 52(a) states in pertinent part:
In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law, thereon, and judgment shall be entered pursuant to Rule 58.

It should be noted that the court is well aware of the *Artis'* court holding which asserts that to the extent that a judge is bound by the jury's verdict in a joint Title VII section 1981 trial, it has conducted a jury trial within the meaning of Rule 52(a) thereby obviating the need for the trial judge's entry of findings of fact and conclusions of law. *Artis,* 967 F.2d at 1137.

With respect to the case at bar, however, it is consistent with the reasoning in this opinion and the court's determination that a hearing on the disparate impact claim is warranted that this court make findings of fact and conclusions of law.

fore, judgment on the disparate treatment claim is found in favor of the defendant for the foregoing reasons. Entry of judgment on this claim, however, will be postponed pending resolution of the disparate impact claim.

With respect to the Title VII disparate impact claim, this court will conduct a hearing on Monday August 15. Further, in accordance with precedent, the court and the parties are bound by the jury's fact-finding as to the common factual issues which exist between the Section 1981 claim and the Title VII disparate impact claim.

Following the hearing and pursuant to F.R.C.P. 52(a), the court will issue findings of fact and conclusions of law for those issues which are relevant to the Title VII disparate impact claim.

tration settlement. In the absence of an express choice of law provision, the FAA prevails. *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 477, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488. State law may be applied in arbitration matters, subject to preemption, only to the extent that it actually conflicts with federal law.

The final sentence should read instead that state law may be applied in arbitration matters to the extent that it does not conflict with federal law.

This opinion has been affirmed by the Seventh Circuit without any mention of the error, and a reading of the passage in context, as well as a reading of the *Volt* case, makes it evident that the rest of the opinion stands as a proper interpretation of the concepts of preemption. However, to be accurate, we have issued this order to correct the clerical error in the opinion.

Ahmad **BARAVATI**

v.

**JOSEPHTHAL LYON & ROSS, INC.**

No. 93 C 338.

United States District Court,
N.D. Illinois.

Sept. 7, 1994.

ORDER

MAROVICH, District Judge.

It has come to this Court's attention that there is an error in one of our earlier opinions. This error is merely a clerical error which can be corrected pursuant to Fed. R.Civ.P. 60(a) at anytime.

In the opinion in *Baravati v. Josephthal Lyon and Ross*, 834 F.Supp. 1023 (N.D.Ill. 1993) *aff'd*, 28 F.3d 704 (7th Cir.1994), the Court states on page 1029:

Furthermore, both Plaintiff and Defendants agreed to submit to the NASD arbi-

Erick **CHARLES**, Plaintiff,

v.

Thomas **COTTER**, et al., Defendants.

No. 93 C 2416.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 12, 1994.

Erick Charles, pro se.

Bruce H. Bornstein, Alan Michael Freedman, Freedman & Bornstein, Chicago, IL, for plaintiff.

Mary Margaret Murray, John F. McGuire, Joseph M. Polick, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In this civil rights action under 42 U.S.C. § 1983, plaintiff Erick Charles ("Charles") sues seven defendant Chicago police officers (collectively, "defendants") alleging that they used excessive force during the course of his arrest on February 7, 1992. Trial is set for September 19, 1994. Presently before the court are plaintiff's motion to bar certain documents at trial and for sanctions, and plaintiff's and defendants' motions *in limine* to exclude certain evidence at trial.

### PLAINTIFF'S MOTION TO BAR CERTAIN DOCUMENTS AND FOR SANCTIONS

Charles moves to bar the use at trial of certain documents obtained informally by defendants from the Evanston Police Department after the close of discovery. The documents consist of a fifteen page incident report, a one page police department form, and a four page witness statement from an individual named Willie Etienne, all concerning an incident on September 11, 1991, in which Charles suffered injuries and was transported to St. Francis Hospital in Evanston for emergency treatment. Defendants maintain that the documents contain probative evidence of the fact that the injuries Charles claims to have suffered at the hands of the defendants on February 7, 1992, were actually incurred during the September 11, 1991 incident.

Discovery closed in this case on June 20, 1994. The foregoing documents were obtained without subpoena or other formal means of discovery on June 28 through July 1, 1994, and were served on Charles' counsel on July 1, 1994. The documents were also listed in the parties' final pretrial order which was tendered to the court. Charles

objects to the use of these documents at trial contending that they were improperly obtained by defendants' counsel after the close of discovery and that he was prejudiced thereby.

■ Charles' arguments to exclude this highly probative evidence are not compelling. First, Charles emphasizes that the documents were obtained after the close of discovery. However, it does not follow from the fact that the court has set a date for the close of discovery, that all investigation into a party's claims or defenses must come to a halt on that date. The parties remain free to track relevant evidence—including, as in the instant case, obtaining information from cooperative third parties. Therefore, the fact that the Evanston Police Department records were obtained after the close of discovery is not a sufficient ground for excluding this probative evidence, particularly where, as here, the material was provided to Charles as soon as it was obtained and well in advance of the filing of a final pretrial order.[1]

■ Charles also emphasizes the fact that the documents were obtained by informal means not available to him. Charles speculates in his motion and reply that defendants obtained the documents informally by sending a fellow Chicago Police Officer to the Evanston Police Department who was able to obtain the documents, without following normal Evanston Police Department procedures, simply by virtue of being a fellow law enforcement officer. Charles, on the other hand, was told by the Evanston Police Department that if he wanted access to the documents he would have to subpoena them and pay a twenty-dollar fee. Thus, simply put, Charles argues that defendants enjoyed an advantage over him with respect to obtaining the documents. Significantly,

Charles does not argue that he could not obtain the documents, only that he would have faced greater impediments than defendants. However, this is not a problem unique to this lawsuit. In virtually all litigation there are third-parties possessing probative evidence who are willing to volunteer the evidence to one party and not the other; the latter must resort to formal means of discovery including subpoena. Thus, Charles' protestation that defendants were able to obtain the challenged documents through channels unavailable to him, also does not justify excluding this probative evidence.

■ Nor can the court conclude that Charles has suffered any prejudice because of defense counsels' conduct. Charles notes that the September 11, 1991, incident was the subject of a complaint he filed and that an internal investigation regarding the incident was conducted. Charles further notes that defendants effectively thwarted his efforts to discover the documents contained in the OPS file regarding this incident claiming that such documents were irrelevant to his section 1983 claims; and, in view of this fact, Charles argues that he is prejudiced by defendants' belated recognition of the relevance of the September 11, 1991 incident. Were it not for this court's August 10, 1994 ruling, we might agree. However, on August 10, 1994, the court granted Charles' motion for reconsideration of prior rulings denying his discovery of defendants' personnel records and disciplinary files. In view of the fact that Charles has no longer been foreclosed from reviewing the OPS files, the court cannot conclude that he has suffered any prejudice in this regard.

Charles also suggests that he was prejudiced by the fact that defendants did not employ formal means of discovery because he was given no opportunity to contest the re-

1. Of course, the court agrees with Charles that it would have been preferable for defendants to have acquired the documents through means of formal discovery. Defendants knew or should have known of the possibility of the existence of these documents since plaintiff's deposition on November 5, 1993, or at least since the time that they obtained Charles' medical records from St. Francis hospital. At the very least defendants' counsel was remiss in not seeking out the police records in a timely fashion. However, the court does not find that the circumstances warrant the drastic measure of excluding such probative evidence. Further, the court notes that plaintiff's counsel appear to be equally responsible for the failure to obtain these records, pursuant to a subpoena, in a timely fashion. Plaintiff's counsel surely were aware of the existence of these documents no later than defendants' counsel (if not sooner). Under Rule 11, plaintiff's counsel have an obligation to conduct a reasonable inquiry into the evidentiary support of their client's allegations and other factual contentions. FED. R.CIV.P. 11(b)(3).

ceipt of the documents. However, in view of the potentially high probative nature of the documents, the court cannot conclude that it would have denied formal discovery of the materials after the close of discovery—and it is noteworthy that Charles has identified no basis other than timeliness to exclude the documents—therefore, Charles' speculative claim of prejudice is insufficient to justify exclusion of the documents.

The court has considered all of Charles' other contentions not specifically mentioned herein and finds them to be without merit. For the foregoing reasons Charles' motion to bar use of certain documents at trial, and for sanctions is denied.

## MOTIONS IN LIMINE

■ Federal district courts have the power to exclude evidence *in limine* pursuant to their authority to manage trials. *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984). Guidelines governing motions *in limine* were recently set forth in *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398 (N.D.Ill.1993), as follows:

> This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine.*

*Id.* at 1400–01. With these guidelines in mind, we turn to the motions before the court.

*Plaintiff's motion to exclude evidence of his criminal convictions*

Pursuant to FED.R.EVID. 609 and 403, Charles moves to exclude all evidence relat-

ing to his criminal convictions, arguing that such evidence has no probative value to the issues at bar and that any probative value is substantially outweighed by the danger of unfair prejudice. As set forth below, Charles' motion is granted in part and denied in part.

Rule 609 permits admission, subject to Rule 403, of evidence of past felony convictions for purposes of impeaching a civil witness. Under Rule 403, such evidence may be excluded where the probative value is substantially outweighed by the danger of unfair prejudice. The Seventh Circuit set forth the proper limits of the use of evidence of past felony convictions in *Campbell v. Greer,* 831 F.2d 700 (7th Cir.1987), wherein the court stated that although a felony conviction may be used to impeach a witness in a civil action:

> this is not to say that the opposing party may harp on the witness's crime, parade it lovingly before the jury in all its gruesome details, and thereby shift the focus of attention from the events at issue in the present case to the witness's conviction in a previous case. He may not. Essentially all the information the cross-examiner is permitted to elicit is the crime charged, the date, and the disposition.

*Id.* at 707. *See also Gora v. Costa,* 971 F.2d 1325, 1330 (7th Cir.1992) (noting that "all that is needed to serve the purpose of challenging the witness's veracity is the elicitation of the crime charged, the date, and the disposition"). Both *Campbell* and *Gora* involved application of Rule 609 as it read prior to its 1990 amendments. The Supreme Court held that the pre-amendment Rule 609 required "a judge to permit impeachment of a civil witness with evidence of prior felony convictions regardless of ensuant unfair prejudice to the witness or the party offering the testimony." *Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989). The 1990 amendments to Rule 609, explicitly condition the admissibility of evidence of past felony convictions offered for impeachment of a witness in a civil action on a balancing of probative value and unfair prejudice pursuant to Rule 403.

Rule 609 embodies "[t]he proposition that felons perjure themselves more often than other, similarly situated witnesses." *Campbell*, 831 F.2d at 707. As the Seventh Circuit noted, this empirical proposition may or may not be true; nevertheless, the premise of Rule 609 "that crookedness and lying are correlated," is not for the court to question. Accordingly, the court must conclude that Charles' prior felony convictions are probative evidence of his credibility. The danger of unfair prejudice posed by cross-examination regarding a witness's prior felony convictions is significantly reduced, albeit not eliminated, by adhering to the clear limits on such examination set forth in *Campbell*. Thus, the court finds that the probative value of properly limited cross-examination regarding Charles' prior felony convictions is not substantially outweighed by the danger of unfair prejudice. Accordingly, defendants may cross-examine Charles as to the crime charged, the date, and the disposition (*i.e.*, guilty or not guilty—not length of sentence) with respect to felony convictions during the past ten years—including his January 25, 1993 conviction stemming from his arrest on February 7, 1992. However, with respect to felony convictions more than ten years old, the court finds that the probative value of such convictions does not substantially outweigh their prejudicial effect. FED.R.EVID. 609(b). Defendants should be sufficiently able to attack the veracity of Charles' testimony by cross-examining him as to his convictions on January 25, 1993 (delivery of controlled substance), November 8, 1987 (armed robbery), and October 7, 1986 (manufacture and delivery of controlled substance) without resorting to a "piling on" effect by using his older convictions. Whatever marginal impeachment effect might be added by throwing in his February 2, 1984 (aggravated battery), September 27, 1979 (armed robbery),

and March 23, 1979 (burglary) convictions is substantially outweighed by the unfair prejudice of further suggesting to the jury that Charles is an evil man who does not deserve any consideration of his claims. *See Devenport v. DeRobertis*, 653 F.Supp. 649, 659 (N.D.Ill.1987), *modified on other grounds and aff'd*, 844 F.2d 1310 (7th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).

A few additional words are warranted regarding Charles' January 25, 1993 conviction arising out of his arrest on February 7, 1992. Charles pled guilty to possession of a controlled substance with intent to deliver and delivery of a controlled substance. Illinois courts treat a guilty plea as an admission by the defendant of the facts alleged in the complaint—an admission that may be used against the defendant in subsequent proceedings. *See Brown v. Green*, 738 F.2d 202, 206 (7th Cir.1984). Federal courts must give preclusive effect to state court judgments whenever the courts of the state from which the judgment was rendered would do so. 28 U.S.C. § 1738. Accordingly, this court must treat Charles' guilty plea as an admission of the facts alleged in the complaint against him; and, this admission is binding against Charles in the instant case.[2] While the court finds the underlying facts of Charles' arrest on February 7, 1992 to be relevant to this trial, in order to properly limit the introduction of unnecessary detail[3], the court directs the parties to confer and submit a stipulation, based on the allegations in the complaint against Charles, regarding those facts.

*Plaintiff's motion to exclude testimony of Dr. Jorge Del Castillo*

Defendants maintain that Charles is using photographs of injuries he sustained on Sep-

---

2. Accordingly, Charles is estopped from arguing in this case that he was not guilty of the offenses to which he pled guilty.

3. This court is well aware of—and Charles' motions *in limine* highlight—the ease with which the trial of a civil rights claim brought by a plaintiff with as unsavory a history as Charles can be effectively (and prejudicially) transformed into an attack on the character of the plaintiff by parading every last disreputable detail of the plaintiff's life before the jury. *See Geitz v. Lind-*

*sey*, 893 F.2d 148, 151 (7th Cir.1990). At the same time, the court is equally aware of the defendants' right to introduce relevant evidence—so long as its probative value is not outweighed by the danger of unfair prejudice. Thus, the court must exercise its discretion in balancing defendants' legitimate right to introduce relevant evidence with the plaintiff's right not to have the trial of his civil rights claims undermined by the excessive and prejudicial introduction of character and "bad acts" evidence.

tember 11, 1991, as evidence of injuries he allegedly sustained at the hands of the defendants on February 7, 1992. Charles anticipates that the defendants will call Dr. Del Castillo, who is board certified in emergency medicine, to testify that the plaintiff's injuries depicted in these photographs occurred on a date other than the date of the alleged incident; that the injuries were not caused by the defendants; and that a comparison of the photographs with one taken at the Cook County Jail indicates that Charles did not receive the injuries he has alleged. Charles contends that Dr. Del Castillo can do no more than look at the photographs and give an opinion about what they portray and that Dr. Del Castillo is no more qualified to look at the photographs and draw inferences than the jurors. Defendants argue that Dr. Del Castillo's expertise enables him to testify about Charles' subjective complaints, objective examinations, diagnoses, and treatment as documented in medical records from September 11, 1991 and February 7, 1992. More specifically, defendants maintain that Dr. Del Castillo's testimony will assist the jury in understanding the documented medical treatments and associating the treatments with the plaintiff's injuries as depicted in the photographs.

 Notwithstanding Charles' somewhat misleading characterization of Dr. Del Castillo's anticipated testimony, the court denies Charles' motion to exclude this testimony. It is clear to the court that defendants intend to have Dr. Del Castillo review Charles' medical records from September 11, 1991 and February 7, 1992, and draw an inference based on his specialized knowledge of emergency medicine as to whether the injuries depicted in the photographs appear to match the injuries diagnosed and treated on September 11, 1991 as opposed to February 7, 1992. Such testimony plainly pertains to scientific knowledge and will assist the trier of fact in understanding the evidence or

determining a fact in issue; thus, it is proper matter for expert testimony. *See O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994). The court believes that the average juror would not have the ability to decipher medical records describing diagnoses and treatments and then correctly match those records to a photograph of injuries. Accordingly, Dr. Del Castillo will be permitted to testify as to his opinions regarding whether the photographs correspond to the injuries documented in the medical records.[4]

*Plaintiff's motion to exclude evidence relating to his arrests and gang affiliations*

Charles moves to exclude evidence relating to his previous arrests and gang affiliations other than arrests by any of the defendants, contending that such evidence is irrelevant and prejudicial. Defendants argue that to the extent that they seek to introduce evidence of Charles' prior arrests, such evidence would be elicited to show Charles' motive for denying that he was engaged in drug activity at the time of his arrest and his motive for trying to evade arrest; additionally, defendants state that depending on Charles' testimony, evidence of his prior arrests might be used for impeachment or to rebut his claims. With respect to Charles' gang affiliations, defendants argue that, to the extent that they seek to introduce such evidence, it would be offered to prove Charles' knowledge of gang affiliations on September 11, 1991, his identity as a member or former member of the Los Angeles Crips gang on September 11, 1991, and an absence of mistake or accident regarding injuries Charles received on September 11, 1991.

 We address the latter issue first. As discussed above, it is defendants' contention that certain photographs sought to be

4. Charles' motion seeks to exclude any testimony by Dr. Del Castillo regarding the credibility of the parties, when and where the plaintiff received his injuries, and whether the plaintiff's injuries were inflicted by the defendants on February 7, 1992. It is not at all clear that defendants intend to offer any such testimony by Dr. Del Castillo; however, for the sake of thorough-

ness the court grants Charles' motion to the extent that it seeks to bar Dr. Del Castillo from giving improper opinion testimony about the parties' credibility, or the location where Charles received the injuries depicted in the photographs. This type of speculative testimony would be well outside the scope of Dr. Del Castillo's expertise.

introduced as evidence by Charles depict injuries he suffered on September 11, 1991 not February 7, 1992. Thus, it is certainly relevant to defendants' case that Charles suffered injuries on September 11, 1991, and that Charles may have suffered these injuries in a physical attack; however, that these injuries may have been gang-related adds absolutely no probative value to defendants' case. Additionally, the court rejects defendants' suggestion that Charles' gang affiliation may be admissible under Rule 608(b) as a specific instance of conduct probative of truthfulness or untruthfulness. Identifying Charles as a gang member is unfairly prejudicial insofar as it encourages the inference that Charles is an evil and menacing person. Because the court finds that the prejudicial effect of evidence of Charles' gang affiliation substantially outweighs its probative value, Charles' motion to exclude any such evidence is granted.

■ Charles' motion to exclude evidence of his prior arrests (except those arrests by the defendants)—and defendants' response—highlight the problems posed by motions *in limine* which are presented to the court in the abstract without the benefit of the context of a trial. Charles asks the court to rule, as a general matter, that any evidence of his prior arrests is inadmissible because its prejudicial effect substantially outweighs its probative value. Such a ruling would be premature and an abuse of the court's discretion. Any ruling on the admissibility of Charles' specific prior arrest evidence must be made in the context of a proffer during the trial.

■ Nevertheless, the court does find that the probative value of Charles' general arrest history as evidence of his motive to avoid arrest is substantially outweighed by its prejudicial effect and therefore such evidence will be inadmissible for the purpose of proving motive to avoid arrest. Additionally, as noted above, Charles is estopped from denying that he was engaged in drug activity

on February 7, 1992, *see supra* note 1; therefore, defendants' argument that evidence of Charles' prior arrests is probative of his motive for such a denial is moot.

■ As defendants correctly note, depending on Charles' testimony at trial, evidence of his prior arrests could be relevant for impeachment purposes or to rebut his claims. For this reason, the court will not rule at this time that evidence of Charles' prior arrests are *per se* inadmissible. However, before defendants seek to introduce any evidence of—or cross-examine Charles with respect to—prior arrests, they shall first advise the court and obtain a ruling, outside of the presence of the jury, concerning the admissibility of the evidence or the propriety of the cross-examination.

Accordingly, Charles' motion to exclude evidence of his prior arrests is granted in part and denied in part.

*Plaintiff's motion to exclude evidence relating to his employment termination*

■ Charles moves to exclude evidence of his prior employment terminations. Defendants argue that because Charles' employment history reveals that he lied to previous employers about his criminal history—and was terminated from one position as a result thereof—cross-examination regarding such specific acts of misconduct is proper under Rule 608(b) because it bears directly on Charles' truthfulness or untruthfulness. Charles argues that even if such evidence is probative of his truthfulness, it should be excluded because of its prejudicial effect—apparently, the "back-door" introduction of evidence regarding his prior criminal history. However, since the court is permitting evidence of Charles' prior felony convictions, the prejudicial effect of admitting evidence that Charles lied about his criminal history on an employment application is minimal. Therefore, the court denies Charles' motion to exclude evidence or any questions concerning his prior employment terminations.[5] Defen-

---

5. However, the court does not intend this ruling to provide defendants with a "back door" through which to introduce evidence of Charles' convictions which are more than ten years old. Defendants do not identify with particularity the

misrepresentation allegedly made by Charles; however, in the event that the misrepresentation concerns a conviction more than ten years old, defendants shall first advise the court and obtain a ruling, outside of the presence of the jury,

dants are bound, of course, by Rule 608(b)'s prohibition of extrinsic evidence as proof of specific instances of conduct.

*Plaintiff's motion to exclude evidence relating to his prior hospitalizations*

 Charles moves to exclude evidence of his prior hospitalizations. Defendants contend that such evidence is relevant because Charles is using photographs of injuries he sustained on September 11, 1991 as evidence of injuries he allegedly sustained at the hands of the defendants on February 7, 1992. Because evidence as to the nature and extent of Charles' September 11, 1991 injuries is relevant to his claim that the photographs in question reflect injuries he sustained on February 7, 1992, the court denies Charles' motion to exclude evidence of his prior hospitalizations.

*Plaintiff's motion to exclude evidence relating to defendants' commendations, awards or honors*

 Charles moves to exclude evidence of commendations, awards or honors conferred upon defendants, arguing that such evidence is not relevant and unfairly prejudicial. Defendants respond that in the event that plaintiff is allowed to introduce negative material from their disciplinary files, evidence relating to their commendations, awards and honors would be relevant in rebutting plaintiff's evidence. However, to the extent that the court allows plaintiff to introduce any evidence from defendants' disciplinary files, such evidence is only admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. FED.R.EVID. 404(b). It is not admissible for purposes of showing that the defendants acted in conformity with a bad character. Accordingly, the court finds no merit in defendants' claim that evidence of their commendations, awards, or honors would be relevant to rebutting any evidence of prior acts of misconduct.[6] Therefore, Charles' motion to exclude

evidence of defendants' commendations, awards or honors is granted. In the event that Charles is permitted to introduce evidence from defendants' disciplinary files, defendants may renew their objection to this motion *in limine* and the court will reconsider, in the context of the disciplinary record evidence, whether the proposed evidence serves to rebut the admitted disciplinary record evidence.

*Plaintiff's motion to exclude evidence of drug activity at his residence*

Charles moves to exclude evidence regarding drug activity at his residence, including evidence of anonymous calls received by the police and observations of suspected drug activity at plaintiff's residence. Plaintiff contends that such evidence is irrelevant and prejudicial, and, with respect to reports of drug activity, such evidence is inadmissible hearsay. Defendants maintain that such evidence is relevant and material because it shows that they had a reasonable basis for being present at Charles' residence and why they had contact with him. Conversely, defendants argue that to bar such evidence would tend to create the prejudicial and inaccurate inferences that defendants had no reasonable basis for being present at Charles' residence, that they had prior knowledge that Charles lived at the residence, and that they had unjustifiably targeted his residence. Regarding plaintiff's hearsay argument, defendants contend that the evidence would not be introduced for the truth of the matter asserted but rather would be elicited to show the effect on the listener.

 As set forth above, the court has directed the parties to confer and present a stipulation based on the allegations in the complaint against Charles as to the facts surrounding his arrest on February 7, 1992. This stipulation should serve to provide adequate context for the defendants' presence at Charles' residence on the night in question without resorting to unnecessary, prejudicial

concerning whether cross-examination regarding the employment termination will be permitted.

**6.** In fact, the court strongly suspects that evidence of defendants' commendations, awards or

honors could only serve the improper function of providing evidence of defendants' character for the purpose of proving action in conformity therewith on the night in question.

references to reports, anonymous or otherwise, of drug activity at Charles' residence. Thus, Charles' motion to exclude evidence of drug activity at his residence is granted in part: No evidence of reports of drug activity at Charles' residence shall be admissible. The court cautions Charles, however, that if he opens the door to the issue of whether the police had adequate cause for being at his residence on February 7, 1992, or denies that drug related activity was taking place at his residence on February 7, 1992, the court will reconsider this ruling. Charles' motion to exclude evidence of drug activity at his residence is denied in part in the following respects: any allegations of drug activity contained in the complaint against Charles are admissible, and defendants shall be allowed to testify as to any drug activity they personally observed at Charles' residence on the night in question insofar as that drug activity is directly related to Charles' arrest.

*Plaintiff's motion to exclude evidence of his drug use*

Charles moves to bar any questioning regarding his or any other witness' prior drug use. Charles contends that such evidence is irrelevant, unfairly prejudicial, and is not probative of veracity, *see United States v. Boyd,* 833 F.Supp. 1277, 1359 (N.D.Ill.1993) ("As a general rule, a witness' past drug use is not probative of veracity and, thus, is not a proper subject for cross examination") (citations omitted). Defendants, also citing *Boyd,* argue that such evidence is relevant "where a witness' memory or mental capacity is legitimately at issue," *id.,* and that the court "may admit evidence of a witness' drug use as it relates to his or her inability to recollect and relate." *Id.* (quoting *United States v. Robinson,* 956 F.2d 1388, 1397 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992)). In *United States v. Cameron,* 814 F.2d 403 (7th Cir.1987), the Seventh Circuit noted that evidence of a witness' drug use:

> may be admitted where the memory or mental capacity of a witness is legitimately at issue. At the same time, however, there is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively dis-

count the witness' testimony. *See* Fed. R.Evid. 403.

*Id.* at 405. Accordingly, the Seventh Circuit has concluded, "A district court may bar cross-examination about a witness' illegal drug use when it is used 'for the sole purpose of making a general character attack.'" *Robinson,* 956 F.2d at 1397 (quoting *Cameron,* 814 F.2d at 405).

■ Once again, the court cannot rule in the abstract on Charles' motion to exclude evidence of prior drug use. The context provided by trial testimony is required in order for the court to determine whether a witness' memory or mental capacity is legitimately at issue or whether the evidence is sought merely to impugn the witness' character. Therefore, at this time, Charles' motion to exclude evidence of prior drug use is denied. However, the parties are directed not to mention this evidence in front of the jury until such time as the defendant obtains a ruling, outside the presence of the jury, that this evidence is admissible.

*Plaintiff's motion to exclude evidence of his present incarceration, length of his present sentence, and all previous sentences*

Charles moves to exclude any evidence or testimony regarding the fact that he is presently incarcerated, the length of his present sentence, and the length of all previous sentences. Charles contends that such evidence is irrelevant and unfairly prejudicial. Defendants maintain that evidence of Charles present and previous incarcerations may be relevant as to proof of motive for resisting arrest and may be relevant if Charles claims emotional distress damages. *See e.g. Gora v. Costa,* 971 F.2d 1325, 1331 (7th Cir.1992) (finding evidence of incarceration was properly admitted where it related to plaintiff's claims of emotional injury).

Specifically with respect to civil rights cases which "often pit unsympathetic plaintiffs-criminals, or members of the criminal class ... against the guardians of the community's safety," *Geitz v. Lindsey,* 893 F.2d 148, 151 (7th Cir.1990), the Seventh Circuit has noted that "evidence of current incarceration is highly prejudicial, and therefore

courts should not be quick to admit such evidence." *Gora,* 971 F.2d at 1331.

■ Defendants' argument that Charles' present and prior incarcerations may be relevant as to proof of his motive for resisting arrest is, perhaps, true. However, because the court finds the probative value of such evidence in this regard to be so insignificant in comparison to its prejudicial effect[7], the court holds that evidence of Charles' present and prior incarcerations shall be inadmissible for purposes of showing Charles' motive to resist arrest.

■ Additionally, there is no indication in this case that Charles is seeking any damages for emotional suffering with respect to which evidence of his present or prior incarcerations would be relevant. Therefore, the court grants Charles' motion to exclude any evidence or testimony regarding the fact that he is presently incarcerated, the length of his present sentence, and the length of all previous sentences. However, in the event that Charles does make a claim for such damages, the court will reconsider this ruling upon proper motion by defendants.

*Plaintiff's motion to exclude evidence of defendants' financial condition*

■ Charles moves to bar any questioning of the defendants regarding their financial condition. In response, defendants state that they do not intend to introduce any such evidence. Accordingly, plaintiff's motion is denied as moot.

*Defendants' motion to exclude evidence of prior complaints and/or lawsuits against defendants*

■ In the wake of this court's August 10, 1994, ruling granting Charles' motion for reconsideration of prior rulings denying discovery of defendants' personnel files and disciplinary reports, the court has made it per-

fectly clear to the plaintiff that evidence of prior misconduct by defendants would only be admissible if it fell within the ambit of Federal Rule of Evidence 404(b). In a hearing on August 24, 1994, the court further stated that it would only allow evidence pertaining to prior allegations of misconduct by the defendants if the evidence was adequate to clearly establish a "modus operandi" of the defendants. Plaintiff was directed to submit to the court any such evidence for a determination of whether it satisfied this requirement. To date, plaintiff has not presented any evidence to the court relating to complaints or lawsuits against the defendants. Accordingly, defendants' motion to exclude such evidence is premature and, therefore, denied. In the event that plaintiff submits to the court evidence of complaints and/or lawsuits against any of the defendants, the court will entertain defendants' present arguments in ruling on the admissibility of plaintiff's proffered evidence.

*Defendants' motion to exclude evidence of the arrest, alleged strip search, and disposition of charges against witness Buffy Michelle Cummings*

■ Defendants move to exclude any testimony by plaintiff or his common-law wife Buffy Michelle Cummings regarding Ms. Cummings' arrest, alleged strip search and the disposition of her charge.

Ms. Cummings was present at Charles' residence at the time of his arrest and claims to have witnessed Charles' alleged beating by the defendants. Ms Cummings was also arrested at that time and charged with disorderly conduct. She contends that she was falsely arrested, illegally strip searched, and that the charge against her was eventually dropped. Defendants seek to exclude testimony concerning the propriety of her arrest, the alleged strip search, and the disposition of her charge, contending that any probative

---

7. Whether an individual with a lengthy arrest or conviction history is more motivated to avoid arrest than a "first timer" is, at best, an empirical question. However, without presuming to know the answer to this question, the court notes that the life consequences of even one arrest or conviction can be so profound that even first timers are likely to have substantial motivation to avoid or resist arrest. Moreover, a convincing argument could be made that a person more familiar with the criminal justice system, such as plaintiff, has fully weighed the consequences of his criminal activities and is prepared to accept a normal arrest as a consequence of those activities.

value of such evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury.

Defendants' motion need not detain the court long. Cummings' testimony as to the events that took place when the defendants entered Charles' residence—including testimony that one of the defendants held a gun to Cummings' head and told her he was going to blow it off and testimony that Cummings was subjected to a strip search—amounts to testimony about acts by the defendants that are intricately related to the conduct alleged by Charles. At the very least, the evidence is plainly relevant insofar as it sets the scene, puts Charles' allegations in context, and provides a description of Charles' ordeal. The testimony is also relevant to and probative of the objective reasonableness of defendants' conduct at the time of Charles' arrest.

Defendants go to great lengths to argue that defendants' alleged conduct towards Cummings is not related to their conduct towards Charles[8] and that the former conduct does not make Charles' claim that he was subject to a brutal attack more likely than not. The court cannot agree. Defendants' apparently fail to recognize that although the alleged conduct appears, at first blush, to be directed solely at Cummings, holding a gun to Charles' common-law wife's head and threatening to kill her in Charles' presence and/or humiliating her by subjecting her to a strip search in his presence also amount to acts of terror directed at Charles.

There can be little doubt that the challenged testimony, if believed, will be damaging to the defendants; however, that is not the yardstick by which to measure the danger of unfair prejudice. *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir.1985). If, as defendants suggest, the challenged testimony serves to inflame the jury, it is only because of the nature of the alleged conduct by the defendants. Moreover, defendants'

arguments notwithstanding, the court does not find the content of the challenged testimony to be so emotionally provocative as to create a substantial danger of prejudicing the jury.

■ However, the court does agree with defendants that the ultimate disposition of Cummings' disorderly conduct charge is of marginal probative value to the issues to be decided by the trier of fact in this case. Moreover, this minimal probative value is substantially outweighed by its undue prejudicial effect—namely, that the evidence encourages the inference that Cummings' arrest was completely groundless when, in fact, the State's decision not to prosecute Cummings may not have rested on such a basis at all. Therefore, evidence of the disposition of Cummings' charge will be excluded.

For the foregoing reasons, defendants' motion to exclude testimony regarding the circumstances surrounding Cummings' arrest and alleged strip search is denied. The defendants' motion to exclude the disposition of charges against Cummings is granted.

*Defendants' motion to exclude evidence relating to broken doors*

Defendants move to exclude photographs and testimony regarding broken doors leading to Charles' residence which he claims were broken by the police when they entered his apartment the night of his arrest. Defendants argue that such evidence would improperly suggest to the jury that the defendants unlawfully entered plaintiff's residence and would improperly suggest that since the defendants used excessive force to enter the apartment, they also used excessive force to effect his arrest. Also, defendants argue that since Charles has made no claim for false arrest or for property damage, the evidence is irrelevant. Charles contends that the evidence of broken doors provides context for understanding the circumstances of his arrest. Additionally, Charles contends

---

**8.** Defendants' related suggestion that Charles has no standing to vindicate Cummings constitutional rights is, of course, is a red herring—Charles is not seeking to vindicate Cummings' rights but merely to provide an accurate and complete narrative of the events surrounding his arrest.

However, to the extent that defendants' fear that the jury might improperly consider Cummings' alleged injuries in determining defendants' liability or damages in this case, they may submit an appropriate jury instruction on the issue.

that the evidence is impeaching and goes to the credibility of defendants in that the defendants all deny breaking through the door, and, Paramedic Koch will testify that one of the defendants told him that Charles was injured when he put his head through the glass door while trying to escape.

■■■■ As an initial matter, we note that defendants' arguments as to the prejudicial effect of photographs and testimony regarding the broken doors are not compelling; the fact that the police may have had to break down doors to enter a suspect's residence does not necessarily, or even probably, give rise to the inference that the police entered *unlawfully* or with *excessive force*. Doors frequently get broken down during arrests, particularly drug arrests; and, it is reasonable to presume that jurors understand this. Therefore, the court finds little merit in the argument that evidence or testimony regarding the broken doors will lead to prejudicial inferences. Conversely, the court finds the evidence potentially relevant in several respects. First, as Charles contends, the circumstances of defendants' entry into his residence are sufficiently connected to the circumstances of his arrest as to set the scene and put the circumstances of the arrest in context. Second, to the extent that defendants deny breaking the door or entering the residence by entering the door, the evidence is directly relevant. Third, the photographs may be relevant if paramedic Koch testifies that one of the defendants told him that Charles was injured when he put his head through the door while trying to escape. For the foregoing reasons, the court finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Defendants' motion to exclude evidence of broken doors is denied.

*Defendants' motion to exclude evidence relating to a false case report*

■■■ Defendants anticipate that Charles will introduce evidence that defendant Cotter prepared a false vice case report in an attempt by defendants to provide an untruthful explanation for plaintiff's injuries. Defendants argue that since Charles has made no conspiracy or cover-up claim in this action,

evidence that a false vice report was prepared is irrelevant and unfairly prejudicial because it suggests that a cover-up was involved. To the extent that this evidence establishes that a cover-up was involved, such evidence is damaging to the defendants—because it may indicate that defendant Cotter believed he needed to hide something—but it is not unfairly prejudicial. Furthermore, this evidence goes straight to the heart of defendant Cotter's credibility—which will be a critical issue in this case. Defendants' motion to exclude evidence relating to a false vice case report is denied.

*Defendants' motion to exclude evidence of indemnification by the City of Chicago*

The court grants defendants' unopposed motion to exclude evidence of, or reference to, the fact that defendants may be indemnified or reimbursed by the City of Chicago.

*Defendants' motion to bar references to defendants' attorneys as Assistant Corporation Counsels*

■■■ The court grants defendants' motion to bar references to defendants' attorneys as Assistant Corporation Counsels for the City of Chicago. Besides noting that this is defendants' attorneys' job title, plaintiff makes no argument as to why any such reference is necessary or relevant. Referring to defendants' attorneys as Assistant Corporation Counsels, invites the inference that the City is paying for the defense and will pay any judgment that is entered against the defendants. This implicit "deep pocket" suggestion serves no purpose and is as prejudicial to the defendants as suggesting to the jury directly that the City will indemnify or reimburse the defendants. Plaintiff has no objection to excluding the latter suggestion and raises no valid objection to excluding the former. The motion is granted.

*Defendants' motion to exclude evidence that defendants violated CPD rules, orders, regulations, or training*

Defendants move to exclude any evidence relating to whether the defendants and/or non-defendant police witnesses breached police department rules, regulations, orders, or

training during the arrest, custody and processing of the plaintiff. Defendants argue that violations of departmental rules or regulations do not give rise to a constitutional claim under section 1983; therefore, defendants argue the introduction of such evidence is irrelevant, confusing, and prejudicial. Defendants assert that if the jury is presented with evidence of such violations, it would be confused and unable to separate the purported rule/regulation violation from the alleged constitutional violation. In response, Charles represents that he will only use the challenged evidence for purposes of impeachment and "refreshing the recollection of witnesses."

 Because the court finds evidence that the defendants violated police rules, regulations etc., to be relevant and probative with respect to Charles' claim that the defendants violated his constitutional rights, the court will deny defendants' motion and permit Charles to introduce the challenged evidence; however, the court will hold Charles to his representation and will limit Charles' use of such evidence to impeachment and "refreshing" the witnesses. The court finds that the threat of prejudice and confusion envisioned by defendants can be adequately alleviated by proper jury instructions as to the meaning or significance of the purported rule violations.[9]

*Defendants' motion to exclude references to other police misconduct or the absence of a videotape*

Defendants move to bar any reference of any alleged instances of misconduct by other police officers which have been the subject of current events (e.g., Rodney King) or any

references to "videotape" (*e.g.*, "There was no video camera at the scene of plaintiff's arrest."), contending that such references are irrelevant and designed solely to inflame the passions of the jury. Charles responds that he does not plan on mentioning other instances of police misconduct although the issue may surface during voir dire and, if so, it may be a proper subject of discussion. Defendants reply that references during voir dire would taint the venire and improperly influence prospective jurors.

 In view of Charles' response, defendants' motion is largely moot; and, to the extent that it is not, the court agrees that the subject of the prospective jurors exposure to cases of police misconduct (including the more publicized cases) may be wholly appropriate for voir dire. Moreover, the court cannot conclude at this time, that mere references to other acts of police misconduct, to "Rodney King," or to "videotape" are unduly prejudicial. Accordingly, defendants' motion is denied. The court notes further that trial judges "exercise broad discretion in controlling counsels' arguments and in 'ensur[ing] that argument does not stray unduly from the mark.'" *United States v. Wables*, 731 F.2d 440, 449 (7th Cir.1984) (quoting *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975); *see also United States v. Grabiec*, 563 F.2d 313, 319 (7th Cir.1977). While the court will entertain any objection to counsel's arguments at the appropriate time, it is unwilling to muzzle Charles' counsel at this early phase of trial.

*Defendants' motion to exclude witnesses from the courtroom*

Defendants' unopposed motion, pursuant to Fed.R.Evid. 615, to exclude witnesses, oth-

---

9. The court respectfully declines to follow *Walker v. Saenz*, No. 91 C 3669, 1992 WL 317188 (N.D.Ill. Oct. 27, 1992), insofar as it determined that jury instructions would be inadequate to prevent the jury from assuming that a violation of police regulations also constitutes a constitutional violation or from confusing the standards for finding a rule violation with the standards for finding a constitutional violation. A jury is presumed to follow the court's instructions. *See United States v. L'Allier*, 838 F.2d 234, 242 (7th Cir.1988) (limiting jury's consideration of the evidence relating to each count separately, and noting "[o]ur theory of trial relies upon the ability of a jury to follow instructions") (quoting

*United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985)); *cf. United States v. Robinson*, 956 F.2d 1388, 1396 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992) (finding that the prejudicial impact of Rule 404(b) evidence was limited by instruction that the jury could not consider the evidence as evidence of guilt). In the instant case, the court does not believe that an substantial probability exists that the jury will be unable to follow an instruction distinguishing a Chicago Police Department rule violation from a constitutional violation, or an instruction regarding the standards for finding a constitutional violation.

er than the parties, from the courtroom is granted.

### CONCLUSION

Charles' motion to bar use of certain documents at trial [60–1] and for sanctions [60–2] is denied. Charles' motion *in limine* [63–1] is granted in part and denied in part. Defendants' motion *in limine* [64–1] [64–2] is granted in part and denied in part. Charles' motion to exclude evidence of his criminal convictions is granted in part and denied in part. Charles' motion to exclude the testimony of Dr. Jorge Del Castillo is denied. Charles' motion to exclude evidence of gang affiliation is granted. Charles' motion to exclude evidence of his prior arrests is granted in part and denied in part. Charles' motion to exclude evidence concerning his prior employment terminations is denied. Charles' motion to exclude evidence of his prior hospitalizations is denied. Charles' motion to exclude evidence of defendants' commendations, awards or honors is granted. Charles' motion to exclude evidence of drug activity at his residence is granted in part and denied in part. Charles' motion to exclude evidence of his or any other witness' prior drug use is denied. Charles' motion to exclude evidence of his present incarceration, length of his present sentence, and all previous sentences is granted. Charles' motion to exclude evidence of defendants' financial condition is denied as moot. Defendants' motion to exclude evidence of prior complaints and/or lawsuits against defendants is denied. Defendants' motion to exclude evidence of the arrest, strip search, and disposition of charges against witness Buffy Michelle Cummings is granted in part and denied in part. Defendants' motion to exclude evidence of broken doors is denied. Defendants' motion to exclude evidence relating to a false vice case report is denied. Defendants' motion to exclude evidence of or reference to indemnification by the City of Chicago is granted. Defendants' motion to bar references to defendants' attorneys as Assistant Corporation Counsels for the City of Chicago is granted. Defendants' motion to exclude evidence that defendants violated CPD rules, orders, regulations, or training is denied. Defendants' motion to bar references to other acts of police misconduct or to "videotape" is denied. Defendants' motion to exclude witnesses from the courtroom is granted.

**SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS WELFARE & PENSION FUNDS, Plaintiff,**

v.

**Paul MOSER, d/b/a Paul Moser Trucking, Defendant.**

**No. 93 C 377.**

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 19, 1994.

Hugh B. Arnold, John Joseph Toomey, Arnold & Kadjan, Chicago, IL, for plaintiff.

Gerard C. Smetana, Law Offices of Gerard C. Smetana, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff, the Suburban Teamsters of Northern Illinois Welfare and Pension Funds ("Welfare and Pension Funds" or "Funds"), has filed a declaratory judgment action against defendant Paul Moser, d/b/a Paul Moser Trucking ("Moser"), seeking a determination of the rights and other legal relations of the parties arising under sections 502 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 USC §§ 1132, 1145, and under section 301 of the Labor Management Relations Act, 29 USC § 185. The Welfare and Pension Funds are ERISA funds established pursuant to written collective bargaining agreements providing benefits to all persons performing covered work under the agreements. Steven English ("English") was an employee of Moser Trucking and a member of Teamsters Local 673. Pursuant to the collective bargaining agreement between Teamsters Local 673 and Moser Trucking, titled "DuPage County Construction Agreement," Moser made contributions on English's behalf to the Funds.

On November 27, 1991, English was involved in an accident while backing a semi-tractor out of Moser Trucking's driveway. Two days later, English visited his doctor complaining of an injury to his elbow. The physician treated English and released him to return to work on Monday, December 2, 1991. English continued to work for Moser two to three days a week during the winter months hauling fuel oil. On February 22, 1992, Moser fired English for not returning money advanced to him for an overweight violation. English did not file a grievance with the union to contest the discharge.

On March 2, 1992, approximately one week after he was terminated, English filed a worker's compensation claim alleging that he was disabled due to the injuries sustained in the November accident. English and Moser settled the worker's compensation claim approximately five months later on August 24, 1992.

On May 2, 1992, the Funds audited Moser and determined that he owed contributions on behalf of English for the period December 1991 through February 1992. Fund Manager James W. Ewing sent a letter to Moser, informing him of the contributions due for this period and requesting payment.

After Moser failed to pay the delinquent contributions, the Funds filed this action on January 21, 1993. Plaintiff seeks a declaration that Moser owes $3,223.00 in contributions to the Funds on behalf of English. The disputed contributions break down as follows: Moser allegedly owes $607.00 in contributions to the welfare fund and $66.00 in contributions to the pension fund for the period of English's employment from December 2, 1991 to February 22, 1992; Moser also allegedly owes $2,300.00 in contributions to the welfare fund and $250.00 in contributions to the pension fund for the twenty-five week

period of the workers' compensation claim, March 2, 1992 through August 24, 1992.

Defendant Moser has moved for summary judgment on the basis that it has no obligation to make contributions to the Funds for the period of English's workers' compensation claim because English was not a "regular employee ... absent because of occupational illness or injury." English was not a "regular employee" or "absent" during this period because he had been terminated for cause unrelated to the alleged injury. In addition, Moser maintains it owes no contributions for the period December 1991 through February 1992 as English was not performing work covered under the terms of the agreement.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Rule 56 further provides that a party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

■ The parties agree that the facts are not disputed. The issues relating to interpretation of the collective bargaining agreement present questions of law which the court can properly resolve on summary judgment.

■ Section 515 of ERISA requires employers to make pension and welfare fund contributions as promised in collective bargaining agreements to the extent the terms of the agreement are not inconsistent with law. *Central States Pension Fund v. Hartlage Truck,* 991 F.2d 1357, 1360 (7th Cir. 1993). Section 515 provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the

terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 USC § 1145. The Welfare and Pension Funds are not parties to the collective bargaining agreements but are third-party beneficiaries. *Central States v. Gerber Truck,* 870 F.2d 1148, 1151 (7th Cir.1989). The Funds are authorized to pursue collection under 29 USC § 1132(a)(3)(B)(ii), which provides that a civil action may be brought by a participant, beneficiary or fiduciary of an ERISA plan to enforce the terms of the plan.

■ The court must enforce the terms of the collective bargaining agreements when those terms are unambiguous. *Hartlage Truck,* 991 F.2d at 1361, citing *Central States v. Independent Fruit & Produce Co.,* 919 F.2d 1343, 1349 (8th Cir.1990). In order to properly resolve a dispute over contractual terms on a motion for summary judgment, a trial court must determine whether the language of the agreement is ambiguous. See *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1389 (7th Cir.1993). "A term is ambiguous if it is subject to reasonable alternative interpretations." *Id,* quoting *Taylor v. Continental Group,* 933 F.2d 1227, 1232 (3rd Cir. 1991).

Plaintiff contends that section 9.1(B) of the agreement delegates responsibility to the Funds' Board of Trustees to resolve any disputes as to contributions owed by Moser:

> Any disagreement with respect to the eligibility, time and method of payments, payments during periods of employee illness or disability, method of enforcement of payment and related matters shall be determined by such Trustees.

The Funds maintain that since the trustees have discretion to resolve these disputes, their decision must be reviewed under an arbitrary and capricious standard of review. See *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Despite the language of section 9.1(B), defendant Moser argues the agreement does not give the trustees any authority (much

less discretionary authority) to interpret or construe the terms of the agreement. Moser contends the agreement *"leaves to the parties* the right to interpret the Agreement where the Agreement is ambiguous and provides no room for the Agreement to be interpreted by third parties contrary to the Agreement's own terms." (Reply at 2) (emphasis in original).

■ In *Firestone,* the Supreme Court set forth the appropriate standard of review for section 1132(a)(1)(B) actions challenging benefit eligibility determinations:

Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

Under *Firestone,* a district court must review a plan administrator's decision to deny benefits *de novo* unless the ERISA plan gives the administrator discretion to determine a claimant's eligibility or to construe the terms of the plan. If the ERISA plan gives the administrator such discretionary authority, the standard of review is arbitrary and capricious. See *Nichol v. Pullman Standard, Inc.,* 889 F.2d 115, 118 (7th Cir.1989); *Fletcher v. Kroger Co.,* 942 F.2d 1137, 1139 (7th Cir.1991).

The Supreme Court in *Firestone* specifically limited its discussion of the appropriate standard of review ·to section 1132(a)(1)(B) actions. The Court did not comment on the applicability of the *de novo* or arbitrary and capricious standards of review to other ERISA actions:

The discussion which follows is limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations. We express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA.

■ This court has found no Seventh Circuit or district court cases where a *de novo* or arbitrary and capricious standard of review was applied in section 515 actions to

recover delinquent employer contributions. See *Indiana State Council of Roofers v. Adams Roofing Co.,* 753 F.2d 561, 564 (7th Cir.1985); *Central States Pension Fund v. Hartlage Truck,* 991 F.2d 1357, 1361–62 (7th Cir.1993); *Central States Pension Fund v. Tank Transport,* 779 F.Supp. 947 (N.D.Ill. 1991). However, none of the agreements at issue in these cases specifically delegated the responsibility to resolve disputes over employer contributions to the fund trustees as in this case.

In *Indiana State Council,* 753 F.2d at 564, the Seventh Circuit held that the provisions of the trust agreement provided the framework under which a court should analyze an employer's obligation to contribute to a health and welfare fund. *Id* at 564, citing *Hinson v. NLRB,* 428 F.2d 133, 139 (8th Cir.1970). The Seventh Circuit found that the trust agreement unambiguously obligated defendants to make contributions only on behalf of employees whose wages were set forth in the collective bargaining agreement. Because helpers' wages were not established in the collective bargaining agreements until 1980, the Court concluded that defendants did not violate section 515 of ERISA by failing to make contributions on behalf of helpers prior to 1980. *Id* at 564.

Similarly, in *Hartlage Truck,* 991 F.2d at 1360, the Seventh Circuit explained that as an initial matter, it must look to the collective bargaining agreements at issue to decide whether the employer was liable for allegedly delinquent contributions. The Court explained that employers are required to make contributions only on behalf of those employees indicated by the agreements. *Id* at 1360. The Court determined that it was unnecessary to look to the plain meaning or dictionary definition of the term "casual employment" as the parties had agreed to a specific definition of the term in the agreements. The Seventh Circuit concluded that the agreements at issue were unambiguous and clearly expressed the parties' intent that the employer need not make contributions to the funds on behalf of casual employees. *Id* at 1362.

These cases require the district court to look to the language of the collective bargain-

ing agreement at issue to determine an employer's obligation to make contributions to the Funds. In this case, the language of the agreement unambiguously delegates the responsibility to resolve disputes over employer contributions to the trustees. Defendant does not articulate how section 9.1(B) is ambiguous and offers no reasonable argument for why the court should disregard this unambiguous language.

*Central States Pension Fund v. Tank Transport,* 779 F.Supp. 947 (N.D.Ill.1991), is the only case this court has found where a district court disregarded the unambiguous language of the collective bargaining agreement that section 515 claims be resolved through grievance committee decisions or arbitration. The court determined that arbitration should not be ordered where there was "an inherent conflict between arbitration and the statute's underlying purpose." *Id* at 950, quoting *Shearson–American Express, Inc. v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). The court explained that the underlying purpose of ERISA is to protect "the interests of participants in employee benefit plans and their beneficiaries ... [by] establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for ... ready access to the federal courts." 29 USC § 1001(b). The district court found the grievance committee/arbitration procedure inconsistent with the underlying purposes of ERISA—especially where the trustee of the fund was not represented on the grievance panel. *Id.* 779 F.Supp. at 951. "It is clear that Central States would have little, if any representation on the grievance panel, and thus, no way to protect their fiduciary interests in the Central States Pension Fund." *Id.* at 951, n. 4.

Unlike *Tank Transport,* no policy reasons exist in this case which would require the court to disregard section 9.1(B) of the agreement. There is no conflict between section 9.1(B) and the underlying purpose of ERISA to protect the interests of participants in employee benefit plans and their beneficiaries. The Funds' interest is obviously protected as section 9.1(B) delegates authority to the Board of Trustees to resolve disputes over employer contributions. In addition, the employer's interest in the dispute is not ignored as section 9.1(G) provides for employer representatives on the Board of Trustees.[1]

Because section 9.1(B) gives the trustees discretionary authority to resolve disputes as to employer contributions, the trustees' determination that contributions were due and owing for English under the agreement[2] will be reviewed under an arbitrary and capricious standard. See *Fuller v. CBT Corp.,* 905 F.2d 1055, 1058 (7th Cir. 1990) (trustees have discretion because the plan provides that trustees are "to construe and interpret the plan"); *Saracco v. Local Union 786 Pension Fund,* 942 F.2d 1213, 1215 (7th Cir.1991) ("the pension plan's trust agreement vests the trustees with discretion '[t]o determine all questions arising in the administration, interpretation and application of the Pension Plan, including questions of eligibility' "); *Fought v. Evans Products Company Racine Pension Plan Agreement,* 966 F.2d 304, 306 (7th Cir.1992) (refusing to

---

1. 9.1(G) provides as follows:

 The employer agrees that it is bound by and is a party to the trust agreement creating the health and welfare fund and the pension fund, and all prior and subsequent amendments thereto, as if it had signed the original copy of each of the said trust agreements, both of which said agreements being incorporated herein by reference and made a part hereof; the employer hereby designates as its representatives on the board of trustees of said funds such trustees as are named in said agreements and declarations of trust, as employer trustees together with their successors selected in the manner provided in said agreements and declarations of trust, as they may be amended from time to time; and further agrees

to be bound by all action taken by said employer trustees regarding and pursuant to the said agreements and declarations of trust as amended from time to time.

2. The trustees have never issued a written opinion or decision letter setting forth their analysis in determining that contributions were due and owing under the agreement. The court assumes that because the Funds initiated this suit, the trustees did make a determination that English was a covered employee for the period December 2, 1991 to February 22, 1992 and that English was a "regular employee ... absent because of occupational illness or injury" for the period March 2, 1992 through August 24, 1992.

invoke de novo standard after finding that "clause authorizing the Committee '[t]o construe the Plan' led to deferential review under *Firestone* "). A trustees' decision shall not be overturned under the arbitrary and capricious standard "absent special circumstances such as fraud or bad faith, if 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.' " *Exbom v. Central States Health and Welfare Fund,* 900 F.2d 1138, 1142 (7th Cir.1990), quoting *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir.1985).

Section 9.1(E) of the agreement provides for employer contributions as follows:

> If any regular employee is absent because of occupational illness or injury, the required contribution shall be made until the employee returns to work, or for a period of twelve (12) months, whichever is the shorter.

The plaintiff Funds contend that employer contributions are required for the period of English's workers compensation claim (March 2, 1992 to August 24, 1992) because the injuries English allegedly sustained in November 1991 prevented him from working following his termination three months later in February 1992. The Funds assert that English's inability to presently work as a truck driver is sufficient to constitute "absence" under section 9.1(E).

█ ERISA clearly contemplates that "trustees will act to ensure that a plan receives *all funds to which it is entitled.*" See *Central States v. Central Transport, Inc.,* 472 U.S. 559, 571, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447 (1985) (emphasis added). In this case, however, the finding of the trustees is unreasonable in light of the plain meaning and sequence of the terms "regular employee," "absent," "because of" and "occupational illness or injury." Section 9.1(E) requires employer contributions for up to one year for any regular employee absent because of occupational illness or injury. The terms "regular employee" and "absent" are not defined in the agreement. However, the parties do not dispute that English was a "regular employee" when the accident occurred on November 27, 1991 and that English was *not* a "regular employee" when he filed his work-

ers compensation claim following his termination. If English was not a "regular employee" once he was terminated on February 22, 1992, he similarly could not be "absent" from work following his termination. English was terminated for not returning money advanced to him for an overweight violation. English did not file a union grievance to contest the discharge; he had no expectation of returning to work for Moser. The fact that section 9.1(E) provides for employer contributions until the "employee returns to work" indicates the parties contemplated coverage for employees who could not work for a period of time because of occupational illness or injury. The parties did not contemplate coverage for individuals who had no expectation of returning to work because they had been terminated for cause. In addition, English was never absent "because of" occupational injury while he was employed by Moser. The trustees' finding that Moser is obligated to make payments to the Funds on behalf of English for this period cannot be supported by "a reasoned explanation, based on the evidence" and is therefore arbitrary and capricious.

█ Moser also maintains that it owes no contributions for the period December 2, 1991 through February 22, 1992 because English was not performing work covered under the agreement. English was hauling fuel oil from Indiana to a storage facility in St. Charles, Illinois for Parent Petroleum. According to Moser, English would have been covered if he had been hauling construction materials as provided in section 1.4 of the agreement. The Funds, on the other hand, argue that coverage is determined by the type of truck English used for hauling oil and that the tractor-trailer belonged to the Group 3–5 axle truck classification set forth in section 8.2 of the agreement.

Section 1.3 describes the employees covered under the agreement:

> Employees covered by this agreement are all employees in the classifications of work covered by this agreement, employed by the employers in the contract territory and engaged in the work described in section 1.4 hereof.

Section 1.4, which was referenced in section 1.3, provides as follows:

This agreement shall apply to employees in the classifications herein set forth in the performance of work involved in the following operations.

A. Heavy construction: Heavy construction is defined a constructing substantially in its entirety any fixed structure, other improvement or modification thereof, or an addition or repair thereto, including any structure of operation which is an incidental part of a contract thereof....

B. Highway construction work: Highway construction work is defined as all work ordinarily included in highway construction contracts, bridges, sewer and street grading, street paving, curb setting, sidewalks, etc., and landscaping on work where prevailing wage rules are in effect....

C. Removal and disposal of rubbish from wrecking jobs.

D. Snow removal.

E. Hauling of cinders, slag, asphalt (including liquid asphalt), sand fill and all other types of fill on construction jobs.

F. Delivery to and spreading on the construction site or the road bed of any stabilized base material to be used on a subsurface, including but not limited to fill, poz-o-pac, aggregate materials, bituminous aggregate materials, cement aggregate materials or any other trade name of base or paving material.

G. Back filling.

H. Digging.

I. Leveling and grading.

J. Street sprinkling and flushing.

K. Concrete breaking or sawing or mini concrete planner, or asphalt planner.

L. Pipeline work.

M. Pavement marking and sealing.

N. Construction slag and sludge hauling or any other trucking in or out of steel mills.

O. Hauling of salt.

P. Asphalt plant and end loaders.

Q. The hauling of broken asphalt and recycled asphalt with doser end loaders and rubber tire end loaders also. Precast slabs and pipe.

R. The securing of all loads shall be the drivers responsibility.

S. Concrete pumping on concrete pumping trucks.

T. Concrete breaking and bob cats or end loaders.

U. Cherry picking booms unloading drywall, bag material, brick and all other materials loaded or unloaded from cherry picking boom and flat bed trucks or semi bed trucks or semis.

V. Street sweepers and mini concrete and asphalt planner.

W. Low boys hauling machinery out of or into joint council number 25 shall receive mileage.

According to section 1.4, an employee is covered under the agreement if he or she is performing work described in subsections A through W.[3] These classifications involve construction activities and include the hauling of construction materials.

The Funds' argument that contribution is determined by truck classification is not supported by the plain language of the agreement. Truck classifications are set forth in Article 8 only as a basis for determining the compensation truck drivers are to be paid. Section 8.1 provides:

The following rates of hourly pay shall prevail during the period herein set forth.

Work or services performed at the construction site which includes driving trucks to and from the spreading on the construction site or the road bed of any base material to be used for such a subsurface which shall include but not be limited to fill, gravel, blacktop, cement or poz-o-pac, and building, wrecking, excavating and renovation shall be covered by the hourly rates set forth as follows:

---

**3.** There appears to be no issue that English was employed by Moser in the contract territory (the geographic area covered by the I.B. of T. Joint Council Number 25 area). (See Agreement, §§ 1.1 and 1.3).

8.2 The trucks listed in this section shall be classified and drivers paid on the following axle basis. . . .

The language of section 8.1 further emphasizes that employees are being paid for work being performed at the construction site, which includes the driving of trucks to and from the construction site. The Funds have not argued that English was hauling oil to and from construction sites. Because the plain language of the agreement covers employees performing construction work or hauling construction materials, the trustees' finding that Moser owed contributions for the period when English hauled oil interstate is arbitrary and capricious.

■ Plaintiff also argues that, as a matter of law, contributions are owed on all hours worked by a union employee even if all of the time was not spent in covered employment. See *Operating Engineers Pension Trust v. Soule Steel Co.*, 797 F.2d 791 (9th Cir.1986); *Chicago District Council of Carpenters Pension Fund v. Exhibition Contractors Co., Inc.*, 618 F.Supp. 234 (N.D.Ill. 1985). The cases cited by plaintiff do not stand for this proposition, however. In *Soule*, the master labor agreement ("MLA") required employers to pay contributions to the funds for every hour worked by a union employee "who performs work covered by the MLA, regardless of whether all of the work done was covered by the agreement." 797 F.2d at 791. The court held that the plain language of the agreement controlled and that the employer owed contributions for all hours worked by the operating engineer, including work not covered by the agreement. *Id.* at 793. Similarly, in *Exhibition Contractors*, the court enforced the plain language of the agreements which required employer contributions for each hour worked by a union employee regardless of the type of work performed. 618 F.Supp. at 238. Unlike *Soule* and *Exhibition Contractors*, the agreement in this case contains no language requiring Moser to pay for all work performed by union employees even if the work was not covered under the agreement. Defendant's motion for summary judgment is granted.

ORDERED: Defendant Moser's motion for summary judgment is granted. The court determines the rights and legal relations of the parties as follows: Moser has no obligation under the agreement to make contributions to the Funds for the period March 2, 1992 through August 24, 1992 because English was not a "regular employee . . . absent because of occupational illness or injury." Moser also owes no contributions for the period December 2, 1991 through February 22, 1992 because English was not performing work covered under the agreement.

The Clerk is ordered to enter judgment for defendant Paul Moser, d/b/a Paul Moser Trucking, and against plaintiff, the Suburban Teamsters of Northern Illinois Welfare and Pension Funds, on a separate document pursuant to FRCP 58. The judgment order should also include the above declaration setting forth the rights and legal relations of the parties.

**MID AMERICA TITLE COMPANY,
Plaintiff,**

v.

**James F. KIRK, Defendant.**

**No. 86 C 2853.**

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 19, 1994.

Robert Edward Wagner, Alan L. Barry, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, Amy L.H. Rockwell, Baxter Travenol Laboratories, Inc., Deerfield, IL, for Mid America Title Co.

Thomas L. Browne, Thomas P. McGarry, Hinshaw & Culbertson, Chicago, IL, Thomas Henry James, Shriver & O'Neill, Rockford, IL, Gary W. Leydig, Levin, McParland, Phillips, Leydig & Haberkorn, Chicago, IL, for James F. Kirk.

James F. Kirk, pro se.

Howard Patrick Morris, William V. Johnson, Johnson & Bell, Ltd., Chicago, IL, for Attorney's Title Guar. Fund, Inc.

Frank J. McGarr, pro se.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, United States Magistrate Judge.

Plaintiff Mid America Title Company ("Mid America") and Defendant James Kirk, an attorney associated with the Attorneys' Title Guaranty Fund, are both in the business of performing title searches and preparing title insurance commitments for real estate in Illinois. In the spring of 1985, Mid America prepared a title insurance commitment on behalf of a lender for a parcel of real estate in Will County, Illinois. Kirk later prepared a title commitment for his clients, the purchasers of the property. At the time Kirk prepared his commitment, his staff had a copy of the commitment that had been prepared by Mid America. Kirk's commitment contains material apparently copied from the Mid America commitment. Mid America registered its title insurance commitment for the Will County property with the U.S. Copyright Office on June 4, 1985. In this lawsuit, filed in April 1986, Mid America charges Kirk with violating Mid America's copyright in its title insurance commitment. Kirk contends that Mid America's

title commitment is a compilation of facts which does not qualify for copyright protection as a matter of law. Now before the court are the parties' cross-motions for summary judgment.[1]

### STATEMENT OF FACTS

Plaintiff Mid America Title Company ("Mid America") provides "real estate settlement services," including title searches, title insurance, and escrow services to buyers, sellers, and mortgage lenders. (Statement of Material Facts as to Which There is no Genuine Issue in Support of Mid America's Motion for Summary Judgment (hereinafter, "Mid America's Rule 12(M) Statement") ¶ 3.) Mid America also acts as a title insurance agent and will create and issue a title insurance commitment for a parcel of property at the request of a seller, buyer, or lender. (Id. ¶¶ 2, 4.) Mid America determines whether it will issue a title insurance commitment on the basis of a land title search. (Id. ¶ 4.) Mid America's title commitments are writings which "compris[e] text and compilation of selected land title data." (Mid America's Rule 12(M) Statement ¶ 6.)

Defendant James F. Kirk ("Kirk"), an Illinois attorney, is a member of the Attorneys' Title Guaranty Fund, Inc. ("ATGF"), an organization that underwrites title insurance. (Mid America's Rule 12(M) Statement ¶ 7, 8.) As an ATGF member, Kirk is authorized to perform title searches and to prepare and issue commitments to issue title insurance on behalf of ATGF. (Kirk's Answers to Plaintiff's First Set of Requests for Admissions, Ex. B to Mid America's Statement of Material Facts as to Which There is a Genuine Issue in Opposition to Kirk's Cross-Motion for Summary Judgment (hereinafter "Mid America's Rule 12(N) Statement"), ¶ 3.) In 1985, Kirk represented George and June Schaaf in a real estate transaction in which the Schaafs purchased a parcel of land in Frankfort, Illinois from Richard and Violet Wagner. (Mid America's Rule 12(M) Statement ¶ 10.)

On April 19, 1985, the Horizon Federal Savings Bank ("Horizon") placed an order with Mid America for title insurance policies for the Wagner property. (Id. ¶ 11.)[2] Mid America did, in fact, prepare its Title Commitment No. 125266 for the property. Thaddeus M. Bond, Sr., Mid America's president, asserts that the commitment "was developed through a manual search of land title records in Will County." (Declaration of Thaddeus M. Bond, Sr., Ex. C to Mid America's Rule 12(M) Statement, ¶ 7.) The fourth page of the Commitment bears the words, "Copyright 1985, Mid America Title Company." (Commitment for Title Insurance, Ex. E to Mid America's Rule 12(M) Statement.) According to Thaddeus Bond, the original and a

---

1. This case was originally filed in August 1986. On Defendant's motion to dismiss, District Judge James Alesia concluded that Plaintiff had not adequately identified the original elements of its title commitment that were allegedly infringed, and that, in any event, Plaintiff was unable to prove that Defendant had copied anything that was original. See Mid America Title Co. v. Kirk, 991 F.2d 417, 419 (7th Cir.) cert. denied, —— U.S. ——, 114 S.Ct. 346, 126 L.Ed.2d 310 (1993) (hereinafter, "Kirk I"). The Seventh Circuit concluded that such a determination was not appropriate on a motion attacking the sufficiency of the pleadings, concluded that Mid America had adequately pleaded that it had a copyrightable interest in its data compilation, and remanded for development of an evidentiary record on the question of whether Mid America could prove that claim. Id. at 422–23. Following remand, the parties consented to the exercise of jurisdiction by Magistrate Judge Bernard Weisberg. After Judge Weisberg's death, the case was reassigned to this court and the parties again executed consents. The parties have now

accepted the Seventh Circuit's invitation to file cross-motions for summary judgment, supported by affidavits, deposition transcripts, and additional exhibits.

2. Kirk denies this assertion but cites in support of his denial only his own hearsay testimony that someone at Horizon had told him that they had not yet ordered a title commitment and would order such a commitment from Attorneys' Title Guaranty Fund. In response to Kirk's own motion for summary judgment, Mid America has submitted a copy of Horizon's written application for a title commitment. (Ex. A to Mid America's Rule 12(N) Statement.) As Thaddeus Bond testified, Mid America has a practice of beginning the process of performing a title search and preparing a title insurance commitment at the lender's request even where the buyer of the property has not yet authorized or contracted with Mid America for a title insurance commitment. (Deposition of Bond, Ex. 7 to Kirk's Memorandum, at 124.)

copy of the commitment was mailed to Horizon, but Horizon cancelled the order. (Bond Declaration ¶¶ 8, 9.)[3]

The Schaafs never requested a title commitment from Mid America. They did order such a commitment from Kirk. (Defendant's Statement of Material Facts as to Which There is no Genuine Issue in Support of Defendant's Cross Motion for Summary Judgment (hereinafter, "Kirk's Rule 12(M) Statement") ¶ 2.) Kirk and his assistant, Cynthia Peri, explained that, when preparing a title commitment for property in Will County, they order a title search from the law firm of Davis, Varsek and Dystrup. (Deposition of Cynthia Peri, Ex. G to Mid America's Rule 12(M) Statement, at 6, 12–13; Deposition of James F. Kirk, Ex. D to Mid America's Rule 12(M) Statement, at 33.) Ms. Peri uses the data she receives from Davis, Varsek to prepare a title commitment which is then reviewed, approved, and signed by Kirk. (Dep. of James F. Kirk, Ex. D to Mid America's Rule 12(M) Statement, at 14–16.) By letter dated April 26, 1985 directed to the attention of "JoAnn," Ms. Peri requested a title search on the Frankfort property. (Letter from Peri to "JoAnn," 4/26/85, Ex. 12 to Memorandum of James F. Kirk in Opposition to Mid America's Motion for Summary Judgment and in Support of his Cross–Motion for Summary Judgment (hereinafter, "Kirk's Memorandum").)

Ms. Peri had not received the results of the title search by early May. Knowing she needed the information in time for a May 7 closing date, Ms. Peri telephoned JoAnn and received an oral report of the results of that search. (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 23.) Mid America asserts that Ms. Peri only received data concerning the taxes, mortgage, and owner of the property; in fact, however, Ms. Peri testified that "[t]he only thing she [JoAnn] *didn't* have on the first day I called her was judgment and lien searches on the buyer and seller, I think." (Peri Dep., Ex. 5 to Kirk's

Memorandum, at 19 (emphasis supplied).) Although neither party explains the circumstances, it is undisputed that at some time prior to the closing, Mid America's title commitment came into Kirk's possession. Ms. Peri recalled that she was "sure it was there prior to the close." (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 17.) On or about May 7, 1985, Kirk issued a title commitment for the property bearing ATGF Commitment No. 774156. (ATGF Title Commitment, Ex. F to Mid America's Rule 12(M) Statement.) Ms. Peri distributed the ATGF title commitment some time prior to the May 7, 1985 closing date. (Mid America's Rule 12(M) Statement ¶ 28.) Ms. Peri acknowledged that she "probably" had the Mid America commitment open on her desk at the time she prepared the ATGF Commitment. (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 27.)

The ATGF commitment contains erroneous information—a mortgage recording date one day later than the actual mortgage date—that Mid America had "planted" in its own title commitment in an effort to detect copiers. (Mid America's Rule 12(M) Statement ¶¶ 31, 32; Bond Declaration ¶ 10.) The written title search report that Kirk received from Davis, Varsek & Dystrup did not contain the error. (Mid America's Rule 12(M) Statement ¶ 33, 34.) Like the Mid America commitment, the title insurance commitment produced by ATGF bears an "effective date" of March 27, 1985; the "effective date" that appears on the written title search report from Davis, Varsek and Dystrup is April 15, 1985. (*Id.* ¶¶ 35–37.) Ms. Peri testified that "[e]vidently I picked it [the March 27 date] up off of Mid America," conduct she attributed to "the kind of chaos that was at the office at that time . . . ." (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 26.) Both the Mid America Commitment and the ATGF commitment contain, in identical language exceptions to the insurance coverage.[4]

---

3. Kirk denies the cancellation occurred, citing the same hearsay testimony referred to earlier.

4. Specifically, both commitments make exceptions for "Rights of the State of Illinois, the municipality and the public in and to that part of the property which may fall in streets and high-

ways" and for "Rights of way for drainage ditches, tiles, feeders and laterals, if any." Mid America Commitment, Ex. E to Mid America's Rule 12(M) Statement, at p. 2 ¶¶ 3, 4; ATGF Commitment, Ex. F to Mid America's Rule 12(M) Statement, at p. 2 ¶¶ 7, 8.

The written report from Davis, Varsek and Dystrup does not contain this information. (Mid America's Rule 12(M) Statement ¶ 41.) Both the Mid America Commitment and the ATGF commitment contain identical information concerning taxes owed on the property and a mortgage lien against the property. (*Id.* ¶¶ 42–44.) Mid America claims it lost $865.00, the price it billed Horizon for the title commitment. (*Id.* ¶ 46.) Kirk admits he collected $904.50 for the ATGF title commitment. (*Id.* ¶ 47.)

The parties are in substantial agreement concerning the basic function of running title searches and performing title commitments. As James Kirk explains, a title insurance commitment is an offer to provide a policy of title insurance, which is ordinarily subject to all interests which affect title to a piece of property. (Affidavit of James F. Kirk, Ex. 2 to Kirk Memorandum, ¶ 7.) These interests, which are matters of public record, consist of "any encumbrances, mortgages, liens, assessments, litigation or wills involving the property and judgments." (*Id.* ¶ 8.) Title commitments should make reference to every encumbrance that appears in the public records, including property tax information, all liens and mortgages, and the names and marital status of the current owner(s). (*Id.* ¶¶ 9, 10, 11.) Indeed, Kirk observed that he had "never seen a properly prepared title commitment during [his] years of practice that did not contain a legal description of the property, the property index number, general taxes on the property and their status, mortgages on the property and any information of record with respect to such mortgages and the current owners of record on the property and whether they are married." (*Id.* ¶ 12.)

Andrew C. Dystrup, a principal in the law firm that Kirk called upon to perform a title search on the Schaaf property, provided a similar description of the process for performing a title search. (Affidavit of Andrew C. Dystrup, Ex. 3 to Kirk Memorandum, at ¶¶ 12–16.) Mr. Dystrup added that it is often a clerk in his office who gathers information for the title search (*Id.* ¶ 17), pursuant to these instructions:

The clerk who completes the search is instructed to simply write down every less than fee "interest" which affects a piece of property as well as identify the record owner of the property. No judgment or discretion is involved in identifying and writing down this information.

(*Id.* ¶ 18.)

Thaddeus M. Bond, President of Mid America, describes the work performed by a "trained title searcher" similarly as a search for facts including, but not limited to, "the identification of all grantors and grantees in the chain of title; the legal description; encumbrances such as mortgages, trust deeds, as well as releases and assignments of those encumbrances; judgments; federal and state tax liens against persons in the chain of title, as well as releases of those liens; divorces, probate matters and bankruptcies against persons in the chain of title; special assessments; drainage district assessments; and real estate tax information." (Declaration of Bond, Ex. L to Mid America's Reply Memorandum, ¶ 3.) After the search is completed, Bond explained, the information is given to the title examiner who prepares a commitment for title insurance by selecting "those facts which in the exercise of the examiner's judgment need to be known by a lender or a purchaser of real estate." (*Id.* ¶ 5.) Bond acknowledges, however, that it is only "those facts that do not affect the property or liens which have been properly released" that are excluded from the title commitment. (*Id.*) Bond thus does not challenge Kirk's assertion that all facts that do affect the property should be included. Bond's declaration continues with a description of the decisions made by the title searcher in preparing the Schaaf title commitment, decisions that Mid America contends reflected judgment and creativity.

On June 4, 1985, Mid America filed a registration for its title insurance commitment No. 125266 with the U.S. Copyright Office. (Certificate of Copyright Registration Nos. 1–786–703 and 1–844–563, Exs. A and B to Mid America's Rule 12(M) Statement.) Kirk contends that the facts contained in the Mid America commitment are matters of public record. (Defendant's

Statement of Material Facts as to Which There is no Genuine Issue in Support of Defendant's Cross Motion for Summary Judgment (hereinafter, "Kirk's Rule 12(M) Statement") ¶ 1.) Mid America admits this, except that Mid America asserts that it owns and leases access to certain maps (the "Sidwell maps") which are the source of the information that requires an exclusion in the commitment for "[r]ights of the State of Illinois, the municipality and the public in and to that part of the property which may fall in streets and highways." (Mid America's Rule 12(M) Statement ¶ 1.)

As Mid America has admitted, further, it is common industry practice for title insurance companies to use an earlier policy or commitment as a "starter" when preparing a commitment, and for a title company to "just come forward"—that is, search for title information only from the effective date of the "starter policy" to the present. (*Id.* ¶ 6.) Mid America does not deny that Kirk himself did not use the Mid America Commitment in preparing the ATGF commitment. (*Id.* ¶ 7.) In addition, Mid America admits that the "arrangement of facts" in the paragraph from the ATGF commitment concerning real estate tax information is "completely different" from the ·analogous paragraphs in the Mid America title commitment. (*Id.* ¶ 12.) Similarly, Mid America admits that the arrangement of facts in the paragraph in the ATGF Commitment concerning the existing mortgage on the property is "completely different" from the arrangement of facts in the corresponding paragraph of the Mid America Commitment. (*Id.* ¶ 14.) Mid America acknowledges, in addition, that there are differences between the two policies in the language identifying the owners of the property and in the language introducing the property description. (*Id.* ¶ 13.) Mid America admits that the ATGF title commitment contains certain paragraphs that do not appear in any form in the Mid America Commitment; specifically, the ATGF commitment sets forth additional exceptions to title insurance coverage unless additional materials—a survey and evidence of coverage against mechanics' liens—are provided. (*Id.* ¶ 16.) In addition, certain tax information provided in the search prepared by the Davis, Varsek firm

appears in the ATGF commitment but not in Mid America's Commitment. (*Id.* ¶ 18.)

## DISCUSSION

Plaintiff Mid America seeks a summary judgment in its favor on the issue of infringement. Kirk argues that he is entitled to judgment as a matter of law because the undisputed facts demonstrate that the material he allegedly copied was not copyrightable.

### A. *Standards for Summary Judgment*

■ Summary judgment may be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A party moving for summary judgment bears the initial burden of informing the district court, and the non-moving party, of the basis for its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This requirement necessitates that the moving party point to those portions of the record or of the nonmovant's case which it believes demonstrate the absence of a genuine issue of material fact. *Id.* Once the moving party has carried its initial burden of pointing to defects in the nonmoving party's case, the nonmoving party must come forward with evidence sufficient to create a material issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

■ The standard for granting summary judgment "mirrors" the standard for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). That is, summary judgment is appropriate when there can be but one reasonable conclusion as to the verdict. *Id.* In making the determination whether reasonable persons could differ as to the evidence, the court must consider whether the nonmovant has put forth sufficient evidence to satisfy the

substantive evidentiary standard for its case. *Id.* at 255, 106 S.Ct. at 2513–14.

## B. *Burden of Proof; the Feist Publications Decision*

Plaintiff has the burden of establishing copyright infringement, and must prove two essential elements to meet that burden: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991).

In *Feist Publications,* the Supreme Court addressed the scope of copyright protection afforded to factual compilations. Rural Telephone Service Company charged that Feist Publications infringed Rural's copyright when Feist published a white pages telephone directory using names and telephone numbers copied from a directory published by Rural. The Supreme Court concluded that Rural was not entitled to a copyright in its directory and reversed a summary judgment for Rural. In reaching that conclusion, the Court emphasized that "[o]riginality is a constitutional requirement for copyright protection...." 499 U.S. at 345, 111 S.Ct. at 1287. Facts of whatever kind—scientific, historical, biographical, and news of the day—"whether alone or as a part of a compilation, are not original and therefore may not be copyrighted." *Id.* at 350, 111 S.Ct. at 1290. A compilation of facts may be copyrightable, however, "if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement." *Id.* at 350–51, 111 S.Ct. at 1290. Thus, a compiler's selection, arrangement and coordination, if original, are the only protectable elements of a factual compilation. Because the facts themselves cannot be protected by copyright, "the copyright in a factual compilation is thin." *Id.* at 349, 111 S.Ct. at 1289.

The Court noted that the names, towns of residence, and telephone numbers listed by Rural were facts, not subject to copyright. Nor was the selection, coordination, and arrangement of Rural's white pages sufficiently original to merit copyright protection. "Rural's selection of listings could not be more obvious: it publishes the most basic information—name, town, and telephone number—about each person who applies to it for telephone service." *Id.* at 362, 111 S.Ct. at 1296. Rural's alphabetical listing of names and numbers showed no original elements of coordination or arrangement. The Court concluded that "Rural expended sufficient effort to make the white pages directory useful, but insufficient creativity to make it original." *Id.*

Prior to the Supreme Court's decision in *Feist,* the United States Courts of Appeals were split as to whether or not a person's hard work in collecting data in a compilation, by itself, was sufficient to justify a copyright in that collection of data. *See* 1 M.B. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 3.04[B] (1993). The view that hard work in a compilation justified copyright protection, also known as the "sweat of the brow doctrine," was explicitly rejected by the *Feist* Court. The Court recognized, in fact, that the very same facts and ideas assembled through hard work might lawfully be "restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." *Feist,* 499 U.S. at 349, 111 S.Ct. at 1289.

Although the standard for creativity is "extremely low," the selector of a copyrighted compilation faces two hurdles. First, when a compilation author adds no expression to his compilation, and therefore lets the facts speak for themselves, he must rely on the originality of his selection and arrangement of facts to justify his copyright. *Feist,* 499 U.S. at 349, 111 S.Ct. at 1289–90. Second, even though the originality requirement is not stringent, the compiler's selection and arrangement of facts cannot be "so mechanical or routine as to require no creativity whatsoever." 499 U.S. at 362, 111 S.Ct. at 1296.

Citing *Rand McNally & Co. v. Fleet Management Systems, Inc.,* 591 F.Supp. 726, 737 (N.D.Ill.1983), Mid America urges that its properly registered copyright of its title commitment constitutes *prima facie* evidence of ownership of a valid copyright, and shifts to Kirk the burden to prove invalidity. In

*Feist,* however, defendant conceded that Rural's telephone directory considered as a whole, might be subject to a valid copyright because it contained some text and original material. Nevertheless, the Court concluded that the material copied by Feist was not copyrightable because the "selection, coordination and arrangement" required in compiling the telephone listings lacked originality. 499 U.S. at 362, 111 S.Ct. at 1290. The Court explicitly stated that because originality is a statutory and a constitutional requirement of copyright, the party alleging infringement bears the burden of showing "the existence of those facts of originality, of intellectual production, of thought, and conception" in its work. *Id.* at 346–47, 111 S.Ct. at 1288 (quoting *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884)). Thus Mid America bears the burden of proving both that it "selected, coordinated, or arranged [otherwise] uncopyrightable facts in an original way" and that Kirk copied the protectable element of its compilation.

■ Although a finding regarding the originality element of a copyright is a fact-driven inquiry, summary judgment may properly be granted where a jury could not, as a matter of law, find that the alleged copied material was original to the plaintiff. *Arica Institute, Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir.1992), quoting *Hoehling v. Universal Studios,* 618 F.2d 972, 980 (2d Cir.1980) (summary judgment appropriate where all alleged similarity relates to noncopyrightable elements). Therefore the threshold question before the court is which parts, if any, of Mid America's title commitment are copyrightable. The related question is whether Kirk infringed that particular element. Both of these issues may properly be addressed by this court on a motion for summary judgment.

## C. *Kirk's Motion for Summary Judgment: The Parties' Contentions*

■ In his Motion for Summary Judgment, Kirk raises the same arguments made in his earlier motion to dismiss. He notes that all of the facts presented in a title commitment are in the public domain. Relying on his own affidavit and that of Attorney Andrew C. Dystrup, Kirk urges that because the preparation of title commitments constitutes a mere rote task dictated by convention and compelled by legal and/or professional obligations, the process of culling information to be used in a title commitment lacks the requisite level of creativity for copyright protection under *Feist.* The fact that, as Mid America concedes, it is standard practice in the industry for examiners to use earlier commitments for the same property as "starters" in preparing fresh title, Kirk argues, supports the conclusion that this task involves no genuine creativity.

Mid America acknowledges that copyright protection is available only if its title commitment "reflects the exercise of judgment in determining what facts are to be included from the available data." *Kirk I,* 991 F.2d at 420, citing *Key Publications, Inc. v. Chinatown Today Publishing Enters., Inc.,* 945 F.2d 509, 513 (2d Cir.1991). Mid America's claim of originality and hence of copyrightability is based exclusively on its manner of selecting which, among the available universe of possible facts, to record in its title commitment. Mid America relies on the sworn declaration of its President, Thaddeus M. Bond, Sr., regarding decisions assertedly made by the title searcher in preparing the Schaaf commitment. Mid America argues that these decisions demonstrate that preparing the title commitment entailed sufficient selective judgment to satisfy the *Feist* originality test. (Mid America's Opposition to Kirk's Cross–Motion for Summary Judgment (hereinafter, "Mid America's Opposition"), at 12–15).

■ Kirk urges that the testimony of Mid America's President is insufficient to meet Mid America's burden of showing that the preparation of the Schaaf commitment required subjective decisions regarding which facts to record. Citing *Hollow Metal Warehouse v. U.S. Fidelity & Guaranty Co.,* 700 F.Supp. 410 (N.D.Ill.1988), Kirk asserts that Bond's testimony on these issues constitutes hearsay not properly considered under FED. R.CIV.P. 56(e). In *Hollow Metal Warehouse,* plaintiff offered testimony of its president to prove that a particular form, which was at

the heart of the parties contract dispute, constituted a "final change order." *Id.* at 412. The president had not participated in the negotiations himself, but rather based his testimony on a memorandum describing a meeting between the relevant parties. *Id.* Here, similarly, Mr. Bond reviewed the materials used to prepare the title commitment for the Schaaf property but did not prepare the title commitment himself. In fact, there is no evidence that Bond himself even interviewed the person(s) who did prepare the commitment. Mr. Bond therefore lacks personal knowledge regarding the selective judgment, if any, exercised in preparing the Schaaf commitment. Although Mr. Bond can testify to the general decision-making processes which, in his opinion and experience are required in preparing title commitments, his testimony regarding the examiner's specific decision-making process in this case is hearsay. Indeed, as Kirk points out, Mid America's reliance on Mr. Bond's opinion actually undermines Mid America's position. Mr. Bond's purported knowledge—based only upon his review of the Schaaf file folder and a title commitment—regarding the reasons that a title searcher included or rejected certain pieces of data suggests that such selections are indeed driven by convention rather than originality.

In any event, Kirk insists that an examiner's manner of selecting facts to include in a title commitment is not a creative process but rather is a mechanistic one, driven by rigorous professional standards. Kirk notes that a title examiner must "report all matters which could affect his client's interests and which are readily discoverable from those public records examined when a reasonably diligent title search is made." If an examiner diverges from these parameters, Kirk asserts, he or she may fail to reveal facts relevant to awarding title insurance and be

subsequently held liable in tort for any resulting damages.[5] Emphasizing the distinction between an abstractor of title, on the one hand, and an insurer, on the other hand, Mid America urges that a title commitment is not a history of title but rather an opinion as to the condition of title and an offer to insure title subject to specified exceptions; accordingly, says Mid America, it need not contain all facts relevant to a piece of property. (Mid America's Brief in Opposition to Kirk's Cross–Motion for Summary Judgment (hereinafter, "Mid America's Opposition"), at 4–5.)

Kirk insists, however, that the professional standards for title insurers establish the parameters of selection and leave no room for genuine originality. Kirk invites comparison to the decision in *Victor Lalli Enters., Inc. v. Big Red Apple, Inc.,* 936 F.2d 671 (2d Cir. 1991), where plaintiff, a publisher of charts containing winning numbers in gambling operations, brought a copyright infringement suit against one of its competitors. The court noted that all publishers of such charts presented the same information; therefore, barring an error, the charts would inevitably be identical. The court concluded that plaintiff's charts were not entitled to copyright protection because they lacked the requisite minimum of originality under *Feist* to trigger copyright protection. Kirk argues that similarly, barring error, two examiners preparing title commitment for the same piece of property will refer to the same sources and ultimately record the same facts—namely, all facts affecting title.

Kirk notes, further, that the size of the universe from which a compilation's facts are drawn affects a compiler's claim to originality. A large universe of facts may be capable of sustaining multiple or original compila-

**5.** Indeed, some jurisdictions hold title insurers to the standard of liability generally associated with abstractors of title. *See, e.g., Moore v. Title Ins. Co.,* 148 Ariz. 408, 411–12, 714 P.2d 1303, 1305–06 (Ct.App.1985) (title insurer may be liable in tort for negligence if it holds itself out as a searcher of titles and provides the information for applicants to rely on); *McLaughlin v. Attorneys' Title Guaranty Fund, Inc.,* 61 Ill.App.3d 911, 18 Ill.Dec. 891, 895, 378 N.E.2d 355, 359 (3d Dist.1978) (person who seeks title insurance expects to obtain a professional title search legal opinion as to the condition of title and a guarantee). Other courts refuse to impose tort liability on title insurers. *See, e.g., Greenberg v. Stewart Title Guaranty Co.,* 171 Wis.2d 485, ——, 492 N.W.2d 147, 150 (1992) (collecting cases); *Culp Construction Co. v. Buildmart Mall,* 795 P.2d 650 (Utah 1990) (collecting cases); *see generally* Annot., *Title Insurer's Negligent Failure to Discover and Disclose Defect as Basis for Liability in Tort,* 19 A.L.R.5th 786 (1994).

tions, whereas the choices available in selecting facts from a small universe may be so limited that no compiler can claim originality in its selection. Thus, for example, a compilation of baseball statistics was found capable of supporting claims of originality because the universe of pitching performance data from which an author could select was sufficiently large to sustain numerous original compilations. *Kregos v. Associated Press,* 937 F.2d 700 (2d Cir.1991). Kirk asserts that the size of the universe of facts from which title information is gathered is so small that an author cannot claim to have "selected" any data.

Mid America concedes that the standards examiners employ in selecting facts to include in title commitment are familiar and unoriginal, but argues that there is room within those parameters for original selection of facts. Mid America claims that the criterion examiners use for selecting facts is essentially a guideline—that is, it is the generic, rather than the creative component of a compilation. Mid America cites *Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir. 1984), where a compilation based upon the generic criteria of selecting "premium" baseball cards, and *Key Publications, Inc. v. Chinatown Today Publishing Enters., Inc.,* 945 F.2d 509 (2d Cir.1991), where a telephone directory listing of businesses of interest to the Chinese community, were both found to involve creative selection. Mid America concludes that its use of the generic criterion, "facts which affect marketable title" therefore, does not defeat its claim to originality. In *Eckes,* the use of the criteria "best" baseball cards to compile a card collector's book was held copyrightable because the selection of facts using this criterion depended upon a highly subjective evaluation, and it was the author's subjective evaluation and selection of the "best" cards which rendered the compilation original. *Eckes,* 736 F.2d at 863. Similarly, in *Key Publications,* a telephone directory was held copyrightable because the author had used her subjective judgment in selecting which businesses she felt would be of interest to, and would remain located for some time in the future within, the Chinese community. *Key Publications,* 945 F.2d at 513. Mid America asserts that

because an "examiner selects [only] those facts which in the exercise of the examiner's judgment need to be known by a lender or a purchaser of real estate," (Mid America's Opposition, at 7), the preparation of title commitments similarly involves subjective judgment. Here, however, in contrast to the plaintiffs in *Eckes* and *Key Publications,* Mid America has not presented specific evidence of the exercise of subjective selection or judgment. Moreover, Mid America has not resolved the contradiction between its concession that the criterion it employs—"facts which affect marketable title"—is generic and unoriginal, and its claim that an examiner's selection of "facts which need to be known by a lender" constitutes an original act.

Mid America's citation to *Mason v. Montgomery Data, Inc.,* 967 F.2d 135 (5th Cir. 1992) is equally unpersuasive. In that case, where plaintiff had prepared land ownership maps using title data from public records and from a title company, the court reasoned that each mapmaker's "selection of sources, interpretation of those sources, discretion in reconciling inconsistencies among the sources, and skill and judgment in depicting the information" was sufficiently original to trigger copyright protection. Kirk urges that the holding in *Mason* was expressly limited to the particular subject matter in controversy—maps. Indeed the *Mason* court's comments in *dicta* suggest that pictorial compilations may more easily satisfy the originality element of copyrightability than can nonpictorial compilations because they contain a purely creative, expressive element. *Mason,* 967 F.2d at 142.

■ In its analysis, the *Mason* court addressed an issue not squarely addressed by either party here: the doctrine of merger. Under that doctrine, plaintiff's claim of copyrightability is defeated if a particular idea is inseparable from its expression—that is, where an idea is incapable of being expressed in more than one manner, there can be no copyright in the expression. *Id.* at 140–41. The *Mason* court ultimately found that the map maker's "compilation" survived this test because the idea embodied in the plaintiff's map was capable of a "variety of expres-

sions." Mid America must similarly show that the sole expressive element in its material—its creative selection of facts to include in a given title commitment—is capable of being expressed in more than one manner.

Mid America's use of the testimony offered by its President, Mr. Thaddeus M. Bond Sr., on this issue is unconvincing. Mr. Bond offers a lengthy list of the kinds of facts through which an examiner must sift in selecting relevant documents to report. While size of the universe of facts is relevant to the possibility of originality, it is the author's subjective selection of facts from that universe and not the rote, albeit time-consuming effort of sorting through the data, that triggers copyright protection. In *Financial Information, Inc. v. Moody's Investors Service*, 808 F.2d 204 (2d Cir.1986), for example, the court concluded that, despite the plaintiff's embellished explanation of the time-consuming process required in publishing bond redemption data in simplified form, the process in fact was a simple, mechanical one, and incapable of triggering copyright protection. This conclusion was firmly endorsed by the Supreme Court's decision in *Feist*, where it concluded that the amount of labor that a compiler expends in preparing a work is irrelevant to granting copyright protection; rather, copyright may be awarded only where a work involves a spark of creativity. Thus Kirk's claim that Mid America's recitation of facts is an "attempt to conceal the simplicity of the process through lengthy descriptions of uncomplicated matters" appears to be well-founded criticism of Mid America's position. (Kirk's Cross–Motion for Summary Judgment, at 1.)

Mid America inadvertently supports Kirk's conclusion by drawing attention to the comparison of two title commitments which Kirk prepared for two different pieces of property—the one at bar, for the Schaafs, and one for another client, Ms. Kamenjarin. Mid America notes that, of these two title commitments, only the Schaaf document includes information regarding drainage tiles—a piece of data which Mid America claims was copied from its own commitment. Mid America argues that normally (when there is no copying) title commitments contain different data, which is a reflection of an examiner's subjective assessment of what data is relevant to awarding title. Such differences between title commitments may also merely reflect differences between the histories of different pieces of property, however.

Using Mid America's terms, it is not clear from this evidence that such differences are properly explained by an examiner's exercise of judgment in selecting facts which "need to be known by a lender or purchaser of real estate" rather than by simply applying the generic criterion of selecting "facts which affect marketable title." Indeed, despite the one discrepancy between the two title commitments prepared by Kirk for the Schaafs and for Ms. Kamenjarin, the same basic ten categories of information[6] are included in both documents. The difficulty involved in isolating meaningful examples of original selection in Mid America's title commitment suggests that this material is susceptible to defeat under the doctrine of merger.

### D. Bond's Declaration Does Not Reflect Original Selective Judgment

Finally, even allowing Mid America the benefit of Bond's testimony regarding the specific selective judgment used in preparing the Schaaf commitment, any claim to originality based on this evidence is defeated under the same legal theories that apply to Mid America's more general claims. Bond's declaration sets forth the following decisions made by the title searcher: (1) the decision to use a legal description from the last title commitment policy drawn in 1976, rather than one based upon the 1883 Treaty of Tippecanoe which had been used for an earlier conveyance in 1954 (Bond Declaration, Ex.

---

**6.** The Mid America and Kirk title commitments for the Schaaf property and the Kirk commitment for the Kamenjarin property all include the following categories of information: (1) commitment number and effective date, (2) name of the proposed insured, (3) proposed amount of insurance, (4) the mortgagee, (5) estate in which the property is currently held, (6) legal description of the property and permanent index number, (7) current state of property taxes, (8) recording date of the existing mortgage, (9) recitation of any liens or rights of way, and (10) any limitations and/or exceptions to coverage.

L to Mid America's Reply Memorandum ¶ 6); (2) the decision to run a 20–year, rather than a standard 40–year search (*Id.* ¶ 7); (3) the decision not to include a reference to documents regarding past assignments of rent which have no bearing on the current title (*Id.* ¶ 9); (4) the decision to set out the property tax due dates and amounts payable rather than simply to state that the current taxes are unpaid (*Id.* ¶ 10); (5) the decision to record that part of the property falls within a public right of way (*Id.* ¶ 11); (6) the decision to except from the commitment any rights of way for "drainage ditches, and subsurface tiles, feeders and laterals" that may exist (*Id.* ¶ 12); and (7) the decision to certify that the street address and legal description are the same property by using a calculation of land area rather than set forth the lot dimensions (*Id.* ¶ 13). While making each of these selections took time, none of them entailed sufficient creativity to trigger copyright protection, for the following reasons.

■ The decision to use a modern legal description rather than one based on a 19th century treaty is not a creative one—it is as obvious as choosing, for example, to arrange customers' names in a telephone book in alphabetical order rather than listing those customer's names beginning with consonants first and those beginning with vowels, second. Moreover, the fact that Mid America used a private, rather than a public source to gain information available to the public at large does not bear on the issue of originality; the decision to use one of two possible sources for a piece of data cannot legitimately be characterized as "original." Thus Mid America cannot claim that its "manner" of selecting this fact is creative.

■ The examiner's decision to run a twenty-year, rather than a forty-year title search on the property is arguably a creative one. This decision is arguably analogous to a compiler's selection of distances to particular destinations in New York City to list in a cab driver's guide. *Nester's Map & Guide Corp. v. Hagstrom Map Co.,* 796 F.Supp. 729 (E.D.N.Y.1992). There, the court reasoned that while the actual calculations of distance was a noncopyrightable fact, the author's selection of which distances between destina-

tions he would calculate, based on his knowledge and experience in the area, was copyrightable. *Id.* at 735. Although the decision to run a twenty-year, rather than a thirty or forty year search appears to involve less creativity than the compiler's decision in *Nester's Map,* this particular element might arguably involve sufficient judgment to be claimed "original." Because Mid America does not contest the fact that Ms. Peri, Kirk's secretary independently directed its title searchers, David, Varsek and Dystrup that a twenty-year search for the Schaaf property would be adequate, however, Kirk cannot be found to have infringed this element.

■ There is no genuine dispute that decisions three (not to reference irrelevant material), five (to record public rights of way), and six (to record rights of way concerning drainage) are ones driven by the profession. Even if title companies are not bound by any legal obligation, as Mid America asserts, to list those facts relevant to awarding title insurance, Kirk has offered unrebutted evidence that they are, as a practical professional matter, driven to do so. Moreover even if Mid America's manner of selecting these particular facts is in some way original, Kirk may copy the facts themselves at will. It does not appear, however, that there is any element of originality in the selection of these facts that can be isolated from the fact itself.

■ The remaining item, Mid America's decision to report the tax due amounts and dates rather than merely the status of whether they are current, suffers a similar flaw. This is arguably an "original expression" of fact. First, however, Mid America offers no claim or legal arguments supporting a claim to copyright in its particular form or expression of the facts—its claim was limited solely to its *manner* of collecting facts. Even if this argument were properly asserted, Mid America could only claim copyright over its particular expression and not the facts themselves. Kirk can freely copy these facts. As Mid America has admitted, Kirk's expression of these facts is not identical to Mid America's; thus, even if he used Mid America's title commitment for this in-

formation, he used only a non-copyrightable element.

Under *Feist,* only the manner of selecting facts, and not the facts themselves can be copyrightable. In this case, the selection of facts used in the compilation was guided by strong external forces. Further, Mid America's own report of the facts included virtually no original expression whatsoever. Mid America's concession that it is standard practice in the field to use the last title commitments prepared for a piece of property as a "starter" for preparing a new commitment, tends to suggest that copyright is not an appropriate means for protecting a title company's efforts in preparing title commitment. Examiners do not attempt to bring anything original to their final product; rather, they seek to record neither more nor less than those facts that are relevant to title. Because originality and not industry is the touchstone of copyright, Mid America's attempt to protect the labor it expends in preparing its title commitments in this manner cannot prevail.

### CONCLUSION

Mid America has not proven that Kirk copied any of the original copyrightable elements of its title commitment. Kirk's motion for summary judgment is granted, and Mid America's motion for summary judgment is denied.

Charles BROM, Plaintiff,

v.

**BOZELL, JACOBS, KENYON & ECKHARDT, INC. and Bozell, Inc., Defendants.**

No. 89 C 7021.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 25, 1994.

Jac A. Cotiguala, Cotiguala & Mennes, Kathleen B. Baliunas, Chicago, IL, for plaintiff.

Alan Francis Curley, Robinson, Curley & Clayton, P.C., Chicago, IL, David Barry Kahn, David B. Kahn & Associates, Ltd., Northfield, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

Plaintiff Charles Brom ("Brom") sues defendants Bozell, Jacobs, Kenyon & Eckhardt, Inc. and Bozell, Inc. (collectively "defendants" or "Bozell") for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* An amended final pretrial order in this case was filed on August 12, 1994. Trial is set for November 7, 1994. The parties' motions *in limine* are presently before the court as is defendants' motion for bifurcation.[1] The court shall first address defendants' motion for bifurcation and then shall address the motions *in limine.*

---

1. This case was originally assigned to Judge Zagel's calendar. By order of the Executive Committee, it was reassigned to this court's calendar

*Defendants' Motion for Bifurcation*

Pursuant to Federal Rule of Civil Procedure 42(b), defendants move to bifurcate the liability and damages phases of the trial. Defendants contend that bifurcation is warranted in the instant case for several reasons: (1) Bifurcation would avoid unduly prejudicing or confusing the jury by presenting evidence of Brom's decade long unsuccessful efforts at finding reemployment; (2) Brom's evidence relating to his damages— namely expert testimony regarding his projected growth in earnings, replacement earnings, benefit losses and tax effects—are distinct from his evidence relating to liability; and (3) Bifurcation is appropriate because the damages issue is itself bifurcated, with the jury determining back pay, if any, and the court determining the appropriateness of reinstatement or front pay in lieu of reinstatement.

Rule 42(b) permits bifurcation of any issues for separate trial where such separation is "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1166 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Only one of these criteria need be met to justify bifurcation. *Id.* The decision to bifurcate the issues of liability and damages for separate trials is committed to the sound discretion of the trial court. *Davis v. Freels,* 583 F.2d 337, 343 (7th Cir.1978); *Keyes Fibre Co. v. Packaging Corp. of America,* 763 F.Supp. 374, 375 (N.D.Ill.1991).

The court is persuaded that bifurcation of the liability and damages phases will best serve the goal of an efficient and expedient trial. Brom seeks a back pay award of well over one-million dollars. This figure covers Brom's back pay for a period spanning approximately nine years and three months. Brom expects to present expert testimony on the amount of back wages to which he is due. Defendants argue that Brom's million dollar back pay claim is gross-

---

effective May 25, 1994. In the name of judicial economy, this opinion presumes familiarity with the facts.

ly exaggerated as a result of incorrect and unreasonable assumptions made by Brom's expert. Defendants also contend that Brom failed to mitigate his damages. Finally, defendants contend that Brom's successor was terminated within days after a client—the sole account on which Brom had worked—withdrew its business from Bozell; and, defendants argue that, even if he had not been previously terminated, Brom would have been terminated at or about the same time that his replacement was terminated—January 13, 1989. Accordingly, defendants contend that Brom's back pay award, if any, should only be calculated from the date of his termination to January 13, 1989.[2] *See* Amended Final Pretrial Order, Ex. I, Defendants' Trial Brief at 14–15. Defendants, like Brom, expect to present expert testimony regarding damages. Indeed, both sides in this case expect to call experts who will testify solely with respect to the issue of the proper damages to be awarded.

It is clear to this court that the damages issues in this case are hotly contested. It appears that the damages evidence will involve relatively extensive testimony on Brom's efforts at finding reemployment over the past nine years, how long Brom would have remained employed by Bozell in light of the loss of his sole account, and such interminable issues as the proper amounts to be awarded for Brom's stock bonus plan, profit sharing and savings, executive wealth accumulation, and other fringe benefits. Moreover, the evidence pertaining to damages appears to be wholly independent of the evidence pertaining to liability. Under these circumstances, the court finds that judicial economy will be best-served by allowing the jury to determine the liability issue before presenting them with the damages evidence.

In the event that the jury finds the defendants not guilty of violating the ADEA, bifurcation will have resulted in a substantial savings of time by avoiding the needless presentation of extensive testimony on damages. And, even if the jury finds the defendants to be liable, the court expects that bifurcation will result in savings insofar as the deliberations regarding liability will not be sidetracked by extraneous and potentially confusing evidence relating to Brom's damages.[3] Accordingly, the court grants defendants' motion to bifurcate the liability and damages phases of this trial, with the understanding that the damages phase will begin immediately, before the same jury, if Brom succeeds in establishing liability.

*Motions In Limine*

■ Federal district courts have the power to exclude evidence *in limine* pursuant to their authority to manage trials. *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984). Guidelines governing motions *in limine* were recently set forth in *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398 (N.D.Ill.1993), as follows:

> This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be

---

2. The question of how long Brom would have remained employed at Bozell is one of fact for the jury to decide based on the evidence presented at trial and guided by a proper instruction from the court.

3. Because the court finds that bifurcation is conducive to expedition and economy, it need not pass judgment on defendants' argument that a single trial would unfairly prejudice them. We note, nevertheless, that the court is unpersuaded that evidence of an advertising executive's decade-long, unsuccessful efforts at finding employ-

ment (and his two million dollar claim for damages) is the sort of evidence that poses a substantial danger of evoking improper juror sympathy. This type of potential liability is not different from that faced by many defendants who proceed to trial in this courthouse. In the same vein, plaintiff's argument that bifurcation prejudices him solely based on somewhat questionable statistical evidence that defendants prevail more frequently in bifurcated trials, stretches the meaning of the term prejudice beyond its reasonable limits.

excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine*. *Id.* at 1400–01. With these guidelines in mind, we turn to the motions before the court.

*Brom's Motion* in Limine *To Exclude Expert Witness Testimony*

Brom moves *in limine* to exclude certain testimony by defendants' expert witness on damages, Louis J. Perl, and to exclude certain exhibits relating to that testimony.[4] Although the bifurcation order does not allow this disputed testimony to be introduced during the initial liability trial, the court will address this issue to allow for an efficient transition to the possible damages portion of the trial.

In brief, Brom seeks to exclude Perl's testimony and exhibits because they are based on "improper assumptions drawn from inappropriate statistical sources." Pl.'s Mtn. at 1.

■ Brom attacks sections IV and V(3)[5] of the Report because they are based on "speculative assumptions supported only by generalized survey data," Pl.'s Mtn. at 2, and he attacks section II "because of the unreliability and generalized nature of the survey data upon which it is based." *Id.* at 5. Section IV of the Report sets out Perl's analysis of the amount by which Brom's damages, if any, should be offset by replacement earnings that Brom would have collected had he attempted reasonably to mitigate his damages. In reaching his conclusions, Perl relied on data from the U.S. Census Bureau's Displaced Worker Survey which indicate that the majority of displaced workers in Brom's age category find jobs within two years and replace 80–85% of their earnings. *See* Report at 3. Section V(3) of the Report addresses Brom's entitlement to lost benefits and is based, in part, on an assumption—

derived from the Displaced Worker Survey relied upon in section IV—that Brom should have been able to find reemployment that would have replaced the benefits he received from Bozell. Brom contends that such reliance on national survey data is misplaced and that the analysis of whether he has failed to mitigate his damages must be based on a particularized analysis of his efforts to find reemployment. It is plain that these attacks speak to the weight of the Perl evidence not its admissibility. Brom will have ample opportunity to discredit Perl's methods and assumptions on cross-examination. For purposes of deciding the pending motions, the court finds the Perl evidence to be relevant and that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Accordingly, Brom's motion with respect to these sections must be denied.

■ Brom also seeks to exclude section II of the Report which addresses Brom's expected work life. In contrast to Brom's expert who assumed that Brom would continue to work until age 65, Perl relied upon a U.S. Department of Labor work life table and arrived at an expected retirement age of approximately 62.5. Brom challenges Perl's reliance on the work life table. Again, Brom's challenge speaks to the weight of the Perl evidence not its admissibility. The appropriateness of relying on the Department of Labor's work life tables for estimating retirement age is a matter that can be thoroughly explored on cross-examination. The court finds the evidence relevant and finds that its probative value is not substantially outweighed by the danger of unfair prejudice. Accordingly, Brom's motion with respect to section II must be denied.

■ Finally, Brom seeks to exclude testimony and other evidence relating to section VI of the Perl Report—entitled "Tax Ef-

---

4. In particular, Perl has prepared a report (the "Report") on Brom's Damages, which defendants have listed as an exhibit in the Amended Final Pretrial Order, and Brom seeks to exclude certain portions of the Report.

5. In the copy of the Perl Report accompanying Brom's motion, the fifth and sixth sections of the

Report are both captioned with the roman numeral V. It is actually the sixth section of the report, entitled "Benefit Losses," that Brom challenges. Nevertheless, for purposes of consistency with Brom's motion, the court shall refer to the challenged section as "V(3)."

fects."[6] Section VI purports to estimate Brom's "after-tax losses" based on the assumption that damage awards under the ADEA are not taxable. However, in *Burns v. Commissioner*, 33 F.3d 836 (7th Cir.1994), the Seventh Circuit recently held·that damage awards under the ADEA *are* taxable. *Id.*, 33 F.3d at 838. Accordingly, section VI of the Perl Report is wholly irrelevant and the court grants Brom's motion insofar as it speaks to section VI. All testimony or other evidence pertaining to Section VI of the Perl Report shall be excluded.

### *Brom's Motion* in Limine *To Exclude IDHR Investigation Report*

Brom moves *in limine* to exclude the Illinois Department of Human Rights ("IDHR") investigation report which was issued after Brom filed a charge of discrimination with the IDHR. Brom contends that the report lacks sufficient indicia of trustworthiness necessary for admission under the "Public Records and Reports" exception to the hearsay rule, FED.R.EVID. 803(8)(C), and that the probative value of the IDHR Report is substantially outweighed by the danger of unfair prejudice.

 Trial courts have broad discretion when ruling on the admissibility of administrative findings regarding claims of discrimination. *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 153 (7th Cir.1985). "[A]dministrative findings regarding claims of discrimination are generally admissible under Fed.R.Evid. 803(8)(C) (the public records and investigatory file exception to the hearsay rule)." *Id.* However, such evidence may be excluded·where the circumstances indicate lack of trustworthiness or where the prejudicial effect of the evidence substantially outweighs its probative value. *Id.*

 This court agrees with the trial court in *Tulloss* that presenting the administrative *findings* with respect to plaintiff's charge of discrimination is "tantamount to saying 'this has already been decided and here is the decision,'" *Tulloss* 776 F.2d at 154 (quoting the district court's opinion); thus, the court finds that the prejudicial effect of presenting such findings substantially outweighs their probative value. Accordingly, the "Conclusion" section of the IDHR Investigation Report will be excluded from evidence at trial.

 The court denies Brom's motion with respect to the remainder of the IDHR Investigation Report. The court finds the report to be admissible under Rule 803(8)(C). Furthermore, Brom has not made an adequate showing to establish that the Report is inherently unreliable or lacks trustworthiness. Although the court is not unmindful of the fact that the IDHR investigations are relatively informal, do not permit cross-examination *per se*, and may involve *ex parte* interviews, the court cannot say that these facts— in the absence of any other evidence suggesting unreliability or lack of trustworthiness— compel the conclusion that such investigations are inherently unreliable. If the court were to accept the factors identified by Brom as *sufficient* to exclude IDHR investigation reports, the court would be pronouncing IDHR investigations—and many other administrative investigations—to be inherently unreliable; this the court is unwilling to do. *Some* showing beyond Brom's dissatisfaction with the investigator's findings must be made in order to establish unreliability or the lack of trustworthiness.[7]

 Although the court finds the IDHR Investigation Report to be admissible under Rule 803(8)(C), its probative value is somewhat marginal. Thus, pursuant to Fed. R.Evid. 403, in order to minimize the potential for confusion and prejudice, as well as to

---

6. Due to a typographical error, "section VI" of the Report is actually the seventh section of the Report. *See supra* note 3. Again, for the purpose of maintaining consistency, the court shall refer to the "Tax Effects" section as "section VI."

7. Brom suggests that the unreliability of the IDHR Report is evidenced by the investigator's failure "to consider or obtain evidence of numerous age-biased comments made by decision-mak-

ers." Pl.'s Mtn. at 3. Conspicuously absent from Brom's motion, however, is an affirmative statement that Brom ever volunteered information. concerning age-biased comments to the IDHR investigator. Brom cannot hold back pertinent information and then criticize the investigator for failing to probe deep enough to elicit the information.

promote efficiency of trial, the court will limit the use of the Investigation Report to purposes of impeachment. The Investigation Report may not be introduced by any party as part of their case-in-chief except with respect to party admissions.

*Brom's Motion* in Limine *To Exclude O'Meara Memoranda*

■ Brom moves *in limine* to exclude certain memoranda authored by Norton O'Meara, who was Brom's immediate supervisor. Initially, Brom moved to exclude three memoranda (defendants' exhibits 10–12); however, Brom has withdrawn his motion as to defendants' exhibits 10 and 11. Accordingly, all that remains is consideration of Brom's motion to exclude defendants' exhibit 12 which is a memorandum drafted by O'Meara approximately five months after Brom was terminated and which was drafted expressly as O'Meara's "attempt to mitigate the charges Mr. Charles Brom has leveled at the agency with respect to the circumstances surrounding his dismissal." Defs.' Ex. 12. Brom moves to exclude this memorandum contending that the document does not fall within the so-called business records exception to the hearsay rule. FED.R.EVID. 803(6). Defendants concede that the memorandum is not admissible as a Rule 803(6) "business record," but contend that the memorandum may be admitted and read into evidence, pursuant to Rule 803(5), as a "recorded recollection" in the event that O'Meara has insufficient recollection to testify fully and accurately at trial. The court finds that this memorandum, written approximately five months after Brom was terminated—and for the express purpose of expressing "[m]anagement's perspective" in the face of an impending investigation by the Illinois Department of Human Rights—does not constitute a "memorandum . . . made or adopted by the witness when the matter was fresh in the witness' memory." FED.R.EVID. 803(5). Accordingly, Brom's motion to exclude defendants' exhibit 12 is granted.

*Defendants' Motion in Limine To Exclude Anticipated Testimony*

Defendants move *in limine* to exclude the anticipated testimony of two Bozell employees. The first of the two challenged statements was allegedly made by Wayne Fickinger, a Vice Chairman of Bozell, approximately five to six months before Brom was terminated. Brom contends that Fickinger stated, "after you have worked an account like Beam for a long time, people feel that they want younger people on the account." Complaint ¶ 16. The second statement was allegedly made by Norton O'Meara, Brom's immediate supervisor, who stated "after a while, a client wants younger people on the account."

Defendants argue that any testimony as to these two comments would involve double hearsay inadmissible under Fed.R.Evid. 802 and 805. Defendants contend that the first level of hearsay consists of the witness's testimony that the statements were made and the second level of hearsay involves the statements allegedly made by Fickinger and O'Meara concerning statements by some other person to the effect that they wanted younger people on the account.

■ At the outset, we disagree with defendants that the anticipated testimony involves double hearsay. There can be no question that the anticipated testimony involves the first level of hearsay. However, as defendants correctly observe, O'Meara's and Fickinger's statements would be admissible as party admissions if these two individuals were involved in the decision to discharge Brom. *See Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir.1990). The issue of whether O'Meara or Fickinger were sufficiently involved in the ultimate decision to discharge Brom is hotly contested by the parties and the issue can only be resolved based upon consideration of the evidence presented at trial. Because it is entirely possible that Brom may succeed in establishing that O'Meara and Fickinger were sufficiently involved in the decision to terminate him, the court cannot conclude—on the present record—that the challenged testimony is clearly inadmissible as a "party admission." FED. R.EVID. 801(d)(2).

■ The court's central disagreement with defendants' position is with respect to whether the challenged testimony contains a

694

second level of hearsay. The court cannot conclude that Fickinger's alleged statement, "after you have worked an account like Beam for a long time, people feel that they want younger people on the account," or O'Meara's alleged statement, "after a while, a client wants younger people on the account," amount to reports or reiterations of what some other declarant previously stated. Rather, the court understands these statements as expressions by Fickinger and O'Meara as to what they believe "people" or "client[s]" generically want. If Fickinger or O'Meara had stated, "Often, a man feels that a man has to do what a man has to do," no one would seriously contend that this is a report or reiteration of a previous statement by a man that "a man has to do what a man has to do." Rather it is a general expression of the speaker's understanding of the philosophical outlook of others. In the same vein, Fickinger's and O'Meara's statements are readily understood as general expression's of their perspective on what other people want. The fact that Fickinger and O'Meara used unidentified and ambiguous referential nouns such as "people" and "a client" lends further support, under the circumstances, to the conclusion that they were not purporting to reiterate the statements of some specific other declarant. In view of the court's understanding of the challenged testimony as being offered not to prove the truth of the matter asserted (namely, that "people" or "a client" feel they want younger people on an account) but rather is being asserted to prove the state of mind of the decision-makers, the court finds no second level of hearsay in the challenged testimony.[8] Thus, provided that Brom can establish the requisite foundation that Fickinger and O'Meara were, in fact, sufficiently involved in the discharge decision, the court cannot conclude that the challenged testimony is "clearly inadmissible" as double hearsay.

■ Nor can the court conclude, on the present record, that the probative value of the challenged testimony is substantially outweighed by the danger of unfair prejudice to defendants. While it is certainly true that stray remarks in the workplace, which are not relatively contemporaneous with an adverse employment action and which are not reasonably related to the action, have been found to be of little probative value in ascertaining discriminatory intent with respect to that action, *see, e.g., Hong v. Children's Memorial Hosp.,* 993 F.2d 1257 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994); *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1116 (7th Cir.1992); *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686–87 (7th Cir.1991), the court cannot conclude that the challenged remarks fall within the ambit of the "stray remark" case-law. In the first instance, the challenged statements were not simply remarks reflecting a general antipathy towards members of the protected class and bearing no relation to a personnel action; rather, the remarks can readily be interpreted as relating directly to Fickinger's and O'Meara's perception of appropriate staffing decisions. Indeed, the relationship of the statements to Brom's termination is relatively straightforward: Fickinger and O'Meara expressed their perception as to the fact that others may feel that a younger person is needed for the job, and shortly thereafter Brom was replaced by a younger person. *Cf. Tibbitts v. Van Den*

---

8. The court respectfully declines defendants' invitation to follow *Carden v. Westinghouse Elec. Corp.,* 850 F.2d 996 (3d Cir.1988). In *Carden,* the Third Circuit construed testimony concerning a statement very similar to Fickinger's and O'Meara's statement as involving double hearsay. The plaintiff in *Carden* asked his immediate supervisor why he did not get a certain position. In response the supervisor said "he *thought* they wanted a younger person for the job." *Id.* at 998 (emphasis added). In construing this statement, the court seized on the fact that the supervisor used the word "they" and reasoned "it is evident that someone ... said something to [the supervisor] which he, [the supervisor], in turn repeated to [the plaintiff]." *Id.* at 1002. Elsewhere, the court stated that the fact that the supervisor used the word "they" "clearly indicates that someone ... other than [the supervisor] wanted a younger person." *Id.* While this court does not find the use of the word "they" as conclusive as the Third Circuit, we note, in addition, that, in the case at bar, the statements at issue used referents (*e.g.,* "people" and "a client") that do not point as strongly as the referent "they" to a particular other or others. Moreover, we further note that the Third Circuit inexplicably ignored the fact that the supervisor's statement was expressly a statement of his thoughts as to what others wanted.

*Bergh Foods Co.,* 857 F.Supp. 1249, 1255 (N.D.Ill.1994). Second, the court cannot conclude that the period of five to six months between Fickinger's statement and Brom's termination[9] renders the statement so non-contemporaneous as to substantially diminish the probative value of the remark.[10] Thus on the present record the court cannot conclude that the probative value of Fickinger's and O'Meara's statements are substantially outweighed by the danger of unfair prejudice.

Accordingly, defendants' motion *in limine* to exclude anticipated testimony regarding the statements allegedly made by Fickinger and O'Meara must be denied.

■■■ Defendants also move *in limine* to exclude anticipated testimony regarding certain statements allegedly made by Lane Barnett, Jim Beam's Vice President of Marketing and Advertising that purportedly evidence age-based animus. Defendants contend that no evidence in the record suggests that Barnett made any such statements to any representative of Bozell. In response, Brom makes no effort to suggest that the challenged statements were, in fact, made to Bozell representatives. Instead, he appears to argue simply that the fact that Fickinger and O'Meara made their alleged statements reveals that Bozell adopted the age animus of Barnett and Jim Beam. Pl.'s Resp. at 5–6. However, the mere fact that Fickinger and O'Meara allegedly made statements echoing the same sentiment as Barnett is entirely insufficient to establish that the former "adopted" the latter's alleged age animus.

Because Barnett was not a decision maker with respect to defendants' decision to terminate Brom; and, because the record offers no basis upon which to conclude that Bar-

nett's alleged comments constitute adopted admissions by defendants under Rule 801(d)(2)(B), the court concludes that the anticipated testimony concerning Barnett's alleged statements is inadmissible hearsay. Accordingly, defendants' motion *in limine* to exclude testimony concerning the statements identified in their motion allegedly made by Barnett is granted.

*Defendants' Motion in Limine To Exclude Exhibits*

Defendants move *in limine* to exclude certain trial exhibits identified by Brom in the Amended Final Pretrial Order. Defendants roughly categorize the challenged exhibits into six categories: "(1) a group of exhibits predating the hiring of Lane Barnett by Beam in December of 1984;[11] (2) a group of memoranda and other documents pertaining to an advertising project for a product called 'Jim Beam and Cola';[12] (3) documents pertaining to Beam's sales;[13] (4) a series of Bozell and/or Beam meeting agendas or invitations;[14] (5) various research reports and proposals;[15] and (6) a group of proposals, reports correspondence, memoranda and budgets for various projects pertaining to the Beam account.[16]" Defs.' Mtn. at 2–3. Defendants contend that the challenged exhibits are irrelevant and, to the extent that they are relevant, their probative value is substantially outweighed by the danger of undue prejudice.

■■■ The Federal Rules of Evidence define "relevant evidence" very broadly as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. All rele-

---

**9.** Significantly, the court cannot determine when the *decision* to terminate Brom was made. It is not unreasonable to assume that the *decision* was made at some earlier date than the day of the actual discharge. Thus, the period of time between the alleged statement and the decision may even be less than five to six months.

**10.** The evidence before the court suggests that O'Meara's alleged statement was made shortly after Fickinger's alleged statement. Niebling Dep. at 61, 62.

**11.** Exhs. 3–7, 9, 11–12, 40, 78.

**12.** Exhs. 38–39, 43–44, 46, 48, 50, 56–59, 61–62, 66, 68–71, 87, 94, 96–97, 100, 104.

**13.** Exhs. 35 and 36.

**14.** Exhs. 41, 42, 55, 78 and 85.

**15.** Exhs. 73, 77, 79, 80, 84, 96, 101.

**16.** Exhs. 13, 47–51, 53–54, 58, 60–65, 67, 70, 72, 74–76, 81–83, 86, 88–93, 95, 98, 99, 102, 103, 106.

**696**

vant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED.R.EVID. 402, 403. Any party that seeks to exclude evidence on relevancy grounds by way of a pretrial motion *in limine* faces an exceptionally high obstacle.

■■■ The court finds defendants' arguments as to the challenged exhibits' lack of relevance unpersuasive. To the extent, limited or not, that the challenged exhibits tend to make the fact that Brom was meeting Bozell's legitimate expectations more or less probable, the evidence is relevant. Similarly, to the extent, limited or not, that the challenged exhibits tend to make the fact that Bozell's nondiscriminatory justification for terminating Brom is pretext more or less probable, the evidence is relevant. The issue of whether the probative value of the challenged exhibits is substantially outweighed by the danger of unfair prejudice cannot be determined at this stage of the proceedings without the benefit of context provided by the evidence presented at trial. Therefore, defendants' motion to exclude exhibits is denied.

### CONCLUSION

Defendants' motion for bifurcation of the liability and damages phases of the trial [140–1] is granted. Brom's motion *in limine* to exclude defendants' expert witness damage calculations [132–1] is granted as to the "Tax Effects" section of the expert's report and is denied in all other respects. Brom's motion *in limine* to exclude the IDHR investigation report [133–1] is granted in part and denied in part: The conclusion section of the IDHR Report shall be excluded and use of the remainder of the Report shall be limited to impeachment; no party shall introduce the Report as part of their case-in-chief except with respect to party admissions. Brom's motion *in limine* to exclude the O'Meara memoranda [134–1] is granted with respect to O'Meara's December 9, 1985 memorandum and is denied in all other respects. Defendants' motion *in limine* to exclude anticipat-

ed testimony [135–1] is denied in part and granted in part: The motion is denied as to statements made by Fickinger and O'Meara; the motion is granted with respect to statements made by Barnett. Defendants' motion *in limine* to exclude exhibits [137–1] is denied.

Cynthia SCHOENECK, Plaintiff,

v.

**CHICAGO NATIONAL LEAGUE BALL CLUB, INC., Defendant.**

No. 93 C 2963.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 29, 1994.

Jay K. Ehrlich, Jay Ehrlich & Associates, Chicago, IL, for plaintiff.

John W. Powers, Elizabeth H. Skalitzky, Seyfarth, Shaw Fairweather & Geraldson, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

The current baseball strike is only the latest in a number of indignities recently inflicted upon followers of the Chicago National League Ball Club, Inc.: the introduction of night games at Wrigley Field; the trading of Lou Brock; the departure of Cy Young winner Greg Maddux; and, as this lawsuit alleges, the elimination, in 1992, of the position of "ball person."

Cynthia Schoeneck was hired as the ball person for the Chicago Cubs' 1991 season. Dressed in a team uniform, her duties included retrieving foul balls and providing fresh baseballs to the umpire. Earning fifty dollars per game, Ms. Schoeneck missed only one of the 82 home games that year. When told that as a part-time seasonal employee she posed insurance problems which prevented her re-hiring, Ms. Schoeneck offered to buy her own insurance and sign a waiver exculpating the Cubs for any personal injury.

Ms. Schoeneck says the Cubs' decision permanently to eliminate the position of ball person the following season was the source of great personal sadness, an assertion which I find easy to believe. Her absence from Wrigley Field the following season was not, she admits, actually responsible for her subsequent separation and divorce, but it was the source of friction between her and her husband: "I didn't let go of the idea with the Cubs, and I kept bringing it up over and over again, and he got tired of hearing it. It's like, enough already. Let it go, and I couldn't."

To hold on to the job she loved, Ms. Schoeneck filed suit in federal court on three counts. She claims that the elimination of the ball person position was a pretext for unlawful gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; that the Cubs breached an

oral contract guaranteeing to her for life the job of ball person; and that she relied to her detriment on a promise of permanent employment.

■ The Chicago National League Ball Club has moved for summary judgment on all three counts. Summary judgement "shall be rendered forthwith if ... there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could not return a verdict favoring the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All inferences will be drawn in favor of the plaintiff on the respective issues. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989).

## I. Gender Discrimination.

■ Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff can establish a prima facie case of sex discrimination by showing that 1) she belongs to the statutorily protected class of women employees; 2) she performed her job satisfactorily; 3) she suffered an adverse employment action; and 4) she was treated less favorably than similarly situated male employees. *Hughes v. Brown*, 20 F.3d 745 (7th Cir.1994). Assuming, for the sake of argument, that Ms. Schoeneck meets the first three prongs of the test, she fails on the fourth: she cannot establish that she was treated less favorably than similarly situated male employees, for the simple reason that no males were similarly situated.

In *Washington v. Garrett*, 10 F.3d 1421 (9th Cir.1994), the plaintiff's position in the Public Affairs office of the United States Navy was eliminated during a reduction in force. The evidence established that at the time of termination no males served in that office and thus no males were potentially subject to the reduction. *Id.* at 1435. The United States Court of Appeals for the Ninth Circuit affirmed summary judgement in favor of the employer, holding that the plaintiff failed to make out a prima facie case of sex discrimination because she could not show that, under the circumstances, men were treated more favorably than she. *Id.*

The logic of *Washington v. Garrett* applies here. This is not a case in which two ball persons, one male and one female, were previously employed and only the comparable male was rehired for the position while the plaintiff was not. Nor is it a case in which a female ball person was replaced in that job by a male. Rather, the position itself—equally open to both sexes—was eliminated. And while Ms. Schoeneck's chances for being ball person were thereby eliminated, so were those of any males who would have competed for the coveted position.

■ A defendant may rebut a prima facie case of sex discrimination by articulating at least some legitimate, nondiscriminatory reasons for its allegedly biased treatment. *Hughes*, 20 F.3d at 746–47. The defendant claims that increased concerns about field security led to an increase in security personnel. The duties of ball person, it was thought, could easily be absorbed by the enhanced security staff.

■ To prove that a more efficient allocation of human resources, not bias against women, was the basis for its decision, the Club offers uncontroverted evidence that female crowd control staff members, along with their male counterparts, eventually became responsible for those tasks formerly performed by the ball person. Since the Club has proffered a legitimate, non-discriminatory basis for its decision, Ms. Schoeneck must establish that the reason is merely pretextual. *Hughes*, 20 F.3d at 747 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)); *Box v. A & P Tea Co.*, 772 F.2d 1372 (7th Cir.1985).

■ Ms. Schoeneck reviles the Cubs for the team's perceived incompetence, both on and off the field, from 1908 to the present. She portrays as "incredible," because supposedly so out of character, the team's concerns for the safety of fans and players. But her burden cannot be surmounted by vitriol.

■ Ms. Schoeneck attempts to prove pretext by stating that she was originally told

she lost the position for "insurance reasons." However, she heard this from someone other than the person who eliminated the position. Actions and comments by employees not responsible for the disputed decision cannot provide a basis for charging other employees with discrimination. *See Jardien v. Winston Network, Inc.*, 888 F.2d 1151 (7th Cir.1989) (citing *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 925 (7th Cir.1988)).

Also, the two explanations allegedly given for eliminating the position of ball person—insurance and security—are not mutually exclusive. They do not, as Ms. Schoeneck claims, show a dispute in the facts. Both reasons are legitimate, non-discriminatory, and, plausible. Ms. Schoeneck has not countered with any evidence showing that 1) the Club's explanation has no basis in fact; 2) the explanation was not the "real" reason; or 3) the reason stated was insufficient to warrant the discharge. *Hughes*, 20 F.3d at 747. *See also Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994).

 Moreover, both men and women occupy on-field security positions. Both sexes now take turns, under a rotation schedule, retrieving foul balls and replenishing the umpire with fresh ones. Neither the circumstances nor the proffered evidence supports inferences of any particular animus towards the female sex.[1]

 Ms. Schoeneck intimates that not being hired for one of the new security positions proves she was the victim of sexual discrimination. But Ms. Schoeneck did not apply for a crowd control job. Absent evidence that she had applied for such a position, which the record shows is open to any interested party, she cannot claim discrimination. *See Box*, 772 F.2d at 1376. Where

an employer has a formal system of posting job openings and allowing people to apply for them, an individual who did not apply cannot establish a prima facie case of discrimination. *Id.*

 In motions for summary judgment, the nonmoving party must present evidence that would support a reasonable verdict in that party's favor; a scintilla of evidence in support of the nonmovant's position will not do. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). . The evidence presented by Ms. Schoeneck in support of her claim barely rises to the level of "scintilla." The defendant's motion for summary judgment on this claim must therefore be granted.

## II. Breach of Oral Contract

Ms. Schoeneck testified that during the summer of 1991, while working as ball person, she broached the subject of future employment for the 1992 season by asking the Cubs' personnel director, "What about next year?" She relates that she was told "You got it," and that she could have the job for "as long as [she] wanted."

According to Ms. Schoeneck, the above conversation created a binding oral contract, the duration of which depended on how she felt. Ms. Schoeneck admits there was no specific length attached to the contract, but she figured that she could do the job "at least another ten years without a problem," depending on "how long [she] would be wanting to do something like this." Her continued ability to do all the running the job required would, she said, factor into her eventual decision to quit.

Ms. Schoeneck claims a genuine question of material fact exists as to whether or not

**1.** An affidavit by Ms. Schoeneck in the record, originally submitted to the EEOC, alludes to statements by certain parties that allegedly point to sexual discrimination. Putting aside any potential admissibility problems, as well as Ms. Schoeneck's cryptic denial that the signature on that affidavit is hers, the court did not consider these conversations since they were not cited to as evidence in plaintiff's briefs. The nonmovant cannot carry its evidentiary burden by asserting a fact, citing a document, and leaving the court to root out the relevant material. Local Rule

12(N) requires a roadmap of specific evidence supporting the nonmovant's position on each material factual issue on which the moving party asserts there is no dispute. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

However, even if the conversations at issue had been considered, at best they only would have shown the unsupported opinions of persons unconnected to the decision-making process behind the elimination of the ball person position.

there was a binding contract. On this point, as with her field experience, Ms. Schoeneck is off base. The alleged contract fails under any of three legal theories: indefiniteness, want of consideration, and lack of mutuality.

Under Illinois law, which governs this pendant state law claim, a valid oral contract for permanent employment must contain a clear and definite statement as to duration and be supported by sufficient consideration. *Koch v. Illinois Power Co.,* 175 Ill.App.3d 248, 124 Ill.Dec. 461, 529 N.E.2d 281 (1988). Ms. Schoeneck is unclear whether the conversation about the job referred only to 1992 or to her entire lifetime. Such great discrepancies about the term of employment precludes enforcement. As in *Koch,* the language at issue here was "so uncertain the court would have to restructure it with new, more definite language." *Id.* Courts, however, are loathe to rewrite a contract by imposing obligations where none existed. *Id.* (citing *Eisele v. Ayers,* 63 Ill. App.3d 1039, 21 Ill.Dec. 86, 381 N.E.2d 21 (1978)).

The alleged contract also fails for want of consideration. As this Court has recognized,

> Illinois courts will enforce an oral promise to employ a person for life or some other equally indefinite length of time only where the employee makes in return some sacrifice—i.e., relinquishes another job and spends a considerable amount to relocate himself and his family—that he probably would not have made absent a guarantee of continued permanent employment.

*Cloud v. Northwestern Golf Co.,* No. 88 C 6254, 1992 WL 112242 (N.D.Ill. May 20, 1992).

Ms. Schoeneck offers no evidence to show that she gave up another job, relocated to take this one, or made a comparable sacrifice. The most she can assert is that she gave up the opportunity to *seek* other employment. Consideration must be made of sterner stuff. Foregoing another employment opportunity is insufficient consideration for an oral contract. *Kercher v. Forms Corp. of America, Inc.,* 258 Ill.App.3d 743, 196 Ill. Dec. 813, 816, 630 N.E.2d 978, 981 (1994)

(affirming summary judgment to an employer in a claim of breach of an oral contract for permanent employment). Since what is true for the greater must be true for the lesser, merely forgoing a chance to seek another job must likewise be deemed insufficient.

Finally, Ms. Schoeneck's alleged contract fails for lack of mutuality.

> Mutuality cannot be said to exist when an employee is free to leave his/her position but claims that the employer is not equally free to dismiss him/her. It would be an anomalous situation raising serious questions of mutuality to interpret an obligation of an employer/defendant to employ an employee/plaintiff for a given period if the employee were able to quit whenever so desired.

*Koch,* 124 Ill.Dec. at 465, 529 N.E.2d at 285.

Mutuality of obligation means "either both parties are bound to the agreement or neither is bound." *Serpe v. Williams,* 776 F.Supp. 1285 (N.D.Ill.1991). Ms. Schoeneck, according to her own testimony, was free to leave her position whenever the whim struck (since the job was supposedly hers for as long as she wanted), yet she would deny the Cubs reciprocal freedom in ending the association. The common law of contracts cannot tolerate such disparate obligations on the part of the respective parties.

Since the contract fails for lack of mutuality, as it does for indefiniteness and want of consideration, the defendant is entitled to summary judgement on this breach of promise claim.

### III. Promissory Estoppel

Illinois law recognizes a narrow exception to the "at-will" employment doctrine under which a plaintiff must prove that 1) the defendant made an unambiguous promise of employment; 2) there has been reliance on the promise; 3) the reliance was expected and foreseeable; and 4) plaintiff relied on the promise to her detriment. *Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251, 1264 (7th Cir.1985); *Moore v. On–Line Software Int'l, Inc.,* No. 92 C 1562, 1993 WL 189753 (N.D.Ill. June 3, 1993).

In the instant case, Ms. Schoeneck asked a question about her future for the 1992 sea-

son. She somehow interpreted the answer as creating an oral contract of lifetime employment. Putting aside for the moment the reasonableness of such an interpretation, the evidence does not show that the alleged promise was unambiguous. The duration of the employment remains a matter of considerable speculation (as do any of the other contract terms, none of which were discussed in the conversation at issue).

Ms. Schoeneck admits in her deposition that "no specific length [of time] was attached to [the promise]." She would have me interpret that lack of specificity as evidence that the job was hers for life, but the language and circumstances cannot definitively support such a reading. The first element of the *Patkus* test thus remains unsatisfied.

Even if Ms. Schoeneck could prove that an unambiguous promise was made, that she relied on it, and that her reliance was expected and foreseeable, the doctrine of promissory estoppel requires relief be afforded only when the reliance is detrimental. *See Patkus,* 769 F.2d at 1264; *S.M. Wilson & Co. v. Prepakt Concrete Co.,* 23 Ill.App.3d 137, 318 N.E.2d 722, 724 (1974). Ms. Schoeneck offers no evidence that she relied on it to her detriment. Her third claim fails as a matter of law. The defendant, therefore, is entitled to summary judgment.

## IV. Conclusion

A fair game requires a clear set of rules, binding on all players equally, which must ultimately be construed by the appropriate authority. This is as true in federal court, where the judge rules on motions, as it is in baseball, where the umpire rules. Ms. Schoeneck has made three claims, each of which would fail before a jury as a matter of law. A federal judge knows, along with everyone else, that in baseball there is only one possible call to be rendered after three successive strikes.

Summary judgement granted.

ROCK–A–BYE BABY, INC., Plaintiff,

v.

DEX PRODUCTS, INC., Defendant.

No. 94 C 1781.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 22, 1994.

Robert Edward Wagner, Alan L. Barry, Linda A. Kuczma, Bradley F. Rademaker, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, for plaintiff.

Ronald B. Coolley, Michael Joseph Blankstein, Arnold, White & Durkee, Chicago, IL, Chris Scott Graham, Berliner, Cohen & Biagini, Scott R. Hover–Smoot, Berliner Cohen, San Jose, CA, Timothy Huber, Brien Kirk, Michael H. Kalkstein, Graham & James, Palo Alto, CA, for defendant.

1. Registration Number 1,171,469.

2. Registration Number 1,184,949.

## *MEMORANDUM OPINION AND ORDER*

NORDBERG, District Judge.

Rock–ABye Baby, Inc. ("RABB") sued Dex Products, Inc. ("DEX") in an eight count complaint, alleging trademark infringement, unfair competition, false advertisement, commercial disparagement, deceptive trade practices, dilution of Plaintiff's protected marks, and consumer fraud. Plaintiff relies on federal law, state statutory law, and common law. DEX has moved for summary judgment on RABB's entire complaint.

## I. BACKGROUND

RABB manufactures and sells, in interstate commerce, several products relating to infant care. Among RABB's products is the Rock–A–Bye Bear, which is a stuffed bear containing a computer microchip which emits intrauterine sounds. The Rock–A–Bye Bear is designed to soothe babies with the presumably familiar sounds of the womb. Rock–A–Bye Bear is a registered trademark belonging to RABB.[1] RABB also maintains a registered trademark on the phrase "Rock–A–Bye" for "stuffed toys containing an intrauterine sound of a new born baby recorded on an integrated circuit chip."[2] RABB has sold and advertised the Rock–A–Bye Bear and other products under the "Rock–A–Bye" trademark since 1979.

DEX also sells, in interstate commerce, a stuffed bear which emits "recorded sounds of the womb," called the "Mommy Bear." In addition, DEX sells an infant support pillow called "Prop–A–Bye Baby." DEX's trademark application for Prop–A–Bye Baby was approved December 3, 1993, but a registration had yet to issue at the time this suit was filed.[3] DEX's introduction of the Mommy Bear and its use of the phrase Prop–A–Bye Baby were subsequent to the presence of Rock–A–Bye Bear on the market and RABB's use of Rock–A–Bye as a trademark.

RABB alleges that Mommy Bear is confusingly similar in name and appearance to RABB's Rock–A–Bye Bear in violation of federal and Illinois law and that DEX's

3. DEX asserts that a registration, number 1,842,-389, was issued on June 28, 1994.

Prop–A–Bye Baby mark is confusingly similar to RABB's Rock–A–Bye mark and RABB's other marks which include the term Rock–A–Bye.[4] DEX now moves for summary judgment. The Court will refer to additional facts as they become relevant to its discussion of the issues presented.

## II. ANALYSIS

### A. Standard

Summary judgment is appropriate against a party who fails to make a sufficient showing to establish the existence of an essential element to its case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552–53; *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). All the evidence submitted must be viewed in the light most favorable to the non-moving party. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608.

Once a properly supported motion for summary judgment has been filed, the non-moving party must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). An issue of fact is genuine only if a jury could reasonably return a verdict for the non-moving party. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. Only facts that might affect the outcome of the case are material. *Id.* Therefore, if the evidence provided by the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11.

### B. Trade Dress Infringement

■ RABB alleges that DEX's Mommy Bear and its trade dress are similar enough to the Rock–A–Bye Bear and its trade dress to cause confusion among the public in violation of common law and the Lanham Act, 15 U.S.C. § 1125(a). That section provides:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents to nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes he or she is likely to be damaged by such an act.

15 U.S.C. § 1125(a). It is well settled in our circuit that, in order to prevail on a claim of trade dress infringement, the plaintiff must prove that its trade dress is protectible and that its trade dress was infringed. *Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1151 (7th Cir.1994).

■ Trade dress refers to the total image of a product, including size, shape, color combinations, graphics, packaging and label. *Id.* Trade dress is protectible if it is inherently distinctive or that it has acquired a secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992). A district court in the Seventh Circuit will not reach the question of likelihood of confusion, until it is satisfied that the claimed trade dress is sufficiently distinctive to be protectible. *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992) (quoting

---

**4.** These marks are the Rock–A–Bye Bear already mentioned and the Rock–A–Bye Bunny, registration number 1,703,475.

*Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 610 (7th Cir.1986)).

Neither party discusses whether Rock–A–Bye Bear's trade dress is distinctive or has secondary meaning. DEX bases its argument for summary judgment exclusively on its argument that no confusion between the Rock–A–Bye Bear and Mommy Bear trade dress is possible, "even assuming that Rock–A–Bye Bear's overall trade dress is distinctive and has acquired strong secondary meaning." (Mem. in Supp. of Def.'s Mot. for Summ.J., p. 8.) Because the Court has received no argument on this issue, the Court will assume, for the purposes of this motion only, that Rock–A–Bye Bear's trade dress is protectible.

■■■ Trade dress is infringed if the similarity of the trade dress of the defendant to that of the plaintiff is likely to cause confusion on the part of consumers as to the source of the goods. *Badger Meter, Inc.,* 13 F.3d at 1151. Courts evaluate the likelihood of confusion in trademark infringement claims by considering the following seven factors:

(1) the similarity between the trade dress in appearance and suggestion;

(2) similarity of the products;

(3) area and manner of concurrent use;

(4) degree of care likely to be exercised by consumers;

(5) strength of complainant's trade dress;

(6) actual confusion; and

(7) intent of defendant "to palm off his product as that of another."

*Badger Meter, Inc.,* 13 F.3d at 1152. The question of the likelihood of confusion is one of fact. *AHP Subsidiary Holding Company v. Stuart Hale Company,* 1 F.3d 611, 616 (7th Cir.1993). "Accordingly, a motion for summary judgment in a trademark infringe-

ment case must be approached with great caution." *Id.*

■■■ RABB does not discuss the seven factors above with respect to trade dress. As a result, the Court is without argument regarding the third and fourth factors. The Court will only consider the factors raised in RABB's motion and supporting briefs.

### 1. Similarity of the Products and the Trade Dresses

DEX argues that the products and their respective trade dresses are so dissimilar that this Court need not even examine the other factors. DEX relies heavily on a California case, *Alchemy II, Inc. v. Yes! Entertainment Corp.,* 844 F.Supp. 560 (C.D.Cal. 1994), where the court granted summary judgment to the defendant based on its conclusion that no reasonable jury could conclude that the goods (also teddy bears) were substantially similar. *Alchemy II,* 844 F.Supp. at 569–71. DEX encourages the Court to perform a side by side examination of the two bears and their respective packaging and to conclude that no jury could reasonably conclude that a likelihood of confusion exists.

■■■ A side by side comparison, however, is not always an appropriate procedure. *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976);[5] *McDonald's Corp. v. Gunvill,* 441 F.Supp. 71, 73 (N.D.Ill.1977), *aff'd,* 622 F.2d 592 (7th Cir.1980). The question presented is whether the defendant's trade dress is likely to confuse the public. Therefore, the two products and their packaging must be compared in light of what occurs in the marketplace. *James Burrough Ltd.,* 540 F.2d at 275. A judicial side by side comparison is probative only to the extent it represents consumers' perception of the products. *Computer Care v. Service Systems Enterprises, Inc.,* 982

---

5. Although *James Burrough Ltd.* is a trademark, rather than a trade dress, case, it is relevant to the Court's analysis of trade dress. The issue of a likelihood of confusion is common to trademark and trade dress infringement, as well as to claims of unfair competition. *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). In its discussion of both the trademark and trade dress infringement claims in this case, this Court will rely on prior courts' analysis of the likelihood of confusion issue irrespective of its source as a trademark or trade dress case. This is a common practice. *See, e.g., Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 937 (7th Cir. 1989) (a trade dress case) (citing *International Kennel Club of Chicago v. Mighty Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir.1988) (a trademark case)).

F.2d 1063 (7th Cir.1992); *Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 937 (7th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990).

DEX has not conclusively shown that the Rock–A–Bye Bear and the Mommy Bear are so dissimilar as to preclude consumer confusion regarding the source or affiliation of Mommy Bear. DEX exhaustively lists all the differences between the two products and their packaging in its brief and its Statement of Material Facts as to which there is no genuine dispute, including such characteristics as the length of the fur and the size of the eyes for each bear and the different color scheme of the respective packaging. Many of these differences are only cognizable by careful and detailed comparison of the products and packaging. Even if a side by side comparison is appropriate, this level of scrutiny is unlike anything which occurs in the marketplace.[6] Side by side comparisons can accentuate minor differences between products. *See International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1088 (7th Cir.1988). DEX's focus on minute details does not address the Court's duty to examine the "perceptual gestalt" of the trade dress, *see Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1431 (7th Cir.1985), *cert. denied,* 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986), or put another way, the "total concept and feel" emitted to consumers by the products. *Nike, Inc. v. "Just Did It" Enterprises,* 6 F.3d 1225, 1230 (7th Cir.1993) (citations omitted). The Court must compare the products and their trade dress against the backdrop of the marketplace, *International Kennel Club,* 846 F.2d at 1088, and with regard to the overall appearance of the products. *Scandia Down,* 772 F.2d at 1431.

The products are generally similar. Each is a stuffed bear which emits a soothing sound. A few specific similarities exist in the products' trade dress as well. Both bears are packaged in a rectangular box. Each box, on its back side, has a picture of the contained bear in a sitting position with the sound device between the bears' legs. Each box also promotes its product through endorsements, although the endorsements on the Mommy Bear package are clearly fictional while the endorsements on the Rock–A–Bye Bear package appear to be from actual customers.

In sum, the Court notes that the two products are somewhat similar in overall appearance. As the scrutiny of the products becomes more intense, differences become more apparent.[7] The balance of these conclusions is that the first two factors, the similarity of the two products and their respective trade dress, do not militate strongly for or against a conclusion that a likelihood of confusion is present.[8]

**2. Strength of Complainant's Trade Dress**

Strength of trade dress relates in part to its uniqueness. *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 937–38 (7th Cir.1989). The more fanciful, as opposed to generic, the complainant's trade dress is, the stronger it is. To the extent the product itself is part of the trade dress, its existence as a teddy bear, surely among the most generic of toys, is evidence of a relatively weak trade dress. RABB does not present any evidence regard-

---

6. There is even some confusion as to whether Rock–A–Bye Bear and Mommy Bear are sold in the same shops. In his affidavit, Jason Clute, President of DEX, stated that the products are to be sold in different stores. Clute Dec., ¶ 8. Mr. Clute, however, admitted that this is not "100% true" in his deposition. Clute Dep., p. 91. Andrew Horn, President of RABB states that DEX and RABB are competitors and sell products to common retailers, but does not state that Rock–A–Bye Bear and Mommy Bear are carried by any retailers simultaneously. The extent of the overlap in the distribution networks for the two products is unclear from this record.

7. This truism is undoubtedly one of the reasons why the Seventh Circuit considers factor number four, the degree of care likely to be exercised by consumers, an important part of this analysis. As RABB did not address this element in its motion or supporting memoranda, the Court is without argument on this factor.

8. RABB also alleges that DEX is liable for using the term "audio pacifier" to describe Mommy Bear. Given the Court's ruling on this motion, it is unnecessary to discuss the status of the "audio pacifier" claim except to say it remains an open issue to be addressed at trial.

ing the strength of its trade dress. DEX, on the other hand, names three other child-related products on the market that include a heartbeat sound intended to soothe a child. Def.'s Stmt. of Mat. Facts., ¶ 14. RABB questions whether these products are intended to soothe children and insists that Rock–A–Bye Bear does not make a heartbeat sound.[9] Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, ¶ 13. In light of these issues of fact regarding the uniqueness of Rock–A–Bye Bear's trade dress, the strength of the trade dress does not support a conclusion of law that no likelihood of confusion exists.

### 3. Actual Confusion

■ RABB submits the declaration of Rita Mott, a RABB employee, to demonstrate actual confusion in the minds of consumers between RABB products and DEX products. Ms. Mott states that she has received calls from individuals who have mistaken Mommy Bear for Rock–A–Bye Bear.

Mott Dec., ¶¶ 4–5.

DEX attacks this declaration as hearsay and thereby inadmissible. Statements regarding the state of mind of a declarant, here the unknown callers, are generally admissible in the Seventh Circuit under these circumstances. In *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079 (7th Cir.1988), the court held that the testimony of employees that they had received letters, calls, and comments expressing confusion between the two similarly named parties in that lawsuit was admissible and probative of the existence of a likelihood of confusion. *Id.* at 1090; *see Imperial Service Systems, Inc. v. ISS International Service System, Inc.*, 701 F.Supp. 655, 659

(N.D.Ill.1988) (relying on Fed.R.Evid. 803(3) to exclude similar statements as a reflection of existing state of mind). *But see Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1331 n. 2 (7th Cir.1993) (citing, without comment, the rejection of the existing state of mind exclusion as it applies to similar statements).

Although admissible, the statements by Ms. Mott are not entitled to great weight. The declarants are unknown, and there sincerity and truthfulness cannot be gauged. Furthermore, the number of inquiries fielded by Ms. Mott regarding Mommy Bear is unknown. The three calls she specifically reports are, by themselves, insignificant. Therefore, the evidence of actual confusion is slight. However, as this Court is obligated to consider all facts in the light most favorable to the plaintiff, and as DEX provides no evidence of a lack of actual confusion, the Court finds that a material issue of fact regarding the existence of actual confusion exists.

### 4. Intent to "Palm Off"

DEX, the movant, makes no reference to the seventh factor except to respond to RABB's allegations of "palming off."[10] RABB alleges that DEX intends to "palm off" the Mommy Bear as related to RABB products, and provides the deposition of DEX's President, Jason Clute, to do so. Mr. Clute admits that he was inspired to the idea of placing a sound box in a stuffed bear by the Rock–A–Bye Bear and that he attempted to become a RABB licensee. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. 1, pp. 42, 203. These points do not demonstrate that DEX intended to pass its products off as those of RABB, it only shows that RABB

---

**9.** RABB's president, Andrew Horn, states that Rock–A–Bye Bear contains an internal sound unit that emits an "actual recording of intrauterine sounds." Horn Dec., ¶ 5. In an advertisement for its Rock–A–Bye Baby Decorator Pillows, RABB states, "NEW! Decorator baby pillows featuring the original Rock–A–Bye Baby sound, the first original recorded intrauterine sound found to calm and quiet newborn infants. Containing the actual maternal pulse sounds as heard by a baby in the womb prior to birth." Apparently, RABB finds a distinction between heartbeat sounds and pulse sounds.

**10.** DEX even goes so far as to argue that the defendant's intent is not relevant to a finding of the likelihood of confusion. Inexplicably, DEX cites a Third Circuit case to support this proposition. This is a Seventh Circuit Court and the seven factor test for likelihood of confusion, including an evaluation of the defendant's intent, has been standard fare here for many years. *See Helene Curtis Industries, Inc. v. Church and Dwight Co., Inc.*, 560 F.2d 1325, 1330 (7th Cir. 1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978).

was in the market first, an undisputed fact, and that RABB's product inspired a competitor, an irrelevant fact.

Although the palming off factor therefore does not, on this record, advance RABB's claim, neither does it advance DEX's argument that no genuine issues of fact regarding a likelihood of confusion exist.

In sum, DEX has not identified, in the current record, an absence of material fact concerning the existence of a likelihood of confusion with regard to the trade dress of the parties' products. Questions still exist regarding the degree of actual or likely confusion regarding the "origin, sponsorship, or approval" of Mommy Bear, if any, experienced by consumers when faced with that product, the strength of DEX's trade dress, and DEX's intent with respect to "palming off." Therefore, this Court does not grant summary judgment on this count.

### C. Trademark Infringement

■ RABB also alleges trademark infringement pursuant to common law and the Lanham Act, 15 U.S.C. § 1114, complaining that DEX's Prop–A–Bye Baby mark is confusingly similar to RABB's marks Rock–A–Bye, Rock–A–Bye Bear, and Rock–A–Bye Bunny as well as its trade name Rock–A–Bye Baby. The elements of a cause of action for trademark infringement are the same as those for trade dress infringement. To prevail at trial, a plaintiff must demonstrate that its trademark is protectible and that it was infringed. *Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993).

DEX argues that RABB's marks are not protectible because they are generic and that DEX has not infringed on RABB's marks because DEX's Prop–A–Bye Baby is not at all similar to RABB's marks.

DEX argues that the only commonality between its Prop–A–Bye Baby and RABB's marks is the "A–Bye" portion, which DEX argues is generic. "A generic term is one that is commonly used as the name of a kind

of goods." *Forum Corp. of North America v. Forum Ltd.*, 903 F.2d 434, 444 (7th Cir. 1990) (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 935 (7th Cir.1986)). DEX provides the names of three products and seven businesses that use some variation of "A–Bye" to describe themselves. Clute Dec., ¶¶ 18, 19.

RABB responds by disclaiming any attempt to enforce a trademark on "A–Bye" by itself. RABB alleges that Prop–A–Bye Baby is confusingly similar to its trade name Rock–A–Bye Baby as well as a violation of its registered marks that include the term Rock–A–Bye. RABB relies on the phonetic and visual similarity of the two phrases to assert a likelihood of confusion. The Court must consider the marks taken as a whole. *Scandia Down Corp.*, 772 F.2d at 1431; *James Burrough Ltd.* 540 F.2d at 275. DEX makes no other attempt to challenge the protectibility of RABB's marks or its trade name, Rock–A–Bye Baby. Therefore, the Court will again assume, for the purposes of this motion only, that RABB's marks and trade name are protectible.

The analysis of the likelihood of confusion between the marks is the same as the analysis regarding likelihood of confusion for trade dress. The same seven factor test applies. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir.1993). Again, DEX ignores the seven factor test, although it does provide some evidence that relates to the factors. The Court will consider this evidence, keeping in mind that the weight accorded to each factor may vary from case to case and that no single factor is determinative. *Id.*

### 1. Similarity of the Marks

DEX argues that the marks "are not at all similar" and again provides no evidence of consumer reaction to the marks, relying on the Court to engage in a side by side comparison. However, the phonetic and visual similarity of Prop–A–Bye Baby and the Rock–A–Bye marks [11] cannot reasonably be denied. The sound of a mark is a relevant

---

11. The similarity is greatest with Rock–A–Bye Baby, which RABB asserts is its protectible trade name. The phonetic and visual similarity with other Rock–A–Bye marks, such as Bear, Bunny and the unmodified Rock–A–Bye are not insignificant.

consideration when determining the likelihood of confusion. *Forum Corp. of North America v. Forum, Ltd.,* 903 F.2d 434, 441 (7th Cir.1990). As the Court must consider the marks in their entirety, the Court finds that enough similarity between the marks exists to preclude a holding that there is no issue of material fact with regard to the similarity of the marks.

### 2. Similarity of the Products

DEX argues that the products are dissimilar because its Prop–A–Bye Baby is a pillow, while RABB's products are toys. RABB provides evidence that it has applied its Rock–A–Bye Baby trade name, with various suffixes, to a wide variety of products, including "Shield–A–Burn," "Carta–Kid," "Comfy Wipe Warmer," "Baby's First Year," "My Potty Game" and others. The Court therefore finds that RABB's characterization of the products as "infant care products" is more accurate. This is not to say the Court considers the product lines to be identical, but the Court is unwilling to hold that no genuine issue of material fact exists regarding the similarity of the products.

### 3. Other Factors

The analysis relevant to the remaining five factors is not materially different than the analysis performed with respect to the claim of infringement of RABB's trade dress. DEX again provides no evidence regarding the area and manner of concurrent use of the marks or the degree of care likely to be used by consumers. The evidence that DEX provides regarding the strength of RABB's marks, actual confusion, and its intent in using Prop–A–Bye Baby has already been discussed in relation to RABB's trade dress claim. The remaining factors do not materially persuade the Court one way or the other in regard to a likelihood of confusion among consumers.

■ DEX also argues that the United States Trademark Office ("USTO") has implicitly found no confusion between Prop–A–Bye Baby and RABB's marks because DEX's mark has been registered. The seven factor test set out by the Seventh Circuit is not exhaustive, *see Nike, Inc.,* 6 F.3d at 1228, so the Court will consider this argument.

The issue of likelihood of confusion in a registration proceeding is not identical to that issue in an infringement action. In a proceeding opposing a registration, "likelihood of confusion is determined only as to the registrability of the applicant's mark exactly as shown in the application and only as to the goods listed, regardless of actual usage." *Jim Beam Brands Co. v. Beamish & Crawford,* 937 F.2d 729, 734 (2d Cir.1991) (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 32:31, at 737–38 (2d ed. 1984)) (holding that defendant was not collaterally estopped from arguing no likelihood of confusion in an infringement case even though the registration of its mark had been cancelled in an earlier proceeding). As this Court has already noted, in an infringement action, the inquiry is much broader, encompassing not only the actual usage, but considering the trade dress, proximity of the parties' marks and other factors which make up the "perceptual gestalt." Therefore, the fact that the USTO granted DEX a registered trademark on its Prop–A–Bye Baby mark is not sufficient to state that there is no genuine issue of material fact with respect to a likelihood of confusion.

In sum, DEX has failed to persuade this Court that there is no likelihood of confusion between its Prop–A–Bye Baby mark and RABB's various marks. This is particularly true in light of test set down by the Seventh Circuit in *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976). In order to win summary judgment on an infringement suit, a defendant must show that there is no likelihood that consumers generally familiar with RABB's marks would, upon seeing only DEX's mark, to believe Prop–A–Bye Baby was in some way related to, or connected or affiliated with, or sponsored by RABB. *Id.* at 274. Summary judgment must be approached cautiously with respect to fact bound inquiries. As genuine issues of material fact exist with regard to many, if not all, of the seven factors used to determine whether a likelihood of confusion exists, DEX's motion for summary judgment with respect to Counts I, II

and VIII, alleging trademark and trade dress infringement, are DENIED.

### D. False Advertising

RABB alleges that DEX has falsely advertised its Mommy Bear and Prop–A–Bye Baby products in three instances. First, RABB alleges that DEX falsely advertised that Prop–A–Bye Baby is a registered trademark. Second, RABB alleges that DEX falsely advertised that Mommy Bear was "clinically proven." Third, RABB argues that DEX falsely advertised that the Mommy Bear sound box contains "actual recorded sounds of the womb."

■ In order to prevail on a claim for false advertisement under the Lanham Act, a plaintiff must show that the defendant's advertisement is (1) false and misleading, (2) actually or likely to deceive a substantial segment of their audience, (3) material in their effects on purchasing decisions, (4) for goods that entered interstate commerce, and (5) actually or likely to injure the plaintiff. *Truck Components, Inc. v. K–H Corp.,* 776 F.Supp. 405, 408 (N.D.Ill.1991).

■ DEX claims it is entitled to judgment as a matter of law on this claim on each of RABB's three allegations. First, DEX argues that its advertisement that Prop–A–Bye Baby was a registered trademark, although technically false, does not entitle RABB to relief because DEX's statement has nothing to do with the nature of DEX's product. The Lanham Act, on which RABB relies, provides that false or misleading representations of fact which "in commercial advertising or promotion, misrepresent the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" are a source of civil liability. 15 U.S.C. § 1125. As the existence of a registered trademark is not relevant to the "nature, characteristics, qualities, or geographic origin" of the Prop–A–Bye Baby pillow, RABB's claim under the Lanham Act cannot succeed based on a false representation that Prop–A–Bye Baby was a registered mark.

Second, DEX argues that its advertising Mommy Bear as "clinically proven" was not false. To support this statement, DEX provides information filed under seal. Pending a further hearing on under seal submissions, suffice it to say that there are a number of genuine issues of material fact, so that summary judgment on RABB's false advertising claim is inappropriate.

■ DEX also argues that its advertisement stating that Mommy Bear contains "actual recorded sounds of the womb" cannot provide the basis for a false advertising claim. Again, DEX relies on the literature which accompanied the compact disc from which the sound used in Mommy Bear was taken. That literature provides, "[t]he recording ... was taken near the head of the fetus in a woman eight months pregnant." Supp. Clute Dec., Ex. A. Although this evidence shows that the producer of the sound claims it is intrauterine, it does not, by itself, demonstrate that no question of material fact exists with regard to the truth or falsity of DEX's advertisement. DEX, in the context of a false advertising claim, essentially asks this Court to blindly assume the truthfulness and reliability of the advertisement of some third party producer of sounds. In light of the procedural posture of this motion, the Court will not do so.

For the foregoing reasons, DEX's motion for summary judgment with respect to Count III, alleging false advertisement, is DENIED.

### E. Commercial Disparagement

DEX moves for summary judgment based on the absence of any evidence in the record establishing that DEX disparaged RABB or RABB's products. As such they have moved for summary judgement and the burden shifts to RABB to point to specific parts of the record that establish at least a genuine issue of material fact as to its right to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

RABB responds, in conclusory fashion, as follows:

RABB is aware of evidence that DEX has made statements that are disparaging to RABB and its product trade names.

These statements were made in DEX's promotion of its Mommy Bear at a trade show in Dallas Texas in 1993.

Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., p. 10. RABB has not gone beyond the pleadings, as required by *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). RABB provides *no* evidence of any disparaging statements.[12] The Court will give RABB two weeks to file supplemental information on this issue and DEX two weeks to respond. The Court will rule by mail.

### F. Deceptive Trade Practices

■ RABB alleges a violation of the Uniform Deceptive Trade Practices Act, codified in Illinois at 815 ILCS 510/1—510/7. The Act provides, in part:

A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;

. . . .

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

815 ILCS 510/2 (Smith–Hurd 1993). Likelihood of confusion has the same meaning in the Illinois Deceptive Trade Practices Act as it does in trademark infringement cases. *McGraw–Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1174 (7th Cir.1986); *M–F–G Corp. v. ERMA Corp.,* 626 F.Supp. 699, 706 (N.D.Ill.1985), *aff'd,* 817 F.2d 410 (7th Cir.1987). As such, DEX relies on its arguments presented in connection with the trademark and trade dress claims. As this Court has already ruled that there are genu-

ine issues of material fact with respect to the likelihood of confusion with respect to the trademark and trade dress claims, summary judgment is also inappropriate for this count. DEX's motion for summary judgment on Count V, alleging deceptive trade practices, is DENIED.

### G. Dilution

■ RABB alleges that DEX violated Illinois' Anti–Dilution statute, which provides:

Every person ... adopting and using a mark, trade name, label, or form of advertisement may proceed by suit ... to enjoin subsequent use by another of the same or any similar mark ... if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark ... notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services....

765 ILCS 1035/15 (Smith–Hurd 1993). A genuine issue of material fact concerning the likelihood of confusion element of a trademark infringement action also constitutes a genuine issue of material fact with respect to an anti-dilution claim under Illinois law. *McGraw–Edison,* 787 F.2d at 1174. As this Court has already held that genuine issues of material fact exist with respect to the likelihood of confusion between the parties' trademarks and trade dresses, summary judgment is inappropriate on the anti-dilution claim as well. DEX's motion for summary judgment on Count VI, alleging dilution in violation of Illinois law is DENIED.

### H. Consumer Fraud

■ RABB alleges that DEX has committed consumer fraud by "unfair competition, deceptive acts and practices ... with respect to its promotion, offer to sell, and sales of products." RABB seeks to recover under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. The parties agree that likelihood of confusion is an element of a consum-

---

**12.** RABB refers the Court to the deposition testimony of DEX's president, Mr. Clute. RABB alleges that Mr. Clute does not deny that disparaging statements may have been made. RABB does not, however, provide the appropriate pages of Mr. Clute's deposition transcript to this Court. This is not sufficient.

er fraud case. *See* Reply Br. in Supp. of Def.'s Mot. for Summ. J., p. 12; Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., p. 12. As this Court has already noted, genuine issues of material fact exist regarding whether there is a likelihood of confusion between the parties' trademarks, products, and trade dresses. Therefore, DEX's motion for summary judgment on count VII, alleging consumer fraud, is DENIED.

## III. CONCLUSION

For the foregoing reasons, DEX's motion for summary judgment with respect to Count IV, alleging commercial disparagement, is deferred pending further submissions and DENIED with respect to all other counts.

**Jeffrey REED, Plaintiff,**

**v.**

**CITY OF CHICAGO, a municipal corporation, Det. John Griffin, Det. W. Murphy, Det. Stanley Kroll, Det. A. Christophersen, Det. J. Stehlik, Det. Stanley Turner, Det. James Green, Defendants.**

No. 94 C 2776.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 27, 1994.

Jill A. Friedman, Law Office of Edward T. Stein, Edward Ted Stein, Chicago, IL, for Jeffrey Reed.

Susan S. Sher, Irene Schild Caminer, Donald Raymond Zoufal, Margaret Ann Carey, Patricia Jo Kendall, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, for City of Chicago.

James Patrick McCarthy, David Mitchell Zinder, Eileen Ellen Rosen, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, for John Griffin, W. Murphy, Stanley Kroll, A. Christophersen, J. Stehlik, Stanley Turner and James R. Green.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Before the Court is Defendants' Motion to Dismiss certain claims of the Plaintiff Jeffrey Reed's Amended Complaint.[1]

---

1. Defendant's Motion to Dismiss originally addressed Plaintiff's Complaint. On August 10, 1994, this Court granted Plaintiff's oral motion to file an amended complaint. At the same time, Defendants were given leave to file a supplement to their Motion to Dismiss. Although Defendants

## ALLEGED FACTS

On June 3, 1991, Lamont Field was shot and killed at or near 5400 South Paulina Street, Chicago, Illinois. (Amended Complaint at ¶ 5.) Thereafter, City of Chicago police officers John Griffin, W. Murphy, Stanley Kroll, A. Christophersen, J. Stehlik, Stanley Turner and James Green began investigating the death of Lamont Field. *Id.* at ¶ 6. Allegedly, the prime suspect for the shooting was Gavin Bryant. *Id.* at ¶ 7. On June 12, 1991, Defendants Turner, Kroll and Murphy went to Bryant's home and questioned him about the shooting of Lamont Field. *Id.* at ¶ 9. Bryant allegedly denied his guilt and pointed the finger at Plaintiff. *Id.* at ¶ 10. Without further investigation and without an arrest or search warrant, Defendants Turner, Kroll and Murphy went to Plaintiff's home on June 12, 1991 and placed him under arrest for the murder of Lamont Field. *Id.* at ¶ 11. Plaintiff alleges, upon information and belief, that Defendants Griffin, Christophersen, Stehlik and Green participated in the investigation of the death of Lamont Field and collaborated with Defendants Turner, Murphy and Kroll in arresting Plaintiff. *Id.* at ¶ 13.

On June 12, 1991, Plaintiff was charged with the murder of Lamont Field and because he was unable to post bond, he remained incarcerated for the entire time the criminal case was pending, approximately twenty-three months. *Id.* at ¶ 15. On May 5, 1993, after a full trial on the merits, Plaintiff was acquitted on the charge of first degree murder. *Id.* at ¶ 22.

Based on the alleged facts recounted above, Plaintiff brings two claims, pursuant to 42 U.S.C. § 1983, for violation of his Fourth and Fourteenth Amendment rights. Count I charges that Defendants deprived Plaintiff of his right to be free from unlawful arrest, search and seizure, wrongful confinement and detention and malicious prosecution in violation of his Fourth Amendment rights. Count II charges that Plaintiff's confinement after his arrest was oppressive and shocking to the conscience, and thus in violation of his Fourteenth Amendment rights. Count III brings a claim for malicious prosecution under Illinois state law and Count IV brings a claim based on Defendants' negligent conduct and the special duty Defendants owed Plaintiff.[2]

Defendants seek to dismiss the claims in Count I of Plaintiff's Complaint for three reasons: (1) the unlawful arrest and search and seizure claims are time barred;[3] (2) the unlawful confinement and detention claims are properly analyzed under the Due Process Clause of the Fourteenth Amendment, not the Fourth Amendment; and finally (3) the malicious prosecution claim is not cognizable under the Fourth Amendment. As to Count II, Defendants assert that Plaintiff has not alleged sufficient facts to state a claim for unlawful confinement and detention in violation of his Fourteenth Amendment due process rights. Finally, with regard to Count III, Defendants ask this Court to dismiss Plaintiff's request for costs and attorney's fees because an award of litigation expenses is not permitted under Illinois law.

## ANALYSIS

 When reviewing a motion to dismiss, the court views all of the facts alleged in the complaint, as well as any inferences reasonably drawn therefrom, in the light most favorable to the plaintiff. *Mosley v. Klincar,* 947 F.2d 1338, 1339 (7th Cir.1992). Dismissal is appropriate only if it is clear that there is no relief that can be granted under any set of facts that can be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

never filed a supplement, both Plaintiff's Response to Defendants' Motion to Dismiss and Defendants' Reply Memorandum in Support of Their Motion to Dismiss addressed Plaintiff's Amended Complaint. Thus, this Court will direct its opinion to Plaintiff's Amended Complaint.

**2.** As Plaintiff has abandoned the claims stated in Count IV, the Court will not address them in this opinion.

**3.** As Plaintiff agrees with Defendant that Count I's unlawful arrest and search and seizure claims are barred by the applicable statute of limitations, this Court will not address the merits of such claims.

*Count I*

### Unlawful Confinement and Detention

In support of his assertion that an unlawful confinement and detention claim is cognizable under the Fourth Amendment, Plaintiff relies on two Supreme Court cases, *Heck .v. Humphrey,* — U.S. ——, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and *Albright v. Oliver,* — U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). This Court agrees with Defendants that neither *Heck* nor *Albright* support the Plaintiff's assertion.

In *Heck,* the Supreme Court held that to recover damages for an allegedly unconstitutional conviction or imprisonment, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus. — U.S. at ——, 114 S.Ct. at 2372. The *Heck* court went on to note that, when a prisoner seeks damages in a § 1983 suit, the district court must determine whether a judgment in favor of the plaintiff would imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence· has already been invalidated. *Id.* Since the Plaintiff in the present case has been neither convicted nor sentenced, the Supreme Court's opinion in *Heck* is inapplicable.

In *Albright,* the Supreme Court was presented with the narrow question of whether a plaintiff could maintain a § 1983 claim for malicious prosecution on substantive due process grounds. — U.S. at ——, 114 S.Ct. at 812. The plaintiff in *Albright* was arrested for selling look-alike drugs. He was bound over for trial at a preliminary hearing, although not imprisoned, and the charges against him were eventually dismissed. *Id.* at ——, 114 S.Ct. at 810.

A plurality of the Supreme Court held that there is no substantive due process right to be free from malicious prosecution. *Id.* Rather, Chief Justice Rehnquist, writing for the plurality, noted that any such claim must be judged under the Fourth Amendment.

*Id.* at ——, 114 S.Ct. at 811. The *Albright* court noted, "[w]here a particular amendment 'provides an explicit textual. source of constitutional protection' against a particular sort of government behavior,' that Amendment not the more generalized notion of substantive due process, must be the guide for analyzing these claims." — U.S. at ——, 114 S.Ct. at 813 (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)). However, as the plaintiff in *Albright* had not challenged the defendant's conduct on Fourth Amendment grounds, the *Albright* court expressed no view as to whether the Fourth Amendment does in fact provide protection from malicious prosecution and what the contours of such protection are, should it be found to exist. *Id.,* — U.S. at ——, 114 S.Ct. at 813–14. Since the *Albright* court confronted a claim of malicious prosecution based on substantive due process, the Supreme court's opinion in *Albright* appears to provide little support for Plaintiff's claim of unlawful confinement brought under the Fourth Amendment. However, the application of *Albright* to Plaintiff's Fourth Amendment unlawful confinement claim cannot be dismissed so readily.

In a case decided prior to the Supreme Court's opinion in *Albright, Wilkins v. May,* 872 F.2d 190, 193 (7th Cir.1989), *cert. denied,* 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990), the Seventh Circuit explained that "once a person is arrested and charged, but before he is convicted, the question whether the fact, manner, or duration of his continued confinement is unconstitutional· passes over from the Fourth Amendment to the due process clause." In his Amended Complaint, Plaintiff alleges that, after he was arrested and indicted for the murder of Lamont Field, he remained incarcerated for twenty-three months because he could not post bond. The unlawful detention and confinement about which Plaintiff complains occurred while he was a detainee awaiting trial and a defendant on trial. Thus, according to the Seventh Circuit's opinion in *Wilkins,* Plaintiff's claim of unlawful detention and confinement is a due process, not a Fourth Amendment, claim. *See also, Titran v. Ackman,* 893 F.2d 145, 147 (7th Cir.1990) (noting

that three different parts of the Bill of Rights apply in sequence during arrest and confinement: force during arrest must be reasonable within the meaning of the Fourth Amendment; between arrest and conviction, the government may not "punish" the suspect without due process of law; after conviction, the government may not inflict cruel and unusual punishment); *Bergren v. City of Milwaukee,* 811 F.2d 1139, 1142–43 and n. 2 (7th Cir.1987).

The question which this Court must address is whether the Seventh Circuit's opinion in *Wilkins* is still good law after *Albright.* The *Wilkins* opinion, which suggests that Plaintiff's unlawful detention and confinement claim, is a due process, not a Fourth Amendment, claim, depends on a line drawn by the Seventh Circuit between claims brought before a *Gerstein* hearing,[4] to which the Fourth Amendment applies, and claims brought after a *Gerstein* hearing, to which the Due Process Clause applies. According to the Seventh Circuit, after a probable cause hearing, a person is no longer seized for the purposes of the Fourth Amendment, and thus the only constitutional provision which applies to the confinement of a person after such a hearing is the Due Process Clause of the Fourteenth Amendment. *See Garcia v. City of Chicago, Ill.,* 24 F.3d 966, 970 n. 6 (7th Cir.1994).

At least one judge on the Seventh Circuit has recognized that the Supreme Court's opinion in *Albright* has blurred the line which separates constitutional violations before and after a *Gerstein* hearing. *Garcia,* 24 F.3d at 975 (Cudahy, J., concurring in part dissenting in part). In *Garcia,* Judge Cudahy took special note of Justice Ginsburg's concurrence in *Albright. Id.* Judge Ginsburg joined the plurality, but wrote separately to explain why she believed Albright's claim should be judged under the Fourth Amendment. Judge Ginsburg opined,

Albright may have feared that courts would narrowly define the Fourth Amendment's key term 'seizure' so as to deny full

scope to his claim. In particular, he may have anticipated a holding that the 'seizure' of his person ended when he was released from custody on bond.... Such a concern might have stemmed from Seventh Circuit precedent set before *Graham v. Connor,* 490 U.S. 386 [109 S.Ct. 1865, 104 L.Ed.2d 443] (1989). *See Wilkins v. May,* 872 F.2d 190, 195 (1989) (substantive due process 'shock the conscience' standard, not the Fourth Amendment, applies to brutal 'post-arrest pre-charge' interrogation).

—— U.S. at —— & n. 2, 114 S.Ct. at 815 & n. 2. The Ginsburg opinion further notes that the Fourth Amendment continues to apply even after an initial bond hearing and release on custody, since the defendant remains " 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." —— U.S. at ——, 114 S.Ct. at 816.

Judge Ginsburg's opinion clearly raises doubts about the line the Seventh Circuit has drawn between violations of an arrestee's constitutional rights prior to a *Gerstein* hearing and violations of a pre-trial detainee's rights after a *Gerstein* hearing. However, Judge Cudahy notes that the Seventh Circuit's line drawn at the *Gerstein* hearing remains viable because the *Albright* court's statements about the applicability of the Fourth Amendment after a probable cause hearing are "essentially dicta in an otherwise narrow substantive due process case." 24 F.3d at 975. Although the *Albright* court noted that a claim of malicious prosecution should be judged under the Fourth Amendment, not substantive due process, the Supreme Court supplied no view as to whether the Fourth Amendment provided any protection against malicious prosecution because the plaintiff had not brought a claim under the Fourth Amendment. —— U.S. at —— – ——, 114 S.Ct. at 813–14.

This Court finds it significant that the majority opinion in *Garcia,* in addition to Judge Cudahy's concurrence, reaffirms the line drawn between alleged constitutional violations which take place prior to the *Gerstein*

---

**4.** *Gerstein v. Pugh,* 420 U.S. 103, 126, 95 S.Ct. 854, 869, 43 L.Ed.2d 54 (1975) held that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite

to detention," and probable cause hearings that take place after arrests made without warrants are commonly referred to as *Gerstein* hearings. *Garcia,* 24 F.3d at 968 n. 2.

hearing, to which the Due Process Clause of the Fourteenth Amendment applies. Specifically, the *Garcia* majority stated, "[b]ecause the seizure of a person ends after the *Gerstein* hearing, the Due Process Clause of the Fourteenth Amendment is the only applicable constitutional provision." *Id.* at 970 n. 6. The *Garcia* majority noted further that the Supreme Court's opinion in *Albright* "casts considerable doubt on the application of substantive due process," after the *Gerstein* hearing, *id.* (citing —— U.S. at ——, 114 S.Ct. at 814 (Scalia, J., concurring)), but the *Garcia* majority did not conclude that *Albright* instructs that the Fourth Amendment applies after a *Gerstein* hearing.

Despite the doubt, cast by the Supreme Court, on the applicability of substantive due process after a *Gerstein* hearing, the court in *Garcia* proceeded to analyze the plaintiff's unlawful confinement claim under the rubric of substantive due process. The *Garcia* court's application of substantive due process to the plaintiff's claim of unlawful confinement might be explained by the fact that the Supreme Court's opinion in *Albright* addressed only a claim of malicious prosecution and not a claim of unlawful confinement or detention.

Although this Court acknowledges the dicta in *Albright* regarding the application of the Fourth Amendment to alleged constitutional violations after a *Gerstein* hearing and the doubt cast on the application of substantive due process, this Court is bound by the Seventh Circuit's opinion in *Garcia* which confirms the line drawn at the *Gerstein* hearing and the application of substantive due process to a claim of unlawful confinement occurring after a *Gerstein* hearing. Consequently, the claims in Count I which allege that Defendants' unlawful detention and confinement of Plaintiff violated Plaintiff's Fourth Amendment rights must be dismissed for failure to state a claim.

**Malicious Prosecution**

As previously noted, *Albright* holds that a plaintiff cannot maintain a § 1983 claim for malicious prosecution on substantive due process grounds. —— U.S. at ——, 114 S.Ct. at 812. Accordingly, Plaintiff does not base his malicious prosecution claim on substantive due process grounds, but rather on the Fourth Amendment.

Writing for a plurality of four justices, Chief Justice Rehnquist held that a claim for malicious prosecution must be judged under the Fourth Amendment. *Id.* at ——, 114 S.Ct. at 811. However, contrary to Plaintiff's assertions, such a holding does not indicate that a claim for malicious prosecution is viable under the Fourth Amendment. Because the plaintiff in *Albright* did not raise a Fourth Amendment claim, the plurality opinion did not address whether the Fourth Amendment does, in fact, provide protection from malicious prosecution and what the contours of such protection are, should it be found to exist. *Id.* at —— – ——, 114 S.Ct. at 813–14. The discussion in the plurality and concurring opinions in *Albright* regarding the applicability of the Fourth Amendment to a claim of malicious prosecution is mere dicta in an otherwise narrow decision regarding substantive due process. Thus, this Court's determination as to whether Plaintiff can sustain a claim for malicious prosecution under the Fourth Amendment must be guided by relevant Seventh Circuit precedent.

 Relying on the Supreme Court's opinion in *Albright,* the Seventh Circuit in *Smart v. Board of Trustees of the University of Illinois,* 34 F.3d 432 (7th Cir.1994), held that, where malicious prosecution results in an arrest or other seizure of the plaintiff, there is an infringement of liberty, which is cognizable under the Fourth Amendment (as made applicable to the states by the Fourteenth), and not under the due process clause directly. In the present case, Plaintiff was arrested without a warrant and indicted for murder the same day. Thus, the Defendant's seizure of Plaintiff ended after his *Gerstein* hearing, at which a grand jury presumably determined that there was probable cause to charge Plaintiff with the murder of Lamont Field. *See, Garcia,* 24 F.3d at 970 n. 6. As Defendants' seizure of Plaintiff ended after Plaintiff's probable cause hearing, the Fourth Amendment is no longer applicable and Plaintiff cannot bring a malicious prosecution claim based on the Fourth Amendment. *Id.*

 Although unclear, the allegations in Plaintiff's Amended Complaint seem to sug-

gest that his *Gerstein* hearing may have been defective because he was denied an opportunity to present witnesses to counter the testimony of Defendants Turner, Kroll and Murphy. Plaintiff alleges that he was indicted for murder, solely on the basis of Defendants Turner, Kroll and Murphy's statements. Amended Complaint at ¶¶ 11, 18. Plaintiff's contention can be easily dismissed as the Seventh Circuit has held that the Fourth Amendment does not require that probable cause hearings be adversarial in nature. *Garcia,* 24 F.3d at 969 (citing *Gerstein v. Pugh,* 420 U.S. 103, 121–22, 95 S.Ct. 854, 866–67, 43 L.Ed.2d 54 (1975)). Thus, Plaintiff's inability to present witnesses in his own behalf does not render his *Gerstein* hearing unreliable.

■ Other than the inability to present witnesses on his own behalf, Plaintiff does not indicate any other reason why his *Gerstein* hearing would be rendered unreliable. Thus, because Defendant's seizure of Plaintiff ended after Plaintiff's *Gerstein* hearing, the Due Process Clause of the Fourteenth Amendment is the only applicable constitutional provision. *See, Garcia,* 24 F.3d at 970 n. 6. As *Garcia* holds that substantive due process governs after a *Gerstein* hearing and as *Albright* holds that a claim of malicious prosecution cannot be based on substantive due process, this Court must dismiss Plaintiff's malicious prosecution claim.

### Count II

Defendants request that this Court dismiss Count II because Plaintiff has not alleged sufficient facts to state a claim for unlawful confinement and detention in violation of his Fourteenth Amendment due process rights.

■ The Due Process Clause requires that a pretrial detainee not be punished prior to an adjudication of guilt in accordance with due process of the law. *Lile v. Tippecanoe County Jail,* 844 F.Supp. 1301, 1306 (N.D.Ind.1992) (citing *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979)). Both the length and conditions of the pretrial confinement must serve legitimate regulatory purposes of the state. *Bergren,* 811 F.2d at 1143 (citing *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963)).

■ Plaintiff alleges that he was arrested, without a warrant, and charged with the first degree murder of Lamont Field on June 12, 1991. Amended Complaint at ¶¶ 11, 14. According to the Amended Complaint, Plaintiff protested his arrest and maintained that he was innocent of the crime with which he was charged. *Id.* at ¶ 16. However, even if Plaintiff was arrested without a warrant, the subsequent grand jury indictment proves that there was probable cause for the arrest. *Lee v. Village of River Forest,* No. 85 C 10583, 1987 WL 12928 (N.D.Ill. June 22, 1987) (citing *Ex parte United States,* 287 U.S. 241, 250, 53 S.Ct. 129, 131, 77 L.Ed. 283 (1932)).

■ As already noted, Plaintiff's contention that he was indicted solely on the basis of Defendants' testimony does not render his probable cause hearing unreliable. The Seventh Circuit has held that the Fourth Amendment does not require that probable cause hearings be adversarial in nature. *Garcia,* 24 F.3d at 969 (citing *Gerstein v. Pugh,* 420 U.S. 103, 121–22, 95 S.Ct. 854, 866–67, 43 L.Ed.2d 54 (1975)). Moreover, probable cause has traditionally been decided by a magistrate judge on hearsay and written testimony and the Supreme Court has approved these informal modes of proof. *Gerstein,* 420 U.S. at 120, 95 S.Ct. at 866. Finally, Plaintiff's eventual acquittal on the murder charge does not establish that the Defendants lacked probable cause to detain. *See Kompare v. Stein,* 801 F.2d 883, 891 (7th Cir.1986).

■ Plaintiff's alleged facts do not support his claim that he was unlawfully detained and confined in violation of his substantive due process rights and this Court is not required to accept legal conclusions alleged in the pleadings. *See Carl Sandburg Village Condo. Ass'n No. 1 v. First Condo. Develop. Co.,* 758 F.2d 203, 207 (7th Cir. 1985). Consequently, even if the Court views all of the facts alleged in the Amended Complaint, as well as any inferences reasonably drawn therefrom, in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to allege sufficient facts to state a claim that he was unlawfully detained and confined in violation of his substantive due

process rights. Defendants' Motion to Dismiss Count II is granted.

*Count III*

 Count III states a claim for malicious prosecution under Illinois state law. The dismissal of Plaintiff's § 1983 claims disposes of all federal claims before this Court and the Court declines to exercise pendent jurisdiction over Plaintiff's state law claim. *See* 28 U.S.C. § 1367(c). Although a federal court may exercise pendent jurisdiction, this Court is mindful of the Supreme Court's admonition that, if the federal claims are dismissed before trial, then the state claims should be dismissed as well. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1972). Accordingly, Count III is dismissed without prejudice.

**CONCLUSION**

For the foregoing reasons, Defendants motion to dismiss Plaintiff's Amended Complaint is granted.

**AMERITECH CORPORATION, Illinois Bell Telephone Company, and Michigan Bell Telephone Company, Plaintiffs,**

and

**Consolidated Communications, Inc. and Illinois Consolidated Telephone Company, Intervenor–Plaintiffs,**

v.

**UNITED STATES of America, Federal Communications Commission, and Janet Reno, in her official capacity as Attorney General of the United States of America, Defendants.**

Nos. 93 C 6642, 94 C 4089.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 28, 1994.

722

Albert Calille, Michigan Bell Telephone Co., Detroit, MI, Howard J. Roin, Christine Ann Pagac, Michael W. McConnell, Mayer, Brown & Platt, Chicago, IL, and Thomas Byron H., III, Mayer, Brown & Platt, Washington, DC, for plaintiffs.

Linda A. Wawzenski, U.S. Attys. Office, Chicago, IL, James J. Gilligan, U.S. Dept. of Justice, Civ. Div., Washington, DC, and L. Michael Wicks and Daniel R. Hurley, U.S. Attys. Office, Chief Affirmative Litigation Div., Detroit, MI, for defendants.

Joseph A. Morris, Morris, Rathnau & DeLaRosa; Santiago A. Durango, Bell & McGurk, Ltd.; and James Arthur McGurk, Chicago, IL, for amici curiae.

Allan Horwich and Owen Eliot MacBride, Schiff, Hardin & Waite, Chicago, IL, for intervenors-plaintiffs.

Thomas W.B. Porter and Donald S. Young, Dykema Gossett, Detroit, MI, for movants.

### *MEMORANDUM OPINION*

GRADY, District Judge.

Ameritech Corporation and Illinois Bell Telephone Company filed this lawsuit against defendants United States of America, the Federal Communications Commission ("FCC"), and Janet Reno, in her official capacity as the Attorney General of the United States (collectively "the Government"), seeking a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201 and 2202. The lawsuit raises a First Amendment challenge to a provision of the Cable Communications Policy Act of 1984, 47 U.S.C. § 533(b), which prohibits the plaintiff local and regional telephone companies from providing cable television directly to customers within their service areas.

On the same date, Ameritech and Michigan Bell Telephone Company filed a virtually identical action against the same defendants in the Eastern District of Michigan. *See Ameritech Corp. v. United States,* No. 93–CV–74617–DT (E.D.Mich. Nov. 1, 1993). On June 14, 1994, United States District Judge

Patrick J. Duggan transferred the Michigan action to this court for consolidation with the action filed here. The Michigan case (N.D.Ill. No. 94 C 4089) has been consolidated for all purposes with this case (No. 93 C 6642).

The court has granted two additional parties, Consolidated Communications, Inc. ("CCI") and Illinois Consolidated Telephone Co. ("ICTC"), leave to intervene as plaintiffs in this action.

Now before the court are the parties' cross-motions for summary judgment. After considering the parties' briefs, which were originally filed in the Michigan action, along with the parties' supplemental memoranda and the submissions of the *amici curiae* in this case, the court grants plaintiffs' motions for summary judgment and denies defendants' motion, for the reasons discussed below.

## BACKGROUND

Cable television is defined broadly as a communications medium in which video programs are transmitted to the homes of subscribers along a closed network of wires or cables, which are often buried underground or attached to utility poles. Cable television differs from broadcast television in that the latter's signals can be received free of charge through the air with a standard television set and antenna. Cable operators ordinarily charge their subscribers a monthly fee for the transmission of video programs along the cable network. Cable is believed to have been born in 1948 in rural Pennsylvania and Oregon, where a handful of entrepreneurs sought to bring television to residents who were too far away from the nearest broadcasting station to pick up the signal through the air.[1] Today the cable television industry is a $20 billion business with access to more than 90 percent of American homes, according to the FCC. *In re Telephone Company–Cable Television Cross–Ownership Rules, Second Report and Order, Recommendation to Congress, and Second Further Notice of Proposed Rulemaking,* 7 FCC Rcd. 5781, 5848 (1992) ("*FCC Video Dialtone Order*") (Plaintiff's Motion for Summary Judgment,

App. Tab 5). Congress has found that more than 60 percent of American households with television sets actually subscribe to cable, and that for these households, cable has replaced broadcast television as the primary provider of video programming. *See Turner Broadcasting Sys., Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2454, 129 L.Ed.2d 497 (1994).

A detailed discussion of the relevant regulatory history of the cable television industry is contained in *US West, Inc. v. United States,* 855 F.Supp. 1184, 1186–88 (W.D.Wash.1994). To summarize, the FCC in 1970 issued a rule prohibiting telephone companies from providing cable television service to customers in their service areas, citing the likelihood of "undesirable consequences" stemming from "the monopoly position of the telephone company in the community, as a result of which it has effective control of the pole lines (or conduit space) required for the construction and operation of CATV [cable] systems." *Id.* at 1186 (quoting *Applications of Telephone Companies for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems,* Final Report and Order, 21 FCC2d 307, 324 (1970)). Congress codified the 1970 FCC rule in the Cable Communications Policy Act of 1984:

(1) It shall be unlawful for any common carrier ... to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier.

(2) It shall be unlawful for any common carrier ... to provide channels of communication or pole line conduit space, or other rental arrangements, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such common carrier, if such facilities or arrangements are to be used for, or in connection with, the provision of video programming directly to subscribers in the

---

1. For an outline of cable television's early history, see Matt Stump & Harry Jessel, *Cable: The*

*First Forty Years,* Broadcasting, Nov. 21, 1988, at 35.

telephone service area of the common carrier.

47 U.S.C. § 533(b)(1), (2).

The term "common carrier" includes telephone companies, which carry interstate wire communications for hire. *See* 47 U.S.C. § 153(h). "Video programming" is defined as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. § 522(19). The FCC has interpreted that definition as including any video programming comparable to that provided by broadcast television in 1984, the year of enactment. *FCC Video Dialtone Order,* 7 FCC Rcd. at 5820. By prohibiting telephone companies from providing "video programming," § 533(b) on its face keeps telephone companies out of the television business altogether in the companies' service areas. Because the plaintiff telephone companies, by virtue of their existing telephone service networks, are in a position to provide video programming along those networks to their telephone subscribers, § 533(b) affects plaintiffs most acutely by preventing them from competing in the potentially lucrative cable television market. Thus plaintiffs challenge the statute as being unconstitutional "on its face" and "as applied." The statute's applicability to over-the-air television broadcasting by plaintiffs' is not at issue, as plaintiffs apparently have no interest in broadcasting.

The parties do not dispute that by its terms, § 533(b) does not bar telephone companies from providing: video programming to consumers outside their service areas; other information services taking the form of visual images—but not "video programming"—to consumers within their service areas; or, video programming to any consumer, if such programming is transmitted indirectly through some other independent entity's facilities (for example, by producing a video program and marketing it to cable or broadcast operators). *See Chesapeake & Potomac Tel. Co. v. United States,* 830 F.Supp. 909, 922–23 & n. 19 (E.D.Va.1993). Plaintiffs argue that § 533(b) nonetheless places impermissible restrictions on speech by preventing them from providing cable television to their own customers along their own networks.

Congress made no findings of fact at the time it enacted § 533(b), which left little in the way of legislative history. *US West,* 855 F.Supp. at 1187. A House of Representatives committee report stated that § 533 "establishes clearly-defined cross-ownership rules and standards to prevent the development of local media monopolies and to encourage a diversity of ownership of communications outlets." *Id.* (quoting H.R.Rep. No. 934, 98th Cong., 2d Sess. 55 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4692).

As the Government points out in its brief, Congress and the FCC began to rethink § 533(b)'s cross-ownership ban by the late 1980s and early 1990s. *See* Defendants' Memorandum in Support of Their Motion, and in Opposition to the Plaintiffs' Motion, for Summary Judgment ("Defendants' Memorandum"), at 11. Several legislative attempts to repeal § 533(b) at that time failed, while the FCC embarked on a five-year rulemaking process that culminated in 1992, when the FCC formally reversed course and recommended § 533(b)'s repeal. The agency stated that although the 1970 FCC rule and its statutory successor had given cable television operators "an opportunity to firmly establish themselves as viable competitors," the cable industry's "enormous growth" since then had "attenuated" the once-feared risks of anticompetitive behavior by the telephone companies. *FCC Video Dialtone Order,* 7 FCC Rcd. at 5848.

The Government does not dispute that the FCC's 1992 decision came amid growing concern about monopolistic practices within the cable television industry. According to the undisputed evidence submitted by plaintiffs on the pending summary judgment motion, "[c]able television systems generally operate as monopolies in the local markets they serve." Plaintiff's Motion for Summary Judgment, Exh. A (Affidavit of Thomas W. Hazlett) at ¶ 3. Only about two percent of American households have a choice among cable systems, and the national level of subscribership of "wireless cable" service received by microwave dishes is estimated to be only one percent of cable viewership. *Id.*

In enacting the Cable Television Consumer Protection and Competition Act of 1992 ("the 1992 Cable Act") over a presidential veto, Congress made similar findings of fact:

> For a variety of reasons, including local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area, most cable television subscribers have no opportunity to select between competing cable systems. Without the presence of another multichannel video programming distributor, a cable system faces no local competition. The result is undue market power for the cable operator as compared to that of consumers and video programmers [persons or organizations which produce and market video programs for consumption by the viewing public].
>
> \* \* \* \* \* \*
>
> The cable industry has become highly concentrated. The potential effects of such concentration are barriers to entry for new programmers and a reduction in the number of media voices available to consumers.
>
> \* \* \* \* \* \*
>
> The cable industry has become vertically integrated; cable operators and cable programmers often have common ownership. As a result, cable operators have the incentive and ability to favor their affiliated programmers. This could make it more difficult for noncable-affiliated programmers to secure carriage on cable systems. Vertically integrated program suppliers also have the incentive and ability to favor their affiliated cable operators and programming distributors using other technologies.
>
> \* \* \* \* \* \*
>
> There is a substantial governmental and First Amendment interest in promoting a diversity of views provided through multiple technology media.

47 U.S.C. § 521 (Historical and Statutory Notes), Pub.L. No. 102–385, §§ 2(a)(2), 2(a)(4–6), 106 Stat. 1460 (1992). The 1992 Cable Act attempted to address these concerns by prohibiting exclusive local franchises, regulating or limiting the rates cable providers may charge consumers [2] and unaffiliated programmers, and prohibiting cable providers from owning "wireless" cable systems. See 47 U.S.C. §§ 532(c), 533(a)(2), 533(f), 543.

Yet the 1992 Cable Act did not repeal § 533(b) or otherwise open the cable market to telephone companies. The Government draws the court's attention to a congressional committee report two years earlier, when a predecessor bill died in the United States Senate. That 1990 report by the Senate Committee on Commerce, Science and Transportation stated that the committee could not support repeal of § 533(b) "because of concerns about the potential for anticompetitive practices by telephone companies and the need to ensure media diversity...." S.Rep. No. 456, 101st Cong., 2d Sess. 9 (1990). Those concerns, which led to the FCC's initial 1970 rule against telephone company provision of video programming, can be summarized as falling into two categories: cross-subsidization and network discrimination. See FCC Video Dialtone Order, 7 FCC Rcd. at 5848. Cross-subsidization is a practice in which telephone companies would abuse their monopoly position in the local telephone service market to subsidize cable service and undercut the competition. Network discrimination is a practice in which the telephone companies would use their control over poles and conduits to discriminate against independent cable operators or video programmers, thereby placing them at a competitive disadvantage. Id.

While Congress was in the process of enacting the 1992 Cable Act, the FCC and the Department of Justice ("DOJ") were publicly stating that the concerns about cross-subsidi-

---

**2.** In one widely reported incident that seemed to illustrate the effects of cable monopolies, an executive of one of the nation's largest cable operators penned an internal memorandum telling managers to compensate for the 1992 Cable Act's impending rate regulations by increasing the charges for ancillary services and installation.

"We cannot be disuaded [sic] from the charges simply because customers object," the memo stated. "It will take a while, but they'll get used to it." See Paul Farhi, TCI Memo Called for Price Hikes, The Washington Post, Nov. 16, 1993, at C1.

zation and network discrimination could be addressed adequately by federal regulations and that allowing telephone companies into the cable market actually would enhance competition. With regard to cross-subsidization, the FCC stated that its existing cost-allocation and accounting rules governing the nonregulated affairs of telephone companies "constitute an effective means of preventing cross-subsidization between regulated and nonregulated services." *FCC Video Dialtone Order,* 7 FCC Rcd. at 5829. The FCC also observed that cable operators already occupy a "leading position" in the market and that "[g]iven this widely changed competitive situation, we find it reasonable to conclude that, with appropriate safeguards on their entry, there is little threat that the local telephone companies could preemptively eliminate competition and monopolize the market for video programming services." *Id.* at 5848–49. The DOJ has recognized that as long as telephone companies have a monopoly over phone service, they "will continue to have incentives, and the ability, to cross-subsidize and discriminate." Plaintiff's Motion for Summary Judgment Motion, App. Tab 10 (Congressional Testimony of DOJ Assistant Attorney General Anne K. Bingaman, hereinafter "Bingaman Testimony"), at 8. But the DOJ also stated during an FCC rulemaking proceeding that the "procompetitive benefits" of allowing telephone companies to provide video programming outweigh "any anticompetitive risks involved." *Id.,* App. Tab 6 (DOJ Cross–Ownership Rules Reply), at 44.

> [S]ince the cable industry is already vertically integrated, it is unlikely that allowing the telephone companies to vertically integrate will have anticompetitive effects. It will just make them more effective competitors, and will create an alternative player with whom third parties can bargain to carry their programming.

*Id.* at 45. The DOJ went so far as to say it "disagrees" with those who argue that permitting telephone companies into the cable business would hamper competition by allowing them to engage in anticompetitive behavior. *Id.* at 46 n. 50. In another footnote, the DOJ explained why its position was not inconsistent with its earlier support for the cross-ownership ban,[3] citing 1982 DOJ comments before the FCC in which the DOJ noted that where "the rationales for such restrictions are no longer valid, they should be removed or, at least modified, to permit the marketplace to function freely." *Id.* at 44 n. 44.

This past year, Congress continued its review of telecommunications law and policy. But a legislative proposal to repeal § 533(b) stalled, amid some degree of pessimism as to whether Congress will ever overhaul the federal telecommunications laws.[4] Unwilling to wait for the legislative wrangling to result in repeal, telephone companies such as plaintiffs have turned to the federal courts for relief, challenging the constitutionality of § 533(b) on First Amendment grounds. So far, each of the district courts that have considered the question has ruled that § 533(b) violates the First Amendment. *See BellSouth Corp. v. United States,* 868 F.Supp. 1335, 1344 (N.D.Ala.1994); *US West, Inc. v. United States,* 855 F.Supp. 1184, 1193 (W.D.Wash. 1994); *Chesapeake & Potomac Tel. Co. v. United States,* 830 F.Supp. 909, 931–32 (E.D.Va.1993) ("*C & P*"). In each of those cases and in this case, the Government takes the position that § 533(b) is constitutional because it furthers the Government's legitimate interest in preventing anticompetitive behavior by the telephone companies, even though it burdens protected speech. Therefore the Government places itself in the somewhat awkward position of defending the statute on grounds it recently dismissed as

---

**3.** Although § 533(b) has been referred to as a "cross-ownership" rule, the court agrees with plaintiffs that the term "cross-ownership" understates the case somewhat, in that the statute actually prohibits plaintiffs from engaging in a particular manner of speech—the provision of video programming directly to customers in plaintiffs' service areas.

**4.** *See* Edmund L. Andrews, *Bill to Revamp Communications Dies in Congress,* N.Y. Times, Sept. 24, 1994, at A1 ("Despite numerous efforts over the last decade, Congress had never come as close as it did this year to passing a broad communications bill. Reassembling the necessary coalitions and restitching the necessary compromises next year would be difficult at best.")

no longer having any force. In any event the Government's litigation of the constitutional issues in this case is not inconsistent with its stated goal of moving telecommunications policy "out of the courts and into the statute books so that Congress, representing the public, can establish the far-reaching and comprehensive framework for governing the telecommunications world of the future that the nation deserves." Bingaman Testimony at 3.

Plaintiffs, however, ask this court to intervene to protect their First Amendment rights where Congress has failed or declined to adapt telecommunications law to changing technological and economic circumstances. Plaintiff Ameritech is the parent corporation of plaintiffs Illinois Bell and Michigan Bell, which desire to provide cable television service, through affiliates, to customers in their service areas. Plaintiffs have couched their complaint as a facial constitutional challenge to § 533(b), and also as a challenge to the statute as it applies to bar specific cable television ventures plaintiffs allege they would launch, through subsidiaries, in Naperville, Illinois, and Troy, Michigan. Plaintiff-intervenor CCI is a holding company whose subsidiaries include plaintiff-intervenor ICTC, a telephone company that serves 18 Illinois counties. CCI also alleges that it desires to offer cable television service, through a subsidiary, to customers in ICTC's service area. Section § 533(b) specifically prohibits entities such as Ameritech, the Bell companies, and other telephone companies such as CCI or ICTC (collectively "plaintiffs") from doing any of these things. Plaintiffs essentially contend that although the statute may have served the Government's asserted interests ten years ago, it no longer does and thus should be held to violate the First Amendment.

### ANALYSIS

■ Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*

477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Dribeck Importers, Inc. v. G. Heileman Brewing Co.,* 883 F.2d 569, 573 (7th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). This case is particularly appropriate for summary judgment because the facts are not in dispute; the parties differ only on the legal question of whether § 533(b) unconstitutionally restricts plaintiffs' free speech rights under the First Amendment.

### I. Section 533(b) Restricts Plaintiffs' Speech.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend I. The Supreme Court has held that cable programmers and operators "engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broadcasting Sys., Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994) (citing *Leathers v. Medlock,* 499 U.S. 439, 444, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991)); *see also City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 494, 106 S.Ct. 2034, 2037–38, 90 L.Ed.2d 480 (1986) (holding that where municipality had refused to lease utility pole space to respondent cable company, "the activities in which respondent allegedly seeks to engage plainly implicate First Amendment interests"). In light of this case law, the Government does not dispute that by prohibiting plaintiff telephone companies from providing video programming to consumers within plaintiffs' service areas, § 533(b) actually restricts the plaintiffs' speech. The parties instead dispute the level of scrutiny that should be applied to § 533(b) and the outcome of the case once the appropriate level of scrutiny is applied.

Courts have applied three levels of scrutiny to statutes or other restrictions that bur-

den speech protected by the First Amendment:

■ (1) In an analysis akin to "rational basis" scrutiny, courts uphold regulations affecting broadcast television if the regulations are "a reasonable means" of promoting a "permissible" public interest, such as the interest in diversified mass communications. *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 796, 802, 98 S.Ct. 2096, 2112–13, 2115–16, 56 L.Ed.2d 697 (1978) ("*NCCB*"). This is the least rigorous degree of scrutiny.

■ (2) Courts apply "intermediate" or "heightened" scrutiny to regulations or restrictions on speech-related conduct or on the time, place or manner of speech. When governmental regulation of conduct has an incidental effect on speech, the regulation will be upheld (1) if it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the burden on speech is no greater than is essential to the furtherance of the governmental interest. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Likewise, governmental restrictions on the time, place and manner of speech are valid so long as (1) they are content-neutral; (2) they are narrowly tailored to serve a significant governmental interest; and (3) they leave open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *Graff v. City of Chicago*, 9 F.3d 1309, 1319 (7th Cir.1993), *cert. denied*, ─ U.S. ─, 114 S.Ct. 1837, 128 L.Ed.2d 464 (1994). The *O'Brien* test is "little, if any, different" from the *Ward* test. *Ward*, 491 U.S. at 798, 109 S.Ct. at 2757.

■ (3) A restriction that burdens speech according to its content, or that affects so small a group of speakers as to be directed at the content of their speech, is presumptively invalid and will be upheld only if it is "necessary to serve a compelling state interest." *R.A.V. v. City of St. Paul*, 505 U.S. ─, ─, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). This level of scrutiny, known as "strict scrutiny," is the most stringent.

The Government argues for the least rigorous level of scrutiny, under which § 533(b) obviously would have the greatest chance of being upheld. Plaintiffs argue that § 533(b) is content-based and should be subject to strict scrutiny, but that the statute is unconstitutional even when intermediate scrutiny is applied. In Part II of this opinion, the court discusses rational basis and strict scrutiny before concluding that intermediate scrutiny is the appropriate test for § 533(b).

## II. *Intermediate Scrutiny Should Be Applied to § 533(b).*

### A. The Supreme Court's Lower Level of Scrutiny in Broadcast Regulation Cases Does Not Apply.

■ As a preliminary matter, this court does not accept the Government's argument in favor of the least stringent level of scrutiny, a form of "rational basis" review which the Supreme Court has employed in cases involving the regulation of over-the-air broadcasting. *See NCCB*, 436 U.S. at 798–802, 98 S.Ct. at 2114–16. In *NCCB*, the Court rejected a First Amendment challenge to an FCC rule barring newspapers from owning broadcast stations in the same community, reasoning that the rule was content-neutral and served as a reasonable means of promoting a "permissible" government interest—the diversification of ownership in the mass communications media as a whole. *Id.* The Government urges this court to apply *NCCB* to § 533(b), despite the Supreme Court's recent pronouncement that *NCCB* and other "broadcast cases"[5] do not apply to regulation of cable television. *See Turner*

5. *E.g., FCC v. League of Women Voters*, 468 U.S. 364, 377, 104 S.Ct. 3106, 3116, 82 L.Ed.2d 278 (1984); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388–89, 89 S.Ct. 1794, 1805–06, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States*, 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943).

*Broadcasting,* —— U.S. at ——–——, 114 S.Ct. at 2456–57.

In *Turner Broadcasting,* the Court upheld the constitutionality of the 1992 Cable Act's "must-carry" provisions, which require cable operators to carry local commercial and non-commercial television stations on their cable systems. Rejecting the Government's argument for the form of rational-basis review articulated in *NCCB, Turner Broadcasting* employed intermediate scrutiny, refusing to apply *NCCB* and other cases involving over-the-air broadcasting to a situation involving cable television. *Id.* The Court described the rational basis standard of the broadcast regulation cases as a "distinct approach" that "rests upon the unique physical limitations of the broadcast medium." *Id.,* —— U.S. at ——, 114 S.Ct. at 2456. Over-the-air broadcasting allows room for a limited number of speakers, so the rationale of cases such as *NCCB* rests on the notion that the Government should be given more leeway to regulate broadcast communications so that a few speakers do not gain a disproportionate hold over the medium as a whole. *See NCCB,* 436 U.S. at 799, 802, 98 S.Ct. at 2114, 2115–16 ("In light of this physical scarcity, Government allocation and regulation of broadcast frequencies are essential, as we have often recognized.... Being forced to choose among applicants for the same facilities, the Commission has chosen on a sensible basis, one designed to further, rather than contravene, the system of freedom of expression.") (internal quotation marks omitted). But that is not the case with cable, in which technological advances have brought about the prospect of having "no practical limitation on the number of speakers who may use the cable medium." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2457.

In the wake of *Turner Broadcasting,* the Government argues that *NCCB* should still apply to § 533(b)'s "cross-ownership" ban (prohibiting telephone companies from providing cable in their service areas and from owning or operating an affiliate that would do the same) because "the scarcity rationale is not necessary to sustain a cross-ownership rule," given that *NCCB* upheld such a rule as applied to newspapers, which, like cable, do not labor under the inherent physical limitations of broadcasting. Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment ("Defendants' Supplemental Memorandum"), at 2 n. 1. But the *NCCB* Court upheld restrictions on newspaper activities only as they concerned newspapers' entry into the broadcast market, and not their activities as newspapers. Moreover, the Supreme Court in *Turner Broadcasting* flatly repudiated the Government's argument, saying in effect that the "scarcity rationale" formed the very basis of the standard applied in the *NCCB* line of cases: "[T]he special physical characteristics of broadcast transmission, and not the economic characteristics of the broadcast market, are what underlies our broadcast jurisprudence." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2457. So although the scarcity rationale may or may not be necessary to sustain a cross-ownership rule, it is a necessary prerequisite to application of rational-basis scrutiny as articulated in *NCCB.*

To say that scarcity is not such a prerequisite is to say that some other rationale supports the lower level of scrutiny applied in *NCCB.* The Government makes precisely this suggestion by citing to a footnote in which the *NCCB* Court referred to its past decisions holding that the applicability of the antitrust laws to newspapers is consistent with the First Amendment. *See NCCB,* 436 U.S. at 800 n. 18, 98 S.Ct. at 2115 n. 18. Although that same footnote stated that the FCC's ban on newspaper ownership of television stations in *NCCB* was based on "First Amendment rather than antitrust considerations," *id.,* the Government appears [6] to be suggesting that a market economic or antitrust rationale, one not related to the scarcity of broadcast frequencies, explains the broad-

---

6. The court uses the word "appears" because the Government, in its supplemental brief filed after *Turner Broadcasting* was decided, does not elaborate on what rationale other than scarcity supported the result in *NCCB. See* Defendants' Supplemental Memorandum at 2 n. 1. But in its initial brief, which was filed before *Turner Broadcasting,* the Government referred to the restrictions in broadcast cases generally as "structural regulations" ostensibly aimed at preventing the "unhealthy concentration of economic power" in the media. Defendants' Memorandum at 20.

cast cases and thus supports their extension to cable television, where the scarcity rationale does not apply. In this respect, the scarcity rationale may be analogous to the theory behind § 533(b), which purports to promote competitiveness and a diversity of ownership in the cable television industry by preventing the telephone companies from monopolizing it. Even if cable television does not suffer from the same physical limitations of broadcasting, it might be susceptible to market forces—such as monopolization—that could bring about the same undesirable results. But as the Supreme Court made clear in *Turner Broadcasting,* such a "market dysfunction" rationale was *not* at the root of the broadcast regulation cases that the Government would like this court to apply to § 533(b). *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2457. The Court in *Turner Broadcasting* specifically refused to extend *NCCB* and the other broadcast cases to cable television, despite the Court's acknowledgment that "the cable market is beset by a similar dysfunction" as that which characterizes the broadcast market. *Id.* —— U.S. at —— - ——, 114 S.Ct. at 2457–58. "[T]he mere assertion of dysfunction or failure in a speech market, without more, is not sufficient to shield a speech regulation from the First Amendment standards applicable to nonbroadcast media." *Id.* —— U.S. at ——, 114 S.Ct. at 2458.

Moreover, the Court in *Turner Broadcasting* added that where a law imposes "special obligations" or "special burdens" upon cable programmers, "some measure of heightened First Amendment scrutiny is demanded." *Id.* —— U.S. at ——, 114 S.Ct. at 2458. Just as the 1992 Cable Act's "must-carry" provisions placed a special burden on cable programmers, so does § 533(b) place a special burden on telephone companies by prohibiting them from directly providing video programming to their customers. Accordingly, the *NCCB* or "rational basis" standard of review does not apply to § 533(b). *See Bell-South,* 868 F.Supp. at 1338–39; *US West,* 855 F.Supp. at 1190; *C & P,* 830 F.Supp. at 918–22.

## B. Strict Scrutiny Does Not Apply.

■ Plaintiffs argue that § 533(b) should be subject to strict scrutiny, under which a restriction is invalid unless it is "necessary to serve a compelling state interest" and is "narrowly drawn to achieve that end." *See R.A.V. v. City of St. Paul,* 505 U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). Strict scrutiny under the First Amendment generally is triggered when a law is content-based, in that it distinguishes favored from unfavored speech on the basis of the ideas or views expressed. *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2459. A law, restriction or tax also may be subject to strict scrutiny if it targets so small a group of speakers that it threatens to censor particular ideas or viewpoints. *See Leathers v. Medlock,* 499 U.S. 439, 451–52, 111 S.Ct. 1438, 1446–47, 113 L.Ed.2d 494 (1991). Plaintiffs contend that § 533(b) is subject to strict scrutiny because it is content-based and because it discriminates against telephone companies as a discrete group of speakers.

### 1. Section § 533(b) Is Content–Neutral.

The core of plaintiffs' argument that § 533(b) is content-based rests with the statute's means of defining what constitutes "video programming," which the statute specifically forbids plaintiffs from providing directly to customers in their service areas. Plaintiffs focus on the FCC's interpretation that "video programming," as stated in § 533(b) and defined in § 522(19), means "programming comparable to that provided by broadcast television stations in 1984." *FCC Video Dialtone Order,* 7 FCC Rcd. at 5820. Plaintiffs argue that if a telephone company were to provide a video image directly to its customers, the FCC's comparison of that video image with broadcast television programming as it existed in 1984 would constitute a content-based determination of whether the image is being provided in violation of the statute. Furthermore, plaintiffs argue that § 533(b) draws a content-based distinction by banning plaintiffs from directly providing "video programming" while allowing them to provide certain video and information services (such as two-way interactive shopping

services and video telephone service). This argument persuaded the district court in *C & P,* which concluded that although § 533(b) appeared to be content-based, strict scrutiny could not be applied to the statute in light of the Supreme Court's decision in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). *C & P,* 830 F.Supp. at 924–26; *see also BellSouth,* 868 F.Supp. at 1339–40 (following *C & P* ). In *Renton,* the court upheld zoning restrictions affecting pornographic businesses, where the justification for the restrictions was "unrelated to the suppression of free expression" and was a means of preventing "secondary effects" such as crime and neighborhood deterioration. *Renton,* 475 U.S. at 48, 106 S.Ct. at 929.

This court parts company here with the analysis in *C & P,* which referred to the FCC's discussion in the Video Dialtone Order and concluded that the FCC's attempt to distinguish "video programming" from the transmission of other video images was unclear at best:

> Apparently, the Commission will allow telephone companies to transmit presentations that are primarily textual, and include some video segments, but will prohibit presentations that are primarily video, and include some textual segments. Irrespective of whether this is a workable line of demarcation, the example is noteworthy because it shows that the Commission's interpretation is inescapably premised on the content of the relevant transmission.

*C & P,* 830 F.Supp. at 923–24. However, the FCC interpretation noted that the key characteristic of video programming in 1984 was that it was "one-way." *FCC Video Dialtone Order,* 7 FCC Rcd. at 5821. The viewer had no ability to interact with or manipulate the image. "Two-way" or "interactive" programming, however, allowed the viewer to "tailor the video images to his or her specific requests." *Id.* The FCC deemed the "interactive" video to be something other than video programming, because it was not comparable to "one-way" programming provided by broadcast television stations in 1984. *Id.* The FCC also added the caveat that some

elements of "interactive" programming might be deemed video programming if those elements could be separated from the interactive package and provided independently as programming comparable to television programming in 1984. *Id.*

In determining whether this distinction is content-based, the court must determine whether it favors some speech over other speech on the basis of the ideas or views expressed. *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2459; *see also Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989) ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."). In that vein, the court does not see how ideas or views fit into the distinction between interactive programming and traditional video programming. There can be no doubt that interactive programming is a form of communication or mode of expression of ideas, but as such it differs from noninteractive video only in the form or manner of speech, rather than in substance. For example, if a local government told people they could not shout messages through a bullhorn in residential neighborhoods but could broadcast them on the radio or television, this rule would not be a content-based restriction, even though it distinguishes among modes of communication. But if our hypothetical local government told people they could not read John Steinbeck or Nelson Algren novels aloud over the megaphone, but could convey any other message, this would be a content-based distinction subject to strict scrutiny. "Thus, a prohibition against the use of sound trucks emitting 'loud and raucous' noise in residential neighborhoods is permissible if it applies equally to music, political speech, and advertising." *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). In *Discovery Network,* a city banned commercial publications, but not noncommercial publications, from using sidewalk newsracks. The Court held that the ban was content-based, and that *Renton* did not apply because the secondary effects of

commercial newsracks were no different from those of noncommercial newsracks. *Id.* —— U.S. at ——, 113 S.Ct. at 1517.

This case would be like *Discovery Network* if, for example, § 533(b) allowed telephone companies to provide educational video programming but not entertainment video programming. But the statute instead prevents telephone companies from directly providing any video programming, no matter what the content. The court also does not believe that the FCC interpretation of § 533(b) requires the agency, in defining "video programming," to compare the ideas or views of a telephone company's video transmissions with, as the *C & P* court put it, "what's on television in 1984." *See C & P*, 830 F.Supp. at 923 n. 22.

This court reaches the same result as *C & P* and *BellSouth*, but for a different reason. Section 533(b) does not distinguish favored speech from unfavored speech on the basis of the ideas or views expressed, and for that reason it is not subject to strict scrutiny. *See Turner Broadcasting*, —— U.S. at —— ——, 114 S.Ct. at 2459–60.

**2. Section § 533(b)'s Distinction Among Speakers Does Not Warrant Strict Scrutiny.**

■ Plaintiffs contend that by targeting telephone companies, § 533(b) affects a small number of speakers and thus should be subject to strict scrutiny. But the Supreme Court's recent decisions on this subject establish that a differential burden on speakers in and of itself does not implicate the First Amendment, unless the distinction "is directed at, or presents the danger of suppressing, particular ideas." *Leathers v. Medlock*, 499 U.S. 439, 452–53, 111 S.Ct. 1438, 1446–47, 113 L.Ed.2d 494 (1991). In *Leathers*, the Court rejected a First Amendment challenge to a state tax on cable operators, where the tax was content-neutral and did not suggest an attempt to censor the cable operators or "stifle the free exchange of ideas." *Id.* at 453, 111 S.Ct. at 1447. Similarly, in *Turner Broadcasting*, the Court noted that the 1992 Cable Act's "must-carry" provisions favored

broadcasters and disfavored cable operators but did so "based only upon the manner in which speakers transmit their messages to viewers, and not only the messages they carry.... So long as they are not a subtle means of exercising a content preference, speaker distinctions of this nature are not presumed invalid under the First Amendment." *Turner Broadcasting*, —— U.S. at —— —— ——, 114 S.Ct. at 2460–61. In this case, § 533(b) favors cable operators and disfavors telephone companies by not allowing the latter to provide video programming directly to customers in their service areas. But as observed in Part II(B)(1) of this opinion, the statute is not based on any content preference and concerns only the manner of speech. Therefore the fact that it targets telephone companies is by itself insufficient to trigger strict scrutiny under cases such as *Leathers* and *Turner Broadcasting*.[7]

**C. Section 533(b) Must Be Reviewed Under Intermediate Scrutiny.**

■ Content-neutral restrictions on speech-related conduct or on the time, place or manner of speech are subject to intermediate scrutiny. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Under intermediate scrutiny, the restriction may be upheld if (1) it is content-neutral; (2) it is narrowly tailored to serve a significant governmental interest; and (3) it leaves open ample alternative channels for communication of the information. *Id.* 491 U.S. at 791, 109 S.Ct. at 2753–54; *Clark*, 468 U.S. at 293, 104 S.Ct. at 3069. When applied to governmental regulations on speech, intermediate scrutiny requires the Government to demonstrate that its asserted interests are real and that the restriction on speech will further those interests in a "direct and material way." *See Edenfield v. Fane*, —— U.S. ——, ——, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543

---

7. Even if strict scrutiny did apply, the result in this case would be the same because of the Government's failure to satisfy even the standard

of intermediate scrutiny, discussed later in this opinion. *See US West*, 855 F.Supp. at 1191.

(1993) (applying intermediate scrutiny to strike down a state's ban on solicitation of business by accountants).

Although the three-part intermediate scrutiny test as stated in *Ward* and *Clark* is somewhat different from the four-pronged version first articulated in *O'Brien,* the Supreme Court considers the two tests to be roughly the same. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. Section 533(b) also is more in the nature of a restriction on the manner of speech and thus fits neatly into the more recent formulation stated in *Ward. Accord BellSouth,* 868 F.Supp. at 1340; *US West,* 855 F.Supp. at 1190–91; *C & P,* 830 F.Supp. at 926. Under the *Ward* test, after determining that § 533(b) is content-neutral, the court must next determine whether the statute is narrowly tailored to serve a significant government interest. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753–54.

### III. *Section 533(b) Is Not Narrowly Tailored To Serve the Government's Significant Interest in Preventing Anticompetitive Behavior in the Cable Television Industry.*

■■■ Plaintiffs do not dispute that the Government has a significant interest in promoting competitiveness and diversity of ownership in the cable television industry, including services related to the provision of video programming to consumers in their homes. The dispute concerns whether § 533(b) is narrowly tailored to serve that interest. "Narrow tailoring" requires only that the regulation promote a substantial government interest that would be achieved less effectively without the regulation. *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2469; *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. "To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. So although the means of advancing the governmental interest need not be the least speech-

restrictive means, they may not be more speech-restrictive than is necessary. *Id.* at 799–800, 109 S.Ct. at 2758–59.

■■■ It may be that § 533(b) would have passed constitutional muster at the time it was enacted in 1984, and earlier. But the business of cable television and of video programming in general has seen rapid technological and economic change in the past ten years. When a statute's constitutionality is predicated on a particular state of facts, that constitutionality "may be challenged by showing to the court that those facts have ceased to exist." *United States v. Carolene Prods. Co.,* 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938) (citing *Chastleton Corp. v. Sinclair,* 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924)); *see also Nashville, Chattanooga & St. Louis Ry. v. Walters,* 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L.Ed. 949 (1935) ("A statute valid when enacted may become invalid by change in the conditions to which it is applied."). Section 533(b) must be analyzed with reference to conditions as they exist today. *Cf. United States v. Western Elec. Co.,* 900 F.2d 283, 309 (D.C.Cir.) ("the district court should determine whether removal of the information-services restriction [in the AT & T consent decree] as applied to the generation of information would be anticompetitive under *present* market conditions") (emphasis in original), *cert. denied,* 498 U.S. 911, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990). If, under present conditions, the statute places a greater burden on speech than is necessary to promote the goals of competitiveness and diversity of ownership in the business of cable television or video programming, the statute is not "narrowly tailored" to promote those goals.

■■■ As the Government correctly points out, federal courts should not second-guess the Government's reasonable determination of how much regulation is needed and how that level of regulation is to be achieved. *Ward,* 491 U.S. at 800, 109 S.Ct. at 2758–59; *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. But this case presents a significant challenge of ascertaining what determinations the Government has made regarding those issues. The FCC and DOJ have taken the position that § 533(b) actually impedes competition,

that competition would be fostered by the statute's repeal, and that concerns about cross-subsidization and network discrimination could be addressed by federal regulations. *FCC Video Dialtone Order,* 7 FCC Rcd. at 5829, 5848–49; DOJ Cross–Ownership Rules Reply at 44–46. In this litigation, the Government states that "the defendant agencies stand by their assessment." Defendants' Memorandum at 30. Nonetheless, the Government contends that despite the firm foothold the cable television industry has developed in the past ten years, Congress can and did reach the reasonable conclusion—when it declined to repeal § 533(b) in 1992—that § 533(b) remains the most effective means of preventing telephone companies from monopolizing cable television through cross-subsidization, predatory pricing and network discrimination. If that is so, according to the Government, it does not matter that the Government itself has recently disagreed. The Government further argues that because this particular field of regulation is highly complex and fact-bound, the court should defer to Congress.

However, the court does not accept that Congress made any clear determination as to whether § 533(b) continues to serve the ends for which it was enacted. Although it is true that Congress, prior to enacting the 1992 Cable Act, did hear voluminous testimony from proponents and opponents of § 533(b)'s repeal, the Supreme Court teaches that "failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'" *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, ——, 114 S.Ct. 1439, 1453, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990)). Congress made no findings of fact at the time it enacted § 533(b), and the fact that Congress did not repeal § 533(b) in 1992 or in 1994 does not translate into a finding that the statute continues to promote competition and diversity in cable television, whatever statements may have appeared in the legislative history of the 1992 Cable Act or of predecessor bills

that did not become law. *See BellSouth,* 868 F.Supp. at 1344 n. 13. Moreover, even if there were such legislative findings of fact, they would not relieve the court of its duty to decide independently whether § 533(b) violates the Constitution by burdening more speech than is necessary to achieve the statute's goals. *See Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989).

The Government also cites two reports of the General Accounting Office and several judicial opinions for the proposition that anticompetitive behavior by the telephone companies remains a significant concern. *See* Defendants' Memorandum at 31. For example, the Ninth Circuit observed that because enhanced competitiveness in the information service markets into which the telephone companies ("BOCs") wished to enter "does nothing" to decrease their monopoly power in the local telephone market, "we fail to see how it can diminish the BOCs' ability to shift costs to their regulated services without detection in ratemaking proceedings." *California v. FCC,* 905 F.2d 1217, 1234 (9th Cir. 1990); *see also United States v. Western Elec. Co.,* 673 F.Supp. 525, 567–79 (D.D.C. 1987) (refusing initially to lift portion of AT & T consent decree concerning ban on telephone company provision of information services, and finding that federal regulatory scheme would not prevent cross-subsidization and network discrimination), *aff'd in part and rev'd in part,* 900 F.2d 283, 309 (D.C.Cir.) (remanding with instructions to consider whether lifting the ban would be anticompetitive under then-present market conditions), *cert. denied,* 498 U.S. 911, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990), *on remand,* 767 F.Supp. 308, 327 (D.D.C.1990) (lifting the ban "with considerable reluctance" but in deference to DOJ's view that doing so would not be anticompetitive), *aff'd,* 993 F.2d 1572 (D.C.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993). Conceding arguendo that the telephone companies may retain the incentive and ability to cross-subsidize and discriminate on their networks,[8] the key issue in this

8. As to the question of network discrimination, the court concurs with the *C & P* court's conclu-

litigation is whether § 533(b), in attempting to address those concerns, places a greater than necessary burden on protected speech. In other words, to sustain the statute, the Government must show that less restrictive measures [9] would not be effective in restraining the monopolistic tendencies of the telephone companies. The undisputed facts are that the FCC and DOJ, the two federal agencies responsible for formulating executive branch policy on telecommunications and antitrust matters, agree that § 533(b) *does not* promote competition and diversity in cable television, and that the statute may actually hinder the achievement of those objectives. The Government characterizes these propositions as debatable, and that they may be. But they must be more than debatable to sustain the Government's burden of showing that § 533(b) is narrowly tailored to promote competition and diversity of ownership in cable television. As in *US West*, "there is no convincing evidence in the record that other current methods of regulating anticompetitive behavior would be ineffective." *US West*, 855 F.Supp. at 1193; *see also Bell-South*, 868 F.Supp. at 1343 ("the Government has not shown that less restrictive regulations would be ineffective"). For these reasons, this court holds that § 533(b) imposes a greater-than-necessary burden on plaintiffs' speech and therefore is not narrowly tailored to serve the Government's significant interest in preventing anticompetitive behavior and promoting diversity of ownership in the cable television industry. Even when all inferences are drawn in the Government's favor, there is no genuine issue of fact as to whether § 533(b) unconstitutionally burdens

substantially more speech than is necessary to serve the Government's interests, *see Ward*, 491 U.S. at 799, 109 S.Ct. at 2758, especially given the "widely changed competitive situation" in which the FCC has found that independent cable operators hold "a leading position" in the delivery of video programming and face "little threat" of monopolization by the telephone companies' entry into the market. *FCC Video Dialtone Order*, 7 FCC Rcd. at 5848–49.

So although § 533(b) is content-neutral, it does not meet the "narrow tailoring" requirement of intermediate scrutiny and cannot be justified as a legitimate time, place, or manner restriction on speech, regardless of whether or not it leaves open ample alternative channels of communication. *See Discovery Network*, ⸻ U.S. at ⸻, 113 S.Ct. at 1517 (passing over the question of ample alternative channels where statute was neither content-neutral nor narrowly tailored). The fact is, however, that the statute does not leave open ample alternative channels of communication, despite the Government's argument that plaintiffs are free to provide video programming to customers outside their service areas or through independent media outlets. Plaintiffs concede that they could communicate through these channels, at great expense and inconvenience, but the court agrees with plaintiffs that the Government's reasoning here is akin to telling the Chicago Tribune that it may distribute a newspaper everywhere but in Chicago, or that its ability to communicate is not significantly curtailed by its having to publish its news stories in other publications. *See Southeastern Promotions, Ltd. v. Conrad*,

---

sion that Congress' enactment of the Pole Attachment Act, 47 U.S.C. § 224, adequately addresses concerns over pole and conduit access discrimination, or, alternatively, demonstrates that effective legislation could be passed to address those concerns. *C & P*, 830 F.Supp. at 929–30 n. 29. The Pole Attachment Act authorizes the FCC to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms and conditions are just and reasonable," and to "adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions." 47 U.S.C. § 224(b)(1). The FCC has promulgated a set of regulations governing pole attachment complaints. *See* 47 C.F.R. § 1.1401 *et seq.* Moreover, it is hard to view network discrimination as a significant problem when, according to the

FCC, cable operators already have their own networks which give access to more than 90 percent of American homes. *See FCC Video Dialtone Order*, 7 FCC Rcd. at 5848.

**9.** These measures could include cost accounting standards to detect cross-subsidization and a "complex regulatory framework designed to protect against discrimination and other anticompetitive conduct." *FCC Video Dialtone Order*, 7 FCC Rcd. at 5829–30. Other possible measures include an initial limit on the percentage of channel capacity that the telephone companies may use for their own programming, with the remainder to be leased to other programmers. *Id.* at 5850.

420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (" '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' ") (quoting *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939)).

### CONCLUSION

For the foregoing reasons, the court grants the summary judgment motions of plaintiffs and intervenor-plaintiffs and denies the motion of defendants. Judgment will be entered on behalf of plaintiffs Ameritech Corporation, Illinois Bell Telephone Company, Michigan Bell Telephone Company, Consolidated Communications, Inc. and Illinois Consolidated Telephone Company. The court will issue a declaratory judgment to the effect that § 533(b) unconstitutionally infringes upon plaintiffs' First Amendment right of free speech. The court will also permanently enjoin defendants from enforcing § 533(b) against plaintiffs Ameritech Corporation, Illinois Bell Telephone Company, and Michigan Bell Telephone Company, and against the intervenor-plaintiffs Consolidated Communications, Inc. and Illinois Consolidated Telephone Company, in their respective service areas.

**Daniel O'REILLY, Petitioner,**

**v.**

**Thomas F. PAGE, Warden, Menard Correctional Center, Menard, Illinois, Respondent,**

**and**

**The Attorney General of the State of Illinois, Additional Respondent.**

**No. 94 C 6254.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 31, 1994.

Michael Edward Deutsch, People's Law Offices, Chicago, IL, William Kunstler, Kunstler and Kuby, New York City, for petitioner Daniel O'Reilly.

Arleen C. Anderson, Ill. Atty. Gen's. Office, Chicago, IL, for respondents Thomas F. Page, Warden, Menard Correctional Center, Menard, IL, Atty. Gen. of State of Ill.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This Court has just received a document captioned "Petition for a Writ of Habeas Corpus" (the "Petition") in which Daniel O'Reilly ("O'Reilly") seeks to level a constitutional attack under 28 U.S.C. § 2254 ("Sec-

tion 2254") against his state court convictions of first degree murder and home invasion, both based on accountability.[1] After O'Reilly had been convicted of those charges following a jury trial, he was sentenced on July 25, 1991 to concurrent sentences of 38 and 30 years. There is no question that O'Reilly has exhausted his state remedies as required by Section 2254(b), because he has taken an unsuccessful appeal to the Illinois Appellate Court (250 Ill.App.3d 622, 190 Ill.Dec. 325, 621 N.E.2d 194 (1st Dist.1993)[2]), and he was then denied leave to appeal to the Illinois Supreme Court.

■ O'Reilly's able habeas counsel have fashioned an ingenious argument that the trial judge committed constitutional error by refusing to give the jury an involuntary manslaughter instruction, thus failing to provide the jury with a third option to either convicting O'Reilly of felony murder[3] or letting him go free.[4] In that respect counsel rely heavily on *People v. Taylor*, 212 Ill.App.3d 351, 156 Ill.Dec. 458, 570 N.E.2d 1180 (5th Dist.1991), which accepted a like argument where (as was the case with O'Reilly) the defendant did not admit his commission of a forcible felony. *Taylor* held that if the jury had found the defendant did not indeed commit the claimed robbery or other forcible felony, under the facts of that case it could have found defendant guilty of involuntary manslaughter.

But that argument is fatally flawed. By definition O'Reilly reasons from analogy in invoking *Taylor*. However, the Illinois Appellate Court in O'Reilly's own case did not accept that analogy, distinguishing *Taylor* (Opinion at 197):

The State distinguishes *Taylor* on the grounds that the defendant was tried for murder based on his own act of assault, not murder based on the act of another.... In *Taylor* the defendant killed the deceased. In this case the defendant did not kill the deceased, Nieves did. It is Nieves' conduct, not the defendant's which is relevant to the issue of murder, and Nieves clearly intended to shoot Schultz.

That was a vital difference, as the Appellate Court went on to explain (*id.*):

We find the court properly refused to instruct the jury on the lesser included offense of involuntary manslaughter because if the defendant was acquitted of felony murder, he could not be found guilty of involuntary manslaughter. It is undisputed that Nieves committed the murder. So the issue for the jury based on the instructions it received was whether the defendant: (1) committed a home invasion, (2) committed felony murder based on the home invasion, (3) assisted Nieves in committing a home invasion, (4) assisted Nieves in committing a murder, or (5) none of these. These are the only conceivable crimes the defendant could have committed. If the jury found the defendant guilty of the underlying home invasion, it could find the defendant guilty of felony murder. If the jury acquitted the defendant of home invasion, it could not find the defendant guilty of felony murder, and if the jury acquitted the defendant of felony murder, it could not then find him guilty of involuntary manslaughter, because he did not kill Schultz. The jury found the defendant guilty of home invasion and murder both based on accountability—perfectly

1. In fact it would appear that the only issue raised by the Petition and discussed in this opinion would, if upheld, affect only the murder charge—not the charge of home invasion. Nothing in the Petition argues that the Illinois courts' asserted deprivation of O'Reilly's constitutional rights by refusing to give an involuntary manslaughter instruction to the jury somehow tainted the guilty verdict on the home invasion. However, the decision reached here makes that a non-issue in any event.

2. Citations to the Appellate Court opinion will take the form "Opinion at—," citing only to the West N.E.2d reporter.

3. O'Reilly did not pull the trigger in the fatal shooting of decedent John Schultz ("Schultz"). Instead the shooter was Manny Nieves ("Nieves").

4. Cases that adopt the approach urged by O'Reilly's counsel make the point that a jury that may believe a defendant guilty of something but is uncertain whether the charged offense has been proved might well opt for conviction because it did not want the defendant to escape punishment and because it was unaware that the two polar opposites were not the only available alternatives.

consistent verdicts given the facts before them.

Although the meaning of the United States Constitution is of course a matter of federal law, the substantive criminal law of a state is defined by *its* courts and not by federal courts sitting in habeas corpus. To put the matter in simplest terms, the definitive exposition of Illinois law applicable to *this* case is not that contained in *People v. Taylor* but rather its expression in *People v. O'Reilly*. What the Illinois Appellate Court has decided (and the Illinois Supreme Court has declined to re-examine) in O'Reilly's own case is that *as a matter of state law* O'Reilly "could not [be] guilty of involuntary manslaughter, because he did not kill Schultz." And by definition it could not have violated O'Reilly's federal constitutional rights for the trial court to refuse to give an instruction that would have told the jury that it could convict O'Reilly of something that was *not* a crime under Illinois law.[5]

That dooms O'Reilly's Petition for the most basic of reasons. Accordingly "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court" (Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts). For that reason the petition is dismissed summarily (*id.*).

James A. McNAMARA, John J. Sullivan, Thomas R. Miller, Charles W. Lux, William T. King, Charles E. Dineen, Richard A. Graf, Henry T. Scavone and Paul B. Sobczak, Plaintiffs,

v.

CITY OF CHICAGO, a municipal corporation, Richard M. Daley, Raymond E. Orozco, Donald J. Stensland and Glenn Carr, Defendants.

No. 93 C 1098.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 2, 1994.

---

**5.** Parenthetically (for on the present Section 2254 Petition this Court cannot of course question the Appellate Court's substantive exposition of state law), this analysis is really supported directly by *Taylor* itself. In that decision the Fifth District Appellate Court distinguished some earlier cases in these terms (156 Ill.Dec. at 462, 570 N.E.2d at 1184):

> We are aware of cases that have held that where, as here, a defendant is charged with felony murder (Ill.Rev.Stat.1989, ch. 38, par. 9–1(a)(3)), an involuntary manslaughter instruction is improper because in such a case no intent is required and the defendant need not even be the actual perpetrator of the killing. (*People v. Weathers* (1974), 18 Ill.App.3d 338, 345–46, 309 N.E.2d 795, 801.) Thus, if the jury finds that the murder was committed

in the course of a forcible felony, in this case robbery, it could not find the defendant guilty of involuntary manslaughter. (See also *People v. Ellis* (1981), 93 Ill.App.3d 981, 984, 49 Ill. Dec. 444, 446, 418 N.E.2d 88, 90.)

It was in that context that the *Taylor* court spoke of the defendant's denial of the commission of any forcible felony. But where as here the murder itself was directly committed by Nieves and not by O'Reilly, it would seem that the distinction made in *Taylor* logically vanishes and that the language just quoted from *Taylor* would come into play as to O'Reilly. As has already been said in this opinion, however, the vital factor that controls this opinion is what the Illinois law of involuntary manslaughter *is*, not whether this Court finds it logical.

Kimberly Ann Sutherland, Chicago, IL, for plaintiffs.

J. Paula Roderick, Kelly Raymond Welsh, Jay Michael Kertez, Shona B. Glink, City of Chicago Law Dept., Corp. Counsel, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

James A. McNamara, John J. Sullivan, Thomas R. Miller, Charles W. Lux, William T. King, Charles E. Dineen, Richard A. Graf, Henry T. Scavone, and Paul B. Sobczak ("the plaintiffs") sue the City of Chicago ("the city"), Mayor Richard M. Daley, Fire Commissioner Raymond E. Orozco, former Deputy Fire Commissioner Donald J. Stensland, and Personnel Commissioner Glenn Carr ("the individual defendants") for violations of 42 U.S.C. §§ 1981, 1983, and 2000e (Title VII).[1] The plaintiffs are white firefighters employed by the Chicago Fire Department who allege that they are victims of the fire department's affirmative action policies. On August 31, 1994, this court granted the defendants' motion for summary judgment on the issue of qualified immunity and dismissed all of the individual defendants. At the same time, the court denied the plaintiffs' motion for summary judgment on the issue of "liability." See August 31, 1994 Memorandum Opinion and Order, No. 93–1098. Presently before the court are the plaintiffs' motion to reconsider each of the August 31st rulings, as well as the defendants' motion for summary judgment on the Title VII and section 1981 claims.

### BACKGROUND

#### A. History Of Racial Issues In CFD

The Chicago Fire Department's ("CFD") non-exempt fire suppression ranks proceed in the following ascending order of promotion: firefighter, engineer, lieutenant, captain, and battalion chief. This case involves the step between lieutenant and captain. In the early 1970's, the CFD was dominated by

---

**1.** This suit is consolidated for pretrial purposes before Judge Holderman with six other cases challenging the fire department's promotion practices. *See In the Matter of Chicago Firefighter Promotions Consolidated Pretrial Procedure,* No. 93 C 3028 (N.D.Ill.Exec.Comm. July 17, 1993). Currently pending before Judge Holderman is the city's motion to consolidate the suits for all purposes.

white males. Galante Aff. ¶3. High ranking CFD officials later attributed this to discrimination in hiring, interim appointments of white firefighters to higher positions, and special training opportunities for white firefighters. *Id.* In 1973, the Department of Justice brought suit against the city, alleging that the fire department's hiring and promotional practices discriminated unlawfully against blacks and Hispanics. Cole Aff. ¶5. In 1974, the city entered into a consent decree with the United States. The consent decree established an interim 50 percent hiring ratio and a long-term goal to increase substantially the black and Hispanic composition of the CFD to reflect the black and Hispanic composition of the whole city. *Id.* at ¶7.

Notwithstanding the consent decree, the CFD black and Hispanic composition remained at only nine percent in September 1978. At that time, the CFD entered into a supplemental hiring order that allocated 120 of the next 280 vacancies to blacks or Hispanics. In 1979, the district court entered another hiring order. This order directed that the 50 percent minority hiring ratio should be maintained for the immediate future, and it retained the long-range goal of substantially increasing the minority composition of the CFD.

Although the priority was to hire blacks and Hispanics, CFD promotion practices were also at issue. The 1973 Department of Justice suit challenged the promotional tests and eligibility lists used by CFD in the 1960's and early 1970's. Cole Aff. ¶9. CFD administered new promotional examinations in 1978. Nevertheless, in 1980, the Department of Justice advised the city that it intended to file a new lawsuit challenging these examinations as having a severe adverse impact on minority candidates. Cole Aff. ¶¶11, 13. The results of the captains examination showed that whites outscored blacks on the written portion at a statistically significant level of more than three standard deviations. On the performance evaluation, a subjective component involving ratings by supervisors, whites fared better than blacks and Hispanics at a statistically significant level of four standard deviations. Soule Aff. ¶¶11(a), 11(b). Promotional examinations for other ranks showed even greater disparities; on the engineers and lieutenants examinations, for example, whites outscored blacks and Hispanics on the subjective performance evaluations at factors of 11 and 12 standard deviations respectively.[2] Soule Aff. ¶¶4(b), 7(c). The city entered into another settlement agreement with the United States, this time addressing promotional practices. The city agreed to a long-term goal of increasing minority composition at each promotional rank to mirror the racial composition at the preceding rank. Def. 12(n) Ex. G.

In 1980, the city entered into a collective bargaining agreement with its firefighters. Section 9.3B of the agreement provides that promotions are "customarily" to be made in rank order, but that non-rank order promotions may be made to comply with affirmative action ordered by a court and in other enumerated circumstances. Def. 12(n) Ex. H, p. 15–16. This provision has twice been interpreted by arbitrators to permit non-rank order promotions for affirmative action purposes. Def. 12(n) Ex. J, K. Appendix G to the collective bargaining agreement requires the fire department to strive for as close to 45 percent minority representation in all ranks as is reasonably achievable and as quickly as reasonably possible. Def. 12(n) Ex. H, Appendix G.

## B. Promotions At Issue

The current plaintiffs enter the picture at this point. Because the 1979 captain eligibili-

---

2. The Second Circuit recently explained:

[s]tandard deviation analysis measures the probability that a result is a random deviation from the predicted result—the more standard deviations the lower the probability the result is a random one. Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for a deviation could be random and the deviation must be accounted for by some factor other than chance. A finding of two or three standard deviations (one in 384 chance the result is random) is generally considered highly probative of discriminatory treatment.

*Billish v. Chicago,* 962 F.2d 1269, 1285 (7th Cir.1992), *rev'd,* 989 F.2d 890 (7th Cir.1993) (*en banc*) (quoting *Waisome v. Port Auth.,* 948 F.2d 1370, 1376 (2d Cir.1991) (citations omitted)).

ty list was becoming stale, and because CFD was unable to make significant progress in increasing the proportion of minority captains using that list,[3] CFD decided to generate a new eligibility list. In 1986, CFD administered a new captains examination and used the results to create a new eligibility list for captains ("the 1987 list"). Eligibility required a passing score of 70. The examination was validated as being job related, but was not validated for strict rank order promotions. Joyce Aff. ¶¶ 10–22, 28. CFD expected to promote 150 individuals off the list over its three-year expected life. If strict rank order were used, 14 percent and 4.7 percent of the captain promotions would be black and Hispanic respectively. Def. 12(n) Ex. O. CFD, citing its consent decrees, the collective bargaining agreement, and its institutional belief that CFD's prior promotion practices were discriminatory, believed that its affirmative action obligations required it to do better. Def. 12(n) Ex. O. As a result, CFD decided to promote captains on an affirmative action basis so that 20 percent of those promoted to captain off the 1987 list would be black and five percent Hispanic. *Id.*

The plaintiffs are white lieutenants who took the 1986 captains examination, received passing scores, and achieved rankings on the 1987 list between 136 to 166. On May 1, 1991, the city made 12 promotions, bringing to 142 its total number of promotions off the 1987 list. Pl. 12(n) ¶ 14. The city promoted through rank 131 in sequence and promoted three black or Hispanic candidates below rank 131.[4] Plaintiffs Graf (rank 136), Scavone (138), and Sobczak (139) would have

been promoted on May 1, 1991 if the promotions had been made in strict rank order. The CFD made 18 more promotions on April 1, 1992, for a total of 160 promotions. Promotions on April 1 were made in rank order through rank 150. A grand total of 14 blacks and Hispanics on the 1987 list below rank 150 were promoted over the life of the list. Amended Compl. ¶ 14 & Ex. G. Because CFD partially digressed from strict rank order promotions, the remaining plaintiffs were not promoted by April 1, 1992: McNamara (rank 152), Sullivan (153), Miller (154), Lux (157), King (159), and Dineen (166).[5]

Every black and Hispanic lieutenant promoted out of rank order had passed the captains examination and was qualified to assume the rank of captain. Moreover, because the 1986 captains examination had a margin of error, scores differing by less than 7.5 points were insufficiently different by themselves to justify selection of one candidate over another. Barrett Aff. ¶¶ 9–12. In fact, the difference in scores between the last candidate promoted in strict rank order off the 1987 list (Ruhnke) and the last minority candidate promoted out of rank order (Rabiela) was less than seven points. Pl. 12(m) ¶ 62.

## C. Prior Related Litigation

Affirmative action promotions off the 1987 list have been the subject of litigation previously. In *Chicago Fire Fighters Union Local No. 2 v. Washington,* 736 F.Supp. 923 (N.D.Ill.1990), white firefighters challenged the constitutionality of CFD's affirmative action policies. Judge Holderman considered the equal protection challenge, applied strict

---

**3.** As of June 1987, 3.6 percent of all captains were black or Hispanic. 13.6 percent of lieutenants were black or Hispanic. The difference between the expected percentage of blacks and Hispanics in the captain rank and the observed percentage was 3.96 standard deviations. Joyce Supp. Aff. ¶ 2. The court expresses no opinion on the cause of this disparity, for the Seventh Circuit has admonished that factors other than actionable discrimination may be responsible for the lack of blacks and Hispanics in CFD's upper ranks. *See Billish v. Chicago,* 989 F.2d 890, 896 (7th Cir.1993) (*en banc*).

**4.** The total number of promotions is larger than the sum of the last in-rank number and the

number of affirmative action promotions. The higher number of actual promotions reflects several affirmative action promotions made off the 1987 list in previous years; those promotions are not at issue in this case. The court also notes that several candidates on the 1987 list who ranked higher than 131 apparently died, retired, or otherwise were ineligible for promotion when their number came due.

**5.** Although ranked 166th, Dineen would have been promoted on April 1 because several higher-ranked candidates became ineligible for promotion after the 1987 list was created.

scrutiny, and granted summary judgment in favor of the defendants, thereby upholding the city's affirmative action policy. A divided appellate panel affirmed, holding that the plaintiffs presented no issue of fact contesting the city's position that its affirmative action policy was justified by the lingering effects of prior discrimination in the CFD. *Billish v. Chicago,* 962 F.2d 1269 (7th Cir. 1992). Nevertheless, the Seventh Circuit reheard the case *en banc* and, by a 5–4 vote, reversed the panel's decision. The court held that a trial was necessary to determine whether the city's affirmative action policy passed muster under strict scrutiny—that is, whether the city had a strong basis in evidence to conclude that there were lingering effects of discrimination in the CFD's higher ranks and whether the affirmative action plan was narrowly tailored to eliminate all remnants of that discrimination. *Billish v. Chicago,* 989 F.2d 890, 896–97 (7th Cir.1993). (*en banc* ).

### DISCUSSION

### I. *Plaintiffs' Motion To Reconsider*

 The plaintiffs move the court to reconsider its August 31st order granting qualified immunity to the individual defendants and denying the plaintiffs' motion for summary judgment on the issue of "liability." Motions for reconsideration serve a narrow purpose. The rulings of a district court "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988). A motion for reconsideration will be granted only to correct manifest errors of law or to present newly discovered evidence. *Lewis v. Hermann,* 783 F.Supp. 1131, 1132 (N.D.Ill.1991) (citing *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985)). The motion is not a vehicle to introduce new evidence or legal theories that could have been raised in the original motion. *Id.* Rather, a motion for reconsideration is appropriate only when "the Court has patently misunderstood a party . . . or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese*

*Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir. 1990).

### A. **Qualified Immunity**

 Qualified immunity protects government officials performing discretionary functions from civil liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine allows government officials to perform their duties free from the specter of most civil liability. *See Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was *knowingly* violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (emphasis added). Rights are clearly developed when they are so sufficiently concrete and defined that the government actor knows that "what he is doing" violates federal law. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Moreover, plaintiffs cannot defeat a qualified immunity defense invoking general propositions of rights; instead, qualified immunity turns on the actual circumstances in which the government official acted. *Lassiter,* 28 F.3d at 1150. The issue is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987). Thus, pre-existing law must "truly compel (not just suggest or allow or raise a question about)[ ] the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Lassiter,* 28 F.3d at 1150 (emphasis in original).

Instead of showing that the court misconstrued the legal arguments or facts raised in their original motion, the plaintiffs merely reassert those arguments, claiming that the actions of the individual defendants were unlawful because they were committed after the

Supreme Court's decision in *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501, 109 S.Ct. 706, 725–26, 102 L.Ed.2d 854 (1989). Although *Croson* expressed a general rule against discrimination, it explicitly condoned affirmative action to right situations where the effects of past discrimination lingered and required remedy. *See Croson*, 488 U.S. at 493, 109 S.Ct. at 721–22.

■ The individual defendants here are clearly entitled to qualified immunity. No court has held that affirmative action is *per se* unconstitutional. To the contrary, courts recognize that affirmative action may be permissible to remedy past discrimination. *See Croson*, 488 U.S. at 493, 109 S.Ct. at 721–22; *United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987); *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977). More significantly, the affirmative action plan at issue had been expressly upheld as lawful by a federal district court one year before the first round of promotions that the plaintiffs now attack. *See Chicago Fire Fighters Union Local No. 2 v. Washington*, 736 F.Supp. 923 (N.D.Ill. 1990). The Seventh Circuit affirmed the decision one month after the second and final round of promotions at issue. *See Billish v. Chicago*, 962 F.2d 1269 (7th Cir.1992) (decided May 4, 1992). Although that decision was subsequently reversed by the Seventh Circuit, the *en banc* court offered no opinion on the legality of affirmative action plan. Instead, the court held that a trier of fact must determine if the plan is lawful by determining whether it satisfies strict scrutiny. *See Billish v. Chicago*, 989 F.2d 890 (7th Cir. 1993) (*en banc*) (vacating summary judgment order and remanding for trial). Although the district court upheld CFD's affirmative action policies one year before the promotions at issue here, the plaintiffs present no evidence that law or facts changed significantly after the decision. Thus, the most reasonable conclusion is that the individual defendants believed, and were entitled to believe, that their actions were lawful. Indeed, their actions may still be found lawful, although that conclusion must await trial. In any event, it cannot be said that the individual defendants violated "clearly established" rights.[6]

### B. "Liability"

■ The plaintiffs also challenge the court's August 31st denial of the plaintiffs' motion for summary judgment on the issue of "liability." In the original motion for summary judgment, the plaintiffs' "liability" argument consisted of one page devoted exclusively to the proposition that "[t]he union contract, Appendix G, violates the equal protection clause." The thrust of the argument was that racial preferences, as a matter of law, were *per se* unconstitutional. The court held that the "plaintiffs' conclusory [legal] argument does not warrant summary judgment." August 31, 1994 Mem. Opinion and Order at 7. Indeed, *Croson* and other cases teach that racial preferences are constitutionally tolerable if they survive strict scrutiny. *See Croson*, 488 U.S. at 509, 109 S.Ct. at 730. Following *Billish*, 989 F.2d at 897, the court also held that issues of fact existed as to the equal protection claim on the question of whether the city's affirmative action plan was justified to remedy past discrimination. *See* August 31, 1994 Mem. Opinion and Order at 6.

Apparently, the plaintiffs now ask the court to consider at once, generally and without differentiation under the term "liability," all of their substantive claims. Identifying the substantive claims is not easy; neither the complaint nor the plaintiffs' current brief is a model of clarity or organization. Nevertheless, several probable claims may be dis-

---

6. It is noteworthy that Judge Holderman granted qualified immunity to the individual defendants in the original decision. *See Chicago Fire Fighters*, 736 F.Supp. at 933. Neither appellate court reviewing the case took issue with Judge Holderman's conclusions on qualified immunity; Judge Holderman noted that his qualified immunity ruling was independent of his decision to grant summary judgment on the merits. *See id.* at 933;

*Lassiter*, 28 F.3d at 1151 ("[a] decision on qualified immunity is separate and distinct from the merits of the case"). Because of that silence, and because the circumstances (such as minority representation in CFD's higher ranks) did not change significantly before the promotions at issue, the court deems Judge Holderman's findings persuasive.

cerned. These include a section 1983 equal protection claim, Title VII claims premised on disparate treatment and disparate impact, and a section 1981 claim. The plaintiffs also take issue with the city's version of the facts, as presented in the city's motion for summary judgment.

As stated above, a motion for reconsideration is neither a forum for new evidence nor a vehicle to restate old arguments with renewed vigor. The plaintiffs improperly attempt to have the court consider all of their substantive claims, as well as their newly-presented introduction and interpretations of evidence. The plaintiffs do not show that the court misconstrued their original argument—that the prescriptions for racial preference in appendix G of their collective bargaining agreement are *per se* unconstitutional. In any event, *Billish* considered the same affirmative action policies at issue here on cross motions for summary judgment and held that a trial was necessary on the equal protection claim to resolve issues of fact as to whether the city's policies were justified under strict scrutiny. *See Billish*, 989 F.2d at 897. *Billish* considered the same arguments and the same evidence as the plaintiffs present here. Therefore, the plaintiffs do not meet their burden on a motion for reconsideration and are otherwise precluded from summary judgment on the equal protection claim by *Billish*. The motion to reconsider must be denied in its entirety.

## II. *City's Motion For Summary Judgment*

On cross motions for summary judgment concerning the same affirmative action policy at issue here, *Billish* reversed a grant of summary judgment in favor of the city and ordered a trial on the equal protection claim. *Billish*, 989 F.2d at 897. Because *Billish* is

controlling, the city does not move for summary judgment on the equal protection claim. A trial is necessary on the equal protection claim.

██ The city does move for summary judgment on the plaintiffs' Title VII and § 1981 claims.[7] A movant is entitled to summary judgment under Federal Rule of Civil Procedure 56 when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of Am.*, 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services–Milwaukee, Inc.*, 979 F.2d 1239, 1242 (7th Cir.1992). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis*, 5 F.3d 1031, 1033 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994).

### A. Title VII

Plaintiffs raise claims of disparate impact and disparate treatment under Title VII.

7. The city also moves for summary judgment on the "appendix G claim." The city reads the complaint as containing a facial challenge to appendix G, the affirmative action provision of the collective bargaining agreement. The court disagrees with this interpretation. CFD's affirmative action policies come from several different sources, only one of which is appendix G. Although their purpose is unclear, the plaintiffs appear to include the appendix G allegations in the complaint in order to buttress factually their section 1983 equal protection and their Title VII disparate treatment claims, as well as to impli-

cate the individual defendants by alleging that the individual defendants were responsible for the inclusion of this allegedly unconstitutional provision in the collective bargaining agreement. *See* Amended Compl. ¶ 17. Read in this manner, the plaintiffs appear to challenge appendix G as applied to them, and the "appendix G claim" may thus be fairly subsumed into the equal protection and Title VII claims. The constitutionality of CFD's affirmative action policies will be decided at trial, and that decision will dictate whether CFD may enforce appendix G of the collective bargaining agreement.

## 1. Disparate impact

■ The plaintiffs allege that the 1986 captains examination had an adverse impact on white candidates. Before filing a civil lawsuit, a Title VII plaintiff is required to file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and receive a right-to-sue letter. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); 42 U.S.C. § 2000e–5(f)(1). This procedure allows the EEOC to engage in an investigatory and conciliatory function designed to solve the problem before lawsuits are undertaken. In order to vindicate this policy, the general rule is that only those claims that are fairly encompassed within an EEOC charge may be the subject of a resulting lawsuit. *Chambers v. American Trans Air,* 17 F.3d 998, 1003 (7th Cir.1994); *Schnellbaecher v. Baskin Clothing Co.,* 887 F.2d 124, 127 (7th Cir.1989). Thus, only discrimination claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations" may be pursued in a lawsuit. *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 864 (7th Cir. 1985) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir. 1976) (*en banc*)). The relevant inquiry is what scope of EEOC investigation could reasonably be expected to grow from the original EEOC complaint. *Schnellbaecher,* 887 F.2d at 127.

■ This standard requires dismissal of the plaintiffs Title VII adverse impact claim. The EEOC charges filed by the plaintiffs are identical. Def. 12(n) Ex. A. The charges allege only that (1) CFD discriminated against the plaintiffs by promoting blacks and Hispanics out of rank order, and (2) that appendix G of the collective bargaining agreement implements an unwarranted affirmative action policy. The only Title VII claim "fairly encompassed" in these charges is disparate treatment—that CFD intentionally discriminated against whites and in favor of blacks and Hispanics by consciously promoting blacks and Hispanics out of rank order. A disparate impact claim is not fairly encompassed in the EEOC charge. The disparate impact claim as alleged in the complaint charges that the captains examination actually had an adverse impact on whites. This claim is distinct from disparate treatment and would not reasonably be expected to grow out of an EEOC investigation into intentionally promoting captains out of rank order because of race. Under the charge it received from the plaintiffs, the EEOC would not be concerned with how the rankings were generated, but rather why CFD was not faithful to those rankings. As a result, summary judgment must be granted in favor of the city and against all plaintiffs on the disparate impact claim.

## 2. Disparate treatment

■ Plaintiffs also allege a Title VII claim for disparate treatment, which was the exclusive subject of the EEOC charge. At the outset, the court finds that plaintiffs Graf, Scavone, and Sobczak did not file EEOC charges contesting the affirmative action promotions. As a result, these plaintiffs may not maintain a Title VII claim here. 42 U.S.C. § 2000e–5(f)(1). The plaintiffs concede as much. *See* Pl.Mem. Opp.Mot.Sum.Judg. at 17.

■ Title VII makes it unlawful for an employer to discriminate against an employee because of race. *See* 42 U.S.C. § 2000e–1. Title VII allows (but does not "require") employers to develop voluntary affirmative action plans designed to "further[ ] Title VII's purpose of eliminating the effects of discrimination in the workplace." *Johnson v. Transportation Agency,* 480 U.S. at 630, 107 S.Ct. at 1451; *see United Steelworkers v. Weber,* 443 U.S. 193, 204, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979). Such plans are consistent with Title VII's goal of "break[ing] down old patterns of racial segregation and hierarchy." *Johnson,* 480 U.S. at 628, 107 S.Ct. at 1450 (quoting *Weber,* 443 U.S. at 208, 99 S.Ct. at 2730). Nevertheless, employers must ensure that while their affirmative action plans further Title VII's purpose, they do not unduly infringe the interests of nonminority employees. *Id.*

■ The plaintiffs have the ultimate burden of demonstrating that CFD's affirmative action program violates Title VII. Analysis

of whether the plaintiffs meet their burden proceeds under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Johnson v. Transportation Agency*, 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). Under this standard:

> Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid.

*Johnson*, 480 U.S. at 626, 107 S.Ct. at 1449.

An affirmative action plan is valid under Title VII if it (1) is adopted and designed to correct "manifest racial imbalances in traditionally segregated job categories," and (2) does not "unnecessarily trammel the interests of white employees." *Johnson*, 480 U.S. at 628–30, 107 S.Ct. at 1450–51 (citing *Steelworkers v. Weber*, 443 U.S. 193, 197, 208, 99 S.Ct. 2721, 2724, 2729 (1979)). Title VII's criteria for validation of an affirmative action plan are different and less stringent than the standards used in an equal protection analysis. *See Johnson*, 480 U.S. at 629 n. 7, 107 S.Ct. at 1450 n. 7. In an equal protection inquiry, the affirmative action plan must survive "strict scrutiny." Under strict scrutiny, there must be a compelling reason for the plan—such as a "strong basis in evidence" that the plan is necessary to remedy lingering effects of past discrimination—and the plan must be narrowly tailored to the goal of eliminating the vestiges of past discrimination. *See Billish*, 989 F.2d at 893. In contrast, the Title VII standards are designed to ensure only that the "purposes of the plan

mirror those of the statute" and that the effects of the plan on nonbeneficiaries are not intolerably onerous. *See Weber*, 443 U.S. at 208, 99 S.Ct. at 2730; *United States v. Board of Educ.*, 832 F.Supp. 836, 844 (D.N.J.1993). Thus, an affirmative action plan that is valid under Title VII may nevertheless constitute an equal protection violation.

The plaintiffs easily establish a *prima facie* case: the city admits it selected lower-ranked candidates for the captain position before plaintiffs because the lower-ranked candidates were black or Hispanic.

The city responds that its selections were made pursuant to an affirmative action program. At this point, the burden of production shifts back to the plaintiffs who, to avoid summary judgment, must establish that an issue of fact exists as to whether the affirmative action plan is valid under Title VII. The plaintiffs spend considerable time attacking the city's assertion that the affirmative action program is necessary to combat past discrimination within the CFD, as well as the city's claim that the effects of that discrimination continue to linger. To this end, the plaintiffs contest the causes for segregated fire houses, the use of "snapshot statistics" by the city to prove racial imbalance, the claim that previous captain examinations adversely affected minorities, and the probative value of the fact that the city has been sued by the United States for discrimination in CFD and has entered into consent decrees several times.

The plaintiffs' arguments are more relevant to an equal protection claim than to the Title VII claim.[8] The validity of an affirmative action plan under Title VII is concerned with two discrete factors: whether the purpose and design of the plan is to correct a manifest racial disparity in some part of the employer's workforce and whether the plan unduly trammels on the rights of nonminority employees.

8. As noted above, the plaintiffs have raised sufficient factual issues to justify a trial on their equal protection claim. Significantly, the plaintiffs do not argue Title VII in their brief except to concede that Graf, Scavone, and Sobczak may not maintain a Title VII claim because of their failure to file an EEOC charge. The plaintiffs generally contest the city's version of facts, but the

plaintiffs do not apply their arguments to any claim in particular. Nevertheless, the tone of the plaintiffs' factual arguments and the cases they cite strongly suggest that the factual discussion is meant to inform the equal protection debate, which is not at issue in the city's summary judgment motion.

The first standard, whether the plan was adopted to correct a "manifest racial imbalance," is fairly objective. An employer seeking to justify adoption of the affirmative action plan under Title VII "need *not* point to its own prior discriminatory practices, nor even to evidence of an 'arguable violation' on its part." *Johnson,* 480 U.S. at 630, 107 S.Ct. at 1451 (emphasis added); *Weber,* 443 U.S. at 212, 99 S.Ct. at 2731–32 (Blackmun, J., concurring). Instead, the employer need only show a "conspicuous [or manifest] racial imbalance in traditionally segregated job categories." *Weber,* 443 U.S. at 209, 99 S.Ct. at 2730 (Blackmun, J., concurring). A "manifest imbalance" is less than a disparity needed to make out a *prima facie* Title VII violation. *Johnson,* 480 U.S. at 632, 107 S.Ct. at 1452.

The city satisfies the first requirement. Although many affirmative action "plans" appear in this litigation, the one most relevant to the plaintiffs is the plan adopted on July 9, 1987 in a letter from Personnel Commissioner Hoskins to Fire Commissioner Galante. Def. 12(n) Ex. O. CFD adopted the plan after it received the results and rankings of the 1987 captains examination. At that time, only 3.6 percent of captains were black or Hispanic. In contrast, 13.6 percent of lieutenants, the rank from which captains were promoted, were black or Hispanic. Def. 12(n) ¶ 43. The difference between the expected percentage of blacks and Hispanics in the captain rank and the observed percentage was 3.96 standard deviations, a significant and suspicious disparity. Joyce Supp.Aff. ¶ 2; *see Castaneda v. Partida,* 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). CFD predicted that it would promote 150 individuals off the 1987 captain eligibility list during the three-year expected life of the list. Def.

12(n) Ex. O. CFD realized, however, that only 14 percent and 4.7 percent of the promotions would be to blacks and Hispanics if strict rank order were followed. As a result, CFD determined that it would promote with the "goal" that 20 percent of the captain promotions would be to blacks and 5 percent to Hispanics. Def. 12(n) Ex. O. CFD believed its actions were warranted because of its obligations under the 1980 consent decree, its obligations under appendix G of the collective bargaining agreement, and its own realization that "dramatically more improvement is needed to correct the effects of such a long history of [our] discrimination." *Id.* at 2.

Because promotions were to be made off a static list, CFD knew exactly who would be promoted, their examination scores, and the order of promotions; the affirmative action hiring goals were developed in light of this information. Significantly, the affirmative action plan stressed that its hiring goals were informed by considering the qualifications of the candidates. As everyone on the eligibility list had received a passing score on the test, the modest affirmative action hiring goals ensured that no one unqualified would be promoted. *Id.* at 4. In addition, assuming that 150 persons would be promoted, the city predicted that the difference in test scores between the lowest in-rank candidate promoted and the lowest affirmative action candidate promoted would be less than 1.5 points on a 100–point scale, a spread that made no difference in terms of qualifications for the rank of captain.[9] *Id.*

This plan survives the first prong of Title VII review. Statistically, a "manifest imbalance" of 3.96 standard deviations existed between the captain rank and the lieutenant rank at the time the plan was adopted.[10]

---

9. The city's predictions were fairly accurate. In actuality, 160 persons were promoted off the 1987 list before it was retired. The difference between the last in-rank candidate promoted and the last affirmative action candidate was less than seven points. A difference of less than 7.5 points is insufficient to justify choosing one candidate over another. Barrett Aff. ¶ 12.

10. The plaintiffs decry the use of "snapshot statistics" to establish this factor, noting that minority representation in the captain rank had in-

creased somewhat by 1989. The argument that minority representation increased after rounds of affirmative action promotions is unexceptional. Moreover, it does not undermine the validity of the affirmative action plan. The first Title VII standard is designed to validate the *purpose* of the plan, to ensure that the plan was not adopted to play racial politics, but rather was intended to vindicate the policies behind Title VII. The Supreme Court has held that an affirmative action plan is consonant with the purposes of Title VII

These ranks were traditionally segregated. Like the plan approved in *Johnson*, the uncontroverted evidence in this case suggests that CFD's affirmative action plan for the 1987 list was adopted for the purpose of remedying underrepresentation at the rank of captain. *See Johnson*, 480 U.S. at 634, 107 S.Ct. at 1453. The plaintiffs offer no evidence that the affirmative action plan was a guise for invidious discrimination or was adopted for any other reason inconsistent with the spirit of Title VII. Moreover, like in *Johnson*, CFD's plan did not authorize blind hiring without concern for qualifications. *See Johnson*, 480 U.S. at 635, 107 S.Ct. at 1453–54. Instead, the plan ensured not only that every individual promoted would be qualified, but that every individual's qualifications would be statistically indistinguishable from every other individual's. As a result, the court finds that the plan is valid under the first prong of Title VII analysis. Whether the city was justified in adopting the plan as a constitutional matter must await an equal protection determination at trial.

In addition to having a valid purpose, a valid affirmative action plan must avoid "unnecessarily trammel[ling] the interests" of nonminority employees. *See Weber*, 443 U.S. at 208. Although there is no precise formula for determining if an affirmative action plan unnecessarily trammels on the interests of nonbeneficiaries, the Supreme Court has hinted at several factors to be used in the calculus. Thus, the Court has approved plans under this standard if they (1) did not require the discharge of white workers and their replacement by black workers; (2) did not create an absolute bar to the advancement of white workers; and (3) if they were a temporary measure designed to *attain* a racial balance, not maintain one. *Weber*, 443

U.S. at 208, 99 S.Ct. at 2729–30; *Johnson*, 480 U.S. at 638–40, 107 S.Ct. at 1455–56; *Board of Educ.*, 832 F.Supp. at 849. Moreover, express assurances that a program is temporary are needed if the program sets aside positions according to specific numbers. *Johnson*, 480 U.S. at 639–40, 107 S.Ct. at 1455–56.

CFD's affirmative action program for the 1987 list is valid under these factors. First, the plan does not require the discharge of white workers in favor of minority workers. Instead, the plan marginally limits the opportunities for immediate promotion of some white lieutenants. In assessing the impact of affirmative action plans, " '[d]enial of a future employment opportunity is not as intrusive as loss of an existing job,' and plainly postponement [of a promotion] imposes a lesser burden still." *United States v. Paradise*, 480 U.S. 149, 183, 107 S.Ct. 1053, 1072, 94 L.Ed.2d 203 (1987) (plurality opinion) (internal citations omitted) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 283, 106 S.Ct. 1842, 1851–52, 90 L.Ed.2d 260 (1986)). Moreover, like in *Johnson*, the plaintiffs here did not have an absolute entitlement to a promotion to captain. Although the collective bargaining agreement provided that promotions would "customarily" be filled in order of ranking on the eligibility list, it also expressly provided a number of exceptions to rank-order promotions, including court-ordered affirmative action.[11] Def. 12(n) Ex. H. Finally, CFD chose its hiring goals modestly in order to "not unduly burden other candidates for promotion." Def. 12(n) Ex. O.

Second, CFD's affirmative action plan did not constitute an absolute bar to the promotion of whites. Although the plaintiffs were initially denied a promotion, they "re-

if the evidence shows that it was adopted to correct a manifest imbalance in traditionally segregated job categories. *See Johnson*, 480 U.S. at 630–33, 107 S.Ct. at 1451–53 ("Our decision [in *Weber*] was grounded in the recognition that voluntary employer action can play a crucial role in furthering Title VII's purpose of eliminating the effects of discrimination in the workplace, and that Title VII should not be read to thwart such efforts"). As a result, the statistics at the time the plan was adopted are probative of whether the city had a good-faith purpose in

adopting the plan. Whether the cause of the disparity is past discrimination is not relevant to Title VII analysis.

11. The court expresses no opinion on whether the affirmative action plan was "ordered by a court" by virtue of the consent decrees. *See Billish*, 989 F.2d at 893–94. The point is that the exceptions in the collective bargaining agreement vitiated any absolute entitlement to promotion on a strict rank order basis.

tained [their] employment with [CFD], at the same salary and with the same seniority, and remained eligible for other promotions." *Johnson,* 480 U.S. at 638, 107 S.Ct. at 1455. Indeed, several of the plaintiffs received promotions before the 1987 list was retired. All of the plaintiffs remain eligible for promotions.

Finally, the affirmative action plan was a temporary measure designed to eliminate a racial imbalance and not to maintain a racial balance. *See Johnson,* 480 U.S. at 639, 107 S.Ct. at 1455–56; *see also* Def. 12(n) Ex. O at 4 ("We also wish to emphasize that these goals are temporary ones designed to remove the effects of past discrimination, not to maintain racial balance once the effects of past discrimination have been corrected."). The plan was slated to last only for the life of the 1987 list, which CFD expected to be three years. In addition, the affirmative action goals were to be reevaluated on an annual basis in order "to insure flexibility and to guarantee that the ratios are used only so long as they are necessary and appropriate." Def. 12(n) Ex. O at 4–5. These safeguards ensured that CFD's plan would be used only to eliminate a racial imbalance and not to guarantee a permanent racial composition.

Bearing in mind "Congress' consistent emphasis on 'the value of voluntary efforts to further the objectives of the law,'" *Wygant,* 476 U.S. at 290, 106 S.Ct. at 1855 (O'Connor, J., concurring), and in the conspicuous absence of any facts or argument on the issue by the plaintiffs, the court holds that CFD's affirmative action plan is valid under Title VII. Accordingly, summary judgment is entered in favor of the city on all Title VII claims.

### B. Section 1981

The plaintiffs also assert discrimination claims under 42 U.S.C. § 1981, which prohibits discrimination in the (now-broadly interpreted) making and enforcement of contracts. The city's decision to promote out of rank order was made pursuant to its affirmative action policy. A race conscious employment decision made pursuant to a valid affirmative action plan is a defense to a section 1981 claim. *Setser v. Novack Inv. Co.,* 657

F.2d 962, 968 (8th Cir.), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981). The standards for determining the validity of an affirmative action plan are the same under both Title VII and section 1981. *See Setser,* 657 F.2d at 966–67; *International Brotherhood of Electrical Workers v. Hartford,* 625 F.2d 416, 425 (2d Cir.1980); *Frost v. Chrysler Motor Corp.,* 826 F.Supp. 1290, 1294 (W.D.Okla.1993). Because the court has determined that the city's affirmative action plan is valid under Title VII, it is also valid for the purposes of section 1981. Accordingly, the city is entitled to summary judgment on the section 1981 claims.

### CONCLUSION

The plaintiffs' motion to reconsider the rulings of August 31, 1994 is denied. The city's motion for summary judgment is granted in part and denied in part. Judgment is entered in favor of the city and against the plaintiffs on the Title VII claims of disparate impact and disparate treatment, as well as the section 1981 claim. The city's motion for summary judgment on plaintiffs' "appendix G" claim is denied as moot. The plaintiffs' equal protection claim remains; a trial is necessary to determine whether CFD's affirmative action policies survive strict scrutiny analysis.

**INDEPENDENT MACHINERY, INC., Plaintiff,**

v.

**KUEHNE & NAGEL, INC., et al., Defendants.**

No. 93 C 3770.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 3, 1994.

Richard A. Wohlleber, Jose J. Behar, Chicago, IL, for plaintiff.

Warren J. Marwedel, Robert L. Reeb, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Independent Machinery, Inc. ("Independent") has sued Kuehne & Nagel, Inc. ("K & N"), Container Port Group ("Container") and Midwest Service Warehouse ("Midwest") for losses allegedly occasioned by defendants' mishandling of industrial machinery being transported from England to Ohio. Independent's claim against K & N is brought under the Carmack Amendment to the Interstate Commerce Act ("Act"), 49 U.S.C. § 11707,[1] and common law breach of contract, while the claims against both Container and Midwest sound in common law negligence.[2]

Independent and K & N have filed cross-motions under Fed.R.Civ.P. ("Rule") 56 for summary judgment on the threshold issue of whether K & N qualified as a "freight forwarder" within the purview of the Carmack

---

1. All citations to Title 49 provisions will simply take the form "Section —."

2. Amended Complaint ("AC") ¶¶ 1–4 set out facts as to the dual corporate citizenship of the several parties as defined by 28 U.S.C. § 1332(c)(1) (facts confirmed by the respective Answers), so that diversity of citizenship exists as well. Although AC ¶ 5 cites to the supplemental jurisdiction concept (28 U.S.C. § 1367(a)) as the predicate for federal jurisdiction over the common law claim against K & N and the claims against Container and Midwest, the existence of diversity jurisdiction obviates any need to consider the effect on federal subject matter jurisdiction of this opinion's having knocked out the Carmack Amendment claim (see this Court's brief August 17, 1993 memorandum opinion and order).

Amendment and, if so, whether K & N is liable to Independent under Section 11707 for the damage to the machinery. In addition, each party moves for summary judgment on the common law breach-of-contract claim. For the reasons stated in this memorandum opinion and order, K & N's motion is granted in all respects (and of course Independent's is denied in full).

### Summary Judgment Principles

■ Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions (see *Camelot Care Centers, Inc. v. Planters Lifesavers Co.*, 836 F.Supp. 545 (N.D.Ill.1993)). Fortunately that proves not to be the case here.

■ This District Court's General Rule ("GR") 12(m) and 12(n) respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. Because the summary judgment motions in this case were filed consecutively, K & N has complied with those rules by filing both a GR 12(m) statement (cited "D. 12(m) ¶ —") and a GR 12(n) statement (cited "D. 12(n) ¶ —"). In response to K & N's motion and in support of its own motion for summary judgment, Independent has filed a single statement under GR 12(n) (cited "P. 12(n)(1) ¶ —" or "P. 12(n)(2) ¶ —," depending on whether the paragraph is responsive to K & N's statement or supports Independent's motion). Facts claimed and adequately supported by either movant will be credited

unless controverted by its opponent (*Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir. 1993)).[3]

### Facts

Independent is a corporation engaged in the purchase, refurbishing and sale of equipment and machinery (D. 12(m) ¶ 2). About October 1991 Independent communicated with K & N's Chicago Branch in Bensenville, Illinois to arrange for the importation of a Bobst SP 1260–E (the "Machine") from Liverpool, England to Williamsburg, Ohio (D. 12(m) ¶ 7). K & N is a forwarding agent whose business is to arrange the international transport of cargos on behalf of shippers and consignees (D. 12(m) ¶ 4). K & N also facilitates the transport of those cargos through customs and arranges for the placing of cargo insurance if requested to do so by the shipper or consignee (*id.*).

Independent ultimately accepted K & N's quote for transporting the Machine to Ohio (D. 12(m) ¶ 8). Although the specific conditions of K & N's undertaking appeared on the reverse side of invoices sent to Independent (D. 12(m) ¶ 10), Independent received those invoices only after the shipment on December 31, 1991 (P. 12(n)(2) ¶ 11). K & N's involvement in arranging transport of the Machine was limited to written and telephone communications on behalf of Independent (D. 12(m) ¶ 11) to retain the services of various carriers to transport the Machine to Ohio (P. 12(n)(2) ¶ 5). Specifically, K & N itself never picked up, loaded or unloaded, consolidated or physically handled the Machine during its movement from England to its final destination in the United States (D. 12(m) ¶ 12).

K & N never issued a bill of lading for any portion of the Machine's transport (D. 12(m) ¶ 12). Instead the record contains a November 22, 1991 Blue Anchor Line bill of lading number 1430–4262–111028–00, listing K & N as a "delivery agent" for the Machine's transport on the M/V CANMAR AMBASSADOR from England to Ohio (D. 12(m) ¶ 13).

---

3. Thus where the P. 12(n)(1) statement either explicitly or implicitly admits an assertion in the D. 12(m) statement, only the latter statement will be cited. And where the D. 12(n) statement admits an assertion in the P. 12(n)(2) statement, only the latter will be cited.

On November 27, 1991 the Machine arrived in the port of Montreal. It was then moved by rail to its destination in Cincinnati, Ohio, where it arrived on December 3, 1991 (D. 12(m) ¶ 15). Three days later Independent changed the consignee to Raymond Enterprises in Middletown, Ohio (D. 12(m) ¶ 16). K & N's Cincinnati office obtained customs clearance and made arrangements with Container to transport the Machine to Middletown by truck (D. 12(m) ¶ 17).

On December 17, 1991 Independent again wrote K & N, this time to request that the Machine be stored temporarily because Independent's customer was unable to take immediate delivery (D. 12(m) ¶ 18 and P. 12(n)(1) ¶ 18; P. 12(n)(2) ¶ 8). K & N then located storage space at Midwest in Lawrenceberg, Indiana (D. 12(m) ¶ 19) and directed Container to transport the Machine (which had been in Container's possession since December 6) to Midwest (D. 12(m) ¶ 20).

On December 20, 1991 Container hauled the Machine from Cincinnati, Ohio to Midwest (D. 12(m) ¶ 22). There a Midwest warehouse representative instructed the Container driver to back the truck into Midwest's warehouse (D. 12(m) ¶ 23). After maneuvering the trailer into the warehouse, the driver asked whether Midwest wanted boards placed under the trailer's landing gear (D. 12(m) ¶ 24). Midwest's representative replied in the negative, adding that Midwest had stored loaded trucks in that warehouse before (id.). Container's driver then lowered the trailer's landing gear, unhooked the trailer from the truck cab and pulled out of the warehouse, leaving the trailer and container within (D. 12(m) ¶ 25).

Container's driver presented the bill of lading to the Midwest representative, who signed without noting any discrepancy (D. 12(m) ¶ 26). Shortly thereafter the trailer's legs punched through the concrete floor of the warehouse as Midwest employees were closing the warehouse doors (D. 12(m) ¶ 27), causing the trailer (and the Machine sitting upon it) to sink, fall off balance and finally fall over on its side (id.). Independent first

learned of the damage on or about December 23, 1991, and it instructed K & N not to reload the Machine (P. 12(n)(2) ¶ 9). As a result of the accident Independent incurred repair costs and other expenses (P. 12(n)(2) ¶ 12).

As the ensuing discussion reflects, Independent's Carmack Amendment claim fails because K & N does not qualify as a freight forwarder under the Carmack Amendment. Independent's breach of contract claim is unsuccessful because nothing in the dealing between the parties stated or implied an obligation on K & N's part to protect Independent against losses in shipment and, moreover, because K & N effectively limited its liability so as to foreclose such a claim.

*Inapplicability of the Carmack Amendment*

In 1906 Congress codified common law principles relating to liability of interstate carriers in the Carmack Amendment to the Act.[4] Though Congress has since recodified the original provisions of the Carmack Amendment (which then appeared at 49 U.S.C. § 20(11)) into Sections 11707, 10730 and 10103, the current sections are still commonly referred to by the earlier name (*Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1412 n. 6 (7th Cir.1987)). Under Section 11707(a)(1) the carrier is generally held liable for actual loss or injury to property. But the same section allows a shipper to recover from the delivering carrier, the receiving carrier or any other carrier over whose line or route the property is transported. That statutory structure was devised "to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods" (*Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950)).

In 1986 Congress amended certain provisions of the Carmack Amendment in the Surface Freight Forwarder Deregulation Act of 1986 ("Deregulation Act"), Pub.L. No. 99–521, 1986 U.S.C.C.A.N. (100 Stat.) 2993.

---

4. For a brief review of the common law pertaining to common carrier liability before the Carmack Amendment, see *Tokio Marine & Fire Ins.* *Co. v. Amato Motors, Inc.,* 996 F.2d 874, 876 n. 6 (7th Cir.1993).

That statute's stated purpose was to "reduce burdensome and unnecessary government regulations and to ensure the competitiveness and efficacy of transportation services of surface freight forwarders in the United States" (*id.*). Nevertheless the final version of the Deregulation Act explicitly provided that freight forwarders would be subject to federal regulation over cargo liability and claims settlement procedures (Deregulation Act § 12(a), codified at Section 11701(a)). Furthermore, though the Senate Report indicates that the Senate Committee intended freight forwarders to have the "maximum flexibility possible in arranging transportation" (Senate Comm. on Commerce, Science, and Transportation, S.Rep. No. 120, 99th Cong., 2d Sess. 11 (1985), *reprinted in* 1986 U.S.C.C.A.N. 5028, 5038), the final version of the Deregulation Act maintained the requirement that a freight forwarder use a carrier subject to Interstate Commerce Commission ("ICC") jurisdiction (Deregulation Act § 4(2), codified at Section 10102(9)(C)).

■ To establish a prima facie case under the Carmack Amendment for damage to cargo, a shipper must prove (1) delivery in good condition, (2) arrival in damaged condition and (3) the amount of damages (*Missouri P. R.R. v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144–45, 12 L.Ed.2d 194 (1964); *Jos. Schlitz Brewing Co. v. Transcon Lines*, 757 F.2d 171, 173 (7th Cir. 1985)). That shifts the burden to the defendant to show that it was free from negligence and that the damage was caused by one of the several excepted causes that relieve carriers (or in this instance freight forwarders) of liability (*id.* (both cases)). But before a shipper may claim the benefit of the Carmack Amendment's strict liability provisions, it must establish that the Amendment applies in the first instance (see 1 Saul Sorkin, *Goods in Transit* § 1.19, at 1–95 to 1–96 (1990)).

K & N is right in claiming that it does not fall within the scope of the Carmack Amendment. Section 11707(a)(1) makes the Carmack Amendment applicable to "a common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of this title and a

freight forwarder." Independent does not claim that K & N is a common carrier, so the sole issue is whether K & N qualifies as a "freight forwarder."

■ As an initial matter, K & N contends correctly that merely labeling an entity as a "freight forwarder" will not subject that entity to the provisions of the Act. *Chicago, M., St. P. & P. R.R. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 484, 69 S.Ct. 692, 701, 93 L.Ed. 817 (1949) explains the statutory "freight forwarder" concept:

> The term was originally applied to persons who arrange for the transportation by common carrier of the shipper's goods. The forwarder did not necessarily consolidate the individual consignments into carload lots, and its duties, as agent of the shipper, went no farther than procuring transportation by carrier and handling the details of shipment. Forwarders of this type charged fees for their services, which the shipper paid in addition to the freight charges of the carrier utilized for the actual transportation.

> Later, a different type of forwarding service was offered. This forwarder picked up the less-than-carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination. The freight forwarder charged a rate covering the entire transportation and made its profit by consolidating the shipment with others in carload quantities to take advantage of the spread between carload and l.c.l. rates. It held itself out not merely to arrange with common carriers for the transportation of the goods, but rather to deliver them safely to the consignee. The shipper seldom if ever knew which carrier would be utilized in the carriage of his shipment.

As the Court went on to say (*id.* at 484, 69 S.Ct. at 701):

> The Freight Forwarder Act encompasses only the second type of forwarder described above.

Thus the definition of a freight forwarder subject to the Act (the same definition that was next quoted in *Acme Fast Freight, id.* and is now codified at Section 10102(9)) fits

only the second and later type of forwarding service:

"freight forwarder" means a person holding itself out to the general public (other than as an express, pipeline, rail, sleeping car, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business—

(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;

(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and

(C) uses for any part of the transportation a carrier subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or III of chapter 105 of this title.

All three subparts of that definition must be satisfied for K & N to be held a freight forwarder under the Act.

■ Independent has not even hinted at any facts from which it might be inferred that K & N performs or provides for the assembly or consolidation of cargo in the ordinary course of its business, as Section 10102(9)(A) requires (let alone any facts to suggest that the transaction at issue was part of any assembly or consolidation of cargo by K & N). That raises a serious question as to the *objective good faith* basis for Independent's Rule 56 motion, which must perforce be denied. As for K & N, it seeks to address that issue in its D. 12(m) ¶¶ 4 and 5:

4. K & N is a forwarding agent whose business is to arrange the international transportation of various cargos on behalf of shippers and consignees. K & N's business is limited to written and telephone communications for the procurement of transportation of such cargos, for the clearance of such cargos through Customs

and for placing cargo insurance for such cargos if requested by the shipper or consignee.

5. K & N is not in the business of assuming responsibility for the safe transportation of cargos on their point of origin to their ultimate point of destination. K & N simply makes arrangements for such transportation as indicated in paragraph 2. K & N advances payment of freight charges, customs duties and warehousing fees on behalf of its principals, and then bills its principals for these disbursements, adding its various service charges.[5]

Nothing in the litigants' submissions deals with, and this Court has not located any appellate tribunal's discussion of, the question whether a company that provides assemblage and consolidation services "in the ordinary course of its business" but has not done so in the transaction at issue—this time doing nothing more than arranging for the transportation of a single item—is still subject to the strictures of the Carmack Amendment as to that item. That certainly would seem to be a strained reading of the statute, for it would impose strict liability on an entity that was not in fact performing freight forwarding services in the case at issue—a sort of revivification of the older concept described in *Acme Fast Freight,* 336 U.S. at 484, 69 S.Ct. at 701. Thus K & N's sworn submission ought logically to be enough to take it out of the ambit of the Carmack Amendment (accord, *Pacific Austral Party, Ltd. v. Intermodal Express, Inc.,* No. 88 C 10470, 1990 WL 141010, at *1–2, 1990 U.S.Dist LEXIS 12638, at *3–*4 (N.D.Ill. Sept. 26)).

But because of the apparent absence of appellate authority on the issue, this opinion will go on to look at the other branches of the Section 10102(9) definition. For that purpose it will be assumed arguendo (however doubtful that assumption may be) that K &

---

5. [Footnote by this Court] Independent admits all aspects of those two paragraphs except for the *first sentence of D. 12(m) ¶ 5, which it says is a* question of law for this Court. But what Independent has obviously missed entirely is that the "freight forwarder" definition is framed in the conjunctive and not the disjunctive, so that even

if K & N were arguably within the scope of Section 10102(9)(B) Independent must still lose *unless it could show that Section 10102(9)(A)* applies to K & N as well. Nonetheless this opinion goes on to touch all of the bases, if only to show just how bootless Independent's motion has been from the outset.

N would have to negate the possibility that its only business activity—written correspondence and telephone calls—may regularly include its making arrangements for the assembly or consolidation of the cargo, even though it did not actually perform such services on this one occasion (D. 12(m) ¶ 12).

 In contrast to its total silence on Section 10102(9)(A), Independent as well as K & N attempts to speak to the facts bearing on K & N's inclusion or noninclusion under Section 10102(9)(B).[6] Allocation of responsibility to a freight forwarder for each stage of a shipment's movement is consistent with the general practice of freight forwarders in offering single carrier liability over a journey employing diverse modes of transport (see Comment, "Intermodal Transportation and the Freight Forwarder," 76 Yale L.J. 1360, 1366 (1967)). But Independent really does not suggest that K & N ever held itself out as "assum[ing] responsibility" for the Machine's journey.[7]

Independent does claim that K & N failed to inform Independent on this or any prior occasion that K & N would not be responsible for the proper shipment of the Machine (P. 12(n) Ex. 1 ¶¶ 4, 6). K & N refutes the inference sought to be drawn from that claim by showing that while the parties may never have specifically discussed the terms of shipment (D. 12(n)(1) ¶ 11), invoices containing those terms and limiting K & N's liability for shipments had been sent to Independent on five prior occasions during 1991 alone—every time the parties dealt with each other (D. 12(n)(2) Ex. A ¶ 4). Finally, K & N demonstrates that while the terms regarding liability did not appear on the shipping advice (which Independent acknowledges receiving on November 22, 1991 (P. 12(n)(2) ¶ 7)), the advice states that the terms of K & N's service are set forth on its invoices and are

also available for inspection upon request (Complaint Ex. 1).

Thus Independent's entitlement to the benefit of reasonable inferences does not help it. Nowhere has it affirmatively asserted that K & N assumes such responsibility generally, nor does Independent even claim that K & N held itself out as willing to assume responsibility for shipment of the Machine—a necessary element of the definition of a freight forwarder under Section 10102(9)(B). Instead Independent has left untouched K & N's evidence that it neither assumes nor holds itself out as assuming responsibility for cargo (D. 12(m) Ex. A). Independent states only that it was never "informed" that K & N would *not* be responsible for the cargo (P. 12(n)(2) ¶ 6), and that is insufficient to raise the requisite issue of material fact. Indeed, even that position is a bit disingenuous, for what it reflects is only that Independent never *discussed* K & N's exculpation from liability (P. 12(n) Ex. 1 ¶¶ 4, 6; P. 12(n) Ex. 2 (Karin Mackey Dep.) at 35).

That also precludes any inference that K & N *implicitly* assumed the responsibility for transporting the Machine. Independent acknowledges in its own GR 12(n) that it had a "prior course of dealings" with K & N (P. 12(n)(2) ¶ 6), and it is undisputed that during that course of dealing Independent always received K & N's standard invoices with terms and conditions on the reverse side stating that K & N assumed no liability as a carrier and was not to be held liable for loss, damage or delay (D. 12(n)(2), Ex. A ¶ 4). Though Independent states that it did not receive the invoice for the shipment of the Machine until after shipment, it admits to having received in November a shipping advice the face of which contained the statement "IMPORTANT—YOUR BUSINESS IS UNDERTAKEN SUBJECT TO TERMS

---

**6.** Again Independent's assertion of its own summary judgment motion, rather than simply resisting the K & N motion, is mysterious. K & N states expressly that it is "not in the business of assuming responsibility for the safe transportation of cargos on their point of origin to their ultimate point of destination" (D. 12(m) ¶ 5), supporting that statement with the affidavit of a K & N vice-president (D. 12(m) Ex. A). At a minimum that creates a genuine issue of material

fact that requires the denial of Independent's Rule 56 motion.

**7.** Though the parties quarrel over whether Independent knew the identity of the carriers chosen by K & N or of the warehouse that K & N chose for storage, that dispute is really beside the mark on the assumption-of-responsibility issue. Hence the text discussion focuses on the facts that bear directly on that question.

AND CONDITIONS WHICH ARE PRINTED ON OUR SHIPPING ADVICES AND INVOICES AND ALSO AVAILABLE UPON REQUEST" (Complaint Ex. 1).

 Finally, it is also undisputed that K & N never issued a bill of lading under its own name to Independent (D. 12(m) ¶ 12). While that alone does not dispose of the question of K & N's responsibility for the shipment,[8] it is notable that K & N does not appear as either the shipper or the consignee on the bill of lading (Complaint Ex. 1). Rather Care Graphics Machinery is listed as the shipper and Independent appears as the consignee, with K & N referred to only as the "delivery agent" (*id.*). When freight is consolidated for shipment by a freight forwarder, the forwarder will usually be designated as *both* consignor and consignee on the carrier's bill of lading (*Acme Fast Freight,* 336 U.S. at 467, 69 S.Ct. at 693). Furthermore, a "bill of lading issued by a carrier to a freight forwarder on its face gives notice of the fact that a freight forwarder is involved" (7 William Hawkland et al., *Uniform Commercial Code Series* § 7–503:03, at 287 (1986), citing U.C.C. § 7–503, Official Comment 3). That practice is consistent with the view that "the forwarder remains a shipper in its relations with underlying carriers under the Act" (*Acme Fast Freight,* 336 U.S. at 480, 69 S.Ct. at 699–700).

In sum, K & N has presented (1) affirmative evidence of the parties' prior course of utilizing K & N's uniform documentation stating that it would *not* be responsible for safety of the cargo and (2) documentation of the current transaction that expressly incorporates K & N's standard provisions. Independent's response is really a nonresponse, for it (1) fails to set out any facts implying an affirmative acceptance of responsibility by K & N, (2) does not deny that K & N expressly *limited* its liability for the shipment of the Machine and (3) does not deny that Independent was aware of the liability waivers appearing in all of K & N's invoices. Again all that Independent has denied is that it ever *discussed* those provisions with K & N.

Thus summary judgment in favor of K & N on the issue of responsibility (Section 10102(9)(B)) is also appropriate. Even with the dubious arguendo assumption set out earlier as to Section 10102(9)(A) (whereas a more realistic reading of the statute also dooms Independent), K & N therefore prevails in negating liability under the Carmack Amendment.

 There is still another and separate predicate for rejecting Independent's statutory claim. Even if K & N had served as a freight forwarder (as it did not) so as to stand in the relation of a carrier of the Machine (*Acme Fast Freight,* 336 U.S. at 477, 69 S.Ct. at 698), such carrier responsibility would have ended when the Machine was delivered to Midwest. Once Independent informed K & N that the consignee could not take delivery and requested that K & N store the Machine, K & N's duties toward Independent shifted to those of a warehouseman (810 ILCS 5/7–102(1)(h) [9]; *General Am. Transp. Corp. v. Indiana Harbor Belt R.R.,* 191 F.2d 865, 872 (7th Cir.1951)). That status rendered K & N liable only for damage caused by its own negligence (Section 7–204(1)).[10] K & N might have chosen to discharge its duty as a warehouseman by (1) leaving the Machine in the Container freight yard, (2) storing the Machine in its own warehouse if it owned one, thus assuming the

---

8. In its review of bills of lading issued by freight forwarders, the ICC recognized that it is a frequent practice for freight forwarders to treat bills of lading issued by carriers as their own. Those bills of lading frequently cover the movement of the cargo from the origin to the ultimate destination and confer upon the freight forwarder ultimate responsibility for the cargo (*Bills of Lading of Freight Forwarders,* 259 I.C.C. 277, 278–79 (1944)).

9. Further citations to the Illinois UCC will take the form "Section—," omitting the prefatory "810 ILCS 5/" and thus tracking the UCC numbering. Where an entire UCC article is referred to, it will simply be cited "Article—."

10. Independent is flatly wrong in arguing that K & N should be strictly liable for the damage to the Machine. There is no question that the Machine was damaged when the floor upon which the trailer rested in the Midwest warehouse gave way. Accordingly the crucial inquiry is whether K & N took reasonable steps in assessing Midwest as a safe depository, not whether Independent ever had control over the Machine.

liability of a bailee, or (3) storing the Machine at a location selected "with the exercise of like degree of care in selecting a responsible and safe depository," charging Independent for such storage, and thereby discharging itself from further liability (*Gregg v. Illinois Central R.R.*, 147 Ill. 550, 560–61, 35 N.E. 343, 346 (1893)).

■■■ K & N chose the third course of action, contracting with Midwest to store the Machine on Independent's behalf. It is undisputed that once informed that the consignee could not take delivery, a K & N customer service representative "inquired in the local area," where Container recommended that the Machine be stored at Midwest's warehouse in Lawrenceberg, Indiana (D. 12(m) Ex. C ¶ 6). Upon inquiry Midwest stated that it "could handle storage of the Machine indoors" (*id.*). Finally, the Midwest representative on site when Container delivered the machine assured the Container driver that Midwest "had stored loaded dump trailers in the warehouse before" (D. 12(m) Ex. D ¶ 4).

Though the parties dispute whether Independent knew that the Machine was to be stored at Midwest, there appears to be no disagreement over the fact that Independent was to cover the additional expense of storage. K & N's customer service representative stated that "Kuehne & Nagel advanced payment of freight charges and warehouse fees to Container Port Group and Midwest Service Warehouse on behalf of Independent Machinery, and then billed Independent Machinery for these disbursements" (D. 12(m) Ex. C ¶ 7).

There is no issue at all as to K & N's degree of care in selecting Midwest as a depository for the Machine. Nor has Independent disputed that it was ultimately responsible for covering the expenses of storing the Machine at Midwest. In this summary judgment game in which even one strike is out, Independent has swung and missed for a third time. Even if the Carmack Amendment had applied to the transaction (as it did not), K & N's strict liability as a carrier for the safety of the Machine would have terminated upon delivery to Midwest.

## Breach of Contract [11]

Independent's Amended Complaint Count II seeks to hold K & N liable for damage to the Machine under a common-law contract theory. Independent claims that K & N breached its contract with Independent when K & N failed to complete shipment of the Machine in undamaged condition and then refused to reimburse Independent for its losses. Though K & N denies that there was a "contract for shipment of the Machine," it acknowledges that K & N did agree to make shipping arrangements on behalf of Independent (Answer ¶ 8). There is no need to sort out that quibble, for in any event K & N did not undertake the kind of absolute commitment for which Independent contends.

Although Count II is worded in strict liability terms, Independent nowhere suggests the basis for such a claim. All that Independent's GR 12(n)(2) statement says (and K & N does not deny) is that Independent contracted with K & N to "arrange for the transport" of the Machine (P. 12(n)(2) ¶ 4). What the Count II argument boils down to, then, is whether that arrangement entailed K & N's agreement that it would be strictly liable for any damage occurring to the Machine.

■■■ As with any effort to obtain summary judgment on a contract claim, Independent must demonstrate the absence of any material fact on the elements of offer, acceptance, consideration, the terms of the contract, plaintiff's performance, defendant's breach of the terms of the contract and damage resulting from that breach (*Valenti v. Qualex, Inc.*, 970 F.2d 363, 366 (7th Cir. 1992)). And as for the terms of the contract, the agreement must be sufficiently definite and certain so that the terms are either determined or may be implied (*id.*). On the other side of the coin, K & N's success on its

---

11. As neither party has addressed the choice-of-law issue, this opinion looks to Illinois law to provide the rules of decision of substantive contract law (*Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 141 n.2 (7th Cir.1994)).

Rule 56 motion depends on its establishing the absence of any material fact on one or more of the components essential to Independent's contract claim.

■ At the risk of sounding like a broken record, this opinion is constrained to repeat that nothing in the parties' agreement states or implies that K & N would be strictly liable for damage to the Machine. Certainly no guaranty of safe delivery appears on the K & N service advice or the K & N invoice. Indeed, this time Independent's contention that the parties never even discussed the issue of liability cuts strongly against the existence of any such agreement. Finally, Independent has not suggested that contracts such as it claims existed here are commonly used in its trade or that the prior course of dealing between Independent and K & N somehow inserts strict liability into the agreement to ship the Machine. In sum, Independent has again utterly failed to demonstrate from the pleadings, admissions on file and affidavits that there is any support in the record warranting summary judgment in its favor.[12]

Now to the other side of the coin: K & N too moves for summary judgment on Independent's breach-of-contract claim. What has been said to this point is really dispositive of that motion as well. Nothing in Independent's retention of K & N to arrange for shipment of the Machine creates any inference that K & N agreed to be an insurer of its safe delivery, holding Independent harmless against the consequences of any negligence (or worse) on the part of those handling the physical transportation. And absent any express or implied undertaking by K & N in that respect, K & N must prevail as a matter of law on Independent's breach of contract claim (or to put it differently, breach of *what* contract?).

Nonetheless, perhaps out of an abundance of caution, K & N also points to two invoice provisions that expressly limit its liability (D. 12(m) Ex. B):

1. **Services by Third Parties.** Unless the Company carries, stores or otherwise physically handles the shipment, and the loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier, and is not to be held responsible for any loss, damage, expense or delay to the goods to be forwarded or imported except as provide [sic] in paragraph 10 and subject to the limitations of paragraph 8 below, but undertakes only to use reasonable care in the selection of carriers, truckmen, lightermen, forwarders, customhouse brokers, agents, warehousemen and others to whom it may entrust the goods for transportation, cartage, handling and/or delivery and/or storage or otherwise.

10. **Liability of Company.** It is agreed that any claim or demand for loss, damage, expense or delay shall be only against the carriers, truckmen, lightermen, forwarders, customhouse brokers, agents, warehousemen or others in whose actual custody or control the goods may be at the time of such loss, damage, expense or delay, and that the Company shall not be liable or responsible for any claim or demand from any cause whatsoever, unless in each case the goods were in the actual custody or control of the Company and the damages alleged to have been suffered be proven to be caused by the negligence or other fault of the Company, its officers or employees, in which event the limitation of liability set forth in paragraph 8 herein shall apply. The Company shall not in any circumstances be liable for damages arising from loss of profit.

If those provisions are effective as between the parties K & N must also win, for Independent does not (and cannot) claim that K & N failed to use reasonable care in selecting Midwest. But because there is no evidence that in this instance Independent consented

---

**12.** What this means is that both branches of Independent's motion had no chance of success at all from the very outset—and its lawyers should have known that. Why then the motion? Does it reflect a misguided notion that for a party opposing a summary judgment motion, a good offense may be the best defense? If so, it misses the critical point that the offense must be *good.* In any event, the motion appears to provide another illustration cutting against the December 1, 1993 amendments that drew the fangs of Rule 11.

to those provisions in so many words, the question on that alternative ground for K & N's victory becomes whether Independent may be bound by those provisions anyway.

Under Illinois law the time for determining the terms of a contract is generally "when the bargain is struck" (see, e.g., *Frank's Maintenance & Eng'g, Inc. v. C.A. Roberts Co.*, 86 Ill.App.3d 980, 991 n. 2, 42 Ill.Dec. 25, 33 n. 2, 408 N.E.2d 403, 411 n. 2 (1st Dist.1980)). It follows that a limitation of liability will not be binding unless it has been disclosed earlier (*id.*). Because the parties' contract here was formed when Independent accepted K & N's quote, any later attempt by K & N to limit its liability by sending an invoice laden with terms and conditions not discussed by the parties would fail if the agreement were an isolated and unique transaction (see, e.g., *Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1202 (7th Cir.1991); Restatement (Second) of Contracts § 211 cmt. d (1979)). However, the shipment of the Machine was not an isolated transaction, but rather the most recent of a series of deals in which the same terms had appeared on prior invoices. Thus the issue becomes whether those terms were imported into the current contract by virtue of the parties' earlier contracts (see Section 1–201(3)).

Whether a course of dealing exists between parties to a transaction is a question of fact (*Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 395 (7th Cir.1992)). Over the course of the transactions between Independent and K & N, the Illinois UCC defined a "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct" (Section 1–205(1)). Implicit in that principle is the notion that the parties to a contract need not have discussed a particular provision during their prior dealing—the mere continuity of the relationship "may fill the void" (*Capitol*, 965 F.2d at 396).[13]

This case bears a strong resemblance to that dealt with in *Capitol*. There Capitol Converting Equipment ("Capitol") hired LEP Transport ("LEP") to arrange for the transportation of machinery from Italy to Illinois. When the machinery failed to arrive in Illinois, Capitol sued LEP both under the Carmack Amendment and for breach of contract. After disposing of the Carmack Amendment claims, our Court of Appeals applied Illinois law to find that a provision appearing on the reverse side of LEP's invoice and limiting its liability was enforceable despite Capitol's claim that it was unaware of the term. Crucial to the Court's determination were the appearance of the same limiting provisions in hundreds of prior invoices and the total absence of any prior discussion that might have created an oral agreement to the contrary.

In light of the sheer volume of prior transactions between the parties, *Capitol* did not reach what it called the "difficult issue" of precisely when and under what circumstances an exchange of forms could create a course of dealing (*Capitol*, 965 F.2d at 395–96 n. 6). But this Court is not without guidance on the issue, for other Seventh Circuit cases suggest factors to be considered when deciding the existence or nonexistence of a course of dealing under Article 1.

Thus *Schulze & Burch* teaches that as few as nine transactions involving the same contractual language may constitute such a course of dealing, providing ample notice that such language will appear in further transactions. There the clause at issue (an arbitration clause) appeared on the bottom of a confirmation form mailed after the parties had entered into an agreement by telephone. Although *Trans–Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1261–63 (7th Cir.1989) later distinguished *Schulze*, it did

---

13. Many cases conflate the course-of-dealing inquiry with an analysis of whether there has been a material alteration to the parties' agreement (see, e.g., *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 715 (7th Cir.1987)), but that latter approach is not appropriate where as here a transaction in goods is not at issue.

"Course of dealing" is covered by Article 1 and hence applies to all commercial contracts (*Capitol*, 965 F.2d at 395 n. 5), while "material alterations" are covered in Article 2, which applies only to "transactions in goods" (Section 2–102). K & N's contract with Independent is of course not an Article 2 transaction.

so under circumstances critically different from those in this case—circumstances where the party receiving the later purchase orders might not have had a reasonable opportunity to recognize that the other party wished to modify the earlier telephonic agreements. Indeed, it is obvious that no course-of-dealing concept could arise in *Trans–Aire* to the extent that the lawsuit arose out of the *initial* transactions between the parties.

 What separates this case from the others—even from the K & N-supporting decision in *Capitol*—is that Independent does not claim that it was unaware of the already-quoted exculpatory provisions of K & N's invoices. And the record reflects that the "prior course of dealings" between the parties (confirmed by Independent itself in P. 12(n)(2) ¶ 6) encompassed, during the year 1991 alone, five separate transactions preceding the shipment of the Machine (D. 12(n) Ex. A ¶ 4) and that the liability-limiting clauses consistently appeared on K & N's invoices covering the parties' earlier transactions.[14] Moreover, it is scarcely surprising that Independent does not profess ignorance of those clauses, for it would be hard-pressed to do so with any credibility: Each invoice has a legend in capital letters and red print referring the reader to the terms and conditions on the reverse side, and each of the relevant clauses appears on the reverse side in a readily readable (though very small) typeface and is preceded by its title ("Services by Third Parties" or "Liability of Company") in bold (though again small) print (D. 12(m) Ex. B).[15]

What might potentially have posed a fact question is thus plainly an easily-decided legal one. In light of the consistent course of prior dealings between Independent and K &

N, it must be concluded that the terms and conditions included in each of those dealings were also built into the parties' agreement covering transportation of the Machine. Hence K & N prevails on the second route to resolution of Independent's breach of contract claim, just as it prevailed readily on the first and more direct route.

### Conclusion

There is no genuine issue of material fact, and K & N is entitled to a judgment as a matter of law on each facet of Independent's claim. Because K & N does not meet the definition of a "freight forwarder" under the Carmack Amendment, judgment must be entered in K & N's favor as to Count I. And Independent's breach-of-contract Count II fails as well, because Independent has utterly failed to establish the kind of absolute undertaking on K & N's part for which Independent contends. Indeed, K & N has provided a dispositive second string to its bow, because the liability-limiting provisions appearing on K & N's invoices formed part of the parties' contract in this instance as well.

Accordingly Independent's action against K & N is dismissed with prejudice. Given the pendency of various cross-claims implicating K & N, however, this Court will not entertain the possibility of entering final judgment in favor of K & N and against Independent (see Rule 54(b)).

---

**14.** Indeed, K & N's stationery also refers to the terms and conditions appearing on the reverse side of its invoices (see P. 12(n) Ex. 1).

**15.** That cross-reference on the front of the document would qualify the clauses on the reverse side to meet a legal standard of "conspicuousness" (see Section 1–201(10)) if that were at issue, although no such requirement exists under the UCC (K & N's invoice is neither a sales contract nor an attempt to limit implied warranties as covered by Section 2–316(2)). Compare

the like holding as to a warehouseman's liability-limiting provisions in *Strom Int'l, Ltd. v. Spar Warehouse & Distrib., Inc.*, 69 Ill.App.3d 696, 701–03, 26 Ill.Dec. 484, 489–90, 388 N.E.2d 108, 112–13 (1st Dist.1979). Like the provisions at issue in that case, K & N's clauses are common in its industry, having been approved by almost 20 organizations engaged in the business of freight forwarding and customs brokerage (D. 12(m) Ex. B).

UNITED STATES of America, Plaintiff,

v.

Joel DUDEK, Defendant.

No. 91 CR 1056.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 4, 1994.

Julia E. Getzels, Chicago, IL, for plaintiff.

Daniel Martin, Chicago, IL, for defendant.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Joel Dudek ("Dudek") has tendered a motion seeking the reduction of his sentence under 18 U.S.C. § 3582(c)(2). To that end Dudek's able counsel seeks to parlay (1) the retroactive amendment to the Sentencing Guidelines ("Guidelines") dealing with LSD-related offenses (Guidelines §§ 2D1.1(c) and 1B1.10) with (2) our Court of Appeals' opinion in *United States v. Wills,* 35 F.3d 1192 (7th Cir.1994).

Dudek's difficulty is that his counsel's argument is only half right—that is, it accurately reflects the change in the Guidelines and the retroactivity of that change—while Dudek must prevail on both branches of the argument if he is to obtain the substantial degree of relief sought by his motion. Under the retroactive Guidelines amendment the range for Dudek's offense does indeed appear to have dropped to between 51 and 63 months. But the problem is that Dudek's plea agreement (the "Agreement") was entered into under Fed.R.Crim.P. ("Rule") 11(e)(1)(C), which in law established a *contract* between Dudek and his lawyer on the one hand and the United States on the other (see, e.g., *Carnine v. United States,* 974 F.2d 924, 928 (7th Cir.1992), *United States v. Ingram,* 979 F.2d 1179, 1184 (7th Cir.1992), and cases cited in both of those decisions) that was then accepted by this Court at the sentencing hearing. And Agreement ¶ 14 provided expressly:

However, this plea agreement is governed, in part, by Federal Rule of Criminal Procedure 11(e)(1)(C). That is, the parties have agreed that the incarceration component of any sentence imposed by the court shall be a term of imprisonment in the custody of the Attorney General of sixty (60) months or one-half the lower end of the guideline range, whichever is higher.

At this point, then, the binding agreement between the parties has become one that still requires a custodial sentence measured by the greater of (1) 60 months and (2) (assuming the correctness of Dudek's counsel's calculations) 25½ months. That being the case, the Guidelines amendment has virtually no effect—the only relief that this Court is empowered to grant is a minuscule reduction from 61 months to 60 months in Dudek's custodial sentence.[1]

█ Nor does *Wills* help Dudek. Under that decision a motion by the United States for a downward departure under Guidelines § 5K1.1 (a motion that does not of course take effect unless it is granted by the district court) cannot limit the extent of the court's resulting exercise of its discretion when, under 18 U.S.C. § 3553(e), it determines the extent of the departure that should be attributed to the defendant's cooperation. Here Dudek's problem is that Rule 11(e)(1)(C) does not vest the sentencing court with any discretion at all—like the on-off alternatives that are provided by a diode or (in more modern terms) a computer chip, the court is limited to either accepting or rejecting the specific sentence that has been expressly agreed to in the Rule 11(e)(1)(C) plea. So *Wills* simply has no bearing here.[2]

In sum, Dudek's present effort to obtain relief must be rejected except in the most nominal of terms. Accordingly his motion is granted only to the extent that his sentence committing him to the custody of the Bureau of Prisons is reduced from 61 months to 60 months. In all other respects the sentence as originally imposed remains in effect.

**Gerrie STRAKA, Bonita Lumbrazo, and Mary Kay McSheffery, Plaintiffs,**

v.

**Bruce FRANCIS, Lincoln Francis, and Executive Flight Management/Trans American Charter, Ltd., Defendants.**

**No. 94 C 3236.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 14, 1994.

---

1. Beginning almost immediately after the November 1, 1993 effective date of the retroactive Guidelines amendment, this Court has reviewed other sentences based on LSD offenses and has granted relief on the basis permitted by that amendment (see, e.g., *United States v. Gaines*, 838 F.Supp. 377 (N.D.Ill.1993)). But particularly in light of the Supreme Court's decision in *Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), it must be understood that the Guidelines amendment has not issued a blank check to sentencing judges to grant retroactive relief to every defendant who was involved in an LSD offense. Indeed, this Court has been constrained to deny any relief whatever to Dudek's co-defendant Jason Cohn because under the circumstances of Cohn's conviction *Chapman* trumped the change in the Guidelines.

2. As Agreement ¶ 14 stated, Rules 11(c)(2) and (4) dictate that this Court's acceptance of the Rule 11(e)(1)(C) agreement foreclosed Dudek's ability to withdraw the plea.

Steven Michael Levin, Steven M. Levin & Associates, David B. Wilson, Levin & Perconti, Chicago, IL, for plaintiffs.

Bruce R. Alper, Janet Marie Hedrick, Michael Paul Nicolai, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendants.

### *MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.

Plaintiffs Gerrie Straka ("Straka"), Bonita Lumbrazo ("Lumbrazo"), and Mary Kay McSheffery ("McSheffery") filed this cause of action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. Sec. 2000e *et seq.,* the Civil Rights Act of 1991, and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"). Defendants in the case are Executive Flight Management/Trans American Charter, Ltd. ("Executive Flight"), and Lincoln and Bruce Francis (collectively, "the Individual Defendants"), who are pilots employed by and shareholders of Flight Management. Lincoln Francis is the President of the company and son of Bruce Francis. Plaintiffs allege that Defendants' acts of sexual harassment and age discrimination created a hostile and intolerable work environment causing Plaintiffs' resignation and constructive discharge on April 11, 1993. Defendants counter-claim that Plaintiffs' resignation caused Flight Management to lose business and they therefore seek damages in the amount of $350,000 and such other relief as this Court deems just and proper.

Defendants filed a partial motion to dismiss the Individual Defendants, claiming that individual employees of an employer may not be held personally liable under Title VII or the ADEA. Defendants also filed counterclaims including: tortious interference with a contract between Executive Flight and a client, David D. Linnemeier ("Linnemeier"), Director of Aviation for Huizenga Holdings, Inc. (Count I); breach of an employment contract alleged to exist between Executive Flight and Plaintiffs (Count II); promissory estoppel (Count III); and equitable estoppel (Count IV). Plaintiffs filed a motion to dismiss Defendants' counterclaims.

For the reasons stated below, the Court grants Defendants' partial motion to dismiss, and Plaintiffs' motion to dismiss Counts I, II, III, and IV of Defendants' counterclaims.

### *BACKGROUND*

Executive Flight is an Illinois corporation that provides charter airline passenger service throughout the United States. Plaintiffs are female residents of Illinois who were hired as flight attendants in September 1992 by Executive Flight. Plaintiffs were hired to provide flight attendant services for sports teams and were assigned to work pursuant to a 1992 contract negotiated in Florida between Executive Flight and Linnemeier for the Florida Marlins ("Marlins"). The contract was to provide charter jet service for the team during the 1993 professional baseball season. According to Defendants, Plaintiffs knew the contract with Linnemeier was the company's largest, that the Marlins were their most publicly recognized client, and that they were being hired and agreed to work on flights for sports teams.

Flight attendants for the Marlins' flights required training for a specially equipped DC-9 aircraft. Accordingly, Plaintiffs were trained between September 1992 and April of 1993. Their first flight with the Marlins occurred on April 1, 1993; it originated in Jacksonville, Florida and ended in Fort Lauderdale, Florida. On April 11, 1993, Plaintiffs were scheduled to work as attendants on a Marlins flight which was to depart Fort Lauderdale at 5:30 p.m. en route to San Francisco, California. Federal Aviation Administration ("FAA") regulations require two certified flight attendants on all flights, and the contract between Executive Flight and the Marlins included provision of three certified attendants on each flight. According to Defendants, Plaintiffs were aware of such regulations.

Executive Flight flew Plaintiff attendants from Chicago to Florida on April 9, 1993, two days prior to the scheduled departure. On April 10, Plaintiffs performed various routine duties in preparation for the April 11th flight, including catering arrangements and cabin preparation. According to Defendants, an unarranged congregation of Executive Flight employees and officers occurred during the evening of April 10 at a restaurant in Ft. Lauderdale. At this impromptu gathering were: Plaintiffs; Lincoln Francis, the scheduled captain for the April 11 Marlins flight; Bruce Francis; Steve Gaines, the scheduled co-pilot for the flight; Andy Townsend, a maintenance mechanic; and Linnemeier and his wife. Defendants allege that throughout the evening and beyond 9:30 p.m. Plaintiffs gave no indication of an intention to not work the Marlins flight the following day.

At about 2:00 p.m. on April 11, 1993, Plaintiffs telephoned Executive Flight's Chicago, Illinois office to provide notice that they were resigning. At some point during that same day, Plaintiffs also telephoned the caterer scheduled to provide meal service on the Marlins flight in an attempt to cancel the order. According to Defendants, Plaintiffs were aware of a provision in the Executive Flight–Marlins contract that required meal service, and that their resignation and cancellation of the catering order would prevent or substantially impede Executive Flight in discharging its contractual responsibilities.

Plaintiffs allege their continued employment was conditioned upon being subjected to repeated incidents of sexual harassment and age discrimination either participated in directly or condoned by the Defendant company through its officers, managers, and employees. Such incidents include alleged comments regarding Plaintiffs' physical appearance and attire, a lewd and lascivious gift from Defendant Bruce Francis to Plaintiff Lumbrazo, comments of a sexual nature regarding Lumbrazo's physical appearance and that Plaintiffs were too old to be flight attendants, suggestions that Plaintiffs should be "more friendly" with the players during flights and "not act like the players' mothers," and lewd and lascivious comments regarding sexual activity with Plaintiff Lumbrazo.

Plaintiffs further claim the repeated acts of sexual harassment and age discrimination caused their constructive discharge from work as of April 11, 1993; and that they, therefore, at that time telephoned their notice of resignation to Flight Management in Chicago.

## DISCUSSION

### I. DEFENDANTS' PARTIAL MOTION TO DISMISS

The Court will first address Defendants' motion to dismiss Individual Defendants Bruce and Lincoln Francis as defendants in this case. A Complaint should not be dismissed unless the court concludes beyond a doubt that plaintiffs can prove no set of facts to support their claim which would entitle them to relief. *Gorski v. Troy*, 929 F.2d 1183, 1186 (7th Cir.1991); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, the court assumes the truth of all well-pled allegations and makes all possible inferences in favor of the non-movant. *Falk v. U.H.H. Home Servs. Corp.*, 835 F.Supp. 1078, 1079 (N.D.Ill.1993). *Individual Liability under Title VII and the ADEA*

The question before the Court is a narrow one: whether individual employees of an employer may be held personally liable under the ADEA or Title VII for conduct or omissions constituting sexual harassment or fostering a hostile work environment. As a general rule, this Court, a majority of the courts in this district, the Seventh Circuit, and the Supreme Court have held that individual employees, regardless of their rank or authority within the employment entity, are not personally liable for conduct or omissions constituting sexual harassment or age discrimination under Title VII or the ADEA. *See, e.g., Hamilton v. City of Chicago*, 93 C 3342, 1993 WL 535351, 1993 U.S.Dist. LEXIS 17889 (N.D.Ill. Dec. 13, 1993); *Pelech v. Klaff–Joss, LP*, 828 F.Supp. 525, 529 (N.D.Ill.1993); *Pommier v. James L. Edelstein Enters*, 816 F.Supp. 476, 480–81

(N.D.Ill.1993); *Weiss v. Coca–Cola Bottling Co.,* 772 F.Supp. 407, 410 (N.D.Ill.1991); *Shager v. Upjohn,* 913 F.2d 398, 404 (7th Cir.1990); *Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 3104–06, 87 L.Ed.2d 114 (1985).

Title VII prohibits employers from discriminating against individuals on the basis of "race, color, religion, sex or national origin." 42 U.S.C. §§ 2000e–2e(a), (b). The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, *and any agent of such a person* ..." 42 U.S.C. § 2000e(b) (emphasis added). The ADEA limits liability to employers with 20 or more employees and similarly defines "employer" to include "agent[s]" thereof. 29 U.S.C. § 630(b).

Courts have interpreted this language differently. In particular, they have divided on whether, by using the term "agents" of employers in the definition of "employer" Congress intended to: 1) hold only employers liable for the illegal acts of their agents; 2) hold only the agents or employees liable for their individual illegal acts of discrimination; or 3) hold either the employer, the employee, or any combination thereof liable for discriminatory practices under Title VII and the ADEA. *See e.g., Shager v. Upjohn Co.,* 913 F.2d 398 (7th Cir.1990).

Plaintiffs attempt to rely on the third proposition by citing to *Tafoya v. Adams,* 612 F.Supp. 1097, 1104 (D.C.Colo.1985), in which the court noted, "Officials and supervisors having responsibility and power to employ personnel and to control their conditions of employment have been held subject to Title VII." [1] The *Tafoya* court held that a super-

visor who participated in managerial decisions had control over employment conditions, was in a position of responsibility and, therefore, an "agent" and "employer" within the meaning of Title VII.[2] *Id.* at 1105.

This Court recently made clear that "[A]n official-capacity suit is in all respects other than name to be treated as a suit against the entity." *Hamilton,* 1993 WL 535351 at *2, 1993 U.S.Dist. LEXIS 17889 at *5 (citing, *Kentucky v. Graham,* 473 U.S. at 165, 105 S.Ct. at 3104–05). Another district court in the Northern District held similarly that a plaintiff was precluded from holding her supervisors personally liable under Title VII or the Equal Pay Act. *Pommier v. James L. Edelstein Enters.,* 816 F.Supp. 476, 480–81 (N.D.Ill.1993). The court reasoned that to the extent such a supervisor is an "agent" of the employer, such individual stands only as a surrogate for the employer and, hence, may be held liable only in their official capacity. *Pommier,* 816 F.Supp. at 480–81. Similarly, the Weiss court recognized that the damages available under Title VII are damages which an employer, not an individual, would generally provide—i.e. "back-pay, reinstatement, etc." *Weiss* at 411.

Plaintiffs argue that this rationale, and therefore the line of cases supporting it, is inapplicable to their claim because they are seeking compensatory, punitive and non-pecuniary damages made available under the 1991 civil rights amendments. *See e.g.,* 42 U.S.C. § 1981a (1992 Supp.). The Ninth Circuit rejected this argument in *Miller* in favor of reliance on the alternative rationale that "[i]f Congress decided to protect small entities with limited resources from liability, it is inconceivable Congress intended to allow civil liability to run against individual employees."

**1.** *See e.g., Owens v. Rush,* 636 F.2d 283 (10th Cir.1980); *Gay v. Board of Trustees,* 608 F.2d 127 (5th Cir.1979); *Goodman v. Board of Trustees,* 511 F.Supp. 602 (N.D.Ill.1981); *Kelly v. Richland School Dist. 2,* 463 F.Supp. 216 (D.S.C. 1978); *Manley v. Mobile County, Ala.,* 441 F.Supp. 1351 (S.D.Ala.1977); *Padilla v. Stringer,* 395 F.Supp. 495 (D.N.M.1974); *Byron v. University of Florida,* 403 F.Supp. 49 (N.D.Fla.1975); *Schaefer v. Tannian,* 394 F.Supp. 1128 (E.D.Mich.1974); *Compston v. Borden, Inc.,* 424 F.Supp. 157 (S.D.Ohio 1976); *Curran v. Portland Superintending School Committee,* 435 F.Supp.

1063 (S.D.Maine 1977); *Jeter v. Boswell,* 554 F.Supp. 946 (D.W.Va.1983).

**2.** At least one court in this district has supported Plaintiffs' argument. In *Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769 (N.D.Ill.1993) (*cited in, Pelech,* 828 F.Supp. at 529), Judge Moran held that a plaintiff bringing a Title VII claim could proceed against an individual employee. However, the trend in the Northern District disfavors this position.

*Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587, n. 2 (9th Cir.1993). The court held further that because of the similarities in the Title VII and ADEA statutory schemes, the rule that individual defendants cannot be held liable for damages under Title VII is applicable to suits under the ADEA.[3]

 This Court declines to hold that employees are *per se* immune from all personal liability resulting from their individual discriminatory conduct or omissions under Title VII or ADEA claims. The Seventh Circuit and the United States Supreme Court have rejected erection of such a wall of immunity. *See e.g., Shager* at 405; and *Meritor* 477 U.S. at 72, 106 S.Ct. at 2408. The Supreme Court in interpreting the definition of "employer" in Title VII and the ADEA has held that it "surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Meritor* at 72, 106 S.Ct. at 2408. As *Shager* articulates, the threshold question is whether the Defendant employees were acting within the scope of their authority. *Id.*[4]

 Like the defendant supervisor in *Shager* who fired a subordinate allegedly on the basis of age, Lincoln and Bruce Francis, as company officials, had the sufficient "appearance of authority" necessary to impute liability to the employer entity. *Id.* The Individual Defendants in this case are not necessary parties to the Title VII or ADEA actions because the full measure of available relief is generally obtainable against the remaining corporate Defendant. *See, e.g.*

*Pommier*, at 478, 481. The Court therefore grants Defendants' partial Motion to Dismiss Plaintiffs' Title VII and ADEA claims against Individual Defendants Bruce and Lincoln Francis.

## II. *PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS*

In order to address Defendants' counterclaims, this Court must first address the issue of choice of law. Executive Flight proposes that the Court should apply Florida law to the counterclaims because the company's contract with the Marlins was negotiated in Florida, the first flight of each Marlins trip was to originate in Florida, and the alleged wrongful conduct (i.e. Plaintiffs' resignation and related acts) occurred in that State. Plaintiffs argue that Illinois law should govern the case.

 The Court's analysis, under the principles first announced in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), must be based on relevant State law. *Loucks v. Star City Glass Co.*, 551 F.2d 745, 746 (7th Cir.1977). Federal courts apply the choice-of-law test applicable to the State in which the Court sits. *Kafka v. Bellevue Corp.*, 999 F.2d 1117, 1121 (7th Cir.1993) (*citing, Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941)); *H.B. Fuller Co. v. Kinetic Systems, Inc.*, 932 F.2d 681, 685 (7th Cir.1991). Under Illinois choice-of-law principles, the court applies the law the parties understood would govern a case. In the absence of an expression of the parties' understanding, which is the situation

---

**3.** Although the Court refuses to adopt a per se rule against holding individuals personally liable in *any* case given the Seventh Circuit's dicta in *Shager*, 913 F.2d at 405, and the Supreme Court's language in *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), *see infra* note 3, the Court rejects the so-called *House* distinction between the ADEA and Title VII drawn by some courts. *House v. Cannon Mills Co.*, 713 F.Supp. 159, 160 (M.D.N.C.1988). *House* distinguished between Title VII and the ADEA because of the difference in the scope of relief (i.e., at the time, liquidated damages were available for willful violations of the ADEA, but not under Title VII) and because the ADEA incorporates the remedies and procedures of the Fair Labor Standards Act ("FLSA"). Since Congress has amended Title VII to allow

compensatory and punitive damages in a way that indicates individuals aren't liable for those damages under Title VII, and since the ADEA incorporates only selective provisions of the FLSA, but not specifically the FLSA definition of "employer," we find that the ADEA and Title VII claims in this cause of action should be treated similarly regarding available remedies and appropriate defendants. *See Miller* at 588, n. 3.

**4.** "If one low-level employee makes sexual advances to another, their conduct is so unrelated to the employer's business that the employer will ordinarily be excused from liability under the doctrine of respondeat superior; the employer's own fault must be shown." *Shager*, at 405.

in this case, courts apply a most-significant-relationship test to determine which State law should govern. *Kafka* at 1121; *Diamond State Ins. Co. v. Chester–Jensen Co.,* 243 Ill.App.3d 471, 183 Ill.Dec. 435, 445–46, 611 N.E.2d 1083, 1093–94 (1993); *Laport v. Lake Michigan Mgmt. Co.,* 252 Ill.App.3d 221, 192 Ill.Dec. 41, 46, 625 N.E.2d 1, 6 (1991); *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593 (1970).

The Illinois Supreme Court has held that the choice-of-law decision may be governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a relationship to the "general contract." *Hofeld v. Nationwide Life Ins. Co.,* 59 Ill.2d 522, 322 N.E.2d 454 (1975); Courts should also consider the relevant policies and interests of the forum and other interested States. *Diamond State,* 243 Ill. App.3d at 486, 183 Ill.Dec. 435, 611 N.E.2d 1083; *see also,* Restatement (Second) of Conflicts of Laws § 188 (1971).

In *Kafka,* an Illinois investor brought suit against California mortgage brokers for failing to honor alleged guarantees on promissory notes involving property located in California. The parties had not explicitly designated which body of law was to govern should a case arise. Emphasizing that the investments were made in California and the guarantees, if made, were transacted in California, the court held that under Illinois choice-of-law principles, California law governed the parties' dispute. *Kafka,* at 1121.

In *Diamond State Insurance,* the court held that Illinois law was properly applied to a declaratory judgment action seeking determination that plaintiff had no duty to defend a claim involving a faulty air-conditioning system installed in Illinois for which insurance policies were issued by authorized representatives listing Chicago addresses. *Id.* at 475, 183 Ill.Dec. 435, 611 N.E.2d 1083. The insured, a Pennsylvania corporation which maintained its principal place of business in Pennsylvania but engaged in business in other states, sought to have Pennsylvania law applied. The plaintiff was a Delaware

corporation with its principal place of business also in Pennsylvania. The insurance policies did not contain a choice-of-law clause and the trial court found Illinois had the most significant contacts with the policies given that the policies were issued by Illinois-based representatives, the insured risks were permanently located in Illinois, and an underlying claim was filed in Illinois. *Id.* at 475, 183 Ill.Dec. 435, 611 N.E.2d 1083.

As in *Kafka,* this Court has no indication that the parties at the time of hiring agreed upon what law would govern and, consequently, must apply the most-significant-relationship test.

Executive Flight's emphasis on the impromptu gathering at the Ft. Lauderdale restaurant, the scheduled departure and flight preparations conducted by the attendants in Florida, and Plaintiffs' resignation and attempt to cancel the catering order is misguided. Like the insurance policy in *Diamond Insurance* that involved signatures and performances by an insured in Pennsylvania and an insurer in Delaware, yet focused on an agreement and business relationship based in Illinois, this case involves an employment agreement and relationship formed and based in Illinois. *See e.g., Diamond Insurance* at 488, 183 Ill.Dec. 435, 611 N.E.2d 1083. Even if the place of performance was to occur predominantly in Florida, which is not clear from the facts presented, the acts in formation of the employment contract, if one exists, occurred by all parties in Illinois, the parties are domiciled in Illinois and must fly from Chicago to Florida prior to scheduled trips, and Plaintiffs' resignation was tendered to the Illinois office. These facts support a conclusion that Illinois is the State with the most significant relationship with the "occurrence and with the parties," as well as with the employment contract from which this litigation arises. *See e.g., Laport,* 192 Ill.Dec. at 46, 625 N.E.2d at 6.

Executive Flight's focus on the negotiations regarding the contract between the company and the Marlins is similarly misguided. Beyond showing the existence of that contract for the purpose of satisfying the elements of the tort of contractual interfer-

ence, the Marlins contract has only a tangential significance to the claims presented by the parties to this case and the employment relationship at issue. In addition, invoking Illinois substantive law in this case is supported by the fact that the underlying litigation, i.e. Plaintiffs federal claim, is filed in Illinois, and that application of Illinois law to Defendant's cross-claims does not appear contrary to the public policies of Florida. *See e.g., Diamond State,* 243 Ill.App.3d 471, 183 Ill.Dec. 435, 611 N.E.2d 1083 (1993).

This Court concludes that given that Illinois has more significant contacts with the hiring, training, and agreements made pursuant to the employment relationship at issue in this case, Illinois law should apply in interpreting the substance of any agreements made or breached between the parties and related claims.

A. *Tortious Interference of Contract— Count I*

■ To sustain a claim for tortious interference of a contract or business relationship, the plaintiff, or, in this case, Defendant-counterclaimant Executive Flight, must show: 1) the existence of a valid and enforceable contract between the plaintiff and another, 2) the defendant's awareness of this contractual relationship, 3) defendant's intentional and unjustified inducement of a' breach of the contract which causes a subsequent breach by the other, and 4) damages. *HPI Health Care v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 23, 545 N.E.2d 672, 676 (1989). Both parties agree that elements one, two and four of the above test have been satisfied. Both parties also focus their arguments on whether to satisfy the claim Executive Flight must show that it *fully* breached its contract with the Marlins because of Plaintiffs' conduct. However, case law suggests the pivotal question is whether Executive Flight has sufficiently pled that the Plaintiff flight attendants *intentionally* and *unjustifiably* induced their breach of contract, regardless of severity. *See, Worrick v. Flora,* 133 Ill.App.2d 755, 272 N.E.2d 708, 711 (1971); *HPI,* 131 Ill.Dec. at 24, 545 N.E.2d at 677; and *Mannion v. Stallings &*

*Co.,* 204 Ill.App.3d 179, 149 Ill.Dec. 438, 443–44, 561 N.E.2d 1134, 1139–40 (1990).

■ The Restatement provides that one who, without a privilege to do so, induces or otherwise purposefully causes a third person not to perform a contract with another . . . is liable to the other for resulting harm. *Worrick,* 272 N.E.2d at 711 (*citing,* 4 ˙Restatement of Torts, chap. 37 § 766). In international interference with contracts cases, courts will recognize a privilege when the defendant was acting to protect an interest which the law deems to be of equal or greater value than plaintiff's contractual rights. *HPI,* 131 Ill.Dec. at 24, 545 N.E.2d at 677; *Mannion,* 149 Ill.Dec. at 444, 561 N.E.2d at 1140. Plaintiff has the burden to plead and prove defendant's ˙interference with a contract was intentional and unjustified and must do more than present mere assertions. The claimant must set forth factual allegations from which ˙it can be inferred that defendant's conduct was unjustified. *Id.*

In *HPI,* the provider of pharmaceutical services and supplies sued hospital management firms and the trustee of bonds issued to finance acquisition of a hospital for tortious interference with a contract. The court held that the plaintiff failed to sufficiently allege the hospital management company's conduct was unjustified where the company was engaged in choosing when and to which creditors payments were to be made. *HPI,* 137 Ill.Dec. at 24, 545 N.E.2d at 677. The court noted that short of ˌtotally antagonistic or illegal conduct aimed at inducing a breach of contract, no cause of action existed. *Id.* at 25, 545 N.E.2d at 678. Conclusory statements are insufficient; the plaintiff must show intentional interference. *Id.* Other examples of interests or conduct held to be of equal or greater value than the plaintiff's contractual rights include First Amendment rights to petition government for redress, reporting the unauthorized practice of medicine, evaluations by hired professional consultants, attorneys rendering advice to clients, and corporate officers acting to influence actions of the corporation. *Mannion,* 149 Ill.Dec. at 444, 561 N.E.2d at 1140.

*Mannion* involved an employer's counterclaim for tortious interference with a busi-

ness expectancy, a claim with elements similar to those of interference with a contract. After the plaintiff signed a subcontracting agreement with a third party, plaintiff's employee, who was aware of the agreement, submitted a bid to and ultimately entered an identical contract with the third party. The pivotal issue was whether the plaintiff pled a lack of justification for the interference in light of defendant's claim that he shared patent rights related to the agreement. Finding that the plaintiff had exclusive rights to the patent and the employee had expressed "mere proprietary and economic interests" as justification for interfering with the contract, the court held that the plaintiff employer had sufficiently alleged intentional and unjustified tortious interference.

■ In this case, Executive Flight has not set forth specific facts alleging Plaintiffs resigned with the intent to interfere with Defendant's contract with the Marlins. Executive Flight also has not alleged any facts to show Plaintiffs were unjustified in tendering their resignation, particularly in light of the employment-at-will presumption. Given that Plaintiff's interests were not merely proprietary and economic, that it is not alleged they acted for the exclusive purpose to harm or antagonize Executive Flight, and that the telephone call to the catering service caused no damage, this Court finds that the Defendant-counterclaimant has failed to sufficiently allege the necessary elements of the tort of interference with a contract or business expectancy. Thus, Plaintiffs motion to dismiss Count I is granted.

### B. Breach of Contract—Count II

■ Defendant's second counterclaim is for breach of contract, which turns on the threshold question of whether the employment relationship between Executive Flight and its former employee flight attendants was of such a nature as to overcome a presumption of employment at will. The question of the existence of a contact is a matter

of law for determination by the court. *Bennett v. Evanston Hospital*, 184 Ill.App.3d 1030, 133 Ill.Dec. 113, 540 N.E.2d 979 (1989).

■ Absent a violation of clearly mandated public policy or a clear understanding to the contrary, employment contracts for indefinite periods are presumed to be terminable at will by either party for any reason or no reason, without cause and without liability. *Id.* at 1031, 133 Ill.Dec. 113, 540 N.E.2d 979 (*citing, Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 88 Ill.Dec. 628, 478 N.E.2d 1354 (1985)).[5] However, this presumption can be rebutted by the terms of an explicit contract. *Corcoran* at 612. To overcome the presumption, a party must demonstrate that a promise of permanent or fixed-duration employment was clear, definite, and supported by valid consideration. *Id. citing, Lee v. County of Cook*, 862 F.2d 139, 142 (7th Cir.1988); *Lamaster v. Chicago & N.E. Ill. D.C. of Carpenters*, 766 F.Supp. 1497, 1499 (N.D.Ill. 1991). Illinois courts have exhibited a certain degree of strictness when applying the "clear and definite" standard. *Lamaster* at 1504. Expressions of "hopes and intentions," and assertions that must be inferred from circumstances and indirect evidence are insufficient to withstand a motion to dismiss. *Corcoran* at 612; *Lamaster* at 1504.

■ Executive Flight contends that an oral promise by Plaintiffs to provide services for a specific duration on April 11th in exchange for compensation in the form of salary and benefits overcomes the presumption of employment at will and that failure to perform such services constitutes a breach of oral contract. Defendants rely on *Johnson v. George J. Ball*, 248 Ill.App.3d 859, 187 Ill.Dec. 634, 638, 617 N.E.2d 1355, 1359 (1993), in which the court held that a plaintiff's allegations were sufficient to state a cause of action for breach of an oral contract to employ plaintiff "through 1991" (emphasis added). However, the allegations set forth in that case were more specific and compelling

---

5. *See also, Johnson v. George J. Ball, Inc.*, 248 Ill.App.3d 859, 187 Ill.Dec. 634, 617 N.E.2d 1355 (1993); *Payne v. AHFI/Netherlands, B.V.*, 522 F.Supp. 18 (D.C.Ill.1980); *Buian v. J.L. Jacobs and Co.*, 428 F.2d 531 (7th Cir.1970); *Geva v. Leo Burnett Co., Inc.*, 931 F.2d 1220 (7th Cir. 1991); *Lamaster v. Chicago & N.E. Ill. D.C. of*

*Carpenters*, 766 F.Supp. 1497 (N.D.Ill.1991); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978); *Corcoran v. Chicago Park Dist.*, 875 F.2d 609, 610 (7th Cir.1989); *Loucks v. Star City Glass Co.*, 551 F.2d 745, 747 (7th Cir.1977).

than those presented here. The party alleging existence of a specific-duration contract in *Johnson* alleged not only that both parties contemplated the project in question to last "through 1991," but also that in reliance on that promise, he left a higher paying position, his wife quit her job, they sold their Michigan home, moved to Illinois, signed a contract to purchase a new home and, therefore, provided adequate consideration for the specific-term employment contract. *Id.* at 637, 617 N.E.2d at 1358. *See also, Buian v. J.L. Jacobs and Co.,* 428 F.2d 531 (7th Cir.1970); *Payne v. AHFI/Netherlands, B.V.,* 522 F.Supp. 18 (N.D.Ill.1980).

In contrast to *Johnson,* Executive Flight fails to allege specific facts evidencing a clear and definite promise or a bargained-for exchange regarding a fixed-term employment contract. The facts as presented by Executive Flight do not support a conclusion that these parties contemplated or specified a contractual duration of one day, April 11. Conclusory statements that Plaintiffs made an oral promise to provide services on a particular day, or were hired at a monthly or annual salary, if no duration is specified, are insufficient to overcome the at-will presumption. *Johnson,* 187 Ill.Dec. at 638, 617 N.E.2d at 1359.

At most, the flight from Chicago to Florida on April 9, the catering and cabin preparations, and the absence of any indication on the evening of April 10 at a restaurant gathering that Plaintiff flight attendants planned to not work April 11 provided Executive Flight with an expectation that the employment relationship would continue. However, absent some facts alleging a mutual, clear and explicit agreement supported by adequate consideration to maintain an employment relationship for a fixed duration, this Court cannot find that the Defendant-counterclaimant in this case has overcome the employment-at-will presumption. In the absence of such a contract for employment, the Court grants Plaintiffs' motion to dismiss Defendant's breach of contract counterclaim.

C. *Promissory and Equitable Estoppel— Counts III & IV*

In Count III Defendants allege that Executive Flight relied to its detriment on Plaintiffs' unambiguous promise to work the April 11, 1993 flight and that Plaintiffs should be held liable for Executive Flight's reliance expenses. In Count IV Defendants allege that Plaintiffs intentionally misled them to believe the flight attendants intended to work on the April 11 flight. The claims are substantially similar and will be combined for the purposes of this discussion.

Illinois at one time maintained a distinction between promissory estoppel and equitable estoppel, but those doctrines today overlap significantly. *See e.g., Geva v. Leo Burnett Co.,* 931 F.2d 1220, 1223 n. 3 (7th Cir.1991). To withstand a motion to dismiss a claim for promissory estoppel, one must sufficiently allege: 1) an unambiguous promise by promisor, 2) upon which the promisee would reasonably and foreseeably rely, 3) and upon which the promisee actually relied, 4) with such reliance resulting in damages. Restatement (Second) Contracts § 90(1) (1981); *See also, Geva* at 1223; *Falk v. U.H.H. Home Services Corp.,* 835 F.Supp. 1078 (N.D.Ill.1993); *Quake Cons., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (1990). Promissory estoppel can be invoked in contract and non-contract settings, the promise may be inferred from words and conduct, and in employment situations the alleged promise need not be for any fixed-duration. *Falk* at 1079–81; *Geva* at 1223. However, Illinois courts have resisted the use of an overly permissive use of promissory estoppel in employment settings as a means to undermine the presumption of employment at will. *Falk* at 1080.

Defendants rely on *Falk* to support their argument and, like the plaintiffs in *Falk,* the only element Plaintiff flight attendants challenge in this case is whether Defendants sufficiently allege an unambiguous promise given their employment-at-will status. In *Falk,* the court held that an employee had sufficiently stated a claim for promissory estoppel where she alleged she was informed that a new position in Chicago would increase her responsibilities and rank in the company, require extensive travel and expand her presence in the entire metropoli-

**778**

tan area. She met with the Vice President of the company to discuss her potential new job responsibilities, and attached notes from that encounter to her complaint. The plaintiff in *Falk* had moved from Boston, given up a lucrative position and home in order to adopt new responsibilities in Chicago.

The court found that the plaintiff did not sufficiently allege a promise for fixed-term employment sufficient to overcome the employment-at-will presumption. However, it held that the plaintiff did state a claim regarding a promise for a certain type of employment upon which she relied to her detriment. However, where ambiguity exists such that it becomes uncertain whether a contract exists, the claim will fail. *See, e.g. Camosy Inc. v. River Steel Inc.*, 253 Ill. App.3d 670, 191 Ill.Dec. 706, 709–10, 624 N.E.2d 894, 897–98 (1993); *LaBolle v. Metropolitan Sanitary Dist.*, 253 Ill.App.3d 269, 195 Ill.Dec. 748, 752, 629 N.E.2d 56, 60 (1992).

The Plaintiff flight attendants in this case make the same error as the Defendant employer in *Falk*; they argue broadly that the "promise" for a promissory estoppel claim must allege the existence of a promise to [be] employ[ed] for a certain duration. *Id.* at 1081. While this is not the case, Defendant Executive Flight fails to present a claim that an unambiguous promise was made for anything other than employment for a fixed duration—services on April 11. Given that shortfall and that Defendants have not alleged more than a vague promise or intention to perform particular services on that day, the Court cannot find that Executive Flight has pled an unambiguous promise sufficient to support a promissory or equitable estoppel claim. Therefore, Plaintiff's motion to dismiss Counts III and IV of Defendants' counterclaims is granted.

### CONCLUSION

Based on the reasoning stated above, the Court grants Defendants' partial motion to dismiss the Individual Defendants as parties to Plaintiffs' Title VII and ADEA claims, and grants Plaintiffs' motion to dismiss Defendants counterclaims Counts I through IV.

The Court has engaged in a lengthy legal discussion of the various claims involved in this matter and is still left with this query: Having established to this Court's satisfaction that they were at-will employees and that their tenure involved such a short period of time, what relief do the plaintiffs see that they are entitled to? The Court wishes to see the parties in chambers to explore this question on the date provided on the front of this order.

**FALCON ASSOCIATES, INC., Plaintiff,**

v.

**CITY OF O'FALLON, ILLINOIS, Defendant.**

**No. 94–CV–301–WDS.**

United States District Court, S.D. Illinois.

Aug. 11, 1994.

Thomas E. Berry, Jr., McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, MO, for plaintiff.

Robert E. Becker, Kassly, Bone, Becker, Dix, Reagan & Young, P.C., Belleville, IL, for defendant.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

Before the Court is defendant's motion to dismiss plaintiff's complaint, and plaintiff's motion to strike defendant's reply to plain-

tiff's response. This cause of action arises from the alleged failure of the defendant to provide water supply to the Misty Valley and Thornbury Hills subdivisions developed by the plaintiff, a residential developer. The defendant provides water services to subdivisions after they make the proper application for these services, in accordance with the O'Fallon Municipal Ordinances. Upon application and payment of fees, the defendant will enter into a written contract to provide water services to a residence.

The record reveals that the plaintiff is currently involved in a labor dispute with Local 670 of the Laborers' International Union of the North America (Local 670). Employees of both the plaintiff and defendant include Local 670 members. In May of 1993, plaintiff established a neutral gate at both subdivisions, which Local 670 has honored. However, plaintiff alleges that defendant has refused to enter the neutral gate to connect plaintiff's residences to the water works systems.

To sustain a dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), the Court must take all well-pleaded allegations as true and construe the complaint in the light most favorable to the plaintiff to determine whether it is entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). "The issue is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

### SECTION 1983 CLAIMS

Counts I and IV of the complaint assert federal question jurisdiction. Count I alleges breach of contract, and Count IV alleges breach of fiduciary duty. Both counts seek relief under the National Labor Relations Act. 29 U.S.C. § 151 *et seq.* Relying on *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), plaintiff asserts that both counts set forth a claim under 42 U.S.C. § 1983, and that the NLRA provides the federal right which has been violated.

In a § 1983 claim, the plaintiff must allege first that the defendant's action against it was taken under the color of state law, and that the action was undertaken pursuant to a plan or policy that could justify imposition of liability on the municipality. *Yeksigian v. Nappi,* 900 F.2d 101, 104 (7th Cir.1990). This official policy or governmental usage or custom need not be formally approved or authorized. *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690–691, 98 S.Ct. 2018, 2035–2036, 56 L.Ed.2d 611 (1978). The NLRA provides a right against governmental interference in the bargaining process. *Golden State,* 493 U.S. at 108, 110 S.Ct. at 449. Plaintiff alleges that the Mayor of O'Fallon announced a policy which required the defendant to refrain from connecting plaintiff's residences to the water works system until the labor dispute was resolved. This policy addresses conduct of the plaintiff unrelated to the obligation of the defendant to connect residences to defendant's water works system. Therefore, plaintiff has alleged that the purpose underlying the policy is interference in the bargaining process, which constitutes a claim that the defendant was acting in the capacity of a regulator, which is an action taken under the color of state law. *Building & Construction Trades Council v. Associated Builders,* —— U.S. ——, ——, 113 S.Ct. 1190, 1197, 122 L.Ed.2d 565 (1993). Therefore, Count I sufficiently alleges a *§ 1983* claim to withstand a motion to dismiss. The Court finds, however, that Count IV is duplicative of Count I, and therefore is **DISMISSED.**

### BREACH OF CONTRACT

Defendant asserts that Count II is subject to dismissal for failure to sufficiently allege the existence of a contract. Under Illinois law, a complaint based upon breach of contract must allege the existence of the contract purportedly breached by the defendant, the plaintiff's performance of all contractual conditions required of it, that the defendant breached the contract, and the existence of damages as a consequence of the breach. *Martin–Trigona v. Bloomington Fed. Sav. & Loan Ass'n,* 101 Ill.App.3d 943, 57 Ill.Dec. 348, 351, 428 N.E.2d 1028, 1031 (1981). *See also, Derson Group Ltd. v. Right*

*Mgt. Consultants, Inc.*, 683 F.Supp. 1224, 1230 (N.D.Ill.1988). Under federal notice pleading standards, a complaint is adequate if it notifies the defendant of the claims brought against it. 5 Wright and Miller, *Federal Practice and Procedure* § 1216 (1990) ("[R]elief-claiming pleadings need not state with precision all elements that give rise to a legal basis for recovery as long as fair notice of the nature of the action is provided."). In Illinois, the "legal relationship between a municipality engaged in the business of furnishing water to its inhabitants and a water consumer is essentially one of contract." *Brooks v. Village of Wilmette*, 72 Ill.App.3d 753, 28 Ill.Dec. 934, 937, 391 N.E.2d 133, 136 (1979), and a municipal ordinance applicable to a contract becomes an implied term of the contract by operation of law. *Id.* The Court finds, therefore, that Count II sufficiently alleges a claim based on breach of contract to survive the motion to dismiss.

### BREACH OF FIDUCIARY DUTY

 In Count III, plaintiff alleges that defendant breached its fiduciary duty by refusing to connect plaintiff's residences to its water works system, and that the defendant has exclusive control over municipal water works system and is the sole provider of potable water. Plaintiff asserts that defendant's exclusive control of the supply of potable water, an essential service, establishes a fiduciary duty. Under Illinois law, a fiduciary relation arises only if "one person has reposed trust and confidence in another who thereby gains influence and superiority over the other." *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir.1992), *quoting Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir.1990). The relationship need not be legal, but may be moral, social, domestic, or merely personal. *Coppens v. Coppens*, 395 Ill. 326, 70 N.E.2d 54, 59–60 (1946). In this case, plaintiff has not alleged that defendant's superiority resulted in influence, nor that plaintiff placed any trust in the defendant. Therefore, the claim of breach of fiduciary duty must fail. Accordingly, the Court GRANTS defendant's motion to dismiss Count III of plaintiff's complaint for failure to allege a breach of fiduciary duty.

### PRE–EMPTION OF STATE CLAIMS

 The defendant claims that Illinois Public Labor Relations Act (IPLRA) pre-empts all state claims, 5 ILCS 315/1 *et seq.*, and therefore, Counts II and III are subject to dismissal. The Court finds, however, that the policy section of IPLRA makes clear that the purpose of the Act is to regulate labor relations *between public employers and employees.* 5 ILCS 315/2. Under IPLRA, "public employee" and "employee" are synonymous, and are defined as those individuals employed by a public employer. 5 ILCS 315/3(n). Plaintiff has not alleged a dispute between defendant and the defendant's employees. Moreover, plaintiff is not a public employer and its employees are not public employees under IPLRA. Therefore, the Court finds that IPLRA does not pre-empt plaintiff's state-law claim.

Accordingly, the Court DENIES defendant's motion to dismiss Counts II and III as pre-empted by the IPLRA.

### CONCLUSION

Accordingly, the Court GRANTS in part and DENIES in part defendant's motion to dismiss. The Court GRANTS defendant's motion to dismiss Count III of the complaint for failure to allege a fiduciary duty and Count III is DISMISSED. The Court GRANTS defendant's motion to dismiss Count IV as duplicative of Count I, and Count IV is DISMISSED. The Court DENIES defendant's motion to dismiss Counts I and II.

The Court DENIES as moot plaintiff's motion to strike defendant's reply to plaintiff's response to defendant's motion for dismissal.

IT IS SO ORDERED.

**782**

ELKHART BRASS MANUFACTURING
COMPANY, INC., Plaintiff,

v.

TASK FORCE TIPS, INC., Defendant.

No. 3:93cv732 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

July 12, 1994.

Steven K. Like, Warrick Weaver and
Boyn, Elkhart, IN, Terence J. Linn, Barry
C. Kane, Price Heneveld Cooper DeWitt and
Litton, Grand Rapids, MI, for plaintiff.

Edward W. Hardig, Hardig Lee and
Groves, South Bend, IN, Donald J. Brott,
Chicago, IL, Edward M. O'Toole, Jeffry W.
Smith, Jane Choi Forest, Marshall O'Toole
Gerstein, Murray and Borun, Chicago, IL,
for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I. Procedural History

On October 15, 1993, the plaintiff, Elkhart
Brass Manufacturing, Inc., ("Elkhart") filed
its complaint with this court, alleging that
the defendant, Task Force Tips, Inc.,

("TFT"), is infringing Patent No. 4,674,686. The plaintiff also made a jury demand. On November 2, 1993, the defendant filed its answer and counterclaim. In its counterclaim, the defendant demands a declaratory judgment of patent invalidity and noninfringement. The parties agree that this court has jurisdiction pursuant to 28 U.S.C. § 1338, and venue is proper under 28 U.S.C. § 1391 and 1400. This court granted the parties' motions for protective order on December 3, 1993. On April 18, 1994, the plaintiff filed its motion for partial summary judgment on defendant's affirmative defense and counterclaim. On April 22, 1994, the defendant filed its motion for summary judgment. On May 2, 1994, the defendant filed its cross motion for summary judgment of unfair competition. This court has jurisdiction over the unfair competition claim pursuant to 28 U.S.C. 1338(b). Oral argument was heard in this court in South Bend, Indiana, on May 19, 1994.

## II. Standard of Review

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)[1]; and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of

material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990).

During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–255, 106 S.Ct. at 2512–2514.

The 1986 Supreme Court trilogy was recently re-examined in *Eastman Kodak v. Image Technical Services,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Kodak* is that it did not tinker with *Celotex* and *Anderson,* and possibly involves an attempt to clarify *Matsushita.* This view is well supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441 (1992).

---

1. For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

## III. Issues Presented

As an initial matter, the plaintiff argues that this court should deny the defendant's motion for leave to amend its answer and counterclaim. The plaintiff alleges infringement of its letters patent No. 4,674,686, issued to James M. Trapp on June 23, 1987, for his "portable fire apparatus monitor." Complaint at 1. The defendant has counterclaimed, in addition to requesting a declaratory judgment on the same claim, that the plaintiff's inequitable conduct renders the patent invalid. Further, the defendant alleges common law unfair competition as a result of the plaintiff's notice to customers.

## IV. Motion for Leave to Amend Answer and Counterclaim

■ The plaintiff argues that the defendant's motion for leave to amend its answer and counterclaim to include the allegations of inequitable conduct and unfair competition should be denied. Plaintiff's Memorandum in Opposition to Defendant's Motion for Leave to Amend its Answer and Counterclaim at 1. The plaintiff argues that the defendant's second counterclaim for unfair competition is insufficient, as the "conclusory allegations are not in any way supported by the underlying evidence relied upon in support of Defendant's Motion to Amend." *Id.* at 4. Further, the plaintiff argues that the defendant has failed to plead its claims of plaintiff's alleged inequitable conduct with particularity as required by Fed.R.Civ.P. 9(b). *Id.* at 2–3. Elkhart also claims that the inequitable conduct defense and counterclaim is all too automatic in patent cases, including this one. The defendant acknowledges this concern in its brief, and argues that its claim is based on facts as alleged. In *Burlington Industries, Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422, Judge Mayer expressed exasperation with this practice:

[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps. They get anywhere with the accusation in but a small percentage of the cases, but

such charges are not inconsequential on that account. The destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself. A patent litigant should be made to feel, therefore, that an unsupported charge of "inequitable conduct in the Patent Office" is a negative contribution to the rightful administration of justice. The charge was formerly known as 'fraud on the Patent Office,' a more pejorative term, but the change of name does not make the thing itself smell any sweeter. *Id.*

While this court takes the same dim view of defendants who use this defense as a tactical device, this court finds that this defendant has not demonstrated bad faith or undue delay in this case. Further, and without engaging in a drawn-out analysis of whether Fed.R.Civ.P. 9(b) applies to the issue of inequitable conduct, the court finds that this argument is quibbling; the defendant has laid out its factual background for both claims. Thus, the defendant's motion to amend its answer and counterclaim is **GRANTED.**

## V. Discussion

### A. *Inequitable Conduct*

Both the plaintiff and defendant have filed for summary judgment, in whole or part, on various issues. As an initial matter, this court addresses the application of Fed. R.Civ.P. 56 in patent cases:

The summary judgment procedure of rule 56, Fed.R.Civ.P., applies to actions involving patents and the problem, as in other civil actions, is to determine whether there is any triable issue of fact or whether the movant is entitled to judgment as a matter of law. 6 Moore's Federal Practice ¶ 56.17[44], at 56–992 to 56–993 (2d ed. 1980). Thus, summary judgment may be rendered on the issues of validity and enforceability where, from the pleadings and extraneous materials, only a question of law emerges and the court can say that the patent is invalid or unenforceable. *Id.* at

56–993. However, a patent case is not ripe for summary judgment on the issues of validity or enforceability where the technical aspects are not readily comprehensible by one unskilled in the art, where the record is inadequate to decide the issue, where there is a need for expert testimony, where the expert testimony submitted is conflicting, or where there is some other genuine issue of material fact. *Id.* at 56–998 to 56–999. Furthermore, the court should not resolve a genuine issue of credibility on a motion for summary judgment. *Id.* ¶ 56–15[4]. at 56–519.

*Acoustiflex Corp. v. Owens–Corning Fiberglas Corp.,* 572 F.Supp. 936, 937 (N.D.Ill.1983).

The defendant bases its assertion of patent invalidity on alleged inequitable conduct by the plaintiff. Earlier analyses of patent invalidity labelled such conduct as "fraud on the PTO." In his seminal opinion, Judge Markey distinguished "fraud" from "inequitable conduct:"

> Because the "fraud" label can be confused with other forms of conduct, this opinion avoids that label and uses "inequitable conduct" as a more accurate description of the proscribed activity, it being understood that the term encompasses affirmative acts of commission, *e.g.,* submission of false information, as well as omission, *e.g.,* failure to disclose material information.

*J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.* 747 F.2d 1553, 1559 (Fed.Cir.1984).

■ As an initial threshold, this court notes that while summary judgment is appropriate in patent cases, granting summary judgment on issues of inequitable conduct must be approached cautiously:

> The material facts upon which a holding of inequitable conduct rests relate to both the intent of the actor and the materiality of the information. These two factors are considered in light of each other. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1363, 220 USPQ 763, 773 (Fed.Cir.) (citing 37 C.F.R. 1.56(b), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984)). If the facts of materiality or intent are reasonably disputed, the issue is not amenable to summary disposition. *KangaROOS U.S.A., Inc.* [v. Caldor,

Inc.], 778 F.2d 1571, 1577, 228 USPQ 32, 36 (Fed.Cir.1985).

*Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1565–66 (Fed.Cir.1987).

Notwithstanding this standard, the defendant has a tough row to hoe on this issue. Summary judgment cannot be lightly granted on the issue of inequitable conduct: "A *summary judgment* that a reputable attorney has been guilty of inequitable conduct, over his denials, ought to be, and can properly be, rare indeed." *Burlington Industries,* 849 F.2d at 1422.

■ The defendant conceded in oral argument that its burden in proving inequitable conduct is heavy; it bears the burden of establishing by clear and convincing evidence that inequitable conduct on the part of the plaintiff occurred during the application process. Judge Markey, in *J.P. Stevens,* 747 F.2d 1553, found the PTO standard the appropriate starting point, since it clarifies how business with the PTO should be conducted:

> PTO Rule 1.56(a), *i.e.,* whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent.... Under the standard, a reference that would have been merely cumulative is not material.

*Id.* at 1559–60 (citations omitted). This case also defined the standard of threshold intent in inequitable conduct issues:

> That intent need not be proven with direct evidence. *Hycor* [Corporation v. Schlueter] 740 F.2d [1529] at 1540, 222 USPQ [1529] at 561. It may be proven by showing acts the natural consequences of which are presumably intended by the actor. *American Hoist,* 725 F.2d at 1363, 220 USPQ at 773; *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151, 219 USPQ 857, 862 (Fed.Cir.1983). Proof of deliberate scheming is not needed; gross negligence is sufficient. *Hycor,* 740 F.2d at 1540, 222 USPQ at 561. Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of a withheld reference. *Driscoll v. Cebalo,* 731 F.2d [878] at 885,

221 USPQ [745] at 751 [(Fed.Cir.1984)]; *Kansas Jack, Inc v. Kuhn,* 719 F.2d at 1152, 219 USPQ at 862. On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. *Orthopedic Equip. Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1383, 217 USPQ 1281, 1286 (Fed.Cir.1983). Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred. *American Hoist,* 725 F.2d at 1364, 220 USPQ at 774. If the court reaches that conclusion, it must hold that the patent claims at issue are unenforceable.

*J.P. Stevens,* 747 F.2d at 1560. It is TFT in this case that must prove invalidity:

> A patent is presumed valid, and the burden of persuasion to the contrary is and remains on the party asserting invalidity. In addition, the party asserting invalidity also bears the initial procedural burden of going forward to establish a legally sufficient *prima facie* case of invalidity. If this burden is met, the party relying on validity is then obligated to come forward with evidence to the contrary. Before rendering its judgment, the court must determine whether "all of the evidence establishes that the validity challenger so carried his burden as to have persuaded the decision-maker that the patent can no longer be accepted as valid."

*Ralston Purina Co. v. FAR–MAR–CO, Inc.,* 772 F.2d 1570, 1573 (Fed.Cir.1985) (citations omitted).

In 1987, however, the Federal Circuit reanalyzed the culpability prong of the inequitable conduct doctrine. In *FMC Corp v. Manitowoc Co, Inc.,* 835 F.2d 1411 (Fed.Cir. 1987), Judge Markey established a more precise standard than "gross negligence:"

> To be guilty of inequitable conduct, one must have intended to act inequitably. Thus, one who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art of information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an *intent to mislead* the PTO.

*Id.* at 1415.

In this case, the defendant is alleging that Elkhart withheld material prior art from the patent office. There is debate between the parties whether the plaintiff knew how material it was and whether it intentionally withheld this art. The next logical inquiry is whether the plaintiff knew that it would not be granted a patent for its hose coupling if the patent examiner had been presented with the other types of couplings at issue: the British Instantaneous Coupling (BIC), the Jones Coupling and the Darley snap connector. Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment of Inequitable Conduct at 4.

Without wading into a detailed comparison of the parties' arguments, this court finds that the facts of this case are not ripe for summary judgment. The defendant has not established its claim by clear and convincing evidence. Material facts are at issue as to the plaintiff's intent and the couplings' materiality. Thus, the court **DENIES** all motions for summary judgment on the issue of inequitable conduct.

## B. *Bifurcation of Inequitable Conduct Issue*

The plaintiff requests, in the alternative, that the inequitable conduct issue be bifurcated and tried to the bench prior to the jury trial. In *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209 (Fed.Cir.1987), as in the case before this court, a jury had been requested; however, the judge separated the inequitable conduct issue from the jury trial on infringement. In *Gardco,* Judge Markey held that "[s]uch a separation is precisely the type contemplated by Rule 42(b) and does not run afoul of the Seventh Amendment." *Id.* at 1213.

TFT argues that "the request is premature, and that the request for bifurcation has not been made by way of a *formal motion.*" Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment of Inequitable Conduct at 19. This

case, as evidenced in the conclusion of this memorandum, has more than its fair share of motions so far. This judge can, however, and does, bifurcate the inequitable conduct issue, to be followed by a jury trial on remaining issues. Thus, the plaintiff's request for bifurcation of the inequitable conduct issue is **GRANTED.**

### C. *Unfair Competition Claim*

■ The plaintiff alleges that TFT's unfair competition claim arises under Indiana law, not federal law, and that TFT has not specified the type of Indiana common law unfair competition action it relies on. Plaintiff's Reply Memorandum at 12. In this case, the plaintiff has not specified federal protection, and, as this judge wrote in a trademark case with claims of unfair competition:

> In analyzing plaintiff's state law claim of unfair competition, this court must look to Indiana law because this cause of action arose in Indiana.

*General Elec. Co. v. Speicher,* 676 F.Supp. 1421 (N.D.Ind.1988). The obvious point the plaintiff is making is that, under Indiana law, the defendant is hard pressed to make a claim under tortious interference with contract or "malicious interference with TFT's advantageous business relationships." Defendant's Memorandum in Support of its Motion to Amend.

TFT argues that Elkhart's notification of the pending lawsuit constitutes unfair competition. TFT claims that Elkhart has threatened lawsuits it would not carry out, thereby going beyond the perimeter of permissible notification. Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment at 17–18. This position is certainly supported by *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700 (Fed.Cir. 1990), which held that:

> Infringement notices have been enjoined when the patentee acted in bad faith, for example by making threats without intending to file suit, *Betmar Hats, Inc. v. Young America Hats, Inc.,* 116 F.2d 956, 48 USPQ 266 (2d Cir.1941); or when the patentee had no good faith belief in the validity of its patent, *Magnetic Engineering &*

*Mfg. Co. v. Dings Mfg. Co,* 178 F.2d 866, 84 USPQ 105 (2d Cir.1950).

*Id.* at 710. The plaintiff has attempted here to make out just such a case. The defendant first claims that Elkhart does not present evidence of its good faith in distributing these notices, and then departs from the premise that notices of infringement are presumed made in good faith. Thus, the burden is on TFT to demonstrate that Elkhart acted in bad faith, and the defendant claims that it has submitted sufficient evidence to overcome this presumption.

This court has studied "Product Update," the one-page document that Elkhart distributed to its distributors and, on down the line, to the subsequent customers. Product Update (attached as Appendix A). Specifically, the defendant has objected to the scope of the distribution of this document:

> The "Product Update" was indiscriminately distributed to distributors, dealers and end users. *See Int'l Industries & Developments, Inc. v. Farbach Chemical Co.,* 241 F.2d 246, 248 (6th Cir.1957) (where bad faith found when patentee sent notices indiscriminately to all members of the trade). This coupled with the fact that Elkhart had *no* intention of suing anyone other than TFT reveals that Elkhart's motive in sending these notices was *not* to protect its patent rights. Rather, Elkhart intended to compete unfairly with TFT by interfering with the continuing and prospective relationships between TFT, and its distributors and end users.

*Id.* at 18. This assertion does not rise to the level of informing the whole trade, nor is this court persuaded that Elkhart had no right to inform those selling the allegedly infringing hose couplings of the suit. Likewise, the court finds the defendant's arguments that the "Product Update" is deficient in fulfilling the requirements for notice lacking merit. This court finds, that notwithstanding which tort law would apply, the analysis must start with the presumption that the notification was valid, and the plaintiff's right to notification:

> [T]he district court's stated grounds can not support an injunction against giving notice to those directly involved in the

asserted infringement. The court's discretionary authority does not, under these circumstances, extend to requiring the patentee to remain silent, even as it publicly litigates issues of direct concern to the objects of the intended notice. *See generally Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 14 USPQ2d (Fed.Cir.1990) (vacating preliminary injunction against filing infringement suits). *Mallinckrodt*, 976 F.2d at 710. The defendant argues that the notification entailed in this case extended beyond the group of possible defendants. Specifically, and by elaborate argument, the defendant claims that since Elkhart would not benefit from bringing suit against the customers of this product, its notification constitutes a mere threat. As quoted in *Mallinckrodt*, it is "not an actionable wrong for one in good faith to make plain to whomsoever that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those rights are." *Mallinckrodt*, 976 F.2d at 710, quoting *Kaplan v. Helenhart Novelty Corp.*, 182 F.2d 311, 314, 85 USPQ 285, 287 (2d Cir.1950). The defendant relies on *Coal Processing Equipment, Inc. v. Campbell*, 578 F.Supp. 445, 464 (S.D.Ohio 1981), to further illustrate notifications that exceed the good faith belief:

> [T]he letters are neither specific as to the equipment accused or the exact nature of the alleged infringement. The letters did not contain enough information to permit substantiation or verification by the addressees. Further, there was no evidence other than the letters that Dr. Campbell intended to bring suit.

*Id.* The defendant's efforts to analogize this case fail; in its analysis of showing bad faith, the court in *Coal Processing* noted that the plaintiff failed to call a material witness; the plaintiff interfered directly with a contract whose social value outweighed his patent rights, and the record reflected a history of ill will. *Id.* at 464. The court elaborated on the factual occurrences of ill will and bad faith. This court does not find any such evidence here. The plaintiff has the presumption of good faith as to his infringement filing, and the defendant has not presented evidence to overcome this presumption. Having found no bad faith, this court does not need to wade into whether the higher standard under Indiana law has been met.

Thus, this court **GRANTS** the plaintiff's partial summary judgment motion on the issue of unfair competition, and **DENIES** the defendant's cross-motion on the same.

## V. Conclusion

Based on the above analysis, the defendant's motion to amend its answer and counter claim is **GRANTED.** The defendant's motion for partial summary judgment on its affirmative defense of inequitable conduct as well as its counterclaim for declaratory judgment on the issue of inequitable conduct are **DENIED.** The plaintiff's motion for partial summary judgment on defendant's affirmative defense and counterclaim is **DENIED.** The defendant's cross-motion for summary judgment of unfair competition is **DENIED.** The plaintiff's motion for summary judgment of unfair competition is **GRANTED.** The plaintiff's request for bifurcation and bench trial of the inequitable conduct issue is **GRANTED.** As to the issues beyond this threshold bench trial, the defendant's motion for summary judgment of noninfringement and failure to comply with best mode requirement is **DENIED.** The bench trial on the issue of inequitable conduct is set for August 25, 1994, at 9:30 a.m.

APPENDIX A

# PRODUCT UPDATE

## Elkhart Brass Files Patent Infringement Lawsuit Against TFT

Elkhart, Indiana...

For nearly a century, Elkhart Brass has been a pacesetter in the design and manufacture of fire fighting and fire protection equipment. Among the company's numerous innovations are the industry's first fog nozzle and the versatile, and patented, STINGER® portable monitor.

To answer your many questions and concerns about the similarities of Task Force Tips' Crossfire monitor to the STINGER® we thought you should be aware that Elkhart Brass has filed suit in the United States District Court for the Northern District of Indiana asserting patent infringement by Task Force Tips (TFT), according to an announcement by Tony Ashbaugh, Vice President, Sales.

It is important to understand that, should the Crossfire monitor be found to be an infringement as alleged in the complaint, not only would TFT be liable as the manufacturer of Crossfire, but those who sell or use this device would also be in violation of the patent laws.

"The lawsuit asserts that in introducing TFT's new Crossfire monitor, TFT infringed Elkhart Brass's patent rights which protect our STINGER® monitor, under United States Patent No. 4,874,686," Ashbaugh explained. "The patent law, 35 U.S.C.271, provides that not only is the manufacturer of an infringing device a direct infringer, but those who sell or use an infringing device are direct infringers as well," he added. "At Elkhart Brass, we believe the STINGER® is America's best, and we're standing behind it all the way."

There's only one STINGER® brand monitor and it's only from Elkhart Brass. If you have any questions about this action, don't hesitate to call Tony Ashbaugh.

Elkhart Brass Mfg. Co., Inc.
P.O. Box 1127
Elkhart, IN 46515
(219) 295-8330
Fax: 219-293-9914

DEFENDANT'S
EXHIBIT
NO. 106

Lisa C. VANDEVENTER, Douglas L. Feltner, Rita Phelps, Brandi Jo Russell, and Sherry Wampler, Plaintiffs,

v.

WABASH NATIONAL CORPORATION, Defendant.

No. 4:93cv46AS.

United States District Court,
N.D. Indiana,
Hammond Division, at Lafayette.

Oct. 17, 1994.

Marshall R. Crawford, A. Robert Thayer, Chavez Crawford and Thayer, Lafayette, IN, for plaintiffs.

Keith R. Fafarman, Jay T. Seeger, Robert L. Bauman, Ellen R. Klausen, Gambs Mucker Bauman and Seeger, Lafayette, IN, for defendant.

## MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS OF PLAINTIFF DOUGLAS L. FELTNER

ALLEN SHARP, Chief Judge.

Plaintiff Douglas L. Feltner has filed suit against his former employer Wabash National Corporation, alleging sexual harassment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The plaintiff alleges both *quid pro quo* and hostile work environment sexual harassment, and retaliatory discharge. Wabash has filed a motion for summary judgment which has been extensively briefed. The court is now prepared to rule.

For the reasons described herein, the defendant's motion for summary judgment is granted, and the plaintiff's claims are dismissed.

### INTRODUCTION

Douglas Feltner was employed as a drill operator by Wabash National Corporation at its Lafayette, Indiana plant from November 4, 1992 until May 17, 1993. Mr. Feltner was absent from work Tuesday, May 11, 1993 through Friday, May 14, 1993 for medical reasons. Feltner Deposition at 42. The plant nurse told Mr. Feltner on May 11, 1993 that he had to request a leave of absence by Friday, May 14, 1993 or risk termination. *Id.* at 39–41. Mr. Feltner was already aware of this policy from employee orientation and the handbook. *Id.* at 40–41, 43. Mr. Feltner did not request a leave of absence by Friday, May 14, 1993, or at any time. *Id.* Mr. Feltner returned to work on Monday, May 17, 1993 to find that he was terminated. *Id.* at 52.

When Mr. Feltner returned to work on May 17, he gave a physician's report to the company nurse, Ms. Mary Jo Gutwein. *Id.* at 119. Ms. Gutwein told Mr. Feltner that the physician's report was late, and she would have to go get Ms. Rhonda Peters from the Human Resources Department. *Id.* at 120. Ms. Peters came in and told Mr. Feltner that "she was sorry, she was going to have to terminate due to the fact that I did not get the attending physician's report back in on time." *Id.* Mr. Feltner told her it was not his fault that he could not get it in on time. *Id.* Mr. Feltner then testified that Ms. Peters "said that she was sorry, she had to follow company policy. I said I understood. I went on about my business." *Id.* Mr. Feltner was then asked in his deposition whether he had said anything else to Ms. Peters, and he replied, "Not that I recall." *Id.*

After his termination, Mr. Feltner filed a complaint with the EEOC charging sexual harassment. On July 6, 1993 he filed a complaint in this court alleging violations of Title VII, 42 U.S.C. § 2000e *et seq.* Mr. Feltner alleges that he was sexually harassed at Wabash National, through both hostile environment and *quid pro quo* sexual harassment. He also alleges that the real reason for his termination was retaliation for his complaints. The defendant has filed a motion for summary judgment which is the subject of this memorandum and order.

### SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986);[1] and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings. *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir.1991), *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir. 1994). Neither may the nonmoving party rely upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990).

During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley*, 929 F.2d 346, 348 (7th Cir.1991). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson*, 477 U.S. at 252–255, 106 S.Ct. at 2512–14.

The 1986 Supreme Court trilogy was recently re-examined in *Eastman Kodak v. Image Technical Services*, —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Kodak* is that it did not tinker with *Celotex* and *Anderson*, and possibly involves an attempt to clarify *Matsushita*. This view is well supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441 (1992).

This court is also very aware of Judge Rovner's recent authoritative opinion in *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446 (7th Cir.1994), which adeptly covers the relevant standards for summary judgment in a Title VII sexual harassment case.

## DISCUSSION

Plaintiff Feltner claims violations of Title VII in the form of *quid pro quo* and hostile environment sexual harassment and retaliatory discharge due to his complaints. The court has determined preliminarily that Mr. Feltner's complaint must be dismissed for two reasons: he lied on his résumé, and same-sex sexual harassment is not actionable under Title VII. Notwithstanding, the court has determined that Mr. Feltner has not alleged facts sufficient to withstand the defendant's motion for summary judgment on the merits.

### A. Application Falsehood

As an initial matter, the defendant states that during discovery in this case it learned that Mr. Feltner provided false information on his employment application. Wabash states that if it had discovered this during Mr. Feltner's brief employment, it would have terminated him. The defendant therefore contends that according to *Washington v. Lake County, Illinois*, 969 F.2d 250 (7th Cir.1992), summary judgment should be entered in the defendant's favor. This court agrees.

---

1. For the judicial epilogue of *Celotex*, see *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

In *Washington v. Lake County* the plaintiff, an African–American, sued his former employer, the Lake County Sheriff's Department, for racial discrimination under Title VII and 42 U.S.C. §§ 1981 and 1983. The court held that since the defendant would have fired the plaintiff upon discovery of the misrepresentation, the plaintiff could not recover on an employment discrimination claim. *Washington*, 969 F.2d at 256–57. The plaintiff had denied any criminal convictions, which was a lie. The defendant submitted an affidavit from the Sheriff and one from the Jail Superintendent stating that Mr. Washington would have been discharged if the employer had learned the truth. *Id.* at 256. The affidavits were "essentially uncontradicted." *Id.* There was no evidence of a departmental policy to fire employees who lied on their applications (*id.* at 257) nor was there any evidence that the department had ever fired anyone for lying on his or her application form (*id.* at 252). The only evidence was the "essentially uncontradicted" affidavits of two high-level employees familiar with the hiring and firing practices (but who were not, by the way, the ultimate decisionmakers in such situations). *Id.* at 256–57. The Seventh Circuit held that the plaintiff could not recover on an employment discrimination claim, and summary judgment was appropriate for the defendant.

In the case now before this court, Mr. Feltner filled out an application for employment at Wabash National. The defendant has submitted that application to the court. *See* Defendant's Brief, Exhibit 34, "Employment Application." Despite the plaintiff's contention to the contrary, the application is a relatively extensive one. It consists of two pages of questions, including sections on personal data, education, military service, employment history (the largest section), and "general." At the bottom of the employment history section is the question "Have you ever been discharged or forced to resign from any position? (If yes, give details including name of employer.)" *Id.* Mr. Feltner marked "No." *Id.* Directly below that is the company's statement that false or misleading information may be cause for dismissal if discovered at a later date. *Id.* The application was signed by Mr. Feltner.

During the plaintiff's deposition the following exchange took place:

Q. Have you ever been terminated from any job other than, aside from Wabash National?

A. I was terminated one time, it was a part-time job for Purolator Courier.

Feltner Dep. at 24. The termination was in 1987 or 1988. *Id.* The plaintiff attempts to clean up this problem by submitting an affidavit stating: "The termination was not involuntarily forced upon me, as I was given a choice: either perform tasks [which he claims were impossible] or leave ... I elected to leave." Feltner Affidavit of April 22, 1994 (ellipses in original). The plaintiff says that he was ordered to do an impossible task or leave—he could not do the task so he left. He had no choice. Whatever spin the plaintiff's counsel puts on it, Mr. Feltner was given an ultimatum and forced to resign because he would not (he says he could not) do the work his employer required.

At any rate, the issue really is whether Mr. Feltner thought it was a termination as opposed to a resignation. Mr. Feltner was asked cold, in his deposition, and he volunteered without any leading that in addition to Wabash, he was terminated by Purolator Courier. *See* Feltner Dep. at 24. He clearly differentiates that from his leaving his other past jobs. Mr. Feltner can not raise a material issue of fact by submitting a contradictory, self-serving affidavit.

The plaintiff cites *Reed v. AMAX Coal,* 971 F.2d 1295 (7th Cir.1992) for his contention that the defendant has not proven that it would have fired him if it had discovered the falsehood. In *Reed,* the district court granted summary judgment in a Title VII racial discrimination case because the plaintiff had lied on his employment application. *Id.* at 1298. The Seventh Circuit affirmed the summary judgment, but stated that summary judgment should not have been based on the falsehood because the employer had not demonstrated that it would have fired the plaintiff if it had discovered the falsehood. *Id.* Rather, summary judgment should have been entered on the merits. *Id.* at 1299.

The *Reed* court stated that a grant of summary judgment on these grounds requires "proof that the employer would have fired the employee, not simply that it could have fired him." *Id.* at 1298. However, this was also the standard used in *Washington v. Lake County*, 969 F.2d 250, in which the Seventh Circuit held that the defendant had proven that it would have fired the plaintiff. As cited earlier, the only evidence in *Washington* was two "essentially uncontradicted" affidavits. *Id.* at 256. *Reed v. AMAX Coal* is unfortunately not helpful to the plaintiff for three reasons: it does not state what, if any, evidence was put forth by the defendant in support of its contention; it was decided prior to *Washington* (June 4, 1992 versus July 10, 1992) and therefore does not refer to or explain *Washington;* and there is stronger evidence in the present case that the defendant would have fired the plaintiff than existed in either *Washington* or *Reed.*

If there was *any* evidence put forth in *Reed v. AMAX Coal* by the defendant, it was apparently just that the employment application stated that falsifications were grounds for dismissal. 971 F.2d at 1298. *Reed* seems to stand only for the proposition that lying on an application (or résumé) does not automatically entitle an employer to summary judgment—the employer must put forth evidence that it *would* have terminated the employer. It may also stand for the proposition that a statement on the application that falsification is grounds for discharge, standing alone, does not provide sufficient evidence that the employer *would* have discharged the plaintiff.

■ In the case now before this court, however, there is sufficient uncontradicted evidence that the defendant would have fired the plaintiff, and the defendant is therefore entitled to summary judgment. The first evidence is the application itself, which states that falsification is grounds for discharge. Standing alone, that would not be sufficient. *See Reed,* 971 F.2d at 1298. Further evidence is the statement in the Employee Handbook (which Mr. Feltner acknowledges he received at orientation) that "Certain serious acts such as ... falsification of information ... cannot be tolerated and subjects the employee to immediate discharge." Defendant's Brief, Exhibit 10, Attachment B. In addition, and most importantly, the defendant has submitted an affidavit by Chuck Fish, Director of Personnel for Wabash National Corporation, which states unequivocally that if Wabash learns after an employee is hired that the employee falsified information on the employment application, the employee is immediately terminated. Fish Affidavit at ¶ 9. He states specifically that if Wabash learns that an employee has lied about being terminated from another job, the employee is terminated immediately. *Id.* Mr. Fish states that there have been incidents where Wabash National has learned of falsified information on an application, and "[i]n each instance, the employee who falsified the information was terminated immediately." *Id.* at ¶ 10. Mr. Fish states in his affidavit that if Wabash had learned of Mr. Feltner's falsehood, he would have been terminated immediately. *Id.* at ¶ 11. Wabash National says that its concern is not really over the fact that Mr. Feltner was terminated, but that he lied about it. Mr. Fish, unlike the affiants in *Washington v. Lake County*, 969 F.2d at 256–57, was actually a personnel decision-maker.

The plaintiff has not contradicted this evidence, other than the plaintiff's affidavit which states that he never knew anyone who was fired for falsifying information. Of course, he does *not* say he knew someone who was discovered to have lied and was *not* terminated. Mr. Fish has been head of Personnel for nine years, and his affidavit is more than "essentially" uncontradicted. Under both *Washington v. Lake County* and *Reed v. AMAX Coal,* the defendant is entitled to summary judgment.

An interesting point that neither side raises, and apparently has never been addressed by the court of appeals, is whether summary judgment in a case such as this is appropriate on all claims or solely on claims of unlawful discharge. Since the plaintiff could bring a sexual harassment claim even if he had not been discharged, this court feels that only discharge-related claims are appropriate for summary judgment on this ground. It could certainly be argued the other way as well.

In an admittedly cursory search, the court has discovered no case on point, but has found two cases in which courts have granted summary judgment on all claims, even garden variety sexual harassment, in light of after-acquired knowledge of résumé or application fraud. In *Churchman v. Pinkerton's, Inc.*, 756 F.Supp. 515 (D.Kan.1991), the court dismissed the plaintiff's sexual harassment claim because of application fraud. In that case, the plaintiff had quit, but then sued for sexual harassment for incidents that had occurred and for constructive discharge. Likewise, in *Mathis v. Boeing Military Airplane Co.*, 719 F.Supp. 991 (D.Kan.1989), the plaintiff alleged ongoing sexual harassment and retaliatory discharge, but the court held that her application falsehoods prevented *any* relief under Title VII.

This is certainly an open question, as the circuits do not even generally agree on the applicability of summary judgment on this issue in these cases. However, this court need not decide the question in light of the other reasons, *infra*, compelling summary judgment on all claims. At the very least, Mr. Feltner's application falsehood entitles this defendant to summary judgment as to the retaliatory discharge claim.

**B. Same–Sex Harassment Under Title VII**

The court has determined that Mr. Feltner's claims must be dismissed for a reason argued earlier by the plaintiff in a motion to dismiss. In light of the fully briefed Rule 56 motion, the court has determined that the harassment complained of is not covered by Title VII.

Mr. Feltner alleges only that he was harassed by another man. This court has gone through the plaintiff's submission of evidence page by page and line by line. In particular, Mr. Feltner complained to Wabash National only that he was harassed by a coordinator (a crew or team leader) named Tremain Gall, who aimed the comments "drop down," "dick sucker," and "crawl under the table" at Mr. Feltner. Feltner Dep. at 72, 75. Mr. Gall made a comment wondering whether Mr. Feltner could perform fellatio without his false teeth. *Id.* at 59, 64, 77, 57, 75 Mr. Gall

also asked Mr. Feltner if he would go with him to a gay bar. *Id.* at 74. Those were the only comments Mr. Feltner ever complained about, because "those were the only problems that really stuck out." *Id.* Mr. Feltner testified that it was the only time he felt sexually harassed at Wabash. *Id.; see also* 78, 80–81.

Same-sex harassment is not actionable under Title VII. *See Ulane v. Eastern Airlines*, 742 F.2d 1081 (7th Cir.1984), *cert. den.*, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985); *Goluszek v. Smith*, 697 F.Supp. 1452, 1456 (N.D.Ill.1988); *Garcia v. Elf Atochem North America*, 28 F.3d 446, 451 (5th Cir.1994) ("[h]arassment by a male supervisor against a male subordinate does not state a claim under Title VII even though the harassment has sexual overtones. Title VII addresses gender discrimination."); *Dillon v. Frank*, 58 Fair Emp.Prac.Cas. (BNA) 90, 1990 WL 358586 (E.D.Mich.1990), *aff'd*, 952 F.2d 403 (6th Cir.1992) (Table; Text in Westlaw).

The evidence shows only that Mr. Feltner was harassed by Mr. Gall. There is no evidence that Mr. Feltner was harassed *because* he was a male. This court agrees with the *Goluszek* analysis that Title VII is aimed at a gender-biased atmosphere; an atmosphere of oppression by a "dominant" gender. *See Goluszek v. Smith*, 697 F.Supp. at 1456. The evidence put forth by the plaintiffs, and dealt with in the Lisa Vandeventer Order of October 12, 1994, show that this was not an "anti-male" atmosphere. In fact, in light of the record, the contention is ridiculous. Mr. Feltner was "razzed" in a way designed to be the most annoying to him personally—he was called a homosexual. It worked; Mr. Feltner was annoyed. Mr. Gall found Mr. Feltner's hot button, and pushed it. The record does not support a reasonable inference that Mr. Gall "harassed" Mr. Feltner *because* he was a man. This was not actionable sexual harassment.[2]

**C. Retaliatory Discharge**

In light of this court's determination that Mr. Feltner's claims must be dismissed,

---

2. If Mr. Feltner was in fear for his safety, he has state law remedies available. *See Dillon v.*

*Frank*, 1992 WL 5436 at **8 (unpublished; text in Westlaw).

the court will give only a summary account of its reasoning regarding the plaintiff's substantive issues. For the same reasons given in this court's order of October 12, 1994 (dismissing plaintiff Lisa Vandeventer's retaliatory discharge claim), Mr. Feltner's retaliatory discharge claim must be dismissed. The legal arguments were amply expressed in that 28 page order, and the court need not repeat them. Mr. Feltner has not stated a prima facie case, as he has not produced any evidence of a link between his complaints and the decision to terminate him.[3] The complaints were handled in Mr. Feltner's department by his supervisor, and the termination was solely between the company nurse (to whom Mr. Feltner never complained) and the Personnel Director, Ms. Rhonda Peters. There has been no evidence of any link.

 Furthermore, as was true of Lisa Vandeventer's claim, the defendant has put forth a legitimate, non-discriminatory reason for Mr. Feltner's termination which the plaintiff has failed to show was pretextual. Ms. Peters, who terminated Mr. Feltner, states that she did so solely because he violated the leave of absence policy. Mr. Feltner admits he did so. *See supra,* page 792. The court notes that Wabash's policy seems unduly harsh, but it is consistent. Furthermore and more importantly, the proffered reason is not pretextual simply because it is poorly founded or unfair. *Reed v. AMAX Coal,* 971 F.2d at 1300.

The plaintiff has not stated a prima facie case, and in any event the defendant has proffered a legitimate, non-discriminatory reason for its action. The plaintiff has put forth no evidence that the reason proffered was pretextual. Therefore, summary judgment is appropriate for the defendant.

D. *Quid Pro Quo* Sexual Harassment

Mr. Feltner also alleges *quid pro quo* sexual harassment under Title VII. However, there have been no factual allegations in support of this claim, and the defendant's motion for summary judgment as to it must be granted.

 The plaintiff misapprehends the legal meaning of *quid pro quo* sexual harassment. *Black's Legal Dictionary* defines *quid pro quo* as latin for "something for something." The *American Heritage Dictionary* states that it means "an equal exchange or substitution." When used to describe sexual harassment, *quid pro quo* means that an employer, or someone of higher rank, requires an employee to submit to sexual conduct in return for increased employment benefits or under threat of adverse employment repercussions.

 The seminal case in the Seventh Circuit is *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456 (7th Cir.1990), which defined *quid pro quo* sexual harassment as "situations in which *submission* to sexual demands is made a condition of tangible employment benefits." *Id.* at 461 (emphasis added) (citing *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1423 (10th Cir.1987)); *see also* 29 C.F.R. § 1604.11(a). Employers engage in *quid pro quo* sexual harassment when they condition employment benefits on the granting of sexual favors or on submission to sexual advances. *Piech v. Arthur Andersen & Co.,* 841 F.Supp. 825, 830 n. 5 (N.D.Ill. 1994); *see also Spencer v. General Electric Co.,* 706 F.Supp. 1234, 1237 (E.D.Va.1989), *aff'd* 894 F.2d 651 (4th Cir.1990). There is no *quid pro quo* harassment when no one at the place of business links economic benefits to the plaintiff's participation in sexual conduct. *See Dey v. Colt Construction,* 28 F.3d at 1453.

 Mr. Feltner has made no factual allegations which fall within the definition of *quid pro quo* sexual harassment. He seems to confuse *quid pro quo* with hostile environment and retaliation; he believes that he was fired for his complaints, and therefore has suffered adverse employment effects for "refusing" to accept the harassment. Additionally, he believes that the hostile environment had the effect of disrupting his ability to do his work properly. These are claims under

---

**3.** Indeed, he may not have satisfied the first prong of the prima facie test, as his complaints were not protected by Title VII. *See supra.* However, he apparently believed that they were, possibly reasonably, and that may satisfy the first prong. *See Dey v. Colt Construction,* 28 F.3d 1446, 1457 (7th Cir.1994).

retaliation or hostile environment; these problems are *not quid pro quo* harassment. He does not allege, for example, that a supervisor asked him to have sexual relations with him or else he would be given poor work assignments, denied benefits, or be fired. The only detriment allegedly suffered by Mr. Feltner was termination and possibly (although unsupported by the record) decreased productivity due to the hostile environment.

He does not allege that he was fired for decreased productivity, or suffered any other harm from such. He does not allege that he was fired because he failed to perform sexually. He alleges he was fired in retaliation for lodging complaints. *Quid pro quo* means that benefits were denied (or threatened) or adverse action was taken towards him by someone else; it does not include one's own lessened productivity due to the aggravation or distraction of the hostile environment. At worst, Mr. Feltner has alleged that he suffered a hostile environment with derogatory sexual remarks and when he complained he was fired. Those concerns are covered by his other two claims, and do not comprise *quid pro quo* harassment.

The defendant's motion for summary judgment is granted as to Mr. Feltner's claim of *quid pro quo* sexual harassment.

### E. Hostile Work Environment

■ Again, the court has addressed the legal arguments of this substantive issue in its memorandum and order of October 12, 1994. There is no need to reprint the legal standards surrounding this issue, especially in light of the court's determination that Mr. Feltner's claims must be dismissed in any event.

■ Mr. Feltner alleges only that he was harassed by another man. This court has gone through the plaintiff's submission of evidence page by page and line by line. In particular, Mr. Feltner complained to Wabash National only that he was harassed by a coordinator (a crew or team leader) named Tremain Gall, who aimed the comments "drop down," "dick sucker," and "crawl under the table" at Mr. Feltner. Feltner Dep. at 72, 75. Mr. Gall made a comment wonder-ing whether Mr. Feltner could perform fellatio without his false teeth. *Id.* at 59, 64, 77, 57, 75 Mr. Gall also asked Mr. Feltner if he would go to a gay bar. *Id.* at 74. Those were the only comments Mr. Feltner ever complained about, because "those were the only problems that really stuck out." *Id.* Mr. Feltner testified that it was the only time he felt sexually harassed at Wabash. *Id.; see also* 78, 80–81. To state a hostile environment claim, the plaintiff's *subjective* view must support an inference of harassment. *See Dey v. Colt Construction,* 28 F.3d at 1454.

In Mr. Feltner's "affidavit" of April 19, 1994, he makes some utterly general allegations of a hostile work environment. One problem with Mr. Feltner's affidavit is that it lacks any specificity. The other problem is that apparently it is not really Mr. Feltner's affidavit. This court would not make such a determination if the only evidence was that the affidavit is clearly written in Mr. Feltner's attorney's (Mr. Crawford's) unique writing style. However, it is patently obvious that the "affidavit" sworn to by Mr. Feltner in fact relates to Ms. Vandeventer, not Mr. Feltner. He "swears" to the incident when Ms. Vandeventer met with her supervisor and signed a document to that effect, which she later recanted, as if it was his experience. Feltner Affidavit at ¶ 11. This paragraph, indeed the *entire affidavit* other than the name printed at the top, is merely an exact copy of Ms. Vandeventer's affidavit. Mr. Feltner swears to things which did not happen to him, and this calls into serious doubt the probative value of his and the other affidavits prepared by his attorneys. At the very least, this court is completely justified in disregarding the plaintiff's affidavit. The court is not pleased by this.

Even if the court turned a blind eye and accepted the affidavit as truthful, it would change nothing. The plaintiff can not create a material issue of fact by submitting a contradictory, self-serving affidavit. He certainly can not create a material issue by trying to contradict specific, repeated sworn deposition testimony with a general and vague affidavit. When the court takes into further consider-

ation the patent fact that the plaintiff is either lying or never even read his affidavit, there is no issue here.

Mr. Feltner's problems were with Mr. Gall. They were relatively isolated incidents, and therefore do not rise to the level required by hostile environment case law.[4] In any event, they were not incidents actionable under Title VII.

## CONCLUSION

In light of the foregoing discussion, the plaintiff's claims (all under Title VII) must be dismissed. The defendant's motion for summary judgment as to Mr. Feltner's claims is hereby **GRANTED**

**SO ORDERED.**

Kataza TAIFA, Paul Komyatti, William Sampley, Mark S. Douglas, Aaron Isby, Kevin Sandifer, James E. Shropshire, John Charles Cole, Jr., Preston Gardner, Edward Broadus, James Thompson, Nolan McDandal, Robert Smith, Robert Jenkins, Richard Mumford, Tillman Morris, Michael Hegwood, Terrence Drain, Eric Malone, Michael Holland, Albert Estep, and Roosevelt Williams, Plaintiffs,

v.

Evan BAYH, in his individual and official capacity as Governor of the State of Indiana, James E. Aiken, in his individual and official capacity as Commissioner of the Indiana Department of Correction, Norman G. Owens, in his individual and official capacity as Director of the Classification Division of the Indiana Department of Correction, John Nunn, in his individual and official capacity as Deputy Commissioner of Oper-

ations of the Department of Correction, and Charles E. Wright, in his individual and official capacity as Director of the Maximum Control Complex of the Indiana Department of Correction, Defendants.

No. 3:92cv0429AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 4, 1994.

See also 846 F.Supp. 723.

---

4. Mr. Gall was disciplined by the supervisor after Mr. Feltner's sole complaint. He was put on a 60–day probation and almost fired. However, Mr. Feltner alleges rather vaguely that the harassment did not cease after that. He does not, however, allege that he told anyone this.

Richard A. Waples, Indiana Civ. Liberties Union, Hamid R. Kashani, Indianapolis, IN, for plaintiffs.

Aaron Isby, pro se.

Michael Holland, pro se.

Roosevelt Williams, pro se.

Carl L. Johnson, pro se.

Dyrone Henderson, pro se.

Jimmy Moorson, pro se.

Jeberekiah Eleazar Kelubai, pro se.

Kenneth Porter, pro se.

Tome L. Hailey, pro se.

Christopher Michael Miser, pro se.

Andrew Benroy Johnson, pro se.

Wayne E. Uhl, Office of Indiana Atty. Gen., Indianapolis, IN, for defendants.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I. INTRODUCTION

The Honorable Magistrate Robin D. Pierce was charged by this court with the management of an exceptionally voluminous and complicated class action lawsuit brought by prisoners confined at the Maximum Control Complex (hereinafter MCC) in Westville, Indiana. After much effort, the parties reached a settlement. On February 2, 1994 this court adopted that settlement as reported in the Magistrate's Recommendation and Report dated January 6, 1994. Judgement was entered by the Clerk of this court on February 15, 1994, but this case is not yet finished. Since the entry of judgment, over 316 documents have been filed with this court contesting, approving, or commenting on the settlement and its surrounding issues. One of the more tenacious commentators has been Mr. Aaron Isby, one of the original named plaintiffs. On October 24, 1994, this court received a report and recommendation from Magistrate Pierce regarding the litigious conduct of Mr. Isby. That report is reproduced in its entirety below.

### REPORT AND RECOMMENDATION

On January 21, 1994, Aaron Isby, an inmate at the Maximum Control Complex ("MCC") in Westville, Indiana, filed a motion objecting to a Report and Recommendation which had been issued by the undersigned recommending the approval of the Agreed Entry in this class action brought on behalf of present and future inmates at the MCC. According to Mr. Isby, "the illegal agreed entry" was "contrary to present laws of this countrie [sic] and US Constitution." Soon thereafter, on February 22, 1994, Mr. Isby filed a "Motion to Stay Judgment," in which he asserted that Chief Judge Sharp abused his discretion in approving the Agreed Entry concerning injunctive relief in this case. Judge Sharp denied Mr. Isby's motion to stay the judgment on March 4, 1994. Mr. Isby also attempted to appeal the Agreed Entry, but was denied leave to proceed *in forma pauperis* on March 23, 1994.

On March 24, 1994, Mr. Isby changed his approach. Instead of attacking the Agreed Entry as illegal and unconstitutional, he filed a "Motion to Enter Civil Contempt," in which he sought to hold "defendant Sharon Hawks" (who has never been a defendant in this case) in contempt "for her failure to abided [sic] by the mandates of the 'consent and decree' approved on February 15, 1994." On April 7, 1994, Mr. Isby filed another "Motion to Enter Civil Contempt," this time asserting that the defendants were refusing to abide by the Consent Decree by using profane language to antagonize and provoke prisoners, by refusing to provide prisoners with

tissue paper, and by "repeatedly using excessive brutal force against MCC prisoner [sic]." On April 8, 1994, Mr. Isby filed a motion to withdraw the record in this case "in order to adequately challenge [his] appeal presently pending before the Seventh Circuit Court of Appeals." On April 12, 1994, Mr. Isby filed another "Motion to Enter Civil Contempt," this time asserting that he had been "brutally beat" by corrections officers, "restrained in handcuffs, black box, belly chain, and leg irons," choked, "restrained to a bed without access to a toilet," and denied medical attention for "a busted right leg." Again, Mr. Isby asserted that "[d]efendants are violating the mandates in the 'consent and decree.'" On April 22, 1994, Mr. Isby filed another "Motion to Enter Civil Contempt," this time asserting that defendant Charles E. Wright was forcing him to wear a "hockey mask" whenever he was let out of his cell (because he allegedly spit on a guard) and that Wright was using the hockey mask to discourage Isby from taking recreation and showers, as well as legal calls from his attorney. On May 13, 1994, Mr. Isby filed still another "Motion to Enter Civil Contempt," this time assertion that Mr. Hamid Kashani, one of the attorneys for the inmate class, should be held in contempt because of his failure to "take immediate action to cease the unlawful acts of the defendants."

In an Order entered on May 16, 1994, Chief Judge Sharp denied all of Mr. Isby's motions for contempt. Undaunted, Mr. Isby filed a "Motion for Emergency Writ of Mandamus" on August 8, 1994, seeking "to compel Charles E. Wright to comply with the 'agreed entry.'" Thereafter, on September 15, 1994, Mr. Isby filed a "Notice of Contempt," advising that he intended to "file a motion to enter civil contempt against defendant Charles E. Wright for violating the 'agreed entry' injunctive order" in this case. On September 20, 1994, Mr. Isby filed another "Motion to Enter Civil Contempt," again challenging defendant Wright's practice of requiring him to wear a hockey mask "with masking tape at the mouth each time he is removed from his cell." Mr. Isby followed this up with a memorandum in support of his motion for civil contempt on October 4, 1994.

It is by now abundantly clear that Mr. Isby's practice of filing repetitive motions for contempt after his previous motions had been denied amount to vexatious conduct deliberately designed to harass and abuse the processes of the court. Under these circumstances, it is **RECOMMENDED** that any and all outstanding motions for contempt by Mr. Isby be **DENIED,** and that he be permanently barred from filing any other matter or pursuing any other action seeking to enforce or challenge the Consent Decree entered in this cause.

**ANY OBJECTIONS to this report and recommendation must be filed with the Clerk of courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Lockert v. Faulkner,* 843 F.2d 1015 (7th Cir.1988); *Video Views, Inc. v. Studio 21 Ltd.,* 797 F.2d 538 (7th Cir. 1986).**

Mr. Isby received a copy of Magistrate Pierce's Report and Recommendation (hereinafter R & R) and timely filed his "Objection to the U.S. Magistrate Report and Recommendation" (hereinafter "Objections") on October 28, 1994. Mr. Isby argues that the R & R is "unconstitutionally sound ... under the First Amendment ... and has no legal support...." Mr. Isby called Magistrate Pierce's finding of harassment and abuse "ludicrous" and cited cases indicating that the right to access the courts is fundamental. *See e.g., Adams v. Carlson,* 488 F.2d 619 (7th Cir.1973).

## II. DISCUSSION

■ This court agrees with Mr. Isby that "[i]t is now established beyond a doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). Whether a prisoner has the logistical ability to traverse the jurisdictional path depends upon his mental and financial re-

sources. Problems encounter by prisoners include limited access to law libraries, lawyers, copiers, and stationary, as well unaffordable filing fees. To help a prisoner cope with these sometimes seemingly insurmountable problems, courts require that inmates have reasonable access to law books, copiers, and such stationary and postage as may be necessary to enable the inmate to maintain his suit. Other inmates who have a better understanding of the law are allowed to act as "jail-house lawyers" and if a prisoner's financial condition is such that he is unable to pay the filing fees, the court may allow the inmate to proceed *in forma pauperis,* thus waiving the filing fee.

■ A quick survey of the case law reveals that although prisoners have the right to traverse the jurisdictional path to the courts, when the right is abused, a court may narrow or even barricade the path. A prisoner may erode the jurisdictional path by filing harassing and/or frivolous complaints and motions. Courts may prevent further erosion by utilizing the power granted under the All Writs Act which states: "The Supreme Court and all courts established by an Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Although rare, the U.S. Supreme Court has invoked § 1651(a) on occasion to prevent abuse of the courts. "We ... direct the Clerk not to accept any further petitions from petitioner for extraordinary writs pursuant to 28 U.S.C. 1651(a)...." *In Re McDonald,* 489 U.S. 180, 181, 109 S.Ct. 993, 994, 103 L.Ed.2d 158 (1989). "The goal of fairly dispensing justice is compromised when the court is forced to devote limited resources to processing repetitious and frivolous requests." *In re Sindram,* 498 U.S. 177, 179–80, 111 S.Ct. 596, 597, 112 L.Ed.2d 599 (1991). The Seventh Circuit has also limited access in the face of harassing and frivolous filings. *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364 (7th Cir.1983), *Sassower v. American Bar Association,* 33 F.3d 733 (7th Cir.1994).[1]

Seemingly hesitant to narrow the jurisdictional path, courts often instead alter the logistical obstacles in the jurisdictional path. One of the most popular methods is to modify, revoke, or enjoin the prisoner's right to proceed *in forma pauperis. In re McDonald,* 489 U.S. at 180, 109 S.Ct. at 993; *In re Sindram,* 498 U.S. at 177, 111 S.Ct. at 596; *Carter v. United States,* 733 F.2d 735 (10th Cir.1984) (reversing District Court's *in forma pauperis* injunction as too broad). Because most inmates have no money, a lack of permission to proceed *in forma pauperis* usually stops them in their procedural tracks. Other remedies include certification of new filings or the posting of a bond. *Depineda v. Hemphill,* 34 F.3d 946 (10th Cir.1994); *Sassower v. American Bar Ass'n,* 33 F.3d 733 (7th Cir.1994).

■ Mr. Isby acknowledges that courts may restrict access when filings are harassing or abusive, but he denies that his filings were meant to harass or abuse the processes of the court. Moreover, Mr. Isby argues that his filings were not nearly as egregious as the filings found in *In re Davis,* 878 F.2d 211 (7th Cir.1989) (31 cases over a four year period); *Cofield v. Alabama Public Service Comm.,* 936 F.2d 512 (11th Cir.1991) (106 cases); *Procup v. Strickland,* 792 F.2d 1069 (11th Cir.1986) (176 cases).

This court recognizes that Mr. Isby's filings are not nearly as numerous as those reported in the cases he cites; however, the correlation between the abuse caused and the remedy ordered in the above cases and in this case is proportional. The filings by the petitioners in the cases cited by Mr. Isby amounted to a broad abuse upon the courts. Thus, the courts issued broad orders restricting and prohibiting filing in several different areas. In the present case, Magistrate Pierce's recommendation is limited to the class action consent decree.

Although not controlling precedent, this court finds the analytic approach developed by the 9th Circuit in *De Long v. Hennessey,* 912 F.2d 1144 (1990) helps insure that Mr. Isby is given a reasonable solution with due

---

**1.** For a more complete listing of cases under § 1651(a) *See,* William T. Goglia, M.A., J.D., Annotation, *Authority of United States District court,* *Under 28 USCS § 1651(a), to Enjoin, Sua Sponte, A Party From Filing Further Papers in Support of Frivolous Claim,* 53 A.L.R.Fed. 651 (1994).

process. The *De Long* court listed four requirements that must be met prior to enjoining any future filings. 1) Provide the litigant with notice and an opportunity to oppose the order before it is entered. 2) Provide an adequate record for review which includes a listing of all the cases and motions that led the court to conclude that an injunction was needed. 3) Make substantive findings as to the frivolous or harassing nature of the litigant's actions. 4) Tailor the injunction narrowly to closely fit the specific vice encountered. *Id.,* at 1146–1148. Concluding, the *De Long* the Court remarked:

Flagrant abuse of the judicial process cannot be tolerated because it enables one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Nonetheless, orders restricting a person's access to the court must be based on adequate justification supported in the record and narrowly tailored to address the abuse perceived. We find such care is demanded in order to protect access to the courts, which serves as the final safeguard for Constitutional rights.

*Id.* at 1148–49.

This court finds that the first three requirements delineated above have been met. Notice was provided, Mr. Isby commented, and the Magistrate's Report and Recommendation provides the requisite record and findings. This court now examines the narrowness of the specific order of the Magistrate. If implemented, it would only slightly narrow the jurisdictional path to this court. In effect, this court would deny itself jurisdiction as to all filings by Mr. Isby that relate to the class action Consent Decree regardless of their legitimacy. Under the Magistrates recommendation, Mr. Isby would not be enjoined from filing *any* claims or motions in this court, he would only be enjoined from filing the claims and motions related to the present class action.

If Mr. Isby was still represented by counsel, such a restriction would be approved by this court without hesitation. The loss of counsel is a factor in this court's decision, but it is not a controlling factor. Mr. Isby was warned by his counsel that his *pro se* efforts were improper. Mr. Isby's loss of direct representation does not mean that Mr. Isby's interests are going to be ignored. As a member of the prison population at MCC (ie. one of the "others similarly situated"), Mr. Isby does have an interest in the proper execution of the class action settlement. Counsel for the remaining named plaintiffs are bound to raise mistreatment of Mr. Isby as a violation of the settlement. Thus, even if this court were to completely block Mr. Isby himself from filing any motions or complaints in connection with this class action, Mr. Isby's interests are still protected as the named plaintiffs and their counsel seek to enforce the settlement. Nevertheless, because Mr. Isby's litigiously maverick conduct has caused him to be abandoned even by his own counsel, this court is willing to first experiment with a less restrictive order that does not foreclose a potentially legitimate claim.

### III. CONCLUSION

This court fully understands the frustration and delay that Mr. Isby's prolific filings has caused the patient and careful magistrate to experience. Thus, this court does not rule out the magistrates recommendation as course of action for the near future. However, at this point this court chooses to alter Mr. Isby's logistical requirements to encourage Mr. Isby to think clearly and carefully about any future filings. Therefore, this court orders the following:

First, after considering all of Mr. Isby's motions currently pending before this court, this court now hereby **DENIES** all of said motions. Second, this court **ORDERS** that any and all future filings by Mr. Isby that have any connection whatsoever with the enforcement, content, or any other relationship to the consent decree be hereby accompanied by a signed and sworn affidavit that the issues raised in the filing have not been raised or addressed in any prior filings or orders of this court. A false or misleading affidavit shall be punished by contempt, monetary sanctions, or any other order as this court sees fit. Third, this court **ORDERS** that any future filings be accompanied by an updated listing of the name, number, date,

substance, and disposition of all previous filings by Mr. Isby (including those filed prior to this order) that relate to the class action. Satisfaction of these requirements will encourage Mr. Isby to carefully screen his filings and enable this court to quickly discern between legitimate and illegitimate filings. IT IS SO ORDERED.

Louis ANDRIAKOS, Plaintiff,

v.

The UNIVERSITY OF SOUTHERN INDIANA, the Board of Trustees of the University of Southern Indiana, Gail Franks, Margaret (Peggy) Graul, Nadine Coudret and Robert L. Reid, Defendants.

No. EV 91–153–C.

United States District Court,
S.D. Indiana,
Evansville Division.

Sept. 23, 1992.

E. Dean Singleton, Owensville, IN, for Louis Andriakos.

Thomas O. Magan, Kahn Dees Donovan & Kahn, Evansville, IN, for University of Southern Ind., University of Southern Ind. Bd. of Trustees, Gail Franks, Margaret (Peggy) Graul, Nadine Coudret, Robert L. Reid.

## MEMORANDUM

BROOKS, Chief Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment against Louis Andriakos on the final basis of his complaint, the Title IX claim.

### FINDINGS OF FACT

1. Andriakos was a nursing student at the University of Southern Indiana from August 1988 to March 1991.

2. During the spring of the academic year 1989–90, Andriakos took Nursing N242, Health Patterns of Children, taught by Gail Franks, R.N.

3. In evaluating the plaintiff's clinical performance, Franks documented on several occasions his failure to demonstrate safe clinical nursing practices.

4. Franks stated in paragraph 4 of her affidavit, "[d]uring Mr. Andriakos's clinical rotation, I observed the following unprofessional and unsafe practices:

(a) On March 21, 22 and 23, 1990 Mr. Andriakos arrived on the clinical unit with his uniform soiled and unshaven. The note documenting Louis' failure to meet the minimal standards for clinical practice is attached hereto as Exhibit 'A.'

(b) On April 4 and 5, 1990 I evaluated Mr. Andriakos and told him he needed to work more on communicating with clients, their families, and the health team members. For example, when I asked Louis to make a nursing assessment of how a child's parents related to the child, Louis replied, 'You're not going to like this but they fit my image of what two eastern Kentucky coal miners are like.' This was not new behavior for Louis nor was it the first time that he was advised of his judgmental behavior. Furthermore, and more important, Louis's clinical practice was unsafe. Louis had prepared the incorrect dosage of medication. I asked Louis 'do you have the correct amount of medication in the syringe?' Louis said 'yes.' I pointed out to Louis that he had 2cc of air in the syringe and squirted out the air. Then he recognized that he had the wrong amount (3cc's, instead of 5cc's) and prepared the correct dose. My clinical evaluation of Louis on April 4 and 5, 1990 is attached hereto as Exhibit 'B.'

(c) On April 10, 1990 I gave Mr. Andriakos his midterm evaluation and again explained that he needed to improve his communication with patients and discuss client care in terms of nursing. Louis' midterm evaluation is attached hereto as Exhibit 'C'.

(d) On April 11, 1990 Louis failed to adjust for the decimal placement when figuring the safe range of medication for a patient. After Louis corrected the dosage he prepared the liquid medication in the syringe and laid it on the counter. He left the room for approximately 15 minutes and when he returned he picked up the syringe. I asked him how he knew that was the same syringe he had left on the counter before he left the room. I pointed out that he had been gone for 15 minutes and that it was unsafe to assume that medication was the same medication he had left. I told Louis he should have place [sic] the syringe in the patient's medication drawer or carried it with him. My clinical evaluation of Louis is attached hereto as Exhibit 'D.'

(e) On May 2, 3 and 4, 1990 Louis again failed to synthesize scientific concepts which resulted in errors during client care. My clinical evaluation of Louis is attached hereto as Exhibit 'E'."

5. In Franks' clinical evaluation of Andriakos on 4–5 April 1990 (Exhibit B of Franks' affidavit), she noted,

Inappropriate use of clinical time. This is a persistent behavior from conference of 3/26/90. Again this is reflective of Louis' unwillingness to accept direction and his determination to do things his way. While caring for a one and a half year old boy, Louis justified leaving him crying in bed and refusing to keep him in the play room because, "he couldn't spend his entire day

in a play room ..." When questioned how he had plan to spend the remainder of the morning with this client, he admitted to not having anything planned for this child. He failed to recognize play as an appropriate use of his time. His action of leaving the child crying in his crib was punitive treatment for this client.

6. In Franks' clinical evaluation of Andriakos on 11 April 1990 (Exhibit D of Franks' affidavit), she noted,

In figuring the safe range of one med he did not adjust for decimal placement. For his child's wieght [sic] of 7.2 kg, what should have been 2.16mg to 4.32mg he figured as 21.6mg and 43.2mg. He had divided this into 7.2mg–1.10mg. I pointed out the mistake in math and had him redo this. Then he converted these rang in to ml. I asked him how much the physician had ordered. He read from the MAR and said 1ml. Asked again and he said 1ml. On the third try he read the correct dose of 1.5ml....

I suggested to Louis that he might need to have his eyes examined since this was the second time he had misread the MAR and the writing was legible.

Louis documented on the MAR that he gave both drugs at 0800 when in fact he had given the meds at 0850. I took the MAR to him and asked him to correct it and he said, "I knew you were going to do that. On 4600 they made me record the meds at the times noted on the MAR. I told Louis that this was not the way that he had been instructed to document drugs correctly in practice and why it might be important to show exact times of administration in children, some specific conditions, and with some specific drugs such as insulin. His reply was that he would do it my way. He ignores the obvious, that there is a correct way.

7. In Franks' clinical evaluation of Andriakos on 2–4 April 1990 (Exhibit E of Franks' affidavit), she noted,

Louis was directed to have the instructor assist him when the child returned to his room from physical therapy in getting the child back into bed. He did not do this and when I entered the room the child was leaning against the foot of the bed, standing on his right leg for support. Louis was unable to identify a means of having the child return to bed from that position, and all the while the child was growing more anxious about the possibility of falling. Louis was instructed on the correct procedure of moving a client from bed to chair and chair to bed.

8. Clinical coordinator Melissa Vandeveer, R.N. observed Andriakos during his clinical rotation in Nursing N242 during the spring of the academic year 1989–90.

9. In Vandeveer's clinical evaluation of Andriakos on 18–19 April 1990 (Exhibit A of Vandeveer's affidavit), she noted,

Specifically, Louis taught an eleven year old boy with diabetes that by cleansing the insulin vial with alcohol he could prevent throat infections. When questioned by the instructor Louis said that he thought that his teaching was correct. He said that if the needle hit a vein/artery then the child could get a throat infection. When further questioned about the body's immune response he had incorrect data base.

. . . . .

While Louis did, at times, identify interventions appropriate to the pediatric patient (discussed baseball player with diabetes with patient, identified a 4 year old unsafely jumping up and down in bed) his overall inability to identify and prioritize nursing diagnoses specific to patient pattern disturbances, his lack of scientific evidence upon which to practice coupled with the fact that he does not seek assistance appropriately make his practice unsafe on April 18, 19, 1990.

10. Franks and Vandeveer issued a final clinical evaluation of Andriakos on 4 May 1990 (Exhibit F of Franks' affidavit, Exhibit B of Vandeveer's affidavit). They concluded,

Louis did demonstrate knowledge of physiological assessments and some interventions, and at times interacted appropriately in a caring manner. He was consistently punctual and attempted to be thorough in planning care. However, his overall inability to synthesize knowledge specific to indi-

vidual patient pattern disturbances, his lack of scientific evidence upon which to practice coupled with inadequate insights into his need for assistance and lack of collaboration make his practice unsafe. During this clinical rotation observations were made by two clinical instructors who concur regarding this evaluation.

11. Andriakos received a failing grade in the clinical component of Nursing N242 during the spring of the academic year 1989-90.

12. The "School of Nursing Student Handbook" states in part, "[s]tudents who do not receive a 'pass' grade in the clinical will receive a letter grade of 'F' in the course. A student who receives an 'F' grade in a nursing course because of a clinical failure will be dismissed from the program."

13. After petitioning Dean Nadine Coudret, R.N., Ed.D., Andriakos was permitted to continue in the nursing program and to re-enroll in N242 the following year.

14. During the spring of the academic year 1990-91, Andriakos took Nursing N242, Health Patterns of Children, taught by Peggy Graul, R.N.

15. In evaluating the plaintiff's clinical performance, Graul documented on several occasions his failure to demonstrate safe clinical nursing practices.

16. Graul stated in paragraph 5 of her affidavit, "[i]n my professional judgment, Mr. Andriakos did not meet the standards required for passing the clinical component of Nursing N242."

17. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she noted concerning his "unsatisfactory application of knowledge,"

1/31/91 (Clinical Week 2) Louis was unable to identify the presence of retractions in a 7 month old child with a respiratory disease after having the material in class and viewing a film emphasizing retraction in an infant the week before and passing a test on the material two days before. Louis told the instructor that he did not know what he was supposed to be looking for. He said that he did not know what it meant when the instructor raised the child's gown and told him to "look at the child's chest." While students in the second week of clinical are continuing to add to their assessment skills, faculty would expect a student to recognized the importance of observing the movement of the chest and seeking information regarding abnormalities.

2/7/91 (Clinical Week 3) Louis was unable to describe a rash or identify the location of the abnormal lesions after the instructor guided skin inspection two times on the same patient. He did not identify the location of the rash in the same location as the instructor. He did not identify the location of the rash on the child after the mother called it to the attention of the instructor and the student together. He was unable to chart the observations after a 45 minute discussion with the faculty regarding location and terminology. The faculty had to complete his work by charting the rash because of his difficulty with the proper terminology as well as the location.

Proper terminology of rashes is reviewed in the fundamentals course during the freshman year. This material is also available in the pediatric textbook specific to this patient's disease process.

2/13/91 (Clinical Week 4) He was unable to describe the proper method of identifying the location for injection. When the instructor first asked Louis about the injection location his response was "I'm going to give it in the tush". The instructor asked him for a more precise and safe description. He remained unable to plan for this procedure when guided by the instructor and when using a handout with diagrams. He was unable to differentiate the lateral and posterior view of the buttocks in the picture.

This material is required learning in the first year and reinforced in every course. In N-242 a "skills day" regarding various nursing activities was provided prior to clinical practice with patients. The importance of proper injection technique was emphasized and a demonstration was done relative to injection into the vastus lateralis. A handout was given regarding other

injection sites. This student attended that skills day.

Potential unsafe nursing action is possible if the student is unaware of proper injection sites, and is unable to problem solve when lacking information. An improperly administered injection could result in damage to the sciatic nerve and/or bolus delivery of medication into the femoral artery.

18. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she noted concerning his failure to demonstrate "competence in nursing process in the clinical setting."

1/30/91 (Clinical week 2) In discussing the necessary assessment of an infected scalp IV Louis indicated that possible dangers included the possibility that "fluid would get in to the brain". The instructor would expect a student to respond in terms of skin integrity (edema, erythema, sloughing). He related this patient's situation to a previous patient who had leaking cerebral-spinal fluid from a brain injury. This application of knowledge prevents accurate assessment and planing for care. . . .

2/7/91 (Clinical week 3) Louis was guided by the instructor that the most age-appropriate method to administer oral liquid medication to a four year old was in a medicine cup. Louis suggested that a syringe was better. The instructor would expect the student to evaluate that a four year old is frightened of "shots" and will see the syringe even without a needle as a "shot". . . . Nursing of children requires an understanding of the developmental stages of children in order to provide the child with the least traumatic environment possible. The knowledge of fears of a four year old, particularly a four year old in the hospital, are basic to competent practice.

2/20/91 (Clinical week 5) In caring for a patient who was ambulatory following shoulder surgery, Louis applied scientific base appropriate for a totally immobilized patient such as a stroke patient to his patient who was ambulatory following shoulder surgery. The nursing measures he told the faculty that he implemented with the patient included the recommendation for increased fluid intake to prevent urinary tract infection, and teaching regarding constipation. This patient did not have a nursing diagnosis nor a related medical diagnosis that warranted this action. He indicated to the instructor the pages in the book he was using to plan for this patient's care. The application of information was totally inappropriate.

On this same patient that Louis was treating for complete immobilization he provided instruction regarding "safe weight training, a gradual exercise program and adjustment of the shoulder sling". This instruction was done without a doctor's order. Changes in activity are medically directed by a surgeon following surgery. These nursing actions were also done without faculty guidance as Louis first informed faculty of his actions at the end of the morning. As a result he provided instruction to a patient that was not based in nursing practice, was not timely for the needs of the patient, and was not in compliance with a medical plan of care. Louis stated in his written teaching plan "The main problem was trying to anticipate the doctor's orders." Possible physical injury to the patient from Louis' instruction includes damage to a recent surgical site (shoulder). Further, the patient was unduly treated by Louis for potential urinary tract infection and constipation.

2/21/91 (Clinical week 5) Louis cared for a patient with the medical diagnosis of croup and a nursing diagnosis of altered respiratory status or respiratory distress or ineffective airway clearance. When preparing his charting for faculty review he first wrote "mild cold" the faculty said that was incorrect. He then suggested "allergic rhinitis", again he was told that this was not correct. His next suggestion was laryngotracheobronchitis. Louis had time to plan his charting in between suggestions but was not able to identify any nursing diagnosis without direct and specific guidance from the instructor. The faculty would expect a student to have varying levels of understanding relative to several nursing diagnosis but not to confuse medical diagnoses with nursing diagnosis.

## Summary B

In addition to inadequate clinical practice, written nursing care plans indicate inadequate understanding. Weekly care plans show improvement only after precise and specific guidance from the instructor. Data, diagnoses and etiologies are often incomplete and/or missed. Written nursing care plans are now mandated by JCAH standards and are a part of the permanent chart and are essential part of nursing practice. The written teaching plan indicated an inappropriate nursing plan of care.

19. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she noted concerning his failure to demonstrate "accountability and responsibility for own nursing practice,"

Louis had to be instructed to have clean clothes, to shave and to comb his hair.

20. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she stated,

## Final Summary

Louis does not evidence safe nursing practice in the clinical setting. In the preceding narrative are examples of practice decisions that place the patient at risk. His inability to apply knowledge essential to nursing, to understand the limits of nursing practice, and to communicate effectively are evidence of unsafe practice. Louis does not meet the standards required for N242 clinical practice and therefore receives a failing grade for the course.

21. Andriakos received a failing grade in the clinical component of Nursing N242 during the spring of the academic year 1990–91.

22. Andriakos filed a formal written grievance regarding his failing grade and on 22 August 1991 the Student Academic Grievance Committee concluded that "faculty members, Mrs. Franks and Ms. Graul, did act in a professional manner in assigning a No Pass grade to Mr. Andriakos." The committee stated, "[b]ased on the written information submitted to the committee; in particular the Clinical Student Self–Evaluation Forms from Nursing N242, the committee feels adequate warning was given to Mr. Andriakos by Ms. Graul as to his failure to demonstrate safe clinical practice."

## TITLE IX SUBSTANTIVE STANDARDS

■ Defendants argue that "in Title IX substantive disputes, the courts have looked to their interpretation of Title VII for guidance." Defendants' Brief at 6. Andriakos answers that "it would not appear that Title VII standards are necessarily applicable here." Though Andriakos is correct that the application of Title VII standards is not mandated in this Circuit, he fails to present this court with an alternative standard for the resolution of this dispute. Despite the split in the circuits on this point, the prevailing standard seems to favor applying Title VII standards in Title IX cases. *See Mabry v. State Bd. of Comm. Colleges,* 813 F.2d 311, 316 n. 6 (10th Cir.1987) ("Because Title VII prohibits the identical conduct prohibited by title IX, i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards ..."); *Cf. Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988) (Holding explicitly limited to employment claims under Title IX.); *Cf. O'Connor v. Peru State College,* 781 F.2d 632, 642 n. 8 (8th Cir.1986) ("[H]er Title IX claim merely duplicates her Title VII claim, and we are bound by the decision thereon in favor of Peru State."); *But see Franklin v. Gwinnett County Public Schools,* 911 F.2d 617, 622 (11th Cir.1990) ("We do not believe applying Title VII to Title IX would result in the kind of orderly analysis so necessary in this confusing area of the law."). Therefore the Seventh Circuit's Title VII standards will be applied in this Title IX case.

## TITLE VII STANDARDS

Though obviously some modification is necessary for the application of the Title VII standards to this Title IX case, the Title VII standards are clearly presented in *Karazanos v. Navistar Int'l Transp.,* 948 F.2d 332 (7th Cir.1991).

The employee must first establish a prima facie case of discrimination. The prima facie case has four elements. The employee must show: (1) he was in the protected

810

class, (2) he was doing his job well enough to meet his employer's legitimate expectations, (3) he was discharged or demoted, and (4) the employer sought a replacement for him. If the employee is successful, this creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext.

*Karazanos,* at 335–6 (citations and parenthetical omitted). Rephrasing this passage for application to this Title IX case, the Court arrives at the following standard:

The student must first establish a prima facie case of discrimination. The prima facie case has four elements. The student must show: (1) he was in the protected class, (2) he was performing the academic requirements well enough to meet his educator's legitimate expectations, (3) he suffered adverse treatment, and (4) the educational program continued to instruct and credit other students. If the student is successful, this creates a rebuttable presumption of discrimination, and the burden of production shifts to the educator to articulate a legitimate, nondiscriminatory reason for the adverse action taken against the student. If the educator is successful, the presumption dissolves, and the burden shifts back to the student to show that the educator's proffered reasons are a pretext.

Modified standard from *Karazanos v. Navistar Int'l Transp.,* 948 F.2d 332, 335–6 (7th Cir.1991) for application to Title IX cases.

## CONCLUSIONS OF LAW

1. The Court has Jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1681.

2. Summary Judgment should be granted where no material issue of fact exists. *Matsushita Electric v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ 3. Andriakos has failed to present evidence which satisfies the second element of a prima facie case: that he was performing the academic requirements well enough

to meet his educator's legitimate expectations.

4. The Court finds it unnecessary to address what the proper role of a court in evaluating the faculty evaluations of students in a professional course of study should be since Andriakos has not presented any evidence that the evaluations of his educators were erroneous, that a different standard of evaluation should have been applied, or that the standards of evaluation were mis-applied in his case. Though Andriakos argues that he disagrees with his educators professional judgment, he has not presented any evidence with which this Court could determine whether their judgment was mis-applied. Therefore the Court accepts the results of the evaluations of Andriakos's educators without need to determine what standards should have been applied or whether the standards used were applied correctly.

5. The academic evaluations presented to this Court and excerpted in the findings of fact sufficiently show that Andriakos failed to meet his educators' legitimate expectations concerning his academic performance.

■ 6. Even assuming that this Court would have found that Andriakos had presented a prima facie case, the Court finds that the academic evaluations presented to this Court and excerpted in the findings of fact sufficiently present a legitimate nondiscriminatory reason for failing Andriakos. Further the Court finds that Andriakos has failed to present evidence showing pretext.

7. Though Andriakos has presented his deposition and the affidavit of Sally Moffatt, this evidence does not make a showing of pretext.

8. There is nothing in the evidence presented which indicates that "but for" Andriakos being male he would not have failed N242. Andriakos has failed to show that "but for" his being male he would not have been expelled from the nursing program. *Cf. Matthews v. Allis–Chalmers,* 769 F.2d 1215 (7th Cir.1985).

■ 9. Though Andriakos argues that female students were treated differently and Moffatt's affidavit states that Andriakos was

treated differently than other students by Franks, he has failed to produce any evidence this disparity in treatment was motivated by sexual discrimination beyond his mere assertion. The plaintiff's mere assertions that he believes that he was discriminated against are insufficient to survive a motion for summary judgment. *See Dale v. Chicago Tribune*, 797 F.2d 458 (7th Cir. 1986).

■ 10. Moffatt's affidavit does not say that Franks treated males differently, it says that Franks treated Andriakos differently. This evidence fails to establish that sexual discrimination was the basis of that difference. It is also significant that no mention is made of Graul other than by Andriakos.

11. Moffatt's assertion that while a fellow student with Andriakos she observed nothing in his academic performance which warranted his failure does not challenge the academic evaluations of his educators who did observe such behavior.

12. Summary Judgment is proper here since Andriakos has failed to present evidence of a genuine issue of material fact and as a matter of law he has failed to present a prima facie case of discrimination pursuant to Title IX.

*CONCLUSION*

Taken as a whole, the professional analysis of the course instructors seem reasonable and presents no evidence sexual discrimination. The School of Nursing attempted to assist Andriakos by providing him with two opportunities to pass N242, a deviation from their stated policy. There is no evidence before this Court which indicates that Andriakos was expelled from the nursing program based on his sex. There is ample evidence that his expulsion was based on his multiple failure to adequately demonstrate safe and professional nursing skills. Summary Judgment is GRANTED in favor of the Defendants and against Louis Andriakos on the final basis for his complaint, violation of Title IX.

WATS/800, INC., Plaintiff,

v.

VOICE AMERICA and Larry Walsh, Defendants.

Cause No. EV 93–101–C.

United States District Court,
S.D. Indiana,
Evansville Division.

June 14, 1993.

Jeffrey A. Wilhite, Jeffrey W. Ahlers, Kahn Dees Donovan & Kahn, Evansville, IN, for WATS/800 Inc.

Brian K. Carroll, Johnson Carroll & Griffith, Evansville, IN, for Voice America and Larry Walsh.

### MEMORANDUM

BROOKS, Chief Judge.

This matter comes before the Court on Plaintiff's Motion to Remand. This case was removed by the Defendants on 11 June 1993. The Court has heard arguments on this motion today and now make the following findings of fact and conclusions of law.

1. It is undisputed that the parties entered into a contract containing the following language:

> 45. *Applicable Law* This Agreement shall be governed and construed under the laws of the state of Indiana. Any litigation brought pursuant to this Agreement or otherwise between the parties shall be brought in the state of Indiana in the courts of general jurisdiction for Evansville, Indiana.

Contract at ¶ 45.

2. District Courts, including this one, are Courts of limited jurisdiction. *See Owen Equipment v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1977).

3. Indiana Circuit and Superior Courts are of general jurisdiction. *See Alberts v. Mack Trucks,* 540 N.E.2d 1268 (Ind. App.1989).

4. "[W]here words or terms having a definite legal meaning and effect are knowingly used in a written instrument, the parties thereto will be presumed to have intended such words or terms to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument." *Cunningham v. New York Central R.R.,* 48 N.E.2d 176, 180 (Ind.App. In Banc 1943).

5. Though unartfully drafted, the language of ¶ 45 is unambiguous.

6. General jurisdiction has a definite legal meaning and there is no evidence that the parties did not intend that it be given that meaning.

7. Paragraph 45 confers sole jurisdiction on a court of general jurisdiction, a state court.

8. To interpret ¶ 45 differently would require construing the words "general jurisdiction" as superfluous.

9. "We cannot treat as surplusage any words in a contract to which may be ascribed some contractual significance." *Cornet v. Guedelhoefer,* 219 Ind. 200, 36 N.E.2d 933, 937 (1941).

10. The Sixth Circuit cases argued by the Defendants (*In re Delta America,* 900 F.2d 890 (6th Cir.1990) and *Regis Assoc. v. Rank Hotels,* 894 F.2d 193), are unavailing to their position. Without relying on them as authority, this Court is following their directive that the language of the contract must be interpreted using established principles of contract interpretation and that it must clearly and unequivocally waive the right of removal. Nevertheless, a clear waiver need not use the words "this case cannot be removed." Where, as here, the contract requires a court of general jurisdiction, this Court will not disturb the parties choice of forum.

11. The Court declines to follow *John's Insulation v. Siska Construction,* 671 F.Supp. 289 (S.D.N.Y.1987). *John's Insula-*

*tion's* interpretation of the contract language "shall be commenced" is too narrow. To interpret this language as meaning that it must start in the specified court but does not have to be resolved in that court and may be transferred or removed, simply tortures the language of the contract to the extent that it loses much of its meaning. This Court believes that when parties specify that a suit may only be commenced in a particular court, that it is their intent that it be resolved in that court.

For the forgoing reasons, this Case will be remanded to the Vanderburgh Superior Court this 14th day of June 1993 in Evansville, Indiana.

**Wendell F. DIXON and Martha A. Dixon, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. EV 92–58–C.**

United States District Court,
S.D. Indiana,
Evansville Division.

Oct. 27, 1993.

814

Theodore Lockyear, Lockyear & Kornblum, Evansville, IN, for plaintiffs.

Douglas W. Snoeyenbos, U.S. Dept. of Justice, Washington DC, Jeffrey L. Hunter, U.S. Atty's Office, Indianapolis, IN, for defendant.

### *ORDER*

BROOKS, Chief Judge.

This matter is before the Court on the "United States' Motion to Dismiss Count I for Failure to State a Claim, or, in the Alternative, for Summary Judgment; to Dismiss Count II for Failure to State a Claim; and for Summary Judgment on Count III" filed on June 24, 1992. A supporting memorandum was filed that same date. Plaintiffs responded by filing a "Memorandum in Opposition to Defendant's Motion to Dismiss and/or Summary Judgment" on September 1, 1992. The "United States' Reply to Plaintiffs' Memorandum in Opposition" was filed on September 30, 1992.

The Court, being duly advised, now **GRANTS** the United States' Motion to Dismiss Counts I and II for failure to state a claim. The Court also **GRANTS** defendant's motion for summary judgment as to Count

III. This case is therefore **DISMISSED** in its entirety.

**IT IS SO ORDERED.**

### *MEMORANDUM*

This cause of action is one in which the plaintiffs seek a refund of the interest assessed by and paid to the U.S. Internal Revenue Service under 26 U.S.C. § 6621(c).[1] Plaintiffs propound three theories of recovery in their Complaint.

In Count I, plaintiffs contend that they in no way participated in the preparation and filing of the tax returns of TM Midland Realty Limited Partnership (hereafter "the Partnership"), which appears to be the underlying cause of plaintiffs' tax and interest assessment. Due to their lack of participation and knowledge, plaintiffs argue that the assessment of an additional 20% as a tax-motivated transaction is unlawful. In Count II, plaintiffs contend that the IRS unreasonably delayed the disallowance of the interest deductions by the Partnership and in assessing tax and interest on the deficiency on plaintiffs as limited partners. Plaintiffs argue that since the delay resulted solely from the acts of the IRS, they should not be accountable for the additional 20% interest. In Count III, plaintiffs state that they signed a Form 870–P prepared and agreed to by the IRS which provided, "there are no penalties or additions to tax to the partners." Plaintiffs contend that the assessment of the additional 20% is in violation of that agreement in that it is a penalty.

In their motion, defendant contends that plaintiffs have failed to state a claim on which relief can be granted in Count I. Defendant contends that Count II should be dismissed for failure to state a claim because § 6621(c) imposes no time restraints upon the IRS in resolving tax shelter issues.[2] As to Count III, the defense proposes that it should be dismissed because § 6621(c) is not a penalty, because the agreement between plaintiffs

---

**1.** The Internal Revenue Code in § 6621(c) governs interest on substantial underpayments attributable to tax motivated transactions.

**2.** The defendant also states that to the extent that Count II may rest on an estoppel theory, defen-

dant notes that plaintiffs have failed to allege either a misrepresentation, detrimental reliance, or affirmative misconduct and therefore have failed to state a claim on that theory also. See Footnote 6.

and the IRS did not include a rate of interest, and because Form 870–P clearly stated that the IRS intended to assess interest at the 120% rate.

### Findings of Fact

The following facts appear to be undisputed:

1. Wendell Dixon and Martha Dixon purchased a limited partnership interest in TM Midland Realty Limited Partnership in 1982. They were not the general partner.

2. The plaintiffs were issued Form 1065, Schedule K–1, by the Partnership. The Partnership used the Rule of 78's in computing the information provided to the plaintiffs on Form 1065, Schedule K–1.

3. The IRS gave plaintiffs notice of its audit of the Partnership in June, 1986. After auditing the Partnership, the IRS determined that the Partnership had improperly used the Rule of 78's in deducting interest for the years 1983 through 1987.

4. As a result of the IRS' disallowance of the use of the Rule of 78's, the plaintiffs, as limited partners, were assessed additional tax for the years 1983 through 1987. The plaintiffs paid this tax.

5. The IRS also assessed interest at the rate of 120% on the theory that the Schedule K–1 deduction claimed by the plaintiffs was a tax motivated transaction under § 6621(c). The plaintiffs have paid this amount also.

6. On September 24, 1990, plaintiffs signed five Forms 870–P, one for each year between 1983 and 1987. The 1983, 1984 and 1985 Forms 870–P were accepted by the IRS on October 19, 1990; the 1986 and 1987 forms were accepted on October 1, 1990 by the IRS.

7. The Forms 870–P which were submitted for the years 1984 through 1987 provide that "[t]here are no penalties or additions to tax to the partners" and "annual rate of interest payable on the partner's tax deficiencies ... shall be 120% of the adjusted rate established under section 6621(b) of the Internal Revenue Code." The 1983 form does not contain this language.

### Discussion

It is appropriate to begin the Court's discussion by determining whether § 6621(c) is a penalty or an interest provision. Such a determination will have a bearing on the remaining issues in this case.

The Internal Revenue Code provides as follows:

**§ 6621. Determination of rate of interest**

\* \* \* \* \* \*

**(c) Interest on substantial underpayments attributable to tax motivated transactions.—**

**(1) In general.—**In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section.

Plaintiffs argue that § 6621(c) operates as an "interest penalty." Plaintiffs also argue that even if it is assumed that the 120% is solely interest, when compounded over several years, it loses its interest characteristics and becomes a penalty. However, plaintiffs cite no authority supporting this proposition.

It is well settled that a court need not look beyond the words to interpret a statute if the language is clear and unambiguous. *Meredith v. Bowen*, 833 F.2d 650 (7th Cir.1987). If a statute is unambiguous, the plain language is the best evidence of its meaning. *Id.*

The Court concludes that the language of § 6621(c) is unambiguous; it is susceptible of only one interpretation. The language of the statute specifically designates the 120% as interest. Nowhere does the word "penalty" appear. In addition, as defendant has pointed out, Chapter 67 of the Internal Revenue Code is entitled "Interest." Section 6621 is included within Chapter 67. Penalty provisions are included in Chapter 68, which is entitled "Additions to the Tax, Additional Amounts, and Assessable Penalties." It is clear to this Court that the 120% payment imposed by § 6621(c) is an interest provision.

■ Another preliminary determination which will have a bearing on the remaining issues in this case is whether the tax motivation transaction analysis is made at the partnership level or at the partner level. Neither party has cited authority to assist the Court in this determination, and the Court was unable to find any case directly on point. Thus the Court analogizes this case to one in which the issue was one of profit motive.

In *Simon v. Commissioner*, 830 F.2d 499 (3rd Cir.1987), the Commissioner of Internal Revenue determined that a limited partnership did not enter into a coal mining venture for the predominant purpose of making a profit. As a result, the partnership's claimed deductions for trade and business expenses under 26 U.S.C. § 162(a) were disallowed. One of the issues in the case was at which level the partnership's profit objective should be scrutinized. The limited partners were claiming that even if the partnership did not have a profit objective, some of the individual investors (i.e., limited partners) did have a profit motive. The Court stated that "(t)he law is settled that the determination of whether an expense is deductible under 26 U.S.C. § 162(a) is controlled by the partnership's motive, not by an individual partner's motive." *Id.* Thus even if the individual partners may have had a profit motive, it was the *partnership's* motive that was inferred to them.

Based on this analogy, the Court holds that the tax motivated transaction analysis is performed at the partnership level. The results of that analysis are then inferred to the individual partners, and it is they who either enjoy or suffer the consequences.

### Count I

■ Having made these initial determinations, the Court turns to the specific issues raised by defendant's motion. In Count I, plaintiffs claim that since they had no partic- ipation in the preparation and filing of the tax returns of the Partnership and no knowledge of the contents of the Partnership's returns, they should not be held accountable for the Partnership's use of the Rule of 78's resulting in the § 6621(c) interest assessment against them. While plaintiffs readily admit that the Partnership erred in using the Rule of 78's,[3] they argue that their claim should be allowed since they had no control over the preparation of the tax returns, never saw the tax returns, and had no control over the use of the rate of amortization used by the general partner's tax accountants. (See plaintiffs' brief in opposition, p. 5.) However, plaintiffs cite no authority in support of this proposition. The defendant contends that plaintiffs have failed to state a claim upon which relief can be granted.[4]

The Court grants defendant's motion to dismiss as to Count I; plaintiffs have failed to state a claim upon which relief can be granted. The Court's rationale is based on its finding that as a matter of law plaintiffs' substantial underpayment was attributable to a tax motivated transaction.

■ Section 6621(c) of Title 26 of the United States Code provides for 120% interest when there is a substantial underpayment[5] attributable to tax motivated transactions. Section 6621(c) provides that "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period ..." qualifies as a tax motivated transaction. This is clearly an objective test and does not require inquiry into the subjective mind of the taxpayer.

Treasury Regulation § 301.6621–2T, A–3(3) proscribes the use of a method of computing interest deductions which results in the amount of interest exceeding the true cost of indebtedness because it may result in a substantial distortion of income. The Rule

---

3. The Rule of 78's can result in an unclear reflection of the partnership's income. For thorough discussion of the Rule of 78's, see *Prabel v. Commissioner*, 91 T.C. 1101, 1988 WL 138769 (1988), *aff'd*, 882 F.2d 820 (3rd Cir.1989).

4. Defendant has withdrawn its alternative motion for summary judgment.

5. Substantial underpayment is defined as "any underpayment of taxes ... which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1000." Neither party has raised the substantiality of the underpayment as an issue.

of 78's has been found to be a method of computing interest expense resulting in interest exceeding the true cost of indebtedness. *See Prabel v. Commissioner, supra.* This Court concludes that the Rule of 78's fits within the definition of tax motivated transactions as set out in § 6621(c).

As the initial determination of this decision indicates, the inquiry of tax motivated transactions takes place at the partnership level, not at the individual partner level. That determination is inferred to the limited partners. Plaintiffs admit that the Partnership erroneously used the Rule of 78's in preparing its tax returns. This resulted in the Partnership's income being substantially underreported to the plaintiffs and the plaintiffs' personal income tax returns reflecting excessive interest deductions. Regardless of whether the plaintiffs were personally motivated by the tax considerations, it is they who must suffer the consequences of the Partnership's use of the Rule of 78's. Plaintiffs' remedy for the Partnership's erroneous use of this method of accounting does not lie against the IRS. Therefore the Court finds that the motion to dismiss Count I should be granted for failure to state a claim upon which relief can be granted.

### Count II

■ Count II complains that defendant unreasonably delayed in completing its examination. Plaintiffs argue that because the delay resulted solely from the acts of the IRS, they should not be charged the additional 20% interest. This Court finds that Count II fails to state a claim upon which relief can be granted for a number of reasons.[6]

First plaintiffs have failed to provide this Court with any statutory or case authority imposing a duty upon the IRS to resolve an issue within a particular time frame. The only "authority" cited by plaintiffs is the Treasury publication entitled "Your Rights As A Taxpayer." The plaintiffs point to the section in the publication regarding "Interest." That section states that while interest

may be assessed, "if [the IRS'] error caused a delay in [the taxpayer's] case and this was grossly unfair, the [taxpayer] *may* be entitled to a reduction in the interest." (Emphasis supplied.) 26 U.S.C. § 6404(e) provides the basis for this portion of the publication's language. Subsection "e" is entitled "Assessments of interest attributable to errors and delays by Internal Revenue Service." It provides that "the Secretary *may* abate the assessment of all or any part of such interest for any period." (Emphasis supplied.) The fact that the word "may" was used instead of "shall" or "must" indicates that the Secretary's decision is discretionary and not mandatory. Several cases have held that judicial review is precluded by the discretionary language and legislative history behind § 6404(e). *See Horton Homes, Inc. v. United States,* 936 F.2d 548 (11th Cir.1991), and *Selman v. United States,* 941 F.2d 1060 (10th Cir.1991). In sum, the decision as to whether there should be an abatement of interest is left to the discretion of the Secretary.

The Court also notes, as previously discussed, that the entire 120% figure is to be considered interest and not a penalty. Because it is characterized as interest, it is meant to compensate the delay in payment similar to interest on a loan. Interest is assessed in order to compensate the government for the period during which it was deprived of the use of the money. *Vick v. Phinney,* 414 F.2d 444 (5th Cir.1969). It thus can be reasoned that the government was without the use of the money during the period for which interest is being assessed and is entitled to interest on that figure.

For the foregoing reasons, the Court finds Count II of plaintiffs' Complaint should be dismissed for failure to state a claim.

### Count III

■ Count III of plaintiffs' Complaint alleges that the assessment of the interest pursuant to § 6621(c) violated the terms set forth in the Forms 870–P executed between the plaintiffs and defendant. Plaintiffs point to the language of the forms that states that

---

6. The government raised a defense to an estoppel theory in its brief in support if its motion to dismiss filed June 24. 1992. However, the plaintiffs have not asserted a claim based on estoppel. Because the plaintiffs have not raised such a claim, the Court declines to discuss this issue.

"there are no penalties or additions to tax to the partners." Plaintiffs premise their argument on "the theory that the defendant by its unconscionable delay and by the compounding of the one hundred twenty percent interest has imposed a penalty upon the taxpayer." (See plaintiffs' memorandum in opposition filed September 1, 1992, p. 6.)

The Court finds that there is no genuine issue of material fact regarding Count III and that, as a matter of law, Count III should be dismissed. As the Court has previously discussed, the 120% figure is to be considered interest and not a penalty. Thus the main thrust of plaintiffs' argument is defeated. In addition, the Forms 870–P for the years of 1984, 1985, 1986 and 1987 clearly state that "the annual rate of interest payable on the partner's tax deficiencies ... shall be 120% of the adjusted rate established under section 6621(b) of the Internal Revenue Code." It is clear to this Court and should have been clear to the taxpayer at the time they executed the documents that the 120% interest figure would be calculated on the assessed deficiencies.

It is true that the Form 870–P for 1983 does not contain the explicit language found on the other forms. However, the 1983 form was signed on the same date as the other forms. In addition, plaintiffs have not submitted any affidavits or other evidence to indicate that they were led to believe that interest would not be assessed against the 1983 tax deficiency.

The Court therefore finds that defendant's motion for summary judgment as to Count III should be granted and said count should be dismissed.

### Conclusion

Count I and II are **DISMISSED** for failure to state a claim. The Court also **GRANTS** defendant's motion for summary judgment as to Count III.

Walter **KIMBREW**, Plaintiff,

v.

**EVANSVILLE POLICE DEPARTMENT,** Officers A. Yeager (1055), J. Evans (1089), D. Erk (1040), Defendants.

No. EV 91–167–C.

United States District Court, S.D. Indiana, Evansville Division.

Sept. 30, 1994.

Walter Kimbrew, Pendleton, IN, R. Lawrence Daly, Wright Evans & Daly, Evansville, IN, for Walter Kimbrew.

Stephen H. Thomas, Statham Johnson & McCray, Evansville, IN, for Evansville Police Dept., Officer A. Yeager (1055), Officer J. Evans (1089), Officer D. Erk (1040).

## MEMORANDUM

BROOKS, District Judge.

This matter came before the Court on a trial without a jury, commencing on July 5, 1994. Having considered the evidence, including all exhibits and depositions admitted into evidence, and having considered the demeanor and credibility of the witnesses, the Court hereby enters its findings of fact and conclusions of law in this memorandum.

### Findings of Fact

These findings of fact are developed from evidence that was presented at trial including testimony and exhibits admitted into evidence. This statement is not intended to represent a complete factual determination of this case; further, additional facts will be applied as necessary in the legal analysis below.

Walter Kimbrew and two other individuals were standing in a group between Sycamore Street and Sycamore Park in Evansville, Indiana on the afternoon of November 12, 1989. Prior to this date, Evansville Police Officers Donald Erk, Jr. and Alan Yeager had been advised, directly or indirectly, of the suspicion of illegal drug-related activity being conducted at or near Sycamore Park. While on patrol on November 12, 1989, Officers Erk and Yeager were driving up Sycamore Street towards Sycamore Park when they observed Walter Kimbrew and the other individuals. Officers Erk and Yeager elected to act on the general suspicion of the area and approached the individuals under the guise of questioning them about a suspect in an unrelated matter. While approaching, the Officers saw one of the individuals toss something to the ground which they immediately suspected to be marijuana. Officers Erk and Yeager immediately requested the three individuals to place their hands on the car in an effort to gain control of the situation.

At some point during the confrontation Officers Erk and Yeager had requested backup, such help arrived in the form of Officers John Evans and Stephen Green. Upon arrival, Officer Evans was instructed to pat down "the one on the end," who in this case happened to be Walter Kimbrew. Aware of the nature of the transaction and otherwise suspecting one of the individuals may have a weapon, Officer Evans conducted a frisk for weapons on Walter Kimbrew. Feeling items contained in Walter Kimbrew's front pockets but unsure of their identity, Officer Evans reached his hands into Walter Kimbrew's front pockets and emptied the contents onto the hood of the police car. Upon observation Officer Evans found the contents to include two small clear plastic baggies containing a white powdery substance. One of the bag-

gies was hidden from immediate view in a cellophane cigarette package. Walter Kimbrew insisted the substance was, in fact, baking soda.

Suspecting the white powdery substance to be cocaine or other controlled substance, Officer Evans requested that the substance be field tested. At some point between Sycamore Park and booking at Vanderburgh County Jail in Vanderburgh County, Indiana, the white powdery substance found in Walter Kimbrew's possession field tested positive as containing a controlled substance. Walter Kimbrew was then arrested for possession of a controlled substance and detained in Vanderburgh County Jail for the same. An independent judicial determination of probable cause of Walter Kimbrew's November 12, 1989 arrest was made in Vanderburgh Superior Court, Misdemeanor Traffic Division, on November 13, 1989.

Pursuant to established procedure, the white powdery substance was placed in the evidence drop box at the Evansville Police Department later in the day of November 12, 1989. Frank Wilkins, Evansville Police Department Evidence Custodian, retrieved the white powdery substance from the evidence drop box on November 13, 1989. On November 28, 1989, Frank Wilkins transported the evidence from the Evansville Police Department headquarters located in downtown Evansville to the Indiana State Police Laboratory located approximately seventeen miles away. Testing commenced on the substance December 1, 1989. On December 4, 1989, the completed testing yielded a result indicating the suspected substance was free from any controlled substances. Frank Wilkins then picked up the evidence and associated test results for the return trip to Evansville Police Department headquarters on December 11, 1989. All charges in the matter were dropped and Walter Kimbrew was released from custody January 8, 1990.

### Conclusions of Law

Plaintiff Walter Kimbrew filed a claim in this Court alleging defendants deprived him of constitutionally guaranteed rights in violation of 42 U.S.C. § 1983. This Court has jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1331.

Section 1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State of Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States, or other person, within the jurisdiction thereon, to the deprivation of the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983. Notably, § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, —— U.S. ——, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114, 122 (1994) (internal quotations omitted); *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). "When government officials abuse their offices, 'actions for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). Presently, Plaintiff Walter Kimbrew alleges the Defendants deprived him of rights guaranteed him by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Specifically, Walter Kimbrew claims his Fourth Amendment rights were contravened by an unauthorized search and seizure; Walter further contends his rights to due process were violated by an unreasonable term of incarceration without cause.

### Search and Seizure

The threshold determination for any § 1983 action is whether there has indeed been a constitutional deprivation. *See Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir.1990). Addressing first the alleged Fourth Amendment violation, it is this Court's reading of the current state of Fourth Amendment jurisprudence that the

822

initial stop and frisk were proper but the subsequent search and seizure were not.

The Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), serves to guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ..." U.S. Const. amend. IV. While "[n]o right is held more sacred, or is more carefully guarded," *Union Pacific Railway Company v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), the Supreme Court has stressed that "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). The searches and seizures prohibited are those " 'conducted outside the judicial process, without prior approval by judge or magistrate ... subject only to a few specifically established exceptions.' " *Thompson v. Louisiana,* 469 U.S. 17, 19–20, 105 S.Ct. 409, 410, 83 L.Ed.2d 246 (1984) (per curiam) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One notable exception was recognized in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the Supreme Court held that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous; where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries; ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment ...

392 U.S. at 30–31, 88 S.Ct. at 1884–85. Momentary seizures of individuals by law enforcement for the reasons indicated are commonly known as *"Terry* stops." *See Michi-*gan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Adebayo,* 985 F.2d 1333 (7th Cir.1993). *Terry* has been applied to make lawful under the Fourth Amendment "a semi-arrest ... if but only if the officers had a 'reasonable suspicion supported by articulable facts' that the persons stopped were engaged in criminal activity." *United States v. Ornelas–Ledesma,* 16 F.3d 714, 716 (7th Cir.1994) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)).

The pat down, or frisk, incident to the *Terry* stop similarly is lawful only if it is "for the protection of [the officer] and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30–31, 88 S.Ct. at 1884–85. More recently the United States Court of Appeals for the Seventh Circuit held that "[t]he only lawful purpose of a search incident to a *Terry* stop is to protect the officers from the danger that the persons they have stopped will reach for a weapon." *United States v. Ornelas–Ledesma,* 16 F.3d at 719 (citing *Minnesota v. Dickerson,* 508 U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993); *Michigan v. Long,* 463 U.S. 1032, 1049–51, 103 S.Ct. 3469, 3480–82, 77 L.Ed.2d 1201 (1983)). The validity of a *Terry* stop and frisk is evaluated under the totality of the circumstances as they occurred to the officer at the time of the stop. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Espinosa–Alvarez,* 839 F.2d 1201, 1206 (7th Cir.1987).

Under the present facts, there existed a reasonable suspicion justifying a *Terry* stop and frisk. Prior to and during the time of the stop the Defendant officers had been advised of drug activity at or near Sycamore Park. The dangerous nature of the drug trade is well known by the law enforcement community and this Court. An uncorroborated tip from an informant cannot by itself furnish probable cause for an arrest or search. *Illinois v. Gates,* 462 U.S. 213, 227, 103 S.Ct. 2317, 2326, 76 L.Ed.2d 527 (1983). That is not important here, however, as Defendant officers testified that while approach-

ing they observed one of the group throw something to the ground which appeared to be marijuana. The Defendant officers testified that they thereafter observed furtive movements and concerned gestures. These factors combine to create the requisite suspicion for a *Terry* stop and frisk. That the individual who tossed the object to the ground was later acquitted has no detrimental effect on the initial stop. The officers, observing "unusual conduct ... lead[ing] them] reasonably to conclude in light of [their] experience that criminal activity may be afoot" were justified in making the initial stop. *Terry*, 392 U.S. at 30–31, 88 S.Ct. at 1884–85.

Regarding the search beyond the initial *Terry* stop and frisk, the recent Supreme Court holding in *Minnesota v. Dickerson,* 508 U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993), is instructive. It is instructive only for the spirit of the reasoning contained therein as while this Court is fully aware a 1993 holding cannot without compelling reason be retroactively binding on Officer Evans, it is highly relevant in this Court's analysis under *Terry*. The point being *Dickerson* is arguably the most liberal reading of *Terry* to date, if Officer Evans could not satisfy *Dickerson* in 1994, he certainly could not satisfy *Terry* and its progeny in 1989.

In *Dickerson* the Supreme Court specifically rejected a so called "plain feel" exception to the warrant requirement where the identity of the concealed object is not immediately apparent. *Id.* The Supreme Court there declined to analogize the "plain view" exception, *See United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985); *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), to validate a search and seizure incident to a lawful *Terry* stop where the investigating officer could only detect "a lump, a small lump, in the front pocket. ... [which he suspected] to be a lump of crack cocaine ..." *Dickerson*, 508 U.S. at ——, 113 S.Ct. at 2133, 124 L.Ed.2d at 341. The lump was later found to be one fifth of one gram of crack cocaine. *Id.* In discussing the analogy, the Supreme Court reaffirmed the "plain view" exception noting that the whole prem-

ise of the exception is that what the police would lawfully observe could not be construed as a search as there could be no expectation of privacy of that which is in "plain view." *Dickerson,* 508 U.S. at ——, ——, 113 S.Ct. at 2136–37, 124 L.Ed.2d at 345 (citing *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983); *Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983)). In *Dickerson,* however, the Court chose to invalidate the search because unlike the "plain view" exception, the "plain feel" in that case required further inquiry into the criminality of the evidence, thus an unlawful search. The Supreme Court held that under a "plain view" exception if the "incriminating character is not immediately apparent" it is not a valid search; therefore, when physical manipulation does not immediately reveal the criminality contained therein, there can be no further lawful investigation under the guise of *Terry. Dickerson,* 508 U.S. at ——, ——, 113 S.Ct. at 2136–37, 124 L.Ed.2d at 345–46. The Supreme Court summarized the *Dickerson* holding as follows:

> [a]lthough the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.

*Dickerson,* 508 U.S. at ——, 113 S.Ct. at 2139, 124 L.Ed.2d at 348 (citing *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)).

In the present case Walter Kimbrew was patted down and searched by Officer John Evans. In discussing the events surrounding the search, Officer Evans represented to this Court a variety of versions of the circumstances. In an August 3, 1992 affidavit submitted by Defendants, Officer Evans stated

"[t]hat incidental to the search of plaintiff, two small bags of what appeared to be cocaine were found inside plaintiff's pants pockets. One bag was concealed within the wrapping of a pack of Salem 100 cigarettes." (Evans Aff., ¶ 6). In his deposition Officer Evans testified as follows:

I, at that time, observed that there were large clumps in his pockets, which appeared to be items inside his pockets. I, at that time, did a routine pat-down for weapons.

At that time I felt the two large clumps, on in each of his pockets. I did not know what was in the pockets. I felt for my safety and for the officers' safety that I should find out what is in the pockets, that it could be a weapon, and felt in fear for the other officers' safety and my safety if I did not reach in and find out what was in the pockets. I did do that to each pocket. When I did so, I placed two globs, is the best way I can describe them, of items away from Mr. Kimbrew on the vehicle.

I did not see any weapons that appeared to be items that could harm me at that time. As I looked at the items, I picked up each glob, and I was going to hand them back to Mr. Kimbrew. I, at that time, observed a pack of cigarettes. Inside the cellophane wrapper around the cigarettes I observed a baggy corner containing a white, powdery substance. . . .

(Evans Dep. at 5). At trial, Officer Evans generally demonstrated an inability to distinguish between a frisk for weapons and an actual search, consistently referring to a "pat down search." On the first day of trial, when he was called as a witness by the Plaintiff, Officer Evans recalled:

THE COURT: What else was in the pocket [in addition to the baggies]?

JOHN EVANS: Several items, sir, a large clump of items. Exactly what they were, I really can't remember. I just remember a large clump of items.

(Testimony of John Evans, 7/5/94). On the second day of the trial, when called as a witness for the defense, Officer Evans gave the following testimony:

MR. RAIBLEY: When you patted down Walter's front pockets, could you tell what was inside?

JOHN EVANS: No, sir, it felt like several items; I couldn't tell. I had no idea what was in there.

MR. RAIBLEY: In order for you to conclude that Walter Kimbrew was not carrying any weapons in his pockets that day, what would you have to do?

JOHN EVANS: The only way I could tell whether or not that he had any weapons in his pockets was to actually stick my hand in and remove the items and see them physically and make sure that they were not weapons.

MR. RAIBLEY: Now, do you recall specifically all the items that you removed from his pockets?

JOHN EVANS: No, sir, I don't recall the items. I vaguely remember maybe there's an ink pen there, but other than a large glob of items is about basically all I can say.

MR. RAIBLEY: There were several items in his pockets; is that your testimony?

JOHN EVANS: Yes, yes.

MR. RAIBLEY: Did you find any weapons?

JOHN EVANS: Other than, like I say, I vaguely possibly remember an ink pen. Other than that, I don't recall.

MR. RAIBLEY: Have you ever seen an ink pen used as a weapon?

JOHN EVANS: I don't know if I've ever seen one used as a weapon. I know they have been.

(Testimony of John Evans, 7/6/94). Reviewing the statements, the affidavit makes no mention of the circumstances by which Officer Evans felt the necessity to invade Walter Kimbrew's pockets and the deposition testimony indicates Officer Evans emptied Walter Kimbrew's pockets in keeping with an inarticulable suspicion or fear; it was only at the trial phase that Officer Evans was able to find the term "weapon" in justification of his search incident to the stop and frisk. Officer Evans, however, has it backwards: finding something which he might have suspected to be a weapon and having the requisite suspi-

cion prior to the search are two entirely different things. Officer Evans did not articulate to this Court any suspicion of a weapon or any indication of a weapon before the search beyond the reasonable suspicion justifying the pat down.

Officer Evans' fatal flaw derives from his failure to either understand or appreciate the protective standards set forth by *Terry* and its progeny. It appears, however, Officer Evans is aware or has *become* aware of the "weapons only" language of cases like *Ornelas–Ledesma,* 16 F.3d at 719. If an ink pen becomes a weapon for *Terry* considerations of "armed and dangerous," the situation presented here could come to be termed the "ink pen" exception: any search desired could be conducted subsequent to a *Terry* frisk by merely referring to a mythical ink pen. This Court is unwilling to carve so clever an exception.

In Officer Evans' defense, several cases on record support his theory that an ink pen can be a weapon. *See, e.g., State v. Johnson,* 598 So.2d 1152 (La.App.1992); *Tumminia v. Coughlin,* 175 A.D.2d 383, 572 N.Y.S.2d 455 (1991); *People v. Williams,* 175 Mich.App. 312, 433 N.W.2d 356 (1988); *State v. Johnson,* 304 N.C. 680, 285 S.E.2d 792 (1982); *State v. Gilcrist,* 12 Wash.App. 733, 531 P.2d 814 (1975). Apparently, however, only one court has addressed the pen-as-a-weapon issue in the context of a *Terry* stop and frisk. *See Thomas v. State,* 853 S.W.2d 734 (Tex. App.1993). The *Thomas* court held that

> [f]or the purposes of a limited *Terry* search by armed police officers, we hold that a suspicion that a pen or pencil is in a detainee's pocket does not constitute a reasonable suspicion that a weapon is being concealed. Accordingly, we hold the removal of the object, which [the] Officer [ ] thought was a pen or pencil, from appellant's pocket, constituted an illegal search without probable cause.

853 S.W.2d at 736 (internal citations omitted). Obviously this holding presently has no more operative effect than to pique the interests of this Court, but that fact is altogether irrelevant as this Court is of the opinion there never existed such a pen, and even if there were, Officer Evans has not indicated he had the appropriate suspicion to conduct the search subsequent to the pat down. Officer Evans appeared before this Court attempting to represent the only importance in analysis of the search is what he may or may not have found, without regard to suspicions by which he deemed that search necessary. Officer Evans appeared to be completely indifferent to rights that may exist under the Fourth Amendment as articulated by *Terry* and its progeny.

The Seventh Circuit holding in *Brownell v. Figel,* 950 F.2d 1285 (7th Cir.1991), is relevant in this determination. In *Brownell,* where the Seventh Circuit upheld a search subsequent to a *Terry* stop and frisk despite the failure to discover weapons in the search, the Court noted

> [a]t trial, [the arresting] Officer … testified that he observed two bulges in the front pockets of [the detainee's] leather jacket, and therefore advised [the detainee] that he wanted to conduct a limited patdown for weapons…. [The] Officer then felt each of the bulges … and determined that each was the approximate size and texture of a small automatic weapon. Only after emptying [the detainee's] pockets was it apparent that the lumps were packets of cocaine. The district court specifically stated it found [the Officer's] testimony about [the] stop and frisk to be fully and completely credible.

*U.S. v. Somers,* 950 F.2d 1279, 1284 (7th Cir.1991) (internal quotations omitted). The holding in *Brownell* is factually distinguishable as Officer Evans did not testify he had the specific suspicion Walter Kimbrew might be concealing automatic weapons, or any weapon for that matter, nor does this Court find Officer Evans' testimony to be fully and completely credible. With specific reference to *Terry v. Ohio* and its recent reaffirmation in *Minnesota v. Dickerson,* "the incriminating character of the object was not immediately apparent to" Officer Evans, thus a further search was unjustified under the current state of Fourth Amendment jurisprudence and that existing at the time of arrest.

*Arrest and Detention*

Pursuant to his arrest on November 12, 1989, Walter Kimbrew was detained in Van-

derburgh County Jail for fifty-eight days before he was eventually released when all charges were dismissed. Walter claims this term of incarceration constituted a deprivation of liberty contravening the due process clause of the Fourteenth Amendment.

■ On November 12, 1989, the arresting officers had probable cause for Walter Kimbrew's arrest. "The police have probable cause to arrest an individual where 'the facts and circumstances within their knowledge and of which they [have] reasonable trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed of was committing an offense.'" *United States v. Goudy,* 792 F.2d 664, 668 (7th Cir.1986) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)), *See also Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "The determination of whether probable cause exists in a given factual situation involves 'the factual, practical considerations of everyday life upon which reasonable, prudent [persons], not legal technicians act.'" *Id.* (quoting *United States v. Watson,* 587 F.2d 365, 368 (7th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979)). Perhaps most succinctly, "finding a white powder in a person's possession provides probable cause to arrest that person for possession of cocaine." *Garcia v. City of Chicago, Ill.,* 24 F.3d 966, 970 (7th Cir.1994).

■ Under the present facts, clearly there was probable cause to arrest. However illegally obtained, the arresting officers acquired from Plaintiff's person a white powdery substance resembling cocaine. The field test kit provided to Evansville Police Officers indicated the substance to be an illegal substance. The fact that a more thorough test subsequently determined the substance was not, in fact, illegal cannot retroactively invalidate the probable cause that existed at the time of arrest. *See Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 2694–95, 61 L.Ed.2d 433 (1979); *Schertz v. Waupaca County,* 875 F.2d 578 (7th Cir.1989).

■ The next issue Walter Kimbrew contests is his fifty-eight day stay in Vander-

burgh County Jail. "The right to arrest a suspect does not, of course, give the state the right to hold him for any length of time or under any conditions. It is axiomatic that due process requires that a pretrial detainee not be punished." *Bergren v. City of Milwaukee,* 811 F.2d 1139, 1143 (7th Cir.1987) (internal quotation omitted). Subsequent to judicial determination of probable cause on November 13, 1989, Walter Kimbrew was no longer "seized" as determined under the Fourth Amendment; thus, Walter's sole grounds for constitutional challenge exist under the Due Process Clause. *See Wilkins v. May,* 872 F.2d 190, 193 (7th Cir.1989), *cert. denied,* 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990).

■ Walter Kimbrew claims that he was unreasonably detained pending final confirmation of field test results and was further unlawfully detained subsequent to the return of negative laboratory results. On these issues the recent Seventh Circuit case of *Garcia v. City of Chicago,* 24 F.3d 966 (7th Cir.1994) *rehearing and suggestion for rehearing en banc denied* (August 15, 1994), is controlling. In *Garcia,* Rafael Garcia, while on probation for an unrelated matter, was arrested for possession of a controlled substance on March 15, 1991; the suspected substance was sent for testing the next day. Subsequent to a judicial of probable cause pursuant to *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), Garcia was detained and his probation revoked. On March 26, 1991, the final laboratory test results indicated the substance found in Garcia's possession at the time of the arrest did not contain any controlled substances. The State's Attorney's office moved for a *nolle prosequi* on April 10, 1991, and Rafael Garcia was released from custody April 15, 1991. *Garcia* 24 F.3d at 968.

Garcia then brought an action under § 1983 seeking money damages alleging, among other things, that "the City of Chicago's procedures for testing substances were constitutionally inadequate." 24 F.3d at 968. The Seventh Circuit addressed Mr. Garcia's relative rights under the Due Process Clause in two parts: 1) rights to speedy confirmation of initial test results while detained; and

2) rights to be released once the prosecutor is in possession of exculpatory evidence. 24 F.3d at 970–71. First, although the probation revocation caused by the judicial determination of probable cause complicated any rights that Rafael Garcia may have otherwise had regarding his term of incarceration, the *Garcia* court addressed the relative merit of an action contesting effectiveness of testing procedures. 24 F.3d at 970–71. The *Garcia* testing procedure was accomplished within a ten day period, but the court declined to find, indeed *could not fathom*, how what was effectively a twenty-five day turn around could be constitutionally deficient. 24 F.3d at 970.

Additionally, although this Judicial District has in the past refused to recognize a substantive right to speedy confirmation of preliminary evidentiary findings, *See Pennington v. Hobson*, 719 F.Supp. 760, 771 (S.D.Ind. 1989), the *Garcia* holding appears to have virtually eliminated any hope for such right; the *Garcia* court noted a concerned would-be § 1983 plaintiff should instead exercise the right for self testing under the Fourth Amendment's Compulsory Process Clause. 24 F.3d at 970 n. 5. This creates an interesting question in the case of a plaintiff proceeding *in forma pauperis*, such as Walter Kimbrew, but this issue will not be addressed, however, as the coverage of the *Garcia* holding appears to preclude lenient rulings on this issue.

Walter Kimbrew was arrested November 12, 1989. A judicial determination of probable cause to arrest pursuant to *Gerstein*, 420 U.S. 103, 95 S.Ct. 854, was made November 13, 1989. The evidence seized from Walter Kimbrew during the arrest was placed into the Evansville Police Department's evidence locker the day of the arrest, thereby setting into motion the testing mechanism. On the date of his arrest Walter was on probation pursuant to Vanderburgh County Circuit Court Criminal Cause Number 6473, an unrelated matter. Prior to the arrest date, through actions unrelated to the present matter, Walter Kimbrew violated the terms of his probation giving cause to the State of Indiana to file a Petition for Revocation of Intensive Supervision Program on October 24, 1989. Obviously due to his incarceration

commencing November 12, Walter Kimbrew failed to appear at a November 16, 1989 revocation hearing causing the issue of a bench warrant. Apparently after learning he was detained on a different matter, on November 22, 1989, Vanderburgh County Circuit Court ordered Walter Kimbrew held in Vanderburgh County Jail pending further order. The laboratory test results were returned to the Evansville Police Department on December 11, 1989.

The present facts differ slightly from those in *Garcia*, but it is controlling nonetheless. Addressing only the period of detention from the initial arrest until the final laboratory determination, the Seventh Circuit has squarely held there exists no substantive right to speedy confirmation of preliminary evidence. 24 F.3d at 970. Walter Kimbrew's position is further complicated by his probationary status at the time of the arrest, thus reducing the questionable period to a mere ten days. The ten days in question here is derived from Walter's detention from November 12 until November 22, thereafter he was being held pursuant to a court order relative to the pending probation revocation. In light of *Garcia* and the foregoing, this Court cannot conclude Walter Kimbrew's due process rights were deprived by virtue of his detention pending final determination of the laboratory results.

■ In the second part of the *Garcia* analysis, the Seventh Circuit went on to address the implications of the time period between the receipt of the negative test results and the State's motion for *nolle prosequi*, the court stated:

What happens when the prosecutor discovers exculpatory evidence after a probable cause determination at a *Gerstein* hearing? Not all exculpatory evidence irrefutably proves the defendant's innocence. The decision to move for *nolle prosequi* is a matter of prosecutorial discretion, and the prosecutor can proceed to trial if the prosecutor believes doing so is warranted. In this case, in fact the prosecutor *did* dismiss the case well before trial, at the preliminary hearing—Garcia just contends that the delay from March 26 until April 10 . . . was too lengthy. The Due Process Clause,

however, does not compel prosecutors to dismiss its cases before trial based on exculpatory evidence in its possession, much less compel them to do so within fifteen days. *See Albright v. Oliver,* [——] U.S. [——], [——], 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (citing *Gerstein* for the proposition that the accused is not "entitled to judicial oversight or review of the decision to prosecute.")

*Garcia,* 24 F.3d at 971 (emphasis original). Presently, the questionable period of prosecutorial discretion was not fifteen days, but twenty-eight. Splitting hairs over the differential is not in order here in light of the spirit of the *Garcia* holding. Under that holding this Court is compelled to hold Walter Kimbrew was not deprived of his Due Process rights by being held subsequent to the return of negative tests results.

As an additional matter, Walter Kimbrew initially claimed the detention constituted a violation of his Eighth Amendment rights in addition his Fourteenth Amendment due process rights. Accordingly, it is relevant at this point to note that once an arrested person is charged, but before he is convicted, questions pertaining to the manner or duration of confinement passes over from the Fourth Amendment to the due process clause; after conviction, it becomes an Eighth Amendment issue. *Wilkins v. May,* 872 F.2d 190, 193 (7th Cir.1989), *rehearing denied, cert. denied* 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990); *Villanova v. Abrams,* 972 F.2d 792 (7th Cir.1992). This Court's analysis of the propriety of Walter Kimbrew's detention is set forth above, as Walter was never convicted in this matter, further analysis under the Eighth Amendment would be misplaced.

*Liability Under § 1983*

■ There having been found a deprivation of Walter Kimbrew's Fourth Amendment rights to be free of illegal search and seizure, a § 1983 liability analysis is in order. Regarding first the individual liability, Defendants Yeager, Erk, and Evans are named in this action by their titles as "officers." Personal capacity civil rights suits seek to impose personal liability on a government official for actions he takes under color of law; in contrast, an official capacity suit is effectively a suit against the governmental body which the individual represents. *See Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Plaintiff's complaint, filed *pro se,* named the Evansville Police Department in addition to the three police officers. Generally, absent express statements that the parties are to be implicated in their personal capacities, an allegation of actions under color of law is construed as an official capacity suit only. *Yeksigian v. Nappi,* 900 F.2d 101, 104 (7th Cir.1990). In *Duckworth v. Franzen,* 780 F.2d 645, 650 (7th Cir.1985), however, the Seventh Circuit chose to treat the individual versus official capacity distinction logically and was inclined accept substance over form. The *Duckworth* court did not undermine the procedural requirements of the distinction, in fact the court admonished the civil rights bar to clearly state the nature in which defendants are being implicated, but when confronted with a situation where procedural distinctions were illogical, the court opted for a reasonable standard. *Id.* This Court is in complete agreement, the bar should and will be held to strict procedural standards. Presently, however, the complaint was filed *pro se.* Further, it is difficult to presume that Walter Kimbrew intended to redundantly implicate the City of Evansville four times over. It is much more logical to presume that Walter Kimbrew named three of the four officers involved in his arrest because he felt they individually had done him some wrong. Due to the general theme of leniency which is afforded to *pro se* litigants, *See Talley v. Lane,* 13 F.3d 1031, 1033 (7th Cir.1994), coupled with the application of the substance theories of *Duckworth,* this Plaintiff will not fail for want of procedural specificity by naming these three individual Defendants by the only names he deemed proper to be filed in this Court. Officers Erk, Yeager, and Evans, therefore, are implicated in this matter in their personal capacities. ·

■ In reviewing the individual defendants, liability will only attach to Officer John Evans. Individual liability under

§ 1983 will only lie where the evidence proves that the individual was directly responsible for Plaintiff's deprivations. *See Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983).

 Regarding the search violative of his Fourth Amendment rights, Walter Kimbrew has failed to set forth evidence sufficiently showing Officers Yeager or Erk were directly responsible for either the unlawful search or seizure. Officers Erk and Yeager, therefore, cannot be held individually liable in this matter. Walter Kimbrew has, however, provided this Court with evidence sufficient to determine Officer John Evans was directly responsible for the unlawful search and seizure contravening Walter Kimbrew's Fourth Amendment rights and thus may be held liable under § 1983.

The potential for liability of Officer John Evans accordingly brings to issue the availability of qualified immunity. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The *Harlow* test has been treated as an objective test protecting the public interest in deterrence while safeguarding the official's ability to make difficult decisions "with independence and without fear of consequences." 457 U.S. at 819, 102 S.Ct. at 2739. *Donovan v. City of Milwaukee,* 17 F.3d 944, 951 (7th Cir.1994). The Seventh Circuit has applied the test to give the official the legal benefit of the doubt, but where the right violated is clearly established such "that a reasonable official would understand that what he is doing violates that right," the official is not immune. 17 F.3d at 951–52 (internal quotations omitted); *Accord Rice v. Burks,* 999 F.2d 1172, 1174 (7th Cir.1993) ("Police officers who use force in making an arrest are entitled to qualified immunity

from suits for damages ... 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow* )). The crucial inquiry is whether the law was clear in relation to the circumstances confronting the police officer. *Maxwell v. City of Indianapolis,* 998 F.2d 431, 436 (7th Cir.1993). This places on a civil rights plaintiff the heavy burden of "establishing the existence of a clearly established constitutional right [violated]." 17 F.3d at 951. The Seventh Circuit heightened that burden going so far as to hold that qualified immunity is "designed to shield from civil immunity all but the plainly incompetent or those who knowingly violate the law." *Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989) *cert. denied, Hughes v. Buss,* 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1985)).

 Under the present facts, it is this Court's view that Walter Kimbrew has carried that burden. The Fourth Amendment rules reviewed above are not new. The landmark decision in *Terry v. Ohio,* decided some years before Officer Evans began wearing a uniform, was in 1967 and still is a very prosecution-favorable case. The Supreme Court has respected *Terry* for the well reasoned decision that it is, and time and again the highest court has declined to broaden *Terry* to an extent undermining the Fourth Amendment itself. *See, e.g., Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Ybarra*

*v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1980); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Minnesota v. Dickerson,* 508 U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993). The state of this aspect of the Fourth Amendment has not been in doubt since the 1967 holding in *Terry,* accordingly Officer John Evans is not entitled to qualified immunity and is, therefore, personally liable for his actions.

■ In ruling on the City of Evansville's potential liability, this Court need look no further than the law of *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and its progeny. In *Monell,* the Supreme Court held a municipality could be liable under § 1983, overruling the 17 year precedent of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In overruling *Pape,* the *Monell* court extended § 1983 liability to municipalities not on the basis of *respondeat superior,* but limited to when the offensive conduct could be found to be in keeping with a municipal policy or custom. 436 U.S. at 694, 98 S.Ct. at 2037.

In finding municipal liability under § 1983, the Supreme Court has held that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Thereafter, however, the Supreme Court held that a *Monell* policy could be found "[i]f the decision to adopt a particular course of action is properly made by [a] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106

S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). "[M]unicipal § 1983 liability attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483, 106 S.Ct. at 1300. In other words, the Supreme Court reasoned that municipal liability could not be imposed merely because an employee had discretion in the discharge of his or her duties; an official must "be responsible for establishing final governmental policy" in order for municipal liability to attach to his decision. *Id.*

Turning to the instant facts, Walter has failed to set forth any evidence concerning a municipal policy or custom concerning the Fourth Amendment violation. This Court has found that Officer John Evans violated Walter Kimbrew's Fourth Amendment rights to be free of search and seizure, but there has been no evidence that the City of Evansville or the Evansville Police Department supports or recognizes such a policy. Nor can this Court find that Officer John Evans could qualify as a policymaker or decisionmaker for the purposes of *Pembaur v. City of Cincinnati.* Thus, as there has been no evidence in satisfaction of *Monell,* there can be no municipal liability concerning the Fourth Amendment violation. The City of Evansville should take note, however, of holdings such as *Powe v. City of Chicago,* 664 F.2d 639, 651 (7th Cir.1981), where isolated incidents can contribute to a pattern giving rise to an inference of an official policy.

*Damages*

Having found Officer Evans liable for violating Walter Kimbrew's Fourth Amendment right to be free from unlawful search and seizure, we turn now to the question of damages. Both compensatory and punitive damages are available to litigants under 42 U.S.C. § 1983. *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (compensatory damages); *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1982) (punitive damages). In his complaint filed *pro se* with this Court, Walter Kimbrew requested

$1,000,000 in compensatory and punitive damages.

 Damages (other than punitive damages) under 42 U.S.C. § 1983 exist solely to provide compensation for harms actually suffered. *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543. Absent evidence of such actual harm, the most a plaintiff may recover is nominal damages for the violation of a constitutional right. *Stachura,* 477 U.S. at 310, 106 S.Ct. at 2544; *Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1977). Walter Kimbrew has shown no actual damages resulting from the unlawful search. Nevertheless, Walter's rights were violated, and we grant nominal compensatory damages in the amount of $1 for the violation of plaintiff's Fourth Amendment right to be free from unlawful search and seizure.

 We now turn to the question of punitive damages. Punitive damages are available under 42 U.S.C. § 1983 in cases where a defendant shows "reckless or callous disregard for the plaintiff's rights" or intentionally violates federal law. *Smith v. Wade,* 461 U.S. at 51, 103 S.Ct. at 1637. In this case, Walter Kimbrew appears to have had his Fourth Amendment rights violated simply because he was at the wrong place at the wrong time. It is further apparent that Officer Evans was content to violate the Fourth Amendment rights of any individual placed in Walter's situation. Officer Evans' actions were inappropriate and it is this Court's view he was fully aware of that fact. We therefore find that punitive damages are appropriate in this matter.

 In setting the amount of punitive damages, we are guided by the objectives of deterrence and punishment. *See McKinley v. Trattles,* 732 F.2d 1320, 1327 (7th Cir. 1984). In *McKinley,* the United States Court of Appeals for the Seventh Circuit upheld a jury award of punitive damages for an improper prison strip search, but found the award of $15,000 to be excessive and on remand set as a guideline an upper limit of $6,000. *Id.* at 1327. In *Bogan v. Stroud,* 958 F.2d 180 (7th Cir.1992), the United States Court of Appeals for the Seventh Circuit upheld a jury award of punitive damages in the amount of $5,000 against one defendant and $1,000 each against two others as a result of an altercation in prison.

In this case, Walter Kimbrew was not a prisoner as in *McKinley* or *Bogan,* but a person on the street, subjected to an invasion of his personal effects and clothing based on an inarticulable suspicion or paranoia. As indicated above, Officer Evans appeared before this Court to be generally indifferent to the rights of Walter Kimbrew or any other individual. In light of this callous lack of concern, this Court finds damages in the amount of $2,500 best serve the objectives of deterrence and punishment.

 The award of attorney's fees, however, is inappropriate in this matter. As the Supreme Court addressed in *Farrar v. Hobby,* —— U.S. ——, ——, 113 S.Ct. 566, 575, 121 L.Ed.2d 494, 506 (1992), while a civil rights plaintiff receiving nominal damages is indeed the prevailing party, "the only reasonable fee is usually no fee at all." In *Cartwright v. Stamper,* 7 F.3d 106, 109 (7th Cir. 1993), the Seventh Circuit found the *Farrar* decision to require analysis of such an award, or refusal to award, to involve the following considerations: "[1] the difference between the judgment recovered and the recovery sought, [2] the significance of the legal issue on which the plaintiff prevailed and finally, [3] the public purpose served by the litigation." The *Cartwright* court further found the first prong to be the most important consideration and the second to be the least important, with the third somewhere in between. 7 F.3d at 110.

In the case at bar, *Cartwright* is not favorable to Walter Kimbrew. Under the first factor, Walter is awarded $1 when he asked for $1,000,000, thus he has failed miserably on the most important factor. Secondly, regarding the legal significance of Walter's claim, it should be obvious this Court holds the United States Constitution in a very high regard, but similar to the recent Seventh Circuit holding in *Maul v. Constan,* 23 F.3d 143 (7th Cir.1994), further analysis is not warranted as this factor is heavily outweighed by the other two. Finally, regarding the public purpose served by Walter

**832**

Kimbrew's suit, the recent Seventh Circuit cases are instructive:

since all Section 1983 claims seek to redress "the deprivation of ... rights, privileges, or immunities secured by the Constitution and laws ...," 42 U.S.C. § 1983, this factor is satisfied merely because the plaintiff establishes, as he did here, that his constitutional rights have been infringed. Instead, this Court must scrutinize plaintiff's complaint to determine whether the allegations made and the relief sought evince a public purpose rather than merely attempt to redress a private injury.

*Maul,* 23 F.3d at 146 (quoting *Cartwright,* 7 F.3d at 110) (omissions original). On this third factor, while he may have filed this claim representatively in spirit, there can be no dispute that in actuality Walter Kimbrew sought only to redress a private wrong. Attorney's fees are therefore inappropriate in this matter.

**IT IS SO ORDERED.**

### *JUDGMENT*

The Court, having heard all the evidence and having entered on this date its findings of fact and conclusions of law in the above styled cause, now enters judgment:

1. Judgment is entered in favor of Defendants Evansville Police Department, Alan Yeager, and Donald Erk, and against Plaintiff Walter Kimbrew.

2. Judgment is entered in favor of Plaintiff Walter Kimbrew and against Defendant John Evans in the following amount:

| | |
|---|---|
| A. Compensatory Damages | $ 1.00 |
| B. Punitive Damages | 2,500.00 |
| **TOTAL** | $2,501.00 |

**IT IS SO ORDERED.**

Vances H. **SMITH** and Jeffery Steiner, Plaintiffs,

v.

Patrick **FIEDLER** and Gary **McCaughtry**, Defendants.

No. 92–C–0815.

United States District Court, E.D. Wisconsin.

Oct. 4, 1994.

Vances Smith, pro se.

Jeffrey R. Steiner, pro se.

Richard A. Perkins, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for defendants.

**MEMORANDUM AND ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MOTION FOR DECLARATORY JUDGMENT, PLAINTIFF'S MOTION FOR APPOINTMENT OF EXPERT WITNESS, AND ROBERTO HINOJOSA'S MOTION TO INTERVENE**

STADTMUELLER, District Judge.

Vances Smith and Jeffery Steiner, prisoners currently or formerly incarcerated at Waupun Correctional Institution (hereinafter referred to as WCI), have filed a *pro se* civil rights complaint under 42 U.S.C. § 1983. Plaintiffs allege that their rights were violated by the presence of asbestos and lead at WCI. Defendants have filed a motion for summary judgment. Plaintiffs oppose this motion. Plaintiffs have also filed a motion for declaratory judgment and a motion for appointment of an expert. Roberto Hinojosa, also an inmate at WCI, has filed a motion to intervene as an additional plaintiff, which defendants oppose. The Court has considered all of the submissions of the parties as well the materials submitted by proposed intervenor Hinojosa. These matters are now ripe for decision. For the following reasons, defendants motion for summary judgment will be GRANTED. Plaintiff's motions for declaratory judgment and appointment of an expert will be DENIED WITH PREJUDICE. Roberto Hinojosa's motion to intervene is therefore moot, and will accordingly be DENIED WITH PREJUDICE.

## BACKGROUND

Plaintiffs allege that their civil rights are being violated by the presence of asbestos in the buildings at WCI, and by the presence of lead and lead filings in the drinking water at the prison. Plaintiffs seek injunctive and declaratory relief, as well as punitive damages. Defendant's answer that asbestos insulated pipes at WCI are properly inspected and maintained, and that the water is monitored and tested. Defendant's deny that either the pipes or the water pose any threat to inmates or staff.

In reply, plaintiff's have submitted materials indicating that hazardous waste has been found at the prison. Plaintiff's have also submitted affidavits stating that they have personally observed some asbestos insulated pipes at WCI which are in poor repair. Other materials submitted by plaintiffs indicate that the presence of hazardous materials at WCI has been the subject of other litigation filed in state court.

## STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c), summary judgment is proper when the pleadings and other submis-

834

sions filed in the case show that there is no genuine issue regarding any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After adequate time for discovery, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. However, the existence of a factual dispute between the parties will not defeat a properly supported motion for summary judgment unless the facts in dispute are those which might affect the outcome or resolution of issues before the court. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only where a reasonable finder of fact could make a finding in favor of the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (1986); *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matshushita Elec. Indus. Co., Lt. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this burden is met, the non-moving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Neither party may rest on mere allegations or denials in the pleadings.

### ANALYSIS

 Deliberate indifference on the part of prison officials to a prisoner's serious needs can constitute unnecessary and wanton infliction of pain, resulting in the cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); see also *Hudson v. McMillian,* — U.S. ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). To support a claim of deliberate indifference, the plaintiff must be able to show that the defendants knew that there was imminent danger and consciously or knowingly refused to do anything about it. *Campbell v. Greer,* 831 F.2d 700, 702 (7th Cir.1987). Deliberate indifference is a subjective factor, requiring facts which indicate not only the conduct but also the attitude of prison authorities. See *Helling v. McKinney,* — U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

 An inmate challenging a condition of his confinement under the Eighth Amendment must demonstrate or indicate in some way the defendant's state of mind, showing that prison officials either established the condition in order to inflict wanton pain or were indifferent to whether the condition had this effect. *Wilson v. Seiter,* 501 U.S. 294, 298–304, 111 S.Ct. 2321, 2324–27, 115 L.Ed.2d 271 (1991). Negligence alone does not constitute a valid Eighth Amendment claim. *Estelle,* 429 U.S. at 106 & n. 14, 97 S.Ct. at 292 & n. 14. Negligence, gross negligence, or even ordinary recklessness (as those terms are used in tort cases) are not actionable under § 1983 and the Eighth Amendment. Negligence, gross negligence, and ordinary recklessness all lack sufficient deliberateness to be the basis for a claim under the Eighth Amendment. See *Santiago v. Lane,* 894 F.2d 218 (7th Cir.1990).

It is entirely possible that allegations of negligence, gross negligence or ordinary recklessness may, in certain instances, state a claim in an appropriate forum such as that of state tort law. It is therefore possible that plaintiffs may be able to pursue their claims through other means under appropriate state laws such as those dealing with negligence or malpractice. Plaintiff's have indicated that state court actions are currently being pursued. The Court expresses no opinion in that regard. Nevertheless, such allegations do not state a violation of the Constitution or of federal law, which prisoners must do to bring an action pursuant to § 1983.

■ Considering the facts as stated in the complaint, there is nothing to show that plaintiffs' allegations, even if true, rise to the level of deliberate indifference. There is nothing submitted to this Court to indicate that defendants had a sufficiently culpable state of mind. The question is not whether hazardous materials exist at the prison, but whether the prison's response was so inadequate that it indicated deliberate indifference. Plaintiffs have failed to show that defendants were indifferent to their health, and they have failed to show that any indifference was deliberate.

Defendants have alleged that the asbestos in the prison is regularly inspected and maintained. Defendants further allege that the institution's water is regularly monitored. Plaintiffs have not produced any facts to challenge these allegations, but instead allege that defendants' efforts are inadequate or are being performed negligently, and therefore fail to remove the risk to inmates. Plaintiffs do not dispute defendants' allegations that the prison was surveyed for asbestos containing material in need of repair. Plaintiffs' own affidavits indicate that damaged asbestos containing materials were repaired within sixty days. (See Affidavit of Vances H. Smith, page 1, paragraph 3). Although this may not have been as fast a response as plaintiffs desire, it does not indicate that prison officials have completely failed to address the problem. Asbestos exists in many public buildings, and exposure to moderate levels of asbestos for limited periods of time is a common fact of contemporary life which does not by itself violate the constitution. *McNeil v. Lane,* 16 F.3d 123 (7th Cir.1993).

Plaintiffs also acknowledge that the water is being tested for contaminants. Materials submitted by plaintiffs support their allegations that prison officials have experienced significant problems with hazardous waste, and are under a July 1993 state court order to draft a plan to deal with the matter. However, nothing in these materials suggests that officials have deliberately ignored the problem. The fact that prison officials may have had problems in developing a plan to deal with hazardous waste does not show deliberate indifference, and falls short of the required showing that the particular defendants named by plaintiffs purposefully failed to address the problem. Plaintiffs further take issue with an alleged failure to inform inmates about the hazards, but again, this failure by itself does not show that defendant's have otherwise failed to take reasonable measures to respond to the risk.

■ Therefore, neither the attitude nor the motives of these defendants has been shown to be constitutionally improper. The Court will not infer an improper motive on the part of prison officials without some fact to support such an inference. See *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). There are no facts in the complaint to support an allegation that defendants had a sufficiently culpable state of mind, and no facts to indicate that defendants completely disregarded or ignored plaintiff's safety. Consequently, plaintiffs are unable to provide the subjective component of deliberate indifference which is necessary for a claim under the Eighth Amendment. See *Helling,* —— U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In the absence of any evidence or facts indicating a deliberate failure to make any effort to minimize serious risks to inmates, plaintiffs cannot prevail at trial. Summary judgment is therefore appropriate.

*CONCLUSION*

Plaintiffs have failed to establish that there are any genuine issues of fact remaining. Additionally, as pointed out above, plaintiffs have failed to make a showing sufficient to establish the existence of deliberate indifference, an element essential to their case, and on which they will bear the burden of proof at trial. The Court finds that since the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. Accordingly, for all of the above reasons, the Court finds that there are no genuine issues of fact, and that defendants are entitled to summary judgment on all issues as a matter

of law. Defendants' motion for summary judgment will be GRANTED.

### ORDER

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment be and hereby is GRANTED.

**IT IS FURTHER ORDERED** that plaintiff's motions for declaratory judgment and appointment of expert witness be and hereby are DENIED WITH PREJUDICE.

**IT IS FURTHER ORDERED** that Roberto Hinojosa's motion to intervene be and hereby is DENIED WITH PREJUDICE.

SO ORDERED.

**Emanual George DEVOSE**

v.

**Larry NORRIS, Director, Arkansas Department of Correction.**

**No. PB–C–91–111.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 3, 1994.

Michael Ray Davis, Davis Law Firm, Conway, AR, for plaintiff.

Emanuel George Devose, pro se.

Darnisa C. Evans Johnson, Atty. General's Office, Little Rock, AR, Jeannette Denham, Arkansas Insur. Dept., Little Rock, AR, for defendant.

Ollis Heard, pro se.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Before the Court is the Petitioner's petition for writ of habeas corpus, the government's response, Petitioner's objections, the Magistrate Judge's Proposed Findings and Recommendations, as well as the tape recordings of the proceedings held before the Magistrate Judge, and various other items requested by the Court related to the hearing held by this Court on July 7, 1994. After careful consideration, for the reasons stated below, the Court has determined that the petition should be granted.

### I. Factual Background/Focusing of Issues

On August 9, 1988, the Petitioner was convicted of delivery of a controlled substance after a jury trial in Jefferson County Circuit Court and was sentenced as a habitual offender to twenty-seven years of imprisonment. At his trial, Robert Thomas, an undercover officer from El Dorado, testified that he and a confidential informant were sitting in a parked car and the informant called Petitioner over to the car and asked him if he had any "rocks" (cocaine) for sale. Thomas testified that Petitioner said that he had one $25.00 rock left. Thomas testified that he then purchased the $25.00 rock from Petitioner. The substance was later tested at the Arkansas Crime Lab, where it was found to be cocaine.

Petitioner appealed his conviction, alleging that 1) there was insufficient evidence to support his conviction; 2) the prosecution used its peremptory strikes in a racially discriminatory manner during jury selection; and 3) the trial court erred in failing to order disclosure of the identity of the confidential informant. Finding no error, the Court affirmed. On September 27, 1989, Petitioner filed a petition in the Arkansas Supreme Court for permission to seek relief under Ark.R.Crim.P. 37, alleging ineffective assistance of counsel; failure to disclose the identity of the confidential informant; improper use of peremptory strikes; failure to disclose a relevant photograph; improper evidentiary foundations for the admission of testimony concerning the cocaine at issue; and insufficiency of the evidence to support a conviction. The Arkansas Supreme Court denied the Petitioner's petition for permission to proceed in circuit court pursuant to Rule 37.

On March 13, 1991, Petitioner filed the present petition for writ of habeas corpus, alleging that his conviction is unconstitutional because the trial court failed to require dis-

closure of the confidential informant; ineffective assistance of counsel; and discriminatory jury selection.[1] The Court will separately consider the issues of racial discrimination during the jury selection process, the failure to disclose the confidential informant, and the failure of the prosecution to disclose other exculpatory material to the defendant prior to trial.

## II. Racially Prejudiced Peremptories

One of the allegations made by Petitioner in this case is that the jury was chosen in a racially discriminatory manner, contrary to the dictates of *Batson v. Kentucky,* 476 U.S. 79, 90–96, 106 S.Ct. 1712, 1719–23, 90 L.Ed.2d 69 (1986). Petitioner agreed to submit this issue on the record. However, during the December 16, 1993 hearing in front of Magistrate Judge Forster, Respondent elicited some testimony on this issue from the assistant prosecuting attorney who tried Mr. Devose's case. This Court further questioned that attorney during its July 7, 1994 hearing.

█ The Court finds that at his state trial, Petitioner established a prima facie case of purposeful discrimination in the jury selection process and that the State failed to articulate a believable neutral explanation for its strikes, thus violating Petitioner's rights under the Equal Protection Clause.

In Jefferson County during the relevant time period, jury panels served for approximately 6 month periods. Toward the end of that time period, after numerous trials, a prosecutor would often be quite familiar with individual members of the panel. In this case, the prosecution was allowed to exercise six peremptory strikes during the selection of the jury, and allowed one peremptory strike during the selection of an alternate juror. After the court asked some very general questions of the panel as a whole, the attorneys for both the state and the defendant were allowed to voir dire the prospective jurors individually. After each prospective juror was questioned, the state would be called upon to either accept or strike the prospective juror. If the state accepted the

prospective juror, the defense was called upon to either accept or strike the prospective juror.

The first prospective juror called, Mr. Ridgway, was a white male. During voir dire, he affirmed that he had "sat in [a juror's] seat several times before." (T.Tr. 33). He was accepted by both sides as Juror 1.

The second prospective juror called, Ms. Moore, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 2.

The third prospective juror called, Ms. Vereen, was a white female. She affirmed that she had "now served on several juries." (T.Tr. 37). She was accepted by both sides as Juror 3.

The fourth prospective juror called, Ms. Simpson, was a white female. She affirmed that she "sat on a jury before." (T.Tr. 39). She was accepted by both sides as Juror 4.

The fifth prospective juror called, Mr. Neece, was a white male. There was no discussion of his prior jury service. He was accepted by both sides as Juror 5.

The sixth prospective juror called, Ms. Small, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 6.

The seventh prospective juror called, Mr. Westerman, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Westerman.

The eighth prospective juror called, Mr. Atkinson, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Atkinson.

The ninth prospective juror called, Mr. Thornton, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Thornton.

The tenth prospective juror called, Ms. Clement, was a white female. She had never served on a jury before. (T.Tr. 49). She was accepted by both sides as Juror 7.

---

1. Other issues were also presented. This Court agrees with the Magistrate Judge that the other issues are procedurally barred. The reasoning for that decision is set forth in the Magistrate Judge's Proposed Findings and Recommendations.

The eleventh prospective juror called, Ms. Rawlings, was a black female. During voir dire, the prosecutor stated "... I started to say that you have had the privilege of serving on two juries, but I decided not to because my assumption is that I may be incorrect in characterizing it." Later, the assistant prosecuting attorney stated that "Ms. Rawlings is known to the prosecution, having served on two prior juries before." (T.Tr. 66). Ms. Rawlings was accepted by both sides as Juror 8.

The twelfth prospective juror called, Ms. Colvin, was a white female. During voir dire, while addressing Ms. Colvin, the prosecutor commented that "... as you already know, having served on a jury before, there will come a time today when the Judge will read you the instructions." After the state accepted Ms. Colvin, the defense struck her.

The thirteenth prospective juror called, Mr. Brooks, was a black male. His voir dire proceeded as follows:

BY THE ASSISTANT PROSECUTING ATTORNEY:

Q. Good morning, Mr. Brooks.

A. Good morning.

Q. Mr. Brooks, if I might have a moment, sir. I'm counting. I believe you have actually served now on four juries. Is that correct?

A. Yes, ma'am.

Q. And have sat in that chair under the voir dire on three others. Is that correct?

A. Yes, ma'am.

Q. So, I would assume there's very little that hasn't been asked you at one time or another. Mr. Brooks, is there such a thing as juror burnout?

A. No, ma'am.

Q. So, you can just keep on keeping on. Is that what you're saying?

A. Yes, ma'am.

Q. Mr. Brooks, is anything that's been asked today so peaked your interest that you would like an opportunity to answer a question a little bit differently than perhaps somebody else?

A. No, ma'am.

Q. Thank you.

BY DEFENSE COUNSEL:

Q. Mr. Brooks, I gather, then, from what the prosecutor says, you have had the dubious honor of sitting, actually sitting, on four trials and being up here for discussion for three more, that you would be a top-notch juror. Is your—you are quite familiar then with the conversations, the reasonable doubt, the burden of proof, the presumptions of innocence, you've heard that may times, correct?

A. Correct.

Q. And for you to rule on these and make decisions on those type of things for at least four times, correct?

A. Correct.

Q. I agree. I think you'd make a fine juror, too. Pass.

PROSECUTOR: Your Honor, the State is going to excuse Mr. Brooks today.

(T.Tr. 52–54).

The fourteenth prospective juror called, Mr. Newton, was a white male. There was no discussion of his prior jury service. He was accepted by both sides as Juror 9.

The fifteenth prospective juror called, Ms. Payne, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 10.

The sixteenth prospective juror called, Ms. Vannoy, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 11.

The seventeenth prospective juror called, Ms. Shaw, was a black female. Her voir dire proceeded as follows:

BY THE PROSECUTOR:

Q. Ms. Shaw, I believe you've served on a few juries yourself, have you not, ma'am.

A. Yes, ma'am.

Q. Do you recall how long ago you were on that first jury?

A. The first one?

Q. Uh-huh.

A. The first one. It's been—my first one, I think it was in February.

Q. It's been a long time is what you're saying?

A. Yeah.

Q. Ms. Shaw, can you think of any reason why you could not serve today as a fair and impartial juror?

A. No.

Q. Other than burnout?

A. Right.

Q. Thank you, Ms. Shaw.

BY DEFENSE COUNSEL:

Q. Ms. Shaw, how many juries have your served upon up here?

A. I don't know. A lot.

Q. One, two, three?

A. Four or five.

Q. Four or five. So would you be a good juror? You've heard a lot, correct?

A. Right.

Q. Are you suffering from juror burnout, or are you still willing to sit up here and say, "I will listen to the evidence. I will listen to the testimony and I will do what is right and correct"?

A. I will do what's right and correct.

Q. Thank you, ma'am. Pass.

BY THE PROSECUTOR: The State is going to excuse Ms. Shaw today.

BY THE COURT: Ms. Shaw, just a moment. Now, you're just going to have to start getting here on time.

MS. SHAW: Okay.

THE COURT: We are just going to have to start about 30 minutes earlier from when we ordinarily do, and I think you'll get here on time for us. Okay? Thank you, Ms. Shaw. Come back tomorrow morning at 9 o'clock.

(T.Tr. 57–58).

The eighteenth prospective juror called, Mr. Walker, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Walker.

The nineteenth prospective juror called, Ms. Davis, was a white female. She stated that she previously had served on two juries. (T.Tr. 60). She was accepted by both sides as Juror 12.

The first prospective alternate juror called, Mr. Mann, was a white male. He affirmed that he previously had served "on at least two juries." (T.Tr. 60). After the state accepted him, the defense struck Mr. Mann.

The second prospective alternate juror called, Mr. James, was a black male. His voir dire proceeded as follows:

BY THE PROSECUTOR:

Q. Good morning, Mr. James.

A. Good morning.

Q. Mr. James, do you agree with me when I say you've done yeoman's duty on juries.

A. I've been on quite a few.

Q. Have you ever sat in that seat in question to be an alternate?

A. Never.

Q. I didn't think so. Thank you, Mr. James.

BY DEFENSE COUNSEL:

Q. Mr. James, how many juries have you sat on, do you know? Three—two or three, four or five?

A. Four or five.

Q. Four or five. Then you—sir, you've done a good job up here and you know whatever we talking (sic) about here, do you not, sir, all the issues?

A. Yes.

Q. Thank you, sir. Pass

BY THE PROSECUTOR: I'm going to excuse Mr. James, your Honor.

(T.Tr. 61–62).

The third prospective alternate juror called, Ms. Early, was a black female. As both sides had already exercised their one peremptory challenge for the alternate juror, Ms. Early was chosen as the alternate juror.

After jury selection, the Court heard motions out of the hearing of the jury. Defense counsel objected to the selection of the jury as being racially discriminatory in violation of the Equal Protection Clause and in contradiction of the dictates of *Batson v. Kentucky*. The prosecutor responded to this objection as follows:

" . . . The State will respond by saying that as the Supreme Court of the State of Arkansas has said, the best reason to show non-discrimination is the actual placing of a black on the jury. And out of the 12, for

# 842

the record, I would like it to be noted that Ms. Rawlings is a black juror. Contrary to what counsel for defense has said, Ms. Rawlings is known to the prosecution, having served on two prior juries before. Also, in terms of Mr. James, Mr. James being a black juror was up here under voir dire as an alternate. The defense had already struck a white alternate Robert Mann. Mr. James came up and the prosecution has used Mr. James on numerous trials before.

\* \* \* \* \* \*

... I have used Mr. James four separate times, your Honor. I also am aware of the fact, having used this jury panel many times, that Mr. James has sometimes been one of the reasons my panels have been out for a length of time and has been extremely argumentative. However, your Honor, the State was aware, having used this panel many times, that the next person up, Ms. Areather Early, is indeed black and was placed as an alternate.

\* \* \* \* \* \*

The other thing that the State would like to respond to, your Honor, is that the State only used two strikes out of a possible six during jury selection. The other point the State would like to raise is that I would have to have time to count, but of the people that came before us in voir dire, a preponderance of them were white.

\* \* \* \* \* \*

... (O)f the ones that were called, a preponderance of them were white to begin with, your Honor. The State feels that under Arkansas law, we have not shown a pattern of discrimination, having placed one black juror on the jury and the other black person was placed as an alternate.

\* \* \* \* \* \*

... (I)t's not that the State has excused them because they've done a good job, your Honor, the State has excused them because they have worked on so many trials. We feel like that they have been burned out at this point, and, indeed, have gotten information in past trials that that is the case.

(T.Tr. 66–68). The *Batson* issue was brought up again post-trial, after the jury retired to deliberate. The prosecution did not comment during this post-trial discussion between defense counsel and the court.

■ The Equal Protection Clause forbids a prosecutor from using peremptory challenges to exclude otherwise qualified persons from the petit jury solely on account of their race. *Batson,* 476 U.S. 79, 106 S.Ct. 1712. In order to establish an equal protection violation, "a defendant must first establish a prima facie case of purposeful discrimination in selection of the jury panel." *United States v. Battle,* 836 F.2d 1084, 1085 (8th Cir.1987). To establish a prima facie case of purposeful discrimination, the defendant must first show that the prosecutor exercised peremptory challenges to remove members of a cognizable racial group from the venire. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23. The defendant must also show that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant factors. *Id.* For example, a "pattern" of strikes against black jurors on the panel might give rise to an inference of discrimination. *Id.* "... (I)t is important to observe that a prima facie case may be made where relevant circumstances indicate an inference of purposeful discrimination no matter that one or more black persons may remain on the jury." *Battle,* 836 F.2d at 1086.[2] "(U)nder *Batson,* the

---

**2.** In the case at bar, the Arkansas Court of Appeals found that the prosecuting attorney used two of six peremptory strikes during jury selection to strike two prospective jurors, and used one strike to exclude a prospective alternate juror, who was black. The Court held that because the State had four peremptory challenges remaining and one black juror was seated on the

jury and another black person was chosen as an alternate, the Petitioner failed to establish a prima facie case of purposeful discrimination. This Court finds that this holding was plain error. When the State had peremptory strikes available, it used them to strike three of the four blacks called for voir dire. There is no indication in the record that there was any significant non-racial

striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." *Id.*

 After a defendant establishes a prima facie case, the burden shifts to the government to "articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. The mere articulation of a non-discriminatory reason is not always sufficient for establishing a lack of purposeful discrimination. The court should look at all relevant circumstances to determine if the articulated reason is pretextual. For instance, in this circuit "it is well established that the government may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics, are also challenged." *Reynolds v. Benefield*, 931 F.2d 506, 512 (8th Cir.1991). The court must make a final determination of whether the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724.

 At Petitioner's trial, a total of 22 prospective jurors were questioned to serve as either a juror or the alternate juror. Ten of those jurors specifically stated that they had served on previous juries, including four of the five blacks. The one black juror who did not specifically so state was Ms. Early, who was chosen to be the alternate juror after both sides had used their one peremptory strike. The state exercised a total of three peremptory strikes. All of those strikes were used against black prospective jurors.

The first black juror called, Ms. Rawlings, had served before and was accepted as Juror 8. The next three black jurors called were stricken by the state. The state asked Mr. Brooks, the thirteenth juror called and the second black juror called, whether he suffered from juror burnout. He stated that he did not. Five other jurors had already stated that they had previously served on juries. None were questioned about juror burnout.

More indirectly, the state questioned Ms. Shaw, the seventeenth juror called and the third black juror called, about juror burnout: "Q. Ms. Shaw, can you think of any reason why you could not serve today as a fair and impartial juror? A. No. Q. Other than burnout? A. Right." (T.Tr. 57). Defense counsel followed this up with the following: "Q. Are you suffering from juror burnout, or are you still willing to sit up here and say, 'I will listen to the evidence. I will listen to the testimony and I will do what is right and correct'? A. I will do what's right and correct." (T.Tr. 58).

After Ms. Shaw, two white jurors, Ms. Davis and Mr. Mann, stated that they had served before. They were not questioned about juror burnout, and the state accepted both, although the defense subsequently struck Mr. Mann. Then Mr. James, the fourth black juror called, was questioned. His voir dire, quoted *supra*, focused solely upon his prior service, although he was not specifically questioned about burnout. The fifth and final black juror was called after each side had used its only peremptory strike against a prospective alternate juror, and she was not questioned about her prior jury service at all. As neither side had any more peremptory strikes to exercise, and no reason appeared to excuse her for cause, Ms. Early served as the alternate juror.

It is true that the record indicates that Ms. Shaw, Mr. Brooks, and Mr. James had all served on four to five juries. The record is not specific for most of the other jurors. Ten white prospective jurors and Ms. Early were not questioned about their prior jury service and therefore the Court cannot determine how many times they may have served previously. Two jurors indicated that they had served "several" times. Three jurors indicated that they had served twice before. Ms. Simpson stated that she had served once. Ms. Clement had never served. The primary justification offered by the state for its striking of the black jurors was "juror burnout". And yet, a portion of the State's questioning of a white juror proceeded as follows:

distinction between these black jurors and the white jurors who were accepted. The defendant

established a prima facie case of purposeful discrimination.

Q. Mr. Ridgway, you have sat in that seat several times before, have you not, sir?

A. Yes, ma'am.

Q. For that reason, I would assume that you now have, in your own mind, a clear understanding of what is meant by beyond a reasonable doubt. And if, at the conclusion of the evidence today, you are convinced of the guilt of the defendant beyond a reasonable doubt, can you vote to convict him and to sentence him to the penitentiary?

(T.Tr. 33). It would appear that white jurors with prior experience were seen by the State as having a clearer understanding of certain issues, making them desirable jurors. Black jurors with prior experience were perceived by the State as suffering from juror burnout, even when they specifically stated that they were not so suffering, or that they would do what was "right and correct." This Court finds that the State's articulated reasons in the record were pretextual, and that the Petitioner established purposeful discrimination by the State in the jury selection process.

Although it is not necessary to its holding, the Court will address the subsequent testimony by the assistant prosecuting attorney regarding jury selection. During the December 16, 1993 hearing before Magistrate Judge Forster, Respondent questioned the assistant prosecuting attorney about her strikes against prospective black jurors. She stated that she had information that the jurors had sat on several juries in the recent past. She also stated that she had conducted exit interviews with some of the jurors after some of the other trials, and that she had information that two to three particular jurors were "tired of being there." The identity of these two to three particular jurors was not set forth.

In the hearing held before this Court on July 7, 1994, the assistant prosecuting attorney was again questioned about her strikes against prospective black jurors. She stated that she remembered a young black woman, whom she thought was named Shaw. The first thing that the assistant prosecuting attorney said was that she remembered Shaw coming in late, and that she had come in late several times before. She testified that she remembered that at the trial, six years ago, the judge had admonished Juror Shaw and had asked that she try to arrive about thirty minutes earlier. This July 1994 testimony was the first time that Ms. Shaw's tardiness was ever articulated as a reason for her excusal from Petitioner's jury.

The assistant prosecuting attorney stated that she was "hazy" about "the other black", which the record indicates was Mr. Brooks. She stated that she just didn't remember the reason for her strike. She said that she remembered Ms. Early and remembered striking a black person before her because "quite frankly, I wanted to reach Ms. Early ..." This was the first time that this reason had been articulated.

The assistant prosecuting attorney testified that she did not conduct formal exit interviews, but that some of the jurors were well known to her and that some of those people "in an aside at a social occasion" may have given her "information" about other jurors. She emphasized that she had worked with these jurors before, and that she had grown up in Pine Bluff and knew some of these people and their families. She stated that she had her own private notes on each of the jurors.

The Court is troubled by the practice of allowing jurors to speak with prosecutors about the intricate interaction that occurs amongst jurors during deliberations, when the panel is still being used and the prosecutor can use such information in its selection of jurors in future cases.[3] The State certainly can not rely upon such secret and undocumented, nebulous hearsay, referred to simply as "information", as a justification for the exercising of peremptory strikes against a cognizable racial group when the record discloses no other significant non-racial distinc-

---

3. The practice also has the potential of creating an improper personal relationship between the prosecutor and the prospective juror. And the potential, usually in favor of the prosecution, is greater when petit jurors serve for six months and try many cases handled by the same prosecutor.

tions between the jurors stricken and the jurors accepted.

The Court is disinclined to credit the supplemental reasons offered by the assistant prosecuting attorney as to Ms. Shaw and Mr. James, reasons which were articulated for the first time six years after the trial of Petitioner. The Court finds that the State has failed to articulate a non-pretextual, legitimate, non-discriminatory reason for its strikes against Ms. Shaw, Mr. Brooks, and Mr. James. Mr. Devose's conviction by a jury chosen in a racially discriminatory manner cannot stand.

### III. Disclosure of the Confidential Informant

■ According to the testimony of Officer Thomas, the drug buy in question occurred in the following manner:

"Me and a confidential informer drove to Third and State Street which is a center where a lot of the drugs are being pushed here in Pine Bluff. Sitting out there in the parking lot, confidential informer noticed Curtis Jones walking in the area. He called him to the vehicle—undercover vehicle. He asked him did he have any cocaine rocks for sale. Mr. Jones stated, "Yes." He had one cocaine rock left. That's all he had left, and I—he asked how much it was, and he stated $25. I told Mr. Jones that I was—that I wanted to buy that last $25 rock he had. He reached into his right pocket and handed me the cocaine rock. I looked at it and then handed Mr. Jones $25. Then myself and the confidential informer left the area."

(T.Tr. 88). Thus, it appears that there were three witnesses to the drug transaction: Officer Thomas, a CI, and an individual who goes by the name "Curtis Jones." Officer Thomas subsequently identified Petitioner as Mr. Jones.

On July 21, 1988, Petitioner filed a motion for the disclosure of the confidential informant. Specifically, he requested the name, address and telephone number and any testimony of the confidential informant so as to enable Petitioner to properly present his defense at trial. This Motion was not formally taken up prior to the trial date. It is clear from a reading of the trial transcript, howev-

er, that it was taken up prior to trial. After the jury retired to deliberate, we have the following discussion on the record:

THE COURT: Let's get some matters on the record that we have previously taken up at the bench. Mr. Brown, do you want to go ahead and proceed with the matters you want to put on the record?

DEFENDANT'S COUNSEL: Yes, your Honor. On the 21st of this month I filed a motion for discovery of the confidential informant. That hasn't been responded to and **this morning when we were in chambers, I again, you know, requested that the Court order the prosecutor to disclose the confidential informant.** I realize that wasn't on record at that time. We were just in chambers discussing it, and my position is that when a confidential informant is present with the police officer when a drug transaction occurs, and witnesses the transaction and could shed obvious light on the perpetrators, then the prosecution is obliged to disclose the name and address and phone number of the confidential informant. They have not done so. I would—since we weren't on record, I moved for that disclosure and, of course, a mistrial because of the failure to disclose or, alternatively, a continuance.

ASSISTANT PROSECUTOR: Your Honor, I don't think the defense counsel can have it either way. He either says that there was a confidential informant there at the time of the drug transaction, and therefore, his client was there, or there was not a drug transaction. He is using an alibi as a defense today. So, I think that is contradictory in and of itself. However, because of where it went down, **I believe that the confidential informer had no exculpatory information that he could have given.** Defense counsel has made no assertion that the buy went down in any other manner than is asserted here by the prosecution; and, therefore, I don't think the confidential informant is necessary to testify. He can't clear up any disputed testimony that I can see.

DEFENSE COUNSEL: Well, the point I was trying to make is, is if he'd been disclosed to me, then I could have talked

with him and made a determination as to whether or not there was any exculpatory [sic]. This way we'll never know.

(T.Tr. 163–64) (emphasis added). Thus, the trial court denied Petitioner's Motion for Disclosure of the Confidential Informant based upon the State's representation that the CI had no exculpatory information to provide.

During the hearing before this Court, the assistant prosecutor was further questioned about the possibility that the confidential informant could provide exculpatory information. She stated that she herself knew nothing about the confidential informant, and that she had never spoken to him, and never read a statement prepared by him. She did not even know his name until the July 7, 1994 hearing. Yet she assured the trial court that this CI, an eyewitness to the alleged transaction, had no exculpatory information to provide.

For background purposes, it is important to note how it came about that Mr. Devose was charged with this crime. On May 21, 1988, Officer Thomas and the CI allegedly made a number of drug purchases. Officer Thomas claims that the CI told him that the person from whom he bought the drugs at issue in this case was named Curtis Jones. An Information was filed accusing "Curtis Jones" of the instant offense. On June 3, 1988, Mr. Devose was brought in on other charges. According to Mr. Devose, on June 3, 1988, another officer came in and asked him if he was Curtis Jones. He told the officer that he was not. The officer said that he thought Mr. Devose was, in fact, Curtis Jones. On June 16, 1988, a new Information was issued, charging Emanuel (sic) George Devose, a/k/a Curtis Jones, with delivery of a controlled substance.

Neither the confidential informant nor Officer Thomas were called in to identify Mr. Devose as the person that had participated in the drug transaction. Indeed, Officer Thom-

as never saw Mr. Devose between the time of the incident and the trial of Mr. Devose, a/k/a Curtis Jones. There was nothing in any police records, or, as far as the Court can determine, anywhere else to indicate that Mr. Devose was also known as Curtis Jones. Mr. Devose has no record of drug offenses. So, the State proceeded to trial based upon the apparently random decision of an officer who was not present for the drug transaction at issue, for some unarticulated reason, he thought that Mr. Devose and Mr. Jones were one and the same. At trial, Officer Thomas did identify Mr. Devose as Mr. Jones. He also insisted that in spite of the fact that his report described the Curtis Jones as approximately 6′2″ tall, whereas Mr. Devose is approximately 6′9″ tall, there was no significant variance.

The CI was called in to testify outside the presence of Mr. Devose, both before the Magistrate Judge and this Court. The proceedings before the Magistrate Judge, with the CI answering questions propounded by Petitioner's present counsel, were, in pertinent part, as follows:

"Q. Did you ever work with a Robert Thomas?

A. Yes, I did.

Q. Okay. Do you know whether or not you were with him on May the 21st of 1988?

A. If it was on a Friday I believe I was. I'm not for sure.

Q. Okay. Now were you with him when he let you purchase some rock cocaine from a Curtis Jones?

A. Yes, I was.

Q. Do you remember what Mr. Jones looks like?

A. Not too good, not his face too good. [CI shown photographs]

A. I see Emanual. But I don't see Curtis Jones.[4]

---

4. It should be noted that Mr. Devose has never had the opportunity to personally confront the confidential informant. His *pro se* filings have argued that if he was present at the drug transaction, he would know who the confidential informant was and there would be no need to protect his identity. It is clear that Mr. Devose assumed

that he did not know the confidential informant, and this was why his attorney attempted to "smoke out" the confidential informant in the hearing before the Magistrate Judge by utilizing a photographic line-up. The confidential informant has since testified that he did know Mr. Devose, and in fact grew up with him. The

Q. You know Emanual Devose?

A. Yes.

Q. Is Curtis Jones who you bought the rock from, for Robert Thomas?

A. His name Emanual Devose? That's the one I bought the cocaine from, we got the cocaine from.

Q. On the 21st of—

A. I'm not sure on what date, you know, the exact date, but I know me and Robert did make a buy off Devose.

Q. Now, Mr. Thomas indicated that the person he made the buy off was Curtis Jones.

A. No. Not to my knowledge. I know we made a buy—made buys off of Devose but we didn't make no buy—to my knowledge off no Curtis Jones that I know of."

One minute, the CI testified that he bought from a Curtis Jones. Literally the next minute, or at most two minutes later, he "didn't make no buy—to [his] knowledge off no Curtis Jones ..." The CI also testified that he had known Emanual Devose for years, and had gone to school with his Emanual Devose's brother. In testimony before this Court, the CI claimed that he never told Officer Thomas that the individual who sold Officer Thomas the drugs in question was Curtis Jones. He said that he "knew of" someone named Curtis Jones, but he did not actually know him. Further, the CI testified that he told Officer Thomas that the individual in question was named "Sleepy".

Petitioner has submitted affidavits proclaiming that he has never been known as "Sleepy". Petitioner's brother, Anthony Devose, submitted an affidavit proclaiming that he, Anthony Devose, is known as "Sleepy". Anthony Devose's prison records reflect "Sleepy" as an alias. Although Anthony Devose is presently incarcerated, he was free at the time of the instant offense. He is approximately 6'2" tall. The Court has also been informed that there is a Curtis Jones in the Pine Bluff area, but knows no details about that individual.

The Court also notes that Mr. Devose testified on his own behalf before this Court. The Court was very impressed with Mr. Devose's credibility. Mr. Devose has adamantly and steadfastly maintained his innocence. Indeed, in response to questioning by the Court he volunteered to take a polygraph examination. While these things are certainly not dispositive, they add to the numerous factors undermining this Court's confidence in Mr. Devose's conviction.

The courts have addressed the problems of determining when the identity of a confidential informant must be disclosed:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

*Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 629, 1 L.Ed.2d 639 (1957).

"Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." .

*United States v. Ordonez,* 737 F.2d 793, 809 (9th Cir.1984) (*citing Roviaro v. United States,* 353 U.S. at 58–62, 77 S.Ct. at 627–28).

In this case, unlike *Roviaro,* the confidential informant was not the only person other than the accused present at the scene of the crime. However, as set forth below, the third person allegedly at the scene, Officer Robert Thomas, has serious credibility problems that were not disclosed to the Petitioner prior to trial. Furthermore, there were numerous problems with the identification by Officer Thomas. These problems make the CI's testimony, and cross-examination, cru-

confidential informant was also told, prior to the hearing, the name of petitioner. Clearly, he was aware that he was expected to identify Mr. De-

vose. The photographic identification was thus rendered meaningless.

cial. Below are excerpts from Thomas's testimony:

"A. Me and a confidential informer drove to Third and State Street which is a center where a lot of the drugs are being pushed here in Pine Bluff. Sitting out there in the parking lot, confidential informer noticed Curtis Jones walking in the area. He called him to the vehicle—undercover vehicle. He asked him did he have any cocaine rocks for sale. Mr. Jones stated, "Yes." He had one cocaine rock left. That's all he had left, and I—he asked how much it was, and he stated $25. I told Mr. Jones that I was—that I wanted to buy that last $25 rock he had. He reached into his right pocket and handed me the cocaine rock. I looked at it and then handed Mr. Jones $25. Then myself and the confidential informer left the area.

Q. Officer, the man that you are referring to as Curtis Jones that you bought the cocaine from that night, do you see him in the courtroom today?

A. Yes, ma'am, I do. [Identifies defendant Emanual Devose.]

\* \* \* \* \* \*

Q. ... You did a report, did you not?

A. Yes, I did.

Q. And I believe you said that he was 6'2 to 6'4?

A. Yes.

Q. He had dark skin and wavy black hair?

A. Yes.

Q. How do you define wavy black hair? Do you have wavy black hair?

A. Yes, I do.

Q. This is wavy black hair?

A. Yes, no curls, long wavy.

Q. Long, wavy curls. And you are saying my client here, except for maybe the length of his hair, looked now like he looked back then?

A. No, he didn't. His hair was straighter.

Q. His hair was straight?

A. And longer.

Q. And long. Okay. What about his eyes? I don't see anything in your report about his eyes.

A. That's not necessary.

\* \* \* \* \* \*

Q. You do not consider his eyes—I mean, they are really big. They're almost—they are bug eyes.

A. Yeah.

Officer Brown's report also described the petitioner as being 6'2 to 6'4. Petitioner claims to be 6'8 to 6'9".

■ In cases involving tipsters who merely convey information to the government but neither witness nor participate in the offense, disclosure is generally not material and is therefore not required. *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir.1987). Where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense. *United States v. Barnes*, 486 F.2d 776, 779–79 (8th Cir.1973).

In this case, Officer Thomas's identification of Petitioner was fraught with inconsistencies. Officer Thomas's credibility is, as discussed below, suspect. The testimony of the confidential informant before the Magistrate Judge and this Court indicates that his own statements are extremely shaky, and those statements do not mesh very well with the statements of Officer Thomas. This combustible combination should have been discovered and disclosed. Perhaps, had the assistant prosecutor spoken with the confidential informant prior to trial, she would have been less likely to assure the Court that the confidential informant had nothing material to add to these proceedings. The failure of the trial court to order disclosure of the identity of the confidential informant in this case was error. Petitioner's conviction cannot stand.

## IV. The Importance of Impeaching Evidence

The Court of Appeals of Arkansas's affirmance of Petitioner's conviction on June 14, 1989 cited only the testimony of Officer Robert Thomas to support its conclusion that there was sufficient evidence upon which the

jury could find petitioner guilty beyond a reasonable doubt. The court stated:

> At trial, Robert Thomas, an undercover officer from El Dorado, testified that he and a confidential informant were sitting in a parked car and the informant called De-Vose over to the car and asked him if he had any "rocks" (cocaine) for sale. De-Vose replied that he had one left for $25.00. The officer then told DeVose that he would like to purchase the rock. De-Vose pulled the rock out of his pocket and sold it to Officer Thomas for $25.00. The substance was tested at the Arkansas Crime Lab where it was found to be, cocaine.
>
> The accuracy of the officer's recollection of events, the identification of appellant, and the alleged weaknesses of the officer's testimony were matters of credibility to be resolved by the jury. See *Davis v. State*, 284 Ark. 557, 683 S.W.2d 926 (1985). The jury may accept or reject any part of the testimony of a witness. *Gilliam v. State*, 294 Ark. 115, 741 S.W.2d 631 (1987). We need only consider testimony lending support to the jury verdict and may disregard any testimony that could have been rejected by the jury. *Sparks v. State*, 25 Ark. App. 190, 756 S.W.2d 911 (1988). Looking at the evidence in its entirety we hold that it was sufficient to support the appellant's conviction.

So, we see the importance of Officer Thomas' testimony in this case. The Court requested the respondent to produce Mr. Thomas at the hearing on July 7, 1994 so that he might be further examined by the parties and the Court.

The State advises that it has not been able to find Mr. Thomas and does not know of his present whereabouts. It is clear to the Court that the credibility of Officer Thomas was, and is, the key issue in this case. We now know that Robert Thomas (the sole eyewitness at trial) had been disciplined for theft and making false statements to a supervisor and a prosecuting attorney while a police officer and *before* the trial of Petitioner. Specifically, the following incidents have now been brought to the Court's attention:

a. According to a letter dated 3–30–87, Officer Thomas was suspended for one week without pay for violation of "Personnel Regulation 227, Deportment"; on this same date he was suspended for one week without pay for giving a false statement in his initial interview with Captain Holt; his probationary status was extended for six months.

b. On 2–22–88, Officer Thomas was suspended without pay for ten days for making untruthful statements to Deputy Prosecuting Attorney Pat Compton and warned that another incident involving untruthfulness would result in termination.

c. In early April 1990, Officer Thomas was investigated for theft of property during drug raids. He apparently admitted that he had taken a silk suit, a woman's watch, and some "whatnots" from the wall. He stated that he took a $50.00 bond "as evidence." After being told that he had not done well on a polygraph exam, he further admitted to taking a woman's gold ring.

Petitioner was tried in August of 1988. The first two incidents involving a false statement to Officer Holt and untruthful statements to Deputy Prosecuting Attorney Pat Compton had already occurred and were not disclosed to Petitioner prior to trial. The latter incident occurred post-trial, but prior to the filing of the instant petition. It was not disclosed. Petitioner's attorney discovered this information because another attorney told him about an experience that this other attorney had had with this officer. After the Court's hearing on July 7, 1994, the State confirmed that the above incidents occurred. The State also referenced a disciplinary received by Officer Thomas on September 11, 1986. The circumstances of that disciplinary are not in the record before the Court. It appears that Officer Thomas began working with the El Dorado police department on June 29; 1986 and that he resigned on April 11, 1990.

The prosecuting attorney testified at the July 7, 1994 hearing that Officer Thomas had been used extensively in undercover drug work around the time of the instant incident. Indeed, she stated that she herself had many drug cases based upon the

testimony of Officer Thomas. She further testified that she was unaware of Officer Thomas's record for untruthfulness until the time of the hearings in the present petition. She stated that had she been aware of Officer Thomas's disciplinaries, she would have disclosed same to Mr. Devose prior to his trial, recognizing the value of the information as impeachment evidence against the sole testifying eye-witness to the transaction. The Court credits all of those statements by the prosecuting attorney as true.[5]

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the government, upon request, must disclose exculpatory evidence to a criminal defendant. Explaining that decision, the Court later stated:

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."

**5.** The Court notes that this issue has not been formally presented to it, but notes Mr. Devose's mention of Mr. Thomas's record in his more recent filings. Even the state prosecutor claims not to have known of Officer Thomas's personnel difficulties until these hearings, and on January 8, 1993, the Magistrate Judge refused to order the state to provide Petitioner with those records upon specific request. If the Petitioner has procedurally defaulted his federal claims, he can obtain review if he shows cause for his default in state court and actual prejudice as a result of the constitutional violation. *Wainwright v. Sykes*, 433 U.S. 72, 88–90, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977); *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982). Where a prisoner defaults his entire appeal, the cause and prejudice standard applies. *Coleman v. Thompson*, 501 U.S. 722, 748–51, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991).

The existence of cause "must ordinarily turn on whether the prisoner can show some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). For example, a showing that the factual or legal basis for the claim was not reasonably available to counsel, that some interference by officials made

*Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). When information would have undermined the credibility of the government's key witness, the prosecution's duty of disclosure is triggered. *See, Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The determination of a *Brady* violation is objective; the prosecutor's good or bad faith is not relevant. *United States v. Joseph*, 996 F.2d 36, 39 (3rd Cir.1993).

Typically, a prosecutor's duty under *Brady* is quite clear. The exculpatory information will have been developed during preparation for the case being prosecuted, such as the discovery of a witness at a crime scene who suggests to the investigating police that he could not identify the defendant as the perpetrator. *Id.* The determination of a prosecutor's duty under *Brady* is more difficult when the exculpatory information is available to the prosecution but is not within its actual knowledge in the context of the particular case in which a defendant asserts that there has been a *Brady* violation and the existence of the information is understandably unknown by the prosecutor in that context. *Id.*

compliance impracticable, or that counsel's performance was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) would constitute factors external to the defense and cause for a procedural default.

In this case, the factual basis for a claim of a *Brady* violation was not reasonably available to Petitioner's counsel, thereby establishing "cause".

It is well established that a new trial must be granted when the prosecution fails to disclose impeaching evidence before trial if the evidence is material, that is, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). For reasons set forth below, the Court also finds that the petitioner is able to satisfy the "prejudice" prong of *Wainwright v. Sykes*. The Court thus concludes that Petitioner's *Brady* claim fits within the "cause and prejudice" exception to the general rule of procedural bar, and the Court will consider the claim on the merits.

The Third Circuit has held that the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it. *United States v. Perdomo*, 929 F.2d 967, 970 (3rd Cir.1991). Factors to consider include the specificity of the defendant's request for particular information, which could serve to direct the prosecutor's attention toward the type of information they were seeking. *Joseph*, 996 F.2d at 40. Thus, where the defendant makes a specific request for any information relating to the criminal background of any of the prosecution's witnesses, and the prosecution erroneously informs the defendant that its key witness did not have a criminal record based upon a National Crime Information Center check which failed to turn up the criminal record, the Third Circuit found a *Brady* violation because the prosecution had been alerted to the defendant's specific concern and the information was readily available to the prosecutor. *Perdomo*, 929 F.2d at 970. On the other hand, when the defendant simply makes a generic request for exculpatory evidence, it is much more difficult to show constructive possession under the Third Circuit's approach. *Joseph*, 996 F.2d at 40.

Other circuits have also addressed this issue. The District of Columbia Circuit Court noted that it was joining the Third, Fifth and Seventh Circuits in its decision to extend the prosecutor's duty under *Brady* to information that is available to the prosecution but of which none of the prosecutors are actually aware. *United States v. Brooks*, 966 F.2d 1500, 1502 (D.C.Cir.1992). The Court stated:

"In extending the *Brady* duty to searches for evidence, the 5th Circuit framed the matter as one of incentives for the government, arguing that without the extension 'we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government.' *United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980). The 7th Circuit has sounded a similar note, warning that a 'prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case.' *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir.1984).

\* \* \* \* \* \*

We suspect the courts' willingness to insist on an affirmative duty of inquiry may stem primarily from a sense that an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure. *See, e.g., Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for 'inherent fairness').

*Id.* at 1502–03. The *Brooks* Court noted that the cases finding a duty to search have principally involved files maintained by branches of government which are closely aligned with the prosecution. *Id.* at 1503. In each such case, the court has found the "bureaucratic boundary" too weak to limit the duty. *Id.*

"Thus in *Auten* the duty reached the key witness's convictions in the FBI and National Crime Information Center files, see 632 F.2d at 480–81; in *United States v. Deutsch*, 475 F.2d 55 (5th Cir.1973)—possible adverse information in the personnel file of a Post Office employee who testified that defendants sought to bribe him; in *Fairman* (a state prosecution)—the worksheet of a Chicago police officer who had testified for the prosecution at a trial involving an attack on Chicago police officers. But cf. *United States v. Zavala*, 839 F.2d 523, 528 (9th Cir.1988) (*Brady* does not extend to reports in the hands of the court or probation office)."

*Id.* at 1503. In analyzing whether the duty to search was triggered in a particular case, the D.C. Circuit found that in some cases, the duty to search flowed directly from the nature of the files, such as the duty to search the FBI and National Crime Information Center records for criminal records of the government's key witnesses. *Id.* In other cases, consideration must be given to whether there was enough of a prospect of exculpatory material to warrant a search. *Id.*

The Eighth Circuit has also discussed a prosecutor's duties under *Brady*:

"This duty of candor, while substantial, is not all encompassing. It neither requires full disclosure as in civil cases nor permits a 'combing of the prosecutors' files' in search of evidence possibly useful to the accused. It has been limited to evidence

favorable to the accused, material to his guilt or punishment, **and evidence affecting the credibility of a key witness when his reliability may be determinative of guilt or innocence."**

*Evans v. Janing,* 489 F.2d 470, 474 (8th Cir.1973) (footnotes omitted) (emphasis added).

■ The prosecutor in Mr. Devose's trial admits that she frequently relied upon the testimony of Officer Thomas in drug cases. In many cases, the only parties to an undercover drug transaction are the accused and the undercover officer. In other cases, like this one, even if there were other parties present, the undercover officer is the only government witness to testify. In this case, Officer Thomas's testimony was absolutely crucial to the State's case. His reliability could have been determinative of guilt or innocence. The personnel records of a police officer being used in state prosecutions are rocks easily overturned by the government.

The *Brady* request filed in this case is perhaps not perfectly specific. It reads in pertinent part as follows:

"The defendant requests that the Court issue its order directing the Prosecuting Attorney to disclose to defense counsel the following information and material as is now or may in the future come within the possession, custody, control or knowledge of the Prosecuting Attorney or any state or federal agency acting in concert therewith in the furtherance of this case, and further permitting defense counsel to inspect test, copy and photograph said information and material, to wit:

\* \* \* \* \* \*

The Defendant requests a copy of the record of prior convictions of persons whom the Prosecuting Attorney intends to call witnesses at any hearing or any trial which information is within the possession, custody or control of the State or through due diligence may come within the possession, custody, or control of the State.

\* \* \* \* \* \*

The Defendant requests that the State disclose to the Defendant's attorney all evidence favorable to the accused which is material, either to his guilt or his innocence or as to punishment, and if any such

evidence or witnesses by furnished to this Defendant together with a copy or a resume of such evidence which is within the possession, custody or control of the State. This Defendant specifically requests all statements of witnesses, exhibits, and testimony with will tend to exculpate, or in any way provide mitigating factors in connection with this Defendant's alleged commission of the offenses charged which evidence is within the possession, custody or control of the State or through due diligence may come within the possession, custody or control of the State. This request is specifically made under DR7–103B of the Code of Professional Responsibility of the American Bar Association and Rule 17 of the Rules of Criminal Procedure of the State of Arkansas."

This is a fairly general *Brady* request. Nevertheless, the paucity, and therefore heightened importance of, witnesses in this case, should have drawn the prosecutor's attention to evidence concerning Officer Thomas's credibility. Where, as here, the government presents only one key witness, and that witness is a police officer working with the prosecution, this Court finds that the prosecution has an affirmative duty to check files readily available to it, such as personnel records and criminal record checks, to determine the credibility of said witness. While it is a close call, this Court concludes that the prosecution in this case failed to comply with its duty under *Brady* and its progeny. In this case, that failure violated the fairness requirement of the due process clause. In light of this violation, Petitioner's conviction cannot stand.

## V. Conclusion

The Court has considered three separate attacks on Mr. Devose's conviction: 1) racially discriminatory jury selection; 2) the failure of the trial court to order the disclosure of the confidential informant; and 3) the failure of the prosecution to fulfill its obligations to exercise due diligence in checking the credibility of its key witness and disclosing impeaching evidence to defense counsel. The Court has found that all three issues are meritorious and that each issue individually requires the Court to set aside Petitioner's conviction.

IT IS THEREFORE ORDERED that the petition for writ of habeas corpus is GRANTED. If the State of Arkansas decides to retry Petitioner, it must file a notice of its intention to do so with this Court prior to August 30, 1994.

IT IS FURTHER ORDERED that the State of Arkansas be, and it is hereby, DIRECTED to release Petitioner from the sanction imposed for the instant offenses prior to 5:00 p.m. on August 30, 1994 if the State does not intend to reprosecute Petitioner.

IT IS FURTHER ORDERED that the State of Arkansas be, and it is hereby, DIRECTED to begin the proceeding to retry Petitioner within 60 calendar days from August 30, 1994 if the State intends to reprosecute him on the instant offense.

Gary and Linda ALLEN, Durst Brothers Dairy Farm, a Minnesota partnership, Armin H. Schrimpf, Stehr Farm, Inc., a Minnesota corporation, Duane Winhorst, Curtis Schrimpf, Kenneth Schrimpf, Ridgeway Enterprises, Inc., a South Dakota corporation, d/b/a Dairyridge, Plaintiffs,

v.

STATE OF MINNESOTA and Elton R. Redalen, Commissioner of Minnesota Department of Agriculture, Defendants.

LE SUEUR CHEESE COMPANY, Plaintiff,

v.

Elton R. REDALEN in his official capacity as Commissioner of the Minnesota Department of Agriculture, Defendant.

Civ. Nos. 3:94–CV–00639, 3:94–CV–00768.

United States District Court,
D. Minnesota,
Third Division.

Nov. 14, 1994.

Doherty, Rumble & Butler Professional Ass'n and Michael R. Docherty, Sunday Prchal and Mark Hanson, for and on behalf of plaintiffs Allen, Durst, et al.

Robins, Kaplan, Miller & Ciresi and Anna-marie A. Daley, Elliot Kaplan and David Bush, for and on behalf of plaintiff Le Sueur Creamery.

Office of the Minnesota Atty. Gen., and Paul A. Strandberg, for and on behalf of defendant Elton R. Redalen.

DAVIS, District Judge.

This matter came before the court on August 18, 1994 on plaintiff's motion for a permanent injunction in an action challenging, *inter alia*, the constitutionality of Minn.Stat. § 32.11 (Supp.1993) as interpreted by the defendants State of Minnesota and the Commissioner of the Minnesota Department of Agriculture (collectively the "State") to prohibit the payment of premiums based on the quantity of milk produced on a periodic basis.[1] The State interprets the statute to

---

1. Minn.Stat. § 32.11(a) provides:

(a) Any person, firm, copartnership, or corporation engaged in the business of buying milk, cream or butterfat for manufacture or for sale of such milk, cream, or butterfat, who shall dis-

criminate between different sections, between persons in the same section, locality, community or city of this state, by purchasing such commodity at a higher price or rate from one person or in one locality than is paid for the same com-

prohibit variations in the prices paid by manufacturers, creameries, processors and other purchasers of milk products when those variations are based on factors other than transportation costs or factors based on quality. *See,* Minn.Stat. § 32.25 (Supp.1993).[2]

Plaintiffs have previously been before this court seeking to temporarily enjoin the State from enforcing Minn.Stat. §§ 32.11 and 32.25 to prohibit volume premiums. This court, by Order dated July 3, 1994, granted plaintiffs' motion and set the matter on for hearing on the merits. The court here finds that Minn. Stat. §§ 32.11 and 32.25 as interpreted by the State, imposes an undue burden on interstate commerce in violation of the Commerce Clause of the United States Constitution, Art. 1, § 8, cl. 3 and the Contract Clause, U.S. Const., Art. 1, § 10, cl. 1.

### I.

The "Allen" plaintiffs are a group of dairy farmers who have received "volume premiums" from purchasers of their dairy products in the past. The producers of the milk products and the purchasers of milk favor this arrangement because the payments constitute an economic incentive for the dairymen to efficiently produce large quantities of milk from their herds. Plaintiff Le Sueur Creamery, a processor of milk products, favors the practice because it is possible for it to acquire the large quantities of milk on a cost efficient basis. Purchasing the milk in great quantities permits it to operate its processing plants at full capacity, thus lowering their fixed operating costs and, by extension, the costs of their products.

The State asserts that the practice of awarding volume premiums violates the prohibition against price discrimination contained in Minn.Stat. § 32.11. The State denies that the enforcement of such prohibition has any impact on interstate commerce or that the impact is so minuscule in relation to the benefits derived therefrom. In brief, the State contends that the prohibition of volume premiums is a reasonable and constitutional means of a legitimate state interest; the preservation of its declining small and family dairy industry.

### A. The Dairy Industry in Minnesota

Minnesota has approximately 13,000 dairy farms, with an average herd size of 48 cows. The average cow produces some 49 pounds of milk per day for ten months a year. In 1990, over 44 per cent of the milk produced in the state was produced on farms having 50–99 cows. (Affidavit of Donald E. Adult at 2.)

It has become highly economical for dairy processors to transport milk from the farm to the processing facility and the practice of volume premiums grew out of the economies of this transport arrangement. Milk is highly perishable and cannot be stored for long periods. *Id.* at 3. It is cheaper to pick up and transport a single large quantity of milk than it is to provide the same service involving many small quantities.

Plaintiffs estimate that volume premiums are received by over half of the dairies in the state of Minnesota. They assert that farms with as few as 15 cows producing 20,000 pounds of milk per month qualify for volume premiums. *Id.* at 4–5.

The impact of the Minnesota dairy industry on the national dairy industry is also

modity by such person, firm, copartnership or corporation in the same locality or in another locality, after making due allowance for the difference, if any, in the reasonable cost of transportation from the locality of purchase to the locality of manufacture or locality of sale of such milk, cream, or butterfat, shall be deemed guilty of unfair discrimination, which is a misdemeanor.

2. Minn.Stat. § 32.25, Subd. 1 (Supp.1993) provides:
 Milk must be purchased from producers using a formula based on one or more of the following:

(1) payment of a standard rate with uniform differentials for milk testing above or below 3.5 percent milk fat;
(2) payment of a standard rate for the pounds of milk fat contained in the milk;
(3) payment of a standard rate for the pounds of protein in the milk;
(4) payment of a standard rate for the pounds of solids, not fat, contained in the milk; or
(5) payment of a standard rates based upon other attributes of value in the milk.
In addition, an adjustment may be made on the basis of milk quality and other premiums.

856

involved in the analysis undertaken by both the Allen and Le Sueur plaintiffs. Due to the pervasive influence of the Federal government in establishing prices paid for milk and the maintenance of minimum prices, see, 7 U.S.C. §§ 601–674, the prices paid for milk produced in Minnesota and Wisconsin determine the prices paid for milk in 48 states through a mechanism known as the M–W price series.[3] The M–W price series ties the basic price paid for milk in 48 states to the "average price per hundred weight for manufacturing grade milk, f.o.b. plants in Minnesota and Wisconsin, as reported to the Department [of Agriculture] for the month ...". *See, e.g.,* 7 C.F.R. §§ 1002.51, 1068.51 and *Minnesota Milk Producers Association v. Yeutter,* 851 F.Supp. 1389, 1391–92 (D.Minn. 1994).

In March or April 1994, the Minnesota Department of Agriculture (Department) became aware that certain dairy processors were offering volume premiums to Minnesota dairymen. After consultation with the Minnesota Attorney General's office, the Department caused a memorandum to be sent to "Purchasers of Producer Milk". (Affidavit of Michael Docherty, Exhibit 3.) In that memorandum, purchasers in Minnesota as well as in other states, were advised that volume premiums were "not provided for under Minnesota law" and requested an immediate cessation of the practice. In response to a variety of inquiries concerning the extent of the prohibition, the Department clarified its intentions in an additional memorandum dated March 30, 1994 and addressed to "Purchasers of Raw Milk from Minnesota Dairy Farmers." In that memorandum, the Department threatened to assess a $1,000 a day administrative penalty against "Minnesota *and* non-Minnesota milk purchasers purchasing milk from Minnesota Producers who continue to offer an illegal volume-based premium." *Id.* Exhibit 2. (Emphasis in original.)

## B. The Allen Plaintiffs

Plaintiff Durst Brothers Dairy Farm ("Durst Brothers") is located in Kasson,

Minnesota. The farm has been in operation for approximately 16 years and produces some 13 million pounds of milk per year. Durst Brothers has received volume premiums from the dairy plant known as Associated Milk Producers, Inc. ("AMPI") for approximately fourteen years. (Amended Affidavit of Rolland E. Durst.)

Based on their receipt of volume premiums, Durst Brothers has expanded its operation. Durst Brothers purchased larger storage facilities and made several improvements in its operation to improve efficiency. Durst Brothers borrowed money from Farm Credit Services to finance the expansion. Without the additional income from the receipt of volume premiums, Durst Brothers will lose approximately $60,000 to $70,000 per year and will be unable to meet its financial obligations. Durst Brothers states it cannot remain a viable operation without the payment of volume premiums. *Id.* at 2–4.

Durst Brothers attempted to export its milk to Iowa when confronted with the loss of volume premiums in Minnesota. It was told that processors in Iowa had been threatened by the State of Minnesota with penalties if they continued the practice of offering volume premiums to Minnesota producers. As a result of the threat of criminal sanctions, Iowa processors ceased offering volume premiums to Minnesota milk producers. Id. at 4.

Plaintiff Ridgeway Enterprises (Ridgeway) operates a dairy farm in Todd County, Minnesota. The farm produces approximately sixteen million pounds of milk per year. Ridgeway has entered into various financial arrangements with both dairies and banks predicated on the receipt of volume premiums. Ridgeway is now threatened with the loss of some $100,000 if volume premiums are prohibited. (Affidavit of James Ridgeway at 3.)

When Ridgeway was notified that the State intended to prohibit volume premiums, it began looking for out-of-state milk processors who might offer volume premiums in an effort to mitigate some of its losses.

**3.** California is not subject to the M–W price series. California, the largest producer of milk in the nation is not subject to a federal milk pricing order.

Ridgeway found a processor in South Dakota who offered to pay volume premiums and Ridgeway made plans to ship its milk to South Dakota. Before the agreement could be finalized however, Ridgeway was informed by the South Dakota processor that it had received a notice from the state of Minnesota threatening to assess penalties if Minnesota milk producers were paid volume premiums. The South Dakota processor withdrew the offer on that basis. *Id.* at 4.

## C. The Le Sueur Plaintiff

Plaintiff Le Sueur Cheese Company is a processor of milk products, purchasing on an annual basis some 62,000 tons of milk from 233 producers in the upper Midwest. Approximately 60,000 tons of that milk is purchased from producers located in Minnesota. (Affidavit of Mark Davis at 2.)

Le Sueur has paid volume premiums to milk producers since 1979 and has entered into contracts with producers which contemplate the payment of such premiums. In 1993, Le Sueur paid approximately $177,000 in volume premiums to eighty five percent of its 233 producers. The ability to purchase large quantities of milk allows Le Sueur to operate its production facilities at near maximum utilization, allowing them to remain competitive in a labor and capital intensive business marked by extreme competition for limited and diminishing supplies of milk. *Id.* at 3.

Le Sueur states that its volume premium program assures it of adequate supplies of milk and posits that its costs would increase markedly if the volume premium program were discontinued. Moreover, it would have to replace those suppliers who sought higher prices elsewhere in the event that the volume premium programs were discontinued. In order to replace those suppliers, Le Sueur's direct and ancillary costs would increase and consequently, the wholesale and retail costs would increase for consumers of its products. *Id.* at 4.

## D. The State of Minnesota

The statute prohibiting the price discrimination for milk has been part of the framework of agricultural regulation in the state of Minnesota since 1909. The predecessor of the statute challenged here was stricken as violative of the Contract Clause of the United States Constitution in *Fairmont Creamery Co. v. Minnesota*, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893 (1927). *Fairmont Creamery* has never been overruled. Although the statute's prohibition against price discrimination was held void by the Court, it apparently was never repealed. In fact, in 1955 the Legislature amended Minn.Stat. 32.11.[4] The statute at issue here is, with minor modifications, the same statute stricken in 1927.[5]

Prior to 1984, milk prices were based solely on weight and butterfat content. In 1984, Minn.Stat. § 32.25 was amended to allow milk prices to reflect "other attributes of value" such as the quantity of non-fat milk

4. The statute was amended to prohibit discriminatory pricing not only between regions, but between persons in the same region; it was also amended to provide a violation constitutes a misdemeanor whereas the 1927 version established the manner of punishment as being a fine not exceeding $100 or by a jail term not to exceed 90 days; and the statute has been amended to provide for "reasonable" allowance for the cost of transportation rather than "actual" cost of transportation.

5. Indeed, the point of departure in plaintiffs' analysis is that this is the same statute that was stricken by the Court in 1927. Plaintiffs argue that by striking section 3907, the predecessor of section 32.11, the Court, in the absence of action by the Legislature, ended the juridical life of Minnesota's price discrimination statute. Defendant contends that the intervening years have given rise to a new analysis which, if properly applied, saves the statute in its current incarnation. The issue not addressed by defendant, however, is the effect of the decision made in 1927. Defendant seems to take the position that the state is somehow free to ignore the Court's declaration and, then, free to begin enforcing a statute after the decision has been largely forgotten or a new jurisprudential approach to the problem has been taken. This court is troubled by the simple fact that the predecessor statute was stricken as unconstitutional and, some 28 years later, amended in some minor and immaterial fashion and enforced as if nothing had ever happened. Because the court today determines that Minn.Stat. 32.11 violates the Contracts Clause under the current analysis utilized by the Supreme Court, this court does not reach this issue.

solids and protein found in the milk. (Affidavit of William W. Coleman at 2.)

The State admits that it was unaware that volume premiums were being offered and that the practice was growing increasingly widespread. There is credible evidence that volume premiums have been offered in Minnesota by milk processors since 1966. (Affidavit of Rudy Nef.) The State asserts the prohibition against price discrimination was enforced from 1955 until 1984, when budget constraints forced the State to abandon enforcement of the prohibition.

Since 1984, the State has failed to investigate compliance with, or enforce, the terms of Minn.Stat. § 32.11 either as it today interprets it or as it is written. Indeed, until March 1994, the State had no knowledge that volume premiums were being offered. Once the volume premiums were discovered, the State asserts it took immediate action to declare its interests by taking steps to prohibit the practice.

The State asserts that it has a legitimate interest in protecting and preserving its declining dairy industry, particularly its small family operated dairy farms. Minn.Stat. § 32.11, the State argues, serves as a prophylactic measure against predatory pricing practices which, if permitted, will allow larger purchasers of milk products to initially set high prices to obtain a disproportionate share of the produce of small farms and then could set ruinously low prices for milk, thus forcing smaller producers out of business. In addition, the State contends that its purpose in enacting and enforcing Minn.Stat. § 32.11, is to maximize the amounts of money available for the purchase of milk products such that all of the producers in the state are treated equally. It is the wish of the State that each of the producers in Minnesota will receive from the purchasers of its products remuneration based solely on the content of that product.

Plaintiffs have brought this suit claiming that 1) the statute has been declared unconstitutional and is therefore void and without effect; 2) that Minn.Stat. § 32.11 is an impermissible burden on interstate commerce; 3) that Minn.Stat. § 32.25 explicitly allows the payment of volume premiums; and, 4) that enforcement of Minn.Stat. § 32.11 constitutes a constitutionally impermissible impairment of contract. For relief, plaintiffs seek a declaration that Minn.Stat. §§ 32.11 and 32.25 are unconstitutional as interpreted by the State and a permanent injunction prohibiting the enforcement of such statute by the State.

## II.

The standard for the issuance of permanent injunctive relief is essentially the same as that applicable to the issuance of preliminary injunctive relief, except that the moving party must show actual success, rather than probable success, on the merits. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987).

The Eighth Circuit has established the following analysis to be used in considering whether to grant or deny a motion for injunctive relief:

> [W]hether a[n] injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *accord Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1090 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). The court balances the four factors to determine whether injunctive relief is warranted. *Dataphase,* 640 F.2d at 113; *West Publishing Co. v. Mead Data Cent. Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986). Plaintiffs bear the burden of proof as to each of the four factors. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

### A. THREAT OF IRREPARABLE HARM

Plaintiffs must prove that harm will result without injunctive relief and the harm will not be compensable with money damages. Possible or speculative harm is not enough. The absence of such a showing is

sufficient to deny a injunctive relief. *Gelco*, 811 F.2d at 420; *Roberts v. Van Buren Pub. Sch.*, 731 F.2d 523, 526 (8th Cir.1984) (citations omitted).

■ The court finds that the plaintiffs have met their burden with regard to the threat that they will suffer irreparable harm if the court denies their request for injunctive relief.

The Allen plaintiffs produce several hundreds of thousands of pounds of milk each year and have been, over the past fourteen years, recipients of hundreds of thousands of dollars in volume premiums. Durst Brothers, for example, undertook an expansion of their production facilities in reliance on the receipt of some $60,000 to $70,000 in volume premiums annually. Ridgeway contends that its operation stands to lose as much as $100,-000 annually if the prohibition against volume premiums is enforced. Moreover, the plaintiffs have estimated that 60–70% of Minnesota's dairy farmers receive the volume premium. Expenditures of the size undertaken by Durst Brothers in reliance on its receipt of volume premium payments, and losses of the magnitude of those which will be sustained by plaintiff Dairyridge are not inconsequential. They are not the kinds of losses which can be easily remedied.

Plaintiff Le Sueur purchases some 60,000 tons of milk per year from Minnesota producers and has paid volume premiums since 1979. The threat of the prohibition of volume premiums has forced Le Sueur to look for other sources of milk as its Minnesota producers look to out-of-state purchasers that offer volume premiums to maximize their income. If the prohibition against the payment of volume premiums stands, Le Sueur contends that it will not be able to find supplies of local raw milk adequate to sustain its operations on an economically viable basis, because its purchasing and operating costs would necessarily rise due to the increased transportation costs and its inability to operated its processing machinery at full capacity. As a result, Le Sueur contends that its plant will not be viable.

Plaintiffs must be secure in their financial and economic projections. Having already relied upon the failure of the State to enforce Minn.Stat. § 32.11 for some fourteen years, it would be manifestly inequitable to allow the State to now unilaterally alter the status quo. Furthermore, because the court finds Minn.Stat. §§ 32.11 and 32.25 as enforced by the State violates the Commerce and Contract Clauses of the United States Constitution, as discussed in detail below, the impairment of plaintiffs' constitutional rights constitutes irreparable harm.

Finally, the court finds that the harm the plaintiffs are likely to suffer would be irreparable because it would not be compensable with money damages. The Eleventh Amendment to the United States Constitution would shield the State from an action to recover the volume premium payments made or damages incurred as a result of the enforcement of Minn.Stat. § 32.11. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974).

Accordingly, the court finds that plaintiffs have made a showing adequate to meet this prong of the *Dataphase* requirements.

## B. THE BALANCE OF HARMS

■ The balance of harm must tip decidedly toward the plaintiffs to justify issuance of an injunction. *See e.g., General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 624 (8th Cir. 1987). Injunctive relief is not appropriate if the hardship to the defendant outweighs the hardship to the plaintiffs, should the injunction issue.

■ The plaintiffs are likely to lose thousands of dollars, if the court denies their request for injunctive relief. The State has failed to show that the hardships which it might suffer outweigh the hardships to be suffered by the plaintiffs.

The State argues that it has a strong interest in enforcing the statutes enacted by the Legislature and that the grant of the injunction will disrupt the "fair administration" of the State's extensive regulatory system. The State, however, has admittedly failed to enforce the provision at issue here for an extended period of time. *See e.g., Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1533 (9th Cir.1993). (". . .

**860**

[T]here had already been a 'forbearance of enforcement of this regulation for a long time', implying that the City itself did not perceive enforcement of the regulation to be a matter of great urgency.") The preservation of the status quo in this matter will not have the disruptive effect predicted by the State, since the State has failed to enforce the statute for some fourteen or more years. During that time period, a large percentage (perhaps a majority) of the dairymen throughout Minnesota have participated in a volume premium program. Many of those milk producers, including the plaintiffs, have become dependant on the income derived from participation in volume premium programs and have ordered their financial affairs around that participation. The State has produced no evidence showing the court how the issuance of the relief requested here will harm the State or its interests. Given the lack of enforcement of the statute, the court is not persuaded, considering the balance of the hardships, that the issuance of the relief will injure the State's interests more than the State's own failure to enforce the statute.

More important, however, is the reality that the State has failed to enunciate a cognizable interest in the balance. Plaintiffs have demonstrated that they will be harmed in a material fashion and that the interest of the national economy will be adversely affected if this court fails to act. Plaintiffs have pointed out that the options available to them in selling their product both in-state and out-of-state will be adversely affected if the statute, as currently interpreted by the State, is allowed to stand. Plaintiffs have shown that they will suffer real hardships, while the State has made no showing of any hardship to which it will be subjected if the permanent injunction issues. At best, the State has made a thin showing that some of its dairymen will be affected. That showing is not enough to tilt the balance in favor of the State.

Based on the foregoing, the court concludes that the second factor of the *Dataphase* test, the balance of harm, weighs in favor of the grant of the requested relief.

## C. SUCCESS ON THE MERITS

### 1. The Commerce Clause

The Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state interests by burdening out of state competitors." *Wyoming v. Oklahoma*, 502 U.S. 437, ——, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) *quoting New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). The court uses a two tiered test to analyze state economic regulations and laws under the commerce clause. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986). If a state statute directly regulates or discriminates against interstate commerce or its effect is to favor in-state interests over out-of-state interests, it is "per se invalid" under the Commerce Clause and will be struck down, *Brown–Forman* at 579, 106 S.Ct. at 2084, and the burden falls upon the state to justify the economic regulation in terms of its benefits to the state and the lack of non-discriminatory alternatives that will accomplish the same goals. *Wyoming*, 502 U.S. 437, 112 S.Ct. at 801 (citation omitted). When, as here, the statute has only indirect effects on interstate commerce and regulates evenhandedly, the court must examine whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefit. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The critical consideration under either tier of the analysis is the overall effect of the regulation on both local and interstate activity. *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084.

In order to determine whether or not there is an impermissible conflict between Minn.Stat. §§ 32.11 and 32.25 and the Commerce Clause, the court must balance the local benefits of the statute against the burden it places on interstate commerce. *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). With this in mind, the court turns to an examination of the interests of the State and the benefits to be derived from the State's prohibition of volume premiums.

The State has set out as its primary interest in defending its interpretation of Minn. Stat. §§ 32.11 and 32.25 to prohibit volume premiums is the protection of its dairy industry. It has not, however, demonstrated that such prohibition of volume premiums will result in any local benefits to the state.

As stated earlier, the State asserts that its prohibition against the payment of volume premiums protects smaller farmers by allowing them to accurately compare price offers received from processors and by protecting them from having to finance the payment of volume premiums paid to large producers. (Affidavits of David Kaseno, William Coleman and Cook.) The State's argument ultimately posits that there is a finite amount of money available for the purchase of milk from Minnesota milk producers and that the money that is used for the payment of volume premiums is derived from that single fixed amount. Out of that fixed fund, however, also comes the purchase price of the milk produced by the State's smaller farmers. By prohibiting the payment of volume premiums, the State asserts that it is protecting its smaller dairymen because the finite sums of money with which producers purchase milk is more widely spread among the State's distressed dairymen. In other words, there is an economic pie of limited size and the State seeks to assure that all of its dairy farmers share access to the pie. By banning volume premiums, the State asserts, it insures that even the smallest and least productive dairy farms share equally, on a pro rata basis, with the largest and/or most productive dairy farm.

Plaintiffs respond that this argument is simplistic and misleading. Plaintiffs state the actual effect of volume premiums is to increase the total dollars available, because of increased milk output and lower costs to processors.

In the alternative, the State asserts that its ban on volume premiums protects its small dairy farmers by prohibiting predatory pricing. Interestingly, the State relies on *Fairmont Creamery* for its statement of the significant and important interests:

> A centralized creamery, supplied with ample capital and facilities, has the ability and meets the temptation to destroy competition at a buying station by overbidding, absorbing the resultant losses, if any, through the profits of its general business and, when competition is ended, to buy on a noncompetitive basis. If it does all this successfully, it has a monopoly, and may or may not treat producers justly. The statute seeks to prevent the destruction of competition by forbidding overbidding unless the dealer makes prices at other buying points correspond after proper allowances for the cost of transportation.

*Fairmont Creamery*, 274 U.S. at 7, 47 S.Ct. at 507. The State's reliance on this statement as a significant interest is misplaced. Not only was this rationale rejected in *Fairmont Creamery*, the State has simply produced no evidence that predatory pricing is anywhere involved in the development or continuing vitality of volume premium programs. The mere possibility that predatory pricing would result is insufficient, in this court's analysis, to avoid a finding of unconstitutionality. Moreover, the State has failed to show that its interest in deterring predatory pricing practices inures to the benefit of Minnesota dairy farmers. The State's interest in avoiding monopolies does not translate into a benefit simply because the State asserts that it is so.

The court has found that many other states that have enacted statutes which are directed at the evil sought to be remedied here.[6] Those statutes, however, contemplate something that this statute does not: a showing that the intent of the discriminatory pricing is to destroy competition. Indeed, the Court in *Fairmont Creamery* specifically objected to the lack of an intent requirement in the statute. 274 U.S. at 8, 47 S.Ct. at 507–08.[7] So broad an infringement on the right

---

**6.** See, e.g. IA.Stat. § 192A.4; WI Stat. § 100.201(b); Cal. Food and Agric. Code § 61382.

**7.** The requirement that the purpose of the discrimination be the destruction of competition or

the creation of monopoly was removed from the statute in 1923. See, Laws of Minnesota, 1923, c. 120.

of persons engaged in commerce cannot be permitted, particularly where, as here, there is no relationship between the statute and the evil sought to be remedied.

The court, having examined the purported benefits of the legislation, now turns to an examination of the burdens plaintiffs argue are imposed on interstate commerce. First of all, the State concedes it cannot enforce the prohibition of volume premiums beyond Minnesota's borders. Plaintiffs argue that the State has nonetheless threatened to impose conditions on exports of milk outside of Minnesota which constitutes an impermissible burden on interstate commerce. The State has suggested that Minnesota dairy farmers may export their milk to obtain volume premiums as long as they use their own trucks and all aspects of the transaction takes place outside of Minnesota. Plaintiffs have provided affidavits of farmers who state such conditions place a substantial burden on them, especially smaller farmers.

The State argues the statute regulates evenhandedly and its effect on interstate commerce is minimal. The State asserts the statute simply prohibits out-of-state purchasers from paying volume premiums; "... the only effect upon out-of-state processors is that they may pay *less* for the milk which they purchase. There is no special burden placed upon them. That is all that the commerce clause requires." Deft.'s Mem. in Opp. to Plaintiff's Motion for Preliminary Injunction at 10. (Emphasis in original.) The overall teaching of the cases addressing this issue, however, is that a state "may not attach restrictions to exports or imports in order to control commerce in other states." *C & A Carbone, Inc. v. Town of Clarkstown,* — U.S. —, —, 114 S.Ct. 1677, 1683, 128 L.Ed.2d 399 (1994) (citing *Baldwin v. GAF Seelig,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935)).

Plaintiffs also argue that the volume premium prohibition to wholly in-state transactions will nonetheless have the impermissible effect of projecting Minnesota's regulations and prices scales into other states. *See, Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989). Through operation of the Agricultural Ad-

justment Act of 1933, 7 U.S.C. § 608c(5), the Department of Agriculture issues marketing orders which set the prices to be paid for dairy products in forty eight states. The prices to be paid are determined by reference to the "average price per hundred weight for manufacturing grade milk, f.o.b. plants in *Minnesota and Wisconsin,* as reported to the Department [of Agriculture] for the month ...". *See, e.g.,* 7 C.F.R. §§ 1002.51, 1068.51 and *Minnesota Milk Producers Association v. Yeutter,* 851 F.Supp. 1389, 1391–92 (D.Minn.1994). (Emphasis supplied.) This pricing system is known as the M–W price series.

Plaintiffs argue that the prohibition of volume premiums has an affect on the M–W price series and, therefore, affects interstate commerce. Plaintiffs have submitted evidence that volume premiums are incorporated in the M–W's calculation of the prices paid for milk in Minnesota and Wisconsin. Because those premiums are included in the prices set by the M–W price series, plaintiffs argue that their prohibition tends to be reflected nationally in lower base prices for milk in each of the states that are subject to pricing orders utilizing the M–W index. As evidence of the adverse impact of the ban on volume premiums, plaintiffs point to the strong upward trend in base prices paid for milk until May 1994, the time at which the State notified purchasers that it intended to enforce its interpretation of Minn.Stat. § 32.11. After the notification, base prices paid for milk declined, an event which plaintiffs attribute to the ban on volume premiums. Plaintiffs estimate that the national impact of Minnesota's determination that Minn.Stat. § 32.11 forbids the payment of volume premiums is at approximately 20 million dollars. (Second Reply Affidavit of Donald E. Adult at (cite)). This, then, is no small impact on the national economy.

While there is much to commend the interest of the State in saving its dairy farmers, the State has failed to produce any evidence that banning incentive payments based on the productivity of certain farmers materially assists other farmers to protect their farms. Essentially, the State has chosen a means which is wholly unrelated to either of the

stated purposes; if the benefits to be derived could be made apparent to the court, the result here might be different. The State's dairy industry, however, has been in decline for many years, primarily as a result of competitive pressures originating in states where larger herds and increasing production of those herds is the norm. That is the fundamental reality that Minnesota seeks to avoid by banning production incentive payments. The harsh economic reality is that those dairymen who are unwilling or incapable of competing in the national market, as the market for dairy products has increasingly become, will not survive. And it is that national market that the Commerce Clause seeks to protect.

Moreover, the State has produced no evidence that purchaser productivity incentives have led to predatory pricing on the part of purchasers. Indeed, given the remarkable amount of regulation to which the dairy industry is subject, it is doubtful that the fears of the State as to the creation of milk monopolies can be realized at this late date. Plaintiffs contend that volume premiums are not designed to destroy competing dairies. Rather, they encourage productivity in the industry and allow manufacturers of dairy products to cut their direct and ancillary costs. The result of that increased productivity and lower cost should translate into lower cost for consumers and increased competition between competing dairies. The court finds plaintiffs argument persuasive.

The net effect of sections 32.11 and 32.25, as interpreted by the state of Minnesota, is to require that out-of-state purchasers of Minnesota milk conform their purchasing practices to reflect Minnesota's pricing regulations; the impact of that conformity on out-of-state producers of dairy products constitutes a burden on interstate commerce.

Based on the foregoing, the issue becomes whether the degree of burden placed on interstate commerce is outweighed by the benefits derived by the state of Minnesota. Because the Minnesota law purports to regulate interstate commerce, plaintiffs have established success on the merits unless it can be shown that the law is justified "both in terms of the local benefits flowing from the statute and the unavailability of ... alternatives adequate to preserve the local interests at stake." *Wyoming,* 502 U.S. 437, 112 S.Ct. at 801 (citations omitted.)

The State has proffered several justifications for its scheme prohibiting price discrimination. The court, however, finds that the State has not met its burden of justifying the statute either by showing the benefits of the statute or by demonstrating that no less burdensome alternative exists. The court therefore finds that plaintiffs have demonstrated success on the merits of their claim that Minn.Stat. §§ 32.11 and 32.25, as interpreted by the State, is invalid under the Commerce Clause.

2. The Contracts Clause

■ Plaintiffs argue that *Fairmont Creamery* remains good law and that the statute there found unconstitutional remains so as the constitutional infirmities which caused the Court to strike the statute in 1927 remain. As previously stated, the predecessor statute to Minn.Stat. § 32.11 held violative of the Contract Clause in *Fairmont Creamery* has not been substantively amended since that decision was rendered. The statute was held unconstitutional because it operated irrespective of motive, and without substantial relation to the anticipated evil of predatory pricing. Nonetheless, the State argues Minn.Stat. § 32.11 does not violate the Contract Clause under current case law.

The United States Supreme Court has employed a three part test to evaluate whether a state statute violates the Contract Clause by substantially impairing a contractual relationship. *General Motors v. Romein,* — U.S. —, —, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992); *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978); *Energy Reserves Group v. Kansas Power & Light Co.,* 459 U.S. 400, 404, 103 S.Ct. 697, 700–01, 74 L.Ed.2d 569 (1983); *Burlington Northern Railroad Company v. Neb.,* 802 F.2d 994, 1006 (8th Cir.1986). The three part inquiry is 1) whether there is a contractual relationship; 2) whether the state statute impairs the contractual relationship; and 3) whether the impairment is substantial. *General Mo-*

*tors v. Romein,* —— U.S. at ——–——, 112 S.Ct. at 1109–10. In addition to the foregoing, it must also be understood that in determining the extent of the impairment, the extent of regulation to which the industry has historically been subjected must be considered. *Allied Structural Steel,* 438 U.S. at 242, n. 13, 98 S.Ct. at 2721, n. 13 (*citing Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38, 60 S.Ct. 792, 794–95, 84 L.Ed. 1061 (1940)).

The prohibition in the Contract Clause against the impairment of contracts is not to be given a literal reading. *W.B. Worthen Co. v. Thomas,* 292 U.S. 426, 433, 54 S.Ct. 816, 818–19, 78 L.Ed. 1344 (1934). The absolute language of the prohibition must be read to accommodate the inherent police power of the state "to safeguard the vital interests of its people". *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434, 54 S.Ct. 231, 238–39, 78 L.Ed. 413 (1934). More recently, the Court has framed the limits imposed on a state within the contours of the Contract Clause as follows: "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977).

The State argues that this claim must fail as the plaintiffs cannot establish the existence of any legal contracts for the payment of volume premiums, because those types of contracts have always been illegal under Minn.Stat. §§ 32.11 and 32.25. This argument lacks merit for a number of reasons. This argument lacks merit for two reasons. First, volume premiums are not explicitly prohibited by section 32.11. Second, section 32.25 arguably allows for volume premiums. There is no support, either by case law or legislative history, for the State's argument that "other premiums" is limited to quality premiums.

The State also asserts that no contracts providing for volume premiums existed at the time of the State's March 1994 memorandum prohibiting such premiums. Plaintiffs have produced a number of such contracts, however-er.

The State argues the legislation at issue is supported by a "significant and legitimate purpose" and "the adjustment of the 'rights and responsibilities of the contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *In re Walker,* 959 F.2d 894, 899 (10th Cir. 1992) (*quoting Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 705, and *United States Trust,* 431 U.S. at 22, 97 S.Ct. at 1518). However, as discussed at length in the section addressing the Commerce Clause, the State has wholly failed to establish that the prohibition of volume premiums serves this asserted interest.

Finally, the State argues that the dairy industry is heavily regulated by both the federal and state governments, and that whatever impairment plaintiffs suffer as a result of the prohibition of volume premiums, is the cost of doing business. The State asserts that allowing plaintiffs to contract for volume premiums would vitiate the important regulatory power of the state. In support of this argument, the State relies upon *Energy Reserves, supra.* In that case, participants in the natural gas industry complained of the state's restrictions on their contracts. Noting the industry to be heavily regulated, the Court stated:

> Price regulation existed and was foreseeable as the type of law that would alter contract obligations.

*Id.* 459 U.S. at 416, 103 S.Ct. at 707. Based on this statement, the State argues that milk prices have always been regulated therefore, the minimal regulation placed upon them by Minn.Stat. 32.11 does not constitute a constitutional impairment of contract. While it is true that milk prices have been regulated in the past, it is not true that a prohibition on volume premiums was foreseeable. This is especially true given the fact that volume premiums have been utilized in Minnesota since 1966, and no action was taken to prohibit them until *1994.* Given the amount of money involved, and the reliance upon the volume premiums by plaintiffs, the prohibition of such premiums is not minimal.

Accordingly, Minn.Stat. §§ 32.11 and 32.25, as interpreted by the State to prohibit the payment of volume premiums, is violative of the Contract Clause of the United States Constitution.

### D. PUBLIC INTEREST

It is plain that the State has an interest in protecting its endangered dairies and that end may be effected on a purely intrastate basis. The State's interest in insuring that out-of-state processors comply with its pricing scheme "is outweighed by the public's interest in ensuring that farmers are able to participate in unfettered interstate competition as guaranteed by the Commerce Clause." *Marigold Foods, Inc. v. Redalen,* 809 F.Supp. 714, 724–5 (D.Minn.1992). Moreover, "every consumer may look to the *free competition from every producing area in the nation to protect him from exploitation by any.*" *H.P. Hood & Sons v. Du Mond,* 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949). The critical issue, then, is competition. Out-of-state processors of Minnesota milk must be free to organize their production without regard to Minnesota's idea of what constitutes a fair price.

Based on the foregoing, the court concludes that the plaintiffs have satisfied their burdens and injunctive relief is appropriate.

### E. ELEVENTH AMENDMENT

■■■ The State argues that the Eleventh Amendment to the United States Constitution prohibits a federal court from granting injunctive relief against a state based upon violations of state law. This argument is based upon the United States Supreme Court in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The State's reliance on *Pennhurst* in this case is misplaced, however. While the general rule is that the Eleventh Amendment bars a suit against a state official when the "state is the real party in interest", the Court has recognized an exception. In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court held that a state official, whose duty it is enforce a state statute which violates the United States Constitution, may be enjoined

by a federal court from enforcing such statute against persons affected thereby.

> If the act which the state [official] seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Ex Parte Young,* 209 U.S. at 159–160, 28 S.Ct. at 454. This exception is specifically recognized in *Pennhurst,* 465 U.S. at 102, 104 S.Ct. at 909.

In this case, plaintiffs are asking for an injunction to enjoin the Commissioner of the Department of Agriculture from interpreting Minn.Stat. §§ 32.11 and 32.25 to prohibit volume premiums on milk prices, and from enforcing such interpretation. Because this court has found such interpretation of the statute as violative of the United States Constitution, this court is not barred by the Eleventh Amendment from enjoining such enforcement.

### III.

Finally, the plaintiffs seek an award for attorney fees, costs and disbursements pursuant to 42 U.S.C. §§ 1983 and 1988. The court finds that the circumstances of this case do not warrant such an award.

It is therefore considered, adjudged and declared, pursuant to 28 U.S.C. § 2201, that Minnesota Statute § 32.11 imposes an impermissible burden on the conduct of interstate commerce in violation of the Commerce Clause of the United States Constitution.

Accordingly, IT IS HEREBY ORDERED that the Minnesota Department of Agriculture, its agents, successors, employees and all persons acting in concert or cooperation with it or at its direction or any other person or organization shall:

1. Minnesota Statutes §§ 32.11 and 32.25, as interpreted and enforced by the Commissioner to prohibit payment of volume-based

**866**

premiums to Minnesota milk producers is contrary to the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3, and the Contract Clause, Art. 1, § 10, cl. 1.

2. Cease from enforcing or attempting to enforce Minnesota Statutes §§ 32.11 and 32.25 of the laws of the State of Minnesota (1993) and the rules and regulations promulgated thereunder to the extent that the statute purports to prohibit the purchasers of milk produced in the State of Minnesota from paying to the producers of such milk a premium price based on the volume of milk delivered to the purchaser.

3. Plaintiffs' motion for attorneys fees, costs and disbursements is denied.

THERE BEING NO JUST REASON FOR DELAY, LET JUDGMENT BE ENTERED ACCORDINGLY.

**NASH FINCH CO.**

v.

**J. Scott PRESTON, individually; and the law firm of Rice, Preston, Brown.**

No. 4–94–CV–678.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 17, 1994.

Steven William Meyer, Robert J. McGillivray, Oppenheimer Wolff & Donnelly, Minneapolis, MN, for plaintiff.

Lewis A. Remele, Jr., Bassford Lockhart Truesdell & Briggs, Minneapolis, MN, for defendants.

## ORDER

ROSENBAUM, District Judge.

The plaintiff, Nash Finch Company ("Nash Finch"), filed this action on August 4, 1994, asserting claims of professional malpractice, negligence, and misrepresentation against an attorney and his law firm. The defendants, J. Scott Preston ("Preston") and Rice, Preston, Brown (the "law firm"), move to dismiss for lack of personal jurisdiction, or alternatively, for an order transferring venue to the United States District Court, Eastern District of Kentucky, pursuant to 28 U.S.C. § 1404(a). The Court heard oral argument on October 19, 1994. The defendants' motion to dismiss is granted.

### I. *Background*

Nash Finch is a Delaware corporation with its principal place of business in Minnesota. It is in the grocery distribution business. In the fall of 1992, Nash Finch loaned $5,100,000 (the "loan") to Paintsville Foods, Inc., and certain of its subsidiaries ("Paintsville"), all of which were based in Kentucky. Paintsville was claimed to be owned by Henry Lyon ("Lyon"). Nash Finch and Paintsville executed at least ten documents, including a Security Agreement, in connection with the loan. The Security Agreement, by its terms, pledged all equipment, machinery, inventory, and receivables located at nine of Lyon's grocery stores as collateral for the loan. Nash Finch was represented by its own counsel in this transaction.

Defendant Preston, an attorney licensed to practice law only in the state of Kentucky, represented Lyon and his companies in their dealings with Nash Finch. Preston is a partner of the four-lawyer firm of Rice, Preston, Brown. He and the firm reside in Kentucky. Neither Preston nor any other lawyer from the law firm has ever been licensed to practice in Minnesota. The law firm has never advertised for clients, or had an office, telephone, or bank account in Minnesota.

Prior to the closure of the loan, Preston and counsel for Nash Finch exchanged correspondence and engaged in telephone conversations. Among the letters exchanged was an October 29, 1992, "opinion letter" to Nash Finch, over Preston's signature, in which Preston represented that he had reviewed the loan documents.

Paintsville ultimately defaulted on the loan. When Paintsville filed for bankruptcy, on August 30, 1993, it owed approximately $4,829,093 to Nash Finch. Nash Finch attempted to enforce its security interest, only to find that Paintsville did not own two of the nine grocery stores it pledged as collateral. The two stores were instead owned by Mineral Labs, Inc., a company owned by Lyon's brother, Paul, who was also one of Preston's clients.

Nash Finch claims that Preston's October 29, 1992, opinion letter constituted professional malpractice, negligence, and an actionable misrepresentation on Preston's and the law firm's part. The plaintiff asserts that this Court has personal jurisdiction, pursuant to 28 U.S.C. § 1332.

### II. *Personal Jurisdiction*

A federal court in a diversity action may assume jurisdiction over non-resident defendants to the extent permitted by the long-arm statute of the forum state and the due process clause of the Fourteenth Amend-

ment. *Morris v. Barkbuster, Inc.,* 923 F.2d 1277 (8th Cir.1991). The Minnesota Supreme Court has interpreted the reach of Minnesota's long-arm statute to be coextensive with that permitted by due process. *Land–O–Nod Co. v. Bassett Furniture Indus., Inc.,* 708 F.2d 1338, 1340 (8th Cir.1983).

■ Due process is satisfied where non-resident defendants have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Sybaritic, Inc. v. Interport Int'l, Inc.,* 957 F.2d 522, 524 (8th Cir.1992). These minimum contacts exist when a defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (*citing Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)). "Purposeful availment" is defined as deliberately engaging in significant activities within a state or creating "continuing obligations" between a litigant and residents of the forum. *Burger King* at 475–76.

■ The Court, in determining the sufficiency of defendants' contacts, must evaluate the following factors:

1) the nature and quality of contacts with the forum state;

2) the quantity of such contacts;

3) the relation of the cause of action to the contacts;

4) the interest of the forum state in providing a forum for its residents; and

5) the convenience of the parties.

*Aftanase v. Economy Baler Co.,* 343 F.2d 187, 197 (8th Cir.1965). Of these factors, the first three are the most important. *Land–O–Nod,* 708 F.2d at 1340. Upon consideration of the *Aftanase* factors, the Court finds that defendants' contacts with Minnesota were so minimal that assertion of personal jurisdiction over the defendants is inconsistent with due process.

It is uncontroverted that Preston's only contacts with Minnesota were in connection with his representation of Paintsville in the Nash Finch loan. The contacts were made exclusively by phone or mail. Neither Preston nor his partners ever solicited clients, practiced law, or met with Nash Finch or its representatives in Minnesota. Such limited contacts by a non-resident attorney, even when the client was a Minnesota resident, led Judge MacLaughlin to find there was no Minnesota jurisdiction in *St. Paul Fire & Marine Ins. Co. v. Servidone Constr. Corp.,* 778 F.Supp. 1496 (D.Minn.1991).

Nash Finch proffers cases which hold that correspondence or phone calls containing misrepresentations or other tortious matter directed to the forum state can be sufficient to confer personal jurisdiction. This is true; but, in none of these cases is the defendant an out-of-state attorney. The distinction has been recognized by the Eighth Circuit in *Austad Co. v. Pennie & Edmonds,* 823 F.2d 223 (8th Cir.1987). In *Austad,* the non-resident attorney had more contacts with the proposed forum than are found here. The contacts were performed on behalf of its own client. The client then became the plaintiff and sued Pennie & Edwards, its former counsel. Yet the Eighth Circuit held that the forum state lacked personal jurisdiction over the defendant because the law firm had not availed itself of the benefits and protections of the forum state's law such that the exercise of jurisdiction comported with due process. *Id.* at 226.

The Ninth Circuit has made the distinction even more clearly. In *Sher v. Johnson,* 911 F.2d 1357, 1363 (9th Cir.1990), the court stated that out-of-state legal representation does not establish purposeful availment of the privilege of conducting activities in the forum state, where a law firm was solicited in its home state and takes no affirmative action to promote business within the forum state. The court found that to be subject to personal jurisdiction, an out-of-state lawyer must do more than merely communicate with persons in the forum state at the client's behest.

A rule limiting jurisdiction in this way is reasonable. A contrary rule would mean that anytime a lawyer sent a letter beyond

his or her own state's borders, that lawyer would be subject to the jurisdiction of the state of the addressee. Such a rule would make interstate law practice all but impossible. A law firm could well be susceptible to the jurisdiction of every state in the union. Such a possibility is absurd.

With all of these thoughts in mind, the Court considers the defendants' contacts with Minnesota in light of the *Aftanase* test. The Court finds that the first factor, the nature and quality of the contacts with the forum state, favors the defendants. Preston's contacts with Nash Finch were essentially responsive in nature. Nash Finch did not compensate Preston for his services. Neither Preston nor any member of his law firm entered Minnesota. In this Court's view, Preston did not purposefully avail himself of the benefits and protections of Minnesota law.

The second *Aftanase* factor, the quantity of the defendants' contacts with the forum state, marginally favors the defendants. It appears that Preston and Nash Finch's counsel engaged in approximately a dozen telephone calls and exchanged thirteen letters. Twenty-five contacts with a forum state could be sufficient to establish personal jurisdiction, but the Court has established that the nature and quality of these contacts weigh against the plaintiff's jurisdictional claim.

The third factor, the relation of the cause of action to the contacts, favors the plaintiff. The October 29, 1992, opinion letter Preston mailed to Minnesota contains the representations which are claimed to be tortious.

The less important fourth and fifth factors, the interest of the forum state in providing a forum for its residents and the convenience of the parties, favor the defendants. Minnesota certainly has an interest in providing a forum for its citizens, be they corporate or individual. But Preston and the law firm have no connection to Minnesota. The plaintiff, on the other hand, regularly transacts business in Kentucky. Most of the witnesses are in Kentucky. Kentucky professional malpractice law will apply to the merits of the case. These factors weigh against Minnesota jurisdiction.

The Court finds that Nash Finch has failed to make a prima facie showing in favor of the exercise of jurisdiction. Accordingly, based on the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

Defendants' motion to dismiss for lack of personal jurisdiction is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**UNITED STATES of America, Plaintiff,**

v.

**Clark Beach FIELD, Richard Field, aka Mike Field, Rudell Oppegard and Martin O. Gjerde, Defendants.**

**Crim. Nos. 4–94–41(1), 4–94–41(2).**

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 17, 1994.

870

Daniel Martin Scott, U.S. Public Defenders Office, Minneapolis, MN, for Clark Beach Field.

Paul Christopher Engh, Engh Law Office, Minneapolis, MN, for Richard Field.

Douglas Halvor Olson, Mauzy Law Office, Minneapolis, MN, for Rudell Merle Oppegard.

James Freeman Nelson, Nelson & Kuhn, Glenwood, MN, Joseph G. Headley, Headley Law Office, Indialantic, FL, for Martin O. Gjerde.

Margaret Burns Magill, U.S. Atty., Minneapolis, MN, for U.S.

## ORDER

DOTY, District Judge.

Defendants Clark Beach Field and Richard Field appeal the order entered by United States Magistrate Judge Floyd E. Boline, dated August 1, 1994. The Fields moved to vacate or amend the *ex parte* restraining order issued by Chief Judge Diana E. Murphy upon return of the original indictment. The motion to vacate was denied by Magistrate Judge Boline's order.

The original indictment was filed on March 23, 1994, and contained 15 criminal counts and three forfeiture counts.[1] The indictment is based on allegations that defendants Clark and Richard Field along with others violated various federal laws in the course of obtaining loan funds from the Department of Housing and Urban Development (HUD). Specifically, defendants Clark and Richard Field are charged with participating in two conspiracies to fraudulently obtain loan funds from HUD. They are also charged with mail fraud, false statements and bankruptcy fraud.

■ Pursuant to 18 U.S.C. § 982, the government seeks forfeiture of real and personal property belonging to Clark and Richard Field. Section 982 authorizes forfeitures for violations of 18 U.S.C. § 1341, the statute which governs mail fraud. Forfeitable assets are defined to include all real or personal property constituting, or derived from, proceeds the defendants obtained directly or indirectly as a result of the criminal violations. 18 U.S.C. § 982(2). Section 982 incorporates by reference the procedures for forfeitures provided in 21 U.S.C. § 853. Under § 853(e)(1), the government may restrain forfeitable assets before conviction if necessary to preserve the availability of the property. The issue presented here is whether "substitute assets"—assets not connected to the underlying criminal violation—may also be restrained by the government prior to conviction.

Upon return of the original indictment, the government filed an *ex parte* motion to restrain the use or disposal of all assets held by defendants Clark and Richard Field that may be subject to forfeiture. Judge Murphy granted the government's motion and entered an order against Clark and Richard

**1.** On August 4, 1994, a superseding indictment containing 14 criminal counts and three forfeiture counts was returned. In a Report and Recommendation dated September 14, 1994, Magistrate Judge Boline recommended that the forfeiture counts be dismissed for failure to allege a violation of any crime affecting a financial institution. A second superseding indictment containing 14 criminal counts and realleging the two forfeiture counts against Clark and Richard Field was filed on September 21, 1994. The forfeiture count against defendant Martin Gjerde was dropped.

Field restraining all property constituting, derived from or traceable to the $282,000 in HUD loan proceeds. The order also restrained any other property or interests belonging to Clark and Richard Field up to the value of $282,000 and listed various items of real and personal property in the control of defendants. Defendants challenge the restraining order on the grounds that 21 U.S.C. § 853 does not permit the restraint of substitute assets before conviction.

The propriety of a pretrial restraint of substitute assets depends on the relationship between three subsections of 21 U.S.C. § 853. Forfeitable assets are defined in § 853(a) to include "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation."[2] Section 853(p) provides for the forfeiture of substitute property in the event that the forfeitable assets of subsection (a) are unavailable for one of five listed reasons. Subsection (p) states:

(p) If any of the property described in subsection (a) of this section, as a result of any act or omission of the defendant—

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty; the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

Under § 853(e), the government may restrain forfeitable assets prior to conviction to preserve the availability of assets that may later be subject to forfeiture. Subsection (e) provides:

(e) Protective Orders

(1) Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of *property described in subsection (a)* of this section for forfeiture under this section—

(A) upon the filing of an indictment or information charging a violation ... for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section.

21 U.S.C. § 853(e)(1)(A) (emphasis added).

This case presents an issue of first impression in the Eighth Circuit. Five other circuits have considered the issue with differing results. Relying on the explicit reference in subsection (e) to "property described in subsection (a)," the Fifth and Ninth Circuits hold that § 853 does not allow the restraint of substitute assets before conviction. *United States v. Floyd*, 992 F.2d 498 (5th Cir. 1993); *United States v. Ripinsky*, 20 F.3d 359 (9th Cir.1994). The Fifth Circuit stated:

We find that the statute controlling the restraint before us plainly states what property may be restrained before trial. Congress made specific reference to the property described in § 853(a), and that description does not include substitute assets. Congress treated substitute assets in a different section, § 853(p). To allow the government to freeze [defendant's] untainted assets would require us to interpret the phrase "property described in subsection (a)" to mean property described in subsection (a) and (p).

*Floyd*, 992 F.2d at 502. The Ninth Circuit, undertaking the same analysis, concluded that substitute assets are not subject to pretrial restraint under § 853. *Ripinsky*, 20 F.3d at 363 ("Because subsection (e) authorizes pretrial injunctions only to 'preserve property described in subsection (a),' and because subsection (a) describes only forfeitable assets and not substitute assets, we conclude that subsection (e) does not authorize the pretrial restraint of substitute assets."). *Accord In re Assets of Martin*, 1

---

**2.** Although § 982 incorporates the procedures for forfeitures provided in § 853, it contains its own definition of forfeitable assets in § 982(a). For purposes of this case, there is no significant difference between the definitions of forfeitable assets in § 982(a) and § 853(a).

F.3d 1351 (3rd Cir.1993) (substitute assets not subject to pretrial restraint under RICO forfeiture provision, 18 U.S.C. § 1963).

The Fourth and Second Circuits reached the opposite result concluding that the RICO forfeiture provision, which is identical in all relevant respects to § 853, authorizes the restraint of substitute assets prior to conviction. *In re Assets of Billman*, 915 F.2d 916 (4th Cir.1990); *United States v. Regan*, 858 F.2d 115 (2d Cir.1988).[3] Those courts, rather than focusing on the specific language of the statute, read the forfeiture provision as a whole to permit pretrial restraint of substitute assets. According to the Fourth and Second Circuits, the restraint provisions must be broadly construed to accomplish the remedial purpose of preserving all assets, before trial, that might ultimately be subject to forfeiture. The Fourth Circuit stated:

> Although reference is made ... to property described in subsection (a), we believe that when, as here, the defendant has placed the assets specified in subsection (a) beyond the jurisdiction of the court, [the subsections] must be read in conjunction ... to preserve the availability of substitute assets pending trial. In this way the purpose of [the restraint provision] can be attained.

*Billman*, 915 F.2d at 921. Although the substitute assets provision concerns the ultimate forfeiture, the Second Circuit reasoned that the provision "suggests that restraining orders entered before forfeiture should be concerned with preserving assets equivalent in value to the potentially forfeitable property, and not necessarily the precise property." *Regan*, 858 F.2d at 121.

Magistrate Judge Boline sided with the Second and Fourth Circuits in the order dated August 1, 1994, and held that 21 U.S.C. § 853 permits the government to restrain substitute assets before conviction. After reviewing the split of authority on the issue, Magistrate Judge Boline found the reasoning of *Regan* and *Billman* more persuasive. Magistrate Judge Boline expressly adopted the statutory analysis of § 853 in *United*

*States v. Schmitz*, 153 F.R.D. 136 (E.D.Wisc.1994). In response to the literal approach of several circuits, the *Schmitz* court stated:

> [I]t is equally clear from the language of subsection (p) that the later enacted subsection (p) was meant to supplant subsection (a) under the appropriate conditions. In other words, subsection (p) is defined as equal to subsection (a) and should be used in lieu thereof whenever substitute property is involved, whether that is pre- or post-conviction.

153 F.R.D. at 139. The *Schmitz* court agreed with the Second and Fourth Circuits that "the language and design of the statute supports the use of the prior restraint or seizure to assure the availability of all assets subject to forfeiture, including substitute assets." *Id.* at 140. To conclude otherwise, the court stated, "would eviscerate the intent of the criminal forfeiture statute" and "thwart the government's legitimate interest in recovering all forfeitable assets." *Id.* at 140 & 141.

Defendants contend that the plain language of the statute cannot be ignored nor amended by statutory interpretation. The government responds that the subsections of § 853 must be read together to achieve the congressional purpose of pretrial restraint. Relying on the common reference in subsections (e) and (p) to "property described in subsection (a)," the government contends that substitute assets should be subject to pretrial restraint when the "property described in subsection (a)" is unavailable for any of the reasons listed in subsection (p). The government claims that such an interpretation is necessary to effectuate the intent of the forfeiture statutes.

Whatever force there might be to the government's arguments that § 853(e)(1) should reach substitute assets, "[t]he short answer is that Congress did not write the statute that way." *United States v. Monsanto*, 491 U.S. 600, 611, 109 S.Ct. 2657, 2664, 105 L.Ed.2d 512 (1989) (quoting *United States v. Naftalin*, 441 U.S. 768, 773, 99 S.Ct. 2077,

**3.** *Accord U.S. v. Wu*, 814 F.Supp. 491, 492–93 (E.D.Va.1993) (construing 18 U.S.C. § 1963); *U.S. v. O'Brien*, 836 F.Supp. 438, 441 (S.D.Ohio

1993); *U.S. v. Swank Corp.*, 797 F.Supp. 497, 500–02 (E.D.Va.1992); *U.S. v. Skiles*, 715 F.Supp. 1567, 1568 (N.D.Ga.1989).

2082, 60 L.Ed.2d 624 (1979)). The statute plainly states what assets are subject to pretrial restraint. Subsection (e) provides that "property described in subsection (a)" may be restrained before trial. Subsection (a) describes only forfeitable assets and not substitute assets which are instead defined in subsection (p). The statutory language compels the court to conclude that subsection (e) does not authorize the pretrial restraint of substitute assets.

The government asserts that § 853(o), which states that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes," supports a broad reading of the property covered by subsection (e). The Fifth Circuit rejected this argument stating that while § 853(o) commands a liberal construction, it does not "authorize [courts] to amend by interpretation." *Floyd*, 992 F.2d at 502. Moreover, the Supreme Court has recognized that the criminal forfeiture statutes are punitive as well as remedial. *See Alexander v. United States,* — U.S. —, — – —, 113 S.Ct. 2766, 2775–76, 125 L.Ed.2d 441 (1993) (noting that 18 U.S.C. § 1963 "is clearly a form of monetary punishment"); *Austin v. United States,* — U.S. —, —, 113 S.Ct. 2801, 2806, 125 L.Ed.2d 488 (1993) (stating that 21 U.S.C. § 853 serves "in part to punish"). Given the punitive component of § 853, the court must exercise caution in construing the statute liberally. *Ripinsky,* 20 F.3d at 363 n. 5.

■ The court holds that substitute assets—assets not connected to the underlying criminal violation—cannot be restrained prior to conviction under 21 U.S.C. § 853(e). The government protests that a literal reading of § 853(e) frustrates its ability to preserve, pending trial, property that may later be subject to forfeiture.[4] While there may be some risk that substitute assets will be unreachable by the government at the time of conviction, the court concludes that "[t]he statute as presently written, cannot be read any other way." *Floyd,* 992 F.2d at 502 (quoting *Monsanto,* 491 U.S. at 614, 109 S.Ct. at 2665 (footnote omitted)).

Based on its review of the law and the record herein, the court declines to adopt the order of Magistrate Judge Boline dated August 1, 1994, insofar as it upholds the validity of the pretrial restraint of substitute assets. Having concluded that 21 U.S.C. § 853 does not allow the restraint of substitute assets before conviction, the court grants, in part, the motion of defendants Clark and Richard Field to vacate the *ex parte* restraining order entered March 23, 1994. Accordingly, **IT IS HEREBY ORDERED** that the *ex parte* restraining order entered March 23, 1994, is vacated to the extent that the order restrains property not connected to the underlying criminal violations. **IT IS FURTHER ORDERED** that the government's application for an amended restraining order pursuant to 18 U.S.C. § 982 is denied.

Randell **BURCH**, Jim L. **Green**, Gary W. **Miller** and Larry G. **Yount**, Plaintiffs,

v.

**FLUOR CORP.**, St. Joe Minerals Corp., the Doe Run Investment Holding Corp., and Leadco Investments Inc., all d/b/a the Doe Run Company, Defendants.

No. 4:93CV0831.

United States District Court, E.D. Missouri, Eastern Division.

April 11, 1994.

---

4. The court notes that its decision does not restrict the government's ability to file a *lis pendens* notice against any real property that may be subject to forfeiture.

William A. Brasher, William A. Brasher Law Offices, St. Louis, MO, for plaintiffs.

Michael P. Burke, Zachary A. Hummel, Bryan Cave, St. Louis, MO, for defendants.

Samuel A. Marcosson, E.E.O.C., Office of Gen. Council, Washington, DC, for E.E.O.C.

## *MEMORANDUM AND ORDER*

HAMILTON, District Judge.

This matter is before the Court pursuant to Defendants' Motion for Summary Judgment.

Defendants, the Doe Run Investment Holding Corporation, St. Joe Minerals Corporation and Leadco Investments, Inc. are partners in the Doe Run Company. Each of the partners in the Doe Run Company is a wholly owned subsidiary of Fluor Corporation. Plaintiffs are former salaried employees of the Doe Run Company. In early 1991, the Doe Run Company terminated Plaintiffs' employment in connection with a reduction in force. Plaintiffs contend that they were terminated because of their age in violation of Age Discrimination in Employment Act, (ADEA), 29 U.S.C. § 621 *et seq.* and the Missouri Human Rights Act (MHRA), Mo. Rev.Stat. 213.010 *et seq.* In their Motion for Summary Judgment, Defendants contend that Plaintiffs executed a valid waiver of the asserted claims.

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party always bears the burden of informing the Court of the basis for the motion. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. However, the party opposing the summary judgment motion may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a material factual dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

When presented with such a motion, the Court must determine whether any factual issues exist that may reasonably be resolved in favor of either party and therefore must be submitted to the finder of fact.

*Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The substantive law determines which facts are relevant and which are immaterial. Only disputes which might affect the outcome will properly preclude summary judgment. *Id.* at 248, 106 S.Ct. at 2510; *Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir. 1992). The Court must view the facts in the light most favorable to the nonmoving party, giving such party the benefit of all reasonable inferences to be drawn from the facts. *St. Paul Fire & Marine Ins. Co. v. Federal Deposit Ins. Corp.,* 968 F.2d 695, 699 (8th Cir.1992).

### *Facts*

Viewing the record in the light most favorable to Plaintiffs, the Court finds for the purposes of the pending motion, that the following facts are true. Plaintiffs Randell Burch, Jim L. Green, Gary W. Miller and Larry G. Yount were terminated from their employment with Defendants on April 8, 1991. All plaintiffs were between the ages of forty and seventy at the time of their discharge. By letters dated April 8, 1991, the Doe Run Company informed each Plaintiff of the termination. (Plaintiffs' Exh. B.) The Company announced a twenty-five percent reduction in its annual lead production figures and a corresponding twenty-five percent reduction in the workforce. Each Plaintiff was informed that his discharge was "not a reflection on performance." (*Id.*)

Plaintiffs also received memoranda detailing the conditions of discharge with respect to pay, unused vacation time, insurance, retirement benefits and career counseling. (*Id.*) Plaintiffs were informed that they were entitled to severance pay if they executed a Settlement Agreement and Release. (The Release.) Each memorandum was identical except for the amount of severance pay each Plaintiff would receive upon execution of the Release. (Plaintiffs' Exh. B.)

Plaintiffs were not given the opportunity to negotiate the terms of the Release. (Plaintiffs' Exh. A.) Plaintiffs were given forty-five days to consider the terms of the Release and had seven days after signing to revoke the Release. Plaintiff Burch signed the Release thirty-three days after termi-

nation. Plaintiff Green signed the Release eleven days after termination. Plaintiff Miller signed the Release five days after termination. Plaintiff Yount signed the Release twenty-three days after termination. (Defendants' Exhs. A–D.) None of the Plaintiffs revoked the Release within the seven day time period.

In relevant part, the Release provided that:

2. The COMPANY will exercise its discretion to provide a severance payment as described in THE DOE RUN COMPANY SEVERANCE POLICY FOR TERMINATED SALARIED EMPLOYEES (hereinafter "POLICY") under the formula described [in the policy]. This severance allowance is provided in exchange for the EMPLOYEE'S promises and obligations herein.

3. EMPLOYEE agrees that he will not file or otherwise submit any charge, claim, complaint, or action to any agency, court, organization, or judicial forum against COMPANY or any of its officers, agents, employees, or anyone acting on its behalf, arising out of any actions or non-actions on the part of COMPANY. Said claims, complaints, and actions include, but are not limited to, ... any claims of violations arising under ... the Age Discrimination in Employment Act, 29, US.C. § 621 *et seq.*, ... or of the Missouri Human Rights Act 213.010 R.S.Mo. *et seq.*

(Defendants' Exh. A–D.) Plaintiffs were not provided any written information regarding the other employees who were terminated on April 8, 1991.

### *Analysis*

Defendants contend that the instant action is barred by the terms of the Release. Plaintiffs counter that their waiver of claims was not knowing and voluntary as required by 29 U.S.C. § 626(f)(1). Plaintiffs also urge the Court to apply the ADEA's requirements for knowing and voluntary waiver to their state law claims.

The ADEA provides that "an individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). Subsec-

tion (1) sets forth the minimum requirements for a knowing and voluntary waiver. The requirements at issue in this litigation are as follows:

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate; ...

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement; ...

(H) if a waiver is requested in connection with an exit incentive program or other employment termination program offered to a group or class of employees, the employer ... informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1).

The statute does not define the term "employment termination program." Nor has the Court's independent research discovered any case law construing the term. However, the legislative history is helpful:

In the context of ADEA waivers, the Committee recognizes a fundamental distinction between individually tailored separation agreements and employer programs targeted at groups of employees. Individual separation agreements are the result of actual or expected adverse action against an individual employee. The employee understands that the action is being taken against him, and he may engage in arms-length negotiation to resolve any differences with the employer.

Group termination and reduction programs stand in stark contrast to the individual separation. During the past decade, in particular, employers faced with the need to reduce workforce size have resorted to standardized programs designed to effectuate quick and wholesale reductions. The trademark of involuntary termination programs is a standardized formula or package of employee benefits that is available to more than one employee. The trademark of voluntary reduction programs is a standardized formula or package of benefits designed to induce employees voluntarily to sever their employment. In both cases, the terms of the programs generally are not subject to negotiation between the parties. In addition, employees affected by those programs have little or no basis to suspect that action is being taken based on their individual characteristics. Indeed, the employer generally advises them that the termination is not a function of their individual status. Under these circumstances, the need for adequate information and access to advice before waivers are signed is especially acute.

S.Rep.No. 101–263, 101st Cong., 2d Sess. 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537–38.

■ Upon review of the record in light of the foregoing, the Court concludes that Plaintiffs were discharged in connection with an employment termination program. Plaintiffs were terminated in connection with a twenty-five percent reduction in force. Plaintiffs received a standard package of benefits upon termination that varied only in the amount of severance pay each was entitled to receive. Plaintiffs were not afforded the opportunity to negotiate the terms the Release. Plaintiffs were notified that their discharge was "not a reflection on performance."

Defendants do not dispute any of the foregoing facts. However, Defendants maintain that Plaintiffs were not dismissed in connection with an employment termination program because they were not offered an "any inducement or incentive to retire early, accept layoff or voluntarily terminate." (De-

fendants' Reply, p. 6.) Defendants state that Plaintiffs were involuntarily terminated in connection with a reduction in force and then, pursuant to a separate "policy," offered the opportunity to receive severance benefits in exchange for a waiver of claims. (*Id.* at 6–7.) Defendants contend that the latter program was not designed to reduce employment and therefore the terms of Subsection H to 29 U.S.C. § 626(f)(1) do not apply.

Defendants implicitly acknowledge that the relevant legislative history indicates that the term "employment termination program" refers to both voluntary and involuntary programs. However, Defendants define involuntary termination programs as those packages "designed to reduce employment through employees electing to surrender their employment involuntarily." (Defendants' Response to Plaintiffs' Surreply, p. 2.) Such packages, according to Defendants, involve an involuntary separation accompanied by "an offer to adjust or change the nature of the separation." (*Id.* at 2–3.) Because Plaintiffs were not offered the opportunity to "adjust or change the nature of their separation" with Doe Run Company, Defendants conclude that Subsection H does not apply.

The Court declines to adopt Defendants' somewhat strained reading of the statute and the legislative history. First, the Court notes that the plain language of the statute does not require that a termination program offer employees an incentive or inducement to leave the company's employ. In fact the juxtaposition of the terms "exit incentive" program and "other employment termination program" indicates that the universe of other programs includes non-incentive programs.

Second, the Court disagrees with Defendants' implicit contention that the severance benefit program was distinct from the reduction in force. Plaintiffs were notified on April 8, 1991 that they were being terminated. By memorandum of the same date, Plaintiffs were informed of the conditions of severance, including the fact that their receipt of severance pay was contingent upon execution of a release document. Under these circumstances, the Court finds no logical or statutory basis for distinguishing between situations where employees are asked

to sign a waiver before termination and the instant scenario where Defendants' request for a waiver came after termination was definite. In either case, the request for waiver is "in connection with" the termination program.

■ Because Plaintiffs executed the Release in connection with an employment termination program, the Release is subject to the requirements of 29 U.S.C. § 626(f)(1)(H). Because Defendants did not inform Plaintiffs in writing of any eligibility factors for the termination program, any time limits applicable to such program, the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program, Plaintiffs' waiver was not knowing and voluntary for the purposes of the ADEA.[1] Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' federal age discrimination claims will be denied.[2]

■ Plaintiffs urge the Court to apply the same knowing and voluntary waiver standard to Plaintiffs' release of their state law claims. In the alternative, Plaintiffs contend that they were under economic duress at the time they executed the Releases and therefore the waivers are ineffective.

While it is true that courts have looked to federal law in construing the terms of the MHRA, that approach is not appropriate here. The elements of a knowing and voluntary waiver under the ADEA are set forth in the statute itself. No such provision exists in the MHRA. It is not for the Court to effectively amend a state statute by reading in provisions that the legislature has not enacted.

■ In support of their allegations of duress, Plaintiffs assert the following facts: (1) they were discharged without advance warning; (2) the discharge shattered their finan-

cial and retirement plans; (3) immediately after being discharged, Plaintiffs were informed that they would not receive any severance money unless they signed a waiver of all legal claims; (4) Plaintiffs did not understand the terms of the waiver; and (5) Plaintiffs did not consult with attorneys prior to signing the waiver.

■ Whether the alleged facts are sufficient to support a claim of duress is a question of law for the court. *Anselmo v. Manufacturers Life Insurance Co.,* 771 F.2d 417, 419 (8th Cir.1985). Whether the alleged facts actually exist is a matter for the fact finder. *Id.* at 419–20. To invalidate the Release on the grounds of economic duress, Plaintiffs must show that "the other party's wrongful acts caused [them] to be 'bereft of the quality of mind essential to the making of a contract'" *Anselmo,* 771 F.2d at 420 (quoting *Wolf v. St. Louis Public Service Co.,* 357 S.W.2d 950, 055 (Mo.Ct.App.1962)). *See also Schmalz v. Hardy Salt Co.,* 739 S.W.2d 765, 768 (Mo.Ct.App.1987).

■ Financial distress that was not caused by the party seeking to enforce the contract does not constitute duress. *Schmalz,* 739 S.W.2d at 768. Nor can a claim of duress succeed where there is "knowledge of the facts and opportunity for investigation, deliberation and reflection." *Aurora Bank v. Hamlin,* 609 S.W.2d 486, 488 (Mo.Ct.App.1980). *See also Ensign v. Jewish Aged,* 274 S.W.2d 502, 508 (Mo.Ct.App. 1955); *Weisert v. Bramman,* 358 Mo. 636, 216 S.W.2d 430, 434 (1948).

The facts of the instant case are very similar to those presented in *Schmalz.* The plaintiff in *Schmalz,* was terminated from his employment with defendant Hardy Salt Co. Plaintiff signed a release of all claims arising from the employment relationship. In consideration of the release, Hardy Salt Co. continued plaintiff on the payroll for an addi-

---

1. Defendants contend that Plaintiffs had the required information because they attended a meeting of all discharged employees. In view of the explicit statutory requirement that persons selected for an employment termination program receive information about the program in writing, the Court finds that Plaintiffs' actual knowledge is irrelevant.

2. Because the Court finds that the waiver was not knowing and voluntary due to Defendants' failure to comply with the requirements of Subsection H of 29 U.S.C. § 626(f)(1), it is not necessary to determine the application of subsections A and E to the Release documents.

tional six weeks and agreed to pay him severance pay upon termination. Plaintiff later asserted that the release had been executed under economic duress.

The court rejected plaintiff's claim for several reasons. The Court determined that "[t]here was no wrongful conduct by Hardy Salt in threatening to discharge plaintiff pursuant to its interpretation of the contract" and, therefore, "plaintiff's financial necessity was not caused by his employer as that concept is viewed in a claim of duress." *Schmalz*, 739 S.W.2d at 768. The court also noted that plaintiff, an experienced businessman, took sufficient time to consider the agreement, consulted with counsel and understood the terms of the document he was signing.

Plaintiffs urge the Court to apply the reasoning of *Carr v. Armstrong Air Conditioning, Inc.*, 817 F.Supp. 54 (N.D.Ohio 1993). In *Carr*, the court held that plaintiff had asserted facts sufficient to state a claim of economic duress when plaintiff asserted that he had been terminated without warning and informed that if he did not sign a release that same day he would be terminated without severance pay.[3] *Carr*, 817 F.Supp. at 58.

Although Plaintiffs in the instant case were not businessmen and did not consult attorneys regarding the terms of the Release, the Court nonetheless finds that the facts of this case are most analogous to the facts of *Schmalz* for the purpose of determining whether Plaintiffs have stated a viable claim of economic duress. Plaintiffs were given ample opportunity to reflect on the terms of the Release and were also given seven days after signing to revoke their agreement. Under these circumstances, the Court finds that Plaintiffs' state of mind upon signing the contract cannot be attributed to Defendants. Therefore, the Court will grant Defendants' Motion for Summary Judgment insofar as it applies to Plaintiffs' state law claims.

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 8] is **DENIED** with respect to Plaintiffs' federal age discrimination claims and **GRANTED** with respect to Plaintiffs' claims under the MHRA.

**MISSOURI DRY DOCK & REPAIR COMPANY, INC. and Delta Enviro-Tech, Inc., Plaintiffs,**

v.

**M/V STE. GENEVIEVE, in rem, and St. Paul Fire & Marine Insurance Co., d/b/a Neare, Gibbs & Co., Defendants.**

**MARINE LEARNING INSTITUTE, Defendant/Third–Party Plaintiff,**

v.

**MIDLAND ENTERPRISES INC., Ohio River Company and The Greater Cincinnati Tall Stacks Commission, Inc., Third–Party Defendants.**

No. 1:93CV5–DJS.

United States District Court, E.D. Missouri, Southeastern Division.

Nov. 2, 1994.

---

3. *Carr* was decided under Ohio law which provides that "[a] person who claims to have been a victim of economic duress must show that he or she was subjected to '... a wrongful or unlawful act or threat, ...' and that it '... deprive[d] the victim of his unfettered will.'" *Carr*, 817 F.Supp. at 58 (quoting *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 551 N.E.2d 1249 (1990) (citations omitted)).

Daryl F. Sohn, Goldstein and Price, Teresa A. McNail, Associate, Greensfelder and Hemker, St. Louis, MO, for plaintiff Missouri Dry Dock & Repair Co., Inc.

Gary D. McConnell, Peper and Martin, St. Louis, MO, for intervenor plaintiff Delta Enviro–Tech, Inc.

Daniel C. Aubuchon, President, Aubuchon and Raniere, St. Louis, MO, for defendants M/V Ste. Genevieve, her engines, tackle, etc., in rem and Marine Learning Institute.

Ronald E. Fox, Bart C. Sullivan, Sandberg and Phoenix, St. Louis, MO, for defendant St. Paul Fire and Marine Ins. Co. d/b/a Neare, Gibbs & Co.

Richard J. Mehan, Jr., Gundlach and Lee, St. Louis, MO, Todd M. Powers, Rendigs and Fry, Cincinnati, OH, for third-party defendants Midland Enterprises, Inc. and Ohio River Co.

Lisa A. Green, Stefan J. Glynias, Evans and Dixon, St. Louis, MO, Lawrence R. Elleman, Rita A. Miller, Dinsmore and Shohl, Cincinnati, OH, for third-party defendant The Greater Cincinnati Tall Stacks Com'n, Inc.

### MEMORANDUM AND ORDER

STOHR, District Judge.

This action was tried to the Court sitting without a jury on December 8, 9, 10 and 13, 1993. All claims involving plaintiff Delta Enviro–Tech, Inc., defendant St. Paul Fire & Marine Insurance Co., and third-party defendants Midland Enterprises Inc. ("Midland") and The Ohio River Company ("Ohio River") have been settled and were dismissed with prejudice on December 6, 1993. Remaining for trial were the claims of plaintiff Missouri Dry Dock ("MDD") against the M/V Ste. Genevieve *in rem* and Marine Learning Institute ("MLI"), and the claims of MLI against third-party defendant The Greater Cincinnati Tall Stacks Commission, Inc. ("Tall Stacks").

On October 1, 1992, the Ste. Genevieve sank in the Mississippi River near Charleston, Missouri, en route to Cincinnati, Ohio to participate in the "Tall Stacks '92" festival scheduled for October 14 through 18. MDD filed this action against the vessel *in rem* and its owner, MLI, seeking payment for repairs, dry dock fees and fleeting charges allegedly incurred by it after the Ste. Genevieve was towed to MDD in Cape Girardeau, Missouri following the sinking. MLI in turn brought a third-party complaint against Tall Stacks,

and seeks indemnification on MDD's claims against MLI as well as additional damages, both predicated upon Tall Stacks' agreement with MLI concerning the Ste. Genevieve's participation in the festival.

The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

### Findings of Fact

1. Defendant M/V Ste. Genevieve is a steam operated dredge, built in 1932, approximately 200' long by 48' wide.

2. The Ste. Genevieve was retired from service with the Army Corps of Engineers in 1985.

3. Defendant Marine Learning Institute is a not-for-profit corporation with its offices in Portage Des Sioux, Missouri. Its president is Mr. Richard Wooten. Its vice-president is Mr. Scott Wooten, Richard's son.

4. From October 1, 1990, MLI owned the Ste. Genevieve pursuant to the terms of "Vessel Conditional Transfer Document" executed by Richard Wooten and Mr. Stanley G. Spadoni, on behalf of "the United States of America, acting by and through the State of Missouri State Agency for Surplus Property."

5. MLI's mission involves educational projects and programs with an environmental and marine emphasis. MLI acquired the retired Ste. Genevieve for use as a museum with a target audience of school children.

6. Defendant Tall Stacks is an Ohio not-for-profit corporation which organized the "Tall Stacks '92" festival featuring a number of historical sternwheeler and other similar boats, to be held in Cincinnati, Ohio on October 14 through 18, 1992.

7. MLI received a formal invitation for the Ste. Genevieve's participation in the festival from Mr. Dan Ricciardi, who identified himself to Richard Wooten as a member of the Tall Stacks Commission, but also as asso-

ciated with both Ohio River and Midland, Ohio River's parent company.

8. Mr. Ricciardi was Manager of Barge Maintenance and Repair for Ohio River, and was the chairman of Tall Stacks' River Operations Committee for the 1992 festival.

9. In one of their conversations concerning the Ste. Genevieve's potential participation in the Tall Stacks festival, Richard Wooten told Ricciardi that the bottom of the Ste. Genevieve's hull had been replated before the dredge was retired by the Corps of Engineers in 1982, and that the Ste. Genevieve needed to be painted. Richard Wooten made no other representations to Ricciardi concerning the Ste. Genevieve's condition.

10. Over a period of years in the 1960's and 1970's, the Ste. Genevieve's hull had been largely replated by the Corps of Engineers.

11. Mr. Ricciardi notified Mr. Wooten that someone would come to look at the Ste. Genevieve, and a Mr. David Griggs, a Barge Maintenance Supervisor employed by Ohio River, was sent. Mr. Griggs himself had no affiliation with Tall Stacks; his involvement with the Ste. Genevieve was at the direction of Dan Ricciardi, who was his supervisor with Ohio River.

12. The principal purpose of Mr. Griggs' visit was to assess the Ste. Genevieve's merit as an attraction at the festival.

13. At that time, the Ste. Genevieve was located in St. Charles, Missouri, where it had no gangplanks and had to be reached by boat.

14. Mr. Griggs and Mr. Wooten went out to the Ste. Genevieve in a boat rented by Griggs. Mr. Griggs examined the Ste. Genevieve for approximately thirty minutes. During this visit, portions of the Ste. Genevieve were locked and Mr. Wooten did not have the keys to open them. Griggs claims that he asked about the hull and that Wooten said it had recently been replated and had no leaking compartments.

15. On two later occasions, Griggs visited the Ste. Genevieve again to check the progress of its painting and general preparation for the festival. During those visits, Griggs neither saw nor smelled anything to indicate that the hull was other than dry.

16. On Griggs' third visit to the Ste. Genevieve, the port bow compartment was being pumped out, and Scott Wooten told Griggs that he was pumping out rainwater.

17. Ricciardi and Griggs never discussed the Ste. Genevieve's ability to make the trip to the festival, and based on his three visits to the vessel, Griggs knew of no reason that the Ste. Genevieve was not capable of the trip.

18. An agreement was entered into between Tall Stacks and MLI in August, 1992, in which Tall Stacks agreed to pay MLI $20,000 for the Ste. Genevieve's participation in the Tall Stacks '92 festival.

19. On behalf of Tall Stacks, Jay Downie, the event producer, signed the agreement in the name of Richard Greiwe, Tall Stacks' Executive Director. This was done with Mr. Greiwe's authorization and approval.

20. Richard Wooten intended to use the $20,000 to repair and paint the Ste. Genevieve in preparation for her appearance in the festival.

21. Tall Stacks agreed to provide the Ste. Genevieve transportation to the festival; the transportation services were donated to Tall Stacks by Ohio River. The value of those services is estimated at $80,000.00.

22. Tall Stacks also agreed to provide MLI and the Ste. Genevieve with insurance in connection with the event in the amounts of $250,000 coverage for hull and machinery and $1,000,000 coverage under a protection and indemnity (P & I) policy. The policies obtained were for the period August 31, 1992 to November 15, 1992. Tall Stacks was the primary insured on the policies, and MLI was named as an additional insured and loss payee.

23. MLI had no concerns about the Ste. Genevieve's ability to make the trip; to MLI's knowledge, the hull had no serious leaks, although MLI hoped some day to have enough money to replate the Ste. Genevieve's hull if it proved necessary.

24. Richard Wooten has no experience in the operation, repair or valuation of inland river vessels.

25. Richard Wooten asked Mr. Ricciardi to provide pumps and other gear necessary to make the trip to the festival safely, and Mr. Ricciardi indicated those needs would be taken care of.

26. When MLI took possession of the Ste. Genevieve in 1990, the dredge was located in Davenport, Iowa. Before bringing the Ste. Genevieve to Missouri, MLI was required to obtain a trip and tow survey for insurance purposes. This survey, dated August 16, 1990, was never offered to Tall Stacks, Ohio River or Midland.

27. Among the conclusions expressed in this survey was the following: "In the event the vessel should be moved from its present location it is our further recommendation that someone knowledgeable of the vessels [sic] hull characteristics and damage control procedures be onboard during transit from origin to destination."

28. Prior to its departure for the festival, portions of the Ste. Genevieve's hull plating were in a deteriorated condition. Most notably, the #7 stern compartment had a number of rust holes which allowed the ingress of some water into the hull, though not enough to create an immediate risk of sinking. In the #2 port wing tank, in an area from which a discharge pipe protruded from the hull plating, there existed a vertical fracture. A number of the bulkheads between the various hull compartments were not watertight, in many instances due to openings which had been made to allow pipes to pass between compartments.

29. Mike Livingston, a friend of Scott Wooten, owns and operates a business called Livingston Wood Floors. For a number of weeks prior to the Ste. Genevieve's departure from Grafton, Livingston and Scott Wooten worked on painting portions of the exterior of the Ste. Genevieve. Livingston also intended to sand and resurface the Ste. Genevieve's floors once she reached Cincinnati.

30. MLI indicated to Mr. Ricciardi that Mike Livingston and Scott Wooten wanted to be on the Ste. Genevieve during the move, in part merely to be "along for the ride," but also to work on cosmetic repairs to ready the dredge for the festival. Ricciardi told Scott Wooten that the two would have to ride on the tug or towboat, rather than on the Ste. Genevieve itself.

31. The Ste. Genevieve began the trip to Cincinnati in late September, 1992, and was moved from its home port in Grafton, Illinois to St. Louis, Missouri by the M/V Senator Dixon.

32. In St. Louis, the towboat Tom Talbert picked up the Ste. Genevieve for tow. The Ste. Genevieve was placed at the head of the tow, with a barge on either side of it to protect it and to allow the tow to be steered without pressure against the sternwheel of the Ste. Genevieve.

33. Captain John Choate of the Tom Talbert asked Scott Wooten if the Ste. Genevieve was dry or taking on any water, and Wooten indicated it was dry.

34. Captain Choate inspected the Ste. Genevieve the night before taking it into the tow, and saw no water or anything else to indicate the Ste. Genevieve was not capable of the trip. He did not enter any hull compartments, but at points the interior of the hull can be seen from the main deck through openings around the machinery.

35. The Ste. Genevieve did not having working pumps or a working radio on board during the tow.

36. Captain Choate allowed Scott Wooten and Mike Livingston on the Ste. Genevieve during the tow, but only on the second deck and on the condition that they wear life jackets.

37. Members of the Tom Talbert's crew checked the tow once each watch, every six hours, and no one reported to Captain Choate that there was water in the Ste. Genevieve's hull.

38. On October 1, 1992, approximately two days after its departure from St. Louis, the tow arrived at Moore's Landing, near Charleston, Missouri, and the entire tow was placed in the lower fleet.

39. Sometime after 6:00 p.m., two tugboats, the John Welch and the Redbird, moved the Ste. Genevieve from the lower fleet to the upper fleet, several miles upstream.

40. During the move, Scott Wooten was aft on the Ste. Genevieve's second deck.

41. On the lower fleet, the John Welch tied up to the Ste. Genevieve loosely midship, port side to port side, with approximately three feet of slack in the lines, which allowed the two to knock together.

42. When Scott Wooten pointed this out to personnel on the John Welch, he was told that, once in the river, the John Welch would come around back of the Ste. Genevieve to push.

43. Once in the river, the Redbird tied tightly on to the Ste. Genevieve, starboard to starboard. The John Welch did not move to the rear at any time during the move.

44. After tying off at the upper fleet, Scott Wooten and Mike Livingston boarded the John Welch and entered the pilot house to inquire about the line boat which was to take the Ste. Genevieve on to Cincinnati, on which they assumed they would have dinner and sleep that night.

45. The Captain of the John Welch, named Alan Duenne, and Scott Wooten both talked to David Griggs on the telephone from the John Welch's pilot house, and Griggs asked Wooten and Livingston to stay on the Ste. Genevieve that night, after getting dinner on a line boat to which the John Welch would take them.

46. When Captain Duenne started to pull the John Welch out into the river, away from the Ste. Genevieve, the back end of the John Welch struck the Ste. Genevieve in the area of the Ste. Genevieve's # 2 port wing tank. The contact between the John Welch and the Ste. Genevieve was not out of the ordinary or unforeseeable in the context of river towage.

47. Some time later, after the Ste. Genevieve had been raised and placed in dry dock, Scott Wooten saw a hole in the Ste. Genevieve's hull at approximately the point on the # 2 port tank at which the John Welch struck the Ste. Genevieve.

48. Once to the upper fleet, the Ste. Genevieve was tied to a coal barge with the Ste. Genevieve facing downstream and its port side open to the river.

49. After eating dinner on another boat, the John Welch returned Scott Wooten and Mike Livingston to the Ste. Genevieve at about 10:00 p.m., at which time they saw nothing unusual and went to bed.

50. Scott awoke at approximately 11:00, and saw that the windowsill and door of the cabin in which he slept were tilted rather than lying level.

51. After getting dressed, Scott shone a flashlight down the port side of the Ste. Genevieve and saw water 6″ to 1′ below, instead of the usual 3′ below.

52. Scott saw and heard water rushing into the Ste. Genevieve's hull compartments as he and Livingston got off the vessel.

53. Scott fired a flare gun and sounded an air horn.

54. Approximately ten minutes later, someone appeared on the bank and was asked to get help. Although he could not see the person clearly in the dark, Scott believed he had a hand-held radio, because he shortly responded that two boats would be there in twenty to twenty-five minutes.

55. Approximately twenty-five minutes later, the John Welch arrived and helped Wooten and Livingston off the fleeting barge to dry ground. By that time, the Ste. Genevieve had already gone over on her side and hit bottom.

56. During the Ste. Genevieve's sinking, no efforts were made to save her.

57. The salvage operations succeeded in raising the Ste. Genevieve on November 1, 1992.

58. Coast Guard Chief Petty Officer George Evans, of the Paducah, Kentucky Marine Safety Office, was assigned to investigate the sinking of the Ste. Genevieve. He went to Moore's Landing and saw the wreck, conducted interviews, and viewed the vessel several times while in dry dock.

59. The Narrative Supplement to the Marine Casualty Investigation Report prepared concerning the sinking noted:

C-shaped fracture found in # 2 port wing tank side plating in way of area 4″ aft transverse bulkhead at (fr24) extending from approx 5′ 2″ draft mark upwards for approx 24″ to within 18″ of maindeck. A 4″ overboard discharge scupper terminated in center of fractured area and projected approx 4″ outwards from hull plating. The fractured area was set in 2–4″. The upper and lower portions of the fracture appeared freshly made, and extended aft from an older vertical fracture which apparently pre-existed these damages. A 2nd fracture, similar size, location and age was found approx 4″ forward of same bulkhead.

60. The contact between the Ste. Genevieve and the John Welch caused an aggravation or enlargement of pre-existing fractures in the # 2 port compartment of the Ste. Genevieve's hull, at or near the waterline. In combination with the pre-existing deterioration of the hull (particularly numerous holes in the # 7 stern compartment) and the lack of watertightness in some of the transverse bulkheads, the enlarged fracture in the # 2 compartment allowed the hull to take on sufficient water to cause the Ste. Genevieve's sinking.

61. Without the enlarged fracture in the # 2 port compartment, the Ste. Genevieve would not have sunk as it did on October 1, 1992. If the transverse bulkheads of the Ste. Genevieve had been watertight and the stern of the hull not had the holes it did, the aggravated # 2 port wing tank fracture would not have resulted in the sinking on October 1.

62. Plaintiff Missouri Dry Dock & Repair, Inc. is a corporation which operates a shipyard at Cape Girardeau, Missouri. Mr. Robert Erlbacher II has been MDD's president since 1970.

63. MDD's Cape Girardeau facility has two dry docks, one for smaller vessels, the other for larger vessels. The dry docks allow a vessel to be lifted above the water for repairs to its underside.

64. On November 9, 1992, at the request of MLI, MDD placed the Ste. Genevieve on MDD's larger dry dock to enable MLI's representatives to inspect the dredge in order to determine what repairs needed to be performed to its hull as the result of the sinking at Charleston the previous month.

65. A letter dated November 9, 1992 from Mr. Kent E. Hoffmeister, MDD's General Manager, to Mr. Scott Wooten, MLI's vice president, sets out prices for "dry docking and selected repairs" to the Ste. Genevieve, including the following:

1. Dry Dock and Blocking...$6,500.00
2. Cut 8″ × 8″ drain holes in bottom of vessel for washing and cleaning hull compartments and providing and welding 12″ × ⅜″ × 12″ doublers over holes when washing and cleaning is complete.................$ 100.00 each

The letter also contains the following paragraph:

Should at anytime work be stopped for a 24 hour period awaiting decision on scope or authorization to proceed a "Lay Day" charge will be assessed to the owner, following the first 24 hour period, of $2,500.00 per each 24 hour period of indecision or withholding of authorization to proceed. Following undocking and refloating of the dredge and completion of work by Missouri Dry Dock the owner shall remove the vessel from the shipyard within a five day period. Should the vessel not move from the yard within the designated time, Cape Girardeau Fleeting Company will move the dredge to their fleet and fleet the dredge at a cost to the owner of $100.00 per calendar day plus tug time at $120.00 per hour.

66. On page 2 of the letter, next to the signature of Mr. Hoffmeister, appears the signature of Richard Wooten, above his handwritten indication that he signed the letter-agreement as president of MLI on November 9, 1992.

67. On November 9, 1992, Mr. Erlbacher inspected the Ste. Genevieve for hull damage and other needed repairs. He found that the sternmost hull compartment had a number of holes and a starboard compartment had

some holes as well. Mr. Erlbacher estimates the total number of holes at between 25 and 50, some as large as 3″ in diameter. In Mr. Erlbacher's opinion, at least some of the leaking of the stern section was due to deterioration of the original metal plating. There also appeared to be some oil in the leakage, creating a pollution risk.

68. MDD attempted to attach "doublers" or temporary plates to stop the hull's leakage, but the attempt was not successful. To prevent further leaking, MDD placed the dredge back in the water, to allow the compartments to fill rather than continue to leak potentially polluted water. For this work, MDD charged MLI $800.

69. Following Delta Enviro–Tech's placement of an oil containment boom on the downstream end of the dock and other precautionary measures, the Ste. Genevieve was dry docked a second time.

70. By letter dated November 10, 1992 addressed to Scott Wooten, Mr. Hoffmeister outlined what MDD had attempted with the dredge to that time, and indicated its intention to again attempt to repair "holed areas" in the stern by patching them with ¼″ plate doublers. The letter suggests that if the use of doublers proved unsuccessful because of the "thin shell plating," that the "only alternative would be to replate the stern" at a cost of approximately $35,000. Mr. Hoffmeister estimated that, in the event re-plating was not necessary, the repairs could be completed by November 12, 1992.

71. In response, MLI instructed MDD to attempt the doubler plate repair. The use of doublers was not successful because the hull wall was too thin to properly attach the doubler plates. This was tried on November 11. For this attempted repair, MDD charged $2,500.

72. MDD later tried attaching doublers with the use of a rubber gasket, caulking, and even foam rubber carpet backing, but to no avail. The charges incurred in these attempts were between $800 and $900.

73. To this point, MLI paid MDD's dry docking and repair charges in the approximate amount of $13,000.

74. Following MDD's failed repair attempts on approximately the 13th and 16th of November, MDD indicated the only alternative was replating. Richard Wooten responded that MLI did not have the money to pay for replating, but would try to raise it.

75. For the next two weeks, MDD left the Ste. Genevieve in dry dock although it had no authorization from MLI to begin the replating work, because MDD anticipated ultimately doing the work, because undocking and redocking would involve additional charges to MLI, and because of the potential pollution problem.

76. MDD has not sought to impose on MLI "lay day" charges for this two-week period because MDD anticipated that it would ultimately do the replating work and because at that time MDD had no other customer in need of the larger dry dock.

77. In its negotiations with Ohio River and Midland concerning settlement of claims arising from the Ste. Genevieve's sinking, MLI informed Ohio River and Midland of the estimated cost of replating, in hopes that they would be willing to fund the repair.

78. As of December 2, 1992, MLI had not yet authorized MDD to repair the Ste. Genevieve or to remove it from dry dock. On that date, the United States Coast Guard issued a Captain of the Port Order prohibiting the dredge's removal from its present location until certain repairs were made, to guard against the possibility of a second sinking and the attendant pollution hazard.

79. As of December 4, 1992, MLI still not having given MDD directions concerning repair of the dredge, MDD gave notice to MLI that MDD would begin charging MLI $2,500 per day for the use of its dry dock, until the dredge was repaired pursuant to the Coast Guard's order and removed from dry dock.

80. In December, MLI indicated it was still attempting to raise money to pay for replating the Ste. Genevieve.

81. In December, MDD had other customers who would have used the larger dry dock had the Ste. Genevieve not been occupying it.

82. On December 17, 1992, MDD informed MLI that MDD was seeking payment of dry dock charges totalling $35,000 at that time, and that MDD reserved the right to exercise a maritime lien against the dredge unless it received adequate assurance that the charges could be paid.

83. On December 31, 1992, MDD notified MLI that MDD was seeking payment of dry dock charges totalling $70,000 as of that time. MDD further indicated that it had learned that another party, Delta Enviro–Tech, Inc., was claiming a lien against the dredge in the approximate amount of $30,-000, and that the repairs required by the Coast Guard's order would cost at least $35,-000. MDD informed MLI that MDD believed the total amount of liens against the Ste. Genevieve would soon exceed the dredge's value, and that MDD intended to file suit against the Ste. Genevieve unless it received adequate guarantee by January 8, 1993 that all claims could be paid.

84. MDD commenced this action on January 8, 1993.

85. The United States Marshal seized the Ste. Genevieve on January 12, 1993.

86. Between January 8 and 19, MDD made certain repairs to the dredge—minimal replating of the bottom of the stern—so that the Coast Guard would permit the dredge to be removed from dry dock.

87. MDD's invoice for these repairs shows labor charges of $21,037.63, materials charges of $4,651.96, and sales tax on materials of $277.95, for total charges of $25,967.54.

88. The Ste. Genevieve was removed from dry dock on January 19, 1993.

89. MDD prepared an invoice for dry dock charges of $117,500.00 for the period from December 4, 1992 through January 19, 1993, calculated at $2,500 per day for 47 days.

90. From January 20 to the present, MDD has held the dredge in its custody pursuant to this Court's order appointing MDD substitute custodian.

91. To date, no one has sought to release the dredge from seizure.

92. MDD seeks fleeting charges of $100 per day beginning January 20, 1993 for fleeting the Ste. Genevieve.

93. Beginning mid-December, 1992, MDD sent MLI monthly invoices showing the cumulative dry docking, repair and fleeting charges indicated above. MDD has received no payment on these invoices.

94. A typical barge dry docking at MDD is charged at $500, and up to four per day can be done if the repairs performed are minor.

95. The other shipyards nearest to Cape Girardeau which are capable of docking and repairing a vessel the size of the Ste. Genevieve are two shipyards in St. Louis, Missouri and two in Paducah, Kentucky.

96. Okie Moore Diving and Salvage prepared an invoice showing total charges of $203,800.00 in connection with salvage operations to raise the Ste. Genevieve. This invoice was paid by Neare, Gibbs & Co., river marine underwriters, out of the $250,000 proceeds of the hull policy obtained by Tall Stacks pursuant to its agreement with MLI, under which Neare, Gibbs determined the Ste. Genevieve to be a constructive total loss.

### Conclusions of Law
*Third–Party Claims of MLI v. Tall Stacks*

The Court turns first to the claims of MLI against Tall Stacks. The third-party complaint, pled in a single count, makes a single reference to the existence of the agreement between MLI and Tall Stacks; this is found in ¶ 7, which alleges that on or about October 1, 1992, pursuant to the agreement, the Ste. Genevieve was in the process of being transported by the third-party defendants to Cincinnati. The third-party complaint goes on to allege that the third-party defendants:

acting by and through their agents, servants and employees, by reason of their neglect, inattention, and improper and unskillful conduct negligently and carelessly caused the M/V Ste. Genevieve vessel to sink ... causing Third–Party Plaintiff to suffer and incur damages.

Third–Party Complaint, ¶ 8. Viewing the complaint as a whole, particularly the lack of any allegation concerning breach of the par-

ties' agreement and the presence of allegations concerning negligence and carelessness, the Court would have interpreted the third-party complaint as asserting only a tort claim. At trial and in their briefs, however, both MLI and Tall Stacks have presumed that the complaint asserted both a tort and a contract claim, and both parties have addressed only the latter, based upon MLI's indication at trial that it had chosen to abandon any tort claim. In view of this treatment of the issues by the parties, and the requirement of Fed.R.Civ.P. 8(f) that all pleadings be construed so as to do substantial justice, the Court will analyze MLI's claim as sounding in contract.

Section III(F) of the parties' agreement provides, in pertinent part:

> Commission shall have full and total responsibility for the safety and well-being of any and all persons on the Boat. Except as otherwise provided for in this paragraph, Commission shall indemnify, defend and save harmless Owner from and against any and all losses, damages, liabilities, expenses (including reasonable attorney's fees) and costs which may be imposed upon or incurred by Owner, its employees or assigns for whatever reasons, or asserted against Owner, its employees or assigns, arising out of or in connection with the Boat including, but not limited to, the Boat's travel to and from the Event, Participation, and the presence of the Boat in Greater Cincinnati during the Event.

MLI invokes the broad language of this indemnification provision to support its claim that Tall Stacks is liable to MLI for all losses to MLI occasioned by the sinking of the Ste. Genevieve en route to the festival. On its face, the language appears to have the application urged by MLI: MLI has suffered or incurred "losses, damages, liabilities, expenses (including reasonable attorney's fees) and costs" in connection with "the Boat's travel to and from the Event." Tall Stacks asserts a number of defenses to MLI's contractual claim for indemnity.

At the close of trial, Tall Stacks filed with the Court a written motion for leave to amend its answer to conform to the evidence. No written opposition to the motion has been filed. None of the additional affirmative defenses asserted in the proposed amended answer is of a type waived under Fed. R.Civ.P. 12(h)(1) for Tall Stacks' failure to assert it earlier. In addition, Rule 15's liberal policy toward amendment of pleadings is best served by permitting the requested amendment, particularly as the additional defenses have been addressed by the parties' evidence at trial. For these reasons, and consonant with the Court's determination to allow MLI to proceed to trial on a contract claim not clearly stated in its third-party complaint, the Court will grant Tall Stacks leave to amend its answer.

■ First, Tall Stacks argues that MLI made material misrepresentations which induced Tall Stacks to enter into the parties' agreement, and that as a result the agreement is void. Tall Stacks relies on the testimony of Dan Ricciardi and David Griggs that Richard Wooten represented to each of them that the hull of the Ste. Genevieve had been replated in the recent past. The Court has given careful consideration to the testimony of Dan Ricciardi, David Griggs, Richard Wooten, Scott Wooten and Jay Downie. As fact-finder, the Court finds that Richard Wooten made a statement to Dan Ricciardi to the effect that the Corps of Engineers had replated the Ste. Genevieve's hull before its retirement in 1982. That statement, whether or not true, was not specific concerning the timing and extent of any such replating, and did not directly bear on the Ste. Genevieve's condition at the time the statement was made.[1] The hull had in fact been largely replated by the Corps of Engineers, over a period of years in the 1960's and 1970's. The Court also finds that Tall Stacks failed generally to exhibit much interest in the Ste. Genevieve's structural condition prior to entering into the agreement with MLI, and that any comments made on that subject were little more than passing remarks. For these reasons, the Court rejects Tall Stacks'

---

1. The Court notes that the Ste. Genevieve was retired by the Corps of Engineers in 1985, rather than 1982. According to Mr. Ricciardi's testimo-

ny, however, Richard Wooten's statement was that the Ste. Genevieve had been replated prior to its retirement in 1982.

contention that the representation made by Richard Wooten was materially relied upon by Tall Stacks in its decision to enter into the parties' agreement.

The Court must also consider Tall Stacks' claims concerning statements made by Richard Wooten to David Griggs. Even if the Court resolves the issue of credibility in favor of David Griggs and against Richard Wooten as to what the latter said in their conversations as to the condition of the hull, the Court would not conclude that any such statement was materially relied upon by Tall Stacks in entering into the agreement with MLI, because Griggs' testimony did not indicate that he had relayed any such statement back to Ricciardi or other decision-makers of Tall Stacks. Finally, Jay Downie, the event producer, testified that he had never asked the Wootens any questions concerning the Ste. Genevieve's condition.[2]

■ Tall Stacks' next defense is that any liability under the contract is precluded by MLI's breach of an implied warranty of seaworthiness. The threshold question relevant to this argument is whether the parties' agreement was one in which an implied warranty of seaworthiness is inherent. Tall Stacks characterizes the agreement as a charter-party. In the mid-nineteenth century, the United States Supreme Court twice relied on a hornbook definition of "charter-party" as "a contract by which an entire ship, or some principal part thereof, is let to a merchant for the conveyance of goods on a determined voyage to one or more places." *Ward v. Thompson,* 63 U.S. (22 How.) 330, 333, 16 L.Ed. 249 (1859); *Vandewater v. Mills,* 60 U.S. (19 How.) 82, 91, 15 L.Ed. 554 (1856). Under this mercantile definition, the agreement at issue here would not constitute a charter-party.

The Court's research has uncovered little else in the case law giving guidance as to the precise definition of "charter-party." One modern treatise notes that "[t]he charter party is the principal document of the tramp shipping industry ... [and] is a specialized

form of contract for the hire of an entire ship, specified by name." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11–1, p. 169 (2d ed. 1994). The treatise distinguishes three principal forms of charter-party:

> (1) Under a time charter, the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs; (2) Under a voyage charter, the charterer engages the vessel to carry goods only for a single voyage; and (3) under a demise, or bareboat charter, the charterer takes complete control of the vessel, mans it with his own crew, and is treated by law as its legal owner.

*Id.* This discussion largely retains the mercantile nature of the Supreme Court's earlier definitions, leaving some room, however, under the concept of bareboat charter, for the hire of a ship for purposes other than the carriage of goods. Because in common parlance and usage, "charter-party" continues to connote the shipment of goods, the MLI/Tall Stacks agreement is not a charter party in the typical sense.

Using Schoenbaum's text as definitional, only the third species of charter, the bareboat charter, has any possible application to Tall Stacks' agreement with MLI, and then only on the presumption that the carriage of goods is not a prerequisite. As Schoenbaum emphasizes, the demise charter "is the transfer of full possession and control of the vessel for the period covered by the contract." *Id.* Under such a charter:

> The owner's fundamental obligation ... is to provide a seaworthy vessel of the specified class and type at the beginning of the charter term. A warranty of seaworthiness of the vessel will be implied; it may, however, be qualified or even waived. The seaworthiness warranty extends only to the beginning of the charter; subsequent to delivery the seaworthiness of the vessel

---

**2.** Tall Stacks' contentions concerning MLI's own actual or constructive knowledge of the condition of the hull are not relevant to a determination of whether MLI made misrepresentations which fraudulently induced Tall Stacks into making the agreement, particularly in view of the Court's findings about the representations actually made.

is the responsibility of the charterer unless otherwise stated.

*Id.* at 174.

The Court also notes that, because the parties' contract included Tall Stacks' obligation to provide transportation for the Ste. Genevieve to the festival and back, aspects of the agreement are in the nature of a contract of towage. Under admiralty law, "[t]he principal duty of the tow is to provide a seaworthy vessel with equipment and structural characteristics that are reasonably necessary to undertake the voyage." *Id.* at § 12–6, p. 227. This includes requirements that "[t]he holds ... be sufficiently watertight and the equipment in working order." *Id.*

This hornbook law indicates that if the parties' agreement is construed as either a demise charter or a contract of towage, MLI was under a duty to provide the Ste. Genevieve in seaworthy condition. Furthermore, even if the agreement cannot be analyzed as either of these recognized types of marine contracts, the Court would conclude by analogy that the parties' agreement carried an implied warranty of seaworthiness. Because the purposes of the agreement contemplated and required the Ste. Genevieve's transportation to Cincinnati, the Court finds that the vessel's seaworthiness was necessary to and inherent in the performance of MLI's obligations under the contract. The Court further concludes as a matter of law that the contract's "only agreement" language, found in § VI(B), is not sufficiently clear and unambiguous to serve as an exclusion of the implied warranty. *Id.* at § 11–9, p. 190.

"Seaworthy" generally means fit for the intended purpose. *See, e.g., Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 337, 75 S.Ct. 382, 384, 99 L.Ed. 354 (1955); *Aguirre v. Citizens Casualty Company of New York*, 441 F.2d 141, 144 (5th Cir.1971). This definition encompasses the notion that seaworthiness is "a relative term depending upon its application to the type of vessel and the nature of the voyage." *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2nd Cir.1978). Here the seaworthiness required for the performance of the parties' contract was minimal. The Ste. Genevieve needed merely to be capable of transport by tug or tow to the festival and to float stably in the water once moored so as to permit tours of the vessel.

Where the captains of the tugboats moving the Ste. Genevieve did not deem it necessary for the dredge to be manned during transport, and given that the tugboats were themselves equipped with pumps and communications equipment, the Court rejects the contention that the lack of a crew and a working radio and pumps in and of itself rendered the Ste. Genevieve unseaworthy. Whether the condition of the Ste. Genevieve's hull rendered her unseaworthy is a closer question. The Court has found that although portions of the hull plating were somewhat deteriorated prior to the Ste. Genevieve's departure for the festival, the Court has also found that the deterioration did not permit the entry of sufficient water into the hull to threaten the Ste. Genevieve with sinking. If not for the C-shaped fracture in the #2 port wing tank, which occurred during the trip, the Ste. Genevieve would not have sunk when it did. On the other hand, the Court is equally persuaded that the pre-existing lack of watertightness between the hull's bulkheads was a contributory cause of the sinking once the C-shaped fracture occurred and allowed a greater amount of water into the hull.

Having given careful consideration to all these intertwining factors, the Court concludes that the Ste. Genevieve was not reasonably fit for the purposes of the parties' contract for the following reasons. First, the deteriorated condition of the hull allowed the C-shaped fracture to occur in ordinary and foreseeable circumstances of towage in which a less deteriorated hull would not have been so seriously affected. Second, a portion of the C-shaped fracture, surrounding the discharge pipe, predated the Ste. Genevieve's trip to the festival and therefore contributed to an increased likelihood of expansion of the fracture, allowing the hull to take on considerable water. Third, the deteriorated condition of the hull included rust holes which allowed the ingress of additional water. Finally, the lack of watertightness between the bulkheads further increased the Ste. Genevieve's vulnerability to sinking.

The combination of these pre-existing conditions resulted in a susceptibility to sinking under conditions ordinary and foreseeable to towage over the distance contemplated by the parties' contract, such that the Ste. Genevieve was not fit for the purpose intended. The Court therefore concludes that MLI breached a warranty of seaworthiness which was implied in its agreement with Tall Stacks, and that Tall Stacks is not liable to MLI on the basis of the indemnification clause in the agreement. Although the observation is without legal effect, the Court notes its conclusion that MLI's provision of the Ste. Genevieve in an unfit condition was not a willful act on MLI's part, but rather attributable to MLI's lack of knowledge and expertise as to both the condition of the Ste. Genevieve and the rigors of towage.

■ Having determined this defense in Tall Stacks' favor, the Court will treat the remaining defenses in less detail.[3] Tall Stacks next contends that MLI breached the provision of § IV(A) of the agreement that the Ste. Genevieve be in "Class A condition." The Court rejects this argument for several reasons. First, the evidence at trial showed that "Class A condition" is not a term of art, and Tall Stacks was unable to establish any fixed meaning for the term. Second, the plain language of the provision requires that the Ste. Genevieve be in Class A condition "during the Event." The term "Event" is earlier defined in the agreement as the period of the festival celebration itself, from October 14 through October 18. Even if "Class A condition" encompasses the Ste. Genevieve's fitness for towage, the vessel sank on October 1, prior in time to the contract's requirement that it be in Class A condition. If instead Class A condition refers to the Ste. Genevieve's aesthetic appearance and fitness as a festival attraction, the fact that the vessel was not yet fully painted and otherwise readied for tours would not, as of October 1, constitute a breach of the Class A condition requirement stated in the contract.

Another defense asserted by Tall Stacks is that the indemnification clause upon which MLI relies is limited in scope to instances of personal injury. As suggested by the discussion at page 20 supra concerning the breadth of the indemnification provision, the Court rejects this construction of the contract language, finding no basis for limiting the broad scope of the clause's second sentence to the personal injury context plainly stated in the first sentence. The Court likewise is unpersuaded by Tall Stacks' assertion that the third sentence of § III(F) constitutes a mutual indemnity clause which "cancels out" Tall Stacks' obligations under the second sentence. The third sentence provides that MLI shall indemnify Tall Stacks for loss "imposed upon or incurred by [Tall Stacks] as a result of any act of omission or commission by [MLI], its agents or employees...." The narrower scope of this indemnification provision would, if at all, cancel only Tall Stacks' obligation to MLI with respect to losses of the limited nature indicated, and would not affect Tall Stacks' indemnification of losses by MLI not resulting from MLI's own conduct.

Tall Stacks' final defenses, invoking doctrines of waiver and estoppel, are that MLI may not recover against Tall Stacks because the $250,000 hull policy purchased by Tall Stacks constitutes the limitation of Tall Stacks' obligation to indemnify MLI and because Tall Stacks is a co-insured with MLI under the policy. To limit Tall Stacks' obligation to the policy limits would in the Court's view render meaningless, or at the very least conflict with, the indemnification clause. As to both arguments, the Court is not persuaded that the legal bases are correct or, in any event, have application to the facts of this case. The cases upon which Tall Stacks relies in support of these contentions, see pp. 9–10 of Tall Stacks' Post–Trial Brief, are each distinguishable from the instant case. These defenses are therefore rejected.

As a practical matter, however, the Court having found for Tall Stacks on other grounds, the $250,000 proceeds of the hull policy which have been paid out to the benefit of MLI constitute the limit of Tall Stacks' liability concerning the sinking of the Ste. Genevieve. Based on its conclusion that

3. The Court will not address at all Tall Stacks' contentions concerning constructive total loss, betterment, set-off and mitigation, all of which relate to MLI's claimed damages.

MLI breached an implied warranty of seaworthiness and thereby voided Tall Stacks' obligations under the indemnification provision of the parties' contract, the Court will enter judgment in favor of Tall Stacks on MLI's third-party complaint.

*MDD's Claims v. MLI*

The Court next turns to the claims of MDD. The Court's disposition of MLI's third-party claim has answered the question as to who ultimately bears responsibility for MDD's charges. MLI having conceded that there is no issue as to *whether* MDD is owed, the sole question remaining is *how much* MDD is owed for repair, dry dock and fleeting charges. The Court concludes generally that MDD's course of action was reasonable and consistent with a measured approach to the rights of the vessel owner, the demands of MDD's own business, and the requirements of the Coast Guard's Captain of the Port order.

The Court finds owing the total of $25,-967.54 for labor, materials and sales tax as the cost of repairs to the hull which were made to meet the Coast Guard's requirements for removal of the Ste. Genevieve from dry dock. MLI has offered no substantial challenge to this amount, and the Court deems it to be fair, reasonable and necessary, as well as a good-faith mitigation of MDD's overall damages, in that it allowed the curtailment of daily dry dock fees.

In addition, MDD seeks dry dock fees of $2,500 per day for the period from December 4, 1992 through January 19, 1993. The Court will award dry dock fees at the requested rate. That rate was set forth in MDD's initial quotation to MLI, which was signed by Richard Wooten as MLI's president. At trial, MDD's expert testimony as to the reasonableness of the charge was not rebutted by MLI. Evidence at trial concerning the potential daily income to MDD for use of the larger dry dock also supports the requested charge. The Court rejects as unreasonable, however, MDD's claim for dry dock fees for the period from January 8 through 19, 1992, during which time MDD was making repairs to the Ste. Genevieve as necessary to remove her from dry dock. MDD's president, Mr. Erlbacher, testified that dry docking charges are not customarily imposed during the period of time in which repair work is being performed on a vessel in dry dock. Although Mr. Erlbacher further testified that in the past two years, MDD had not charged any other customer a per diem charge, he also indicated that MDD had had no other customers who docked a vessel but did not give authorization for repairs within two weeks' time. Based on this testimony, the Court will award MDD dry dock fees only for the period of December 4, 1992 through January 7, 1993. At $2,500 per day for 35 days, the Court's calculation yields a total of $87,500 in dry dock charges.

With respect both to dry dock and fleeting charges, the Court rejects MLI's contention that the charges owing should be calculated only on the basis of a six-day week, on the ground that MDD's work week ordinarily consisted only of six days. The provision of a dry dock or fleeting berth was made to the Ste. Genevieve for seven days each week; furthermore, MDD's quotation letter indicates no basis for the limitation urged, referring as it does to "Lay Day" charges for "each 24 hour period of indecision" with the vessel in dry dock and to fleeting charges assessed "per calendar day."

MDD seeks fleeting fees at the rate of $100 per day from January 20, 1993 through the present. As with the dry dock charges, this rate was set forth in MDD's November 9, 1992 quotation letter, to which Richard Wooten indicated his assent by his signature dated the same day, and MDD's expert testimony concerning the reasonableness of the charge was not challenged at trial. At the rate of $100 per day, the fleeting charges through the date of the entry of judgment total $65,200.00 for 652 days. The Court notes, however, as does MDD itself, a distinction between MDD's recovery of dry dock charges and its recovery of fleeting charges. Although they might have been, fleeting charges were not pled by MDD in its complaint as an item of damage; Count I of the complaint seeks recovery for dry dock charges and Count II for repairs. Instead, MDD seeks fleeting charges as expenses *custodia legis, i.e.,* as expenses reasonably in-

curred in its role as substitute custodian of the Ste. Genevieve while under arrest pursuant to the seizure warrant pending the outcome of this action.

 Under the common law of admiralty, MDD is entitled to pre-judgment interest on its claims against MLI: "[p]rejudgment interest is awarded in admiralty suits in the discretion of the district court to ensure compensation of the injured party in full and should be granted unless there are exceptional or peculiar circumstances." *Ohio River Co. v. Peavey Co.*, 731 F.2d 547, 549 (8th Cir.1984). *See also SCNO Barge Lines, Inc. v. Sun Transportation Co., Inc.*, 775 F.2d 221, 227–28 (8th Cir.1985). The Court finds that the rate of 6% per annum compounded annually, as urged by MDD and not objected to by MLI, approximates the average prime interest rate for the period since MDD's claims accrued and is reasonable and in accordance with pertinent case law. *See, e.g., Ohio River*, 731 F.2d at 549; *Federal Barge Lines, Inc. v. Granite City Steel*, 664 F.Supp. 453, 454 (E.D.Mo.1987).

Based on the distinction noted above between the awards of repairs and dry dock charges on the one hand, and fleeting charges on the other, the Court does not deem prejudgment interest appropriate as to the fleeting charges. This conclusion is also based on the "running" nature of the per diem fleeting charges, which have continued to accrue through the date of the entry of judgment herein. The Court will calculate prejudgment interest as having begun to accrue on the dry dock charges as of January 8, 1993, the day following the Ste. Genevieve's removal from dry dock, and as having begun to accrue on the repair charges as of January 20, 1993, the day following the completion of the repairs.

MDD has not demonstrated, and the Court is not aware of, any legal basis for the imposition of attorney's fees against MLI. Based on the foregoing, the Court will enter judgment in favor of MDD and against MLI and the Ste. Genevieve *in rem* in the total amount of $191,332.92, consisting of $25,967.54 for repairs, $87,500 in dry dock charges, $65,200.00 in fleeting charges, and $12,665.38 in prejudgment interest, plus costs and such post-judgment interest as is allowed by law.

For the reasons stated above,

**IT IS HEREBY ORDERED** that third-party defendant Greater Cincinnati Tall Stacks Commission's motion for leave to amend its answer to conform to the evidence is granted.

Anthony **HARPER** and Debbie **Harper, Plaintiffs,**

v.

Wallace E. **STICKNEY, Director, FEMA, Defendant.**

No. 4:92CV02147 GFG.

United States District Court, E.D. Missouri, Eastern Division.

Nov. 18, 1994.

Don Nangle, St. Louis, MO, for plaintiffs.

Joseph B. Moore, Office of U.S. Atty., St. Louis, MO, Cynthia S. Mazur, Federal Emergency Management Agency, Washington, DC, for defendant.

## MEMORANDUM

GEORGE F. GUNN, Jr., District Judge.

This matter is before the Court on defendant Wallace E. Stickney's motion for summary judgment and plaintiffs Anthony and Debbie Harper's opposition thereto.

In his motion for summary judgment, defendant contends that plaintiffs failed to verify their loss as required by the National Flood Insurance Program pursuant to the Standard Flood Insurance Policy (SFIP) terms and failed to establish a direct physical loss with respect to the building claim. At the outset the Court notes that plaintiffs in their opposition to the motion for summary judgment abandon their claim for recovery of the building contents. Accordingly, the only matter before the Court is the claim for the building in the amount of $12,500.00.

Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *First Sec. Sav. v. Kansas Bankers Sur. Co.*, 849 F.2d 345, 349 (8th Cir.1988). In passing on a motion for summary judgment, a court is required to view the facts and inferences that reasonably may be derived therefrom in the light most favorable to the non-moving party. *Holloway v. Lockhart*, 813 F.2d 874, 878 (8th Cir.1987). The burden of proof is on the moving party and a court should not grant a summary judgment motion unless it is convinced that there is no evidence to sustain a recovery under any circumstances. *Foster v. Johns–Manville Sales Corp.*, 787 F.2d 390,

392 (8th Cir.1986). As the Supreme Court stated:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Upon review of the pleadings, memorandum, and exhibits, the Court finds the following undisputed facts. Plaintiffs Anthony Harper and Debbie Harper, husband and wife, brought this action seeking to recover on the building and the building contents portions of claims made under the flood insurance policy number FL2–0320–4313–I issued by the National Flood Insurance Program (NFIP) of the Federal Emergency Management Agency (FEMA). The policy period covered the time from August 24, 1991 through August 24, 1992 with the coverage limits of $34,000.00 for the building and $13,400.00 for the contents with a $500.00 deductible for each.

On April 30, 1992, plaintiffs reported a flood loss at the insured address. NFIP retained Crawford and Company to inspect the property and to draft a preliminary report and to photograph the damages. After inspecting the premises, Ronald Allen, a general adjuster, filed the preliminary report on May 22, 1992. In a letter dated June 8, 1992, NFIP instructed plaintiffs to file a formal proof of loss within sixty days of the loss date and cited the date of June 30, 1992 as the deadline for filing the proof of loss for the April 30, 1992 flood loss. The letter also warned them that failure to file within the sixty day period would result in coverage being denied.

On June 14, 1992, Allen sent plaintiffs a copy of the worksheets for the building and contents loss and a blank proof of loss form. Allen also advised the Harpers that documentation would be necessary to verify that the building repairs had been made from the two prior flood losses.

On June 30, 1992, NFIP received a proof of loss from Mr. Harper in the amount of $19,400.97 without any documentation in support as requested. Moreover, Mrs. Harper did not sign the proof of loss and Mr. Harper's signature was not notarized.

On July 1, 1992, NFIP rejected the proof of loss because of plaintiffs' failure to document their loss but NFIP made a $2,800.00 partial payment in reliance on Mr. Harper's assurances that documentation to substantiate the loss was forthcoming as explained in a letter dated July 10, 1992. In a notarized letter dated August 6, 1992 faxed to NFIP, Mr. Harper claimed that all documentation necessary to verify losses was destroyed in the flood.

In a letter dated August 11, 1992, NFIP denied plaintiffs' building claim citing Article III of the NFIP policy which specifically excludes coverage for losses not caused directly by a flood. NFIP advised plaintiffs in a letter dated August 19, 1992 that their contents claim over and above the $2,800.00 payment was denied due to their failure to properly document their loss.

■ The standard flood insurance policy is a single-risk insurance policy providing coverage for direct physical loss by or from flood. A direct physical loss is defined as any loss that is "directly and proximately caused by a 'flood'." 44 CFR Pt. 61, App. A(1) Article II. The policy expressly excludes coverage for losses from other causes such as "land sinkage, land subsidence ... or movement of land resulting from the accumulation of water in subsurface land areas." *Id.* at Art. III(A)(1). Damage to a building foundation is covered only if directly caused by flood waters on the date of the loss. *See Wagner v. Director, Federal Emergency Management Agency,* 847 F.2d 515, 522 (9th Cir.1988) ("[a]s the courts have all but universally held, federal flood insurance policies do not cover losses stemming from water-caused earth movements"); *Sodowski v. National Flood Ins. Program,* 834 F.2d 653, 657–59 (7th Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 619 (1988) (the standard flood insurance policy does not provide coverage for losses caused by earth movement even if such movement is caused

by flooding); *West v. Harris,* 573 F.2d 873, 877 (5th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979) (policy does not cover loss by earth movement in the form of soil settlement regardless of whether this settlement has been in the process over a period of time or whether it occurred immediately after the flood). *But see Quesada v. Director, Federal Emergency Management Agency,* 753 F.2d 1011, 1013–14 (11th Cir.1985) (damage covered when caused by settlement and compaction of sand fill under the home where settlement resulted from saturation of the fill by water from a tropical storm).

■ Although the Eighth Circuit Court of Appeals has not had the opportunity to rule on this specific question, the Court finds the analysis of the Ninth, Seventh and Fifth Circuit Court of Appeals on this precise issue persuasive. Even if the damage to plaintiffs' foundation occurred after the flood due to the soil movement, such damage is excluded from coverage under SFIP. Moreover, the report reflects that the damage to plaintiffs' property was a result of settlement due to inadequate construction on poor soil type, not flooding. Accordingly, the Court will grant defendant's motion for summary judgment.

Jeanne NUNEZ, Raymond Perez, and Richard Morgan, Plaintiffs,

v.

MONTEREY PENINSULA ENGINEERING et al., Defendants.

Civ. No. C 93–20510 EAI.

United States District Court, N.D. California.

Nov. 7, 1994.

Richard K. Grosboll, Carolyn A. Anderson, Neyhart, Anderson, Reilly & Freitas, San Francisco, CA, for plaintiffs.

Richard A. Leasia, Marlene S. Kleinman, Littler, Menderson, Fastiff, Tichy & Mathiason, San Jose, CA, for defendant Monterey Peninsula Engineering Profit Sharing Plan.

C. Michael McClure, Monterey, CA, for defendants Monterey Peninsula Engineering and Bart J. Bruno.

## MEMORANDUM & ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

INFANTE, United States Magistrate Judge.[*]

### I. INTRODUCTION AND BACKGROUND

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs Jeanne Nunez, Raymond Perez and Richard Morgan are each former employees of defendant Monterey Peninsula Engineering ("MPE"), which sponsors and administers defendant Monterey Peninsula Engineering Profit Sharing Plan (the "Plan") in which plaintiffs are, or were, participants.[1] Defendant Bart J. Bruno is president of MPE and is primarily responsible for administering the Plan.[2] The action was filed on July 16, 1993, and the pleadings were amended in March 1994.

#### A. Plaintiffs' First Amended Complaint

Plaintiffs' First Amended Complaint asserts four causes of action:

##### 1. First Cause of Action [3]

Allegedly, in the late 1980's or early 1990's, defendants amended the Plan, without notice

---

[*] The matter was heard before a magistrate judge by the consent of the parties. 28 U.S.C. § 636(c).

1. First Amended Complaint, filed March 30, 1994, ¶¶ 2–7, 9.

2. Id., ¶ 8.

3. Id., ¶¶ 25–30.

to its participants. Previously, Plan participants had been entitled to the option of receiving a lump sum benefit distribution immediately upon termination of their employment with MPE. Under the Plan amendment, participants are required to endure an 18-month waiting period before being entitled to distribution of benefits.[4] Plaintiffs contend that the amendment of the Plan so as to eliminate the immediate lump-sum benefit option violated the terms of the Plan, as well as ERISA and its accompanying regulations.[5] They seek an order requiring defendants to pay plaintiffs accrued interest for the period between plaintiffs' termination of employment until the respective dates each plaintiff's vested benefits were paid.[6]

## 2. *Second Cause of Action*[7]

Plaintiff Perez alleges, on information and belief, that "only a portion of the retirement funds to which he was entitled for his work on public works projects was contributed by MPE on his behalf and collected by the Plan". The remaining portion was allegedly allocated to the profit-sharing accounts of other employees, including defendant Bruno and his family.[8] Perez alleges that defendants' failure to collect, credit and properly allocate pension contributions on his behalf constituted a breach of their fiduciary obligations under ERISA and violated a host of other federal and state laws.[9]

## 3. *Third Cause of Action*[10]

Perez also alleges that MPE improperly failed to make any contributions to the Plan on his behalf for Plan year 1991, notwithstanding that he was employed on the last *working* day of the Plan year, November 27,

1991.[11] Allegedly, the Plan requires participants to be employed on the very last day of the Plan year, in this case November 30, 1991, regardless whether it falls on a weekend or a holiday.[12] Perez avers, however, that defendants never furnished him with a copy of a summary plan description, as ERISA requires. Had defendants done so he would have been informed of the specifics of the Plan's requirements and would have ended his employment effective three nonworking days later.[13]

## 4. *Fourth Cause of Action*[14]

Finally, plaintiffs Nunez and Perez allege that, pursuant to ERISA regulations and prior to filing the lawsuit, they requested pertinent documents and information from defendants relating to Nunez's and Perez's entitlement to benefits.[15] Allegedly, defendants failed to timely comply with the requests in violation of ERISA and its regulations.[16]

## B. *Defendants' Motion for Summary Judgment*

Defendants have presently moved for summary judgment, asserting (1) that plaintiffs lack standing to assert claims under ERISA because they are no longer "participants" in the Plan and (2) that "[n]one of plaintiffs' causes of action have merit".[17] For the reasons which follow, the motion is granted in part and denied in part. Defendants are entitled to summary adjudication in their favor on the second and fourth, but not the first and third, causes of action of plaintiffs' First Amended Complaint.

---

4. *Id.,* ¶ 26.

5. *Id.,* ¶ 27.

6. *Id.,* Prayer for Relief, ¶ 3.

7. *Id.,* ¶¶ 31–36.

8. *Id.,* ¶ 33.

9. *Id.,* ¶¶ 32–36.

10. *Id.,* ¶¶ 37–40.

11. *Id.,* ¶ 38.

12. *See id.,* ¶ 39.

13. *Id.,* ¶¶ 38–39.

14. *Id.,* ¶¶ 41–46.

15. *Id.,* ¶¶ 42, 44.

16. *Id.,* ¶¶ 45–46.

17. Memorandum of Points and Authorities in Support of Motion for Summary Judgment, etc. ("Defendants' Brief"), at p. 1.

## C. *Material Facts*

The material facts are undisputed.[18] Plaintiffs are all former employees of MPE who are, or were at the time of their employment, participants in the Plan.[19] Plaintiffs all terminated their employment during the 1990–91 Plan year, which ran from December 1990 through November 1991.[20] Plaintiffs do not intend to return to work with MPE and do not anticipate accruing additional benefits under the Plan.[21] Plaintiff's earned *and* received vested benefits under the Plan as follows: (1) Nunez, $5,686.07 distributed on November 23, 1993; (2) Perez, $8,440.16 on September 22, 1993; and (3) Morgan, $34,709.50 on November 5, 1993.[22]

Defendant Bart Bruno is president and chairman of the board of directors of MPE. His two sons, Paul and James Bruno, are also officers and directors of MPE. MPE administers the Plan, and defendant Bart Bruno is the Plan's trustee.[23]

The terms of the Plan are set forth in multiple documents:[24] (1) the Prototype Defined Contribution Plan and Trust;[25] (2) the Adoption Agreement;[26] and (3) a one-page Attachment A to the Plan, which became effective December 31, 1988 and was revised May 31, 1992.[27]

Attachment A by its terms adopted a pair of "policy changes [which] have been deemed to be in keeping with the original intent of the profit sharing plan by the plan administrators".[28] One of these changes provided for payment of termination benefits to be made either five years after termination, upon the participant's fifty-second birthday, or death, whichever was earlier.[29] Prior to adoption of Attachment A at the end of 1988, MPE permitted a participant who terminated his or her employment to receive Plan benefits at the end of the Plan year in which the participant terminated his or her employment.[30]

18. The parties quarrel in their respective "separate statements" of fact about various matters which are fundamentally legal interpretations of the facts. The Court thus derives the factual scenario from the parties factual statements (including evidentiary references) in their respective briefs.

19. *First Amended Complaint,* ¶¶ 3–5, 9; Plaintiff's Opposition Memo to Summary Judgment Motion ("Opposition Brief"), at p. 1.

20. Declaration of Paul Bruno ("P. Bruno Decl."), ¶ 8.

21. As defendants indicate, plaintiffs have not alleged otherwise in their First Amended Complaint. Nor do plaintiffs challenge the assertion on this motion.

22. P. Bruno Decl., ¶¶ 9–10. Paul Bruno is MPE's controller and "perform[s] many of the tasks necessary to the administration of the Plan" and is thereby aware of "the monetary amount of each employee's benefits in the Plan, and when each employee receives his or her disbursement from the Plan". *Id.,* ¶¶ 1 and 3. Plaintiffs assert that they are entitled to greater benefits under the Plan, which they have not received, but that is a *legal* question and one which is the focus of the instant motion.

23. Declaration of Richard K. Grosboll ("Grosboll Decl."), ¶ 5 and Exhibit A (copy of pertinent portions of deposition transcript of defendant Bruno ["B. Bruno Depo. Tr."], at 9:15—11:13; 12:2–5; 33:17—34:4).

24. *See* Defendants' Brief, at pp. 1–2.

25. P. Bruno Decl., ¶ 13 and Exhibit A (copy of a 68–page document denoted Prototype Defined Contribution Plan and Trust). Note that Exhibit A also contains two separate, single-spaced MPE board of directors resolutions, one adopted November 28, 1983, the other adopted November 30, 1990. The 1983 resolution purports to adopt the Plan. The 1990 resolution purports to authorize various MPE corporate officers, all members of the Bruno family, to calculate and deposit contributions to the Plan.

26. P. Bruno Decl., ¶ 14 and Exhibit B (copy of adoption agreement purportedly "in effect at the time the Plaintiffs were terminated"). Exhibit B is a two-page document, hand dated June 13, 1990, which consists almost entirely of illegible miniature type.

27. *Id.,* ¶¶ 15–16 and Exhibits C and D (copies of Attachment A and Revised Attachment A, respectively).

28. *Id.,* Exhibit C.

29. *Id.*

30. Declaration of Ray Perez ("Perez Decl."), ¶ 2. Plaintiffs were not given prior notice of these so-called "policy changes". *Id.* Although the matter of notice is disputed in the parties' pleadings, *compare* First Amended Complaint, ¶ 10 (alleging lack of notice of change) *with* Joint Answer to First Amended Complaint, ¶ 10 (denying same),

The five-year period has since been revised to eighteen months,[31] and plaintiffs' benefits were ultimately distributed *after* the lawsuit was filed, in partial settlement of the claims originally asserted by plaintiffs.[32] The parties' joint case management conference statement provides:

"The parties agree that plaintiffs shall be entitled to cash the disbursement checks recently issued to them by the MPE Plan without waiving their right to proceed against the defendants in this action, and that the plaintiffs' receipt of said checks does not preclude them from seeking greater benefits which may be due. Plaintiffs acknowledge that their receipt of such benefits may render moot one or more of their claims. "Plaintiffs agree that their receipt of benefits cuts off any accrual of interest on the amount received up to the date of receipt."[33]

The terms of the Plan are summarized in a summary plan description ("SPD") but plaintiff Perez was never furnished with one by MPE.[34] Perez terminated his employment with MPE on November 27, 1991, the last work day of November preceding the Thanksgiving holiday weekend; he did so without being informed that if he terminated his employment effective three days later, on November 30, 1991, MPE would have been required to make a contribution to the Plan on his behalf.[35]

On or about October 26, 1992, an attorney representing Nunez and Perez (among others) requested in writing (among other things) that defendant Bruno, on behalf of MPE, provide documents in response to 13 enumerated requests.[36] In response, MPE provided Nunez's and Perez's attorney with several documents "on or before" November 25, 1992: (a) a copy of the then-current summary plan description; (b) a copy of an SPD in existence prior to the then-current SPD; (c) a copy of the annual reports completed by the Plan during the years 1988–1991; (d) a copy of the then-current Plan; (e) a copy of the then-current adoption agreement; and (f) a copy of the then-current investment plan.[37] Unsatisfied with the response, Nunez's and Perez's counsel dispatched another letter to defendant Bruno, dated March 8, 1993, containing a "reiteration" of the document requests.[38] Paul

---

defendants have not provided evidence countering Perez's attestation that he does not recall receiving notice.

**31.** *Id.*, Exhibit D.

**32.** Defendants assert in their papers, without evidence, that "[p]laintiffs' vested benefits were distributed in accordance with the latter policy", i.e., the one calling for distribution *eighteen* months after termination. Defendants' Brief, at p. 2. Further, defense counsel argued at the hearing on the instant motion that "the distributions of the benefits were made at the time they would have been made, regardless of the lawsuit. It was in the natural course of administering the plan, and it came time to give the distributions. We offered plaintiffs their distributions." Transcript of Proceedings, dated September 12, 1994 ("Tr."), at 18:11–15. However, counsel's assertion is impeached by the simple chronology of events. For example, it is undisputed that Perez's employment terminated on November 27, 1991, and he received his distribution on September 22, 1993, roughly *twenty-two* months later. Similarly, Morgan had to wait *twenty-four* months, from November 1991 when he was terminated until November 1993 when he received benefits. *See* First Amended Complaint, ¶ 11 (listing termination dates). Nunez had to wait

the longest period, *thirty-nine* months, from August 1990 to November 1993. *Id.*

**33.** Grosboll Decl., Exhibit G (copy of joint case management conference statement, ¶ J).

**34.** Perez Decl., ¶ 4.

**35.** *Id.*, ¶ 5.

**36.** P. Bruno Decl., ¶¶ 11 and 18 and Exhibit F (copy of letter from Grosboll to defendant Bart Bruno). Paul Bruno has not established in his declaration that he was in a position to have received, and therefor authenticate, the letter in question. Plaintiffs, however, do not dispute its authenticity. ·

**37.** *Id.*, ¶ 12. These documents were apparently supplied to plaintiffs' counsel without any form of cover letter memorializing the production or explaining what was being produced and perhaps as importantly whether any requested documents were being withheld and the asserted grounds therefor. Certainly no such correspondence, if it existed, has been presented to the Court.

**38.** *Id.*, ¶ 19 and Exhibit G (copy of unsigned letter from Grosboll to defendant Bruno, dated March 8, 1993).

Bruno sent a reply letter, dated March 23, 1993, claiming he had "scrupulously" attempted to provide all the items counsel was statutorily entitled to receive.[39]

## II. DISCUSSION

### A. Standard for Reviewing Summary Judgment Motion

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Fed.R.Civ.P. 56(c).

■ The standard for determining whether summary adjudication of a claim is appropriate is identical to that for evaluating a motion for judgment as a matter of law under Rule 50: "the trial judge must direct a verdict, if under the governing law, there can be but one reasonable conclusion as to the verdict". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment". *Id.*, 477 U.S. at 253, 106 S.Ct. at 2513. Hence, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor". *Id.*

### B. Plaintiffs' Standing to Bring ERISA Claims

"ERISA carefully enumerates the parties entitled to seek relief [thereunder]". *Franchise Tax Bd. v. Const. Laborers Vacation Trust for Southern California*, 463 U.S. 1, 25, 103 S.Ct. 2841, 2855, 77 L.Ed.2d 420 (1983); *see* 29 U.S.C. § 1132(a). "The *express* grant

of federal jurisdiction in ERISA is limited to suits brought by certain parties ..." *Franchise Tax Bd., supra*, 463 U.S. at 20, 103 S.Ct. at 2852 (emphasis added).

■ Among those *expressly* entitled to bring suit under ERISA are "participants". 29 U.S.C. § 1132(a)(1). A participant is defined by statute as:

"any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer ... or whose beneficiaries may be eligible to receive any such benefit."

*Id.*, § 1002(7). The statutory definition of a participant does not subsume former employees unless they " 'have a reasonable expectation of returning to covered employment' or [ ] have a 'colorable claim' to vested benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989) (citations omitted). Claimants who seek a damage award, rather than vested benefits improperly withheld, lack standing to bring suit under ERISA. *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 474 (10th Cir.), *cert. denied*, 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990).

■ Defendants contend that plaintiffs are no longer Plan participants entitled to sue under ERISA because they are *former* employees who have "neither a 'reasonable expectation of returning to covered employment' nor 'a colorable claim to vested benefits'."[40] Defendants point out that plaintiffs have supplied no evidence (or allegation) that they anticipate resuming employment with MPE. Further, defendants argue that plaintiffs have received a lump-sum payment " 'of all their vested benefits' " and thus have no colorable claim to vested benefits.[41] At the

39. *Id.*, ¶ 20 and Exhibit H (copy of letter from Paul Bruno to Grosboll, dated March 23, 1993).

40. Defendants' Brief, at p. 5.

41. *Id.*, at p. 6, quoting *Mitchell, supra*, 896 F.2d at 474. Neither the first nor fourth causes of action of the First Amended Complaint asserts that vested benefits have been improperly withheld, and these are the only claims to which plaintiffs Nunez and Morgan are parties. (Nu-

nez is a party to both the first and fourth claims, Morgan only to the first.) As originally configured, in July 1993, the first cause of action was for wrongful withholding of vested benefits, but after benefits were distributed, the claim was amended to seek damages for "late payment of benefits". However, the second cause of action, asserted by Perez alone, alleges that benefits Perez earned on public works projects, and to which he was entitled, were not allocated to him.

hearing on the motion, plaintiffs' counsel counter-argued that the standing issue is a "red herring":

"I want to remind the Court that this—when this lawsuit was filed, each of the plaintiffs in this suit had not received their benefits. They were still waiting to receive those benefits.... So, it was during the pendency of the lawsuit that there was a distribution of benefits. And during the lawsuit, there was a Catch–22 situation. Plaintiffs wanted to receive at least the benefits to which they thought they were entitled, but they did not want to waive their rights to pursue [their other claims for relief].... So, I think when you look at the standing issue, you have to put that into context because it is undisputed that all three of these plaintiffs were participants in the plan when this lawsuit was filed ..." [42]

Ninth Circuit case law nominally supports plaintiff's contention: "Whether a person is a plan participant must be decided *at the time of the filing of the lawsuit.*" *Harris v. Provident Life and Accident Ins. Co.,* 26 F.3d 930, 933 (9th Cir.1994); see also, *Olson v. General Dynamics Corp.,* 960 F.2d 1418, 1422 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2968, 119 L.Ed.2d 588 (1992) ("*At the time he filed his suit,* Olson was receiving benefits [and] was therefore a 'participant' ") [emphasis added]; *Nishimoto v. Federman–Bachrach & Associates,* 903 F.2d 709, 714 (9th Cir.1990) ("former employees whose vested benefits under a plan have already been distributed in a lump sum *at the time they file suit* are not 'participants' within the meaning of [ERISA]") [emphasis added]; *Kuntz v. Reese,* 785 F.2d 1410, 1411 (9th Cir.), *cert. denied,* 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986) ("plaintiffs are not participants because, as former employees whose vested benefits under the plan have already been distributed in a lump sum, [they] were not 'eligible to receive a benefit,' and were not likely to become eligible to receive a benefit, *at the time that they filed suit* ") [emphasis added].[43]

Defendants correctly contend, however, that "[n]either the *Harris* case, nor the cases cited therein, stand for the proposition that where a plaintiff files an amended complaint

---

Further the third cause of action, also singularly Perez's, asserts that he *earned* benefits during Plan year 1991 which would have been paid to him had he merely retired effective November 30, 1991, a holiday, rather than on November 27, the final work day of the Plan year. Arguably, Perez has a colorable claim to vested benefits under both the second and third causes of action and as such remains a "participant" within the statutory meaning of the term. As will be seen, the Court need not address this question.

**42.** Tr., at 9:7—10:10. Plaintiffs also contend that defendants "admitted" that plaintiffs are "participants" in initially answering the First Amended Complaint. Opposition Brief, at pp. 7–8. Defendants, however, timely amended their answer within 20 days, denying that plaintiffs are participants. *Compare* Joint Answer to First Amended Complaint, filed April 21, 1994, ¶¶ 3–5, *with* Joint First *Amended* Answer to Plaintiffs' First Amended Complaint, filed May 11, 1994, ¶¶ 3–5. "[P]rior pleadings cease to be conclusive judicial admissions, [although] they are admissible in a civil action as evidentiary admissions." *Contractor Utility Sales v. Certain–Teed Products,* 638 F.2d 1061, 1084 (7th Cir.1981). Here, the evidentiary value of the withdrawn admission is insufficient to overcome the undisputed objective evidence that plaintiffs are no longer "participants". Therefore, the withdrawn admission, while it would technically be admissible in the

event of a trial, *see, United States v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984), nevertheless would not be credited by a reasonable trier of fact.

**43.** See also, *Morongo Band of Indians v. California State Bd. of Equalization,* 858 F.2d 1376, 1380 (9th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989) ("In determining federal jurisdiction, *we look to the original, rather than to the amended, complaint.*") [action brought under Federal Interpleader Act, 28 U.S.C. § 1335; emphasis added]; *Winchester v. Pension Committee,* 942 F.2d 1190, 1194 (7th Cir.1991) (plaintiff "was not a plan participant *at the time the action was filed* and thus had no standing") [emphasis added]. But see, *Raymond v. Mobil Oil Corp.,* 983 F.2d 1528, 1535 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993) ("*current* participant status is the relevant test") [emphasis added]; *Yancy v. American Petrofina, Inc.,* 768 F.2d 707, 708 (5th Cir.1985) ("[Q]uestions of standing must be resolved on the facts existing *when the challenge is raised.*") [emphasis added]. *Yancy,* an ERISA decision, cites *Safir v. Dole,* 718 F.2d 475, 481 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347, *reh. denied,* 467 U.S. 1268, 104, S.Ct. 3563, 82 L.Ed.2d 864 (1984) ("Standing, since it goes to the very power of the court to act, *must exist at all stages of the proceeding,* and *not merely when the action is initiated ...*") [emphasis added].

which reveals that the court lacks subject matter jurisdiction over his claims, the plaintiff is nonetheless entitled to have jurisdiction based on the original, superseded complaint".[44] Defendants cite as being more closely on point a Fifth Circuit decision, *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058 (5th Cir.1984), *on petition for rehearing en banc*, 759 F.2d 504 (1985).

In *Boelens*, plaintiffs sued for breach of warranty under both Texas state law and the federal Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 et seq., which contains a predicate $50,000 amount-in-controversy requirement, and three other federal statutes. Plaintiffs amended their complaint to drop all the federal claims except the MMWA claim. The Fifth Circuit ruled, however, that plaintiffs had not satisfied the amount-in-controversy requirement for the MMWA and therefore that federal-question subject matter jurisdiction was lacking. 748 F.2d at 1063. Plaintiffs sought rehearing en banc, arguing that jurisdiction should have been determined by their original complaint, which included the three additional federal statutory claims. 759 F.2d at 506. A panel of the Fifth Circuit denied rehearing en banc, ruling that "because the burden is on the plaintiff to establish jurisdiction in the first instance, we conclude that the plaintiff must be held to the jurisdictional consequences of a voluntary abandonment of claims that would otherwise provide federal jurisdiction". *Id.*, at 508.

"Our conclusion that we must look to the amended complaint in assessing original federal jurisdiction is consistent with the general rule that an amended complaint ordinarily supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." *Id.* (citations omitted).[45]

In this case, applying *Boelens, supra*, and evaluating subject matter jurisdiction by reference to the superseding amended complaint, there nevertheless remains federal common law jurisdiction for plaintiffs' claims pursuant to 28 U.S.C. § 1331. See, *Northeast Dept. ILGWU v. Teamster Local Union No. 229*, 764 F.2d 147 (3rd Cir.1984).

In *Northeast Dept. ILGWU*, one Ruth Fazio was a participant in the Northwest Department International Ladies' Garment Workers' Union ("ILGWU") employee benefit plan, and her husband was a participant in the Teamsters plan. 764 F.2d at 150. Mrs. Fazio underwent medical treatment and submitted her bills to the ILGWU fund, which advised her that she was ineligible because she was covered by the Teamsters fund. "Faced with one set of medical bills and two insurers who refused to pay, Mrs. Fazio filed suit in the United States District Court for the Middle District of Pennsylvania, naming both funds as defendants." *Id.*

"From the outset, it was clear that Mrs. Fazio was entitled to reimbursement from one of the funds. The district court thus

44. Defendants' Letter Brief, dated September 25, 1994, at p. 2. Note that at the hearing on the instant motions, defense counsel handed up a copy of the *Harris* decision, *supra*, and plaintiffs' counsel was given leave to submit a letter brief commenting on the decision. Tr., at 4:9 –5:15; 22:12–15. Plaintiffs' counsel submitted the authorized letter brief, dated September 17, 1994. In the meantime, on September 16, defense counsel filed a notice of supplemental authority, attaching a recent Ninth Circuit decision, *Friend v. Sanwa Bank*, 35 F.3d 466 (1994). Plaintiffs' counsel then felt compelled to respond to such unauthorized submission by letter brief dated September 21, which in turn prompted a letter brief from defense counsel dated September 25. For the record, all of these supplemental submissions have been read and considered by the Court.

45. Among the cases cited in *Boelens* was *Loux v. Rhay*, 375 F.2d 55 (9th Cir.1967), which merely

states that "[t]he amended complaint supersedes the original, the latter being treated as nonexistent", *id.*, at 57, without commenting on the jurisdictional implications such proposition. Yet, the Ninth Circuit has more recently stated that, "[i]n determining federal court *jurisdiction*, we look to the *original*, rather than to the *amended*, complaint." *Morongo Band of Indians, supra*, 858 F.2d at 1380 [emphasis added]. The *Morongo* court was aware of the *Boelens* decision and declared that "*Boelens* in no way conflicts with our [specific] ruling that a court is powerless to grant leave to amend when it lacks jurisdiction over the original complaint". *Id.*, at 1380 n. 2. The *Morongo Band of Indians* decision did not, however, address the specific holding in *Boelens* respecting cases where the original complaint supplies jurisdiction but the amended one arguably does not.

thought it unfair for Mrs. Fazio to incur counsel fees and to wait for payment while the court decided which of the funds was liable for her bills. The Court therefore suggested, and the defendants agreed, that (1) the ILGWU Fund would pay Mrs. Fazio's claim, (2) the action brought by Mrs. Fazio would then be dismissed, and (3) the ILGWU Fund would file, contemporaneously with the dismissal, a complaint in federal court against the Teamsters Fund seeking a declaration of the rights and obligations of the two funds regarding Mrs. Fazio and persons similarly situated." *Id.* The district court granted summary judgment for ILGWU. *Id.*, at 151 (citing district court's opinion, at 584 F.Supp. 68). The Teamsters appealed. Although both pension funds agreed that there was federal jurisdiction, the Third Circuit sua sponte requested supplemental briefing on the question. *Id.* The appeals court noted that "if Mrs. Fazio had remained a party to the action, the district court unquestionably could have exercised jurisdiction pursuant to [ERISA], 29 U.S.C. § 1132(a)(1)(B)." *Id.*, at 152. In her absence, however, the question was "much more problematic". *Id.* The Third Circuit rejected the parties' mutual argument that the trustees of one fund could "stand in the shoes" of an aggrieved beneficiary of another fund and sue on her behalf. *Id.* Accordingly, the Third Circuit held that jurisdiction over the suit could not be predicated under ERISA. *Id.*, at 153. Instead, the appeals court ruled, the case arose under federal *common law* and, as such, presented a federal question cognizable under the relevant jurisdictional statute, 28 U.S.C. § 1331.

*Id.*, at 159. "An action 'arises under' federal common law", the Third Circuit noted, "if, inter alia, plaintiff's requested relief requires the interpretation and application of federal judge-made law." *Id.*, at 157. Further, the Third Circuit observed that " 'Congress intended that federal courts create federal common law' " in interpreting ERISA. *Id.*, quoting *Franchise Tax Bd., supra,* 463 U.S. at 25, 103 S.Ct. at 2855.[46] Thus, the court concluded, "there can be little doubt" that the lawsuit before it presented a question of federal common law. 764 F.2d at 157.

> "[F]inding jurisdiction in cases such as the one at bar ... would expand the scope of federal jurisdiction over ERISA-related actions only minimally because the vast majority of ERISA cases involving entitlement to benefits will fall under the express jurisdictional provisions of the statute. Indeed, the instant case would have been in federal court without question had not the district court, out of sympathy for Mrs. Fazio, suggested that the parties pay her and reinstitute the suit. For the odd case that does not fall under § 1132, a finding of federal jurisdiction promotes certainty and uniformity by having federal courts decide issues of federal common law."

*Id.,* at 159; see also, *Winstead v. J.C. Penney Co., Inc.,* 933 F.2d 576, 580 (7th Cir. 1991);[47] *Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985, 988–991 (4th Cir.), *cert. denied,* 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990); *Airco Industrial Gases v. Teamsters Health & Welfare Pension Fund,* 850 F.2d 1028, 1033 (3rd Cir.1988) (federal common law claim must be of "cen-

---

**46.** This interpretation of congressional intent also finds direct support in the Ninth Circuit: "Congress realized that the bare terms, however, detailed, of [ERISA] statutory provisions would not be sufficient to establish a comprehensive regulatory scheme. It accordingly empowered the courts to develop, in light of reason and experience, a body of *federal common law* governing employee benefit plans. First, it supplements that statutory scheme interstitially ... Second and more generally, it serves to ramify and develop the standards that the statute sets out in only general terms ... Third, Congress viewed ERISA as a grant of authority to the courts to develop principles governing areas of the law regulating employee benefit plans that had previously been the exclusive province of

state law." *Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1499 (9th Cir.1984) (emphasis added).

**47.** In *Winstead,* Seventh Circuit Judge Richard Posner writes: "It is apparent that Congress, while it gave careful consideration to a vast number of issues that might arise in the administration of new federal pension law, overlooked a vast number of other issues ... For such omissions, which seem neither deliberate nor consistent with administering the statute sensibly in accordance with its overall goals and structure, section 1331 would provide a suitable [jurisdictional] remedy, as held in *Northeast Dept. ILGWU, [supra]*". 933 F.2d at 580.

tral concern" to ERISA); *Whitworth Bros. Storage Co. v. Central States Pension Fund,* 794 F.2d 221, 236 (6th Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986).

■ The Third Circuit's decision in *Northeast Dept. ILGWU* is controlling in this case. Here, akin to Mrs. Fazio in *Northeast Dept. ILGWU,* it was "clear from the outset" that plaintiffs were entitled to receive vested benefit payments from defendants. 764 F.2d at 150. In both cases, there was a partial settlement of the claims involved. In *Northeast Dept. ILGWU,* at the district court's behest, one of two defendants paid Mrs. Fazio in consideration for dismissal of her action and then sued the other for indemnity. *Id.* In this case, defendants agreed to distribute stipulated amounts of vested benefits in consideration for being relieved of further accrued interest,[48] and plaintiffs amended their complaint accordingly. In both cases, all parties agreed that federal jurisdiction would be continuing notwithstanding the partial settlement. In the Third Circuit case, the agreement was implicit and honored even by the pension fund which brought the appeal. *Id.,* at 151. Here, plaintiffs negotiated for and received written assurance that their receipt of vested benefits was "without waiv[er] of their right to proceed against the defendants in this action" and that it "does not preclude them from seeking greater benefits which may be due".[49] In *Northeast Dept. ILGWU,* the district court "unquestionably could have exercised jurisdiction pursuant to [ERISA]" had Mrs. Fazio remained a party to the action. *Id.,* at 152. Similarly, here, had plaintiffs' claims to vested benefits remained outstanding, this Court's statutory jurisdiction under ERISA would be unquestioned because it is undisputed that at the time this lawsuit was filed (and continuing

until the distribution of benefits) plaintiffs were "participants" with standing to sue under ERISA. Finally, here as in *Northeast Dept. ILGWU,* the remaining claims at-issue require the interpretation and application of federal common law relating to ERISA. Like *Northeast Dept. ILGWU,* this is an "odd case" which does not fall under § 1132 but which is of "central concern" to ERISA and for which "a finding of federal jurisdiction promotes certainty and uniformity by having federal courts decide issues of federal common law". *Northeast Dept. ILGWU, supra,* 764 F.2d at 159; *Airco, supra,* 850 F.2d at 1033. Accordingly, this Court finds that plaintiffs' First Amended Complaint presents questions of federal common law for which subject matter jurisdiction exists under the federal question statute, Section 1331. See, *Northeast Dept. ILGWU, supra,* 764 F.2d at 155 ("the absence of an express statutory grant of jurisdiction under § 1132 of ERISA is ... irrelevant, and this claim may be adjudicated in federal court pursuant to 28 U.S.C. § 1331(a)."). The Court thus turns to the substantive merits of plaintiffs' claims.

### C. *First Cause of Action*

The first cause of action alleges that defendants unlawfully amended the Plan to eliminate the immediate lump-sum payment of vested benefits upon an employee's termination in favor of an eighteen-month waiting period. Defendants contend that the claim is essentially one for breach of fiduciary duty and, because defendants' fiduciary obligations are owed merely to the Plan not individual beneficiaries, that plaintiffs have no valid cause of action.

#### 1. *breach of fiduciary duty claim*

Section 1132(a)(2) of ERISA permits a participant to pursue "appropriate relief" under Section 1109, which pertinently states:

---

48. *See* Grosboll Decl., Exhibit G (copy of joint case management conference statement, ¶ J).

49. Grosboll Decl., Exhibit G (copy of joint management conference statement, ¶ J). Defendants seek to renege on this condition of the partial settlement, arguing that lack of subject matter jurisdiction cannot be waived. Defendants' Reply Brief, at p. 3, citing *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1194 n. 2 (9th Cir.1988) ("It is elementary that the subject matter jurisdiction of the district court is not a waivable matter and

may be raised at anytime by one of the parties, by motion or in the responsive pleadings, or *sua sponte* by the trial or reviewing court."). See also, *Morongo Band of Indians, supra,* 858 F.2d at 1380 ("The parties have no power to confer jurisdiction on the district court by agreement or consent."). Defendants misconstrue their agreement as purportedly "conferring" jurisdiction. Instead, the parties' agreement merely reflects recognition of the outstanding issues of federal common law which remain to be decided.

"Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be personally liable to make good *to such plan* any losses to the plan resulting from such breach, and to restore *to such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary ..."

29 U.S.C. § 1109(a) (emphasis added). "There can be no disagreement ... that § [1132(a)(2)] authorizes a [participant or] beneficiary to bring an action against a fiduciary who has violated § [1109].... [H]owever, that recovery for a violation of § [1109] *inures to the benefit of the plan as a whole*.... [¶] A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of the plan assets, and with remedies that would protect *the entire plan,* rather than with the rights of an individual beneficiary.... [¶] And the entire text of § [1109] persuades us that Congress did not intend that section to authorize any relief *except for the plan itself."* *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 139–43, 105 S.Ct. 3085, 3089–91, 87 L.Ed.2d 96 (1985) [emphasis added]; see also, *Mertens v. Kaiser Steel Retirement Plan,* 744 F.Supp. 917, 920 (N.D.Cal.1990) (Patel, J.), *aff'd,* 948 F.2d 1105 (9th Cir.1991) ("a civil action alleging a fiduciary's liability under ERISA section [1109] ... must be brought on behalf of the benefit plan, since no individual relief is available"). Plaintiffs contend, however, that their first cause of action is otherwise authorized under sections 1132(a)(1)(B).[50]

### 2. *breach of contract claim*

Section 1132(a)(1)(B) permits a participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan". 29 U.S.C. § 1132(a)(1)(B). Essentially, subsection (a)(1)(B) allows an action in the form of breach of contract, the contractual instrument being the pension plan.

Plaintiffs contend that the amendment of the Plan violated the terms of Section 1.4(A) thereof, which pertinently provides:

"(1) The Plan sponsor reserves the right to amend any part of the Plan at any time.... No amendment to the Plan shall decrease the Accrued Benefit of any Participant.... [¶] (2) No amendment to the Plan ... shall be effective to the extent that it has the effect of decreasing a Participant's Accrued Benefit.... For purposes of this paragraph, a Plan amendment which has the effect of ... (b) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment, shall be treated as reducing Accrued Benefits...." [51]

In construing Section 1.4(A) of the Plan, plaintiffs suggest that ERISA's language and legislative history are a useful guide. Under ERISA, as under the terms of the Plan in this case, "[t]he accrued benefit of a participant ... may not be decreased by an amendment of the plan ...". 29 U.S.C. § 1054(g).

"The committee expects that the regulations will not permit the elimination of a 'lump-sum distribution' option because, for a participant or beneficiary with substandard mortality, the elimination of the option could eliminate a valuable right ..."

S.Rep. No. 575, 98th Cong. (1984), *reprinted in* U.S.Code Cong. & Admin.News 2547, 2576.

Defendants urge, however, that they did not "amend" the Plan, but instead adopted a "policy change".[52] As defendants observe,

---

50. Opposition Brief, at pp. 8–9.

51. P. Bruno Decl., ¶ 13 and Exhibit A (copy of Plan, at ¶ 1.4(A)).

52. Defendants' Brief, at pp. 10–14, citing P. Bruno Decl., Exhibit C (copy of Attachment A to Plan, at ¶ 2) ["Payment of profit sharing funds due upon termination of the participant shall be made five (5) years after termination ... The

above policy change[ ] ha[s] been deemed to be in keeping with the original intent of the profit sharing plan by the Plan Administrators."]. Note that the version of Attachment A submitted in evidence is the original one adopting a five-year waiting period instead of the eighteen-month period currently in force (under which defendants implausibly assert that benefits were actually distributed). *See* Footnotes 29–32 and accompanying text hereinabove. Since plaintiffs

the Ninth Circuit has "h[e]ld that the modification of [a] lump-sum distribution policy d[oes] not rise to the level of a plan amendment". *Oster v. Barco of California Employées' Retirement Plan,* 859 F.2d 1345, 1351 (9th Cir.1988).

"*Oster* involved an action by a beneficiary of a defined benefit plan whose request for a lump sum payout was denied by the plan trustees in the exercise of their discretion and via the retroactive application of a new policy under which terminating employees entitled to $3,500 or more, would not, as a general rule, be paid in a lump sum.... [¶] In *Oster,* the trustees adopted a policy which applied to a provision already a part of the pension plan. *[T]he adoption of that policy did not result in the reduction of plaintiff's benefits, just a delay in their payment.*" *Criscenti v. Bradco Profit Sharing Investment Plan,* 698 F.Supp. 1486, 1492–93 (S.D.Cal.1988) (explaining and applying *Oster* ) [emphasis added].[53]

■ This case is likely distinguishable from *Oster* in that, unlike *Oster,* this appears to be a case in which the policy change has resulted in participants "suffering a reduction in benefits". *See* 859 F.2d at 1348. In *Oster,* the present-value lump-sum benefit was converted into an "actuarially equivalent" annuity. *Id.* Here, the lump-sum benefit is simply deferred. Basic economics suggests that unless accrued interest is paid over the period of the deferral there is no *actuarial equivalency* and, distribution of benefits deferred becomes distribution of benefits partially denied. It is a material question for the trier-of-fact whether this is what has actually happened in this case (although it appears more likely than not since recovery of interest accrued over the deferral period is precisely what plaintiffs have sued for). Thus, the instant case, depending on facts to be adduced, is not necessarily governed by the *Oster* doctrine, and defendants are not as a matter of law entitled to judgment on plaintiffs' first cause of action.

Accordingly, defendants' motion for summary adjudication with respect to the first cause of action is denied.

### D. *Second Cause of Action*

The second cause of action alleges that defendants breached their fiduciary duties by failing to collect, credit and properly allocate pension contributions for work plaintiff Perez performed on MPE's public works contracts. "Instead, a portion of the funds which MPE contributed for Perez's work were [sic] allocated to the profit sharing accounts of other employees, including defendant Bruno, his family members and other MPE personnel".[54]

Again, defendants argue that because this cause of action is one for breach of fiduciary duty, under the Supreme Court's ruling in *Russell, supra,* 473 U.S. at 139–43, 105 S.Ct. at 3089–91, an individual plan participant such as Perez has no right of action.[55]

Yet, "mechanically applied to the present case, *Russell* is not dispositive". *Sokol v. Bernstein,* 803 F.2d 532, 534 (9th Cir.1986). The *Russell* decision is "without controlling significance beyond the question of relief under § [1109]". *Russell, supra,* 473 U.S. at 151, 105 S.Ct. at 3095 (Brennan J., concurring) ["writ[ing] separately ... to emphasize the issues left open by today's decision"]; *see*

---

have not urged otherwise, the Court assumes that the language of Attachment A currently in force is identical in all respects except the length of the waiting period.

**53.** In *Oster,* "the policy change was based on the recommendation of an actuary that the routine lump-sum distribution policy should be so modified ... to *make the plan more of a retirement program* rather than a severance pay program.... [¶] [W]e note that this is not a case in which the complaining beneficiary is suffering a reduction in benefits. Whether Oster received his benefits in the form of an annuity or a lump-sum distribution, the amount paid to him would

be *actuarially equivalent."* Oster, supra, 859 F.2d at 1347, 1348 (emphasis added).

**54.** First Amended Complaint, ¶ 33. Perez alleges that defendants breached their fiduciary duties by violating the federal Davis–Bacon Act, 40 U.S.C. § 276a et seq. and Anti–Kickback Act, 41 U.S.C. § 51 et seq., as well as California Labor Code § 1720 et seq. Perez's theory, seemingly, is that these statutes supply the standard of care for evaluating the fiduciary duties imposed under ERISA.

**55.** *See* Defendants Brief, at p. 14; Reply Brief, at p. 8.

*id.*, at 137 n. 5, 105 S.Ct. at 3088 n. 5 (majority opinion) [Because respondent relies entirely on § [1109(a) ] ... we have no occasion to consider whether any other provision of ERISA authorizes recovery of "extracontractual damages"]. Justice Brennan has advanced the notion that, notwithstanding the judgment in *Russell* (in which he concurred), a private extracontractual damage remedy for breach of fiduciary duty may constitute " 'appropriate equitable relief' " allowed for under Section 1132(a)(3). 473 U.S. at 151–56, 105 S.Ct. at 3095–3098 (Brennan J., concurring).

> "The legislative history demonstrates that Congress intended by § [1104(a) ] to incorporate the fiduciary standards of trust law into ERISA, and it is black-letter trust law that fiduciaries owe strict duties running *directly* to beneficiaries in the administration and payment of trust benefits."

*Id.*, at 151–52, 105 S.Ct. at 3095–96 (emphasis added). Justice Brennan also declared:

> "Trust-law remedies are equitable in nature, and include the provision of monetary damages ... Thus, while a given form of monetary relief may be unavailable under ERISA for other reasons ... it cannot be withheld simply because a beneficiary's remedies under ERISA are denominated 'equitable.' "

*Id.*, at 152 n. 10, 105 S.Ct. at 3096 n. 10.

At least one federal circuit has responded to Justice Brennan's clarion call to action: "We believe Justice Brennan's conclusion is correct that under the law of trusts, a beneficiary is entitled to a remedy that will put him in the position he would have been in if the fiduciary had not committed a breach of trust, and that such a remedy includes monetary damages." *Warren v. Society Nat. Bank*, 905 F.2d 975, 982 (6th Cir.), *rehearing en banc denied*, 1990 U.S.App. LEXIS 16686 (1990), *cert. denied*, 500 U.S. 952, 111 S.Ct.

2256, 114 L.Ed.2d 709 (1991). The Ninth Circuit, however, has rejected this view:

> "Whether extracontractual and punitive damages are available under section 1132(a)(3) for 'other appropriate relief' was expressly reserved by the Court. [*Russell* ], [473 U.S. at 137, n. 5,] 105 S.Ct. at 3088, n. 5. Despite the reservation, the Court reasoned that the civil enforcement provisions found in section 1132(a) were exclusive and in broad language suggested fiduciaries cannot be held personally liable to beneficiaries for extracontractual damages. *Id.*, at [145–47, 105 S.Ct. at] 3092–93. The reasoning of the [Supreme] Court [majority] suggests that *extracontractual damages should be unavailable under section 1132(a)(3) as well.*"

*Hancock v. Montgomery Ward Long Term Disability Trust*, 787 F.2d 1302, 1306–07 (9th Cir.1986) (emphasis added); accord, *Sokol, supra*, 803 F.2d at 536 ("the logic of *Russell* forecloses the availability of extracontractual damages under § [1132](a)(3)"); *Williams v. Caterpillar, Inc.*, 944 F.2d 658, 665 (9th Cir.), *amended*, 91 C.D.O.S. 8863, *reported in full*, 1991 U.S.App. LEXIS 2607 (1991).[56]

■ Accordingly, because the Ninth Circuit has determined that a plan participant has no right of action for breach of a fiduciary duty, defendants are entitled to summary adjudication of the second cause of action of the First Amended Complaint.

### E. Third Cause of Action

■ The third cause of action, denoted "for breach of fiduciary duty and loss of benefits", alleges that no contributions were made to the Plan on behalf of Perez for Plan year 1991 because he terminated his employment on November 27, 1991, the last *working* day of the Plan year, instead of three days later, on November 30, 1991, the very last

56. See also, *Amos v. Blue Cross–Blue Shield of Alabama*, 868 F.2d 430, 431 (11th Cir.), *rehearing en banc denied*, 875 F.2d 874, *cert. denied*, 493 U.S. 855, 110 S.Ct. 158, 107 L.Ed.2d 116 (1989); *Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821, 824 (1st Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *Powell v. Chesapeake and Potomoc Tel. Co.*, 780 F.2d 419, 424 (4th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986) ("The

provision for 'other appropriate equitable relief', whatever it embraces, cannot be held to authorize extracontractual or punitive damages for the breach of a plan administrator's fiduciary duties under ERISA."); *Warren, supra*, 905 F.2d at 984 (Wellford J., dissenting) ("I would take the opinion of the majority in *Russell*, even if dicta, as setting a proper guide to follow rather than Justice Brennan's separate opinion which speaks for a minority of the Court.").

day of the Plan year. The crux of the claim is as follows:

"Defendants failed to furnish plaintiff Perez with the Plan's Summary Plan Description (SPD). As a direct result of defendants' failure to distribute an SPD to plaintiff Perez, Perez was unaware of the Plan's requirement that he be employed as of the end of the plan year to be eligible for a contribution for that year. Had he received an SPD and thereby been informed of the Plan's requirements, plaintiff Perez would not have terminated his employment on November 27, 1991, but would have delayed his termination effective three non-working days later. [¶] Defendants *breached their fiduciary duty to Perez* under ERISA and the Plan by failing to distribute to him a copy of the Plan's SPD, and by subsequently failing to make a contribution to the Plan on his behalf for 1991." [57]

In opposition to the instant motion, however, Perez appears to re-characterize his claim, arguing that "[d]efendants *violated the Plan* and ERISA when MPE failed to make a contribution on Perez's behalf for the 1990–1991 Plan Year". [58]

It is settled that Perez is legally disabled from claiming a breach of fiduciary duty. *Hancock, supra*, 787 F.2d at 1306–07. The Court therefore construes his allegations as stating a claim for breach of the terms of the Plan pursuant to Section 1132(a)(1)(B) and examines such terms to determine whether the undisputed facts support summary adjudication in favor of defendants.

Defendants argue that "[t]he undisputed facts show that, at the time of plaintiff Perez's termination, the Plan *expressly* provided that participants who were not employed by MPE *on November 30* of a particular year were not entitled to an allocation for the preceding Plan Year". [59] They cite to § 10.1 of the Plan's adoption agreement, which provides:

"The Employer shall not make a contribution on behalf of a participant who terminated employment with the Employer and is not employed with the Employer on the Anniversary Date. [60]

The "Anniversary Date" does not appear to be defined in the adoption agreement. However, the Plan itself prescribes that the term, " 'Anniversary Date' " shall mean the last day of the Plan Year." [61]

Section 10.1 of the adoption agreement cannot carry the day because, even construed in conjunction with the entire Plan, it is ambiguous. Certainly, the Plan itself does not ascribe any magical significance to the date November 30. Thus, the "express" terms are not inconsistent with Perez's apparent understanding that the term Anniversary Date refers to the last *working* day of the Plan year, in this case, November 27, 1991. It is undisputed that MPE was closed on November 28 (Thanksgiving Day), Friday November 29 and Saturday, November 30, 1991, [62] and Perez plausibly argues that "[e]ven if [he] had wanted to terminate on November 28, 29 or 30, he could not have". [63] The Court concludes that there are genuinely disputed material issues of fact as to the meaning of the pertinent terms of the Plan. [64]

**57.** First Amended Complaint, ¶ 39 (emphasis added).

**58.** Opposition Brief, at p. 19.

**59.** Reply Brief, at p. 14 (emphasis added).

**60.** *See* P. Bruno Decl., ¶ 14 and Exhibit B (copy of Plan adoption agreement, at § 10.1).

**61.** *Id.*, ¶ 13 and Exhibit A (copy of Plan, at ¶ 2.6).

**62.** *See* Grosboll Decl., ¶ 6 and Exhibit A (B. Bruno Depo. Tr., at 108:1—110:15; 113:17–23).

**63.** Opposition Brief, at p. 20.

**64.** The summary plan description (SPD), which summarizes but is not actually part of the Plan, contains greater specificity than the Plan. *See* Grosboll Decl., ¶ 11 and Exhibit F (copy of SPD). The SPD states: "The vesting schedule is based on covered years of service. A covered year of service is any 12 month period *ending on November 30th* during which you worked for the employer at least 1000 hours." *Id.* (SPD, at p. 6) [emphasis added]. Also: "Once you have become a participant in the Plan, you will remain a participant until a year (which *ends on November 30th* ) passes, during which you did not work 500 hours." *Id.* (SPD, at p. 7) [emphasis added]. The SPD is plainly substantial, although not conclusive, parol evidence of the meaning of the Plan terms. However, defendants do not dispute Perez's attestation that he never received a copy of the SPD, as required under 29 U.S.C. § 1024(b)(1). *See* Perez Decl., ¶ 4. Accordingly,

Accordingly, defendants' motion for summary adjudication of the third cause of action of the First Amended Complaint is denied.

### F. *Fourth Cause of Action*

The fourth and final cause of action alleges that, prior to initiating the lawsuit, plaintiffs Nunez and Perez requested certain documents and other information from defendants relating to their claims for benefits, but that defendants refused to satisfy some of the requests, purportedly in violation of ERISA and its associated regulations.[65] They seek "assess[ment of] a reasonable fine for failing to furnish documents".[66] Defendants argue in support of their motion that "plaintiffs were provided with all the documents to which they were legally entitled".[67]

ERISA pertinently provides:

"Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant ... by mailing the material requested ... within 30 days after such request may *in the court's discretion* be personally liable to such participant ... in the amount of up to $100 per day from the date of such failure or refusal, and the court may *in its discretion* order such other relief as it deems proper."

29 U.S.C. § 1132(c)(1)(B) (emphasis added). ERISA contains explicit disclosure requirements that obligate a plan administrator to furnish a participant, upon written request, with "the *latest* updated summary plan description", "the *latest* annual report" of a plan's assets, liabilities, receipts, and disbursements, and the documents under which the plan was established. 29 U.S.C. § 1024(b)(4) (emphasis added). Also, upon written request, the administrator must supply a participant with a statement of the latter's total accrued benefits and total accrued nonforfeitable pension benefits. *Id.,* § 1025(a).

Plaintiffs effectively concede that they have received all documents which ERISA explicitly requires be produced.[68] The Ninth Circuit has ruled, though, that these explicit disclosure requirements are *not* necessarily exhaustive.

"[A]n ERISA fiduciary's duty to disclose information to beneficiaries [or participants] is not limited to the dissemination of the documents and notices specified in [ERISA], but may *in some circumstances* extend to additional disclosures where the interests of the beneficiaries [or participants] so require. However, common law trust duties regarding the disclosure of information to beneficiaries [or participants] may be read into ERISA ... only to the extent that they relate to the provision of benefits or the defrayment of expenses, and only insofar as they do not contradict or supplant the existing reporting and disclosure provisions."

*Acosta v. Pacific Enterprises,* 950 F.2d 611, 618–19 (9th Cir.1991), *amended on rehear-*

---

defendants may perhaps be estopped from introducing the SPD into evidence at trial. *See* 29 U.S.C. § 1132(a)(3) (permitting participants appropriate *equitable* relief). The Court reserves this question.

**65.** *See* Footnotes 14–16 and accompanying text hereinabove (discussing pertinent allegations in First Amended Complaint); *see also* Footnotes 36–39 and accompanying text hereinabove (discussing undisputed facts relating to the requests for documents).

**66.** *Id.,* Prayer for Relief, ¶ 8.

**67.** Defendants' Brief, at p. 20. Alternatively, they urge that liability, if any, may only be imposed on a "plan administrator"—in this case, MPE—, and therefore that defendants Bruno and Monterey Peninsula Engineering Profit Sharing Plan are immune from liability. *Id.,* at p. 25. The Court finds that the fourth cause of action can be adjudicated without reaching this question.

**68.** *See* Defendants' Separate Statement of Undisputed Material Facts, etc., ¶ 22 (at p. 7) ("Defendant MPE responded to plaintiffs' [written] request by providing [plaintiffs' counsel] with ... (a) a copy of the then-current summary plan description; (b) a copy of a SPD in existence prior to the then current SPD; (c) a copy [sic] of the annual reports completed by the Plan during the years 1988–1991; (d) a copy of the then-current Plan; (e) a copy of the then-current Adoption Agreement; and (f) a copy of the then-current Investment Plan."); *see also* Plaintiffs' Separate Statement of Disputed Facts, etc., at p. 6 ("Defendants only furnished documents and information listed on [their separate] Statement of Facts (page 7).").

*ing,* 1992 U.S.App. LEXIS 639 (1992) (emphasis added).

It is unnecessary to determine whether this is one of those circumstances alluded to in *Acosta, supra,* in which additional disclosures should have been made because, in exercise of its discretion pursuant to 29 U.S.C. § 1132(c)(1)(B), this Court finds that no financial penalties for non-disclosure are warranted in this case. "An employer's procedural violations of ERISA entitle employees to monetary relief only in exceptional cases. Most courts that have considered the issue have held that the employer must have acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced their employees ... before recovery for procedural violations is warranted." *Kreutzer v. A.O. Smith Corp.,* 951 F.2d 739, 743 (7th Cir. 1991), *rehearing en banc denied,* 1992 U.S.App. LEXIS 2092 (1992). Here, there is no allegation or evidence that defendants acted in bad faith; indeed, MPE produced all documents explicitly called for under ERISA. Compare, *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1353–54 (9th Cir.1984), *cert. denied,* 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). Nor is there any allegation or evidence that plaintiffs have been prejudiced by the non-disclosures. The documents were apparently requested in anticipation of this lawsuit in an effort to conduct informal, pre-litigation discovery. Plaintiffs are not harmed by having to request the same documents by means of formal discovery *during* the ordinary course of this litigation. The Court rules in exercise of its discretion that defendants are entitled to judgment as a matter of law on plaintiffs' fourth cause of action.

### III. *ORDER*

Accordingly, IT IS HEREBY ORDERED that:

(1) Defendants' motion for summary adjudication of the first and third causes of action of the First Amended Complaint is DENIED; and

(2) Defendants' motion for summary adjudication of the second and fourth causes of action of the First Amended Complaint is GRANTED.

SO ORDERED.

**Boyd PAULSON, Plaintiff,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al., Defendants.**

**No. CV 94–2691 JSL.**

United States District Court, C.D. California.

Oct. 27, 1994.

912

Michael J. Faber, Yuhl, Faber & Yuhl, Santa Monica, CA, for plaintiff.

John N. Frye, Frye & Alberts, Los Angeles, CA, for defendants.

**OPINION**

LETTS, District Judge.

Plaintiff Boyd Paulson ("Paulson") has sued his automobile insurance carrier, State Farm Mutual Automobile Insurance Company ("State Farm") for breach of contract, bad faith, intentional infliction of emotional distress, negligent infliction of emotional distress, and fraud arising out of State Farm's initial refusal to cover Paulson for injuries he sustained in an automobile accident caused by the negligence of an underinsured motorist. State Farm initially denied coverage to Paulson based on medical records indicating that Paulson had recovered fully from his injuries and on the fact that Paulson had received already $21,740 from the negligent driver's insurer and his employer in workers' compensation. State Farm eventually paid Paulson the $8,260 that he originally had requested, the full value of his insurance policy and its entire contractual obligation.[1]

State Farm moved for summary judgment under Federal Rule of Civil Procedure 56, arguing that Paulson cannot sustain any of the causes of action alleged in his complaint as a matter of law. Based on a review of the file, record and proceedings, and for the reasons stated below, this Court granted defendant State Farm's motion for summary judgment. Judgment was entered on October 17, 1994.

The legal issues in this case are not novel and ordinarily would not merit a written opinion. This case, however, is a prime example of what Ninth Circuit Judge Kozinski has labelled the "tortification of contract law," or the tendency of courts to treat a contract dispute as a tort, which creates incentives for plaintiffs to invest in tort causes of action. *See Oki America, Inc. v. Microtech Int'l, Inc.,* 872 F.2d 312, 315–16 (9th Cir.1989) (Kozinski, J., concurring) (discussing the tort of bad-faith denial of the existence of a contract). All contracts, including insurance contracts, include in their initial calculus the estimated costs of performance. This allows insurance companies, who are in

---

1. Paulson's underinsured motorist policy provided bodily injury coverage of $30,000, which is offset by the amounts he received from his employer and the negligent motorist's insurer. *See* Statement of Facts and Fn. 8, *infra.*

the business of writing contracts to pay claims, to price their policies accurately to include these costs. Tort damages, on the other hand, depend on case-by-case jury determinations that often turn on nebulous standards, resulting in the inability of insurance companies to estimate and account for those costs in advance. Thus, an insurer like State Farm facing potential tort liability for a failure to pay an insured's policy limits on demand is under great pressure to settle the lawsuit rather than to spend large amounts of money and time to litigate the case to an unpredictable result. The ability of an insured to create a tort lawsuit out of a good faith denial of insurance coverage creates settlement value for the plaintiff out of proportion to the merits of the underlying contract dispute.

In a case like this, where the insured has obtained the full measure of contract performance, courts should make a threshold determination of whether the undisputed facts support the existence of a tort cause of action. *Cf. Cox v. Resilient Flooring Div. of Congoleum Corp.*, 638 F.Supp. 726, 731 (C.D.Cal.1986) (facts which do not give rise to contractual liability should not form the basis for liability in tort of breach of implied-in-fact promise to terminate employee only for good cause). A possible standard for this determination would be whether the plaintiff has alleged facts which would, if proved, so shock the conscience of the court that to provide no remedy would frustrate the clear ends of justice. *Cf. id.* at 738 (proposing such a standard). Certainly, an insurer may remain liable in tort if it unreasonably and in bad faith withholds payment of the claims of its insured. *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 575, 108 Cal.Rptr. 480, 486, 510 P.2d 1032, 1038 (1973). Courts, however, must be able to address at the earliest possible stage the initial determination of wheth-

er, as a matter of law and based on the undisputed facts, the insurer's actions are unreasonable and in bad faith.

The following sections will set forth in more detail the undisputed facts and the Court's conclusions of law.

## I. UNDISPUTED FACTS

On March 6, 1992, plaintiff Paulson was involved in an automobile accident caused by the negligence of an underinsured motorist. At the time of the accident, Paulson was driving a van owned by his employer, Pacific Bell, and was operating it in the scope of his employment as a service technician. As a result of the accident, Paulson sustained various bodily injuries, including a broken finger, minor lower back pain, and a cut on his forehead.

Paulson received a total payment of $21,740 from the insurance company of the driver who caused the accident, Allstate Insurance Company ("Allstate"), and from his employer, Pacific Bell, in workers' compensation benefits.[2]

On or about September 11, 1992, six months after the accident, Paulson submitted an underinsured motorist claim under his policy with State Farm. The policy provided Paulson with bodily injury coverage of $30,000 in the event he was injured in an automobile accident caused by the negligence of an uninsured or underinsured motorist. Paulson presented a claim for $8,260, the difference between what he received from Allstate and Pacific Bell and the limits of his underinsured motorist policy.

Paulson's claim was assigned to State Farm claim representative Nancy Bennett on September 11, 1992. State Farm claim superintendent Peggy Ellis was assigned to supervise Ms. Bennett's handling of the file.[3]

---

**2.** Paulson received from Allstate $15,000, the limit of the other driver's liability policy, and from Pacific Bell $11,740 in workers' compensation benefits. Paulson reimbursed Pacific Bell $5,000 for certain medical and other expenses incurred on his behalf from the proceeds of his settlement with Allstate. Therefore, a net amount of $21,740 was paid to Paulson in connection with his accident.

**3.** State Farm has submitted ample evidence that Bennett was adequately trained as a State Farm claim representative. The training for each State Farm claim representative consists of the following: (1) a six-week orientation period, during which each representative receives individualized instruction from a State Farm Claim Superintendent; (2) a three-week claims school; (3) presentations given by automotive and medical professionals about various aspects of damage

That day, Bennett reviewed Paulson's claim file, which included looking at and evaluating medical bills, records, and reports that Paulson had submitted to State Farm in support of his claim. The records that Bennett reviewed revealed that Paulson's primary accident-related injury was a fractured little finger on his nondominant (left) hand. Paulson had undergone surgery for this injury, followed by three weeks of rehabilitative therapy.

Paulson's hand surgeon, Dr. Mitchel Silverman, M.D., wrote a series of reports detailing Paulson's post-surgical recovery. These reports indicated that Paulson experienced rapid and consistent progress in the healing of his finger injury. In his final report, dated July 22, 1992, Dr. Silverman wrote that Paulson's finger essentially was healed. Dr. Silverman reported his "opinion that Mr. Boyd Paulson has no permanent disability nor prophylactic work restrictions." Dr. Silverman concluded that "with regard to the injury in question, no further medical treatment or hand therapy is warranted." [4]

Paulson also received rehabilitative physical therapy at the California Hand Center following his surgery. His records from the Center indicate that he received treatment there on nine occasions between April 1, 1992 and April 22, 1992. The California Hand Center records document Paulson's recovery. In Paulson's discharge evaluation report, dated April 22, 1992, therapist Jody Giangreco rated Paulson's pain at "0" while at rest and at "1" while active, on a "pain scale" of one to ten, ranging from least to most pain. She described Paulson's progress as "excellent" and stated that "[a]t this time, I believe that Boyd has received maximum benefits from formal hand therapy." She concluded that "[n]o further hand therapy is indicated."

The only other medical records in Paulson's file relate to a minor low back soft tissue injury for which he sought physical therapy on eleven occasions between March 13, 1992 and April 2, 1992. The records reflect no further treatment for that condition after April 2, 1992.

Based on the documentation in Paulson's file, Bennett formed the opinion that the $21,740 paid by Allstate and Pacific Bell adequately compensated Paulson for the injuries he sustained in the March 6, 1992 accident.[5]

Bennett submitted two progress reports to Ellis concerning Paulson's claim. Upon receipt of the progress reports, Ellis reviewed them to ensure that Bennett's investigation of the claim was proceeding properly. On October 20, 1992, when Ellis received Bennett's second progress report, she reviewed the entire file again.

Based on Paulson's medical records, Bennett's progress reports, and the fact that Paulson's medical bills had been paid, Ellis also concluded that the $21,740 aggregate payout by Allstate and Pacific Bell adequately compensated Paulson for the injuries he sustained in the March 6, 1992 accident.

---

and injury evaluation; (4) lectures by State Farm employees with medical background and training, typically as registered nurses; and (5) a "trainee" period lasting several months, during which time the trainee is closely supervised by a Claim Superintendent. After the trainee period, claim representatives are given more responsibility and less supervision, although they continue to receive training and supervision throughout their employment.

Bennett participated in this training program and was supervised by Claim Superintendent Peggy Ellis. Bennett finished in the top five of her claim school class of approximately thirty five students. No one seriously contends that Bennett was not trained properly reasonably and adequately to perform her duties.

4. Dr. Silverman cited several medical facts and findings in support of his opinion that Paulson suffered no disability: (1) that Paulson was "working without restrictions" at the time of the report; (2) that there was "no evidence of neurovascular deficits in the left small finger;" (3) that the range of motion of the left small finger was "within normal limits" and that there was "no deficit in left elbow, forearm, finger or wrist motion;" (4) that Paulson's surgical scar was "well healed" and associated tenderness was "slight;" (5) that "[f]lexor function and extension function" were "normal;" and (6) that Paulson's x-ray films revealed "no evidence for angulation or rotational problems." Faber Declaration in Support of Opposition to Defendant's Motion for Summary Judgment, Exhibit 5.

5. In a subsequent arbitration, it was determined that Paulson's medical bills totalled $12,448.52. His lost wages amounted to $1,632. Thus, given his $21,740 payment, Paulson initially received $7,659.48 in additional compensation.

Ellis informed Paulson, by letter to his attorney, dated November 9, 1992, of State Farm's position that no further payment was warranted.[6] Paulson's attorney disputed State Farm's position and, by letter dated November 16, 1992, demanded that Paulson's claims be submitted to arbitration.

State Farm assigned attorney Lisa Rosenwasser to handle the arbitration of Paulson's claim on behalf of State Farm. Ellis mailed Paulson's claim file to Rosenwasser on December 2, 1992. Based on the file materials, including Paulson's medical bills, records, and reports, Rosenwasser concluded that the $21,740 aggregate payout by Allstate and Pacific Bell reflected reasonable value for the personal injury and damage claim submitted by Paulson. Rosenwasser based her conclusion on much of the same facts upon which the State Farm claims adjusters had relied.

On December 10, 1992, Rosenwasser noticed Paulson's deposition for the mutually agreed upon date of February 16, 1992. On December 20, 1992, Paulson's lawyer spoke with Rosenwasser and stated that Paulson's personal injury claim was limited to the period between March 6, 1992, the date of the accident, and July 22, 1992, the date on which Paulson was deemed "permanent and stationary" by Dr. Silverman. Paulson's lawyer stated that Paulson was not seeking compensation for residual injury, that the injuries essentially had healed over the course of the treatment period, and that State Farm's file was current with respect to Paulson's wage loss and other damage claims.

Paulson's deposition twice was continued upon plaintiff's request and finally was conducted on April 6, 1993. At the deposition, Paulson claimed for the first time that he had residual symptoms and lost wages for which he still was not compensated.

On April 9, 1993, three days after Paulson's deposition, State Farm recommended a re-evaluation of its settlement position, and offered Paulson the remaining $8,260 available under the underinsured motorist policy.

Paulson's lawyer immediately rejected the offer that day.

On April 30, 1993, Paulson's lawyer telephoned Rosenwasser and stated that his client's settlement demand was now $35,000. He suggested that the $35,000 payment would protect State Farm from Paulson's lawsuit for bad faith. State Farm rejected the new settlement demand and Paulson elected to proceed with arbitration.

The arbitration of Paulson's claim against State Farm took place on May 21, 1993. The arbitrator found that Paulson's damages exceeded State Farm's $30,000 policy limits,[7] and concluded that State Farm was obligated to pay Paulson the total sum of $8,260. State Farm paid that amount to Paulson.

## II. ANALYSIS

### A. Standard for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the movant presents evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986);

---

6. Paulson already had retained legal counsel before he was informed that his claim to State Farm was denied.

7. The arbitrator found that the damage suffered by Paulson totalled $49,580.52 (medical $12,-448.52; wage loss $1,632.00; general $35,-000.00).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett, supra.*

The Ninth Circuit has held that "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *Varig Airlines v. Walter Kidde & Co.,* 690 F.2d 1235 (9th Cir.1982). Paulson has failed to raise properly genuine issues of fact and therefore has failed to defeat State Farm's motion for summary judgment.

**B.** *Paulson's Claims*

The material facts of this case are undisputed. Paulson was injured in an automobile accident. He received $21,740 from Allstate and in workers' compensation for his injury. In determining whether to pay the $8,260 requested by Paulson, State Farm claim representatives reviewed medical records and reports that Paulson had submitted. In these reports, Paulson's doctor stated that Paulson's condition was "permanent and stationary," that he had no permanent disability arising from the injury, and that, on a scale of one to ten, Paulson's pain was rated zero

to one. Based on these reports, State Farm denied Paulson's claim.

Paulson demanded arbitration. Paulson's attorney informed State Farm that he was not seeking compensation for residual pain or lost wages. During his deposition prior to arbitration, however, Paulson told State Farm for the first time about his residual pain and entitlement to compensation for lost wages. Based on this new information, State Farm offered to pay the policy limit before arbitration was completed. Paulson rejected the settlement offer and elected to go forward with arbitration. The arbitrator concluded that State Farm was obligated to pay Paulson $8,260, the amount that State Farm offered to pay prior to the arbitration. State Farm paid that amount.

Based on the facts above, Paulson has no viable causes of action as a matter of law.

1. *Breach of Contract Claim*

In his first cause of action, Paulson alleges that State Farm's initial refusal to pay the $8,260 in benefits upon demand by Paulson constituted a breach of the underinsured motorist provisions of his insurance contract. Paulson further claims that he was injured by the breach because he was forced to demand arbitration of his claims.

Paulson's claim is not viable. State Farm has paid Paulson the limits of liability under his policy.[8] To the extent Paulson claims emotional distress as a result of State Farm's alleged delay in paying the policy limits, such a remedy is not to be awarded on a cause of action for breach of contract. *Sawyer v. Bank of America,* 83 Cal.App.3d 135, 139, 145 Cal.Rptr. 623, 625 (1978). *See also* 1 B.E. Witkin, Summary of Cal. Law, Contracts, § 829 at 746 (9th ed. 1987 and Supp. 1993) (noting that damages are not recovera-

---

**8.** While the stated limits of underinsured motorist coverage under Paulson's policy are $30,000, State Farm was entitled to set off from that limit the amounts paid to him from Pacific Bell ($11,740 in workers' compensation less $5,000 in reimbursement) and Allstate ($15,000), which totalled a net payment of $21,740. Thus, State Farm's policy limits were the difference between $30,000 and $21,740, or $8,260. *See* Cal.Ins. Code § 11580.2(h) ("Any loss payable under the terms of the uninsured [or underinsured] motorist endorsement as coverage to or for any person

may be reduced: (1) By the amount paid ... under any workers' compensation law, exclusive of nonoccupational disability benefits"); § 11580.2(p)(4) ("When bodily injury is caused by one or more motor vehicles, whether insured, underinsured, or uninsured, the maximum liability of the insurer providing the underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury").

ble for mental suffering from breach of contract).

Paulson also cannot claim incidental damages resulting from any alleged breach of contract, namely the costs of arbitration and attorneys fees. To the extent that Paulson alleges that he incurred increased attorney's fees, Paulson retained his attorney even before he was informed that State Farm had decided not to pay any further compensation. Thus, he has failed to establish a causal connection between the breach and the damages sought.

Paulson was offered $8,260 by State Farm more than one month prior to the arbitration hearing. He rejected this offer, choosing instead to go to arbitration despite the fact that, under the policy, Paulson could not be awarded more than that which was offered. Paulson will not be compensated for his decision to incur those expenses.

Because Paulson was not compelled to undergo arbitration, and because he retained counsel before State Farm rejected his claim, there is no causal connection between either of these events and any conduct by State Farm. Thus, there are no damages as a matter of law for breach of contract.

### 2. Bad Faith Claim

In his second cause of action, Paulson alleges that State Farm's conduct amounted to a breach of its covenant of good faith and fair dealing and that he is entitled to compensation for the costs of arbitration, attorneys fees, interest and other damages. He states that as a direct cause of State Farm's initial refusal to pay the policy limits, Paulson suffered mental and emotional distress, including "frustration, depression, nervousness, and anxiety." Complaint, at 5.

■ Under California law, all insurance contracts contain an implied covenant of good faith and fair dealing which requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefit of the agreement. *Hanson v. Prudential Ins. Co. of America,* 783 F.2d 762, 766 (9th Cir.1985). An insurer may breach this covenant if it fails properly to investigate its insured's claim, *Egan v. Mutual of Omaha Ins. Co. et al.,* 24 Cal.3d 809,

819, 169 Cal.Rptr. 691, 695, 620 P.2d 141, 145 (1979), *cert. denied,* 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), or when it refuses, without proper cause, to compensate its insured for a loss covered by the policy. *Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 920, 148 Cal.Rptr. 389, 394, 582 P.2d 980, 985 (1978). Denial of benefits alone, however, does not demonstrate bad faith. *Hanson,* 783 F.2d at 766. The withholding of benefits must be "unreasonable," *Congleton v. National Union Fire Ins. Co.,* 189 Cal.App.3d 51, 59, 234 Cal.Rptr. 218, 222 (1987), or "without proper cause," *California Shoppers, Inc. v. Royal Globe Ins. Co.,* 175 Cal.App.3d 1, 54–55, 221 Cal.Rptr. 171, 200–01 (1985).

In evaluating the evidence to see if there was any unreasonable conduct by the insurer, "it is essential that no hindsight test be applied. The reasonable or unreasonable action by the [insurer] must be measured as of the time it was confronted with the factual situation to which it was called upon to respond." *Austero v. National Casualty Co.,* 84 Cal.App.3d 1, 32, 148 Cal.Rptr. 653, 673 (1978).

■ In this case, both State Farm's claim representative Bennett and claim superintendent Ellis reviewed Paulson's medical bills, medical records and physical therapy records relating to his March 6, 1992 accident. Based on these reports indicating that Paulson suffered minimal residual pain and no permanent disability, and that his medical expenses were reimbursed, Bennett and Ellis reached the conclusion that the $21,740 already received by Paulson adequately compensated him for his injuries. Given the facts available to State Farm, the initial evaluation and denial of Paulson's claim for the remaining $8,260 available under his policy was not unreasonable or without proper cause.

After Paulson testified in his April 6, 1993 deposition that he continued to suffer from residual pain, that he feared additional surgery, and that he had foregone an estimated $1,000 in overtime pay, State Farm re-evaluated its settlement position and offered Paulson the $8,260. Paulson refused the offer, and subsequently, the arbitrator awarded

him that amount. The fact that State Farm changed its initial position and that the arbitrator subsequently found that State Farm owed Paulson the limit of his policy does not imply that State Farm acted in bad faith in the first instance.

■ As a matter of law, the conduct of State Farm in handling Paulson's claim was reasonable and took into account equally and fairly both the interest of the insurer and the insured. Where the full value of an underinsured motorist policy has been paid and there is no overt evidence of bad faith, an insured does not have a claim against an insurer for breach of the implied duty of good faith and fair dealing and is not entitled to tort damages.[9]

### 3. Intentional Infliction of Emotional Distress Claim

In his third cause of action for intentional infliction of emotional distress, Paulson alleges that State Farm "pursued an outrageous course of conduct, intentionally, and/or recklessly proximately causing plaintiff severe emotional distress, shock and other highly unpleasant emotions" in the form of "frustration, depression, nervousness and anxiety." Complaint, at 6.

■ The elements of a prima facie case for intentional infliction of emotional distress include 1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress and 2) the plaintiff's suffering severe or extreme emotional distress. *Cervantez v. J.C. Penny Co.*, 24 Cal.3d 579, 593, 156 Cal.Rptr. 198, 206, 595 P.2d 975, 983 (1979). The defendant's outrageous conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.*

■ As a matter of law, State Farm's conduct cannot be deemed "outrageous" within that definition. The good faith denial of insurance benefits does not amount to extreme conduct that exceeds all bounds of civility. *See Ricard v. Pacific Indemnity Co.*, 132 Cal.App.3d 886, 894–95, 183 Cal. Rptr. 502, 507 (1982) (denial of insurance claim, even if negligent or dilatory, is not outrageous conduct); *Beckham v. Safeco Ins. Co. of America*, 691 F.2d 898, 904 (9th Cir. 1982) (refusal by insurance company to settle third-party suit against insured, even if in bad faith, is not outrageous conduct).

■ Further, Paulson cannot show "severe" distress as a matter of law. In order to establish that element, California law requires that plaintiff prove that he suffered objective symptoms of distress. "[H]eadaches, insomnia, anxiety, irritability [are] not 'severe' under California law." *Standard Wire & Cable Co. v. Ameritrust Corp.*, 697 F.Supp. 368, 372 (C.D.Cal.1988). In his response to State Farm's interrogatories, Paulson stated only that he suffered from "frustration, depression, nervousness and anxiety," and that he had not sought any medical care for the emotional distress alleged in his complaint.

Therefore, Paulson does not have a claim for intentional infliction of emotional distress.

### 4. Negligent Infliction of Emotional Distress Claim

In his fourth cause of action for negligent infliction of emotional distress, Paulson again alleges that he experienced frustration, depression, nervousness and anxiety as a result of State Farm's conduct.

■ Generally, damages for the negligent infliction of emotional distress are allowed only when the defendant's conduct contains elements of "intentional malfeasance or bad

9. Punitive damages are also not available to Paulson. In order to justify an award of exemplary damages, the plaintiff must prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal.Civ.Code § 3294(a). The defendant must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. *Silberg v. California Life Ins. Co.*, 11 Cal.3d 452, 462, 113 Cal.Rptr. 711, 718, 521 P.2d 1103, 1110 (1974). Even if the defendant violated its duty of good faith and fair dealing, that alone does not necessarily establish that the defendant acted with the requisite intent to justify an award of punitive damages. *Id.* at 462–63, 113 Cal.Rptr. 711, 521 P.2d 1103. In this case, there is no evidence of bad faith, much less the kind of intentional, reprehensible conduct that would justify the imposition of punitive damages.

faith." *Quezada v. Hart,* 67 Cal.App.3d 754, 761, 136 Cal.Rptr. 815, 819 (1977). As discussed above, State Farm did not act unreasonably in denying Paulson's initial claims, and therefore, it lacked the intentional malfeasance or bad faith necessary to sustain this cause of action.

 Also, serious emotional distress is an essential element of a cause of action for negligent infliction of emotional distress. *Kelly v. General Telephone Co.,* 136 Cal. App.3d 278, 286, 186 Cal.Rptr. 184, 187–88 (1982). Aside from the statement that Paulson suffered from frustration, depression, nervousness, and anxiety, Paulson has not provided any evidence tending to prove that his emotional distress was serious or required medical or professional help.

#### 5. *Fraud Claim*

In his fifth cause of action for fraud, Paulson alleges that State Farm, in its policy, represented that it would compensate him under the terms of the underinsured motorist benefits in the event of a covered claim, but that State Farm "did not intend to pay such monies" at the time these promises were made. Complaint, at 8.

The burden of establishing fraud belongs to the insured. *Delos v. Farmers Ins. Group,* 93 Cal.App.3d 642, 656, 155 Cal. Rptr. 843, 852 (1977). The insured must show that the insurer did not intend to fulfill its obligations at the time the contract was entered into; mere denial of coverage will not suffice. *Miller v. American Life Ins. Co.,* 54 Cal.App.3d 331, 338 n. 4, 126 Cal. Rptr. 731, 734 n. 4 (1976). Proof indicative of fraud may come by inference from the circumstances surrounding the transaction, the relationship, and interest of the parties. *Id.* at 338, 126 Cal.Rptr. 731.

Paulson sets forth no facts establishing this cause of action. The undisputed evidence shows that State Farm's conduct in processing Paulson's claim cannot support an inference of prior intent not to fulfill its representations. When State Farm received Paulson's claim, it reviewed all the materials submitted by Paulson. When State Farm learned about Paulson's residual symptoms,

it offered to pay the amount that Paulson originally requested. These actions do not evince intent to defraud plaintiff.

### CONCLUSION

For the reasons stated above, the Court grants defendant's motion for summary judgment.

**LAKE AT LAS VEGAS INVESTORS GROUP, INC., Plaintiff,**

v.

**PACIFIC MALIBU DEVELOPMENT CORPORATION, a California corporation, Pacific Malibu Development Corporation, a Nevada corporation, Barry Silverton, Transcontinental Corporation, Transneva Corporation, Transneva Limited Partnership, Lake at Las Vegas Joint Venture, Botaba Realty Company, a general partnership d/b/a Transcontinental Properties, BSF Partners, Sid R. Bass, Robert M. Bass, Lee M. Bass and Ronald F. Boedekker, Defendants.**

**No. CV–S–87–768–PMP (RLH).**

United States District Court, D. Nevada.

Nov. 15, 1994.

Carl H. Hanzelik, Gerald E. Burns, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, Barry L. Lieberman, Dickerson, Dickerson, Lieberman & Consul, Las Vegas, NV, for plaintiff.

Rodney M. Jean, Deborah L. Earl, Lionel Sawyer & Collins, Las Vegas, NV, for defendant Lake at Las Vegas Joint Venture.

## ORDER

PRO, District Judge.

Before the Court is a Motion for Summary Judgment (# 321) filed by Defendant Lake at Las Vegas Joint Venture ("Joint Venture") on July 19, 1994. Plaintiff Lake at Las Vegas Investors Group, Inc. ("Investors"), filed an Opposition (# 333) on September 14, 1994, and Joint Venture filed a Reply (# 336) on October 4, 1994. On October 12, 1994, Investors filed a Motion for Leave to Supplement Opposition to Motion for Summary Judgment (# 337). Joint Venture did not oppose the Motion for Leave to Supplement Opposition and instead filed a Request That Summary Judgment Motion Stand Submitted (# 339) on October 13, 1994.

Investors filed its Fourth Amended Complaint (# 230) on May 17, 1990. Of the ten Counts asserted against the various defendants, Defendant Joint Venture is named only in Counts Eight and Nine. Count Eight alleges that Joint Venture tortiously interfered with the contractual and business relationship between Investors and Defendants Pacific Malibu Development Corporation ("Pacific Malibu") and its principal shareholder, Barry Silverton ("Silverton"), and Count Nine alleges that Joint Venture induced a breach of Pacific Malibu's and Silverton's fiduciary duties to Investors.

The salient facts according to Joint Venture in support of its Motion for Summary Judgment are as follows: On September 4, 1987, Investors entered into a letter agreement with Pacific Malibu and Silverton for the acquisition and assemblage of land in Henderson, Nevada (the "Land").[1] The letter agreement provided that Investors was to obtain a bona fide financing commitment for the acquisition of the Land by September 22, 1987. Thereafter, however, for reasons that are in dispute among the parties, Silverton began to explore the possibility of new financing for acquiring the Land.

Subsequently, on September 23, 25 and 28, Silverton met with Ronald Boedekker ("Boedekker"), president of Defendant Transcontinental Corporation ("Transcontinental"), to discuss the joint acquisition and development of the Land. Joint Venture contends that Silverton made no reference to any previous agreement with Investors during any of the meetings.

On September 29 or 30, while performing due diligence on Transcontinental's deal with Silverton and Pacific Malibu, Transcontinental's attorneys became aware of the previous agreement Silverton and Pacific Malibu had entered into with Investors. Joint Venture contends that when Transcontinental's attorney's inquired about the previous deal, Pacific Malibu's attorney unequivocally informed them that the previous agreement had been terminated.

On October 6, Pacific Malibu entered into a letter agreement with Transcontinental to form a partnership to acquire and develop the Land. Boedekker claims it was later that same day that Transcontinental's counsel first informed him of Investors' asserted contractual right to purchase the Land. As a result, Boedekker further claims that he instructed Transcontinental to refrain from closing the deal with Pacific Malibu until the litigation was resolved.

On October 9, 1987, Investors filed a Complaint seeking injunctive relief against Pacific Malibu, Silverton, and Transcontinental in Nevada State Court. On October 15, 1987, however, Investors voluntarily dismissed that Complaint pursuant to Nev.R.Civ.P. 41(a)(1) and then filed an identical pleading that same day. Pacific Malibu and Silverton removed the case to this Court on October 22, 1987.

Investors had sought a temporary restraining order in the state court action on

---

1. For the purposes of this Order, it is assumed that this agreement was a valid and binding contract.

October 15. After removal, however, Investors withdrew the motion for a temporary restraining order. Allegedly having become aware that Transcontinental still refused to go forward with the agreement to acquire the Land, Investors' attorney wrote to Silverton's attorney proposing to take "appropriate steps" to remove any impediments to an agreement between Transcontinental and Silverton and Pacific Malibu. *See* Letter date November 9, 1987, from Mel Close to Urban Schreiner, attached as Ex. "J" to Joint Venture's Motion for Summary Judgment (# 321). Thereafter, on November 10, 1987, Investors filed another Rule 41(a)(1) dismissal of Transcontinental. On that same date, Investors amended its Complaint "to withdraw all of its causes of action against Transcontinental Corporation." *See* Motion to Amend Complaint, attached at Ex. "L" to Joint Venture's Motion for Summary Judgment (# 321). On December 21, 1987, Transcontinental, through a related business entity, Transneva Limited Partnership, entered into Joint Venture with Pacific Malibu and acquired the Land on that same date. Subsequently, Investors again amended its Complaint and reasserted tortious interference claims against Transcontinental and related entities, including Joint Venture.

Joint Venture now moves for summary judgment on Counts Eight (interference with contractual relationship) and Nine (inducing breach of fiduciary duty).

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

▮ The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988).

▮ If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270 (9th Cir. 1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id.*

▮ A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1305–06 (9th Cir.1982); *Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir.1982).

▮ All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact ex-

ists for summary judgment purposes. *Poller v. CBS, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor,* 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). *See also Avia Group Int'l, Inc. v. L.A. Gear Cal.,* 853 F.2d 1557, 1560 (Fed.Cir.1988).

### B. *Inducing Breach of Fiduciary Duty*

■ Count Nine of Investors' Fourth Amended Complaint alleges that Joint Venture induced Pacific Malibu and Silverton to breach fiduciary duties to Investors. Joint Venture correctly notes that no Nevada court has ever recognized a cause of action for inducing a breach of fiduciary duty. Investors acknowledge that this type of claim has yet to be recognized in Nevada, but point out that neither has it been explicitly rejected. Investors, in noting that other jurisdictions have recognized such a cause of action, see *Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir.1986); *United States v. Rivieccio,* 846 F.Supp. 1079, 1086 (E.D.N.Y.1994), urges this Court to do the same. To address this question, because this Court sits in diversity, it must attempt to predict whether the Nevada Supreme Court would recognize a cause of action for inducing a breach of fiduciary duty.

■ The Court finds that under the circumstances of this case, the Nevada Supreme Court would not recognize a cause of action for inducing a breach of fiduciary duty. Any fiduciary duty that exists between Investors and Silverton and Pacific Malibu was created solely by contract. Thus, any breach of that fiduciary duty is a breach of the contract as well. As Investors has alleged a cause of action for tortious interference with contractual relations against Joint Venture, and because the fiduciary duty is created by contract, proving of a breach of this duty necessarily proves a breach of the contract. Allowing Investors to maintain an independent cause of action for inducing a breach of fiduciary duty against Joint Venture would be redundant. The Court finds that the Nevada Supreme Court would not recognize a redundant cause of action. Therefore, Joint Venture's Motion will be granted, and Count Nine of Investors' Complaint will be dismissed.

### C. *Intentional Interference With Contractual Relations*

■ As the Court has found that Count Nine of Investors' Complaint should be dismissed, the remainder of Joint Venture's arguments in support of summary judgment will be addressed with respect to Investors' remaining claim for intentional interference with contractual relations. Joint Venture argues that summary judgment is appropriate for the following reasons: 1) Investors is equitably estopped from asserting any claims against Joint Venture; 2) the tortious interference claims cannot survive because Joint Venture caused no breach; 3) Joint Venture cannot be held liable for tortious acts for which its partners could not be held liable; and 4) the two dismissal provision of Rule 41(a)(1) bars Investors' claims against Joint Venture.

Because the Court finds that Investors has failed to identify any acts taken by Joint Venture which induced Pacific Malibu and Silverton to breach the contract with Investors, and has not come forward with any evidence from which the Court could infer the existence of such acts on Joint Venture's part, summary judgment will be granted in Joint Venture's favor on Count Eight as well.

It is clear that a party seeking summary judgment may discharge its burden of showing the absence of a genuine issue of material fact by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, "[t]he burden then shifts to the nonmoving party to present evidence sufficient to support a verdict in its favor on every element of its claim for which it will carry the

burden of proof at trial." *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) (citing *Catrett,* 477 U.S. at 321–25, 106 S.Ct. at 2552–53).

In Nevada, to maintain a cause of action for intentional interference with contractual relations, the plaintiff must show: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *Sutherland v. Gross,* 105 Nev. 192, 772 P.2d 1287, 1290 (1989). As explained by this Court in a previous case, "[a]t the heart of [an intentional interference] action is whether Plaintiff has proved *intentional acts by Defendant* intended or designed to disrupt Plaintiff's contractual relations...." *Nat. Right to Life P.A. Com. v. Friends of Bryan,* 741 F.Supp. 807, 814 (D.Nev.1990) (emphasis added). It is Investors' failure to come forward with proof of intentional acts *by Joint Venture* that is the undoing of this claim.

Undoubtedly, Investors carries the burden of demonstrating at trial that Joint Venture committed intentional acts intended or designed to disrupt Investors' contract with Pacific Malibu and Silverton. Investors, however, fails to identify any acts *taken by Joint Venture* that were intended to disrupt Investors contractual relations. Indeed, no evidence has been presented to indicate that Joint Venture took any action whatsoever in this case, except for purchasing the Land, and most of the actions identified by Investors that might be construed by this Court as giving rise to an intentional interference claim are alleged to have been committed by Defendant Transcontinental—not Joint Venture. In fact, all the allegedly tortious acts identified by Investors were committed prior to the date of Joint Venture's creation and, therefore, they are acts for which Joint Venture cannot be held responsible.

Furthermore, Joint Venture is a partnership between Pacific Malibu and Transneva Limited Partnership [2] that was formed as a vehicle to purchase and develop the Land, which it did. With regard to basing an intentional interference action against Joint Venture for its purchase of the land, it is clear that "[o]ne does not induce another to commit a breach of contract with a third person ... when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person." Restatement (Second) of Torts § 766 cmt. n (1979). It appears to the Court that if a cause of action for intentional interference exists in this case, it lies against other defendants and not Joint Venture. Therefore, Joint Venture's Motion for Summary Judgment will be granted on Count Eight as well.

IT IS THEREFORE ORDERED THAT Defendant Lake at Las Vegas Joint Venture's Motion for Summary Judgment (# 321) is Granted.

**PHOENIX ELECTRIC COMPANY, an Oregon corporation, et al., Plaintiffs,**

**v.**

**NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC., et al., Defendants.**

**NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC., Counterclaim Plaintiff,**

**v.**

**ASSOCIATED BUILDERS AND CONTRACTORS, INC., Counterclaim Defendant.**

**Civ. No. 91–436–JE.**

United States District Court, D. Oregon.

May 9, 1994.

---

2. Transneva Limited Partnership is a limited partnership organized under the laws of the State of Nevada, whose general partner is Defendant Transneva Corporation. Transneva Corporation is a Nevada corporation and is a wholly owned subsidiary of Transcontinental.

Thomas M. Triplett, Schwabe, Williamson & Wyatt, Portland, OR, Maurice Baskin, Edward F. Glynn, Jr., Venable, Baetjer, Howard & Civiletti, Washington, DC, for plaintiffs.

Jack L. Kennedy, Susan E. Watts, Kennedy, King & Zimmer, Portland, OR, John A. McGuinn, Gary L. Lieber, Paul Monroe Heylman, Karen S. Russell, Henry A. Platt, Schneltzer, Aptaker & Shepard, P.C., Washington, DC, for defendant Nat. Elec. Contractors Ass'n, Inc.

Wayne Hilliard, Milo Petranovich, Richard N. Van Cleave, Lane Powell Spears Lubersky, Portland, OR, for defendants Oregon–Columbia Chapter of NECA, Atlas Elec. Contractors, Inc., and Oregon Elec. Const., Inc.

Paul C. Hays, James W. Kasameyer, Carney, Buckley, Kasameyer & Hays, Portland, OR, for defendant Intern. Broth. of Elec. Workers Local 48.

## OPINION

FRYE, District Judge:

The matters before the court are (1) the objections of the plaintiffs (# 227); and (2) the objections of defendant National Electrical Contractors Association, Inc. (# 226) to the Findings and Recommendation of the Honorable John Jelderks, United States Magistrate Judge, dated February 24, 1994.

The plaintiffs bring this action for alleged violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, challenging the Market Recovery Program of defendant International Brotherhood of Electrical Workers Local 48 (Local 48). The Market Recovery Program was proposed by Local 48 during the collective bargaining negotiations between Local 48 and the Oregon–Columbia Chapter of the National Electrical Contractors Association, Inc. On April 6, 1986, these parties formally executed the Market Recovery Program as an amendment to the collective bargaining agreement.

Under the Market Recovery Program, union members contribute a percentage of their union dues to a fund used to assist employers who utilize union labor on certain targeted projects.

### Counterclaims for Defamation

Initially, in his Findings and Recommendation, Magistrate Judge Jelderks concludes at page 932, line 18 through page 935, line 19 that the court should grant summary judgment for the plaintiffs and against the National Electrical Contractors Association, Inc. on the two counterclaims of the National Electrical Contractors Association, Inc. for defamation and should enter judgment in favor of the Associated Builders and Contractors, Inc. on these counterclaims. Magistrate Judge Jelderks concludes that the alleged defamatory statements are insufficient to support a finding by a trier of fact that the Associated Builders and Contractors, Inc. acted with actual malice.

■ No objections have been timely filed to this portion of the Findings and Recommendation. Since no objections have been filed, this relieves this court of any obligation to give the factual findings *de novo* review. *Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th Cir.1983). Having reviewed the legal principles *de novo*, the court finds no error. Accordingly, this court adopts the findings of Magistrate Judge Jelderks and his recommendation at page 932, line 18 through page 935, line 19 that this

court grant summary judgment against the National Electrical Contractors Association, Inc. on its two counterclaims for defamation and enter judgment in favor of the Associated Builders and Contractors, Inc. on these two counterclaims.

### Exemptions to the Plaintiffs' Antitrust Claims

In the remaining portions of his Findings and Recommendation, Magistrate Judge Jelderks considers the merits of the antitrust claims brought by the plaintiffs against the defendants.

In his Findings and Recommendation at page 935, line 20 through page 938, line 14, Magistrate Judge Jelderks considered the arguments of the defendants that they are entitled to summary judgment on the claims of the plaintiffs for antitrust violations on the grounds that statutory and non-statutory exemptions applicable to certain labor activities preclude liability under the facts of this case. Magistrate Judge Jelderks concludes that both the statutory and non-statutory exemptions apply under the facts of this case, and that the defendants are entitled to summary judgment based upon the labor exemption from antitrust liability.

The plaintiffs contend that summary judgment in favor of the defendants is not proper. The plaintiffs argue that Magistrate Judge Jelderks improperly found that the Market Recovery Program is a wage concession and that the issue of whether the Market Recovery Program is a wage concession or an anti-competitive subsidy is a disputed question of fact for the jury to determine.

The plaintiffs further argue that, contrary to the findings of Magistrate Judge Jelderks, the statutory exemption from the antitrust laws does not apply to these defendants because the Market Recovery Program is a product of a combination between a union and a non-labor group and does not serve the legitimate self-interest of the union.

In addition, the plaintiffs argue that Magistrate Judge Jelderks improperly analyzed the applicability of the non-statutory exemption.

The defendants respond that Magistrate Judge Jelderks properly considered the undisputed facts and to those facts applied the correct law.

When either party objects to any portion of a magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate's report. 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). The matter is before this court pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b).

This court has, therefore, reviewed *de novo* the rulings of Magistrate Judge Jelderks. The court finds that there is no dispute as to the material facts in this case. While the legal conclusions that each of the parties draws from the undisputed facts differ, the material facts which relate to whether the exemption from antitrust liability is applicable are not in dispute.

The court has reviewed with care the undisputed facts and the applicable legal principles, and upon so doing adopts the Findings and Recommendations of Magistrate Judge Jelderks at page 935, line 20 through page 938, line 14. The defendants are entitled to summary judgment on the antitrust claims filed against them by the plaintiffs because statutory and non-statutory exemptions applicable to certain labor activities preclude their liability under the undisputed facts of this case.

### Merits of the Antitrust Claims

On page 938, line 15 through page 943, line 19, Magistrate Judge Jelderks addresses the merits of the antitrust claims filed by the plaintiffs and concludes that these claims fail on the merits. Magistrate Judge Jelderks recognizes that a finding that the defendants are entitled to summary judgment on the labor exemption from the antitrust liability makes it unnecessary for the court to address the contentions of the defendants that the antitrust claims must fail on the merits but analyzes the merits in order to have a complete record.

This court declines to adopt this portion of the Findings and Recommendation of Magistrate Judge Jelderks on the grounds that the Findings and Recommendation adopted by this court renders moot these issues.

### The Objections of the National Electrical Contractors Association, Inc.

The National Electrical Contractors Association, Inc. objects to a sentence in the background portion of the Findings and Recommendation at page 931, which states: "Defendant National NECA, a trade association of electrical contractors, negotiates and administers collective bargaining agreements on behalf of electrical contractors with Local IBEW unions." The National Electrical Contractors Association, Inc. contends that this statement of fact has no impact on the recommendation and that the statement is factually inaccurate.

In addition, the National Electrical Contractors Association, Inc. argues that this court should not adopt that portion of the Findings and Recommendation at page 943, line 3 through page 943, line 19 in which Magistrate Judge Jelderks concludes that material issues of fact remain concerning questions of agency and the extent to which the National Electrical Contractors Association, Inc. might otherwise share responsibility for the policies at issue.

The plaintiffs contend that Magistrate Judge Jelderks correctly concludes that there are disputed issues of material fact as to the role of the National Electrical Contractors Association, Inc.

Magistrate Judge Jelderks concludes that the National Electrical Contractors Association, Inc. is entitled to an order of summary judgment in its favor on the claims of the plaintiffs in this case. Magistrate Judge Jelderks recognizes that the issues raised by the claims of the plaintiffs do not need to be reached. This court declines to adopt the portion of the Findings and Recommendation at page 943, line 3 through page 943, line 19. The court finds that this issue is moot in light of the court's previous ruling and will not adopt the statement at page 931 from the background section on the grounds that it is not material to the resolution reached and the plaintiffs have not opposed this portion of the objection.

## CONCLUSION

The court has reviewed *de novo* those portions of the Findings and Recommendation filed February 24, 1994 to which objections have been filed (# 226) and (# 227).

The court adopts the Findings and Recommendation from page 930, through page 938, line 14, except the sentence at page 931, lines 8 through 11. The court does not adopt the Findings and Recommendation from page 938, line 15 through page 943, line 19.

The court rules as follows:

(1) The motion of plaintiff Associated Builders and Contractors, Inc. for partial summary judgment on its second antitrust claim (# 169) is denied.

(2) The motion of plaintiff Associated Builders and Contractors, Inc. for summary judgment on the counterclaims of defendant National Electrical Contractors Association, Inc. (# 174) is granted.

(3) The motion of defendant National Electrical Contractors Association, Inc. for summary judgment on the claims of the plaintiffs (# 177) is granted.

(4) The motion of defendants Oregon–Columbia Chapter of the National Electrical Contractors Association, Inc., Atlas Electrical Contractors, Inc., Oregon Electrical Construction, Inc., and the International Brotherhood of Electrical Workers Local 48 for summary judgment as to the claims of the plaintiffs (# 182) is granted.

## FINDINGS AND RECOMMENDATION

JELDERKS, United States Magistrate Judge:

Plaintiffs Associated Builders and Contractors, Inc. (ABC), Phoenix Electric Company (Phoenix), and New Tech Electric (New Tech) bring this antitrust action against defendants National Electrical Contractors Association (National NECA), the Oregon–Columbia Chapter of NECA (Oregon NECA), Atlas Electrical Contractors, Inc. (Atlas), Or-

egon Electrical Construction, Inc. (Oregon Electric) and Local 48 of the International Brotherhood of Electrical Workers (Local 48). Defendant National NECA asserts two counterclaims for defamation against plaintiff ABC.

Before the court are plaintiff ABC's motion for partial summary judgment as to its second antitrust claim, plaintiff ABC's motion for summary judgment on defendant National NECA's counterclaims, defendant National NECA's motion for summary judgment on plaintiffs' claims, and defendants Oregon NECA and Local 48's motion for summary judgment on plaintiffs' claims.

These motions should be granted in part and denied in part. Plaintiff ABC's motion for partial summary judgment on its second antitrust claim should be denied, and its motion for summary judgment on defendant National NECA's counterclaims should be granted. Defendant National NECA's motion for summary judgment on plaintiffs' claims should be granted. Defendants Oregon NECA and Local 48's motion for summary judgment on plaintiffs' claims should be granted. Adoption of these recommendations will fully resolve all issues pending in this action.

## BACKGROUND

Plaintiff ABC is a trade association whose members are engaged in the construction industry. Plaintiffs Phoenix and New Tech are nonunion ABC members operating as electrical construction contractors in Oregon.

Defendant National NECA, a trade association of electrical contractors, negotiates and administers collective bargaining agreements on behalf of electrical contractors with local IBEW unions. It charters local chapters such as Oregon NECA throughout the United States.

Oregon NECA, a local chapter of National NECA, is a trade association made up of electrical contractors in Western Oregon and Washington State. Oregon NECA has an ongoing collective bargaining relationship with Local 48, and serves as the collective bargaining representative for its members as well as for certain nonmember electrical con-

tractors. Oregon NECA and Local 48 have negotiated separate collective bargaining agreements covering commercial/industrial and residential construction work.

Atlas and Oregon Electric, members of Oregon NECA operating in Western Oregon, have signed labor agreements with Local 48.

### 1. *Plaintiffs' Claims*

In this action, plaintiffs challenge Local 48's "Market Recovery Program" (MRP), otherwise referred to as the Oregon Job Targeting Program (OJTP). Under the OJTP, unions use various methods to improve their members' ability to secure work. As part of this effort, union members contribute a percentage of their dues to a fund used to assist employers using union labor on certain targeted projects. The unions sometimes inform union contractors that, on a particular job, the job targeting fund will be available to effectively reduce the standard hourly wages normally paid to union laborers. In other targeted jobs, the fund will reimburse the employer for a portion of the union scale wages after the employer pays the union workers at the collectively-bargained rate.

Plaintiffs characterize the OJTP as a conspiracy to "exclude from commercial/industrial electrical construction industry in the metropolitan Portland area, a relevant market under the antitrust [laws], nonunion electrical construction companies, including plaintiffs." They allege that the OJTP is used to identify nonunion contractors who are expected to bid on given projects, and to specify the number of hours of electrical work to be performed. Plaintiffs add that selection of targeted projects is based "upon the identity of the nonunion bidder and/or the nature of the project in order to obtain maximum exclusionary effect."

Plaintiffs allege that defendants' job targeting program allows members of Oregon NECA to bid for jobs against nonunion firms at "predatory prices ... explicable only by an intent to discipline or eliminate nonunion competition from the market." They contend that the subsidized bids submitted by Oregon NECA members are so low that

(1) The benefit of the bids is dependent upon their tendency to discipline or eliminate competition and thereby to enhance long-term ability to reap the benefits of monopoly power;

(2) Absent the subsidy, the bids would generally be below total costs; and/or

(3) Absent the subsidy, in selective cases, the bids are below variable costs of the bidders.

As other evidence of defendants' "specific intent" to exclude nonunion firms from the electrical contracting market plaintiffs cite "threats" to general contractors using nonunion contractors, agreements with owners and developers to use only union labor on projects, and agreements with Taft–Hartley Trusts to invest funds in projects on the condition that nonunion contractors be excluded.

Plaintiffs allege that the OJTP has allowed members of Oregon NECA to increase their market share of the "commercial/industrial electrical construction projects in the Portland metropolitan area" from 30–40% to more than 70%. They add that, by the end of the fourth quarter of 1990, the OJTP "was successful in procuring 68% of the targeted jobs; and had been used on more than 4,000 jobs; and has secured projects in excess of $90,000,000." Plaintiffs contend that their costs are lower than those of Oregon NECA members, both because they have lower labor costs, and because they use their labor more efficiently than do union contractors. They add that the OJTP has substantially weakened the financial position of nonunion contractors, threatened to drive them from the market, and deterred nonunion contractors from bidding on some projects. Plaintiffs contend that prices for electrical labor will rise to "supra-competitive" levels once efficient nonunion contractors have been driven from the market.

Plaintiffs bring claims for alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. In the first claim, alleging violation of 15 U.S.C. § 1, plaintiffs assert that low bids by defendant union contractors reflect "an intention to create entry barriers and to discipline or eliminate competition from non-union firms and thereby enhance the long-term ability of members of Oregon NECA to raise prices above competitive levels." They characterize defendants' prices as predatory, and contend that, in the long run, these prices will drive competition from the market. After nonunion competition has been eliminated, they assert, the threat of renewed subsidies will prevent other would-be competitors from entering the market.

Plaintiffs' second claim alleges violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In this claim, plaintiffs allege that the OJTP "constitutes a combination or conspiracy to monopolize the market" by excluding non-Oregon NECA members from the market. As overt acts in furtherance of the "combination or conspiracy," plaintiffs cite "the exchange of information on projects selected for job targeting and the exchange of competitively-sensitive information by members of Oregon NECA." They further allege that the OJTP "was undertaken, and is carried out, with a specific intent ... to monopolize the market" for commercial/industrial electrical construction business in the Portland metropolitan area.

Plaintiffs seek recovery of treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. They also seek an injunction "restraining violations by defendants of the antitrust laws of the United States" as described in the complaint.

### 2. *National NECA's Counterclaims*

National NECA's answer includes two counterclaims for defamation against ABC. The first counterclaim alleges that ABC issued a defamatory press release concerning this action on May 14, 1991, in the District of Columbia. National NECA asserts that the following statements concerning it in that press release were defamatory:

(a) "NECA ... violated the Sherman–Clayton Antitrust Act by conspiring to exclude open shop contractors from Oregon's electrical construction market."

(b) "... the defendants are restraining trade and violating antitrust laws."

(c) "But NECA itself has taken an active role in the conspiracy."

(d) "NECA has ... encouraged or directed its members to participate in unlawful job targeting conspiracies, both in Oregon and elsewhere in the country."

National NECA alleges that plaintiff ABC made these statements with knowledge of their falsity or with reckless disregard of their truth. In the alternative, National NECA alleges that the statements were made "in negligent disregard for their truth or falsity." National NECA adds that the statements "were made maliciously, in bad faith, and without privilege," and with the "actual intent to defame National NECA."

The second counterclaim alleges that ABC published an article concerning this litigation, including the same statements as are cited in its first counterclaim, in its newsletter. This counterclaim asserts that the statements at issue "implied illegal conduct by National NECA," and are actionable *per se.*

### STANDARDS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case. *Id.* When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1985). No genuine issue for trial exists however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### DISCUSSION

I. *Plaintiff ABC's motion for summary judgment on Defendant National NECA's Counterclaims*

Plaintiff ABC earlier moved to dismiss National NECA's counterclaims for lack of jurisdiction and for failure to state a claim upon which relief could be granted. In the alternative, it sought summary judgment on these claims. I recommended that those motions be denied. *Tigard Elec., et al. v. National Elec. Contractors Ass'n, Inc., et al.,* 790 F.Supp. 1498, 1504–05 (D.Or.1992). I based my recommendation on the existence of several discrepancies between the complaint and the allegedly defamatory statements, and the submission of materials demonstrating that National NECA and ABC have been engaged in a struggle over the legality of the job targeting program for some time. I concluded that a single affidavit denying malice was insufficient to support granting a motion for summary judgment in the face of the opposing submissions, and that material issues of fact remained concerning privilege defenses and malice.[1] *Id.* at 1505.

National NECA contends that my earlier recommendation to deny the motion against its counterclaims renders the present motion against those claims an inappropriate "second bite at the apple," and that it should be awarded costs and attorneys' fees for "opposing the same motion for a second time." I disagree. My earlier recommendation was made before the parties had conducted significant discovery. ABC's present

---

1. The parties agree that the defamation laws of the District of Columbia apply to this action.

*Tigard Elec.,* 790 F.Supp. at 1505, n. 3.

motion is based upon the much more thorough factual record now before the court. Having reviewed that record, I conclude that plaintiff ABC is entitled to summary judgment on National NECA's counterclaims.

Plaintiff ABC contends that it is entitled to summary judgment on the counterclaims because National NECA cannot establish that it acted with actual malice, and because ABC's statements were privileged as a fair and accurate report of its complaint. Because I agree with the former proposition, I need not reach the latter.

■■■■ To prevail on a defamation claim, a public official or public figure [2] must establish that the defendant published false statements with "actual malice." *See, Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342–46, 94 S.Ct. 2997, 3008–10, 41 L.Ed.2d 789 (1974). "Actual malice" is defined as making statements with knowledge, or reckless disregard, of their falsity. *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Only statements made with a high degree of awareness of their probable falsity are made with actual malice. *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964).

■■■■ A finding that a defendant made defamatory statements with actual malice must be supported by sufficient evidence that the defendant "entertained serious doubt as to the truth of [the] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Proof sufficient to satisfy this difficult standard will usually consist of evidence that the story in question was either (1) "fabricated"; (2) "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3) "based wholly on an unverified anonymous

telephone call" or some other source that the defendant had "obvious reasons to doubt." *Id.* at 732, 88 S.Ct. at 1326.

■■■■ Defendant NECA has not shown evidence from which a trier of fact could conclude that ABC acted with actual malice in publishing the statements at issue. Plaintiff ABC has shown evidence that it had ample reason to believe that National NECA was directly involved with job targeting programs in Oregon and elsewhere in the United States, and that it encouraged and assisted its members' participation in these programs. National NECA therefore cannot establish that statements concerning its role in the alleged conspiracy were made with actual malice.

National NECA likewise has not shown sufficient evidence to allow a trier of fact to conclude that ABC's statements concerning the alleged unlawful nature of its job targeting activities were made with actual malice. My conclusion that the OJTP does not violate antitrust laws does not come close to establishing that ABC's statements concerning job targeting programs were made with actual malice. ABC's assertions that job targeting programs violate antitrust law are supported by the legal opinion of competent counsel. They are in no way based upon the kind of fabrication, obviously inherent improbability, or reliance upon obviously dubious sources generally required to establish actual malice.

That some of the allegedly defamatory statements go beyond the precise allegations of ABC's complaint is not significant. The statements at issue substantially reiterate key allegations of the complaint. The relatively minor differences between the complaint, which is supported by legal opinion, and the published statements, are insufficient

---

**2.** A plaintiff's status as a public figure is a question of law for the court. *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C.Cir.), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). A party may be an "all purpose" public figure, or may be accorded that status as to a particular issue of public concern. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 n. 3, 106 S.Ct. 2505, 2509 n. 3, 91 L.Ed.2d 202 (1986).

In response to a request for admissions, National NECA stated that it "may be a limited public figure in the electrical construction indus-

try for some purposes...." In its opposition to ABC's motion for summary judgment on the counterclaims, National NECA notes that it "does not contest that it is required to prove that ABC made its defamatory statements with actual malice." Even in the absence of that concession, I would conclude that the job targeting issue presented in this action is a matter of public interest, and that defendant National NECA is a public figure for the purposes of the statements at issue here.

to support the conclusion that ABC acted with actual malice.

ABC's motion for summary judgment on National NECA's counterclaims should be granted.

## II. National NECA's, Oregon NECA's, and IBEW 48's Motions for Summary Judgment on Plaintiffs' Claims

As noted above, plaintiffs allege that defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Section 1 prohibits contracts, combinations, and conspiracies in restraint of trade. Section 2 prohibits monopolization and attempted monopolization.

Defendants contend that they are entitled to summary judgment on plaintiffs' claims because statutory and nonstatutory exemptions applicable to certain labor activities preclude liability under the facts at issue here, and because plaintiffs' antitrust claims fail upon other grounds as well. Defendant National NECA also contends that it is entitled to summary judgment on plaintiffs' claims because it cannot be held vicariously liable for the acts of Oregon NECA, and because there is no evidence that it had a "conscious commitment" to the alleged predatory pricing scheme.

### A. Statutory and Non-Statutory Labor Exemption

#### 1. Statutory Exemption

Congress has exempted a number of labor activities from antitrust liability. Under Section 6 of the Clayton Act, 15 U.S.C. § 17,

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, constituted for the purposes of mutual help ... or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

Section 20 of the Clayton Act, 29 U.S.C. § 52, likewise prohibits injunctions of certain work-related activities. In addition, the Norris–LaGuardia Anti–Injunction Act, 29 U.S.C. § 101 et seq., and the Wagner Act, 29 U.S.C. § 157 et seq., prohibit labor injunctions as a means to enforce antitrust laws, and establish organized labor's collective bargaining rights.

The labor antitrust exemption is not boundless, and several Supreme Court decisions have interpreted its scope. In *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 504 n. 24, 60 S.Ct. 982, 998 n. 24, 84 L.Ed. 1311 (1940), the Court observed that enactment of the labor exemption statutes "clearly recognizes that combinations of workers eliminating competition among themselves and restricting competition ... based on wage cutting are not contrary to public policy."

In *United States v. Hutcheson*, 312 U.S. 219, 231, 61 S.Ct. 463, 465–66, 85 L.Ed. 788 (1941), the Court noted that courts are required to consider the policies underlying the Clayton Act, the Norris–LaGuardia Act, and the Sherman Act. The Court concluded that the labor exemption applies "[s]o long as a union acts in its self-interest and does not combine with non-labor groups." *Id.* at 232, 61 S.Ct. at 466.

In *Allen Bradley Co. v. Local 3, IBEW*, 325 U.S. 797, 809, 65 S.Ct. 1533, 1539–40, 89 L.Ed. 1939 (1945), the Court held unlawful an agreement between a union and local manufacturers and contractors to prohibit the purchase of products not manufactured locally.

In *United Mine Workers v. Pennington*, 381 U.S. 657, 664, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626 (1965) the Court observed that a union could lawfully attempt to unilaterally impose the same wage rate upon all employers because the Sherman Act did not intend to restrict attempts to eliminate wage competition. The Court concluded, however, that the exemption does not apply where unions agree with non-labor entities to eliminate competitors from the market. *Id.* at 665–666, 85 S.Ct. at 1590–91.

In *Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 625, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418 (1975), the

Court concluded that the statutory labor exemption does not apply where a union imposed an agreement requiring a general contractor to subcontract only with companies that had signed agreements with the union. The Court noted, however, that the *nonstatutory* exemption reflected a labor policy favoring labor organization "to eliminate competition over wages and working conditions." *Id.* at 622, 95 S.Ct. at 1835. The court added that it had acknowledged "that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions." *Id.*

■■■■ Based upon my review of the applicable Supreme Court cases, I conclude that the appropriate standard for analyzing the statutory exemption is that set out in *Hutcheson,* 312 U.S. at 232, 61 S.Ct. at 466. As noted above, under that test, the statutory exemption to antitrust scrutiny applies "[s]o long as a union acts in its self-interest and does not combine with non-labor groups." Plaintiffs correctly observe that this is a two-part test, and that the exemption applies only where both parts are satisfied. *See H.A. Artists & Assoc. v. Actors' Equity Ass'n,* 451 U.S. 704, 715, 101 S.Ct. 2102, 2109, 68 L.Ed.2d 558 (1981). The record submitted in support of and opposition to the parties' cross-motions for summary judgment leaves no doubt that the OJTP has been established and maintained to further the union's legitimate self interest. From that record, it is clear that the union members were losing work to non-union workers in the electrical field during the early 1980s, and that the OJTP was designed to allow union workers to obtain more work by enabling union contractors to compete with non-union contractors more effectively. It is likewise clear that this attempt to strengthen the position of organized workers is consistent with the public policy reflected in the statutory exemption.

That the second part of the *Hutcheson* test is satisfied here is perhaps less obvious. A thorough review of the record, however, establishes that, in carrying out the OJTP, the union does not "combine" with non-labor groups, the members of Oregon NECA, in the manner proscribed in *Hutcheson.* The

parties vigorously dispute the proper characterization of the OJTP. It can fairly be described, however, not as a wage subsidy, but as a negotiated wage concession which Local 48 and the members of Oregon NECA agree will be available in particular instances. Under this program, union workers contribute 3.5% of their wages to a fund that can then be used to reduce the amount that union contractors must pay in wages to union workers on specific projects. Under the OJTP, unions are not "combining" with non-labor groups in ways Courts have condemned as outside the statutory labor exemption: They are not agreeing with union contractors to limit who can bid on given projects, or on any other terms or conditions applicable to the provision of services. Instead, stated simply, the union workers in question have agreed to work for less than the hourly rates negotiated in the collective bargaining agreement. Any collective bargaining agreement between Local 48 and union contractors generally lowering wages paid to union workers would clearly allow union contractors to compete more effectively with non-union contractors. Any such agreement clearly would not, simply because it was the product of an agreement, be considered a "combination" outside the scope of the statutory exemption. The fact that the OJTP allows union contractors to incur lower labor costs on *particular* targeted jobs does not alter the analysis or remove that activity from the statutory labor exemption.

■■■■ Though the OJTP is clearly the primary issue in this action, as noted above, plaintiffs also cite "threats" to general contractors who engage nonunion subcontractors, agreements with owners and developers to use only union labor on projects, and agreements with Taft–Hartley Trusts to invest funds in projects on the condition that nonunion contractors be excluded. In opposing defendants' motion for summary judgment on the basis of the labor exemption, plaintiffs assert that legitimate union activity does not include "acts of secondary pressure and/or threats, even if undertaken to achieve a legitimate end." Plaintiffs have not produced sufficient evidence to support their position, and defendants are entitled to sum-

mary judgment on these assertions as well. A trier of fact could not reasonably conclude that the employer defendants participated in the activities alleged. Under the Norris–LaGuardia Act and Section 20 of the Clayton Act, unions are allowed to engage in peaceful secondary activity without violating antitrust laws. Plaintiffs have not shown evidence that defendants engaged in secondary activity that was not protected or entered into unlawful combinations with plaintiffs' competitors.

### 2. *Non-statutory exemption*

■ In addition to the statutory exemption enacted by Congress, courts have recognized a non-statutory labor exemption to antitrust laws that might otherwise proscribe certain labor activities. In *Connell Co. v. Plumbers & Steamfitters,* 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975), the court noted that this exemption

> has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws.

In *Continental Maritime of San Francisco v. Pacific Coast Metal Trades Dist. Council,* 817 F.2d 1391, 1393 (9th Cir.1987), the Ninth Circuit noted that neither this circuit nor the Supreme Court has "enunciated a general rule" for determining if a particular activity is covered by the non-statutory exemption. The *Continental* court noted that the non-statutory exemption is "based on the recognition that national labor policy should sometimes override antitrust policy," and cited with approval the analytical standards applied to that exemption in *Mackey v. National Football League,* 543 F.2d 606, 612 (8th

Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). *Id.* The *Mackey* court concluded that parties to an employment agreement that restrains trade are exempt from antitrust liability only if: (1) the restraint on trade primarily affects only the parties; (2) the agreement concerns a mandatory subject of collective bargaining; and (3) the agreement results from bona fide arm's-length bargaining. *Mackey,* 543 F.2d at 614 (citations omitted).

As discussed above, I conclude that defendants are entitled to summary judgment on the basis of the statutory exemption because the union has acted in its legitimate self interest, and because it has not "combined" with union contractors in the manner in which that term is applied to these claims. Even if the statutory exemption did not apply, defendants would be entitled to summary judgment because their activities at issue here satisfy the *Mackey* test. The first part of the test is satisfied because the activities at issue do not restrain trade: the OJTP is available on a nondiscriminatory basis to any contractor who signs a labor agreement with Local 48. There is no evidence that the union contractors who take advantage of the program either share bidding information, or fail to otherwise vigorously compete with each other for the projects. The record also establishes that nonunion contractors are allowed to compete on, and frequently secure, targeted projects.[3] It likewise supports the conclusion that the wage reduction granted union contractors on targeted projects is often insufficient to account for the failure of nonunion contractors to secure contracts on certain of the projects on which they bid.[4] Rather than restrain trade, by making union labor more competitive, it appears that the OJTP encourages more vigorous competition between union and nonunion contractors.

The second prong of the non-statutory exemption test is satisfied because wages are a mandatory subject of bargaining. *See, e.g., United Mine Workers v. Pennington,* 381

---

**3.** From the record submitted, it appears that between 1986 and January 1993, union contractors have obtained contracts on 3911 of 7213 projects on which job-targeting funds have been available.

**4.** Plaintiffs New Tech and Phoenix have produced bid files or bid quotes for 86 of the 282 jobs they assert they have lost because of the OJTP. It appears that the job targeting wage concession was a determining factor in awarding 12 of these 86 contracts.

U.S. 657, 664, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626 (1965) (Wages are at the heart of issues about which employers and unions must bargain).

Finally, though I conclude that the OJTP is not the result of a "combination" within the meaning of the statutory labor exemption, the record supports only the conclusion that it is the result of collective bargaining between Local 48 and the union contractors. Based on the voluminous record submitted, a reasonable trier of fact could only conclude that the program was negotiated by the union and union contractors as an alternative to an across-the-board reduction of wages. The agreement authorizing the program, which allows union contractors to pay lower wage rates than otherwise specified in the collective bargaining agreement on a job-by-job basis, was signed by bargaining parties in April 1986.[5]

Application of the non-statutory exemption here is consistent with the underlying rationale for that exemption. Courts have recognized that organization of labor will inevitably have some effect on price competition, but that the goals of federal labor law could not be achieved if merely affecting business competition were a basis for invoking antitrust laws. The job targeting program at issue here indisputably affects competition between union and nonunion contractors. That is not a sufficient basis for applying antitrust laws to the program, however, and defendants' motion for summary judgment on the basis of the non-statutory exemption should be granted.

### B. *Antitrust Claims*

My conclusion that defendants are entitled to summary judgment based on the labor exemption from antitrust liability makes it unnecessary to address defendants' contention that the antitrust claims must fail on other grounds. However, to have a complete record as to the issues in dispute, I will briefly analyze the merits of plaintiffs' antitrust claims.

### 1. *Claim 1: Sherman Act Section 1 Claim*

Section 1 of the Sherman Act, 15 U.S.C. § 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade...." Plaintiffs allege that defendants have violated this section by pricing their services at predatory levels. They allege that defendant union contractors' low bids are explicable only as "an intention to create entry barriers and to discipline or eliminate competition from non-union firms and thereby enhance the long-term ability of members of Oregon NECA to raise prices above competitive levels."

Courts have long recognized that, because restraint is "the very essence of contract," Section 1 would, if read literally, render the entire body of private contract law illegal. *See National Soc'y of Professional Eng'r v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637 (1978), citing *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Therefore, in evaluating restraints imposed by contracts or agreements, two complimentary categories of antitrust analysis have been developed. *Id.* 435 U.S. at 692, 98 S.Ct. at 1365–66. The first category includes agreements "whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal per se.'" *Id.* The second category covers agreements "whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Id.* Under this second prong of analysis, commonly referred to as the "rule of reason," "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Syl-*

---

5. Plaintiffs contend that the OJTP was not established through collective bargaining. Though I find that the record does not support that contention, a contrary conclusion should not alter the disposition of defendants' motion for summary judgment based on the non-statutory exemption.

The Ninth Circuit has applied the non-statutory exemption to agreements between unions and employers that are not the result of collective bargaining. *See Richards v. Neilsen Freight Lines*, 810 F.2d 898, 905 (9th Cir.1987).

*vania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

As noted in the two Findings and Recommendations filed earlier in this action, this case must be analyzed under the rule of reason. This rule requires that a claimant alleging a violation of Section 1 of the Sherman Act initially establish: (1) an agreement among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition. *Les Shockley Racing v. National Hot Rod Ass'n,* 884 F.2d 504, 507 (9th Cir.1989). This requirement of an injury to competition is consistent with the frequent observation that antitrust laws were enacted "for the protection of *competition,* not *competitors. . . ." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977), citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

This is a highly unusual antitrust case. Predatory pricing, a generally ill-defined term, has been described as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). Allegations of predatory pricing are often supported by analysis of a producer's average total and variable costs. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1031–32 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) (Predatory pricing occurs when a competitor sets low prices in order to drive out competition so that it can later charge monopoly prices and reap monopoly profits.).

This traditional pricing analysis serves poorly in the present action. Normally, one engaging in predatory pricing sells products at an artificially low level, sacrificing short-term profits for the long-term gains that might accrue if competitors are driven from, and then kept out of, the market. Here, we must begin an analysis of pricing by asking whose prices are relevant. The job targeting fund used to help union contractors obtain particular projects is funded by individual union members, who contribute 3.5% of their wages to the fund. What is the "cost" of labor to the laborers selling their services? As long as union workers charge more than minimum wage, which is the legal minimum at which labor can be sold, it is difficult to argue that laborers are selling their services below any generally recognized economic measure of costs. Union contractors taking advantage of the wage concessions on targeted projects do not, unless they choose to reduce the price of their services and materials in other ways, sacrifice any profit by reducing their bids to reflect lower labor costs. In that these competitors give up nothing in order to submit lower prices reflecting lower labor costs on targeted prices, it is hardly fair to speak of union contractors as pricing their services in a predatory manner. The union members themselves give up nothing more than the 3.5% of their wages that they have contributed on other work in order to fund the wage reduction on targeted jobs. An agreement under which union members negotiated an across-the-board wage decrease of 3.5% with union contractors clearly would offend no antitrust statutes. That the 3.5% reduction is accumulated and targeted to particular projects likewise does not appear to run afoul of antitrust provisions as a predatory pricing scheme.

Plaintiffs' peculiar predatory pricing allegations reflect the unusual nature of this action. Plaintiffs allege that the bids of Oregon NECA members

> are not merely low enough to meet non-union competition, but are at levels that, absent the subsidy, forego short run profit maximization, would frequently be below the total cost and, in selective cases, below the variable cost of the bidding members of Oregon NECA. At such levels, such bids are explicable only by an intention to create entry barriers and to discipline or eliminate competition from non-union firms and thereby enhance the long-term ability of members of Oregon NECA to raise prices above competitive levels. Such subsidized bid prices are well below those necessary for members of Oregon NECA to sell their services, are frequently well

below cost, and are predatory. An agreement among competitors to charge predatory prices for the purpose of excluding lower cost and more efficient competitors from the market is a violation of [antitrust laws]. . . .

I find it significant that plaintiffs assert that the bids must be analyzed "absent the subsidy." It appears that, in fact, any analysis of the bids submitted by union contractors without taking into account the wage concession available on targeted jobs would be meaningless. Any analysis of what costs would be if they were in fact different appears to be hopelessly abstract: if the bidders' costs were different, it is fair to assume only that their bids would also be different. Labor costs the union contractors whatever per-hour rate union employers are required to pay for labor on a given project. If these employers pay $15 per hour instead of $20, pretending that the labor actually costs $20 appears to be engaging in an insupportable fiction.

From this discussion, it is obvious that I seriously doubt whether traditional antitrust pricing analysis applies at all in this action. However, I will attempt to examine this action under traditional predatory pricing analysis. In doing so, I am guided by the cases cited above, and by the Supreme Court's recent decision in *Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, ——. U.S. ——, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Though the *Brook* Court considered a predatory pricing claim under Section 2 of the Sherman Act and price discrimination under the Robinson–Patman Act, several of its observations apply equally to the Section 1 claim at issue here. First, the *Brook* Court observed that only sales below cost should suffice to establish predatory pricing. *Id.* —— U.S. at ——, 113 S.Ct. at 2588. The Court based this conclusion on its observation that

As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to

control without courting intolerable risks of chilling legitimate price-cutting.

*Id.*

The *Brook* Court also noted that a competitor may be liable based upon low prices only if there is "a demonstration that the competitor has a reasonable prospect . . . of recouping its investment in below-cost prices. . . ." *Id.* The Court added that

If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed. In certain circumstances—for example, where the market is highly diffuse and competitive, or where new entry is easy . . . summary disposition of the case is appropriate.

*Id.* at ——, 113 S.Ct. at 2589.

Finally, as to analyzing the possibility that a predatory pricing scheme might succeed, the Court observed that those selling at predatory prices may recovery their losses only where below-cost pricing can

driv[e] [competitors] from the market, or . . . caus[e] them to raise their prices to supracompetitive levels within a disciplined oligopoly. . . . The inquiry is whether, given the aggregate losses caused by the below-cost pricing, the intended target would likely succumb.

*Id.*

Based on the guidance of *Brook Group* and the cases cited above, I conclude that a reasonable trier of fact could not find in plaintiffs' favor on the predatory pricing claim based on the record submitted. First, plaintiffs have not produced evidence from which a trier of fact could conclude that defendants are selling their services, identified either as the labor of union electricians, or the projects completed by the union contractors, below any reasonable measure of costs.

Further, defendants have submitted evidence establishing that the market for commercial/industrial contracting services is both "diffuse and competitive." The record demonstrates that more than 300 electrical contractors, less than one-third of which have signed agreements including job targeting

provisions, now bid regularly on commercial industrial projects in the Portland area.

The record further establishes that non-union contractors frequently are awarded contracts on targeted jobs, and that union contractors compete vigorously among themselves as well for targeted jobs. Given the wide range of bids received on some projects, it is apparent that both union and non-union contractors have significantly different (or at least calculate differently) costs other than labor. In addition, the record supports only the conclusion that barriers to entry in the relevant market are low.

Finally, defendants are entitled to summary judgment on the Section 1 claim because plaintiffs have not produced evidence from which a trier of fact could conclude that not just competitors, but competition, is harmed by the practices of which they complain. *See, e.g., Les Shockley Racing*, 884 F.2d at 507.

2. *Claim 2: Sherman Section 2 Claim*

Section 2 of the Sherman Act, 15 U.S.C. § 2, proscribes monopolization, attempted monopolization, and conspiracies to monopolize. Plaintiffs allege that defendants violated this Section by conspiring to monopolize the market for commercial/industrial electrical construction business in the Portland metropolitan area.

Defendants contend that they are entitled to summary judgment on this claim because plaintiffs' claim is based upon a theory of "shared monopoly" rejected by the Ninth Circuit, and because they cannot establish that defendants had a "specific intent to monopolize" the relevant market. I agree.

(a) *"Shared Monopoly" Issue*

In *Harkins Amusement Enterprises, Inc. v. General Cinema Corp.*, 850 F.2d 477, 490 (9th Cir.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989), the Ninth Circuit expressed serious reservations concerning the viability of a "shared monopoly" claim asserted under Section 2 of the Sherman Act. The *Harkins* court noted that Professors Areeda and Turner "admit that 'no case has held the § 2 monopolization provision applicable to shared monopoly,'" *id.* (citation omitted), and that "[o]ne court

directly addressing the issue stated bluntly, 'an oligopoly, or a shared monopoly, does not in itself violate § 2 of the Sherman Act.'" *Id.*, citing *Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.*, 535 F.Supp. 225, 228–29 (S.D.N.Y.1982). The *Harkins* court concluded that, though it was not required to decide whether a shared monopoly might ever violate Section 2, in the case before it, "involving a small market with numerous sellers, no claim is stated under section 2." *Harkins*, 850 F.2d at 490.

Under the guidance of *Harkins*, I conclude that plaintiffs have not shown evidence from which a trier of fact could find for them on the Section 2 claim. In *Harkins*, the court characterized nine distributors as "numerous sellers," and a market consisting of Phoenix, Arizona, and its suburbs as small. Here, the record submitted shows that there are nearly 100 union contractors in the Portland metropolitan area. In the present action, with many more alleged participants in an alleged monopoly, the reasoning of *Harkins* requires the conclusion that plaintiffs' Section 2 claim must fail.

Plaintiffs contend that *Harkins* is inapposite because, while that action concerned a "shared monopoly," the present action concerns "a conspiracy to monopolize case with an *identified potential monopolist*—ONECA." They also assert that, if Section 2 requires that a single defendant possess the requisite market power, ONECA qualifies as the monopolist.

These arguments fail for two reasons. First, as noted above, Section 2 proscribes monopolization, attempted monopolization, and conspiracies to monopolize. If a monopolization does not offend that section because it is shared, liability cannot logically be premised on an attempt to create such a monopoly. Perhaps it is useful to think about the issue like this: Suppose Congress enacted a law making it illegal to import or to conspire to import ponies. If that law were interpreted as allowing the importation of horses, it could hardly be interpreted as proscribing conspiracies to import them.

Second, plaintiffs' contention that Oregon NECA satisfies any requirement of a single

monopolist under Section 2 also fails. Oregon NECA is merely an association of contractors.[6] As a multi-employer bargaining agent, it negotiates collective bargaining agreements with the electrical union, and provides management and administrative services related to those agreements. It does not bid on, or perform, electrical contracting work. It does not distribute projects among its members, or share bidding information among its members. Nothing in the complaint or the record submitted suggests that Oregon NECA can in any way be considered a "competitor." There is likewise no suggestion that any one or small group of the contractors who belong to Oregon NECA have or could obtain monopoly power. As mentioned previously, nothing in the record suggests that the members of Oregon NECA do not compete vigorously among themselves.

### (b) *Specific Intent to Monopolize*

My conclusion that defendants' motion for summary judgment on the Section 2 claim should be granted for other reasons makes it unnecessary to reach the question whether summary judgment is appropriate on the grounds that plaintiffs have not shown evidence from which a trier of fact could conclude that defendants specifically intended their elimination. I will nevertheless briefly address the issue.

Though *Eichman v. Fotomat Corp.*, 880 F.2d 149, 162 (9th Cir.1989) raises the issue whether all defendants must have a specific intent to monopolize in order to incur liability under Section 2, Ninth Circuit decisions have frequently cited the specific intent requirement. *See, e.g., Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1174 (9th Cir.1988).

Having thoroughly reviewed the record, I conclude that plaintiff has not shown evidence allowing the conclusion that defendants specifically intended to monopolize the relevant market. At the outset, I note that it is union members who contribute the funds needed to fund the OJTP, and a union, Local 48, that has negotiated the agreements making those funds available to Oregon NECA members. Unions have a legitimate, statutorily permissible objective, the organization of the work force: organization of the entire work force in any particular area by legitimate means would offend no law or federally-recognized public policy.

The record does show that some non-union contractors have joined Oregon NECA.[7] The record likewise shows that the leadership of Local 48 has promoted the OJTP as a means of organizing non-union contractors. The record also supports the conclusion that the OJTP has allowed members of Oregon NECA to compete more effectively with non-union contractors.[8] This evidence is not, however, sufficient to establish defendants' specific intent to monopolize the market. The record submitted would not support the conclusion that non-union contractors have been forced out of business by the OJTP: Plaintiffs have identified no non-union contractors who have been forced out of work by the program. So long as their actions are otherwise lawful, a union is permitted to attempt to organize all workers in a given area of employment. That is a long-recognized right reflected in the statutes cited in the discussion of the statutory labor exemption. As to the union contractors, even the elimination of a number of non-union contractors does not result in monopolization. The union contractors continue to compete among themselves, including any formerly non-union contractors who choose to join Oregon NECA. The record would not support the conclusion that, through the use of the OJTP

---

**6.** Plaintiffs' reliance on *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) is misplaced. The Associated Press, unlike Oregon NECA, actually sold a product.

**7.** Tigard Electric, formerly the lead plaintiff in this action, has subsequently joined Oregon NECA and has signed a bargaining agreement with Local 48.

**8.** The record also supports the conclusion that some non-union contractors, including plaintiffs Phoenix Electric and New Tech Electric, are financially robust and in no danger of imminent demise.

and other practices complained of here, any particular Oregon NECA member intends to monopolize the relevant market. In the absence of such evidence, I conclude that plaintiffs cannot show a specific intent to monopolize within the meaning of Section 2.

### C. *National NECA's Motion for Summary Judgment on Other Grounds*

National NECA contends that, even if it were not entitled to summary judgment on the grounds discussed above, it is entitled to summary judgment on other grounds. It contends that plaintiffs have not produced evidence from which a trier of fact could conclude that it acted as National NECA's agent with respect to the OJTP, or that National NECA played an "active role" in the alleged predatory pricing and monopolization conspiracy. Because I have concluded that National NECA is entitled to summary judgment for the reasons discussed above, I need not reach this issue. In order to make this record complete, however, I note my conclusion that National NECA is not entitled to summary judgment on these alternative grounds. The record submitted demonstrates that material issues of fact remain concerning questions of agency and the extent to which National NECA might otherwise share responsibility for the policies at issue.

### III. *Plaintiff ABC's Motion for Summary Judgment on Claim 2*

Obviously, from my recommendation that defendants' motion for summary judgment on this claim be granted, I have concluded that plaintiffs are not entitled to summary judgment on this claim.

### CONCLUSION

I recommend DENYING plaintiff ABC's motion for summary judgment on the second claim (# 169).

I recommend GRANTING plaintiff ABC's motion for summary judgment on defendant National NECA's counterclaims (# 174).

I recommend GRANTING defendant National NECA's motion for summary judgment on plaintiffs' claims (# 177).

I recommend GRANTING defendant Oregon NECA's and defendant IBEW 48's motion for summary judgment on plaintiffs' claims (# 182).

DATED this 24 day of February, 1994.

**A.T. KEARNEY, INC., Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation, Defendant.**

**Civ. No. 92–1536–HA.**

United States District Court,
D. Oregon.

Aug. 9, 1994.

Douglas G. Houser, John A. Bennett, John P. Ashworth, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, for plaintiff.

Michael H. Simon, Nancy E. Martin, Robert L. Aldisert, Perkins Coie, Portland, OR, for defendant.

## OPINION

HAGGERTY, Judge:

This is an action for negligence, negligent misrepresentation, contribution, and indemnity by A.T. Kearney, Inc. (ATK), a consulting firm, against International Business Machines (IBM). Plaintiff seeks to recover $13.25 million from defendant, which is the amount ATK paid to Fred Meyer ("FM") to settle a prior lawsuit brought by FM against ATK. Both parties seek summary judgment. For the following reasons, defendant's motion for summary judgment is granted.

## BACKGROUND

In 1989 FM retained ATK, an international management and information technology consulting firm, to provide professional transition management services. Plaintiff provided consulting services to FM from 1989 through mid-1991. These services included developing an "MIS" [Management Information System] Plan designed to provide enhanced computer processing power in FM

stores. This MIS Plan was also called an "architecture."

Plaintiff and FM solicited information regarding improving FM's system from several computer vendors, including defendant. In May 1989 IBM proposed using an IBM mainframe computer at the FM headquarters. This was rejected, and in October 1989 plaintiff recommended that FM use the "distributed MIS architecture," that did not use a mainframe computer.

Fred Meyer approved of and agreed to this proposal. In late 1989 and early 1990, FM purchased 100 AS/400 computers from IBM under an extensive written agreement between FM and IBM.

It is undisputed that plaintiff's new architecture presented a massive change in the way FM could conduct business, and that the architecture was soon deemed a failure. By mid-1991 FM had returned to a more traditional, "centralized" business structure. An IBM mainframe computer was installed at FM headquarters, and FM's relationship with plaintiff was terminated.

In September 1991, FM sued plaintiff for breach of contract, professional negligence, breach of fiduciary duty, and negligent misrepresentation. In October 1992, FM amended its complaint against ATK, increasing the damages sought from $14 million to $110 million. Plaintiff then filed this indemnity suit against IBM in state court in Oregon.

In December 1992 ATK settled its suit with FM by agreeing to pay FM $13.25 million. Plaintiff did not acknowledge fault or liability. While ATK was settling with FM, IBM petitioned to remove Kearney's suit against IBM to federal court. Defendant has now moved for summary judgment.

STANDARDS

 Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477

U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

 The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *Id.* at 631. Inferences drawn from facts are viewed in the light most favorable to the nonmoving party. *Id.* at 630–31.

DISCUSSION

Plaintiff presents three sets of claims: (1) negligence and negligent misrepresentation; (2) contribution; and (3) indemnity. These are addressed in turn below.

1. *ATK'S NEGLIGENCE CLAIMS*

Defendant grounds its motion against ATK's negligence claims on a December 1992 decision from the Oregon Supreme Court recognizing that negligence claims for the recovery of economic losses "must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to prevent foreseeable harm." *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 159, 843 P.2d 890 (1992).

This decision acknowledges that economic losses might be recoverable in some cases on a claim for negligent misrepresentation, but emphasizes that in such cases "the concept of duty as a limiting principle takes on a greater importance than it does with regard to the recovery of damages for personal injury or property damage." *Id.* The court in *Onita* chose not to specifically identify the types of relationships—besides a traditional fiduciary relationship—that could give rise to negligent misrepresentation liability, but did clearly exclude relationships founded upon

"arm's length transactions." *Id.* at 163, 843 P.2d 890.

Plaintiff acknowledges that *Onita* requires that a "special relationship" must exist before economic losses are recoverable under a theory of negligent misrepresentation. *See* Plaintiff's Brief in Opposition at 18 ("At bottom, the evidence demonstrates that IBM had the requisite special relationship with Kearney and Fred Meyer such that IBM owed a duty 'to exercise reasonable care to avoid misrepresenting facts.' *Onita,* 315 Or. at 165, 843 P.2d 890.").

Accordingly, ruling on defendant's motion for summary judgment on the negligence claims requires first determining whether the existence of a "special relationship" is an issue of law for the court to decide.

### A. *Is the Existence of a Special Relationship a Question of Law?*

■ At oral argument on the summary judgment motion, both parties acknowledged that the court in *Onita* established a case-by-case approach to determining the existence of a special relationship. *See Onita,* 315 Or. at 159, 843 P.2d 890 ("rather than adopting a black letter 'rule,' we opt to develop the scope of the duty and the scope of recovery on a case-by-case basis....").

Plaintiff asserted that the court should either (1) find as a matter of law that a special relationship existed, or (2) leave the question for a jury to decide. Defendant contended that the recognition of a special relationship is based upon finding that duties were owed between parties. The Oregon Supreme Court has held that " 'duty' by definition appears as a legal issue and, if disputed, is decided by the court." *Fazzolari v. Portland School Dist. No. 1J,* 303 Or. 1, 4, 734 P.2d 1326 (1987).

Plaintiff points to no dispute between the parties that would require a factfinder's determination before the question of whether a special relationship existed could be answered. Defendant has accepted plaintiff's factual corrections and assertions regarding the case, for the purposes of this motion. This leaves only the interpretation of those factual assertions to determine the issue of whether a special relationship existed between the parties. This court concludes that this presents a question of law left to the court. In the absence of disputed material facts in the case, this court proceeds to determine whether a relationship sufficient to give rise to liability for negligent misrepresentation existed between ATK, IBM, and/or FM.

### B. *Was there a special relationship between plaintiff and defendant?*

■ There is little to support a conclusion that IBM shared a special relationship with plaintiff sufficient to give rise to liability for negligent misrepresentation under *Onita.* There was no contract existing between the two, and IBM received no compensation from ATK. Instead, defendant served as a vendor in supplying computers to FM that fulfilled ATK's proposal to FM.

Plaintiff argues that a special relationship had developed between IBM and FM because IBM had served as computer vendor to FM for over seven years. Plaintiff asserts that IBM "expanded" its relationship with FM and encompassed plaintiff in a "special, non-adversarial relationship" in September 1989. Plaintiff's Concise Statement of Facts at Para. 18. Plaintiff suggests that as a computer vendor for an information system, IBM made implicit and explicit commitments to support and advance the equipment the vendor sells, so that IBM's obligations to FM in assisting the implementation of the new system went beyond the parties' sales contracts.

Essentially, plaintiff contends that IBM's reputation for enhancing its sales with close cooperation with the buyer in implementing the merchandise should raise the relationships between IBM, plaintiff and FM to the "special" level required in *Onita.* Plaintiff emphasizes that IBM assigned personnel to work with the FM account full-time, and frequently referred to its relationship with FM as a "partnership." *See* references provided in Plaintiff's Memorandum, pp. 3–7. IBM itself characterized its "over-the-years" relationship with FM as a "partnership" (from deposition of IBM executive Randi

Reeder–Kangail, Ex. 11 to Bennett Affidavit).

Moreover, Kearney offers expert testimony from Theodore Grossman, a professor at Babson College:

> In reality, in the information systems community, the user, or selecting company, looks to the commitment of the computer hardware manufacturer, and the others involved in the solution, to in essence form a partnership with the customer to successfully implement an information system solution for the customer. Only the computer hardware manufacturer has the resources and knowledge of its customer base and its products to provide resources, advice and guidance to the customer and the customers' effort to implement an information system.
>
> \* \* \* \* \* \*
>
> ... IBM has always been known in the information system industry as a company that provides added resources and added-value above and beyond the mere sale of computer hardware. It is axiomatic in the information systems industry that if a company wanted to play safe, it should purchase IBM for the support it provides to the customer.

Affidavit of Theodore Grossman, p. 5; Ex. 8 of Bennett Affidavit.[1]

Grossman's testimony and plaintiff's other arguments are insufficient to create an issue of fact regarding whether a special relationship existed. The undisputed facts are that plaintiff proposed a unique MIS Plan to FM, and FM adopted it and contracted with IBM to purchase computers according to the plan. Nothing in these facts (including IBM's overall business reputation, which is the essence of Grossman's testimony) establishes a "spe-

cial relationship" within the reasoning of *Onita.* IBM's promotional use of the term "partners" in reference to its customers fails to create either a legal partnership or a "special relationship." IBM's internal concerns regarding the appropriateness of plaintiff's MIS Plan may indicate that IBM considered a different perspective on the plan than did plaintiff, but not necessarily that (1) IBM and plaintiff had a special relationship, nor (2) that IBM was obliged to disclose all of its doubts about the proposed system. IBM's "vendor" involvement with the MIS Plan fails to rise to the level of a requisite special relationship between IBM and plaintiff.

### II. ATK'S CONTRIBUTION CLAIM

■ IBM also seeks summary judgment on plaintiff's contribution claim. Contribution in Oregon is governed by ORS 18.440(1), which states that the right of contribution exists when "two or more parties become jointly or severally liable in tort for the same injury." The statute goes on to provide that there is no right of contribution from a person who is not liable in tort to the claimant. Accordingly, IBM must first have been liable in tort to FM before ATK is entitled to contribution from IBM for ATK's settlement.

Fred Meyer's loss was economic. *Onita* requires a special relationship before there is any liability for negligence or negligent misrepresentation. Just as between IBM and ATK, there is insufficient evidence to create a question of fact regarding the existence of a special relationship between IBM and FM. IBM was not paid for consulting services to FM, and received no compensation except that which was owed because of the sale of goods. Cy Green, president of FM, testified in deposition that he believed IBM was "a

---

1. IBM has moved to strike the conclusions Grossman draws in his affidavit (that IBM had a "special, non-adversarial relationship with Kearney and FM," and a duty to work with them beyond any contractual relationship; and that computer buyers like FM "look to the commitment of the computer hardware manufacturer ... to in essence form a partnership with the customer to successfully implement an information system"). Even if these conclusions are stricken, however, other assertions that "only the computer hardware manufacturer has the re-

sources and knowledge of its customer base and its products to provide resources, advice and guidance to the customer and the customers' effort to implement an information system," and "IBM has always been known in the information system industry as a company that provides added resources and added-value above and beyond the mere sale of computer hardware" might remain admissible. The motion to strike is denied as moot; this court has considered the expert testimony in rendering its decision.

vendor selling a product" and nothing else. Simon Affidavit, Ex. 28.

Under *Onita*, an arm's-length, vendor-buyer relationship is not a "special relationship" for purposes of finding liability in negligence claims. IBM was nothing more than a seller commonly providing information incidental to its sales. FM never hired IBM or paid IBM for anything else.

In *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2nd Cir.1979), the court said that even though additional services were contemplated from computer manufacturer Honeywell, "the contract [between computer vendor and buyer] remains one for sale if those services were merely incidental or collateral to the sale of goods." *Id.* at 743. Honeywell did not bill for services prior to or after installation, and such services were recognized by the court as "indicia of a contract for a sale of goods, and not the rendition of professional services."[2]

## III. *KEARNEY'S INDEMNITY CLAIM*

Finally, IBM seeks summary judgment on Kearney's claim for indemnity. In Oregon, an indemnity claim requires the claimant to show that the claimant discharged a legal obligation to a third party, and that the defendant was also liable to the third party. *See Fulton Insurance Co. v. White Motor Corp.*, 261 Or. 206, 493 P.2d 138 (1972) (plaintiff must prove it discharged a legal obligation owed to a third party; that defendant also was liable to the third party; and that as between the plaintiff and the defendant, the obligation should have been discharged by the latter). In accordance with the reasoning above, this court concludes that ATK has failed to show that IBM was liable to FM in tort. Plaintiff also fails to come forward with any other basis for finding liability.

## CONCLUSION

For the reasons stated in this Opinion, defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment, and defendant's motion to strike are denied as moot.

**STATE OF COLORADO, Plaintiff,**

v.

**UNITED STATES of America and Shell Oil Company, Defendants.**

**No. 83–C–2386.**

United States District Court, D. Colorado.

Nov. 17, 1994.

---

**2.** Moreover, the fact that IBM happened to harbor some doubt as to the feasibility of the plan devised by its customer's consultant fails to create grounds for concluding that a special relationship existed.

Casey Shpall, Jane T. Feldman, Mary Ramsay McCormick, Office of the Atty. Gen., Denver, CO, for plaintiff.

Bradley Bridgewater, U.S. Dept. of Justice, Robert H. Foster, Denver, CO, Major Lawrence Rouse, Army Environmental Law Div., Arlington, VA, William Pharo, Asst. U.S. Atty., Denver, CO, for defendant U.S.

Ed McGrath, Linnea Brown, Holme, Roberts & Owen, Denver, CO, for Shell Oil Co.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

Plaintiff, the State of Colorado, seeks to recover from the United States and Shell Oil Company (Shell) response costs incurred from January 1, 1989 through June 30, 1992, in connection with the Rocky Mountain Arsenal (RMA) cleanup and litigation. Cost reimbursement is sought pursuant to section 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607(a). Before trial to the court commenced on October 31, 1994, the plaintiff filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56, to which the defendants filed a response in opposition. Defendants also filed a motion for partial summary judgment with respect to the date on which interest begins to accrue, to which the plaintiff responded.

The issues raised by those motions have been fully briefed. Oral argument was heard on October 31, 1994, and November 2, 1994.

Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b).

## I. *THE DATE ON WHICH INTEREST ACCRUES.*

■ Section 9607(a)(4), 42 U.S.C., provides, in relevant part:

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.

Plaintiff argues that it met the requirements of subsection (i) when it filed its complaint in December 1983. Thus, it contends that prejudgment interest began to accrue the date costs were incurred. Defendants assert that interest should accrue from August 10, 1992—the date the defendants received a demand letter from the plaintiff, seeking $4,531,340.77 for costs incurred between January 1, 1989 and April 30, 1992.

Plaintiff relies primarily on *In re Bell Petroleum Services, Inc.*, 3 F.3d 889 (5th Cir. 1993), in which the Fifth Circuit concluded that a complaint which did not specify an exact amount nonetheless constituted a written demand for payment sufficient to trigger the accrual of prejudgment interest. *Id.* at 908;[1] *see also Colorado v. Idarado Mining Co.*, 735 F.Supp. 368, 371 (D.Colo.1990). However, I am not persuaded by the authority cited. Subsection (i), 42 U.S.C. § 9607(a)(4), clearly requires a written demand for *specified* response costs. Thus, a majority of courts have concluded that the plaintiff must present the defendant a demand in the form of a dollar amount. *See, e.g., United States v. Hardage*, 750 F.Supp. 1460, 1505 (W.D.Okla.1990), *aff'd in part, rev'd in part*, 982 F.2d 1436 (10th Cir.1992);

*United States v. Northernaire Plating Co.*, 685 F.Supp. 1410, 1421 (W.D.Mich.1988).

The complaint that commenced this action in December 1983 sought "damages for injury to, destruction of and loss of natural resources," pursuant to 42 U.S.C. § 9607(f). It did not seek recovery of response costs pursuant to § 9607(a); thus, it did not demand a specified amount. The complaint was amended in 1985 and again in 1990. In those amended complaints the plaintiff did assert claims for response costs. Its prayer for relief on the response cost claims in these amended complaints read:

On the third claim for relief, the State of Colorado seeks a judgment that defendants are jointly and severally and strictly liable to the plaintiff for all response costs, including, but not limited to monitoring, investigations, treatment and disposal of contaminated soils and water including ground waters, removal and remedial action or other necessary costs of response, incurred or to be incurred by the State of Colorado, not inconsistent with the national contingency plan, together with prejudgment and post judgment interest thereon;[2]

Thus, while the amended complaints sought response costs, they did not specify any amount. Accordingly, I find and conclude that neither of them constituted a written demand for a specified amount as required by subsection (i).

■ Plaintiff next argues that it demanded payment of a specified amount in a letter dated February 7, 1989, and that interest should begin to accrue from the latter of that date or the date on which the costs were accrued. The United States agrees. Shell, however, contends that prejudgment interest for response costs incurred between January 1, 1989 and June 30, 1992 cannot begin to accrue until the defendant receives notice of the specific response costs incurred for that period. Shell's position is based upon the

---

1. The Fifth Circuit acknowledged that the statute requires a written demand for specified response costs as a prerequisite to prejudgment interest. It further held that "[n]either the notices informing Sequa that generally the EPA would look to it for potential reimbursement 'at some future time,' nor the [record of decision] satisfy [the requirement of written demand for specified re-

sponse costs.]" *In re Bell Petroleum Servs., Inc.*, 3 F.3d at 908.

2. The 1985 and 1990 amended complaints are identical in this prayer for relief with the exception of the last clause, which appears only in the 1990 amended complaint.

premise that a defendant should be able to "pay its bill" before interest begins to accrue.

The State has been seeking to recover response costs incurred at the RMA for the last ten years. Cleanup at the RMA will continue for the foreseeable future and the State likely will continue to seek recovery of response costs incurred. To protect its ability to recover prejudgment interest according to Shell's reading of the statute, the State would be required to make a series of monthly, weekly, or even daily demands for costs *already* incurred, enabling Shell and the United States to pay their "bills." [3] However, the statute does not create such a requirement, either implicitly or explicitly. It provides that before interest accrues, the costs must have been actually incurred and a written demand of a specific amount must have been made. However, the statute does not require that the costs be incurred *before* a written demand is made.

■ I conclude that the requirements of 42 U.S.C. § 9607(a)(4)(i) are satisfied when a plaintiff makes a written demand for recovery of any dollar amount. I find that the plaintiff made such a demand on the United States and Shell in its letter dated February 7, 1989. Accordingly, prejudgment interest for response costs incurred before February 7, 1989, will begin to accrue on February 7, 1989; prejudgment interest for response costs incurred after February 7, 1989 will begin to accrue on the date the costs were incurred; and the defendants' motion for partial summary judgment on the date interest begins to accrue will be denied.

## II. *DIMP–RELATED WORK.*

■ Plaintiff's claim includes costs incurred in responding to the release of diisopropyl methylphosphonate (DIMP) at the RMA. The parties have stipulated that DIMP is a "pollutant or contaminant" but not

a "hazardous substance," as those terms are defined in CERCLA, 42 U.S.C. § 9601(14) & (33). It is undisputed that there can be no recovery pursuant to 42 U.S.C. § 9607(a), for actions directed solely at pollutants and contaminants. *See, e.g., Eagle–Picher Indus. v. United States E.P.A.,* 759 F.2d 922, 932 (D.C.Cir.1985) ("Under section 107, 42 U.S.C. § 9607, the owner of a facility may be liable for cleanup of a release of a 'hazardous substance,' but not for the cleanup of a release of a 'pollutant or contaminant.'"). It is also undisputed that costs incurred from actions directed at hazardous substances are recoverable response costs. *See id.*

Plaintiff contends that it can recover costs incurred in responding to the release of DIMP for the asserted reason that once a party is found liable under § 9607(a), it is liable for all cleanup costs. Defendants concede that costs incurred from actions directed at hazardous substances are recoverable response costs even if the actions had the effect of assisting in the cleanup of pollutants and contaminants. They argue, however, that a discrete action that does not purposefully address hazardous substances does not give rise to response costs within the meaning of § 9607(a) simply because it is part of a larger cleanup program.

Section 9607(a)(4)(A) provides that a liable party is responsible for "all costs *of removal or remedial action* incurred by ... a State ... not inconsistent with the national contingency plan." (Emphasis added.) Thus, a liable party is not responsible for "all" costs, as the plaintiff asserts, but only costs "of removal or remedial action." The terms "removal" and "remedial action" are defined in 42 U.S.C. § 9601(23) and (24) as actions taken in response to the threatened or actual release of hazardous substances, to protect public health or otherwise clean up the environment.[4] The definitions clearly focus on

---

**3.** If the State were to make a single demand guessing at the total response costs for the duration of the cleanup, Shell clearly would object to paying for costs that had not yet been incurred. Because the response costs would remain reimburseable, interest would begin to accrue pursuant to subsection (ii), from the date of the expenditure concerned, once again making Shell liable for interest without first being handed a "bill."

**4.** "Removal" is defined in 42 U.S.C. § 9601(23) as:

the cleanup or removal of released *hazardous substances* from the environment, such actions as may be necessary taken [sic] in the event of the threat of release of *hazardous substances* into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of *hazardous sub-*

actions taken in relation to hazardous substances or "associated" contamination. Pollutants are not mentioned at all, nor are those contaminants not associated with hazardous substances. Thus, I conclude that the language in § 9607(a)(4)(A), when interpreted in accordance with the definitions in § 9601(23) and (24), dictates that response costs are available only when the response actions are directed at hazardous substances.[5] Accordingly, the plaintiff is not entitled to recover costs for DIMP-related work.

## III. RCRA ENFORCEMENT ACTIVITIES.

■ Plaintiff seeks costs associated with oversight of the defendants' cleanup activities and enforcement of the Colorado Hazardous Waste Management Act (CHWMA) at the RMA.[6] Defendants argue that these costs are not recoverable under 42 U.S.C. § 9607(a) because the plaintiff's purpose was to ensure compliance with state laws. Plaintiff responds that the source of regulatory authority is irrelevant to the question of recovery under § 9607(a).

Section 9607(a)(4)(A) merely requires that response costs be incurred (1) by the United States, a State or an Indian tribe, (2) in connection with a removal or remedial action, (3) that is not inconsistent with the national contingency plan. It does not require removal or remedial action pursuant to CERCLA. 42 U.S.C. § 9607(a)(4)(A), 9601(23) & (24); see also United States v. Rohm & Haas Co., 2 F.3d 1265, 1274 (3d Cir.1993) ("[N]either [section 107(a)] nor the definition of 'removal' contains CERCLA specific language.")

Defendants argue that the CHWMA and CERCLA are not co-extensive, and that the

---

stances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of this Act [42 U.S.C. § 9604(b)], and any emergency assistance which may be provided under the Disaster Relief Act of 1974.

(Emphases added.) "Remedial action" is defined in 42 U.S.C. § 9601(24) as:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of

permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

(Emphases added.)

5. Plaintiff argues that 42 U.S.C. § 9621(d) requires that the selected remedial action address the cleanup of pollutants and contaminants. However, § 9621(d) discusses only the degree of cleanup to be attained from an already selected remedial action. The general rules governing selection of a remedial action are found in § 9621(b), where it is provided that actions involving treatment that "permanently and significantly reduces the volume, toxicity or mobility of the hazardous substances, pollutants, and contaminants ... are to be preferred over remedial actions not involving such treatment." This section is not inconsistent with my holding, however, because an action that reduces hazardous substances, pollutants, and contaminants obviously is preferable to one that reduces only hazardous waste.

6. CHWMA is the State's delegated program for managing hazardous waste in lieu of the federal program under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 et seq.

plaintiff's CHWMA costs should not be recoverable because the actions were not equivalent to removal or remedial actions as defined in 42 U.S.C. § 9601(23) and (24). The Tenth Circuit has recognized, however, that "CERCLA's definition of 'removal and remedial action' is conceivably broad enough to encompass certain RCRA corrective actions." *United States v. State of Colorado*, 990 F.2d 1565, 1580 (10th Cir.1993). Further, § 9607(a) begins, "Notwithstanding any other provision or rule of law," which indicates that recovery may be available under that section despite the applicability of other laws such as the CHWMA. *See Rohm & Haas*, 2 F.3d at 1274. Accordingly, I find and conclude that if the plaintiff's actions, taken pursuant to the CHWMA, independently meet the definition of "removal" or "remedial action" under § 9601(23) and (24), the resulting costs are recoverable as response costs pursuant to § 9607(a).

Defendants argue that the plaintiff's oversight activities at the RMA, taken pursuant to the CHWMA, do not fit within the definition of removal or remedial action, and therefore do not give rise to recoverable response costs. However, § 9601(25) provides that the terms removal and remedial action "include enforcement activities related thereto." The concept of enforcement necessarily encompasses oversight activities. *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985).

The need for oversight activities to enforce removal and remedial actions is particularly acute in situations where the United States is a CERCLA defendant. If only the Environmental Protection Agency were granted oversight authority, the State would be forced to leave the interests of its people in the hands of a law enforcement agency with an inherent conflict of interest. There is no reason to believe that the United States is immune from the conflicts that arise when a liable party is responsible for enforcing its own cleanup activities. Thus, I find and conclude that the plaintiff's oversight activities may give rise to properly recoverable response costs pursuant to §§ 9607(a) and 9601(25).

Accordingly, IT IS ORDERED that:

(1) Defendants' motion for partial summary judgment on the date prejudgment interest begins to accrue is denied;

(2) Prejudgment interest for response costs incurred before February 7, 1989, will begin to accrue on February 7, 1989;

(3) Prejudgment interest for response costs incurred after February 7, 1989 will begin to accrue on the date the costs were incurred;

(4) Plaintiff is not entitled to recover costs associated with DIMP-related work;

(5) Plaintiff is entitled to recover costs for those actions taken pursuant to the CHWMA that independently meet the definitions of removal or remedial action pursuant to § 9601(23), (24), and (25);

(6) Oversight activities taken pursuant to the CHWMA may give rise to properly recoverable response costs; and

(7) The parties and their counsel are ordered to meet and confer within eleven days of this order in a good faith attempt to settle the case without further litigation, expense or delay. The parties shall report to this court in writing within fifteen days of this order, stating the results of their settlement negotiations and whether a conference before a Magistrate Judge or some other alternative dispute resolution proceeding would facilitate settlement.

Terrance P. TOWLE, Plaintiff,

v.

FLEXEL CORPORATION, Defendant.

No. 93–4167–SAC.

United States District Court,
D. Kansas.

Oct. 4, 1994.

Lee R. Barnett, Keith E. Renner, Barnett, Yockers & Renner, P.A., Wakarusa, KS, for plaintiff.

Stephen W. Cavanaugh, Fisher, Cavanaugh & Smith, P.A., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

In this diversity of citizenship action, the plaintiff, Terrance P. Towle, claims that the defendant, the Flexel Corporation, breached an express or implied contract of employment when it actually or constructively terminated him without following the procedures for a hearing found in the Flexel employee procedure manual. Towle seeks compensatory damages in the amount of $68,-392.29, representing lost wages and lost 401(k) benefits.

This case comes before the court upon Flexel's motion for summary judgment. Flexel contends that there is no evidence to demonstrate the existence of an express or implied contract of employment. Flexel contends that even if Towle can demonstrate that an employment contract existed, it did not breach that contract. In this regard, it is Flexel's position that the plaintiff was not terminated, but instead, voluntarily retired.

The plaintiff responds, arguing that Flexel breached the express or implied contract of employment when he was actually or constructively discharged. Towle denies that he voluntarily retired, but instead that he preemptively retired prior to a scheduled disciplinary meeting to avoid the "inevitable termination" that was about to occur. Towle contends that a *de facto* termination occurred prior to his retirement and that his termination breached the terms of his contract of employment with Flexel. Towle contends that he has presented sufficient facts to demonstrate that summary judgment is not appropriate.

The court, having considered the briefs of counsel[1] and the applicable law, grants the defendant's motion for summary judgment.

### Standards for Summary Judgment

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

---

1. Flexel did not file a reply brief.

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e)' . . . [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings); *see also Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences.

*Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## Uncontroverted Facts [2]

Flexel is a Georgia corporation which owns and operates a cellophane manufacturing plant at Tecumseh, Kansas. Towle began working at the Tecumseh cellophane plant on September 15, 1958, at which time the plant was owned and operated by E.I. Dupont. In 1986, Flexel acquired the Tecumseh plant and Towle continued his employment with Flexel, until August 26, 1992. In general, Towle apparently had an excellent performance record while working at the Tecumseh plant.

Towle was employed as a recycle operator for approximately twenty years and held that position on his last day of employment with Flexel. The recycle department receives waste cellophane from the other departments at the plant. In that department, the cellophane is shredded, reduced to smaller material and recycled.

In August 1992, Towle was working the 7 a.m. to 7 p.m. shift in the recycle department. On August 22, 1992, while working his normal shift, Towle removed a four by eight foot section of a wall from the building in which he was working. Towle, apparently believing that it was within the scope of his implied authority under Flexel's "honor system," took down the section of the wall without prior approval from any supervisory personnel. Towle removed the section of wall based upon his assessment that the area in which he worked was essentially inaccessible to firefighters and their equipment in the event that a fire were to occur in his work area. In Towle's opinion, removal of the wall improved the safety of his work area in the event emergency personnel and equipment were needed. Towle did not consult with anyone about his safety concerns prior to removing the wall. Towle took approximately eight hours to remove the wall.

**2.** In preparing the uncontroverted facts, the court has endeavored to summarize only those facts necessary to the court's decision.

There have been two fires in the recycle area, both of which occurred several years prior to the date in question. One fire occurred in a material bin which is located above the recycle area and the other was in a separator area which is also above the recycle area. No fires have occurred in the actual recycle area where Towle worked.

On August 23, 1992, Towle worked the 7 a.m. to 7 p.m. shift. Jim Oldham, the area supervisor, approached Towle and inquired as to why Towle had removed the wall section. Towle indicated that he removed the wall section to allow access for a fire hose. Oldham told Towle that he would mention this incident to management.

Towle was not scheduled to work until Tuesday evening, August 25, 1992, 7 p.m. On the morning of August 25, 1922, Towle was contacted by Rich Bertels who inquired about removal of the wall section. Bertels asked Towle to come to the plant for a meeting regarding the incident. Towle went to the plant and met with Bertels and Orville Ingling. At the meeting, Towle was again asked why he had removed the wall section. Towle responded that he removed the wall section to allow access for fire hoses. Towle suggested that a permanent door be installed where the wall section was removed to allow better access. At the conclusion of the meeting, Towle was advised to go home and call the plant in the morning, prior to noon, and he would be told what disciplinary action, if any, would be taken. Towle was also informed that his shift was covered the rest of the week. Towle was then accompanied to the front gate by Bertels and Ingling.

At that point, Towle was not told what type of discipline action, if any, would be taken. Towle was not told that he was going to be fired. Towle was only informed that Flexel was going to consider whether or not some form of discipline was appropriate. Based upon the fact that he had been escorted to the gate, Towle believed, however, that he was being terminated. At no point did any representative of the management of Flexel specifically tell Towle that he was fired.

According to Towle, on August 26, 1994, he called Bob Morris, a friend who was a member of management at Flexel, to inquire what action was going to be taken by the corporation regarding the dismantling of the wall. According to Towle's deposition, Morris said "[T]he decision is made. He says I can't get you out of this one. I says (sic) what should I do, and he told me I could still retire."

The deposition of Towle continues:

Q: Okay. It's your testimony that Bob Morris told you the decision had been made?

A: That's right.

Q: Did he tell you what the decision was?

A: No, not exactly. He didn't say they're going to fire you, but he said you can still retire.

Q: Did you ask him about retiring?

A: I didn't ask him. It was just he could still—(Pause)

Q: Okay. So going back to my first question, nobody who worked at Flexel told you that they were going to fire you?

A: It was my belief that they did.

Q: But nobody ever told you that they were going to terminate you?

A: No.

Deposition of Terrance P. Towle, at p. 43.

That morning, Towle proceeded to sign the forms necessary for him to retire from Flexel. Towle signed a document which included a request for actual retirement benefits. Towle then left Flexel.

On September 3, 1992, a vacation check for $940.17 was sent to Towle as payment for the remaining earned vacation. Towle cashed that check shortly thereafter. On September 29, 1992, Towle was sent a calculation of his retirement benefits effective August 26, 1992. That letter requested Towle to sign certain documents that were enclosed in order to initiate payments of his benefits. Towle never returned the retirement documents sent to him on September 29, 1992. On December 10, 1992, Towle was again requested to return the retirement documents sent to him. Towle has not responded to any of the letters.

Flexel subsequently replaced the section of the wall Towle had removed. It took a cou-

ple of mechanics a "few days" to repair the section of the wall removed by Towle.

Flexel utilizes a written three-step progressive disciplinary process at the plant. The disciplinary process provides that the first step is verbal contact with the employee regarding the problem. The second step provides that a written notice of the problem be given to the employee and placed in the employee's file. The third step is called the "problem case" which is used if acceptable performance is not obtained through the previous two steps, or for more serious infractions, or for repeat infractions. The disciplinary plan expressly provides that the first two steps do not have to be followed and that it is not necessary to take each or any of the three steps before discharging an employee.[3] In fact, the plan notes that some situations may be serious enough to merit immediate disciplinary action up to and including discharge. The disciplinary plan lists several types of conduct which will not be tolerated and which may be cause for discharge. One type of conduct that fell within that category was the theft or wilful abuse of company property. In Flexel's opinion, Towle's removal of the wall section constituted wilful abuse of company property.

Towle subsequently attempted to regain his position with Flexel. Flexel had already filled Towle's position and did not accept Towle's application for employment.

### Analysis [4]

As a precursor to recovery for breach of a contract of employment, the plaintiff must demonstrate that he was either actually or constructively terminated. Based upon the facts presented, Towle has failed to demonstrate that he was actually or constructively discharged.

■ Towle has not presented sufficient facts upon which a rational factfinder could conclude that he was actually terminated by Flexel when he was escorted to the front gate. While termination may have been a possible sanction to be imposed by Flexel, the evidence presented by the plaintiff merely demonstrates that termination was at most the likely event to occur. While the plaintiff is correct in his observation that there are no "magic words" required to prove that he was terminated by Flexel, the plaintiff's prognostication of events he believed likely to occur is simply insufficient to demonstrate that he was in fact terminated.

■ As for the plaintiff's constructive discharge claim, the plaintiff has not directed the court's attention to any case law directly supportive of his claim. The cases cited by both parties generally involve constructive discharge claims arising out of federal civil rights and discrimination statutes such as the ADEA or Title VII, *see, e.g., Vega,* 3 F.3d at 480–481; *Mitchell v. Mobil Oil Corp.,* 896 F.2d 463 (10th Cir.), *cert. denied,* 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990); *Irving v. Dubuque Packing Co.,* 689 F.2d 170 (10th Cir.1982). The determination of whether an employee is constructively discharged in such settings turns on the issue of " 'whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person would feel compelled to resign.' " *Mitchell,* 896 F.2d at 468 (quoting *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986)). *See Cockrell v. Boise Cascade Corp.,* 781 F.2d 173, 177 (10th Cir.1986) (" '[A] constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit.' ") (quoting *Irving,* 689 F.2d at 172). "The test is whether a reasonable man would view the working conditions as intolerable and would feel compelled to resign." *Cockrell,* 781 F.2d at 177; *see Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3rd Cir. 1993) (" 'We employ an objective test in de-

---

**3.** It is Flexel's position that the three-step process was never utilized and no decision regarding discipline was ever made because Towle retired on August 26, 1992. Towle argues that the three step process was not utilized because the decision to terminate Flexel had already been made.

**4.** The briefs of the parties appear to drift into discussions of topics essentially irrelevant to this case. The court will not endeavor to address all of the arguments advanced by the parties, but instead, only consider those issues necessary to decide this case.

termining whether an employee is constructively discharged from employment: whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." ' ") (quoting *Gray v. New York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir.1992) (quoting *Goss v. Exxon Office Systems, Co.*, 747 F.2d 885, 887–88 (3d Cir. 1984)), *cert. denied*, —— U.S. ——, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993)).

In its independent research of this issue, the court located only one case [5] discussing whether Kansas would recognize a cause of action for breach of an employment contract due to constructive discharge. In *Leopoldstadt, Inc. v. Kuti*, No. 91–2419–GTV, 1992 WL 396330, *5, 1992 U.S.Dist. LEXIS 20170, *17 (D.Kan. Dec. 22, 1992), the court concluded that "Kansas would recognize a cause of action for breach of an employment contract due to constructive discharge." The court concluded that genuine issues of material fact existed precluded summary judgment.

■ In the case at bar, assuming that Kansas would recognize a cause of action for breach of an employment contract due to constructive discharge, Towle has failed to present sufficient facts upon which a rational factfinder could conclude that he was constructively discharged. Viewed in the light most favorable to Towle, his decision to retire was not the product of an intolerable set of circumstances created by the defendant, but was instead the product of his own, albeit perhaps improvident, decision to retire. *See Long v. City of Kansas City*, No. 93–2073–EEO, 1994 U.S.Dist. LEXIS 9147 (D.Kan. June 30, 1994) (plaintiff does not demonstrate that he was subjected to intolerable working conditions). The plaintiff's apparent angst or concern associated with facing Flex-

el's management on August 26, 1994, or any decision they might render is not evidence to support a claim of constructive discharge. Nor does Towle's apparent unfounded concern that he might lose his retirement if he did not resign buttress his breach of contract claim.

■ The plaintiff has not demonstrated either factually or legally that he was constructively discharged. The ambiguous information provided to the plaintiff by his friend in management, Morris, was apparently not provided to the plaintiff at Flexel's request, but was provided to Towle upon his own inquiry. In any event, assuming that a contract of employment existed, there is essentially no evidence that Flexel breached that agreement. Any failure by Flexel to rigidly adhere to its disciplinary guidelines [6] was simply due to Towle's own actions.

In short, the plaintiff has not demonstrated that he was terminated, actually or constructively, by the defendant, and/or that the defendant breached any term of the alleged contract of employment. Based upon the facts and arguments presented, Flexel is entitled to summary judgment.

IT IS THEREFORE ORDERED that Flexel, Inc.'s motion for summary judgment (Dk. 24) is granted.

---

**5.** In *Hanke v. Phillipsburg Coop. Assn.*, No. 65,-917, 1992 Kan.App. LEXIS 53 (Kan.Ct.App. Feb. 14, 1992), an unpublished decision, the Kansas Court of Appeals appears to have assumed that Kansas would under certain circumstances recognize a cause of action for breach of an employment contract by constructive discharge. However, in that case, the Kansas Court of Appeals affirmed the district court's grant of directed verdict in favor of the defendant on that claim, agreeing that there was no evidence to demonstrate that the plaintiff was forced to retire in violation of an express contract of employment.

**6.** In this regard, the court simply notes that "under Kansas law, personnel rules which are not bargained for cannot alone be the basis for an express or implied contract of employment, since they are merely the unilateral expression of the employer's policy." *Copple v. City of Concordia, Kan.*, 814 F.Supp. 1529, 1536 (D.Kan.1993).

Pamella A. HENRY, Plaintiff,

v.

The GEHL CORPORATION, and
Mike Duryea, Defendants.

No. 93–4168–SAC.

United States District Court,
D. Kansas.

Oct. 19, 1994.

K. Gary Sebelius, Catherine A. Walter, Wright, Henson, Somers, Sebelius, Clark & Baker, Topeka, KS, for plaintiff.

Carol B. Bonebrake, Cosgrove, Webb & Oman, Topeka, KS, Daphne E. Jones, Tripp, Scott, Conklin & Smith, Fort Lauderdale, FL, Cleo G. Murphy, Murphy & Freund, Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the motions for summary judgment (Dks. 84, 89) filed by the defendant The Gehl Corporation ("Gehl") and the defendant Mike Duryea. The plaintiff brings this employment discrimination action under Title VII, 42 U.S.C. § 2000e, as amended by 42 U.S.C. § 1981a. Her claims are (1) disparate treatment in terms and conditions of employment, (2) hostile work environment, and (3) discriminatory termination on the basis of sex and in retaliation for protesting sexual harassment at work. Both defendants seek summary judgment on all claims arguing the plaintiff is unable to present a prima facie case of disparate treatment, hostile work environment, and retaliatory termination. The defendant Gehl also denies liability for Duryea's actions under the plaintiff's hostile work environment claim. The court denies the defendants' motions on the following analysis.

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case." *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The court views the evidence and draws any possible inferences in the light most favorable to the non-moving party. *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1117 (10th Cir.1991). A summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

The plaintiff, Pamella Henry, had worked as a telemarketer and had heard from Scott Clark, a telemarketer with Gehl, that the Gehl office in Topeka was a "good phone room." Based on that information, Pamella applied for a job with Gehl. The defendant, Michael Duryea, was the Topeka office manager for Gehl. He hired the plaintiff on December 12, 1991, and terminated her approximately six weeks later. The plaintiff filed a charge with the Kansas Human Rights Commission in February of 1992 alleging discrimination on the basis of sex and retaliation.

### Disparate Treatment in the Terms and Conditions

During the hiring interview, Duryea told the plaintiff it was his general rule not to hire women but that Scott Clark had highly recommended her. On other occasions, Duryea had explained that women generally didn't "work out" as they lacked a "strong voice" and could not bring in "the kind of money" needed. The plaintiff alleges that throughout her six weeks of employment Duryea did not treat her the same as the male telemarketers on the critical issues of attendance and production. In the pretrial order, the plaintiff specifically alleges that Duryea unfairly reprimanded her on January 21, 1992, and told her the reprimand was because "women don't work out."

■ It is an unlawful employment practice for an employer to discriminate against an employee with respect to terms and conditions of employment because of the employee's sex. 42 U.S.C. § 2000e–2(a). When the claim is disparate treatment on the basis of sex, the plaintiff must prove the defendant acted with a discriminatory motive or intent. *Sorensen v. City of Aurora*, 984 F.2d 349, 351 (10th Cir.1993). Absent the unusual instance where there is direct evidence of the employer's discriminatory intent, the Title VII plaintiff may turn to the burden of proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Under the *McDonnell Douglas* three-step scheme, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of sexual discrimination. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 415 (1993). If proved, a prima facie case gives rise to a presumption of discrimination and shifts the burden of production to the defendant to rebut the presumption. *St. Mary's*, —— U.S. at ——, 113 S.Ct. at 2747, 125 L.Ed.2d at 416. In short, it becomes the defendant's burden to produce evidence that the challenged actions were taken for a legitimate, nondiscriminatory reason. *Id.* To carry this burden, the defendant " 'must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094).

■ If the defendant carries the burden of production, then the presumption drops from the case. *St. Mary's*, —— U.S. at ——, 113 S.Ct. at 2747, 125 L.Ed.2d at 416. The plaintiff retains the ultimate burden of persuading the factfinder of intentional discrimination. *Id.* To prevail, the plaintiff must directly prove the employer acted on a discriminatory motive or indirectly prove the employer's reasons were a pretext for discrimination, that is, the stated reasons were false and discrimination was the real reason. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d at 1417; see *St. Mary's*, —— U.S. at ——, 113 S.Ct. at 2752, 125 L.Ed.2d at 422. "Although a prima facie case combined with disproof of the employer's explanation does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer intentional discrimination, and thus preclude summary judgment for the employer." *Durham v. Xerox Corp.*, 18 F.3d 836, 840 (10th Cir. 1994) (citations omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994).

■ To establish a prima facie case of employment discrimination in the terms, conditions or privileges of employment, the

plaintiff must show that similarly situated male employees were treated differently. *Torre v. Federated Mut. Ins. Co.,* 854 F.Supp. 790, 804 (D.Kan.1994); *see Sorensen v. City of Aurora,* 984 F.2d at 352–53. The defendants argue the plaintiff is unable to show she was subjected to standards or treatment any different from those imposed on male co-workers. According to the defendants, the plaintiff was paid the same hourly wage, was required to meet the same production quota, and was subjected to the same disciplinary measures and motivational techniques used on all the Topeka sales staff. As for the unfair reprimand on January 21, 1992, the plaintiff testified that Duryea yelled at everybody for low production and put everyone on part-time employment, but that she was the only employee to whom Duryea specifically discussed other reasons for the part-time employment. In her deposition, the plaintiff admits that she, not Duryea, initiated the conversation between them about the part-time employment reprimand. The defendants contend the plaintiff complains not about receiving unequal treatment but about not receiving preferential treatment.

In response, the plaintiff points to the fact that most of the sales staff was put on part-time but that her personnel file is the only one having a formal written reprimand regarding this event. Melanie Bearden, Duryea's secretary, testified that Duryea prepared this reprimand after he terminated the plaintiff. The plaintiff complains that Duryea abruptly terminated her while on part-time status without giving her at least a week to meet the goal. There was a male employee with production totals lower than the plaintiff who was not terminated or even counseled. The plaintiff further notes that her file shows she was counseled for absences when her attendance was better than other male employees.

■ In reply, the defendant Gehl argues that the male employees to whom the plaintiff compares herself were either working under different circumstances or receiving similar disciplinary treatment. Though Gehl's arguments seem facially meritorious in many respects, the court will not consider

them. The defendant Gehl filed a forty-page reply brief. The court's scheduling order (Dk. 11) and pretrial order (Dk. 90) provide that "[r]eply memoranda shall not exceed 20 pages." Gehl did not file a motion for leave to submit a memorandum in excess of the court's page limitation. Gehl's apparent disregard for the page limitations requires an appropriate sanction. The court shall not consider any part of Gehl's reply brief or the materials attached thereto.

■ It is essential to any disparate treatment claim that the plaintiff prove the comparables are similarly situated. *Torre v. Federated Mut. Ins. Co.,* 854 F.Supp. at 804. The plaintiff's proof must address all relevant aspects of similarity:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated *in all respects.* Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992) (citations omitted) (quoted in *Magruder v. Runyon,* 844 F.Supp. 696, 702 (D.Kan.1994)).

■ The plaintiff's arguments and proof seem to gloss over what may be circumstances that differentiate some of the male employees from her. Even so, the production and attendance records show there were similarly situated male employees who were not as severely reprimanded and were given more chances at improving. In addition, Duryea's attitude about women having a difficult time being telemarketers raises the inference that he looked for the plaintiff to fail and, therefore, was quick to reprimand her on any perceived problem with production or attendance. Viewed in the light most favorable to the plaintiff, the evidence creates genuine issues of material fact.

### Hostile Work Environment

In the pretrial order, the plaintiff alleges she was continually subjected to unwelcomed and offensive remarks, jokes and attention from Duryea. Duryea's comments were directed at her body and the way she dressed. He told demeaning sexual jokes. He belittled her as being hired only for her looks. He stared at her and stood in doorways requiring her to brush against him. The plaintiff alleges these offensive actions and words occurred with such regularity that they interfered with her work performance and created a hostile work environment.

■ "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2404–05, 2406, 91 L.Ed.2d 49 (1986)). The Supreme Court said this standard is the middle ground between one that makes merely offensive conduct actionable and a standard that requires a psychological injury.[1] *Id.* — U.S. at —, 114 S.Ct. at 370, 126 L.Ed.2d at 301. A "mere utterance of an ... epithet which engenders offensive feelings in a employee," *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405, does not impact a condition of employment and, therefore, does not implicate Title VII. *Harris,* — U.S. at —, 114 S.Ct. at 370–71, 126 L.Ed.2d at 302. On the other hand, Title VII becomes an issue before the employee suffers a nervous breakdown. *Id.*

■ To recover on this claim, the plaintiff must prove the work environment would reasonably be perceived, and was perceived by her, as hostile or abusive. *Id.* The Supreme Court put it this way:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no Title VII violation.

— U.S. at —, 114 S.Ct. at 370, 126 L.Ed.2d at 302. In short, a hostile work environment claim includes elements of both subjective and objective harm to the employee. *Spain v. Gallegos,* 26 F.3d 439, 447 (3rd Cir.1994).

■ When is a work environment "hostile" or "abusive" is a case-by-case determination guided by no sharply defined rules. *Harris,* — U.S. at —, 114 S.Ct. at 370–71, 126 L.Ed.2d at 302. Circumstances to consider in each case include:

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

at —, 114 S.Ct. at 369, 126 L.Ed.2d at 302–03. An environment that is discriminatorily abusive "often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris,* at —, 114 S.Ct. at 371, 126 L.Ed.2d at 302. These tangible effects are not a precondition to Title VII liability; it is enough to prove the harassing conduct was so severe or pervasive as to create an abusive work environment.[2]

---

**1.** The defendant Duryea in his original and reply briefs argues the plaintiff did not come forth with sufficient facts to show "that the work environment was sufficiently severe and persistent to affect the psychological well-being of employees." (Dk. 89 at 2 and Dk. 92 at 3) (Citing *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982)). The Supreme Court in *Harris* plainly rejected the standard found in *Henson* that an employee must show psychological harm to recover on a hostile environment claim.

**2.** Justice Ginsburg elaborated on this point in her concurrence. A trier of fact should focus on whether the harassment interfered with work performance. Nonetheless, the employee is not

■ Applying the above to the present case, the court finds that the plaintiff has come forth with sufficient evidence of a sexually abusive or hostile work environment to defeat the defendants' motions for summary judgment. The plaintiff's evidence shows that Duryea daily engaged in sexual banter, made sexual innuendos about her, told crude sexual jokes, embarrassed her with comments about her body and clothes, and stood so the plaintiff was forced to brush against him. The record supports some of the following specific instances. At the office Christmas party, Duryea told the group that he had been waiting for the plaintiff's loose fitting sweater to fall the rest of the way down from her shoulder and that he hired her only for her looks. When the plaintiff had chicken pox, Duryea asked the plaintiff every day where she had broken out and volunteered to check for spots where she could not see. He daily made a point of smelling the plaintiff's perfume and trying to guess what she was wearing. Duryea often times would make a sexual joke about the name of the perfume. He told the plaintiff not to wear things that covered her up. In front of the sales group, Duryea announced that his supervisor was scheduled to visit and then asked the plaintiff to wear a dress that would take his boss's mind off of business. Duryea referred to one of the plaintiff's dresses as her "do me" dress. One day when sales were slow, Duryea came in and instructed the plaintiff to stand up front and let the male telemarketers look at her awhile and "maybe that will get them excited" and sales would improve. On another occasion, Duryea told the men to keep up the sales so they could watch the plaintiff walk while she retrieved the verification slips and recorded them. Duryea's managerial style was intimidating and aggressive with him often screaming and yelling at the sales staff to improve. Duryea sometimes worked while under the influence of alcohol, and employees noticed that Duryea was particularly difficult at those times.

One night after work, some of the office went to a bar for drinks. At the bar, Duryea twice put his hand on the plaintiff's thigh. She immediately removed his hand both times and moved away from him. Afraid that she was still angry enough to say something to Duryea that could lead to her firing, the plaintiff called in sick the next day.

The plaintiff says that Duryea's comments and conduct made her uncomfortable, often embarrassed her, and interfered with her work. She tried to avoid and ignore Duryea and even to discourage his attention. This put the plaintiff in the most difficult position of slighting the very person with the authority to fire her at will. The plaintiff eventually complained to Duryea about his harassment and was fired immediately. The evidence shows the plaintiff perceived the work environment as abusive.

The defendant argues the court should disregard those incidents of harassment which the plaintiff failed to allege specifically in her administrative charge. This entails a credibility determination inappropriate in summary judgment proceedings. The circumstances here match those present in cases finding actionable harassment: physical touching, continuous and patently offensive sexual comments and propositions directed at the plaintiff, harassment furthered by the implicit use of supervisory power over the victim, and hostile and demeaning behavior. *See Schindler v. Larry's IGA, Inc.*, No. 92–1033–PFK, 1994 WL 324563 at *8, 1994 U.S.Dist. LEXIS 9100 at *24 (D.Kan. June 16, 1994); *see, e.g., Martin v. Nannie and the Newborns, Inc.*, 3 F.3d at 1412–13, 1418–19. Whether's Duryea's harassment " 'was sufficiently severe and pervasive is quintessentially a question of fact.' " *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir.1994) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir.1990 (en banc))). Indeed, this case is more than relatively isolated instances of innocuous sexual

---

required to prove that the harassment caused lower productivity only that it made the job more difficult to perform. —— U.S. at ——, 114 S.Ct. at 372, 126 L.Ed.2d at 304 (Ginsburg, J., concurring) (citing *Davis v. Monsanto Chemical Co.*, 858

F.2d 345, 349 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989)); *see Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1455 (7th Cir.1994).

teasing and more than an offensive utterance. The plaintiff has come forth with sufficient evidence and deserves the opportunity to prove that Duryea's harassment altered the terms and conditions of her employment. The court denies summary judgment on this claim.

### Retaliatory Discharge

■ The plaintiff claims she was discharged in retaliation for complaining about Duryea's sexual harassment. In support of her claim, the plaintiff submits evidence showing the following facts. The plaintiff and several co-workers, including the defendant Duryea, went out for drinks after work on Friday, January 24, 1992. Twice that evening, Duryea put his hand on the plaintiff's thigh. The plaintiff considered his advances unwelcomed, removed his hand, and moved from where she was sitting. The plaintiff called in sick the next day afraid of what she might say to Duryea about the prior evening. On Monday, the plaintiff worked two hours when Duryea called her into his office. According to the plaintiff, Duryea told her in the privacy of his office that her dress was lovely, that it complemented her legs, and that he really liked a dress which she had worn the previous week. At that point, the plaintiff said she did not appreciate his comments on her body or how her clothes looked on her, his dirty jokes, or his touching of her last Friday night. The plaintiff added that she believed his conduct constituted sexual harassment and asked Duryea to stop. Duryea responded that he did not need this and fired her.

■ Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, the plaintiff must prove: "(1) she engaged in a protected opposition to discrimination or participation in a proceeding arising out of the discrimination, (2) adverse action by the employer subsequent to the protected activity, and (3) a causal connection between the employee's activity and the adverse action." *Griffith v. State of Colo., Div. of Youth Services,* 17 F.3d 1323, 1331 (10th Cir.1994) (citation omitted). The plaintiff need prove only a reasonable good faith belief that there was discrimination. *Mitchell v. Visser* 529 F.Supp. 1034, 1044 (D.Kan.1981). An informal complaint to management qualifies as protected activity. *Phelps v. Sears Roebuck and Co.,* No. 90–4133, 1993 WL 523202 at *5, 1993 U.S.App. LEXIS 33587 at *14 (10th Cir. Dec. 15, 1993); *see Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2nd Cir. 1990).

Gehl and Duryea assert the plaintiff was terminated for poor attendance and production and not in retaliation. The defendants argue that the records showing the plaintiff's poor performance and the reasons for her discharge stand uncontroverted. The defendants are wrong. The plaintiff offers evidence that only after Duryea fired the plaintiff did he prepare and insert into the plaintiff's personnel file most of the negative comments about her performance and attendance. Duryea's secretary testified that Duryea even forged the plaintiff's signature on an employee reprimand prepared after the plaintiff's termination. To say the least, this is suspicious conduct. During the plaintiff's brief employment with Gehl, most of the staff failed to meet the daily sales goal. Duryea testified that December and January are two of the most difficult months for sales. Besides this, the plaintiff's account of what happened when she was fired is enough evidence on which a reasonable trier of fact could find that Duryea acted on a retaliatory motive. This claim withstands the defendants' summary judgment challenge.

### Gehl's Liability on Hostile Work Environment Claim

■ Finally, Gehl argues it is not liable for Duryea's harassment under established agency law principles. According to Gehl, Duryea's alleged conduct was unauthorized and unreported. Gehl denies receiving any complaints from the plaintiff or any other employees concerning sexual harassment by Duryea. Gehl refers to its "Non–Harassment Policy" and "Problem–Solving Procedure" found in its employee handbook. The plaintiff maintains Gehl is liable, because Du-

ryea was her supervisor with the ultimate authority to hire and fire her.

Title VII prohibits only "an employer" from engaging in unlawful employment practices. 42 U.S.C. § 2000e–2(a). "Employer" is defined to include an "agent" of any person who has fifteen or more employees and conducts a business that affects commerce. 42 U.S.C. § 2000e(b). The Supreme Court has read that definition as evincing congressional "intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408. While passing on the opportunity to establish definitive limits, the Court referred to agency principles for guidance in determining employer liability. *Id.* The Court did offer at least two boundaries by rejecting the proposition "that employers are always automatically liable for sexual harassment by their supervisors" and by recognizing that "absence of notice to employer does not necessarily insulate that employer from liability." *Id.*

The Tenth Circuit has followed the Supreme Court's advice and relied on agency principles, Restatement (Second) of Agency § 219, as providing three alternative bases for holding an employer liable for an agent's hostile work environment sexual harassment: (1) § 219(1)—employer liable for tort committed by employee acting within scope of employment; (2) § 219(2)(b)—employer liable for negligence or recklessness in failing to remedy or prevent a hostile work environment; and (3) § 219(2)(d)—employer liable when employee relied upon apparent authority or was aided in accomplishing the harassment by the agency relationship. *Griffith v. State of Colo., Div. of Youth Services,* 17 F.3d at 1330; *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 576–79 (10th Cir.

1990); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1417–18 (10th Cir.1987).

The plaintiff does not separately address these agency principles preferring instead to rely exclusively on the holding in *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993). The plaintiff there had worked as a secretary to the county attorney and sued the county attorney and the county for sexual harassment. The Tenth Circuit held:

> We agree with the Fourth Circuit that "[a]n individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing, or conditions of employment." *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989), *aff'd in pertinent part,* 900 F.2d 27 (4th Cir.1990) (en banc). In such a situation, the individual operates as the alter ego of the employer is liable for the unlawful employment practices of the individual without regard to whether the employer knew of the individual's conduct. *See* 29 C.F.R. 1604.11(c). (footnote omitted).
>
> In this case, defendant Cannon is a paradigm example of a supervisor with significant control over plaintiff's hiring, firing, or conditions of employment. The parties agree that, as county attorney, Cannon had the ultimate authority over her employment and working conditions. Consequently, plaintiff's claim of a hostile work environment caused by Cannon's conduct is a claim against Salt Lake County itself, and no knowledge or recklessness on the part of the County must be demonstrated.

1 F.3d at 1125. The court agrees with the plaintiff that *Sauers* [3] is on all fours. Duryea had the ultimate authority to hire and fire the plaintiff. He exercised significant control over the plaintiff's conditions of employment. There is a factual and legal basis for imposing liability on Gehl for Duryea's harassment.

**3.** *Sauers* is one in a line of cases recognizing an employer's direct liability for harassment by a supervisor with direct and significant control over the victim. *See, e.g., Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1559–60 (11th Cir. 1987); *Campbell v. Kansas State University,* 780 F.Supp. 755, 764 (D.Kan.1991). Such a rule is consistent with the EEOC's guidelines, 29 C.F.R. § 1604.11(c) making a supervisory employee an agent. This rule is really nothing more than a

liberal reading of the apparent authority agency principles. *Hastings v. Hancock,* 842 F.Supp. 1315, 1320 (D.Kan.1993); *see, e.g., Karibian v. Columbia University,* 14 F.3d 773, 780 (2nd Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994), and *Dutt v. Delaware State College,* 854 F.Supp. 276, 280–81 (D.Del.1994); *cf. Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 108–10 (3rd Cir.1994).

Alternatively, the court believes there are genuine issues of material fact regarding the third basis of liability stated in *Hirschfeld*. Section 219(2)(d) of the Restatement (Second) of Agency recognizes a master is liable for a servant acting outside the scope of delegated authority if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship." The Tenth Circuit in *Hirschfeld* quoted with approval from the district court's opinion: " 'Section 219(2)(d) properly imputes an employee's actions to the employer whose delegation of authority empowered the agent to undertake them.' " 916 F.2d at 579. That the agency relationship or the employment provided proximity to the plaintiff is not enough. *Id.* Unlike *Hirschfeld*, the supervisor here relied on his supervisory position for much more than providing him access to the plaintiff. Duryea had the express authority to determine the plaintiff's duties, to comment on the plaintiff's attire, to inquire into her health, and to hire and fire her. In the apparent exercise of that authority, Duryea directed the plaintiff to stand up and motivate her male co-workers, Duryea explicitly commented on how plaintiff's dress complimented certain parts of her body, and Duryea asked about where the plaintiff had spots from the chicken pox. In essence, Duryea capitalized on his authority over the plaintiff to create an intimidating and sexually-charged atmosphere in which the plaintiff realized the almost certain termination facing her if she challenged his offensive conduct.[4] Based on the foregoing facts and analysis, the court believes there are genuine issues of material fact as to Gehl's liability for Duryea's conduct.

IT IS THEREFORE ORDERED that the summary judgment motions of the defendant Gehl (Dk. 84) and the defendant Duryea (Dk. 89) are denied.

**UNITED STATES of America, Plaintiff,**

v.

**Etta May HOLVECK, and Ronald Joe Frazier, Defendants.**

**No. 94–40037–01/02–SAC.**

United States District Court, D. Kansas.

Oct. 24, 1994.

---

**4.** Gehl's employee handbook required the plaintiff to take her complaints first to her supervisor, Duryea. The handbook provides no alternative method of reporting an employee's complaints when the supervisor is the alleged harasser.

Marilyn M. Trubey, David J. Phillips, Office of Federal Public Defender, Kansas City, KS, for Etta May Holveck.

Joseph D. Johnson, Joseph D. Johnson, Chtd., Topeka, KS, for Ronald Joe Frazier.

James E. Flory, Office of U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

The defendants are charged with one count of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371 with reference to 18 U.S.C. § 1958 and one count of soliciting another to commit a felony having as an element physical force in violation of 18 U.S.C. § 373 with reference to 18 U.S.C. § 1958. The defendant Ronald Joe Frazier has filed the following pretrial motions: motion to join co-defendant's motions (Dk. 33); motion for discovery (Dk. 36); and motion to dismiss indictment for outrageous government conduct (Dk. 37). The defendant Etta May Holveck has filed the following motions: motion to dismiss count two on the ground of multiplicity (Dk. 39); motion for 404(b) disclosure (Dk. 40); motion to compel discovery concerning informant (Dk. 41); motion to join motions of co-defendant (Dk. 42) and motion to dismiss indictment for lack of federal jurisdiction (Dk. 43). Having heard oral argument on October 21, 1994, the court is ready to decide the defendants' pretrial motions.

### Motions to Join Co-defendant's motions (Dks. 33 and 42)

It is the court's practice to grant such motions on the following conditions. *See, e.g., United States v. Ridley,* 814 F.Supp. 992, 995 (D.Kan.1993). Unless argued in the motion to join, the joining defendant will not be allowed to raise any new, additional or different arguments other than those found

in the moving defendant's motion and memorandum. "In other words, any issues of prejudice, standing, fairness, need or other factors unique to the party seeking to join shall be made in the written motion to join or the court will consider them to have been waived." *Id.* The court grants both motions to join on these same conditions.

**Motion for Discovery (Dk. 36)**

The defendant Frazier makes a broad request for all documents or other evidence of communications between the Marysville Police Department, the Marysville County Attorney's office, the Kansas Bureau of Investigation, any other state governmental agency, and any federal governmental agency. Frazier does not describe the substance or nature of the communications which he seeks. Frazier grounds his requests on Rule 16 of the Federal Rules of Criminal Procedure which means he seeks documents that are material to his preparation of a defense, that the government intends to use in its case in chief, or that were obtained from or belong to the defendant. The government opposes Frazier's motion arguing it violates this court's guideline I.B. and asks for documents that are not discoverable.

█ Frazier admits in his written motion that he made no informal request of the government for these documents. This is the second time that Frazier has filed a discovery motion without complying with this court's guidelines. The court summarily denied the first motion on September 20, 1994. Two weeks later, Frazier filed the instant discovery motion offering the imminent pretrial motion deadline as his excuse for not consulting the government first. Frazier's excuse is untenable. On September 6, 1994, the magistrate judge imposed the pretrial motion deadline of September 20, 1994. On

Frazier's motion, this court extended that deadline to October 4, 1994. Frazier has had a reasonable time to consult the government about this discovery request before filing his motion. Finally, the purpose of the court's guidelines is to limit discovery motions to those presenting a genuine dispute. That purpose is thwarted when a motion like Frazier's is filed. Frazier's motion violates guideline I.B. and is summarily denied on that ground.

**Motion to Dismiss for Outrageous Conduct (Dk. 37)**

█ Frazier paints a picture of innocuous joking first misinterpreted by his nephew and then transformed into criminal conduct through the excessive involvement and zeal of the police. From his reading of the state trial transcript, Frazier extracts the following facts.[1] On September 8, 1994, he and Holveck were painting a house in Marysville, Kansas, and Frazier's nephew, Mike, was helping them. They were having a good time laughing and joking during this project. At some point, Holveck "jokingly" asked Mike if he would shoot out the tires of the car belonging to her former husband, James Prokop. Holveck apparently explained that she would benefit from Prokop's retirement plan if Prokop was retired, disabled or deceased. Their conversation about this subject lasted approximately ten minutes.[2]

At the end of the day, Mike had a few beers and went home to his wife, Brenda. Mike told Brenda about his day including Holveck's offer to shoot Prokop's car tires. Believing Holveck's offer was not a joke, Brenda called the police who asked that Mike contact them. After speaking with Mike, the police believed the situation was not a joke

---

1. Motions to dismiss for outrageous government conduct generally cannot be decided unless the parties stipulate to the facts or until the evidence at trial is closed. Frazier apparently believes his motion can be decided pretrial from the state trial transcript. Frazier, however, did not furnish the court with a copy of the state trial transcript with his motion. The government disputes the facts as presented by Frazier in his brief and at oral argument. In order to have some context for discussing the relevant law, the

court accepts the facts as Frazier has represented them in his written memorandum.

2. At the hearing, Frazier's counsel offered a different impression of this conversation. He argued the only thing said was defendant Holveck's general comment that she wished "someone" would shoot out the tires on Prokop's car. He saw this comment as expressing only an intent to cause property damage.

and requested the Kansas Bureau of Investigation's ("KBI's") involvement.

Special Agent Brandau met with Mike and created a cover in which Brandau and Mike would be former acquaintances and Mike would introduce Brandau as an available hit man. On the afternoon of September 9, 1994, Mike made a recorded call to Frazier's residence saying he was in Junction City visiting an old friend. Mike explained that his friend was willing to get rid of Holveck's former husband. Frazier discussed his understanding of Holveck's terms as $6,000 to the hit man after Prokop "kicks the bucket." Frazier told his nephew to call back in an hour as Holveck was taking a nap. Approximately an hour later, Mike called again and spoke to both Frazier and Holveck this time. It was agreed that Mike would bring Brandau to Frazier's residence within the next hour and a half.

When Brandau and Mike arrived, small talk was exchanged and Frazier admitted during the conversation that he was an alcoholic. Frazier was drinking when they arrived and continued drinking while they were present. At some point, Brandau said that he understood Holveck wanted Prokop killed, and Frazier agreed that was Holveck's wish. Holveck then provided some documents regarding the retirement plan and offered to pay Brandau $7,000 of the money she received from Prokop's retirement plan. Holveck asked Brandau how he would kill Prokop. Brandau proposed a staged burglary instead of shooting the tires on Prokop's car. Holveck then provided Brandau with Prokop's address in Nebraska and a map. After leaving, Brandau prepared search and arrest warrants which were later executed.

■ The concept of outrageous conduct was first recognized by dictum in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973): "[W]e may some day be presented with a situation in which the conduct of law enforce-

ment agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Harris,* 997 F.2d 812, 815 (10th Cir.1993). Most circuits, including the Tenth, recognize outrageous government conduct as a viable defense. *United States v. Mosley,* 965 F.2d 906, 909 (10th Cir.1992). The burden is with the defendant to prove this defense. *United States v. Pedraza,* 27 F.3d 1515, 1521 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994).

Neither the Supreme Court nor the Tenth Circuit have reversed a conviction on this defense with one possible exception. *United States v. Diggs,* 8 F.3d 1520, 1523 (10th Cir. 1993) (citing *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (reversed conviction when government did not dispute inducing the defendant and failed to adduce evidence supporting the jury's verdict that the defendant was predisposed)); *see United States v. Harris,* 997 F.2d at 816 (only two circuit court decisions and a handful of district court decisions have set aside convictions or dismissed charges because of outrageous government conduct). The outrageous government conduct defense "is an extraordinary defense reserved for only the most egregious circumstances. It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating. Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense." *United States v. Mosley,* 965 F.2d at 910; *see United States v. Clonts,* 966 F.2d 1366, 1369 (10th Cir.1992) (the defense "has been severely limited").[3]

■ To be so outrageous as to bar a prosecution, the government's conduct must offend "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. As opposed to the defense of

---

3. In setting such a difficult standard for this defense, courts have accounted for the danger of giving courts the power to "veto" law enforcement practices. *Russell,* 411 U.S. at 435, 93 S.Ct. at 1644. In *Mosley,* the Tenth Circuit recognized that law enforcement is afforded ample

discretion in devising methods to fight crime and that one accepted method is for government agents to assume the role of criminals in infiltrating criminal enterprises and apprehending the criminals. 965 F.2d at 910.

entrapment that looks at the defendant's state of mind, the defense of outrageous conduct focuses on the government's actions with respect to the charged offense. *Diggs,* 8 F.3d at 1525. This defense is resolved only after an inquiry into the totality of the circumstances of the particular case. *Mosley,* 965 F.2d at 910. Though not exclusive, two factors commonly present when this defense has been successful are government creation of the crime and substantial coercion. 965 F.2d at 911.

### A. Creation of the Crime

■■■■■ "Generally, the government may not manufacture a crime from whole cloth and then prosecute a defendant for becoming ensnared in the government's scheme." *Harris,* 997 F.2d at 816. The government is excessively involved when it " 'engineer[s] and direct[s] the criminal enterprise from start to finish.' " *Pedraza,* 27 F.3d at 1521 (quoting *Mosley,* 965 F.2d at 911). On the other hand, it is not outrageous when the government infiltrates an ongoing criminal scheme, induces a defendant to expand prior criminal activity, or provides supplies or expertise for illegal activity. *Mosley,* 965 F.2d at 911–12.

■■■ Frazier argues the government overreached in creating a crime from a mere joke. The court will assume for now that Holveck and Frazier were just joking when they first offered Mike $7,000 to shoot out Prokop's tires. Still, the criminal design of committing such a crime originated with the defendants; it was not implanted by the government. *See United States v. Pardue,* 983 F.2d 843, 847–48 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 3043, 125 L.Ed.2d 728 (1993). The defendants had considered not only a possible means for committing the crime but the financial benefit to them. When the undercover agent working with the Frazier's nephew, Mike, approached the defendants, the government simply provided the defendants with the expertise to accomplish their criminal scheme. The defendants had three opportunities, the two phone calls and subsequent personal visit, to tell Mike and Brandau to forget it as they were only joking. Instead, the defendants agreed to

meet with Mike and Brandau and then to hire Brandau to murder Prokop. Holveck set the terms of payment and asked Brandau to explain his plans for killing Prokop. Holveck aided Brandau by providing Prokop's address and a map. On these facts, the court cannot say that the government created or manufactured the crime.

### B. Coercion

■■■ This factor looks at the government's means and efforts at influencing or inducing the defendant to commit the crime. Examples of sufficient affirmative coercion are physical force, incarceration, and large financial inducements. *Mosley,* 965 F.2d at 912. "[C]oercion of any type must be particularly egregious before it will sustain an outrageous conduct defense." *Id.*

■■■ The two phone calls to the defendants and the conversations that transpired during them do not even approach coercive conduct. Neither Mike nor Brandau said or did anything that was intimidating, threatening, or coercive. Frazier argues the government knew of his drinking problem and exploited his intoxicated state. There is nothing to suggest that the government knowingly preyed upon Frazier's drinking problem or that Frazier's will was overborne by the government's efforts. Finally, the court finds nothing outrageous in the government agent acting as a friend of Frazier's nephew. " '[G]overnment agents may employ appropriate artifice and deception in their investigation.' " *Mosley,* 965 F.2d at 912 (quoting *United States v. Biswell,* 700 F.2d 1310, 1314 (10th Cir.1983)); *see United States v. Pardue,* 983 F.2d 835, 841–42 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 3043, 125 L.Ed.2d 728 (1993). None of the acts as argued by the defendant Frazier constitute coercion sufficient to establish outrageous conduct.

### Motion to Dismiss Count Two As Multiplicitous (Dk. 39)

The defendant Holveck contends that the solicitation offense in count two charges the same criminal act as the conspiracy offense in count one and that the government would

prove every element to the solicitation charge upon proving the conspiracy charge. Indeed, Holveck considers the solicitation count to be nothing more than an overt act charged in the conspiracy count. The government disputes the similarity of elements and argues it must separately prove for the solicitation charge that the defendants solicited, commanded, induced or persuaded another person to engage in felony conduct.

■■■ " 'Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior.' " *United States v. Fleming,* 19 F.3d 1325, 1330 (10th Cir.1994) (quoting *United States v. Dashney,* 937 F.2d 532, 540 n. 7 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991)), *cert. denied,* —— U.S. ——, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994). Though not a fatal error for an indictment, multiplicity presents the danger of multiple sentences for one offense and the improper impression to the jury that the defendant committed more than one crime. *United States v. Jackson,* 850 F.Supp. 1481, 1497 (D.Kan.1994). The test for deciding whether someone may be prosecuted simultaneously for violations of two different statutes involving the same conduct is not the same as the standard for deciding whether someone can be convicted and punished under the two different statutes. *Ball v. United States,* 470 U.S. 856, 859–61, 105 S.Ct. 1668, 1670–72, 84 L.Ed.2d 740 (1985); *United States v. Parra,* 2 F.3d 1058, 1071 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993). As to the former standard, the issue is whether the statutory language and legislative history show the two statutes were intended to operate and to be applied independently. *Ball,* 470 U.S. at 860, 105 S.Ct. at 1671. As to the latter standard, the issue is whether Congress intended someone to be convicted and punished for two offenses for having committed the same conduct. *Ball,* 470 U.S. at 861, 105 S.Ct. at 1671.

■■■ The defendant Holveck erroneously relies on the latter standard in arguing for the pretrial dismissal of count two. The court finds no basis for concluding that Congress intended an interdependent relationship between the conspiracy statute, 18 U.S.C. § 371, and the solicitation statute,[4] 18 U.S.C. § 373. Absent some evidence that the two statutes were not to be applied independently, the court is without cause to limit the government's broad discretion in selecting the charges on which a case is brought. *Ball,* 470 U.S. at 859–60, 105 S.Ct. at 1670–71.

■■■ Since the issue has been raised, the court will decide on the facts as now argued whether the defendant may be convicted and sentenced for both conspiracy and solicitation on the same criminal behavior. This too involves a quest to determine congressional intent. Since neither the statues nor the legislative history disclose congressional intent, the court must resort to the "rule of statutory construction" found in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See United States v. Morehead,* 959 F.2d 1489, 1506 (10th Cir. 1992). The Supreme Court enunciated the rule as follows:

[W]here the same act or transaction constitutes a violation of the two distinct statuto-

4. Section 373 was enacted as part of the Comprehensive Crime Control Act of 1984. It proscribes the offense of solicitation to commit a federal crime of violence. The legislative history to § 373 does not show that Congress intended it to be charged only when a conspiracy is not charged. "[A] person who makes a serious effort to induce another person to commit a crime of violence is a clearly dangerous person and ... his act deserves criminal sanctions whether or not the crime of violence is actually committed. The principal purpose of the new section is to allow law enforcement officials to intervene at an early stage where there has been a clear demonstration of an individual's criminal intent and danger to society." S.Rep. No. 98–225, 98th Cong., 2d Sess. 308 (1984), *reprinted in,* 1984 U.S.C.C.A.N. 3182, 3487. Indeed, Congress may have intended for the solicitation statute to bring within its scope some of the conduct already proscribed by the conspiracy statute. *United States v. Buckalew,* 859 F.2d 1052, 1054 (1st Cir.1988) (quoted Senate Report No. 97–307, 97th Cong., 1st Sess. 179 as saying "that the 'principal reason' for the statute is 'to cover the situation where a person makes a serious effort to induce another to engage in conduct constituting a crime but is unsuccessful in doing so' and that 'if the solicitee agrees to engage in criminal conduct and an overt act is performed to effect an objective of the agreement, the solicitor would be guilty of conspiracy.' ").

ry provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 184. In short, the same criminal act may constitute separate offenses if each requires proof of some fact not required in proving the other.

■■■ The charging language in counts one and two reveal they are based on the same conduct: the defendants' arrangement to murder James Prokop. Count one charges the defendants with conspiring to violate 18 U.S.C. § 1958, using interstate commerce facilities in the commission of murder-for-hire. There are five elements which must be established for a conspiracy conviction under 18 U.S.C. § 371: (1) an agreement, (2) to break the law, (3) an overt act, (4) to further the conspiracy, and (5) willful participation in the conspiracy by the defendant. *United States v. Nall,* 949 F.2d 301, 305 (10th Cir.1991); *see United States v. Pardue,* 983 F.2d at 842. The essence of a conspiracy charge is the agreement to commit a crime. *United States v. Johnson,* 977 F.2d 1360, 1371 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1024, 122 L.Ed.2d 170 (1993).

■■■ Count two charges the defendants with soliciting Brandau to commit a murder in violation of 18 U.S.C. § 1958. To obtain a solicitation conviction under 18 U.S.C. § 373, the government must prove two elements: (1) that the defendant intended, as evidenced by strongly corroborative circumstances, for Brandau to commit a murder in violation of 18 U.S.C. § 1958; and (2) that the defendant solicited, or otherwise tried to persuade Brandau to commit the murder. *United States v. Razo–Leora,* 961 F.2d 1140, 1147 n. 6 (5th Cir.1992); *United States v. McNeill,* 887 F.2d 448, 450 (3rd Cir.1989), *cert. denied,* 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990); *United States v. Buckalew,* 859 F.2d 1052, 1053 (1st Cir.1988). The essence of a solicitation offense is the serious effort to induce another to commit a Title 18 offense. *Buckalew,* 859 F.2d at 1054.

■■■ A simple contrast of the essential elements to a § 371 conspiracy and a § 373 solicitation reveals that each requires the proof of a different fact. For the defendants here to be found guilty of conspiracy, the government need not prove that they induced or tried to persuade Brandau to murder Prokop. For the defendants to be found guilty of solicitation, the government need not prove an agreement or conspiracy between the defendants to violate 18 U.S.C. § 1958. Though the issue of multiplicity on § 371 and § 373 charges appears to be one of first impression, other courts have upheld convictions under both statutes for the same criminal activity, and their analysis illustrates the differences between the statutes. *See, e.g., United States v. Razo–Leora,* 961 F.2d at 1144, 1147; *United States v. Gabriel,* 810 F.2d 627, 633–36 (7th Cir.1987); *cf. United States v. Dolt,* 27 F.3d 235, 238–39 (6th Cir.1994). The court finds that count two is not multiplicitous of count one.

## Motion for 404(b) Disclosure

The government responds that it presently knows of no evidence coming within its disclosure obligation under Rule 404(b) of the Federal Rules of Evidence. Anticipating that the government has conducted a diligent inquiry prior to filing its response, the court finds the government's response sufficient.

## Motion to Compel Discovery Concerning Informant (Dk. 42)

The defendant Holveck files a stock motion for informant information regarding Mike Frazier. She seeks disclosure of certain matters with which to impeach Mike Frazier, the government's assurance that it will make reasonable efforts to produce him as a witness at trial, recorded communications between Mike Frazier and government agents, a transcript of his grand jury testimony, an opportunity to interview Mike Frazier, and disclosure of any other informants. The defendant Holveck couches her request on case law regarding confidential informants.

■■■ Because the defendant presumably knows who the informant is, where the informant lives and what he has testified to

in the state trial, the court considers the case law cited by the defendant inappropriate in deciding her motion. It is true that Mike Frazier assisted in arranging the commission of the offenses and was present when the defendants allegedly committed them. Still, there is nothing to suggest that Mike Frazier is unavailable to the defendants' counsel or that their investigation of him is impeded by any efforts to keep his identity or location confidential.[5] The court has no basis for imposing those discovery obligations[6] reserved for confidential informants. As with any witness, the government, however, has the discovery obligations otherwise imposed by *Brady, Giglio,* Rule 16 of the Federal Rules of Criminal Procedure, and the Jencks Act, 18 U.S.C. § 3500. The court expects the government understands its duties and will meet them. The court denies the defendant's motion for failure to comply with the court's guideline I.B.

## Motion to Dismiss for Lack of Federal Jurisdiction (Dk. 43)

The defendant Holveck argues that interstate or foreign commerce is a jurisdictional prerequisite to a violation of 18 U.S.C. § 1958 and that the government has not shown the factual basis for federal jurisdiction. The defendant does not specifically challenge the sufficiency of the indictment. The government argues that the indictment adequately alleges a federal nexus and that there are no extraordinary circumstances justifying a pretrial factual review.

■■■ At this stage, an indictment is judged solely for the sufficiency of its charges without regard to the strengths and weaknesses of the government's case. *United States v. Quintanilla,* 760 F.Supp. 687,

690 (N.D.Ill.1991), *aff'd,* 2 F.3d 1469 (7th Cir.1993); *see United States v. Sampson,* 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962). A court is not to look behind the indictment to see if it is supported by substantial evidence. *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). "An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Hall,* 20 F.3d 1084, 1087 (10th Cir.1994) (citing *United States v. Sampson,* 371 U.S. at 78–79, 83 S.Ct. at 175). An exception exists in this circuit when the operative facts are undisputed, an evidentiary hearing is conducted, and the government does not object to the trial court's consideration of evidence. *Hall,* 20 F.3d at 1087–88. The exception is inapplicable here, for the government asks the court to look only at the indictment and opposes an evidentiary review.

■■■ On the face of the indictment, the jurisdictional basis for each count has been adequately charged. "'An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.) (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50, 96 S.Ct. 55 (1975)) *cert. denied,* —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992). In count one, the indictment alleges that the defendants agreed to cause another to commit an offense against the United States involving interstate travel. Count two charges the defendants solicited or tried to persuade Brandau to travel interstate and commit murder. The truth of

---

5. "A defendant who knows the informer must show that he made a diligent attempt to locate him before relief will be ordered under *Roviaro* [*v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639] [(1957)]." *United States v. Turbide,* 558 F.2d 1053, 1060 n. 6 (2nd Cir.), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *see United States v. Ridley,* 814 F.Supp. 992, 997 n. 3 (D.Kan.1993); *cf. United States v. Reardon,* 787 F.2d 512, 516–17 (10th Cir.1986) (no error in denying defendant's request for information on informant who he knew was his niece's boyfriend).

6. When the court orders disclosure pursuant to *Roviaro,* it may require the government to exercise reasonable diligence in locating the informant and producing him at trial. *See, e.g., United States v. Suarez,* 939 F.2d 929, 932 (11th Cir.1991). Informants, however, "cannot be compelled to a pretrial interview with defense counsel." *United States v. Nixon,* 777 F.2d 958, 967 n. 12 (5th Cir.1985).

those allegations is a matter reserved for trial. The government has alleged a valid basis for federal jurisdiction against the defendants.[7]

The facts as alleged in the indictment do not bear the slightest resemblance to the facts in cases where the government agents have manufactured federal jurisdiction. In *United States v. Coates*, 949 F.2d 104, 105 (4th Cir.1991), the government agent working undercover drove across state lines, telephoned the defendant, and discussed the details of their criminal scheme. *See also United States v. Archer*, 486 F.2d 670 (2nd Cir.1973); *United States v. Brantley*, 777 F.2d 159 (4th Cir.1985), *cert. denied*, 479 U.S. 822, 107 S.Ct. 89, 90, 93 L.Ed.2d 42 (1986). The Tenth Circuit "has expressly limited the applicability of *Archer* to cases of virtual entrapment." *United States v. Esch*, 832 F.2d 531, 539 (10th Cir.1987) (citations omitted), *cert. denied*, 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 (1988). There is nothing in the indictment that suggests Agent Brandau provoked the defendants to undertake an interstate activity that they were not predisposed to undertake. *See Esch*, 832 F.2d at 539. Moreover, the indictment simply does not present an instance where the government agent, contemplating the need for an interstate nexus, patently contrives the means for obtaining federal jurisdiction. The face of the indictment supplies no basis for finding that the government manufactured federal jurisdiction.

IT IS THEREFORE ORDERED that the defendants' motions to join (Dks. 33 and 42) the co-defendant's motions are granted on the conditions stated above;

IT IS FURTHER ORDERED that the defendant Frazier's motion for discovery (Dk. 36) is denied for failure to comply with the court's guidelines;

IT IS FURTHER ORDERED that the defendant Frazier's motion to dismiss indictment for outrageous government conduct (Dk. 37) is denied;

IT IS FURTHER ORDERED that the defendant Holveck's motion to dismiss count two on ground of multiplicity (Dk. 39) is denied;

IT IS FURTHER ORDERED that the defendant Holveck's motion for 404(b) disclosure (Dk. 40) is denied as moot;

IT IS FURTHER ORDERED that the defendant Holveck's motion to compel discov-

7. The jurisdictional requirement to 18 U.S.C. § 1958(a) is stated in these terms:

> "Whoever travels in or **causes another** (including the intended victim) **to travel in interstate or foreign commerce,** or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value shall be fined ... or imprisoned ... or both...."

(emphasis added). The interstate travel, mail or facility requirement is jurisdictional in nature, and the government normally need not prove that the defendant intended to use one of these interstate means. *See United States v. Winters*, 33 F.3d 720, 721 (6th Cir.1994); *United States v. Razo–Leora*, 961 F.2d 1140, 1148 (5th Cir.1992); *United States v. Edelman*, 873 F.2d 791, 794–95 (5th Cir.1989). "When the charge is not the substantive offense but is instead conspiracy, there still must be some federal jurisdictional nexus; the question is what facts, physical or mental, will suffice to supply that nexus." *United States v. Rosa*, 17 F.3d 1531, 1544 (2nd Cir.

1994), *cert. denied*, — U.S. —, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994). If the substantive offense is actually committed in the manner proscribed by statute, then federal jurisdiction always exists for the conspiracy charge. *United States v. Feola*, 420 U.S. 671, 695, 95 S.Ct. 1255, 1269, 43 L.Ed.2d 541 (1975). When the conspiracy falls short of actually committing a jurisdictional act involved in the substantive offense, then it becomes a matter of whether the agreement itself contemplates the actions or concerns associated with federal jurisdiction. *Feola*, 420 U.S. at 695–96, 95 S.Ct. at 1269–70; *see, e.g., United States v. Rosa*, 17 F.3d at 1546 ("[E]ven where there are no stolen goods and no actual interstate or foreign transport of any goods, the jurisdictional nexus may be supplied simply, as in *Rose* [*United States v. Rose*, 590 F.2d 232 (7th Cir.1978)], by evidence that the defendants agreed to receive goods that they believed would be stolen and transported to them interstate."); *United States v. Sarro*, 742 F.2d 1286, 1296 (11th Cir.1984) ("Proof that goods actually traveled in interstate or foreign commerce is unnecessary when a defendant is charged with conspiracy to violate 18 U.S.C. § 2314.") These same principles support federal jurisdiction here if the government proves at trial the facts as alleged in the indictment.

ery concerning informant (Dk. 41) is denied for failure to comply with the court's guidelines;

IT IS FURTHER ORDERED that the defendant Holveck's motion to dismiss indictment for lack of federal jurisdiction (Dk. 43) is denied.

**UNITED STATES of America, Plaintiff,**

v.

Jesse AILSWORTH, Jr., a/k/a "J.C.", Undra P. Mock, Kenneth R. Torain, Arnett Louise Rice, a/k/a Delores Perry, Terence J. Douglas, a/k/a "T", George T. Stewart, Jr., a/k/a "Pigg", and Calvin Lee Conway, Defendants.

Nos. 94–40017–01–SAC to 94–40017–07–SAC.

United States District Court, D. Kansas.

Oct. 27, 1994.

Joseph D. Johnson, Joseph D. Johnson, Chtd., Charles D. Dedmon, Office of Federal Public Defender, Topeka, KS, for defendant Jesse Ailsworth, Jr., aka "J.C."

F.G. Manzanares, Jerold E. Berger, Topeka, KS, for defendant Undra P. Mock.

James G. Chappas, Jr., Topeka, KS, for defendant Kenneth R. Torain.

Mark L. Bennett, Jr., Bennett & Dillon, Topeka, KS, Benjamin C. Wood, Lawrence, KS, for defendant Arnett Louise Rice aka Delores Perry aka Arnett L. Rice.

Matthew B. Works, Works, Works & Works, P.A., Amy C. Bixler, Alan G. Warner, Topeka, KS, for defendant Terence J. Douglas, aka "T" aka Terrance J. Douglas.

Stephen W. Kessler, Topeka, KS, for defendant George Stewart, Jr., aka "Pigg".

Jeannine D. Herron, William K. Rork, Rork Law Office, Topeka, KS, for defendant Calvin Lee Conway aka Calvin L. Conway.

Gregory G. Hough, Office of U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

On March 24, 1994, the grand jury returned a twenty count superseding sealed indictment charging certain violations of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine base), 21 U.S.C. § 841(a)(1) (possession with intent to distribute), 7 U.S.C. § 2024(b) (unlawful acquisition of food stamps), 18 U.S.C. § 924(c)(1) (use of a firearm during and in relation to a drug trafficking crime), and 26 U.S.C. § 5861(h) (receipt or possession of a firearm without serial number or other identification).

On August 24, 1994, this court entered a seventy-two page memorandum and order disposing of several pretrial motions filed by the defendants. *See United States v. Ailsworth,* 1994 WL 539347, 1994 U.S. Dist. LEXIS 14413 (D.Kan. Aug. 24, 1994). In that order, certain motions were taken under advisement to be decided on the eve of or during trial.

In that memorandum and order, the court granted the defendants' motion to compel retention of notes, logs, recordings, reports and statements of government agents (Dk. 158) to the extent that the court would inspect in camera the disputed materials and decide if additional production is required. In accordance with that order, the government has provided the materials described on pages 2 and 3 of its "Response to Defendants' Motion in Limine Regarding Disclosures" of September 28, 1994 (Dk. 294). The court has reviewed those materials and concludes, based upon its review of the materials provided as well as the government's description of the items it has provided the defendants, that the government has already provided to the defendants all of the Jencks Act

material in its possession which it would be obligated to turn over to the defendants. The court has returned all of those materials provided by the government to the government.

On October 3, 1994, trial was set to commence on October 31, 1994. On October 19, 1994, the grand jury returned a thirty-seven page second superseding indictment, adding twenty-five additional counts, for a total of forty-five counts. In addition to the crimes charged in the superseding indictment, the second superseding indictment charges violations of 21 U.S.C. § 843(b) (use of a communication facility to cause or facilitate a felony drug trafficking crime), 21 U.S.C. § 856 (control of a building for the purpose of storing a controlled substance), and 18 U.S.C. § 922(g) (felon in possession of a firearm). The second superseding indictment also charges another violation of 21 U.S.C. § 841 and another violation of 18 U.S.C. § 924(c)(1).

The following motions yet remain undecided:

### Joint Motions filed on behalf of all the defendants:

1. Joint motion for discovery of information relating to specified evidence that the government intends to use at trial (Dk. 275).

2. Motion of defendants in limine (Dk. 277).

### Motions filed by Jesse Ailsworth (represented by Joseph Johnson):

1. Motion to exclude unintelligible audio and video tapes (Dk. 187).[1]

2. Motion to strike surplusage language in affidavit (Dk. 188).[2]

### Motions filed by Undra P. Mock (represented by Jerold E. Berger):

1. Motion to exclude unintelligible audio and video tapes (Dk. 197).[3]

2. Motion to strike surplusage language in affidavit (Dk. 199).[4]

3. Motion in limine [Re: Exclusion of certain statements by arresting officers] (Dk. 244).[5]

### Motions filed by Kenneth R. Torain (represented by James Chappas):

1. Motion in limine [Re: Exclusion of evidence of previous convictions and juvenile proceedings] (Dk. 118).[6]

2. Supplemental motion in limine [Re: Exclusion of evidence of previous misdemeanor conviction for possession of a concealed firearm] (Dk. 247).

3. Second supplemental motion in limine [Re: Rule 404(b) evidence relating to alleged drug transaction in which Torain personally participated] (Dk. 249).

4. Motion for additional grand jury selection information (Dk. 257).

5. Motion for enlargement of time to move to quash grand jury indictment (Dk. 279).

6. Third supplemental motion in limine [Re: Exclusion of evidence pertaining to alleged sales of confidential informant to Torain's brothers and one sister] (Dk. 282).

7. Motion for entitlement to present evidence of alibi at trial and to receive an instruction of alibi defense (Dk. 245).

8. Supplement to joint motion for discovery of information relating to specified evidence that the government intends to use at trial (Dk. 280).

1. This motion was taken under advisement in the court's August 24, 1994, memorandum and order.

2. This motion was taken under advisement in the court's August 24, 1994, memorandum and order.

3. This motion was taken under advisement in the court's August 24, 1994, memorandum and order.

4. This motion was taken under advisement in the court's August 24, 1994, memorandum and order.

5. This motion lacks sufficient particularity to make any meaningful evaluation of the motion.

6. This motion was taken under advisement in the court's August 24, 1994, memorandum and order.

**Motions filed by George Stewart (represented by Stephen Kessler):**

1. Motion in limine [Re: Exclusion of evidence of defendant's prior conviction for possession of a controlled substance] (Dk. 93).[7]

2. Memorandum in support of defendant Stewart's request to present alibi evidence and for an alibi instruction (Dk. 253).

3. Motion for order to issue subpoena [Re: Issuance of subpoena under Fed. R.Crim.P. 17(b) for Eddielena Green of Montgomery, Alabama] (Dk. 251).

**Motions filed by the Government:**

1. Motion to compel discovery (Dk. 203).

2. Motion in limine [Re: Exclusion of Stewart and Torain's "alibi" witnesses' testimony] (Dk. 243).

3. Motion in limine regarding Douglas' alibi evidence (Dk. 268).

4. Motion in limine [Re: Evidence concerning the address or whereabouts of Johnnie Evans, the confidential informant] (Dk. 256).

On October 25, 1994, the court heard oral argument on the pending motions. At the outset of the hearing, the court indicated that it would limit oral argument to thirty minutes per side, based upon the court's assessment that such an allotment of time would allow each side an opportunity to adequately present the key aspects of their respective positions. Counsel for Torain objected to

that time limitation. The court simply notes the defendants did not use all of the time allotted to them, a fact essentially confirming the reasonableness of the court's time limitation.

At the hearing, based upon the defendants' uniform position that they would be unable to proceed on October 31, 1994, as they were unprepared to defend against the additional twenty-five counts added by the second superseding indictment, the trial of this case was continued and reset to commence on November 28, 1994.

Having considered the briefs and arguments of counsel, and the applicable law, the court is now prepared to rule on some of the pending motions yet undecided.

**Analysis of Motions to be decided or discussed before trial:**[8]

**Joint Motions filed on behalf of all the defendants:**

**Joint motion for discovery of information relating to specified evidence that the government intends to use at trial (Dk. 275); Supplement to joint motion for discovery of information relating to specified evidence that the government intends to use at trial (Dk. 280).**

Based upon their perception that the government has not provided full discovery as agreed to at the omnibus hearing, the defendants essentially renew their requests for discovery which the court previously denied

---

7. This motion was taken under advisement in the court's August 24, 1994, memorandum and order.

8. The court takes under advisement the following motions: Motion to exclude unintelligible audio and video tapes (Dk. 187); Motion to strike surplusage language in affidavit (Dk. 188); Motion to exclude unintelligible audio and video tapes (Dk. 197); Motion to strike surplusage language in affidavit (Dk. 199); Motion in limine [Re: Exclusion of certain statements by arresting officers] (Dk. 244); Motion in limine [Re: Exclusion of evidence of previous convictions and juvenile proceedings] (Dk. 118); Supplemental motion in limine [Re: Exclusion of evidence of previous misdemeanor conviction for possession of a concealed firearm] (Dk. 247); Second supplemental motion in limine [Re: Rule 404(b) evidence relating to alleged drug transaction in which Torain personally participated] (Dk. 249); Third supple-

mental motion in limine [Re: Exclusion of evidence pertaining to alleged sales of confidential informant to Torain's brothers and one sister] (Dk. 282); Motion for entitlement to present evidence of alibi at trial and to receive an instruction of alibi defense (Dk. 245); Motion in limine [Re: Exclusion of evidence of defendant's prior conviction for possession of a controlled substance] (Dk. 93); Memorandum in support of defendant Stewart's request to present alibi evidence and for an alibi instruction (Dk. 253); Motion for order to issue subpoena [Re: Issuance of subpoena under Fed.R.Crim.P. 17(b) for Eddielena Green of Montgomery, Alabama] (Dk. 251); Motion to Compel discovery (Dk. 203); Motion in limine [Re: Exclusion of Stewart and Torain's "alibi" witnesses' testimony] (Dk. 243); Motion in limine regarding Douglas' alibi evidence (Dk. 268); Motion in limine [Re: Evidence concerning the address or whereabouts of Johnnie Evans, the confidential informant] (Dk. 256).

in part upon the merits and in part as moot in its August 24, 1994, memorandum and order. The defendants contend that the government has misled the court and the defendants as it has not provided full discovery in this case.

The government responds, indicating that it has provided the defendants with all of the information that they seek. The government contends that it has provided the defendants with all Jencks Act material and has provided the defendants with all indicted and unindicted coconspirators' statements. The government argues that the defendants are informally seeking a bill of particulars, when their initial request for such a bill was correctly denied. The government also indicates that it will provide an exhibit list to the defendants 48 hours prior to trial.

The court accepts the government's renewed assurance that it has provided all of the information within its possession, and these motions are denied as moot.

### Motions of defendants in limine (Dk. 277).

■ In this motion, the defendants seek to exclude from trial any and all information contained in the "facts" communique to counsel dated September 28, 1994. The defendants basically argue that not until that communique were they informed of information which the government intends to introduce through the testimony of its confidential informant. The defendants contend that the government has sandbagged them by not providing this information sooner. The defendants contend that this late disclosure will severely prejudice them and make it impossible for them to adequately prepare to defend against the charges in the indictment and proceed to trial October 31, 1994.

The government responds, indicating that the information it provided to the defendants was not a "statement" within the meaning of

18 U.S.C. § 3500(e) (The Jencks Act), and that even if portions of that communique qualify as Jencks Act material, the government was under no obligation to provide that information until *after* the confidential informant testified. The government contends that it has promptly fulfilled its obligations under the reciprocal discovery order and that the defendants' motion should be denied. Even if the government has somehow breached the discovery agreement, the government suggests that a continuance would cure any prejudice the defendants may otherwise suffer from the "late" disclosure of the confidential informant's testimony.

■ The proper analysis of this issue turns on the answers to the following questions:

1. Did the government breach the agreement it entered regarding full discovery at the omnibus hearing?[9] If the answer is "Yes," the next issue must be addressed:

2. What is the appropriate remedy for the government's breach of the agreement to provide prompt and full discovery?

In *United States v. Mavrokordatos,* 933 F.2d 843 (10th Cir.1991), the government appealed the district court's pretrial order excluding the testimony of six government witnesses because the government's alleged breach of the discovery deadline agreed to by the government and the defendant. The Tenth Circuit reversed, finding that the government had provided most of the discovery prior to the deadline, and therefore no breach had occurred. As to the other materials, the Tenth Circuit held that although the government had provided two of the reports a few days after the deadline, there was no evidence that the government had acted in bad faith. Nor was the defendant able to articulate any prejudice as a result of the government's delay in providing the reports. Based upon these circumstances, the

---

9. The agreement between the defendants and the government reached during the omnibus hearing regarding reciprocal discovery is akin to a contractual agreement. *Cf., United States v. Gamble,* 917 F.2d 1280, 1282 (10th Cir.1990) ("In determining the rights of a defendant, or the government, under a plea agreement in a criminal proceeding the '[c]ourts have frequently looked to contract law analogies.'") (*quoting United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981)). As all contracts embody a duty of good faith and fair dealing, it is reasonable to assume that a similar duty arises in this setting.

Tenth Circuit found that the district court abused its discretion in excluding the testimony of the witnesses.

 In determining the appropriate sanction for noncompliance with a discovery order the Tenth Circuit has looked to the following factors which the trial court must evaluate:

"(1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance." [*United States v. Wicker*], 848 F.2d [1059] at 1061 [(10th Cir.)] (citing [*United States v.*] *Euceda–Hernandez,* 768 F.2d [1307] at 1312 [(11th Cir.)]; *United States v. Fernandez,* 780 F.2d 1573, 1576(11th Cir.)).

933 F.2d at 847.

The defendants do not appear to argue that the government's disclosure violated the express terms of the agreement to provide full discovery, only that the disclosure of the information provided by the confidential informant was late. Instead, the defendants essentially argue that the government has breached the implied covenant of good faith in the performance of its agreement to provide full discovery by its unwarranted delay in debriefing the confidential informant. During oral argument, the defendants basically argued that the government, for strategic purposes, had waited to debrief the confidential informant until after the defendants had filed their pretrial motions. By doing so, the defendants argued that the government was able to see and fill holes in its case against each of the defendants. The defendants contend that the testimony of the confidential informant now conveniently fills the gaps the government has gleaned from the motions they have filed.

While the government's performance in this case should perhaps not be viewed as a paradigm for future cases,[10] there is no showing of bad faith by the government. The defendants' suggestion that the government has manipulated the timing of its debriefing of the witness to its advantage is merely speculation on their part. The court notes that the government, immediately after the witness's debriefing, provided disclosure of the substance of the witness's anticipated testimony, and that such disclosure occurred in advance of trial, albeit not well in advance of trial.

Even if the government did in some way breach the full discovery agreement, the court would find that a continuance, rather than exclusion of evidence, would be the appropriate remedy.

### Torain's Motions

4. Motion for additional grand jury selection information (Dk. 257).

5. Motion for enlargement of time to move to quash grand jury indictment (Dk. 279).

 In these motions, the defendant requests additional information relevant to the selection of the grand jury; the second motion merely requests additional time. Torain argues that because D.Kan. Rule 125(f) was violated,[11] and because African–Americans are under-represented statistically, his discovery requests should be granted.

The government opposes the defendant's motion, erroneously conceding that a violation of Rule 125 occurred in this case, but arguing that the defendant has nevertheless made an insufficient showing to warrant additional discovery.

---

**10.** In light of the government's repeated assurances that this was a "full" discovery case, the government's failure to debrief one of its key witnesses sufficiently in advance of trial arguably does not exhibit an abundance of foresight or prudence. So as to avoid similar problems in the future, if the government agrees to provide full discovery, the court encourages the government to more thoroughly evaluate the need to debrief its witnesses earlier in the proceedings.

**11.** D.Kan. Rule 125(f) provides in pertinent part:

The master wheel shall be emptied and refilled, as herein provided, between January 1 and June 30 of the year following the year in which a presidential election is held.

Torain argues that the wheel was not refilled in the manner prescribed by the Rule, resulting in under-representation of African–Americans.

The parties have incorrectly interpreted Rule 125 and/or the facts surrounding the selection of the grand jury returning the indictment and superseding indictment in this case. Fed.R.Crim.P. 6(g) states that a grand jury shall serve until discharged, but not longer than 18 months (unless extended by the court upon a determination that such an extension is in the public interest.) The panel that returned the indictment and superseding indictment in this case was impanelled on January 27, 1993. D.Kan. Rule 125(f) states that the wheel shall be emptied and refilled between January 1 and June 30 of the year following the year in which a presidential election is held. A presidential election was held in November, 1992, and the master wheel was refilled April 22, 1993, in accordance with D.Kan. Rule 125(f). Therefore, no violation of the court's local rule occurred.

Of more significance, the second superseding indictment, filed on October 19, 1994, was returned by a grand jury selected from the wheel filled on April 22, 1993. Torain's motion has therefore not presented any evidence to base a request for additional discovery relevant to the grand jury which has returned the second superseding indictment. Torain's motion is therefore denied, as is his motion for an extension of time.

Nevertheless, the defendant is permitted to inspect the grand jury wheel subject to the same limitations stated in the court's August 24, 1994, memorandum and order.

### Evidence of Alibi

The following motions/memoranda deal with the issue of whether any of the defendants should be permitted to introduce evidence of alibi:

### Torain

7. Motion for entitlement to present evidence of alibi at trial and to receive an instruction of alibi defense (Dk. 245).

### Stewart

2. Memorandum in support of defendant Stewart's request to present alibi evidence and for an alibi instruction (Dk. 253).

### Government

2. Motion in limine [Re: Exclusion of Stewart and Torain's "alibi" witnesses' testimony] (Dk. 243).

3. Motion in limine regarding Douglas' alibi evidence (Dk. 268).

During a previous hearing, the court directed the parties' attention to *United States v. Thomas*, 34 F.3d 44 (2nd Cir.1994), concerning the issue of whether an alibi jury instruction is warranted in cases where the defendant is charged under a *Pinkerton* or aiding and abetting theory. In *Thomas*, the defendants were charged with conspiracy to distribute cocaine, distribution of cocaine, murdering of a federal agent, murder in furtherance of the conspiracy to distribute cocaine and use of a firearm during and in relation to a drug trafficking crime. At trial, one of the defendants introduced the testimony of four witnesses who indicated that he was in New York City at the time the federal agent was shot in Syracuse. The defendant argued on appeal that the district court erred in not giving an alibi instruction. The court of appeals disagreed, holding that the district court did not error in refusing to give an "alibi" instruction where the defendant, as to each of the substantive counts, was charged under both an aiding and abetting theory and a *Pinkerton* theory.

By directing the parties' attention to the Second Circuit's opinion in *Thomas*, this court was simply prompting the parties, in advance of trial, to research and consider the appropriateness of an alibi jury instruction in the case at bar. At present, the parties not only dispute the issue of whether such a jury instruction is appropriate, but also whether the defendants should be permitted to introduce evidence that they were not present on certain occasions. The government contends that because the defendants may be convicted under an aiding and abetting theory and/or a *Pinkerton* theory, the issue of their physical presence at any scene of a crime is completely irrelevant and should be excluded as such.

The defendants contend that physical presence is relevant, particularly with regard to the substantive counts. The defendants also

argue that if there is no evidence to support their conviction as to any substantive counts, the jury may also acquit them on the conspiracy count.

■ A defendant in a case charging a conspiracy may be liable for each of the substantive counts charged in the indictment under three separate theories:

1. Actual commission of the crime;
2. Participation in the crime as an aider or abettor;
3. Liability under a *Pinkerton* theory.[12]

Because the government may prove liability under any alternative theory, and because the jury will not return a verdict indicating the precise manner in which the defendant committed the crime, the defendant is entitled to introduce evidence tending to demonstrate that he was not physically present at the time a crime was committed. It belabors the obvious that presence at the scene of a crime is incriminating evidence. *Cf., United States v. Cartwright,* 6 F.3d 294, 299 (5th Cir.1993) (intent to distribute may be inferred from actions at the scene as well as from the large quantity of drugs involved), *petition for cert. filed,* July 19, 1994. To preclude the defendants from presenting this evidence, if that evidence is relevant, i.e., that it would tend to demonstrate that they were not at the scene of the crime, would seemingly violate their constitutional right to present evidence in their own defense.

As the court is only aware of the general nature of the defendant's evidence, the court will make no attempt to render a definitive ruling as to the admissibility of their "alibi" evidence at this time. The court simply believes that these observations may assist the parties in evaluating their respective positions.[13] Similarly, the court at this time expresses no final opinion on the appropriateness of an "alibi" jury instruction in the case at bar.

## Government's Motion Regarding Discovery Motion to Compel Discovery (Dk. 203).

During a previous hearing, the court specifically asked the defendants if they had provided to the government all of the reciprocal discovery they intended to provide. The defendants' appeared to agree that they had provided all of the discovery in their possession that they intended to offer at trial. During the October 25, 1994, hearing, the government indicated the limited extent of the discovery that it had received from the defendants. In light of the second superseding indictment, some of the defendants indicated that they may wish to provide further discovery to the government. The court simply reminds the defendants of the reciprocal nature of the agreement entered regarding discovery and anticipates that all parties will adhere to that agreement without further intervention by the court.

IT IS THEREFORE ORDERED that the Joint Motion for discovery of information relating to specified evidence that the government intends to use at trial (Dk. 275) and the Supplement to joint motion for discovery of information relating to specified evidence that the government intends to use at trial (Dk. 280) are denied as moot.

IT IS FURTHER ORDERED that the Motion of defendants in limine (Dk. 277) is denied.

IT IS FURTHER ORDERED that Torain's Motion for additional grand jury selection information (Dk. 257) and his Motion for enlargement of time to move to quash grand jury indictment (Dk. 279) are denied.

IT IS FURTHER ORDERED that the Clerk of the Court shall allow Torain to inspect the master jury wheel, the qualified jury wheel and the completed jury qualification forms relevant to grand jury which returned the second superseding indictment in

---

12. "A conspiracy participant is legally liable for all reasonably foreseeable acts of his or her co-conspirators in furtherance of the conspiracy." *United States v. Brewer,* 983 F.2d 181, 185 (10th Cir.) (citing *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946)), *cert. denied,* — U.S. ——, 113 S.Ct. 2348, 124 L.Ed.2d 257 (1993).

13. To save time, if the government does not claim that the defendant was actually present during the commission of the crime, it is possible that the parties may be able to reach a stipulation as to the defendant's location at the relevant time.

this case. Torain shall be allowed access to these records only for purposes of inspection. The right of access shall be by appointment only. The defendant shall not be allowed to make photostatic or any other manner of copy of any of the information provided without written permission of the court. The defendant may seek permission to make copies of the information in the manner set forth in the court's August 24, 1994, memorandum and order.

Until further written order of this court, the defendant is denied access to a list of the jurors on the grand jury that returned the instant indictment and to all materials pertaining to the selection of prospective jurors in this case or the grand jury which returned the indictment in this case, including but not limited to, the starting name and number used to select the grand jury. The Clerk, his staff and C.C. & S. Data Processors, Inc., shall in no way indicate any manner by which the list of prospective petit or actual grand jurors might be determined from reference to the master or qualified wheels.

Violation of this court's order will be considered not only as contempt of court, but also as a violation of 28 U.S.C. § 1867(f), which imposes a maximum sentence of $1,000 and imprisonment of one year. If the Clerk of the Court or his staff have any questions pertaining to their duties under this order, they shall contact this court immediately.

No government or defense attorney in this action, or any defendant, or any other person acting on their behalf, shall himself, or through any investigator or other person acting for him, interview, examine, question or contact any prospective juror for this case or any juror on the grand jury that returned the instant indictment, or any relatives, friends or associates of such prospective juror or grand juror, either prior to trial, during the pendency of trial, or with the respect to the deliberations or verdict of the grand and petit juries in this case except on express written leave of this court on good cause shown. Violations of this paragraph will not only be considered as contempt of court, but will also be reported to the Justice Department for investigation.

IT IS FURTHER ORDERED that the following motions are taken under advisement:

**Motions filed by Jesse Ailsworth:**

1. Motion to exclude unintelligible audio and video tapes (Dk. 187).

2. Motion to strike surplusage language in affidavit (Dk. 188).

**Motions filed by Undra P. Mock:**

1. Motion to exclude unintelligible audio and video tapes (Dk. 197).

2. Motion to strike surplusage language in affidavit (Dk. 199).

3. Motion in limine [Re: Exclusion of certain statements by arresting officers] (Dk. 244).

**Motions filed by Kenneth R. Torain:**

1. Motion in limine [Re: Exclusion of evidence of previous convictions and juvenile proceedings] (Dk. 118).

2. Supplemental motion in limine [Re: Exclusion of evidence of previous misdemeanor conviction for possession of a concealed firearm] (Dk. 247).

3. Second supplemental motion in limine [Re: Rule 404(b) evidence relating to alleged drug transaction in which Torain personally participated] (Dk. 249).

6. Third supplemental motion in limine [Re: Exclusion of evidence pertaining to alleged sales of confidential informant to Torain's brothers and one sister] (Dk. 282).

7. Motion for entitlement to present evidence of alibi at trial and to receive an instruction of alibi defense (Dk. 245).

**Motions filed by George Stewart:**

1. Motion in limine [Re: Exclusion of evidence of defendant's prior conviction for possession of a controlled substance] (Dk. 93).

2. Memorandum in support of defendant Stewart's request to present alibi evidence and for an alibi instruction (Dk. 253).

3. Motion for order to issue subpoena [Re: Issuance of subpoena under Fed. R.Crim.P. 17(b) for Eddielena Green of Montgomery, Alabama] (Dk. 251).

**Motions filed by the Government:**

1. Motion to compel discovery (Dk. 203).

2. Motion in limine [Re: Exclusion of Stewart and Torain's "alibi" witnesses' testimony] (Dk. 243).

3. Motion in limine regarding Douglas' alibi evidence (Dk. 268).

4. Motion in limine [Re: Evidence concerning the address or whereabouts of Johnnie Evans, the confidential informant] (Dk. 256).

Keith A. SCHOOLEY, Plaintiff,

v.

MERRILL LYNCH, PIERCE FENNER & SMITH, INC., Defendant.

No. CIV–94–1357–A.

United States District Court,
W.D. Oklahoma.

Sept. 28, 1994.

Richard J. Gore, Arthur W. Schmidt, Mahaffey & Gore, Oklahoma City, OK, for plaintiff.

Rodney J. Heggy, Bruce W. Day, Day Edwards Federman Propester & Christensen, Oklahoma City, OK, for Merrill Lynch, Pierce Fenner & Smith, Inc.

## ORDER

ALLEY, District Judge.

This matter comes before the Court on defendant's Motion to Compel Arbitration. Plaintiff Keith Schooley filed an action in state court arising out of his termination by the defendant, Merrill Lynch, Pierce Fenner & Smith, Inc. ("Merrill Lynch"). On August 18, 1994, the case was removed to this Court. Merrill Lynch seeks an order compelling arbitration of plaintiff's action under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("the Act").

Keith Schooley was employed by Merrill Lynch from July 1, 1991, until October 18, 1992, in Enid, Oklahoma. The disputed circumstances of Mr. Schooley's termination form the basis for his cause of action. The details, however, are not pertinent to the resolution of the matter currently before Court. Mr. Schooley has filed claims for tortious breach of contract, constructive discharge, misrepresentation, the negligent and intentional infliction of emotional distress, invasion of privacy and fraudulent contractual interference. Plaintiff also seeks a declaratory judgment establishing his right to a jury trial in this matter.

In July, 1991, when plaintiff commenced his employment with Merrill Lynch, both parties signed a Uniform Application for Securities Industry Registration or Transfer ("U-4 form"). The U-4 form registered plaintiff with the American Stock Exchange ("ASE"), the National Association of Securities Dealers ("NASD"), and the New York Stock Exchange ("NYSE"). The U-4 form contained an arbitration clause and various other provisions concerning registration as an investment advisor.[1] In addition to the U-4 form, Mr. Schooley and Merrill Lynch entered into a Financial Consultant Trainee Agreement. This employment agreement was to be governed by the laws of Oklahoma.[2] During plaintiff's tenure at Merrill Lynch, he submitted two additional U-4 forms. Each subsequent U-4 form contained an arbitration provision and plaintiff indicated registration with the same exchanges. Defendant Merrill Lynch asserts that the provision in the U-4 forms combined with the Rules of the NYSE and NASD places this action under the guidelines of the Federal Arbitration Act. Plaintiff challenges arbitration asserting that Oklahoma law prohibits arbitration of this matter and that the parties' agreement specifically called for application of Oklahoma law.

9 U.S.C. § 2 provides that "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable." Defendant asserts that the U-4 form submitted by the plaintiff is a contract evidencing an agreement to arbitrate. Plaintiff asserts that the trainee agreement signed by the parties controls this dispute and that the trainee agreement contained no arbitration clause. Plaintiff additionally contends that the Oklahoma Consti-

---

1. The U-4 form included the following provision:

 I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgement in any court of competent jurisdiction.

 Item 10 indicated plaintiff's registration with ASE, NASD and the NYSE.

2. The trainee agreement provided that "[t]his agreement shall be construed, and the validity, performance and enforcement thereof shall be governed by the laws of the State of Oklahoma." Trainee Agreement at 2.

tution prevents enforcement of any arbitration clause.[3]

▮ Before determining whether the U–4 form or the trainee agreement is controlling, the question of whether Oklahoma law prohibits arbitration must be considered. "Federal law governs the construction and scope of agreements to arbitrate contracts or transactions within the coverage of the [Federal Arbitration] Act; [Oklahoma] law determines whether the arbitration clause is part of the contract." *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal.App.3d 632, 223 Cal. Rptr. 838 (1986). If a contract has an arbitration clause that is covered by the Act, the Act controls. "The Federal Arbitration Act is the law of [Oklahoma] with respect to any contract evidencing a transaction involving commerce." *Mamlin v. Susan Thomas, Inc.*, 490 S.W.2d 634 (Tex.Civ.App.1973) (quoting 9 U.S.C. § 2). "While the [Act] does not contain an express preemptive provision it has been held to preempt state laws that preclude parties from submitting matters to arbitration." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 812 F.Supp. 845 (N.D.Ill.1993), *aff'd*, 20 F.3d 713 (7th Cir. 1994) (citing *Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)).[4] In *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), the Supreme Court held that a state law that "undercut[s] the enforceability of arbitration agreements . . . . violates the Supremacy Clause." *Id.* at 16, 104 S.Ct. at 861. Plaintiff's contention that this Court's diversity jurisdiction mandates the application of the Oklahoma law so as to preclude arbitration is unfounded. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404–05, 87 S.Ct. 1801, 1805–07, 18 L.Ed.2d 1270 (1967). If the Act applies, whether arbitration may be compelled is solely a question of federal law, regardless of whether the forum is federal or state court.

*See Chan v. Drexel*, 178 Cal.App.3d 632, 223 Cal.Rptr. 838 (1986) (state court application of the Act); *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (Supreme Court mandated application of the Act by state court); *Adams v. Merrill Lynch Pierce Fenner & Smith*, 888 F.2d 696 (10th Cir.1989) (federal court application of the Act to pendent state law claims). The reason is that, although Oklahoma law applies, Oklahoma law must be cognizant of the Supremacy Clause through which the Act is preemptive. The Supremacy Clause of the United States Constitution is as much a part of Oklahoma law as a provision of the Oklahoma Constitution.

▮ The applicability of federal law determined, the question arises whether an arbitration clause existed within a contract evidencing commerce, thereby invoking the Act. Plaintiff asserts that the employment contract, not the U–4 form, is the proper focus of this dispute. Plaintiff's assertion lacks merit. The trainee agreement entered into by the parties did not preclude the use of the terms contained in the U–4 forms in defining the parties' obligations. Additionally, U–4 forms have consistently been held to require arbitration of claims by employees against former employers. *McGinnis v. E.F. Hutton & Co., Inc.*, 812 F.2d 1011, 1013 (6th Cir.), *cert. denied*, 484 U.S. 824, 108 S.Ct. 87, 98 L.Ed.2d 49 (1987); *Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 704 (2d Cir. 1985), *cert. denied*, 475 U.S. 1067, 106 S.Ct. 1381, 89 L.Ed.2d 607 (1986). The U–4 form expressly contemplated the arbitration of certain claims between Schooley and Merrill Lynch. Plaintiff presents no compelling argument for excluding the U–4 form in determining his obligations to Merrill Lynch. Not all claims by employees, however, are subject to arbitration. The final question is whether plaintiff's claims fall under the rules, constitutions or by-laws of the ASE, NASD, or the NYSE.

**3.** Article 2 Section 19 of the Oklahoma Constitution guarantees the right a jury trial. Article 23 Section 8 provides that "[a]ny provision of a contract, express or implied, made by any person, by which any of the benefits of this Constitution is sought to be waived, shall be null and void."

**4.** In the period since the Court issued this Order, the Supreme Court granted certiorari in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, — U.S. ——, 115 S.Ct. 305, 130 L.Ed.2d 218 (1994).

This Court need only find that one of the above exchanges requires arbitration of this dispute to compel plaintiff to arbitrate. Rule 347 of the New York Stock Exchange (NYSE) provides in pertinent part:

> Any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party in accordance with the arbitration procedure prescribed elsewhere in these rules.

There is no argument that Schooley was not a registered representative or that Merrill Lynch was not a member organization. Plaintiff's claims arise out of his termination by Merrill Lynch. Rule 347 calls for arbitration of controversies arising out of employment or termination. By signing the U–4 forms Keith Schooley agreed to abide by Rule 347 in handling particular disputes. The applicable provisions of Rule 347 specify arbitration of plaintiff's claims in this action. Because the Court finds that the rules of the NYSE require arbitration of plaintiff's claims, the application of ASE and NASD rules need not be addressed.

■ Plaintiff's argument that the Act does not apply to the trainee agreement because it is an employment contract is misguided. The U–4 form, not the trainee agreement, is the applicable contract here. The U–4 form is not an employment agreement; it is "a contract with the securities exchanges." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991). That Merrill Lynch was not a party to the U–4 contract is irrelevant. Plaintiff's signature on the U–4 form indicated his acceptance of the terms, including the unambiguous arbitration provision. Plaintiff cannot argue that he did not intend to divest himself of the right to a jury trial by signing the U–4 forms. Each U–4 form signed by Schooley contained the same language requiring the arbitration of certain claims; each signature by the plaintiff indicated assent. One who signs a contract is presumed to have read and understood the terms. *Allis Chalmers Mfg. Co. v. Byers*, 184 Okla. 475, 88 P.2d 368 (1939). Plaintiff's claim that he did not intend to be bound by the arbitration clause is without merit.

Plaintiff filed this action and challenges defendant's motion to compel. There is no question that Schooley refuses to arbitrate his claim. Under 9 U.S.C. § 4, when the Court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration." This Court finds no triable issues in this controversy and plaintiff refused to arbitrate; therefore, the mandate of § 4 applies, and defendant's motion to compel must be GRANTED.

It is so ordered.

**Mike SULLIVAN, Plaintiff,**

v.

**Gary BAILIFF and Sweetwater County Wyoming, Defendants.**

**No. 94–CV–0170–B.**

United States District Court, D. Wyoming.

Nov. 17, 1994.

Bernard Q. Phelan, Cheyenne, WY, for plaintiff.

William M. McKellar, Cheyenne, WY, for defendant Bailiff in his individual capacity.

Stephenson D. Emery, Casper, WY, for defendant Bailiff in his official capacity and Atty. for Sweetwater County, Wyo.

### ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

BRIMMER, District Judge.

The above-entitled matter having come before the Court upon Defendants' Motions to Dismiss, and the Court having reviewed the materials on file herein, having heard the oral arguments of the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

### BACKGROUND

Plaintiff Mike Sullivan filed his complaint on June 28, 1994. He alleges that the defendants constructively terminated his employment as a deputy sheriff for Sweetwater County, Wyoming. The facts before the Court are as follows:

Prior to the election of defendant Gary Bailiff as sheriff of Sweetwater County, the incumbent sheriff was Roger Simms. Sullivan worked as a deputy sheriff for Simms and supported his campaign for re-election against Bailiff. Shortly after Bailiff's election, he allegedly terminated Sullivan's employment without cause because of Sullivan's political support of Simms. After firing Sullivan, Bailiff allegedly received notice that such action was wrongful and reinstated Sullivan. Sullivan then alleges that Bailiff, personally and through his agents, made the work atmosphere so intolerable as to force Sullivan to resign. Plaintiff resigned his position on July 10, 1991.

Sullivan contends that such forced resignation constitutes a constructive termination, and that Bailiff's actions were taken in violation of Sullivan's First, Fifth and Fourteenth Amendment rights which include the right to be free from patronage dismissal and the right to freedom of political belief and affiliation. The Plaintiff seeks redress for these alleged deprivations under 42 U.S.C. § 1983.

Bailiff and Sweetwater County have both filed motions to dismiss on grounds that the claim, filed almost three years after the cause of action arose, is barred by the two-year limitation period established by Wyo. Stat. § 1-3-115 (1977). The defendants contend that § 1-3-115 applies to Sullivan's § 1983 claim since such claim is based upon a liability created by a federal statute.

Sullivan responds that under *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the appropriate limitation period is four years as established by Wyoming's statute of limitations for personal injury claims. Wyo.Stat. § 1-3-105(a)(iv)(C) (1977). For the reasons outlined below, the Court finds that the limitation period applicable to Sullivan's § 1983 claim is four years, and thus denies the Defendants' Motions to Dismiss.

### DISCUSSION

■ The issue which confronts the Court today is straightforward: What is the statute of limitations for a § 1983 action brought in the District of Wyoming? Section 1983 provides no guidance since it does not provide a statute of limitations. However, both the Tenth Circuit Court of Appeals and United States Supreme Court have definitively ruled on the issue at bar. In *Wilson v. Garcia*, 471

U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court thoroughly discussed the history of § 1983, noting that it provides a "uniquely federal remedy for incursions under the claimed authority of state law upon rights secured by the Constitution and law of the Nation." *Id.* at 271–72, 105 S.Ct. at 1944. Having characterized § 1983 as a uniquely federal remedy, the Supreme Court then discussed the need for uniformity within and among the states regarding the applicable statute of limitations:

> [T]he legislative purpose to create an effective remedy for the enforcement of federal civil rights is obstructed by uncertainty in the applicable statute of limitations ... Although the need for national uniformity has not been held to warrant the displacement of state statutes of limitations for civil rights actions, uniformity within each State is entirely consistent with the borrowing principle contained in § 1988. We conclude that the statute is fairly construed as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims. The federal interests in uniformity, certainty, and the minimization of unnecessary litigation all support the conclusion that Congress favored this simple approach.

*Id.* at 275, 105 S.Ct. at 1946. (Citations and footnote omitted).

Recognizing the need to establish uniform statutes of limitations for § 1983 claims, the Supreme Court then looked at state causes of action in an effort to find, by analogy, that cause of action which was most similar to § 1983. The Court's purpose in going through this exercise was to borrow the statute of limitations associated with the analogous state cause of action and effectively transpose it onto all § 1983 actions brought within that state. In making this determination, the Court agreed with the Tenth Circuit's conclusion that an action for damages for personal injuries was most analogous to a § 1983 claim:

> Among the potential analogies, Congress unquestionably would have considered the remedies established in the Civil Rights Act to be more analogous to tort claims for personal injury than, for example, to claims for damages to property or breach of contract. The unifying theme of the Civil Rights Act of 1871 is reflected in the language of the Fourteenth Amendment that unequivocally recognizes the equal status of every *"person"* subject to the jurisdiction of any of the several States. The Constitution's command is that all *"persons"* shall be accorded the full privileges of citizenship; no *person* shall be deprived of life, liberty, or property without due process of law or be denied the equal protection of the laws. A violation of that command is an injury to the individual rights of the person.

*Id.* at 277, 105 S.Ct. at 1947. (Emphasis in original) (footnote omitted).

■ The wisdom of this choice is readily apparent when considered in the context of the foundational purpose of the Civil Rights Act: providing a federally generated civil remedy for violations of constitutional or federal statutory rights in states where such protection was otherwise uncertain. By tying the statute of limitations for § 1983 actions inexorably to a state's statute of limitations for personal injury actions, the Court encouraged neutrality by creating a system where a state legislature could not fix a statute of limitations discriminatorily against federal civil rights claims without at the same time and by equal measure also limiting intra-state actions for personal injury. The Supreme Court observed:

> The characterization of all § 1983 actions as involving claims for personal injuries minimizes the risk that the choice of state statute of limitations would not fairly serve the federal interests vindicated by § 1983. General personal injury actions, sounding in tort, constitute a major part of the total volume of civil litigation in the state courts today, and probably did so in 1871 when § 1983 was enacted. It is most unlikely that the period of limitations applicable to such claims ever was, or ever would be, fixed in a way that would discriminate against federal claims, or be inconsistent with federal law in any respect.

*Id.* at 279, 105 S.Ct. at 1949. (Footnote omitted).

Furthermore, and as mentioned above, the Tenth Circuit has squarely addressed the issue before this Court today. Indeed, the Supreme Court made its ruling in *Wilson* while affirming the Tenth Circuit's decision in *Garcia v. Wilson*, 731 F.2d 640 (1984). In *Garcia*, the Tenth Circuit flatly stated: "[W]e conclude that every section 1983 claim is in essence an action for injury to personal rights.[1] Henceforth, all section 1983 claims in this circuit will be uniformly so characterized for statute of limitations purposes." *Id.* at 651. The Court strains to imagine a more lucid statement of law or more compelling precedent than that contained in the Tenth Circuit's statement.

The Court notes the defendants' argument that the determination of this issue should be based on Wyo.Stat. § 1–3–115, which reads: "All actions upon a liability created by a federal statute, other than a forfeiture or penalty, for which no period of limitations is provided in such statute, shall be commenced within two (2) years after the cause of action has accrued." Casual examination of this statute seems to support its application to the instant case. However, agreement with the defendants' position would defeat the reasoning of both the Supreme Court in *Wilson* and the Tenth Circuit in *Garcia*. It strains common sense to allow individual states to limit the viability of § 1983 actions through specific statutes of limitation, the application of which are based solely on § 1983's status as a federal statute. By adopting such a position, this Court would invite the very discrimination against constitutional and federal claims that the drafters of the Civil Rights Act of 1871 sought to avoid. When taken to its logical extreme, the defendants' argument would allow individual states to hobble § 1983 by making it subject to specialized statutes of limitation of unreasonably short duration.

This Court's position is further supported by the Tenth Circuit's recent opinion in *Arnold v. Duchesne County*, 26 F.3d 982 (10th Cir.1994). While the facts of Arnold are distinguishable from those of the instant case,[2] the reasoning of the court is instructive.

In 1987, two years after the Supreme Court's ruling in *Wilson*, the Utah legislature enacted a statute which specifically provided a two-year period in which to bring an action for an injury under § 1983.[3] The applicable personal injury statute had a four-year statute of limitations. *Id.* at 983, Utah Code Ann. § 78–12–25(3). The Tenth Circuit faced the important question whether a statute targeted specifically at § 1983 "provides an appropriate limiting principle and is consistent with the 'purpose and nature' of section 1983". *Arnold*, 26 F.3d 982 at 986. The Tenth Circuit held:

an important ground for the Supreme Court's conclusion that section 1983 actions are properly characterized as personal injury actions was its confidence that such a characterization would assure that neutral rules of decision would be available to enforce them ... By enacting a specific statute of limitations for section 1983 actions alone, the Utah legislature has both usurped the role of federal law in characterizing the essence of such actions and has eliminated the assurance that neutral rules of decision will apply to section 1983 in Utah.

\* \* \* \* \* \*

In sum, [the Utah Statute] attempts to do that which it cannot—to unilaterally declare that the statute of limitations for section 1983 actions in Utah shall be two years. While Congress permits federal courts to borrow state limitations periods, neither Congress nor the Supreme Court has authorized states to create limitations

---

**1.** This language is remarkably similar to that contained in Wyo.Stat. 1–3–104(a)(iv)(C), which requires a plaintiff to bring a cause of action within four years for "an injury to the rights of the plaintiff not arising under contract ...".

**2.** Where the statute in *Arnold* was drafted after, and possibly in response to, the Supreme Court's

decision in *Wilson*, Wyo.Stat. § 1–3–115 (1977) was drafted long before the Court heard *Wilson*. Furthermore, unlike the Utah statute, Wyo.Stat. § 1–3–115 makes no specific mention of § 1983.

**3.** Utah Code Ann. § 78–12–28(3) (1987).

periods specifically and exclusively applicable to section 1983 actions.

*Id.* at 987, 989 (citations omitted).

### CONCLUSION

The Court must not ignore the clear and binding precedent before it. The statute of limitations for § 1983 actions brought in the District of Wyoming is controlled by Wyoming's statute of limitations for personal injury actions. Wyo.Stat. § 1–3–105(a)(iv)(C). That period is four years. Accordingly, Sullivan's claim against the defendants remains viable and the Defendants' Motions to Dismiss are **DENIED.**

**THEREFORE,** it is

**ORDERED** that the Defendants' Motions to Dismiss be, and the same hereby are, **DENIED.**

**Robert C. MacELVAIN, Plaintiff,**

v.

**UNITED STATES of America and Mohammed Ali Shah, Defendants.**

**Civ. A. No. 93–T–542–N.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 23, 1994.

Richard L. Pyper, Thorington & Gregory, Montgomery, AL, Julian L. McPhillips, Jr., Kenneth Jay Shinbaum, McPhillips, Shinbaum & Gill, Montgomery, AL, David G. Chiodo, David G. Chiodo & Associates, P.C., Atlanta, GA, for Robert C. MacElvain.

Kenneth E. Vines, Redding Pitt, U.S. Attys., U.S. Attys. Office, Montgomery, AL, Carol Koehler Ide, U.S. Dept. of Justice, Tax Div., Washington, DC, for U.S.

Kenneth L. Millwood, Kevin H. Hudson, B. Shane Clanton, Nelson, Mullins, Riley & Scarborough, Atlanta, GA, for Mohammed Ali Shah.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiff Robert C. MacElvain has brought this lawsuit against defendants United States of America and Mohammed Ali Shah, claiming: first, that he is entitled to have the sale of property seized from him in 1993 set aside because the Internal Revenue Service ("IRS") failed to follow proper procedures; and, second, that the IRS should be enjoined from further efforts to assess and collect unpaid taxes for the years 1980 to 1986 because the IRS did not adhere to the correct procedures for making assessments and did not make such assessments within the time period allowed by statute. This action is now before the court on motions to dismiss filed by both the government and Mohammed Ali Shah. For the reasons that follow, the motions will be granted on the ground that the court lacks jurisdiction to grant the relief MacElvain seeks.

## I. BACKGROUND

The IRS has determined that, for the years 1980 to 1986, MacElvain is liable for unpaid federal income taxes, interest, and statutory additions in excess of $2,036,835. The IRS has made various attempts to collect these unpaid taxes. It mailed notices and demands for payments to MacElvain, and it informed him that his property might be subject to seizure. After these collection efforts proved futile, the IRS obtained a writ of seizure against his and his wife's property. It then seized several assets, including MacElvain's stock interest in Fulton Ferracute Industries International, Inc. The IRS determined that the stock interest was in danger of perishing or becoming greatly reduced in value and needed to be sold immediately. It therefore sold the stock interest to a Pakistani national, Mohammed Ali Shah, at a public auction.

In his complaint filed in April 1993 against the United States of America and Mohammed Ali Shah, MacElvain challenged the sale of his stock interest on the ground that the IRS did not provide adequate notice of the sale. He asked that the court set aside the sale and enjoin further efforts at collection by the IRS. MacElvain later amended his complaint to challenge the validity of the tax assessments made against him between 1980 and 1986. He contends that the IRS did not properly follow the procedures for making tax assessments and failed to impose the deficiencies within the time allowed by the statute of limitations. With the amended complaint, MacElvain added a request for injunctive relief requiring the IRS to withdraw all liens filed against his property and to cease its efforts to file future liens.

The government contends that MacElvain's lawsuit should be dismissed because the court has no subject-matter jurisdiction over his claims. Ali Shah also moves for dismissal on several grounds, including lack of subject-matter jurisdiction.

## II. THE GOVERNMENT'S MOTION TO DISMISS

MacElvain seeks several forms of injunctive relief. He asks that the government be required to set aside the sale of his stock interest in Fulton Ferracute Industries. He also asks that the IRS be directed to withdraw all liens filed on his property and to "cease and desist levying against any and all bank accounts, investment accounts, retirement benefits and any and all other tangible and intangible property owned by [him]."[1] It appears that there are two possible jurisdictional bases for the relief he seeks in this

---

1. MacElvain's amended complaint at 2–3, filed on November 17, 1993.

case: first, a judicially created exception to the Anti–Injunction Act, 26 U.S.C.A. § 7421(a); and, second, 28 U.S.C.A. § 2410(a), which authorizes a taxpayer to sue the United States to determine title. Each of these possible sources of jurisdiction will be considered in turn.

*A. Exceptions to the Anti–Injunction Act*

■ Under the Anti–Injunction Act, district courts have only limited power to grant equitable relief to litigants who challenge the government's tax collection powers. Section 7421(a) provides that:

"Except as provided in sections 6212(a) and (c), 6213(a), 6672(b), 6694(c), 7426(a) and (b)(1), and 7429(b), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."

None of the exceptions applies in this case. Sections 6212 and 6213 both apply only when taxpayers appeal a notice of deficiency to the United States Tax Court; § 6672(b) applies to bonds filed within 30 days of the assessment to ensure collection; § 6694 applies to penalty proceedings against return preparers; § 7426 addresses third-party wrongful levy suits; and § 7429 applies to proceedings brought to review jeopardy assessments.

■ There is, however, one additional exception to § 7421(a). The Supreme Court has carved out an exception for cases in which (1) there are no circumstances under which the government could prevail on the merits and (2) where the plaintiff has no adequate remedy at law and might face an irreparable injury. *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962). In determining whether there is a chance the government could prevail on the merits, the

court must decide that, "under the most liberal view of the law and the facts, the United States cannot establish its claim," *id.;* the government's claim must be "without foundation." *Id.* at 8, 82 S.Ct. at 1129.

■ MacElvain has not established that he is entitled to this exception. The certificates of assessment and payment entered against a taxpayer are treated as presumptively valid evidence that the assessments are correct and that they were prepared in accordance with IRS procedures. *United States v. Chila,* 871 F.2d 1015, 1017–18 (11th Cir.), *cert. denied,* 493 U.S. 975, 110 S.Ct. 498, 107 L.Ed.2d 501 (1989). MacElvain has offered no evidence to rebut this presumption of correctness. He never identifies with any degree of specificity or detail the procedural defects to which he refers in his complaint. In addition, MacElvain's contention that his tax liabilities were not assessed within the time period allowed by the statute of limitations also appears to be without merit. The statute of limitations is tolled "[i]n the case of a false or fraudulent return," or in the event of "a willful attempt ... to defeat or evade tax [liabilities]." 26 U.S.C.A. § 6501(c)(1) & (2). Because the tax liabilities MacElvain listed on his tax returns were substantially less than those determined by the IRS, the government has a more than colorable case that MacElvain engaged in intentional fraud, which would toll the running of the statute of limitations.[2] The court therefore cannot conclude, as required in *Enochs,* that there are no circumstances under which the government could prevail on the merits against MacElvain.

■ Finally, as to the claim that was at the heart of MacElvain's original complaint—that he was not given adequate notice of the sale of his stock interest—again he is unable to show, as required in *Enochs,* that there are no circumstances under which the gov-

---

**2.** In 1980, MacElvain stated that he owed $1,896 in income taxes, while the IRS determined the amount to be $190,291. In 1981, MacElvain claimed that he owed only $189 in taxes, while the IRS determined the amount owed to be $384,648. In 1982, MacElvain showed his tax liabilities to be only $23, while the IRS determined his liabilities to be $81,897. In 1983, MacElvain admitted to only four dollars in tax

liability, while his taxable income was later determined to be $350,768. In 1984, MacElvain claimed he had no taxable income, while the IRS valued the actual amount at $52,847. This trend continued in 1985, with MacElvain claiming seven dollars in tax liabilities, and the IRS determining the amount to be $139,483. Finally, in 1986, MacElvain listed his tax liabilities at eleven dollars, and the IRS placed them at $75,536.

ernment could prevail on the merits. 26 U.S.C.A. § 6336 provides:

"If the Secretary determines that any property seized is liable to perish or become greatly reduced in price or value by keeping, or that such property cannot be kept without great expense, he shall appraise the value of such property and—

(1) Return to owner.—If the owner of the property can be readily found, the Secretary shall give him notice of such determination of the appraised value of the property. The property shall be returned to the owner if, within such time as may be specified in the notice, the owner—

(A) Pays to the Secretary an amount equal to the appraised value, or

(B) Gives bond in such form, with such sureties, and in such amount as the Secretary shall prescribe, to pay the appraised amount at such time as the Secretary determines to be appropriate in the circumstances.

(2) Immediate sale.—If the owner does not pay such amount or furnish such bond in accordance with this section, the Secretary shall as soon as practicable make public sale of the property in accordance with such regulations as may be prescribed by the Secretary." [3]

The evidence reflects that, after the IRS determined that the stock interest in Fulton Ferracute Industries was in danger of becoming either perishable or greatly reduced in value, an effort was made to notify MacElvain. On February 17, 1993, the IRS orally notified a representative of MacElvain's that, because of its diminishing value, the stock would be sold in two days. On February 18, notice of the sale was delivered in writing to MacElvain's home, and notice was also posted in five public locations. On February 19, MacElvain's wife acknowledged receipt of the notice, but she advised an IRS representative that her husband was unavailable.

In response, MacElvain contends that the IRS did not have a sufficient basis for its conclusion that his stock interest was declining in value; moreover, he suggests that the IRS failed to comply with the expedited notice procedures. According to MacElvain, he never personally received advance notice of the sale either orally or in writing. Without deciding whether the IRS's efforts at notice were all that is required under the relevant statute and regulations, the court still concludes that the government's position is not so weak that under no circumstances could the court conclude that the government could prevail on the merits against MacElvain. In addition, there is no evidence in the record to suggest that the government had no legitimate basis for its conclusion that MacElvain's stock interest was declining in value. On all of MacElvain's claims, he fails to establish that the government does not have a colorable case against him.

3. The relevant IRS regulations provide in part: "(a) Appraisal of certain seized property. If the district director determines that any property seized by levy is liable to perish or become greatly reduced in price or value by keeping, or that such property cannot be kept without great expense, he shall appraise the value of such property and return it to the owner if the owner complies with the conditions prescribed in paragraph (b) of this section or, if the owner does not comply with such conditions, dispose of the property in accordance with paragraph (c) of this section.
(b) Return to owner. If the owner of the property can be readily found, the district director shall give him written notice of his determination of the appraised value of his property. However, if the district director determines that the circumstances require immediate action, he may give the owner an oral notice of his determination of the appraised value of the property, which notice shall be confirmed in writing prior to sale. The property shall be returned to the owner if, within the time specified in the notice, the owner—
(1) Pays to the district director an amount equal to the appraised value, or
(2) Gives an acceptable bond....
(c) Immediate sale. If the owner does not pay the amount of the appraised value of the seized property within the time specified in the notice, or furnish bond ..., the district director shall as soon as practicable make public sale of the property in accordance with the following terms and conditions—
(1) Notice of sale. If the owner can readily be found, a notice shall be given to him. A notice of sale also shall be posted in two public places in the county in which the property is to be sold. The notice shall specify the time and place of sale, the property to be sold, and the manner and conditions of sale ...
(2) Sale. The property shall be sold at public auction to the highest bidder."
26 C.F.R. § 301.6336–1.

■ Finally, MacElvain has failed to meet *Enochs's* second requirement: that he must be without legal remedies and that he must be facing irreparable injury. *Lovell v. United States*, 795 F.2d 976, 977 (11th Cir.1986). MacElvain could have filed a petition with the United States Tax Court within 90 days of the notice of deficiency for a redetermination of his liabilities. 26 U.S.C.A. § 6213(a). He could also still pay the liabilities and sue for a refund in a federal district court, but he has not pursued this remedy either. § 7422. Moreover, even the prospect of substantial financial loss does not establish irreparable harm. *See Hughes v. United States*, 953 F.2d 531, 536 (9th Cir.1992).

### B. Quiet–Title Action

■ The court also finds that 28 U.S.C.A. § 2410(a)—which permits the United States to be named as a party in any suit brought to determine who has title to real or personal property over which the United States has asserted an interest—does not support jurisdiction.[4] Whether the jurisdictional bar imposed by the Anti–Injunction Act is applicable to a claim brought as a quiet-title action is a question that is unsettled. At least one appellate court has suggested, without deciding, that § 2410(a) operates as a potential basis for injunctive relief, independent of the constraints of the Anti–Injunction Act. *See Hughes*, 953 F.2d at 537. *See also Smith v. United States*, 1989 WL 91136 at *4 (M.D.Ala. June 19, 1989) (Thompson, J.). Other courts have treated the Act as a limitation on the relief sought under a quiet-title action. *See, e.g., Bassett v. United States*, 782 F.Supp. 113, 116–17 (M.D.Ga.1992).[5] This court finds, however, that, for purposes

of this lawsuit, it need not decide the precise boundaries between the Anti–Injunction Act and a § 2410(a) quiet-title action. Even assuming that a quiet-title action is an avenue for pursuing injunctive remedies, the rationale behind § 2410(a) suggests that the claims advanced by MacElvain should still be foreclosed.

■ The reach of § 2410(a) has been limited by the Eleventh Circuit Court of Appeals and virtually every other appellate court that has addressed the issue. The only litigation which may be brought under § 2410(a) is a challenge to the procedural validity of a federal tax lien. *Stoecklin v. United States*, 943 F.2d 42, 43 (11th Cir.1991); *see also McCarty v. United States*, 929 F.2d 1085, 1087–88 (5th Cir.1991); *Robinson v. United States*, 920 F.2d 1157, 1161 (3d Cir.1990); *Kulawy v. United States*, 917 F.2d 729 (2d Cir.1990); *Schmidt v. King*, 913 F.2d 837, 839 (10th Cir.1990); *Elias v. Connett*, 908 F.2d 521, 527 (9th Cir.1990); *Pollack v. United States*, 819 F.2d 144, 145 (6th Cir.1987). Taxpayers may *not* attack the merits of the underlying assessment itself. *Stoecklin*, 943 F.2d at 43.

■ MacElvain's claim that the statute of limitations had run on the determination of liability is a challenge to the underlying merits of the assessment and is therefore beyond the scope of a § 2410(a) action. *See McCarty*, 929 F.2d at 1088 (analyzing a statute of limitations based challenge as a challenge to the underlying validity of the assessment). In addition, although MacElvain characterizes as procedural his claim that the IRS failed to follow required procedures in making its assessments for the years 1980 to 1986, he fails to describe exactly how the IRS

4. Ordinarily, lawsuits against the United States are barred by the doctrine of sovereign immunity, which permits the United States to be sued only when it consents to be sued. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Section 2410(a), however, provides:
"Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter—
(1) to quiet title to,
(2) to foreclose a mortgage or other lien upon,

(3) to partition,
(4) to condemn, or
(5) of interpleader or in the nature of interpleader with respect to,
real or personal property on which the United States has or claims a mortgage or other lien."

5. Litigants bringing tax challenges have at times couched their claims for declaratory relief in terms of § 2410(a) while staking their claims for injunctive relief on the exceptions to the Anti–Injunction Act. *See, e.g., Elias v. Connett*, 908 F.2d 521, 523–27 (9th Cir.1990); *Brewer v. United States*, 764 F.Supp. 309 (S.D.N.Y.1991).

violated any required procedures. A close examination of this claim suggests that MacElvain is essentially trying to challenge the merits of the underlying assessments for the years in question. In any event, irrespective as to whether his claim is characterized as procedural or substantive, he has failed to state the factual basis for a claim that the IRS did not follow required procedures in making its tax assessments for the years 1980 to 1986.[6]

Finally, even assuming that one or more of MacElvain's claims might legitimately be brought under a § 2410(a) quiet-title action because they are procedural in nature, this is not the end of the court's inquiry. The government contends that § 2410(a) confers jurisdiction only if, at the time the action is commenced, the government still claims a lien interest in the property. In this case, MacElvain's original challenge to the sale of the Fulton Ferracute Industries stock interest was brought on April 28, 1993, well after the government had surrendered any lien interest by selling the stock.

■ As best this court can determine, this is an issue the Eleventh Circuit has never squarely resolved.[7] A variety of courts, however, have followed the approach the government urges on this court, that of permitting a quiet-title lawsuit only when the government had a lien interest in the property at the time the lawsuit was commenced and thus the property has not been sold as of the time the lawsuit is filed. *See Powelson v. United States,* 979 F.2d 141, 145 (9th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1844, 123 L.Ed.2d 468 (1993); *Hughes v. United States,* 953 F.2d 531, 538 (9th Cir. 1992); *Brewer v. United States,* 764 F.Supp. 309, 314 (S.D.N.Y.1991); *Erickson v. United States,* 780 F.Supp. 733, 736 (W.D.Wash. 1990). Although a few courts have allowed a § 2410(a) action after a sale has been completed, they have done so only because the government still had a lien interest in the property at the time the lawsuit was brought. *See Kulawy v. United States,* 917 F.2d 729, 733–34 (2d Cir.1990) (when lien was on property at time complaint was filed, government cannot oust valid jurisdiction by selling property); *see also Bank of Hemet v. United States,* 643 F.2d 661, 665 (9th Cir.1981) (quiet-title action authorized when government still had an interest in the property at the time the complaint was filed). The court therefore concludes that jurisdiction under § 2410(a) is inappropriate when, before the taxpayer initiates litigation, the government has completed its sale of property and no longer retains a lien.

■ The most persuasive reason for this limitation is in the very nature of a quiet-title action. The purpose of a quiet-title action is "to determine who owns the title to real or personal property over which the United

6. The government further argues that MacElvain has failed to satisfy § 2410's procedural prerequisites for bringing suit. Section 2410(b) provides:

"The complaint or pleading shall set forth with particularity the nature of the interest or lien of the United States. In actions or suits involving liens arising under the internal revenue laws, the complaint or pleading shall include the name and address of the taxpayer whose liability created the lien and, if a notice of the tax lien was filed, the identity of the internal revenue office which filed the notice, and the date and place such notice of lien was filed."

The court agrees that MacElvain has failed to satisfy these requirements—in particular, because the government had no interest in the Fulton Ferracute Industries stock at the time MacElvain initiated this lawsuit, he could not meet the requirement that "The complaint or pleading shall set forth with particularity the nature of the interest or lien of the United States."

7. MacElvain cites two cases in support of the proposition that the Eleventh Circuit and the former Fifth Circuit have permitted quiet-title actions to go forward even though the government no longer had a lien interest in the property and the lawsuit was brought after the sale had commenced. However, neither of these cases is persuasive precedent for MacElvain's contention. In *Stoecklin,* the Eleventh Circuit authorized an action to quiet title against property upon which notices of levy had been placed. However, there is no indication in *Stoecklin* that the property had actually been sold, and the liens on the property were intact at the time of the suit. 943 F.2d at 43. As for the Fifth Circuit's opinion in *Reece v. Scoggins,* 506 F.2d 967, 971 (5th Cir. 1975), that court did not address the issue of whether a completed sale terminated jurisdiction over a quiet-title action; nor did the defendants raise lack of jurisdiction as a defense.

States has asserted some interest," *Smith v. United States,* 1989 WL 91136 at *4 (M.D.Ala. June 19, 1989) (Thompson, J.), and implicit in this purpose is the requirement that the defendant—in this case the United States—have, at the time of the initiation of the lawsuit, an interest adverse to that of the plaintiff. Indeed, consistent with this purpose, § 2410(a) requires that "The complaint or pleading shall set forth with particularity the nature of the interest or lien of the United States." Moreover, this reading of § 2410(a) is consistent with the understanding that has devolved from its ancient underpinnings. State courts have held that in order to maintain quiet-title actions, which have their roots in courts of chancery from the earliest times, there must be a showing that the defendant asserts a claim or interest that is adverse to the plaintiff's. *See, e.g., Sadler v. Home Savings,* 733 S.W.2d 856 (Mo.App.1987) (once bank had assigned deed of trust it no longer had interest in property and was properly dismissed from quiet-title action); *Lake Garda Improvement Association v. Battistone,* 155 Conn. 287, 231 A.2d 276 (1967) (an action to quiet title is quasi in rem and lies against those who at time it is instituted are present claimants to land under an instrument that creates cloud); 74 C.J.S. Quieting Title § 37 ("In order to maintain the statutory action to determine adverse claims to realty, there must be a showing that defendant asserts a claim which is adverse to plaintiff's title or possession") (1951).

■ In the present case, with the purchase of MacElvain's stock interest by Mohammed Ali Shah, the government's lien was extinguished well before MacElvain brought this lawsuit. MacElvain cannot therefore maintain an action against the government under § 2410(a).

### III. MOHAMMED ALI SHAH'S MOTION TO DISMISS

MacElvain also names as a defendant Mohammed Ali Shah, who purchased the Fulton stock in the February 1993 sale. Ali Shah moves for dismissal on the grounds that (1) service of process was insufficient, (2) the complaint fails to state a cause of action, and (3) the court lacks subject-matter jurisdiction over MacElvain's claims. The court agrees that Ali Shah's motion to dismiss should be granted on the grounds that jurisdiction over this action is lacking.

In his original complaint, which addresses the sale of the Fulton Ferracute Industries stock, MacElvain does not identify any misconduct on the part of Mohammed Ali Shah. He suggests only that Mohammed Ali Shah profited from improprieties by the IRS relating to the sale. The sole basis for including Mohammed Ali Shah in this lawsuit, therefore, is apparently MacElvain's theory that the stock sale could not be set aside without affecting Mohammed Ali Shah's interests. This theory, of course, presupposes that the court has jurisdiction to grant the relief MacElvain seeks.

■ Because the assumption that the court may grant MacElvain relief is false, there is no longer any basis for including Mohammed Ali Shah as a party in this lawsuit. Even assuming that a valid claim could ever exist against a purchaser of property, such a claim could lie only if this court had jurisdiction over the subject matter of the lawsuit.[8] *See Hughes,* 953 F.2d at 541 (rejecting joinder of additional parties in quiet-title action when the court lacked jurisdiction to grant relief against the government).

DONE.

---

**8.** The court need not address Mohammed Ali Shah's arguments relating to MacElvain's failure to state a claim and insufficient service of process.

ALLSTATE INSURANCE
COMPANY, Plaintiff,

v.

Marion BRANTLEY, Defendant,

Unisun Insurance Company, Intervenor.

Civ. A. No. 92–D–543–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 28, 1994.

Jeffrey W. Smith, Montgomery, AL, for plaintiff.

William Sidney Haynes, Jack B. Hinton, Jr., Montgomery, AL, for Unisun.

De MENT, District Judge.

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on Motion for Summary Judgment, together with brief and supporting materials, filed herein April 5, 1993, by Plaintiff Allstate Insurance Company ("Allstate"); and on Intervenor Unisun Insurance Company's ("Unisun") memorandum in opposition thereto, together with brief and supporting materials, filed May 5, 1993.

### I. BACKGROUND

On May 24, 1990, Marion Brantley and his wife Dorothy Brantley were involved in an automobile accident on Interstate 85 near Greenville, South Carolina. The accident occurred when Mr. Brantley, who was driving his wife's car, attempted to change lanes on the northbound side of the interstate. In doing so, Mr. Brantley, turned into the path of a Howard Lisk, Inc. tractor trailer rig which occupied the left hand lane. In an effort to avoid the car, the truck driver, Robert Jackson, turned sharply to the left but, in doing so, the truck crossed the median and entered the southbound side of the interstate where it struck another vehicle. The southbound vehicle was occupied by Lawrence Lewis and William Godfrey. The vehicle was owned by Carolina Woodworking, Inc., and both men were employed by the business at the time of the accident.

As a result of the crash, Mr. Godfrey sustained a collapsed lung, fractured ribs, a fractured left leg, a fractured left arm, facial bruises and lacerations. Mr. Lewis sustained a fractured left knee, head injuries, and facial lacerations. During that time, Mr. Lewis incurred medical expenses of $21,-799.03. In addition, a worker's compensation lien was in effect for the sum of $58,573.43.

Mr. Godfrey incurred medical expenses of $26,511.69. He also accumulated $10,810.06 in lost wages.

On April 15, 1991, Mr. Godfrey filed suit against Mr. Brantley, Mr. Jackson, and Howard Lisk, Inc. in the Court of Common Pleas of Greenville County, South Carolina. On July 1, 1991, Mr. Lewis filed suit against Mr. Brantley and Howard Lisk, Inc. in the United States District Court for the District of South Carolina, Greenville Division.

The vehicle driven by Mr. Brantley at the time of the accident was in fact owned by Mrs. Brantley. Mrs. Brantley purchased the vehicle prior to her marriage to Mr. Brantley. An auto insurance policy was purchased by Mrs. Brantley from State Farm Insurance Company ("State Farm"), when she bought the vehicle. The vehicle was still insured by State Farm when the accident occurred. Mr. Brantley also owned an automobile that he had purchased prior to his marriage and, like his wife, he also obtained an auto insurance policy for the vehicle at the time the vehicle was bought. However, Mr. Brantley was insured by Allstate and his wife's vehicle was not listed on his Allstate policy.

Shortly after Godfrey and Lewis filed their respective suits, Allstate wrote Mr. Brantley a letter dated July 18, 1991, in which they denied coverage for the accident and declined to defend him in the lawsuits. Allstate based its decision to deny coverage on the following language contained in Mr. Brantley's policy:

Part I. Automobile Liability Insurance

Bodily Injury—Coverage AA

Property Damage—Coverage BB

Allstate will pay for all damages a person insured is legally obligated to pay—because of bodily injury or property damage meaning:

(1) Bodily injury, sickness, disease, or death to any person, including loss of services; and

(2) Damage to or destruction of property, including loss of use.

Under these coverages, your policy protects the person insured from claims for accidents arising out of the ownership, maintenance or use, loading or unloading of the auto we insure.

 * * * * * *

Part I. Continued ...

Persons Insured

(1) While using your insured auto:

(a) You,

(b) any resident, and

(c) any other person using it with your permission.

(2) While using **a non-owned auto:**

(1) **you,**

(2) any resident relative using a four wheel private passenger or utility auto,

(3) Any other person or organization liable for the use of an insured auto if the auto is not owned or hired by the person or organization. [Emphasis supplied.]

 * * * * * *

**INSURED AUTOS**

(1) Any auto described on the declarations page and the four wheel private passenger auto or utility auto you replace it with.

(2) An additional four wheel private passenger auto or utility auto you acquire during the premium period. This auto will be covered if we insure all other private passenger autos or utility autos you own. You must, however, notify us within 60 days of acquiring the auto and pay any additional premium.

(3) A substitute four wheel private passenger auto or utility auto, not owned by you or a resident, being temporarily used while your insured auto is being serviced or repaired, or if your insured auto is stolen or destroyed.

**(4) An unowned auto used by you or a resident relative with the permission of the owner.** *This auto must not be available or furnished for the regular use of a person insured.* [Emphasis supplied.]

(5) A trailer, while attached to an insured auto designed for use with a private passenger auto or utility auto. This trailer can't be used for business purposes other than with a private passenger auto or utility auto.

Specifically, Allstate informed Mr. Brantley that his wife's vehicle was not covered under his own policy because the vehicle was "available or furnished for [his] regular use."

Following Allstate's denial of coverage, the parties involved in the underlying lawsuits entered into settlement negotiations. During those negotiations, State Farm (Mrs. Brantley's insurer) agreed to pay the limits of their liability on Mr. Brantley's behalf. Unisun, the insurance carrier for Carolina Woodworking and the intervenor in this case, agreed to provide Mr. Lewis and Mr. Godfrey with underinsured motorist benefits. In an agreement dated January 30, 1992, Unisun settled the balance of Mr. Lewis's claim against Mr. Brantley for the sum of $20,000.00. In a separate writing Mr. Brantley assigned his rights to recovery against Allstate to Unisun. On August 31, 1992, Unisun entered into an agreement with Mr. Godfrey to settle the balance of his claim against Mr. Brantley for the sum of $30,000.00. Again by a separate writing, Mr. Brantley assigned his rights to recovery against Allstate to Unisun.

On May 1, 1992, between the time of the Lewis settlement and the Godfrey settlement, Allstate filed this Declaratory Judgment action seeking a determination by this Court that they have no obligation to defend or indemnify Mr. Brantley for the accident. On June 2, 1992, Unisun sought to intervene in Allstate's declaratory judgment action and in fact filed a complaint against Allstate for subrogation following the settlement with Mr. Godfrey. Allstate, answered Unisun's complaint for subrogation stating first that Mr. Brantley's accident was not covered under their policy and second, that Unisun had failed to notify them of the settlement negotiations that were entered into by the parties and thus were not entitled to reimbursement for their payments to Godfrey and Lewis on Mr. Brantley's behalf.

At this time, Unisun and Allstate have agreed to submit this case to the court on stipulated facts, the deposition and affidavit testimony of Mr. and Mrs. Brantley, as well as exhibits thereto, and briefs.

## II. STANDARD FOR SUMMARY JUDGMENT

In considering a motion for summary judgment, this Court must refrain from deciding material factual issues but, rather, must decide whether such factual issues exist and, if not, whether the party moving for summary judgment is entitled to judgment as a matter of law. See *Dominick v. Dixie National Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987). Furthermore, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. See *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986). "Rule 56(c) mandates the entry of summary judgment * * * against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); accord *Kramer v. Unitas*, 831 F.2d 994, 997 (11th Cir.1987). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party * * *. If the evidence is merely colorable * * * or is not significantly probative, summary judgment may be granted." *Anderson*, supra, 477 U.S. at 249–50, 106 S.Ct. at 2511; accord *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir.1988).

Furthermore, the district court has the power to grant summary judgment for a nonmoving party. See *Pollack v. Birmingham Trust National Bank*, 650 F.2d 807 (5th Cir.1981); *Black Warrior Elec. Membership Corp. v. Mississippi Power Co.*, 413 F.2d 1221 (5th Cir.1969). However, the Court must take care "to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is ren-

dered is entitled thereto as a matter of law." *Pollack,* 650 F.2d at 810 (quoting MOORE'S FEDERAL PRACTICE paragraph 56.12).

### III. DISCUSSION

 The first question raised in the motion for summary judgment is whether or not the accident Mr. Brantley caused while driving his wife's car is covered under his Allstate policy. In order to answer that question, this Court must determine whether or not Mrs. Brantley's car was "available or furnished for the regular use" of Mr. Brantley. In doing so, this Court is mindful of the Alabama Supreme Court's admonition that "exceptions to coverage in a policy of insurance must be interpreted as narrowly as possible in order to provide maximum coverage of the insured." *Hall v. State Farm Insurance Co.,* 514 So.2d 853, 856, 57 (Ala. 1987).

To begin with, it should be noted that the sole evidence presented to the Court which pertains to this question is the affidavit and deposition testimony of Mr. and Mrs. Brantley. While Allstate might have benefitted by offering the testimony of some neutral and disinterested party, it chose not to, and this Court must therefore decide this matter with the evidence before it. With this in mind, it appears to be clear that there is no genuine issue of material fact as to this question and that Unisun is entitled to summary judgment. The testimony contained in the Brantley's affidavits and depositions establish that Mrs. Brantley's vehicle was not available or furnished for the regular use of Mr. Brantley. The following passages contained in Mr. Brantley's deposition tend to support this finding:

"Q. Would you ever drive her car just on your own, by yourself?

A. No.

Q. You never did that, did you?

A. I don't think I did that."

\*　　\*　　\*　　\*　　\*　　\*

"Q. But as you recall it, though, the times that you drove your wife's car were only times when she was in the car with you and you were relieving her from driving; is that correct?

A. That's right. That's right."

\*　　\*　　\*　　\*　　\*　　\*

"Q. And when you were going to use your wife's car when ya'll were traveling together, would you ask her permission before you did that?

A. Yes.

Q. And that would be something you would do all the time, ask her permission?

A. All the time. Yes, that's right.

Q. You wouldn't just go out and take her car without asking permission, would you?

A. No sir.

Q. You felt like that was a necessary thing to do, did you not?

A. That's right. That's right."

\*　　\*　　\*　　\*　　\*　　\*

"Q. Would you consider your Cadillac back then to be the car that you used principally?

A. As my principal car.

Q. Would you consider that the times that you used Mrs. Brantley's automobile to be occasional—

MR. SMITH: Object as to the form.

A. Occasional.

Q. —as you understand the word occasional?

A. Yes.

In addition, the following excerpts from Mrs. Brantley's affidavit tend to support the Court's finding: "It was not customary for him to use my car except when he was relieving me of the driving duties ..."; "[H]e did not use it freely and often ..."; "[T]he only time my husband would drive my automobile would be with my permission. I have never known him to take my automobile without first asking me or making sure that I approved of his use of it."

While the Court assumes that some married couples would have routine access to one another's automobiles, apparently, such was not the case here. Based on the evidence before this Court, Allstate was obligated to defend and provide coverage for Mr. Brantley under the terms of the insurance agreement.

## IV.

■ Allstate also contends, in the alternative, that Unisun is not entitled to subrogation in this instance because of its failure to notify Allstate of the negotiation and eventual settlement of the underlying claims against Mr. Brantley. The Court notes from the outset that it has not been directed to a single Alabama statute or case which imposes such duty on an underinsured motorist carrier where the primary carrier has denied coverage. Nevertheless, Allstate argues that such a duty should be imposed by this Court based upon the reasoning set out in the case of *Allstate Insurance Company v. Amerisure Insurance Company,* 603 So.2d 961 (Ala. 1992), and the Alabama Supreme Court's general requirement that an insured has a duty to give notice to his insurance carrier of a proposed settlement with an underinsured motorist. *Lambert v. State Farm Mutual Automobile Insurance Co.,* 576 So.2d 160 (Ala.1991). For the reasons set out below, the Court declines to impose such duty in this case.

In *Lambert,* the Alabama Supreme Court held, among other things, that before a settlement between an insured and an underinsured motorist was final, reasonable notice that a claim would be filed must be given to the underinsured motorist carrier. The purposes of this requirement is to first protect the carrier's rights to subrogation against the tortfeasor, and second, to protect the carrier from possible collusion between its insured and the tortfeasor's liability insurer at the expense of the carrier. *Id.,* at 187. However, the situation described in *Lambert,* is far different from this one. When an insured settles a claim with an underinsured motorist the insured does so with the knowledge that his carrier will be the one which foots the bill. There is no reason for the insured to make wise decisions in the settlement process because neither he nor the underinsured motorist will ever have to answer for those decisions in a financial sense. Thus, the underinsured motorist carrier ought to have some chance to object to the terms of a settlement that it will ultimately be obligated to honor. Yet here, Unisun settled because it appeared (based on Allstate's letter to Brantley) that the tortfeasor had no more coverage. Obviously, Unisun had no incentive to settle the claim for more money than it had to. In such a case, Allstate can hardly claim that they were prejudiced in the manner addressed by the *Lambert* Court. Therefore, the *Lambert* requirement for notice has no application to this case.

Similarly, the reasoning behind the Alabama Supreme Court's holding in *Allstate* does not compel this Court to render a judgment against Unisun. In that case, Morris Sherrill, an employee of Wadsworth Contractor's, Inc., was involved in an accident that occurred when one of Wadsworth's trailers that was attached to his personal truck came unhitched and rolled into another vehicle driven by Fred Demo. Demo subsequently brought a personal injury action against both Sherrill and Wadsworth.

Shortly after the suit was filed, Allstate, Sherrill's insurer, filed a separate declaratory judgment action against Amerisure, Wadsworth's insurer, in which it sought a judgment declaring that it was not obligated to defend or indemnify Sherrill in Demo's personal injury suit. In its answer to Allstate's complaint, Amerisure stated that it did have primary coverage for its policy holder Wadsworth, but that any coverage for Sherrill was secondary to Allstate's coverage. Shortly thereafter, Allstate filed a motion for summary judgment and the trial court granted that motion holding that Allstate was not obligated to cover Sherrill.

Following the trial courts entry of summary judgment in favor of Allstate, Amerisure appealed. However, during the time that the appeal was pending, Amerisure settled with Demo for the claims against Sherrill, Wadsworth, and Amerisure, and Demo agreed to dismiss his claims and to release all three defendants. In doing so, Amerisure did not inform the Supreme Court of its settlement, nor did it give notice to Allstate that it had any intention of seeking indemnity, contribution or subrogation from Allstate in a subsequent action should the Supreme Court reverse the Trial court's ruling.

Soon after the settlement was entered into, the Supreme Court reversed the trial court's ruling, and remanded the case to the trial

court holding that Allstate was obligated under its policy to provide coverage for the harm caused by the trailer. The Supreme Court did not address the question of which insurer had primary coverage for the accident.

On remand, Amerisure filed a counterclaim against Allstate seeking reimbursement for the sums it paid in the earlier settlement. The trial court entered summary judgment in Amerisure's favor and Allstate appealed. On appeal, Allstate argued that Amerisure was not entitled to either legal or equitable relief for two reasons; first, because Amerisure failed to preserve its right to proceed against Allstate when it did not give notice that it would seek reimbursement from Allstate and second, because Amerisure did not take steps to either postpone the settlement until the Supreme Court's opinion was released or ask for a continuance of the trial on the underlying liability claims. The Supreme Court agreed with Allstate's contentions and held that Amerisure had indeed forfeited its right to reimbursement for the cost of settlement because of its failure to give notice of its intentions, or to seek a postponement of the settlement.

In the present case, Allstate argues that Unisun has forfeited its right to subrogation based on the above holding of the Alabama Supreme Court. However, this Court finds that the relationship between Unisun and Allstate here is different from the relationship between Amerisure and Allstate in the above mentioned case. Here, Unisun is not a co-defendant with Allstate in the liability claim and it is not an original party to this declaratory judgment action. Unisun's sole duty in this case was to secure for its policy holder a prompt and just settlement for his claim. Allstate argues that Unisun should have given it notice of Unisun's intention to seek subrogation for the amount it paid to its policyholder, yet, Allstate knew that its refusal to provide coverage to Brantley would leave him underinsured, and Allstate further knew that Unisun could not neglect its own policy holder's need for recovery while this Court, solely for the benefit of Allstate, answered the question posed. Additionally, Allstate's argument that Unisun should have postponed its settlement or asked for a continuance in the underlying liability case is equally unpersuasive. As stated above, Unisun had the duty to represent its policyholder. Unisun had no duty to seek a postponement for the benefit of Brantley or his insurer of its policyholder's settlement or trial. Thus, while the Supreme Court's holding in *Allstate* is altogether correct given the relationship of the parties in that case, that holding has no application to the present case and is not authority upon which to deny Unisun's claim for subrogation.

## V. CONCLUSION

Accordingly, it is CONSIDERED and ORDERED that summary judgment for Plaintiff Allstate is due to be, and the same is hereby, DENIED. It is further CONSIDERED and ORDERED that summary judgment is due to be, and the same is hereby, GRANTED in favor of Intervenor Unisun on its claim for subrogation and attorneys' fees relating to the settlement with Marion Brantley.

Jurisdiction is retained in the event the parties cannot arrive at a sum representing reasonable attorneys' fees.

All costs herein incurred, including reasonable attorneys' fees, are hereby taxed against the plaintiff Allstate Insurance Company, for which let execution issue.

DONE.

**EPIC METALS CORPORATION,
a Pennsylvania corporation,
Plaintiff,**

v.

**CONDEC, INC., a Florida corporation,
and Frank Souliere, Sr., an
individual, Defendants.**

**No. 92–744–CIV–T–17C.**

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 1, 1994.

Frank R. Jakes, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, FL, for Epic Metals Corp., a Pennsylvania Corporation plaintiff.

Robert E. Brazel, Smith & Fuller, P.A., Tampa, FL, Sidney W. Kilgore, Coton, Kilgore & Lavigne, P.A., Clearwater, FL, for Frank Souliere, Sr., defendant and Condec, Inc.

## *ORDER*

JENKINS, United States Magistrate Judge.

THIS CAUSE comes on for consideration of Plaintiff's Motion for Partial Summary Judgment (Dkt. 39), Defendants' Response (Dkt. 42), and Plaintiff's Memorandum of Law in Opposition to Defendants' Cross–Motion for Partial Summary Judgment (Dkt. 44).[1] Oral argument has been held.

### I

In 1969 plaintiff began manufacturing and selling its EPICORE composite floor system for use in multiple-unit residential construction. In 1980 it authored a promotional bro-

---

1. The parties have consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed.R.Civ.P. 73.

chure entitled "Epicore Concept 2 Composite Floor System for multiple-unit residential construction." The brochure and its contents were proper subject matter for copyright protection and on November 11, 1980 plaintiff's registration of copyright was granted.

In 1991 plaintiff created another promotional brochure entitled "Composite Floor System with Steel or Concrete Framing." Again plaintiff duly registered its copyright in its EPICORE brochure.

In 1980 plaintiff hired defendants to be the exclusive EPICORE distributor for Sarasota, Pinellas, Hillsborough and Manatee counties. Defendants had access to and used plaintiff's promotional literature and catalog. Defendants had the exclusive right to sell and market EPICORE products until 1987 when plaintiff cancelled defendants' distributorship. Plaintiff terminated the distributorship because defendants had begun manufacturing and selling a substantially similar, if not identical, composite floor system competitive to plaintiff's system. The cancellation terminated defendants' right to use plaintiff's copyrighted brochures and this fact was emphasized to the defendants. Defendants, former EPICORE distributors, are now engaged in direct competition with the plaintiff.

In 1991 defendants produced their own promotional brochure and later admitted that they copied the plaintiff's brochure in preparing their brochure. (Dkt. 37, Exh. G; Dkt. 40, pp. 132–37, 140). Plaintiff then instituted this lawsuit alleging trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); copyright infringement of plaintiff's copyrighted EPICORE brochure in Count II; copyright infringement of plaintiff's copyrighted composite floor system brochure in Count III; reverse passing off in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count IV); and unfair competition under Florida common law (Count V). On April 29, 1994, defendants filed counterclaims alleging violation of Florida Statute § 540.08 (1993) (Counts I and III), and claims for common law invasion of privacy (Counts II and IV).

## II

Plaintiff requests summary judgment on its copyright infringement claim, Count II, and on the defendants' counterclaims. The parties agree that there is no genuine issue as to any material fact regarding plaintiff's Count II. Plaintiff contends that the certificate of copyright registration constitutes *prima facie* evidence of the validity of the copyright, including the requirement of originality and entitlement to copyright protection. Plaintiff also argues that defendants have failed to rebut this presumption. Moreover, because defendants admitted copying plaintiff's work, plaintiff argues that summary judgment must be entered in its favor.

Defendants argue that summary judgment should be entered in their favor because the photographs, charts and tables are not original or protectible subject matter. Therefore, defendants state that the material they copied is not entitled to copyright protection. Defendants contend that the doctrine of merging ideas into expression also prevents plaintiff's brochure from copyright protection.

Summary judgment is appropriate when the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. It is undisputed that there is no genuine issue as to an material fact concerning Count II of plaintiff's amended complaint. (Dkt. 42, p. 2). Therefore, only a legal issue remains for this Court's determination.

■ To succeed on its copyright infringement claims, plaintiff must prove that (1) it owns a valid copyright in the work allegedly infringed, and (2) that defendants copied that work. *See Donald Frederick Evans and Assoc., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 903 (11th Cir.1986).

The validity of plaintiff's copyright in the EPICORE brochure is not specifically attacked by defendants. Plaintiff received a certificate of copyright registration in its brochure which constitutes *prima facie* evidence that the copyright is valid, original and entitled to copyright protection. *See* 17 U.S.C. § 410(c) ("in any judicial proceedings the

certificate of a registration made within five (5) years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate"); *see also Arthur Rutenberg Corp. v. Dawney,* 647 F.Supp. 1214, 1216 (M.D.Fla.1986). Defendants have failed to produce evidence creating a genuine issue of material fact to rebut the presumption of copyrightability.

■ It has also been established that defendants admit to copying portions of plaintiff's copyrighted EPICORE brochure. The president of CONDEC, INC., defendant Souliere, testified at his deposition that defendants copied the tables and charts from plaintiff's brochure. (Dkt. 40, pp. 133–137). However, a few of the numbers were changed. Defendant Souliere also admitted that defendants appropriated two photographs from plaintiff's brochure for use in their CONDEC brochure. (Dkt. 40, p. 140). After comparison of the two brochures, it is clear that defendants copied substantial portions of plaintiff's brochures and incorporated them as their own. (Dkt. 39, Exh. E).

The parties' brochures have similar designs on their covers, the photos with the accompanying textual captions on page 2 and 3 are identical, and the remainder of the brochures illustrate a substantial copying of the charts and tables. The fact that a few numbers in the charts and tables were altered and only two of twelve photographs were copied does not constitute a de minimis appropriation.[2] "A taking is considered *de minimis* only if it is so meager and fragmentary that the average audience would not recognize the appropriation." *Fisher v. Dees,* 794 F.2d 432, 435, n. 2 (9th Cir.1986). Overall, the defendants' brochure is substantially similar to the plaintiff's EPICORE brochure and an average person would recognize the appropriation.

■ Defendants argue that the photographs, charts and tables they copied from plaintiff's brochure are not the proper subjects of copyright protection. (Dkt. 42, p. 4). Defendants contend that the photographs

"simply depict various stages of construction which could easily be obtained from any number of job sites" and therefore do not retain any elements of copyright protection. It is well settled that photographs are copyrightable. *See* 17 U.S.C. §§ 101, 102(a)(5); *Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). However, copyright protection extends only to original aspects of the work such as posing of the subject matter, lighting, angle, selection of film and camera, evoking a desired expression, and almost any other variant involved. *Id.* at 307. "[T]he quantity of originality that need be shown is modest—only a dash of it will do." *Id., citing Feist Pub., Inc. v. Rural Telephone Serv. Co., Inc.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The cases cited by defendants stand for the same proposition. Defendants are permitted to copy the idea presented by plaintiff's photographs but can not simply make copies of the photographs. *Blackman v. Hustler Magazine, Inc.,* 620 F.Supp. 792, 796 (D.D.C.1985) (magazine which published a photographer's photographs infringed the photographer's copyrights), *aff'd in part, rev'd in part,* 800 F.2d 1160 (D.D.C.1986) (on issue of damages).

Defendants state, "the fact that the identical subject matter is present in two (2) photographs does not prove copying or infringement," relying on *Franklin Mint Corp. v. National Wildlife Art Exchange, Inc.,* 575 F.2d 62 (3d Cir.), *cert. denied,* 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). However, the *Franklin Mint* case involved two paintings with similar ideas but different expressions, unlike the instant situation where defendants copied plaintiff's photographs and then admitted to the copying.

Defendants argue that there are only a very few ways to express the idea contained in plaintiff's photographs. Therefore, they argue that the idea and expression have merged and become inseparable. "Under the merger doctrine, 'expression is not protected in those instances where there is only one or so few ways of expressing an idea that

---

2. Defendants noted at the hearing that the inside cover of the EPICORE brochure contains a license to freely copy page 18. However, this fact bears on damages and not liability.

protection of the expression would effectively accord protection to the idea itself.'" *BellSouth Adv. & Pub. Corp. v. Donnelley Info. Pub., Inc.*, 999 F.2d 1436, 1442 (11th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 323 (1994). However, plaintiff does not seek to monopolize the subject matter or idea of the photographs but to protect the actual reproduction of the expression of the idea, the photographs themselves. Making a copy of plaintiff's photographs constitutes copyright infringement. *See Blackman,* 620 F.Supp. at 796.

■ The charts and tables of information and specifications are also copyrightable. This data is original expressions of facts and processes derived from independent testing conducted by plaintiff and as such may be protected under the copyright laws. *See Applied Innovations, Inc. v. Regents of the Univ. of Minn.,* 876 F.2d 626, 635–36 (8th Cir.1989) (psychological testing data were copyrightable as expressions of facts or processes).

Defendants argue that because EPICORE and CONDEC products are "very similar, if not identical, it would hardly be surprising for test results performed on each product to likewise be very similar, if not identical." (Dkt. 42, p. 6). Defendants are permitted to use the underlying data and facts to conduct their own tests for use in their brochures. *See generally id.* at 636 (although discovered facts, statistical models and mathematical principles cannot be copyrighted, certain adjustments on basis of expertise and clinical experience resulting in testing data are original expressions of those facts or processes as applied and are copyrightable). However, defendants have not shown that they performed similar tests or that had they performed similar tests the results would have been identical.

Defendants again rely on the doctrine of merger. The relevant inquiry is whether plaintiff demonstrated originality in its arrangement or coordination of the facts. *See BellSouth,* 999 F.2d at 1443. The charts and tables at issue contain information about

U.L. Fire Ratings, sound transmission ratings, engineering tables regarding amounts or reinforcing steel required over supports, corresponding to slab depth and span length, and load tests. (Dkt. 37, Exh. A). The brochure states, and plaintiff claims, that the test results are a result of independent laboratory testing. This technical information is provided to assist experienced structural engineers. The EPICORE product is an original creation, "[t]here is no other Composite deck system similarly designed or able to match EPICORE's performance." (Dkt. 37, Exh. A, p. 2). Therefore, plaintiff tested its new product.

There is no merger of idea and expression because plaintiff's coordination of the facts are a result of independent testing. Plaintiff does not seek to prevent defendants from using statistical information or tests similar to plaintiff's, but to prevent defendants from copying the independent test results set out in plaintiff's brochure. *See Applied Innovations,* 876 F.2d at 635–36.

Plaintiff has established that it owns a valid copyright in the EPICORE brochure and that defendants copied that work. Moreover, defendants' argument that portions of plaintiff's copyrighted EPICORE brochure are not subject to copyright protection does not defeat plaintiff's claim on the facts presented. Accordingly, plaintiff's motion for partial summary judgment as to liability in Count II is granted. The issue of statutory damages resulting from defendants' copyright violation as alleged in Count II is reserved for trial.

### III

Plaintiff has also moved for summary judgment on defendants' counterclaims. Defendants' counterclaim alleges violations of Florida Statute § 540.08, and claims for common law invasion of privacy.[3] A photograph of defendant Souliere was taken by an EPIC officer in 1980 as defendant Souliere appeared to be looking at a set of plans on a job site with two other individuals. This color

---

**3.** The question of whether CONDEC has standing to bring these invasion of privacy counterclaims

has not been raised by the plaintiff.

photograph was subsequently used by plaintiff in its colored 1980 brochure and was later published in black and white in its 1991 brochure. (Dkt. 39, Exh. A). Defendant Souliere alleges that he did not expressly consent to plaintiff using the photograph in its promotional brochures.

Plaintiff contends that it is not liable because it did not associate Souliere's name or personality with its product or promote a product or service with the photograph. Plaintiff argues that no reasonable juror could conclude that the use of the photo in the brochures constituted commercial exploitation. Further, plaintiff argues that defendants' counterclaims are barred by laches and Florida's four year statute of limitations.

Defendants contend that the counterclaims involve questions of fact and are therefore inappropriate for summary judgment. Defendants argue that plaintiff's use of defendant Souliere's photograph amounts to commercial exploitation and that whether the photograph of defendant Souliere falls within the member of the public exception is a jury question. Defendants state that a 40 year statute of limitations is provided for in the statute and that even if this is not the applicable statute of limitations, the republication in 1991 constitutes a separate cause of action. *See* Fla.Stat. § 540.08(4).

Florida Statute § 540.08 provides in relevant part:

(1) No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use ...

(3) The provisions of this section shall not apply to:

(c) Any photograph of a person solely as a member of the public and where such person is not named or otherwise identified in or in connection with the use of such photograph.

(4) No action shall be brought under this section by reason of any publication, printing, display, or other public use of the name or likeness of a person occurring

after the expiration of 40 years from and after the death of such person.

Fla.Stat. § 540.08 (1993).

■ The threshold inquiry is what statute of limitations applies and whether the counterclaims are barred by the applicable statute of limitations. There is a distinct difference between a statute of limitations and a statute of repose. "A statute of limitations normally governs the time within which legal proceedings must be commenced after the cause of action accrues.... A statute of repose, however, limits the time within which an action may be brought and is not related to the accrual of any cause of action. The injury need not have occurred, much less have been discovered." *Bradway v. American Nat'l Red Cross,* 992 F.2d 298, 301 (11th Cir.1993) (citations omitted).

■ Statutes of repose terminate the right to bring an action after the lapse of a specific period. Statutes of limitations provide the time a party has to initiate an action once the injury has occurred. Section 540.08(4) is a statute of repose because it terminates the right to bring an action if the commercial use does not transpire within 40 years after the death of the individual. This is an absolute bar occurring before the cause of action accrues.

Because section 540.08 does not provide its own limitations period and the action does not fall within any of the specific categories provided in Florida Statute § 95.11, the four year all inclusive statute of limitations is applicable. *See* Fla.Stat. § 95.11(3)(p). Counts I and II are based on the 1980 publication of the EPICORE brochure. Defendants conceded at the hearing that Count II, the common law invasion of privacy claim on the 1980 brochure, is barred by the 4 year statute of limitations. Therefore, Counts I and II are barred by the four year statute of limitations.

■ Whether defendants' counterclaims in Counts III and IV are also barred by the four year statute of limitations turns on whether the 1980 publication and the later 1991 reproduction are one cause of action arising when the first brochure was published, or whether the 1991 publication of the

same photo, but in black and white, constitutes a separate cause of action. Defendants contend that the later brochure is a new publication and because a new copyright was obtained, constitutes a separate cause of action.

Plaintiff argues that simply continuing to use the photograph the same way does not constitute a new cause of action. Plaintiff also argues that the fact two copyrights were obtained is irrelevant for purposes of this determination.

■ There is no case law directly dealing with this issue. However, in *Blackman* the court treated three successive publications of a photograph involving distinct set-up and arrangements as three separate infringements for the purpose of assessing damages. *Blackman,* 620 F.Supp. at 796. Also, in defamation actions the modern rule is that subsequent publications of the same material, such as a new edition of a newspaper or book, are republications that "trigger a new cause of action and commence a new limitations period." *See Foretich v. Glamour,* 753 F.Supp. 955, 960 (D.D.C.1990). Thus, assuming that the 1991 publication of defendant Souliere's photograph in the plaintiff's second brochure is a separate cause of action, the four year statute of limitations does not bar defendants' Counts III and IV.

■ However, plaintiff's motion for summary judgment regarding defendants' Counts III and IV is granted on other grounds because no reasonable juror could find that plaintiff's use of defendant Souliere's photograph constitutes commercial exploitation.

The photograph at issue shows construction material and the caption reads, "[o]ne truck can transport 15,000 square feet of EPICORE deck. Unloading can be completed quickly and efficiently. Material can be easily stored until ready for installation." In the photograph, three individuals stand near deck material but they are not identified. Apparently, defendant Souliere is the man in the center standing behind a stack of lumber with only his head and shoulders visible. His head is down, and he is wearing a straw hat. The depiction of Souliere is less than a half

inch in width and length. Further, the black and white photograph is unclear and defendant Souliere's features are unrecognizable.

Florida Statute § 540.08 prevents the unauthorized use of a name or personality to directly promote the product or service of the publisher. The publication is harmful because of the way it associates the individual's name or personality with the product. *Valentine v. C.B.S. Inc.,* 698 F.2d 430, 433 (11th Cir.1983) (*per curiam*); *Loft v. Fuller,* 408 So.2d 619, 622–23 (Fla. 4th DCA 1981), *rev. denied,* 419 So.2d 1198 (Fla.1982). It is not enough that the publisher make money through sales of product, but that the name or photograph distinguishes the product to rise to the level of commercial exploitation prohibited by the statute. *Valentine,* 698 F.2d at 433 ("use of a name is not harmful simply because it is included in a publication sold for profit.").

The intended focus of the photograph was on the deck material, not defendant Souliere. The caption is the same for the 1980 and 1991 brochures and discusses the deck material in the photograph. Defendants have presented no evidence that plaintiff exploited defendant Souliere's photograph for the purpose of promoting EPIC products. Instead, defendant Souliere testified that no one had recognized him as being depicted in the subject photograph. (Dkt. 40, pp. 177–78). Further, defendants have not produced any evidence that any customer viewing the photograph believed that defendant Souliere was endorsing the EPICORE product.

The instant case is unlike the *Nottage* case relied on by defendants in that defendant Souliere's photograph was not prominently displayed as the focal point of large posters and postcard advertising distributed worldwide. *See Nottage v. American Express Co.,* 452 So.2d 1066, 1068 (Fla. 3d DCA 1984) (*per curiam*). Also, the *Nottage* case involved a motion to dismiss the complaint which is a different standard than a motion for summary judgment. In a motion to dismiss for failure to state a· cause of action, matters outside the pleading are not considered. Therefore, *Nottage* is distinguishable on its facts.

Moreover, this photograph falls within the statutory "member of the public" exception. *See* Fla.Stat. § 540.08(3)(c). The three men in the photograph are not named, are not in uniform, and are not otherwise connected with the use of the photograph. Defendant Souliere appearing in the photograph is merely fortuitous. Therefore, this Court finds that no reasonable juror could find that the photograph of defendant Souliere in plaintiff's brochure constituted commercial exploitation or that it does not fall within the member of the public exception provided by Florida Statute § 540.08(3)(c). Accordingly, plaintiff's motion for summary judgment is granted as to defendants' Count III.

 Defendants claims for common law invasion of privacy, Counts II and IV, also concern whether plaintiff appropriated the photograph of defendant Souliere for commercial use. Under Florida common law, the tort of invasion of privacy is divided into the following four categories:

(1) intrusion into an individual's physical solitude or seclusion;

(2) public disclosure of private facts;

(3) portraying an individual in a false light in the public eye; and

(4) appropriation, i.e., commercial exploitation of the property value of one's name.

*Loft,* 408 So.2d at 622. Defendants' claims fall within the fourth category.

Appropriation of one's name or likeness has been compared to impairment of a property right which involves an aspect of unjust enrichment to the publisher. *Loft,* 408 So.2d at 622, *citing* RESTATEMENT (SECOND) OF TORTS § 652I (1977). Defendants have not shown commercial exploitation of defendant Souliere's name or personality that resulted in unjust enrichment to plaintiff. No one recognized defendant Souliere in the photograph and there is no evidence that he was associated with and was endorsing the EPICORE product.

Defendant is required to prove that he has been publicly identified as a prerequisite to recovery on his invasion of privacy counterclaims. *See Rawls v. Conde Nast Pub., Inc.,* 446 F.2d 313, 318 (5th Cir.1971), *cert. denied,* 404 U.S. 1038, 92 S.Ct. 712, 30 L.Ed.2d 730 (1972) (plaintiff may not recover for invasion of privacy when privacy remains inviolate). Defendant Souliere was not identified in the photograph and testified at his deposition that no one had recognized him as being depicted in the subject photograph. (Dkt. 40, pp. 177–78). Defendants have not presented evidence of commercial exploitation to support their common law invasion of privacy claims. No reasonable juror could conclude otherwise. As a result, summary judgment is entered for plaintiff on Count IV of defendants' counterclaims.[4]

Upon consideration it is ORDERED:

(1) that Plaintiff's Motion for Partial Summary Judgment (Dkt. 39) is GRANTED as to Count II or the Amended Complaint (liability only) and as to Counts I through IV of defendants' counterclaims;

(2) that Defendants' Motion for Partial Summary Judgment (Dkt. 42) is DENIED.

**DONE and ORDERED.**

James P. **SCIARRINO,** an individual d/b/a Clancy's Gourmet Pizza; and Wade Ferrel, an individual, Plaintiffs,

v.

**CITY OF KEY WEST,** a Florida municipal corporation, Defendant.

No. 93–10031–CIV.

United States District Court, S.D. Florida.

Oct. 27, 1994.

---

**4.** Defendant was aware of the photograph appearing in the plaintiff's brochure in 1980 yet did not object or bring this fact to plaintiff's attention until his deposition in April 1994. (Dkt. 40, pp.

174–75). However, because defendants' counterclaims are barred on other grounds, plaintiff's laches defense need not be addressed.

Michael Barnes, Key West, FL, Richard Wilson, Orlando, FL, for plaintiffs.

Michael Burke, Ft. Lauderdale, FL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, District Judge.

### I. Findings of Fact

In response to various complaints by pedestrians and property owners, the City of Key West (the "City") sought to limit the use of "barkers" who solicited customers for business purposes along various streets and beaches in Key West's Historic District. Businesses such as restaurants and timeshare apartments hired barkers to approach pedestrians, engage in face-to-face advertising, distribute printed advertising materials and solicit customers for area businesses. The activities of barkers are referred to as "off-premises canvassing" ("OPC").

In response to complaints received regarding the activities of the barkers, the City conducted a workshop meeting on November 12, 1991 to discuss the problems caused by OPC activity. The City drafted a proposed ordinance and held public hearings regarding the proposed ordinance on March 3, 1992 and March 17, 1992. During these public hearings, numerous proponents of the ordinance described the problems caused by OPC activity in the historic district. These problems included: sidewalk congestion, invasion of pedestrian privacy, litter, impact on businesses proximate to where the OPC activity occurred and damage to the tourist-friendly atmosphere that Key West attempts to cultivate. At the conclusion of the March 17, 1992 meeting, the Key West City Commission adopted Ordinance No. 92–12 and created Sections 94.01–10 of the Key West Code of Ordinances (the "Ordinance").

The Ordinance prohibits OPC activity on publicly-owned parking lots, beaches and Mallory Dock. It also imposes limitations on OPC activity on Duval Street, Front Street, Clinton Square, and parts of Simonton and Whitehead Streets. The Ordinance does not completely ban OPC activity, but rather limits the location of OPC activity and the number of off-premises canvassers per business.

The Ordinance also establishes a permitting system for persons who seek to engage in OPC activity on publicly-owned land. Each off-premises canvasser must submit an application containing his or her name, date of birth, business represented and business address and telephone number. Proof of citizenship or an applicable work permit is also required.

After promulgation of the Ordinance, the City noticed a decrease in the amount of litter created by discarded advertising materials. The City also received fewer complaints regarding unwanted solicitation and sidewalk congestion. However, the Ordinance has not solved all the problems that the Ordinance was designed to remedy.

Plaintiff[1] James P. Sciarrino ("Sciarrino") owns and operates a restaurant under the trade name "Clancy's Gourmet Pizza." The restaurant is located on Charles Street, one of several side streets which are perpendicular to heavily travelled Duval Street. Prior to the enactment of the Ordinance, Plaintiff relied heavily on OPC activity on Duval Street to solicit customers for his restaurant. Subsequent to the adoption of the Ordinance, Sciarrino employed and/or contracted with persons who engaged in OPC activity on behalf of Clancy's Gourmet Pizza.

---

1. The Court finds that Plaintiff Wade Ferrel, who leases the property to Plaintiff Sciarrino and who does not employ off-premises canvassers, lacks standing to challenge the Ordinance.

## 1020

### II. Conclusions of Law

#### A. First Amendment Challenge

■ It is axiomatic that the public streets are a quintessential public forum. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (" '[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks and parks, are considered, without more, to be 'public forums.' "). The Ordinance, which applies to certain speech on the public streets, restricts commercial speech,[2] which is speech that proposes a commercial transaction. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Commercial speech has traditionally been given less protection under the First Amendment than non-commercial or "pure" speech. *Id.* (commercial speech entitled to First Amendment protection); *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (commercial speech afforded less protection under First Amendment than non-commercial speech).

#### *Central Hudson Gas* Analysis

■ The Supreme Court in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), set forth a four-part test to determine if a restriction on commercial speech is constitutionally valid. The four prongs are as follows: (1) the speech must be truthful and concern lawful activity; (2) the government must have a substantial interest in restricting the speech; (3) the regulation must directly advance the asserted governmental interest and (4) the regulation must be narrowly tailored to serve the governmental purpose.[3]

#### 1. Is the speech truthful and does it concern lawful activity?

In order to receive First Amendment protection, commercial speech must be truthful and must relate to lawful activity. Neither party contests the fact that the speech in issue is truthful and relates to lawful activity. Therefore, the Court finds that the speech regulated by the Ordinance is protected commercial speech.

#### 2. Is there a substantial governmental interest in restricting the speech?

Defendant contends that three substantial governmental interests[4] exist for regulating commercial speech though the Ordinance. First, the City argues that off-premises canvassers harass tourists and pedestrians walking along the streets and beaches of the Historic District and invade pedestrian privacy. The City contends that prevention of this invasion of privacy is a substantial governmental interest. *See Hays County Guardian v. Supple,* 969 F.2d 111, 119 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1067, 122 L.Ed.2d 371 (1993) (although finding a university's restriction on distribution of newspapers unconstitutional, the Court found that the university had a legitimate interest in preventing invasion of privacy). Plaintiff contests this interest and

---

2. Plaintiff contends that the Ordinance covers commercial and non-commercial speech. The Court finds that this argument is without merit because the terms of the ordinance restrict only OPC activity and off-premises canvassing is defined as "distribution of information or solicitation of customers on a street, sidewalk, or other publicly owned right-of-way in connection with a business." Key West, Fla.Code of Ordinances § 94.02.

3. The Supreme Court modified the fourth prong of the *Central Hudson* analysis in *Board of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 478, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989), so that the inquiry is whether the restriction is narrowly tailored to serve the governmental interest. Previously, the fourth prong inquired whether the means were no more restrictive than necessary.

4. The City also proffered a fourth reason for the Ordinance—the preservation of the aesthetics and tourist-friendly atmosphere of the Historic District. This interest derives from the City's analogy of off-premises canvassers to "human signs" and the First Amendment jurisprudence regarding sign ordinances. However, the Court does not find this to be an apt analogy and therefore finds that aesthetic concern is not a substantial governmental interest advanced by the Ordinance. Additionally, a "tourist-friendly" atmosphere is too amorphous a concept to constitute a *substantial* governmental interest.

claims that protection of pedestrian privacy is not a substantial governmental interest. The Court finds that protection of pedestrian privacy is a substantial governmental interest. "Even solicitation that is neither fraudulent nor deceptive may be pressed with such frequency or vehemence as to intimidate, vex, or harass the recipient." *Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1799, 123 L.Ed.2d 543 (1993) *(citing Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 462, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978) for the proposition that protection of privacy is a legitimate state interest).

The second asserted governmental interest is reduction of sidewalk congestion. The areas of Key West that are subject to the Ordinance experience heavy pedestrian and automobile traffic. Plaintiff concedes that this is a substantial governmental interest.

The third governmental interest asserted is reduction in litter. The City argues that many pedestrians discard OPC materials soon after receiving them and that the City has an interest in reducing this type of litter. Plaintiff concedes that this is a substantial governmental interest.

Thus, the Court finds that the City has a substantial governmental interest in protecting pedestrian privacy, reducing congestion and preventing litter.

### 3. Does the regulation directly advance the asserted governmental interests?

The Ordinance does not completely proscribe OPC activity. Rather, it limits the number of canvassers, restricts the location of the canvassing, and requires permits for off-premises canvassers. As such, it does not completely eliminate the problems that the Ordinance seeks to solve. However, the Ordinance does not need to completely solve the problems, it must merely directly advance the governmental interest. "The City may 'directly advance' its interest by pursuing a partial solution to its problems, a proposition confirmed by the Supreme Court in *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)." *Supersign of Boca Raton, Inc. v. City of Fort Lauderdale,* 766 F.2d 1528, 1531 (11th Cir. 1985).

By restricting OPC activity through the Ordinance, the City advances its goal of protecting pedestrian privacy by limiting the harassing conduct of the off-premises canvassers. This conclusion is buttressed by a decrease in the number of complaints regarding OPC activity.

The Ordinance also directly advances the City's second goal of reducing congestion in the City's Historic District. Plaintiff argues that the City streets are always congested due to heavy tourist flow and street performers, who cause tourists to stop and gather around to watch their performances. Plaintiff is correct that congestion continues to be a problem for Key West and that the Ordinance does not significantly reduce this problem. However, the Ordinance removes OPC activity from the most congested thoroughfares in the Historic District, thereby providing a tangible, if modest, reduction in sidewalk congestion.

Although the Key West Historic District is a heavily trafficked area which is subject to litter problems, Felix Cooper, the Key West City Manager, testified that the OPC activity contributed to this litter problem and that the Ordinance reduced the litter caused by OPC activity.

In sum, the Ordinance directly advances all three of the City's asserted interests.

### 4. Is the regulation narrowly tailored to serve the governmental purpose?

The fourth prong of the *Central Hudson* analysis focuses on the "fit" between the regulation and the substantial governmental interests. Plaintiff relies on *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) for the proposition that the Ordinance is not narrowly tailored to serve the governmental interests asserted. In *Discovery Network,* the Supreme Court found that Cincinnati's complete ban on commercial newsracks was unconstitutional where Cincinnati did not prohibit non-commercial newsracks and where the regulation did not directly advance the governmental interest underlying the regulation. The Court found that while aesthetics and safety were legitimate inter-

ests, a regulation banning sixty-two commercial newsracks while allowing 1500–2000 non-commercial newsracks violated the First Amendment. Cincinnati's distinction between commercial and non-commercial speech lacked a close relationship to the governmental interests. *Discovery Network*, — U.S. at ——, 113 S.Ct. at 1514. This was especially problematic where non-commercial speech, which the regulation did not restrict, caused the vast majority of the safety and aesthetic impairment.

Unlike the Cincinnati regulation, the Ordinance is not a "categorical ban" on OPC activity. The Ordinance simply limits the number of off-premises canvassers per business and the location of OPC activity. Were Key West to completely prohibit OPC activity throughout the entire city, such a ban would be impermissible. However, the modest restrictions imposed by the Ordinance do not run afoul of the First Amendment. Moreover, while the Cincinnati ordinance did not promote improved aesthetics or safety, the Ordinance does protect pedestrian privacy and, to a lesser degree, reduce litter and congestion.

A tenuous fit existed between the Cincinnati regulation and the asserted interests where the City restricted only commercial speech, despite the fact that non-commercial speech caused the bulk of the problem. In contrast, the opposite is true in Key West. Commercial OPC activity causes the harms that the Ordinance is designed to remedy. Non-commercial handbilling in Key West is not a significant cause of congestion, invasion of pedestrian privacy or litter. Finally, the *Discovery Network* Court made clear that

the "holding, however, is narrow. As should be clear from the above discussion, we do not reach the question whether, given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and noncommercial newsracks." *Id.* at ——, 113 S.Ct. at 1516.

Thus, the Ordinance satisfies all four prongs of the *Central Hudson Gas* analysis and does not violate the First Amendment of the United States Constitution.

### B. Florida Statute § 166.0443

■ Having found that the Ordinance is valid under the First Amendment, the Court now examines the Ordinance's validity under Florida Statute § 166.0443 [5] (the "Statute"). Plaintiff contends that the Statute invalidates the Ordinance. Specifically, Florida Statute § 166.0443 prohibits municipalities from enacting any ordinance that requires the "registration or background screening of any individual engaged in or applying for a specific type or category of *employment* in the county or municipality or requires the carrying of an identification card issued as a result of such registration or screening ..." (emphasis added). Plaintiff asserts that the Ordinance's permit provisions violate the Statute by requiring registration or background screening in connection with employment as an off-premises canvasser. However, the Statute does not invalidate the Ordinance because it does not require the registration or background screening of individuals who wish to obtain employment as an off-premises canvasser. Under the Ordinance, only

---

5. Florida Statutes § 166.0443 provides, in full:

(1) Except as authorized by law, no county or municipality shall enact or enforce any ordinance, resolution, rule, regulation, policy, or other action which requires the registration or background screening of any individual engaged in or applying for a specific type or category of employment in the county or municipality or requires the carrying of an identification card issued as a result of such registration or screening, whether or not such requirement is based upon the residency of the person. However, an ordinance that regulates any business, institution, association, profession, or occupation by requiring background screening, which may include proof of certain

skills, knowledge, or moral character, is not prohibited by this section, provided that such regulation:

(a) Is not preempted to the state or is not otherwise prohibited by law;

(b) Is a valid exercise of the police power;

(c) Is narrowly designed to offer the protection sought by the county or municipality; and

(d) Does not unfairly discriminate against any class of individuals.

(2) This section shall not be construed to prohibit any employer, including a local government, from investigating the background of employees or prospective employees or from requiring employees to carry an identification card or registration card.

persons who seek to conduct commercial advertising or solicitation in certain areas of the Key West Historic District must obtain permits. An off-premises canvasser may work without a permit in any area of Key West unregulated by the Ordinance. The OPC Ordinance thus focuses on the *activity* and location of off-premises canvassers rather than on their employment.

 Assuming arguendo that the Ordinance violates the main section of the Statute, the Ordinance is a valid regulation under the "savings" clause of § 166.0443. This clause exempts ordinances that would otherwise violate the terms of the Statute if the regulation (a) is not preempted to the state or prohibited by law; (b) is a valid exercise of police power; (c) is narrowly tailored to serve the protection sought and (d) does not unfairly discriminate against any class of individuals. The Court finds that the Ordinance meets the requirements of this savings clause and thus does not violate Florida Statute § 166.0443.

### III. *Conclusion*

Accordingly, after a careful review of the record, and the Court being fully advised, it is

ORDERED and ADJUDGED that final judgment be, and the same is hereby, entered in favor of Defendant. The validly enacted Ordinance does not violate the First Amendment or Florida Statute § 166.0443. Therefore, Plaintiff's request for injunctive relief, declaratory relief and damages is denied. The City may enforce the Ordinance. Defendant is hereby ordered to submit a proposed final judgment to the Court within ten (10) days.

DONE and ORDERED.

UNITED STATES of America, Plaintiff,

v.

Francisco NOVATON, et al., Defendants.

No. 93–0597–CR.

United States District Court,
S.D. Florida,
Miami Division.

Nov. 8, 1994.

**1024**

Alex Angueira and Joel Vaughn, Asst. U.S. Attys., Miami, FL, for plaintiff.

Oscar Rodriguez, Miami, FL, for Francisco Novaton.

Michael Blacker, Miami, FL, Jose Villalobos, Coral Gables, FL, for Cuni.

John Bergendahl, Miami, FL, for Lopez.

William Matthewman, Miami, FL, for Reynaldo Rodriguez.

Arthur W. Tifford, Miami, FL, for Sarmiento.

Richard Docobo, Miami, FL, for Rosell.

Albert Z. Levin, Miami, FL, for Dominguez.

Abe Bailey, Miami, FL, for Mercedes Novaton.

Gregory Prebish, Miami, FL, for Humberto Rodriguez.

Joseph Gibson, Miami, FL, for Matamoros.

Martin Feigenbaum, Miami, FL, for Leopoldo Rodriguez.

Adrienne J. Goodman, Miami, FL, for Walkine.

K. MICHAEL MOORE, District Judge.

Defendants have been indicted for their participation in an alleged drug conspiracy. At trial, the government introduced into evidence numerous wire-intercepted telephone conversations. Several law enforcement witnesses testified as to the meaning of coded language that defendants purportedly used in these calls to conceal criminal communications.

The Government sought to admit this testimony into evidence under Federal Rule of Evidence 701. Defendants have objected, contending that such testimony is admissible, if at all, only as expert testimony pursuant to Federal Rule of Evidence 702 and then only after pretrial disclosure pursuant to Federal Rule of Criminal Procedure 16(a).

This Court disagrees and concludes that the officers' testimony is admissible under Rule 701. Rule 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness

and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

It is within the discretion of the trial judge to determine whether a lay witness is qualified to give opinion evidence under Rule 701. *United States v. Myers,* 972 F.2d 1566, 1576–77 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993).

In this instance, each government witness was a law enforcement officer monitoring a court-ordered wire interception. Each witness heard the calls about which he or she testified at the time the calls were intercepted. Testimony was in the form of an opinion or inference rationally based on a perception of what the witness heard. Moreover, each witness testified as to what actions he or she personally took or instructed other law enforcement officers to take in response to what was heard on a telephone conversation. For example, when a witness overheard a communication that he or she believed was a coded reference to a planned delivery of cocaine, that witness notified other law enforcement officers so that surveillance or seizure could be undertaken. Consequently, each witness' opinion or inference regarding defendants' alleged use of code was necessary to provide the jury with a clear understanding of his or her testimony and to help the jury to determine a fact in issue.

Defense counsel had an opportunity to cross-examine each witness regarding the purported coded conversations and, in fact, did so. The defense also had an opportunity to rebut the testimony of the law enforcement witnesses with alternative exculpatory explanations as to the meaning of these conversations. Indeed, defense counsel cross-examined the witnesses in an effort to establish that the calls actually related to such conduct as the practice of Santaria religion, bolita gambling and vacation trips to visit relatives. The jury was free to accept or reject the witnesses' testimony, in whole or part, and was given a cautionary instruction to that effect.

Rule 701 permits the monitors' testimony under these circumstances. In *United States v. Awan,* 966 F.2d 1415 (11th Cir.1992), defendants convicted for money laundering challenged the admission of similar testimony. Agent Robert Mazur had dealt with the defendants as part of an undercover investigation, and many of his communications with them had been recorded. When the government introduced these communications into evidence at trial, Mazur testified about the meaning of many terms that defendants used in the subject conversations. For example, when a defendant informed Mazur that banks had to report money that was "not clear," Mazur testified that the defendant was referring to drug money. *Id.* at 1429. Mazur also explained the meaning of terms used in international finance such as "shell corporations" and "haven countries."

On appeal, defendants asserted that the district court improperly allowed Mazur to testify as to his "subjective views about what straightforward comments in the tape-recorded conversations meant and why he and the defendants had uttered them." *Id.* at 1430. The Eleventh Circuit disagreed, holding that Mazur's testimony was admissible under Rule 701 because defendants' cryptic comments were not "perfectly clear." *Id.* at 1430–31. *Accord United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 184, 93 L.Ed.2d 118 (1986) (witnesses' understandings of implied criminal meanings of defendants' statements were admissible under Rule 701).

■ As in *Awan,* the wiretap monitors' testimony was admissible under Rule 701 because defendants' cryptic conversations were not "perfectly clear." This testimony reported the monitors' perceptions of conversations conducted under their surveillance and clarified the meaning of terms used in those conversations. *Awan* thus indicates that the monitors' testimony was admissible under Rule 701.

■ The fact that the monitors did not speak in these conversations, and that Defendants were unaware of their presence, does not alter the Court's determination as to the admissibility of their testimony. It is enough that the monitors overheard the conversations as they occurred. In *United States v. Russell,* 703 F.2d 1243 (11th Cir.1983), defendants were convicted on various drug con-

spiracy charges after being arrested in an undercover sting operation. The government used an experienced drug smuggler to work with the defendants in bringing narcotics into the United States, and agent Ronnie Cornelius secretly recorded conversations between the undercover operative and the defendants. At trial, Cornelius testified about what the defendants said and meant in the recorded conversations that he had "overheard." *Id.* at 1248. On appeal, defendants asserted that Cornelius, a non-expert, erroneously gave his opinion about the meaning certain overheard statements. *Id.* The Eleventh Circuit rejected this claim, concluding that the "district court did not err in admitting this description of facts as perceived by Cornelius." *Id.*

■ Further, although this circuit has admitted testimony interpreting narcotics code as the opinion of an expert pursuant to Federal Rule of Evidence 702, *see United States v. Carrazana*, 921 F.2d 1557, 1567–68 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 191, 116 L.Ed.2d 152 (1991); *United States v. Brown*, 872 F.2d 385, 392 (11th Cir.), *cert. denied*, 493 U.S. 898, 110 S.Ct. 253, 107 L.Ed.2d 203 (1989), neither Rule 702 nor case law interpreting it suggests that it is the sole vehicle by which such testimony may be admitted. While expertise regarding narcotics code has been found to exist, such expertise does not foreclose lay opinion which is rationally based on a witnesses' perception and which is helpful to a clear understanding of the witness' testimony or to the determination of a fact in issue. A monitor's opinion as to meaning of conversations that he or she personally overheard at the time they occurred is at least as probative of a fact in issue as any Rule 702 "narcotics code" expert opinion arrived at after the fact. Further, the cloak of "narcotics code" testi-

mony as Rule 702 expert opinion may well cause a factfinder to attach greater weight to such testimony than a Rule 701 lay opinion.

Consequently, the Court concludes that the monitors' testimony is admissible under Rule 701 and overrules Defendants' objections.[1]

**The WILDERNESS SOCIETY, Sierra Club, Tennessee Audubon Council, Tennessee Citizens for Wilderness Planning, and Smoky Mountains Hiking Club,**

v.

**John E. ALCOCK, as Regional Forester of the Southern Region of the U.S. Forest Service; John Ramey, as Forest Supervisor of the Cherokee National Forest; F. Dale Robertson, as Chief of the U.S. Forest Service; and Edward Madigan, as Secretary of the United States Department of Agriculture**

**and**

**TENNESSEE FORESTRY ASSOCIATION, Multi–Use Association of the Southeast, National Hardwood Lumber Association, and Mountain City Lumber Company (Intervening Defendants).**

Civ. No. 1:92–cv–1040–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1994.

---

1. The Eleventh Circuit's opinion in *United States v. Myers*, 972 F.2d 1566, also supports this conclusion. In *Myers*, a former police officer was convicted of violating prisoners' constitutional rights after he had shot them with stun guns. At trial, a fellow officer who had not witnessed the shootings testified that reddish brown marks on one prisoner's backs were consistent with marks that would be left by a stun gun. *Id.* at 1577. The defendant contended that the district court improperly admitted this testimony under Rule

701. The Court of Appeals rejected this claim because the testimony "was relevant to a determination of a fact in issue" and because the officer's conclusion "was rationally based upon his personal perception of the [prisoner's back] and his nineteen years of experience on the police force." *Id.*

The instant case is analogous to *Myers*. As in that case, the witnesses testified about calls they had monitored and their previous experience with the use of narcotics code.

Gregory W. Blount, Constangy Brooks & Smith, Atlanta, GA, Charles W. Burson, phv, Office of State Atty. Gen., Nashville, TN, Paul A. Lenzini, phv, Wilkinson Barker Knauer & Quinn, Washington, DC, for State of Tennessee Wildlife Resources Agency, International Ass'n of Fish and Wildlife Agencies.

Gregory R. Crochet, Angela Mae Gottsche, Kutak Rock, Atlanta, GA, David W. Carr, Jr., phv, Deborah M. Wassenaar, phv, Charlottesville, VA, Olivia Baker, phv, Kutak Rock, Washington, DC, for Wilderness Soc., Sierra Club, Tennessee Audubon Council, Tennessee Citizens for Wilderness Planning, Smoky Mountains Hiking Club.

Russell Glenn Vineyard, Office of U.S. Atty., N.D. of Georgia, Atlanta, GA, for John E. Alcock, John Ramey, F. Dale Robertson, Edward Madigan.

Alexander Stephens Clay, IV, Mary Lillian Walker, Kilpatrick & Cody, Atlanta, GA, Steven P. Quarles, phv, Thomas R. Lundquist, phv, Crowell & Moring, Washington, DC, for Tennessee Forestry Ass'n, Multi–Use Ass'n of the Southeast, National Hardwood Lumber Ass'n, Mountain City Lumber Co.

## ORDER

ORINDA D. EVANS, District Judge.

This environmental suit challenging the 1986 Final Land and Resource Management Plan for the Cherokee National Forest is before the court on the following motions: (1) Plaintiffs' revised motion for summary judgment, (2) the motion for summary judgment of John E. Alcock, John Ramey, F. Dale Robertson, and Edward Madigan ("Federal Defendants"), (3) the motion of State of Tennessee Wildlife Resources Agency and International Association of Fish and Wildlife Agencies for leave to file amici curiae brief, (4) Plaintiffs' notice of objection and motion to strike, (5) two motions to supplement briefing by the Tennessee Forestry Association, Multi–Use Association of the Southeast, National Hardwood Lumber Association, and Mountain City Lumber Company ("Timber Intervenors"), (6) the Federal Defendants' motion to supplement briefing, and (7) Plaintiffs' motion for oral argument on summary judgment motion. Responses in opposition have been filed to all of the foregoing motions.

In 1897, Congress established the national forests. The act states that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475.

In the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. §§ 528–531 ("MUSYA"), Congress set forth its policy that the national forests are to be administered in order to provide "for outdoor recreation, range, tim-

ber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.[1] In furtherance of this policy, Congress directed the United States Forest Service ("Service"), a component of the Department of Agriculture, "to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529. Congress defined "multiple use" as

[t]he management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

16 U.S.C. § 531(a). Congress defined "sustained yield of the several products and services" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b).

In the National Forest Management Act of 1976 ("NFMA"), Congress directed the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Congress further directed that

[i]n developing, maintaining, and revising plans for units of the National Forest Sys-

---

1. In § 528, Congress expressly stated that the MUSYA was supplemental to, not in derogation

of, 16 U.S.C. § 475.

tem pursuant to this section, the Secretary shall assure that such plans—

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the [MUSYA], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection [ (e) ](1) of this section, the definition of the terms "multiple use" and "sustained yield" as provided in the Multiple–Use Sustained–Yield Act of 1960, and the availability of lands and their suitability for resource management.

16 U.S.C. § 1604(e). Congress required that land and resource management plans be revised at least every fifteen years. 16 U.S.C. § 1604(f)(5).

In § 1604(g) of the NFMA, Congress required the Secretary of Agriculture to promulgate regulations "that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection." The "guidelines and standards" that § 1604(g) prescribes address compliance with the National Environmental Policy Act ("NEPA"); suitability of lands for resource management; inventory of renewable resources, soil, and water; methods to identify special conditions or hazards vis-a-vis resources; "consideration of the economic and environmental aspects of various systems of renewable resource management," 16 U.S.C. § 1604(g)(3)(A); "provi[sions] for diversity of plant and animal communities," 16 U.S.C. § 1604(g)(3)(B); study and evaluation of management systems so as to avoid impairment of the land's productivity; allowance of increased harvest levels only if certain conditions are met; allowance of timber harvesting only if certain conditions are met; and allowance of certain timber cutting techniques only if certain conditions are met.

Regulations have been promulgated pursuant to § 1604(g). *See* 36 C.F.R. §§ 219.1–219.29 (1993). Section 219.1(b) states in part that land and resource management plans "guide all natural resource management activities and establish management standards and guidelines for the National Forest System. They determine resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management." Among other things, the regulations establish a ten-step process that planners must follow in creating land and resource management plans. The steps are "identification of purpose and need," "planning criteria," "inventory data and information collection," "analysis of the management situation," "formulation of alternatives," "estimated effects of alternatives," "evaluation of alternatives," "preferred alternative recommendation," "plan approval," and "monitoring and evaluation." 36 C.F.R. § 219.12(b)–(k).

The Cherokee National Forest, which contains approximately 623,565 acres, is located on the eastern boundary of Tennessee. In 1986, the Service, acting pursuant to the NFMA and the regulations promulgated under it, adopted a land and resource management plan ("Plan") for the Forest. A Final Environmental Impact Statement ("FEIS") accompanied the Plan.

The process that led to the adoption of the plan began in the early 1980's. The Service developed seven management alternatives for the Forest, as well as a Draft Environmental Impact Statement ("DEIS"). In 1985, the Service published and distributed for public comment all seven alternatives, as well as the DEIS. The Service proposed that the seventh alternative be adopted. After receiving numerous public comments about the proposed alternative, the Service made some changes to the alternative and then adopted it as the Plan on April 1, 1986.

Plaintiffs immediately filed an administrative appeal of the Plan.[2] A partial settlement was reached in August 1988.[3] The parties

---

2. The administrative appeal record is cited as "App.R."

3. Under the settlement agreement, the Service, among other things, performed further environmental analysis, issued a draft supplement to the

submitted the issues that the settlement did not resolve to the Chief of the Service. After receiving written and oral arguments, the Chief rendered a decision in December 1990. The Secretary of Agriculture declined to review the Chief's decision. Plaintiffs filed this action in May 1992.

The Plan is a bound, 300–page document. Chapter I is entitled "Forest Plan Introduction." It states that the Plan "establishes management direction and associated long-range goals and objectives for the Forest for the next 10 to 15 years." (Plan at I–1.) Chapter I summarizes the Plan's purpose and structure, and the Plan's relationship to the FEIS and higher-level planning goals. It also describes the location of the Forest, the administrative organization of the Forest, and the staff that manages the Forest.

Chapter II of the Plan is entitled "Analysis of the Management Situation Summary." It addresses the resources of the Forest as a prelude to long range planning. The chapter describes the Forest's physical, biological, social, and economic characteristics. Later, the chapter discusses the Forest's "current management, demand, and supply potentials." (Plan at II–10.) This portion of the chapter describes current timber demand in the United States and estimates demand in the coming 50 years. It classifies the land in the Forest, subtracting from the total acreage the various categories of land that are deemed unsuitable for producing timber, thereby yielding acreage designated "tentatively suitable" as a timber resource. *Id.* at II–21. Out of the 616,406 acres of forest land in the Forest, 579,752 acres are identified as tentatively suitable for timber production.

Chapter III is entitled "Plan Responses to Issues, Concerns and Opportunities." Among other things, it addresses the following query: "How can the timber resource be best managed to meet the demand for timber products and concurrently meet the demands of other resources?" *Id.* at III–6. The response to this query is policy-type pronouncements regarding timber-harvesting methods, the use of herbicides, the availability of firewood, hardwood production, pest

FEIS for public comment, and in February 1990

management methods, and other matters. With regard to timber-harvesting methods, Chapter III states that "[t]he even-aged silvicultural system will be applied to the suitable forest land on the Cherokee National Forest." *Id.*

Chapter III also includes a table that summarizes the assignment of various portions of the Forest to "visual quality objectives" ("VQOs"), with the objectives ranging from the "preservation" category to the "maximum modification" category. This table is followed in part by the following commentary:

> Timber management objectives may be difficult to achieve while meeting other resource management requirements as well as visual quality objectives. Public concern for the visual quality of National Forest lands, especially in the Blue Ridge Province, has become increasingly acute. This concern is not expected to diminish soon, so public demand for increased goods and services from this same land base may present occasional conflicts.

*Id.* at III–10.

Chapter IV is entitled "Forest Management Direction." It again notes that the Plan provides "long range management direction" for the Forest. *Id.* at IV–1. Chapter IV states that the Plan is implemented "through the Program Development and Budgeting and Annual Work Planning processes." *Id.* It declares that the Plan

> provides guidance for developing multiyear implementation programs for each Ranger District. The Plan's management area directions, outputs and standards and guidelines are translated into these multiyear program budget proposals which specifically identify the activities and expenditures necessary to achieve the direction provided by the Forest Plan. These implementation programs form the basis for the Forest's annual program budget.

*Id.* Chapter IV also states that when appropriate for particular project level decisions, additional environmental assessments will be undertaken.

adopted a supplemental FEIS.

Chapter IV contains tables setting forth "Forestwide Management Goals," *id.* at IV–5, as well as goals for eighteen specific "Management Areas" in various portions of the Forest, *id.* at IV–72.[4] The broad categories of "Management Practices/Activities" that the tables identify include "recreation"; "wildlife"; "timber"; "water, soil and air"; "minerals and geology"; "lands"; "facilities"; and "protection." Under the heading "General Direction" the tables state the Plan's determination as to whether the land is classified as suitable for timber production and, if so, on what basis. Table IV–1, captioned "Planning Targets, Activities and Costs for the Cherokee National Forest," contains "allowable sale quantity" figures for timber sales for years beginning in 1984 and extending through 2030. For the years 1986 through 1990, the allowable sale quantity of timber from the Forest (i.e., the amount that is to be *offered* for sale) is targeted at 8.1 million cubic feet annually. Table IV–4 similarly recognizes an allowable sale quantity of 8.1 million cubic feet of timber annually.

Regarding timber sales, Chapter IV refers to Appendix C, which is entitled "Ten Year Timber Sale Action Plan" ("action plan"). *Id.* at IV–58. The action plan sets out targeted harvest yields for specific geographic areas (denominated as "compartments" in specific Ranger Districts). However, though the action plan extends through 1994, no specific areas are designated for timber harvesting in the years following 1989.

Chapter IV also contains a table entitled "Land Classification." *Id.* at IV–54. Initially drawing on the analysis noted above in Chapter II, the table shows that the total amount of forest land is 616,406 acres. The amount withdrawn from timber production is 32,902 acres, while the amount not capable of producing industrial wood is 3,752 acres. The table states that no land is physically unsuited for timber production. From these figures, 579,752 acres are identified as tentatively suitable for timber production. Then, another 197,871 acres are designated as unsuitable for timber production due to "(a)

assignment to other resource uses to meet Forest Plan objectives; (b) management requirements; and (c) not being cost efficient in meeting Forest Plan objectives over the planning horizon." *Id.* at IV–54 n. 2. The total amount of land designated as unsuitable for timber production is 234,525 acres, while that designated as suitable is 381,881 acres.

Chapter V of the Plan is entitled "Implementation." It discusses procedures for monitoring and evaluating the implementation of the Plan. Regarding monitoring, it states that "[m]onitoring requirements can be divided into (1) the monitoring for accomplishment of practices (i.e., the actual execution on the ground of standards and guidelines called for in Forest wide and management area direction) and (2) monitoring outputs and effects." *Id.* at V–1. Regarding evaluation, it states that "[e]valuation of results of the monitoring program will be documented in the Annual Forest Plan Evaluation Report." *Id.* at V–2.

Chapter VI of the Plan is a glossary of terms used in the Plan. Chapter VII contains various appendices referred to in earlier chapters.

The Plan has been amended twenty-two times since 1986. The first amendment occurred in April 1987, and the most recent was in May 1994.

Amendment # 5, dated May 1988, changes the Land Classification table in Chapter IV. The amount of land withdrawn from timber production is increased from 32,902 acres to 66,294 acres, while the total acreage designated not appropriate for timber production is decreased to 164,818 acres (from 191,871 acres). The net result of these changes is a 339–acre increase (to 234,864 acres) in the amount of land designated as unsuitable for timber production.

Amendment # 6, dated August 1988, changes the Land Classification table again. The amount of land designated not appropriate for timber production is increased to 174,163 acres (from 164,818 acres), thus causing a 9,345–acre increase (to 244,209 acres) in

---

**4.** The term "Management area" does not necessarily connote one physically contiguous area. Lands deemed to have the same "management objectives" are grouped into the same "management area" even though they may be in different parts of the Forest.

the amount of land designated as unsuitable for timber production.

Amendment #7, dated February 1990, changes the policy announcement on page III–6 of the Plan to read as follows:

Even-aged silvicultural systems will be applied to 90% of the suitable forest land on the Cherokee National Forest. Clearcut, seedtree and shelterwood regeneration methods will be used at the respective rates of 70%, 5%, and 15%. On the remaining 10%, uneven-aged management will be used, with group selection on 9% and single tree selection on 1%. The above suitable acres are all in Management Areas 14, 15, 16, 17, and part of 18. In MA 5, timber cutting may occur only for other than timber purposes.

Amendment #7 contains tables setting forth new, revised targets for allowable sale quantity of timber for the years 1986 through 1995. The allowable sale quantity of timber is reduced from 8.1 million cubic feet of timber to 6.4 million cubic feet annually.

Amendments #5, #12, #13, #21, and #24 make relatively minor changes to the distribution of acreage in management areas. None of the twenty-two amendments addresses the post–1989 absence of specific geographic sites for targeted timber sales in the action plan designated as Appendix C to the Plan.

In May 1991, the Service commenced a five-year review of the Plan, which led to the issuance of a document entitled "5–Year Review" ("Review"). Regarding timber sales, the Review states that the average amount of board feet of timber offered for sale annually in the period 1986–1990 was 33.8 million board feet ("MMBF"), 2% less than the 34.5 MMBF target set by the (amended) Plan. (Review at 2–9.) The Review also states that "[v]olume cut was 4.5 MCF." *Id.* Assuming

that "MCF" should be "MMCF," the average amount of timber *cut* annually in the period 1986–90 was almost 2 MMCF less than the 6.4 MMCF that was to be *offered* annually during the same period. Thus, according to the Review, only 70% of the timber offered for sale in the period 1986–90 was actually cut. The Record filed with the court does not appear to contain any information concerning actual timber harvests or timber sales after 1990.

Plaintiffs' complaint contains thirteen counts. Almost all of the counts argue that the Plan violates the NFMA or its regulations in some respect.[5] Basically, Plaintiffs' arguments break down into four categories: (1) the Plan designates too great a proportion of the Forest as suitable for timber harvesting; (2) the Plan sets targeted timber harvest levels which are too high; (3) the Plan inadequately protects the biological diversity of the Forest; and (4) the Plan inadequately protects the Forest's visual resources by designating too great a percentage of the land to categories allowing for modification of the natural terrain, *e.g.,* clear cuts and roads. In making these arguments, Plaintiffs do not attack the classification of any particular parcel of land, the clearing of any particular area, or any particular project.[6]

*Count I:* Plaintiffs assert that the Federal Defendants failed to designate, before establishing a timber harvest target level, what lands are physically unsuited for timber production. Plaintiffs also assert there are such physically unsuitable lands (even though the Plan expressly states that there are none), because the Federal Defendants erroneously found that technology is available which would allow timber harvesting without irreversible damage to soils productivity or watershed conditions. In support of these assertions, Plaintiffs rely on 16 U.S.C. § 1604(k)[7] and its attendant regulations:

---

**5.** The exceptions are Counts III, VI, and X. Count III argues that 36 C.F.R. § 219.14 (the "suitability regulation") violates the NFMA; Count VI argues that the Plan is inconsistent with the Department of Agriculture's own internal policies; and Count X argues that the Federal Defendants violated the settlement agreement by failing to propose a revised list of "Management Indicator Species" ("MIS").

**6.** The following discussion of Plaintiffs' arguments in support of their claims is drawn from the brief in support of their motion for summary judgment.

**7.** 16 U.S.C. § 1604(k) provides that

[i]n developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which

The suitability regulations provide for the review of physical suitability upfront, prior to the selection of harvest levels as required by section 6(k). The regulations provide that lands shall be identified as not suited for timber production on the basis of physical conditions if "technology is not available to ensure timber production for the land without irreversible resource damage to soils productivity, or watershed conditions." 36 C.F.R. § 219.14(a)(2) (1991). Moreover, to establish that technology is available, the Forest Service must identify the technology to be used in preventing irreversible damage and make provisions for its implementation in the Forest Plan.

. . . . .

Instead of evaluating the impacts of roads and cuts on slopes above 60 percent and other sensitive lands, the Cherokee planners avoided the required physical suitability analysis by categorically assuming that advanced logging technology was available and could be implemented on the Cherokee to avoid irreversible damage.

(Plaintiffs' Revised Mem. of Law in Supp. of Motion for Summ. Judg. ["Plaintiffs' Brief"] at 15, 19.)

*Count II:* Plaintiffs assert that the Federal Defendants (1) failed to designate, before establishing the harvest level, what lands are economically unsuited for timber production, (2) allowed the timber harvest target level to influence their designation of what lands are unsuited for timber production, and (3) included uneconomic lands in the timber base even though the government would lose money from timber harvesting on those lands. The first and second assertions appear to be two sides of the same coin. Regarding the first assertion, Plaintiffs reiterate their argument that 16 U.S.C. § 1604(k) and its attendant regulations mandate the economic unsuitability determination prior to the designation of the harvest level. Regarding the second assertion, Plaintiffs contend that even if uneconomic lands

are not designated prior to the establishment of the harvest level, the aforementioned statute and regulations do not allow the harvest level to influence the designation of uneconomic lands. Regarding the third assertion, Plaintiffs contend that 16 U.S.C. § 1604(k) "also requires that land not economically suited for timber production be excluded from the timber base." (Plaintiffs' Brief at 21.)

*Count III:* Plaintiffs assert that

the planning regulations on economic suitability are illegal to the extent that they (1) allow the Forest Service to ignore the economic character of the national forest land and (2) allow the suitable base to be dictated by harvest levels instead of by an objective evaluation of the economic character of the lands prior to, and independent of, the selection of harvest levels.

(Plaintiffs' Brief at 34.) In support of these assertions, Plaintiffs note that the suitability regulations establish a three-stage process for determining suitability. Their complaint is that "Stage II (Section 219.14(b)) ... requires a comparison of the direct costs of harvesting timber with the direct revenues. This exercise, however, does not (but should) result in lands being designated as unsuitable for timber production, regardless of how much money those lands would lose on timber production." *Id.*

*Count IV:* The Plan projects timber harvest target levels for six decades. Plaintiffs assert that the Federal Defendants "chose a harvest level for the fifth decade, 83 million board feet ("mmbf") that was nearly two and a half times current levels. This fifth decade harvest level and the sixth decade level of 102 mmbf required planners to include over 380,000 acres in the suitable base." (Plaintiffs' Brief at 29 [footnote omitted].) Plaintiffs argue that "a suitable base with less than 75,000 acres could produce more than enough timber for the Plan's first decade harvest level." *Id.* Assuming the suitability regulations are valid, Plaintiffs contend that

are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible, as determined by the Secretary, and shall assure that, except for

salvage sales or sales necessitated to protect other multiple-use values, no timber harvesting shall occur on such lands for a period of 10 years.

allowing the fifth decade harvest level to dictate the timber base violates the economic suitability regulation. The ... regulation provides that only lands that are cost-efficient over the planning horizon in meeting *forest objectives,* which include timber production, should be included in the suitable timber base. 36 C.F.R. § 219.14(c) (1991). Only the first decade harvest level constitutes a "forest objective." Therefore, only those lands needed to meet the first decade harvest objective can be included in the suitable timber base under the regulations.

*Id.* at 37–38 (footnote omitted).

*Count V:* As noted above, the Stage II analysis compares the direct costs of harvesting timber with the direct revenues. "In the six years preceding the Plan the timber program lost over $2 million dollars each year.... The planners' own analysis showed that only 35,500 acres of the Forest would have timber revenues in excess of costs over the next fifty years and beyond." (Plaintiffs' Brief at 24 [citations omitted].) Plaintiffs assert that the Federal Defendants (1) failed to disclose to the public the results of the Stage II analysis and (2) "failed to disclose whether and, if so, how, they used the results of the Stage II analysis in the formulation of alternative harvest levels." *Id.* at 27. Plaintiffs argue that "[h]ad the decisionmakers been forced by the public to face up to the fact that the validity of the entire Plan depended on the planners' large projected price increases, the results would have been substantially different, and harvest levels would have been lower." *Id.* at 28.

*Count VI:* In July 1985, the Secretary of Agriculture issued a decision entitled "USDA Decision on Review of Administrative Decision by the Chief of the Forest Service Related to the Administrative Appeals of the Forest Plans and EISs for the San Juan National Forest and the Grand Mesa Uncompahgre, and Gunnison National Forest" (hereafter "*San Juan* decision"). Plaintiffs assert that under the *San Juan* decision, "when a forest plan proposes to expand an unprofitable timber sale program, the planning documents and Record of Decision must be rigorous in explaining and justifying that *non-timber* benefits of the timber sale program in fact warrant its expansion and continuation." (Plaintiffs' Brief at 41 [emphasis in original].) Plaintiffs argue that the *San Juan* decision is binding administrative precedent that the Federal Defendants failed to follow when they promulgated the Plan.

*Count VII:* The Federal Defendants used a computer program called FORPLAN to assist them in promulgating the Plan. Plaintiffs assert that the assumptions the Federal Defendants made when they input data into the FORPLAN program were arbitrary and capricious: "First, they selected arbitrarily high harvest levels. Second, they assumed timber prices that were arbitrarily high. Finally, they failed to account for the costs of logging on steep slopes when much of the land in the suitable base has slopes greater than 40%." (Plaintiffs' Brief at 54.)

*Count VIII:* In this count, Plaintiffs assert that

[t]he Forest Service has failed to meet the requirements of 16 U.S.C. § 1604(g)(3)(B) and the NFMA regulations to provide for diversity of plant and animal communities and tree species, in the Cherokee as a whole, and in the cove hardwood community, in particular, and to provide for diversity at least as great as that which would be expected in a natural forest. By focusing on short-rotational, even-aged management, the Forest Service fails to allow the Forest to develop the structure and processes supporting the diversity inherent in natural forests....

... Furthermore, although the Forest Plan will result in a significant reduction in diversity in the Cherokee, the Forest Service has not shown that such reduction is needed to meet overall multiple-use objectives.

(Complaint, ¶¶ 99–100.)

Plaintiffs assert that "[a] forest's natural environment is composed of diversity at three biological levels: species, genetic, and ecological." (Plaintiffs' Brief at 64.) "Species" refers to trees and other plants, animals, and indeterminate organisms such as fungi and protozoa. *Id.* at 65. "Genetic"

refers to variations within a species. *Id.* "Ecological" refers to "differences in community types." *Id.* Plaintiffs further assert that

> [t]he cove hardwood forest community found in the Southern Appalachian Highlands represents the heart of this diversity. At maturity, a cove hardwood forest may contain dozens of hardwood tree species and hundreds of species of shrubs, ferns, flowers, and mosses.... Cove hardwood forests provide suitable habitat for a variety of animals ranging from black bears to salamanders and pileated woodpeckers. The cove hardwood community is among the most diverse of any ecosystem outside the tropics.

*Id.* at 61 (citations omitted).

Plaintiffs note that the NFMA directs the Federal Defendants to

> provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan.

16 U.S.C. § 1604(g)(3)(B). Plaintiffs assert that Congress passed this provision "to remedy the Forest Service's excessive emphasis on timber production at the expense of healthy forest ecosystems" and "to stop the wholesale conversion of mixed hardwood forests in the East to pine monocultures." (Plaintiffs' Brief at 62, 63.) Plaintiffs contend that § 1604(g)(3)(B), its legislative history, and the regulations promulgated under it "indicate[ ] that the diversity provision is intended to ensure that the Forest Service provide for and maintain the ecological integrity of our national forests.... To maintain the Forest as a healthy, functioning ecosystem, the Forest Service must provide for and maintain diversity at all biological levels." (Plaintiffs' Brief at 64.)

Plaintiffs note that the Federal Defendants do not agree the Service is required to "provide for and maintain diversity at all biologi-

cal levels." Instead, the Federal Defendants argue that only concerns over the large-scale conversion of forests from hardwoods to pine caused Congress to add a diversity provision to the NFMA. Plaintiffs disagree with this position, arguing that "[t]he diversity provision does more than simply focus on preserving existing diversity of tree species to discourage forest conversions and monocultures. The statute also directs the Forest Service to provide for diversity of 'plant and animal communities.'" *Id.* at 66.

Given Plaintiffs' interpretation of the NFMA's diversity provisions, it is not surprising that they dispute the Federal Defendants' statement that "the Plan [with its emphasis on even-aged logging] 'will provide a greater mix of stand age classes and stand structures than any of the other alternatives—therefore greater diversity within the Forest.'" *Id.* at 69 (quoting App.R. 26 [the Service's second ROD] at 5). Plaintiffs counter that the Service's approach causes "biological complexity [to] give[ ] way to simplicity as the Forest Service manipulates the complex natural environment to a homogeneous structure that resembles a tree farm rather than a forest. Clearcutting and other forms of even-aged logging simplify or homogenize the structure of a forest." *Id.* at 70. In support of their argument that clearcutting violates the NFMA's diversity provisions, Plaintiffs cite 16 U.S.C. § 1604(g)(3)(F)(v), which provides that

> clearcutting ... and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where—
>
> . . . . .
>
> such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

Plaintiffs make a number of arguments to support their position.

Plaintiffs attack the Federal Defendants' assertion that even-aged logging practices increase wildlife habitat by creating "early successional" conditions (i.e., the shrubs and thickets that arise after the clearcutting of a

parcel of land). Plaintiffs contend that (1) animals associated with old growth conditions are rare or endangered, while animals associated with early successional conditions are common; (2) "abundant browse and early successional habitat already exist in the Cherokee as a result of prior timber harvesting and natural disturbances," (Plaintiffs' Brief at 74); (3) natural forces, such as wind and fire, will lead to more early successional conditions; and (4) early successional conditions soon evolve into a condition where the land is suitable for few species, i.e., the land is too old for the early successional species and too young for old growth species.

Plaintiffs take particular exception to the Plan's identification of more than half of the acreage containing cove hardwoods being available and suitable for harvesting:

> The Forest Service has acknowledged that the cove hardwoods represent a distinct community and that cove hardwoods "are more diverse than many other forest communities." Responsive Statement at 25, App.R. 152. But the Forest Service did not account for the cove hardwoods' special ecological attributes in determining how many acres would be identified as unsuitable for timber harvesting or in providing for diversity in the Forest.

*Id.* at 78.

Plaintiffs contend that "the fragmentation of the Forest and the alteration of its natural condition to an even-aged structure will greatly reduce diversity in the Forest." *Id.* at 80. The main thrust of this contention appears to be that even-aged logging creates more forest "edge," even though "[l]arge, continuous, undisturbed tracts are necessary for the long-term stability of mature and old growth forest ecosystems." *Id.* at 81.

In summary, the court notes Plaintiffs' characterization of the Federal Defendants' position on even-aged logging as "a post hoc rationalization for [the Service's] timber harvesting program." *Id.* at 70. Plaintiffs argue that

> [t]he Forest Service has wrongfully rejected biological diversity as the guiding principle in forest management, in favor of a simplistic approach that focuses on achieving a checkerboard pattern of age classes

of trees distributed across the Forest. The Forest Service's view does not represent an objective examination of diversity; rather, "diversity" is defined by the Forest Service's even-aged timber harvesting methods.

*Id.* at 68. Plaintiffs thus contend that the Federal Defendants violated § 1604(g)(3)(B) by allowing the harvest level to influence their alleged duty to provide for diversity at all biological levels.

*Count IX:* Plaintiffs assert that the Federal Defendants failed to conduct certain inventories which the NFMA requires. Plaintiffs' argument is founded on two NFMA regulations. The first states that "[m]anagement prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities ... so that it is at least as great as that which would be expected in a natural forest." 36 C.F.R. § 219.27(g) (1993). The second states that "[i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." 36 C.F.R. 219.26 (1993).

Plaintiffs assert that "[t]he Forest Service failed to conduct any evaluation or inventory of diversity in terms of prior conditions, including the condition of a natural forest." (Plaintiffs' Brief at 86.) As a result, Plaintiffs assert that there is no diversity baseline for comparison purposes, and the Federal Defendants thus "cannot preserve and enhance diversity so that it is at least as great as that which would be expected in a natural forest." *Id.* Plaintiffs also complain that the Federal Defendants did not inventory the present diversity conditions in the Forest.

*Count X:* As explained below in footnote 15, Plaintiffs no longer seek any relief pursuant to Count X.

Counts XI through XIII each contend that the Plan violates the requirements of the NFMA by not protecting the Forest's visual resources.

*Count XI:* Plaintiffs note that the "maximum modification" category "allows large clearcuts and roads to dominate. Under maximum modification, 'vegetative and land-

form alterations'—that is[,] timber harvesting—'may dominate the landscape.'" (Plaintiffs' Brief at 93 [citation omitted].) The NFMA requires that clearcutting be used "only where ... such cuts are carried out in a manner consistent with the protection of ... esthetic resources." 16 U.S.C. § 1604(g)(3)(F)(v). Noting the statute's use of the words "only where," Plaintiffs argue that the maximum modification category "does not protect aesthetic resources, does not blend in with the natural terrain, and hence, quite glaringly, exceeds that which is permitted by statute." (Plaintiffs' Brief at 94 [footnote omitted].)

*Count XII:* Plaintiffs assert that the Plan's placement of 62% of the Forest into the "modification" and "maximum modification" categories represents a failure to protect the Forest's visual resources, which is a violation of 16 U.S.C. § 1604(g)(3)(F)(v). Moreover, Plaintiffs assert that the Federal Defendants failed to offer a rational basis or support for the 62% decision. Plaintiffs take particular exception to the Plan's statement that the Forest should have "'a managed look.'" (Plan at IV–67.)

*Count XIII:* An NFMA regulation provides that

> [t]he visual resource shall be inventoried and evaluated as an integrated part of evaluating alternatives in the forest planning process, addressing both the landscape's visual attractiveness and the public's visual expectation. Management prescriptions for definitive land areas of the forest shall include visual quality objectives.

36 C.F.R. § 219.21(f) (1993). Plaintiffs explain that the Service conducted a visual resource inventory and concluded that 60% of the Forest can be seen from roads, trails, or waterways. Accordingly, the Service stated that 40% of the Forest would be assigned a "Sensitivity Level" of 3, which is "generally a reference to the VQO categories of maximum modification and modification." (Plaintiffs' Brief at 98.)

Plaintiffs' complaint is that 62%, not 40%, of the Forest was placed in the maximum modification and modification categories, and that this increase occurred in the face of an "overwhelming number of public comments expressing concern for protecting the visual quality of the Cherokee and maintaining its natural beauty." *Id.* at 99. Given 36 C.F.R. § 219.21(f)'s direction regarding "the public's visual expectation," Plaintiffs argue that "the Forest Service's inventory and evaluation of visual resources did not comply with the NFMA regulations." (Plaintiffs' Brief at 99 [footnote omitted].)

Were they to prevail, Plaintiffs seek the following specific relief:

(1) a declaratory judgment that the Plan/FEIS and the decisions implementing and upholding them are "arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, as set forth in the [Administrative Procedure Act], 5 U.S.C. § 706(2)" (Complaint at 38–39);

(2) a declaratory judgment that the suitability regulations violate the NFMA;

(3) a remand of the Plan/FEIS and the decisions implementing and upholding them with directions that Defendants make the Plan/FEIS comply with the NFMA;

(4) an order directing Defendants to circulate for public review and comment the revised Plan/FEIS;

(5) an order directing Defendants to "identify in the re-analysis and reformulation of the Forest Plan all lands that are physically or economically not suited for timber production, independent of the selection of timber harvest levels; exclude those lands from timber harvesting for at least ten years; revise the suitability regulations, 36 C.F.R. § 219.14 (1991), to require an objective economic suitability determination based on a rule of reason that will be made independently of the selection of timber harvest levels; fully comply with the Secretary of Agriculture's *San Juan* decision; undertake a thorough economic analysis of the timber program that accurately considers all factors determining revenues and costs of timber harvesting including roads; discuss this economic analysis in the documents circulated to the public; use the results of the economic analysis in deter-

mining unsuitable lands and in setting harvest levels and other objectives of the Forest Plan; in the alternative, if harvest levels are allowed to influence the suitable base, permit only first decade harvest levels to be considered; and remedy the other illegalities and flaws regarding the suitability analysis identified in this Complaint" (Complaint at 39–40);

(6) an order directing Defendants to "provide for and maintain the biological diversity of the Cherokee as a whole, and the cove hardwood community in particular, by considering the ecological characteristics and natural cycle of the Forest and by allowing the Forest to develop the structure and processes supporting the diversity inherent in natural forests; eliminate the use of age class distribution as a measure of diversity; inventory and evaluate diversity in terms of present and prior conditions; and remedy the other illegalities and flaws concerning diversity identified in this Complaint" (*id.* at 40);

(7) a declaratory judgment that Defendants are in breach of the settlement agreement due to their alleged failure to propose a revised MIS list, as well as an order directing Defendants "to prepare a new list of management indicator species forthwith that will be subject to public review and comment" (*id.*);

(8) an order directing Defendants to "eliminate the use of the Maximum Modification visual quality objective on the basis that it is a *per se* violation of the NFMA requirement to protect the visual resources of the national forests; inventory the Forest's visual resources; and redesignate the Cherokee Forest, using visual quality objectives that adequately protect the Forest's visual resources and that are based on sound and documented public expectations and the visual attractiveness of the landscape; and remedy the other illegalities and flaws re-

garding visual quality identified in this Complaint" (*id.* at 40–41).[8]

Defendants dispute each of Plaintiffs' claims and contend that neither the Plan nor the methods used to prepare it violated the NFMA or any other law or regulation. Defendants also contend that because of the nature of the Plan, Plaintiffs lack standing to assert the claims set forth in the complaint, and that the claims are not ripe for resolution. Defendants ask that Plaintiffs' claims be dismissed, or alternatively, that summary judgment be granted in their favor.

The court first turns to the Federal Defendants' contentions that Plaintiffs have no standing to bring this action and Plaintiffs' claims are not ripe for judicial review. The court finds these two arguments to be meritorious, with the result that Plaintiffs' claims must be dismissed.

### STANDING

In *Lujan v. Defenders of Wildlife*, 504 U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (*"Defenders"*), the Supreme Court set forth the essential elements of standing analysis for purposes of the Constitution's "case or controversy" requirement:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical'".... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Defenders*, 504 U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364 (citations omitted).[9]

---

**8.** Plaintiffs also seek "their costs, disbursements, and attorney's fees." (Complaint at 41.)

**9.** In their brief, Plaintiffs characterize the foregoing elements as "prudential" considerations. (Plaintiffs' Mem. in Opp. to Federal Defendants' Cross Motion for Summ. Judg., etc. ["Plaintiffs'

Response"] at 4 n. 4.) However, the Supreme Court clearly stated that the three standing elements it identified represent "the irreducible *constitutional* minimum of standing." *Defenders*, 504 U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364 (emphasis added).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* Based on the discussion that follows, the court finds that Plaintiffs have failed to show injury in fact.

The Federal Defendants argue that Plaintiffs cannot show actual or imminent injury in fact because

> the Plan simply establishes parameters for activity on the forest for a ten to fifteen year period, until the plan is revised. *See* 36 C.F.R. § 219.10(g). The Plan does not dictate any specific action to be taken which would alter the forest environment. Any alleged "injury" of which plaintiffs complain would occur only as site-specific projects are implemented. Hence, at this stage in the process, there is no imminent injury in fact.

(Federal Defendants' Brief at 13.) The Timber Intervenors amplify this argument as follows:

> Adoption of a paper plan does not change the on-the-ground environment or dictate that any particular site-specific action causing an environmental injury must occur. Instead, environmental injury would result only if: (1) a site-specific action (*e.g.,* a timber sale) is later proposed consistent with the plan or pursuant to a plan amendment; (2) the site-specific action is subjected to NEPA and NFMA analysis, and public review; (3) the Forest Service adopts the site-specific action: and (4) no one challenges that action and obtains injunctive relief.

(Timber Intervenors' Brief in Supp. of The Government's Motion for Summ. Judg. and in Opp. to Plaintiffs' Cross–Motion ["Timber Intervenors' Brief"] at 21.)

Plaintiffs offer two rationales for a finding that they have suffered injury in fact. The first rationale turns on the notion of "procedural injury," as exemplified in *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516–1517 (9th Cir.1992) ("*Mumma* "). In *Mumma*, a conservation group challenged, as a violation of the NEPA and the NFMA, the Service's decision to recommend that forty-three of forty-seven roadless areas in the Idaho Panhandle National Forest not be designated as "wilderness" areas. *Id.,* 956 F.2d at 1510. There, as here, the Service argued that there was no actual or imminent injury because of the absence of site-specific decisions.

The Ninth Circuit anchored its finding of personal injury on the proposition that injury in fact for standing purposes arises from an agency's alleged failure to follow proper procedures in rendering a decision of general application. *Id.* at 1514 ("[B]ecause 'NEPA is essentially a procedural statute designed to ensure that environmental issues are given proper consideration in the decisionmaking process,' injury alleged to have occurred as a result of violating this procedural right confers standing.") (citation omitted). The Ninth Circuit then proceeded to reject the defendants' claims that the plaintiffs lacked standing because the challenged action was too remote and because the plaintiffs had not shown an impact on their personal interests.[10]

The Supreme Court's opinion in *Defenders* expressly invalidates the notion that standing can arise from an alleged procedural injury. In *Defenders*, the Supreme Court addressed a provision of the Endangered Species Act ("ESA") (called the "citizen-suit" provision) that purports to allow "any person" to sue the United States or one of its agencies for an alleged violation of the ESA. *Defenders*, 504 U.S. at ——, 112 S.Ct. at 2142–43, 119 L.Ed.2d at 371. The lower court had viewed this statute as authorizing standing based on the notion of procedural injury:

> The court [below] held that, because § 7(a)(2) [of the ESA] requires interagency consultation, the citizen-suit provision creates a "procedural right[ ]" to consultation in all "persons"—so that *anyone* can file suit in federal court to challenge

---

10. *Mumma's* ruling on the remoteness issue is discussed below. As for the personal interest issue, there appears to be no dispute in this case, based on the affidavits Plaintiffs have filed, that many of Plaintiffs' members have visited the Forest, intend to visit it in the future, and perceive that Defendants' actions will harm their enjoyment of the Forest. Whether this perception of harm is legally sufficient for standing purposes is discussed in conjunction with the remoteness issue.

the Secretary's (or presumably any other official's) failure to follow the assertedly correct consultative procedure, notwithstanding their inability to allege any discrete injury flowing from that failure.

*Defenders,* 504 U.S. at ——, 112 S.Ct. at 2142, 119 L.Ed.2d at 371 (emphasis in original) (quoting *Defenders of Wildlife, Friends of Animals & Their Environment v. Lujan,* 911 F.2d 117, 121 (8th Cir.1990)). The Supreme Court strongly rejected this notion: "[T]he court [below] held that the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental "right" to have the Executive observe the procedures required by law. We reject this view." *Defenders,* 504 U.S. at ——, 112 S.Ct. at 2143, 119 L.Ed.2d at 372 (footnote omitted).[11] Thus, the court finds that *Mumma's* theory of procedural injury is invalid and of no help to Plaintiffs' contention that they have suffered injury in fact.

Plaintiffs' other rationale for injury in fact is that the Plan without more does threaten them with actual or imminent injury because it sets the parameters for future decisions as to specific timber sales or the development of particular sites. In *Mumma* the Ninth Circuit agreed with this argument:

> [W]hether or not it is irrevocable, the Service's decision is harmful for standing purposes. . . .

... [I]f the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan predetermines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never.

*Mumma,* 956 F.2d at 1516 (footnote omitted). Plaintiffs also rely on *Sierra Club v. Robertson,* 764 F.Supp. 546 (W.D.Ark.1991), *rev'd,* 28 F.3d 753 (8th Cir.1994). Though it predates *Mumma,* the district court's opinion in *Robertson* foreshadowed *Mumma's* reasoning; in rejecting the site-specific argument, the *Robertson* district court held that "[t]hough the Forest Service argues that it may in fact alter the plan after it is adopted, and not utilize the harvesting patterns or techniques recommended by the plan, such an ability should not work to insulate all of its decisions from judicial review." *Id.,* 764 F.Supp. at 554.[12]

The Federal Defendants and the Timber Intervenors on the other hand rely on *Sierra Club v. Robertson,* 28 F.3d 753 (8th Cir.1994), the Eighth Circuit decision reversing the *Robertson* district court case upon which Plaintiffs rely. In *Robertson,* the Eighth Circuit found that plaintiffs had no standing:

---

**11.** The Supreme Court stated it had

> consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Defenders,* 504 U.S. at ——, 112 S.Ct. at 2143, 119 L.Ed.2d at 372. In *Region 8 Forest Serv. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 810–11 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994), the Eleventh Circuit followed *Defenders* and rejected the argument of several timber industry groups that they had standing to challenge a decision of the Service because of alleged procedural injury.

**12.** Plaintiffs cite two additional cases in support of their attack on the site-specific argument: *Seattle Audubon Society v. Moseley,* 798 F.Supp.

1484 (W.D.Wash.1992) ("*Moseley*"), and *Seattle Audubon Society v. Espy,* 998 F.2d 699 (9th Cir. 1993) ("*Espy*"). In *Moseley,* the plaintiffs challenged a FEIS and ROD regarding "revised standards and guidelines to ensure the viability of the northern spotted owl in national forests." *Id.,* 798 F.Supp. at 1487. The *Moseley* court first noted *Defenders'* statement of the minimum requirements for standing. The court next quoted from affidavits by a few of the plaintiffs' members which essentially showed that the members had visited the forests at issue in the past and planned to visit them in the future. The court then found the existence of standing because "[t]he threatened injury to plaintiffs from further logging of old growth habitat for the spotted owl is concrete, specific, imminent, caused by the agency conduct in question, and redressable by a favorable ruling." *Moseley,* 798 F.Supp. at 1488. *Espy* was the decision of the Ninth Circuit on the defendants' appeal in *Moseley;* the Ninth Circuit simply tracked its reasoning in *Mumma* on the remoteness issue to affirm the district court's finding of standing.

The mere existence of the Ouachita Forest Plan does not produce an imminent injury in fact. A forest plan ... is a general planning tool. It provides guidelines and approved methods by which forest management decisions are to be made for a period of ten to fifteen years. Adoption of the Plan does not effectuate any on-the-ground environmental changes. Nor does it dictate that any particular site-specific action causing environmental injury must occur. Indeed, before an environmental change can come about, several events must transpire. [Here the Court recites the steps that must occur before a site-specific plan is approved; *see* Timber Intervenors' Brief, *supra.*] Finding an environmental injury based on the Plan alone, without reference to a particular site-specific action, would "take[ ] us into the area of speculation and conjecture." *O'Shea v. Littleton,* 414 U.S. 488, 497 [94 S.Ct. 669, 676, 38 L.Ed.2d 674] ... (1974).

*Robertson,* 28 F.3d at 758.

The Eighth Circuit noted that the Supreme Court has not directly addressed the standing issue in the context of a challenge to a land and resource management plan. *Id.* However, the Eighth Circuit also noted the Supreme Court's insistence " 'that the injury proceed with a high degree of immediacy,' *Defenders,* [504 U.S. at —— n. 2, 112 S.Ct. at 2138 n. 2, 119 L.Ed.2d at 367 n. 2], in order to avoid deciding a case in which no injury will occur." *Robertson,* 28 F.3d at 758. The *Robertson* court used the Supreme Court's opinion in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("*NWF*"), to illustrate this point:

In *NWF,* environmental groups sought judicial review of the "program" by which the Bureau of Land Management classifies and administers public lands. The Court held that the plaintiffs did not have standing to challenge the program wholesale. In addition, the Court advised that even the individual classifications of public land by the BLM might not be sufficiently developed for judicial review. The Court stated that "the individual [classifications] of the BLM ... can be regarded as rules of general applicability (a 'rule' is defined in the APA as agency action of 'general or particular applicability *and future effect,'* 5 U.S.C. § 551(4) (emphasis added)) announcing, with respect to vast expanses of territory that they cover, the agency's intent to grant requisite permission for certain activities, to decline to interfere with other activities, and to take other particular action if requested. It may well be, then, that even those individual actions will not be ripe for challenge until some further agency action or inaction more immediately harming the plaintiff occurs." *NWF,* 497 U.S. at 892, 110 S.Ct. at 3190. The classifications discussed in NWF are analogous to the Ouachita Forest Plan, and the Court's language bolsters our conclusion that the appellants lack standing to challenge the Plan except in the context of a proposed site-specific action.

*Robertson,* 28 F.3d at 758–59.

There is no Eleventh Circuit case addressing the issue of standing with respect to a general attack on a land and resource management plan for a national forest. The court finds the Eighth Circuit's opinion in *Robertson* to be more persuasive than that of the Ninth Circuit in *Mumma* and accordingly will adopt the Eighth Circuit's decision finding a lack of standing in a case such as the instant one.

■ Plaintiffs correctly point out that the decision of the Chief of the Service adopting the Plan in the face of their objections is a "final agency action" under the APA. Also, Plaintiffs are correct that the Plan sets parameters for future timber sales and future development of the Forest. However, final agency action does not necessarily confer standing and the Plan is quite general in nature, contains projections far into the future, and, as is demonstrated by the record herein, is subject to piecemeal change and periodic revision. Also, the court's determination that Plaintiffs lack standing at this time to assert the claims made herein is *ipso facto* a determination that at such time as the Plan is implemented in a specific way, it will not be too late to complain. Should Plaintiffs find that a particular proposed development in the Forest under the Plan is objectionable,

there would be no impediment to judicial review at that time.

■ Plaintiffs' argument ignores the fact that while administrative agencies exercise quasi-judicial powers, they are not limited by the "case or controversy" requirement of Article III of the Constitution. *Ecee, Inc. v. Federal Energy Regulatory Comm'n,* 645 F.2d 339, 349 (5th Cir.1981).[13] Consequently, administrative agencies may hear and decide disputes of a broad nature that would not be eligible for judicial review. *Id.* ("[W]ithin their legislative mandates, agencies are free to hear actions brought by parties who might be without standing if the same issues happened to be before a federal court."). On the other hand, the "case or controversy" requirement is an express constitutional limitation on the activities of all Article III courts. *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982). It is beyond dispute that the courts, not the Congress or the executive branch, have retained (as they must) the authority to decide whether the standing component of the "case or controversy" requirement is satisfied. *See Defenders, passim.*[14] Thus, while a court may inquire about and be informed by the administrative proceedings that have occurred prior to the filing of an action, those proceedings are certainly not decisive on the issue of whether or not a litigant has standing to bring his dispute before the court.

In summary, Plaintiffs cannot show injury in fact solely on an assertion that the Federal Defendants violated the NFMA and/or its regulations. The other ground for a finding of standing turns on whether the Plan without more creates actual or imminently-threatened injury to Plaintiffs. The court

finds that it does not. Accordingly, Plaintiffs have failed to carry their burden of showing that they have standing to bring this action.

## RIPENESS

■ The standing issue aside, the Federal Defendants argue that this action should be dismissed because the issues presented are not ripe for judicial review.

> [I]t is fair to say that [the ripeness doctrine's] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

"[B]oth standing and ripeness analyses look to the existence of actual injury to the plaintiff caused by the alleged wrong...." *Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 n. 3 (11th Cir.1991); *cf. Abbott Labs.,* 387 U.S. at 152, 87 S.Ct. at 1517 ("[T]he impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage."). Thus, Plaintiffs' claims are not ripe for the same reason that they lack standing.

The court also is persuaded that Plaintiffs' claims are not ripe because dismissal of this action will cause little or no hardship to Plaintiffs. "An assessment of hardship often

---

**13.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**14.** In *Defenders,* the Supreme Court expressly announced the judiciary's supremacy on this issue. As discussed earlier, the Court unequivocally rejected the notion of a "citizen-suit," i.e., the notion that Congress can enact a law which confers standing on any person to sue over the

alleged violation of a procedural law. *Id.,* 504 U.S. at ———, 112 S.Ct. at 2142–43, 119 L.Ed.2d at 371–72; *cf. id.* at ———, 112 S.Ct. at 2147, 119 L.Ed.2d at 377 (Kennedy, J., concurring) ("[I]t would exceed [the] limitations [that Article III places on courts] if, at the behest of Congress and in the absence of any showing of concrete injury, we were to entertain citizen-suits to vindicate the public's non-concrete interest in the proper administration of the laws.").

turns on a straight-forward prediction of the course events are likely to take." 13A Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 3532.3 at 159 (1984). First, though Plaintiffs filed this action almost 2½ years ago, they have not sought leave to amend their complaint to challenge any specific timber sales. This fact tends to indicate that the Federal Defendants, being aware of Plaintiffs' concerns, have refrained from proposing timber sales in areas of the Forest which Plaintiffs consider to be sensitive.

Second, the Federal Defendants contend that "Plaintiffs' arguments regarding suitability will become moot in the near future because the NFMA requires a new suitability determination be made every ten years. 16 U.S.C. § 1604(k). In this case, the Forest Service must undertake a new suitability analysis in 1996." (Federal Defendants' Brief at 26 n. 6.) Since a new administrative planning cycle is imminent, if not already begun, the court cannot help but note that the administration now in power may be more receptive to Plaintiffs' vision of the uses to which the National Forests should be put.

Third, it cannot be disputed that in this and other cases Plaintiffs have demonstrated an indefatigable determination in their efforts to advance their vision of how the Forest should be utilized. This determination may have been a catalyst in the settlement of a number of the disputes that arose from the adoption of the Plan in 1986. The seeming absence of objectionable timber sale proposals is also evidence of this determination. Finally, the court does not doubt that Plaintiffs will carry this determination into the next administrative planning round.

Fourth, to the extent that Plaintiffs do suffer some hardship, the court believes it will be justified.

The value of not deciding [an issue] is affected by the relationships of the federal judiciary with other branches of the federal government and with state institutions, the need to conserve judicial resources, and the risk that premature decision may be proved unwise as facts are more fully developed and as more minds consider the question.

13A Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *supra* § 3523.3 at 146–47. The issues here are decidedly complex and do not readily lend themselves to judicial resolution by "generalist" federal courts. *Batanic v. INS,* 12 F.3d 662, 665 (7th Cir. 1993) ("The agency, when interpreting a statute which it administers in an area in which it has expertise, is better able to evaluate and weigh the competing policy interests in that field than is a generalist federal court.") (footnote omitted). Moreover, the nearness of a new administrative planning cycle, the possibility that new facts will be developed during the cycle, and the fact that "more minds," perhaps with different outlooks, will be involved in the cycle convince the court that it should defer a decision on Plaintiffs' claims.[15]

### REMAINING MOTIONS

The motion of State of Tennessee Wildlife Resources Agency and International Association of Fish and Wildlife Agencies for leave to file amici curiae brief, Plaintiffs' notice of objection and motion to strike, and the Timber Intervenors' two motions to supplement briefing all pertain to the merits of this action. Therefore, all of the foregoing motions are dismissed as moot, since the court does not reach the merits given Plaintiffs' lack of standing. The Federal Defendants' motion to supplement briefing is granted, since that motion introduces the Eighth Circuit's decision in *Robertson.* Plaintiffs' motion for oral argument is denied.

### CONCLUSION

Accordingly, Count X of Plaintiffs' complaint [# 1–1] is DISMISSED as moot. The

15. The one exception to the court's reasoning on the standing and ripeness issues concerns Plaintiffs' claim that the Federal Defendants violated the settlement agreement vis-a-vis issuing a revised MIS list. Based on the foregoing analysis of standing and ripeness, the court finds that this claim is properly before it. However, in their reply Plaintiffs concede that they have received a favorable ruling on their administrative appeal of the MIS issue. Plaintiffs thus state that they "are not seeking further relief on this issue." (Plaintiffs' Response at 107.) The claim is therefore dismissed as moot.

Federal Defendants' motion for summary judgment [# 38–1] is GRANTED on the standing issue with regard to Counts I–IX and XI–XIII of Plaintiffs' complaint. Counts I–IX and XI–XIII of Plaintiffs' complaint are DISMISSED WITHOUT PREJUDICE. The balance of the Federal Defendants' motion for summary judgment is DISMISSED AS MOOT. Plaintiffs' revised motion for summary judgment [# 36–1] is DISMISSED AS MOOT. The motion of State of Tennessee Wildlife Resources Agency and International Association of Fish and Wildlife Agencies for leave to file amici curiae brief [# 40–1], Plaintiffs' notice of objection and motion to strike [# 41–1], and the Timber Intervenors' two motions to supplement briefing [# 50–1 and # 52–1] are DISMISSED AS MOOT. The Federal Defendants' motion to supplement briefing [# 55–1] is GRANTED. Plaintiffs' motion for oral argument on summary judgment motion [# 58–1] is DENIED.

SO ORDERED.

UNITED STATES of America

v.

Hollis LOCKETT, Defendant.

CR. No. 92–48–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Nov. 10, 1994.

Deborah M. Vaughan (§ 2255 motion) Atlanta, GA, for Lockett.

Asst. U.S. Atty., Michael T. Solis, Macon, GA, for U.S. Attorney's Office.

## ORDER

OWENS, Chief Judge.

Before the court is defendant's 28 U.S.C. § 2255 motion to vacate, set aside or correct sentence. After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order.

### PROCEDURAL HISTORY

On May 29, 1992, a grand jury for the Middle District of Georgia returned a seven-count indictment against Hollis Lockett and two co-defendants. The indictment charged Lockett with conspiracy to possess with intent to distribute cocaine (Count 1) and distribution of cocaine (Counts Two, Three, Four, Five, and Six). On June 10, 1992, Lockett entered a plea of not guilty. On May 13, 1993, after a jury trial, Lockett was found guilty on Counts One, Four, Five, and Six of the indictment. On August 20, 1993, Lockett was sentenced to 235 months on Counts One, Four, Five, and Six.

On February 15, 1994, Lockett filed a 28 U.S.C. § 2255 motion to vacate, set aside or correct sentence. The court denied Lockett's motion on May 31, 1994. On August 16, 1994, Lockett filed a second 28 U.S.C. § 2255 motion to vacate, set aside or correct sentence. In his second § 2255 motion, Lockett contends that his sentence should be vacated because: (1) The United States Attorney violated his right to a speedy trial; (2) the drugs on which the indictment and conviction were based had been destroyed prior to trial; (3) the evidence was insufficient to sustain his conviction; (4) the amount of drugs used in calculating his sentence was improper; (5) ineffective assistance of counsel; (6) his sentence was improperly enhanced for obstruction of justice; and (7) the court failed to submit an entrapment charge to the jury. After reviewing defendant's motion, the court ordered the United States Attorney to file a written response. The United States Attorney has filed a written response to defendant's motion, and the motion is now before the court for decision.

## DISCUSSION

### I. Right to Speedy Trial

██ Defendant contends that his "Fifth and Fourteenth Amendment due process rights and Sixth Amendment right to a speedy trial were violated and denied through the Government's bringing of an Indictment against him in 1992 . . . for alleged criminal conduct which took place in 1987. . . ." (Def.'s Br. at 2.)

██ In *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the United States Supreme Court held: "[T]he protection of the [Sixth] Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." *Marion,* 404 U.S. at 313, 92 S.Ct. at 459. Therefore, the Sixth Amendment does not provide a basis for challenging pre-indictment delay.

██ On the other hand, "the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to [defendant's] right[ ] to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Id.* at 324, 92 S.Ct. at 465. Defendant, however, has provided the court with only a general allegation of prejudice. In light of the evidence submitted at trial, defendant has not shown that the pre-indictment delay

resulted in substantial prejudice to his right to a fair trial. Further, there is absolutely no evidence in the record to suggest that the pre-indictment delay was an intentional act designed to gain tactical advantage over defendant.

■ Finally, the court notes that the May 29, 1992 indictment was brought within the applicable statute of limitations. As the Supreme Court stated in *Marion*, the applicable statute of limitations is "'the primary guarantee against bringing overly stale criminal charges.'" *Marion*, 404 U.S. at 322, 92 S.Ct. at 464.

Accordingly, defendant's Fifth Amendment due process rights and Sixth Amendment right to a speedy trial were not violated through the Government's bringing of an indictment against him in 1992 for criminal conduct that occurred in 1987.

## II. Destruction of Evidence

■ According to defendant, his "Fifth, Fourteenth Amendment, and Sixth Amendment confrontation rights were violated by the government as the alleged controlled substances on which the indictment and conviction/sentence depended ... had already been destroyed by the Crime Lab prior to trial and prior to the indictment." (Def.'s Br. at 2.)

■ "A defendant in a drug prosecution has a right to have an expert of his own choosing perform an independent analysis of the seized substance." *United States v. Rolande–Gabriel*, 938 F.2d 1231, 1238 (11th Cir. 1991); *see also United States v. Nabors*, 707 F.2d 1294, 1296 (11th Cir.1983). "The government additionally has a concomitant obligation to try in good faith to preserve important material." *Rolande–Gabriel*, 938 F.2d at 1238. However, "where the material has been destroyed in spite of the government's good faith attempt to preserve it, testimony as to the nature of the material need not be suppressed absent showing that the testing of the material by another expert would have been reasonably likely to produce evidence favorable to the defendant." *Nabors*, 707 F.2d at 1297. Further, "[a]bsent some proof that the destroyed evidence was exculpatory or that the evidence was destroyed in bad

faith, the case should not be dismissed." *Rolande–Gabriel*, 938 F.2d at 1238.

In the case *sub judice*, the United States, through various witnesses, explained the absence of the evidence to the jury. In addition, the United States presented overwhelming evidence that the substance at issue was cocaine. Finally, defendant presented absolutely "no evidence that the material was anything other than the contraband charged," *Nabors*, 707 F.2d at 1297, and the record lends no support to a contention that the evidence was destroyed in bad faith. "In short, the absence of the seized evidence did not deprive [defendant] of a fundamentally fair trial." *Id.*

## III. Insufficiency of Evidence

■ Defendant asserts that there was insufficient evidence presented at trial to support his conviction. In judging the sufficiency of the evidence presented at trial, this court is required to review "the evidence 'in the light most favorable to the government, accepting all reasonable inferences and credibility choices that tend to support the jury's verdict.' It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, if a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Howard*, 918 F.2d 1529, 1534 (11th Cir.1990); *see also United States v. Gates*, 967 F.2d 497, 499 (11th Cir. 1992). After a careful review of the record, the court finds that a reasonable trier of fact could have found that the evidence submitted at trial established defendant's guilt beyond a reasonable doubt.

## IV. Quantity of Drugs Attributable

Defendant contends that his "Sixth Amendment right was violated at the sentencing by the trial court when it adopted and sentenced [defendant] by the measure of 'drugs' in the overall transaction ... and not from the quantity submitted into evidence." (Def.'s Br. at 4.)

■ On May 13, 1993, after a jury trial, defendant was found guilty on Counts One, Four, Five, and Six of the indictment. Count

I of the indictment charged defendant with conspiracy to possess with intent to distribute cocaine. As a participant in the conspiracy, defendant is held accountable for the total amount of drugs attributable to the conspiracy. *See United States v. LaFraugh,* 893 F.2d 314, 317 (11th Cir.1990); U.S.S.G. § 1B1.3(a)(1). The United States presented sufficient evidence at trial to establish the amount of drugs attributed to defendant. Accordingly, defendant's Sixth Amendment right was not violated by holding defendant accountable for the overall measure of drugs involved in the conspiracy.

### V. Ineffective Assistance of Counsel

Defendant asserts that his "right to effective assistance and advice of counsel at both the pretrial and trial stages was denied...." (Def.'s Br. at 4.)

As an initial matter, the court notes that defendant raised this same contention in his first 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence. The court denied that motion on May 31, 1994. Section 2255 provides that "[t]he sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." 28 U.S.C. § 2255. Accordingly, the court declines to entertain defendant's contention that he received ineffective assistance of counsel.

However, even if this court were to exercise its discretion and address defendant's contention a second time, defendant's argument would fail yet again. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established a two-pronged test for determining whether a defendant has received ineffective assistance of counsel. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697, 104 S.Ct. at 2069. Accordingly, after a careful examination of the record, the court finds that the alleged deficiencies were not "so serious as to deprive the defendant of a fair trial." *Id.* at 687, 104 S.Ct. at 2064.

### VI. Enhancement for Obstruction of Justice

Defendant contends that his "Fifth and Fourteenth Amendment due process rights were violated by the district court's improper ... assessment of ... a two (2) level sentence enhancement for obstruction of justice...." (Def.'s Br. at 5.)

Section 3C1.1 of the United States Sentencing Guidelines provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1. The comments to § 3C1.1 state that perjury is an example of the type of conduct to which § 3C1.1's two-level enhancement applies.

In *United States v. Dunnigan,* —— U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the United States Supreme Court held that "upon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." *Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1119. A witness testifying under oath commits perjury if he "gives false testimony concerning a material matter with the wilful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Id.* at ——, 113 S.Ct. at 1116.

In the case *sub judice*, the United States introduced at trial evidence of tape recordings of defendant. Defendant, however, testified at trial that it was not his voice on the recordings submitted by the United States. Defendant does not suggest that his testimony was the result of confusion, mistake, or faulty memory; defendant simply contends that it was not his voice on the recordings. The evidence submitted at trial, however, showed otherwise. It was on this basis that the court assessed a two-level enhancement pursuant to U.S.S.G. § 3C1.1. Accordingly, defendant's Fifth Amendment due process rights were not violated by the assessment of a two (2) level enhancement *for obstruction of justice.*

### VII. Entrapment Charge

█ Defendant asserts that his "Fifth and Fourteenth Amendment due process rights were violated by the district court's rejection and refusal to submit Defendant's entrapment defense on charge to the jury . . . ." (Def. at 5.)

Entrapment is an affirmative defense which requires the defendant to present some evidence of government misconduct or improper inducement before the issue is properly raised. The defendant has the initial burden of producing evidence to establish government misconduct, and the law clearly requires more than a scintilla of evidence that improper government conduct created the risk that a person other then one ready to commit the offense was so involved. Only after the defendant meets this burden is a jury question on entrapment presented.

*United States v. Davis*, 902 F.2d 860, 866 (11th Cir.1990); *see also United States v. Gates*, 967 F.2d 497, 499 (11th Cir.1992). After a careful review of the record, the court finds that defendant has failed to meet his burden of "producing evidence to establish government misconduct." *Davis*, 902 F.2d at 866. Accordingly, defendant was not entitled to have the jury instructed as to the defense of entrapment.

### VIII. Evidentiary Hearing

"In a section 2255 proceeding, the district court must accord the movant an evidentiary hearing ' "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." ' " *Anderson v. United States*, 948 F.2d 704, 706 (11th Cir.1991). For the reasons set forth in Parts I–VII of this order, the court finds that the record in the case *sub judice* conclusively shows that defendant is entitled to no relief. Accordingly, defendant's request for an evidentiary hearing is **DENIED.**

### *CONCLUSION*

Defendant Hollis Lockett's 28 U.S.C. § 2255 motion to vacate, set aside or correct sentence is **DENIED.**

**SO ORDERED.**

James Griffin LANE, Plaintiff,

v.

Federico PENA, et al., Defendants.

Civ. A. No. 94–1608.

United States District Court,
District of Columbia.

Oct. 26, 1994.

Walter A. Smith, Jr., Daniel B. Kohrman, Timothy J. Carlson, and Mitchell E. Zamoff, of Hogan & Hartson, Washington, DC of counsel: Arthur B. Spitzer, of the American Civil Liberties Union of Nat. Capital Area, Washington, DC for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Eric H. Holder, Jr., U.S. Atty., Brian G. Kennedy and Patricia M. Russotto, of Dept. of Justice Civ. Div. Federal Programs Branch, Washington, DC for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

Before the Court in the above-captioned case are the parties' cross-Motions for Summary Judgment, as well as their oppositions and replies thereto. This case was originally filed as a preliminary injunction. On July 28, 1994 the Court held a hearing and issued an Order on August 1, 1994 which, with the parties' consent, consolidated a hearing on the Plaintiff's Motion for Preliminary Injunction with a final determination on the merits of the case, pursuant to Rule 65 of the Federal Rules of Civil Procedure. The parties informed the Court that there would be no dispute as to material facts and that the matter could be resolved through cross-motions for summary judgment. On September 29, 1994, the Court held a hearing on the parties' cross-motions for summary judgment.

The Plaintiff filed a preliminary injunction seeking reinstatement to the United States Merchant Marine Academy ("USMMA" or "Academy"). He was admitted to the Academy in July of 1991. Thereafter he developed diabetes but managed to complete his first year. In September of 1992, the Academy informed him that he would be disenrolled due to his medical condition. The Plaintiff argues that the Defendants' actions violate both the Maritime Education and Training Act of 1980, 46 App. U.S.C. § 1295 ("META"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. ("Section 504"). In his motion, the Plaintiff seeks a preliminary and permanent injunction requiring the Academy to reinstate Lane immediately, compensatory damages, including out-of-pocket costs, loss of professional opportunity, and pain and suffering, attorneys' fees, and costs.

The Defendants argue, in sum, that the META imposes on USMMA graduates an obligation to serve in an armed forces reserve unit upon graduation as a condition of receiving an education at the Academy. The Defendants contend that the Plaintiff cannot satisfy his reserve service obligation because he has insulin-dependent diabetes mellitus

and, therefore, does not meet the physical standards established by the Department of Defense for a commission in the armed forces reserve. According to the Defendants, the Plaintiff cannot satisfy an essential statutory requirement as a condition of attending the Academy and, therefore, he cannot be considered an "otherwise qualified person with a disability" for purposes of Section 504 of the Rehabilitation Act. The Defendants further argue that the agency's interpretation of the statute warrants due deference by the Court, and assert sovereign immunity with respect to damages.

Alternatively, the Plaintiff argues, in sum, that the META nowhere authorizes the *per se* exclusion of a student simply because he has a medical condition which precludes admission into the naval reserve, when that same condition in no way limits the student's ability to serve in the merchant marine.[1] He further argues that the META mandates only that students qualify for a merchant marine license—not that they also qualify to serve in the naval reserve—and contends that he is eligible for a merchant marine license. Moreover, the Plaintiff maintains that the Court need not afford the agency deference because it has not consistently followed their alleged practice of disenrolling cadets who fail to meet the requirements for a naval reserve commission, and because the plain language of the META demonstrates that no such practice is required. Finally, the Plaintiff asserts that Section 504 was also violated because he was denied the opportunity to complete his education at a federally funded academic institution solely because he developed a disability.

Upon careful consideration of the papers filed by both parties for dispositive relief, the oral arguments of counsel, the applicable law, and the entire record in this case, the Court has determined that the Plaintiff's Motion shall be granted, and the Defendants' Motion shall be denied.

The Court finds that the Defendants violated Section 504 of the Rehabilitation Act by disenrolling Lane solely on the basis of his diabetes and without making any attempt to reasonably accommodate his disability. The Stipulated Facts reveal that James Griffin Lane has repeatedly achieved an "outstanding" rating on the physical readiness exam administered by the Academy, that it is undisputed that James Griffin Lane may qualify for a merchant marine license if he maintains control of his diabetes, that his physician has reported that his diabetes mellitus is under "extremely good control," and that the Academy has allowed students in the past with a lost limb, a lost eye, brain damage, and color blindness to remain at the Academy and graduate despite their disabilities. Nevertheless, the Defendants now refuse to acknowledge that the Rehabilitation Act requires any reasonable accommodation—or even an attempt to provide reasonable accommodation—of Lane's diabetes mellitus. The Court simply cannot accept this untenable reading of the Rehabilitation Act. The Court thus finds that the Defendants have not shown that Lane has failed to meet an essential program requirement under Section 504 or, critically, that the Academy would suffer undue hardship by reasonably accommodating the diabetes mellitus of this otherwise extremely well qualified cadet.

The Defendants argue that the META dictated their disenrollment of Lane. However, the Court further finds that the plain language of the META does no such thing. Neither the statute, the regulations promulgated thereunder, nor the agency's inconsistent practices support the Defendants' position that the Academy was obliged to disenroll Lane upon discovery of his diabetes mellitus. The Court finds that, despite the Defendants' assertions to the contrary, the META contains no requirement that cadets such as Lane meet all physical requirements for a commission in the armed forces reserve or suffer unconditional expulsion from the Academy. Moreover, the Court finds that the agency's reading of the META does not warrant due deference because it is contradicted by the plain language of the statute,

---

1. The Plaintiff does not challenge the Department of Defense's determination that diabetes mellitus prevents an individual from meeting requisite physical qualifications for participation in the armed forces reserve. He only argues that eligibility for the reserve is not a requirement for continued enrollment in the Academy, and that he meets all necessary requirements.

and because the USMMA has acted inconsistently with respect to Lane and other disabled students.

Accordingly, the Court shall order the United States Merchant Marine Academy to reinstate forthwith Plaintiff James Griffin Lane as a student at the USMMA, and shall require the Defendants to take all steps necessary to permit Lane to resume his maritime training as soon as practicable. Finally, the Court finds that the Plaintiff is entitled to compensatory damages for his injuries.

As a result of the Court's findings, judgment must be entered in favor of the Plaintiff. The Court shall issue an Order of even date herewith consistent with this Memorandum Opinion.

### BACKGROUND [2]

In 1990, the Plaintiff, James Griffin Lane, applied for an appointment to the U.S. Merchant Marine Academy, a federal service academy that trains men and women to serve as commercial merchant marine officers and as commissioned officers in the United States armed forces.[3] As a condition of his appointment, the Plaintiff was required to undergo a physical examination to determine if he met the requisite physical qualifications. On November 29, 1990, the Department of Defense Medical Examination Review Board ("DOD-MERB") administered the examination. Two days earlier, the Plaintiff had submitted a medical history form which asked whether he had at any time "blood, protein, or sugar in urine;" to this, he answered "no." The results of a urinalysis test administered later by DODMERB were "negative" for sugar in the urine.

On June 4, 1991, DODMERB stamped on the Plaintiff's medical evaluation form that he was "medically qualified" and "recommended for service academies and ROTC programs," and the Plaintiff entered the Academy the next month.

On February 1, 1991, Lane consulted a private family physician and reported excessive thirst and hunger. A test showed he had an elevated blood sugar level, and the doctor directed the Plaintiff to limit his intake of calories and take an oral hypoglycemic medication to reduce his blood sugar level. Over a period of seven weeks, Lane's blood sugar level fluctuated between the normal range and higher. In September or October of that year, the Plaintiff had the flu and began to lose weight and again experience excessive thirst and hunger. In December 1991, the Plaintiff was diagnosed with diabetes mellitus by Dr. Didace Kabatsi, a private endocrinologist, who performed several tests on blood and urine samples.

On February 11, 1992, Lane visited Dr. Daniel Kalash, Chief Medical Officer at the Academy, who recorded in his notes that the Plaintiff advised that he had an "intermittent history during [the] past several months of glycosuria [sugar in the urine] and [elevated] blood sugar" and that he had been treated for his condition. He further recorded that the Plaintiff reported he was monitoring his "blood sugar in [his] barracks" and that "all findings [were] normal." Finally, he made the following notes: "Assess: Early Diabetes type I" and "Capt. Bauer notified & communicated problem to BuMed." At that time, Bauer was the Head of the Department of Naval Science at the Academy. Dr. Kalash instructed the Plaintiff to continue observing his blood sugars and report abnormalities and symptoms, and told him that he would repeat the lab workup at the end of the Plaintiff's third class, or sophomore year.

In March 1992, the Plaintiff consulted Dr. Jay Skyler, an endocrinologist at the University of Miami, and President of the American Diabetes Association. Dr. Skyler confirmed that Lane had diabetes, recommended insulin therapy, and referred him to Dr. S. Mark Tanen, an endocrinologist in Northern Virginia. In early July 1992, shortly before commencing his second year, the Plaintiff began seeing Dr. Tanen and, upon Dr. Tanen's recommendation, began insulin therapy.

In a letter dated July 23, 1992, the Plaintiff's father, J.W. Lane, Jr., notified Paul

---

**2.** Pursuant to the Court's Order of August 1, 1994, the parties filed a Stipulated Statement of Undisputed Material Facts.

**3.** The Maritime Administration ("MARAD"), within the Department of Transportation ("DOT" or "the agency"), administers the USMMA.

Krinsky, the Superintendent of the Academy, that his son had began taking insulin to control his diabetes. On September 4, 1992, the Plaintiff learned that a Physical Examination Review Board ("PERB") hearing had been scheduled for September 8, 1992 to determine his "medical suitability for continuance" at the Academy. The hearing was to confirm that the Plaintiff had insulin-dependent diabetes mellitus, as indicated in his father's July 23, 1992 letter. At the hearing, which Lane attended unaccompanied, the PERB did not evaluate the particular circumstances of Lane's case other than verify his status as a diabetic.

On September 16, 1992, the PERB advised the Superintendent of the Academy that the Plaintiff had insulin-dependent diabetes and that, under U.S. Navy commissioning standards, this was "a disqualifying condition for military service" and, accordingly, that the Plaintiff "would not be commissionable in the Navy/Merchant Marine Reserve Program." The PERB further advised, however, that Lane may not be ineligible for a Coast Guard merchant marine license as the "requirements do not seem to be as rigid as the Navy requirements but a waiver is required when an applicant is insulin-dependent and may not be automatic[;] it would depend on the specifics of the condition."

In contrast to the Department of the Navy, the United States Coast Guard grants merchant marine licenses, including those which permit holders to serve as deck officers at sea, to persons with diabetes mellitus who obtain a waiver of Coast Guard physical qualifications standards with respect to diabetes. Waivers are issued to individuals who show to the Coast Guard's satisfaction that their diabetes is under control and that they are otherwise physically qualified for a merchant marine license. As of December 1993, more than fifty persons with diabetes, some insulin-dependent, are sailing on an active merchant marine license.

On September 21, 1992, the Superintendent advised the Plaintiff that he would be separated from the Academy effective December 18, 1992, and stated that "Adult-onset (Type I) diabetes is a disqualifying condition for military service. You are not eligible for appointment as Midshipman, MMR/USNR nor for commissioning as a Naval Reserve Officer." The Superintendent advised Lane that he would be permitted to continue to take classes at the Academy through December 18, 1992, and thus complete the first half of his sophomore year. This did not include participation in shipboard training, however.

Lane achieved a 3.4 grade point average during his first year at the Academy, rowed crew, and participated in various sea-going activities, including a four to five day journey up the East Coast in a tugboat, during which storm conditions caused the boat to undergo 40 degree rolls. The Plaintiff's medical records contain no indication that he had any medical problems associated with these activities, and in November 1992, Lane achieved an "outstanding" rating on the physical readiness exam administered by the Academy, as he had achieved each time it was administered previously. In December 1992, Dr. Tanen concluded that Lane's diabetes was under "extremely good control" and noted that he had not experienced any incapacitating episodes due to his condition.

In early October 1992, the Plaintiff's father wrote to Captain Warren G. LeBack, then-Administrator of the U.S. Maritime Administration ("MARAD"), to challenge the Superintendent's decision. In a letter dated January 15, 1993, LeBack responded to the Plaintiff's request for a review of the decision, and between January 15, 1993 and April 15, 1994, the Plaintiff took steps to obtain the assurances specified in the January 15, 1993 letter.

On April 15, 1994, MARAD Administrator A.J. Herberger issued a letter to Lane stating, in part, that Lane could not meet physical qualifications standards applicable to midshipmen at the USMMA because "insulin dependent diabetes disqualifies an individual from receiving a commission in any component of the reserve of the armed forces of the United States."

The Department of the Navy has consistently applied the same physical qualifications standards with respect to diabetes mellitus, which is a disqualifying condition for commissioning in all active duty and reserve

**1056**

units of the armed forces. In recent years, however, students have attended and graduated from the Academy despite having developed physical disabilities while they were students, which include loss of a limb, loss of an eye, brain damage, and color blindness. Moreover, students with insulin-dependent diabetes have enrolled in and recently graduated from at least one state maritime academy, the Maine Maritime Academy.

### *STATUTES AND REGULATIONS APPLICABLE TO THIS CASE*

The Plaintiff claims violations of both the Maritime Education and Training Act of 1980, 46 App. U.S.C. § 1295 ("META"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Section 504").

### I. *The META*

In the META, Congress assigned the United States Merchant Marine Academy a two-fold mission: "education and training of citizens of the United States who are capable of providing for the safe and efficient operation of the merchant marine of the United States at all times and as a naval and military auxiliary in time of war and national emergency." 46 U.S.C.App. § 1295(1). Moreover, the statute directs the Secretary of Navy, in cooperation with the Maritime Administrator, to assure that the training of merchant marine officers at the USMMA includes programs for "naval science training in the operation of merchant marine vessels," and that the programs be "consistent with United States Navy standards and needs." *Id.* § 1295(2). The Plaintiff claims that the Academy's primary mission is to serve the merchant marine, and that its secondary goal is to serve as naval and marine reserve. Thus, he contends, Congress did not categorically require that all students at all times meet naval reserve requirements, only that they at all times meet merchant marine requirements. The Defendants argue that both purposes are primary and that, therefore, the Plaintiff's inability to meet requisite physical qualifications for naval reserve status precludes him from continuing at the USMMA.

The Court finds, however, that this statutory language does not clearly lead to either conclusion. It is undisputed that Congress anticipated that the USMMA would serve both the merchant marine and the armed forces reserve. The obligations Congress imposed on cadets at the USMMA with respect to each, however, are covered by other portions of the statute. The Court thus observes that the extent of these obligations is the seminal issue posed by this dispute.

The parties' main contention is over three portions of the statute which explicitly deal with the armed forces reserve. The statute requires that "[a]ny citizen of the United States selected for appointment ... *must agree to apply for midshipman status in the United States Naval Reserve* (including the Merchant Marine Reserve, United States Naval Reserve) before being appointed as a cadet at the Academy." 46 U.S.C.App. § 1295b(b)(3)(F) (emphasis added). The final authority to appoint cadets to a reserve post lies with the Secretary of the Navy:

> Any citizen of the United States who is appointed as a cadet at the Academy *may be appointed by the Secretary of the Navy as a midshipman in the United States Naval Reserve* (including the Merchant Marine Reserve, United States Naval Reserve).

46 U.S.C.App. § 1295b(c) (emphasis added).

The key statutory language at issue in this case, however, deals with a cadet's commitment agreements once he or she is appointed:

> Each individual appointed as a cadet at the Academy ... who is a citizen of the United States, shall as a condition of appointment to the Academy sign an agreement committing such individual—
>
> (A) to complete the course of instruction at the Academy, unless the individual is separated by the Academy;
>
> (B) to fulfill the requirements for a license as an officer in the merchant marine of the United States on or before the date of graduation from the Academy of such individual;
>
> (C) to maintain a license as an officer in the merchant marine of the United

States for at least 6 years following the date of graduation from the Academy of such individual;

(D) *to apply for an appointment as, to accept if tendered an appointment as, and to serve as a commissioned officer in the United States Naval Reserve* (including the Merchant Marine Reserve, United States Naval Reserve), the United States Coast Guard Reserve, or any other Reserve unit of an armed force of the United States, for at least 6 years following the date of graduation from the Academy of such individual; and

(E) to serve in the foreign or domestic commerce and the national defense of the United States for at least 5 years following the date of graduation from the Academy

 (i) as a merchant marine officer;

 (ii) as an employee of the United States maritime industry, if the Secretary determines that service under (i) is not available to such individual;

 (iii) as a commissioned officer on active duty in the armed forces of the United States or in the National Oceanic and Atmospheric Administration; *or*

 (iv) any combination of (i), (ii) or (iii).

46 U.S.C.App. § 1295b(e)(1) (emphasis added).

The Plaintiff argues that this language is conditional, such that cadets only have to apply for and, if tendered, accept a commission in the armed forces reserve. The Defendants contend that this language creates a binding obligation both to serve in the naval reserve or some other armed forces reserve unit and, by implication, to meet physical requirements for such a commission.

Next, the parties focus attention on the power of the Secretary of the Navy to waive any of the statutory service obligations in cases of individual "hardship." The relevant provisions read as follows:

If the Secretary determines that any individual who has attended the Academy for not less than 2 years has failed to fulfill the part of the agreement ... such individual may be ordered by the Secretary of the

Navy to active duty in the United States Navy to serve for a period of time not to exceed 2 years. *In cases of hardship as determined by the Secretary, the Secretary may waive this paragraph.*

46 U.S.C.App. § 1295b(e)(2) (emphasis added).

The statute continues with a similar provision:

If the Secretary determines that any individual has failed to fulfill any part of the agreement ... such individual may be ordered to active duty to serve a period of time not less than 3 years.... *In cases of hardship as determined by the Secretary, the Secretary may waive this paragraph.*

*Id.* § 1295b(e)(3)(A) (emphasis added).

While the Plaintiff argues that this language proves that Congress did not intend the *per se* rule that cadets qualify for the naval reserve at all times, the Defendants assert that this language only affords waiver for hardship incurred by cadets during their third or fourth years at the Academy.

Further, the parties disagree over how to interpret properly the provision of the statute addressing the awarding of Bachelor of Science degrees to cadets:

The Superintendent of the Academy may confer the degree of bachelor of science upon any individual who has met the conditions prescribed by the Secretary and who, if a citizen of the United States, has passed the examination for a merchant marine officer's license. *No individual may be denied a degree ... because the individual is not permitted to take such examination solely because of physical disqualification.*

*Id.* § 1295b(g) (emphasis added). The Plaintiff argues that the Defendants violated the META under this provision by disenrolling him due solely to his medical condition, while the Defendants assert that this provision speaks only to qualifying for merchant marine licenses, not to meeting armed forces reserve requirements.

Finally, the parties discuss the agency regulations promulgated under the META. The Academy is administered by the Maritime Administration ("MARAD"), which is within

the Department of Transportation ("DOT"). The general regulatory provisions promulgated under the META with respect to the USMMA read as follows:

> *Midshipmen are appointed to the Academy for training to prepare them to become officers in the U.S. merchant marine.* The Academy, located at Kings Point, New York, is maintained by the Government as a part of the Administration. After successful completion of the 4–year course of study, a graduate of the Academy shall receive a Bachelor of Science degree and a merchant marine license as either a third officer or third assistant engineer ... issued by the U.S. Coast Guard. *If qualified, an officer may be commissioned as an officer in a reserve component of an armed force of the United States.*

46 C.F.R. § 310.52(a) (emphasis added).

The regulations also reiterate the statutory requirement that USMMA cadets *"[a]pply for an appointment as, accept any tendered appointment as* and serve as a commissioned officer in the USNR (including the Merchant Marine Reserve, USNR), the United States Coast Guard Reserve, *or* any other Reserve component of an armed force of the United States...." 46 C.F.R. § 310.58(a)(4) (emphasis added).

The relevant regulations regarding physical standards for admission and training of midshipmen at the USMMA read as follows:

> *Physical standards.* (1) *A candidate shall meet the physical requirements prescribed by the Department of the Navy for appointment as Midshipman, USNR [United States Naval Reserve] (including the Merchant Marine Reserve, USNR) and the requirements prescribed by the U.S. Coast Guard for original licensing as a third mate and third assistant engineer.* All candidates shall have color perception and refractive error within the limits prescribed by the Department of the Navy or by the U.S. Coast Guard, whichever are higher.

46 C.F.R. § 310.56(a) (emphasis added).

In addition, the regulations provide for waiver of some medical requirements for enrolled students and applicants to the USMMA:

> (2) The requirement to meet these standards is a continuing one and shall apply through graduation from the Academy. Failure to meet the standards while attending the Academy is grounds for, and may lead to disenrollment. *Individuals who have completed at least two years of study and, as a result of an accident, illness or other cause (during official duty), fail to meet this requirement may be permitted to remain at the Academy at the discretion of, and under conditions set by, the Administrator....*

46 C.F.R. § 310.56(a) (emphasis added).

Later, the regulations state:

> The Administrator *shall have the discretion to grant waivers* of the service obligation contract in cases where there would be undue hardship or impossibility of performance due to accident, illness, or other justifiable reason.

46 C.F.R. § 310.58(f).

The Plaintiff argues that, like the META, the regulations employ conditional language which, along with the allowance for waiver upon hardship, support the conclusion that the agency does not follow a hard and fast rule that all Academy students meet requirements for a naval reserve commission at all times. The Defendants, however, point to another regulatory provision in order to demonstrate that the agency policy is clear:

> Since commissioning in the United States Navy, or any other branch of the Armed Forces, is a requirement for graduation, *no waivers will be granted for medical conditions which would prevent commissioning in at least a restricted status in the U.S. Navy Reserve.*

*Id.* § 310.56(d) (emphasis added).

As discussed in detail below, the Court finds that the META does not contain a clear statutory requirement that every cadet both serve in, and at all times meet physical qualifications for, commissioning in the armed forces reserve. This conclusion is critical to the Court's analysis under Section 504.[4] The

---

4. The Defendants claim that a suit for violation of the META cannot be maintained because the

Court further finds that the agency's regulatory interpretation of the META in 46 C.F.R. § 310.56(d) does not support the Defendants' contention that the META obliged them to separate Lane from the USMMA for failure to meet physical requirements for commissioning in the naval reserve.

## II. *SECTION 504 OF THE REHABILITATION ACT*

The Plaintiff claims that, even if the Defendants could show that Congress required all Academy students to meet physical criteria for commissioning in the naval reserve, it would not necessarily follow that such a requirement is "essential" within the meaning of Section 504, which states:

> *No otherwise qualified handicapped individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in,* be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under *any program or activity conducted by any Executive agency....*

29 U.S.C. § 794(a) (Supp.1994) (emphasis added).

The relevant DOT regulation reads as follows:

> *Qualified individual with handicaps means*—(1) With respect to education services provided by the U.S. Merchant Marine Academy or the U.S. Coast Guard Academy, an individual with handicaps who meets the essential eligibility requirements for participation in and receipt of such services, including the physical standards applicable to the U.S. Naval Reserve or the U.S. Coast Guard.

49 C.F.R. § 28.103.

The Plaintiff argues that, here, Lane is clearly qualified to continue at the Academy. The Defendants argue that, since commissioning in a reserve unit of the armed forces

is, under their reading of the META, a statutory requirement for receiving an education at the USMMA, physical qualification for such a commission is necessarily an "essential" condition which must be satisfied. The Court agrees with the Plaintiff that the Defendants have violated Section 504 by disenrolling him solely on the basis of his diabetes mellitus, without attempting to provide reasonable accommodation, and without making an individualized determination under Section 504.

The Court shall now turn to its analysis of the Defendants' actions with respect to Plaintiff Lane under both statutes.

## *DISCUSSION*

## I. *THE PLAIN LANGUAGE OF THE META DOES NOT REQUIRE ALL CADETS TO BE ELIGIBLE FOR RESERVE SERVICE AT ALL TIMES*

The crux of the Defendants' argument under both statutes rests on the agency's reading of the META as expressly mandating that all USMMA students meet the physical requirements for commissioning in the armed forces reserve. The Court finds that the Defendants have unreasonably stretched the plain language of the META too far.

It is undisputed that, on its face, the META sets forth a requirement that USMMA students apply for and, if tendered, accept an appointment as a commissioned officer in the naval reserve, or another reserve unit of the armed forces. 46 U.S.C. § 1295b(e)(1). From this language, the Defendants conclude not only that the META contains an express requirement that all USMMA students serve in the armed forces reserve, but that it further contains a clear requirement that all students at all times meet physical eligibility requirements for commissioning in the reserve. The Defendants concede in their papers that the physical eligibility requirement is, at best, implied

META does not create a private cause of action. Defendants' Motion, at 17 n. 6. Without further briefing the issue, however, the Defendants further state that they "treat the essential elements of plaintiff's cause of action under [the META] as though they stated a claim for violation of the Rehabilitation Act." *Id.* Accordingly, for purposes of this Memorandum Opinion, the Court shall address the Plaintiff's claim without reaching the separate issue of whether a private cause of action exists under the META.

from the statute. Defendants' Motion, at 20. Thus there is no clear mandate from Congress that Lane or any other cadet meet physical standards for the naval reserve. Accordingly, the Court finds that the Defendants' further arguments under the META *and* Section 504 lack merit because they are based on the erroneous premise that the META contains a clear and unconditional requirement that all enrolled students meet armed forces reserve requirements.

**A. The META only mandates that USMMA students qualify for a license as an officer in the merchant marine and apply for and, if tendered, accept a commission in the armed forces reserve.**

The Defendants maintain that the "apply for" and "accept if tendered" language of the META requires that cadets obtain a commission in an armed forces reserve unit as a condition of receiving a taxpayer-funded education at the USMMA. 46 U.S.C. App. § 1295b(e)(1). By necessary *implication,* the Defendants argue, the statute also contains a requirement that cadets meet the physical standards to satisfy that obligation.

The Court finds, however, that the language of the META speaks for itself. The plain language of the META requires each cadet to apply for an appointment in the reserve and, if an appointment is offered, to accept it. Indeed, it is undisputed that cadets must apply for such a position. However, the only logical way to give effect to the "if tendered" language is to conclude that, *upon application* for a reserve commission, receipt of such commission becomes conditioned on an evaluation of the cadet's eligibility for a reserve unit at that time. Consequently, in section 1295b(b)(3)(F), Congress required that individuals selected for appointment at the Academy "must *agree to apply for* midshipman status in the United States Naval Reserve ... before being appointed as a cadet at the Academy." *Id.* (emphasis added). The statute further states that individuals appointed as cadets at the Academy "*may be appointed* ... as a midshipman in the United States Naval Reserve...." 46 U.S.C.App. § 1295b(c) (em-

phasis added). Thus, consistently, Congress employed unconditional language only to express the requirements that cadets apply for the reserve, and conditional language to express the possibility that cadets "may be appointed" as midshipmen in the reserve upon graduation. The Court finds no support for the Defendants' suggestion that Congress did not require what the plain language expresses, namely, that all cadets apply for and accept if tendered a commission in the armed forces reserve but, rather, that Congress required that all cadets serve in, and at all times qualify for, the reserve.

Moreover, in the same subsection containing the "apply for" and "accept if tendered" language, namely, 46 U.S.C.App. § 1295b(e)(1), Congress affords cadets a *choice* in meeting their duty "to serve in the foreign or domestic commerce and the national defense" upon graduation. *Id.* § 1295b(e)(1)(E). Congress expressly provided that, as part of their commitment agreement, students must serve as *either* merchant marine officers, employees in the maritime industry, *or* commissioned officers. *Id.* The Defendants argue that the statutory active duty requirement is entirely separate from the alleged reserve service requirement, and remind the Court that statutes must be read to give meaning to every section.

This, however, is precisely what the Court intends to do. Again, the Court finds that nowhere does the META require, as the Defendants assume, that each and every cadet serve in the armed forces reserve. It only requires that students apply for a reserve commission and accept one if tendered. With respect to the META's *express active* duty requirement, however, the META gives cadets a choice. As long as each cadet serves in one of the three capacities listed in the statute, they have fulfilled their postgraduation commitment under the META. The Court finds that, given the express statutory allowance of a choice upon graduation regarding active duty, it cannot conclude that, on the other hand, Congress *impliedly* intended an unconditional requirement that all cadets serve in a reserve unit of the armed forces. Accordingly, the Court also finds that there is no merit to the Defen-

dants' contention that the statute impliedly requires that all cadets be qualified for armed forces reserve positions throughout their training.

Furthermore, the Court observes that other subsections of the META *are un*conditional; thus Congress knew how to make an express, mandatory requirement when it wanted to. For example, in the same section which sets forth the "apply for" and "accept if tendered" language, the statute unconditionally requires cadets to complete the Academy's course of instruction, to fulfill the requirements for a license as an officer in the merchant marine of the United States,[5] to maintain a license as an officer in the merchant marine of the United States for at least 6 years following graduation, and to serve as either a merchant marine officer, an employee in the maritime industry or as a commissioned officer in the armed forces upon graduation. 46 U.S.C.App. § 1295b(e)(1)(A)–(E).

The Court observes that, if Congress so clearly intended to make service in, and qualification for, the reserve an unconditional requirement, it would have used the unconditional language it employed throughout the rest of section 1295b(e)(1) in order to say just that. Moreover, because the statute contains a provision regarding fulfillment of the requirements for a merchant marine license, the absence of such a provision regarding the requirements for a reserve commission suggests that Congress did not intend that satisfaction of standards for service in the reserve be an absolute graduation requirement. *See I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) ("[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclu-

sion or exclusion") (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)).

The Defendants explain the tentative nature of the language in the META as reflecting the President's appointment power—because the President, acting through the Secretary of the Navy, is empowered under the Constitution to determine who will be offered a reserve commission, Congress cannot mandate appointment. However, Congress has used much stronger language than that of the META to mandate that graduates of Annapolis and West Point accept positions in the reserve if an active duty commission is not tendered. *See* 10 U.S.C. § 6959(a)(3) (App.1994) (graduates *"will accept* an appointment as a commissioned officer in the Naval Reserve") (emphasis added); 10 U.S.C. § 4348(a)(3) (App.1994) (graduates *"will accept* an appointment as a commissioned officer as a reserve for service in the Army Reserve or Air Force Reserve") (emphasis added). Moreover, even accepting arguendo Defendants' argument that the tentative nature of the META's language reflects the reservation of the appointment power to the President, Congress still could have required every student to meet the requisite qualifications for a naval reserve commission in the event that the President does appoint certain students to the reserve. Instead, Congress required only that cadets fulfill the requirements for obtaining a merchant marine license.

The Defendants themselves point to the military academy statutes cited above, which contain the "accept" and "if tendered" language in describing the active duty requirements, to support their argument that all cadets must serve in the armed forces reserve and therefore must meet physical prerequisites for the reserve while at the USM-

---

5. The Defendants argue that the Plaintiff necessarily implies physical requirements into the subparagraph of the META which sets forth this prerequisite to appointment to the USMMA and that, therefore, the same implication must be afforded the "apply for" and "accept if tendered" language of the subparagraph addressing reserve commissions. *See* 46 U.S.C.App. § 1295b(e)(1)(B)(D). The Court observes, however, that subparagraph B states that students must "fulfill the requirements" for obtaining a merchant marine license. *Id.* § 1295b(e)(1)(B). It is not such an intuitive leap to imply "physical

or otherwise" into language which expressly deals with requirements for obtaining a merchant marine license. In contrast, subparagraph D says nothing about requirements or prerequisites for obtaining a commission in the armed forces reserve. Thus, the Court cannot agree with the Defendants that, in light of the Plaintiff's reading of physical requirements into subparagraph B, it is a necessary implication of subparagraph D that a student must satisfy the physical requirements for commissioning in the armed forces reserve.

MA. *See* 10 U.S.C. § 6959(a) (Annapolis); 10 U.S.C. §§ 4348(a)(3) (West Point). The Defendants assert that the language of the META mirrors the language employed by Congress in these statutes "which has been recognized as creating the service obligations of graduates" of Annapolis and West Point. Defendants' Opposition, at 10–11. The Defendants further warn that, if the Court invalidates the reserve service requirement at the USMMA, it must also invalidate the same requirement at the Naval, Military, Air Force and Coast Guard Academies because each uses the same statutory language to create the same obligations.

The Court finds these arguments without merit. First, it is undisputed that the Annapolis Academy and West Point serve only a military purpose. In contrast, Congress charged the USMMA with a dual purpose and, accordingly, gave cadets a choice of where to serve their active duty after graduation. 46 U.S.C.App. § 1295b(e)(1)(E). Thus there is no support for the sweeping conclusion that the Court's holding with respect the USMMA will have grave implications for service academies whose sole purpose is to provide the military with trained officers. Indeed, the unique nature of the "dual purpose" of the USMMA is what, at bottom, generated this dispute.

In addition, the language of 10 U.S.C. § 6959(a) and § 4348(a), when read in context, does *not* mirror that of the META. Rather, both Title 10 statutes contain unconditional language requiring that cadets "*will accept* an appointment as a commissioned officer" in the reserve *if* an appointment in the *regular* Army, Air Force or Marines is not tendered. 10 U.S.C. §§ 6959(a), 4346(a) (App.1994) (emphasis added). Thus in these statutes, Congress used unconditional language to create the reserve requirement, and conditional language to create the active duty requirement. Similarly, the META contains an unconditional requirement to obtain and maintain merchant marine license, and a conditional requirement to serve in the armed forces reserve. 46 U.S.C.App. § 1295b(e)(1)(B)–(D). Moreover, unlike in the META, in neither military academy statute did Congress include the lesser preliminary requirement that cadets *apply for* a commission in either the regular armed forces or the reserve. Clearly, Congress envisioned something different, to at least some degree, for students appointed to the USMMA than it did for students at Annapolis or West Point.[6] The Court finds that it must give effect to congressional intent as expressed by the plain language of the META.[7]

**B. The META's language affording waivers for hardship and precluding the denial of degrees based solely on an inability to meet the physical requirements for obtaining a merchant marine license undermines the Defendants' central argument.**

In support of the argument that Congress created a mandatory requirement that

---

6. Moreover, the Court observes that the case cited by the Defendants for the proposition that a graduate of West Point incurs a duty service obligation is not controlling of the Court's reading of the "apply for" and "accept if tendered" language under the META. In *Shaffer v. Cheney,* 725 F.Supp. 40 (D.D.C.1989), the district court cited 10 U.S.C. § 4348(a)(2)(B) for the proposition that "[a] graduate of [West Point] *generally* incurs a five-year [active duty service obligation]." *Shaffer,* 725 F.Supp. at 46 (emphasis added). The court made no express holding with respect to the "if tendered" and "accept" language of the statute which nevertheless, as described above, differs from that of the META. Accordingly, the Court finds that *Shaffer* in no way supports the Defendants' claim that the language of the META, a wholly different statute from those discussed in *Shaffer,* firmly establishes a service obligation. *Shaffer,* 725 F.Supp. at 46.

7. The Defendants submit a detailed description of the META's legislative history and conclude that Congress's "clear expectation" was that USMMA graduates would serve in both active and reserve duty upon graduation. Defendants' Motion, at 25–31, 30. The Court observes, however, that the legislative history, as cited by the Defendants, does not unambiguously support this conclusion. Rather, portions of the testimony quoted by the Defendants also support a conclusion that Congress envisioned that eligibility for a reserve commission would be determined upon application for such a commission. *See id.* at 28. Moreover, nothing cited by the Defendants speaks to their reading of the META as impliedly mandating that all students such as Lane meet physical requirements for a reserve commission or suffer disenrollment. Accordingly, the Court declines to afford considerable weight to the legislative history cited by either the Defendants or the Plaintiff.

all cadets meet the physical qualifications for a commission in the armed forces reserve, the Defendants claim that the statutory language affording waiver in cases of hardship creates a quid pro quo between a cadet and the Government—if the cadet fails to fulfill his or her agreement, the Secretary of the Navy can order him or her to active duty in the armed services as a "pay back" for receiving a taxpayer-funded education at the USMMA. *See* 46 U.S.C.App. § 1295b(e)(2)–(3)(A). The Defendants further contend that this deal assumes that each cadet would be qualified to serve in a reserve unit of the armed forces.

The Plaintiff argues, however, that the language waiving this duty for "hardship" confirms that Congress did not intend that it be mandatory for all cadets to meet physical qualifications for a naval reserve commission at all times. The Court agrees with the Plaintiff that the language affording waiver for hardship undermines the argument that USMMA students at all times must meet physical requirements for a commission in the naval reserve. Indeed, the Defendants cannot, and do not, deny that a waiver exists, but argue that the agency's interpretation of the statute as strictly limiting the waiver to students in their third or fourth years at the Academy, is a reasonable one.

The Court notes at the outset that, in arguing that the hardship waiver only applies to third or fourth year students, the Defendants concede that the reserve requirements, if any, do not apply at all to students in their first and second years. In particular, the Defendants state that "a midshipmen's obligations under the statute do not even become effective until a student has completed 2 years of study.... Thus, prior to their junior year, there is nothing for the Secretary to waive." Defendants' Opposition, at 18–19. The Defendants argue that the Academy can disenroll first and second year students who fail to meet the requirements for a reserve commission because "the government can see immediately that it will not get the benefit of its bargain with that midshipman." *Id.* at 19.

However, the Court observes that, if the Defendants concede that the reserve obligations do not apply to students such as

Lane, their argument that Lane was separated from the Academy because of his failure to meet statutory reserve requirements loses any merit. The Court is puzzled and unpersuaded by the Defendants inconsistent statements. The Defendants want to argue on one hand that, because the statute contains a clear requirement that cadets meet prerequisites for a reserve commission, Lane's disenrollment was warranted. Yet on the other hand, the Defendants want to argue that the agency's refusal to extend the statute's waiver provisions to first and second year students is warranted because the clear requirement regarding reserve duty does not apply to such students. The Defendants cannot have it both ways. Moreover, the Court finds that the Defendants' alternative argument that Lane's disenrollment was permissible because "the government is justified in terminating the arrangement before any obligation is incurred" in order to get its "benefit of the bargain" is wholly unsupported by the statute or the regulations. *Id.* at 19.

Moreover, notwithstanding the hardship provisions, the Court finds the language of 46 U.S.C.App. § 1295b(g) difficult to square with the Defendants' main contention. That provision expressly states that "[n]o individual may be denied a degree ... because the individual is not permitted to take [the merchant marine officer's license] examination solely because of physical disqualification." 46 U.S.C.App. § 1295b(g). The Defendants argue that this language allows cadets to graduate despite physical disabilities disqualifying them from receiving a merchant marine officer's license. Read in conjunction with § 1295b(e)(1)(B), which requires that cadets obtain their license as a precondition to receiving a USMMA degree, the Defendants assert that section 1295b(g) alleviates the "harsh result" which would follow from statutorily precluding cadets from receiving a degree where they develop a physical disability which disqualifies them from obtaining a merchant marine license. Defendants' Opposition, at 13–14. The Defendants contend that this provision operates to remove the statutory pre-condition to graduation where cadets develop a physical problem late in their studies, but in no way relieves gradu-

ates of their separate active duty and reserve service obligations, as the Plaintiff maintains.

The Court finds the Defendants' argument unconvincing. The Court agrees that this provision in no way directly speaks to the alleged requirement that all cadets meet physical qualifications for commissioning in the armed forces reserve. However, the fact that Congress afforded an express waiver of a express condition for admission to the USMMA is quite telling. It is undisputed that Congress intended all cadets to fulfill the requirements for, and to maintain a license as, an officer in the merchant marines. 46 U.S.C.App. § 1295b(e)(1)(B)–(C). From these clear mandates, a requirement that cadets meet the requisite physical qualifications for such a license can be easily implied. If not, these express requirements would be meaningless. The Defendants apply the same reasoning to imply a requirement that cadets meet armed forces reserve qualifications from section 1295b(e)(1)(D), which contains the "apply for" and "accept if tendered" language. That language, however, does not set forth the same clear mandate contained in the provisions listed directly before it.

Moreover, it is undisputed that the requirements for a merchant marine license are not as rigorous as those for a reserve commission. See Stipulated Facts at ¶ 36. Indeed, the Defendants conceded at the hearing that Lane could obtain such a license if his diabetes were kept under control. In addition, the Court notes that at least 50 people with the same condition are currently operating under a merchant marine license at sea. Id. at ¶ 39.

It then follows that, because the physical qualifications for a merchant marine officer's license are less stringent than those required for a naval reserve commission, and because the statute explicitly states that a cadet cannot be denied a diploma because he or she could not meet the qualifications for a merchant marine officer's license, it would be illogical to conclude that the same person with the same disability would be subject to disenrollment for failure to meet the more stringent—but implied—naval reserve prerequisites. The Defendants argue that section 1295b(g) is irrelevant because it applies

only to merchant marine license requirements, not to qualifications for commissioning in the reserve. This argument, however, does nothing to explain why Congress would intend such inconsistent results with respect to physical disqualification for express, versus implied, sets of requirements.

The Defendants claim that, while section 1295b(g) applies to merchant marine license requirements, the statutory provisions for waiver upon hardship apply to the alleged naval reserve requirement. Under section 1295b(e)(3)(A), a cadet who fails to meet his or her maritime or military reserve service obligations must perform active duty military service for a period of three to five years, depending on the unexpired portion of their obligation. If the Secretary of Defense is unable or unwilling to order the defaulting graduate to active duty service, the Secretary of Transportation may recover the cost of educating that individual. Id. § 1295b(e)(3)(B). The Defendants further observe that Congress authorized the Secretary of Transportation to waive the provision allowing defaulting graduates to be called to active duty service in cases of hardship. Id. § 1295b(e)(3)(A). The Defendants thus conclude that this provision, not section 1295b(g), provides authority for the agency to excuse a defaulting graduate's reserve service obligations.

However, these latter provisions deal with punishment for failing to comply with the express requirements for appointment to the Academy. If a cadet fails to meet these requirements, such punishment is automatically imposed under the statute. At that point, the Secretary may waive the punishment upon a finding of hardship. This is a very different scheme from that of section 1295b(g) which completely waives an express requirement to graduation, with no repercussions. Again, how Congress would on one hand expressly avoid the "harsh result" of precluding cadets from graduating from the United States Merchant Marine Academy for their failure to meet physical requirements for a merchant marine license, yet on the other impliedly mandate that these same cadets meet more stringent standards for a reserve commission or lose their appointment

at the Academy, is a mystery which the Defendants have not explained. To use the Defendants' characterization of the purpose behind section 1295b(g), the latter result, which the Defendants condone, is a *particularly* "harsh" one which Congress surely would not have intended if, as the Defendants concede, it intended to prevent the harsh result of precluding cadets from graduating for failure to meet physical prerequisites to obtaining a merchant marine license.

Moreover, this result contradicts the Defendants' argument that Congress intended the USMMA to serve two priorities equally, namely, to serve the merchant marine and to serve the armed forces reserve. Rather, under the Defendants' construction of the statute, Congress must have intended that more leniency be employed with respect to merchant marine license requirements than with respect to armed forces reserve requirements. Surely, this could not have been Congress's intention for the United States Merchant Marine Academy. The Court thus concludes that the META does not contain a requirement that all cadets, absent a waiver for hardship late in their education, must at all times meet physical prerequisites for commissioning in the armed forces reserves if they are to remain at the Academy.

Finally, the Defendants argue that the Plaintiff's interpretation of section 1295b(g) effectively nullifies any physical requirements for graduation because it presumes that Congress simultaneously established service in the merchant marine as a condition of attending the USMMA *and* precluded the Academy from enforcing that requirement through physical prerequisites to admission. However, the Defendants ignore the distinction between admission and graduation after enrollment. This provision clearly applies to *enrolled* cadets, and the Plaintiff's argument speaks to enrolled cadets. Nowhere do the Defendants point to any authority indicating that section 1295b(g) also applies to individuals *seeking* enrollment. Both section 1295b(g) and the waiver provisions envision situations where cadets begin their education at the USMMA and, for some reason, face an obstacle to meeting every provision in the META, whether the obstacle is self-imposed or not. Accordingly, the Court sees no reason why it cannot adopt the Plaintiff's view and remain in consonance with the express requirements the META sets forth for appointment to the Academy.

**C. MARAD's own regulations, and its inconsistent interpretation thereof, belie the Defendants' argument that the USMMA has an unconditional rule that all cadets meet all physical requirements for commissioning in the armed forces reserve, absent waiver late in their education.**

As discussed above, the Court finds that the agency's decision to separate Lane from the Academy upon discovery of his diabetes mellitus conflicts with the plain language of the statute. Moreover, the Court observes that the agency's own past practices and regulations undermine the Defendants' claim that MARAD was bound to disenroll Lane when it learned of his diabetes.

First, the Court observes that in cases involving disabilities other than diabetes, disabled students have been allowed to remain at the Academy and receive their academic degree. Stipulated Facts at ¶ 37. The Defendants do not contest that the Academy allowed students to remain at school and graduate despite the Academy's learning, during the term of their enrollment, that the students were color blind. *Id.* Notably, unlike diabetes mellitus, color blindness is a disability which, as the Court is advised, disqualifies an individual from obtaining not only a naval reserve commission, but a merchant marine license as well. Plaintiff's Motion for Preliminary Injunction, Exhibit 15 at ¶ 6 (Declaration of Commander Joseph Gebhard). *See also* 46 C.F.R. § 10.205(d). In addition, in recent years, students have attended and graduated from the Academy despite the loss of a limb, loss of an eye, and brain damage, while they were students. Stipulated Facts at ¶ 37.

Moreover, the Academy's actions with respect to Lane were inconsistent with its alleged *per se* policy. The Stipulated Facts reveal that, in addition to allowing other disabled students to graduate despite this rule, Dr. Kalash, the Academy's Chief Medical

Officer assessed Lane back in February of 1992 as having "Early Diabetes Type I," yet took no action. In addition, Dr. Kalash noted that "Capt. Bauer notified & communicated problem to BuMed," the Head of the Department of Naval Science at the Academy, and instructed Lane to monitor his blood sugar levels and report any abnormalities. Stipulated Facts at ¶¶ 13–14. Moreover, upon receipt of a letter from Lane's father requesting review of the agency's decision, Captain LeBack, then-Administrator of MARAD, did not invoke the unconditional rule that enrolled cadets who discover conditions which disqualify them for naval reserve service must be disenrolled, but put Lane on "administratively approved absence status" and afforded him "the opportunity to establish as fact the arguments raised on [his] behalf." Plaintiff's Motion for Preliminary Injunction, Exhibit 11 at 3 (letter from LeBack to Lane dated January 15, 1993). Thus, rather than acting immediately to disenroll Lane in accordance with its alleged "long standing" policy,[8] the Academy permitted Lane to remain at the school for close to a year before finally separating him from the Academy, and for seven months before initiating proceedings to do so. *See* Stipulated Facts at ¶¶ 11–19, 21–22, 27.

Moreover, the agency's own regulations contradict the Defendants' claim that this "long standing" policy is clear and has been consistently implemented. The Plaintiff argues that the government claims discretionary authority under its own regulations to permit candidates to remain at the Academy despite failure to meet naval reserve requirements. Thus, he claims, there is no *per se* exclusion of all students not meeting these requirements. The Defendants claim that, because of his diabetes, the Plaintiff cannot meet the physical requirements set forth in the regulations, which mandate Lane's disenrollment ·but fulfill congressional intent by allowing for waiver upon hardship incurred by cadets late in their education.

The Court first observes that the regulations do, in part, require candidates for admission to "meet the physical requirements . . . for appointment as Midshipman, [United States Naval Reserve,]" as well as those for obtaining a merchant marine license. 46 C.F.R. § 310.56(a). Moreover, the regulations state that failure to meet these standards "while attending the Academy is grounds for, and may lead to disenrollment." *Id.* § 310.56(a).

However, the Court finds the regulations internally inconsistent. For example, the regulations state that "[i]ndividuals who have completed at least two years of study and, as a result of an accident, illness or other cause (during official duty), fail to meet this requirement may be permitted to remain at the Academy at the discretion of, and under conditions set by, the Administrator . . . ." *Id.* Later, however, the regulations allow for waiver for hardship without imposing *any* limitation on first and second year students. *Id.* § 310.58(f).

Moreover, the Court finds that these regulations, read together with others, simply do not support the Defendants' claim that a *per se* rule exists which required Lane's disenrollment after his first year. First, the regulations properly employ the conditional language of the statute, and definitively state that cadets "are appointed at the Academy for training to prepare them to become officers in the U.S. merchant marine" and that after graduation they shall receive a merchant marine license. *Id.* § 310.52(a). Later, the regulations state that "*[i]f qualified,* an officer *may be* commissioned as an officer in a reserve component of an armed force of the United States." *Id.* (emphasis added).

Thus the mission of the USMMA, here reflected as its primary one, to train students to become merchant marine officers is made clear, the need for students to qualify for merchant marine licenses is made clear, and the fact that cadets may—not must—be commissioned in the armed forces reserve, if qualified, is made clear. Notably, the regulations recognize that only "qualified" students may be commissioned as officers in the armed forces reserve, and thus assume that all enrolled students will not qualify. 46 C.F.R. § 310.52. The Court observes that such a reading is consistent with the lan-

---

8. Defendants' Opposition, at 16.

guage of the META and does not justify the Defendants' peremptory expulsion of Lane for failure to qualify while a student at the USMMA.

Second, the regulations require that cadets "[a]pply for an appointment as, [and] accept any tendered appointment as" a commissioned officer in the United States Naval Reserve, the United States Coast Guard Reserve *or* any other Reserve component of the armed forces. *Id.* § 310.58(a)(4) (emphasis added). Thus, under the agency's express regulations, Lane can fulfill his statutory obligations by serving in the Coast Guard Reserve. The Defendants have conceded that Coast Guard service is possible if Lane keeps his condition under control, and they have conceded that Dr. Tanen, an endocrinologist treating Lane, has concluded that Lane's diabetes is under "extremely good control." Stipulated Facts at ¶ 30.

■ Third, the Defendants point out that the regulations also state that "no waivers will be granted for medical conditions which would prevent commissioning in at least a restricted status in the U.S. Navy Reserve." *Id.* § 310.56(d). However, this language directly conflicts with the Defendants' own interpretation of the META itself. The Defendants do not contest that the META allows for waiver upon a finding of hardship, and argue that these provisions apply directly to the requirement that all cadets meet armed forces reserve qualifications.[9] In this regulatory provision, however, the agency precludes the very waiver which the Defendants argue, and the Court agrees, Congress clearly set forth in 46 U.S.C.App. §§ 1295b(e)(2)–(3)(A).[10] Accordingly, the Court declines to bind itself to 46 C.F.R. § 310.56(d), as it is unsupported by the META, while other regulatory provisions, which the Court shall follow, are consistent with the plain language of the META.

**D. Because the Court finds that the Defendants' alleged policy mandating the separation of Lane from the Academy upon discovery of his diabetes is not supported by the statute or its regulations, the Court shall not defer to the Defendants' espoused reading of the META.**

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), the Supreme Court set forth the method by which federal courts shall review an agency's construction of a statute it administers:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, ... the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). The Supreme Court also noted that "[t]he judiciary is the final authority on issues of statutory construction which are contrary to clear con-

---

9. In particular, the Defendants state that "Congress recognized that hardship situations may develop in which a graduate may default on his or her maritime or military reserve obligations. Thus, Congress provided that '[i]n cases of hardship as determined by the Secretary [of Transportation], the Secretary may waive [the provision allowing defaulting graduates to be called to active duty service.]'" 46 U.S.C.App. § 1295b(e)(3)(A). "This provision ... provides authority for the agency to excuse a defaulting graduate's service obligations." Defendants' Opposition, at 15.

10. Technically, 46 U.S.C.App. § 1295b(e)(2)–(3)(A) applies to waive the punishment imposed by the META upon default, while 46 C.F.R. § 310.56(d) precludes the Superintendent of the USMMA from waiving physical prerequisites to obtaining a commission in the U.S. Naval Reserve upon application by an enrolled student. However, for purposes of the Court's analysis, the difference is not significant because the statutory language clearly affords waiver of the same physical requirements of which the regulation precludes waiver. The Court finds that Congress could not have intended this result.

**1068**

gressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9.

■ The Defendants contend that the Court must defer to the agency's interpretation of the statute as requiring that all cadets meet the physical qualifications for commissioning in the armed forces reserve. The Plaintiff responds that the plain language of the statute, its purpose, and its history all demonstrate that Congress did not intend the rule the Defendants urge. Moreover, the Plaintiff argues that, under *Chevron,* this Court can determine Congress's intention by using traditional tools of statutory construction and, therefore, no agency deference is appropriate. Further, Lane asserts that little deference is due where, as here, the agency has been inconsistent in its interpretation of the statute. The regulation allowing waiver for hardship, as well as the USMMA's admission of students with other disabilities which disqualify individuals from commissioning in the naval reserve, belie the Defendants' claim that this is a long standing agency policy. In addition, the Plaintiff argues, the Defendants behaved inconsistently with respect to Lane's diabetes mellitus.

The Court finds that the matter may be determined under the first prong of the *Chevron* analysis because congressional intent is clear. Where congressional intent can be determined "by using 'traditional tools of statutory construction,' then that interpretation must be given effect." *Natural Resources Defense Council v. Reilly,* 983 F.2d 259, 266 (D.C.Cir.1993) (quoting *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987)). In the META, Congress expressly stated that cadets apply for and accept, if tendered, an appointment as a commissioned officer in the United States Naval Reserve, or another reserve unit of the armed forces. 46 U.S.C.App. § 1295b(e)(1)(D). The Court thus finds that Congress did not require that all cadets meet all physical requirements for such an appointment or lose their status as an enrolled student at the USMMA. Rather, Congress only expressly required that cadets "fulfill the requirements for a license as an officer in

the merchant marine of the United States...." *Id.* § 1295b(e)(1)(B).

■ Moreover, should the Court reach the second prong of *Chevron,* it need not adopt the Defendants' reading of the META because "the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 698, 111 S.Ct. 2524, 2535, 115 L.Ed.2d 604 (1991). *See also I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)). Here, the relevant regulations repeat the "apply for" and "accept if tendered" language of the META itself, yet the Defendants now contend that its long standing policy has been that all students must meet the requisite physical requirements for a naval reserve commission. However, as discussed above, the Defendants concede that the USMMA has allowed students to graduate despite physical conditions which would disqualify them for a commission in the armed forces reserve.

Moreover, the agency displayed great inconsistency with respect to Lane's particular case. Although the Defendants stated in September of 1992 and April of 1994 that they were required to disqualify Lane from further studies at the Academy, at other times the Academy took a quite different position. In February of 1992, for example, although the Chief Medical Officer learned of Lane's condition and reported it to the Head of Naval Science at the Academy, Lane was allowed to remain at the Academy without any sanctions. Furthermore, in January 1993, the acting head of MARAD, Captain LeBack, officially placed Lane on "administratively approved absence" status rather than declaring him ineligible to continue at the Academy as a result of his diabetes mellitus, as the alleged *per se* rule would require. Captain LeBack's letter also conflicts with MARAD's earlier position in September of

1992 when it informed Lane that "diabetes is a disqualifying condition ... You are not eligible for appointment as midshipman, MMR/USNR nor for commissioning as a Naval Reserve Officer." Plaintiff's Motion for Preliminary Injunction, Exhibit 8 (memorandum from Krinsky to Lane dated September 21, 1992).

The Defendants respond that the USMMA did not know with certainty that Lane had diabetes mellitus until his father wrote to the Superintendent on July 23, 1992, advising him of that fact. Moreover, they explain that MARAD's Administrator, Captain LeBack, acted "[i]n reliance on statements of [Lane's] representatives that [Lane] ... could secure a reserve officer's commission." Defendants' Motion, at 8. In any event, they argue, the Academy physician's failure to implement USMMA policy cannot estop the agency from executing that policy when it learned with certainty that the Plaintiff had diabetes mellitus.

The Court is not persuaded by the Defendants' arguments on this issue. Not only did the Chief Medical Officer and Head of Naval Science refrain from enforcing the agency's alleged policy, but the acting head of MARAD himself entertained the possibility that Lane could remain at the Academy despite his affirmative diagnosis as having diabetes mellitus. If Lane's condition did so clearly warrant his disenrollment under the agency's policy, there would be absolutely no reason why the Head of MARAD would do anything but reiterate that rule and separate Lane from the Academy immediately and unconditionally. Moreover, Captain LeBack's alleged reliance on statements of Lane's representatives that Lane could secure a reserve commission undermines the Defendants' contention that reserve commissioning requirements were mandatory for all cadets and that diabetes was *per se* inconsistent with such standards, as MARAD expressly asserted in its letter of April 15, 1994. The Court finds that the Stipulated Facts show that the Academy did not consistently follow its allegedly clear and long standing policy, a conclusion which, in turn, sheds doubt on the clarity and longevity of the policy itself.

Accordingly, the Court finds that traditional tools of statutory construction reveal that congressional intent is clear: the META does not require that all cadets meet physical requirements for commissioning in the naval reserve or lose their enrollment status. As detailed above, the interpretation espoused by the Defendants in the instant matter runs contrary to the express language of the statute, which requires only that cadets apply for and, if tendered, accept a commission in the armed forces reserve. Moreover, the Defendants' position is inconsistent with its own regulations and past policy. Accordingly, the Court finds that the agency's action with respect to Lane is due no deference.

## II. THE COURT FINDS THAT THE DEFENDANTS VIOLATED SECTION 504 BY DISENROLLING LANE SOLELY ON THE BASIS OF HIS DIABETES MELLITUS

### A. The Defendants have not shown that meeting the physical qualifications for commissioning in the armed forces reserve is an essential program requirement of the USMMA.

■ It is undisputed that Section 504 is violated if (1) the claimant has a disability; (2) he or she was denied participation in a federal program because of that disability; and (3) he or she was otherwise "qualified" for the program. *See Gallagher v. Catto*, 778 F.Supp. 570, 577 (D.D.C.1991), *aff'd*, 988 F.2d 1280 (D.C.Cir.1993). The issue in the instant case is whether the Plaintiff was otherwise qualified to remain at the USMMA.

■ A qualified disabled person is one who meets all academic and non-academic qualifications that are "essential to participation in the program in question." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (citation omitted). Further, even if the person *cannot* meet all essential qualifications, he is still "qualified" under Section 504 if reasonable modifications in the program will accommodate his disability. *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); *Davis*, 442 U.S.

at 408, 99 S.Ct. at 2368. Such accommodations are reasonable if they do not require a "fundamental alteration in the nature of [the] program" in question or if they pose "undue financial and administrative burdens." *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17; *Davis,* 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370. The federal agency bears the burden of establishing that "further reasonable accommodation would present an undue hardship." *Catto,* 778 F.Supp. at 577–78. In addition, the Supreme Court has stressed that "in most cases" the question of whether a disabled person is qualified will involve an "individualized inquiry" and "appropriate findings of fact." *Arline,* 480 U.S. at 287, 107 S.Ct. at 1130. Thus a refusal to apply Section 504 to a class of disabled persons is lawful only where Congress has "specifically determined that no individualized inquiry [i]s necessary." *Traynor v. Turnage,* 485 U.S. 535, 551 n. 11, 108 S.Ct. 1372, 1383 n. 11, 99 L.Ed.2d 618 (1988).

Once again, the Defendants base their entire argument under Section 504 on the erroneous premise that Congress intended that all cadets meet the physical qualifications for commissioning in the armed forces reserve in order to remain at the Academy. The Defendants argue that, since commissioning in an armed forces reserve unit is, in their view, a statutory requirement for receiving an education at the USMMA, physical qualification for such a commission is necessarily an "essential" condition which must be satisfied. Because Lane cannot meet this essential program requirement, they reason, he is not otherwise qualified to complete his education at the USMMA. The Defendants further claim that exempting Lane from this general requirement would undermine the Academy's mission to provide trained reserve officers for military service. Because of the congressional mandate that cadets serve in, and qualify for, a reserve commission, the Defendants assert, such an accommodation would work a "fundamental alteration in the nature of the program." The Defendants therefore conclude that their actions with respect to Lane do not violate the Rehabilitation Act.

The Court cannot endorse the Defendants' position that continuous eligibility for the armed forces reserve is an essential program requirement under Section 504, or that attempting to accommodate Lane would result in undue hardship. As discussed above, the META in no way binds the Academy to the *per se* policy it purports to follow; rather, the statute merely requires cadets to apply for and, if tendered, accept a naval reserve commission, or a commission in another reserve unit of the armed forces. Moreover, the Defendants admit that such requirements, if any, do not even apply to students such as Lane who have not yet reached their third year. Consequently, the Defendants cannot simply point to that statute and definitively conclude that maintaining eligibility for such a commission is an essential requirement to remaining at the USMMA and that, therefore, their actions were consistent with Section 504.

In addition, the Court finds that, *aside from* pointing to the statute, the Defendants have not offered any explanation of how continuous eligibility for an armed forces reserve commission is an essential program requirement for purposes of Section 504. Rather, given that many people with diabetes have obtained merchant marine licenses, and at least 50 people with diabetes mellitus are currently operating under a merchant marine license at sea, the Court finds that the rigid naval reserve requirements are not "essential" to at least one purpose of the program, namely, training officers for the merchant marine.

Further, even if producing people for military reserve service were an equally important purpose under the META, the Court finds that purpose is fully satisfied without Lane through the Academy's graduation of the many other cadets who do not have diabetes. Indeed, it is undisputed that a large portion of these graduates never enter the reserve. As counsel for the Plaintiff have observed, if the situation at hand arose in a time of war, or if the Defendants could demonstrate a recognition by Congress that the supply of reserve troops was sorely insufficient when Lane was disenrolled, the Defendants' argument under Section 504 might

have some merit. But here, the Defendants concede that they can "only speculate" as to the impact of allowing Lane to graduate. Defendants' Opposition, at 28. The Defendants have made no showing that the reason for separating Lane from the Academy was essential to the program at all.

### B. The Defendants have not even attempted to make reasonable modifications in the program to accommodate Lane's disability.

 Moreover, even if cadets' continuous eligibility for an armed forces reserve commission were an essential program requirement, the agency carries the burden of showing that it could not reasonably accommodate Lane's disability. *Gallagher v. Catto*, 778 F.Supp. at 577–78. The Defendants argue that any accommodation would require a fundamental alteration in the nature of its program because the physical eligibility requirement for an armed forces reserve commission is mandated by the META.

It is undisputed that, aside from his diabetes, Lane is extremely well qualified to complete his education at the USMMA. Moreover, in Lane's case, he developed the disease after enrolling in the Academy, and he has maintained an excellent record with respect to both academic *and* physical testing. This is not a case of an applicant challenging the Academy under Section 504. Rather, Lane was an enrolled student, who was fully qualified upon application, and who made a serious investment in the USMMA and in his future following his education there. In turn, the government, through tax-payer dollars, also made an investment in his training and, as Lane's record shows, their investment was a good one. It is undisputed that, if Lane continues to control his diabetic condition, he will make a fine merchant marine officer.

Accordingly, the Court finds that the Defendants have made no showing under Section 504 that the Academy cannot provide reasonable accommodation for Lane's condition. Such accommodation, as far as the Court can tell from the record before it, would amount to simply allowing Lane to graduate. Those most familiar with Lane's abilities and control over his diabetes confirm that he could complete his education and training at the Academy with little or no difficulty. Plaintiff's Motion for Preliminary Injunction, Exhibit 10 at 1 (medical evaluation letter by Dr. Mark Tanen); Exhibit 15 at ¶¶ 5, 7 (Declaration of Commander Joseph Gebhard). Moreover, the Defendants admit that, in their view, such accommodation may be made for third and fourth year students under the regulations addressing the statute's waiver provisions, and they admit that the Academy has allowed students in the past with a lost limb, a lost eye, brain damage, and color blindness to remain at the Academy and graduate despite their disabilities. The Court cannot conceive of any reason why accommodating Lane would, in contrast, cause the Academy grievous injury. Moreover, Lane developed the disease after he enrolled. Thus a finding that the Academy's act of separating Lane from the USMMA after he discovered he had diabetes mellitus would not necessarily impact the Academy's admission standards.

Moreover, to the Court's knowledge, Lane has not asked to be excused from participating in any of the USMMA's academic or physical programs as a result of his condition. Thus nothing further than allowing Lane to complete his courses of instruction along with every other student would be required to accommodate him under Section 504. The Defendants have not demonstrated where the alleged undue hardship would lie in this event. It is true that the Court's holding, depending on the facts of the case, might preclude the Academy from disenrolling future students who, after they enroll, develop a physical condition inconsistent with requirements for a naval reserve commission, yet meet all other program requirements. But the Defendants have not persuasively shown that accommodating such students would result in undue hardship. Indeed, the Defendants concede that, in cases of colorblindness, a lost limb, a lost eye, and brain damage, the Academy has accommodated students and allowed them to graduate. Accordingly, the Court finds that no undue hardship will result from allowing Lane to graduate and become a merchant marine offi-

cer. Indeed, the Court observes that the government will likely benefit greatly from his service.

### C. The Court finds that the Defendants erred in failing to make an individualized inquiry into the particular facts of Lane's case.

 The Court further finds that the Agency erred in failing to make an individualized inquiry into the particular facts of Lane's case. *See School Board of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987). The Defendants argue that such an individualized inquiry was unnecessary because an "'individualized inquiry' need be no more extensive than the facts of the case demand." *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994). Here, they argue that the Academy's inquiry ended with Lane's disqualification under the blanket rule requiring cadets to meet reserve service requirements. At oral argument, the Defendants also relied upon *American Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 611–12, 111 S.Ct. 1539, 1543, 113 L.Ed.2d 675 (1991) (*AHA*), for the proposition that an agency may establish rules of general applicability to guide its discretion in making the individualized determinations required by a particular statutory scheme.

Because the Court finds that the META does not impose a requirement that all students meet eligibility standards for commissioning in the armed forces reserve, the Court determines that the facts of Lane's case did demand a more thorough inquiry than simply confirming that he had diabetes mellitus. Moreover, the Court observes that the Defendants erred in creating a blanket restriction absent a specific determination by Congress that such restriction is necessary. *See Traynor v. Turnage*, 485 U.S. 535, 551 n. 11, 108 S.Ct. 1372, 1383 n. 11, 99 L.Ed.2d 618 (1988).

Finally, the Court further finds that *AHA* does not address the authority of federal agencies to interpret Section 504 of the Rehabilitation Act and, therefore, does not relieve the Defendants of the individualized inquiry requirement under Section 504. Defendants reply that the case affords the De-

fendants discretion in determining whether, and under what circumstances, a hardship exception to the requirements of the META shall be made. The Defendants state that the agency's decision to accommodate hardship cases only after cadets begin their third year is "eminently reasonable, since midshipmen do not incur a service obligation until their junior year." Defendants' Response to Plaintiff's Supplemental Memorandum in Response to New Authority Cited by Government at Oral Argument, at 4.

The Court declines to make any findings regarding whether *AHA* entitles the Defendants to make blanket rules to guide their decisions regarding whether to waive the express requirements of the META upon a showing of hardship. Rather, the Court need not reach that question given its finding that the META does not require cadets to be commissionable in the armed forces reserve throughout their education. In short, with respect to Lane's condition, there is no statutory rule to waive. Similarly, even in the Defendants' view, Lane did not even incur a service obligation while at the USMMA and, therefore, "he was not eligible for a waiver." *Id.* Thus the waiver provisions have no bearing on the Defendants' duty to conduct an individualized inquiry into the facts of Lane's situation. Thus the Court finds that the Defendants have not demonstrated that Congress has absolved the DOT of assuring that students at the USMMA will receive individualized determinations and reasonable accommodation under Section 504.

In sum, the Court finds that the Defendants have violated Section 504 of the Rehabilitation Act by separating Lane from the Academy based solely on his diabetes mellitus. In particular, the Court finds that meeting physical requirements for commissioning in the naval reserve is not an essential program requirement. Even if it were essential, however, the Court holds that the Defendants have not met their burden of showing that providing reasonable accommodation would result in undue hardship for the USMMA and, further, that the Defendants erroneously failed to make any individualized inquiry into the facts of the Plaintiff's case.

## III. THE COURT FINDS THAT THE PLAINTIFF IS ENTITLED TO RE-INSTATEMENT TO THE ACADEMY FORTHWITH AND TO COMPENSA-TORY DAMAGES UNDER SECTION 504

■ "It is well-established that injunctive and declaratory relief are available under the Rehabilitation Act." *Doe v. District of Columbia*, 796 F.Supp. 559, 573 (D.D.C.1992) (Hogan, J.).[11] In light of its finding that the Defendants violated Section 504 of the Rehabilitation Act, the Court shall therefore order the Defendants to reinstate Lane to the Academy forthwith, and to take all steps necessary to permit Lane to resume his maritime training.

■ The parties remain in dispute, however, over whether the Plaintiff may recover compensatory damages against the government under Section 504 of the Rehabilitation Act.[12] For the following reasons, the Court finds that the Plaintiff, as the prevailing party, is entitled to compensatory damages under Section 504.[13]

With respect to actions against private parties and local counties, the Defendants do not contest the conclusion that, "based on the Supreme Court's recent decision in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992),

compensatory damages are available under the Act." *Doe*, 796 F.Supp. at 571.[14] *See also Tanberg v. Weld County Sheriff*, 787 F.Supp. 970, 972 (D.Colo.1992) (*Franklin* "provides dispositive analysis" for determining whether compensatory damages are recoverable under the Rehabilitation Act); *Kraft v. Memorial Medical Center*, 807 F.Supp. 785, 790–92 (S.D.Ga.1992) (compensatory damages recoverable under section 504); *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 637, 104 S.Ct. 1248, 1256, 79 L.Ed.2d 568 (1984) (plaintiffs may recover backpay under section 504). Rather, the Defendants assert primarily that the doctrine of sovereign immunity protects them from a damages suit for violation of Section 504, and contend that the Rehabilitation Act only affords a cause of action against private agencies. The Court cannot agree.

In the 1978 Amendment to the Rehabilitation Act, Congress specifically extended the Act's discrimination prohibition to "any program or activity receiving Federal financial assistance or any program or activity conducted by any Executive agency...." 29 U.S.C. § 794. Prior to this amendment, Section 504 only prohibited handicap discrimination by private federal aid recipients.

In *Doe v. Attorney General*, 941 F.2d 780 (9th Cir.1991), the Ninth Circuit held that

---

11. Section 504 specifically entitles a prevailing party to petition the Court for "a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b).

12. As both parties observe, no federal court in a published decision has addressed the forms of relief, if any, available to a prevailing plaintiff under the META. Plaintiff's Motion, at 30 n. 64; Defendants' Opposition, at 29. Thus both sides analyze Lane's entitlement to damages under Section 504 only. As the Court finds that the Defendants have violated Section 504, and as neither party has presented for decision the issue of whether the Plaintiff is entitled to recover damages under the META, the Court shall confine its discussion to the damages principles arising under the Rehabilitation Act.

13. The Plaintiff seeks three components of compensatory damages, including (1) out-of-pocket expenses that Lane and his family incurred to procure an alternative college education for Lane after he was disenrolled from the USMMA; (2) loss of professional opportunity damages due to

the delay of Lane's entry into his chosen career as a merchant marine officer; and (3) damages for pain and suffering. The Court declines to rule at this time on the appropriate components of damages Lane may recover.

14. In *Franklin*, the Supreme Court held that compensatory damages are available under Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"), which bans sex discrimination in educational institutions that receive federal funds. Although the Court acknowledged that Title IX was silent on the availability of remedies, it found that the its "reading of the two amendments to Title IX ... lead[ the Court] to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX." *Franklin*, 503 U.S. at ——, ——, 112 S.Ct. at 1035, 1036. The Supreme Court thus concluded that "a damages remedy is available for an action brought to enforce Title IX," as the Court "presume[d] the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Id.* 503 U.S. at ——, ——, 112 S.Ct. at 1038, 1032.

the language and history of the 1978 Amendment reveal Congress's intent, "unequivocally expressed," "to put the federal government on equal footing with everyone else in making it subject to Section 504's prohibition of discrimination against the handicapped." *Id.* at 789, 792. Accordingly, the Court found that "Congress waived sovereign immunity and provided a private right of action for damages for discrimination claims against the United States under section 504 of the Rehabilitation Act." *Id.* at 799.

In *Doe,* a physician with Acquired Immune Deficiency Syndrome brought a Rehabilitation Act suit against the government when the Federal Bureau of Investigation ceased having its agents examined at the plaintiff's clinic, as had been its practice pursuant to an annually renewed procurement contract between the FBI and the clinic. The FBI argued that sovereign immunity cloaked them from suit under Section 504. In rejecting that claim, the Ninth Circuit reviewed the Amendment's legislative history in detail, and explained that, although "the [congressional] debates do not state outright that section 504 subjects federal agencies to private actions for money damages, they nevertheless unequivocally express Congress's intent to do precisely that." *Id.* at 792–93. Moreover, the Court observed that, at the time of the 1978 Amendment, Congress was aware that the courts had interpreted Section 504 to create a private right of action for victims of discrimination. *Id.* at 789–90. Thus it concluded that, because "Congress appended the new coverage to the end of the pre-existing sentence under which a private cause of action had been implied," congressional intent "that there be no distinction in [the statute's] enforcement against federal defendants" is evident. *Id.* at 790. In *J.L. v. Social Sec. Admin.,* 971 F.2d 260, 270 (9th Cir.1992), the Ninth Circuit affirmed its holding in *Doe.*

Persuaded by the Ninth Circuit's reasoning, the Court finds that Plaintiff Lane is entitled to recover compensatory damages against the Defendants. In particular, the Court finds that Congress's 1978 extension of the Rehabilitation Act to programs or activities conducted by Executive agencies demonstrates that Congress intended to make federal agencies such as the DOT liable for money damages stemming from discrimination against the handicapped in their programs.

In *Dorsey v. United States Dep't of Labor,* Civil Action No. 88–1898 (D.D.C. Feb. 10, 1993), *appeal filed,* Dk. No. 93–5080 (D.C.Cir. 1994), Judge Hogan found that, although the plaintiff's reading of Section 504 was a plausible one, Congress has not expressly authorized a damages remedy against the federal government under the Rehabilitation Act. With all due respect, the Court finds this position erroneous. Section 504 of the Rehabilitation Act prohibits discrimination under any program or activity that receives federal financial assistance. Because the 1978 amendments to Section 504 expressly extended the Act's discrimination provision to programs receiving federal financial assistance, the conclusion is inescapable that Congress contemplated that the federal government would be on "equal footing with everyone else" who discriminates against the handicapped. *Doe,* 941 F.2d at 792. The Court finds no reason to conclude that Congress intended to exclude rights or remedies as against the federal government when it gave the courts broad authority to enforce its statutory provisions requiring reasonable accommodation for the handicapped.

## *CONCLUSION*

The Court concludes that the Defendants' actions with respect to Plaintiff Lane were not justified by the META or the regulations promulgated thereunder. Moreover, the Court finds that, based on the language of the statute, the regulations, and the USM-MA's inconsistent actions with respect to Lane as well as other disabled students, the Court need not defer to the agency's reading of the META as requiring Lane's ultimate disenrollment solely because of his diabetes mellitus.

In addition, the Court finds that the Defendants violated Section 504 of the Rehabilitation Act in separating Lane from the Academy, as they have failed to show that meeting the physical qualifications for commissioning in the armed forces reserve is an

essential program requirement of the USM-MA, they have not even attempted to make any reasonable accommodations for Lane's disability, and they failed to make an individualized inquiry into the particular facts of Lane's case. Finally, the Court finds that the Plaintiff is entitled to reinstatement forthwith as a student at the Academy, and that the Plaintiff is entitled to compensatory damages against the Defendants, as Congress has waived sovereign immunity to damages for discrimination claims under Section 504.

Accordingly, the Court shall grant the Plaintiff's Motion for Summary Judgment, deny the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, and enter judgment for the Plaintiff. The Court shall further order the Defendants to reinstate Lane as soon as practicable, and shall schedule a status conference, pursuant to Rule 16 of the Federal Rules of Civil Procedure, to set forth the framework for the just and speedy resolution of any outstanding issues with respect to damages.

### ORDER

Upon consideration of the parties' cross-Motions for Summary Judgment, the applicable law, the oral arguments of counsel, the entire record, and for all of the reasons articulated in this Court's Memorandum Opinion issued of even date herewith, the Court finds that the Plaintiff's Motion for Summary Judgment shall be granted, and the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment shall be denied. The Court shall therefore direct that judgment be entered for the Plaintiff, and shall order the Defendants to reinstate forthwith the Plaintiff as a student at the United States Merchant Marine Academy, and to allow the Plaintiff to resume his maritime training as soon as practicable.

Further, the Court has determined that a status conference shall be scheduled, pursuant to Rule 16 of the Federal Rules of Civil Procedure, at which the parties shall be prepared to address the framework for the just and orderly resolution of any outstanding issues regarding damages.

Accordingly, it is, by the Court, this 26 day of October, 1994

ORDERED that the Plaintiff's Motion for Summary Judgment shall be, and hereby is, GRANTED, except as to the amount of damages and costs; and it is

FURTHER ORDERED that the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that judgment shall be, and hereby is, ENTERED in favor of the Plaintiff on the issue of liability; and it is

FURTHER ORDERED that the Defendants shall reinstate Plaintiff Lane as a student at the United States Merchant Marine Academy forthwith and shall take all steps necessary to ensure that Plaintiff Lane resumes his maritime training at the Academy as soon as practicable; and it is

FURTHER ORDERED that counsel for both parties shall appear before the Court at 11:00 on November 16, 1994, for a status conference, to be held pursuant to Rule 16 of the Federal Rules of Civil Procedure, at which the parties shall be prepared to discuss the framework for the just and orderly resolution of any outstanding issues regarding damages.

Louis J. D'AMICO, Regional Director of Region Five of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED STATES SERVICE INDUSTRIES, INC., Respondent.

Civ. A. No. 94–1795 PLF.

United States District Court, District of Columbia.

Nov. 3, 1994.

1076

Orrin Dole Baird, Angela Stover Anderson, N.L.R.B., Washington, DC, for Louis J. D'Amico.

Joel Ibert Keiler, Reston, VA, for U.S. Service Industries, Inc.

Orrin Dole Baird, Service Employees Intern. Union, AFL–CIO, Washington, DC, for Service Employees Intern. Union, Local 82 amicus.

*OPINION*

FRIEDMAN, District Judge.

This matter is before the Court on the petition of Louis J. D'Amico, Regional Director of Region Five of the National Labor Relations Board, for a temporary injunction pursuant to Section 10(j) of the National Labor Relation Act (the "NLRA"), 29 U.S.C. § 160(j), against Respondent, United States Service Industries, Inc. ("USSI") pending resolution of an unfair labor practice proceeding before the Board. Upon the Court's issuance of an Order to Show Cause why injunctive relief should not be granted, Respondent filed an Answer to the Petition, and the Court heard argument on the issues raised in the Petition and the Answer. On the unopposed motion of Petitioner, and in accordance with Local Rule 205(d), no live testimony was heard by the Court.

The Court granted permission to counsel for both parties to submit additional affidavits and documentary evidence relevant to certain issues raised at argument, and Respondent submitted a supplementary response. The charging party in the Board proceeding, Service Employees International Union, Local 82, AFL–CIO ("SEIU"), sought leave to file a brief as *amicus curiae,* and the Court granted the unopposed motion.

For the reasons set forth in this Opinion and the accompanying Findings of Fact, Conclusions of Law and Order, the Court has determined that Petitioner has met its burden of demonstrating that the issuance of a temporary injunction is just and proper under Section 10(j) of the Act.

## I. BACKGROUND

USSI employs 1400 maintenance and janitorial workers at various sites in Washington, D.C. and Maryland. SEIU is attempting to organize these employees for the purpose of collective bargaining. The workers are mostly Spanish-speaking and many work part-time. SEIU filed unfair labor practice charges against USSI with the Board on June 17, 1993, July 19, 1993, August 17, 1993 (amending the July 19, 1993 charge), November 8, 1993, January 24, 1994, March 16, 1994, and July 11, 1994. Pet.Ex. A, B, C, F, I, M. Each charge was referred to Petitioner as Regional Director of Region Five. The Regional Director, on behalf of the General Counsel of the NLRB, investigated the charges and, during the period from December 23, 1993 through June 3, 1994, issued Complaints and Notices of Hearing relating

to each set of charges. Pet.Ex. D, G, J, L, N, O.

On August 17, 1994, Regional Director D'Amico, on behalf of the Board, petitioned the Court for a temporary injunction under Section 10(j), alleging that there is "reasonable cause" to believe that USSI has engaged in unfair labor practices in violation of Sections 8(a)(1) and 8(a)(3) of the NLRA, 29 U.S.C. §§ 158(a)(1), (a)(3), and that the issuance of temporary injunctive relief is "just and proper" under Section 10(j).[1] Petitioner asserts that the Board's investigation of the six sets of charges filed by SEIU demonstrates that USSI engaged in a continuous course of illegal conduct that interfered with the rights of USSI employees to take part in organizational activities and to present petitions inquiring about wages and benefits.

Specifically, Petitioner alleges that USSI supervisory personnel surveilled, interrogated and threatened workers because of their union activities, prohibited workers from wearing union insignia, restricted the right of employees to talk about the Union, confiscated union literature, promulgated an illegal no solicitation policy, instructed workers to inform supervisors of employees' union activities, failed to reinstate employees who made unconditional offers to return to work after unfair labor practices strikes, reinstated employees into positions that were not substantially equivalent to those they had left, and took adverse job actions against employees for their union activities. Petitioner requests a temporary injunction, requiring Respondent to cease and desist from committing unfair labor violations, to reinstate certain employees, and to disseminate copies of the Court's Order and Opinion to all current and future employees. Petitioner says that an injunction is necessary to prevent Respondent's illegal conduct from frustrating the very purposes of the NLRA.

Respondent claims that the Union is not engaged in a legitimate organizing campaign. It notes that in over 22 years the Union has not filed a petition for a union election despite having signed up a majority of employees at certain locations. Respondent alleges that SEIU is simply trying to harass USSI into losing business by contacting USSI's clients about the Union and engaging in intermittent, unprotected, economic strikes. Respondent contends that SEIU comes to this Court with unclean hands because of its own alleged unfair labor practices and that the delay in prosecuting the charges in the underlying Board proceeding demonstrates that there is no real need for a temporary injunction.

## II. STANDARD FOR TEMPORARY INJUNCTION UNDER SECTION 10(j)

### A. The History Of Section 10(j)

In the labor field, Congress has determined that labor disputes are to be adjudicated by the National Labor Relations Board, not by a court, and that, when necessary, the Board's orders are to be enforced by the Courts of Appeals. For that reason, the federal courts are generally deprived of jurisdiction to issue injunctions in labor disputes. *See* Norris–LaGuardia Act, 29 U.S.C. §§ 101–115; *McLeod ex rel. NLRB v. General Elec. Co.*, 366 F.2d 847, 849 (2d Cir.1966), *vacated on other grounds*, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). Section 10(j) of the National Labor Relations Act is a narrow exception to the decision by Congress not to give jurisdiction to the courts.[2] By

---

1. Sections 8(a)(1) and 8(a)(3) provide:

 It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in [Section 7] ...
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....
 29 U.S.C. §§ 158(a)(1), (a)(3).
 Employee rights under the Act are set forth in Section 7, which provides:

 Employees shall have the right to self organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
 29 U.S.C. § 157.

2. Section 10(j) provides:

 The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has en-

this section Congress gave the federal courts the power to grant temporary injunctive relief pending the Board's resolution of an unfair labor practice charge, in order to restore the status quo or to preserve it as it existed before the commencement of the charged unfair labor practices. This authority was provided so that the alleged illegal conduct would not render the labor violations unremediable and make the final resolution by the Board a nullity. *Int'l Union, UAW v. NLRB (Ex–Cell–O Corp.)*, 449 F.2d 1046, 1051 n. 25 (D.C.Cir.1971); *McLeod ex rel. NLRB v. General Elec. Co.*, 366 F.2d at 849.[3] Upon the conclusion of the Board's often protracted and time consuming proceedings, a Section 10(j) injunction expires automatically. *See Levine v. C & W Mining Co., Inc.*, 610 F.2d 432, 436–37 (6th Cir.1979).

■ The parties disagree about the correct test to be applied by a District Court in determining whether to issue a temporary injunction under Section 10(j). Petitioner says that the Court must consider: (1) whether the Board has "reasonable cause to believe" that the violations of the NLRA that Respondent has been charged with have been committed; and (2) whether injunctive relief is "just and proper" to preserve the Board's ability to effectively remedy the violations alleged. Respondent says that the Union must meet the traditional test for the grant of injunctive relief in this jurisdiction. The Court agrees with Respondent.

Section 10(j) provides that, upon the issuance of a complaint charging unfair labor practices by the Board's General Counsel, the Board may petition a United States District Court for appropriate temporary injunctive relief, and the Court may grant such relief "as it deems just and proper." 29

U.S.C. § 160(j). By its terms, Section 10(j) has no "reasonable cause" component. That threshold "reasonable cause" inquiry was adopted by some courts from Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), as an additional requirement for a Section 10(j) injunction, but one less onerous than the more traditional likelihood of success on the merits standard. Section 10(*l*) was enacted at the same time as Section 10(j) and governs situations where a charge has been filed with the Board alleging that one or more specifically enumerated unfair labor practices has occurred. 29 U.S.C. § 160(*l*). In such cases, the NLRB's Regional Attorney must conduct a preliminary investigation, and "[i]f, after such investigation, the officer or regional attorney to whom the matter may be referred has *reasonable cause* to believe such charge is true and that a complaint should issue," the Regional Attorney, on behalf of the Board, is *required* to seek interim relief from a United States District Court even though no complaint has yet been issued by the Board or its General Counsel. 29 U.S.C. § 160(*l*) (emphasis added).

Although there is no similar "reasonable cause" language in Section 10(j), many courts traditionally have incorporated Section 10(*l*)'s "reasonable cause" standard into their Section 10(j) analysis to determine when a Section 10(j) temporary injunction is appropriate. *See, e.g., Frye v. District 1199, Health Care and Social Services Union, Service Employees Int'l Union, AFL–CIO*, 996 F.2d 141 (6th Cir.1993); *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 373 (11th Cir.1992); *Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445 (1st Cir.1990); *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076 (3d Cir.1984); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir.1975), *cert. de-*

gaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred ... for appropriate temporary relief or restraining order.... [T]he court ... shall have jurisdiction to grant the Board such temporary relief or restraining order as it deems just and proper.
29 U.S.C. § 160(j).

**3.** In enacting Section 10(j), Congress recognized that

by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done.... Since the Board's orders are not self enforcing, it has sometimes been possible for persons violating the [NLRA] to accomplish their unlawful objective before being placed under any legal restraint and thereby making it impossible or not feasible to restore or preserve the status quo pending litigation. S.Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1947).

*nied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). Courts have applied the "reasonable cause" standard to Section 10(j) petitions, rather than the familiar and traditional likelihood of success/balancing of harms test, as a way of acknowledging the legislative judgment that District Courts in Section 10(j) situations, just as in Section 10(*l*) situations, lack authority to *decide* the merits of the unfair labor practice charge and to emphasize the judicial view that the processes and judgments of the Board, which has primary jurisdiction over such charges, deserve respect and deference. *See Boire v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America,* 479 F.2d 778, 792 (5th Cir.1973).

Even apart from this rationale for reading a "reasonable cause" requirement into Section 10(j), Petitioner contends that this Court is bound to apply the two-pronged reasonable cause/just and proper test because it was adopted by the District of Columbia Circuit in *Int'l Union, U.A.W. v. NLRB (Ex–Cell–O Corp.),* 449 F.2d 1046 (D.C.Cir.1971). The Court disagrees with Petitioner's reading of *Ex–Cell–O.* Our Court of Appeals in that case was concerned with the appropriateness of temporary injunctive relief in a Section 10(e) enforcement action pending the employer's appeal of a Board bargaining order to the appellate court, not a Section 10(j) injunction before the District Court. Explaining that the usual strict standards for equitable relief in private actions do not apply when important public purposes are threatened under the NLRA, the Court, in deciding the request for injunctive relief under Section 10(e), held that the Board was required to show only reasonable cause to believe that the Act had been violated rather than irreparable injury and substantial likelihood of success on the merits. 449 F.2d at

1051. It noted in passing that the same test applied under Section 10(j). *Id.* It relied for this proposition on *NLRB v. Aerovox Corp. of Myrtle Beach, South Carolina,* 389 F.2d 475, 477 (4th Cir.1967). That case, like *Ex–Cell–O,* also involved Section 10(e) relief, but the Fourth Circuit in *Aerovox* equated Section 10(e) standards with the Section 10(j) criteria. *Int'l Union, U.A.W. v. NLRB (Ex–Cell–O Corp.),* 449 F.2d at 1051 n. 29.[4]

Because the matter was not before it in *Ex–Cell–O,* the District of Columbia Circuit specifically declined to declare the proper standard to be applied in a Section 10(j) action: "Whatever the appropriate standard is under § 10(j), temporary relief may be granted under § 10(e) upon a showing that the Board is likely to succeed in enforcing its order, and that interim relief is necessary to achieve the remedial purposes of the Act." 449 F.2d at 1052 n. 29. As dictum in a case not involving a Section 10(j) injunction, the discussion of Section 10(j) in *Ex–Cell–O* is not binding on this Court. All that can fairly be said after *Ex–Cell–O* is that the District of Columbia Circuit recognizes that some courts apply the reasonable cause/just and proper test when considering a Section 10(j) application. *See also Coronet Foods, Inc. v. NLRB,* 981 F.2d 1284, 1286 (D.C.Cir.1993). In the absence of any authoritative pronouncement by the District of Columbia Circuit, however, this Court is not bound to read "reasonable cause" into the statute and apply the two-part test advanced by Petitioner.[5]

**B. *Recent Judicial Construction Of Section 10(j)***

Two circuits recently revisited this issue and rejected "reasonable cause" as a criterion for granting a Section 10(j) temporary injunction, adopting instead the traditional

---

4. Section 10(e) has the same "just and proper" language as does Section 10(j), but, like Section 10(j), it does not include the "reasonable cause" language of Section 10(*l*). 29 U.S.C. § 160(e).

5. This District Court has rarely been called on to resolve a petition for a Section 10(j) temporary injunction and does not appear to have engaged in any independent analysis of the appropriateness of the "reasonable cause" gloss on the statute. *See, e.g., Humphrey v. Retired Persons Pharmacy,* 1973 WL 1236 (D.D.C.1973) (applying rea-

sonable cause/just and proper test); *Penello v. Int'l Union, UMWA,* 88 F.Supp. 935 (D.D.C.1950) (considering whether charged acts are unfair labor violations, whether the record shows a "reasonable probability" that such practices were committed, and whether injunctive relief is just and proper); *Reuben v. FDIC,* 760 F.Supp. 934, 942 (D.D.C.1991) (dictum in case applying traditional equitable discretion under the Federal Service-Labor Management Relations Act).

test for equitable relief as the analytical framework for applying the only statutory requirement under Section 10(j), a determination of what is "just and proper." *See Miller v. California Pacific Medical Center,* 19 F.3d 449, 460 (9th Cir.1994) (en banc) ("[l]ikelihood of success is no longer to be equated with 'reasonable cause' ... nor is it to be measured by whether the factual allegations are not insubstantial and frivolous"); *Kinney v. Pioneer Press,* 881 F.2d 485, 493 (7th Cir.1989) ("[o]nce the Board seeks injunctive relief under § 10(j), the only question for the court is whether the Board has demonstrated that relief is 'just and proper' "). Two other circuits, while retaining the "reasonable cause" threshold, consider traditional equitable criteria in order to determine whether injunctive relief is just and proper. *Asseo v. Pan American Grain Co., Inc.,* 805 F.2d 23, 26 (1st Cir.1986); *Maram ex rel. NLRB v. Universidad Interamericana de Puerto Rico, Inc.,* 722 F.2d 953, 958 (1st Cir.1983); *Kaynard ex rel. NLRB v. Mego Corp.,* 633 F.2d 1026, 1033 (2d Cir.1980).

■ As noted above, while Section 10(j) and Section 10(*l*) were enacted at the same time, and for the same basic purpose of preventing frustration of the purposes of the NLRA and the Board's processes, *see Kinney v. Pioneer Press,* 881 F.2d at 488, the two sections operate quite differently and serve different functions. If charges are filed alleging certain enumerated unfair labor violations (such as secondary boycotts and certain illegal picketing), then Section 10(*l*) directs the Regional Attorney to give preliminary investigation of those charges a priority over other pending investigations. Section 10(*l*) also expressly *requires* the Regional Attorney to seek an injunction on behalf of the Board whenever he or she has "reasonable cause" to believe that any of the enumerated labor violations has occurred. In a Section 10(*l*) situation, the Regional Attorney may not wait until after a charge has been fully investigated and an administrative complaint issued, but must petition immediately for temporary relief. In imposing such a mandatory obligation, Congress both defined when the Regional Attorney's responsibility to seek injunctive relief is activated and set a standard—"reasonable cause"—by

which the Court asked to grant such relief could measure the Regional Attorney's judgment.

Section 10(j), on the other hand, *permits* the Board to pursue interim relief for *any* violation, but only after the General Counsel of the Board (usually acting through the Regional Attorney) uncovers enough evidence to warrant the bringing of a formal action by issuance of a complaint. The Regional Attorney then decides in his or her *discretion* whether the case is sufficiently important to call for temporary injunctive relief. *Kinney v. Pioneer Press,* 881 F.2d at 489. Having given the Board's General Counsel discretion not to issue a formal complaint and the Board's Regional Attorney discretion not to seek a temporary injunction, Congress did not need to set a "reasonable cause" trigger for the Board to act, and it did not do so. *See Kinney v. Pioneer Press,* 881 F.2d at 489–90; *Miller v. California Pacific Medical Center,* 19 F.3d at 456. Indeed, "when the Board simply has discretion [whether to seek an injunction] under general section 10(j), we believe the whole panoply of discretionary issues with respect to granting preliminary relief must be addressed by the Court." *Maram ex rel. NLRB v. Universidad Interamericana de Puerto Rico,* 722 F.2d at 958. For Congress to have required that "reasonable cause" be shown would make no sense under Section 10(j) because the "reasonable cause" determination required by Section 10(*l*) focuses on the preliminary investigation before the issuance of a formal complaint, a point that already has passed under Section 10(j), rather than the likely success of prevailing on the merits of the already-filed complaint. *Miller v. California Medical Center,* 19 F.3d at 457.

The Court finds the logic of Judge Easterbrook's reasoning in *Kinney* entirely persuasive on this issue:

Perhaps the problem lies not in the details of "reasonable cause" but in thinking that the subject need be resolved in a suit under § 10(j). The words "reasonable cause" appear in § 10(*l*) but not § 10(j). The Board may invoke § 10(j) at its discretion whenever it believes someone has

transgressed the NLRA, but may do so only after the General Counsel has filed an administrative complaint. Section 10(*l*), by contrast, is mandatory. It requires the Board to seek injunctive relief if an investigation yields "reasonable cause" to believe that secondary boycotts or other identified kinds of especially grave violations are in progress....

"Reasonable cause" is the trigger of the Board's duty under § 10(*l*). Because § 10(*l*) is mandatory, Congress had to establish the boundary of the Board's obligation. It would be silly to require the Board to seek an injunction whenever someone shouts "secondary boycott". Some preliminary investigation is essential. May the Board investigate so thoroughly that the disputants expire in the interim? Congress chose to require the Board to put the subject before a court as soon as it discovers "reasonable cause" to believe that one of the unfair labor practices named in § 10(*l*) is in progress. If the Board never turns up "reasonable cause", it need not start the judicial process. "Reasonable cause" under § 10(*l*) thus serves two functions: it requires the Board to investigate before filing suit, and it allows the Board to filter out claims of violations that do not justify litigation.

Section 10(j) has a different structure. This law never requires the Board to sue, and the Board may act on its own schedule. First the General Counsel investigates, often a time-consuming process. Only if the General Counsel files a complaint may the Board use § 10(j), and the Board has discretion to disdain this remedy no matter how strong the evidence. Having given the Board unfettered discretion not to sue under § 10(j), Congress did not need the threshold that "reasonable cause" represents under § 10(*l*); having told the Board not to file suit under § 10(j) until the administrative complaint has been lodged, Congress did not need to require any further minimum investigation. Per-

haps there are instances where the General Counsel files charges against an employer or union, the Board determines that interim relief is necessary under the circumstances and asks for an injunction, yet nonetheless the case is so thin that not even "reasonable cause" supports the Board's position. But Congress might rationally decide that the search for such instances is not worth the candle. If it had such a view, it would leave "reasonable cause" out of § 10(j) while putting that language in § 10(*l*)—which is what Congress did.

*Kinney v. Pioneer Press,* 881 F.2d at 489–90.

As Judge Easterbrook noted, rejecting reliance on the "reasonable cause" threshold does little more than to eliminate the requirement that a District Court engage in repetitive analysis. *Kinney v. Pioneer Press,* 881 F.2d at 490.[6] Once a court considering "reasonable cause" determines that the threshold has been met, it must still determine whether an injunction is "just and proper," a requirement found in the text of Section 10(j) itself. The "just and proper" provision necessarily subsumes the traditional test for injunctive relief; a Section 10(j) temporary injunction is an equitable remedy, and courts traditionally consider the likelihood of success on the merits, the public interest, and the balance of hardships in deciding whether to grant equitable relief. There is no reason to depart from the traditional test for equitable relief under the "just and proper" language of Section 10(j) unless Congress had expressly, or by inescapable inference, otherwise sought to control the exercise of the court's discretion, which it has not done. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982) ("A major departure from the long tradition of equity practice should not be lightly implied."); *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944).

■ Section 10(j) does not direct district courts to ignore traditional equitable criteria

---

6. And, as he also noted, despite numerous Section 10(j) decisions, no court of appeals had ever before "discussed reasons pro and con why § 10(j) should (or shouldn't) be treated as containing a requirement of 'reasonable cause.'" *Kinney v. Pioneer Press,* 881 F.2d at 493. *See*

*also Maram v. Universidad Interamericana de Puerto Rico,* 722 F.2d at 957 (noting the "unhappy realization" that no one appears previously to have considered the statutory differences between Section 10(j) and Section 10(*l*)).

when evaluating petitions for temporary injunctive relief. Indeed, as the Ninth Circuit has pointed out, "just and proper" is another way of saying "appropriate" or "equitable." *Miller v. California Pacific Medical Center,* 19 F.3d at 458; *see Kinney v. Pioneer Press,* 881 F.2d at 491. "Even though § 10(j) is an exception to the primary jurisdiction of the NLRB over labor disputes, it reflects an intention that the district court will exercise judgment rather than simply sign off on Board requests." *Miller v. California Pacific Medical Center,* 19 F.3d at 458. Therefore, in determining whether interim relief is "just and proper" under Section 10(j), the Court must consider traditional equitable criteria but through "the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charges." *Id.* at 459–60.

▇ In sum, "reasonable cause" may be the inquiry the Board (or its Regional Attorney) must conduct in determining whether to file a complaint, but the courts, in determining what is "just and proper," should employ the familiar standards customarily used in suits seeking injunctions. *Kinney v. Pioneer Press,* 881 F.2d at 490. The Court therefore concludes that Petitioner need not demonstrate "reasonable cause" in seeking an injunction under Section 10(j). Rather, he must show that temporary injunctive relief is "just and proper." In determining whether the Board has met its burden under that standard, the Court turns to this Circuit's established four-part test for injunctive relief.[7]

## III. SECTION 10(j) TEMPORARY INJUNCTIVE RELIEF IS JUST AND PROPER

▇ According to the traditional formulation for the grant of an injunction in this jurisdiction, a movant is entitled to injunctive relief upon a showing (1) that it has a substantial likelihood of success on the merits; (2) that movant will suffer irreparable harm if the relief is denied; (3) that other interested parties will not suffer substantial harm if injunctive relief is granted; and (4) that the public interest favors the granting of relief or, at least, that the granting of relief is not adverse to the public interest. *Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 842–44 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921 (D.C.Cir.1958). Under *Holiday Tours,* the factors must be viewed as a continuum—more of one factor compensating for less of another. Thus, the necessary level or degree of possibility of success will vary according to the court's assessment of the other factors; when the other three factors strongly favor interim relief, a court may grant injunctive relief where the moving party has merely made out a "substantial case" on the merits. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d at 843. An order maintaining the status quo is appropriate when a serious legal question is presented, the public interest is served, denial of the requested relief would inflict irreparable injury on the movant and when little if any injury would befall the respondent. *Id.* at 844.

### A. The Public Interest

▇ The public interest is always an important factor in the exercise of the Court's equitable discretion under Section 10(j) of the NLRA. *Miller v. California Pacific Medical Center,* 19 F.3d at 460 (citation omitted). The public interest in a case

7. Respondent suggests that the National Labor Relations Board under the Clinton Administration has changed its policy and has set too low a standard for petitioning the courts for temporary injunctive relief pursuant to Section 10(j). Resp. Mem. at 8 n. 4. The Board's policy with regard to Section 10(j) petitions has been discussed publicly by William B. Gould IV, Chair of the National Labor Relations Board, and the Board's expanded use of Section 10(j) was acknowledged by counsel for Petitioner at oral argument. Resp.Ex.H, I. Congress has unquestionably granted the Board the discretion to seek injunctive relief, however, and this case does not provide an appropriate forum for Respondent to question the Board's exercise of its discretion. The only issue that can be decided by this Court is whether the Board is entitled to Section 10(j) relief in *this case.*

involving alleged unfair labor practices under the Act lies in ensuring that the purposes of the statute are furthered and that the processes of the Board, and any ultimate remedies it imposes, are effective. As Judge Joyce Green said in another context:

> [W]here federal statutes are violated, the guiding principle for determining the propriety of equitable relief is whether an injunction is necessary to effectuate the Congressional purpose behind the statute.... the equities to be balanced are not simply those of the litigants, but also the interests of the public as defined by Congress.

*Securities Industry Ass'n v. Board of Governors of Federal Reserve System*, 628 F.Supp. 1438, 1443 (D.D.C.1986).

■■■■ The National Labor Relations Act was enacted to protect the integrity of the collective bargaining process. "[T]he passage of the statute is itself an implied finding by Congress that violations will harm the public." *Miller v. California Pacific Medical Center*, 19 F.3d at 459. In a Section 10(j) case, "the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Id.* at 460. Section 10(j) provides a mechanism for safeguarding this interest by preserving the Board's remedial power while it processes the charge that an unfair labor practice has occurred. *See* S.Rep. at 105, 80th Cong., 1st Sess. 8, 27 (1947); *Int'l Union, UAW v. NLRB (Ex–Cell–O Corp.)*, 449 F.2d at 1051 n. 25; *McLeod ex rel. NLRB v. General Elec. Co.*, 366 F.2d at 849. In this case, many of the alleged unfair labor practices occurred over a year ago, and if the deleterious effects of those violations on the goals and purposes of the NLRA endure, then the public interest requires restoration of the status quo.

■■■■ Respondent argues that the delay in adjudicating the earliest charges is the Board's fault. The Court finds, however, that the delay in this case is not excessive in view of the allegations of continuing incidents of unfair labor practices, requiring the Board's General Counsel to issue complaints in response to six sets of charges over a 5–month period, and the close relationship among the allegations in the various cases. The Board petitioned for injunctive relief just eleven weeks after the final complaint was issued. *See Pascarelli v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir.1990); *Blyer v. Domsey Trading Corp.*, 139 L.R.R.M. 2289, 2291, 1991 WL 150817 (E.D.N.Y.1991). "A busy administrative agency [such as the NLRB] cannot operate overnight. The very fact that it must exercise discretion, and that its decision is entitled to presumptive weight ... indicate that it should have time to investigate and deliberate." *Asseo v. Pan American Grain Co.*, 805 F.2d at 29, citing *Maram ex rel. NLRB v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d at 960. The public interest clearly favors the granting of relief when there is a basis for the charge that the NLRA is being violated, as there is here; certainly the granting of relief is not adverse to the public interest. *Cf. Brown v. Artery Org., Inc.*, 654 F.Supp. 1106, 1119 (D.D.C.1987). The public interest will most readily be served by a return to the status quo in order to permit violations of the NLRA to be effectively remedied.

### B. Irreparable Harm

■■■■ Many USSI employees are recent immigrants with a poor command of English and little familiarity with their rights. Petitioner argues that because they are in low-end janitorial jobs, they are particularly vulnerable to coercive conduct by their employers. Petitioner contends that in the absence of a temporary injunction the foreseeable result of continuing coercion and adverse job actions will be to dissipate support for the Union. Adverse job actions aimed at "active and open union supporters ... risk[s] a serious adverse impact on employee interest in unionization," a relevant factor in determining whether an injunction under Section 10(j) is appropriate. *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir.1980). The Court concludes that, in the absence of injunctive relief, adverse job actions taken against union supporters and the failure to reinstate unfair labor violation strikers promptly to "substantially equivalent" positions may permanently deprive the workplace of the presence of union supporters and

suggest that workers may be retaliated against for their participation in organizational activities. *See Aguayo v. Tomco Carburetor Co.,* 853 F.2d 744, 749–50 (9th Cir. 1988); *overruled on other grounds by, Miller v. California Pacific Medical Center,* 19 F.3d 449; *Kaynard v. Palby Lingerie Inc.,* 625 F.2d at 1053.

Petitioner urges an especial urgency to its petition because of the inherent difficulty of organizing the janitorial industry in the Washington, D.C. area. Most janitorial contracts have 30 day cancellation clauses and the buildings turn over to new janitorial contractors frequently. Many of the jobs are part-time and the USSI turnover rate is as high as 250%. Petitioner argues that these conditions make it extremely difficult for workers in the janitorial industry to organize and that any dissipation of union support can be a major setback. Thus, if allowed to continue, USSI's activities may deny many of its workers from ever exercising their rights under the NLRA.

▉ Petitioner also argues that it is likely to prove that there has been actual harm to the Union campaign because former union supporters have refused to associate with union organizers as a result of USSI's unfair labor violations. Pet.Exs. 22, 23. Proof of such actual harm to the organizing campaign is relevant to the Court's assessment of the Petition. *Arlook v. S. Lichtenberg & Co.,* 952 F.2d 367 (considering possibility of remedial failure, evidence of actual damage to organizing effort, and likely continuation of damage); *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d at 1053. An employer's threats, coercion and adverse job actions may undermine union strength. In the absence of temporary injunctive relief, such conduct may render ineffective any final relief that might be afforded by the Board.

Petitioner suggests that prior history also suggests that USSI's unlawful conduct will continue unabated in the absence of injunctive relief. Petitioner notes that USSI has been found to have violated the NLRA on two recent occasions. In one of these cases, the Board affirmed an Administrative Law Judge's decision finding that USSI violated Section 8(a)(1) of the Act by discharging an employee who had complained about wages, hours and working conditions. *See USSI,* 314 N.L.R.B. No. 8 (1994). In another case, an Administrative Law Judge found that USSI violated Section 8(a)(1) of the Act by making threats and other statements to employees and by failing and refusing to reinstate strikers. *See* Pet.Ex. 40. That case is currently pending before the Board on exceptions. Moreover, Petitioner says USSI's public stance is "in opposition to unionization." Pet.Ex. 44 (letter from USSI Vice President to the *Wall Street Journal* stating that "Washington, D.C., is not a union city and never will be one for janitors."). USSI's asserted recidivism and its public statements, when considered in the light of this highly contentious organizational campaign, suggest that USSI's conduct in violation of the NLRA will not cease in the absence of a temporary injunction. *See Arlook v. S. Lichtenberg & Co.,* 952 F.2d at 372.

Respondent argues that temporary injunctive relief should be denied because the Union comes to the Court with unclean hands. It cites three specific incidents as evidence of the Union's violent activities: an Administrative Law Judge's finding that a sister local engaged in illegal picketing, blocked building entrances, threatened employees, and engaged in other activities in violation of the NLRA, Resp.Ex. D; an "invasion" of USSI's offices by SEIU which is the subject of a pending civil suit in the Superior Court of the District of Columbia, Resp. Ex. C; and affidavit evidence of altercations between USSI managerial staff and two men alleged to be involved in the Union. Resp.Supp.Ex. 3. Each one of these incidents demonstrates how heated and contentious a labor dispute can become. The courts have held, however, that "clean hands" is not a requirement for Board proceedings or a prerequisite for interim injunctive relief. *Henderson v. IUOE Local 701,* 420 F.2d 802, 808 (9th Cir.1969). While Respondent's allegations are not unrelated to the proceedings in this Court, Respondent more appropriately should raise violations of the NLRA by filing charges with the Board or, as it has done in its Superior Court case, bringing a legal action for conduct that does not fall within the NLRA.

Finally, "[i]t should be noted ... that the petitioner here is not one of the parties to the labor-management dispute, but is a representative of the Government of the United States acting to protect the rights of the public." *Penello v. Int'l Union, UMW*, 88 F.Supp. 935, 942 (D.D.C.1950). The relief sought is not designed to help or protect the Union, but to protect all USSI employees and others similarly situated who seek to exercise their rights to self organization for the purposes of collective bargaining or other mutual aid or protection under the National Labor Relations Act.

## C. *Likelihood of Success on the Merits*

▆▆▆▆ Although Congress has found that violations of the NLRA will harm the public interest, the Board nevertheless remains obligated under the traditional test for obtaining injunctive relief to demonstrate to the Court that it has a substantial likelihood of success or, at the very least, a substantial case on the merits in the underlying proceeding before the Board; its obligation to make that showing is not lifted simply because the injunction is sought to prevent a violation of an Act of Congress. In this case, Petitioner's allegations demonstrate that, in addition to the public interest favoring preservation of the status quo until the completion of Board proceedings, Respondent's conduct irreparably harms employee rights under the Act. Under this Circuit's approach to preliminary injunctive relief, Petitioner, therefore, must merely make out a substantial case on the merits. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d at 843.

▆▆▆ At the same time, the Court must bear in mind that it is not authorized by Congress to determine the merits of the unfair labor practice cases underlying the petition for a temporary injunction. That is the Board's function. In assessing the evidence in the record in a Section 10(j) case, therefore, the Court is not called on to resolve factual disputes because they will ulti-

mately be resolved by the Administrative Law Judge who is charged with ruling on the underlying cases. Rather, the Court must determine whether the evidence presented, whether by affidavit or witness testimony, demonstrates a substantial likelihood of success on the merits or at least a substantial case on the merits in the underlying complaints pending before the Board.[8]

### 1. *Allegations of Threats, Interrogation and Surveillance*

Petitioner has set forth in its formal complaints, and in the numerous affidavits filed with the Court, facts supporting a litany of unfair labor practices that began at least as early as May, 1993, in connection with the Union's organizing activity. As noted at the outset of this Opinion, the Board has charged that USSI supervisory personnel surveilled or created the impression of surveillance of workers, videotaped workers, interrogated workers about union activities, threatened adverse consequences for union activity, including termination or transfer, prohibited the wearing of union buttons, confiscated union literature, promulgated an illegal no solicitation policy, instructed workers to inform supervisors of union activities, otherwise interfered with organizational activities, failed to reinstate employees who made unconditional offers to return to work after unfair labor practices strikes, reinstated employees into positions that were not substantially equivalent, restricted the right of employees to talk about the Union, threatened to close operations because of union activities, terminated employees, and transferred employees. Petitioner supports each of the alleged incidents with detailed affidavit evidence and seeks a cease and desist order to prevent future conduct by USSI that will interfere with employees' rights under the Act.

▆▆▆ The Board has consistently adhered to the position that threats of discharge and threats to close operations because of union activity are serious and flagrant forms of

---

**8.** Under the "reasonable cause" standard, which we reject, it was said that the Court was required to view the evidence in the light most favorable to the Board and to determine whether a rational factfinder could rule in its favor. *Arlook v. S.*

*Lichtenberg & Co.*, 952 F.2d 367, 373; *Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3d Cir.1986); *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir.1988); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 36–37 (2d Cir.1975).

interference with the free exercise of employee rights under the NLRA. *Eisenberg v. Honeycomb Plastics,* 125 L.R.R.M. 3257, 3277–78, 1987 WL 109093 (D.N.J.1987). Moreover, interrogation, if it reasonably induces fear, constitutes a violation of the NLRA. *Zipp v. Shenanigans,* 106 L.R.R.M. 2989, 2991, 1980 WL 2195 (C.D.Ill.1980). While some of the other conduct alleged by Petitioner, including the surveillance of employees, might not violate the Act on its own, certain conduct, such as videotaping employees, becomes coercive when viewed together with the Board's other allegations, and interferes with the employees' rights. *Eisenberg v. Honeycomb Plastics Corp.,* 125 L.R.R.M. at 3270. The many affidavits filed by Petitioner detail warnings, threats, interrogation and surveillance, and include the names of USSI supervisory personnel and the times and locations of the incidents. *See* Pet.Ex. 1–35. On the basis of this record the Court concludes that Petitioner has demonstrated a substantial likelihood that Respondent has interfered with the exercise of rights guaranteed by the NLRA in violation of Section 8(a)(1) and that it likely will succeed on the merits of these charges.

### 2. *Allegations of Failure to Reinstate Workers after an Unfair Labor Practices Strike*

Petitioner contends that 21 USSI employees made an unconditional offer to return to work from an unfair labor practices strike but that USSI refused to immediately reinstate them to "substantially equivalent" jobs. Petitioner accuses Respondent of engaging in unfair labor practices by either delaying or by failing to reinstate these 21 employees.[9] Petitioner does not seek back pay for the 21 employees that it contends were not immediately reinstated, but argues that the delay in their reinstatement and the fact that some employees were not reinstated to "substantially equivalent" jobs are themselves unfair labor practices and interfere with employee rights. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956) (unfair labor violation strikers are entitled to reinstatement regardless of whether the employer has replaced them).

Respondent says it had no obligation to reinstate the employees who went on strike because the SEIU strikes were economic strikes motivated by the workers' desires to achieve greater pay and benefits, not unfair labor practice strikes. Respondent produced the affidavit of a USSI employee who was involved in the strikes, who states that she believes the workers were striking in order to gain pay increases and vacation and sick leave benefits. Resp.Ex.B. Petitioner's affidavits demonstrate, however, that the USSI employees were striking to protest a USSI supervisor's refusal to accept an employee petition, interrogation about union activities and threats relating to union involvement, among other unfair labor practices. *See, inter alia,* Pet.Exs. 2, 3, 4, 30.

The law is clear that an unfair labor practice need only be a contributing motivation for a strike, not the sole motivation. *See, e.g., Allied Industrial Workers, Local 289 v. NLRB,* 476 F.2d 868, 882–83 (D.C.Cir.1973). The fact that there are also economic motivations for a strike does not remove the strike or the strikers from the protection of the NLRA. *See, e.g., General Indus. Emp. Union Local 42 v. NLRB,* 951 F.2d 1308, 1311–12 (D.C.Cir.1991). If the evidence before the Board is consistent with the affidavit evidence before the Court, Petitioner will be able to demonstrate that the employees who went on strike were engaged in an unfair labor practice strike and therefore were entitled to reinstatement.

Respondent also contends that all the workers ultimately were reinstated or given the opportunity to return to work. Petitioner does not directly dispute the fact that some of the workers were given an opportunity to return to work at USSI but argued in open court that USSI's failure to timely reinstate employees to "substantially equivalent" positions, and its warnings to employees that they would not be reinstated, are precisely the kind of threatening and coercive conduct

9. Seven of these employees, along with three others not included in the 21, are the subjects of a request for injunctive relief requiring immediate reinstatement to substantially equivalent positions. This request is discussed below.

that discourages unfair labor practice strikes and are themselves unfair labor practices. Petitioner also argued that because USSI employees work in low wage jobs, and discharged employees must move on to other work as soon as possible in order to survive, any delay in reinstatement may effectively deprive the discriminatees from ever being reinstated, thereby magnifying the unfair labor practice violations. On the record presented, the Court concludes that Petitioner has a substantial likelihood of succeeding on the merits of these claims as well.

### 3. *Employees For Whom Immediate Reinstatement Is Sought*

The Court now turns to the ten employees for whom Petitioner seeks injunctive relief requiring immediate reinstatement. Petitioner contends that Estela Hernandez was terminated and not reinstated after her participation in an unfair labor practices strike. Respondent places the blame for Ms. Hernandez's current lack of employment on her, saying that she simply never returned to work. Respondent agreed in open court, however, that Ms. Hernandez would be rehired, so there is no further need for the Court to consider Petitioner's motion on behalf of Ms. Hernandez.

Ricardo and Cristina Diaz are both currently employed by USSI. Petitioner argues that prior to an unfair labor practices strike Mr. and Ms. Diaz worked in two USSI buildings, but they were each terminated from one of their two USSI jobs after participating in the strike and were told that it was because of their union activities. Respondent explained that to employ Mr. and Mrs. Diaz in the second building would require paying them overtime and that USSI currently has a policy against overtime in order to maintain competitive labor costs. Respondent did not offer a written policy to the Court or demonstrate that the policy is applied to every USSI employee. Given the fact that no limitation on overtime was applied to Mr. and Ms. Diaz prior to their participation in the strike, the Court is persuaded that Petitioner has a substantial likelihood of demonstrating in the NLRB proceeding that Mr. and Ms. Diaz were the victims of an adverse job action because of their union activities.

Four other employees who were not timely reinstated to substantially equivalent jobs and are among those for whom Petitioner seeks immediate reinstatement (Agustin Barrero, Maria Campos, Maria Ester Treminio and Juan Bolanos) have, since their untimely reinstatement, been terminated. Petitioner argues that these terminations were motivated by the workers' participation in unfair labor practice strikes among other union activities.

After they were reinstated, Agustin Barrero and Maria Campos worked in the same building as Maricruz Sorto, who was also involved in union activities. USSI then lost the contract for that building and informed employees that some would be transferred to other worksites and others could try to remain with the new janitorial contractor. USSI refused to transfer Mr. Barrero, Ms. Campos and Ms. Sorto. Ms. Campos specifically says she was told that it was because of their union activities. Pet.Ex. 7. Respondent contends that these three workers simply elected to stay with the new janitorial contractor. Given USSI's refusal to transfer these three workers and the affidavit of Ms. Campos stating that they were denied transfer because of their union activities, however, the Court concludes that Petitioner has made out a substantial case that Mr. Barrero, Ms. Campos and Ms. Sorto were subject to unfair labor practices.

After her reinstatement, Maria Ester Treminio received three warning notices for poor work and was discharged. Prior to her discharge, however, she was told by a supervisor that all the people who took part in the strike had problems. Pet.Ex. 33. After his reinstatement, Juan Bolanos was quoted in an article in the Washington Post regarding USSI working conditions. Thereafter, he requested a leave of absence to deal with some personal problems. A USSI supervisor advised him that the leave would be granted, but because of Bolanos' participation in union activities he would not be returned to the same position at the same site when he returned to work. Mr. Bolanos returned to work one day late, and someone informed

USSI that Bolanos had been attending a union training session in Los Angeles. He was then terminated. Pet.Ex. 5. The record before the Court demonstrates that Petitioner has a substantial likelihood of demonstrating in the underlying proceedings before the Board that the terminations of Ms. Treminio and Mr. Bolanos were in reaction to the employees' involvement in union activities.

Rosa Cristina Flores states in her affidavit that she was interrogated by her supervisor regarding her interest in the Union. When she began wearing a union button, she was threatened with disciplinary action and told not to wear the button. Pet.Ex. 16. Respondent points out, however, that several of Petitioner's affiants cite occasions when they were wearing a union t-shirt or button and no mention of the union insignia was made by USSI supervisory personnel and no action was taken against them on that account. The fact that USSI supervisors did not threaten, harass or even talk to workers about every possible demonstration of support for the Union, however, does not demonstrate that warnings, threats, or coercion did not occur with respect to some employees.

Ms. Flores states in her affidavit that she was issued a written warning for refusing to remove a union button, and when she insisted on taking the written warning with her she was fired for insubordination. Pet.Ex. 16. Respondent claims that Ms. Flores was actually discharged for failing to punch out on the time clock. The Court cannot predict how the Administrative Law Judge will resolve this factual dispute, but the Board, the Board certainly has a substantial case on the merits of this unfair labor practice claim.

Carlos Ipanaque stated in his affidavit that he was questioned about his union activities and was threatened with surveillance and adverse job actions. Pet.Exs. 24, 25. After Mr. Ipanaque's photo appeared in a union flyer, USSI supervisory personnel increased their scrutiny of his work and transferred him to a different USSI worksite. A USSI official told Mr. Ipanaque that he was transferred for his union involvement. Respondent claims that Mr. Ipanaque received six warning notices relating to his work performance prior to his discharge, and USSI's usual policy is to discharge employees after three warning have been issued. Again, the Administrative Law Judge will find the facts at the hearing, based in part on his assessment of credibility, but at this stage the affidavit evidence is sufficient for the Board to have met its burden on the merits for temporary injunction purposes. As in the case of Ms. Flores, Ms. Treminio and Mr. Bolanos, the affidavit evidence in conjunction with the entire record before the Court tend to indicate that the real reason for USSI's actions with respect to Mr. Ipanaque may well have been to try to prevent the growth of union organizing activities.

Petitioner alleges many additional incidents of USSI supervisors having engaged in harassment and transfers of USSI personnel and other coercive activity to discourage employee involvement in union activities. When viewed as a whole, the affidavit evidence demonstrates that Petitioner has a substantial likelihood of demonstrating before the Administrative Law Judge that the adverse job actions were unfair labor practices in violation of Section 8(a)(3) of the Act. On the basis of the affidavits submitted, the Court concludes that the Board has a substantial likelihood of success on the merits. The Findings of Fact and Conclusions of Law accompanying this Opinion more fully set out the Court's findings.

### IV. CONCLUSION

Petitioner has demonstrated that it has at least a substantial case on the merits and, in most cases, a substantial likelihood that it will prove in the Board proceeding that USSI has been using and is likely to continue to use threats, coercion, refusal to timely reinstate unfair labor violation strikers to substantial equivalent jobs, and adverse job actions in order to discourage USSI workers from engaging in their protected right to organize for the purposes of collective bargaining or other mutual aid or protection. There is substantial evidence that the impact of USSI's activities on union activities has already been considerable and, if allowed to continue unabated, will irreparably harm USSI workers by denying them rights protected by the NLRA. Having de-

termined that Petitioner has a substantial likelihood of demonstrating that Respondent has violated and will continue to violate Sections 8(a)(1) and 8(a)(3) of the Act, and that the public interest and the balance of the equities favor temporary injunctive relief pending resolution of the underlying Board proceedings, it is just and proper for the Court to issue a temporary injunction under Section 10(j) of the NLRA, requiring Respondent to cease and desist from engaging in unfair labor practice.

 Petitioner further requests that the Court's Opinion and Order be disseminated to USSI employees by various means. USSI employees who previously were involved in union activities have refused to remain involved because they fear that they would lose their job, be transferred, or otherwise suffer adverse job consequences. Pet. Exs. 22, 23. One important purpose of notice is to dispel the coercive effects of the unfair labor practices. *Bloedorn v. Teamsters Local 695,* 132 L.R.R.M. 3102, 3109 (W.D.Wis. 1989). All USSI workers, and those allegedly discharged because of their union activities, must be informed that they have a protected right to engage in concerted activities, to question their employer about wages, benefits and working conditions, and to protest unfair labor violations. Dissemination of this message is crucial in order to prevent USSI employees from being permanently discouraged from taking part in union activities. Because USSI workers are mainly Spanish speaking and work, many part-time, at locations throughout Washington, D.C. and Maryland, distribution of the Court's Order in English and Spanish in order to inform USSI workers that they are entitled to take part in union activities and that USSI is violating the law when it threatens, coerces, or otherwise discourages worker involvement in the Union is just and proper.

 Respondent does not argue that injunctive terms requiring compliance with NLRA provisions and dissemination of the Court's Opinion and Order would cause it any hardship. In fact Respondent claims that USSI has been abiding by the National Labor Relations Act. Resp.Ex.B, Felice Aff.[10] There being no hardship to USSI in being required to do that which it already says it is doing and to advise all employees of their rights and this employer's obligations under the Act, it is just and proper to order USSI to cease and desist from unfair labor practices and to order that the Court's Opinion and Order be posted and distributed to workers.

Finally, on the basis of the evidence presented, the Court concludes that the ten employees who supported the Union and suffered adverse job actions for their union activities are entitled to immediate reinstatement. Respondent objects to any requirement that it reinstate the individual discriminatees, arguing that reinstatement of the workers will allow the Union to spread dissension and encourage employees to engage in sabotage. While the reinstatement of certain employees may be somewhat burdensome to USSI, that burden does not come close to the burden to the organizing campaign if relief is not granted. Petitioner only seeks reinstatement of ten individuals to a workforce of 1400 which Respondent concedes has a 250% turnover. USSI therefore would seem able to absorb these ten individuals with considerably less difficulty than these workers would experience if required to wait two to three years for a decision on the merits by the Board. USSI has already agreed to rehire one of the individuals, and it currently employs two others, although on a more limited basis than prior to their union activities. Furthermore, if the Union is not successful before the Board, the employer's burden can be lifted. If those workers actively expressing their right to engage in

10. Respondent argued in open court that an injunction against "garden variety" unfair labor practices, that essentially merely requires compliance with the NLRA, does not serve the purposes contemplated by Section 10(j). Certainly, a temporary injunction under Section 10(j) is considered an extraordinary remedy and should not be granted lightly. *Boire v. Pilot Freight Carriers,* 515 F.2d 1185, 1192 (5th Cir.1975); *Fleischut v. Nixon Detroit Diesel, Inc.,* 859 F.2d 26, 30 n. 4 (6th Cir.1988). Section 10(j), by its terms is not limited to certain types of labor violations, however. Rather, the statute addresses *the effect* of *any* unfair labor practice within the range of violations covered by the NLRA.

concerted activities for the purpose of collective bargaining are not reinstated, however, the Union campaign may be irreparably harmed.

For the reasons set forth in the foregoing Opinion and in the accompanying Findings of Fact, Conclusions of Law and Order, the Court grants the Petition of the Regional Director for a Temporary Injunction under Section 10(j) of the National Labor Relations Act on the terms requested by Petitioner.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER GRANTING TEMPORARY INJUNCTION

This matter is before the Court on the Petition of Louis J. D'Amico, Regional Director of Region Five of the National Labor Relations Board, for a temporary injunction pursuant to Section 10(j) of the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 160(j), pending the final disposition of Cases 5–CA–23629, 5–CA–23724, 5–CA–24030, 5–CA–24168, 5–CA–24291, and 5–CA–24547, pending on Consolidated Complaints of the General Counsel of the Board charging that Respondent United States Service Industries, Inc. ("USSI"), has engaged in, and is engaging in, unfair labor practices in violation of Sections 8(a)(1) and 8(a)(3) of the NLRA. Upon the issuance of an Order to Show Cause why temporary injunctive relief should not be granted, Respondent filed an Answer to the Petition. The Court heard argument on the issues raised by the Petition and the Answer on September 12, 1994. Upon the unopposed motion of Petitioner, and in accordance with Local Rule 205(d), no live testimony was heard by the Court.

The Court granted permission to counsel for both parties to submit additional affidavits and documentary evidence relevant to certain specific issues raised during argument, and Respondent submitted a supplementary response to the Petition. The charging party in the Board proceeding, Service Employees International Union, Local 82, AFL–CIO ("SEIU") moved to file a brief as *amicus curiae*, and the Court granted the unopposed motion.

All parties were afforded full opportunity to be heard, to present affidavit and documentary evidence bearing on the issues, and to argue the facts and the law. Upon full consideration of the Petition, the Answer, the supporting documentation, the arguments of counsel, the applicable law, and upon the entire record, the Court makes the following:

### FINDINGS OF FACT

1. Petitioner is the Regional Director of Region Five of the Board, an administrative agency of the United States government, and files his Petition for and on behalf of the Board.

2. The Court has jurisdiction of this matter under Section 10(j) of the NLRA, 29 U.S.C. § 160(j).

3. (a) On June 17, 1993, under the provisions of the NLRA, the SEIU filed an unfair labor practice charge with the Board alleging in Case 5–CA–23629 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

(b) On July 19, 1993, under the provisions of the NLRA, the Union filed an unfair labor practice charge with the Board alleging in Case 5–CA–23724 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

(c) On August 17, 1993, under the provisions of the NLRA, the Union filed a first amended unfair labor practice charge with the Board alleging in Case 5–CA–23724 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

4. The unfair labor practice charges described in paragraphs 3(a), 3(b) and 3(c) were referred to Petitioner, as the Regional Director of Region Five of the Board, whose office is located in Baltimore, Maryland.

5. On January 14, 1994, upon the unfair labor practice charges referred to in paragraphs 3(a), 3(b) and 3(c), the General Counsel of the Board, on behalf of the Board, by the Petitioner as the Regional Director of Region Five of the Board, issued an Order Consolidating Cases, Consolidated Complaint

and Notice of Hearing under Section 10(b) of the NLRA, alleging that Respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

6. On November 8, 1993, under the provisions of the NLRA, the Union filed an unfair labor practice charge with the Board alleging in Case 5–CA–24030 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

7. The unfair labor practice charge described in paragraph 6 was referred to Petitioner, as the Regional Director of Region Five of the Board.

8. On December 23, 1993, upon the unfair labor practice charge referred to in paragraph 6, the General Counsel of the Board, on behalf of the Board, by the Petitioner as the Regional Director of Region Five of the Board, issued a Complaint and Notice of Hearing under Section 10(b) of the NLRA, alleging that Respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

9. On January 24, 1994, under the provisions of the NLRA, the Union filed an unfair labor practice charge with the Board alleging in Case 5–CA–24168 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

10. The unfair labor practice charge described in paragraph 9 was referred to Petitioner, as the Regional Director of Region Five of the Board.

11. (a) On March 8, 1994, upon the unfair labor practice charge referred to in paragraph 9, the General Counsel of the Board, on behalf of the Board, by the Petitioner as the Regional Director of Region Five of the Board, issued a Complaint and Notice of Hearing under Section 10(b) of the NLRA, alleging that Respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

(b) On May 19, 1994, the Petitioner as the Regional Director of Region Five of the Board, issued an Order Consolidating Cases and Setting Hearing Date in Cases: 5–CA–23629, 5–CA–23724, 5–CA–24030 and 5–CA–24168.

12. On March 16, 1994, under the provisions of the NLRA, the Union filed an unfair labor practice charge with the Board alleging in Case 5–CA–24291 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

13. The unfair labor practice charge described in paragraph 12 was referred to Petitioner, as the Regional Director of Region Five of the Board.

14. (a) On May 31, 1994, upon the unfair labor practice charges referred to in paragraphs 3(a), (b), (c) and 12, the General Counsel of the Board, on behalf of the Board, by the Petitioner as the Regional Director of Region Five of the Board, issued an Order Consolidating Cases, Complaint and Notice of Hearing under Section 10(b) of the NLRA, alleging that Respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

(b) On June 3, 1994, the Petitioner as the Regional Director of Region Five of the Board, issued an Order Consolidating Cases in Cases: 5–CA–23629, 5–CA–23724, 5–CA–24030, 5–CA–24168 and 5–CA–24291.

15. On July 11, 1994, under the provisions of the NLRA, the Union filed an unfair labor practice charge with the Board alleging in Case 5–CA–24547 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

16. The unfair labor practice charge described in paragraph 15 was referred to Petitioner, as the Regional Director of Region Five of the Board.

17. On August 10, 1994, upon the unfair labor practice charge referred to in paragraph 15, the General Counsel of the Board, on behalf of the Board, by the Petitioner as the Regional Director of Region Five of the Board, issued a Complaint and Notice of Hearing under Section 10(b) of the NLRA,

alleging that Respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

18. Petitioner has demonstrated that it has a substantial likelihood of proving in the Board proceeding that:

(a) Respondent is a Delaware corporation that maintains an office and place of business in Washington, D.C., within this judicial district. Respondent provides janitorial services to offices and buildings in Washington, D.C. During the preceding twelve months, a representative period, in the course and conduct of its business operations, Respondent derived gross revenues in excess of $1,000,-000, and purchased and received goods and supplies valued in excess of $5,000 directly from points located outside the District of Columbia.

(b) Respondent is *now*, and at all material times has been, an employer engaged in commerce within the meaning of Sections 2(2), (6) and (7) of the NLRA.

(c) The Union is an unincorporated association in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment and other terms and conditions of employment.

(d) The Union is now, and has been at all material times, a labor organization within the meaning of Section 2(5) of the NLRA.

19. Petitioner has demonstrated that it has a substantial likelihood of proving in the Board proceeding that:

(a) At all times material herein, the following named persons have occupied the position set forth opposite their respective names, and are now, and have been agents of the Respondent within the meaning of Section 2(13) of the NLRA:

| | |
|---|---|
| Sandra Aguilar | Supervisor |
| Sandra Alfaro | Supervisor |
| Richard Amstutz | Vice–President of Operations |
| Henry Aparicio | Supervisor |
| Raul Arro | Vice–President/Area Manager/Operations Manager |
| Christino Ayala | Supervisor |
| Richard Benavid | Supervisor |
| Fernando Becerra | Area Manager |
| Antonio Castro | Supervisor |
| Jose Cea | Supervisor |
| Henry Claros | Supervisor |
| Joel Felrice | Vice–President of Finance and Administration |
| Richard Gallager | Vice–President |
| Fernando Garcia | Supervisor/Area Manager/Operations Manager |
| Walter Hancock | Manager 401 M Street, SW |
| Carlos Hernandez | Supervisor |
| Henry Lara | Supervisor, Giant Food Building |
| Victor Lobos | Supervisor, Giant Food Building |
| Juan Lopez | Supervisor |
| Javier Marios | Official, Main Office |
| James Matthews | President |
| Alby Mery | Supervisor |
| Denis Parrales | Supervisor |
| Mauricio Portillo | Supervisor |
| Rosa Saravia | Supervisor |
| Antonio _____ (last name currently unknown to Petitioner) | Supervisor |
| Carlos _____ (last name currently unknown to the Petitioner) | Supervisor at 529 14th St., N.W. |
| Floy _____ (last name currently unknown to the Petitioner) | Supervisor at 401 M Street, N.W. |
| Luis _____ (last name currently unknown to Petitioner) | Supervisor |
| Melvin _____ (last name currently unknown to Petitioner) | Supervisor |
| Porfirio _____ (last name currently unknown to Petitioner) | Supervisor |

Sandra _____ (last name currently unknown to Petitioner) Project Manager at 1730 Pennsylvania Avenue, N.W.

Towana _____ (last name currently unknown to Petitioner) Supervisor at 401 M Street, N.W.

As to Victor Lobos and Henry Lara, Respondent claims that they were not USSI supervisory personnel. The record demonstrates, however, that these persons were responsible for supervising USSI employees, granting leave, and transporting workers. Accordingly, Petitioner has made out a substantial case that it will prove Victor Lobos and Henry Lara were supervisory personnel during the relevant period.

20. Petitioner has demonstrated that it has a substantial likelihood of proving or, at the very least, a substantial case on the merits before the Board that:

(a) Respondent, by Mauricio Portillo, at Respondent's 3000 K Street, N.W., Washington DC location:

(1) On or about May 5, 1993, created the impression that Respondent was engaging in the surveillance of employees' activities on behalf of the Union;

(2) On or about May 25, 1993, threatened employees by telling them that their activities on behalf of the Union would result in adverse consequences;

(3) On or about May 25, 1993, told employees they were not allowed to wear union buttons.

(b) On or about May 17, 1993, Respondent by Fernando Becerra at Respondent's 1445 New York Avenue, N.W., Washington, DC location:

(1) Created the impression that Respondent was engaging in the surveillance of employees' activities on behalf of the Union;

(2) Ordered employees to hand over to him union literature and to tell other employees not to sign a union petition;

(3) Verbally promulgated an illegal no solicitation policy by telling employees they could only engage in union activities outside the building;

(4) Told employees to inform him if they heard anything from the Union.

(c) Respondent, by Fernando Garcia:

(1) On or about May 20, 1993, at Respondent's 1331 Pennsylvania Avenue, N.W., Washington, DC location, interrogated employees by telling them he wanted to find out who delivered to the tenant of the building a petition drafted by the Union;

(2) On or about May 25, 1993, at Respondent's 655 15th Street, N.W., Washington, DC location, interrogated employees regarding the petition described above in paragraph 20(c)(1), and threatened employees with written warnings for their refusal to identify the employee who had delivered the petition.

(d) Respondent, by Henry Claros, at Respondent's 529 14th Street, N.W., Washington, DC location:

(1) On or about May 26, 1993, threatened employees by telling them that he was told by Respondent Supervisor Fernando Garcia to inform them they would be discharged if they went on strike again;

(2) On or about May 28, 1993, threatened employees by telling them that Respondent's Vice President Gallagher would not tolerate another strike and that the next time Respondent would fire all of them;

(3) On or about June 1 through 3, 1993, interrogated employees regarding their activities on behalf of the Union.

(e) Respondent, by Antonio Castro at its 1800 Massachusetts Avenue, N.W., Washington, DC location:

(1) On or about July 2, 1993, promulgated and since that time has maintained a rule forbidding employees from talking during their hours of work;

(2) On or about July 8, 1993, interrogated its employees regarding their union membership, activities and sympathies and about the union membership, activities and sympathies of other employees.

(f) Respondent, at its 1420 New York Avenue, N.W., Washington, DC location:

(1) Acting through Luis _____, whose last name is currently unknown to the Petitioner, on or about June 16, 1993, interrogated its employees regarding their union membership, activities and sympathies, and about the

union membership, activities and sympathies of other employees.

(2) Acting through Richard Gallagher and Raul Arroyo, on or about June 16, 1993, engaged in surveillance of employees engaged in union activities.

(g) Respondent, at its 529 14th Street, N.W., Washington, DC location:

(1) Acting through Porfirio _____, whose last name is currently unknown to the Petitioner, on or about July 9, 1993, threatened its employees with discharge because they participated in a strike;

(2) Acting through Henry Claros, at various times in July 1993, interrogated its employees regarding their union membership, activities and sympathies, and about the union membership, activities and sympathies of other employees;

(3) Acting through Henry Claros, at various times in July 1993, created the impression among its employees that their union activities were under surveillance;

(4) Acting through Melvin _____, whose last name is currently unknown to the Petitioner, at various dates in or around July 1993, interrogated its employees regarding their union membership, activities and sympathies, and about the union membership, activities and sympathies of other employees;

(5) Acting through Melvin _____, whose last name is currently unknown to the Petitioner, at various times in or around July 1993, threatened its employees with elimination of part of its operation because they joined the Union and engaged in a strike;

(6) Acting through Juan Lopez, on or about July 6, 1993, interrogated its employees regarding their union membership, activities and sympathies, and about the union membership, activities and sympathies of other employees;

(7) Acting through Henry Claros, in or around early June 1993, interrogated its employees regarding their union membership, activities and sympathies, and about the union membership, activities and sympathies of other employees;

(8) Acting through Henry Claros, in or around early June 1993, promulgated, and

has since maintained a rule forbidding its employees from any and all contact with union representatives;

(9) Acting through Henry Claros, during or around June 1993, interrogated its employees regarding their union activities, membership and sympathies, and about the union activities, membership and sympathies of other employees;

(10) Acting through Henry Claros, at various times between late May 1993 and on or about June 14, 1993, interrogated its employees regarding their union membership, activities and sympathies, and about the union membership, activities and sympathies of other employees.

(11) Acting through Henry Claros, between late May 1993 and on or about June 14, 1993, threatened its employees with discharge if they did not cease their support of the Union.

(12) Acting through Fernando Garcia and Juan Lopez, on or about July 1, 1993, restrained and coerced its employees by telling them they had been permanently replaced because they engaged in a strike to protest unfair labor practices committed by Respondent.

(h) On or about June 30, 1993, Respondent, by Fernando Garcia, at its main facility at 1424 K Street, N.W., Washington, DC, restrained and coerced its employees by telling them they had been permanently replaced because they engaged in a strike to protest unfair labor practices committed by Respondent.

(i) On or about June 18, 1993, Respondent, by Antonio Castro, at its worksite at 1800 Massachusetts Avenue, N.W., Washington, DC location, threatened its employees with transfer if they engaged in a strike.

(j) From on or about June 14, 1993, until on or about July 1, 1993, certain employees of Respondent at worksites at Respondent's 529 14th Street, N.W., and 1331 Pennsylvania Avenue, N.W., Washington, DC locations, ceased work concertedly and engaged in a strike.

(k) From on or about June 18, 1993 to July 1, 1993, certain employees of Respondent

employed at its 1420 New York Avenue, N.W., Washington, DC location, ceased work concertedly and engaged in a strike.

(*l*) From on or about June 22, 1993 to July 1, 1993, certain employees of Respondent employed at its 1800 Massachusetts Avenue, N.W., Washington, DC location, ceased work concertedly and engaged in a strike.

(m) The strikes described above in paragraphs 20(j) through 20(*l*) were caused by Respondent's unfair labor practices described above in paragraphs 20(a) through 20(i) inclusive, and were prolonged by these same unfair labor practices.

(n) On or about July 1, 1993, by letter, the following employees, who had engaged in the strikes described above in paragraphs 20(j) through 20(*l*), made an unconditional offer to return to their former positions of employment:

| | |
|---|---|
| Agustin Barrero | Saul Herrera |
| Juan Bolanos | Santos Juares |
| Maria D. Campos | Jose Osmin Lopez |
| Nelson Canales | Maria Mancia |
| Olga Carranza | Jose Rovira |
| Nemecio Cotzc | Felicita Saravia |
| Rosendo Donis | Jose Saravia |
| Jose Galicias | Alfonso Sorto |
| Milton Guzman | Maria Ester Treminio |
| Alma Hernandez | Rosa Urrutia |
| Maria Hernandez | |

(*o*) Effective July 1, 1993, Respondent failed and refused to offer full and immediate reinstatement to the employees named above in paragraph 20(n), and/or has not returned them to substantially equivalent positions.

(p) On or about October 11, 1993, Respondent, by Jose Cea at Respondent's facility located at 6323 Georgia Avenue, told employees that because they had signed with the Union and gone on strike they were not allowed to work at two buildings.

(q) On or about October 11, 1993, Respondent terminated the employment of Ricardo Diaz and Cristina Diaz its employees, at the 6223 Georgia Avenue facility.

(r) On or about December 13, 1993, Respondent, acting through Carlos _____, whose last name is currently unknown to the Petitioner, at Respondent's facility located at 529 14th Street, NW, told an employee that the employee and other employees had problems because they had engaged in a strike.

(s)(1) On or about November 29, 1993, Respondent, by Sandra _____, whose last name is currently unknown to the Petitioner, issued a written warning to Maria Ester Treminio;

(2) On or about December 7, 1993, Respondent, by Christino Ayala, at Respondent's 1730 Pennsylvania Avenue, NW facility, issued a written warning to Maria Ester Treminio;

(3) On or about December 22, 1993, Respondent terminated the employment of Maria Ester Treminio.

(t) Respondent, by Raul Arroyo:

(1) On or about November 8, 1993, at 1850 M Street, NW, Washington, DC, threatened employees by telling them that after their return from a leave of absence they would be transferred to another building and their current position could not be reserved because they had participated in activity on behalf of the Union;

(2) On or about January 31, 1994, at 1424 K Street, NW, Washington, DC, interrogated employees about their union activity;

(3) On or about January 31, 1994, at 1424 K Street, NW, Washington, DC, informed employees that they had not been transferred because of their participation in activities on behalf of the Union and threatened that other employees who engaged in union activities would eventually be terminated;

(4) On or about February 28, 1994, at 1700 Pennsylvania Avenue, NW, Washington, DC, informed employees that they had been transferred because of their union and/or protected concerted activities.

(u) In or around November and December 1993, and January 1994, Respondent, by Henry Aparicio and Sandra Alfaro, at 655 15th Street, NW, Washington, DC, increased surveillance of employees' work because of their activities on behalf of the Union.

(v) In or around November 1993, Respondent, by Henry Aparicio, at 655 15th Street, NW, Washington, DC:

(1) Told employees that they were being watched more closely because they had engaged in activities on behalf of the Union and threatened that employees could lose their jobs because of their union activities;

(2) Interrogated employees about their union membership and sympathies and threatened employees by saying they could lose their jobs for supporting the Union.

(w) On or about November 22, 1993, Respondent discharged its employee Juan Bolanos.

(x) On or about January 27, 1994, Respondent discharged its employees Maria Campos, Agustin Barrero and Maricruz Sorto.

(y) Respondent engaged in the conduct described above in paragraphs 20(o), 20(q), 20(s), 20(w), and 20(x) because the employees named therein engaged in activities on behalf of, and supported the Union, and in order to discourage employees from engaging in these activities.

(z)(1) In or around January 1994, Respondent's employee Carlos Ipanaque, at 655 15th Street, NW, Washington, DC, concertedly complained to Respondent regarding the wages, hours and working conditions of Respondent's employees, by complaining about the manner in which Respondent was investigating allegations of theft.

(2) On or about February 3, 1994, Respondent transferred its employee Carlos Ipanaque.

(3) On or about February 28, 1994, Respondent, issued a warning to its employee Carlos Ipanaque.

(aa) Respondent engaged in the conduct described above in paragraph 20(z)(2) and (3) because Carlos Ipanaque engaged in the protected concerted conduct described in paragraph 20(z)(1), and to discourage employees from engaging in these or other protected concerted activities, and because Carlos Ipanaque engaged in activities on behalf of, and supported the Union, and in order to discourage employees from engaging in these activities.

(bb) Respondent, at the Giant Food Building in Landover, Maryland:

(1) Acting through Victor Lobos, on or about May 18, 1994, threatened to fire employees because they had gone to Respondent's office wearing union tee shirts;

(2) Acting through Henry Lara, on or about June 6, 1994, informed employee Estela Hernandez, that she was discharged because of her union membership;

(3) On or about June 6, 1994, discharged Estela Hernandez.

(cc) Respondent, at a building which it cleaned at 401 M Street, SW, Washington, DC:

(1) Acting through Towana _____, whose last name is currently unknown to the Petitioner, during May 1994, interrogated employees regarding their interest in the Union;

(2) Acting through Towana _____, whose last name is currently unknown to the Petitioner, on June 7, 1994, and on various other dates, repeatedly threatened to discharge employees because they wore union buttons;

(3) Acting through Walter Hancock, on June 7, 1994, told employees that they could not wear union buttons;

(4) Acting through Walter Hancock, on June 7, 1994, interrogated employees about their union activities;

(5) On or about June 8, 1994, issued Rosa Cristina Flores a written warning because she wore a union button;

(6) On or about June 9, 1994, discharged Rosa Cristina Flores.

(dd) Respondent, at its main office, acting through Fernando Becerra, on or about June 15 or 16, 1994, stated that employees could be fired for wearing union buttons.

(ee) Respondent, at a building which it cleans at 1700 Pennsylvania Avenue, NW, Washington, DC:

(1) Acting through Sandra Aguilar, at various times during March 1994, threatened employees that joining the Union would cause them to lose their jobs;

(2) On or about April 7, 1994, issued a warning to Carlos Ipanaque;

(3) On or about April 26, 1994, issued a warning to Carlos Ipanaque;

(4) On or about April 27, 1994, discharged Carlos Ipanaque.

(ff) Respondent engaged in the conduct described above in paragraphs 20(bb), 20(cc), and 20(ee) because the employees named therein engaged in activities on behalf of, and supported the Union, and in order to discourage employees from engaging in these activities.

21. Petitioner has demonstrated that it has a substantial likelihood of proving or, at the very least, a substantial case on the merits before the Board that, by the acts and conduct set forth in paragraph 20(a) through and including paragraph 20(ff), and by each of those acts, Respondent has interfered with, restrained and coerced and is interfering with, restraining and coercing its employees in the exercise of their rights guaranteed in Section 7 of the Act, and has discriminated and is discriminating in regard to hire, tenure and terms and conditions of employment of employees to discourage membership in the Union, and thereby Respondent has engaged in, and continues to engage in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA.

22. It may be fairly anticipated that unless enjoined, Respondent will continue the acts and conduct above, or similar acts and conduct, in violation of Sections 8(a)(1) and 8(a)(3) of the NLRA, and will continue to interfere with, restrain and coerce employees in the exercise of the rights guaranteed them by Section 7 of the NLRA and to discriminate against employees in regard to their hire or tenure of employment or their terms and conditions of employment to discourage membership in a labor organization. Injunctive relief is warranted to prevent the irreparable destruction of the Union's organizational campaign among the Respondent's employees. Petitioner has demonstrated that it has a substantial likelihood of proving or, at the very least, a substantial case on the merits before the Board that Respondent reacted to its employees attempts to unionize by:

(a) engaging in the serious unfair labor practices alleged in paragraphs 20(a) through 20(ff), including;

(b) discriminatorily discharging union activists Juan Bolanos in November 1993 and Maria Ester Treminio in December 1993, both of whom had been unlawfully denied immediate reinstatement in July 1993 after striking against Respondent;

(c) refusing to transfer and thereby discriminatorily terminating employees Maria Campos, Agustin Barrero and Maricruz Sorto in January 1994, where Respondent linked the action to their participation in a strike;

(d) discriminatorily discharging Ricardo Diaz and Christina Diaz from their second jobs in October 1993, because they had participated in a strike at another Respondent location;

(e) discriminatorily transferring union activist Carlos Ipanaque in February 1994;

(f) discriminatorily discharging Estela Hernandez in May 1994 because of her union membership;

(g) discriminatorily discharging union activist Rosa Cristina Flores in June 1994; and

(h) discriminatorily discharging union activist Carlos Ipanaque in April 1994.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this proceeding, and under Section 10(j) of the NLRA is empowered to grant temporary injunctive relief, 29 U.S.C. § 160(j).

2. Respondent USSI has been, at all times material herein, an employer engaged in commerce within the meaning of Sections 2(2), (6) and (7) of the NLRA, 29 U.S.C. §§ 152(2), (6) and (7).

3. On the basis of the evidence presented and the law, Petitioner has demonstrated that he has a substantial likelihood of success on the merits of his complaints; and that Petitioner and the union will suffer irreparable harm if relief is denied; that Respondent will not suffer substantial harm if injunctive relief is granted; and that the public interest favors the granting of such relief.

4. By the acts and conduct described in Findings of Fact 20(a) through 20(ff), Respondent interfered with, restrained and coerced and is interfering with, restraining and coercing its employees in the exercise of their rights guaranteed in Section 7 of the NLRA, 29 U.S.C. § 157, and has discriminated and is discriminating in regard to hire, tenure and terms and conditions of employment of employees to discourage membership in the Union, and thereby Respondent has engaged in, and continues to engage in, unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(3) of the NLRA, 29 U.S.C. §§ 158(a)(1), (a)(3).

5. To preserve the issues for the orderly determination as provided for in the NLRA, and to avoid the serious consequences set forth above, it is therefore just and proper, for the purposes of effectuating the policies of the NLRA and avoiding substantial, irreparable and immediate injury to such policies of the NLRA, to the employees involved and to the public interest, and in accordance with the remedial purposes and provisions of Section 10(j) of the NLRA, 29 U.S.C. § 160(j), that pending final disposition of the administrative matters involved in NLRB Cases 5–CA–23629, 5–CA–23724, 5–CA–24030, 5–CA–24168, 5–CA–24291, 5–CA–24547 pending before the Board that Respondent be enjoined and restrained from the commission, continuation or repetition of the acts and conduct set forth above in Findings of Fact 20(a) through 20(ff), acts or conduct in furtherance or support thereof, or like or related acts or conduct, the commission of which in the future is likely or may fairly be anticipated from Respondent's acts and conduct in the past.

6. Furthermore, to avoid the serious consequences set forth above, it is just and proper, for the purposes of effectuating the purposes and policies of the NLRA and avoiding substantial, irreparable and immediate injury to those policies, to the employees and the Union involved, and to the public interest, and in accordance with the purposes of Section 10(j) of the NLRA, 29 U.S.C. § 160(j), that pending final disposition of the administrative matters involved in NLRB Cases 5–CA–23629, 5–CA–23724, 5–CA–24030, 5–CA–24168, 5–CA–24291, 5–CA–24547 now pending before the Board, the Respondent be directed, enjoined and restrained as follows:

### ORDER GRANTING TEMPORARY INJUNCTION

This case came to be heard on the Petition of Louis J. D'Amico, Regional Director of Region Five of the National Labor Relations Board, for and on behalf of the Board, for a temporary injunction under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), pending the final adjudication by the National Labor Relations Board of the underlying unfair labor violation claims. The Court, upon consideration of the Petition, the Answer, the supporting documentation, the arguments of counsel, and the entire record in the case, has made and filed its Opinion, Findings of Fact and Conclusions of Law, finding and concluding that Petitioner has demonstrated that it has a substantial likelihood of proving or, at the very least, a substantial case on the merits before the Board that Respondent has engaged in, and is engaging in, acts and conduct in violation of Sections 8(a)(1) and 8(a)(3) of the NLRA, affecting commerce within the meaning of Sections 2(6) and (7) of the NLRA, that such conduct will likely be repeated or continued unless enjoined, and that such conduct will frustrate the purposes of the NLRA by rendering the charged unfair labor violations unremediable.

Now therefore, upon the entire record, it is ORDERED that

1. Respondent United States Service Industries, Inc., its officers, representatives, agents, servants, employees, attorneys, and all persons acting in concert or participation with it or them, at all the Respondent's metropolitan Washington, D.C., service and janitorial contract locations, including those which are obtained during the life of this injunction, and pending the final disposition of the matters involved now pending before the Board, to cease and desist from:

(a) threatening to transfer employees because of their union activities;

(b) threatening to deny employees' requests for transfers, and threatening to

transfer them, because of their union activities;

(c) threatening to deny employees the opportunity to work because of their union activities;

(d) threatening to fire employees if they go on strike or engage in other union activity;

(e) interrogating employees;

(f) telling employees they cannot wear union buttons;

(g) confiscating union literature;

(h) promulgating no-solicitation rules and policies, including forbidding employees to talk during their working hours, and telling employees they could only engage in union activity outside of the Employer's buildings;

(i) telling employees they cannot contact union representatives;

(j) threatening to eliminate portions of the Employer's operations because of employees' union or protected strike activity;

(k) threatening employees and telling employees that the Employer would permanently replace employees because they participate in unfair labor practice strikes;

(l) telling employees to inform supervisors of other employees' union activities, and threatening employees who refuse to do so; surveilling employees, or creating the impression that they are being surveilled;

(m) threatening to fire employees for wearing union buttons and because employees had gone to Respondent's office wearing union tee shirts.

(n) threatening employees that joining the Union would cause them to lose their jobs and telling employees that they are fired because of their union membership.

(o) discharging, transferring or refusing to transfer employees, issuing warnings, or otherwise discriminating against employees because they join, support or assist the Union or because they engage in concerted protected activity; and,

(p) in any other manner interfering with, restraining or coercing employees in the exercise of their Section 7 rights.

2. Affirmatively, requiring Respondent, its officers, representatives, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, at all the Respondent's metropolitan Washington, D.C., service and janitorial contract locations, including those which are obtained during the life of this injunction, and pending the final disposition of the matters involved now pending before the Board, to:

(a) Offer interim reinstatement to employees Juan Bolanos, Maria Ester Treminio, Maria Campos, Agustin Barrero, Maricruz Sorto, Ricardo Diaz, Christina Diaz, Estela Hernandez, Rosa Cristina Flores and Carlos Ipanaque to their former positions, without prejudice to their former seniority or other rights and privileges, displacing, if necessary, any other person(s) hired or reassigned by the Respondent as their replacements, or, if those positions no longer exist, to substantially equivalent positions.

(b) Post copies of this Opinion and Order, both dated November 3, 1994, in English and in Spanish translation: (i) at all buildings and locations where Respondent currently cleans or otherwise provides janitorial services in the Washington, D.C., metropolitan area; (ii) at all future work locations Respondent commences during the term of the Court's Order in this Section 10(j) injunction proceeding; and (iii) at its own offices in the Washington, D.C., metropolitan area. In each case, Respondent shall post copies of this Court's Opinion and Order at locations where employer notices to employees are customarily posted. Such postings shall be maintained during the Board's administrative proceeding, free from all obstructions and defacements. Agents of the Board shall be granted reasonable access to the Respondent's offices, facilities and work locations to monitor compliance with this posting requirement.

(c) Promptly mail copies of the Court's Opinion and Order, both in English and in a Spanish translation approved by the Petitioner, the Regional Director of Region Five of the Board, (i) to all employees alleged as discriminatees, and (ii) to all Respondent's current janitorial employees, and (iii) to all janitorial employees hired while this Order is in effect.

(d) Within twenty (20) days of the issuance of this Order, file with this Court, with a copy to the Petitioner, the Regional Director of Region Five of the Board, an affidavit from a responsible official of Respondent, setting forth with specificity the manner in which Respondent has complied with the terms of Court's decree. The affidavit shall include the exact locations where the documents described in paragraphs (b) and (c) have been posted, and all the names and addresses of the employees to whom copies of the Court's Opinion and Order were mailed.

(e) Inform the Petitioner, the Regional Director of Region Five of the Board, within ten (10) days of the commencement of any and all new metropolitan Washington, DC work, the locations where posting of notices to janitorial employees is permitted by the landlords or owners of those locations, and showing the date of commencement of the Respondent's operations, the exact locations, the mailing addresses and telephone numbers of the locations, and the names, mailing addresses and telephone numbers of the landlords or owners of the locations; and it is

FURTHER ORDERED that this injunction shall remain in effect pending the final adjudication by the National Labor Relations Board in NLRB Cases 5–CA–23629, 5–CA–23724, 5–CA–24030, 5–CA–24168, 5–CA–24291, 5–CA–24547.

SO ORDERED.

Eleanor T. JOHNSON, et al., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.

Civ. A. No. 86–3110–LFO.

United States District Court, District of Columbia.

Nov. 15, 1994.

Allen T. Eaton, W. David Allen, and David T. Smorodin, Eaton, McClellan & Allen, Washington, DC, for plaintiffs.

Fredric H. Schuster and Bruce P. Heppen, Asst. Gen. Counsel—WMATA, Washington, DC, for defendant.

### MEMORANDUM AND ORDER

OBERDORFER, District Judge.

#### I.

On March 20, 1986, Devora Johnson leaped from the train platform at the lower level of the Metro Center subway station. An oncoming subway train struck and killed her. Plaintiffs are Devora's parents. It is undisputed that decedent "assumed the risk and was contributorily negligent by jumping into the path of an oncoming train." *Johnson v. Washington Metro. Area Transit Auth.*, 764 F.Supp. 1568, 1571 (D.D.C.1991) (quoting Memorandum of February 5, 1988, at 19). Plaintiffs argue, however, that the Washington Metropolitan Area Transit Authority ("WMATA") is liable because its train operator, Keister Dixon, had the "last clear chance" to avoid Devora's death.

An Order filed on January 27, 1988 granted defendant's first motion for summary judgment. A Memorandum filed on February 5, 1988 stated the reasons for that Order. A panel of the Court of Appeals reversed and remanded, concluding that (1) conflicting evidence precluded summary judgment on the issue of whether defendant had the "last clear chance" to avoid the injury; and (2) on remand, the District Court should consider whether "the results of the drug tests [given to Dixon after the accident] are probative on the issue of whether [he] behaved wantonly or merely negligently, and if so, whether that relevance is not substantially outweighed by the danger of unfair prejudice." *Johnson v. Washington Metro. Area Transit Auth.*, 883 F.2d 125, 130 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990).

The Court of Appeals affirmed the legal conclusion that plaintiffs' negligence claim "was barred by Devora's assumption of the risk or at least contributory negligence." *Id.* at 128. In deciding the "last clear chance" issue, the Court of Appeals explicitly rejected defendant's claim that "one of the essential

elements of the last clear chance doctrine is that both [decedent's] and defendant's negligence must have placed the decedent in a position of peril." *Id.* at 129. The Court of Appeals also rejected defendant's argument that "the last clear chance doctrine [was] inapplicable in a suicide case." *Id.* at 130. The Court of Appeals nevertheless reversed the summary judgment because of a perceived dispute of material fact as to the extent of the train operator's opportunity to stop the train after decedent jumped and before the train struck her.

Defendant's motion for summary judgment was supported by evidence that "[a]ll the eyewitnesses testif[ied] that the train was from 4 to 20 feet away from her. No witnesses place[d] the train farther than 20 feet from decedent." Memorandum of February 5, 1988, at 12. Included in that evidence was an affidavit by Jo Ann Mary Funderburk, a WMATA employee, who was on the platform when decedent jumped. Funderburk's affidavit stated that "[a]t the time Devora Johnson jumped, she was approximately four (4) feet from the front of the train." Funderburk Aff. ¶ 5. There was no dispute that if the train had been anywhere between 4 and 20 feet away from decedent at the time she jumped, no train operator could have stopped the train before it struck her.

In addition to the testimony about distance, however, two witnesses had testified as to the amount of time between decedent's jump from the platform and the train striking her: one, Ronald Thompson, estimated that 5 to 15 seconds elapsed; another, Ricardo Louis Moore, estimated the interval to be approximately 10 seconds. Plaintiffs' expert witness testified that a reasonably prudent train operator should have been able to stop the train in 10 seconds.

Yet, both Thompson and Moore had given distance estimates that flatly contradicted these time estimates. Moore testified that decedent was only 10–12 feet from the front of the train when she jumped from the platform, and Thompson testified that decedent was no more than 20 feet from the front of the train. Moreover, both Moore and Thompson said that there was not enough time to stop the train before it struck dece-

dent, and Thompson "acknowledged that his estimates of time were . . . less reliable because of the way in which time seems to 'slow[ ] down' when an accident is witnessed." Memorandum of February 5, 1988, at 14. Nevertheless, the Court of Appeals concluded that when viewed "from the point of view most favorable to the Johnsons, [this testimony] support[ed] the conclusion that the train operator had enough time to stop the train without harming their daughter," and thus reversed the granting of summary judgment. *Johnson,* 883 F.2d at 129.

Pursuant to the remand order and the Court of Appeals' suggestions, a Memorandum and Order dated May 22, 1991 denied defendant's second motion for summary judgment, ruling that genuine issues of material fact remained on the "last clear chance" issue and on whether Dixon's conduct proximately caused the accident. *Johnson v. Washington Metro. Area Transit Auth.,* 764 F.Supp. 1568, 1583 (D.D.C.1991). By denying defendant's motion for summary judgment, the Order followed the Court of Appeals' decision and necessarily decided that the "last clear chance" doctrine did not require decedent's initial position of peril to be caused by the negligence of both plaintiffs' decedent and defendant.

Nine days later, on May 31, 1991, a different panel of the Court of Appeals decided *Andrews v. Wilkins,* 934 F.2d 1267 (D.C.Cir. 1991). *Andrews* stated explicitly that the first element of the "last clear chance" doctrine is "that plaintiff was in a position of danger caused by negligence of both plaintiff and defendant." *Id.* at 1272 (quoting *Queen v. Washington Metro. Area Transit Auth.,* 842 F.2d 476, 481 (D.C.Cir.1988) (in turn quoting *Washington Metro. Area Transit Auth. v. Jones,* 443 A.2d 45, 51 (D.C.1982))). *Andrews* did not cite *Johnson.*

Confronted with this apparent conflict, defendant filed a motion for a certificate that would authorize a petition for leave to file an interlocutory appeal. Based on the possibility of an intra-circuit split between *Johnson,* 883 F.2d 125 (D.C.Cir.1989) and *Andrews,* 934 F.2d 1267 (D.C.Cir.1991) on the issue of whether the "last clear chance" doctrine required plaintiffs to show that decedent's ini-

tial position of peril was caused by the negligence of both plaintiffs' decedent and defendant, a Memorandum and Order dated September 10, 1991, 773 F.Supp. 459, granted defendant's motion for a certificate.

With this certificate, defendant petitioned the Court of Appeals for leave to file an interlocutory appeal. A panel of the Court of Appeals denied the petition. Despite the fact that the May 22, 1991 Memorandum and Order, 764 F.Supp. 1568, necessarily followed *Johnson* and decided that the "last clear chance" doctrine did not require decedent's initial position of peril to have been caused by the negligence of both plaintiffs' decedent and defendant, the Court of Appeals concluded: "we cannot address this matter absent a district court order resolving the [certified] questions.... Should the district court enter a proper order, this court may then consider the merits of this matter." *Johnson v. Washington Metro. Area Transit Auth.*, No. 91–8035, Order (D.C.Cir. Nov. 4, 1991) (citing *Ray v. American Nat'l Red Cross*, 921 F.2d 324, 325–26 (D.C.Cir.1990) (per curiam)) [1].

A subsequent Memorandum dated December 20, 1991 spelled out more fully the grounds for the denial of defendant's summary judgment motion, noting that "the *Johnson* opinion correctly interpreted the District of Columbia precedents" and in any case, that a district court is "bound by the law of the case as stated by the *Johnson* panel unless and until the entire Court of Appeals had at least informally approved a departure from that mandate." *Johnson v. Washington Metro. Area Transit Auth.*, 790 F.Supp. 1174, 1176–77 (D.D.C.1991) (citing *Irons v. Diamond*, 670 F.2d 265, 268 n. 11 (D.C.Cir.1981)). The accompanying Order

re-granted defendant's motion for certification. *Johnson v. Washington Metro. Area Transit Auth.*, 790 F.Supp. 1174 (D.D.C. 1991).

The defendant petitioned again for leave to file an interlocutory appeal. A different panel of the U.S. Court of Appeals denied that petition. *Johnson v. Washington Metro. Area Transit Auth.*, No. 91–8039, Order (D.C.Cir. Feb. 24, 1992). In its entirety, the Order stated:

> Upon consideration of the petition for leave to file an interlocutory appeal, the answer thereto and the reply, it is
>
> ORDERED that the petition for leave to file an interlocutory appeal be denied. Concerning the application of the last clear chance doctrine, the law of the case governs here. *See Johnson v. Washington Metro. Area Transit Authority*, 883 F.2d 125 (D.C.Cir.1989).

Two and a half months later, on April 9, 1992, the full Court of Appeals denied WMATA's suggestion for a rehearing *en banc*. On the same day, the panel that denied the petition for leave to file an interlocutory appeal amended its February 24, 1992 Order by deleting "all text after the word 'denied.' in the ordering paragraph." Because the panel "denied permission for an interlocutory appeal, the panel had no authority to instruct the district court concerning further proceedings in this case." *Johnson v. Washington Metro. Area Transit Auth.*, No. 91–8039, Order (D.C.Cir. Apr. 9, 1992).[2]

Trial then commenced on December 9, 1992. Ronald Thompson's trial testimony contradicted his deposition testimony. He

---

**1.** "[T]he basic requirement of an interlocutory appeal under [section] 1292(b) is that the district court have made an order. The statute does not contemplate that a district judge may simply certify a question without first deciding it." *Ray* at 325 (quoting C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3930, at 156 (1977)).

**2.** Ambrose Bierce's "Fantastic Fables" told of:
An Associate Justice of the Supreme Court [who] was sitting by a river when a Traveler approached and said:
"I wish to cross. Will it be lawful to use this boat?"

"It will," was the reply; "it is my boat."
The Traveler thanked him, and pushing the boat into the water embarked and rowed away. But the boat sank and he was drowned.
"Heartless man!" said an Indignant Spectator. "Why did you not tell him that your boat had a hole in it?"
"The matter of the boat's condition," said the great jurist, "was not brought before me."
Ambrose Bierce, *Fantastic Fables*, in *Collected Works of Ambrose Bierce* 6:294 (1911) (quoted in Fred R. Shapiro (ed.), *The Oxford Dictionary of American Legal Quotations* (1993)).

said that decedent was on the tracks for no more than five seconds between the time she jumped and the accident. While he acknowledged his deposition testimony of ten seconds, he stated that in retrospect it could not have been ten seconds. His deposition testimony was then admitted into evidence as a prior inconsistent statement. Transcript of Trial, Volume II, December 9, 1992, at 53–57.

Between the time of Ricardo Louis Moore's deposition testimony and the trial, Moore passed away. Pursuant to Federal Rule of Civil Procedure 32(a)(3)(A), his deposition testimony was read into the record. His testimony stated that the time between the decedent's jump and when she was hit was approximately 10 seconds, maybe 5 seconds more. Transcript of Trial, Volume II, December 9, 1992, at 154.

At trial, Jo Ann Mary Funderburk testified for plaintiffs about the time between decedent's jump and when she was hit, and was then cross-examined particularly about her affidavit of November 25, 1987. When asked at trial whether the train had entered the station when decedent jumped onto the tracks, Funderburk said, "No." Transcript of Trial, Volume IV, December 11, 1992, at 368. She was then asked specifically whether she knew "how long in seconds [decedent] was on the track." She replied that she did not. *Id.* at 370. At that point, plaintiffs' counsel showed Funderburk a two-page unsworn statement that she had written on March 23, 1986, three days after the accident. Funderburk read the statement to herself. Counsel then asked Funderburk whether, having read the statement, she recalled how long it was that decedent was on the tracks. Funderburk replied, "I really don't remember, but it was very short, very short." *Id.* at 372–73. Counsel then asked the witness to read the relevant section of the statement aloud as a past recollection recorded pursuant to Federal Rule of Evidence 803(5).[3] From the statement, Funderburk read aloud: "I turned my head and started screaming and crying. About thirty

seconds elapsed when she first jumped and the time that the train hit her. She could have saved herself." *Id.* at 374.

On cross-examination, defendant's counsel asked Funderburk to read to herself a different unsworn statement that she had written, this one written on March 20, 1986, immediately after the accident. Defendant's counsel then asked Funderburk whether, having read that statement, she recalled how far the train was from decedent when she jumped. Funderburk replied, "No, I can't. Like I said before, I can't tell you." *Id.* at 377. Defendant's counsel then asked Funderburk to read the statement aloud in order to refresh her recollection. She testified: "Black lady in black—brown long coat and heels, at 8:49 walked to the edge of the platform, took small jump onto track and laid down. Train could see or hear us screaming because it was about four feet away."

Still cross-examining, defendant's counsel then asked Funderburk to read to herself her sworn affidavit dated November 22, 1987, about a year and a half after the accident. Counsel then asked her to read aloud what the affidavit said about decedent's distance from the train when she jumped onto the tracks. Funderburk testified: "At the time Devora Johnson jumped, she was approximately four feet from the front of the train." *Id.* at 379.

On redirect, plaintiffs' counsel asked Funderburk whether she disagreed with her affidavit. The testimony was as follows:

Q. And you disagree with [the affidavit]; is that correct?

A. I disagree with that four-hour thing, that four-hour thing, four minute thing—four seconds.

The Court: Four minutes?

Plaintiffs' counsel: Four whatever.

The Court: Four feet.

---

3. The unsworn statement was eventually admitted into evidence. Transcript of Trial, Volume IV, December 11, 1992, at 383–84. According to Fed.R.Evid. 803(5), the statement itself may not be admitted into evidence unless offered by an adverse party. Since Funderburk was plaintiff's witness at trial, it may have been a mistake to admit the unsworn statement into evidence; however, there was no objection from defendant's counsel to the statement's admission.

The Witness: Four feet, yes.

*Id.* at 384–85.

On recross-examination, defense counsel again asked Funderburk to read to herself the statement of March 20, 1986, which she had made immediately after the accident. Defendant's counsel asked whether Funderburk had written the statement based upon what she had observed at the accident. She replied, "I wrote the statement after I was brought down to show them where the body were [sic]—where I saw her jump."

On reredirect, plaintiffs' counsel asked Funderburk whether she (Funderburk) was "about four feet away screaming at that point in time when [the train] hit [decedent]." Funderburk stated, "I was, yes, I was four feet away." Confronted with the testimony of Moore, Thompson and Funderburk, the jury was unable to reach a unanimous verdict after extended deliberations. On December 18, 1992, I declared a mistrial.

A second trial was scheduled to commence on September 17, 1993. At that time, a case was pending in the Court of Appeals involving the question of the proper elements of the "last clear chance" doctrine. *Belton v. Washington Metro. Area Transit Auth.,* No. 92–7248. At the request of defendant and with the consent of plaintiffs, the second trial was continued pending a decision in *Belton.* The Court of Appeals decided *Belton* on April 22, 1994. *Belton v. Washington Metro. Area Transit Auth.,* 20 F.3d 1197 (D.C.Cir. 1994). Based on *Belton,* defendant now moves for summary judgment for the third time.

### II.

The *Belton* decision effectively embraced the *Andrews* ruling that the first element of the "last clear chance" doctrine is that the plaintiff's initial position of danger be caused by the negligence of both plaintiff and defendant. The *Belton* Court thereby rejected the *Johnson* precedent with the observation that "[t]he D.C. Court of Appeals' later decision in [*Robinson v. District of Columbia,* 580 A.2d 1255 (D.C.1990) ] ... restated the District's adherence to the requirement, undermining whatever force *Johnson* might have as an interpretation of D.C. law." *Belton,* 20 F.3d at 1200. *Belton* further confirmed that it is the law as articulated by District of Columbia courts that determines what that requirement means. *Id.*

■ A reasonable trier of fact, applying *Belton* and District of Columbia precedents, could find that plaintiffs' claim, that Dixon failed to stop the train in time due to the influence of illegal drugs, satisfies this requirement. For example, plaintiffs may be able to show that Dixon came under the influence of drugs, and that defendant negligently allowed him to operate the train before decedent placed herself in danger by jumping onto the track. On this theory of the facts, a trier of fact could conclude that decedent "was in a position of danger caused by the negligence of both [plaintiffs' decedent] and defendant," and thus, the District of Columbia's "last clear chance" doctrine, as stated in *Belton,* could come into play.

■ However, even if plaintiffs established such negligence on defendant's part, an issue would remain as to whether that negligence was a proximate cause of decedent's death. For the evidence may show that even a drug-free train operator could not have stopped the train in time to avoid the accident. But the issue of proximate cause is material and factual, and the mandate in this case requires its trial.

### III.

Defendant further argues that the last clear chance doctrine is not applicable to an assumption of risk defense, but rather is only applicable to a contributory negligence defense. Since it has already been determined not only that decedent was contributorily negligent but also that she assumed the risk, *see Johnson v. Washington Metro. Area Transit Auth.,* 764 F.Supp. 1568, 1571 (D.D.C.1991), defendant argues that summary judgment should be granted even if plaintiffs could establish that defendant had the last clear chance to avoid the fatal injury suffered by the decedent.

Whether the last clear chance doctrine can bar an assumption of risk defense appears to be a question of first impression in the Dis-

trict of Columbia.[4] In fact, there appear to be very few cases in other jurisdictions that directly address the issue. Defendant has cited to a California case for the proposition that the "last clear chance" doctrine does not apply to an assumption of risk defense. *See Boyles v. Hamilton,* 235 Cal.App.2d 492, 45 Cal.Rptr. 399, 404 (1965). By contrast a Louisiana court has explicitly applied the "last clear chance" doctrine to trump an assumption of risk defense. *See Litton v. Travellers Ins. Co.,* 88 F.Supp. 76, 83 (W.D.La.1950). Neither *Boyles* nor *Litton* provide a careful analysis of the issue.

The lack of authority on this question may be due partly to the ever-present confusion surrounding the terms "assumption of risk" and "last clear chance." "Assumption of risk" is a confused term because it is used to mean many different things. The Restatement, for example, lists four different meanings. Restatement (Second) of Torts § 496A, comment c (see Appendix attached hereto).

■ The defense of "assumption of risk" is ordinarily available to a defendant when a plaintiff voluntarily incurs a known risk. *District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.1987). Ordinarily, this means a *voluntary* exposure to a *reasonable* risk, such as the risk taken by a spectator who enters a baseball park. The spectator "may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by the ball." Restatement (Second) of Torts § 496A, comment c.

■ This meaning of "assumption of risk" contrasts with the defense of "contributory negligence." "Contributory negligence" does not require actual knowledge of any danger, and hence does not ordinarily involve voluntariness. *See Queen v. Washington Metro. Area Transit Auth.,* 842 F.2d 476, 478 (D.C.Cir.1988). It simply requires *unreasonable* conduct on the part of the plaintiff.

■ There is, however, a hybrid concept that melds "assumption of risk" with "contributory negligence," a *voluntary* exposure to an *unreasonable* risk. *See Scoggins v. Jude,* 419 A.2d 999, 1004 (D.C.1980). It is in this sense that decedent here "assumed the risk" when she jumped in front of an oncoming train. *See* Memorandum of February 5, 1988, at 19 (decedent "unreasonably and voluntarily encounter[ed] a known risk").

■ Following the Restatement, *see* Restatement (Second) of Torts § 496A, comment c, ¶ 4, the District of Columbia courts have "classified this hybrid ... as a type of contributory negligence," and explicitly subsume the analysis of this type of circumstance under "contributory negligence." *See Mitchell,* 533 A.2d at 639. While this case presents facts that differ slightly from cases involving an ordinary contributory negligence defense, District of Columbia cases say that this "concept of 'assumption of risk' overlaps with contributory negligence and amounts to the same defense." *Janifer v. Jandebeur,* 551 A.2d 1351, 1352 (D.C.1989) (citing *Scoggins,* 419 A.2d at 1004–05). It would seem to follow, therefore, that in this jurisdiction a plaintiff who voluntarily assumes an unreasonable risk, like a contributorily negligent plaintiff, could prevail by showing that defendant had the last clear chance to avoid, for example, a fatal collision.

Moreover, the only additional element involved in finding that decedent "assumed the risk" (rather than simply acted in a contributory negligent manner) in this case is the voluntariness of decedent's actions. That voluntariness arose from her attempt to commit suicide. Defendant's argument that the last clear chance doctrine is inapplicable to an assumption of risk defense in this case would thus necessarily imply that there is a suicide exception to the last clear chance doctrine. But, as noted above, the *Johnson* court explicitly rejected that exception, and

**4.** Since this is a question of District of Columbia law, it might seem appropriate to certify it to the District of Columbia Court of Appeals. The District of Columbia Code authorizes the District of Columbia Court of Appeals to "answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or the highest appellate court of any State"; however, the D.C.Code apparently does not permit the District of Columbia Court of Appeals to answer questions certified by a federal District Court. D.C.Code § 11–723(a).

this aspect of its ruling is undisturbed. *See supra* page 1104.

Furthermore, subsequent to the initial determination that decedent legally "assumed the risk" by jumping off the platform, the Court of Appeals reversed and remanded this case without upsetting the legal determination that she had "assumed the risk." *Johnson v. Washington Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C.Cir.1989). If a finding that decedent assumed the risk had precluded consideration of the last clear chance doctrine, the Court of Appeals presumably would not have remanded, but would have affirmed the initial grant of summary judgment on the ground that decedent assumed the risk, so that plaintiffs could not recover irrespective of who had the last clear chance to avoid the ultimate impact.

### III.

■ There remains another possible issue: whether the dispute about material facts discovered by the Court of Appeals when it reversed the first grant of summary judgment was resolved, or resolvable, in the live testimony adduced at trial which resulted in a mistrial, i.e. whether anyone, drugged or drug-free, could have stopped the train before it struck decedent. The parties' post-trial briefs and transcript references persuade me that *at least* a preponderance of evidence establishes that no one could have stopped the train in time to save the decedent. But substantially the same evidence, buttressed by the trial testimony of Jo Ann Mary Funderburk, about the time available to the train operator to stop the train that persuaded the Court of Appeals to reverse the first summary judgment remains. *Johnson v. Washington Metro. Area Transit Auth.*, 883 F.2d 125, 128–29 (D.C.Cir.1989). That evidence precludes granting of the defendant's renewed motion. That issue must again go to the jury guided by instructions to be framed in accordance with this opinion and appellate guidance.

Accordingly, it is this 15th day of November, 1994, hereby

ORDERED: that defendant's Third Motion for Summary Judgment should be, and is hereby, DENIED; and it is further

ORDERED: that a pretrial conference will be held on *January 13, 1995 at 10:00 a.m.* in Courtroom No. 3.; and it is further

ORDERED: that a jury trial will commence on *January 18, 1995 at 10:00 a.m.* in Courtroom No. 3 for *five* days.

### APPENDIX

Restatement (Second) of Torts § 496A, comment c.

c. *Meanings of assumption of risk.* "Assumption of risk" is a term which has been surrounded by much confusion, because it has been used by the courts in at least four different senses, and the distinctions seldom have been made clear. These meanings are as follows:

1. In its simplest form, assumption of risk means that the plaintiff has given his express consent to relieve the defendant of an obligation to exercise care for his protection, and agrees to take his chances as to injury from a known or possible risk. The result is that the defendant, who would otherwise be under a duty to exercise such care, is relieved of that responsibility, and is no longer under any duty to protect the plaintiff. As to such express assumption of risk, see § 496B.

2. A second, and closely related, meaning is that the plaintiff has entered voluntarily into some relation with the defendant which he knows to involve the risk, and so is regarded as tacitly or impliedly agreeing to relieve the defendant of responsibility, and to take his own chances. Thus a spectator entering a baseball park may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by the ball. Again the legal result is that the defendant is relieved of his duty to the plaintiff. As to such implied assumption of risk, see § 496C.

3. In a third type of situation the plaintiff, aware of a risk created by the negligence of the defendant, proceeds or continues voluntarily to encounter it. For example, an independent contractor who finds that he has been furnished by his employer with a machine which is in dangerous condition, and

that the employer, after notice, has failed to repair it or to substitute another, may continue to work with the machine. He may not be negligent in doing so, since his decision may be an entirely reasonable one, because the risk is relatively slight in comparison with the utility of his own conduct; and he may even act with unusual caution because he is aware of the danger. The same policy of the common law which denies recovery to one who expressly consents to accept a risk will, however, prevent his recovery in such a case. As to such implied assumption of risk, see § 496C. As to the necessity that the plaintiff's conduct be voluntary, see § 496E.

4. To be distinguished from these three situations is the fourth, in which the plaintiff's conduct in voluntarily encountering a known risk is itself unreasonable, and amounts to contributory negligence. There is thus negligence on the part of both plaintiff and defendant; and the plaintiff is barred from recovery, not only by implied consent to accept the risk, but also by the policy of the law which refuses to allow him to impose upon the defendant a loss for which his own negligence was in part responsible. (See § 467.)

John J. ADAIR, Inspector General of the Resolution Trust Corporation, Petitioner,

v.

ROSE LAW FIRM, A Professional Association, Respondent.

Misc. No. 94–0278 PLF.

United States District Court, District of Columbia.

Nov. 16, 1994.

John H. Korns and Paul M. Laurenza from Pettit & Martin, Washington, DC, Patricia M. Black from Office of the Inspector General, Rosslyn, VA, for petitioner.

Walter B. Stuart, C. Michael Buxton and Alden L. Atkins from Vinson & Elkins, L.L.P., Washington, DC, for respondent.

## OPINION AND ORDER

FRIEDMAN, District Judge.

This case is before the Court on the Petition of the Inspector General of the Resolu-

tion Trust Corporation For Summary Enforcement of an Administrative Subpoena Duces Tecum and the Motion of Respondent Rose Law Firm for a Protective Order. The Court has determined that the subpoena should be enforced, as narrowed by the Petition and the representations of counsel that Rose may produce a list of Rose's clients for the relevant period and need not produce the other client-identifying documents originally sought. In view of the revised Confidentiality Undertaking and the additional protections now offered by the Inspector General, the Court denies Rose's Motion for a Protective Order.

## I. BACKGROUND

■ In response to the savings and loan imbroglio, Congress created the Resolution Trust Corporation in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). 12 U.S.C. §§ 1441a(b), 1811 et seq. The RTC acts as receiver for failed thrifts and succeeds to the entirety of each association's rights, assets and obligations. 12 U.S.C. §§ 1821(d)(2)(A), (B).[1] FIRREA requires the RTC to maximize the net present value of thrift assets, minimize the impact of its transactions on local real estate and financial markets, make efficient use of government funds and minimize any loss from resolution of cases. 12 U.S.C. § 1441a(b)(3)(C). To facilitate the completion of the RTC's duties, FIRREA authorizes the RTC to contract with private law firms and others in the private sector to obtain services. 12 U.S.C. § 1441a(b)(10)(A).

Since 1989, the Rose Law Firm has entered several legal service agreements with the Federal Deposit Insurance Corporation and the RTC to provide them with legal services with respect to a number of failed thrift institutions; and it continues to repre-

sent the RTC. Declaration of John J. Adair, RTC Inspector General ("Adair Decl.") ¶ 4; Declaration of Clark W. Blight, Assistant Inspector General for Investigation ("Blight Decl.") ¶ 5; Second Affidavit of Ronald M. Clark, chief operating officer of Rose ("Clark Aff.") ¶¶ 4, 5. These service agreements, as well as retainer letters, FDIC and RTC guidelines and policies, and RTC regulations, 12 C.F.R. Part 1606, imposed obligations on Rose to disclose, and to certify that it had disclosed, all actual or potential conflicts of interest to the FDIC and the RTC. Blight Decl. ¶ 6.[2] Rose certified that it had found no conflicts of interest that had not already been waived. Adair Decl. ¶ 4; Blight Decl. ¶ 6.

In addition to retaining Rose for other engagements, the FDIC retained the firm to represent the interests of the FDIC and later the RTC as conservator of Madison Guaranty Savings and Loan Association in litigation against Frost & Company, an accounting firm. Adair Decl. ¶ 5. Clark Aff. ¶ 6. In 1993, allegations surfaced that Rose had not disclosed actual or potential conflicts in this matter. Adair Decl. ¶ 5; Blight Decl. ¶ 7; Clark Aff. ¶ 7. The RTC's Office of Contractor Oversight and Surveillance ("OCOS") reviewed the allegations and issued a report on February 8, 1994. The FDIC Legal Division also issued a report regarding conflict of interest issues on February 17, 1994. Adair Decl. ¶ 6; Blight Decl. ¶ 8.

During a hearing before the Senate Committee on Banking, Housing and Urban Affairs on February 24, 1994, certain Senators criticized the FDIC and RTC reports and requested that the Inspector General of the RTC conduct an independent investigation of the matters addressed by the OCOS report. Adair Decl. ¶ 7; Blight Decl. ¶ 9. On March

---

1. See also 12 U.S.C. § 1441a(b)(4)(A) (granting RTC "the same powers and rights to carry out its duties" as the Federal Deposit Insurance Corporation has under 12 U.S.C. §§ 1821–1823).

2. The actual or potential conflicts that Rose was required to disclose include participation of any partner or associate of the firm as a director or officer of any insured institution that has failed or that is the subject of any ongoing supervisory action; representation of an officer, director,

debtor, creditor or stockholder of any failed or assisted institution in a matter related to the FDIC or RTC; representation of a creditor whose claim competes with that of the FDIC or RTC; the existence of any outstanding loans from a failed institution on which any partner or associate of the firm is a borrower or guarantor; and representation of a client in a matter adverse to the FDIC or RTC. Blight Decl. ¶ 6.

2, 1994, John E. Ryan, Deputy CEO of the RTC, sent a formal request to the Inspector General of the RTC to conduct such an investigation. Adair Decl. ¶ 8; Blight Decl. ¶ 10.

The IG immediately initiated an investigation of the Rose Law Firm to determine whether Rose had failed to disclose to the FDIC and later the RTC any actual or potential conflicts of interest on matters for which it was retained by the FDIC or the RTC; whether any such failures violated any laws, regulations, agreements, guidelines or policies; and whether the FDIC and the RTC properly conducted their review of any such conflicts. Adair Decl. ¶¶ 9–10; Blight Decl. ¶ 11. Under the Inspector General Act, the IG must report his findings and recommendations to the head of the RTC, to the Congress and, if he believes there has been a violation of criminal law, to the Attorney General. 5 U.S.C.App. 3 §§ 4(d), 5.

As a first step in its investigation, the IG sought to identify conflicts of interest by reviewing and comparing the identities of Rose's clients against the records of the RTC and of the failed institutions for which Rose provided legal services. Adair Decl. ¶ 11; Blight Decl. ¶ 13. On April 18, 1994, the IG issued a subpoena duces tecum to the Rose Law Firm for information regarding the firm's clients. The subpoena demanded the production of

> [a]ny documents listing the names of any individual, partnership, corporation, association or other person or entity to whom the Rose Law Firm ... provided legal services at any time or from time to time during the period from January 1, 1985 through April 15, 1994. The documents to be produced may consist of a single list, or multiple lists, identifying clients during such period.

Rose failed to produce the documents requested, and the IG petitioned this Court to enforce its subpoena.

On September 8, 1994, Respondent moved the Court to transfer the case to the United States District Court for the Eastern District of Arkansas. Rose argued that an evidentiary hearing was required to determine whether the subpoena was too burdensome and whether the IG issued the subpoena for an improper purpose. Rose claimed that the witnesses and documents regarding those issues are located in Little Rock and urged the Court to transfer the case there for the convenience of the parties and witnesses. Rose's burdensomeness argument was based on its conviction that it would have to produce all documents containing client names to satisfy the subpoena. This argument was undermined when the IG assured Rose that it could respond to the subpoena by producing a client list or lists and no other documents.

The Court denied Respondent's motion to transfer. It noted that a subpoena enforcement action is a summary proceeding and found that Respondent had failed to prove that "extraordinary circumstances" existed that would justify an evidentiary hearing. *See FTC v. Invention Submission Corp.,* 965 F.2d 1086, 1091 (D.C.Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993). The Court concluded that Rose could use affidavits rather than the testimony of witnesses to address the issue of burdensomeness. The Court also rejected Rose's argument that improper political pressure from members of Congress induced the IG to initiate the investigation that led to the issuance of the subpoena. The Court found that Rose had failed to make the required threshold showing that members of Congress exerted undue influence or control over the IG's investigation that caused the IG to initiate the investigation or issue the subpoena in bad faith or for improper purposes. *See FTC v. Invention Submission Corp.,* 965 F.2d at 1091; *United States v. Aero Mayflower Transit Co., Inc.,* 831 F.2d 1142, 1145–47 (D.C.Cir.1987).

On October 7, 1994, Petitioner and Respondent entered into a Memorandum of Understanding that describes how the Rose Law Firm may comply with the subpoena by providing client lists and no other documents. Appendix A. The Memorandum specifies the client lists that Rose will provide if the Court enforces the subpoena. As a result, Respondent has abandoned its burdensomeness argument and has submitted no affidavits regarding the onerousness of complying with the subpoena.

## II. DISCUSSION

In opposing the IG's petition, the Rose Law Firm argues that the Inspector General's subpoena exceeds his statutory authority. Rose also argues that if the Court enforces the subpoena, the Court should grant its motion for a protective order, which would more closely control the IG's use of the subpoenaed information than the Confidentiality Undertaking the IG has offered.

### A. The Subpoena Was Within The Authority Of The Inspector General

■ In enforcing an administrative subpoena, the Court's role is limited to determining whether the subpoena is issued for a lawful purpose within the statutory authority of the agency that has issued it, whether the demand is sufficiently definite and not unduly burdensome, and whether the subpoena seeks information reasonably relevant to the agency's investigation. *RTC v. Walde,* 18 F.3d 943, 946 (D.C.Cir.1994); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC,* 5 F.3d 1508, 1513 (D.C.Cir.1993); *FTC v. Invention Submission Corp.,* 965 F.2d at 1089. Rose does not oppose the IG's subpoena on the grounds that it seeks irrelevant information, that it is indefinite or that it is unduly burdensome. Respondent does assert, however, that the IG's investigation exceeds his statutory authority.[3]

■ Rose argues that the Inspector General Act, by its language and legislative history, limits Inspectors General to investigating only the internal operations of federal departments and agencies. It maintains that the IG's investigation should be limited in its scope to determining whether the RTC properly conducted its review of any conflicts of interest and should not extend to a *de novo* review of any potential or actual conflicts that Rose may have had that were not considered by the OCOS. The Court disagrees.

The Inspector General Act grants Inspectors General authority to conduct investigations and audits:

It shall be the duty and responsibility of each Inspector General ... to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of [the agency].

5 U.S.C.App. 3 § 4(a)(1). Respondent argues that "relating to the programs and operations of" the agency is limiting language that restricts the IG to internal investigations of the agency's own conduct. The Court does not accept this construction of the statute and finds the "relating to" language a broad grant of authority rather than a limitation. This language is expansive enough to extend the IG's authority beyond investigations of the agency·itself to investigations of individuals and entities outside the agency involved with an agency's programs. Furthermore, other sections of the Inspector General Act clarify, if clarification is needed, that the IG's authority extends to conducting audits and investigations of programs that the agency finances, including investigations into alleged fraud, abuse and waste by government contractors and other recipients of government funds in connection with those programs.

Section 2 of the Inspector General Act states that the purpose for the creation of independent offices of Inspectors General in various agencies was to provide "independent and objective units ... to conduct and supervise audits and investigations relating to the programs and operations of" such agencies and "to provide leadership and coordination and recommend policies for activities designed ... to prevent and detect fraud and abuse in, such programs and operations...." 5 U.S.C.App. 3 § 2. Sections 4(a)(2) through 4(a)(5) grant to Inspectors General the responsibility for conducting reviews and making recommendations regarding fraud, abuse and waste in programs administered or financed by the agency. 5 U.S.C.App. 3 §§ 4(a)(2)–(a)(5). Section 5 requires the IG to prepare reports regarding its activities, including its findings regarding fraud, abuse

---

**3.** As noted, the issue of burdensomeness was resolved when the IG made it clear that Rose could comply with the subpoena by providing a client list to the IG and no other documents. In a footnote in its Reply Memorandum, Rose once again argues that improper political pressure caused the IG to initiate the investigation. Rose has failed to present any additional facts that would convince the Court to change its earlier rejection of this argument.

and waste in programs of the agency. 5 U.S.C.App. 3 § 5.

It is obvious that the IG could not fulfill many of its responsibilities under sections 4(a)(2) through 4(a)(5) and section 5 of the Act, as well as under section 4(a)(1), without investigating fraud, abuse and waste by *both* the agency administering and financing the program *and* the participants in the program. The "relating to" language of Section 4(a)(1) is extremely broad, and it is given context by these other sections of the Act. The Court therefore finds that the investigatory authority granted by section 4(a)(1) necessarily extends to investigations of fraud, waste and abuse by government contractors and other recipients of government funds under or relating to programs of a Department or agency.

The legislative history of the Act also makes plain that Congress intended the IG's investigatory authority to extend to the investigation of recipients of government funding as well as to government agencies themselves. Congress enacted the Inspector General Act in part because of revelations of significant corruption and waste in the operations of the federal government and among government contractors, government grantees and other recipients of federal funds. S.Rep. No. 1071, 95th Cong., 2d Sess. 4 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2679, 2683. In justifying the need for subpoena power, the Senate Report stated that Inspectors General are to investigate both an agency's "internal operations and its federally-funded programs" and that the IG should identify "perpetrators of programmatic fraud." 1978 U.S.C.C.A.N. at 2702. The Senate Report also stated:

> Subpoena power is absolutely essential to the discharge of the Inspector and Auditor General's functions. There are literally thousands of institutions in the country which are somehow involved in the receipt of funds from Federal programs. Without the power necessary to conduct a comprehensive audit of these entities, the Inspector and Auditor General could have no serious impact on the way federal funds are expended....

> The committee does not believe that the Inspector and Auditor General will have to resort very often to the use of subpoenas. There are substantial incentives for institutions that are involved with the Federal Government to comply with requests by an Inspector and Auditor General. In any case, however, knowing that the Inspector and Auditor General has recourse to subpoena power should encourage prompt and thorough cooperation with his audits and investigations.

1978 U.S.C.C.A.N. at 2709. *See also United States v. Aero Mayflower Transit Co., Inc.,* 831 F.2d at 1145.

Representative Levitas, one of the co-sponsors of the Act, explained the IG's intended role:

> [T]he Offices of Inspector General would not be a new "layer of bureaucracy" to plague the public. They would deal exclusively with the internal operations of the departments and agencies. *Their public contact would only be for* the beneficial and needed purpose of receiving complaints about problems with agency administration and in *the investigation of fraud and abuse by those persons who are misusing or stealing taxpayer dollars.*

124 Cong.Rec. 10,405 (1978) (emphasis added). As the co-sponsor of the Act, Representative Levitas's remarks "are an authoritative guide to the statute's construction." *North Haven Board of Education v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982). Representative Levitas's statement and the Senate Report demonstrate that Congress understood the Act to give the Inspectors General the authority to investigate recipients of federal funds, such as government contractors, who may have misused or stolen the funds through fraud, abuse or waste.

■ Rose argues, however, that the IG's authority is not boundless and that it is expressly limited by sections 8G(b) and 9(a)(2) of the Inspector General Act. Both sections provide that in establishing an Office of Inspector General, the agency head may not transfer to the IG "any program operating responsibilities." 5 U.S.C.App. 3 §§ 8G(b), 9(a)(2). Just as the agency head

may not transfer such responsibilities to the IG, reciprocally, Respondent argues, the IG may not usurp the agency's program operating responsibilities. Rose asserts that one of the RTC's program operating responsibilities is determining whether its contractors have any conflicts of interest. Thus, the IG's investigation of whether Rose had any conflicts of interest is really an investigation of Rose's compliance with the RTC's regulations at 12 C.F.R. Part 1606, an investigation that is within the purview of the OCOS and consequently exceeds the IG's authority.

Petitioner responds that sections 8G(b) and 9(a)(2) do not limit the IG's authority established under the earlier sections of the Act. The IG maintains that these sections are directed at the agency heads who are given authority to transfer certain functions to the IG, but are expressly prohibited from transferring to the IG the responsibility for operating the programs entrusted to the agency. The sections do not impose a reciprocal limitation on the IG that circumscribes his authority to investigate fraud, abuse and waste in programs of the agency. Respondent's reading of the Act is strained and is inconsistent with the language, legislative history and overall scheme of the statute. The Court therefore agrees with Petitioner.

The Court is not persuaded to the contrary by the decision in *Burlington Northern R.R. v. Office of Inspector General, Railroad Retirement Board,* 983 F.2d 631, 643 (5th Cir. 1993), on which Rose relies.[4] The court in *Burlington Northern* concluded that Congress intended that "Inspectors General should not be allowed to conduct 'program operating responsibilities' of an agency," that "the Inspector General has an oversight rather than a direct role in investigations conducted pursuant to regulatory statutes" and that "he may investigate the Department's conduct of regulatory investigations but may not conduct such investigations himself." *Burlington Northern R.R. v. Office of Inspector General, Railroad Retirement Board,* 983 F.2d at 642, 643.

*Burlington Northern* imposed limits on the authority of Inspectors General that do not appear on the face of the statute or in its legislative history. In addition, it turns on a set of facts clearly distinguishable from the facts before the Court in this case. In *Burlington Northern,* the Railroad Retirement Board Inspector General investigated tax compliance by a regulated railroad that was *not* a recipient of federal funds. The IG's investigation was in no way related to its oversight responsibilities for a federal program. Furthermore, the IG in *Burlington Northern* was not investigating fraud, abuse or waste. The court noted that "[t]he Inspector General never suggested that he had any reason to suspect that Burlington Northern was engaged in fraudulent or abusive reporting," and thus upheld the district court's determination "that the detection of fraud and abuse in the RRB's programs would have only been a by-product of the proposed" regulatory audit. *Burlington Northern R.R. v. Office of Inspector General, Railroad Retirement Board,* 983 F.2d at 640.

By contrast, the IG's investigation into Rose's possible conflicts of interest directly concerns whether a government contractor receiving federal funds related to a federal program may have committed fraud or abuse or wasted taxpayer dollars by failing to disclose actual or potential conflicts. Any undisclosed Rose conflicts of interest could have denied the RTC the independent, loyal and diligent legal representation and advice for which taxpayer dollars were paid, which the IG might conclude constituted waste and abuse. Any miscertification of the nonexistence of conflicts could have constituted false statements and fraud.

The Inspector General's investigation into Rose's conflicts of interest does not exceed his statutory authority and does not usurp the program operating responsibilities of the RTC. As part of its mission to resolve failed thrift institutions, the RTC may investigate the possible conflicts of interest of its contractors. As part of its mission to root out

---

4. Rose also relies on *United States v. Montgomery County Crisis Center,* 676 F.Supp. 98 (D.Md. 1987), but that reliance is misplaced. In that case, the IG's subpoena was not in connection with an investigation of alleged fraud, inefficiency or waste, but of a security matter not involving the expenditure of federal funds relating to a program of the Department involved.

fraud, abuse and waste in RTC programs, the Inspector General may also investigate conflicts of interest of the RTC's contractors. In this situation, the RTC investigation and the IG investigation are not, and need not be, mutually exclusive. The failure to disclose a conflict of interest, if there was such a failure, may constitute not only a violation of the RTC's regulations, which the RTC through OCOS has authority to investigate, but also may constitute fraud, abuse or waste in federal programs by a recipient of federal funds which the IG has authority to investigate. Accordingly, the Court will enforce the subpoena.

### B. The IG's Revised Confidentiality Undertaking Makes It Unnecessary For The Court To Exercise Its Authority To Issue A Protective Order

To protect the confidentiality of the materials sought from the Rose Law Firm, the IG provided a Confidentiality Undertaking to Respondent on June 28, 1994. Following discussions between the parties, the IG provided a revised Confidentiality Undertaking on August 15, 1994. After the Court denied its Motion to Transfer, Respondent moved the Court to enter a Protective Order that would provide greater assurances of confidentiality.

Rose requested a protective order that would require the documents produced to be kept in a neutral location under the control of the Court, limit the number of persons in the IG's office who would be permitted access to the documents, require the IG to maintain a log of persons with access and when they had access to the documents, prohibit disclosure outside the IG's office of information derived from the documents, require the IG to give reasonable notice before disclosure of the documents to other agencies or the Congress, and require the return of the documents within 30 days after production. Rose argued that in the circumstances of this case the IG's August 15 Confidentiality Undertaking was insufficient to protect the client list from disclosure or leaks.

At the October 20 hearing, the Court expressed its concern about the privacy interests of Rose's clients who have no relationship to this investigation. It suggested that those clients had a right to engage a law firm with the legitimate expectation that even the fact of that engagement would not become a matter of public knowledge in the course of a highly-publicized, politically-charged investigation relating to the law firm they had chosen. October 20, 1994, Hearing Transcript at 35–44, 50–51. The Court suggested that the parties attempt to negotiate further changes to the IG's August 15 Confidentiality Undertaking that might accommodate both parties, provide greater protection to Rose and its clients and respond to the concerns expressed by the Court. Transcript at 73. Despite their inability to reach agreement, on October 26, 1994, the Inspector General did offer an amended Confidentiality Undertaking that provided additional protections. Appendix B. The Court must decide whether those protections are sufficient and whether it has the authority to provide greater confidentiality protections.

 Petitioner argues that the Court may not substitute its judgment for the IG's regarding the level of confidentiality protections a subpoenaed party should receive. Rather, the IG asserts, once a court has determined that an agency's subpoena should be enforced, it may evaluate only the reasonableness of the way in which the agency has exercised its discretion regarding what confidentiality protections are necessary. *United States International Trade Comm. v. Tenneco West*, 822 F.2d 73, 76 (D.C.Cir.1987). Where an agency has promulgated a reasonable regulation governing the confidentiality of documents produced to the agency, the courts usually will defer to the agency's regulations or rules regarding the level of protection to be provided. *United States International Trade Comm. v. Tenneco West*, 822 F.2d at 79. The IG notes that even in the absence of formal regulation, courts usually will defer to reasonable written assurances of confidentiality like the Confidentiality Undertaking provided here. *Id.; FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 973–74 (D.C.Cir.1980).

 Notwithstanding the IG's assertions, the Court concludes that its authority is not so limited. "Since the enforcement of

a subpoena is an independent judicial action, and not merely an action ancillary to an earlier agency action, a court is free to change the terms of an agency subpoena as it sees fit." *United States v. Exxon Corp.*, 628 F.2d 70, 77 (D.C.Cir.), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980) (citations omitted). It therefore necessarily falls within the Court's discretion to provide additional confidentiality protections beyond those offered by the agency when it concludes that the agency, in the exercise of its discretion, has not provided safeguards sufficient to protect the interests of those at risk. *FTC v. Owens–Corning Fiberglas Corp.*, 626 F.2d at 974. Indeed, in appropriate circumstances, it may modify a subpoena it is asked to enforce to incorporate such confidentiality provisions. *United States v. Exxon Corp.*, 628 F.2d at 77.

■ An agency invoking the aid of a court to enforce a subpoena may not tell a court it has no authority to condition or modify the subpoena to protect those whom enforcement of the subpoena may put at risk. After all, a court is not merely a "rubber-stamp" in subpoena enforcement proceedings. *FTC v. Owens–Corning Fiberglas Corp.*, 626 F.2d at 974. A court may place "[s]ome limits ... on an agency's use of *court* process, since ... it is the court's process that compels the respondent to comply with these administrative demands.... [W]here the processes of the Court are involved, there must be opportunity for the Court to satisfy itself that the agency's power will be properly used." *RTC v. KPMG Peat Marwick*, 779 F.Supp. 2, 3–4 (D.D.C. 1991). *See also SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1032–33 (D.C.Cir.1978), *cert. denied* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). "[A]gency determinations on confidentiality are not sacrosanct." *FTC v. Owens–Corning Fiberglas Corp.*, 626

F.2d at 980 (Wald, J., concurring in part and dissenting in part); *see id.* at 981–84. It is a legitimate exercise of the court's authority to modify the terms of an agency subpoena by providing additional confidentiality protections for a person or entity to whom the subpoena is directed, and particularly for innocent third parties about whom the respondent that is the subject of subpoena may possess information. *See United States v. Exxon Corp.*, 628 F.2d at 77.

■ In the highly-charged political atmosphere surrounding the Whitewater investigations, Rose's submission of the client list to the IG creates the risk of public disclosure of the names of clients who have themselves done nothing wrong, whose engagement of the Rose Law Firm is wholly irrelevant to any legitimate conflict of interest investigation by the IG, and who had an expectation of privacy when they chose the law firm. The Court is concerned that the media and other interested individuals and organizations may seek to learn the names of Rose's clients in order to embarrass the firm or simply to see what prominent or newsworthy individuals or companies may have chosen Rose as their law firm at any time from 1985 to 1994. If the IG transfers the client lists to other entities within the RTC, to other Departments or agencies of government or to the Congress, the risk of advertent or inadvertent public disclosure increases. Indeed, as Respondent has pointed out, the RTC's Deputy CEO, John Ryan, testified before Congress that "the RTC does leak ... [i]t's almost a certainty around the RTC that any matter that has any kind of public interest at all is leaked to the press prematurely." Hearings on Whitewater Inquiry Before the Senate Committee on Banking, Housing and Urban Affairs, 33, 55 (August 1, 1994), Respondent's Exhibit D.[5]

---

5. Rose argues that Mr. Ryan did not exclude the IG's office from his testimony discussing the certainty of leaks at the RTC. The Office of the Inspector General is independent from the RTC, however, and the Confidentiality Undertaking offered by the IG provides a sufficient wall between the IG and other components of the RTC. The purpose of the Inspector General Act is to create independent and objective watchdogs of agencies. *See* 5 U.S.C.App. 3 § 2; S.Rep. No. 1071, 95th Cong., 2d Sess. (1978), *reprinted in*

1978 U.S.C.C.A.N. 2676, 2682. Accordingly, the Court will not treat Mr. Ryan's statements as extending to the IG's office. Furthermore, "allegations of the prevalence of 'leaks' ... notwithstanding," the Court will not presume that improper disclosure will occur in the absence of specific evidence of an "immediate threat of illegal disclosure." *Exxon Corp. v. FTC*, 589 F.2d 582, 591 (D.C.Cir.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979).

As the IG acknowledged in open court, the vast majority of the clients on Rose's client list will not present potential or actual conflicts. When the IG compares the client list with the documents and records he has within his own files or has acquired from others during the course of his investigation, he is likely to uncover only a small subset of clients whose relationship with Rose warrants further investigation as to whether their representation by Rose may present a conflict of interest. The Court therefore finds that most of the names on the client list Rose is to provide to the IG pursuant to subpoena are irrelevant to the IG's investigation and that the IG himself will quickly see that major portions of the list are wholly irrelevant.

Public disclosure of names of clients irrelevant to the investigation would harm the Respondent in its business and in its relationship with its clients and could also harm the clients whose names are disclosed. The Court is concerned that clients who are not and never will be implicated in the IG's investigation will become subject to media and political speculation that intrudes on the client's legitimate expectation of privacy. But for the fact that there is no feasible way to separate relevant from irrelevant client names until after the IG has completed the preliminary phase of his investigation, the Court would be justified in refusing to enforce the subpoena at all as to client names that the RTC could not show are relevant. *See FTC v. Invention Submission Corp.,* 965 F.2d at 1089 (citation omitted); *FTC v. Anderson,* 631 F.2d 741, 746 (C.A.D.C.1979) (citation omitted). Because there is no practical way to provide that relief, however, the question is whether a protective order can achieve a comparable result.

The Confidentiality Undertaking now offered by the IG provides that the Office of Inspector General will not disclose the confidential documents of the Rose law firm or their contents except with certain protections. *See* Appendix B. First, the client list

will not be disclosed in response to a Freedom of Information Act request without the IG providing Rose ten days' prior notice. Confidentiality Undertaking ¶ 1.[6] Second, the IG will provide Rose ten days' prior notice *where possible,* or as much advance notice as can reasonably be given under the circumstances, before disclosing the client list or parts thereof in response to an official request from Congress. ¶ 2. Third, the IG will give Rose ten days' prior notice before disclosing the client list to other federal or state agencies, except that no notice will be provided to Rose for disclosures to the Department of Justice or the Independent Counsel investigating Whitewater. ¶ 3. The IG will inform any entity, either Congress or an agency to which the client list is disclosed, that the list is confidential. ¶¶ 2–3. Fourth, only those personnel within the OIG who need to use the Rose client list in the performance of their official duties may have access to the information. Those personnel also will be informed of the information's confidentiality. ¶ 4.

Nothing in the Confidentiality Undertaking, however, would prohibit the OIG's right to use, retain or bring to the attention of other components of the RTC, the Justice Department, the Independent Counsel, Congress or any other governmental agency, without notice to Rose, any client names or relevant portions of documents that the OIG concludes are "relevant to conflicts-of-interest issues, to violations of law, regulation or contract, to misrepresentations, or to any findings or recommendations the OIG intends to make." Confidentiality Undertaking ¶ 5. Finally, when the IG concludes that he no longer requires physical possession of the client list or after 180 days, whichever is the shorter period, the IG will submit all documents that Rose has produced and all client lists that the OIG has created to the Clerk of this Court to be held by the Court under seal. Thereafter, relevant personnel

---

**6.** This provision is typical of regulations promulgated by other Departments and agencies of the government, including the RTC, at least with respect to confidential commercial information, such as client lists, under exemption 4 of the FOIA. *See* 12 C.F.R. § 1615.6. The FOIA regulations governing the RTC Inspector General, however, have no such notice provision. *See* 12 C.F.R. Part 1680.

within the OIG will have access to the documents only at the courthouse. ¶ 6.

The IG's revised Confidentiality Undertaking provides significant protections beyond those offered in the August 15 Confidentiality Undertaking. It also goes a long way towards dealing with the concerns expressed by the Court at the October 20 hearing. With respect to almost all situations in which the lists, or portions of them, will be disclosed to others, and particularly with respect to Rose's clients who are wholly irrelevant to the IG's investigation and whose expectations of privacy deserve special protection, it provides Rose with notice sufficient to object and make its arguments before any disclosure. *See, e.g., FTC v. Texaco, Inc.,* 555 F.2d 862, 884–85 (D.C.Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). While the Confidentiality Undertaking does not limit the OIG's use, or the use by other enforcement agencies, of client names that the OIG in its discretion determines are relevant to its conflicts investigation or other violations of law, the Court concludes that this exclusion from the protections of the Confidentiality Undertaking is a legitimate exercise by the IG of his discretion consistent with his statutory responsibilities.

Despite its expressed concerns, the Court cannot devise any greater protections for those unimplicated clients of the Rose law firm, consistent with the IG's law enforcement and other statutory responsibilities, than those the IG himself has offered. A careful examination of the two proposals now made by Rose demonstrates that Rose, too, has been unable to develop additional workable protections for the privacy interests of the non-relevant clients. First, Rose maintains that the IG should not retain possession of the client list at all, in part because the IG intends to carry the list to various sites where failed thrift institutions are located, which Rose argues will increase the risk of leaks. Instead, Rose proposes that copies of the client list should reside only at the offices of the Rose Law Firm in Little Rock, Arkansas and in Washington, D.C. Second, and in the alternative, Rose argues that the Court should require the IG to return the client list to Rose at the completion of the initial phase

of the IG's investigation, rather than have the IG file the list under seal with the Court. This procedure, Rose claims, would prevent the risk of disclosure from remaining open-ended beyond the time necessary for the RTC to conduct its comparison and would insulate the Court from media and other requests.

The Court rejects Respondent's request that the client list be retained at the offices of the Rose Law Firm rather than be turned over to the IG. Rose's request that the IG's access to the subpoenaed materials be limited to such locations would impermissibly interfere with the IG's discretion to conduct its investigation as he sees fit, without disclosing the scope of the investigation to those who may be affected. It would impose unnecessary practical impediments to the ability of the IG to work with the list. *See* Third Declaration of Assistant Inspector General Clark W. Blight ¶¶ 4–7; *FTC v. Texaco, Inc.,* 555 F.2d at 871, 883. Furthermore, Rose has not made a showing that the Inspector General will act "cavalierly or in bad faith" and thus has not overcome the presumption of administrative regularity and good faith that the Court is obliged to give to the IG. *See FTC v. Invention Submission Corp.,* 965 F.2d at 1091 (quoting *FTC v. Owens–Corning Fiberglas Corp.,* 626 F.2d at 975).

The Court also rejects Respondent's request that the client list be returned to the Rose Law Firm at the end of the initial phase of the IG's investigation rather than being filed under seal with the Court. While the Court may have discretion to require the IG to return the client list to Rose, *United States v. Exxon Corp.,* 628 F.2d at 77; *SEC v. Arthur Young & Co.,* 584 F.2d at 1032–33, it is more appropriate to defer to the agency's discretion on this matter if it is being reasonably exercised in the circumstances. The Court will not impose Rose's requested requirement on the IG over his objection because to do so would not alleviate the Court's primary concern in this case: that the privacy and confidentiality interests of the clients who are not relevant to the investigation be protected. Requiring the IG to return all documents and all client lists to Rose would not afford these clients any

greater protection than will be furnished by having this information filed under seal with the Court.

The IG has acted in good faith in addressing the concerns the Court raised at the October 20 hearing. His new Confidentiality Undertaking incorporates many of the additional protections for Rose and its clients that the Court had indicated were reasonable and appropriate. The IG's considered judgment and reasonable exercise of his discretion strengthens his argument that his judgment deserves deference from the Court. Accordingly, the Court concludes that the IG has exercised his discretion within permissible limits and defers to his judgment. *See FCC v. Schreiber,* 381 U.S. 279, 291, 85 S.Ct. 1459, 1468, 14 L.Ed.2d 383 (1965); *FTC v. Owens–Corning Fiberglas Corp.,* 626 F.2d at 974.

The Court does, however, remain concerned about the possibility of leaks and about the possible disclosure of the identities of clients of the Rose Law Firm who have no relationship to the IG's investigation. The notice provisions of the IG's October 26 Confidentiality Undertaking provide a mechanism for Rose to object to disclosure and to attempt to protect that information under relevant exceptions to the Freedom of Information Act and recognized state and federal privileges. If these procedures prove unworkable or unsatisfactory or if unauthorized disclosures or leaks do take place, or if Rose has reason to believe they are about to take place, the Court remains ready on short notice to deal with such concerns. It will make itself available to address these matters on an expedited basis and is prepared to deal appropriately with those who violate the Confidentiality Undertaking, the Orders of this Court or the rights of Rose or its clients.

### III. CONCLUSION

The Court finds that Respondent has failed to carry its burden of proving that the subpoena exceeds the statutory authority of the Inspector General. The Court also concludes that, in view of the substantial additional protections the Inspector General provided in his October 26, 1994 Confidentiality Undertaking, Respondent has failed to supply a sufficient basis for the Court to enter an order requiring, *inter alia,* that the client list remain in the possession of the Rose Law Firm or, alternatively, that it be returned to Rose rather than filed under seal with the Court.

For the foregoing reasons, it is hereby

ORDERED that the Petition of the Inspector General of the Resolution Trust Corporation For Summary Enforcement Of Administrative Subpoena Duces Tecum is GRANTED; it is

FURTHER ORDERED that the Rose Law Firm, A Professional Association, shall commence its compliance with the terms of the Memorandum of Understanding entered into on October 7, 1994, attached as Appendix A, within fifteen (15) days of the date of this Order and proceed to produce the subpoenaed information in accordance with the schedule agreed to in Paragraph II.F. of the Memorandum of Understanding; it is

FURTHER ORDERED that the Respondent's Motion for Protective Order is DENIED; and it is

FURTHER ORDERED that the Inspector General, the Office of Inspector General and its employees, and all other agencies of government and government employees to whom Rose Law Firm documents are provided pursuant to the Memorandum of Understanding or the Confidentiality Undertaking shall comply with the terms of the Confidentiality Undertaking provided by the RTC on October 26, 1994, attached as Appendix B.

SO ORDERED.

### APPENDIX A

*MEMORANDUM OF UNDERSTANDING*

This Memorandum of Understanding is entered into this 7th day of October, 1994, between the Office of Inspector General, Resolution Trust Corporation ("OIG") and Rose Law Firm, P.A., ("RLF") with respect to the Inspector General subpoena dated April 18, 1994 issued to RLF ("the subpoena") and the subpoena enforcement action *John J. Adair, Inspector General of the Resolution Trust Corporation v. Rose Law*

*Firm, A Professional Association,* Misc. No. 94–278 (PLF), which is pending in the United States District Court for the District of Columbia ("*Adair v. RLF*").

## I. *RLF Representations*

RLF represents that it does not have, in either hard copy or computer medium, a list containing all the client identities demanded by the subpoena. Further, RLF represents that it does not maintain any other centralized system(s) containing client identities that could be searched to produce a more comprehensive list of clients during the period January 1, 1985 through April 15, 1994, than the aggregate of client identities covered under Section II below.

## II. *Production Constituting Compliance With Subpoena*

RLF represents that it has the following systems containing client identities covered by the subpoena and RLF agrees that, if the district court in *Adair v. RLF* orders enforcement of the subpoena, RLF will produce the following information, and OIG agrees that production of the following information will constitute full and complete compliance with the subpoena:

A. RLF maintains hard copy monthly fee credit reports, generated over time by its accounting system, for each calendar month from January 1985 through April 1994, which reports list all RLF clients that paid fees to the firm during the prior month. RLF will produce copies of all these reports, redacted to show only the title and date of the report and the names of all clients included in the report.

B. RLF's accounting system generates each month a hard copy alphabetical list which includes all active clients ("alpha list"). From time to time clients for which RLF no longer actively provides legal services are purged from the system and thus are not included in succeeding alpha lists. RLF routinely discards prior alpha lists when the following month's alpha list is produced. To the best of its knowledge, the earliest alpha list that RLF currently possesses is the al-

pha list dated August 5, 1994. RLF will produce that alpha list, redacted to show only the title and date of the list and the names of all clients contained in that alpha list.

C. As part of its system for checking conflicts, beginning in 1987 RLF created a computer data base that included its then-active clients, and thereafter it added all new clients to that computer data base through some time in 1992, after which no new clients were added to the data base ("Wang/Text-Ware Data Base"). RLF will print out a list of all clients names contained in the Wang/TextWare Data Base and produce this list. If it can reasonably be done, RLF will also provide the same names on a computer tape in a form useable by the OIG, and the OIG will reimburse RLF for the reasonable cost of producing the tape.

D. When RLF discontinued entering new client names into the Wang/TextWare Data Base in 1992, it relied on identification of all new clients in Weekly Summaries, hard copies of which it has retained. RLF will produce copies of the Weekly Summaries for January 1, 1992 through April 15, 1994, redacted to show only the title and date of the summary and the names of all clients included in the summary.

E. To cover the period before the initiation of the Wang/TextWare Data Base, RLF will produce the following documents to the extent that it has them in its possession or control: (a) for January 1, 1986 through December 31, 1987, copies of Weekly Summaries redacted to show only the title and date of the summary and the names of all clients included in the summary; and (b) for April 25, 1985 (before which date RLF represents that it does not have such documents) through December 31, 1985, copies from microfilm of Daily Briefs redacted to show only the title and date of the Daily Brief and the names of all clients included in the Daily Brief. The OIG will reimburse RLF for the reasonable cost of retrieving and producing these copies.

F. RLF will produce the documents as necessary redactions are completed, but not later than the following number of days after issuance of an order of the district court enforcing the subpoena, unless that order is

stayed by that court or by the United States Court of Appeals for the District of Columbia Circuit, in which case the time would begin to run if and when such stay is dissolved: RLF will produce the alpha list specified under paragraph B within 15 days; RLF will produce the information specified under paragraphs C and D on a rolling basis, with completion of such production within 30 days; and RLF will produce the documents specified under paragraphs A and E within 45 days.

G. When RLF's production of the documents and information described above to the OIG is complete, RLF will so certify in the form provided in Section III below.

RLF hereby makes the representations and agreements contained in Sections I and II above.

/s/ Ronald M. Clark
Ronald M. Clark
Chief Operating Officer
Rose Law Firm, P.A.

OIG hereby agrees that production of the documents and information described in Section II will constitute full and complete compliance with the subpoena and that it will reimburse RLF as specified in paragraphs II.C and II.E.

/s/ Patricia M. Black
Patricia M. Black
Counsel to the Inspector General of the Resolution Trust Corporation

III. *RLF Certification*

I hereby certify that RLF has produced to the OIG a complete set of all of the documents described in Sections II.A, B, C, D and E above to the extent that they are in RLF's possession or control, disclosing all client names contained therein, with no redactions of client names.

/s/ Ronald M. Clark
Ronald M. Clark
Chief Operating Officer
Rose Law Firm, P.A.

Date: _____, 1994

APPENDIX B

OFFICE OF INSPECTOR GENERAL

RESOLUTION TRUST CORPORATION

*CONFIDENTIALITY UNDERTAKING*

*BY*

*THE INSPECTOR GENERAL OF THE*

*RESOLUTION TRUST CORPORATION*

*WITH RESPECT TO THE*
*ROSE LAW FIRM*

In connection with the April 18, 1994 subpoena issued by the Inspector General, Resolution Trust Corporation to the Rose Law Firm, P.A. ("Rose") and the October 7, 1994 Memorandum of Understanding between the Office of Inspector General ("OIG") and Rose regarding what documents would constitute full and complete compliance with that subpoena ("MOU"), I am issuing this Confidentiality Undertaking to Rose. Prior to Rose's producing such documents to the OIG, Rose may designate such documents as confidential by stamping each page "CONFIDENTIAL". I have determined that the OIG will not disclose these documents or their contents except pursuant to the following provisions and that the following provisions will protect the confidentiality of such documents and their contents:

(1) The OIG acknowledges that these documents, which reveal the identity of Rose's clients, constitute "confidential commercial information" within the meaning of Executive Order 12600, and will not be disclosed pursuant to a FOIA request without giving Rose ten days prior notice and complying with the other procedures specified in that Executive Order. Any request that does not meet the requirements of paragraphs 2 and 3 below will be treated as a FOIA request.

(2) In response to any official request from Congress, either House thereof, or a Congressional Committee or Subcommittee acting pursuant to Committee business, the OIG may disclose the documents to the requesting entity, but will not do so without (a) giving Rose ten days prior notice where possible, and in any event, as much advance notice as can reasonably be given under the circum-

stances, before releasing or granting access to the documents, and (b) informing the requesting entity that the documents should be considered confidential.

(3) In response to any request from another federal agency (including other components of the RTC) or a state agency, the OIG may disclose the documents to the requesting entity as follows:

(A) In response to a request from the Department of Justice or the Independent Counsel, the OIG may disclose the documents to the requesting agency or instrumentality and, if it does so, will inform the requesting entity that the documents should be considered confidential;

(B) In response to any request not within subparagraph (A) above, the OIG may disclose the documents to the requesting entity, but will not do so without (1) giving Rose ten days prior notice, and (2) informing the requesting entity that the documents should be considered confidential.

(4) Nothing herein shall limit the OIG's internal use of the documents or information contained therein, such use to be determined solely by the OIG. However, within the OIG, Rose's client list and the identities of individual clients will be kept confidential and will be shared internally only with those OIG employees and counsel who have a need for such documents or information in the performance of their duties. Such employees and counsel shall be apprised of this confidentiality undertaking and the need to maintain the confidentiality of such documents and information.

(5) Nothing herein shall limit the OIG's right to use, to retain or to bring to the attention of other components of the RTC, the Department of Justice, the Independent Counsel, Congress, or any other government agency or instrumentality, without notice to Rose, any client names or relevant portions of particular documents which names or portions of documents the OIG concludes are relevant to conflicts-of-interest issues, to violations of law, regulation or contract, to misrepresentations, or to any findings or recommendations the OIG intends to make.

(6) When the Inspector General determines that the OIG no longer needs to have physical possession of the documents in order to continue his investigation, but in any event no later than 180 days following the OIG's receipt of all the documents and the certification called for by the MOU, the OIG will submit (a) all the documents produced by Rose, and (b) all lists of Rose clients created by OIG from the documents produced by Rose, to the Office of the Clerk of the United States District Court for the District of Columbia ("Clerk") to be held by the Clerk under seal pursuant to court order in *John J. Adair, Inspector General of the Resolution Trust Corporation v. Rose Law Firm, A Professional Association,* Misc. No. 94–278, pending in that Court, provided, however, that:

(A) The OIG will retain possession of the names and documents described in paragraph 5 above;

(B) The OIG will be entitled to review within the Courthouse upon request to the Clerk, but not to remove from the Courthouse, the documents held under seal by the Clerk at any reasonable time and as often as it wishes, and shall have the right to take possession of and retain any individual client names and/or documents that the OIG determines fall within the scope of paragraph 5 above but which the OIG theretofore had not retained under said paragraph 5, all without notice to Rose and without the need for approval by the Court;

(C) If any request for documents pursuant to paragraphs 2 and 3 is pending at the time the OIG is to deliver the documents to the Clerk (*e.g.,* because of a notice period, stay or timing of receipt of the request), the OIG will process such request pursuant to the provisions of said paragraphs and will delay delivering the documents to the Clerk until it completes processing such request; and

(D) When the Inspector General determines that there is no further need for the documents to be retained, he shall so notify the Clerk and Rose. The Clerk shall then destroy the documents.

/s/ John J. Adair
JOHN J. ADAIR
Inspector General
Resolution Trust Corporation

October 26, 1994

**HEWLETT–PACKARD, INC., Plaintiff,**

v.

**Helge BERG and Lars Arvid Skoog, Defendants.**

**Civ. A. No. 93–10128–JLT.**

United States District Court, D. Massachusetts.

Nov. 7, 1994.

Douglas W. Salvesen, Todd & Weld, Boston, MA, Kevin P. Light, Choate, Hall & Stewart, Boston, MA, Richard Allan Horning, Horning, Janis & Harvey, San Francisco, CA, for Apollo Computer, Inc.

Richard M. Gilbert, Goldstein & Manello, Boston, MA, David A. Burman, Stockholm, Sweden, for Helge Berg, Lars Arvid Skoog.

## MEMORANDUM

TAURO, Chief Judge.

This case arises out of an international arbitral award rendered in favor of Defendants. Plaintiff contends that the tribunal never reached a final decision on the merits regarding an asserted set-off. Defendants claim that the award is final and complete. In essence, Defendants seek to confirm the award as written, and Plaintiff seeks to authorize a set-off against the award and/or compel the Defendants to attend another arbitration on the remaining issues.

Presently before the court are Defendants' Motion to Dismiss and Motion to Confirm Arbitral Award.

### I.

#### Background

In March of 1982, Apollo Computer, Inc. ("Apollo")[1] and Dicoscan Scandinavia AB ("Dicoscan") entered into a distribution agreement (the "1982 Agreement"). Dicoscan, a distributor of computer products, was given an exclusive license to distribute Apollo's computer workstations in Scandinavia for a period of two years. At the end of the two years, the parties executed a second contract (the "1984 Agreement"), for all purposes identical to the first, extending the relationship for three more years. Both Agreements contain clauses subjecting any disputes to arbitration.

Shortly after the signing of the 1984 Agreement, a dispute arose as to the financing of Dicoscan's purchases. Allegedly, Dicoscan was delinquent on payments for eleven shipments made pursuant to the 1982 Agreement, totalling approximately $207,000. Two further shipments were made under the 1984 Agreement, for approximately $10,000. Apollo then terminated the distributorship agreements. It is uncontested that Dicoscan has not paid the invoices from the 1982 or 1984 Agreements.[2]

Soon after the termination, Dicoscan filed for bankruptcy under Swedish law. The bankruptcy receiver liquidated the company, and assigned to Berg and Skoog, the Defendants, any claims Dicoscan may have had against Apollo.[3] Defendants sought to initiate arbitral proceedings in the International Chamber of Commerce Court of Arbitration in Paris ("ICC").[4] Due to the fact that Berg and Skoog claimed under an assignment of Dicoscan's rights, Apollo denied that the dispute was subject to arbitration. Apollo filed suit in this court seeking a permanent stay. This was denied. *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir.1989).

On June 1, 1990, the arbitral tribunal issued its "Terms of Reference".[5] Apollo filed its answer with the ICC in which it denied

---

1. Apollo was subsequently acquired by Hewlett–Packard, Inc., which has been substituted as the party in interest. For simplicity, however, it will be referred to throughout as "Apollo".

2. Although Dicoscan admits non-payment, it contends that it has defenses to the invoices.

3. Berg and Skoog were principals in Dicoscan.

4. This claim alleged breach of contract, breach of implied covenant of good faith and fair dealing, unfair competition, and tortious interference with business relations. The Defendants claimed damages of over 100,000,000 Swedish crowns (Skr).

5. The Terms of Reference are to define the scope of the proceeding. The ICC Rules of Arbitration state: "[b]efore proceeding with the preparation of the case, the arbitrar shall draw up, on the basis of the documents or in the presence of the parties and in light of their most recent submission, a document defining his Terms of Reference." Article 13(a).

the claims against it and asserted a counter-claim based on the unpaid invoices from the 1982 Agreement. The dispute was finally brought to an ICC tribunal (the "Tribunal") sitting in Boston, Massachusetts in March of 1991.[6] During the course of the proceedings Apollo sought to amend its counterclaim to add $10,978, stemming from the two shipments pursuant to the 1984 Agreement, and to dismiss the arbitration on the grounds that the assignment of Dicoscan's rights by the Swedish Bankruptcy Court was invalid. Both of these motions were denied.[7] After seven days of hearings the Tribunal found for Defendants. *Berg & Skoog v. Apollo Computer, Inc.*, Int'l Comm. Arb. No. 6259/BGD (January 24, 1992) (the "Award").

▮▮▮ The Tribunal calculated damages in the amount of Skr 4,557,068, which it then converted to U.S. dollars. Surprisingly, it allowed Apollo a set-off in the amount of $10,978—after it denied the motion to put this claim before the court.[8] More importantly, it disclaimed, *sua sponte*, jurisdiction over the 1982 Agreement set-off.[9] Four months after the award was handed down, Plaintiff tendered a check for $592,433.17. This represented the amount owed, less $207,111.59 from the 1982 Agreements which Apollo withheld unilaterally.

6. It is undisputed that Massachusetts law controls the proceedings.

7. The Tribunal interpreted the ICC Rules as not allowing the amendments without consent from both parties. Award, p. 5.

8. Other questionable decisions with regard to the award are noted. The Tribunal mistakenly and unnecessarily converted the award to U.S. dollars, using the exchange rate in effect at the time of the breach, instead of that in effect at the time of the award. *See Gutor International AG v. Raymond Packer Co.*, 493 F.2d 938, 943 (1st Cir.1974). This lowered Defendants' recovery by approximately $200,000. Also, contrary to Massachusetts law, the Tribunal awarded interest from the time of the filing of the complaint as opposed to the time of the breach. M.G.L. c. 231 § 6C; *see also Acushnet Federal Credit Union v. Roderick*, 26 Mass.App.Ct. 604, 608, 530 N.E.2d 1243, 1247 (1988). This error cost the Defendants four years of accrued interest, or $267,409.

9. See discussion *infra*.

10. Defendants' Memorandum of Reason in Support of Motion to Confirm Arbitration Award

At the time it tendered the deficient amount, Apollo initiated another arbitration to resolve any remaining issues—namely the 1982 Agreement counterclaim. Now that the shoe is on the other foot, the Defendants deny the jurisdiction of the second arbitration. Presently, that arbitration has been stayed at the request of Apollo, who does not want to proceed without the presence of Defendants. This court notes that the ICC has made a preliminary determination that they have jurisdiction over the second arbitration.

## II.

### Analysis

A. Confirmation of the Arbitral Award.

▮▮▮ The Award is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §§ 201–08. This court has the power to confirm the Award. 9 U.S.C. §§ 203, 207. The Code allows for any party subject to an arbitration to apply for an order confirming the award within three years.[10] 9 U.S.C. § 207.[11]

▮▮▮ The Convention strictly limits the scope of review applicable to ICC awards. Convention Art. V. The procedures allowed by the implementing legislation are meant to

mistakenly applies the Federal Arbitration Act's one year time limit for confirming an award and argues for leniency. Plaintiff admirably points out that the Award is instead subject to the Convention's three year period. Defendants' Motion is, therefore, timely.

11. The court notes, however, that Defendants failed to follow the proper confirmation procedures. Article IV of the Convention reads:

1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:
 (a) the duly authenticated original award or a duly certified copy therefore
 (b) the original agreement ... or a duly certified copy thereof....

The Defendants have not submitted the original or a certified copy of either of the two necessary documents, although uncertified copies have been submitted. The court will overlook this deficiency, however, due the confused nature of the proceedings and the fact that neither party is contesting their validity.

be summary in nature. *Imperial Ethiopian Gov't v. Baruch–Foster Corp.*, 535 F.2d 334, 335 (5th Cir.1976). The decisions of the panel cannot be reviewed for errors in law or fact. *Mobile Oil v. Oil, Chemical and Atomic Workers Int'l Union*, 600 F.2d 322, 326 (1st Cir.1979). Even egregious mistakes are not reversible unless they fall into one of the narrow categories supplied in the Convention. Moreover, the implementing legislation mandates that "the court *shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207 (emphasis added).

Article V of the Convention sets forth the only grounds under which a court may refuse to confirm an award:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) the parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) the award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) the subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) the recognition or enforcement of the award would be contrary to the public policy of that country.

 Clearly, none of the procedural exceptions in Art. V(1) apply. It should also be noted that nothing in Article V or elsewhere in the Convention grants a reviewing court the power to alter or modify the award.[12] Defendants have implied that subsection 2(b) is applicable. They claim that the assessment of interest from the time of the filing of the complaint, as opposed to the time of the breach, is contrary to Massachusetts law and public policy. Defendants do not cite any cases supporting the proposition that a court may alter an arbitral award for mistakes of law. Neither do they point to a case which holds that such mistakes rise to a sufficient level to be considered an affront to public policy.

 The Convention has consistently been interpreted with a "pro-enforcement" bias. *See Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier*, 508 F.2d 969 (2d Cir.1974). When an American district court reviews the decision of an international arbitral panel, it is bound by principles of comity. *See Hilton*

---

**12.** Article V(1)(c) does allow for severance of parts of the award that exceed the scope of the arbitration. This section is inapplicable here.

v. *Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). As the Second Circuit noted in *Parsons,* the "Convention's public policy defense should be construed narrowly. Enforcement of foreign arbitral awards may be denied on [the basis of Article V(2)(b) ] only where enforcement would violate the forum state's most basic notions of morality and justice." *Id.* at 974. Due to the fact that the above errors in law noted by the parties would not justify setting aside a domestic award, *Trustees of Boston & M. Corp. v. Mass. B.T.A.,* 363 Mass. 386, 294 N.E.2d 340, 343 (1973), clearly they cannot form the basis for setting aside an international award.[13] The Award, therefore, is confirmed as written.

### B. Defendants' Motion to Dismiss

1. Apollo's Declaratory Judgment Action and Claim for a Set-off of $207,112.

■ Defendants moved to dismiss Apollo's complaint, asserting that the Convention does not permit a district court to alter or modify an arbitral award or to sanction an unauthorized set-off from the judgment. Apollo seeks a declaration by this court that it has fulfilled its obligations under the judgment. In effect, they ask this court to approve its unilateral and unauthorized "set-off in recoupment" of $207,112 from the Award handed down by the Tribunal. This sum represents the amount claimed to be due on deliveries made under the 1982 Agreement.

Defendants contend that such an action is not provided for under the Convention. They argue that the Convention specifically and purposefully limits defenses available in a confirmation proceeding and that nothing in the Convention authorizes a separate attack on the validity of an award.

■ In so far as this case is proceeding in the posture of a confirmation under Article IV of the Convention, Apollo's request for a set-off must fail. As noted above, confirmation proceedings are expected to be brief and summary in nature. *Imperial Ethiopian Gov't v. Baruch–Foster Corp.,* 535 F.2d 334, 335 (5th Cir.1976). The Conven-

tion only allows for specific and limited attacks on the validity of the claim, and nowhere does the Convention provide that a court sitting over a confirmation proceeding may adjudicate a counterclaim. As noted in *Fertilizer Corp. of India v. IDI Management, Inc.,* 517 F.Supp. 948 (S.D.Ohio 1981), cited by Apollo for other purposes, "a confirmation proceeding is not an original action; it is, rather, in the nature of a post-judgment enforcement proceeding. In such a proceeding a counterclaim is clearly inappropriate." *Id.* at 963.

Apollo has cited only one case to supports its position, *Jugometal v. Samincorp,* 78 F.R.D. 504 (S.D.N.Y.1978). In *Jugometal,* the Southern District of New York allowed the defendant in a confirmation proceeding to set-off from an arbitral award amounts due from the plaintiff pursuant to three unrelated final arbitral decrees. At the outset, it should be noted that the case at bar is distinguishable from that in *Jugometal.* In *Jugometal,* the amounts claimed to be set-off were uncontested final awards from an arbitral panel. Here, the counterclaims asserted are contested issues of contract law which would require discovery and a full trial.

The reasoning in *Jugometal* was criticized by the Eleventh Circuit in *Booth v. Hume Publishing, Inc.,* 902 F.2d 925, 933 (11th Cir.1990). *Booth,* decided under the Federal Arbitration Act, reaffirmed the prevailing wisdom that "the court's function in confirming or vacating an arbitration award is severely limited. If it were otherwise, the ostensible purpose for resort to arbitration, i.e., the avoidance of litigation, would be frustrated." *Id.* at 932 (citing *Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp.,* 274 F.2d 805, 808 (2d Cir.), *cert. denied,* 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960)). This concern of avoiding further litigation in the confirmation proceeding was also implicitly present in *Fertilizer Corp. of India.* 517 F.Supp. at 963. If the counterclaim were to be allowed, Defendants would have to be given the opportunity

---

**13.** A favorite example of setting aside a foreign award under similar principles is a case in a which an English defendant was "noticed" by the nailing of a complaint to the door of the courthouse on the island of Tobago. *Buchanan v. Rucher,* 103 Eng.Rep. 546 (K.B. 1808).

to present their defenses. This court believes that the reasoning behind *Booth* is more applicable to the case before it. It finds, therefore, that Apollo may not raise its counterclaim as a defense to the confirmation.

Apollo also puts forth an argument that it is entitled to a common law right of a "set-off in recoupment". This theory is unavailing, and more importantly, no longer in existence. The Supreme Judicial Court opinion in *Bose Corp. v. Consumers Union of United States, Inc.*, 367 Mass. 424, 326 N.E.2d 8 (1975), adequately discusses the demise of two theories of set-off and recoupment.[14]

*Bose* concerned the effect of Massachusetts Statutes of Limitations on counterclaims brought under the then newly enacted Federal Rules of Civil Procedure. The court clearly proclaims that "[t]his whole law and equity structure was swept away on July 1, 1974 [the date Massachusetts enacted their new Rules of Civil Procedure]. We now have counterclaims, compulsory and permissive, ..., absorbing the old recoupments, set-offs, and counterclaims, and going beyond them." *Id.* at 430, 326 N.E.2d 8. Under Massachusetts law, set-off and recoupment are no more.

The court continues, pointing out that the theories of set-off and recoupment, as described in the *Bose* opinion, would not have aided Apollo. These two actions did not allow a party to unilaterally withhold payment of a judgment by asserting the existence of a dispute which has yet to be ruled upon. Instead, recoupment and set-off were analogous to the modern day counterclaims, and had to be timely pled, argued and won at the trial level. For instance, the Massachusetts Court's discussion of the timeliness of a recoupment claim states that "it was generally, if not always timely, no matter when *actually pleaded in the action* ..." *Id.* at 427, 326 N.E.2d 8 (emphasis added). So too, the set-off could be pled in an action at law and the statute of limitations would be applied "in the same manner as it would have been to an action brought on the same demand if it had been commenced at the time when the plaintiff's action was commenced." *Id.* at 428, 326 N.E.2d 8 (implying that the set-off must have been pled during the pendancy of the action). As noted above, the district court is not empowered to hear counterclaims in order to alter awards under the Convention.

As a final note on this matter, the court points out that a declaratory judgment is not a permissible procedure to review an arbitral decision. Apollo lists a string of cases to support the proposition that "courts have routinely entertained declaratory relief actions where the issues involved enforcement of a contract to arbitrate or the meaning and effect of an arbitration award." Pltf. Mem. at 20. Unfortunately, none of the cited cases support their contention that a declaratory action can be used to alter the award of an arbitral tribunal.

Long ago the First Circuit held that a plaintiff cannot "by a suit for a declaratory judgment reopen the questions which it referred to a neutral for a binding decision and which the neutral decided against the plaintiff." *Mutual Benefit Health & Acc. Ass'n v. United Casualty Co.*, 142 F.2d 390, 393 (1st Cir.1944). This rational is still sound today. In the instant case Apollo requests that this court, through the means of a declaratory judgment, relieve them of the obligation to pay the Award issued by the Tribunal. The court may not do this.

### 2. The Tribunal's Denial of Jurisdiction Over the 1982 Agreement

Between the years of 1982 and 1984 Apollo shipped, in good faith, over $200,000 of goods to Dicoscan. After almost a decade of litigation, these claims still remain unpaid. The essential purpose behind Apollo's filing of this action is to receive, in one form or another, vindication of their claims arising under the shipments.

Both parties spend a great portion of their submissions interpreting the Tribunal's treat-

---

14. Defendants are quick to highlight that Apollo technically has been asking for a "set-off in recoupment". Apparently, Apollo believes that the two theories together will survive where separately they have been lost to the ages.

ment of the 1982 Agreement counterclaim. It is uncontested that the Tribunal did not allow Apollo a reduction of damages due to these allegedly outstanding debts. The issue is whether the decision went to the merits of the claim or whether they were dismissed on jurisdictional grounds. If the decision was jurisdictional, the claims are still alive and may be the subject of a second arbitration. If the decision was on the merits, the claims are gone.

We note at the outset that Apollo properly asserted the issue of the 1982 Agreement in its answer to the original arbitration demand. Defendants admit as much in their Memorandum. Apollo also contends, and Defendants do not dispute, that neither party questioned the Tribunal's jurisdiction over the 1982 Agreement during the proceeding.

Apollo correctly points out that the Terms of References set forth four jurisdictional "issues to be determined" by the Tribunal, none of which concerned its power to adjudicate the 1982 Agreement. These questions are:

D. Definition of Issues to Be Determined

----

*JURISDICTION OF THE TRIBUNAL*

2. Whether a valid arbitration agreement exists between Claimants and Apollo based on the 1984 Agreement between Apollo and Dico[scan].

3. Whether the Tribunal has jurisdiction to enter an award in favour of Berg and Skoog as assignees of claims held by Dico[scan] against Apollo.

4. Whether the purported termination of the 1984 Agreement by Apollo was valid effective.

5. Whether the right to arbitration survived the termination of the 1984 Agreement. Terms of Reference, p. 14.

▮▮▮ As the court interprets it, this section does not *define* the Tribunal's jurisdiction as set down by the ICC.[15] It merely sets out disputed issues of jurisdiction, raised by the parties, that the Tribunal must determine. Solely because the Tribunal was not

asked to affirmatively determine whether it had jurisdiction over the 1982 Agreement, it does not follow that the jurisdiction did not exist. In fact, reading the Terms of Reference as a whole, it is clear that that it did.

Continuing on, the Terms of Reference unambiguously and in two instances, directed the Tribunal to determine the merits of the counterclaims:

D. Definition of Issues to be Determined

-----

*As To The Counterclaims*

20. Whether Dico[scan] is legally obligated to Apollo for the *$206,855* for products ordered, received and accepted.

*The Award*

21. ... In preparing its award, the Tribunal need not answer every question mentioned in these Terms of Reference; *the Tribunal, however, shall address each of the claims and counterclaims* made by the parties. Terms of Reference, p. 16 (emphasis added).

The Tribunal ignored its clear mandate to determine the question of Apollo's counterclaim and failed to reach the issue. Its reasoning follows:

II. *THE COUNTERCLAIM*

1. *The Tribunal Does Not Have Jurisdiction to Rule Upon Defendant's Counterclaim for Approximately U.S. $207,112 Because that Debt Is Not a Debt Arising Under the 1984 Agreement.* Defendant's counterclaim in the amount of U.S. $178,- 891.59 for FNBB Drafts ... guaranteed by Defendant, for equipment shipped to Dico[scan] in May, October, November and December, 1983, is not a debt arising under the 1984 Agreement over which the Arbitral Tribunal has jurisdiction. For the same reason, the Tribunal has no jurisdiction to hear defendant's counterclaim in the amount of U.S. $28,220 for Drafts ... not guaranteed by Apollo and not purchased by FNBB for equipment shipped to Dico[scan] in January, 1984. Because the

15. The ICC made a preliminary finding of jurisdiction before the filing of the first suit in this court in January of 1989. The parties have not

submitted any specifics of this decision nor have they indicated the presence of a document.

Terms of Reference permit the Tribunal to hear disputes arising only under the 1984 Agreement, the Tribunal is without jurisdiction to rule on the counterclaim for approximately U.S. $207,112. Thus, the counterclaim for approximately U.S. $207,112 is denied. (Award, p. 57; emphasis in original).

Defendants argue vehemently that the counterclaim arising out of the 1982 Agreement has been determined on the merits. They claim that Apollo's assertion that the above quoted passage be deemed a "dismissal not on the merits" is "a baseless and specious argument." In support of this contention, they note that the Award concludes by stating that "[t]his award is in full settlement of all claims and counterclaims submitted to this Arbitration." Award, p. 70. Further, they note that under the ICC Rules "arbitral awards shall be final." ICC Rules Article 24(1). Finally, they argue that the Tribunal's ruling is neither ambiguous or inconsistent.

This court disagrees.

■ This court finds that the above quoted passage cannot be interpreted as anything but a denial of jurisdiction over the 1982 Agreement counterclaims.[16] It is irrelevant that such denial was mistaken or unexplained. True, the Tribunal concluded that the Award "is in full settlement of *all claims and counterclaims submitted* to this Arbitration." (emphasis added). It is clear, however, from the Tribunal's unambiguous denial of jurisdiction, that they did not consider claims under the 1982 Agreement to have been within the scope of the Arbitration. It would therefore be wrong to consider them as having been "submitted". As for the finality of the Award under ICC Rules Article 24, this

decision in no way disturbs the Award. It merely determines the scope.

■ That the final sentence of the decision on the counterclaim states that it is "denied" is of no matter. The counterclaim could not have been "denied", as that term is used in this context, because the Tribunal, by its own admission, did not decide the issue. Rather, their use of the word "denied" can be seen as unfortunate draftsmanship. Nothing in Award discusses the merits of the counterclaim or evidence presented by either party.

■ This court, therefore, concludes that the Tribunal's decision "denying" the 1982 Agreement counterclaims was jurisdictional, and not a determination on the merits. Defendants have argued that, should the court "somehow find[ ] a basis to consider [Apollo's claims], the court should consider defendants' request to modify with respect to the interest calculation." As Defendants themselves have argued throughout, this court does not have the power to alter or modify the substantive findings of the Tribunal. Their complained of issues, i.e., the chosen date for calculation of interest and the conversion of the award from Swedish crowns to dollars, clearly fall within the prerogatives of the Tribunal.

■ The issue of the counterclaims arising out of the 1982 Agreement has yet to be ruled upon by a competent authority. Again, it is undisputed that the issue was properly put before the court in Apollo's original answer. It is also clear, from admissions by the Defendants, that Apollo's claims have merit.[17] The Convention was drafted to afford quick and *complete* resolution of disputes. Article V(1)(b) of the Convention has

---

16. Further evidence is contained in the Tribunal's allowance of the counterclaim in the amount of $10,978.78. The Tribunal decided:
 2. *Defendant Is Entitled to Setoff the Sum It Must Pay Claimants with Its Counter-claim in the Amount of U.S. $10,978.78.* Because Defendant's counterclaim in the amount of U.S. $10,978.78 ... is a debt arising under the 1984 Agreement, the Tribunal does have jurisdiction *to rule upon that portion of the counterclaim.* Award, p. 5.
 The Tribunal awarded this set-off, after denying the motion to put the claim before them, based

on "basic principles of fairness." Certainly, if the Tribunal thought they had the 1982 Agreement in front of them, the same principles of fairness would dictate allowing a set-off of these monies.

17. This opinion in no way determines whether Apollo does, in fact, deserve an award based on the unpaid invoices from the 1982 Agreement. Defendants claim to have defenses to payment and, therefore, the issue must be decided after a hearing.

**1136**

been interpreted as sanctioning the application of the forum state's standards of due process. *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier,* 508 F.2d 969, 975 (2nd Cir.1974). Without deciding the issue, it would appear that not allowing Apollo the opportunity to be heard on a counterclaim it adequately raised may violate our notions of justice and fair play. *See Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also Iran Aircraft Indus. v. Avco Corp.,* 980 F.2d 141 (2d Cir.1992) (refusing to confirm an award under Article V(1)(b) because the party had been led to believe that its condensed submissions of proof were adequate, yet later lost on the grounds of insufficiency of proof). Instead, pursuant to this court's powers under 9 U.S.C. § 206,[18] the parties are ordered to attend the arbitration proceeding presently stayed in France.[19]

■ Apollo has requested a stay of the confirmation award pending the outcome of the France Arbitration. This court is without that power. The Convention only authorizes a stay under one narrow provision. Article VI states:

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in Article V paragraph (1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

This section is intended to prevent inconsistent verdicts wherein one court confirms an award while a petition challenging the award is pending in another. *See, e.g., Fertilizer Corp. of India v. IDI Management,* 517 F.Supp. 948. We do not have that situation here.[20]

---

**18.** "A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206.

**19.** The ICC has already noted probable jurisdiction over this second arbitration.

### III.

#### *Conclusion*

For the foregoing reasons, Defendants' Motion to Confirm Arbitration Award is ALLOWED; Defendants' Motion to Dismiss is ALLOWED, to the extent consistent with this opinion; Plaintiff's Motion to Compel Arbitration is ALLOWED. The case is otherwise closed.

**KLEEN LAUNDRY & DRY CLEANING SERVICES, INC.**

v.

**TOTAL WASTE MANAGEMENT, INC.**

Civ. No. 91–493–JD.

United States District Court, D. New Hampshire.

Oct. 12, 1994.

**20.** The other decision cited by Apollo, *Puerto Rico Maritime Authority v. Star Lines,* 454 F.Supp. 368 (S.D.N.Y.1978), is inapplicable as it was decided under the more lenient language of the Federal Arbitration Act. 9 U.S.C. § 10(d).

Eleanor H. MacLellan, Sulloway & Hollis, Concord, NH, Franklin G. Stearns, Brown, Rudnick, Freed & Gesmer, Boston, MA, Maureen D. Smith, Atty. General's Office, Environmental Protection Bureau, Concord, NH, for plaintiff.

Paul J. Barbadoro, Andrew W. Serell, Rath, Young, Pignatelli & Oyer, P.A., Concord, NH, for defendant.

## OPINION

DiCLERICO, Chief Judge.

This lawsuit concerns a parcel of contaminated property ("site") owned by plaintiff Kleen Laundry and Dry Cleaning Services ("Kleen") and located in Lebanon, New Hampshire. In October 1991, the plaintiff brought an action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601 *et seq.* (West 1983 & Supp.1994), against the defendant, Total Waste Management, Inc. ("TWM"), seeking costs related to the cleanup and remediation of the site. The

plaintiff asserts that TWM is liable by virtue of its removal of the tanks at the site and also in its capacity as the corporate successor to George West & Sons d/b/a Portland Oil Recycling ("Portland Oil") or George West & Sons d/b/a Conn–Val Oil Recycling ("Conn–Val"), two companies that allegedly stored waste oil in the Kleen tanks.

On March 19, 1993, the court denied the defendant's motion for summary judgment on the issue of its liability as a successor to Portland Oil. The court found that TWM's successor liability hinged on the consideration of genuine issues of material fact. On September 7, 1994, the court conducted an evidentiary hearing to determine whether TWM succeeded to the liabilities of Portland Oil under CERCLA.

## Background

The following facts are not in dispute. On May 1, 1984, Conn–Val leased two underground storage tanks located at the site from the plaintiff and, as part of a written contract, agreed to absolve the plaintiff of all liability related to their use. The following day, the plaintiff was issued a certificate of insurance naming Portland Oil as the insured under at least three policies covering potential liabilities at the Kleen site. Conn–Val ceased operations approximately six weeks later. The Kleen tanks were drained and use of the plaintiff's property ceased.

On May 31, 1988, the defendant executed an agreement ("agreement") to purchase the bulk of Portland Oil's operating assets, including the Portland Oil name, customer lists, vehicles, and leases. George West & Sons, the former parent of Portland Oil, retained certain non-operating assets, such as office furniture and those accounts payable/receivable existing at the time of the sale. In addition, George West & Sons and Mr. George West III, former president and sole shareholder, signed non-compete agreements at the defendant's request. The agreement did not call for an exchange of stock or other form of ownership interest between the two companies or their principals. The agreement is silent on matters related to Conn–Val and the Kleen site and these topics were not raised during the nego-

tiations that resulted in the defendant's 1988 acquisition.

Following the acquisition, the defendant retired the Portland Oil name but continued uninterrupted service to Portland Oil customers using former Portland Oil trucks driven by former Portland Oil employees. George West & Sons continued to exist as a distinct business entity for the limited purposes of winding down its accounts and also as a parent company to Mr. West's nursery business.

There are two issues to be resolved by this opinion. Did the 1988 transaction merely call for the sale of certain Portland Oil assets or did it involve the sale of the entire business such as to create successor liability under CERCLA? And, if the latter, was Conn–Val an independent business entity or an integrated part of Portland Oil resulting in the attrition of all Conn–Val activities and liabilities to Portland Oil?

## Findings of Fact and Conclusions of Law

I. *Total Waste Management, Inc.'s Liability as Corporate Successor to George West & Son d/b/a Portland Oil Recycling*

The plaintiff alleges that TWM has succeeded to the liabilities of Portland Oil because the 1988 agreement called for and resulted in the acquisition of the entire Portland Oil business. Plaintiff's Memorandum of Law in Support of Request for Findings of Fact and Rulings of Law ("Plaintiff's Memorandum") at 9. In contrast, the defendant characterizes the transaction as merely an asset purchase. Defendant's Memorandum of Law in Support of Motion for Summary Judgment on Successor Liability ("Defendant's Memorandum") at 7.

At common law, a corporation which purchases the business assets of another does not assume the liabilities of the predecessor corporation absent the application of one of four exceptions to this general rule: (1) the successor expressly or impliedly agrees to assume liability; (2) the transaction may be considered a *de facto* merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is found to have been fraudulent.

*John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 408 (1st Cir.1993); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837–38 (4th Cir.1992) (*citing* Fletcher, Cyclopedia of the Law of Private Corporations, § 7122 (rev'd ed. 1990)); *Atlantic Richfield Co. v. Blosenski*, 847 F.Supp. 1261, 1283–84 (E.D.Pa.1994) (citations omitted).

Earlier in the litigation the plaintiff, conceding that the first and fourth exceptions do not apply, argued that the defendant is a successor under either the *de facto* merger or "mere continuation" exceptions. *Kleen Laundry & Dry Cleaning Servs., Inc. v. Total Waste Management Corp.*, 817 F.Supp. 225, 230 (D.N.H.1993).

The *de facto* merger exception permits the court to hold a purchaser of business assets liable for the conduct of the transferor corporation if the parties have achieved "virtually all the results of a merger," even if they have not observed the statutory requirements of a *de jure* merger. *Kleen Laundry*, 817 F.Supp. at 230 (citing *In re Acushnet River & New Bedford Harbor Proceedings re: Alleged PCB Pollution*, 712 F.Supp. 1010, 1015 (D.Mass.1989)). The court examines four factors when determining whether a purported asset sale constitutes a *de facto* merger:

(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 230–231 (citing *Acushnet River*, 712 F.Supp. at 1015). While all of these factors favor the finding of a *de facto* merger, "no one of these factors is either necessary or sufficient to establish a *de facto* merger." *Id.* (citing *Acushnet River*, 712 F.Supp. at 1015).

Under the traditional view of the "mere continuation" exception, the court may find a corporation to be the continuation of predecessor corporation only if one party survives the purported asset sale and both parties share an identity of stock, stockholders and directors. *Id.* (citing *Carolina Transformer*, 978 F.2d at 838); *see Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.*, 847 F.Supp. 389, 399 (E.D.Va. 1994). However, other courts have adopted a broader interpretation of the exception, known as the "continuity of enterprise" or the "substantial continuity" doctrine. *Kleen Laundry*, 817 F.Supp. at 231 (citations omitted); *see Northwestern Mutual*, 847 F.Supp. at 399 (citations omitted). The court examines a series of factors when determining whether successor liability is appropriate under this alternative theory:

(1) retention of the same employees;

(2) retention of the same supervisory personnel;

(3) retention of the same production facilities in the same location;

(4) production of the same product;

(5) retention of the same name;

(6) continuity of assets;

(7) continuity of general business operations; and

(8) whether the successor holds itself out as the continuation of the previous enterprise.

*Kleen Laundry*, 817 F.Supp. at 231 (citations omitted); *see Northwestern Mutual*, 847 F.Supp. at 399. For example, the purchaser of a corporation's assets is liable as a successor where it continues the predecessor's operations without interruption and where the "primary assets involved in th[e] business [are] goodwill, customer lists, customer contract and routes, and the trucks and containers used to serve those customers."

*Atlantic Richfield,* 847 F.Supp. at 1290–91 (purchaser of assets of waste haul business liable as successor).

■ Neither of these traditional doctrines, standing alone, is particularly well suited to either the goals of CERCLA or the contours of the present litigation. *See Kleen Laundry,* 817 F.Supp. at 233. As such, the court announced the application of a more flexible standard to govern the present question of whether TWM is in substance, if not in classic form, the successor to Portland Oil:

> [S]trict adherence to the parochial requirements in CERCLA cases may in some instances conflict with the remedial policies underlying [CERCLA]. Therefore, the court will adopt a common sense rather than an overly restricted look at the corporate transfer.

*Id.* (quotations omitted). The pragmatic approach does not repudiate the factors regularly used to determine questions of corporate successorship under the *de facto* merger or "mere continuation" exceptions. Rather, the court considers the traditional doctrine in a somewhat more flexible manner in order to promote the broad remedial policies underlying CERCLA. *See United States v. Kayser–Roth Corp.,* 910 F.2d 24, 26 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991); *Smith Land & Improv. Corp. v. Celotex Corp.,* 851 F.2d 86, 91–92 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *Boyd,* 992 F.2d at 405 & n. 4; *see also Carolina Transformer Co.,* 978 F.2d at 837–39; *Atlantic Richfield,* 847 F.Supp. at 1283–84; *United States v. Distler,* 741 F.Supp. 637, 642 (W.D.Ky.1990). The court is guided by the principles behind the application of the successor liability doctrine in CERCLA cases:

> Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Acushnet River,* 712 F.Supp. at 1013–14 (citing *Smith Land,* 851 F.2d at 91–91).

■ The court finds that TWM purchased the Portland Oil business notwithstanding the absence of certain formalities present in a traditional merger or acquisition. The May 31, 1988 agreement, which laid the foundation for this now-disputed transaction, is explicit on this point:

> Seller agrees to sell and Buyer agrees to purchase from Seller the Seller's *waste oil collection and sales business,* including ·Seller's Collection and Sales Customer Lists and telephone numbers, which business Seller now operates in the States of Maine, New Hampshire, and Vermont.

Plaintiff's Exhibit 1, ¶ 1 (emphasis supplied). Later provisions of the agreement are similarly clear that the parties intended that "Seller shall deliver to the Buyer a Bill of Sale to vest in the Buyer *free and clear title to the Seller's waste oil collection and sales business.*" *Id.* at ¶ 2 (emphasis supplied); *see* ¶ 3 ("purchase price for the Seller's waste oil collection and sales business is"). The court recognizes that the agreement and related papers specifically itemize certain assets for inclusion in the transaction, such as trucks, tanks and customer lists, while expressly excluding others from purchase, such as Portland Oil's accounts receivable and office furniture. Exhibit 1 at ¶¶ 4–7; Exhibit 2 at 1 & Attachment A. However, the fact that the written documents happen to include a catalogue of assets does not preclude a finding that the agreement was executed for the sale of a business.

In arriving at this finding, the court has placed great weight not only on the face of the agreement, but also on the conduct and relationship of the parties before and after the sale was completed. George West III, the president and owner of Portland Oil, wanted to leave the oil recycling industry altogether and has testified at deposition that this was the purpose behind the 1988 transaction. Exhibit 6 at 50. Donald Littlefield, then vice president and currently president of TWM, knew Mr. West wanted to leave the industry and considered the transaction a prime opportunity to eliminate a competitor. Transcript, Evidentiary Hearing on Succes-

sor Liability ("Tr."), 9/7/94 at 29–30. Indeed, although he characterizes the 1988 transaction as simply an asset purchase, Mr. Littlefield required Mr. West to execute a non-compete clause as part of the deal. Exhibit 3; Tr. at 37–38 ("I paid over $400,000 for this company. Why would I have him compete against me?"). Finally, Mr. Littlefield himself described the 1988 transaction as the purchase of an "oil collection business" even though he has insisted throughout that it was no more than an asset purchase. Tr. at 29–31.

The course of events following the agreement further indicates that the defendant purchased an entire business. After the sale was completed, TWM moved to integrate Portland Oil's operations into its own. The defendant either retired the Portland Oil trucks or, where salvageable, repainted them to bear the TWM insignia. Tr. at 20–21, 34–35. The defendant hired and retrained five out of eight or nine Portland Oil drivers. Tr. at 35. A caller to Portland Oil's telephone line would automatically be transferred to the defendant's office and answered as TWM. Tr. at 21, 36. The defendant assumed Portland Oil's contracts for Yellow Pages advertisements. Exhibit 1 at ¶ 4; Tr. at 19. The defendant also received the rights to the Portland Oil name. Tr. at 34–35, 41.

Perhaps most significantly, the defendant assumed Portland Oil's customers and serviced them without interruption with the same drivers and trucks but under the TWM name. Tr. at 35.

Q. The Portland Oil customers were not given any communication about this transaction, were they?

A. No, there was a letter that was delivered by our drivers that indicated that *we had bought the company and that ... TWM was going to service them.*

Q. So a customer would then simply get a bill on a TWM letterhead rather than Portland Oil.

A. Correct.

Tr. at 36 (emphasis supplied). This seamless client transfer reveals that the defendant purchased and operated a complete business and, in so doing, tacitly held itself out to the public as the continuation of the Portland Oil. Moreover, following the sale of its waste oil business, George West & Son's was nothing more than a corporate shell for the winding down of various financial obligations and existed as a parent company to an unrelated nursery business. Exhibit 6 at 48–51. Although this continuation of the (George West & Sons) business bars a finding of corporate successorship under the *de facto* merger exception, such a formalistic distinction has little bearing on this court's common sense analysis. *See Boyd,* 992 F.2d at 408–09; *Acushnet River,* 712 F.Supp. at 1015.

The 1988 transaction, both as conceived and consummated, has yielded sufficient indicia of corporate transfer and consolidation for the court to find that the defendant succeeded to Portland Oil in substance, if not in traditional form.[1]

II. *Total Waste Management's Liability for Conduct Associated with Conn–Val Oil Recycling*

The next step in the court's inquiry is to determine whether the Portland Oil liabilities that TWM succeeded to include those activities at the Kleen site associated with Conn–Val. This requires a determination of whether Conn–Val was an independent business entity or instead an integrated part of the Portland Oil business.[2]

The defendant urges that, even if it is a successor to Portland Oil, it cannot be held liable for remediation costs because the environmental damage at that site was caused by

1. Although the court has applied a pragmatic, common sense analysis to the successor liability issue, the court would have arrived at the same conclusion even under a more traditional approach. A review of the factual record which has developed since the defendant's failed motion for summary judgment reveals that the defendant's purchase of Portland Oil contains many of the factors pointing towards successor liability under the substantial continuity doctrine.

2. The court has already determined that TWM is not liable as a successor to Conn–Val in the event that Conn–Val is determined to be an independent business entity. *Kleen Laundry,* 817 F.Supp. at 232.

Conn–Val, a separate division of George West & Sons that was disbanded several years prior to the 1988 purchase. Defendant's Memorandum at 6–7, 10–11; Tr. at 41–44. The defendant asserts that its officers were not even aware of the prior existence of Conn–Val until well after it purchased Portland Oil and that it would be fundamentally unfair to burden them with its liabilities. Defendant's Memorandum at 10–11; Tr. at 41–43.

The plaintiff responds that Conn–Val was never a distinct business entity such as to give rise to its own liability. Plaintiff's Memorandum at 3. Rather, it argues that Conn–Val was legally indistinguishable from Portland Oil and, as a result, when TWM purchased the oil recovery business, any lingering assets or liabilities associated with Conn–Val went along with it. *Id.* at 3–4.

### A. Conn–Val Was at All Times Part of Portland Oil

■■■■■ Courts are frequently called upon to untangle corporate webs in their efforts to distribute liability appropriately. *See Boyd,* 992 F.2d at 408; *Kayser–Roth,* 910 F.2d at 27. For purposes of CERCLA liability an internal division of a corporation does not have a separate legal existence from the corporation itself. *Atlantic Richfield,* 847 F.Supp. at 1292. Likewise, a parent corporation which exercises "persuasive control" over an autonomous subsidiary may be liable under an operator theory for the subsidiary's environmental torts. *Kayser–Roth,* 910 F.2d at 26–27; *see Boyd,* 992 F.2d at 408. Under this theory, the parent is held responsible for *its* own activities as an operator and, because the liability is direct, the court need not pierce the veil. *Boyd,* 992 F.2d at 408 (citing *Kayser–Roth,* 910 F.2d at 27). When determining whether a parent exercised persuasive control over a subsidiary, the court undertakes a fact-specific examination of both the formal and practical relationship between the two entities. *See Boyd,* 992 F.2d at 408;

*Atlantic Richfield,* 847 F.Supp. at 1292–93. The court considers the nature and extent of the parent's involvement in the financial, managerial and personnel decisions of the subsidiary when determining if the parent "exerted practical total influence and control over the [subsidiary's] operations." *Kayser–Roth,* 910 F.2d at 27 (quotations omitted); *see Boyd,* 992 F.2d at 408.

■■■■ The court finds that, notwithstanding the use of the label Conn–Val, all relevant conduct at the Kleen site was performed as part of the Portland Oil business.

First, Conn–Val was never officially established as an independent business. Exhibit 6 at 23–24. It was neither incorporated under any state laws nor recognized as a distinct entity in any written document. *Id.* at 24. Rather, Conn–Val was the name used by a short-lived venture that undertook the same waste oil recovery activities as Portland Oil but in a different geographic area. *Id.* at 16–18. Conn–Val was financed by Portland Oil and, for its life of approximately six weeks, operated a single truck owned by Portland Oil. *Id.* at 15, 18, 32. It was managed on a day-to-day basis by Charlie Wasson, who reported back to George West to discuss financial details and matters related to maintenance of the truck. *Id.* at 22–23. And when Conn–Val failed to reach George West's expectations, he shut it down, removing whatever oil it was storing with Portland Oil trucks. *Id.* at 16–17, 36, 71.[3]

Second, the circumstances surrounding the use of the Kleen tanks also reveal that Conn–Val was not an independent business. In a document executed on May 1, 1984, Conn–Val agreed to pay the plaintiff $200 a month for use of the storage tanks at the Kleen site. Exhibit 4. The agreement also included what appears to be an indemnification provision whereby Conn–Val "agree[d] to absolve [the plaintiff] of all liability" related to the use of the tanks. *Id.* Portland Oil does not appear on the face of the agreement. *Id.*

---

**3.** The informality of the relationship between Portland Oil and Conn–Val is underscored by Mr. West's inability to consistently describe its nature. During his deposition, Mr. West refers to Conn–Val alternately as a business or a division. *E.g.,* Exhibit 6 at 24, 33, 60. Having ruled

that Conn–Val was never a cognizable entity apart from George West & Son's oil recovery business (Portland Oil), this court need not identify precisely where Conn–Val would fall in the traditional corporate taxonomy.

However, Portland Oil arranged for a certificate of insurance to be issued to the plaintiff listing Portland Oil as the insured under policies covering general, automobile and workers' compensation/employers' liability.[4] Exhibit 5; Exhibit 6 at 58–59. The defendant has not been able to offer a reasonable explanation of why Portland Oil would hold itself out to both its insurance companies and the plaintiff as the party responsible for potential liabilities at the Kleen site if Portland Oil did not consider the Conn–Val activities to be part of its overall oil recovery business.

Finally, when George West decided to withdraw from the Connecticut Valley market, he drained the waste oil from the Kleen tanks into Portland Oil trucks. Exhibit 6 at 16–17, 36, 71.

■ In both a technical and practical sense, Conn–Val never existed as anything other than an informal venture operating fully within George West & Son's overall oil recovery business, Portland Oil. However, even if the court determined that Conn–Val was as an independent subsidiary, Portland Oil would still be directly liable as an operator. There can be little doubt that Portland Oil exercised "persuasive control" over Conn–Val considering that it financed the entire operation, owned all the equipment, initiated and discontinued service in the space of six weeks and, at one point, was even consulted about how to address problems related to a worn tire and truck battery.

### B. TWM's Ignorance of Conn–Val Activities Does Not Shield It From CERCLA Liability.

The defendant has placed great weight on evidence that its officers had no idea that Portland Oil operated as Conn–Val several years earlier and, as a result, unknowingly exposed TWM to CERCLA liability when it signed the 1988 Agreement. Defendant's Memorandum at 10–11; Defendant's Response at 2; Tr. at 44. This ignorance is the cornerstone of defendant's argument that it would be fundamentally unfair to burden TWM with the liabilities of oil recovery activities that it was unaware of and that had ceased operation prior to its purchase. Defendant's Memorandum at 11; Defendant's Response at 2.

The court does not question the veracity of defendant's claims of ignorance concerning Portland Oil activities associated with the name Conn–Val. Nonetheless, the court does not consider this to constitute a bar, equitable or otherwise, to today's finding of successor liability for the Kleen site.[5] CERCLA is a remedial statute which has been broadly construed to hold "the company that sullied the property responsible for the costs of cleanup." *Boyd,* 992 F.2d at 405; *see Carolina Transformer,* 978 F.2d at 838. Both the goals of CERCLA and fundamental fairness require that if Portland Oil, under its own name or that of Conn–Val, is found to have contaminated the Kleen site, all resulting liability remains with the business and, in turn, passes to TWM as successor.

---

4. The defendant has placed great reliance on the fact that the certificate of insurance reflecting coverage for the Kleen site listed "George West & Sons, DBA Portland Oil Recycling Et Al" as the insured party. Defendant's Request for Findings of Fact and Rulings of Law at ¶ 9 ("Defendant's Request"); Defendant's Response to Plaintiff's Memorandum of Law in Support of Request for Findings of Fact and Rulings of Law at 3 ("Defendant's Response"). Defendant argues that the inclusion of the term "et al" tacitly acknowledges the existence of other, unspecified businesses that were operated as independent companies under the larger George West & Son's umbrella. *Id.* at 3. The court finds the argument unpersuasive in view of the strong evidence indicating that Conn–Val was merely a label or informal arm of the Portland Oil business.

5. The court understands that, in retrospect, the defendant assumed an environmental lawsuit when it thought it was just purchasing a business. However, the agreement was negotiated and signed in 1988, eight years after the well-publicized enactment of CERCLA. By this time, Mr. Littlefield, a TWM officer and principal, had at least ten years experience in the waste oil industry and, prior to working for the defendant, had served as compliance manager for a similar business. Tr. at 5–6. This expertise should have led the defendant to recognize that the disposal of used petroleum invariably creates the risk of environmental liability and, as such, potential acquisitions in the industry should be scrutinized with due diligence. If Portland Oil's activities at the Kleen site were unknown to the defendant at the time of purchase, they may not have been unknowable.

*Conclusion*

In executing the 1988 Agreement, the defendant was able to expand its business by assuming the ongoing operations and all necessary assets of a key competitor in a single transaction. The defendant has reaped the commercial benefits of its purchase of Portland Oil and, by the same token, should not be allowed to step away from the burdens that go along with it.

The court finds TWM is the corporate successor to Portland Oil Recycling for purposes of CERCLA liability. The court also finds that Conn–Val Oil Recycling was never a cognizable business entity independent of Portland Oil and, as such, any liabilities associated with the former properly rest with the latter.

SO ORDERED.

**Joseph, Claire, and Anthony
VARRONE, Plaintiffs,**

v.

**Michael BILOTTI, et al., Defendants.**

**No. 92–CV–1290 (JRB).**

United States District Court,
E.D. New York.

Oct. 6, 1994.

Bernard W. McCarthy, Nancy L. Woodhouse, Chadbourne & Parke, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. by Frederic L. Lieberman, New York City, for defendants.

## MEMORANDUM–DECISION AND ORDER

BARTELS, District Judge.

Defendant John Matthews moves this Court under Rule 56 of the Federal Rules of Civil Procedure for summary judgment. Plaintiff Anthony Varrone moves under Rule 15 for an order granting him leave to amend

the complaint to name six additional known defendants and ten unidentified "John Doe" defendants. For the reasons set forth below, the defendant's motion for summary judgment is denied and the plaintiff's motion to amend is granted.

*BACKGROUND*

At the time of the events precipitating this action,[1] Joseph Varrone was incarcerated at the Arthur Kill Correctional Facility in New York (the "Facility"). On March 8, 1989, Joseph's son, plaintiff Anthony Varrone, and his companion, Susan Wight, spent what prison officials term a "contact visit" with Joseph at the Facility during regular visitation hours. This visit prompted prison security to subject Joseph to a strip search, a procedure they contend is performed routinely on inmates after contact visits. Although the strip search proved negative for contraband, security personnel placed Joseph in the Special Housing Unit ("SHU"), an area of solitary confinement within the Facility, where he was held for a period of twenty-seven hours. While Joseph was confined in SHU, authorities failed to uncover the presence of any contraband during an inspection of his bowel movement.

Plaintiff alleges that defendant violated 42 U.S.C. § 1983 on March 10, 1989, when he again visited his father at the Facility. Upon his arrival, defendant Matthews, a Facility correction sergeant assigned to the visiting room at the relevant time, informed plaintiff that he must submit to a strip search before he would be granted visitation privileges.[2] A sign posted outside the Facility expressly warns that "[a]ll visitors are subject to searches as a condition of visitation." (*See* Affidavit of Brian Malone, sworn to November 24, 1993 [the "Malone Aff."], Exhibit C.)

More importantly, plaintiff admits having signed a "Consent to Search" form (*id.*, Ex. E) before defendant Matthews escorted him to a private room, where a full-body search proved negative for contraband.

The account offered by defendant Matthews tells virtually the same story with a few important elaborations. Matthews claims that on March 3, 1989, Kings County Assistant District Attorney Eric Seidel telephoned Brian Malone, the Inspector General for the New York State Department of Correctional Services ("DOCS"), to notify him that ADA Seidel had received information regarding possible drug trafficking by Joseph, Claire, and Anthony Varrone. Specifically, ADA Seidel stated that he had been told by a "reliable source" that Anthony and Claire Varrone planned to visit Joseph within the near future, and that they would attempt to transport heroin into the Facility at that time.

After reviewing records pertaining to Joseph Varrone's conviction for criminal sale of a controlled substance, and armed with the knowledge that DOCS currently was investigating allegations of instances of drug smuggling at the Facility (none of which implicated Joseph Varrone, however), Malone directed Deputy Inspector General Thomas Mansfield to ensure that prison personnel subjected both Claire and Anthony Varrone to a strip search before their next visit. Deputy Inspector Mansfield then assigned the matter to Investigator Juan Ramos with instructions to contact senior security staff at the Facility. On March 6, 1989, Investigator Ramos provided Gerald Wells, Deputy Superintendent for Security at the Facility, with Malone's orders to search any visitor before allowing them to see Joseph Varrone. (*See* Malone Aff., Ex. B.) Apparently, this order

---

1. By order dated October 26, 1992, this Court consolidated three separate actions brought pursuant to 42 U.S.C. § 1983. On September 22, 1993, the Court dismissed as untimely all of the claims asserted by plaintiffs Joseph and Claire Varrone. Plaintiff Anthony Varrone then voluntarily dismissed his claims against defendants Michael Bilotti, Francisco Berrios, and Bert Ross. Because defendant Raymond Bara died prior to commencement of the present action, the only claims left remaining are those asserted by plaintiff against defendant John Matthews.

2. Claire Varrone had attempted to visit her husband Joseph on March 9, 1989, when, upon her arrival at the Facility, she too was told that before she would be permitted to see Joseph she must submit to a strip search. Although the search of Claire Varrone uncovered no illegal contraband, authorities allowed only a non-contact visit. Claire Varrone's Section 1983 claim was based on this strip search.

eventually was carried out by defendant Matthews.

## DISCUSSION

### A. Defendant's Motion for Summary Judgment

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the record demonstrates clearly that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 571–73 (2d Cir.1991). The party seeking summary disposition bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2558, 91 L.Ed.2d 265 (1986). The court's function on such a motion is to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991).

Defendant's motion launches a multi-tiered attack, arguing that Anthony Varrone has failed to state a violation of his constitutional rights because he retained no legitimate expectation of privacy once he entered the Facility. Alternatively, Matthews asserts that even if plaintiff did enjoy a legitimate privacy expectation, he expressly consented to the strip search and thereby waived any Fourth Amendment protections he may have had. In any event, Matthews claims the search was based on reasonable suspicion, and thus passes constitutional muster. A second line of defense asserts that Matthews himself cannot be held liable should the Court find that the strip search was constitutionally unreasonable. First, Matthews relies on the principle that in order to establish liability in a Section 1983 action, plaintiff must demonstrate personal involvement on the part of a defendant. Matthews argues further that even if he were involved personally in the search, the doctrine of qualified immunity shields him from liability. Each of defen-

dant's contentions here will be dealt with separately.

### 1. Plaintiff Retained a Legitimate Expectation of Privacy While Visiting the Facility

■ Plaintiff did not abandon his constitutional right to be free from unreasonable government intrusion when he entered the Facility to visit his father. While the Court of Appeals for the Second Circuit has recognized that "[c]ontacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates' privacy," *United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989), neither that court, nor any other circuit court, has held that the need to maintain prison security justifies wholesale abrogation of rights protected by the United States Constitution. Indeed, the circuit courts generally agree that a prison visitor retains a Fourth Amendment right to be free from unreasonable searches and seizures. *See, e.g., Boren v. Deland*, 958 F.2d 987 (10th Cir.1992); *Cochrane v. Quattrocchi*, 949 F.2d 11 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Daugherty v. Campbell*, 935 F.2d 780 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Smothers v. Gibson*, 778 F.2d 470 (8th Cir.1985); *Thorne v. Jones*, 765 F.2d 1270 (5th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 313 (1986).

■ Although plaintiff retained a legitimate expectation of privacy while in the Facility, the Court agrees with defendant that any such expectation necessarily was diminished. The Second Circuit has recognized that noninmates possess legitimate expectations of privacy; the court has noted, however, that "in light of the difficult burdens of maintaining safety, order and security," these privacy expectations diminish when one enters a correctional facility. *Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 204 (2d Cir.1984). As stated by the Court of Appeals for the First Circuit, "[t]o be sure, those visiting a prison cannot credibly claim to carry with them the full panoply

of rights they normally enjoy. But neither may they constitutionally be made to suffer a wholesale loss of rights...." *Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir.1985). Accordingly, once inside the Facility plaintiff enjoyed a legitimate, albeit diminished, expectation that he would be free from unwarranted government intrusion into his bodily privacy.

2. *Whether the Strip Search of Plaintiff Was Supported by Reasonable Suspicion Raises an Issue of Material Fact*

■ The Court finds that defendant Matthews has failed to demonstrate that, as a matter of law, the gross invasion of plaintiff's Fourth Amendment rights was supported by reasonable suspicion. The Fourth Amendment "vests individuals with the right to be free from 'unreasonable government intrusions into their legitimate expectations of privacy.'" *Carey,* 737 F.2d at 201 (quoting *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 [1977]). Having concluded that Anthony Varrone enjoyed a legitimate privacy expectation while a visitor at the Facility, it now is incumbent upon defendant to establish that the government's intrusion on that privacy right was reasonable. The United States Supreme Court has held that to determine the reasonableness of a strip search conducted at a correctional facility, "the court must balance the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Application of this balancing test has led the courts to adopt a reasonable suspicion standard to govern the conduct of strip searches of prison visitors. *See, e.g., Boren,* 958 F.2d at 988; *Cochrane,* 949 F.2d at 13; *Daugherty,* 935 F.2d at 784; *Thorne,* 765 F.2d at 1277; *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

■ In weighing the severity of the intrusion involved here against its alleged justification, the Court is mindful that a strip search involves a grave violation of bodily privacy. *See, e.g., Cochrane,* 949 F.2d at 13 (a strip search "'constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual'") (quoting *Burns v. Loranger,* 907 F.2d 233, 235 n. 6 [1st Cir.1990]); *Hunter,* 672 F.2d at 674 ("a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience"). Thus, although the courts are bound to accord great weight to the interest prison officials have in intercepting contraband and maintaining prison security, *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878; *Blackburn,* 771 F.2d at 564, the inherently invasive nature of a strip search requires a greater showing of necessity to justify its conduct.

■ Matthews's proof falls short of making the requisite showing of necessity. Defendant contends that the information provided by ADA Seidel's unidentified "reliable source" and general suspicions of drug smuggling at the Facility alone warranted a search of plaintiff. However, "'[t]o justify the strip search of a particular visitor ... prison officials must point to specific objective facts and rational inferences'" that establish particularized reasonable suspicion directed specifically to that visitor. *Thorne,* 765 F.2d at 1277 (quoting *Hunter,* 672 F.2d at 674). Where, as here, authorities rely on information provided by a confidential informant, the tip must possess some "indicia of reliability sufficient to give prison officials reasonable grounds to suspect drug smuggling activity" on the part of the individual searched. *Hunter,* 672 F.2d at 676. Reasonable suspicion exists only when "the information contained in the tip is linked to other objective facts known by correctional authorities." *Id.* (citing *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 [1972]).

Defendant has cited no objective fact or rational inference implicating Anthony Varrone as a probable drug smuggler. Indeed, the general suspicions of drug trafficking at the Facility in no way implicated Joseph, Claire, or Anthony Varrone, and prison authorities discovered no evidence buttressing the informant's tip or specifically implicating plaintiff in any drug trafficking activity. Rather, prison authorities apparently subjected plaintiff to one of the most demeaning and humiliating forms of government intru-

sion on the basis of nothing more than an uncorroborated confidential informant's tip.

Although defendant urges that the strip search was required to thwart a reasonably suspected attempt by plaintiff to smuggle drugs into the Facility, several facts belie this contention. First, on March 8, 1989, five days *after* authorities had received the tip from ADA Seidel's informant, prison officials permitted Anthony Varrone and Susan Wight to visit Joseph *without first subjecting them to a search for contraband.*[3] According to Brian Malone, ADA Seidel purportedly notified DOCS authorities on March 3, 1989 of his receipt of the tip that Anthony or Claire Varrone likely would attempt to transport drugs into the Facility within the near future. (Malone Aff., ¶ 3.) A memorandum sent by Investigator Ramos to Gerald Wells, the Deputy Superintendent of Security at the Facility, confirms that Facility security personnel clearly were apprised of ADA Seidel's tip as early as March 6, 1989. (Malone Aff., Ex. B.) Noticeably absent, however, is any explanation for why prison personnel, admittedly armed with the information provided by ADA Seidel and faced with the directive to strip search Anthony, Claire, and "anyone that is with them" on "their next attempt to visit" Joseph (*id.*), neglected to conduct *any* search of plaintiff and his companion on March 8, 1989.

Defendant does not allege that prison authorities received corroborative information between March 8 and March 10 that could have bolstered the reliability of the tip or provided independent justification for a strip search of plaintiff on March 10. Rather, examination of the surrounding circumstances reveals that all evidence received by authorities after learning of ADA Seidel's tip actually points *away* from Joseph, Claire, and Anthony Varrone as suspects in any illegal drug trafficking at the Facility. For example, immediately after the March 8 contact visit with plaintiff, prison authorities strip-searched Joseph and then held him in isolation in a fruitless attempt to uncover secreted contraband. Similarly, authorities again failed to intercept any illicit drugs during a strip search of Claire Varrone conducted before her visit on March 9, 1989. Viewing collectively the authorities' failure to search plaintiff and his companion before their March 8 visit with the absence of any evidence of drug trafficking uncovered during previous searches of both Joseph and Claire, it appears that authorities were less justified in searching plaintiff on March 10 than they would have been prior to the March 8 visit.[4]

The issue of whether prison authorities properly were justified in subjecting plaintiff to a strip search renders inappropriate a grant of summary judgment on the basis of the present record. Indeed, as noted above, the information received by prison authorities subsequent to their learning of the tip not only failed to bolster, but actually questioned, the veracity of the information provided about the Varrones. Viewing, as it must, these facts in the light most favorable to plaintiff, the Court holds that the confidential informant's tip, absent some measure of corroboration, fails to demonstrate as a matter of law that the strip search of plaintiff was warranted. The evidence presently before the Court leaves open to question whether there existed at the time of the search independent, articulable grounds to suspect plaintiff of an attempt to smuggle drugs into the Facility, and the reasonableness of defendant's conduct thus is a question of fact best left for the jury. *See Keeler v. Hewitt,* 697 F.2d 8, 12 (1st Cir.1982) (jury properly determines the reasonableness of a

---

**3.** Whether Anthony Varrone actually visited Joseph on March 8 cannot logically be contested. Although defendant's motion papers here make no mention of the March 8, 1989 visit, this visit and the subsequent strip search and SHU confinement of Joseph Varrone formed the basis of Joseph's Section 1983 claim and were, in part, the subject of this Court's September 22, 1993 order dismissing the claims asserted by plaintiffs Joseph and Claire Varrone.

**4.** The Court draws the distinction between the knowledge possessed by security personnel on March 8 and March 10 for purposes of comparison only, and makes no finding with respect to whether any search of plaintiff would have been supported by reasonable suspicion if it had been conducted on March 8, 1989.

search in a Section 1983 action).[5]

### 3. *Plaintiff Did Not Waive his Fourth Amendment Protections by Consenting to the Search*

Because the Court has held that there remains a question of fact concerning the reasonableness of the strip search at issue, it becomes necessary to determine whether, as a matter of law, plaintiff's alleged consent to the search effectively waived his Fourth Amendment protections.

■ Matthews argues that Anthony Varrone cannot contest the reasonableness of the strip search because plaintiff knowingly consented to the conduct of that search. On this point Matthews bears the "burden of proving' that consent was, in fact, freely and voluntarily given." *Carey,* 737 F.2d at 202 n. 23 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 [1973] ). Defendant points first to a sign posted outside the Facility—which warns would-be visitors that the right of visitation may be contingent upon ·a search—as grounds for implying plaintiff's consent. More importantly, defendant relies heavily on the "Consent to Search". form plaintiff signed as evidence of an express waiver of plaintiff's Fourth Amendment rights. It is undisputed that absent his consent to the search, plaintiff would have been denied visitation privileges.

The Court finds neither of defendant's arguments persuasive. In *Cochrane v. Quattrocchi, supra,* the Court of Appeals for the First Circuit held invalid consent obtained from a prison visitor where the would-be visitor was put to the choice of either consenting to a strip search or leaving the prison. The court rejected the argument that the visitor's right to choose to decline visitation rendered her consent constitutionally

meaningful. Rather, the court concluded that "a prison visitor confronted with the choice between submitting to a strip search or foregoing a visit cannot provide a 'legally cognizable consent,' " because it " 'is the *very choice to which she was put* that is constitutionally intolerable.' " 949 F.2d at 14 (quoting *Blackburn,* 771 F.2d at 569, 568 [emphasis in original] ). The Court here agrees that plaintiff "was confronted with a similar, and no less 'constitutionally intolerable,' choice between being denied prison visitation access . . . or waiving [his] constitutional right to be free from [an] unreasonable search." *Id.* at 14–15. Where, as here, access to a prison is "impermissibly conditioned" on submission to a strip search, consent is constitutionally deficient as a matter of law. *Blackburn,* 771 F.2d at 567.

■ The Court also finds no merit in defendant's suggestion that the posting of the warning sign outside the Facility rendered permissible an invasion of plaintiff's privacy rights. A similar argument was advanced in *Thorne v. Jones, supra,* where the court rejected the defendant's assertion that plaintiff had consented to a strip search by executing a prison visitor form and by passing through the prison gates, at which warning notices were posted. The court cautioned that "[i]f accepted, this argument would render reasonable a strip search of any such prison visitor" irrespective of the need for the particular intrusion. 765 F.2d at 1276. Accordingly, the Court finds invalid any alleged express or implied consent to the search in question.

### 4. *Matthews was Personally Involved in Conducting the Search of Plaintiff*

■ Defendant Matthews correctly notes that Section 1983 liability requires a showing

---

5. The search involved here failed even to meet the standards the Department of Correctional Services sets for itself. DOCS Directive 4403, section IV.D.2., as it existed in March 1989, provides that "[i]n order to justify a strip search of a particular visitor, the Superintendent or his designee, must point to specific objective facts and rational inferences that he is entitled to draw. . . . In other words, [he] must have reasonable cause to believe that· drugs or other contraband is concealed upon the person of the

visitor. Generalized suspicion of smuggling activity is insufficient." That section also cautions officials that *"[s]trip searches may not be ordered based on uncorroborated tips* merely stating that visitors would attempt to introduce contraband into a facility where the informant's reliability cannot be assessed and observations of visitors upon arrival at the facility do not contribute to reasonable suspicion of contraband. *Reasonable suspicion exists only if the tip can be linked to other objective facts."* (Emphasis added.)

of a defendant's personal involvement in the alleged unconstitutional behavior. *See Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). However, the Court finds wholly unconvincing defendant's attempt to distance himself from the alleged infraction involved here. While admitting that he actually performed the strip search in question, defendant Matthews argues that because he was not involved in making the *decision* to subject plaintiff to a strip search, he cannot be held liable under Section 1983. Defendant has cited no legal authority in support of this position, and the Court finds the argument meritless.

5. *Whether the Doctrine of Qualified Immunity Shields Defendant Matthews From Civil Liability Raises a Question of Material Fact*

■ The defense of qualified immunity shields government officials from civil liability " 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Prue v. City of Syracuse,* 26 F.3d 14, 17 (2d Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 [1982] ). Whether the doctrine of qualified immunity properly applies is a question of law to be decided by the court. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985).

■ To establish this defense on motion for summary judgment, defendant bears the burden of showing upon undisputed facts either that it was not clear at the time he conducted the search that "the interest asserted by the plaintiff was protected by federal law," *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993), or that it was "objectively reasonable" for defendant to believe that his conduct did not violate plaintiff's clearly established rights. *Prue,* 26 F.3d at 17. When examining whether a right was clearly established at the time a defendant committed an alleged violation, the court must consider:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Soares v. Connecticut,* 8 F.3d 917, 922 (2d Cir.1993). *See also Calhoun v. New York State Div. of Parole Officers,* 999 F.2d 647, 654 (2d Cir.1993). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738.

■ The Court holds that in March 1989, the decisional law of the United States Supreme Court, the Court of Appeals for the Second Circuit, and the other circuit courts of appeals collectively had established that "the search of prison visitors without at least reasonable suspicion violated clearly established law." *Daugherty,* 935 F.2d at 784. As early as 1979, the Supreme Court had announced that strip searches conducted at correctional facilities—in particular strip searches of prison inmates, who logically enjoy fewer rights within a penal institution than do noninmates—must be reasonable, and that this reasonableness determination requires the court to balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884.

The Second Circuit, elaborating upon the rule set forth in *Bell,* then defined the parameters of Fourth Amendment protection in the context of a penal institution in terms of the reasonable suspicion standard. In *Security and Law Enforcement Employees v. Carey, supra,* the court firmly established that the strip search of a corrections officer working in a correctional facility was constitutionally deficient absent reasonable suspicion. In adopting the reasonable suspicion standard, the Second Circuit relied in part on *Hunter v. Auger, supra,* a case that earlier had applied that standard to strip searches of prison visitors. In its discussion of *Hunter,*

the Second Circuit took great pains to detail the "significant parallels between visitors to correctional facilities and correction officers who work in them." 737 F.2d at 204. Then, in *United States v. Willoughby, supra,* the Second Circuit expressly recognized development of the rule that prison visitors may be subject to strip searches upon a showing of reasonable suspicion. 860 F.2d at 22 (emphasis added).

Although in March 1989 the Supreme Court and the Second Circuit had not explicitly adopted the reasonable suspicion standard in the context of a prison visitor search, existing case law addressing the "predicate requirement of reasonable suspicion for the search of prison visitors provided 'an authoritative, 'clearly established' rule forewarning'" the defendant that his actions violated plaintiff's constitutional rights. *Daugherty,* 935 F.2d at 787 (quoting *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 [6th Cir.1988]). Indeed, each circuit court to have spoken on the issue by 1989 had declared that in order to be constitutionally sound, the strip search of a prison visitor must meet the reasonable suspicion test. *See, e.g., Smothers,* 778 F.2d 470 (Eighth Circuit); *Blackburn,* 771 F.2d 556 (First Circuit); *Thorne,* 765 F.2d 1270 (Fifth Circuit); *Hunter,* 672 F.2d 668 (Eighth Circuit).

The rules promulgated by the Department of Correctional Services bolster the conclusion that the rights asserted by plaintiff were delineated clearly at the time of the March 1989 search. *See Duamutef v. Leonardo,* 1994 WL 86700, at *10–11, 1994 U.S. Dist. LEXIS 2904 at *35–36 (N.D.N.Y. March 7, 1994). The applicable regulation in effect in March 1989, DOCS Directive 4403, section IV.D.2., expressly required corrections officers first to make a finding of reasonable suspicion based on "specific objective facts and rational inferences" before subjecting prison visitors to strip searches. *See* note 5, *supra.*

In light of the foregoing, the Court concludes that by March 1989, the law clearly established "the contours of the prison visitor's right to be free from a [strip] search in the absence of reasonable suspicion that he

or she is carrying contraband." *Daugherty,* 935 F.2d at 787. Consequently, unless defendant can demonstrate that as a matter of law it was objectively reasonable for him to believe that his actions did not violate plaintiff's rights, his qualified immunity defense must await resolution at trial.

In this respect, defendant has failed to make the showing necessary to succeed on the present motion. The doctrine of qualified immunity shields officials from suit if a reasonable official could have believed his conduct "'to be lawful, in light of clearly established law and the information [he] possessed.'" *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 [1987]). *Accord Castro v. United States,* 34 F.3d 106, 112 (2d Cir.1994). In defense of his actions, Matthews urges that it was objectively reasonable for him to follow an order he had received from his superior directing him to perform a search of Anthony Varrone before granting him entry to the Facility. Matthews correctly notes that his position required him to obey the orders of his superiors. However, defendant's position also presumably required him to follow the directives issued by the Department of Correctional Services. Here, DOCS Directive 4403 tracked the language typically employed by the courts when discussing the reasonable suspicion standard, and set forth with utmost clarity the conditions that justify the strip search of a visitor at the Facility. Defendant's proof fails to "proffer details from which ... the factual reasonableness of [his] actions would have been established," *Castro,* 34 F.3d at 112, and there remain factual questions precluding summary judgment on qualified immunity grounds.

### B. *Plaintiff's Motion to Amend*

██ Plaintiff moves to amend the complaint to name ten unidentified "John Doe" defendants and six additional known defendants, including Henrique Frett, Thomas Eisenschmidt, Gerald Wells, Juan Ramos, Thomas Mansfield, and Brian Malone.[6] Ab-

**6.** The newly-added "John Doe" defendants com-

prise the chain of command between Gerald

sent written consent from the adverse party, Federal Rule of Civil Procedure 15(a) requires leave of court to amend a pleading once service of a responsive pleading has been effected. While the court enjoys "considerable discretion in deciding whether to grant leave to amend, as a rule leave to amend 'shall be freely given when justice so requires.'" *New York v. Storonske Cooperage Co., Inc.,* 144 F.R.D. 179, 182 (N.D.N.Y. 1992) (quoting Fed.R.Civ.P. 15[a]). This liberal policy advises that requests to amend be granted absent a showing of undue delay, bad faith, or dilatory tactics. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

■ Plaintiff seeks to assert claims that indisputably are barred by the applicable statute of limitations. Rule 15(c) provides that an otherwise stale claim relates back to the original pleading if: (1) the proposed claim arises out of the conduct or transaction set forth in the original pleading; (2) each new defendant received notice of the action such that he will not be prejudiced in maintaining a defense; and (3) each new defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought" against him.[7] Fed.R.Civ.P. 15(c)(2), (3). Because the claims plaintiff now seeks to add clearly arise out of the same events set forth in the original pleading, the real issue before the Court is proper notice.

Plaintiff urges that the newly-added defendants received notice of the pendency of the action through common representation by the Attorney General of the State of New York (the "Attorney General"). Plaintiff correctly notes that the courts of this Circuit have held that "when both the old and new defendants are state officials and are represented by the same lawyers ... a court is entitled to find that the new defendants received constructive notice which satisfies Federal Rule of Civil Procedure 15(c)." *Af-*

*rika v. Selsky,* 750 F.Supp. 595, 599 (S.D.N.Y.1990). Defendant Matthews and the defendants previously dismissed from the action are and were represented by the Attorney General. The Attorney General likewise would represent both the known and the "John Doe" defendants plaintiff proposes to add. The Court's inquiry cannot end here, however, because before the Attorney General's knowledge of the action can be imputed to the proposed defendants, it also is incumbent upon plaintiff to demonstrate that "the attorney(s) knew that the additional defendant[s] would be added to the existing suit." *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989). The appropriate standard by which to assess whether counsel possessed the requisite knowledge is whether he "knew or should have known" that the proposed defendants would be added. *Id.* "If counsel is on notice to prepare a defense for additional defendants, then such defendants will not be prejudiced by being named at a later date." *Felix v. New York City Police Dep't,* 811 F.Supp. 124, 128 (S.D.N.Y.1992).

The Court agrees with plaintiff that the Attorney General should have known that additional defendants would be added to the existing lawsuit. In *Hood v. City of New York,* 739 F.Supp. 196 (S.D.N.Y.1990), plaintiff inmate commenced a *pro se* action alleging Section 1983 liability against the City of New York and two corrections officers he claimed assaulted him in the Bellevue Hospital Prison Ward. Six months after counsel was appointed, plaintiff filed an amended complaint adding as defendants the Commissioner of the New York City Department of Corrections and the Commanding Officer of the Bellevue Hospital Prison Ward. The proposed defendants contested the amendment, urging that the claims asserted therein were untimely.

The court in *Hood* held that common representation by Corporation Counsel imputed to defendants knowledge of the pending suit

---

Wells, Deputy Superintendent for Security at the Facility, and defendant Matthews, the corrections officer who actually carried out the search.

7. Although Rule 15(c) purports to apply only to those cases wherein a party has been misnamed,

the courts of this Circuit have not limited its application to mistaken identity cases. *See Hood v. City of New York,* 739 F.Supp. 196, 198 n. 1 (S.D.N.Y.1990) (and cases cited therein).

sufficient to satisfy the notice requirements of Rule 15(c). Rejecting the contention that plaintiff intentionally excluded the proposed defendants from the original *pro se* complaint, the court stated that "Corporation Counsel should have known that the omission of [the proposed defendants] was likely due to plaintiff's lack of knowledge of the identity of the persons he alleges were responsible, not a result of a conscious tactical decision." 739 F.Supp. at 199. The court stressed that plaintiff's addition of "supervisory municipal employees"—whose identity presumably was more difficult for plaintiff to ascertain—to a suit originally naming only the city and the officers who allegedly beat plaintiff should have come as no surprise. *Id.*

Similarly, in *Hodge v. Ruperto*, 739 F.Supp. 873 (S.D.N.Y.1990), the court permitted plaintiff to amend his Section 1983 action to add several new municipal defendants. Although at the time of the amendment plaintiff was represented by counsel, plaintiff had filed the original complaint *pro se*. Like the court in *Hood*, the *Hodge* court concluded that Corporation Counsel's joint representation of several members of the New York City Police Department placed counsel and the newly-added defendants on notice that they would be added to the pending suit. The court noted that plaintiff's failure to name the new defendants in the original complaint did not appear to be the result of dilatory tactics, but rather likely was "due to plaintiff's unfamiliarity with the causes of action available to him and his lack of knowledge of the identity of the persons he alleges were responsible." 739 F.Supp. at 881.

Plaintiff's original *pro se* complaint named only defendant Bara, the Superintendent of the Facility at the relevant time, and defendant Matthews, the correction sergeant who actually performed the strip search of plaintiff. Like the plaintiffs in *Hodge* and *Hood*, Anthony Varrone apparently was ignorant of the identity of the other players involved in the alleged infraction, and accordingly named only those Facility employees he knew or believed to have participated directly in ordering and conducting the search. Because plaintiff filed his original complaint without

the benefit of legal representation, the Court finds excusable his failure to sue less easily ascertainable supervisory employees. Furthermore, no prejudice will result from permitting plaintiff to amend, as the facts giving rise to the claims sought to be added mirror those asserted in the original complaint. Accordingly, the Court finds notice through shared representation sufficient to confer knowledge for Rule 15(c) purposes, and plaintiff's amendment properly relates back to the original complaint.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment hereby is DENIED, plaintiff's motion to amend the complaint hereby is GRANTED, and plaintiff hereby is directed to file with the Court an amended complaint within thirty (30) days of the date of this order.

SO ORDERED.

**Walter JONES, et al., Plaintiffs,**

v.

**CITY OF BUFFALO, et al., Defendants.**

**No. 92–CV–345S.**

United States District Court,
W.D. New York.

Oct. 17, 1994.

Walter L. Jones, pro se.

Patricia R. Jones, pro se.

Michael B. Risman, Office of Corp. Counsel, Dept. of Law, Buffalo, NY, for City of Buffalo, James D. Griffin, Ralph V. Degenhart, R. Peter Morrow, III, Michael B. Risman, Kenneth Krempa, Michael Gasper, Dennis Allesi, Richard Smith, Reginald Hokes, George Fletcher and Lawrence K. Rubin.

F. David Rusin, Erie County Atty., Buffalo, NY, for County of Erie, David J. Swarts, F. David Rusin, Charles E. Craven, James W. McGill, David B. Kelly, and Mark A. Adrian.

Paul William Beltz, Buffalo, NY, for William A. Quinlan and Paul William Beltz.

Bryan G. Brockway, Cheektowaga, NY, for Mohammed K. Quayed.

Douglas S. Cream, State Atty. General's Office, Buffalo, NY, for Vincent E. Doyle, Peter B. Sullivan, and Joseph J. Sedita.

The numerous remaining defendants did not have appearance by counsel.

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Presently before this Court are numerous causes of action that were initiated in New York State Supreme Court or Buffalo City Court which have been removed to this Court by Walter Jones.[1] Generally stated, these petitions all relate to Jones' allegation that he has been the victim of a conspiracy to violate his civil rights. In addition to the present petitions, the claimed conspiracy has also been the subject of several prior state and federal court proceedings. As shall be discussed *infra*, these prior cases are of great significance with regard to this Court's handling of the present petitions.

Having reviewed the record kept in this matter, this Court shall, for the reasons set forth below, dismiss and/or remand all the causes of action presently pending under Docket No. 92–CV–345 and direct the Clerk of the Court to close the file and accept no future filings in this matter. Further, this Court shall reaffirm the injunction originally issued by the Honorable John T. Curtin and, as such, Walter Jones as well as all persons acting on his behalf are permanently enjoined from filing any future complaints or removing any state causes of action based on any of the claims set forth in the present case or the previous actions discussed herein. Finally, this Court shall direct the Clerk of the Court for the Western District of New York to accept no future filings from Walter Jones except in accordance with the procedure set forth herein.

### FACTS AND PROCEDURAL HISTORY

The history of the actions filed by Walter Jones ("Jones") is lengthy and exhaustive. Nevertheless, in an attempt to ensure that the claims Jones presently as well as previously asserted will never again unduly burden the judicial system, this Court shall endeavor to map the course of events that has led to the present Decision and Order.

Walter Jones is a litigious *pro se* litigant who has filed approximately sixty motions, affidavits, amendments, and demands since attempting to remove his state actions, Erie County Index Nos. 2611–91, 14730–91, and 1637–92, to federal court on May 22, 1992.

---

1. All causes of action removed to this Court under Docket No. 92–CV–345 have previously been dismissed and/or remanded to state court by this Court's Orders filed on June 24, 1994, and September 30, 1994. This Decision shall set forth the reasons for these two prior Orders.

The history of the present action can be traced to November 24, 1980, when Jones filed a civil action in federal district court for the Western District of New York under Docket No. 80–CV–1075. In that action, Jones alleged that the failure of the defendants to award construction contracts to Jones' corporation for the Niagara Falls Transit Authority Light Rail Project (the "Project") was a violation of his constitutional and statutory rights. Some of Jones' claims were dismissed by the Honorable John T. Elfvin on April 17, 1981 due to a lack of standing. On January 29, 1983, Jones filed civil action 83–CV–86 in an attempt to reallege these claims. Judge Elfvin dismissed this action on February 11, 1985, and the Second Circuit affirmed this decision.

Jones' remaining claims in 80–CV–1075 were dismissed on April 15, 1987, based upon Jones' failure to comply with the Honorable Edmund F. Maxwell's, United States Magistrate Judge, discovery orders. The Second Circuit affirmed this dismissal on December 13, 1987. *See Jones v. Niagara Frontier Transp. Authority,* 836 F.2d 731 (2d Cir. 1987), *cert. denied,* 488 U.S. 825, 109 S.Ct. 74, 102 L.Ed.2d 50 (1988).

On December 10, 1987, Jones filed civil action 87–CV–1532 alleging constitutional and statutory violations, as well as bribery, embezzlement, perjury, conspiracy and other various acts against two hundred and twenty original defendants, including the Mayor of Buffalo, virtually every union and contractor in the Buffalo area that was connected in any way with the Project, and all of the attorneys who represented defendants in 80–CV–1075. The complaint alleged that the defendants conspired to embezzle and extort federal funds earmarked for minority contracts in the Project, and then used those funds to pay bribes to Judge Elfvin and Magistrate Judge Maxwell to induce them to render unconstitutional decisions in 80–CV–1075. The complaint also alleged that the defendants con-

spired to set an arson fire at Jones' property at 1–19 Liberty Avenue. In a connected action, Docket No. 88–CV–887, Jones alleged that the United States Attorney General, Federal Bureau of Investigation, the present and former United States Attorneys, Assistant United States Attorney Marc Gromis, and the Clerks of the Court were involved in the improper dismissal of a racially mixed Grand Jury before which Jones testified in February 1988, and replaced it with an all white Grand Jury to investigate the fires at 1–19 Liberty Avenue. In addition, on February 24, 1989, Jones filed civil action 89–CV–253 seeking to remove tax foreclosure actions against three of his properties.

All three of these actions were assigned to Judge Curtin, who handling them simultaneously, dismissed them on June 9, 1989, by a Decision and Order read from the bench finding that the actions were "vexatious, harassing and duplicative ... [and had] put undue expense and burdens on the parties, on Court personnel, [and] the Court...." *Walter Jones v. City of Buffalo, et. al.,* Nos. 87–1532, 88–887, and 89–253 (W.D.N.Y. June 9, 1989). Further, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), the court ordered that Jones be enjoined from filing any further lawsuits in federal or any other court that were related to the subject matter of the cases that had been dismissed by the court. The court also ordered that a procedure be created to permit the court to examine any papers that Jones attempted to file with the Clerk's office in the future to determine if the subject matter of such papers was related to the prior proceedings.[2]

Following the dismissal of his actions in federal district court,[3] Jones commenced Erie County Index No. 2611–91 in the State of New York Supreme Court on March 13,

---

**2.** Unfortunately, such a procedure was not adhered to at the time of the filing of the present action, and this Court was unaware of this aspect of Judge Curtin's Order. As a result, the present action was initiated without having to undergo this screening process.

**3.** This Court notes that Walter Jones also initiated several other civil actions in federal district

court under Docket Nos. 89–CV–1088, 89–CV–1117, and 90–CV–688, which also appear to have been dismissed. This Court finds it unnecessary to elaborate on the details for purposes of this decision. However, this Court does note that many of the same claims dismissed by Judge Curtin were likewise raised in 89–CV–1088 and dismissed by Judge Larimer.

1991. In this action, Jones wished to recover "treble, compensatory, special and punitive damages" against the defendants for their conspiracy and involvement in the arson, destruction, and unlawful demolition of the plaintiff's property at 1–19 Liberty Avenue. Based on these allegations as well as this Court's review of the complaints, motions, and affidavits filed by Jones in connection with Erie County Index No. 2611–91, it is clear that that action was directly related to the subject matter of the federal actions that were dismissed by Judge Curtin.

New York State Supreme Court Justice Joseph J. Sedita dismissed Erie County Index No. 2611–91 on October 8, 1991. Justice Sedita stated that the actions were "baseless and without merit, and can be viewed as an unwarranted harassment of these defendants." *Walter Jones v. City of Buffalo et. al.,* Erie County Index No. 2611–91, Memorandum Decision dated Oct. 8, 1991. Justice Sedita also enjoined the plaintiff from filing any similar motions in state court. Jones then filed motions to vacate the order of dismissal and to renew his action, but Justice Sedita denied these motions by Orders dated January 13, 1992 and January 31, 1992, as well as directed that the Erie County Clerk's Office not accept any further motion papers from the plaintiff that involved related subject matter. Although his action was dismissed, Jones attempted to file judgments dated April 30, 1992, against the named defendants. The attempt to file these judgments was raised as part of an Order to Show Cause heard by New York State Supreme Court Justice Vincent E. Doyle, which shall be discussed *infra.*

Jones also initiated two further actions under new state docket numbers after receiving the adverse rulings from Justice Sedita. First, he instituted an action under Erie County Index No. 14730–91 on April 23, 1992, by filing a forty-two page complaint which reiterates allegations identical to those asserted in the previous federal and state actions. The complaint also includes a claim relating to the execution of a search warrant, lawfully issued by County Court Judge D'Amico, on February 11, 1992, during which Jones apparently threatened an IRS agent with a shotgun. Representatives of the United States Bureau of Alcohol, Tobacco and Firearms have indicated that the possession of a firearm was illegal because of Jones' prior felony conviction. Second, Jones filed a one hundred thirty-eight page complaint under Erie County Index No. 1637–92 on April 29, 1992, asserting essentially the same allegations of conspiracy relating to the Project and fire at 1–19 Liberty Avenue that had been identified in his other actions.

On May 4, 1992, Justice Doyle signed an Order to Show Cause with respect to Erie County Index Nos. 2611–91, 14730–91, and 1637–92, with a hearing to be held on May 11, 1992. The Order directed Jones to show cause why the actions should not be dismissed and he should not be held in contempt. Following argument at the Order to Show Cause hearing, Justice Doyle granted Jones until May 14, 1992, to respond to the pleadings of defendants.

On May 22, 1992, Jones, rather than respond to the show cause proceedings before Justice Doyle, filed a petition for removal of Erie County Index Nos. 2611–91, 14730–91, and 1637–92 to federal court and effectively brought all proceedings in state court to a halt. These actions are currently filed in the Office of the Clerk of the Court for the Western District of New York under Docket No. 92–CV–0345.

Jones has filed six amended/supplemental removal petitions since his original petition of May 22, 1992. On June 10, 1992, Jones filed an Amended Consolidated Notice of Petition for Removal ("First Amended Petition"). This petition sought to remove Erie County Index No. 1049–88, a cause of action essentially intertwined with Erie County Index Nos. 2611–91, 14730–91, and 1637–92. Jones thereafter filed a Supplemental Petition for Removal ("Second Amended Petition") on August 13, 1992. The petition sought to remove Erie County Docket No. 8950–89 wherein Jones was a defendant and third-party plaintiff. The lawsuit was brought on behalf of a fireman who was killed in fighting a fire that destroyed Jones' warehouse at 1–19 Liberty Avenue on February 2, 1988. In conjunction with his Second Amended Petition, on August 14, 1992, Jones filed an Ex Parte Motion seeking various forms of relief,

including leave to file the Second Amended Petition. ("Ex Parte Motion"). This motion did not attempt to remove any additional actions from state court other than Erie County Index No. 8950–89. Along with the Second Amended Petition of August 13, 1992, Jones also filed a Verified Civil Rights and Suit in Equity Complaint, which essentially asserts the same conspiracy theory that pervades all of his legal actions. Jones then filed a Notice of Filing Additional Supplemental Petition for Removal ("Third Amended Petition") on September 17, 1992, again seeking to remove Erie County Docket No. 8950–89. On September 21, 1992, Jones filed a Notice of Filing of Another Additional Supplemental Petition for Removal ("Fourth Amended Petition") wherein he again sought removal of Erie County Index No. 1637–92 because the Honorable Joseph D. Mintz, Justice of the New York Supreme Court, issued an Order dismissing this cause of action on September 14, 1992. All of these removal petitions involve essentially similar or identical causes of action asserted by Jones, and in some instances contain specific references to Jones' prior federal court actions as supporting his present legal claims.

More recently, Jones filed two additional removal petitions supplementing the causes of action removed to Docket No. 92–CV–345. First, on May 27, 1994, Jones filed a Consolidated, Supplemental Removal Petition ("Fifth Amended Petition") seeking to remove actions filed against him in Buffalo City Housing and Traffic Court identified as H–04663–92 and H–0368–94. Jones asserts that the traffic tickets and Housing Court actions are part of the overall "retaliatory conspiracy" against him. (Fifth Amended Petition at pp. 1–3.) Jones most recently filed, on June 14, 1994, a Supplemental Removal Petition ("Sixth Amended Petition") wherein he sought to remove an action initiated against him to enjoin him as well as other "African American defendants, from protesting the violations of their civil rights." (Sixth Amended Petition at ¶ 4.) Jones asserts that the action should be "joined with related state court actions; as consolidated, and filed under WDNY Federal Civil Docket No. 92–345S." (Sixth Amended Petition, Jones Aff.) For reasons to be explained herein, this

Court *sua sponte* filed an Order on June 24, 1994, remanding the causes of action underlying these two most recent petitions to the state court system.

Jones' allegations in the present actions essentially have as their genesis his claims regarding the NFTA Project and the alleged arson of the Jones' property at 1–19 Liberty Avenue. Although some new events have been alleged in the lawsuits which have followed Jones' original causes of actions based on the Project and the fire, essentially what Jones has done in each successive lawsuit has been to expand upon his conspiracy theory. In fact, the nature of these subsequent actions is such that each attorney who has opposed Jones and each judicial officer who has ruled against Jones has been named as a defendant in the following action. As a result, the present causes of action name as participants in the alleged conspiracy not only all of the presiding federal court judges in the Western District of New York, but also numerous Appellate Judges of the Second Circuit Court of Appeals, as well as the Clerk of the Court for the United States Supreme Court. (*See* Motion to Disqualify at pp. 2–5 & ¶¶ 12, 23–27; Ex Parte Motion, Jones Aff. ¶¶ 16(b), 17(a), 43, 46, 50, 52, 54, 57–58, 60, 81–87, 101–115.)

The docket sheet in this case reflects that there are numerous motions and other matters presently pending. Rather than provide an exhaustive listing of these matters, this Court shall identify those which are significant to the present Decision and Order. First, defendant City of Buffalo filed a motion to dismiss on July 20, 1992. Second, a request from Jones to proceed *in forma pauperis* filed on August 11, 1992. Third, a motion to disqualify this Court from this action and transfer venue to the District of Columbia filed on September 4, 1994. ("Motion to Disqualify.") At the present time, no action has been taken regarding these motions. Fourth, this Court's Order of August 27, 1992, directing that all other matters in this action would be held in abeyance pending this Court's determination of whether Jones' removal petition was contrary to Judge Curtin's aforementioned Order. Finally, an Order referring all pretrial matters,

including dispositive motions, to the Honorable Leslie G. Foschio, United States Magistrate Judge, filed on September 21, 1992.

## DISCUSSION

As noted previously, this action was referred to Magistrate Judge Foschio pursuant to 28 U.S.C. § 636(b)(1) in September 1992. However, this Court shall revoke its Referral Order filed on September 21, 1992, and proceed to address and resolve the matters presently pending in this action.

### I. Motion for Disqualification and Transfer of Venue to District of Columbia

Initially, I must address Jones' motion to disqualify and transfer venue to the District of Columbia. Jones has essentially identified two bases for my disqualification. First, he asserts that disqualification is necessary "due to Judge Skretny being an employee of the Erie County District Attorney's Office, from which the conspiracy against Deponent WALTER L. JONES' rights, and property originated by former Erie County District Attorney, Richard J. Arcara." (Jones Aff. ¶ 12.) Moreover, Jones asserts that "Judge WILLIAM SKRETNY ... fraudulently entered an unconstitutional and fraudulent order upon a falsified letter from the City of Buffalo attorney defendants, in violation of the due process and equal protection clauses of the Fourteenth Constitutional Amendment." (Jones Aff. ¶ 19.) Based on the foregoing as well as other similar allegations, Jones seeks "[a]n order recusing and disqualifying this court Judge from further presiding in this action, pursuant to Title 28 USC, sections 455(a)(b)(1)(2)." (Jones Aff., WHEREFORE CLAUSE (b).)

 Upon considering Jones allegations in view of the legal standards set forth in 28 U.S.C. § 455 and the Supreme Court's recent explanation of those standards in *Liteky v. United States*, —— U.S. ——, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), I find Jones' motion for disqualification to be unsupported. First, the August 27, 1994, Order challenged by Jones as "unconstitutional and fraudulent" was a mere scheduling order and did not constitute a ruling against Jones. Moreover, even if this Order could be construed as

adverse to Jones, "judicial rulings alone almost never constitute [a] valid basis for a bias or partiality motion." *Id.*, at ——, 114 S.Ct. at 1157. Finally, Jones has alleged that I possess "extrajudicial" information regarding his case based on my prior employment at the Erie County District Attorney's Office where I worked with the Honorable Richard J. Arcara, United States District Court Judge and former Erie County District Attorney. However, during none of my prior affiliations have I worked on or been asked to contribute my opinions regarding any of Jones' prior lawsuits. More importantly, my prior associations have not provided me with an "extrajudicial source" of information regarding the specifics of Jones' present or prior lawsuits. There is simply no basis for his claim that I am biased or prejudiced against him.

 Finally, it is apparent that Jones employs a litigation tactic by which he moves for disqualification or recusal of any judge who has or Jones believes will rule against him. In this regard, I find it relevant to note the comments and findings of the Honorable David G. Larimer when faced with a similar disqualification motion following his ruling against Jones when Erie County Index No. 8950–89 was originally removed to federal district court in 1989:

> Obviously disgruntled at my decision, Jones now seeks to sue me on the grounds that my dismissal of his third-party complaint in connection with his motion to proceed *in forma pauperis* was a violation of the Constitution and at least sixteen separate statutory provisions. Because he has attempted to sue me and because several other judges in Buffalo were named in the original third-party complaint, Jones seeks my recusal and the wholesale transfer of the case to Washington, D.C.

> It is significant that Jones has had matters before three district judges in this district, Judges John T. Elfvin, John T. Curtin and now me. Soon after each of us ruled against Jones, we were named as defendants.

> I was not named originally in the third-party complaint that was the subject of my

decision of December 14, 1989. It was only after I ruled against Jones that he determined that I too was part of the elaborate "conspiracy" that he has alleged and he now seeks to add me as a defendant. It is clear, however, that the only reason for adding my name to the long list of defendants is my unfavorable ruling against Jones.

In my view, this tactic of suing federal judges and then seeking their disqualification is nothing more than a tactic to delay and frustrate the orderly administration of justice. Judges should not be held hostage to this kind of tactic and automatically recuse themselves simply because they or their fellow judges on the court are named defendants in a truly meritless lawsuit.... [Section 455] has been repeatedly construed by the courts as not requiring automatic disqualification of a judge in circumstances such as this.... Otherwise, § 455 could be used as a vehicle to engage in judge-shopping, and to "manipulate the identity of the decision maker." To let such a motion succeed absent a legally sufficient basis would allow any litigant to thwart the legal process by merely filing a complaint against the judge hearing the case.... It is clear that a judge is not disqualified under 28 U.S.C. § 455 merely because a litigant sues him. I am convinced that if I disqualify myself and the case is reassigned to one of the few remaining judges in this district who have not yet been named as a defendant, if they rule contrary to Jones perceived interests, eventually they will also be named as a defendant. Even if the case is transferred to some other judge in another district, there is every expectation based on past history that Jones' list of defendants will be increased accordingly to include that judge.

Section 455(a) also does not require recusal. That section requires disqualification when the judge's impartiality might "reasonably" be questioned. The inquiry is an objective one. The appropriate test for disqualification is whether a "reasonable person" with knowledge of all the facts would be led to the conclusion that the judge's impartiality might be questioned.

In my view, under this test a reasonable person with access to all the relevant facts would not question the Court's impartiality. Courts have an obligation and duty to sit when there is no valid reason not to do so. Reassignment or transfer of a case are serious matters that affect the parties as well as the new judge.

Docket No. 89–1088, Decision and Order dated March 20, 1990, pp. 3–5 (citations omitted). Whereas Jones has made similar arguments in the present case, I find it appropriate to adopt the statements of Judge Larimer in full as part of my ruling on Jones' present motion to disqualify.

Therefore, because Jones has failed to demonstrate that disqualification or recusal is appropriate in this case, his motion for disqualification and transfer of venue to the District of Columbia shall be denied.

## II. *Request to Proceed In Forma Pauperis*

 This Court has reviewed Jones' affidavit in support of his request to proceed *in forma pauperis* filed on August 11, 1992, as well as the supporting documentation attached thereto. Upon consideration of these submissions, this Court shall grant Jones' request to proceed as a poor person in this matter.

The same statute that allows a litigant to commence a civil or criminal action in federal court *in forma pauperis* "authorizes federal courts to dismiss [such] a claim ... 'if satisfied that the action is frivolous or malicious.'" *Neitzke v. Williams*, 490 U.S. 319, 324, 109 S.Ct. 1827, 1831, 104 L.Ed.2d 338 (1989) (citing 28 U.S.C. § 1915(d)). In *Neitzke* the Supreme Court went on to state that

Section 1915(d), is designed largely to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate because of the costs of bringing suits and because of the threat of sanctions for bringing vexatious suits under Federal Rule of Civil Procedure 11. To this end, the statute accords judges not only the

authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.

*Id.* 490 U.S. at 327, 109 S.Ct. at 1833.

■ Affording Jones' petitions and other submissions the liberal reading due pleadings filed by *pro se* litigants, *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), *reh'g denied,* 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972), this Court finds that the causes of action he has commenced as a plaintiff in state court must be dismissed with a limited remand for the purpose of assessing whether Jones should be sanctioned, and those wherein Jones is named as a defendant must be remanded. The basis for these findings shall be discussed more thoroughly below, however, at present two significant points must be noted. First, as Jones is proceeding *in forma pauperis* in this action, this Court has the "unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Neitzke v. Williams,* 490 U.S. at 327, 109 S.Ct. at 1833. Exercising such authority, this Court finds Jones' conspiracy allegations to be utterly baseless and delusional, and that his litigation tactics, in general, are of malicious design and intent. These allegations are present in all of the causes of action Jones has removed or attempted to remove to this Court as well as the complaint which Jones filed on August 13, 1992. Second, the conspiracy theories which were the basis for Jones' prior causes of action and which Judge Curtin forever barred Jones from reinitiating in this or other courts pervade the record of this action and are, at least in part, the identified basis for federal jurisdiction over these actions. Thus, Jones' actions are also barred by Judge Curtin's Order. These findings provide separate and independent grounds justifying dismissal and/or remand of all the identified causes of action.

## III. *Procedural Defects as Grounds for Remand of the Removed Actions*

Preliminarily, this Court wishes to comment on a procedural tactic employed by Jones which appears designed to serve two purposes: (1) circumvent Judge Curtin's Order; and (2) avoid the payment of filing fees. Specifically, Jones has consecutively removed state causes of action which are wholly unrelated but for the deluded conspiracy which Jones claims underlies them all. In this regard, although Jones has moved for consolidation with each successive petition, even upon the most superficial scrutiny, it is clear that his requests for consolidation are wholly lacking in merit. Unfortunately, during the early stages of this case these matters were not addressed promptly. Nevertheless, to the extent that Jones' request to consolidate these successive actions are meritless, this finding alone is sufficient to warrant remand of the causes of action Jones has attempted to remove by his Second through Sixth Amended Removal Petitions.

## A. Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88

On July 20, 1992, defendant City of Buffalo ("defendant") filed a motion seeking an order "dismissing the above-noted action ... and [for] such other and further relief as to the Court to deem just and proper." (Notice of Motion, Cover Page.) This motion seeks dismissal of the identified actions based on Judge Curtin's Order as well as principles of res judicata and collateral estoppel. (Risman Aff. ¶¶ 4–7, 10, and 11.) In addition, defendant City of Buffalo also noted that "28 U.S.C. § 1446 authorizes only a defendant to remove an action to Federal Court." (Risman Aff. ¶ 9.) Specifically, this motion pertains to Jones' state causes of action identified as Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 which were removed to this court via Jones' original removal petition as well as his First, Second and Fourth Amended Petitions. Defendant argues that Jones' removal of these causes of action is improper, the logical consequence of which is that these actions must be remanded to state court. As such, this Court shall initially analyze this argument and treat this aspect of defendant's motion as one for remand.

The provisions governing the procedure for removal of actions from state to federal court are set out in 28 U.S.C. §§ 1441–1452. The current statute permits removal by defendants in certain specified situations. *See, e.g.,* 28 U.S.C. § 1441(a) & (b) (defendants in diversity actions); 28 U.S.C. § 1441(b) (actions involving federal question jurisdiction); 28 U.S.C. § 1441(c) ("cause of action within the jurisdiction conferred by section 1331 . . ."); 28 U.S.C. § 1442 (a cause "against a member of the armed forces of the United States"); 28 U.S.C. § 1443 (civil rights cases). However, the removal of a case from state to federal court is a right available only to a defendant or defendants. This conclusion is supported by several considerations.

First, the express language of the removal provisions grants the right of removal only to defendants. For example, § 1441(a), "Actions removable generally," states that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by *the defendant or the defendants,* to the district court of the United States. . . ." (emphasis added). Similarly, § 1443, "Civil rights cases," states that "[a]ny of the following civil actions or criminal prosecutions, commenced in a State court may be removed by *the defendant* to the district court of the United States. . . ." (emphasis added). Finally, § 1446 entitled "Procedure for removal" states that "(a) A *defendant or defendants* desiring to remove any civil action or criminal prosecution from a State court shall. . . ." (emphasis added). In addition, interpreting this language to restrict the right of removal to defendants is consistent with the purpose of the removal statutes. The process of removing a case from state to federal court was statutorily created to permit *a defendant* to substitute a forum of his or her own choosing that has jurisdiction. 14A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3721 (1985). The removal statutes intentionally "restrict the right [of removal] to the party who had no choice of forum." *Victorias Milling Co. v. Hugo Neu Corp.,* 196 F.Supp. 64, 68 (S.D.N.Y.1961). Finally, numerous courts have either explicitly or implicitly recognized that only defendants have a right to remove a cause of action to federal court. For instance, in the case of *In re Walker,* 375 F.2d 678 (9th Cir.1967), the Ninth Circuit Court of Appeals stated that "[n]o right [of removal] exists in favor of a person who, as plaintiff, has filed an action in the state court, to cause the removal of such action to a federal court." *Id.,* 375 F.2d at 678. More recently, the Second Circuit, when squarely faced with this issue, stated "the [district] court was correct in its observation that there was not authority permitting [plaintiff] to remove his own action to federal court." *Hamilton v. Aetna Life & Casualty Co.,* 5 F.3d 642, 644 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1100, 127 L.Ed.2d 413 (1994); *see also Oregon Egg Producers v. Andrew,* 458 F.2d 382, 383 (9th Cir.1972) (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941)) & *Conner v. Salzinger* 457 F.2d 1241 (3d Cir.1972). Based on the foregoing, it is clear that Jones had no authority to remove the actions identified as Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88, and, as such, his removal of these actions was improper.

It would seem that these defects in Jones' removal of the identified state court actions necessitate remand to state court. As noted by the Second Circuit, "[a]n action removed other than in accordance with the statutory provisions may be remanded to state court." *Hamilton v. Aetna Life & Casualty Co.,* 5 F.3d at 643. However, all remands to state court must be done in accordance with § 1447(c) which provides that "[a] motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under § 1446(a)." Based on this provision, any motions to remand or *sua sponte* decisions to remand which are premised on procedural defects, such as the motion in present in this case, must be filed within thirty days of the filing of the notice of removal; otherwise such defects are waived. *Hamilton v. Aetna Life & Casualty Co.,* 5 F.3d at 644; *Air–Shields, Inc. v. Fullam,* 891 F.2d 63, 65 (3d Cir.1989).

In the present case, Jones filed the notice of removal with respect to Erie County Index Nos. 2611–91, 14730–91, and 1637–92 on May 22, 1992. Defendant City of Buffalo was served with the Federal Removal Petition on May 26, 1992. (*See* Affidavit of Service, Docket Entry # 2). Defendant City of Buffalo did not file a motion to remand the case within thirty days of such service. However, Jones later filed an Amended Consolidated Notice of Filing Petition for Removal on June 10, 1992. This was permissible as a "petition may be amended freely prior to the expiration of the 30–day period for seeking removal." Wright, Miller, & Cooper, *supra*, at § 3733. By filing this amended petition, Jones sought to add Erie County Index No. 1049–88 to the claims removed under Docket No. 92–CV–345.[4] The affidavit of service shows that this document was not served until July 14, 1992, thirty-five days after its filing. Three days later, on July 17, 1992, defendant City of Buffalo responded to the amended petition by filing a motion to dismiss/remand. Moreover, after the motion to remand was filed, Jones filed several additional amended/supplemental removal petitions. Of these, his Fourth Amended Petition filed on September 17, 1992, again sought removal of Erie County Index No. 1637–92. Thus, the present remand motion was filed fifty days after service of the original notice of, but no more than three days from, the service of Jones' subsequent amended removal petitions.

At first glance, it appears that the Second Circuit's decision in *Hamilton* is controlling and that defendant's motion to remand, based on procedural grounds, must be denied because the motion was brought more than thirty days after the filing of the notice of removal. However, unlike *Hamilton*, this

case involves the question of whether the opportunity to file a motion to remand on procedural grounds is renewed upon the filing of an amended removal petition. Thus, the critical issue which must be resolved is to determine the effect of amending a petition for removal on the thirty day time period for the opposing party to file a petition for remand.[5]

From this Court's review of the relevant case law, it appears that the question of whether amendment of a petition for removal provides an opposing party with a renewed opportunity to move for remand of the action is a relatively novel one. However, this Court finds that extrapolation of several well-recognized legal principles leads to the common sense conclusion that it must.

The only provision in the removal statutes which addresses the question of amendment to a removal petition is § 1446(b), which provides that an amended removal petition may be filed within thirty days of the defendant's "receipt" of the initial removal petition. *See Gafford v. General Electric Co.*, 997 F.2d 150, 164 (6th Cir.1993). However, the statutes are silent as to whether a petition may be amended outside this thirty day window and the effect of such amendments upon the right of an opposing party to file a motion to remand. Despite this statutory silence, " '[v]irtually all of the commentators and the great weight of judicial authority favor the rule' " recognizing " 'that the time has come to apply the principles of modern pleading relating to amendments to removal petitions, and that amendments should be [liberally] permitted.' " *Id.* (quoting *Stanley Electric Contractors, Inc. v. Darin & Armstrong Co.*, 486 F.Supp. 769, 772–73 (E.D.Ky.1980)); *Tech Hills II Assocs. v.*

---

4. According to Jones, Erie County Index No. 1049–88 involves another Order to Show cause which contains "the same unlawful, and unconstitutional restraints and intimidation threats, of imprisonment ... [as those in] Index Nos. 2611–91, 14730–91, and 1637–92." (Amended Consolidated Notice of Filing Petition for Removal, Docket Entry # 5, ¶ 4.)

5. Because Jones filed several amended/supplemental removal petitions after defendant City of Buffalo moved for dismissal/remand on July 17, 1992, it is unnecessary to resolve the question of

whether the thirty day period in which a motion to remand may be brought commences from the date the removal petition is filed or the date of service on a particular defendant because it is clear that the remand motion was brought earlier than thirty days after the filing of these later amended/supplemental removal petitions. Therefore, the only issue is whether the thirty day period in which a motion to remand must be brought runs anew upon the filing of an amended/supplemental removal petition.

*Phoenix Home Mut. Ins. Co.*, 5 F.3d 963, 969 (6th Cir.1993), *reh'g denied*, (6th Cir. Oct. 12, 1993); *Armada Coal Export, Inc. v. Interbulk, Ltd.*, 726 F.2d 1566 (11th Cir.1984). The conclusion in the cited cases was applied to allow defendants who had removed actions to federal court an opportunity to cure jurisdictional defects in their removal petitions after the statutory period for filing such amendments had technically expired. It would seem implicit to adopting such a rule that a party who may wish to oppose removal should be provided with an additional opportunity to file such a challenge. Absent such a rule, a party's amended removal petition would effectively be insulated from challenge.

The necessity of allowing opposing counsel an opportunity to respond to amended pleadings is expressly recognized in Federal Rule of Civil Procedure 15 "Amended and Supplemental Pleadings." Rule 15(a) permits a party to amend a pleading "once as a matter of course at any time before a responsive pleading is served or ... at any time within 20 days after it is served" if no responsive pleading is permitted. The Rule further states that "[a] party shall plead in response to an amended pleading within the time remaining for response to the original pleading or *within 10 days after service of the amended pleading, whichever period may be the longer,* unless the court otherwise orders." (emphasis added). However, it is uncertain whether the term "pleading" as used in Rule 15(a) should be defined to include a petition for removal.

■ Generally, "pleading" has been defined, consistent with Federal Rule of Civil Procedure 7(a), to include: a complaint, an answer, a reply to a counter-claim, an answer to a cross-claim, a third-party complaint, a third-party answer, and a reply to an answer or third-party answer. Although removal petitions and motions for remand are not

specifically identified, this Court does not "believe that the word 'pleadings' ... [should be] restricted to those papers set forth in Rule 7(a)." *Carter v. American Bus Lines, Inc.*, 22 F.R.D. 323, 326 (D.Neb.1958). Instead, the concept of "pleadings" should receive a "liberal interpretation" in appropriate circumstances. With respect to removal petitions, this Court notes several considerations which justify its treatment as a pleading. Much like a complaint, it is the first document filed in a lawsuit proceeding in federal district court and, in this regard, provides the foundation for the lawsuit. Moreover, it is also the instrument which contains the allegations which attempt to establish the basis for federal jurisdiction. Finally, the initial petition is subject to jurisdictional attack on both procedural and substantive grounds via a motion to remand much the same as a complaint is subject to a motion to dismiss on similar grounds.[6] For these reasons, this Court finds that a petition for removal is a statutorily created "pleading" and, as such, Rule 15(a) should be applied to amendments to a petition for removal. Therefore, in accordance with Rule 15(a), this Court finds that defendant City of Buffalo timely filed its motion to remand on the grounds that Jones' removal petitions are procedurally defective in that they have been filed by Jones, who is the plaintiff. Thus, this Court may remand Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 because Jones' attempt to remove them to this Court did not satisfy the requirements of the removal statute.

**B. Erie County Index No. 8950–89**

Jones filed his Third Amended Removal Petition on August 13, 1992, intending to remove to this Court Erie County Index No. 8950–89 wherein Jones was a defendant and third-party plaintiff.[7] No challenge to this

---

6. It is also significant that in filing his amended/supplemental removal petitions Jones specifically identified Federal Rule of Civil Procedure 15 as providing the legal basis for granting such relief. Accordingly, to the extent that he expressly relied on and sought to invoke this Rule, he implicitly acquiesced to those aspects of the Rule which would provide defendants with an additional opportunity to move against his petition.

7. In a connected maneuver, Jones filed a civil rights complaint on August 13, 1994. This complaint named as defendants the plaintiff and plaintiff's counsel who had initiated the civil action against Jones in Erie County Index No. 8950–89.

removal was raised by counsel or this Court *sua sponte* within thirty days.

Nevertheless, amendment of a removal petition is only permitted as a matter of right within thirty days of the filing of the original petition. Beyond this period, amendments are only permitted upon leave of the court. When appropriate, such leave is to be given freely. However, in this case the proposed amendment of the petition to consolidate Erie County Index No. 8950–89 with the other previously removed actions is frivolous. The only basis for consolidation of these actions is Jones' conspiracy theory which, as shall be discussed below, is baseless. As such, this Court shall not grant leave to amend the petition to add Erie County Index No. 8950–89. To the extent that it appears that the Clerk of the Court or the parties may have treated Jones' motion to amend the petition to add Erie County Index No. 8950–89 as an actual removal of this action, this Court directs that the matter shall be "remanded" to state court.

Finally, as shall be discussed *infra,* the claims asserted in the Third Amended Petition are substantively defective in that Judge Larimer previously dismissed all of Jones' third-party actions in the case when it was previously removed to federal court under Docket No. 89–CV–1088.

### C. Jones' Removal Petitions of May 27, 1994 and June 14, 1994

By these petitions, Jones attempted to consolidate actions against him in City of Buffalo Housing and Traffic Court as well as New York State Supreme with Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88. Based on this Court's finding that these petitions are defective, these actions were remanded to state court by summary order on June 24, 1994.

These actions were remanded for several reasons. First, they were not properly removable to Docket No. 92–345. Again, the only common thread connecting these actions to Jones' previous actions was his baseless conspiracy theory. Moreover, Jones' attempt to amend his petition to include these actions occurred more than thirty days after the filing of his original petition. Based on these considerations, this Court found consolidation and amendment of the removal petition to add these causes of action inappropriate. Accordingly, it was ordered that these actions be remanded to state court. Further, as shall be discussed *infra,* these petitions were also substantively defective because there existed no legitimate basis for exercising federal jurisdiction.

### D. Conclusion as to Appropriateness of Remand

Based on the foregoing analysis, Jones' removal of Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 on May 22, 1992, and June 10, 1992, was improper and has been attacked by timely challenge. As such, this Court has authority to remand these matters to state court. However, as shall be explained below, there are also several grounds which justify dismissing rather than remanding these matters. In this regard, this Court notes that it is more appropriate to dismiss these matters at the present time in order to avoid the needless waste of further judicial resources. In addition, there are procedural defects with the removal of Erie Index No. 8950–89 as well as the causes of action attempted to be removed by Jones Fifth and Sixth Amended Petitions. As a result, these causes of action shall be remanded to state court. In sum, this Court shall (1) dismiss Jones' causes of action identified as Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 for the reasons explained below, however, these actions shall be remanded to the appropriate state court for the limited purpose of assessing whether it is appropriate to sanction Jones; and (2) remand Erie County Index No. 8950–89 as well those actions identified in Jones' Fifth and Sixth Amended Petitions.

### IV. *Substantive Bases for Dismissal and/or Remand*

On June 9, 1989, Judge Curtin ruled from the bench dismissing three of Jones prior cases, 87–CV–1532, 88–CV–887, and 89–CV–253, and also issued the following Order enjoining Jones from bringing future related causes of action:

In light of plaintiff's history of litigation in this Court which has been set forth in the argument and on the papers, which have been supplied to the Court, it is clear that these lawsuits have been vexatious, harassing and duplicative. They have put an undue expense and burdens on the parties, on Court personnel, the Court and as a result of that history plaintiff is also directed not to file any further lawsuits in this or any other court relating to the subject matter of the actions that have been dismissed by this Court, either today or at a previous time. All of the plaintiff's cases are now closed, and the Clerk of the Court of the Western District of New York is directed not to accept ... any further filings regarding these or any other cases plaintiff should wish to bring in the future involving any of the issues that have already been decided in these cases. These orders are issued pursuant to the Court's authority under the All Writs Act, 28 U.S.C., Section 1651(a). The court will set up a procedure with the clerk so that if there is any attempt to file by the plaintiff that a procedure will be in force to take up the filing and determine whether or not it involves these or any other cases, which have already been decided.[8]

*Walter Jones v. City of Buffalo, et. al.,* Nos. 87–CV–1532, 88–CV–887, & 89–CV–253 (W.D.N.Y. June 9, 1989). Although Jones asserts otherwise, this order is valid. The All Writs Statute contained in 28 U.S.C. § 1651(a) permits a district court to enjoin litigants from further vexatious litigation. *Abdullah v. Gatto,* 773 F.2d 487, 488 (2d Cir.1985) (holding that district court was within its discretion in limiting prisoner's ability to bring *in forma pauperis* actions at will); *In re Hartford Textile Corp.,* 681 F.2d 895, 897 (2d Cir.1982) (section 1651(a) gives the court the power to enjoin a vexatious litigant from filing future motions), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983); *Ward v. Pennsylvania*

*New York Cent. Transp. Co.,* 456 F.2d 1046, 1048 (2d Cir.1972) (district court dismissed a state action which was removed to federal court because of federal court injunction against the plaintiff filing future related actions); *Sperry Rand Corp. v. Rothlein,* 288 F.2d 245, 249 (2d Cir.1961) (when federal court believes that another suit is being brought to undermine decision already made by court, injunction is proper). Excessive litigiousness alone does not justify such an order, it must also be found that "the courts are being used as a vehicle of harassment by a 'knowledgeable and articulate experienced pro se litigant' who asserts the same claims repeatedly in slightly altered guise." *Kane v. New York,* 468 F.Supp. 586 (S.D.N.Y.), *aff'd without op.,* 614 F.2d 1288 (2d Cir.1979). Here, Judge Curtin's Order was supported by such findings as he found that the "lawsuits have been vexatious, harassing and duplicative. They have put an undue expense and burdens on the parties, on Court personnel, the Court, . . . ." Faced with a litigant employing such tactics, it is also appropriate to enjoin the filing of future claims without first obtaining leave of the court. *See In re Martin–Trigona,* 737 F.2d 1254, 1262 (2d Cir.1984) ("The district court is part of the federal judicial system and has an obligation to protect and preserve the sound and orderly administration of justice throughout that system.") Finally, this Court finds that Judge Curtin's Order is not so burdensome as to deny Jones meaningful access to the courts. Based on the foregoing, the Order enjoining Jones from filing future related actions must be enforced.

Before proceeding to apply Judge Curtin's Order to the claims advanced by Jones here, this Court notes that in each successive removal petition Jones has sought to consolidate all claims removed to 92–CV–345, apparently based on his view that all of the state causes of action are inexorably linked by the conspiracy which allegedly pervades them. However, whereas this Court has not-

---

**8.** Unfortunately, this procedure was not adhered to in May through September 1992 when Jones filed his initial petition, as well as several supplemental removal petitions. This was, in part, a result of this Court's lack of familiarity with the Jones' prior federal court actions, including the

Order issued by Judge Curtin. Accordingly, the procedure put in place by Judge Curtin was not adhered to regarding these initial submissions. On the other hand, this procedure has been applied with respect to Jones' most recent petitions filed in May and June of 1994.

ed that assertion of this conspiracy theory is baseless and frivolous as well as a violation of Judge Curtin's Order, this single theory which Jones claims links all of these separate causes of action together and serves as the basis for their consolidation, instead is the basis for their dismissal/remand.

This Court first considers Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 wherein Jones was proceeding as the plaintiff. Jones' action of bringing these cases violates Judge Curtin's Order as well as constitutes vexatious and malicious conduct as evidenced by several considerations. While Jones has injected new factual elements into the claims he makes, the overriding theory being advanced is that of a continually expanding conspiracy whose origins can be traced to the facts underlying Jones' original complaints for which all legal action is now foreclosed. For instance, on pages eight and nine in the "SIXTH" paragraph of Jones' complaint filed under Erie County Index No. 14730–91 on April 23, 1992, Jones claims that his "claims against the forementioned and described governmental co-conspirators, is . . . evidenced in Plaintiff's State, and federal courts civil actions Erie County Index Nos. 01049–88, 2611–91, WDNY Federal Docket Nos. 87–1523C, 88–0887C, 89–0253, 89–1117, 89–1088L, 90–0688." Further, in the "NINTH" paragraph on page eleven of the same complaint, Jones asserts that the "arson and murder crimes" he alleges have "been concealed by former and present U.S. attorneys, federal County and states judges, federal, County and state clerks, and . . ." In addition, paragraph twenty-two of the complaint Jones filed in state court on April 29, 1992, under Erie County Index No. 1637–92, states that "at all times material to this Verified Complaint the forestated unlawful acts, and denial of the plaintiff's constitutionally protected and demanded jury trials, and denial of demanded injunctions, . . . in plaintiff's federal actions, WDNY docket nos. 87–1532C, 88–0887C, 89–0253C, 89–0061E–C, 89–1088L, and 89–1117E, were concealed and covered up. . . ." Similar allegations are present throughout the record regarding these causes of action. This Court finds such charges to be baseless

and, moreover, to be foreclosed by Judge Curtin's Order.

Further, this Court notes that in Erie County Index No. 8950–89 Jones makes similar conspiracy allegations which are not only frivolous, but violate Judge Curtin's Order. In addition, the cause of action had previously been removed to federal court by third-party defendants named by Jones under Docket No. 89–1088. Judge Larimer dismissed all of the claims raised in Jones' third-party complaint and remanded to state court the remaining state law claims that were originally made against Jones. Jones has essentially realleged the claims dismissed by Judge Larimer. Further, Jones' continued assertion of his conspiracy theory and that such theory has been broadened to include Judge Larimer is evidenced by statements in his Second Amended Petition regarding Judge Larimer's ruling against him in 89–1088. For instance, Jones asserts that a footnote in Judge Larimer's Decision and Order "was based upon certain information, said court obtained from the United States Court of Appeals, for the Second Circuit, which evidences that said court was unlawfully conferring, scheming, and conspiring with the clerks, attorneys and the judges of the district and circuit courts, to deprive petitioner of his rights and liberties . . ." (Second Amended Petition ¶ 28.) It is clear that not only are Jones' claims associated with Erie County Index No. 8950–89 baseless and frivolous, they are also barred by Judge Larimer's prior Decision and Order. Similarly, Jones' complaint of August 13, 1992 must also be dismissed as baseless and frivolous, as contrary to Judge Curtin's Order, and because it asserts claims previously dismissed by Judge Larimer. See Docket No. 89–CV–1088, Decision and Order dated December 12, 1989.

Finally, there are Jones' two most recent amended removal petitions. As with the other claims removed by Jones, these too are premised on his baseless claims of a constitutional and civil rights conspiracy. For example, in the May 27, 1994, petition Jones makes repeated reference to the fact that his removal is based upon the "retaliatory conspiracy" that is being waged against him.

Also, Jones' assertion in his June 14, 1994, petition that the underlying state action "be joined with related state court actions" is far too vague to justify allowing the amendment and consolidation and thereby permitting removal. Again, it appears that the only relatedness is Jones' baseless conspiracy theory. Accordingly, there is no basis for federal jurisdiction over the causes of action. Further, as noted earlier, Jones attempts to remove these actions to Docket No. 92–345 must fail because there is no valid basis to allow for consolidation or otherwise allow for amendment of the removal petition at this time. For these reasons, this Court, by its Order of June 24, 1994, remanded all of these claims to state court.

The overall vexatious nature of this litigation is also evidenced by the fact that Jones has continually updated the defendants named in his actions to include the attorneys who oppose him and any judicial officer who happens to rule against him. For instance, Jones has asserted claims against the following judges and political figures: (1) James D. Griffin, former Mayor of the City of Buffalo; (2) Assemblyman Arthur O. Eve; (3) the Honorable Vincent E. Doyle, Justice of the State of New York; (4) the Honorable Joseph Sedita, Justice of the New York State Supreme Court; (5) David M. Swartz, Erie County Clerk; (6) Jeffrey A. Spencer, Law Clerk in New York State Supreme Court; (7) Michael Risman, Senior Deputy Corporation Counsel for the City of Buffalo; (8) Laurence K. Rubin, Corporation Counsel for the City of Buffalo; (9) Peter B. Sullivan, Assistant Attorney General; and (10) all of the presiding Judges of the United States District Court for the Western District of New York. As noted by the Second Circuit Court of Appeals in *In re Martin–Trigona*, 9 F.3d 226 (2d Cir.1993), "[m]aking judges defendants in a repetitive series of lawsuits whenever a judge rules against a litigant is also a tactic employed by many vexatious litigants." *Id.*, 9 F.3d at 230.

■ This Court also finds it relevant to discuss *Ward v. Pennsylvania New York Central Transp. Co.*, *supra*, which involved a scenario strikingly similar to the present case. The plaintiff had filed four previous unsuccessful actions against the defendants in federal district court. The district court eventually ordered that the plaintiff not be permitted to commence further similar actions against the defendants without leave of the court. Plaintiff thereafter brought an action in state court to circumvent the injunction by the district court. Defendants removed the case to federal court and filed motions to dismiss, which were granted. On appeal, the Second Circuit affirmed this decision. Like the plaintiff in *Ward*, it appears that Jones attempted to circumvent Judge Curtin's Order by proceeding with his claims in New York State Supreme Court. However, unlike the *Ward* case, it was Jones himself who chose to return to this federal forum via his removal petitions, and, therefore, it was Jones who chose to directly challenge the authority of this Court to enforce its lawful orders. Thus, as in *Ward*, this Court finds that Jones' cases identified as Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 must be dismissed in that the complaints underlying these causes of action, despite the interjection of some new factual material, remain dominated by Jones' conspiracy theories which were the basis for the lawsuits dismissed by Judge Curtin.

Therefore, for all of these reasons, Jones claims identified under Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 shall be dismissed, but with a limited remand to the appropriate state courts for the assessment of sanctions against Jones. Further, the reasons explained above provide an alternative basis for remand of the Erie County Index No. 8950–89 as well as all claims raised in Jones' Fifth and Sixth Amended Petitions.

### CONCLUSION

For the reasons set forth above, this Court shall direct that Jones' actions identified as Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 be dismissed, but the Clerk of the Court shall remand these actions to the appropriate state court for a determination as whether Jones should be sanctioned for his conduct in these lawsuits. Further, Erie County Index No. 8950–89 shall be remanded to state court, and Jones'

related complaint of August 13, 1992, shall be dismissed. Further, as directed by this Court's previous Order of June 24, 1994, the causes of actions which Jones attempted to remove to this Court via his Fifth and Sixth Amended petitions shall be remanded to state court. Finally, as set forth below, this Court shall reaffirm Judge Curtin's prior Order establishing a procedure with the Clerk of the Court for handling any future filings, including complaints, removal petitions, or otherwise, to ensure that such future filings involve the subject matter of neither this nor any other cases which have already been decided.

### ORDER

IT HEREBY IS ORDERED, that the Order of this Court referring all pretrial matters to Magistrate Judge Foschio filed on September 21, 1992, is REVOKED.

FURTHER, that the Clerk of the Court is directed to strike all entries of default made under Docket No. 92–CV–345.

FURTHER, that the causes of action removed to this court identified as Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 are DISMISSED.

FURTHER, that the Clerk of the Court is directed to remand the causes of action identified as Erie County Index Nos. 2611–91, 14730–91, 1637–92, and 1049–88 to the appropriate state courts for determination of the sole issue of whether sanctions should be imposed against Walter Jones.

FURTHER, that Walter Jones' Complaint filed on August 13, 1992, is DISMISSED.

FURTHER, that Walter Jones' claims as a third-party plaintiff asserted in the cause of action identified as Erie County Index No. 8950–89 are DISMISSED, and the Clerk of the Court is otherwise directed to REMAND this action to the appropriate state court for further proceedings.

FURTHER, that consistent with this Court's Order of June 24, 1994, all causes of action which Walter Jones attempted to remove to this court via his Fifth and Sixth Amended petitions filed on May 27, 1994 and June 14, 1994, respectively, are REMANDED to the appropriate state court.

FURTHER, that all causes of action having been removed to this Court under Docket No. 92–CV–345 having been dismissed and/or remanded to state court, this Court shall DENY all pending motions identified under Docket No. 92–CV–345 as moot.

FURTHER, that the Clerk of the Court is directed to take the appropriate steps to close the file relating to this action.

FURTHER, that the Clerk of the Court is directed to not accept for filing, except in accordance with the procedure set forth below, any complaints, removal petitions, or other submissions from Walter Jones.

FURTHER, that in the future all submissions, if any, of Walter Jones in this district shall be stamped as received by the Clerk of the Court and shall be directed by the Clerk of the Court to the Pro Se Law Clerk for the Western District of New York.

FURTHER, that as part of any future submissions, Walter Jones must include an affidavit indicating that such submission is not of vexatious or malicious intent and that the allegations contained therein are not duplicative of the subject matter of his prior lawsuits.

FURTHER, that upon delivery to the Pro Se Law Clerk, the Pro Se Law Clerk shall conduct an initial review of such submissions to determine if their subject matter is connected with Walter Jones' prior lawsuits discussed in this Decision and Order.

FURTHER, that the Pro Se Law Clerk shall submit to an available district court judge, as designated by the Clerk of the Court, a recommendation as to whether such submissions should be filed by the Clerk of the Court.

FURTHER, that the Clerk of the Court shall deem and stamp such submissions as filed only upon direction from the designated district court judge.

FURTHER, that if upon review of the designated district court judge it is determined that the submission of Walter Jones is connected to the subject matter of his prior lawsuits, such submission shall be returned

to the Clerk of the Court who shall return such submission to Walter Jones by mail.

SO ORDERED.

COLUMBUS McKINNON CORPORATION, Plaintiff,

v.

CHINA SEMICONDUCTOR CO., LTD., Defendant.

CHINA SEMICONDUCTOR CO., LTD., Third–Party Plaintiff,

v.

Raymond NEWMAN d/b/a Micro Designs, Third–Party Defendant.

No. 88–CV–0211E (F).

United States District Court, W.D. New York.

Nov. 22, 1994.

William Reith, Buffalo, NY, Mark Ladner, New York City, for plaintiff.

Michael A. Brady, Buffalo, NY, for defendant.

Erie W. Lawson, Jr., East Aurora, NY, for third-party defendant.

## MEMORANDUM AND ORDER

ELFVIN, District Judge.

Presently before this Court is a motion by third-party defendant Newman to dismiss the Third–Party Complaint of China Semiconductor Co, Ltd. ("CSC") and, in the alternative, to request a more definite statement. For the reasons stated herein, Newman's motion to dismiss will be granted.[1]

Plaintiff Columbus McKinnon Corporation ("CM") brought this diversity action against CSC in connection with CM's efforts to develop the first computer-assisted hoist. CM is a New York corporation with its principal place of business in the Town of Amherst, N.Y. CSC is a foreign corporation headquartered in Taiwan. Plaintiff's First Amended Complaint ("Complaint") ¶¶ 1–2. See 28 U.S.C. §§ 1332, 1391(a).

By way of background, this case mainly and primarily focuses on an allegedly defective computer microprocessor ("chip") utilized in the control board of the hoist. CM asserts that in 1983 it entered into a written agreement with CSC for the purchase of computer boards manufactured by CSC for the hoists. The agreement provided that CSC would utilize "an Intel 8049 microprocessor" in such boards or, at CM's option, an equivalent chip. Complaint, ¶ 8. The control board was designed by Newman, who had been contractually retained by CM for that purpose. The Intel 8049 chip allegedly was an integral part of the control board design. Id. ¶ 7. At CSC's suggestion, CM and CSC agreed that CSC should purchase the chips from United Microelectronics Corp. ("UMC"), which CSC represented to be an Intel licensee. The manufactured control boards incorporating the UMC chip, were delivered to CM in New York. Id. ¶¶ 10–12. The control boards are alleged to have been defective, with CM later determining that the "faulty" chip (faulty because it was not an Intel 8049 equivalent) was the cause of many of the problems with the hoists. Id. ¶¶ 13–15.

CM proceeds against CSC under the theories of breach of contract, breaches of implied and express warranties, as a third-party beneficiary of the contract between UMC and CSC for the purchase of the chips, and under a theory of fraudulent misrepresentation. Id. ¶¶ 16–48. Among the responses of CSC in its Answer to the First Amended Complaint ("Answer") are the assertions that CM, "its agents or other parties over which CSC had no control" caused the alleged defects in the computer boards. Answer ¶ 49. CSC further asserts that CM was responsible for the computer board design and "the software components of the computer chip" and that CSC cannot be held liable for damages resultant therefrom. Id. ¶ 51.

The original complaint in this action was filed February 19, 1988, served on the defendants months thereafter and answered by CSC December 14, 1988. The First Amended Complaint was filed August 17, 1989 and answered by CSC September 15, 1989. Over three years later, CSC moved before United States Magistrate Judge Leslie G. Foschio of this Court for leave to file a third-party

---

1. Because both parties to the instant motion have taken a minimalist approach to arguing and substantiating their respective positions, much of the legal analysis contained herein did not find its source in either CSC's Memorandum of Law in Opposition to Motion of Third–Party Defendant to Dismiss or in the Alternative for a More Definite Statement or through any assistance from Newman. For whatever reason, Newman failed to submit a Memorandum of Law in support of his position, even to point out CSC's failure to cite pertinent authority to this Court.

complaint against Newman.[2] Leave having been granted, CSC served and filed its Third–Party Complaint, reiterating its denial of any liability to CM, while alleging in the alternative that, if it is found liable to CM, "Newman is responsible in whole or in part for the damages suffered by [CM] based on his negligence, malfeasance, professional malpractice, and culpable acts and omissions." Third–Party Complaint ¶ 15. CSC, in essence, does not seek to hold Newman liable to itself directly, but seeks instead "contribution and/or indemnification" from Newman for any damages for which CSC is found liable to CM. Newman's Third–Party Answer denies any responsibility for such damages. He now seeks dismissal of the third-party action "pursuant with Rule 56(b) because the complaint fails to state a claim against [him] upon which relief can be granted, or, alternatively, * * * [p]ursuant with Rule 10–B, * * * for a more definite statement * * *." Notice of Motion to Dismiss for Failure to State a Claim and, in the alternative, Motion for a More Definite Statement, at 1–2.

■■■ A district court in ruling upon a FRCvP 12(b) motion to dismiss a complaint for failure to state a claim upon which relief can be granted has two options when, as in this case, matter outside the pleading has been presented in support thereof. The court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under FRCvP 56 and afford the parties an opportunity to present pertinent supporting material. FRCvP 12(b); *Kopec v. Coughlin*, 922 F.2d 152, 153 (2d Cir.1991); *Fonte v. Bd. of Mgers. of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir.1988). Because this motion was originally noticed by Newman as one under FRCvP 56(b) and both parties have submitted affidavits in support of their respective positions and have participated in oral argu-

ments on the motion, this Court will proceed as if it were one for summary judgment under FRCvP 56. *Grand Union Co. v. Cord Meyer Development Corp.*, 735 F.2d 714, 716–717 (2d Cir.1984). Such motion may be granted if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCvP 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the granting of such a motion. In other words, only *genuine* issues that relate to *material* facts will defeat a motion for summary judgment. Facts that do not relate to the legal elements of a claim are not material. *Anderson*, 477 U.S. at 247–248, 106 S.Ct. at 2509–10. Further, the party opposing the motion may not rest solely on mere allegations, but must present competent evidence showing that there is a genuine and material factual issue for trial; a "mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Newman has submitted an affidavit and several exhibits in support of his motion. To the extent that his averments are uncontested, they may be summarized as follows: As a consultant he entered into a "non-specific 'Consultant's Agreement' with [CM] on September 14, 1982 to perform research, development and design work." Third Party Defendant's Affidavit in Support of His Motion to Dismiss, or Alternatively, to be supplied with a more definite statement (sworn to July 29, 1993) ("Newman Affidavit"), at ¶¶ 1, 2. He relates therein that, on September 30, 1982, he and CM entered into an "agreement" for the development of hardware and software for control boards using a microprocessor chip, that a prototype was built using

2. By a previous Order of this Court, all nondispositive motions had been referred to Judge Foschio. Rule 14(a) of the Federal Rules of Civil Procedure requires that a defendant obtain leave of the Court to file a third-party complaint if such filing is to occur more than ten days after the serving of its "original answer." CSC's an-

swer to the amended complaint and was filed September 15, 1989 and must, in all rationality, be considered to have been its original answer. Leave to file the Third–Party Complaint was requested December 28, 1992 and was granted by Judge Foschio January 22, 1993.

Newman's design and "an Intel chip," that this prototype worked properly and that, after he had learned that CM could not secure an adequate supply of the specified chips from Intel, he had cautioned CM against purchasing chips that were made neither in the United States nor by a "US licensee." Newman continuingly states that he had not been involved in the agreement between CM and CSC to buy UM8049 chips manufactured by UMC and that he had not been involved in arranging for the purchase of those chips. After the chips had been installed in the hoists and the hoists placed in operation, malfunctioning occurred. Newman thereafter cooperated with CM in an attempt to repair and redesign the hoists so that they would operate properly, traveling to Taiwan in February 1985 at the request of CM. He then diagnosed the source of the trouble as the intolerance of the UM8049 chips to "random 'electrical noise.'" It evolved that these chips had been manufactured by an offshore producer who was not a US licensee. After Newman had redesigned the hoists, employing a chip meeting his original specifications, they operated properly. Newman then notes that the agreement to purchase the UM8049 chips had been entered into between CM and CSC, that he was never a party to such contract and that he never contracted to supply such chips. He also states that he had never been in privity with CSC and never had had any "mutuality of interest" with CSC. Exhibit B to the Newman Affidavit is said to be the above-mentioned written agreement between CM and Newman and appears to cover the design of hardware and software and the delivery of a working prototype in six weeks including "production field test unit debugging." Newman Affidavit, Exhibit B. Exhibits C and D thereto appear to be after-the-fact letters by Newman, recounting the problems with the hoists and his involvement in resolving the problems that arose post-production. The affidavit and exhibits make clear that his relationship with CM had been contractual and that he had

had no contractual relationship with CSC. In opposition to Newman's motion, CSC submitted an affidavit of its attorney with, as Exhibits A, B and C, excerpts from transcripts of the deposition testimony given by CM's employee Robert H. Broyden and Broyden's December 8, 1981 interoffice memorandum and other CM documents as Exhibit D. Affidavit of Michael A. Brady, Esq. (sworn to August 6, 1993); Defendant and Third–Party Plaintiff, China Semiconductor Co. Ltd.'s Memorandum of Law in Opposition to Motion of Third–Party Defendant to Dismiss or in the Alternative for a More Definite Statement ("CSC's Memorandum of Law").

For the purposes of background, additional facts that appear at least arguably pertinent are referenced under two subheadings under the heading "Statement of Facts" within CSC's Memorandum of Law, the first being "The Selection of the 8049 Microprocessor," which may be summarized as follows: CM relied on Newman for the selection of the original and soon-to-be-unavailable microprocessor, and later for recommendations as to other manufacturers of a compatible chip after it had been learned that the original could not be obtained. Brady Affidavit at Exhibit A, pp. 39, 42–46. Broyden eventually had found what he either believed or was led to believe by CSC to be an Intel licensee in defendant UMC and another entity, Electronics Research & Service Organization. Newman's input had been neither requested nor offered relative to the selection of any of the defendant suppliers up to this point. Newman did, however, travel to Taiwan in June 1984 at the request of CM. According to the excerpts from the transcript of Broyden's testimony, Newman, at least to some extent, inspected the specifications for UMC's chip and reported back to Broyden that he was satisfied that the UMC chip was the equivalent of the Intel chip, confirming what Broyden already believed. Brady Affidavit, Exhibit A at 101, 114–115, 118–122.[3]

---

3. CSC characterizes Newman's role as central to CM's approval of CSC's supplying UMC's chips. The transcript excerpts submitted do not support this contention. It should also be noted that the testimony therein relates to documents that have not been submitted for the purposes of this mo-

tion. Portions of this testimony are therefore discounted. The fact that Newman was merely reaffirming Broyden's beliefs also undermines the assertion that Newman's role was central to the process of approving the UMC chip. CM's Complaint, however, does mention Newman's

CSC specifically points out that Newman's Affidavit makes no mention of the June 1984 trip to Taiwan.

The second subheading of factual references in CSC's Memorandum of Law is entitled "The Involvement of and Wrong–Doing By Newman and Micro Designs." *Id.* at 4. This section of the Statement of Facts deals with the design and pre-production testing of the control board and hoist as described in the CM–Newman agreement mentioned *supra*. It should be noted that these allegations also appear to reiterate the affirmative defenses that CSC has posed against CM— *viz.*, that any defect in the computer boards was caused by CM or its agents, CM's failure to mitigate and CSC's lack of control over the computer board design or the software components—which either reduce or obviate CSC's liability. *See* Answer ¶¶ 49–51.

■ FRCvP 14(a) provides in part: "[A] defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action *who is or may be liable* to the third-party plaintiff for all or part of the plaintiff's claim against the third party plaintiff." (Emphasis added.)

As the above-emphasized language makes clear, a third-party claim is proper only if a non-party might be found liable to the defendant for all or a part of a plaintiff's successfully-asserted claim against a defendant. In a diversity action, a federal court must look to the applicable state substantive law in order to determine if such contingent liability exists. *Widett v. U.S. Fidelity and Guar. Co.*, 815 F.2d 885, 886 (2d Cir.1987). In the present case, there is no contention that New

York law is not controlling as between these parties. *See Brown v. Cranston*, 132 F.2d 631, 633 (2d Cir.1942) (state law of contribution controls whether third-party plaintiff may sustain a claim under such a theory), *cert. denied sub nom. Cranston v. Thompson*, 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698 (1943). Thus, irrespective of the lenient notice-pleading requirements of the federal rules and the broad discretion courts have in allowing the impleading of third parties—*see Old Republic Ins. Co. v. Concast, Inc.*, 99 F.R.D. 566, 568 (S.D.N.Y.1983)—, there still must be a basis for the third-party's liability to the defendant under state law. Under New York law, CSC claims that Newman is liable to it under the theories of indemnification and/or contribution for any damages for which it might be found liable.

CSC does not seek to hold Newman directly liable to it for any direct damages. Whether such a claim were grounded in contract or in tort, Newman owed no duty to CSC. Because he contracted solely with CM, there was no privity of contract by him with CSC and thus no contractual duty owed by him to CSC. It is also doubtful that CSC could assert that it was a third-party beneficiary of Newman's contract with CM. *See Morse/Diesel, Inc. v. Trinity Industries, Inc. ("Morse/Diesel III")*, 859 F.2d 242, 247–248 (2d Cir.1988) (under New York law there can be direct liability between or among subcontractors absent privity only when their respective contractual duties inure to the benefit of a third party asserting liability). Finally, because of this lack of any duty to CSC and because CSC has not suffered any injury to its person or property due to a dangerously defective product, Newman may not be

June 1984 visit to UMC in Taiwan in the company of representatives of CSC and of another defendant. Newman is referred to as "CM's announced agent and representative." Complaint ¶ 40 (attached to Third–Party Complaint as Exhibit C). It should also be noted that CSC states that, at the time of Newman's visit to Taiwan, "*no* 8049s had yet been manufactured by UMC." CSC's Memorandum of Law at 3. This assertion may be neither accurate nor relevant considering that purchase agreements had already been entered into between the parties. Furthermore, why would Newman go to inspect the UMC plant and its chips if none had yet been manufactured? Finally, Broyden stated that CM

already had "the initial run of chips", "had run what we called the 'full-function' tests and were satisfied with the results [and] were not expecting anything else." Brady Affidavit, Exhibit A at 122. Therefore, inasmuch as UMC and CSC would presumably supply the same product in the initial run, at least a modicum of chips was manufactured by UMC and supplied to CM and tested by CM, precipitating Newman's trip to Taiwan in June 1984. Another seemingly relevant fact is stated in CSC's Answer: "the published specifications for UMC microprocessor 8049 were equivalent to the published specifications for the Intel 8049 microprocessor * * *." Answer ¶ 38.

found directly liable to CSC under a theory of negligence or strict products liability. *See, e.g., Schiavone Const. Co. v. Elgood Mayo Corp.,* 81 A.D.2d 221, 439 N.Y.S.2d 933, 937–940 (1st Dept.1981) (Silverman, J., dissenting) (in commercial setting, loss of value, cost of repair, other economic losses should be recoverable under contract and warranty theories, not tort theories), *rev'd,* 56 N.Y.2d 667, 451 N.Y.S.2d 720, 436 N.E.2d 1322 (1982) (adopting Judge Silverman's dissenting opinion); *Bocre Leasing Corp. v. GMC,* 840 F.Supp. 231, 232–234 (E.D.N.Y. 1994) (discussing New York case law as consistently holding that there is no basis for a tort claim when the only injury is economic loss or damage to the product itself). Thus, there rightly can be no claim by CSC that Newman would be directly liable to it.

■ Whether Newman could be responsible, in whole or in part, for the damages suffered by CM but sought by the latter solely from CSC is a closer question. While it is generally true, as CSC asserts, that a third-party action is a proper vehicle for asserting a claim for indemnity or contribution, the authorities it cites in support of this proposition are inapposite to the present case, or have been abrogated by later decisional law. As previously stated, New York law is controlling on this issue.

■ Pursuant to such law, indemnity "usually arises from an express agreement by which one party [to a contract] agrees to hold the other harmless from claims brought against it by a third party." *Knight v. H.E. Yerkes and Associates, Inc.,* 675 F.Supp. 139, 143 (S.D.N.Y.1987). CSC does not allege any such agreement between it and Newman. In *Hanley v. Fox,* 97 A.D.2d 606, 468 N.Y.S.2d 193 (3d Dep't 1983), however, it was stated that under certain circumstances indemnity may be implied. "Indemnity * * * will be implied to allow one who was compelled to pay for the wrong of another to recover from the wrongdoer the damages paid to the injured party. But where the party seeking indemnification is himself at 'east partially at fault, indemnity will not be implied." *Id.,* 97 A.D.2d 606, 468 N.Y.S.2d at 194. *See also Knight, supra; Rock v. Reed–Prentice Div. of Packaging Machinery,* 39

N.Y.2d 34, 39, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976). CM's claim against CSC, for which CSC seeks indemnity from Newman, sounds primarily in contract and any recovery had by CM against CSC on its claims is necessarily predicated on establishing CSC's breach thereof. Under such circumstances, indemnity cannot be implied under New York law. Thus, as a matter of law, CSC has not stated a claim for indemnification. *See Knight, supra* at 143.

■ CSC also seeks from Newman contribution which is, in effect, partial indemnity. Section 1401 of New York's Civil Practice Laws and Rules ("CPLR"), New York's contribution statute, states:

> "Except as provided in section 15–108 of the general obligations law, two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."

At first glance, a basis for CSC's third-party claim under this theory appears tenable. As CSC quotes:

> " 'Article 1401 of the CPLR, as enacted in 1974, creates a right of contribution for a tort feasor [sic] regardless of whether or not the other tort feasors have been sued by P, the injured person. David D. Siegel, New York Practice, Section 172 (1978). CPLR 1401 ... applies not only to joint tort feasors, but also to concurrent, successive, independent, alternative, and even intentional tort feasors.' *Id.* Thus, under settled precedent, CSC is entitled to contribution and/or indemnification from Newman." CSC's Memorandum of Law at 7–8.

In this regard, CSC has attempted to frame CM's Complaint as one grounded in both contract and tort, and its own Third–Party Complaint as one grounded in tort. *Id.* at 2 (Newman's "actions and omissions show professional malpractice, negligence, malfeasance and breach of duty" entitling CSC to contribution if it is found liable for CM's injuries). Most likely, this is because New York's Court of Appeals has definitively stat-

ed that the above contribution statute has no application to claims that essentially sound in contract. *Bd. of Educ. v. Sargent, Webster, Et Al. ("Sargent")*, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987).[4] *See also Morse/Diesel III, supra*, 859 F.2d at 249–250; *Knight*, 675 F.Supp. at 144–146.

It is far from clear, however, that "settled precedent" affords CSC indemnification or contribution from Newman, as CSC claims. To so hold, this Court would have to conclude that (1) CM's complaint sounded in tort rather than in contract and (2) both (a) that Newman's alleged breach of his duty to CM was tortious and (b) that CSC sufficiently alleged a third-party claim for contribution based on such tortious behavior. Otherwise, such contribution would not be between two tortfeasors. Because whatever liability Newman would have had to CM would be contractual in nature, the above contribution statute has no application to the present case.[5] Thus, as a matter of law, CSC has not stated a claim for contribution against Newman. While CSC has raised disputed facts as to Newman's possible breach of duty to CM and as to any injuries caused by such breach, these facts are not material to the viability *vel non* of the claims against Newman. CSC has failed to present any facts showing that Newman breached a legal duty independent of his contractual relationship with CM. CSC has also failed to present any facts showing that the injuries suffered by Newman's breach were anything more than economic losses.

A discussion of pertinent New York case law illustrates the propriety of this conclusion. Such evidences a trend toward a stricter delineation between contract and tort by New York's courts in recent years, which delineation is ignored by CSC. For instance, in *Sargent, supra*, a school district sought damages for a faulty roof against an architectural firm and a general contractor involved in a high school construction project. Both had been hired by the school, but under separate contracts. Not unlike the present case, the complaint therein alleged various contractual claims, as well as a claim of fraudulent concealment. *Id.*, 71 N.Y.2d at 24, 523 N.Y.S.2d 475, 517 N.E.2d 1360. The trial court had granted the defendants' motions and dismissed the complaint as against the general contractor, finding that it sounded primarily in contract and was thus barred by the six-year statute of limitations applicable to contract actions under CPLR § 213(2). The Appellate Division had affirmed, specifically concluding that the school's claims against both parties sounded in contract. Thereafter, the architectural firm sought contribution and indemnification from the general contractor. Under a set of facts similar to those herein,[6] New York's Court of Appeals rejected the architectural firm's attempt to bring the general contractor into the case for the purposes of contribution. *Sargent* at 25–26, 523 N.Y.S.2d 475, 517 N.E.2d 1360. By looking at the legislative history of CPLR § 1401, as well as *Dole v. Dow Chemical Company*, 30 N.Y.2d 143, 331

**4.** CSC cites *Tower Mtg. Corp. v. Reynolds*, 81 F.R.D. 560 (W.D.Okla.1978), as support for its contention that the Third–Party Complaint should not be dismissed. While that Court found that a contracting third party could be found liable for contribution, that case dealt wholly with Oklahoma's substantive law. Assuming there are not any bizarre choice-of-law issues unresolved between the parties, Oklahoma law has no application to the present case. The one case that CSC cites in its Memorandum of Law that is not readily distinguishable from the present matter, *Crow–Crimmins–Wolff & Munier v. County, Etc.*, 90 A.D.2d 785, 455 N.Y.S.2d. 390, 391 (2d Dep't 1982), can no longer be good law in New York in light of *Sargent* because *Crow–Crimmins* allowed contribution based upon a contractual relationship between two of the parties. In the unlikely event that it might still be good law, its reasoning is rejected as unpersua-

sive in light of the subsequent statements by the highest New York court. CPLR § 1401 is only applicable to tortfeasors seeking contribution, not those who are alleged to have breached a contract.

**5.** Because this disposes of the issue of whether CSC may seek contribution from Newman under New York law, this Court will not reach the issue of whether CM's complaint essentially sounds in contract.

**6.** *E.g.*, both the architectural firm and the general contractor had contracted separately with the school district; Newman and CSC each contracted separately with CM. Each case also involved complaints based on contractual relationships but including fraud counts, and third-party complaints invoking New York's contribution statute.

N.Y.S.2d 382, 282 N.E.2d 288 (1972) (codified by section 1401), the *Sargent* Court concluded that purely economic loss resulting from a breach of contract did not constitute "injury to property" under New York's contribution statute and that the statute should not be extended beyond tort so to also include contribution based upon contractual liability.

"To permit apportionment of liability, pursuant to CPLR 1401, arising solely from breach of contract would not only be at odds with the statute's legislative history, but also do violence to settled principles of contract law which limit a contracting party's liability to those damages that are reasonably foreseeable at the time the contract is formed * * *." 71 N.Y.2d at 28, 523 N.Y.S.2d 475, 517 N.E.2d 1360. The Court buttressed its position by noting that the statute defined " 'injury to property' as 'an actionable act, whereby the estate of another is lessened, other than a personal injury, *or the breach of a contract* ' (emphasis added)." *Id.* at 28 fn. 2, 523 N.Y.S.2d 475, 517 N.E.2d 1360 quoting from section 25–b of New York's General Construction Law ("GCL"). Thus, contribution was not available to Sargent (the architectural firm) against Thompson (the general contractor) because the school's damages were essentially contractual as they related to Thompson. *Id.* at 26–29, 523 N.Y.S.2d 475, 517 N.E.2d 1360. The Court also noted that, although the contribution statute was applicable to "breach of warranty" cases involving a defective product that caused physical injury, such cases were properly characterized as based in both tort and contract. Because *Sargent* involved a contractual relationship without an injury to person or property, it could not possess such duality. *Id.* at 28 fn. 2, 523 N.Y.S.2d 475, 517 N.E.2d 1360. *See also Schiavone, supra; Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (expressing the now-widely adopted view that tort remedies are not available in the commercial setting when economic loss absent physical injury is at issue); *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 552, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) (discussing the factors New York courts have used to determine whether an action sounds in either contract or tort).

Within this context, CSC has raised a factual dispute as to Newman's potential liability to CM and, for the purposes of this motion, this dispute is resolved in CSC's favor. Nonetheless, the dispute is not material because any such liability cannot be characterized as arising out of tort. By no stretch of this Court's reasoning or conjecture may Newman—a computer consultant contractually retained by CM to design the hardware and software of the computer control board, to produce a working prototype of a hoist and to attempt later to work out the alleged difficulties with the UMC chip—be considered a tortfeasor. Any lapse in performance on his part could only be redressed via a contract action—even with regard to the June 1984 trip to Taiwan or the troubleshooting role he played after he had fulfilled his obligations under the original contract. His relationship with CM remained contractual and any breach of duty to CM could only be considered a breach of contract. Indeed, CSC not only fails to allege any *specific* breach of duty, but also fails to allege any breach of duty that would involve an extra-contractual duty. Further, any injury he may have caused CM would be mere economic injury which does not qualify as an injury to property under New York law. *See* GCL § 25–b; *Schiavone,* 81 A.D.2d 221, 439 N.Y.S.2d at 937–940. CSC does not present any material facts creating a genuine issue in this regard either.

This conclusion is buttressed by the reasoning of the United States Court of Appeals for the Second Circuit in *Morse/Diesel III, supra,* 859 F.2d at 249–250. That case involved third-party claims filed by various subcontractors against other subcontractors and sub-subcontractors, based on theories of third-party beneficiary and contribution, with the latter being relevant to the present discussion. The third-party plaintiffs in that case claimed that, despite the fact that the obligations between the parties were contractual in nature, "the third-party defendants were negligent in failing to perform these obligations with due care, and are accordingly liable for contribution as tortfeasors under New York law." *Ibid.* The Court rejected this contention outright, restating the posi-

tion of New York's Court of Appeals—*viz.*, that merely couching a complaint in tort language will not convert a breach of contract action into a tort claim. *Id.* at 250 (citing *Sargent, supra,* and *Clark–Fitzpatrick v. Long Is.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)). The federal appellate court thereafter remanded the case to the district court with directions to dismiss the claims for failure to state any claims upon which relief could be granted. 859 F.2d at 250. Here, as there, any obligation third-party defendant Newman allegedly failed to perform was "essentially contractual in nature." *Ibid. See* Newman Affidavit, ¶¶ 1–6, 10, 14, 18 & Exhibits A–D; Complaint ¶¶ 7, 40; Answer ¶ 7; CSC's Memorandum of Law at 2, 4; Brady Affidavit at Exhibit A, p. 39, and at Exhibit C, pp. 91–93, (all discussing the relationship between Newman and CM, with the last-cited reference specifically and explicitly explaining the contractual nature of the relationship). This contractual relationship does not provide a basis for contribution under New York law; thus CSC has failed to state a claim upon which relief could be granted.[7]

In 1992, New York's Court of Appeals further elucidated the distinction between claims based upon contract and those based upon tort, and how such a distinction affected the law of contribution. In *Sommer, supra,* the Court held that defendant Holmes Protection, a fire alarm company, could be found liable to other defendants for contribution in a suit by the owner of a building against all of the defendants to recover for property damage due to fire.[8] The Court rejected Holmes Protection's contention that its obligations to the landlord and the other defendants were solely contractual and that the opinion in *Sargent* put it beyond the reach of the contribution statute. *Id.* 71 N.Y.2d at 557, 523 N.Y.S.2d 475, 517 N.E.2d 1360. Most relevant to the present case, *Sommer* identified the two controlling factors that New York courts rely on to separate contract from tort—(1) whether or not there is a public policy imposing a legal duty as an incident to and independent of the contractual relationship, and (2) the nature of the injury. *Id.* at 550–552, 523 N.Y.S.2d 475, 517 N.E.2d 1360.[9] Pursuant to this first factor, the Court noted that professionals, common carriers and bailees may be subject to tort liability for failing to exercise reasonable care, irrespective of their contractual duties. *Id.* at 551–552, 523 N.Y.S.2d 475, 517 N.E.2d 1360. By like reasoning, Holmes Protection not only had the duty to perform its contractual duties, but the nature of its services and of its relationship with its customers also implicated a significant public interest, thereby imposing a duty of reasonable care independent of its contracts. *Id.* at 552–553, 523 N.Y.S.2d 475, 517 N.E.2d 1360.[10] *Sommer*

7. It also would not support a claim for negligent performance of services which, prior to *Sargent, supra,* might have allowed this Court to characterize Newman as an alleged tortfeasor (for the purposes of contribution) if his contract could be characterized as one for services. *Compare Morse/Diesel, Inc. v. Trinity Industries, Inc.* ("*Morse/Diesel II*"), 664 F.Supp. 91, 95 (S.D.N.Y.1987) (on reargument, the trial court held that a claim for negligent performance of services could be sustained even though only economic damages were sought), *with Morse/Diesel III,* 859 F.2d at 249–250 (rejecting claim that third-party defendants were negligent in failing to perform contractual obligations with due care and thus liable for contribution). "Any obligations which the third-party defendants failed to perform here were essentially contractual in nature. Such failure does not provide a basis to impose liability for contribution under New York law." 859 F.2d at 250.

8. The landlord had contracted with Holmes Protection which allegedly had thereafter failed to heed a fire alarm at the apartment and to transmit the alarm to the fire department. 79 N.Y.2d at 548, 583 N.Y.S.2d 957, 593 N.E.2d 1365. Among the many ensuing lawsuits, the landlord sued Holmes as well as others connected with the alarm system. *Id.* at 549, 583 N.Y.S.2d 957, 593 N.E.2d 1365.

9. The court also rejected the distinction between nonfeasance (nonperformance) and misfeasance (improper performance) as purely semantic and not controlling as to whether an action sounded in contract or tort. Thus, CSC's attempts to label Newman as a misfeasant (and thus a tortfeasor) are unavailing.

10. In this regard, *Sommer* seems to place much reliance on New York City's comprehensive scheme of fire-safety regulation, which imposed various duties upon Holmes above and beyond its contractual undertakings. *Ibid.*

also allowed other defendant alarm entities to seek contribution because of the nature of the injury to the property owner—a fire that had spread out of control causing extensive damage to the building. *Id.* at 557, 523 N.Y.S.2d 475, 517 N.E.2d 1360. This injury obviously qualified as an injury to property, separate and above mere benefit-of-the-bargain damages available in a contract action. Another justification for allowing the contribution claim to proceed was that the injury was also caused by a fire—an "abrupt, cataclysmic occurrence," more familiar to tort law than contract. *Id.* at 552, 523 N.Y.S.2d 475, 517 N.E.2d 1360.

Under the cursory allegations of CSC's Third–Party Complaint, as expounded upon in its Memorandum of Law, it is obvious that CSC is merely employing language familiar to torts in an attempt to characterize the alleged breach of duty by Newman to CM as tortious rather than contractual. In order to prove negligence and withstand a motion of summary judgment, CSC would have to show that Newman owed CM a cognizable duty of care, that he breached that duty and that CM's damages were the proximate result of that breach. *See Morse/Diesel, Inc. v. Trinity Industries, Inc. ("Morse/Diesel I"),* 655 F.Supp. 346, 356 (S.D.N.Y.1987), *rev'd on other grounds, Morse/Diesel III, supra.* Again, assuming for the purposes of this motion that Newman did in fact breach a duty to CM and that this breach was the proximate cause of CM's damages, a review of CSC's allegations and supporting evidence still shows that CSC cannot overcome the two hurdles mentioned earlier. First, the duty in this instance is not cognizable as a duty imposed in tort; it arises solely out of the contract. Second, CSC fails to assert or substantiate that CM suffered any damages

beyond mere economic injury due to Newman's breach.

With regard to the relationship between Newman and CM, CSC alleges that it involved basically three overlapping series of events. The first part of the relationship involved Newman's design of the computer control board and the software for the Intel 8049 chip and the delivery of the prototype hoist. The second surrounded the hunt for a viable alternative chip after it was discovered that Intel would not supply CM. The third involved Newman's attempts to rectify the problems that arose in either the control board as a whole (CSC's interpretation of the Complaint) or the UMC chip itself (Newman's interpretation).[11]

With regard to this first phase of the relationship, Newman did indeed design the computer control board and its various components and accompaniments, but this was a contractual duty. Other than its brief allegation of negligence, malpractice and the like, CSC's Memorandum of Law and the Brady Affidavit offer no basis for, and often contradict, such an allegation. CSC also asserts that CM *relied* upon Newman's *expertise* in selecting the original microprocessor, in an apparent attempt to construct some type of malpractice claim, but this too must fail as a matter of law. Not only does CSC not dispute the existence of the CM–Newman contractual relationship, references to such relationship are found throughout its third-party papers. *See* Complaint ¶¶ 7, 40 and Third–Party Complaint, Exhibit C; Answer ¶ 7 and Third–Party Complaint, Exhibit D; CSC's Memorandum of Law at 2, 4; Brady Affidavit at Exhibit A, p. 39, and Exhibit C, pp. 91–93. There is no basis in law for extending the doctrine of professional malpractice to cover independent computer consultants. To

---

11. The Complaint appears to focus on the injuries caused primarily by the defective chip, but also alleges injuries caused by flaws in the control board itself. It repeatedly alleges that CSC breached the agreement by supplying "control boards which contained numerous flaws, including a microprocessor which, in violation of the agreement, was not the equivalent to the Intel 8049." *See* Complaint at ¶ 18 (Exhibit C to Third–Party Complaint). *See also, e.g., id.* at ¶¶ 22, 27, 30, 33, 35, 38, 39, 42 and 43. Thus, while the Complaint does mention flaws in the

control board, it appears that this is collateral to the injuries caused by the defective chip. This is relevant to the current motion because during oral argument Newman contended that the Complaint alleges injuries due solely to the defective chip, and thus that Newman could not be liable under New York's contribution statute because he was not responsible for the "same injury" as was CSC, having had nothing to do with the manufacture of the chip. The Court need not and does not reach this issue.

lift the theory of malpractice from its narrow origin of personal, professional services to a lay patient or client and apply it to the law of commercial contracts would obfuscate the necessary boundaries of these two areas of law. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 745 (2d Cir.1979) (rejecting application of malpractice statute of limitations to a commercial relationship). Thus, *Taft v. Shaffer Trucking, Inc.*, 52 A.D.2d 255, 383 N.Y.S.2d 744, 747 (4th Dep't 1976), and *Corva v. United States Auto. Ass'n*, 108 A.D.2d 631, 485 N.Y.S.2d 264, 265 (1st Dep't 1985),—which were relied on by CSC in support of its position—are both easily distinguished in that they dealt with the potential liability of a plaintiff's attorney to the defendant tortfeasor under the theory of contribution. No additional duty above and beyond his contract may be imposed upon Newman under the facts of this case. *Cf., AT & T v. New York City Human Resources Admin.*, 833 F.Supp. 962, 984 (S.D.N.Y.1993).

CSC alleges that CM's reliance on Newman extended to the latter's advice on the selection of alternate manufacturers—the second phase of the CM–Newman relationship. However, such advice is irrelevant, not only because of the nature of the CM–Newman relationship, but also because there is no allegation that Newman recommended either CSC or UMC to CM. It appears that Newman had not had any contact with CSC until after CM had selected it as its supplier. Even if Newman had, this Court is still left with merely a contractual relationship. Even if he breached some type of duty to CM during his June 1984 trip to Asia, by not discovering that UMC was not an Intel licensee or that the chips had an intolerance to electrical "noise," this was still undertaken pursuant to the contractual relationship with CM, unsupported arguments to the contrary notwithstanding. Thus, with regard to this phase of the relationship, CSC also fails to make any allegation or to present material facts alluding to a breach of duty above and beyond the contractual relationship.

Finally, with regard to the third phase of the CM–Newman relationship—the after-the-fact troubleshooting Newman under-took—the same reasoning as above applies. The relationship was contractual; CSC has not created a genuine issue of material fact to the contrary.

Maintaining this important distinction between the realms of tort and contract is also not undermined by the nature of the injury allegedly suffered by CM at the hands of Newman. There are no material facts creating a genuine issue whether Newman's design, the prototype and his other activities caused CM to suffer an injury to person or property. Unlike the property owner in *Sommer, supra*, there is no evidence that CM suffered any damage to property due to Newman's alleged breach of duty. CSC did not even allege such. Further, this breach of duty did not result in any type of accident or cataclysmic occurrence similar to the fire in *Sommer*.

Furthermore, with regard to all phases of the CM–Newman relationship, public policy does not warrant the imposition of a duty upon Newman to exercise reasonable care independent of his contractual duties. Primarily, this is so because of the nature of his services—an unincorporated consultant engaged in the rather impersonal and relatively unregulated (compared to many other industries) field of computer design. *Cf., Sommer, supra* (fire safety heavily regulated). Also, the nature of his relationship with CM was arms-length and, while he may have been vested with a certain degree of responsibility, his duties were not affected by any significant public interest. If liability exists, it is purely contractual. Actually, public policy weighs against allowing tort liability considerations to interfere with the ordering of private contractual relationships in many instances, this being one of them. *See, e.g., East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (declining to extend tort liability to a contractual relationship). Tort law is premised primarily on the public policy of making the injured party whole, while contract law is meant to facilitate primarily economic exchange and is premised upon the ordering of private affairs by the parties involved. *Carmania Corp, N.V. v. Hambrecht Terrell Intern.*, 705 F.Supp. 936, 938

**1184**

(S.D.N.Y.1989). To infuse the current controversy with tort law, allowing it to further encroach upon private bargained-for relationships, would only upset the necessary order and predictability upon which the business world relies. *Sargent, supra*, 71 N.Y.2d at 28–29, 523 N.Y.S.2d 475, 517 N.E.2d 1360; *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 336, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987) ("stability and predictability in contractual affairs is a highly desirable jurisprudential value"); *Schiavone, supra*, 81 A.D.2d 221, 439 N.Y.S.2d at 938–940.

It should also be noted that this result does not emburden CSC with the harsh consequence of having to assume liability for which it might not be responsible. It has asserted in its Answer the affirmative defenses that (1) CM or its agents were responsible for the defects in the computer boards, (2) CM failed to mitigate its damages and (3) the computer board design and the software components of the computer chip were the responsibility of CM. Answer at ¶¶ 49–51. Thus, CSC may still attempt to establish that CM or its agents were responsible for the defects in the board, the board design and the software, and that this was at least the partial cause of CM's damages.[12] CSC can therefore be held liable only for the damages it is found to have caused.

Based on the foregoing, this Court concludes that, as a matter of law, Newman's duty to CM was solely contractual. CSC has failed to present any material facts creating a genuine issue to the contrary and thus, it cannot sustain a claim for contribution.

Because there was no contract to indemnify and because CSC must be found at least partially at fault to incur any liability, there is no basis for allowing third-party plaintiff CSC to pursue its claim for indemnification against third-party defendant Newman. Further, because (1) CM's alleged injury at the hands of Newman was not alleged to be an injury to person or property, (2) CM and Newman had a commercial relationship and (3) there is no basis for imposing an independent legal duty upon Newman, CSC's claim

for contribution against Newman must also be dismissed.

Accordingly, it is hereby ***ORDERED*** that third-party defendant Newman's motion for summary judgment dismissing CSC's third-party complaint is granted.

UNITED STATES of America, Plaintiff,

v.

**Jose Rafael MALDONADO, M.D., Defendant.**

**Jose Rafael MALDONADO, M.D., Third–Party Plaintiff,**

v.

**ALBERT EINSTEIN COLLEGE OF MEDICINE OF YESHIVA UNIVERSITY, Third–Party Defendant.**

**No. 93 Civ. 4210 (MGC).**

United States District Court,
S.D. New York.

Nov. 7, 1994.

---

**12.** Indeed, in the Complaint CM refers to Newman as its "announced agent and representative." Complaint ¶ 40.

Mary Jo White, U.S. Atty., S.D.N.Y. by Kathleen A. Zebrowski, Asst. U.S. Atty., New York City, for plaintiff.

Reaves & Yates by James A. Reaves, New York City, for defendant and third-party plaintiff.

Martin H. Bockstein by Toby Stone, Gen. Counsel for Yeshiva University, New York City, for third-party defendant.

## OPINION

CEDARBAUM, District Judge.

This is an action for breach of three contracts between the Secretary of the Department of Health and Human Services ("Secretary") and Dr. Jose R. Maldonado under the National Health Service Corps ("NHSC") Scholarship Program, 42 U.S.C. § 254*l*, *et seq.* The Government claims that Maldonado accepted $46,878 in scholarship funds to finance three years of his medical education, but upon completion of his medical education failed to commence his three-year service obligation in an area designated by the Secretary as a health manpower shortage area ("HMSA").[1] The Government seeks to recover $412,051.41, plus interest from June 11, 1993, pursuant to the liquidated damages provisions of the contracts. The Government also seeks a surcharge of 10% of the amount

---

**1.** The NHSC statute has since been amended to substitute the term Health Professional Shortage Area for Health Manpower Shortage Area. 42 U.S.C. § 254e(a)(1).

of the debt pursuant to 28 U.S.C. § 3011. Jurisdiction is based on 28 U.S.C. § 1345.

Maldonado asserts fourteen affirmative defenses and a third-party claim against Albert Einstein College of Medicine of Yeshiva University ("AECOM"). Maldonado moves for summary judgment on the Government's claim, contending that the Government's action is time barred and that the Secretary failed to assign him to a specific site at which to fulfill his service obligation before he was declared in default. The Government cross-moves for summary judgment. AECOM is not involved in either of the motions for summary judgment. For the reasons discussed below, Maldonado's motion for summary judgment is denied, and the Government's motion for summary judgment will be granted unless within thirty days Maldonado submits a specific request for discovery that might raise a genuine issue of material fact.

## Facts

The following facts, except where noted, are undisputed. On May 16, 1980, Maldonado signed a contract with the Secretary, accepting a scholarship award for the 1980–81 academic year at AECOM pursuant to the NHSC Scholarship Program. (Lee Dec., Ex. C.) On March 12, 1981, Maldonado signed an extension contract pursuant to which he accepted scholarship funds for the 1981–82 academic year. (Id., Ex. D.) On May 4, 1983, Maldonado entered into his third and final contract with the Secretary, accepting a scholarship award for the 1983–84 academic year. (Id., Ex. E.) These scholarship awards totalled $46,878.

The terms of these contracts are established by statute. 42 U.S.C. § 254*l* (f). The contract outlines the following "obligations of the Secretary": providing the applicant with a scholarship award; utilizing the applicant to provide health services; and granting a deferral so that the applicant may complete an internship or residency before commencing service. (Lee Dec., Ex. C, § A(1)–(3).) In return, Maldonado agreed to accept the scholarship award; maintain full-time enrollment and an acceptable level of academic standing; and provide one year of service for each year a scholarship is awarded in an area

designated by the Secretary as an HMSA. (Id., § B(1)–(6).) In addition, the contract provided that "[i]f the applicant ... [f]ails to begin or complete the period of obligated service incurred under this contract for any reason ..., the United States shall be entitled to recover an amount equal to three times the scholarship funds awarded, plus interest...." (Id. § C(3).)

Following his graduation in June of 1985, Maldonado was granted a one-year deferment of his service obligation so that he could complete a residency in general surgery at Montefiore Medical Center. (Lee Dec., Ex. H.) This residency was to be completed by June 30, 1986 and Maldonado was therefore scheduled to commence his service on July 1, 1986. On August 1, 1985, Dr. Kenneth Moritsugu, then Director of the NHSC, mailed to Maldonado an Information Bulletin regarding the 1986 placement process, a timetable for site selection, and the 1986 HMSA Placement Opportunity List. (Lee Dec., Ex. K.) At that time, Maldonado was advised that he had until August 15, 1985 to complete a site selection questionnaire if he wanted his placement preference considered, and that he had until October 31, 1985 to choose a site under the Early Decision Alternative. (Id.) Maldonado did not submit a questionnaire, nor did he choose a site.

During the next phase of the 1986 placement process, the State or Region Assignment Period, which ran from November 1, 1985 through April 15, 1986, scholarship recipients were assigned to a region and were instructed to match themselves to an approved site within that region. On December 9, 1985, Moritsugu wrote to Maldonado, informing him that he had been assigned to Texas. In that letter, Moritsugu provided to Maldonado the name, address, and telephone number of the Regional Representative, Douglas Mahy, "who is awaiting your contact." (Lee Dec., Ex. L.) The letter further stated that if Maldonado did not match himself to a specific site by April 15, 1986, he would be assigned to a site by the NHSC. (Id.) Maldonado did not respond to Moritsugu's letter, nor did he contact Mahy.

On February 10, 1986, the Texas Department of Health wrote to Maldonado, stating that at that time there were no placement sites in his specialty. (Maldonado Aff. ¶ 11, Ex. G.) On March 10, 1986, Mahy wrote to Maldonado, noting that Maldonado had not yet made any attempt to contact his office as directed in the December 9, 1985 letter. He further noted that the April 15 deadline was approaching and that if Maldonado did not reply, he would be assigned randomly to a specific site or he would be placed in default of his NHSC service obligation. (Lee Dec., Ex. M.) Maldonado did not respond to Mahy's letter. On March 31, 1986, Dr. John Dyer, the NHSC Regional Health Administrator, wrote to Maldonado stating that if he did not reply within five working days, he would presume that Maldonado did not plan to fulfill his service obligation, and he would recommend that Maldonado be placed in default. (Lee Dec., Ex. N.) Once again, Maldonado did not respond.

In a mailgram dated May 1, 1986,[2] Dyer notified Maldonado that he had been assigned to the Briscoe County Clinic in Silverton, Texas, and that he should respond within two days or would risk being placed in default. (Lee Dec., Ex. O.) Maldonado asserts that he never received that mailgram. (Maldonado Aff. ¶ 15; Maldonado Dep. at 91–92.) In a letter to Maldonado, dated May 12, 1986, Moritsugu wrote that "[s]ince you have not responded to our recent mailgram, we assume that you do not intend to fulfill your NHSC scholarship obligation at the site to which you were assigned." (Lee Dec., Ex. P.) Moritsugu concluded the letter by informing Maldonado that he was recommending that he be placed in default effective July 1, 1986. (Id.) Although that letter is dated May 12, 1986, it bears two postmarks, one with the date May 30, 1986, the other with the date June 2, 1986. (Id.) The registered mail stamp indicates two notification dates, June 2 and 12, 1986. (Id.) Maldonado admits that he received the May 12 letter, but states that he cannot remember when he received it. (Maldonado Dep. at 92–93.) He asserts that he believed that the letter's reference to the "recent mailgram" was to the March 31, 1986 letter from Dyer, and that he did not know that a specific site assignment had been made. (Maldonado Dep. at 95.) Maldonado did not respond to Moritsugu's May 12 letter.

On July 1, 1986, John E. Bird, Chief of the Debt Management Branch of the Division of Fiscal Services, wrote to Maldonado notifying him that he had been placed in default "because you do not intend to begin your service obligation." (Lee Dec., Ex. Q.) He advised Maldonado that as a result of his default he was required, within one year, to pay three times the amount of his scholarship award, plus interest. (Id.) He further advised Maldonado that any questions or requests for review should be sent to the address provided. (Id.) Maldonado did not respond to that letter. On May 12, 1987, James C. Hargrave, Chief of the Accounts Receivable Section of the Debt Management Branch, reminded Maldonado by letter that his debt must be paid in full by July 1, 1987. (Lee Dec., Ex. R.) He also offered him an opportunity to fulfill his obligation through service at an HMSA pursuant to a Forbearance Agreement. (Id.) Maldonado did not respond to that letter.

On July 24, 1987, Hargrave sent Maldonado his "final notice," which stated that his NHSC debt had become due on July 1, 1987, and that if he did not respond within sixty days, the debt would be referred to a private collection agency or the Department of Justice. (Lee Dec., Ex. S.) Hargrave further informed him that if he wished to have an explanation of the debt, an opportunity to dispute any information about the debt, or an administrative review of the debt, he should send a written request to the address provided. (Id.) Finally, Hargrave again offered Maldonado the opportunity to enter into a Forbearance Agreement. (Id.) In a notice dated August 3, 1987, the Department of Health and Human Resources informed Maldonado that his debt was being referred to

---

**2.** The Government has produced a copy of a Department of Health and Human Services verification form that includes the text of the mailgram, as well as confirmation that the message was received by the Western Union processing center in Middletown, Virginia on May 1, 1986. (Sprague Dec. ¶¶ 2–3; Nelson–Maxey Aff. ¶¶ 3–4.)

the Internal Revenue Service for collection by offsetting his tax refunds. (Lee Dec., Ex. T.) He was also informed that he had the right to present evidence to contest the debt and that if he wished to do so, he should send a letter with the evidence within sixty days. (*Id.*)

On August 20, 1987, Maldonado responded to Hargrave's July 24, 1987 letter. Maldonado stated that his residency in urology would be completed in June of 1991, and that after "[h]aving successfully completed my residency training in Urology, I will be adequately trained to fulfill my 3–year service obligation in a Health Manpower Shortage Area." (Lee Dec., Ex. U.) He concluded by stating that "I intend to comply with my service obligation at that time and accordingly, request deferment of the obligation until completion of my residency training." (*Id.*) In a letter dated November 12, 1987, Siegel E. Young, Jr., Director of the Division of Health Services Scholarships, denied Maldonado's belated request for a deferment, reminding him that the Deferment Information Bulletin, (Lee Dec., Ex. F), which had been sent to Maldonado in August of 1984, specifically stated that only primary care specialties, such as family practice, internal medicine, pediatrics, or obstetrics, would be approved for deferment. (Lee Dec., Ex. V.) Young again offered Maldonado an opportunity to fulfill his obligation pursuant to a Forbearance Agreement. (*Id.*) Maldonado asserts that the November 12, 1987 letter from Young was the first notice he ever received that referred to his specific placement at the Briscoe County Clinic. (Maldonado Aff. ¶ 8.)

On February 26, April 14, April 18, and May 6, 1988, the NHSC sent letters to Maldonado, offering him an opportunity to participate in the newly enacted Special Repayment Program, which would allow him to satisfy his financial debt through service. (Lee Dec., Exs. W, X.) Maldonado did not participate in the Special Repayment Program, nor did he enter into a Forbearance Agreement. The Government commenced this action on June 21, 1993.

## Discussion

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In examining the record, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Cos., Inc.,* 892 F.2d 1128, 1132 (2d Cir. 1989); *see Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2. The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## I. *Statute of Limitations*

An action by the government for money damages on a contract "shall be barred unless the complaint is filed within six years after the right of action accrues...." 28 U.S.C. § 2415(a). Maldonado was declared in default when he failed to commence his service on July 1, 1986. According to his contracts, Maldonado was required to pay money damages to the Government "within one year of the date the Secretary determines that the applicant has failed to begin ... the period of obligated service." (Lee Dec., Ex. C § C3; Ex. E § C2.) That provision is established by 42 U.S.C. § 254*o* (b)(1)(B)(i), which states:

> Any amount of damages that the United States is entitled to recover under this subsection ... shall, within the 1–year period beginning on the date of the breach of the written contract (or such longer period beginning on such date as specified by the Secretary), be paid to the United States. Amounts not paid within such period shall be subject to collection through deductions in Medicare payments pursuant to section 1395ccc of this title.

42 U.S.C. § 254*o* (b)(1)(B)(i).

The Government filed the complaint on June 21, 1993. Thus, the critical question is

whether the Government's right of action accrued upon Maldonado's default on his service obligation on July 1, 1986, or upon his failure to satisfy his financial obligation by July 1, 1987, at the expiration of the one-year statutory grace period.

All of the courts that have addressed this issue have held that the Government's right of action does not accrue until the expiration of the statutory grace period, when the applicant's debt becomes due in full. *See United States v. Richards*, No. 87–1103, 838 F.2d 468, 468, 1988 WL 4575, at *1 (4th Cir.1988); *United States v. Ewell*, No. 91–760, slip op. at 8 (N.D.Tex. Jan. 15, 1993); *United States v. Margolin*, No. 92–515, slip op. at 4–5 (N.D.Ca. Nov. 17, 1992); *United States v. Grise*, No. 91–616, slip op. at 7–8 (D.Or. July 9, 1992); *United States v. Avila*, 687 F.Supp. 778, 783 (W.D.N.Y.1988); *United States v. Potts*, No. 87–1257, 1988 WL 19625, at *5 n. 6 (D.D.C. Feb. 23, 1988); *United States v. Hogan*, 43 B.R. 117, 118–19 (D.Ariz.1984). These courts reasoned that since the applicant is not required to make any payment prior to the expiration of the statutory grace period, the Government's right of action cannot accrue until the applicant fails to make the payment by the end of that period.

The *Richards, Avila,* and *Hogan* courts each interpreted a prior version of the statute which provided that an applicant was required to pay back the actual amount of his scholarship award within three years. *See* 42 U.S.C. § 234(f)(1) (repealed 1977) ("Any amount which the United States is entitled to recover ... shall, within the three-year period beginning on the date the United States becomes entitled to recover such amount, be paid to the United States.").[3] Maldonado argues that the current provision, § 254*o* (b)(1)(B)(i), requires immediate payment and that these cases are therefore inapposite. Although Maldonado concedes that both his contracts and the statute provide a one-year payback period, he contends that this provi-

sion does not bar the Government from filing suit before that one-year period has expired.

For this proposition, Maldonado relies on *United States v. Gary*, 963 F.2d 180 (8th Cir.1992), in which the court stated that "[w]hen [the scholarship recipient] defaulted, the United States had an immediate right to recovery of the scholarship award plus interest." 963 F.2d at 184. However, the *Gary* court was not addressing the statute of limitations issue, and that statement cannot be read as a determination that the Government's right of action accrues immediately upon default. The *Gary* court held that once the scholarship recipient was placed in default of his service obligation, the Secretary's decision as to whether he would be allowed to satisfy his obligation through service in lieu of paying damages was "wholly at the discretion of the Secretary." 963 F.2d at 183. Thus, the Government had an "immediate right" to recover damages from the defendant, as opposed to being required to consider whether alternative service could be arranged. Maldonado also cites *United States v. Gross*, 725 F.Supp. 892 (W.D.La.1989). However, like the *Gary* court, the *Gross* court did not address the question of when the Government's right of action accrues, and simply held that "[o]nce the recipient is in default status, the service option terminates and the recipient must repay the debt financially." 725 F.Supp. at 893. Neither court even addresses the provisions of § 254*o* (b)(1)(B)(i).

Maldonado also relies on *Matthews v. United States (In re Matthews)*, 150 B.R. 11 (Bankr.W.D.Penn.1992), in which the court interpreted 42 U.S.C. § 254*o* (d)(3)(A). That section provides that:

Any obligation of an individual under the Scholarship Program (or a contract thereunder) ... for payment of damages may be released by a discharge in bankruptcy under Title 11 only if such discharge is granted after the expiration of the five-year period *beginning on the first date*

---

3. The Conference Report indicates that when that provision was amended to its present form (§ 254*o* (b)(1)(B)(i)), a compromise was reached between the House of Representatives, which had proposed a three-year payback period and damages of twice the scholarship award, and the

Senate, which had proposed a sixty-day payback period and damages of three times the scholarship award. H.R.Conf.Rep. No. 1612, 94th Cong., 2d Sess. 107–08 (Sept. 17, 1976), U.S.Code Cong. & Admin.News 1976, 4947.

*that payment of such damages is required,* and only if the bankruptcy court finds that nondischarge of the obligation would be unconscionable.

42 U.S.C. § 254*o* (d)(3)(A) (emphasis added). The *Matthews* court held that the first date that payment was required was the date that the NHSC declared the applicant in default of his service obligation. Maldonado, in an effort to demonstrate that the current provision requires immediate payment, compares *Matthews* to an earlier decision, *United States v. Dillingham (In re Dillingham),* 104 B.R. 505 (Bankr.N.D.Ga.1989), in which the court analyzed the dischargeability of a scholarship recipient's debt under the prior three-year grace period.

However, the *Matthews* court did not even mention the one-year grace period provided by § 254*o* (b)(1)(B)(i), perhaps because the court construed § 254*o* (d)(3)(A) as requiring the court to calculate the five-year period from the first date the payment obligation began, and thus decided that the grace period was irrelevant. In addition, the *Dillingham* court was construing the terms of a Bankruptcy Code provision regarding the general dischargeability of debts. That provision stated that a scholarship debt is not dischargeable in bankruptcy unless "such loan first *became due* before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition...." 11 U.S.C. § 523(a)(8)(A) (emphasis added).[4] The *Dillingham* court held that the debtor's loan first became due after the expiration of the then three-year grace period. 104 B.R. at 509–10. The best explanation for the different outcomes in these two bankruptcy cases is not the change in the NHSC statute regarding the grace period, but instead the different dischargeability provisions that the courts examined.

Maldonado contends that the July 1, 1986 letter, which notified him of his default, supports his understanding that § 254*o* (b)(1)(B)(i) requires immediate payment, and that the Government's right of action therefore accrued on the date of his default on his service obligation. However, that letter does

not help Maldonado and, in fact, adds further support for the Government's position. That letter clearly states that "[t]his debt must be paid within one year from the date of this letter," and that if it is not paid "by the end of the specified time, we will refer your account to a private collection agency to pursue collection and/or to the Department of Justice for litigation." (Lee Dec. Ex. Q at 1–2.) The letter further states that "[y]ou may elect to pay your debt immediately or by monthly or quarterly installments." (*Id.* at 2.) The letter simply restates the terms of Maldonado's agreement according to the statute and as provided in his contracts. The fact that the Government offered to let Maldonado pay immediately or by installments does not change the fact that the Government specifically stated that it would not pursue litigation until the end of the statutory grace period.

There appears to be no basis in the language of the contracts or the statute for treating the one-year grace period provided in § 254*o* (b)(1)(B)(i) differently from that provided in the prior statute. The contracts signed by Maldonado indicate that he agreed to pay the Government damages within one year of his failure to begin his service obligation, in accordance with § 254*o* (b)(1)(B)(i). Thus, Maldonado did not breach that agreement until July 1, 1987, when he failed to pay his damages or secure some other arrangement with the Secretary to satisfy his debt through service. Accordingly, the Government had no statutory or contractual right to bring this action prior to the expiration of the one-year grace period. Any other interpretation would render meaningless the statutory and contractual language which provides a one-year grace period.

■ This one-year grace period, in effect, creates a two-part obligation on the part of each scholarship recipient: a service obligation and a financial obligation. *See Gary,* 963 F.2d at 183–84; *Gross,* 725 F.Supp. at 893. Once a scholarship recipient defaults on his service obligation, his debt to the Government becomes a financial one that must be satisfied within one year. Until that one-

---

4. That provision has since been amended. *See* Pub.L. 101–647, § 3621(2) (1990).

year period expires, the scholarship recipient is not yet in default and the Government's right of action cannot yet accrue.

■ Maldonado argues that the provisions of § 254o (b)(1)(B)(i) cannot be interpreted as creating a "service" obligation and a separate "financial" obligation. He contends that the financial obligation is merely the consequence of the breach of his service obligation, and that the financial obligation is fixed on the date of default and remains unchanged after the expiration of the one-year grace period. However, while it is true that Maldonado's financial obligation became fixed on the date he failed to commence his service, this does not mean that the Government's right to sue Maldonado necessarily arose on that same date. Indeed, by granting Maldonado a one-year grace period, the Secretary provided Maldonado with an opportunity to avoid litigation by obtaining a loan to satisfy his debt or by arranging with the Secretary to satisfy his debt through service by entering into a Forbearance Agreement or a Special Repayment Program, both of which were offered to Maldonado. Had this suit been filed prior to July 1, 1987, the Secretary would have been in breach of that agreement.

■ Maldonado contends that the language in § 254o(b)(1)(B)(i) which provides that the payback period shall be one year "(or such longer period . . . as specified by the Secretary)" undermines that conclusion. He argues that the one-year grace period, which can be extended by the Secretary, cannot be read to delay the accrual of the Government's right of action because it would give the Government the right to unilaterally extend the statute of limitations. He relies on *United States v. Cocoa Berkau, Inc.*, 990 F.2d 610 (Fed.Cir.1993) and *United States v. Commodities Export Co.*, 972 F.2d 1266 (Fed.Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1256, 122 L.Ed.2d 654 (1993), which held that the Government's right of action for breach of a customs bond accrues when all the events necessary to fix the liability of the defendant have occurred, and that the Government may not unilaterally delay that accrual. *Cocoa Berkau*, 990 F.2d

at 613; *Commodities Export,* 972 F.2d at 1270.

In *Cocoa Berkau,* the Government made a formal demand for payment more than five years after the defendant breached a customs bond, and the court rejected its argument that its right of action did not accrue until that formal demand was made. The *Commodities Export* court addressed facts similar to those in *Cocoa Berkau,* and stated that "[w]ithout agreement of the parties or statutory obligations delaying the institution of suit," the cause of action would accrue when liability was fixed; that is, on the date of the breach. 972 F.2d at 1271. The court stated that the purpose behind the statute of limitations would be undermined if it were to "permit a single party to postpone unilaterally and indefinitely the running of the statute of limitations." *Id.*

The facts in *Cocoa Berkau* and *Commodities Export,* however, are very different from the present case. The parties here agreed to delay the institution of suit. When Maldonado signed his NHSC contract, he agreed to repay his debt within one year of any default on his service obligation. The Secretary, by contractually providing the one-year grace period, agreed to delay any suit for default by one year. The Government, had it sued immediately upon default, would have violated that agreement. Furthermore, the one-year grace period was not extended by the Government in this case and Maldonado's debt was demanded in full in July of 1987. The fact that the statute may permit the Secretary in her discretion to extend the one-year grace period and the fact that this provision could potentially be abused should not affect this case.

■ Maldonado argues further that because there is no specific restriction in the statute on the Government's right to institute litigation, one should not be implied through the provision for a one-year grace period. He points to the second sentence of § 254o (b)(1)(B)(i), which provides that "[a]mounts not paid within such [one-year] period shall be subject to collection through deductions in Medicare payments." Maldonado argues that because Congress specifically restricted the Government's right to collect an unpaid

debt through Medicare deductions until after the one-year period, it would have included a similar provision regarding the Government's right to bring suit had it intended such a limitation.

This argument is without merit. No restriction on the Government's right to sue is being implied. Indeed, as stated above, § 254(b)(1)(B)(i) itself restricts the Government's right to sue by granting to Maldonado one year in which to satisfy his debt. The fact that the provision regarding Medicare deductions, which was added in 1987,[5] reiterates the fact that a scholarship recipient cannot be forced to make any payments until the one-year grace period expires cannot be construed as an indication that Congress did not intend to restrict the Government's right to bring suit.

■ Maldonado's argument regarding the tolling of the statute of limitations period for Special Repayment Program ("SRP")[6] applicants also must fail. That program provides that the statute of limitations period for any action by the Government to enforce a scholarship recipient's financial obligation will be tolled once the Secretary receives notice that the recipient intends to enter into an SRP agreement until such time as the Secretary decides that it will not grant the request. Maldonado argues that the absence of any analogous tolling provision for the one-year grace period suggests that Congress did not intend to delay the Government's institution of suit. However, the delay in the accrual of the Government's right of action, required by the one-year grace period, is not analogous to a tolling of the statute of limitations. The reason that the Government's right of action does not accrue until the expiration of the one-year period is that a scholarship recipient does not actually breach his contract until he fails to satisfy his financial obligation within one year's time. The SRP, in fact, provides an example of how a scholarship

recipient might take advantage of the one-year grace period to avoid litigation.

■ Finally, Maldonado argues that in a memorandum of law filed in 1989 in a case in the Northern District of New York, (Reaves Aff., Ex. 11), the Government "admitted" pursuant to Fed.R.Evid. 801(d)(2) that the statute of limitations period begins to run on the date the scholarship recipient is placed in default of his service obligation.[7] Maldonado contends that that admission precludes the Government from arguing in this case that the statute of limitations period does not begin to run until the expiration of the one-year grace period. Maldonado cites no authority for this novel proposition. Indeed, what Maldonado essentially is arguing is that the Government is estopped from putting forth a different interpretation of the NHSC statute than it proposed in a different case five years earlier. The Government cannot be estopped in this manner, and Maldonado has not even suggested that he in any way relied on this prior interpretation of the statute of limitations provision, nor could he possibly show that such reliance would have been reasonable. *See generally, Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("the Government may not be estopped on the same terms as any other litigant"); *Patton v. Dole,* 806 F.2d 24, 30 (2d Cir.1986) ("A claim for equitable estoppel typically involves a situation in which an employee of an administrative agency incorrectly represents the law in rendering advice to a citizen who relies on that representation to his detriment.")

In sum, because the terms of Maldonado's contract did not require him to pay his debt in full until July 1, 1987, the Government's right of action for breach of contract did not accrue until he failed to make full restitution by that date. Thus, the Government's action is not time barred.

---

**5.** *See* Pub.L. 100–203, § 4052(b) (1987).

**6.** The Special Repayment Program, introduced in 1987, offered scholarship recipients who had breached their contracts an opportunity to satisfy their financial debt through service at an HMSA. *See* 42 U.S.C. § 254*o* note.

**7.** It is worth noting that on the facts in the Northern District case, the one-year grace period was irrelevant in that the case was filed within six years of the date of both the breach of the service obligation and the breach of the financial obligation. (Reaves Aff., Ex. 11, at 24.)

## II. Breach of Contract

■ Maldonado acknowledges that he received NHSC scholarship funds and was therefore obligated to provide three years of service in an area to be determined by the Secretary. (Def. 3(g) Stmt. ¶ 3.) However, he contends that because the Secretary failed to assign him to a specific HMSA, he was improperly placed in default. The Government contends that summary judgment is warranted because the Secretary did, in fact, assign Maldonado to a specific site and that Maldonado cannot defeat summary judgment simply by asserting that he did not receive notice of that assignment.

The NHSC statute provides that "[t]he Secretary shall assign individuals performing obligated service in accordance with a written contract under the Scholarship Program to [HMSA]s...." 42 U.S.C. § 254m(d). The Government asserts that the Secretary fulfilled her obligation by assigning Maldonado to the Briscoe County Clinic in Silverton, Texas. The Government further asserts that Maldonado was notified of this assignment in May of 1986, but failed to respond. Maldonado, on the other hand, asserts that he never received a letter notifying him that his site-specific assignment had been made, and that the Government has not offered any proof that the notice was sent or that Maldonado received it. Maldonado argues that without that proof the Government's claim must fail because it cannot demonstrate that the Secretary fulfilled her obligation under the statute to assign him to an HMSA.

To support his argument, Maldonado relies exclusively on the Ninth Circuit's opinion in *United States v. St. Thomas*, 966 F.2d 476 (9th Cir.1992). The *St. Thomas* court found that the defendant was erroneously placed in default because the Secretary had assigned the defendant to a three-state region, but had failed to assign him to a specific service site within that region in accordance with § 254m(d). However, because the Secretary assigned Maldonado to a specific site, *St. Thomas* is inapposite. Although Maldonado contends that the Secretary never assigned him to a specific site, the mailgram dated May 1, 1986, which stated that Maldonado had been assigned to the Briscoe County Clinic in Silverton, Texas, belies that contention. While it remains disputed whether Maldonado ever received the mailgram, the Government has offered undisputed proof that a communication assigning Maldonado to the Briscoe County Clinic was transmitted to the Western Union Processing Center in Middletown, Virginia on May 1, 1986, thus establishing that the Secretary in fact made the assignment. Although Maldonado suggests that the May 1 mailgram from Dyer is not the official notice of his assignment,[8] that does not change the fact that a site-specific assignment had been made at least as early as May 1, 1986.

■ Maldonado argues that even assuming that an appropriate assignment had been made, summary judgment is not warranted because there remains a genuine issue of material fact as to whether he received notice of that assignment. The Government has submitted evidence that, according to standard procedure, once the mailgram was transmitted to Western Union in Middletown, Virginia it should then have been sent to the Western Union Facility in the Bronx and hand delivered to Maldonado. However, since the sender did not request confirmation of delivery, there is no evidence that conclusively demonstrates that Maldonado actually received that mailgram. (Nelson–Maxey Aff. ¶¶ 1–11.)

The Supreme Court has stated that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, the question presented is whether the Government must establish that Maldonado actually received the May 1 mailgram assigning him to the Briscoe County

---

8. Barbara Lee, Deputy Director of the Division of Scholarships and Loan Repayments, stated in her deposition that Maldonado's site-specific assignment would have been made by Moritsugu and that she believed that Maldonado should have been sent his official notice on or about April 15, 1986. *See* Lee Dep. at 56–57; 85–86.

Clinic, or whether it is sufficient to show that the Secretary in fact made the assignment. For purposes of deciding this motion, it will be assumed that Maldonado did not receive the May 1 mailgram.

As an initial matter, it should be noted that while the Secretary indisputably has the obligation to make a site-specific assignment for each scholarship recipient, there is no provision in either the NHSC contracts or statute that specifies how a scholarship recipient shall be informed of that assignment. Thus, this case provides an opportunity to explore the obligations of both the Secretary and the scholarship recipient under the NHSC contracts and statute.

In order to understand the parties' obligations, it is helpful to review the notices that Maldonado acknowledges that he received. First, Maldonado does not dispute that he was informed that his service obligation was scheduled to commence on July 1, 1986. In addition, Maldonado has admitted that he received the December 9, 1985 letter, in which Moritsugu notified him that he had been assigned to Texas and that he should contact Mahy, the Regional Representative, in order to arrange his placement. (Maldonado Aff. ¶ 10.) Maldonado also has admitted receiving the March 31, 1986 letter, in which Dyer informed him that if he did not reply within five working days it would be presumed that he did not intend to fulfill his service obligation and he would be placed in default. (Maldonado Dep. at 95.) Thus, before the Secretary actually made Maldonado's site-specific assignment, Maldonado was on notice that the Secretary was expecting his cooperation in the assignment process and that if he had any questions regarding his assignment he should contact either his Regional Representative or Moritsugu. Nevertheless, Maldonado made no effort to contact anyone about his assignment and seems to have simply ignored those letters.

Maldonado also admits that he received the May 12, 1986 letter which stated, in part, that "[s]ince you have not responded to our recent mailgram, we assume that you do not intend to fulfill your NHSC scholarship obligation *at the site to which you were assigned.*" (Lee Dec., Ex. P) (emphasis added). That letter also informed Maldonado that he would be placed in default on July 1, 1986. Maldonado offers no explanation for his failure to contact anyone to learn where he had been assigned, or to make clear that he did intend to commence his service on July 1, 1986.[9]

Maldonado, in fact, offers no meaningful explanation for his failure to commence service as scheduled on July 1, 1986. Instead, Maldonado has submitted carefully worded affidavits and deposition testimony which avoid that issue and focus only on the Secretary's failure to make a proper assignment. For example, Maldonado states:

> NHSC never made or communicated to me a site specific assignment to a location at which I was obligated to fulfill my service obligation. Therefore, NHSC failed to comply with its own placement procedures and statutory mandate and erroneously declared me to be in default. In short, I never refused to fulfill a valid site-specific placement assignment and consequently I did not breach my NHSC Scholarship Contracts service obligation.

(Maldonado Aff. ¶ 6.) And, in response to the question, "In May of 1986, were you under the assumption that you had to complete your service obligation starting July 1st, 1986?," Maldonado stated, "It was my understanding that if I was placed by the National Health Services Corps for July 1, 1986, that I would have to comply with that service obligation at that time." (Maldonado Dep. at 96.)

An NHSC scholarship recipient cannot simply ignore correspondence from NHSC officials, particularly when that correspondence specifically directs the recipient to contact a particular person within a specific period of time. Furthermore, Maldonado

9. When asked whether he "consider[ed] calling the National Health Services Corps to see whether or not they had placed [him] for service effective July 1st, 1986," Maldonado responded, "I don't recall if I made that consideration." (Maldonado Dep. at 96.) And when asked whether it "at all concern[ed] him that [he was] going to be placed in default of [his] service obligation effective July 1st, 1986," Maldonado replied, "At some point, it did." (*Id.* at 95.)

had notice that his approved deferment for his general surgery residency expired on June 30, 1986, and that he was obligated to commence service on July 1, 1986. Assuming that he did not receive the May 1 mailgram, Maldonado should have contacted Moritsugu, Mahy, or Dyer to inquire if an assignment had been made so that he could commence his service according to schedule. Moreover, upon receipt of either the letter dated May 12 or the notice of default dated July 1, 1986, Maldonado had an obligation to contact someone at the NHSC to make clear that he did intend to fulfill his service obligation and that he had not yet received an assignment.[10] Instead, Maldonado chose to allow more than twelve months to go by after he received notice of default before making any response.

When Maldonado agreed to accept $46,878 in NHSC funding to finance his medical education, he made a commitment to provide three years of service in an HMSA. Although Maldonado had notice that his service was to commence on July 1, 1986, it appears that he simply decided to do nothing and to hope for some technical defect to avoid that service. However, Maldonado may not avoid his service obligation, nor may he avoid summary judgment, simply by disputing whether he actually received one piece of correspondence from the NHSC, after having ignored several others. It is clear from the record that the Secretary did not fail to make a site-specific assignment and that the Secretary sent Maldonado enough information to put him on notice that an assignment would be made sometime after April 15, 1986, and that such an assignment had in fact been made. In contrast, Maldonado made no good faith effort to live up to his obligation in the contract, and so was properly placed in default.

### III. *Affirmative Defenses*

 Maldonado asserts a laundry list of affirmative defenses, none of which has merit. Three of these defenses are based on

Maldonado's contention that he should have been allowed to defer his service to complete his urology residency and that his current practice as a urologist satisfies his obligation under the contract. First, because Maldonado did not request a deferment until a full year after he was placed in default, the Secretary's decision to deny that request was discretionary and is not reviewable under the Administrative Procedure Act. 5 U.S.C. § 701(a)(2); *see United States v. Gary*, 963 F.2d at 183–84. In any event, the Secretary's decision was not arbitrary and capricious because Maldonado had been informed that only residencies in primary care specialties would be approved for deferment.

 Second, according to both the contracts and the statute, the Secretary has the discretion to assign scholarship recipients to a specific site for service. *See United States v. Lopez*, No. 91–730, slip op. at 21–22 (S.D.N.Y. March 29, 1993). Maldonado cites no authority for the proposition that the Secretary abused her discretion in failing to assign Maldonado to a site that he had chosen, or in deciding not to retroactively approve Maldonado's current practice as satisfying his obligations under the contracts. Indeed, the NHSC program is not intended "as a mechanism solely to subsidize health professional education" but "as a means to overcome a geographic maldistribution of health professionals." S.Rep. No. 887, 94th Cong., 1st Sess. 201 (1975). Thus, the Secretary must have the ability to place scholarship recipients in areas that she decides are most in need of medical services.

 Next, Maldonado asserts that his financial obligations should be waived pursuant to 42 U.S.C. § 254o (d)(2). That section provides that:

> The Secretary shall by regulation provide for the partial or total waiver or suspension of any obligation of service or payment by an individual under the Scholarship Program (or a contract thereunder) . . . whenever compliance by the individual

---

**10.** Maldonado's inability to recall whether he received the May 12 letter before or after he was placed in default is irrelevant. Even if he received that letter after he had been placed in default, he was still obligated to advise the NHSC that he had been placed in default improperly. In addition, the actual notice placing Maldonado in default specifically advised him where to direct any questions, and Maldonado failed to respond to that notice as well.

is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable.

42 U.S.C. § 254o (d)(2). The Government argues that Maldonado cannot now raise a claim for waiver because he never raised any such request with the Secretary, nor did he submit any information necessary for the Secretary to make a waiver determination. In *United States v. Barry*, 904 F.2d 29 (11th Cir.1990), the court refused to consider a request for waiver on the ground that the scholarship recipient had not followed the procedure set forth in the regulations. *Id.* at 31. According to 42 C.F.R. § 62.12(b)(1), a scholarship recipient "may seek a waiver or suspension of the service or payment obligations incurred under this part by written request to the Secretary setting forth the bases, circumstances, and causes which support the requested action." Maldonado failed to comply with this regulation and this claim will therefore not be considered. In any event, Maldonado has provided no evidence that he is eligible for waiver. Finally, Maldonado's contention that he was denied the right to pursue these administrative remedies is disingenuous, in light of his failure to respond to countless letters which advised him of his opportunity to contest his default.

▆▆▆▆ Maldonado also asserts that he could not have commenced service on July 1, 1986 because he did not pass his FLEX examinations until February of 1988. Section 254o (b)(1)(A) states that "if an individual breaches his written contract by failing ... *for any reason* ... to begin such individual's service obligation ... the United States shall be entitled to recover [treble damages plus interest]." 42 U.S.C. § 254o (b)(1)(A) (emphasis added); *see also* Lee Dec.Ex. C, § C(3). Thus, impossibility of performance is not a defense. *See United States v. Vanhorn*, 20 F.3d 104, 112 (4th Cir.1994); *United States v. Gross*, 725 F.Supp. at 894 (W.D.La. 1989) ("The default provision ... is indifferent as to the reason why an individual fails to begin performing his service obligation.") In any event, as stated above, the NHSC statute recognizes that "compliance by the individual [may be] impossible" and that such an individual is entitled to request from the

Secretary a waiver or a suspension of his service obligation on that basis. 42 U.S.C. § 254o (d)(2). However, Maldonado never informed the Secretary of his failure to pass the exams, nor did he ever request that his service obligation be waived or suspended.

▆▆▆▆ Maldonado's defenses of waiver, estoppel and laches are without merit. First, the defense of laches is unavailable when the Government is enforcing its rights. *United States v. Schmitt*, 734 F.Supp. 1035, 1056 (E.D.N.Y.1990) (citing *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) ("It is well settled that the United States is not ... subject to the defense of laches in enforcing its rights.")) Second, as stated earlier, "the Government may not be estopped on the same terms as any other litigant." *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224. At the very least, Maldonado would have to demonstrate that he relied to his detriment on a misrepresentation by an NHSC official. *See id.*, 467 U.S. at 59–60, 104 S.Ct. at 2223–24. Maldonado has made no such showing. His defense of waiver is similarly without factual basis.

▆▆▆▆ Maldonado's argument that the treble damages provision is a penalty has been rejected routinely. *See United States v. Turner*, 660 F.Supp. 1323, 1332 (E.D.N.Y. 1987) (citing cases). "The general rule for determining the enforceability of a liquidated damage clause in a federal contract requires a finding by the court that the provision is a 'fair and reasonable attempt[ ] to fix just compensation for anticipated loss caused by breach of contract.'" *Id.* (quoting *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947)). It cannot be said that the treble damages provision is not a fair and reasonable attempt to calculate the loss suffered by the Government when a scholarship recipient fails to provide service to a medically underserved area of this country.

▆▆▆▆ In his final affirmative defense, Maldonado alleges that the Secretary erroneously overpaid scholarship funds to AECOM because AECOM had awarded Maldonado a

50% scholarship. Maldonado's arrangement with AECOM cannot affect his obligation to satisfy the debt that he agreed to pay to the Secretary. If Maldonado's assertions have any merit, he may pursue them in his third-party claim against AECOM.

Accordingly, since Maldonado's affirmative defenses are without merit, the Government is entitled to recover the liquidated damages outlined in the NHSC contracts and statute. However, the Government is not entitled to recover the 10% surcharge pursuant to 28 U.S.C. § 3011 since this action involves neither a pre-judgment nor post-judgment remedy. *See Lopez,* slip op. at 32–33; *United States v. Mauldin,* 805 F.Supp. 35, 36 (N.D.Ala.1992).

Finally, Maldonado argues that the Government's motion for summary judgment should not be considered on the ground that the affidavits submitted regarding the question of whether Maldonado received the May 1 mailgram are not based on personal knowledge. However, since it is assumed for purposes of this motion that Maldonado did not receive the May 1 mailgram, this argument is without merit. Maldonado's contention that additional discovery on this issue is required is similarly without merit. Maldonado also contends that additional discovery is necessary to support his affirmative defenses, but cites no specific requests for discovery that relate to the affirmative defenses. Indeed, any information that might support the affirmative defenses would seem to be peculiarly within Maldonado's own knowledge.

Nevertheless, Maldonado is granted thirty days from the date of this Opinion to submit a specific request for discovery that might raise a genuine issue of material fact in light of this Opinion. If such a specific request is not received within thirty days, judgment will be entered in accordance with this Opinion.

SO ORDERED.

Edward A. **HARRY**, Plaintiff,

v.

**UNITED STATES POSTAL SERVICE**, Defendant.

No. 3:CV 92–1372.

United States District Court, M.D. Pennsylvania.

Sept. 29, 1994.

Donald H. Brobst, Joseph G. Ferguson, Rosenn, Jenkins & Greenwald, Wilkes Barre, PA, for plaintiff.

James A. Gibbons, Andrew S. Quinn, Asst. U.S. Atty., Scranton, PA, for defendant.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

Presently before the Court is Defendant's Motion for Summary Judgment (Doc. No. 15) to which Plaintiff has responded and Plaintiff's Motion for Summary Judgment on the issue of liability (Doc. No. 18). The Defendant has responded to the motion. We have carefully reviewed the proffered arguments. For the reasons stated below, we grant the Defendant's Motion for Summary Judgment.

### PROCEDURAL HISTORY

On September 30, 1992, Plaintiff initiated this Privacy Act wrongful disclosure action against his employer, United States Postal Service (hereinafter "USPS") and the Postmaster General. On April 19, 1993 Plaintiff filed an amended complaint seeking relief for violations of the Privacy Act of 1974, 5 U.S.C.

§ 552a *et seq.* (1977). Plaintiff claims the violations were in three forms: (1) an intentional failure to maintain his records; (2) intentional disclosure of confidential information; and (3) failing to respond to request for documents made pursuant to the Privacy Act.

On July 21, 1993, Defendant filed a Motion for Summary Judgment alleging, inter alia, that Plaintiff's claims should be dismissed for failure to meet the statute of limitations and that the Plaintiff's complaints are not actionable under the Privacy Act. (Doc. No. 15). Before responding to the Defendant's motion, the Plaintiff then filed a Motion for Summary Judgment on the issue of liability. (Doc. No. 18). On August 9, 1993, Plaintiff filed his opposition to Defendant's Motion for Summary Judgment. (Doc. No. 21). Shortly thereafter, on August 23, 1993, Defendant's reply brief to Plaintiff's motion was submitted. (Doc. No. 23).

*BACKGROUND*

On June 27, 1988, Harry and the USPS entered into a settlement agreement in a hearing before Mary M. Cleland, EEOC Administrative Law Judge. In return for a cash settlement and an adjustment of annual leave, Harry agreed to withdraw all EEO complaints, grievances, NLRB claims, and Privacy Act complaints up through the date of the agreement. Both parties agreed to keep the terms of the settlement confidential. The ALJ noted that "the agency has agreed not to disclose to anyone the terms of the agreement except for those individuals necessary to accomplish the terms of the settlement agreement; in other words, to pay (Harry the sum of money . . . and to credit . . . (his)) annual leave. . . ." *See* D–1 Statement of Material Facts.

On December 8, 1988, Plaintiff Harry made a request to Tom Bly, Postmaster of the Hazleton office of the USPS, to review his personnel and medical records.[1] (Doc. No. 10, amended complaint at ¶ 8). On January 26, 1989, Plaintiff Harry examined his files in the Hazleton Post Office. He claims

that during the review he discovered errors in their maintenance. Specifically, he contends that certain records were incorrectly purged and others, which he had never seen before, were wrongfully retained. In addition, Harry found a problem with the file cabinet being unlocked in an unrestricted area of the post office. Subsequently Mr. Bly placed all files pertaining to Harry in a locked cabinet in his office. Nevertheless, on April 1, 1988, Harry filed a formal EEOC complaint claiming handicap discrimination and the improper storage and filing of his files. In response, on May 5, 1989, the Postal Service issued a final agency determination denying his claims.

In granting a request to reopen on January 24, 1990, the EEOC upheld the USPS decision to deny the discrimination action on the ground that EEO contact was untimely, but ordered the USPS to consider the Privacy Act claim, since the issue was not addressed in the agency's determination and was timely raised. The EEOC placed the date when Harry discovered that documents concerning him were allegedly purged and misfiled as January 29, 1989.

On August 14, 1990 and October 9, 1990, Harry entered into settlement agreements with the USPS, in which he withdrew his Privacy Act claims (his EEO complaint). Harry then proceeded to contact Congressman Paul Kanjorski by letter dated June 13, 1990. The letter concerned the Privacy Act violations he believed the Postal Service committed. It specifically requested the Congressman's "help and intercession" in obtaining a "full and independent investigation into the reluctance of the USPS and the U.S. Attorney's Office to investigate this Privacy Act Complaint." (Doc. No. 10, Amended Complaint).

On April 3, 1991, Congressman Kanjorski wrote a letter to Charles R. Clauson, inspector general of the USPS asking him to investigate Harry's allegations. (Doc. No. 10, amended complaint, Exh. "E"). In a letter dated April 26, 1991, Mr. Clauson indicated

---

**1.** Plaintiff requested review of his medical files in an effort to prepare a claim with the Occupation-

al Safety and Health Administration.

that Julie Tagen from the Subcommittee on Human Resources had been contacted and that a more complete response would be forthcoming. *See* D–3, Statement of Material Facts. Ms. Tagen provided more information to Mr. Clauson in a letter dated April 23, 1992. Her letter contained a list of facts from the mid 1970's detailing the background of Harry's claims of both handicap discrimination and the mismanagement of his files.

Although Plaintiff seems to take issue with how thorough the investigation was, the Inspection service did initiate an investigation and on June 25, 1991, Barbara Burnhauser, a postal inspector did submit a report to Clauson. Attached to her final report was a copy of an EEO Settlement Agreement between Harry and USPS.

Following the receipt of Ms. Tagen's letter and Burnhauser's report, Clauson wrote to Congressman Kanjorski again on September 6, 1991. In his letter Clauson stated that in the 1988 settlement, Harry had agreed to withdraw all grievances, Privacy Act claims and congressional inquiries. He further indicated that additional settlements were reached on August 14 and October, 1990. He went on to describe, according to the accounts of the different postmasters, the maintenance of Harry's files. (Doc. No. 10, amended complaint, Exh. "F").

On October 29, 1991, Harry wrote to Joseph E. Stokes, Manager of EEOC Complaint Processing in the USPS Harrisburg Division complaining that the unwarranted disclosure of the terms of the 1988 Settlement Agreement constituted a violation of the Privacy Act. Congressman Kanjorski also wrote to Clauson to this effect on February 5, 1992. (Doc. No. 10, amended complaint, Exh. "I"). Clauson responded to the Congressman on June 8, 1992. In his letter, Clauson provided additional details pertaining to the maintenance of Harry's files, and indicated that Harry had authorized the disclosure of some of the terms of the 1988 settlement agreement. (Doc. No. 10, amended complaint, Exh. "J"). In an attempt to disprove Defendant's assertion that he authorized disclosure, Plaintiff Harry, on June 8, 1992, sent a request to Raymond Monroe, Division Manager of the USPS asking for copies of his files and specifically requesting any document indicating his authorization of the disclosure of the confidential settlement terms. *See* Exh. "A" to Harry Declaration.

### STANDARD OF LAW

Federal Rule of Civil Procedure 56(c) requires that we render summary judgment "... forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–8, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

 Accordingly, in order for a moving party to prevail on a motion for summary judgment, the party must show two things: (a) that there is no genuine issue as to any material fact, and (b) that the party is entitled to judgment as a matter of law. F.R.C.P. 56(c); See 7 Wright & Miller, *Federal Practice and Procedure;* Civil Section 2712. A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Levendos v. Stern Entertainment Inc.,* 860 F.2d 1227, 1233 (3d Cir. 1988). An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party.[2] *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15; *Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987); *Equimark Commercial Finance Co. v. C.I.T. Financial*

---

2. In this sense, the summary judgment standard mirrors that which applies to a directed verdict under Federal Rule of Civil Procedure 50(a), i.e., that the trial judge must direct a verdict if, under the governing law, there can be only one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511.

*Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

■ In determining whether an issue of material fact does exist, all inferences must be drawn against the moving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir.1988); 6 J. Moore, Moore's Federal Practice ¶ 56.04[2]. In order to stave off a summary judgment motion, however, the non-moving party may not rest on the bare allegations contained in his or her pleadings. Once the moving party has satisfied its burden of identifying evidence which demonstrates an absence of a genuine issue of material fact, *see Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988), the nonmoving party is required by Federal Rule of Civil Procedure 56(e)[3] to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial. *Equimark, supra* at 144. If, however, "the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Advisory Committee Notes to Fed.R.Civ.P. 56(e) (1963 Amend.).

## DISCUSSION

This Court construes Plaintiff's complaint as one that sets forth three identifiable claims. First, Plaintiff complains that his personnel files, once kept at the Hazleton Post Office but now residing in Harrisburg, were improperly maintained. Specifically, he contends that certain files are missing. Additionally, he avers that certain other notes and files were improperly added to his file and that we are to assume that the contents of those notes were damaging in that they were inaccurate or completely false. Next, in an attempt to rectify his situation and right his perceived wrongs, Plaintiff claims that he stumbled upon an additional violation of his privacy rights. Plaintiff alleges wrongful disclosure of a confidential settlement agreement reached between himself and the USPS Labor Relations. This disclosure, Plaintiff claims, is violative on two levels. First, Harry claims that the Labor Relations was not at liberty to release the settlement agreement to the Postal Inspection Service and secondly, that the Inspection Service improperly disclosed portions of the agreement's terms to Congressman Paul Kanjorski, the individual from whom Harry sought intervention. We will discuss these claims seriatim.

## I. *Improper Maintenance of Files*

■ Defendant states, inter alia, that even when viewing Plaintiff's complaint in the most favorable light, his claims still do not make out a cause of action under the Privacy Act. Defendant contends, and we acknowledge, that pursuant to the Privacy Act, the Plaintiff must show both that his records were incorrectly maintained and that he suffered an adverse determination as a result of the wrongful maintenance of his files.[4] *Rose v. U.S.*, 905 F.2d 1257, 1259 (9th Cir.1990); *Johnston v. Horne*, 875 F.2d 1415, 1422 (9th Cir.1989); *Hubbard v. EPA*, 809 F.2d 1, 6

3. In relevant part, Rule 56(e) states:
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

4. Under the Privacy Act,

"Whenever any agency fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual (the individual may bring a civil action against the agency)."
5 U.S.C. § 552a(g)(1)(C).

(D.C.Cir.1986). In addition, Defendant contends that Plaintiff has failed to state a serious claim for damages. We find it unnecessary, however, to inquire as to whether the aforementioned standards were met or, if in the affirmative, whether the merits ultimately warrant a particular determination because specific undisputed facts demand that this action fall to the Statute of Limitations.[5]

■ The Courts have consistently held that the limitations period commences when the Plaintiff should have known about the improper file maintenance, *Shannon v. General Elec. Co.,* 812 F.Supp. 308 (N.D.N.Y. 1993); *Bergman v. United States,* 751 F.2d 314 (10th Cir.1984); *DiLiberti v. v. United States,* 817 F.2d 1259 (7th Cir.1987); *Englerius v. Veterans Admin.,* 837 F.2d 895 (9th Cir.1988), or actually discovered the records' inaccuracies. *Akutowicz v. United States,* 859 F.2d 1122, 1126 (2nd Cir.1988). Although the exact date of when the Plaintiff should have known, is unclear[6], the date of the actual discovery is sterling clear.

According to Plaintiff Harry's own statements, which were accepted by the EEOC in

its granting of the Request to Reopen and reiterated by Harry when he was deposed, Harry discovered the problems with his files after a physical review of them on January 26, 1989, a full 32 months prior to the commencement of this litigation.[7] While being deposed, Plaintiff Harry specifically stated that he was aware of the problems with his files as early as January of 1989. (Harry Deposition at p. 16) ("That's when I became aware of the misfiling of my records and the missing records."). It is clear that Plaintiff Harry's cause of action under the Privacy Act is time-barred when calculated as of the date he reviewed his files.

Accordingly, since the case before us was not initiated until September 30, 1992, Plaintiff Harry has failed to satisfy the Statute of Limitations and his claims regarding improper maintenance of files must fall.

## II. *Disclosures between Labor Relations and the Postal Inspection Service*

■ Essentially, the Privacy Act prohibits the disclosure of records by an agency with-

5. The Privacy Act requires that litigation be brought:
 "Within two years of when the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability ... the action may be brought at any time within two years after discovery by the individual of the misrepresentation."
 5 U.S.C. § 552a(g)(5).

6. The fact that the date of when the Plaintiff should have first known of the files' irregularities is unascertainable is not fatal to the defense position. The true date, by logic, had to have been sometime before the Plaintiff had physical possession of the files. Thus, any other date prior to Plaintiff Harry's review of the files would have initiated the running and tolling of the statute's two year limitation *well before* the commencement of this suit. Nevertheless, we can discern from the record before us that the Plaintiff actually knew of the existence of his personnel files and possible irregularities as early as 1987. *See* Harry Deposition pp. 6–9 provided in pertinent part as follows:
 Q: Can you describe how—can you connect any of these reactions to any particular violation or was it just the sum total?
 A: Well, the records that were missing. I'm reflecting back on what I was put through

from 1980—it's going back to 1986 actually. This all started mainly in 1987, when I was put on restricted sick leave. At that time I did not—I could not understand how I could be put on restricted sick leave, when I substantiated all absences of three days or more. I was issued a letter of warning at that time which took an adverse affect on me.
 Q: So you are saying that your negative consequences are related to the missing documents?
 A: Missing documents.
 * * * * * *
 Q: What kind of negative personnel action did you suffer, if any?
 A: Well, the personnel actions that you are speaking of—this all started when I was put on restricted sick leave at that time. That was—
 Q: Which was when?
 A: In 1987. I'm relating these back to then because there had to be a reason for these records missing in order for him to give me a letter of warning and put me on restricted sick leave.

7. For Harry's confirmation of this date see: Doc. No. 21—Plaintiff's Brief in Support of Motion for Summary Judgement; Doc. No. 34—Plaintiff's Pre-Trial Memorandum; Doc. No. 36—Comprehensive Statement of Undisputed Facts; and Doc. No. 37—Deposition Transcript of Edward A. Harry.

out a written request by, or without the prior consent of, the individual to whom the record pertains. 5 U.S.C. § 552a(b) (Supp.1993). *See Quinn v. Stone,* 978 F.2d 126, 131 (3rd Cir.1992). However, this general prohibition against disclosure is subject to twelve specific and articulated exceptions, 5 U.S.C. § 552a(b)(1)–(12), one of which Defendant maintains precludes liability for the release of information from Labor Relations to the Inspection Service within the United States Postal Service. The exception, § 552a(b)(1), allows for disclosures "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."

In the performance of his duties, Mr. Charles Clauson, Inspector General, responding to the Congressman's letter asking for an investigation, and acting on behalf of the Inspection Service requested information on Harry's employment with the Postal Service, including the agreement that in part settled prior Privacy Act complaints by Harry. That such information was released from one internal subdivision of the Postal Service to another does not seem unreasonable when considering that those individuals within the Inspection Service were conducting an investigation and therefore had a need for the records in the performance of their duties.

### III. *Disclosure from the Inspection Service to Congressman Kanjorski*

 Plaintiff Harry avers that the Defendant has violated the Privacy Act by wrongfully disclosing information contained in his files, specifically, a portion of his 1988 Settlement Agreement.[8] The Defendant Postal Service claims that although excerpts of content of certain documents regarding Harry's employment history were provided to Congressman Kanjorski, the Privacy Act interposes a complete bar to suit as all responses made in an effort to address congressional

intervention are permissible under defined and published routine use exceptions.

The Privacy Act exempts disclosures for "routine uses" which would otherwise violate the Act. § 552a(b)(3) (Supp.1993). The statute states that identification of all routine uses must be published annually in the Federal Register "including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D) (Supp.1993). "The term 'routine' means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7) (Supp.1993).

One of the routine uses identified by the Postal Service in the Federal Register states that "[d]isclosure may be made to a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the prompting of that individual." 54 Fed.Reg. 43654 (1989).

 We are inclined to agree with Defendant's contention that the plain language of the routine use set forth in the Federal Register (54 Fed.Reg. 43654, Part 2, Sec. E, Oct. 26, 1989) applies to all reasonable responses to congressional inquiries. Accordingly, we view Postmaster Clauson's response of September 6, 1991, as wholly permissible regardless of its depth, and regardless of its paraphrasing of the June 27, 1988 settlement agreement between Harry and United States Postal Service.

 The record before us, however, contains the text of the letters from the congressman and his designated aid in this matter, Julie Tagen of the Subcommittee on Human Resources staff, as well as those from the Postal Service. Therefore, we were able to assess the responsiveness of the Postal Service's letters to the inquiries from the congressional offices.[9] Our inquiry being

---

8. Additionally, Plaintiff claims that the 1988 Settlement Agreement, entered into before an EEOC Administrative Law Judge, by it own terms, was to be kept confidential and that the Postal Service's disclosure to Representative Kanjorski was directly violative of the "gag order" provision. We decline to address that issue at this time as this Court is divested of jurisdiction absent both

a review of the agreement by the ALJ and an appeal of the ALJ's determination.

9. "Offices" plural—meaning either Congressman Kanjorski's office as a Representative or the office of the Subcommittee on Human Resources of which Mr. Kanjorski was the Chairman prior to and during the initiation of this action.

whether the Postal Service's disclosure exceeded the congressional inquiries.

After a review of the record before us, we find that, given the non-delineating language of the Kanjorski intervention letter (Doc. No. 10, Amended Complaint, Exh. "E") and the detailed letter of Julie Tagen (Doc. No. 16, Defendant's Statement of Material Facts, attachment), a staff member from the Committee on Post Office and Civil Service's Subcommittee on Human Resources (of which Congressman Kanjorski is a member), the Postal Service's response to Congressman Kanjorski was neither excessive nor, detrimental to Plaintiff Harry's present Privacy Act Claim—the same claim for which the statute of limitations sounded the death knell.

On April 23, 1991, Mr. Kanjorski wrote to Mr. Charles Clauson, Chief Postal Inspector at that time, asking him to investigate Harry's allegations. Mr. Kanjorski indicated Harry claimed that he had discovered, as a result of an OSHA complaint he was filing, that his medical files had been tampered with, perhaps intentionally, by the Hazleton Postmaster. (Doc. No. 1, Complaint, Exh. "E," also Doc. No. 10, Amended Complaint, Exh. "E").

In a letter dated April 26, 1991, Mr. Clauson indicated that Julie Tagen had been contacted on April 11, 1991, and that a further response would follow the receipt of greater detail of the alleged offenses from Ms. Tagen. (Doc. No. 16, Defendant's Statement of Material Facts). Ms. Tagen provided more information in a letter dated April 23, 1991. Her letter contained a list of facts from the mid 1970's to 1988 detailing the background of Harry's claims of handicap discrimination and the mismanagement of his files.

Following receipt of Ms. Tagen's letter, Clauson wrote to Congressman Kanjorski again on September 6, 1991. In his letter he indicated that in the 1988 settlement, Harry

had agreed to withdraw all grievances, Privacy Act Claims, and congressional inquiries.[10] In that letter, Clauson also described, according to the accounts of the different postmasters or officers in charge in Hazleton, the maintenance of Harry's files since the 1988 agreement. In short, Mr. Clauson's letter addressed matters not only germane to Harry's present Privacy Act claim but to his entire tenure at the Post Office as did Ms. Tagen's letter.

Although Plaintiff Harry complains that the 1988 agreement had nothing to do with his privacy act claim, it is apparent that Mr. Clauson thought, and understandably so, that the language "not pursue any privacy act violations" contained in that agreement was pertinent to an understanding of Plaintiff's general employment history and the relationship between the Postal Service and Harry prior to the current claim.

■ What Plaintiff must prove, but fails to, is that: (1) the disclosure to the person intervening on his behalf was somehow detrimental to his Privacy Act claim; (2) the disclosure was a willful and intentional disclosure; and (3) that he suffered an adverse effect as a result of the disclosure. *Quinn v. Stone*, 978 F.2d 126, 137 (3rd Cir.1992); *Albright v. United States*, 732 F.2d 181, 186 (D.C.Cir.1984).

(1) Let us remember that the Clauson letter of September 6, 1991, was a response to Congressman Kanjorski's request for an investigation. Presumably, Mr. Kanjorski's intervention and following efforts were to help and not harm Plaintiff's attempt to build a case. The fact that the investigation revealed what Plaintiff obviously feels is damaging information is irrelevant. Upon learning of Plaintiff's litigation history and his 1988 settlement agreement, Congressman Kanjorski neither abandoned Harry, nor attempted to dissuade him from pursuing his

10. Plaintiff specifically takes issue with the following excerpt of Clauson's letter:

Mr. Harry's allegations were examined through various Equal Employment Opportunity Commissions (EEOC) investigations and American Postal Workers Union (APWU) grievances. In 1988, an EEO settlement was reached in which, among other things, Mr.

Harry agreed to: 1) withdraw all congressional inquiries and/or investigations; 2) withdraw all pending grievances; and 3) not pursue any Privacy Act violations against the Postal Service of postal officials. Additionally, Mr. Harry agreed that if the terms of the settlement were disclosed, all benefits accruing to him or to his representative would be forfeited.

**1208**

failure to maintain files—Privacy Act claim. In addition, there was no further disclosure of the information. In this light, we cannot see how the disclosure injured his litigation posture.

(2) For Plaintiff to receive an award of damages under the Privacy Act, he must show that the Postal Service "acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). The Courts have interpreted this standard as requiring a showing of conduct on the part of the agency that is more than negligent. *Johnston v. Horne,* 875 F.2d 1415, 1422 (9th Cir.1989) (requiring conduct "amounting to more than gross negligence"); *Andrews v. VA,* 838 F.2d 418, 424–25 (10th Cir.), *cert. denied,* 488 U.S. 817, 109 S.Ct. 56, 102 L.Ed.2d 35 (1988); *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir. 1987).

■ As interpreted by this Court, the language of § 552a(g)(4) does not make the Postal Service strictly liable for every affirmative or negligent action that might be said to violate the Privacy Act's provisions. The violation must be so "patently egregious and unlawful" that anyone undertaking the conduct should have known it unlawful. *Wisdom v. Dept. of Hous. & Urban Dev.,* 713 F.2d 422, 425 (8th Cir.1983).

In this case, the Postal Inspection Service disclosed information not on its own initiative but in response to a congressional inquiry and request for an investigation. Again, the plain language of the Federal Register promulgated pursuant to the Privacy Act and its "routine use" exception to § 552a(b) gives us no parameters to utilize in restricting the Postal Service's response. Absent an attempt by Plaintiff to prove that the Postal Service acted without grounds for believing its actions lawful, we must conclude that the record before us is devoid of a genuine issue as to the Service's intent in disclosing the import of the 1988 settlement agreement.

■ (3) This claim of wrongful disclosure under the Privacy Act requires, however, not merely an intentional or willful disclosure, but also actual damages sustained or "an adverse effect" as a result of such disclosure. We hold this to mean that the viola-tion of the Act must *cause* the damages complained of. In the present case, that means Harry had to establish that the reason he suffered physical damages was the disclosure of the 1988 settlement through Clauson's letter to Congressman Kanjorski. In other words, Harry must establish that he suffered the claimed injuries and that those injuries were caused by the letter's contents.

■ According to the record before us, Mr. Harry's health problems started as far back as 1975. Mr. Harry tells us that the first time he was treated for any of his "current" ailments was in 1975. He admits that prior to 1989 (the year in which Harry realized problems with the maintenance of his files and nearly three years prior to initiation of this suit) he had been hospitalized some fifteen times. Furthermore, according to Plaintiff Harry himself, all the ailments he recently suffered are a direct result of the maintenance, or lack thereof, of his files and the EEOC procedures he was involved in as a result of his grievance. (Doc. No. 37, Harry Deposition, p. 19). It is clear that the aggravation of most of these sufferances (heart problems, vertigo, kidney stones) started between 1989 and 1991, although some resurfaced in 1992. But nowhere in the record does Harry state, let alone prove, that these illnesses and various ailments were caused by the letter dated September 6, 1991, from Clauson to Kanjorski. We fail to see just how there exists a causal link.

*CONCLUSION*

For the reasons stated above, summary judgment will be granted in favor of the Defendant on all claims. An appropriate Order is attached.

*ORDER*

AND NOW, THIS 28th DAY OF SEPTEMBER, 1994, IT IS HEREBY ORDERED THAT:

1. The Plaintiff's Privacy Act claim regarding improper maintenance of files is time-barred and therefore, DISMISSED for failure to satisfy the Statute of Limitations.

2. The Defendant's Motion for Summary Judgment as to the remaining wrongful disclosure claims is GRANTED.

3. Judgement is entered in favor of the Defendant.

4. The Clerk of Court is directed to close the case file.

5. This Order disposes of Documents numbered 15 and 18.

6. Any appeal from this decision will be deemed frivolous, taken in bad faith, and without probable cause.

Lawrence STRANGE, et al., Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, et al., Defendants.

Civ. A. No. 93–6585.

United States District Court, E.D. Pennsylvania.

Sept. 26, 1994.

Joseph M. Toddy, Adam M. Soll, Zarwin and Baum, P.C., Philadelphia, for plaintiffs.

Stanley B. Edelstein, Jacoby, Donner & Jacoby, P.C., Philadelphia, Joel W. Rice, Fox and Grove, Chartered, Chicago, IL, for defendants.

## MEMORANDUM

LOWELL A. REED, Jr., District Judge.

Currently before me is the motion of defendants to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. (Document No. 4) This court has jurisdiction pursuant to 28 U.S.C.A. § 1331 (West 1993) as plaintiffs have stated causes of action under 29 U.S.C.A. §§ 621–34 (West 1985 & Supp.1994) and 42 U.S.C.A. § 3604 (West

Supp.1994), and pursuant to 28 U.S.C.A. § 1332 (West 1993) as the parties are of diverse citizenship and the amount in controversy exceeds $50,000 exclusive of interest and costs for each plaintiff.

For the reasons discussed below, the motion of defendants to dismiss will be granted as to Counts III, IV, and VIII, and denied as to Counts I, II, and V. In addition, the motion of defendants to dismiss will be denied without prejudice as to Counts VI and VII; plaintiffs will be given leave to amend their complaint with regard to Counts VI and VII and will also be given leave to amend in order to include a new claim of defamation. Finally, the claim of plaintiff Samuel Vassallo[1] under Count I will be stayed until November 4, 1994.

## I. FACTUAL BACKGROUND[2]

Plaintiffs are Lawrence Strange, Howard Silver, Warren Pine, Edward Sheehan, and Samuel Vassallo, five former Nationwide insurance agents. The defendants are Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide General Insurance Company, and Nationwide Property and Casualty Insurance Company (hereinafter collectively referred to as "Nationwide"). Plaintiffs brought this action against Nationwide after their agency contracts with Nationwide were terminated. At the time their agency contracts were terminated, all five plaintiffs were over the age of forty (40). Prior to filing this action, each plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") charging Nationwide with violation of the Age Discrimination in Employment Act, 29 U.S.C.A. §§ 621–34 (West 1985 & Supp.1994) ("ADEA"). The complaints of Lawrence Strange, Howard Silver, Warren Pine, and Edward Sheehan were referred to the EEOC for investigation; the EEOC dismissed their

---

1. The parties appear to have incorrectly spelled Samuel Vassallo's name as "Samuel Vassalo" on all court documents. This memorandum will use the former spelling, drawn from plaintiff Vassallo's signature on his "Agent's Agreement." Defendants' motion to dismiss ("Motion"), Exhibit A.

2. The following facts are based on plaintiffs' well-pleaded factual allegations, construed in the light most favorable to the plaintiffs, as required when considering a motion to dismiss. *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990).

**1212**

complaints, concluding that they were independent contractors and not employees within the meaning of the ADEA. The EEOC and PHRC complaints of plaintiff Samuel Vassallo are still pending.

After filing their complaints with the EEOC and PHRC, the plaintiffs filed a complaint in this court alleging that Nationwide discriminated against them on the basis of age when Nationwide terminated their employment. The plaintiffs further allege that Nationwide engaged in discrimination in the writing of insurance policies on the basis of age, sex, race, color, financial ability, and geographic location [3] in violation of state and federal law. This discrimination had the effect of denying plaintiffs commissions and other monetary benefits and eventually resulted in their termination of employment. In addition, the plaintiffs state that their terminations (1) were procedurally defective due to lack of notice and opportunity for rehabilitation, (2) violated their contracts with Nationwide, (3) violated public policy, and (4) gave rise to claims for fraudulent misrepresentation and defamation.[4]

## II. DISCUSSION

In determining whether or not to grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, I am required to accept "as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990). Dismissal is allowed for failure to state a claim only in "those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Id.*

### A. Count I—Age Discrimination

In Count I of their complaint, plaintiffs state that Nationwide discriminated against them on the basis of age in violation of the ADEA when Nationwide terminated their employment. Nationwide argues that the ADEA only protects persons who are "employees" and that the plaintiffs were not employees but independent contractors. Nationwide also argues that plaintiff Samuel Vassallo's ADEA claim is premature.

### 1. Status of Plaintiffs Under the ADEA

Nationwide correctly states, and plaintiffs do not contest, that the ADEA protects only employees and not independent contractors. 29 U.S.C.A. § 623(a) (West 1985); *EEOC v. Zippo Mfg. Co.*, 713 F.2d 32, 35 (3d Cir.1983). In order to determine whether a person is an employee or an independent contractor for the purposes of the ADEA, the Court of Appeals for the Third Circuit has adopted a so-called "hybrid test," combining the traditional test for common-law agency with a modern economic realities test. *Zippo*, 713 F.2d at 38.[5] It is unneces-

3. Discrimination based on geographic location is generally known as "red lining." *See NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993).

4. Count I of plaintiffs' complaint alleges federal age discrimination, Count II violation of the federal Fair Housing Act, Counts III and IV violations of Pennsylvania insurance law, and Counts V through VIII Pennsylvania common law claims for wrongful discharge, fraudulent misrepresentation, breach of contract, and defamation.

The parties both assume that Pennsylvania law applies to plaintiffs' state law claims, and their assumption is correct. Federal courts must apply the choice of law rules of the states in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Pennsylvania has adopted a choice of law methodology which combines contacts

analysis and interest analysis. *Carrick v. Zurick–American Ins. Group*, 14 F.3d 907, 909–10 (3d Cir.1994); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). Given that all of the plaintiffs are residents of Pennsylvania and that the conduct complained of primarily occurred in Pennsylvania and primarily affected Pennsylvania residents, I find that Pennsylvania law applies.

5. The continued viability of this hybrid test is in doubt, however, because the Supreme Court of the United States recently stated that as a general rule the common-law agency test should be used to define the term "employee" for the purposes of statutes which do not helpfully define the term. *Nationwide Mut. Ins. Co. v. Darden*, — U.S. —, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). While the *Darden* case involved ERISA, this general rule would appear also to extend to ADEA cases. *See Stouch v. Brothers of Order*, 836 F.Supp. 1134, 1139 (E.D.Pa.1993).

sary for the purposes of this motion, however, to apply any test. The plaintiffs have alleged in their complaint that they were "employed" with Nationwide and that their "employment" was terminated. Complaint, at ¶¶ 16–22. Under the standard of review for a motion to dismiss, I must accept plaintiffs' factual allegations that they were "employed" by Nationwide as true, and therefore, plaintiffs' complaint adequately states a claim under the ADEA.

### 2. Timeliness of Plaintiff Vassallo's ADEA Claim

■ Plaintiffs state in their complaint that plaintiff Samuel Vassallo filed his complaints with the EEOC and the PHRC on or about November 22, 1993.[6] Complaint, at ¶ 31. The plaintiffs filed their complaint in this court on December 8, 1993, sixteen days after Mr. Vassallo filed his EEOC and PHRC complaints.

The ADEA provides that "[n]o civil action may be commenced by an individual ... until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission." 29 U.S.C.A. § 626(d) (West 1985) ("Section 626(d)"). The ADEA further provides that "no suit may be brought ... before the expiration of sixty days after proceedings have been commenced under the [applicable, if any] State law." 29 U.S.C.A. § 633(b) (West 1985) ("Section 633(b)").

Since plaintiff Vassallo's ADEA claim is untimely under both of these sections, the question then becomes how this court should handle his ADEA claim. With regard to Section 633(b), the Court of Appeals for the Third Circuit has held that when a plaintiff does not comply with that provision's requirements, her suit must be stayed until compliance has been achieved. *Smith v. Jos. Schlitz Brewing Co.,* 604 F.2d 220 (3d Cir. 1979). The Court of Appeals for the Third Circuit has not addressed a violation of Section 626(d). The Court of Appeals for the Second Circuit, however, has held that an ADEA claim that is barred by Section 626(d) should be stayed pending expiration of the statutory 60–day waiting period. *Dalessandro v. Monk,* 864 F.2d 6, 9 (2d Cir.1988).[7]

The courts in *Smith* and *Dalessandro* rested their decisions on *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979). In *Evans,* the Supreme Court of the United States held that when a plaintiff violated Section 633(b), the proper remedy was not dismissal but instead suspension of the plaintiff's claim pending satisfaction of Section 633(b)'s requirements. *See* 441 U.S. at 765 n. 13, 99 S.Ct. at 2076; *see also Dalessandro,* 864 F.2d at 9; *Smith,* 604 F.2d at 220–21.

Following the holdings in *Evans, Smith* and *Dalessandro,* I will stay plaintiff Vassallo's ADEA claim in order to allow the statutory waiting period to expire. Since more than sixty days has passed from when plaintiff Vassallo filed his EEOC and PHRC complaints, I will stay his ADEA claim from the date of this memorandum and order for 43 days, the amount of the waiting period that had not passed when the plaintiffs' filed their complaint in this court.

Accordingly, Nationwide's motion to dismiss will be denied as to Count I. In addition, Plaintiff Samuel Vassallo's Count I claim will be stayed until November 4, 1994.

### B. Count II—Violation of the Fair Housing Act

■ In Count II of their complaint, plaintiffs allege that Nationwide has violated sec-

---

**6.** The other four plaintiffs filed their EEOC and PHRC complaints on or about February 17, 1993. Complaint, at ¶ 26.

**7.** Other courts of appeals applying Section 626(d) have dismissed untimely ADEA claims instead of staying them; in each of those cases, however, either the district courts had reached the merits or the untimeliness was only an alternate ground for dismissal. *See Chapman v. City of Detroit,* 808 F.2d 459, 462 (6th Cir.1986) (alternate ground); *Dempsey v. Pacific Bell Co.,* 789 F.2d 1451, 1453 (9th Cir.1986) (merits reached); *Vance v. Whirlpool Corp.,* 707 F.2d 483, 490 (4th Cir.) (same), *supplemented on reh'g,* 716 F.2d 1010 (1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); *Cannon v. University of Chicago,* 559 F.2d 1063, 1076 (7th Cir.1976) (alternate ground), *rev'd on other grounds,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

tion 804 of the Fair Housing Act ("Section 804"), codified at 42 U.S.C.A. § 3604 (West Supp.1994), by discriminating against individuals on the basis of age, sex, color, financial ability, and geographical location.[8] Defendants make two challenges to this count: first, that Section 804 does not apply to the business of insurance; and second, that the plaintiffs have failed to allege a causal link between the alleged discrimination in housing, which is covered by Section 804, and actual harm to the plaintiffs.[9]

█ The first issue to be addressed is whether discrimination in insurance related to housing is covered by Section 804. Nationwide argues that under *Mackey v. Nationwide Ins. Companies,* 724 F.2d 419, 423–25 (4th Cir.1984), Section 804 does not apply to such insurance.

The *Mackey* court rested its decision on four grounds. First, that given 42 U.S.C.A. § 3605's (West Supp.1994) ("Section 805") specific prohibition of discrimination in the financing of housing, Section 804 could not have been designed to reach every discriminatory act that might conceivably affect the availability of housing. Second, that Congress may not have intended to interfere with the insurance industry's classification of risk. Third, that Section 804 and its legislative history lacks any reference to insurance. And fourth, that Congress has failed to pass amendments to the Fair Housing Act that would have explicitly made Section 804 applicable to insurance. 724 F.2d at 423–24.

The Court of Appeals for the Seventh Circuit rejected these arguments for five reasons. *See NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993). First, the court could not find any reason why

Section 805 and Section 804 could not overlap. Second, financial lenders are as much in the risk assessment business as insurers, but Congress did not choose to allow them to escape the provisions of the Fair Housing Act; therefore, the court found no reason to imply that Congress intended to exempt insurers from the Fair Housing Act's coverage. Third, Section 804 was written in general terms and did not specifically apply to any particular persons or industry. Fourth, the court found the failure of the Congress to pass subsequent amendments was irrelevant for determining the original congressional intent embodied in Section 804, especially since subsequent amendments may fail for any number of reasons. 978 F.2d at 298–300.

While I am not completely convinced by the first four reasons given by the Court of Appeals for the Seventh Circuit, I do find their fifth and final argument compelling: the court of appeals found that after *Mackey* was decided the Department of Housing and Urban Development had promulgated regulations explicitly stating that Section 804 covers discrimination in the provision of property and hazard insurance. 24 C.F.R. § 100.70(d)(4). Given the deference that is due to an agency's congressionally delegated and plausible construction of a statute, the existence of this regulation supports plaintiffs' position that Section 804 applies to the business of insurance. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

█ With regard to Nationwide's second argument, the plaintiffs have sufficiently alleged a causal link between the illegal discrimination and the actual harm done to them. Reading the complaint in the light

---

**8.** Section 804(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b) (West Supp.1994).

**9.** It is well settled that to have standing under the Fair Housing Act, a plaintiff need only have sustained an injury in fact resulting from the defendant's violation of the Fair Housing Act,

even when the plaintiff was not the primary target of the alleged violation. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120–21, 71 L.Ed.2d 214 (1982). The plaintiffs have sufficiently alleged such an injury by stating that they lost commissions and suffered other monetary losses as a result of defendants' alleged violations of the FHA. Complaint, at ¶¶ 37, 38. In addition, the plaintiffs imply that they were terminated as a result of these violations. *Id.* at ¶ 36(n).

most favorable to the plaintiffs, plaintiffs claim that Nationwide adopted policies that forced agents to withdraw from predominantly minority areas. Complaint, at ¶ 36. The plaintiffs further allege that these policies caused the plaintiffs to lose commissions and other monetary benefits. Complaint, at ¶¶ 37–38. In addition, plaintiffs imply that as part of Nationwide's program to not insure in predominantly minority areas, Nationwide terminated the employment of the plaintiffs. Complaint, at ¶ 36(n).[10]

Accordingly, I will deny Nationwide's motion to dismiss Count II of the complaint.

### C. *Counts III & IV—Violation of Pennsylvania Insurance Laws*

In Count III of their complaint, plaintiffs allege that Nationwide engaged in red lining of automobile insurance in violation of the Pennsylvania Automobile Insurance Act, 40 Pa.Stat.Ann. §§ 1008.1–.11 (1992) ("Auto Insurance Act"), specifically section 1008.3.[11] In Count IV, plaintiffs allege that Nationwide terminated them improperly because Nationwide failed to provide them with ninety days notice of their terminations and failed to put them in a rehabilitation program prior to their terminations as required by 40 Pa.Stat.Ann. § 242(a) and (f) (1992) ("Agent Termination Act"). Nationwide argues that there is no private right of action under either the Auto Insurance Act or the Agent Termination Act. With regard to the Agent Termination Act, Nationwide argues in the alternative that the Agent Termination Act does not apply to the plaintiffs, because Nationwide is the owner of

the plaintiffs' insurance businesses. *See* 40 Pa.Stat.Ann. § 241.1(b)(1) (1992) ("[t]he provisions of [the Agent Termination Act] do not apply to: (1) business owned by the insurer and not by the agent, provided such insurer offers to continue such policies through another of its agents").

Pennsylvania has not adopted a general test for determining whether a given statute creates a private cause of action, and no Pennsylvania court has ruled on whether either of these acts creates a private cause of action. Therefore, I must examine the Pennsylvania cases interpreting similar statutes in order to determine whether a private cause of action exists under these two acts. One federal court has already taken this approach, finding that the Auto Insurance Act is sufficiently similar to Pennsylvania's Unfair Insurance Practices Act, 40 Pa.Cons. Stat.Ann. § 1171.1–.15 (1992) ("Unfair Practices Act") so as to allow the Supreme Court of Pennsylvania's decision regarding whether a private right of action exists under the Unfair Practices Act to apply to the Auto Insurance Act. *See Park Ins. Agency v. National Grange Mut. Ins. Co*, 722 F.Supp. 1206, 1207 (E.D.Pa.), *aff'd*, 888 F.2d 1381 (3d Cir.1989).

In *D'Ambrosio v. Pennsylvania Nat'l Mut. Casualty Ins. Co.*, 494 Pa. 501, 431 A.2d 966 (1981), the Supreme Court of Pennsylvania ruled that the Unfair Practices Act does not provide a private cause of action. The Court rejected the plaintiff's invitation to judicially create a private cause of action under 40 Pa.Cons.Stat.Ann. §§ 1171.4–.5 (1992) for "bad faith" conduct by an insurance carrier.[12]

---

**10.** Nationwide argues that the termination of the employment of the plaintiffs was the result of a failure to meet *auto insurance* loss ratios and therefore cannot be related to housing discrimination. The plaintiffs in their complaint, however, do not characterize the loss ratio requirement as applying to any particular type of insurance. Nationwide's evidence to the contrary cannot be considered in the context of a motion to dismiss. In addition, the plaintiffs imply that Nationwide's discriminatory practices and not the loss ratio requirement were the true basis for the termination of their employment. *See* Complaint, at ¶ 36(n).

**11.** Section 1008.3 of the Auto Insurance Act states in relevant part: "[n]o insurer shall cancel

or refuse to write or renew a policy of automobile insurance for one or more of the following reasons: . . . (2) Residence or operation of a motor vehicle in a specific geographic area." 40 Pa.Stat.Ann. § 1008.3(a) (1992).

**12.** The Court did invite the legislature to create such a cause of action, and the legislature responded by doing just that in the form of enacting 42 Pa.Cons.Stat.Ann. § 8371 (Supp.1994). *See Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 750 (3d Cir.1994). This statutory provision, however, is not at issue in this case because it only extends to actions arising *under an insurance policy* that allege "bad faith conduct" toward the insured. 42 Pa.Cons.Stat.Ann. § 8371 (Supp.1994).

431 A.2d at 969–70. It found that the regulatory scheme created by the legislature in the Unfair Practices Act was sufficient to accomplish the purposes of that Act without the addition of a private cause of action. *Id.* 431 A.2d at 970.

In *Park, supra,* a federal district court expanded the *D'Ambrosio* holding to include the Auto Insurance Act. In *Park,* an insurance agent filed a breach of contract action against an automobile insurer after he was terminated for complaining about alleged red lining; the *Park* decision involved a motion by the defendant for partial summary judgment with regard to punitive damages that the plaintiff had sought based on the public policy against red lining reflected in the Auto Insurance Act. 722 F.Supp. at 1207. The court granted the motion based on its finding that the similarity between the Auto Insurance Act and the Unfair Practices Act indicated that the Supreme Court of Pennsylvania would find that no private cause of action existed under the Auto Insurance Act as well as under the Unfair Practices Act. *Id.*

The three acts, the Auto Insurance Act, the Agent Termination Act, and the Unfair Practices Act, are similar in their purposes and the administrative scheme established in each to further those purposes, though their scopes vary. All three acts regulate the insurance business in Pennsylvania, each act covering a different areas of that business.[13] Certain conduct, such as redlining, is barred by both the Auto Insurance Act and the Unfair Practices Act. 40 Pa.Stat.Ann. §§ 1008.3(a)(2) (1992) (Auto Insurance Act); 40 Pa.Cons.Stat.Ann. § 1171.5(a)(7)(iii) (1992) (Unfair Practices Act). All three acts grant the Pennsylvania Insurance Commissioner ("Commissioner") the power to investigate suspected violations and to impose penalties. 40 Pa.Stat.Ann. §§ 245(b) (Agent Termination Act), 1008.8–.10 (Auto Insurance Act) (1992); 40 Pa.Cons.Stat.Ann. §§ 1171.7–11 (Unfair Practices Act).

In the three acts, there are only two mentions of a right of insureds, potential insureds, or insurance agents to take action on their own. In the Auto Insurance Act, an insured or an applicant whose policy or application has been canceled, not renewed, or refused may send a written request to the Commissioner for a review of the matter. 40 Pa.Stat.Ann. § 1008.8 (1992). In the Agent Termination Act, a terminated agent may request that the Commissioner review her termination. *Id.* at § 242(d).

Therefore, the Auto Insurance Act and Unfair Practices Act are similar in terms of the activities regulated and the powers granted to the Commissioner, and in terms of the failure of either act to mention any private right of action. The Agent Termination Act, while not covering the same activities as the other two acts, also provides the Commissioner with enforcement powers and does not mention any private right of action. Since under all of these acts the Commissioner has the power to investigate and remedy violations, and the legislature has not seen fit to provide explicitly for a private right of action under any of these acts, I conclude that the Supreme Court of Pennsylvania would extend its *D'Ambrosio* holding to both the Auto Insurance Act and the Agent Termination Act. Therefore, I find that no private right of action exists under either act.

Plaintiffs argue that the existence of other remedies for the plaintiff in *D'Ambrosio,* such as under the Unfair Trade Practices and Consumer Protection Law, 73 Pa.Stat. Ann. §§ 201–1 to 9.2 (Supp.1993), renders the holding in *D'Ambrosio* inapplicable to the Auto Insurance Act and the Agent Termination Act. Even assuming the existence of other remedies for the plaintiff in *D'Ambrosio,* these other remedies were not mentioned as a relevant factor by the Court in that case. The Court's rationale rested instead on its reasoning that the legislature's policies were sufficiently vindicated by the enforcement power of the Commissioner and so the Unfair Practices Act does not provide for or require a private right of action. *D'Ambrosio,* 431 A.2d at 970.

---

**13.** The Unfair Practices Act covers all types of insurance. *See* 40 Pa.Stat.Ann. § 1171.3 (1992). The Auto Insurance Act is limited to certain types of automobile insurance. 40 Pa.Stat.Ann. § 1008.2 (1992). The Agent Termination Act applies solely to the termination of insurance agents. *Id.* at §§ 241–42.

■ Plaintiffs also assert that there is a common-law "bad faith" conduct cause of action available against insurers in Pennsylvania. This assertion is incorrect. The case that the plaintiffs rely upon, *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 410 Pa. 55, 188 A.2d 320 (1963), does not establish such a cause of action. In *Gedeon*, the Supreme Court of Pennsylvania found that an insured had a cause of action against his insurer for failure to defend the insured against a lawsuit arising under the policy. The cause of action existed because such a failure was a breach of the contract between the parties, not because a separate bad faith conduct cause of action existed. *Id.*

The plaintiffs are also incorrect in asserting that 42 Cons.Stat.Ann. § 8371 (Supp. 1994) ("Section 8371") represents the codification of a thirty year old bad faith conduct common-law cause of action. Instead, Section 8371 was passed in response to the *D'Ambrosio* decision. *See Polselli, supra,* 23 F.3d at 750.[14]

Because I find that the Auto Insurance Act and the Agent Termination Act do not provide private causes of action, Nationwide's motion to dismiss will be granted as to Counts III and IV.

### D. *Count V—Wrongful Discharge*

■ In Count V of their complaint, plaintiffs state that they were ordered by Nationwide to implement unlawful red lining policies in order to meet a "loss ratio" requirement, and that they were fired when they failed to meet this requirement.[15] Nationwide moves to dismiss this count on two grounds. First, Nationwide argues that plaintiffs cannot state a claim for wrongful discharge because they have failed to allege a violation of a clear mandate of public policy as required by Pennsylvania law. Second, Nationwide argues that plaintiffs are independent contractors and not employees and, therefore, cannot state a claim for wrongful discharge under Pennsylvania law.

The Supreme Court of Pennsylvania created a cause of action for wrongful discharge in *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974). The Court held that an employee who was allegedly fired for complaining about potentially unsafe pipes being sold by his employer did not state a cause of action; but the Court went on to say that when a "clear mandate of public policy" was violated by an employee's termination, then a cause of action would exist. *Id.* 319 A.2d at 180. While the Court declined to delineate the parameters of this exception to the general rule that no non-statutory cause of action exists for termination of an at-will employment relationship, subsequent Pennsylvania court decisions have generally found such clear mandates "when the discharge is a result of the employee's compliance with or refusal to violate the law." *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 701–2 (3d Cir.1988); *see Field v. Philadelphia Elec. Co.*, 388 Pa.Super. 400, 565 A.2d 1170 (1989) (discharged for reporting violations of

---

**14.** Plaintiffs also argue that because the Agent Termination Act leaves to an agent's discretion whether she should seek review of her termination by the Commissioner, the agent must also have the option of seeking judicial enforcement of the Agent Termination Act. *See* 40 Pa.Stat. Ann. § 242(d). This argument also fails. Simply because the legislature left it up to an aggrieved agent's discretion as to whether to pursue relief by complaining to the Commissioner does not imply that the legislature intended to give aggrieved agents who eschew complaining to the Commissioner another avenue for pursue relief in the form of filing a complaint in court. The plaintiffs' reliance on the only federal decision involving the Agent Termination Act is misplaced. *See Ardrey v. Federal Kemper Ins. Co.*, 798 F.Supp. 1147, 1153 (E.D.Pa.1992). In *Ardrey*, the court determined that the act was not applicable to the harm alleged by the plaintiffs, and so the court did not reach the issue of whether the plaintiffs had a cause of action under the act separate from seeking relief from the Commissioner. *Id.*

**15.** Plaintiffs also include in this count Nationwide's failure to rehabilitate them as required by the Agent Termination Act. Complaint, at ¶ 61. Plaintiffs appear, however, to have abandoned any assertion that the Agent Termination Act creates a clear mandate of public policy that would support a claim for wrongful discharge, since they make no mention of the act in their subsequent briefs. Under any conditions, as the discussion of Count IV, *supra*, makes clear, the proper way to seek a remedy for a violation of the Agent Termination Act is to seek relief through the administrative review mechanism established in that act.

Nuclear Regulatory Commission regulations as required by law); *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (discharged for performing jury service). The federal courts have likewise found that a cause of action for wrongful discharge exists under Pennsylvania law when a statute or constitutional provision is involved. *See, e.g., Woodson, supra* (discharged for obeying Pennsylvania law that requires liquor sellers to refuse to sell liquor to visibly intoxicated persons); *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894 (3d Cir. 1983) (discharged for refusing to participate in company lobbying effort; court held that the discharged violated the plaintiff's freedom of political expression and association embodied in U.S. and Pennsylvania constitutions); *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir.1979) (discharged for refusing to take a polygraph examination; Pennsylvania law forbids using polygraph examinations as a condition of employment).[16]

Red lining is a prohibited activity for insurers. 40 Pa.Stat.Ann. § 1008.3(a)(2) (1992); 40 Pa.Cons.Stat.Ann. § 1171.5(a)(7)(iii) (1992). When red lining involves property or hazard insurance and is associated with discrimination on the basis of race or color, it is also forbidden under the Fair Housing Act. *See* discussion of Count II, *supra.* In addition, insurance *agents* are also specifically prohibited from red lining. 40 Pa.Cons.Stat.Ann. § 1171.5(a)(7)(iii) (1992).[17] Agents who do red line can be subject to civil penalties. *Id.* at § 1171.11. Therefore, as the court in *Park Ins. Agency, supra,* stated, there is a "strong public policy in Pennsylvania against 'red-lining' by insurance companies." 722 F.Supp. at 1207.

The plaintiffs have detailed numerous programs and practices of the defendants which they allege were part of overall red lining plan, for example, pricing Nationwide policies out of certain geographical areas, providing lower quality service of policies in certain areas, and ordering agents out of certain areas. Complaint, at ¶ 36. It can be inferred from their complaint that plaintiffs were terminated as a result of their refusal to follow these allegedly illegal programs and practices. *Id.* at ¶¶ 36(n), 57–60. Therefore, reading the plaintiff's complaint in the most favorable light, it states a claim for wrongful discharge under Pennsylvania law.

To support their assertion that red lining does not constitute a violation of public policy sufficient enough to support a claim of wrongful discharge, Nationwide relies on *Newton v. Nationwide Mut. Ins.*, No. 93–3220 (3d Cir. Nov. 16, 1993).[18] The court in *Newton,* however, did not explicitly rule on whether red lining could constitute a suffi-

16. In a few cases, Pennsylvania courts have refused to find a cause of action even when the plaintiffs alleged that their actions were necessary in order to comply with statutes. *See Callahan v. Scott Paper Co.*, 541 F.Supp. 550 (E.D.Pa. 1982) (objecting to and attempting to eliminate alleged illegal price discounts and promotional allowances); *Hineline v. Stroudsburg Elec. Supply Co., Inc.*, 384 Pa.Super. 537, 559 A.2d 566 (dismantling of allegedly illegal surveillance equipment), *appeal denied*, 524 Pa. 628, 574 A.2d 70 (1989); *McGonagle v. Union Fidelity Corp.*, 383 Pa.Super. 223, 556 A.2d 878 (refusal to mail insurance mailings that were allegedly in violation of state law), *appeal denied*, 525 Pa. 584, 575 A.2d 115 (1989). In each of these cases, however, the issue of whether the act alleged was indeed illegal was unclear; in light of this uncertainty, the courts felt that the judgement as to whether the act was illegal was in the hands of the employer and not the employee. *Callahan,* 541 F.Supp. at 563 ("employee complaints on matters generally entrusted to management" do not rise to the level of a clear mandate of public policy); *Hineline,* 559 A.2d at 569–70 (holding that plaintiff had no authority or statutory right for actions; proper course was to report actions to proper legal authority); *McGonagle,* 556 A.2d at 885 ("when the act to be preformed turns upon a question of judgment, as to its legality or ethical nature, the employer should not be precluded from conducting its business where the professional's opinion is open to question"). The discrimination and red lining that the plaintiffs have alleged, and which must be assumed to be true for the purposes of this motion to dismiss, are clearly illegal, as discussed *infra.*

17. 40 Pa.Cons.Stat.Ann. § 1171.4 extends § 1171.5's provisions to any "person"; person is defined in § 1171.3 to specifically include insurance agents.

18. As the parties point out, under the Court of Appeals for the Third Circuit Internal Operating Procedures ch. 5, § 5.8, the *Newton* opinion is not binding precedent for this court. However, the Internal Operating Procedures do not bar me from considering that opinion based simply on the soundness of its reasoning.

cient violation of public policy so as to support a wrongful discharge cause of action. Rather, the court upheld the district court's grant of summary judgment to the defendants on the wrongful discharge claim because the evidence presented to the district court failed to substantiate the plaintiff's "'amorphous allegation of redlining.'" *Id.* at 5. Since I am ruling on a motion to dismiss, I need only consider the allegations in the plaintiff's complaint, and, as explained, *supra*, I find them sufficient to state a cause of action.

■ Nationwide also argues that the plaintiffs' claim must fail because Pennsylvania's tort of wrongful discharge does not extend to independent contractors such as the plaintiffs. Even if I assume that Nationwide is correct in that the tort of wrongful discharge is not available for independent contractors, plaintiffs have sufficiently alleged in their complaint that they were employees. *See* discussion of Count I, *supra.* Therefore, since the factual allegations in their complaint must be taken as true, this argument must fail.

Accordingly, Nationwide's motion to dismiss will be denied as to Count V.

### E. *Count VI—Fraudulent Misrepresentation*

■ In Count VI of their complaint, plaintiffs allege that Nationwide intentionally made false representations to them by promising that their employment would not be terminated as a result of their loss ratio. Nationwide moves to dismiss this count for three reasons. First, Nationwide argues that the plaintiffs have failed to plead fraudulent misrepresentation with the specificity required by Fed.R.Civ.P. 9(b) ("Rule 9(b)"). Second, Nationwide argues that even assuming it made the alleged statements to plaintiffs, the statements constitute a mere promise to refrain from doing a future act which does not rise to the level of a valid fraud claim. Third, Nationwide argues that plaintiffs' fraud claim fails because they have not alleged a required element, justifiable reliance resulting in damages.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The Court of Appeals for the Third Circuit has stated that "in applying Rule 9(b), 'focusing exclusively on its "particularity" language "is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." ' " *Seville Indus. Mach. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984) (quoting *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1298, at 407 (1969)), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). The *Seville* case involved the purchase of pieces of industrial machinery by the defendant from the plaintiff; the sales were allegedly induced by fraudulent misrepresentations made by the defendant. *Id.* at 788. The *Seville* court rejected a reading of Rule 9(b) that would absolutely require "allegations of 'date, place or time'" for the fraudulent misrepresentations and instead accepted as sufficient a complaint that gave the substance of the misrepresentations and tied each of the misrepresentations to the specific transactions that were induced by that misrepresentation. *Id.* at 791. In *Saporito v. Combustion Engineering Inc.*, 843 F.2d 666 (3d Cir.1988), *vacated on other grounds*, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989), the Court of Appeals for the Third Circuit held that a complaint that did "not indicate who the speakers were ... or who received the information" did not meet the requirements of Rule 9(b). *Id.* at 675.

In the instant case, the plaintiffs have provided more information than the plaintiffs in *Saporito* provided, but I find that their allegations still fall short of the requirements of Rule 9(b). While the plaintiffs have stated the content of the allegedly fraudulent misrepresentations ("[w]hile in the employ of Nationwide, Plaintiffs were assured they would not be terminated for their loss ratio") and identified themselves as the recipients of the misrepresentations, they have failed to identify what agent or employee of the defendants communicated these misrepresenta-

tions. Complaint, at ¶ 66. In addition, the plaintiffs in *Saporito* limited the time of the communications to eleven days. 843 F.2d at 669, 673. In the instant case, the plaintiffs have given their entire time of employment with Nationwide as the period during which the defendants made the fraudulent misrepresentations. Complaint, at ¶ 66. This period extends up to approximately twenty-seven and a-half years for some of the plaintiffs. *Id.* at ¶¶ 17, 20. It is unreasonable to require the defendants to answer the plaintiffs' claims faced with such a wide range of possible communicators of the misrepresentations, and such a long period of time during which the misrepresentations were made.

Accordingly, plaintiffs are granted leave to amend their complaint as to Count VI, and Nationwide's motion to dismiss will be denied without prejudice as to Count VI.

### F. Count VII—Breach of Contract

■ In Count VII of their complaint, plaintiffs state that Nationwide breached their contracts with the plaintiffs by imposing a "loss/ratio" requirement that was purportedly the reason for their termination of employment. The plaintiffs rely on paragraph 17 of their Agent's Agreements ("Agreements") with Nationwide, which states: **"Amendments or Modifications.** Except as otherwise provided herein, this Agreement may be changed, altered, or modified only in writing signed by you and an officer of the Companies." Motion, Exhibit A, at ¶ 17.[19] Nationwide counters that the imposition of the loss/ratio requirement did not breach the Agreements with the plaintiffs, or, in the alternative, that the plaintiffs ratified any such breach.

Plaintiffs have asked for leave to amend Count VII in order to additionally allege that Nationwide breached an implied contractual provision "that plaintiffs would never be terminated for loss/ratio." Plaintiffs' memorandum in support of plaintiffs' response to de-

fendants' motion ("Reply Memorandum"), at 26. The plaintiffs have also asserted that their Agreements with Nationwide were contracts of adhesion because the plaintiffs "lacked complete economic bargaining power to reject, modify, amend or contract out any provision." *Id.* at 1 n. 1. Since nothing alleged in the complaint supports this charge, I will treat this new allegation as an additional request for leave to amend the complaint.

The main arguments of the defendants against both the breach of contract count as currently stated and against the breach of implied contract amendment rest on various provisions within the Agreements. Since the plaintiffs' contract of adhesion allegation is presumably aimed at the very provisions upon which the defendants rely, I will first address the plaintiffs' request for leave to amend the complaint so as to add a contract of adhesion allegation.

■ Leave to amend must be "freely given when justice so requires." Fed.R.Civ.P. 15(a); *see also Dole v. Arco Chemical Co.,* 921 F.2d 484, 486–87 (3d Cir.1990) (leave to amend should be granted liberally). The factors that may weigh against granting leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ In order for a contract to be invalidated as a contract of adhesion, the plaintiffs "must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so one-sided as to be oppressive." *Stebok v. American Gen. Life & Acc. Ins. Co.,* 715 F.Supp. 711, 714 (W.D.Pa.), *aff'd,* 888 F.2d 1382 (3d Cir.1989). Since I do not

---

**19.** This passage is located at paragraph 17 on page 8 of the Agreements between Nationwide and plaintiffs Howard Silver, Warren Pine, Edward Sheehan, and Samuel Vassallo, and at paragraph 16 of the Agreement between Nationwide and plaintiff Lawrence Strange. Motion, Exhibit A. The Agreement with Lawrence

Strange substitutes the word "Agency" for "you," apparently because the Agreement was between Lawrence J. Strange Insurance, Inc. and Nationwide. Neither the plaintiffs nor the defendants have challenged the validity of this Agreement with regard to Mr. Strange's claims as an individual.

currently have enough information to determine whether allowing this amendment would be futile, and none of the other factors that weigh against granting leave to amend appear to be applicable, I will grant the plaintiffs leave to amend this count in order to put forward a claim that the Agreements or portions thereof constitute contracts of adhesion. In order to save time and judicial resources, I will also grant the plaintiffs leave to amend Count VII to put forward a claim of an implied contractual term forbidding the imposition of loss ratio requirements. Since Nationwide's arguments in opposition to this request for leave to amend rely heavily on the provisions that I presume the plaintiffs intend to attack with their contract of adhesion allegation, it is appropriate to allow both issues to be fully pled.

Accordingly, I will grant plaintiffs leave to amend their complaint as to Count VII; Nationwide's motion to dismiss will be denied without prejudice as to Count VII.

### G. Count VIII—Defamation

In Count VIII of their complaint, plaintiffs allege that Nationwide defamed plaintiffs Strange and Pine by terminating them as a result of their loss ratios, and so compelled plaintiffs Strange and Pine to "self-publish" this allegedly false and defamatory information to prospective employers. Nationwide counters that the plaintiffs have not stated a cause of action for defamation because they have failed to allege publication *by Nationwide* of the allegedly defamatory information. In the alterative, Nationwide argues that the plaintiffs' claims are time-barred.

In addition, plaintiffs have made additional allegations that Nationwide sent letters regarding their termination to every customer of the plaintiffs, and that these letters falsely implied that the plaintiffs had engaged in some type of improper conduct, and, therefore, were defamatory. Reply Memorandum, at 27. I will treat these additional allegations as a request to amend this count of the complaint.

### 1. Compelled Self–Publication

First, I will address the motion by Nationwide to dismiss the count as it was originally stated. Pennsylvania law requires plaintiffs to plead "publication by the defendant" of defamatory remarks in order to sustain an action for defamation. 42 Pa.Cons.Stat.Ann. § 8343(a)(2). The plaintiffs argue that "publication" should include "compelled self-publication," which occurs when a "defendant makes a defamatory statement to the plaintiff who later is compelled to communicate the defamatory matter to a third party, and it was foreseeable to the defendant that the plaintiff would be compelled to publish the matter." *Yetter v. Ward Trucking Co.,* 401 Pa.Super. 467, 585 A.2d 1022, 1024, *appeal denied,* 529 Pa. 623, 600 A.2d 539 (1991). They note that while the court in *Yetter* refused to find publication when an employer gives an employee, and only the employee, a termination letter stating the reasons for her discharge, the court explicitly left open the possibility that compelled self-publication could constitute publication under Pennsylvania law in a different set of circumstances. *Id.* at 1025.

While the plaintiffs are correct in their assessment of *Yetter's* holding, the facts that they allege are very close to the facts in *Yetter.* In *Yetter,* a terminated employee was "compelled" to disclose to his family, relatives, and prospective employers the allegedly defamatory statements contained in his termination letter. In this case, the plaintiffs have alleged that they were compelled to communicate the reason for their termination to prospective employers. The allegedly defamatory reason was orally communicated to them by Nationwide, and only to them. Therefore, the only significant factual difference is that here the communication was oral while in *Yetter* it was in writing. This is the same difference that existed in *Ritter v. Pepsi Cola Operating Co.,* 785 F.Supp. 61 (M.D.Pa.1992), where the federal district court found that *Yetter* was applicable when the initial communication from the employer was oral instead of in writing. *Id.* at 64. I agree with the *Ritter* decision in that I fail to see how the method of communication is relevant in this context.[20] Since

**20.** The *Yetter* decision rested on a holding that

"Pennsylvania law recognizes the absolute privi-

the plaintiffs have not produced and I have not discovered any Pennsylvania case that rejects *Yetter*'s holding, I find that Pennsylvania law does not recognize compelled self-publication as constituting publication for defamation purposes when the initial communication is from an employer to an employee regarding the reasons for the employee's dismissal.

### 2. *Request for Leave to Amend*

With regard to the request for leave to amend, the plaintiffs in their Reply Memorandum have alleged that Nationwide sent letters to the plaintiffs' former clients, informing these clients that the plaintiffs were no longer employed by Nationwide. The plaintiffs allege that these letters implied that the plaintiffs were guilty of some impropriety. Reply Memorandum, at 27. Nationwide responds that these letters could not have been defamatory because they only stated a true fact, that the plaintiffs were no longer associated with Nationwide.

■ The fact that a communication was true is usually a complete defense to a charge of defamation. *U.S. Healthcare v. Blue Cross of Gr. Philadelphia*, 898 F.2d 914, 923 (3d Cir.1990), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Even true statements, however, must be read in context; "[t]he literal accuracy of individual statements will not insulate a defendant from liability where the overall impression left by those statements is false." *Coughlin v. Westinghouse Broadcasting & Cable, Inc.*, 603 F.Supp. 377, 385 (E.D.Pa.), *aff'd*, 780 F.2d 340 (3d Cir.1985), *cert. denied*, 476 U.S. 1187, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986). While the complaint makes it clear that the

plaintiffs were indeed terminated from their employment, the context and the exact language of any communications from Nationwide to the plaintiffs' customers have not been pled and so is not known to me. Therefore, I cannot determine whether the plaintiffs could successfully plead a cause of action for defamation based on these alleged letters.

Because I find that Pennsylvania law does not allow a defamation claim based on compelled self-publication, I will grant Nationwide's motion to dismiss as to Count VIII. In addition, I will grant plaintiffs leave to amend their complaint so as to include a new claim of defamation based on the alleged letters from Nationwide to the former customers of plaintiffs.

## III. CONCLUSION

For the foregoing reasons, Nationwide's motion to dismiss plaintiffs' complaint will be granted as to Counts III, IV, and VIII and denied as to Counts I, II, and V. Therefore, Counts III, IV, and VIII will be dismissed with prejudice. In addition, Nationwide's motion to dismiss will be denied without prejudice as to Counts VI and VII; plaintiffs are given leave to amend Counts VI and VII and are given leave to amend in order to allege a new claim of defamation. Plaintiff Vassallo's claim under Count I will be stayed until November 4, 1994.

---

lege of employers to publish defamatory matter in notices of employee termination." 585 A.2d at 1024. This privilege has expanded over time. Initially, it only applied to statements made in connection with a labor dispute arbitration. *See DeLuca v. Reader*, 227 Pa.Super. 392, 323 A.2d 309 (1974). It was then extended to termination notices required by a collective bargaining agreement. *See Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984). Next, evaluations of an employee came within the privilege's orbit because evaluations are considered consented to by the employee. *Baker v. Lafayette College*, 350 Pa.Super. 68, 504 A.2d 247 (Pa.Su-

per.1986), *aff'd*, 516 Pa. 291, 532 A.2d 399 (1987). Finally, in dicta, a Pennsylvania court extended the privilege to all notices of employee terminations. *See Sobel v. Wingard*, 366 Pa.Super. 482, 531 A.2d 520, 522 (1987). This expansion has not yet come before the Supreme Court of Pennsylvania. It has also been subject to at least one federal court criticism. *See Frymire v. Painwebber, Inc. (In re Frymire)*, 87 B.R. 856, 859 (Bankr.E.D.Pa.1988). It appears, however, to be the current direction of Pennsylvania law and, therefore, a reasonable support for the holding in *Yetter*.

HEALTHCARE SERVICES,
INC., Plaintiff,

v.

NATIONAL PRESCRIPTION
ADMINISTRATORS, INC.,
Defendant.

No. 93–CV–4983.

United States District Court,
E.D. Pennsylvania.

Nov. 10, 1994.

Debra Klebanoff, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for plaintiff.

Virginia A. Lazala, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for defendant.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

The defendant in this civil matter, National Prescription Administrators, Inc. (NPA), has brought a motion seeking an order granting it summary judgment on all counts of the Plaintiff's complaint as well as an order awarding it costs and attorney's fees pursuant to Rule 11 of the Federal Rules of Civil Procedure. For the reasons outlined below, the motion will be denied in part and granted in part.

### I. HISTORY OF THE CASE

The plaintiff in this diversity case, Healthcare Services, Inc. (HCS), is a Delaware corporation engaged in the business of filling medical prescriptions by mail order. The defendant NPA is a New Jersey corporation that provides prescription program administration services to certain companies and other entities. In 1983, NPA and HCS entered into a contract (HCS/NPA agreement) by which HCS agreed to join NPA's network of companies willing to fill prescriptions for companies with employee prescription plans. In 1990, NPA entered into a written contract (Pan Am/NPA agreement) with Pan American World Airlines, Inc. (Pan Am), a wholly owned subsidiary of Pan American Corporation. Pursuant to this contract, NPA agreed to provide prescription administrative services to Pan Am.

The relationship between the three companies operated as follows. HCS filled prescriptions for Pan Am's employee prescription plan and then submitted claims to NPA for reimbursement. NPA would review the claims in order to insure that the claims conformed to Pan Am's billing guidelines. Following review, NPA would report the non-conforming claims to HCS and submit to Pan Am a billing report for all valid claims, indicating the amount owed to HCS. Pan Am would then transfer monies to NPA to cover both NPA's services and the reimbursement of HCS's claims. Finally, NPA

would reimburse HCS for the valid claims out of funds received from Pan Am. NPA would only provide payment to HCS after receiving funds from Pan Am.

In the late summer and fall of 1991, NPA rejected a large number of claims submitted by HCS.[1] When HCS contacted NPA to inquire about the large number of rejected claims, NPA instructed HCS to resubmit the claims. HCS sent the first of its resubmissions on November 25. The vast majority of these claims were eventually approved at various times during late November and December of 1991 and January of the following year. However, on December 4, 1991, Pan Am ceased all business operations and informed HCS that it could not fill any more prescriptions. Soon thereafter, Pan Am contacted HCS directly to ensure that HCS would continue to ship prescriptions to Pan Am employees. HCS agreed to continue to provide services on condition that Pan Am send an advance payment of $155,000 directly to HCS. This amount, intended to be a prepayment for future services, was sent to HCS on December 6, 1991.

Meanwhile, HCS and Pan Am entered into direct negotiations to resolve the issue of the outstanding claims. HCS allowed the claims to be processed by NPA, but it sought payment from Pan Am directly. On or about January 9, 1992, Pan Am agreed to make a direct payment to HCS for a number of claims amounting to approximately $913,000. Pan Am's vice president of finance requested funds to finance this payment on January 21, 1992, but Pan Am refused to make the payment, opting instead to allow those obligations to be resolved through the bankruptcy process. Later, Pan Am offered HCS 50 cents on the dollar to satisfy its claim, but HCS did not accept this offer.

In September of 1993, HCS filed its complaint, asserting an entitlement to relief under the theories of breach of contract, promissory estoppel, and negligence. The essence of HCS's complaint is that HCS failed to receive payment as a direct result NPA's improper rejection of the claims for reimbursement. NPA answers these allegations by stating that it was contractually bound to

transfer funds to HCS only after it received payment from Pan Am. Since both parties agree that Pan Am never paid NPA, NPA never became obligated to make payment to HCS and, as a result, it is entitled to an award of summary judgment. Further, NPA contends that by entering into direct negotiations with Pan Am, HCS essentially waived any claim it had against NPA. The Court holds that issues of fact exist as to whether NPA breached its contract with HCS by mishandling the claims and as to whether HCS was harmed as a result. As a result of this disposition, this Court further holds that NPA's motion for Rule 11 sanctions must be denied.

## II. DISCUSSION

### A. The Summary Judgment Standard

This Court is authorized to award summary judgment "if the pleadings, depositions, ... on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court's responsibility is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citing *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Boiled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512. With these principles in mind, the Court turns to HCS's complaint.

---

**1.** HCS contends that the amount of claims improperly rejected by NPA totals $621,486.61.

## B. *Breach of Contract*

Counts I and II of HCS's complaint allege that NPA is liable to HCS under a breach of contract theory. Count I asserts that HCS is entitled to relief as a third party beneficiary of the Pan Am/NPA agreement, while Count II alleges that NPA breached the HCS/NPA agreement.

### 1. *Third Party Beneficiary Theory*

■ HCS's complaint seeks relief under the theory that HCS is a third party beneficiary of the Pan Am/NPA agreement. NPA argues that HCS is merely an incidental beneficiary of the Pan Am/NPA contract, and as such, it has no standing to sue under that agreement. Under applicable law,[2] a third party beneficiary is one for whose benefit a contract is made, such that he may enforce it in the courts. *Werrmann v. Aratusa, Ltd.,* 266 N.J.Super. 471, 476, 630 A.2d 302, 305 (App.Div.1993). Thus, New Jersey courts have held that "[t]he essence of contract liability to a third party is that the contract be made for the benefit of said third party within the intent and contemplation of the contracting parties." *Gold Mills, Inc. v. Orbit Processing Corp.,* 121 N.J. Super 370, 373, 297 A.2d 203, 204 (Law Div.1972), *quoted in Air Master Sales Co. v. Northbridge Park Co-op., Inc.,* 748 F.Supp. 1110, 1117 (D.N.J. 1990). The key inquiry, therefore, is whether the parties intended, at the time of contracting, that some third party should acquire a right of performance. *Grant v. Coca–Cola Bottling Co.,* 780 F.Supp. 246, 249 (D.N.J.1991); *see Air Master Sales,* 748 F.Supp. at 1117 ("New Jersey courts have been hesitant to imply a third-party beneficiary obligation unless the parties explicitly indicate that (1) the claimant is an intended beneficiary of the proposed arrangement and (2) that the claimant will have a direct claim under the contract.").

By applying these rules, New Jersey courts have held that a restaurant patron was a third party beneficiary of an agreement between the restaurant owner and its insurance agent to procure coverage. *Werrmann,* 630 A.2d at 305. Although the plaintiff was not identified in the agreement, the court justified its conclusion by reasoning that an innocent third party expects that some source of compensation for injury will be available. *Id.* at 305–06. Further, in *Broadway Maintenance Corp. v. Rutgers, State Univ.,* 180 N.J.Super. 350, 434 A.2d 1125 (App.Div.1981), *aff'd,* 90 N.J. 253, 447 A.2d 906 (1982), a New Jersey appellate court held that each of six construction contractors were intended beneficiaries of the contracts between Rutgers and the other contractors. *Broadway,* 434 A.2d at 1129. In reaching its decision, the court looked to the language of the contracts, which provided that the contractors were to coordinate their efforts. The court therefore allowed the contractors to sue the one contractor who failed to perform, since each contractor benefitted from the performance of the others, and each "had a direct stake in the performance of all other contracts." *Id.*

On the other hand, a court applying New Jersey law concluded that a glass manufacturer was merely an incidental beneficiary of a contract between a window installer and an apartment complex owner, even though the contract specifically provided for the use of the glass manufacturer's product. *Air Master Sales,* 748 F.Supp. at 1117. In explaining its rationale, the court noted that the contract "does not indicate in any way that [plaintiff] was to be a beneficiary of the proposed arrangement nor does it state that [plaintiff] will have any claim under the contract." *Id.* In a similar decision, the United States Court of Appeals for the Third Circuit concluded that, under New Jersey law, a ventilation system manufacturer was not an intended beneficiary of a contract between a general contractor and a subcontractor that called for the installation of the plaintiff's equipment. *Dravo Corp. v. Robert B. Kerris, Inc.,* 655 F.2d 503, 510 (3d Cir.1981). The *Dravo* court noted that the plaintiff's interests were sufficiently protected by its agreement with the subcontractor, and that the intention of the parties was most probably for the plaintiff to collect under this agreement. *Id.*

■ Upon review of the foregoing, this Court concludes that Pan Am and NPA did

---

**2.** For purposes of this motion, the parties agree that New Jersey law applies.

not enter into their agreement for the benefit of HCS. As a result, HCS cannot sue NPA as a third party beneficiary of that agreement. While the contract provides that NPA is to reimburse providers, such as HCS, for all valid prescriptions, there is no indication that the parties entered into the contract with the purpose of benefiting prescription providers. Moreover, there is no evidence to suggest that NPA and Pan Am intended to allow HCS or any other provider to enforce the agreement. Indeed, the fact that HCS had negotiated a contractual arrangement directly with NPA suggests that HCS and NPA intended that the NPA/HCS agreement would govern disputes between those parties. *Dravo*, 655 F.2d at 510; *see Air Master Sales*, 748 F.Supp. at 1118 (evidence that glass manufacturer sought to establish contractual relationship with homebuilder suggests that glass manufacturer is not intended beneficiary of contract between homebuilder and glass installer). Accordingly, NPA's summary judgment motion with respect to the third party beneficiary claim will be granted.

### 2. *Breach of the HCS/NPA Agreement*

HCS also argues that it has presented a proper claim against NPA for its alleged breach of the HCS/NPA agreement. To support this assertion, HCS contends that NPA was under a contractual duty to process valid claims and submit them to Pan Am for payment. HCS argues that NPA improperly rejected a large number of valid claims, and that by the time NPA corrected its mistakes, Pan Am had ceased to honor any debts. But for NPA's improper rejection of the claims, HCS's argument concludes, HCS would have been reimbursed before Pan Am filed for bankruptcy protection.

██ Upon review of the evidence presented, this Court finds that, pursuant to Article II of the HCS/NPA agreement, NPA was required not only to "[r]eceive and process invoices presented by [HCS] on Claim Forms," but also to "[r]eimburse [HCS] . . . within thirty (30) days of receipt." This language imbues NPA with a contractual duty to process valid claims submitted by HCS and forward them to Pan Am, thereby allowing HCS to be compensated for its services. This Court further concludes that an issue of fact has been raised as to whether NPA rejected a number of claims that should have been approved, in violation of the HCS/NPA contract. The fact that the great majority of the rejected claims were approved after they were resubmitted is evidence that the claims were valid all along.[3] Accordingly, NPA will prevail at the summary judgment stage only if it can show that its alleged breach is unrelated to HCS's loss.

In an effort to make this showing, NPA offers two arguments. First, NPA cites *American Handkerchief Corp. v. Frannat Realty Co.*, 17 N.J. 12, 20, 109 A.2d 793, 797 (1954), and contends that its performance was excused because a condition precedent to its performance had not been satisfied. NPA correctly notes that it was under no obligation to reimburse HCS until it had received funds from Pan Am; and since it had not received those funds, its failure to make payment to HCS was excused. NPA's argument misses the point, however, since HCS alleges a breach based upon NPA's alleged mishandling of the claims, and not upon an allegation that NPA is wrongfully withholding funds for reimbursement received from Pan Am.

██ Second, NPA invokes the doctrine of election of remedies and contends that even if NPA did breach the HCS/NPA agreement, HCS waived any action that it might have had when it elected to negotiate with Pan Am directly in order to secure payment. A New Jersey court has described the election of remedies doctrine as follows:

"where a party injured by a breach definitely manifests a choice of a remedy that is actually available to him, in the place of some other alternative remedy, such a

---

**3.** It does little good for NPA to argue, as it does, that it must prevail on this issue because the vast majority of disputed claims were eventually approved. Since a great number of the claims were approved after December 4, there remains a question as to whether the delay in approval caused HCS's loss. Accordingly, NPA's motion for summary judgment cannot be granted on this ground.

manifestation will bar an action for the latter remedy, provided that the party against whom the remedy is asked makes a substantial change of position in reliance on the manifestation of intention before notice of its retraction. This makes the conclusiveness of an 'election' depend upon the existence of facts sufficient to create an 'estoppel.' ... The mere bringing of a suit asking one remedy rather than another practically never affords ground for an estoppel and is not sufficient reason to deny an application for an alternative remedy."

*Newark Paraffine Paper Co. v. Dugan,* 162 N.J. Super 575, 577–78, 394 A.2d 114, 115 (App.Div.1978) (quoting 5A Corbin, *Contracts,* § 1220 at 461–65 (1964)). Thus, a litigant may not invoke a remedy inconsistent with an alternative remedy previously invoked. *See Evcco Leasing Corp. v. Ace Trucking Co.,* 828 F.2d 188, 195 (3d Cir.1987) (noting that election of remedies refers to a choice made "between two alternative and inconsistent rights").

■■■ NPA's argument with respect to election of remedies must be rejected, at the outset, because there is nothing legally inconsistent between the two paths HCS could have taken to achieve satisfaction of its claims. In short, there is no precedent to support the notion that HCS foreclosed any contractual action it had against NPA merely by entering into direct negotiations with Pan Am. Further, even if HCS's options could be construed as inconsistent remedies, there is no evidence to suggest that it "elected" one of them for purposes of the doctrine. Election generally requires much more than merely pursuing, through negotiation, satisfaction of a debt. *See Newark Paraffine,* 394 A.2d at 115 ("bringing of a suit asking one remedy rather than another practically never affords ground ... to deny an application for an alternative remedy" (citation omitted)).

This Court finds that disputed issues of fact exist as to whether NPA mishandled the claims in breach of the HCS/NPA agreement and whether HCS was harmed as a result. Moreover, NPA has failed to demonstrate that it is entitled to judgment as a matter of law. Accordingly, its summary judgment motion with respect to Count II of HCS's complaint will be denied.

### C. *Alternative Claims*

HCS also raises, as alternative claims, causes of action based upon promissory estoppel and negligence. Because the facts on the record do not support either theory, NPA's motion for summary judgment as to Counts III and IV will be granted.

#### 1. *Promissory Estoppel*

■■■ HCS asserts that it is entitled to recovery under a promissory estoppel theory. The promissory estoppel doctrine allows a court to enforce a party's promise in order to prevent unfairness in situations where there is an absence of consideration. *International Minerals & Mining Corp. v. Citicorp N. Am.,* 736 F.Supp. 587, 600 (D.N.J.1990). Thus, promissory estoppel is usually applicable only when there is no enforceable contract. *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir.1990). In order to make out a prima facie case under this theory, therefore, a party must demonstrate the existence of (1) a definite promise by the promisor, (2) made with the expectation that the promisee will rely on the promise, (3) actual reliance by the promisee, and (4) some detriment incurred as a result of reliance. *Ballard v. Schoenberg,* 224 N.J.Super. 661, 541 A.2d 258, 260–61 (App.Div.), *certification denied,* 113 N.J. 367, 550 A.2d 473 (1988).

■■■ HCS argues that its promissory estoppel theory is supported by NPA's "promise" to HCS that it would receive payment if it allowed its claims to be processed through NPA; and that by submitting its claims through NPA, HCS relied on NPA's promise, to its detriment. This Court concludes, however, that HCS's argument lacks merit. In the first instance, the two agreements that govern the relationship between Pan Am, NPA, and HCS are enforceable agreements supported by consideration. Pan Am receives pharmaceutical products in exchange for cash payments. NPA receives cash in exchange for its administrative services. And HCS receives cash in exchange for its products. Further, the "promise" that, according to HCS, triggers the application of

the doctrine is not some unbargained-for overture upon which HCS detrimentally relied, but is instead the manner of performance called for in the agreements. Accordingly, the facts alleged by HCS do not support the application of the promissory estoppel doctrine, and as a result, NPA's motion for summary judgment on this count will be granted.

## 2. *Negligence Theory*

The final theory of liability asserted by HCS is that NPA processed the claims in a negligent manner, and is liable to HCS as a result. HCS's argument reflects an attempt to recast this contract action as a tort case. New Jersey courts have commented on the often indistinct line between duties arising in tort and contract. *Spring Motors Distribs. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660, 672 (1985); *New Mea Constr. Corp. v. Harper*, 203 N.J.Super. 486, 497 A.2d 534, 538 (App.Div.1985). One line of distinction, however, appears in the interests protected by each area of the law. The Supreme Court of New Jersey has explained this distinction as follows: "The purpose of a tort duty of care is to protect society's interest in freedom from harm, *i.e.*, the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises." *Spring Motors*, 489 A.2d at 672. Accordingly, the majority of courts have denied relief under a negligence theory to plaintiffs whose economic expectations have been frustrated. *Id.* at 673; *See People Express Airlines v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107, 109 (1985) (negligence actions seeking recovery solely for economic losses will not lie).

While HCS concedes that negligence actions cannot normally be maintained to recover economic losses, it argues that a plaintiff can properly proceed under a negligence theory in situations where the law imposes a duty of care upon the defendant. To support this contention, HCS cites *Carter Lincoln–*

*Mercury v. EMAR Group*, 135 N.J. 182, 638 A.2d 1288 (1994), wherein the court held that an insurance broker and agent owed a duty to an insured to procure insurance with a financially stable insurer. *Id.* 638 A.2d at 1298. The *Carter Lincoln–Mercury* court based its decision on the long-standing common law duty of care that an insurance agent owes to an insured. *Id.* at 1291 (citations omitted).[4] Further, the court recognized a duty of care because of the foreseeability that an insured would suffer harm as a result of an agent's failure to obtain insurance with a solvent carrier. *Id.* at 1296–97.

Relying on *Carter Lincoln–Mercury*, HCS argues that NPA owed a duty of care to HCS because it should have been foreseeable that HCS would suffer harm if NPA failed to process HCS's claims properly. This Court concludes, however, that this case is more appropriately suited to the application of contract principles than for resolution under a tort theory. First, in the instant case, there is no principal/agent relationship between HCS and NPA, as there was in *Carter Lincoln–Mercury*. *Id.* at 1291. Accordingly, there is no special relationship between NPA and HCS that justifies the imposition of a legal duty. Moreover, NPA's duty to process valid claims is not a duty imposed by law, but is instead imposed by agreement of the parties involved. As such, it is clearly a contractual duty, one that is subject to analysis by the application of contract principles. Finally, since it will always be "foreseeable" that harm will come to non-breaching party in the ordinary contractual setting, to impose a duty of care upon contracting parties as a general measure and allow non-breaching parties to recover in tort would be to transform every breach of contract action into a tort case. Such a result would consume much of contract law. Accordingly, NPA's summary judgment motion with respect to the negligence claim will be granted.

## III. *CONCLUSION*

Because HCS has presented this Court with disputed issues of fact concerning

4. The court noted, more generally, that it was "appropriate to impose a duty on tortfeasors who by virtue of their activities, training, or preparation for their work had particular knowledge or reason to know that others would be harmed by their negligent conduct." *Id.* at 1294 (citation omitted).

whether NPA breached its contract with HCS and whether HCS suffered a loss as a result, NPA's motion for summary judgment will be denied as to Count II of the complaint. In view of this conclusion, NPA's motion for Rule 11 sanctions is likewise denied.[5] In all other respects, NPA's motion for summary judgment will be granted. An appropriate order follows.

**Mike DEVICH, Jr. and Margaret Devich, his wife, Plaintiffs,**

v.

**COMMERCIAL UNION INSURANCE COMPANY, Defendant.**

Civ. A. No. 93–0963.

United States District Court, W.D. Pennsylvania.

Nov. 10, 1994.

---

5. NPA's motion for Rule 11 sanctions is grounded in its contention that the HCS's complaint lacks any factual basis. Because this Court concludes that there is a sufficient set of facts on the record to support HCS's breach of contract claim, NPA's Rule 11 motion must be denied.

James J. Ross, Ambridge, PA, for plaintiffs.

William R. Tighe, Pittsburgh, PA, for defendant.

## OPINION

ZIEGLER, Chief Judge.

Pending before the court are the cross-motions for summary judgment filed by plaintiffs, Mike and Margaret Devich, and defendant, Commercial Union Insurance Company ("Commercial Union"), in this civil action alleging breach of contract and bad faith. The central issue that we are called upon to resolve is whether, under Pennsylvania law, a negligence claim of "failure to warn" falls outside the coverage of the general liability insurance policy issued by Commercial Union to Maverick Mobile Equipment, Inc. ("Maverick") where the terms of the insurance policy include a "products-completed operations hazard" exclusion. For the reasons that follow, we hold that (1) the products-completed operations hazard exclusion did not exclude plaintiffs' negligence claims from coverage, and (2) defendant did not act in bad faith in investigating the claim and in refusing to defend Maverick. Summary judgment will be entered for plaintiffs in the amount of $500,000.00.

The undisputed material facts are as follows. Maverick Mobile Equipment, Inc., a Pennsylvania corporation, came into existence, with Robert Bajek as its president, in the summer of 1986. Maverick is the named insured in the insurance policy at issue and was the sole defendant in the underlying state court personal injury action (*Devich v. Maverick Mobile Equipment, Inc.*, C.A. No. 1808 of 1990 (C.P. Beaver County)). Maverick was formed primarily for the design, development and manufacture of aerial work platforms for sale to the U.S. Navy. Maverick's main office was located on Duss Avenue in Beaver County, Pennsylvania, and Maverick performed all work at that location.

In furtherance of its efforts to secure funding for the production of aerial platforms for the Navy, Maverick sought to engage the assistance of the Corporation for Owner/Operator Projects ("Coop"). Coop is an entity organized for the purpose of assisting businesses in start-up and expansion activities and is primarily engaged in helping to secure federal and state grants and loans. Plaintiff Mike Devich is and was the Executive Director of Coop. Coop agreed to assist Maverick and was successful in obtaining funding. Under a financing arrangement agreed to by the parties, Coop retained a security interest in the aerial platforms, along with other corporate assets of Maverick.

Maverick produced the aerial platforms for the Navy and shipped them to Florida for the Navy's inspection in July, 1988. The platforms were rejected as defective and were returned to Maverick's offices in Beaver County, where Maverick unsuccessfully attempted to repair them in anticipation of a second inspection in September, 1988. After the platforms were rejected a second time, the Navy cancelled the contract with Maverick. Maverick was thereafter unable to secure a buyer for the platforms.

As a result of its inability to sell the platforms, Maverick defaulted on its financial obligations to Coop. In November 1988, Coop seized the platforms from Maverick's headquarters in the hopes that it would be able to find a buyer for the product. On December 28, 1988, Mike Devich was injured while operating one of the platforms for the benefit of a potential buyer. The platform malfunctioned and threw Devich from the basket of the unit to the ground 10–15 feet below, causing severe personal injuries.

Pursuant to its agreement with the Navy, Maverick had been required to obtain general liability insurance. Commercial Union issued a policy to Maverick for the policy years August 1, 1987 through August 1, 1989, in the amount of $500,000.00 per occurrence. Affidavit of Norman B. Whitton, ¶ 3. The policy was terminated by Commercial Union on February 4, 1989 due to Maverick's failure to pay the insurance premiums. *Id.* at ¶ 4. It is undisputed that the Commercial Union policy was in effect at the time that Mike Devich was injured.

In February of 1989, plaintiffs initiated an action against Maverick and its president, Robert Bajek, in the Court of Common Pleas of Beaver County, Pennsylvania, by filing a praecipe for summons. By letter dated August 28, 1989, counsel for Maverick notified Commercial Union's local agent of the summons, and forwarded a copy to defendant. Commercial Union opened a file on the claim on September 1, 1989. On September 14, 1989, defendant took a statement from Bajek with respect to the Devich lawsuit. Apparently in complete reliance on the facts as provided by Bajek, Commercial Union, by letter dated October 3, 1989, notified Maverick's counsel of its determination that no coverage existed because the claim was excluded from coverage pursuant to the products-completed operations hazard exclusion. Maverick sought reconsideration of the determination, without avail. Commercial Union did state, however, that it would reevaluate the claim in the event that a complaint was filed.

In January of 1991, plaintiffs filed their complaint against Maverick, asserting claims under the theories of strict liability (section 402A of the Restatement of Torts, Second), and negligence. By agreement of the parties, Bajek was dropped from the lawsuit and was not a named defendant in the complaint. Bajek, with full power of attorney granted to him by Maverick's Board of Directors in 1987, also agreed to assign all of Maverick's rights under the Commercial Union policy to plaintiffs.

By letter of January 31, 1991, Maverick's counsel sent a copy of the complaint to Commercial Union and advised the carrier that Maverick would offer no defense to the claim. After reviewing the complaint, Commercial Union again denied coverage. Defendant's only stated reason for the denial was that the claim was excluded by the products-completed operations hazard exclusion. Commercial Union acknowledged the existence of "averments of negligence" in the complaint but found them inconsequential because they did not "address anything other than the insured's product." Defendant also stated that

it had no obligation to defend Maverick against the Devich's claims and instructed Maverick to retain its own attorney.

By letter of March 5, 1991, Maverick's counsel informed Commercial Union that plaintiffs intended to take a default judgment against Maverick. Again, the carrier stated that it would take no action because there was no coverage. On April 4, 1991, plaintiffs took default judgment against Maverick. Thereafter, plaintiffs' counsel continued to keep Commercial Union on notice of the status of the lawsuit. On December 4, 1992, a non-jury trial was held to liquidate damages. Defendant was informed of the date of the trial, but declined to participate on behalf of Maverick. At the trial, plaintiffs expressly withdrew all of their claims premised on strict liability and proceeded only on the negligence claims. The state court awarded plaintiffs $800,000.00 in damages and $59,078.30 in delay damages, for a total judgment of $859,078.30. By special interrogatories, the court ruled that plaintiffs' injuries were proximately caused by Maverick's "negligent failure to warn [Mike Devich] of known defects."

After the judgment was entered against Maverick, plaintiffs, as assignees of Maverick's rights under the Commercial Union policy, filed the instant civil action claiming that defendant is liable for payment of the entire amount of the judgment. Plaintiffs contend that the negligence claim upon which judgment was rendered was covered by the Commercial Union policy and that defendant acted in bad faith in failing to defend Maverick in the state court proceeding and in refusing to provide coverage. Commercial Union denies coverage and a duty to defend. Because we find no genuine issues as to any material fact, we agree with the parties that this case is ripe for resolution on summary judgment.

Essentially two issues are raised by the motions; first, whether the negligence claim of failure to warn, upon which judgment was rendered in the state court litigation, was excluded from coverage under the policy pursuant to the products-completed operations hazard exclusion; and second, whether Commercial Union had an obligation to defend Maverick in the underlying litigation and, if

so, whether the carrier's refusal to do so was an act of bad faith.

## I. POLICY COVERAGE

■ In determining whether the failure to warn claim was covered by the Commercial Union policy, we must first examine the terms of the policy under the general rules of policy construction. It is the duty of the court to interpret the intent of the parties to an insurance contract. *DiFabio v. Centaur Ins. Co.*, 366 Pa.Super. 590, 531 A.2d 1141, 1142 (1987). In doing so, we must give the terms that are unambiguous and which clearly reflect the intent of the parties their plain and ordinary meaning. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986). However, "overly-subtle or technical interpretations may not be used to defeat reasonable expectations of insureds", *Harford Mut. Ins. Co. v. Moorhead*, 396 Pa.Super. 234, 578 A.2d 492, 495 (1990), and any ambiguous terms must be resolved against the insurer or drafter of the policy. *DiFabio* 531 A.2d at 1142.

■ The commercial general liability policy purchased by Maverick provides that coverage shall extend to all of "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Commercial Union Policy, § I, ¶ 1(a). Under a general liability policy, this declaration of coverage must be read broadly to include all bodily injury or property damage that occurs during the policy period, except to the extent that such coverage is specifically limited by the express exclusions found elsewhere within the policy.

The exclusion upon which defendant principally relies is the products-completed operations hazard exclusion, which states that: "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products-completed operations hazard." The policy defines "products-completed operations hazard" as follows:

"Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from the premis-

**1234**

es you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned.

"Your product" and "Your work" are each defined to include:

warranties or representations made at any time with respect to the fitness, quality, durability or performance of ["Your product" or "Your work"].

Commercial Union contends that, pursuant to the this exclusion, plaintiffs' claims were excluded as a matter of law because (1) the platform was no longer in Maverick's physical possession; (2) Maverick had completed or abandoned work on the platform by the time that Mike Devich was injured; and (3) the injuries to Devich were caused by a defect in the platform.

In response, plaintiffs argue that pursuant to two recent decisions of the Pennsylvania Superior Court, the exclusion is inapplicable to plaintiffs' negligence claims.[1] In *Harford Mutual Ins. Co. v. Moorhead, supra,* the Superior Court addressed the identical issue. There, Harford brought a declaratory judgment action seeking a determination as to whether it was obligated to defend the insureds against a failure to warn claim. The court held that the carrier had a duty to defend and further that the products hazard exclusion, similar in its terms to the instant exclusion, did not exclude from coverage a negligent failure to warn claim. *Id.* 578 A.2d at 501–03.

In reaching its holding, the court noted that the Pennsylvania Supreme Court "perhaps more than any other state appellate court in the nation, has been emphatic in divorcing negligence concepts from product liability doctrine." *Id.* at 500 (citations omitted). Accordingly, the court held that where

a claim is brought under the auspices of a "negligent failure to warn," it is appropriate to view the complaint as one charging improper *conduct,* and not one of making a defective *product,* despite arguable similarities between such claims. The fact that the same facts could have given rise to a *product* related claim is irrelevant; nothing in our prior case law suggests that such claims must be asserted under strict liability theories rather than negligence theories. Indeed, there appears to be no restriction even requiring an election between theories; rather, both may be pursued in a single suit.

*Id.* at 501 (citations omitted; emphasis in the original).

Commercial Union argues that *Harford* should be distinguished because, unlike here, the product in that case (a sulphur strip used in the wine-making process for killing bacteria) was not defective, rather it was the failure to provide warnings or instructions with respect to the use of the product which caused the injuries. Because, in the instant action, the Devichs' claim is that Maverick failed to warn Mike Devich of a defect in the product itself, Commercial Union contends that the claim is more akin to a defective product claim than an improper conduct claim and, therefore, must be excluded from coverage. We disagree.

In *Harford,* the court recognized the overlap between a products liability claim and a claim of negligence:

The difficulty in determining the nature of the instant complaint lies in the fact that in the "failure to warn" context, the theories of strict liability (in proving the product defective) and negligence (in proving

1. Plaintiffs raise two additional arguments which are without merit. First, plaintiffs argue that the products-completed operations hazard exclusion does not apply to the instant dispute because the exclusion applies only to businesses that perform work at premises other than their own. *Pacific Indemnity Co. v. Linn,* 766 F.2d 754 (3d Cir. 1985). While we agree that, pursuant to *Linn,* the "completed operations" section of the exclusion has no relevance to this action because Maverick performed all of its work at its Beaver County office, the rule does not extend to "products hazard" exclusions. *Id.* at 764–65.

Plaintiffs second argument is that, pursuant to the testimony of Bajek, Maverick's work on the platforms had not been completed. We reject this argument on the basis that, even if Maverick had intended to continue work on the project, it could no longer do so and, due to the seizure by Coop, any work which had not been completed was effectively abandoned.

the seller acted unreasonably) appear to overlap.

578 A.2d at 499. In the face of this overlap, the court, as rehearsed, held that a complaint which asserts a claim of failure to warn under a negligence theory must be viewed as "one charging improper conduct, and not one of making a defective product." This holding is consistent with the analogous rule of insurance law that "the underlying complaint fixes the parameters of an insurer's obligation to defend its insured." *Stidham v. Millvale Sportsmen's Club,* 421 Pa.Super. 548, 618 A.2d 945, 953 (1992). In our judgment, *Harford* stands for the proposition that an insurer must accept a claim as stated in the complaint and cannot justify its decision to deny coverage by attempting to recharacterize the claim to fit within the terms of the exclusion.

■ Commercial Union's attempt to distinguish *Harford* is also unpersuasive in light of the Superior Court's decision in *Pennsylvania National Mutual Cas. Ins. Co. v. Kaminski Lumber Co., Inc.,* 397 Pa.Super. 484, 580 A.2d 401 (1990), which was decided less than two months after *Harford.* In that case, the insurer brought a declaratory judgment action seeking a determination as to its policy coverage and duty to defend the insured against a negligent failure to warn claim in the face of the products-hazard exclusion in the insured's policy. In that case, in addition to claims that the seller of the product (an electric saw) failed to provide adequate warnings, instructions and advice as to the use of the product, it was also alleged that the product itself, specifically the anti-kickback safety device and certain controls on the saw, was defective. *Id.* 580 A.2d at 402. The court, relying on *Harford,* rejected the insurer's contention that the failure to warn claims were excluded from coverage because they were, "in essence", claims of product liability, and held that the plaintiff

had a duty to defend and to provide coverage on the negligence claims. *Id.* at 402, 404.[2]

Commercial Union's reliance on the opinion of the Court of Appeals in *Viger v. Commercial Ins. Co. of Newark, N.J.,* 707 F.2d 769 (3d Cir.1983), is also misplaced because the Court did not apply Pennsylvania law to that action, which arose from transactions that occurred in the Virgin Islands. Moreover, *Viger,* which was decided in 1983, was decided without the benefit of the *Harford* decision. Finally, we reject defendant's contention that the Pennsylvania Supreme Court implicitly overruled *Harford* in *J.H. France Refractories v. Allstate Ins. Co.,* 534 Pa. 29, 626 A.2d 502 (1993). Nowhere in the opinion does the court address the applicability of a products hazard exclusion in the context of a negligent failure to warn claim. Indeed, there is no indication that the plaintiffs in that case even alleged claims of negligence or that the Supreme Court considered the applicability of the exclusion with respect to negligence claims. Accordingly, we hold that the products-completed operations exclusion contained in the Commercial Union policy did not exclude coverage for plaintiffs' claim of negligent failure to warn.

Defendant relies on two additional terms of the policy in support of its motion. It contends that judgment is warranted because (1) coverage does not exist due to the absence of an "occurrence" which would trigger coverage, in light of Bajek's alleged intentional misrepresentations to Mike Devich regarding the safety of the lifts, and (2) that coverage does not exist due to the "expected or intended" exclusion in the policy and Maverick's knowledge of the dangerous nature of the lifts.[3]

■ Commercial Union asserts that, because Bajek allegedly made intentional misrepresentations to Devich regarding the safe-

---

**2.** Defendant argues that *Kaminski* was actually decided on other grounds. We disagree. Although the court concluded that coverage existed over the products liability claims on the basis that the term "product" in the policy was ambiguous, the court also determined that the failure to warn claims were not excluded by the products hazard exclusion because they alleged negligent conduct. *Id.* 580 A.2d at 403.

**3.** We note that, because defendant did not raise these defenses at the time that it denied coverage to Maverick, it is estopped from asserting them in defense of plaintiffs' bad faith failure to defend claim. However, defendant is not estopped from asserting these defenses in attempting to establish that there was no coverage.

ty of the aerial platforms, there was no " 'occurrence' in terms of an 'accident', *i.e.*, an unexpected and unintended act", and that coverage exists "only if [Devich's] injuries resulted from an accident." Defendant's Memorandum of Law in Support of Motion for Summary Judgment, p. 13. Defendant also asserts that the injuries to Devich were "expected or intended" by Maverick because Bajek knew of the defective condition of the platforms. The Commercial Union policy excludes coverage for bodily injury which is "expected or intended from the standpoint of the insured." Policy, § I, ¶ 2(a).

We reject both arguments because they rely on theories of intentional misconduct on the part of Maverick. Such reliance is misplaced because the state court has already concluded that the cause of Mike Devich's injuries "[w]as the *negligence* of [Maverick] ... in failing to warn [Coop or Mike Devich] of [the] defects [in the platform]." Special Interrogatory for the Court, No. 6 (emphasis added). As a result, we agree with plaintiffs that Commercial Union is estopped from asserting intent as a defense.

In sum, we hold that plaintiffs' claim of negligent failure to warn does not fit within any of the express exclusions and is therefore covered by the defendant's policy.

## II. BAD FAITH DUTY TO DEFEND

Our finding of coverage does not completely resolve the instant action because the policy limit ($500,000.00) is less than the judgment that the state court awarded to plaintiffs ($859,078.30). Plaintiffs assert that Commercial Union is liable for the entire judgment, regardless of the policy limits, because it acted in bad faith in refusing to defend Maverick in the personal injury action.

█ It is settled under Pennsylvania law and elsewhere that an insurer owes the insured a duty to act in good faith. *See, e.g., Cowden v. Aetna Casualty and Surety Co.,* 389 Pa. 459, 134 A.2d 223 (1957). Moreover, an insurer has a duty to defend its insured against any claims which could potentially fall within the coverage of the policy. *Gedeon v. State Farm Mutual Automobile Ins.*

*Co.,* 410 Pa. 55, 188 A.2d 320 (1963). Plaintiffs contend that Commercial Union, in bad faith, breached its obligation to defend Maverick.

█ Our finding of coverage mandates a holding that defendant also breached its duty to defend. As rehearsed, an insurer is obligated to defend against claims made against the insured if the claims are potentially within the coverage of the policy. Thus, if the complaint asserts a claim "which may fall within the coverage of the policy, the insurer is obligated to defend." *Stidham v. Millvale Sportsmen's Club,* 421 Pa.Super. 548, 618 A.2d 945, 953 (1992). Because we have concluded that the claim against Maverick for negligent failure to warn falls within the policy's coverage, we also hold that Commercial Union breached its duty to defend.

█ Our holding that Commercial Union breached its duty to defend is, within the context of this case, unimportant. Where an insurer is found to have breached its duty to defend, the insured may recover the costs of hiring substitute counsel and other costs of the defense. However, such a finding does not, without more, require the insurer to indemnify plaintiffs for the entire amount of the judgment. *Id.* Because Maverick did not defend against the personal injury claims and incurred no defense costs, plaintiffs cannot claim damages from a finding of breach.

█ Commercial Union may be required to indemnify beyond the limits of the policy only if its decision not to defend was made in bad faith. As stated, an insurer owes the duty to act in good faith in handling the claim of the insured and failure to do so may subject the insurer to liability for the entire amount of the judgment against the insured, regardless of the policy limitation. *Cowden,* 134 A.2d 223, 227. Bad faith must be proven by clear and convincing evidence. *Id.* at 229.

█ We hold that Commercial Union did not act in bad faith in denying a defense to Maverick. Although we find that defendant's conduct was impractical with respect to risk management, the facts establish that the carrier acted in good faith based upon a firm belief that the claims were not covered. Im-

mediately after receiving notice of the claim from Maverick, defendant undertook an investigation of the claim, which included interviewing Bajek, to determine the underlying facts relevant to the coverage issue. Once it determined that the injuries to Mike Devich were caused by defects in the aerial platform, defendant denied coverage on the basis that the claim fell within the products-completed operations hazard exclusion. Although we have determined that this was a faulty basis for coverage denial, it was not unreasonable for Commercial Union to rely on the exclusion in view of the status of the law in Pennsylvania with respect to the scope of the exclusion.

Prior to the decisions of the Superior Court in *Harford* and *Kaminski Lumber*, no Pennsylvania appellate court had directly addressed the question whether the products hazard exclusion applied to claims for negligent failure to warn. Moreover, the authorities in other jurisdictions favored exclusion of such claims where the injuries were caused by a defect in the product itself. *See Brewer v. Home Ins. Co.*, 147 Ariz. 427, 710 P.2d 1082 (1985) (citing cases). Although we have held that the Superior Court decisions establish that, under Pennsylvania law, the products hazard exclusion does not apply to negligent failure to warn claims, we recognize that those decisions contain language which could lead to another conclusion. For example, in *Harford*, the court quoted with approval the following passage from *Brewer*:

> The foregoing cases establish the following principles. Products Hazard coverage is intended to protect the manufacturer or seller of goods from claims for injury or damage arising out of the use of the insured's products. The risk which is being insured is that the product will not perform in the manner expected. If the product works as it is supposed to, but through other negligence the insured's product causes injury or damage, there is no coverage. *Thus, where Products Hazard coverage is excluded, the insurer is not responsible for the failure of the insured's products or goods to work as anticipated.*

*Harford*, 578 A.2d at 496 (quoting *Brewer* 710 P.2d at 1086) (emphasis in the original).

Under these circumstances, we hold that the refusal of Commercial Union to defend Maverick does not constitute bad faith.

We note that, although defendant did not act in bad faith, it refusal to defend was, in our judgment, imprudent. It is settled that an insurer that refuses to defend an insured does so at its peril. *Cadwallader v. New Amsterdam Casualty Co.*, 396 Pa. 582, 152 A.2d 484 (1959). In view of the clear allegations of negligence in the underlying complaint and the state of Pennsylvania law on the issue, defendant should have been aware that a court could conclude that the claim was covered. Under the circumstances, its failure to defend Maverick under a "reservation of rights" or seek a declaratory judgment for a determination as to coverage was a high-risk gamble taken in the face of a potentially large judgment. Moreover, by failing to choose either of these options, Commercial Union lost any chance to challenge the merits of plaintiffs' underlying claims.

## IV. CONCLUSION

We hold that plaintiffs are entitled to summary judgment against Commercial Union in the amount of $500,000.00. We further hold that defendant did not engage in bad faith in refusing to defend Maverick against the plaintiffs' claims and, therefore, the carrier is not obligated to indemnify plaintiffs for a sum that exceeds the policy limits.

### ORDER OF COURT

AND NOW, this 10th day of November, 1994,

IT IS ORDERED that the motion (document no. 33) of plaintiffs, Mike Devich, Jr. and Margaret Devich, for summary judgment be and hereby is granted in part and denied in part. The motion be and hereby is granted with respect to the claim of coverage and judgment be and hereby is entered in favor of plaintiffs in the amount of $500,-000.00.

IT IS FURTHER ORDERED that the motion be and hereby is denied with respect to the claim of bad faith and judgment be and hereby is entered in favor of defendant,

Commercial Union Insurance Company, on that claim.

IT IS FURTHER ORDERED that the motion of defendant (document no. 27) for summary judgment be and hereby is denied.

Kenneth JORDAN, et al., Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY, Defendant.

Civ. A. No. 1:91–3569–22.

United States District Court,
D. South Carolina,
Aiken Division.

Sept. 30, 1994.

## ORDER

CURRIE, District Judge.

### I. Procedural Background

Plaintiffs filed this action in state court on October 18, 1991. Plaintiffs sought recovery of severance benefits from Defendant E.I. du Pont de Nemours & Company ("du Pont") under various state and federal causes of action. Although the action is styled as a class action, the Complaint appears to name all individual members of the proposed class. On November 22, 1991, du Pont removed the action to this court based upon federal question jurisdiction.

After the close of discovery, du Pont filed a motion for summary judgment, arguing that Plaintiffs' claims were completely preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") and that, as a matter of law, Plaintiffs could not recover under ERISA. Plaintiffs filed a cross-motion for summary judgment, asserting that they were entitled to recover severance benefits under South Carolina common law governing implied, unilateral contracts. On April 20, 1994, the court held a hearing on the motions for summary judgment. At the conclusion of the hearing, the court denied Plaintiffs' cross-motion for summary judgment and partially granted du Pont's motion, finding that Plaintiffs' claims were completely preempted by ERISA.

The court identified the sole remaining issue to be determined at the summary judgment stage as follows:

> Whether du Pont's severance benefit plan was effectively amended on or before March 31, 1989, such that Plaintiffs were entitled to receive severance benefits under the severance benefit plan at the time of the termination of their employment with du Pont on March 31, 1989?

The court then ordered the parties to prepare a set of stipulated facts and briefs on the issue.

### II. Factual Background

The following factual background is based on the stipulated undisputed facts agreed to by the parties pursuant to the court's order.

Thomas D. Broadwater, Sr., Columbia, SC, for plaintiffs.

Gardner G. Courson, Allen W. Groves, Atlanta, GA, Richard J. Morgan, Columbia, SC, for defendant.

1. Du Pont constructed and operated the Savannah River Site for the United States Department of Energy ("DOE") from 1950 until March 31, 1989. The construction of the Site was the responsibility of the Construction Division of du Pont's Engineering Department, while the operation of the Site was the responsibility of du Pont's Petrochemicals Department. [Ex. 29; Ex. 38, p. 25.]

2. The Savannah River Construction Division of du Pont's Engineering Department was often referred to in Company documents and publications by the initials "SRC." [Ex. 14; Ex. 39, pp. 63, 89, 97–98.] The operations department of du Pont's Petrochemicals Department at the Site was often referred to in Company documents and publications by the Initials "SRP." [Ex. 22; Ex. 39, pp. 63, 66–67, 89, 96.] The laboratory department of du Pont's Petrochemicals Department at the Site was often referred to in Company documents and publications as "SRL." [Ex. 22; Ex. 39, pp. 39, 96–97.]

3. SRP/SRL and SRC had totally separate lines of supervision, through and including the vice presidential level at the Company's Wilmington, Delaware, corporate headquarters. [Ex. 29, pp. 62, 233–234; Ex. 8, pp. 29–34, 36–37; Ex. 39, pp. 24–26, 33, 35–37, 56, 61, 76, 89.] During the relevant period for purposes of this action, Charles Brown was vice president of du Pont's Engineering Department [Ex. 39, p. 90]; Bud Hartnett and, subsequently, Bob Wooten, reported to Mr. Brown in their capacity as manager of the Engineering Department's Savannah River Construction Division, and were the division's senior manager during respective tenures at the Site. [Ex. 8, pp. 12, 19; Ex. 21; Ex. 39, p. 89; Ex. 38, pp. 77–78.] E.F. Ruppe was vice president of du Pont's Petrochemicals Department during the relevant period [Ex. 17; Ex. 39, pp. 56–57]; J.T. Granaghan and, subsequently, J.T. Lowe, reported to Mr. Ruppe in their capacity as plant manager of the Petrochemicals Division's Savannah River Plant operations, and were that division's senior manager during their respective tenures at the Site. [Ex. 5; Ex. 8, pp. 36–37; Ex. 29, p. 254; Ex. 15; Ex.

17–18; Ex. 22; Ex. 38, pp. 76–78; Ex. 39, pp. 89, 96.]

4. Manual craft wage roll employees in du Pont Engineering's Savannah River Construction Division were those employees who performed craft work in one or more of the fourteen AFL/CIO building trades. These employees were paid on an hourly basis, and their compensation was set according to their respective union memoranda of understanding and site stabilization agreements with du Pont SRC. Plaintiffs were at all times relevant to this action employed as manual craft wage roll employees in the SRC Division of du Pont's Engineering Department, and were members of, and represented by, various building trades unions for purposes of collective bargaining with du Pont SRC. [Ex. 37, ¶ 6; Ex. 35–36, Admission # 6; Ex. 38, pp. 80–81.]

### ESTABLISHMENT AND TERMS OF DU PONT'S SEVERANCE PAY PLAN

5. On January 4, 1956, du Pont's Executive Committee established a severance pay policy for the Company. The severance policy as adopted gave each "employment point" express discretion to choose in what manner it would adopt and implement severance pay, and also what procedures would be developed for determining eligibility for receipt of severance pay. [Ex. 2.]

6. On February 1, 1956, and pursuant to the du Pont Executive Committee's aforementioned directive, the du Pont Engineering Department adopted a severance pay procedure for employees in its Construction Division. According to this modified severance procedure, all manual craft wage roll employees at Savannah River were excluded from receiving severance benefits. [Ex. 3; Ex. 39, p. 77.]

7. Application of this severance procedure to du Pont SRC manual craft wage roll employees was expressly reaffirmed by the Construction Division manager on February 25, 1972. [Ex. 4; Ex. 39, pp. 23–23, 87.]

8. Plaintiffs' named representative in this action was laid off for lack of work from manual craft wage roll positions with du Pont SRC on at least four separate occasions dur-

ing his employment, and did not receive severance pay on any of these occasions. [Ex. 38, pp. 23–27; Ex. 29, p. 85.] None of the identified Plaintiffs ever received severance pay as a result of any number of layoffs from du Pont SRC prior to March 1989. [Ex. 38, p. 53; Ex. 35–36, Admissions #1 & #2.]

## THE 1985 AMENDMENTS TO DU PONT'S SEVERANCE PAY PLAN

9. Effective October 1, 1985, du Pont's Executive Committee amended the definition of "lack of work" for purposes of the Company severance policy. Under the plan as amended, "lack of work" triggering severance pay no longer included those situations where du Pont was replaced by another contractor which hired former du Pont employees at no loss of pay, benefits or work. However, all Company service accrued prior to September 30, 1985, was "grandfathered" under the 1985 plan amendments, which meant that such service was credited towards computation of severance pay to be paid to all du Pont employees who were otherwise eligible for severance benefits as of the date of any termination of operations at Savannah River by du Pont. [Ex. 5–6; Ex. 9, "severance"; Ex. 39, pp. 16–28.] No subsequent changes to the severance plan were established by the Executive Committee between 1985 and 1989.

10. On December 18, 1984, all du Pont Petrochemicals SRP employees were notified of these amendments to du Pont's benefits plans in a memorandum for J.T. Granaghan, plant manager, address "SAVANNAH RIVER PLANT [—] TO ALL EMPLOYEES." [Ex. 5.] This memorandum discussed changes to du Pont's medical, group life and severance benefit plans, and was not distributed to any du Pont Engineering SRC Division employees.

11. On January 18, 1985, a memorandum was prepared and distributed by C.M. Sudler, du Pont Savannah River Construction employee relations specialist, addressed "TO ALL DU PONT CONSTRUCTION EMPLOYEES (NON–MANUALS)" concerning two benefit plan changes applicable to "lack of work" terminations occurring on or after July 1, 1984, as well as the aforementioned change in severance pay effective October 1, 1985. [Ex. 6.] This memorandum was not distributed to SRC manual craft employees.

12. A second memorandum, also dated January 28, 1985, from Mr. Sudler, was prepared and distributed to "ALL DU PONT CONSTRUCTION EMPLOYEES (MANUAL)" regarding "BENEFIT PLAN CHANGES—LACK OF WORK TERMINATIONS." [Ex. 7.] This memorandum was sent to the class of SRC employees at the Site which included Plaintiffs, and contained no reference to severance pay or the changes thereto effective October 1, 1985. Plaintiffs' named representative received a copy of this memorandum in January 1985. [Ex. 38, pp. 95–96.]

## DU PONT'S SUMMARY PLAN DESCRIPTION

13. On or about September 11, 1987, du Pont distributed binders entitled "Your Du Pont Benefits Resources" to Savannah River employees, which contained summary descriptions of the various employee benefits for which certain employees were eligible. [Ex. 9.] The benefits binders distributed to non-manual Engineering Department employees, as well as to those employed in positions in the Petrochemicals Department, contained a specific section providing a detailed summary of du Pont's "Severance Pay Policy," identified as "[t]he formal name of the plan." In this section, under the sub-heading "Future of the Plan," the summary plan description included the statement that "While du Pont intends to continue the benefits and policies described in this booklet, the Company reserves the right to change, modify or discontinue this policy at its discretion." [Ex. 9.]

14. Under the sub-heading "Who Is Eligible," the du Pont Severance Pay Policy summary plan description stated that "You're eligible for benefits under the Severance Pay Policy if you're a full service employee and you're terminated for lack of work after you've had at least one year of service with du Pont or one of its subsidiaries that has adopted this policy." [Ex. 9.]

15. On or about September 11, 1987, a second, modified set of benefits binders were

prepared and distributed to SRC manual craft employees, including Plaintiffs. [Ex. 10; Ex. 37, ¶ 9; Ex. 39, pp. 92–93.] These binders were specifically stamped "for Savannah River Construction Wage Roll Employees" on the cover and on each benefit divider (in black ink on green stock), and were distributed with a cover letter addressed to "All Du Pont E.D.—A.E.D. Manual Employees" from G.B. Ford, the equal employment and employee benefits officer for du Pont SRC. [Ex. 12; Ex. 38, pp. 87–88.] The abbreviation "E.D.—A.E.D." referred to du Pont's Engineering Department—Atomic Energy Division, which was formed when du Pont began work at the Savannah River Site. [Ex. 29, p. 233.] All du Pont SRC Division employees at the Site, including Plaintiffs, were part of the Engineering Department's Atomic Energy Division. [Ex. 38, pp. 87–88.]

16. Ms. Ford's memorandum, which was prepared for hourly manual craft employees including Plaintiffs, stated that the benefits binders were being distributed as a matter of information to employees, and that any questions employees might have regarding specific benefits should be handled through line supervision and du Pont SRC's Employee Benefits Department. [Ex. 12.] Plaintiffs' named representative in this action received the SRC manual crafts benefits binder and the memorandum from Ms. Ford in September 1987, and has testified that this benefits binder contained a description of the full range of benefits available to SRC manual craft employees as of the date of issue. [Ex. 38, pp. 87, 91, 106.]

17. The benefit binders distributed to SRC manual craft wage roll employees did not contain a section on severance pay, nor was severance pay mentioned anywhere in the summary plan descriptions provided in the binders. [Ex. 10; Ex. 37, ¶ 9; Ex. 38, p. 93; Ex. 39, pp. 92–93.]

## DU PONT'S COMMUNICATIONS WITH EMPLOYEES REGARDING THE COMPANY'S CESSATION OF OPERATIONS AT THE SAVANNAH RIVER SITE

18. Du Pont operated the Savannah River Site pursuant to a "pass through" contract with the United States Department of Energy, the most recent version of which covered the period 1984 to 1989. Under the terms of this contract, DOE agreed to reimburse du Pont for all operating expenses incurred by the Company in constructing, operating and maintaining the Site. The contract did not set the specific employee benefits reimbursable under its provisions, but rather limited reimbursable benefits under the contract to those paid out pursuant to "all welfare and employee relations plans and policies of the contractor, insofar as the same are applied to the work performed under this contract, or ... pursuant to agreements made as a result of collective bargaining with representatives of employees." Du Pont was only permitted to seek reimbursement of those employee benefits to which Savannah River employees were eligible under the terms of regular Company policies and procedures. [Ex. 1.]

19. In October 1987, du Pont advised the Department of Energy that the Company did not wish to operate Savannah River beyond the contract period, and would not seek renewal of its Site operating contract with DOE after the expiration of the last five year agreement signed in 1985. [Ex. 13.]

20. In anticipation of employee questions regarding the effects of du Pont's pending departure from the Savannah River Site, du Pont established a transition team to address employee questions. [Ex. 39, p. 80.] As part of this transition process, retired du Pont employees were set up in offices on Site to answer employee questions regarding benefits. [Ex. 39, p. 80.]

21. In addition, on or about November 1987, du Pont SRC Division's human resources department issued a document entitled "BENEFIT QUESTIONS RE: CONTRACT NON RENEWAL," which was addressed to "ALL SRC DUPONT ROLLS." [Ex. 14; Ex. 39, pp. 42–43, 50–54.] This document, provided to all SRC foremen for review with SRC employees, including those in manual crafts [Ex. 39, p. 52], contained a series of questions and answers regarding the effect on SRC employee benefits of du

Pont's planned 1989 termination of operations at the Site. Plaintiffs' named representative recalls seeing a copy of this document at the time it was distributed and "put out on [the] plant site." [Ex. 38, p. 85.] SRC manual craft supervisors were also instructed by the du Pont transition team to respond to all questions regarding severance pay by stating that SRC manual craft employees were not eligible for that benefit. [Ex. 39, p. 100.]

22. Several of the questions and answers included in this document concerned the issue of severance pay. Question I(1)(a) asked "Will 1– and 2–employees get severance pay?" the response to which was "Yes, if service and eligibility requirements are met." [Ex. 14.] The term "1–employees" referred to certain exempt supervisors and engineers employed by SRC; the term "2–employees" referred to non-exempt clerical and technical employees with SRC. [Ex. 39, pp. 101–102.] No Plaintiffs were employed in 1– or 2– classifications during the relevant period. [Ex. 38, p. 86.]

23. Question I(1)(b) contained in the November 1987 "Q & A" document asked "Will manual employees get severance pay?", the response to which was "No. Manual employees are not eligible." [Ex. 14.] Question I(7) asked "If offered a job with contractor of lower compensation or position will employee get severance pay?" the response to which was, in pertinent part, "Yes, if non-manual roll." [Ex. 14.]

24. Shortly after du Pont's announcement that it would leave the Site in 1989, several articles appeared in local newspapers regarding du Pont's decision. This local press coverage included one or more editorials in *The Augusta Chronicle*, in which the newspaper's editors criticized du Pont's intention to seek reimbursement from the Department of Energy of any severance payments to employees which the Company might make at the time cessation of its Savannah River operations in March 1989. [Referenced in Ex. 17–18.]

25. On April 28, 1988, J.T. Granaghan, du Pont Petrochemicals SRP manager, issued a memorandum addressed "TO SAVANNAH RIVER PLANT AND LABORATORY EMPLOYEES," in which Mr. Granaghan responded to published articles regarding du Pont's severance pay policy. [Ex. 15.]

26. On May 25, 2988, in response to continued editorial criticism of du Pont's intention to pay severance benefits according to established policy and to seek reimbursement of severance pay from DOE, E.F. Ruppe, du Pont Petrochemicals Department vice president, wrote to Philip Kent, editorial page editor of *The Augusta Chronicle*, indicating du Pont's disagreement with the newspaper's stated position regarding the reimbursement issue. [Ex. 16–17.]

27. On May 31, 1988, after *The Augusta Chronicle* printed an edited version of Mr. Ruppe's letter to the editor [Ex. 16], Mr. Granaghan, SRP manager, and J.T. Lowe, du Pont Petrochemicals SRL director, issued a memorandum addressed "TO SAVANNAH RIVER PLANT AND LABORATORY EMPLOYEES" [Ex. 17], attaching a full-text copy of Mr. Ruppe's May 25, 1988, letter to the editor. [Ex. 17.]

28. On August 24, 1988, and in direct response to a decision by the Secretary of Energy that the U.S. Government would not reimburse du Pont for severance payments to du Pont employees, Mr. Granaghan, SRP manager, released a memorandum addressed "SAVANNAH RIVER PLANT [—] TO ALL EMPLOYEES," in which Mr. Granaghan "reaffirm[ed]" du Pont's position regarding severance pay and the Company's intention to seek reimbursement of severance pay from DOE. [Ex. 18.]

29. As late as January 1, 1989, published newspaper reports in *The Augusta Chronicle* detailed the fact that severance pay was not among the benefits to which SRC manual craft employees were eligible under du Pont's benefit plans. [Ex. 20.] Another report published in the December 9, 1988, edition of *The Augusta Chronicle* specifically referred to the fact that du Pont provided benefits to SRC manual craft employees which were "different" from those provided to other du Pont employees at the Site. [Ex. 19.]

30. On March 27, 1989, Mr. Lowe, Mr. Granaghan's successor as du Pont Petrochemicals SRP manager, and D.L. McIntosh,

Mr. Lowe's successor as du Pont Petrochemicals SRL director, issued a memorandum addressed "ALL SRP AND SRL EMPLOYEES" and entitled "SEVERANCE PAY" [Ex. 22], to which they attached a letter dated March 22, 1989, from R.E. Heckert, du Pont chairman. [Ex. 22.] Dr. Heckert's letter, addressed "TO DUPONT EMPLOYEES," summarized du Pont's position regarding severance benefits and the Department of Energy's obligation to reimburse any such benefits paid by du Pont.

31. At no time did any manager in du Pont's Engineering Department, including the SRC Division, issue or publish any statement that SRC manual craft employees would receive, or be eligible for, severance benefits under the du Pont severance pay policy, or indicate that the severance pay policy had been amended to include SRC manual craft employees. [Ex. 39, pp. 90–91.]

32. On March 31, 1989, du Pont paid severance benefits, based on all accrued Company service prior to 1985, to those du Pont Savannah River employees whom the Company determined were eligible to receive severance pay under its interpretation of the du Pont severance pay policy, and the Construction Division's modified severance procedure. No severance benefits were paid to any employees in SRC manual craft wage roll positions as of March 31, 1989, which classification included Plaintiffs. [Ex. 37, ¶ 11; Ex. 35–36, Admission # 3; Ex. 39, pp. 86, 93–94.] However, severance benefits were paid to those employees who had accrued their full du Pont service credit in SRC manual craft positions on or prior to 1985, but who were not in SRC manual craft positions as of the date of du Pont's termination of operations at the Site. [See Affidavits of former du Pont employees, attached to Plaintiffs' Complaint.]

33. Du Pont subsequently claimed reimbursement of these severance benefits paid to SRP, SRL and eligible SRC employees, pursuant to its contract with the Department of Energy. Du Pont has never made any demand for funds from the Department of Energy relating to severance benefits for that class of manual-craft SRC employees which includes Plaintiffs. [Ex. 39, pp. 87, 94.]

### PLAINTIFFS' SUBSEQUENT EMPLOYMENT WITH BECHTEL SAVANNAH RIVER COMPANY, INC.

34. Sometime after du Pont's 1987 announcement that it would cease operations at the Savannah River Site in 1989, the Department of Energy announced that beginning on April 1, 1989, Westinghouse Savannah River Company, Inc. (hereinafter "WSRC") and Bechtel Savannah River, Inc. (hereinafter "Bechtel") would replace du Pont as operations and construction contractors, respectively, at the Site. [Ex. 19–21.]

35. At the time of the cessation of du Pont's operating presence at the Savannah River Site on March 31, 1989, Plaintiffs were offered manual craft wage roll positions with Bechtel. This offer included continuation of the exact same employee benefits as the Plaintiffs had enjoyed while employed by du Pont SRC (termed "Du Pont Amended Benefits"). [Ex. 21; Ex. 23; Ex. 38, pp. 100–102.] Du Pont's departure from the Site resulted in no loss of work, compensation, benefits or seniority rights for Plaintiffs. [Ex. 38, pp. 139–140.]

36. The Bechtel employee benefit handbook, which was provided to manual craft employees who opted to accept employment with Bechtel while continuing their du Pont benefits, contained no reference to severance pay as a benefit to which those employees were eligible, nor have any manual craft wage roll employees in fact received severance pay as a benefit with Bechtel. [Ex. 23; Ex. 38, pp. 102–103.] The benefit handbook provided to non-manual employees of Bechtel and WSRC contained an express reference to severance pay, which is a benefit non-manual employees are eligible to receive with Bechtel and Westinghouse. [Ex. 24.]

### PLAINTIFFS' POST–TERMINATION DEMANDS FOR SEVERANCE BENEFITS AND DU PONT'S RESPONSES

37. On March 30, 1989, Kenneth Jordan, Plaintiffs' named representative, wrote to Dr. Heckert, du Pont chairman, inquiring why Plaintiffs had not, and would not, receive severance pay from du Pont when the Com-

pany ceased operations at Savannah River on March 31, 1989. [Ex. 38, p. 49.]

38. On May 4, 1989 Lawton A. Burrows of du Pont's legal department replied to Mr. Jordan, stating that under du Pont's severance pay plan, "SRC crafts have never been eligible for severance pay." [Ex. 26.]

39. Sometime prior to April 26, 1989, Plaintiffs' counsel contacted Mr. Burrows by telephone to discuss the demand by certain SRC manual craft wage roll employees for severance pay. By letter dated April 16, 1989, Mr. Burrows detailed the reasons why these employees were not eligible to receive severance pay, attaching several documents which supported du Pont's position in this regard. [Ex. 25.]

40. On October 7, 1989, Plaintiffs' counsel again wrote to Dr. Heckert regarding Plaintiffs' demand for du Pont severance benefits. [Ex. 27.]

41. On October 20, 1989, Mr. Burrows responded, once again detailing the basis for du Pont's determination that Plaintiffs were not eligible to receive severance pay under the du Pont severance pay policy and procedures. [Ex. 28.]

42. On October 18, 1991, Plaintiffs filed the instant civil action, seeking an award of severance benefits under du Pont's severance benefit plan.

### III. Summary Judgment Standard

In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to the fact finder or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–53, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). If Defendant carries the burden of showing there is an absence of evidence to support a claim, then Plaintiffs must demonstrate by evidence of record that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106

S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for Plaintiffs. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of Plaintiffs' case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552. Moreover, production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511.

In other words, summary judgment should be granted in those cases in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees*, 955 F.2d 924, 928 (4th Cir.1992); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). With these standards in mind, the court now focuses its attention on whether summary judgment is appropriate for Plaintiffs' claim under ERISA.

### IV. Analysis

Plaintiffs essentially make five arguments in support of their claims for severance benefits from du Pont. First, Plaintiffs contend that a March 22, 1989, letter from du Pont Chairman R.E. Heckert constituted a "summary plan description" under ERISA which entitled Plaintiffs to severance benefits. Second, they claim that the March 22, 1989, letter constituted a unilateral contract which was enforceable against du Pont under South Carolina law governing implied, unilateral employment contracts. Third, Plaintiffs assert that they relied upon the March 22, 1989, letter to their detriment and that they are entitled to severance benefits under a federal common law theory of equitable estoppel. Fourth, Plaintiffs claim that the original 1950 Savannah River Site "interim" letter contract between du Pont and the United States Government created an obligation to pay severance benefits to all Savannah River Site employees and that no effort

was made to notify Plaintiffs in writing that du Pont's severance plan was amended to exclude them from eligibility. Finally, Plaintiffs rely upon various communications from du Pont Petrochemicals officials as the basis for their entitlement to severance benefits. For the reasons discussed below, the court finds these arguments to be without merit and grants summary judgment in favor of du Pont.

■ The present controversy centers around the du Pont severance benefit plan, identified in formal plan documents as the "du Pont Severance Pay Policy." [Stip. 13.] Plaintiffs concede in their brief they were aware that they were not eligible for severance benefits under the terms of the du Pont severance plan as late as March 22, 1989. [Plaintiffs' Brief, at 1.] This admission is consistent with the undisputed facts in this case which show that at the time the severance plan was originally adopted, du Pont Savannah River Construction ("SRC") manual craft employees were expressly identified in plan documents as ineligible for severance benefits. [Stips. 5–7, 12, 15–17, 21, 23.] Plaintiffs, however, contend that a March 22, 1989, letter from du Pont Chairman R.E. Heckert was an effective modification of the du Pont severance plan and made Plaintiffs eligible for receipt for severance pay after that date. The court finds this contention to be without merit.

The du Pont severance plan was originally adopted by formal action of the du Pont Executive Committee on January 4, 1956. [Stip. 5.] The du Pont Executive Committee modified the severance plan relating to the method for determining "lack of work" by formal action, as well. [Stip. 9.] No formal action, however, was taken by the Executive Committee in 1989 to modify the severance plan to alter Plaintiffs' status as severance-ineligible SRC manual craft employees. [Stip. 9.] Therefore, it is clear that no formal action was ever taken by the Executive Committee to amend the severance plan according to prior procedures and that no enforceable amendment to the plan occurred. *See Biggers v. Wittek Industries, Inc.*, 4 F.3d 291, 295 (4th Cir.1993) ("Informal written amendments are inadequate to alter the written terms of a plan").

In its original action establishing the du Pont severance plan, the Executive Committee provided that each "employment point" had express discretion to determine the manner in which it would implement the plan. [Stip. 5.]. In accordance with this provision, the Engineering Department adopted a severance pay procedure for its Construction Division. Under the express terms of this procedure, all manual craft employees were excluded from eligibility for severance benefits. [Stip. 6.] This provision was reaffirmed by the Construction Division manager on February 25, 1972. [Stip. 7.] The stipulated facts establish that no subsequent modifications were made to the severance pay procedure by the Construction Division. Plaintiffs have identified nothing to indicate that the Construction Division amended the severance pay procedure to change Plaintiffs' status so that they were eligible for severance pay.

Plaintiffs also contend that the March 22, 1989, letter "carried the equivalency of a Summary Plan Description (SPD)" entitling Plaintiffs to receive severance pay under the du Pont plan. [Plaintiffs' Brief, at 1–2.] This assertion is also without merit.

■ The letter could not amend the plan in the absence of a formal amendment of the plan according to the terms of the plan instrument. *See Biggers*, 4 F.3d at 295. The letter was not distributed to Plaintiffs. It was drafted in response to media reports critical of du Pont's intention to honor existing severance plan commitments to severance-eligible employees. It was distributed only to severance-eligible employees in du Pont's Petrochemical Division at the Savannah River site, which included Savannah River Plant ("SRP") and Savannah River Labs ("SRL") employees, and had a one-page cover memo indicating it was being sent "TO ALL SRP AND SRL EMPLOYEES," [Stip. 30.] The stipulated facts make clear that the Petrochemicals Department's SRP and SRL operations at the Site were separate from the Engineering Department's SRC operations, in which Plaintiffs were employed. [Stips. 1–4.] Plaintiffs admit in their brief that the letter was not actually distributed to them,

but that they discovered its contents because the letter "was left around for your Plaintiffs to review." [Plaintiffs' Brief, at 1.] Given the fact that a summary plan description ("SPD") already existed for the severance plan, [Stips. 13–17], it is obvious that a two-page letter could not be deemed to be a second "free-standing" SPD.

Furthermore, Plaintiffs assertion that the March 22, 1989, letter is a SPD is contrary to Fourth Circuit caselaw. In *Elmore v. Cone Mills Corp.,* 23 F.3d 855, 860–61 (4th Cir. 1994) (en banc), the court was faced with the issue whether a promise to provide benefits contained in a letter to salaried employees from a company's chief executive officer was sufficient to amend a written plan. In reversing the district court, the Fourth Circuit held that the letter was insufficient and noted that:

> Under ERISA, plan fiduciaries must provide benefits only "in accordance with the *documents* and *instruments* governing" the employee pension benefit plan. 29 U.S.C.A. § 1104(a)(1)(D) (emphasis added); *see also Dzinglski v. Weirton Steel Corp.,* 875 F.2d 1075, 1080 (4th Cir.) ("To adhere to the plan is not a breach of fiduciary duty."), *cert. denied,* 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). It is undisputed that the surplus representation was not incorporated into the written terms of the 1983 ESOP plan documents adopted by Defendants on April 2, 1984. Instead, the actual plan documents only mandated that Cone Mills provide benefits under the 10%/10%/1% formula.
>
> Nonetheless, the district court found that an employer representation not contained in the formal plan documents could become a part of the plan if the promise to provide benefits was contained in a written, formal, authorized, and ratified statement sent by the employer's CEO to all of the employer's salaried employees. In reaching its conclusion, the district court applied the inverse logic of our holding in *Pizlo v. Bethlehem Steel Corp.,* 884 F.2d 116 (4th Cir.1989). In *Pizlo,* we held that a plaintiff does not have a cause of action for benefits under ERISA when such benefits were promised in informal and unau-

thorized amendments to the benefit plan. *Id.* at 120. We did not state, however, that employees are entitled to recover benefits under *any* written statement made by a company official, even if authorized and ratified.

> On the contrary, only representations adopted in accordance with the amendment procedures outlined in the formal plan documents will suffice to incorporate the promised benefits into the plan. *Miller v. Coastal Corp.,* 978 F.2d 622, 624 (10th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993).

*Elmore,* 23 F.3d at 860–61 (footnote omitted).

There is no evidence to establish that any representations in the March 22, 1989, letter were adopted in accordance with formal amendment procedures. Plaintiffs have failed to point to any evidence that any amendment of the du Pont severance plan modifying Plaintiffs' status as severance-ineligible was adopted by the Executive Committee. Nor is there any evidence that the Construction Division made any modification of the severance pay procedure. Absent such evidence, Plaintiffs' contentions regarding the effects of the March 22, 1989, letter must fail as a matter of law. *Id.*

Plaintiffs also claim that the original SPD for the severance plan provided that "the Company reserves the right to change, modify or discontinue the plan at its discretion," and that this language provides that amendment of the plan could occur through Mr. Heckert's letter. [Plaintiffs' Brief, at 2.] In making this argument, Plaintiffs overlook the written plan instrument and prior du Pont practice, which make clear that plan amendments could occur only through Executive Committee action (as to plan structure) or Construction Division management (as to plan implementation).

■ Furthermore, even if Plaintiffs were correct that the SPD provided that the du Pont severance plan could be amended at any time, and that the plan itself did not contain a formal amendment procedure, their claims would still be without merit. In *Biggers,* the Fourth Circuit faced the issue whether, and under what conditions, an employee welfare benefit plan could be amended

when "although it may be terminated or amended, provides no mechanism or standard for doing so." *Biggers,* 4 F.3d at 295. The court held that "in the absence of provisions in a plan that provide procedures for amendment, a writing amends a plan only when accompanied by a clear manifestation of an intent to alter the policy or plan." *Id.* at 296.

■ The question presented in the present case, therefore, is whether the March 22, 1989, letter and the circumstances surrounding the distribution of the letter establish a clear manifestation of intent to amend the severance plan, making Plaintiffs eligible for severance pay. The stipulated facts make clear that there was no clear manifestation of intent to amend the severance plan. The Letter was not intended to be distributed to Plaintiffs and could not have been intended to amend Plaintiffs' status. The letter does not make any reference to amending the plan. Nor does it make any reference to Plaintiffs' class of employees. A clear manifestation of intent to amend a plan requires at the very least a reference to the amendment.

The letter clearly was not intended to amend the severance plan. The letter repeatedly refers to du Pont's intention to honor the terms of its existing severance plan, but makes no mention of amending the plan. Mr. Heckert makes reference to du Pont's severance policy as expressed over "many years," and to political pressure on du Pont to breach its obligation to make "severance payments in accordance with du Pont policy. [Ex. 22.] Later in the letter, Mr Heckert states du Pont's intention to meet its "clear" obligation to pay severance benefits according to "our employment policies and practices." [Ex. 22.] At the end of the letter, Mr. Heckert states that du Pont "will pay severance to Savannah River employees according to our policy." [Ex. 22.] The only reference to modification of the severance plan explains the 1985 severance plan amendments adopted by the Executive Committee and the decision not to apply the amendments retroactively. [Stip. 9; Ex. 22.] The letter's stated intent and numerous references to du Pont's obligations under and

intentions to comply with the existing severance plan demonstrate that the letter was not intended to amend the plan.

■ Plaintiffs also contend that the March 22, 1989, letter operates to create a "stand-alone" SPD. This contention is also without merit. In *Elmore,* the Fourth Circuit rejected a similar contention that a letter from a CEO could create an "informal" ERISA benefit plan. The court explained:

> An informal plan may exist independent of, and in addition to, a formal plan as long as the informal plan meets all of the elements outlined in *Donovan [v. Dillingham,* 688 F.2d 1367 (11th Cir.1982) (en banc)]. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees,* 974 F.2d 391, 400 (3d Cir.1992) (absence of integration clause in a formal plan and distribution of informal documents may lead the court to find that an informal plan existed in addition to the formal plan).
>
> Applying these criteria, the surplus claim clearly does not constitute an informal plan existing independent of the 1983 ESOP. Although the first three *Donovan* elements (the intended class of beneficiaries, the intended benefits, and the source of the funding) arguably may be ascertainable from the [CEO's] letters, these letters do not satisfy the fourth element (the procedure for receiving benefits). The only way an employee could ascertain the procedures for obtaining benefits would be to refer to the ... formal plan document....

*Elmore,* 23 F.3d at 861–62.

The Heckert letter makes numerous references to the existing severance plan. The letter does not contain any information regarding the method of calculating severance pay under the plan or determining severance eligibility. [Ex. 22.] Instead, that information could only be determined by referring to the text of the existing severance plan. [Exs. 2–4, 9.] Therefore, Plaintiffs cannot satisfy the *Donovan* test for establishing an "informal" severance plan. *See also Carver v. Westinghouse Hanford Co.,* 951 F.2d 1083 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992) (holding that informal plan under *Donovan* creat-

ed only if surrounding circumstances demonstrate creation of *de facto* pension plan).

Plaintiffs also allege "detrimental reliance" upon the March 22, 1989, letter which they assert supports their claim for benefits under an implied, unilateral contract theory arising under South Carolina law. [Plaintiffs' Brief, at 3–4 citing *Small v. Springs Industries, Inc.*, 292 S.C. 481, 357 S.E.2d 452 (1987).] The court has already ruled, at the hearing on April 20, 1994, that ERISA completely preempts any contractual claims asserted by Plaintiffs under South Carolina law including any theory outlined in *Small.* Therefore, Plaintiffs' reliance upon *Small* is misplaced.

■ Although state law contract causes of action are not applicable to an ERISA action, in limited circumstances, a showing of detrimental reliance may be relevant under a federal common law theory of equitable estoppel. In *Elmore*, the Fourth Circuit permitted claims for benefits arising out of two letters from the company's CEO to proceed under principles of equitable estoppel, subject to the plaintiffs showing detrimental reliance. *Elmore*, 23 F.3d at 863. In *Elmore*, however, the formal adoption of the benefit plan followed the CEO's letters. By contrast, in the present case, du Pont's severance plan was adopted and in force for thirty three years prior to Mr. Heckert's letter. This distinction is fatal to Plaintiffs' attempt to rely upon an equitable estoppel theory to modify the existing du Pont severance plan. *Elmore*, 23 F.3d at 868–69 (holding that estoppel principles cannot be used to effect a modification of an existing ERISA benefit plan).

■ Furthermore, even if Plaintiffs could bring their claims pursuant to a federal common law theory of equitable estoppel, they cannot make the necessary showing of detrimental reliance. Plaintiffs have the burden of showing by a preponderance of the evidence that they reasonably relied upon the alleged representations contained in the March 22, 1989, letter to their detriment.

*Elmore*, 23 F.3d at 863. The stipulated facts make clear that Plaintiffs cannot make the required showing. Plaintiffs contend that as a result of reading the letter, they "withheld their search" for other employment "in anticipation of being paid" severance benefits. [Plaintiffs' Brief, at 3.] Plaintiffs offer no supporting citation for this contention and there is no support in the stipulated record. Therefore, Plaintiffs have failed to meet their burden of producing evidence of detrimental reliance. *See Amwest Sur. Ins. Co. v. Republic Nat. Bank*, 977 F.2d 122, 124 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993) (To withstand summary judgment, non-moving party may not rest upon mere allegations or denials but must designate specific facts showing genuine issue for trial).

■ Plaintiffs focus on the original 1950 Savannah River Site "interim" letter contract between du Pont and the United States Government as further support of their claim.[1] Plaintiffs contend that language in this 1950 agreement created an obligation to pay severance benefits to all Savannah River Site employees and that no effort to notify Plaintiffs in writing of any subsequent amendment was ever made. This argument is also meritless. First, for many years, the 1950 interim agreement was classified and obviously was not "distributed" to du Pont employees as an announcement of a benefit plan. Second, the portion of the document cited by Plaintiffs merely references the Government's obligation to reimburse du Pont for all payments made according to the terms of du Pont's established benefit plans. It does not set forth any specifics regarding du Pont's benefit plans. Third, the du Pont severance plan was not even adopted until 1956. [Stips. 5–6.] Plaintiffs have failed to explain how the 1950 interim agreement can be relevant to the interpretation of provisions of a benefit plan which did not even exist at the time.

Finally, Plaintiffs reference various communications from du Pont Petrochemicals of-

---

**1.** This document was not included in the exhibits to the joint stipulated material facts submitted to the court. Relevant excerpts of the operating contract between du Pont and the Department of Energy were included in Exhibit 1 and refer-

enced in Stipulation 18. Exhibit 1 clearly indicates that the interim agreement was merged into and superseded by subsequent versions of the operating contract.

ficials. Like the March 22, 1989, letter, these communications were not directed, addressed, or distributed to Plaintiffs. Instead, each specifically referenced a department and division in which Plaintiffs were not employed. Moreover, they were distributed by managers to whom Plaintiffs did not report. Furthermore, none of these communications indicate an intention to amend the severance plan so that Plaintiffs would be eligible for severance benefits. For example, a May 25, 1989, letter to the editor of the *Augusta Chronicle* from E.F. Ruppe, vice president of du Pont Petrochemicals, specifically states its intention as being a defense of du Pont's plans to abide by the terms of the company's severance benefit policy in the face of media criticism. [Exhibit 16–17.] No mention is made of any new amendments to the severance plan. Similarly, the August 24, 1988, letter written by J.T. Granaghan, SRP manager, specifically states the company's intention to "reaffirm DuPont's position" regarding the integrity of the existing severance plan. [Ex. 15.]

The court received an untimely reply from Plaintiffs which was filed on September 27, 1994.[2] A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril. *Johnson v. Mammoth Recreation, Inc.*, 975 F.2d 604, 610 (9th Cir.1992); *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D.Me.1985). The court would be justified in refusing to consider Plaintiffs' reply. However, the arguments in Plaintiffs' reply are meritless.

### V. Conclusion

For the foregoing reasons, the court finds Plaintiffs' arguments to be without merit. Plaintiffs are not entitled to severance benefits. Accordingly, the court grants summary judgment in favor of du Pont.

IT IS SO ORDERED.

Charles McCoy SHEARIN, Plaintiff,

v.

CORRECTION OFFICER E.W. PENNINGTON, et al., Defendants.

Civ. A. No. 2:93cv568.

United States District Court, E.D. Virginia, Norfolk Division.

July 26, 1994.

---

2. The court's scheduling order filed on June 8, 1994 required Plaintiffs to file their reply on or before September 16, 1994. Plaintiffs also filed their initial brief a week late and filed a supplementary brief without leave of court.

Charles McCoy Shearin, pro se.

Susan C. Alexander, Asst. Atty. Gen. of Virginia, p.d., Richmond, VA, for defendants.

## FINAL ORDER

REBECCA BEACH SMITH, District Judge.

Plaintiff, a Virginia inmate, brought this *pro se* action, pursuant to 42 U.S.C. § 1983, to redress alleged violations of his constitutional rights. By Opinion and Order filed January 5, 1994, this matter was referred to a United States Magistrate Judge to conduct an evidentiary hearing and to submit findings of fact and recommendations for disposition of the case. Subsequent to the Opinion and Order, defendants filed dispositive motions and conducted some discovery. A hearing was conducted on May 18, 1994.

On June 23, 1994, the magistrate judge filed a Report and Recommendation recommending that plaintiff's motion for summary judgment be denied, and defendants' motion for summary judgment be granted.

By copy of the report and recommendation of the magistrate judge, the parties were advised of their right to file written objections thereto. The court has received no objections to the magistrate judge's report and recommendation, and the time for filing same has expired.

The court does hereby adopt and approve in full the findings and recommendations set forth in the Report and Recommendation of the United States Magistrate Judge filed June 23, 1994. Accordingly, it is ORDERED that plaintiff's motion for summary judgment be granted.

Plaintiff is advised that he may appeal *in forma pauperis* from this final order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, Granby Street, Norfolk, Virginia 23510, which said written notice must be received by the Clerk within thirty (30) days of the date of this Order and may be filed without the prepayment of costs or the giving of security therefor.

The Clerk shall forward a copy of this Final Order to plaintiff and to counsel for defendants.

It is so ORDERED.

Filed June 23, 1994.

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

BRADBERRY, United States Magistrate Judge.

Plaintiff, a Virginia inmate, has brought this *pro se* action pursuant to 42 U.S.C. § 1983 to address the alleged violation of constitutional rights accorded him under the Eighth Amendment of the United States Constitution. The complaint alleges that Corrections Officer E.W. Pennington committed an assault and battery against his person, and other corrections employees failed to protect him, thereby subjecting him to cruel and unusual punishment.

The matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 29 of the Rules of the United States District Court for the Eastern District of Virginia, to conduct an evidentiary hearing and submit findings of fact and recommendations for disposition of the case.

### I. STATEMENT OF THE CASE

#### A. Background

On June 2, 1993, the plaintiff conditionally filed a complaint under 42 U.S.C. § 1983 for violation of his civil rights. The complaint alleged that on April 27, 1993, while confined at Powhatan Correctional Facility Corrections Officer E.W. Pennington (1) committed an unlawful assault and battery upon plaintiff, and (2) immediately following the assault, Lt. Richard W. Rowlette placed the plaintiff on "strip cell status" for six days without according plaintiff due process and a disciplinary hearing.

Upon payment of a partial filing fee, the complaint was formally filed on August 17, 1993, and defendants were ordered to file responsive pleadings.

The answer was received on September 1, 1993.

On September 24, 1993, plaintiff filed a motion to amend the complaint by adding charges of misconduct by corrections officials on August 8, 1993, when, following an altercation with guards, plaintiff was placed on strip cell status for three days and thereafter sentenced to fifteen days in isolation.

On September 24, 1993, plaintiff filed a request for trial by jury.

On September 30, 1993, defendants, by counsel, filed a motion for summary judgment and accompanied the motion with the affidavits of defendants Pennington and Rowlette; Corrections Officer A.C. Smith; prison physician Muhammad Sarker; and prisoner hearing officer Janet Bain.

Plaintiff filed a response to the defendants' motion, together with his own motion for summary judgment, accompanied by affidavits of inmates Walter Jeffries, Freddie Ferrell, Anthony C. McGaha, Henry Gorum, Gerald F. McNabb, Lonnie Gholson, and Christopher E. Cockrell.

No response was ever filed to plaintiff's motion to amend.

On January 5, 1994, the District Court entered an order denying plaintiff's motion to amend or supplement his complaint; denying plaintiff's request for trial by jury, demand having been made in an untimely fashion; denying plaintiff's motion for summary judgment; and granting defendants' motion for summary judgment as to Count II of the complaint. Defendants' motion for summary judgment as to Count I of the complaint, alleging that corrections officials used excessive force against the plaintiff and committed an assault and battery upon his person, was denied, and the matter was referred to this Court for a hearing.

After addressing some minor scheduling problems, arising as a result of the unavailability of a witness who was outside of the continental United States for an extended period of time, the matter was set down for hearing on May 18, 1994.

On the appointed date, the matter came on for hearing.

## B. Facts

On April 27, 1993, plaintiff was an inmate in the Virginia Department of Corrections and assigned to Powhatan Correctional facility, where he was housed in the maximum security portion of the prison. (Tr. at 13, 24.) On that date, plaintiff was the sole inmate in a "strip cell" which consisted of a cell containing a single bunk. (Tr. at 24.) The evidence does not reflect whether plaintiff's cell contained a commode. However, the plaintiff had no containers, personal effects, or utensils in the cell. (Tr. at 24.)

On the same morning, defendant E.W. Pennington was working in M Building where plaintiff was housed. (Tr. at 24, 58, 73, 86.) The plaintiff states that Pennington came to the building twice in the morning for the purpose of harassing him. (Tr. at 24.) The plaintiff is white, and Pennington is African American. Plaintiff claims that the harassment consisted of threats and racial slurs directed at him as a white male. (Tr. at 24.) After leaving the second time for reasons unknown, Pennington returned a third time and began the process of opening ventilation windows near the top of a wall. (Tr. at 30, 59, 73.) On that morning, another inmate had become disruptive, hurling human waste and feces at corrections officers from his cell. His conduct had continued for some time, and much of the waste was on the floor and walls adjacent to his cell and created a stench throughout the cell block. (Tr. at 72.) In order to better ventilate the cell block, Pennington, using a long metal window rod, started to open the windows at the top of the wall. (Tr. at 59, 73.) The rod has been described by inmate Walter Jeffries as fifteen feet long, and by Pennington as a "long" rod. (Tr. at 20, 59.)

While he was so engaged, plaintiff threw liquid waste, consisting of feces which had been dissolved, on Pennington, covering him from his head to his knees. The people who saw him after the assault uniformly described him as covered with excrement. (Tr. at 15, 61, 86.) Plaintiff has admitted that he threw the waste material on the officer and said he did so because Pennington had harassed and threatened him as a result of an altercation on the prison recreation yard in-volving the plaintiff and Pennington the day before, April 26, 1993. (Tr. at 24, 25, 47.) The willful nature of the act is reflected in the fact that plaintiff had no containers in which such material could be held and used to hurl the material on Pennington. Instead, plaintiff obtained the material from a prisoner in an adjacent cell who was not in a "strip" status. (Tr. at 25.)

Following the attack, Pennington took the window rod and placed it through the bars of plaintiff's cell. Plaintiff says that Pennington came at him with the window rod charging towards the cell bars and pushing the rod violently into him, injuring him in his abdomen or chest. (Tr. at 25.) He said he crouched down behind the bed in an effort to hide from Pennington. (Tr. at 25.) The officer, on the other hand, said that while he did put the rod through the bars and under the bed, he did so to keep the plaintiff from acquiring more feces which he, Pennington, feared was to be thrown on him. (Tr. at 59, 74, 75, 88.)

The events are essentially corroborated, although not in every detail, by inmates Walter Jeffries, Anthony Charles McGaha, and Freddie Lewis Ferrell, and by Officer Smith who was on the cell block at the same time. (Tr. at 14–15, 19; 30–31, 34; 42; 86–88.)

Jeffries, who was a few cells away from the plaintiff and could not see the cell, described Pennington as having feces on his head, back, and other parts of his body and described him as "highly upset." (Tr. at 15.)

Inmate Anthony McGaha testified that during this time he talked to the plaintiff, using a mirror as a means of supplementing communications. (Tr. at 30–31.) He was the inmate who had requested that the windows be opened. McGaha said something was thrown on Pennington's face but conveniently claimed not to know who had thrown the material. (Tr. at 32.) He described Pennington as upset and stated that the officer jabbed the window rod into plaintiff's cell. He claimed to see the officer poking the rod in the vicinity of plaintiff's torso. (Tr. at 34.) He also claims to have heard the metal rod hitting the bed in plaintiff's cell.

Freddie Ferrell denied knowing where the feces had come from or who had thrown the feces on Pennington. He also saw the officer stick the rod in the cell and heard plaintiff yell for help. (Tr. at 42–43.)

A fourth inmate, Gerald McNabb, was called and testified that he had seen feces thrown on a number of occasions, but his testimony was not related to any specific events on April 27, 1993. However, when asked by plaintiff, McNabb indicated that in general he had no trouble or difficulties with Pennington. (Tr. at 44–45.)

Pennington was called as a witness for the plaintiff. When asked by the plaintiff why he did what he did, Pennington replied "I reacted," (Tr. at 60–61), further explaining that he was attempting to avoid being hit with additional feces which he thought the plaintiff was trying to retrieve from under the bed. (Tr. at 59.) Pennington was re-called to the witness stand by his own counsel and testified that on April 26, 1993, the day before, he had written up the plaintiff for two violations (refusing an order and indecent exposure) and that after receiving notice of the violations, plaintiff told Pennington that he would no longer be able to work in M Building. (Tr. at 71–72.)

Pennington further explained the problem with the first inmate who threw waste and the steps taken to deal with the problem. (Tr. at 72.) He said that he was opening the windows because of the stench; when he felt the material hit him, he turned around and saw the plaintiff under the bed. (Tr. at 59, 73–74.) After throwing the waste, Pennington said plaintiff threatened to kill him. (Tr. at 76.) Pennington said that Smith pulled him back from the cell and sent him off to clean himself up. (Tr. at 77.)

Officer Smith confirmed the testimony of Pennington. He described Pennington getting hit and said that Pennington was covered from head to toe with feces. After Pennington ran the window rod into the cell, Smith ran to Pennington, grabbed the rod, and pulled Pennington back. Pennington was visibly upset. When Smith arrived at the cell plaintiff was getting up. Smith said that Pennington never did get the window rod all the way into the cell. (Tr. at 86–89.)

Following the incident, which was reported to higher ranking corrections officials, plaintiff complained of pain in his abdomen and chest as a result of being struck with the window rod. (Tr. at 25.) Defendant Rowlette came to the plaintiff's cell, having been advised of the incident, and was told by the plaintiff that he was hurt and needed medical attention. (Tr. at 90.) Rowlette summoned two additional corrections officers who placed plaintiff in handcuffs (behind his back). (Tr. at 93.) There is a question about whether the plaintiff was also placed in leg irons. On a prior occasion, as part of an administrative hearing, Rowlette wrote a statement indicating that the plaintiff was placed in leg irons. His testimony, during the hearing, contradicted the previous written statement. When asked, by plaintiff, he replied that he did not have a recollection of having previously made that statement and that to the best of his recollection leg irons were not used. (Tr. at 115–16.)

Inmate McGaha told the plaintiff not to leave his cell. When asked why, he responded that he thought the guards were going to try to retaliate against plaintiff in some manner. (Tr. at 38.)

The plaintiff was taken from his cell to be medically examined. Inmate Jeffries said it appeared that the plaintiff was in pain. He observed the plaintiff who had to pass by his cell to go to the infirmary. (Tr. at 18–19.)

Rowlette, accompanied by Corrections Officers Brown and Palmer, moved the plaintiff out of his cell and took him to the infirmary. (Tr. at 64, 65.) Rowlette described plaintiff's appearance when he arrived at the cell. He had on no shirt and his stomach was perfectly white. His stomach, torso, and chest reflected no apparent evidence of impact with any kind of rod, blunt instrument, or pole. (Tr. at 90.)

With Rowlette leading and Palmer and Brown following, holding on to the plaintiff, the group moved out of the cell block and down a flight of stairs leading past the kitchen. About the time they got to the stairs, Pennington came out of the kitchen where he had been cleaning himself. Pennington saw the plaintiff and immediately bolted towards

the plaintiff, attempting to leap over Rowlette in order to get to the plaintiff. Rowlette testified that Pennington's arms were swinging and that he looked like a "duck trying to take off." (Tr. at 65.) Rowlette was able to block Pennington and was himself hit in the attempt. (Tr. at 66.) Rowlette, Pennington, and Corrections Officer Sergeant Nathaniel Laury, who was also assisting in the movement of the prisoner, all testified that Pennington never made contact with the plaintiff. (Tr. at 66, 83, 96.)

In addressing the second confrontation, Jeffries said he heard a commotion down the hall and heard the plaintiff say "keep him away from me" or "get him off of me." Jeffries, however, was unable to see what occurred and has no personal knowledge. (Tr. at 20.)

Plaintiff was taken directly to the infirmary where he was examined by Dr. Muhammad Sarker, the prison doctor. Upon arrival at the infirmary, plaintiff complained of neck and chest pains but did not complain that he had been hit in the abdomen or chest with a rod. Dr. Sarker testified, in response to direct questions by the Court, that plaintiff displayed no physical evidence whatsoever of bruising on his chest or abdomen that was consistent with plaintiff being hit with a rod, pole, or blunt ended metal object with any force. (Tr. at 101.) Dr. Sarker was aware of the fact that the plaintiff had been seen in the prison infirmary on the day before, April 26, 1993, (Tr. at 103, 104), following an altercation in which several corrections officers were needed to subdue the plaintiff and return him from the recreation yard to his cell. In the course of that altercation, plaintiff was sprayed with mace, (Tr. at 104), hit with a riot shield, placed forcibly on the ground on his face, handcuffed from behind, and manacled in leg restraints. (Tr. at 107.)

Corrections Officer David Lee Widener testified about the altercation which occurred in the recreation yard on April 26, 1993. The Court takes note of the fact that Widener is a physically big man and an imposing presence. He testified that he was one of the four officers who helped to subdue the plaintiff, and that he personally hit the plaintiff in the face and chest area with a heavy protective shield as a part of the direct effort to forcibly place the plaintiff on the ground and apply restraints to him.

Dr. Sarker found some tenderness in plaintiff's neck and upper chest but testified that the tenderness could have been present for several days. (Tr. at 101, 105). X-rays were ordered, but there is no evidence that the x-rays revealed injury of any type.

It is also appropriate to consider the unrebutted testimony of Rowlette regarding plaintiff's claim of injury:

I had him placed in a holding cell, and I informed the nurse what had happened, and the major what had happened, and had a nurse come back and told her specifically, "Check him because he claimed he had been assaulted." He also claimed when Pennington was charging towards him, he claimed that Officer Palmer pulled him. He was caught from behind. And he claimed Officer Palmer pulled him back and it snapped his neck back. And he said now his neck hurt.

He never at any time claimed Pennington had hit him. He claimed that his neck was injured by Palmer pulling him back. So he wanted to be seen for the window rod hitting him in the stomach, he claimed, and his neck was hurting because he said Palmer pulled him by the cuff and snapped his neck back.

(Tr. at 92.)

In an attempt at rebuttal, plaintiff called to the witness stand Erwin H. Beckoff, a psychologist at the Haynesville Correctional Center who had previously treated the plaintiff. Beckoff remembered the plaintiff from contacts he had had with plaintiff when plaintiff was in isolation at the Augusta Correctional Center. (Tr. at 113.) When asked by the plaintiff whether he recalled the plaintiff complaining of flash-backs and claims of emotional trauma as a result of the assault by Pennington, Beckoff responded that he had absolutely no recollection of any such conversations. (Tr. at 113.) In response to questions propounded by the Court, Beckoff indicated that the plaintiff had never contacted him prior to the hearing and he had no

idea of why he had been called as a witness. (Tr. at 113.)

### C. Issues

1. Was the plaintiff subjected to the use of excessive force by corrections officers at Powhatan Correctional facility?

2. As a result of the use of force by corrections officers at Powhatan Correctional facility, was plaintiff injured on April 27, 1993?

3. Were plaintiff's Eighth Amendment rights violated on April 27, 1993?

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Plaintiff was Not Subjected to the Use of Excessive Force.

■ The record reveals that on the day preceding the events of April 27, 1993, plaintiff and Pennington had been involved in an altercation in the recreation yard of Powhatan Correctional Center. The plaintiff declined to leave the yard and return to his cell and required the physical efforts of four corrections officers to subdue him and return him to the cell block. Plaintiff accused Pennington of striking him with a stick during that incident.

Accepting plaintiff's testimony at face value, though it was not corroborated by other witnesses, Pennington engaged in verbal harassment on two separate occasions during the early morning of April 27, 1993, prior to returning to open the ventilation windows in the cell block. What the defendant did not do was direct against the plaintiff any force. Plaintiff was not hit in the head with a baton or thrown forcibly to the floor, *Highsmith v. Pulley*, 1991 WL 110360, 1991 U.S.App. LEXIS 13108 (4th Cir.1991); nor was he struck with a kubotan [1], *Grimsley v. Luttrell*, 1993 WL 53150, 1993 U.S.App. LEXIS 4525 (4th Cir.1993); nor did a jailer swing a set of keys on a brass ring at his face, *Norman v. Taylor*, 9 F.3d 1078 (4th Cir.1993), *vacated* (1994); nor was he sprayed with high-pressure fire hoses, *Campbell v. Grammer*, 889

F.2d 797, 802 (8th Cir.1989); subjected to electric shock, *Jackson v. Bishop*, 404 F.2d 571, 574–75 (8th Cir.1968); or flogged. *Id.* At best, and if believed, Pennington verbally provoked the plaintiff.

The plaintiff, on the other hand, assaulted Pennington. His conduct was intentional, as evidenced by his requisition of liquid waste from a prisoner in an adjoining cell, and according to his own testimony was carefully calculated. The numbers of people privy to the events inside the cell block established that in his retaliatory efforts, plaintiff was highly successful: the defendant was covered with human waste from head to knee.

The response of the defendant was no more than might have reasonably been expected considering the personal degradation inherent in the assault.

Twenty years ago, Judge Friendly, speaking for the Second Circuit, noted:

> Although "the least touching of another in anger is a battery," it is not a violation of a constitutional right actionable under 42 U.S.C. § 1983.... Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) (citation omitted), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Judge Friendly has been favorably quoted in *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1090 (4th Cir.1990),

---

**1.** A kubotan is a miniature billy club with an attached ring designed to subdue inmates by inflicting pain.

*cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Thus the question becomes whether the force applied by Pennington was applied "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at ——, 112 S.Ct. at 999, 117 L.Ed.2d at 166.

Pennington acknowledged his anger following the assault and further acknowledged that he thrust the window rod through the bars of the cell in the direction that plaintiff was located. The defendant claims that he was attempting to prevent the plaintiff from acquiring additional material to throw upon him; plaintiff says that he was hiding under the bed in order to escape the efforts of Pennington to thrust the pole at him. In either event, Pennington had been assaulted, perceived the risk of an additional assault, and took prompt and immediate steps, including physical action, to prevent plaintiff from continuing his disruptive and assaultive behavior. In the context of Pennington's knowledge of the events of the day before, including the fact that four officers were required to subdue plaintiff, it would be difficult to describe his response as "excessive." (Tr. at 107–08.)

The testimony presented by the plaintiff, as well as that offered by the defendant, suggests that the incident was over very quickly, having been brought to a prompt conclusion by the intervention of Smith who pulled Pennington away and sent him out of the cell block.

The second part of the excessive force claim arises from the allegation of the plaintiff that Pennington attacked him while he was in a handcuffed and shackled status and being conveyed to the infirmary for an examination.

Rowlette testified that he received the blows which were intended for the plaintiff when he stepped between a charging Pennington and the plaintiff. Laury confirmed the testimony of Rowlette that Pennington never made contact with the plaintiff. Finally, Pennington, who was called by the plaintiff and testified in his own behalf, consistently, stated that he was angry and upset and went after the plaintiff but never reached him, his intended blows instead striking Rowlette.

None of the prison inmates saw the second incident and were dependent upon self-serving declarations of the plaintiff.

The Court finds from the evidence that following the intervention by Smith and the removal of the window rod from the cell, plaintiff was subjected to no further physical contact or restraint, save and except for procedures implemented to carry him to the infirmary for examination. The Court further finds that Pennington was prevented from making further contact with the plaintiff, though he was still upset and agitated.

The evidence fails to reflect "the unjustified striking, beating, or infliction of bodily harm upon a prisoner by the police or a correctional officer...." *Grimsley v. Luttrell,* 1993 WL 53150, at *2, 1993 U.S.App. LEXIS 4525, at *6 (4th Cir.1993) (quoting *King v. Blankenship,* 636 F.2d 70, 72 (4th Cir.1980)), nor can it be inferred that the force used by Pennington was not reasonably related to a nonpunitive objective. *Highsmith v. Pulley,* 1991 WL 110360, 1991 U.S.App. LEXIS 13108 (4th Cir.1991); *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990), *cert. denied,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991).

### B. There is no Evidence That the Plaintiff was Physically Harmed.

The testimony of the plaintiff established him as a man prepared to engage in violent and disruptive behavior, without regard to his own physical well-being.

Only a few moments after the events of April 27, 1993, Rowlette arrived at the plaintiff's cell. He inquired about what had occurred and was informed by the plaintiff that he had been injured by Pennington using the window pole. In response to plaintiff's complaint, Rowlette requisitioned additional correctional officers and promptly began moving plaintiff to the infirmary. The trip was interrupted for only the briefest interval by the presence of Pennington in the hallway outside the kitchen. Once Pennington was deflected, the plaintiff was taken directly to the

infirmary where he was promptly examined by a physician.

The medical doctor who examined plaintiff found no evidence of bruising or blunt trauma to his abdomen or chest, consistent with the use of a pole or metal object being driven against him with great force. Instead, Dr. Sarker merely found evidence of tenderness in the upper chest and responded to plaintiff's complaints of neck and back pain by giving plaintiff a mild pain reliever. According to Rowlette, plaintiff's chief complaint appeared to arise from efforts of the guards to keep him away from Pennington.

The medical records submitted in evidence as Exhibit 7 on behalf of the Commonwealth reveal that on April 26, 1993, the plaintiff was in the infirmary following his altercation with correctional officers in the recreation yard for treatment of his eyes which had been sprayed with mace. The record does not reveal whether he received any treatment or expressed any complaint about a back or neck being injured. However, on the following day, Dr. Sarker was unable to tell whether the complaints of the plaintiff, concerning his neck or his shoulder, were related to the events of April 27 or the day before.

■ In order to sustain an Eighth Amendment claim of cruel and unusual punishment, plaintiff must establish some evidence that he has been injured as a result of the conduct perpetrated by the prison official. As the Fourth Circuit stated in *Norman v. Taylor*,

> Although the Court stated that "contemporary standards of decency always are violated" when "prison officials sadistically and maliciously use force to cause harm"—*Hudson* does not hold that such a claim may be stated in the absence of *any* injury or one of *de minimis* proportions.

9 F.3d at 1082.[2]

The plaintiff has failed to sustain his burden of proving that he suffered a compensable injury as a result of the conduct of any defendant.

---

**2.** Although judgment was vacated, 1994 U.S.App. LEXIS 412 (1994), counsel for the defense correctly notes that both the panel majority and the

*C. Plaintiff Has Failed to State a Claim Cognizable Under the Eighth Amendment to the United States Constitution.*

An excellent summary of the law governing Eighth Amendment claims was set forth by the Fourth Circuit Court of Appeals in *Highsmith v. Pulley,* a 1991 unpublished decision:

> Inmates are protected from the use of excessive force against them by the cruel and unusual punishment clause of the eighth amendment. *Graham v. Connor,* 490 U.S. 386 [109 S.Ct. 1865, 104 L.Ed.2d 443] (1989). As noted by the Supreme Court, "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause...." *Whitley v. Albers,* 475 U.S. 312, 319 [106 S.Ct. 1078, 1084, 89 L.Ed.2d 251] (1986); see also *Miller v. Leathers,* 913 F.2d 1085 (4th Cir.1990) (*en banc*) (must show infliction of unnecessary and wanton pain and suffering), *cert. denied,* [498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100] 59 U.S.L.W. 3564 (U.S.1991). The question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320–21 [106 S.Ct. at 1085] (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 [94 S.Ct. 462, 38 L.Ed.2d 324] (1973)). Punitive intent may be inferred when the force used was not reasonably related to a legitimate non-punitive objective. *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990), *cert. denied,* [498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778] 59 U.S.L.W. 3482 (U.S.1991). The court should also consider such factors as the need for the application of force, the relationship between need and amount of force used, and extent of injury inflicted. *Miller,* 913 F.2d at 1087 (quoting *Whitley,* 475 U.S. at 321 [106 S.Ct. at 1085]); see also *Pressly v. Gregory,* 831 F.2d 514, 517 (4th Cir.1987); *King v. Blankenship,* 636 F.2d 70, 73 (4th Cir.1980).

dissent agreed that a *de minimis* injury standard still exists in light of the Supreme Court's opinion in *Hudson.*

1991 WL 110360, at *1, 1991 U.S.App. LEX-IS at 1–2.

*Highsmith* both preceded and anticipated the holding in *Hudson v. McMillian.* Of significance in both the *Highsmith* and the *Hudson* decisions is conduct on the part of prison officials which appears to be deliberate and committed with the intent to cause harm, and nothing more. There is no evidence to support such conduct in the case now before the Court.

Instead, the plaintiff, advancing the claim of excessive force, concedes that he assaulted a corrections officer by throwing human waste on him. As Pennington noted in his testimony, what made the event even more degrading was that plaintiff obtained the excrement of another prisoner to use against defendant.

Prisons are not always the most congenial of places. In *Miller v. Leathers,* 913 F.2d 1085 (4th Cir.1990), Judge Wilkinson wrote a powerful dissent in which he quoted Judge Friendly: "The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force." *Id.* at 1090. He went on to say that "While endurance of a certain amount of verbal jousting is part of the profile of professionalism of any prison guard, the people behind the uniforms are still human beings. Prisons, moreover, are combustible settings, and prison order rests upon a fragile equilibrium." *Id.*

■ Plaintiff was not subjected to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution because the conduct of Pennington did not constitute any part of the punishment imposed by the Virginia Department of Corrections; it involved a response by a corrections officer who had just been covered in filth as a result of an unwarranted assault by a prison inmate. Whether his use of the window rod through the bars of the cell was appropriate or not, Pennington left no doubt that he did not intend to tolerate another cup of waste thrown at him. The incident was brought to a prompt and professional conclusion by the intervention of a second correc-tions officer who convinced Pennington to leave the area and attend to himself. As the Supreme Court in *Hudson* stated:

> [T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.
>
> . . . .
>
> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order.... [W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

503 U.S. at ——, 112 S.Ct. at 998–99, 117 L.Ed.2d at 165–66 (citations omitted).

Plaintiff fails to satisfy both components: objectively, he suffered *no* harm; subjectively, the officer acted to defend himself and not with a "culpable state of mind."

Plaintiff is not entitled to judgment against Pennington.

### D. There is no evidence of use of excessive force, or the condoning thereof, by Lt. Rowlette.

■ The record is devoid of any facts, or evidence, which support an Eighth Amendment claim against Rowlette. To the contrary, the record establishes that Rowlette visited the plaintiff immediately after the incident of April 27, 1993; promptly presented plaintiff to a physician for treatment; protected plaintiff from further harm; and moved to discipline the offending corrections officer.

Rowlette is entitled to summary judgment.

### III. RECOMMENDATION

For all of the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment be DENIED, and the defendants' motion for summary judgment be GRANTED.

## IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 10 days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(e) of said rules.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir.1984), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

Newport News, Virginia

June 22, 1994.

**Kathleen L. KETZEL, Plaintiff,**

v.

**MISSISSIPPI RIVERBOAT AMUSEMENT, LTD., Defendant.**

**Civ. A. No. 1:93cv546GR.**

United States District Court, S.D. Mississippi, S.D.

Sept. 21, 1994.

David A. Hilleren, Hilleren, Bains & Le-Blanc, New Orleans, LA, Joseph A. LoCoco, D'Iberville, MS, for plaintiff.

Michael J. McElhaney, Jr., Colingo, Williams, Heidelberg, Steinberger & McElhaney, Pascagoula, MS, for defendant.

## MEMORANDUM OPINION

GEX, District Judge.

This cause comes before the Court on the parties' motions for summary judgment in connection with plaintiff Kathleen L. Ketzel's lawsuit against defendant Mississippi Riverboat Casino for injuries and damages under the Jones Act and general Maritime Law arising out of her employment as a cocktail waitress on the allegedly "unseaworthy" Biloxi Belle Casino. The outcome determinative question is whether Ketzel was a "seaman" at the time of her alleged injury, which necessarily requires an inquiry into whether the Biloxi Belle is a "vessel" for purposes of the Jones Act. After due consideration of the evidence of record, the briefs of counsel, the applicable law, and being otherwise fully advised in the premises, the Court finds as follows.

### Standard of Review

Summary judgment is designed "to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1; *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986) (citation and internal quotation omitted); *see Berry v. Armstrong Rubber Co.,* 780 F.Supp. 1097, 1099 (S.D.Miss.1991), *af-*

**1262**

firmed, 989 F.2d 822 (5th Cir.1993), cert. denied, — U.S. —, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994). A grant of summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party, "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### Statement of Facts

The facts of this case are not complicated. It is undisputed that Ketzel worked as a cocktail waitress on the defendant's Biloxi Belle casino at the time of her alleged injury. Ketzel alleges that she received a severe knee injury during the course of her employment when she tripped on a garbage can lid negligently left in her path by the defendant's employees. The defendant concedes that the alleged injury occurred during the course of Ketzel's employment, but disputes her status as a "seaman" or a "crew member," a prerequisite to invoking federal jurisdiction over her claims. As set forth below, the Court's inquiry into this issue requires a close consideration of the facts relevant to the determination whether the Biloxi Belle is a "vessel" under the Jones Act.

### Legal Analysis

The issue is one of first impression in this Court. As a threshold matter, to establish a claim under the Jones Act [1], Ketzel must be a "member of a crew" or a "seaman." Southwest Marine, Inc. v. Gizoni, 502 U.S. 81, 87, 112 S.Ct. 486, 491–92, 116 L.Ed.2d 405 (1991).[2] Indeed, "[t]he inquiry

into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it." McDermott International, Inc. v. Wilander, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). The determination of "seaman" status is a "mixed question of law and fact." Gizoni, 502 U.S. at, — – — 112 S.Ct. at 491–92; Wilander, 498 U.S. at 356. The inquiry in such cases is whether the established facts meet the statutory standard for invoking federal jurisdiction as determined by an undisputed rule of law. Wilander, 498 U.S. at 356, 111 S.Ct. at 818; see Pullman–Standard v. Swint, 456 U.S. 273, 290 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982) (defining a mixed question).

When the facts underlying seaman status are reasonably in dispute, the issue must be resolved by the trier of fact. See Wilander, 498 U.S. at 342–43, 355–56, 111 S.Ct. at 810–11, 817–18 (issue whether the nature of plaintiff's work in connection with vessel entitled him to seaman status). On the other hand, if "the facts and the law will reasonably support only one conclusion," summary judgment is mandated. Id. at 356, 111 S.Ct. at 818; Gremillion v. Gulf Coast Catering Co., 904 F.2d 290, 292 (5th Cir. 1990). Stated differently, summary judgment is proper in Jones Act cases "where the only rational inference to be drawn from the evidence is that the worker is not a seaman." Daniel v. Ergon, Inc., 892 F.2d 403, 407 (5th Cir.1990) (citation and internal quotation omitted).

"The key to seaman status is employment-related connection to a vessel in navigation." Gizoni, 502 U.S. at 88, 112 S.Ct. at 492

---

**1.** Congress enacted the Jones Act in 1915 (codified at 46 U.S.C. § 688 (1982)) "to fill the void in the general maritime law of negligence, and it became the sole basis upon which a seaman or his beneficiary may sue his employer for negligence." Beltia v. Sidney Torres Marine Transp., Inc., 701 F.2d 491, 493 (5th Cir.1983) (citation and internal quotation omitted).

**2.** Ketzel's complaint alleged, alternatively, that her claim states a cause of action under the Longshore Harbor Workers' Compensation Act (LHWCA). However, Ketzel's job as a cocktail waitress is not included among the occupations

intended by Congress to constitute "longshoremen." Id. at 492 (citations omitted). Moreover, the parties agree that Ketzel's job was substantially confined to the Biloxi Belle. Assuming arguendo that Biloxi Belle was a vessel, LHWCA benefits would not be available. Congress enacted the LHWCA in 1927, see 33 U.S.C. § 901, et seq., extending benefits to all maritime workers except masters or members of a crew of a vessel ("seaman"), the latter falling under the Jones Act. See Swanson v. Marra Bros. Inc., 328 U.S. 1, 4–6, 66 S.Ct. 869, 870–72, 90 L.Ed. 1045 (1946).

(citing *Wilander*, 498 U.S. at 355, 111 S.Ct. at 818). Although "vessel" is not defined in the Jones Act, see 46 U.S.C. § 688 (1982), "courts have naturally spoken of seamen in terms of ships, vessels, and voyages." *See Digiovanni v. Traylor Bros. Inc.*, 959 F.2d 1119, 1121 (1st Cir.) (en banc), *cert. denied*, ―― U.S. ――, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992). "The existence of a vessel is a fundamental prerequisite to Jones Act jurisdiction and is at the core of the test for seaman status." *Gremillion*, 904 F.2d at 292 (citations and internal quotations omitted).

> Unfortunately, the term "vessel" has escaped precise definition, which helps to explain why special-use structures such as submersible oil and gas drilling platforms may qualify at times as Jones Act vessels, despite traditional notions in maritime jurisprudence to the contrary. The arguable vagueness of the term "vessel" also has led to serious, though unsuccessful, attempts to secure vessel status for floating planes and helicopters. Not surprisingly, it has been suggested that "three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale."

*Id.* at 292–93 (citations omitted).

In *Gremillion*, the disputed issue was whether a "quarterboat barge" was a vessel under the Jones Act. *Id.* at 293–94. The court applied the following analysis:

> As a general principle, where the vessel status of an unconventional craft is unsettled, it is necessary to focus upon the *purpose for which the craft is constructed and the business in which it is engaged.* The caselaw is heavily skewed in favor of conferring such status upon craft whose primary mission is the transportation of cargo, equipment or passengers over navigable waters. The greater the structure's resemblance to conventional seafaring craft, the greater the odds of securing vessel status.
>
> In light of this bias favoring traditional craft, it is not surprising that we look to whether a given structure maintains or possesses (1) navigational aids, (2) lifeboats and other lifesaving equipment, (3) a raked bow, (4) bilge pumps, (5) crew quarters, and (6) registration with the Coast Guard as a vessel. In addition, the intention of the owner to move the structure on a regular basis, the ability of the submerged structure to be refloated, and the length of time that the structure has remained stationary are also relevant to the inquiry. *Structures need not lack all of the above-mentioned attributes to be deemed nonvessels.* The greater the degree of attenuation from the attributes of traditional vessels ... the less likely that Jones Act jurisdiction and seaman status will be secured by the claimant.
>
> Nevertheless, exotic craft may qualify as vessels, especially if frequently navigated, or if exposed to the perils associated with maritime service, or if injury occurs during ocean transport. In fact, we have stated that *a structure whose purpose or primary business is not navigation or commerce across navigable waters may nonetheless satisfy the Jones Act vessel requirement if, at the time of the worker's injury, the structure was actually engaged in navigation.*

*Id.* at 293 (citations and internal quotations omitted; emphasis added). The *Gremillion* court also identified three common attributes for "dry docks and floating work platforms" that are deemed "nonvessels" as a matter of law:

> (1) The structure is constructed primarily as a work platform;
>
> (2) the structure is moored or otherwise secured at the time of the accident; and
>
> (3) although the platform is capable of movement, and is *sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose.*

*Id.* at 293–94 (citations omitted; emphasis added).

The defendant submitted the affidavits of Jim Hasslocher, the owner and majority shareholder of the defendant corporation, and Steven Yates, who "participated in the design and supervised the construction of the

steel structure above the floating structure ('hull') of the Biloxi Belle." *See* Def's. Exhs. A & B. The affidavits indicate that the Biloxi Belle was originally constructed as a floating restaurant and was designed to conform to "the Southern Building Code for land-based restaurants." The structure was thus "designed and constructed without propulsion engines, rudders, and navigational equipment." The Biloxi Belle has never had a captain.

The affidavits further detail that the stern of the Biloxi Belle is "flat-bottomed, not raked." The Biloxi Belle was designed to resemble "an operational conventional ship" and was equipped with a decorative paddlewheel and a pilothouse. The paddlewheel rotates permanently above the water level and is powered by a small motor with water jets spraying outward from positions around the wheel to give the illusion of propulsion. The pilothouse contains only a light switch and a non-functional, antique steering wheel. The Biloxi Belle contains no lifeboats or lifesaving equipment, other than "decorative ring buoys" that "were not intended to serve any actual life-saving function." The Biloxi Belle has never had any running or anchor lights to assist in its navigation. Although the structure contains an emergency generator that was designed to provide electricity "to sustain 60% of the structure's operations as a restaurant," the Biloxi Belle "has always utilized shore-based power and utility sources."

The defendant also submits the affidavit of Neal Miller, Biloxi Belle's Vice-President, who indicates that, other than a plan to move the structure over to make way for another floating gambling structure, there are no intentions to move the Biloxi Belle from the location where it is presently moored. *See* Def's Exh. C. Miller testified on deposition that the bow of the Biloxi Belle is "raked so it can be towed easier." Pl.Exh. 22 at 35. Miller also testified that the Biloxi Belle was floating, but was moored by "dolphins" or pilings driven deep into the ground, against which the structure was secured by steel cables. *Id.* at 27, 35.

Ketzel contends that, *inter alia,* because the Biloxi Belle is registered with the Coast Guard, has "bilge pumps," "dining quarters," and an "employee break room," the result should be different. However, the factors set forth by *Gremillion* "are not to be applied mathematically but are useful guides in determining vessel status." *See Gremillion,* 904 F.2d at 294 n. 9. Applying *Gremillion*'s attribute test, the foregoing characteristics suggest that the Biloxi Belle is not a vessel under the Jones Act.

Ketzel seeks, however, to distinguish the guidelines summarized by *Gremillion,* contending that they are applicable to dry docks and work platforms only. Ketzel contends further that such crafts primarily assist workers involved in "construction and marine repair," contrasted by the Biloxi Belle's more elaborate design as a "vessel facility" for its employees. Ketzel apparently contends further that, assuming *arguendo* that the Biloxi Belle falls under a work-platform analysis, the Supreme Court's decision in *Gizoni,* decided after *Gremillion,* requires that the fact question of whether a work platform is a vessel *must* be determined by a jury. This Court disagrees with Ketzel's analysis of relevant caselaw.

In *Gizoni,* a platform case, the claimant [Gizoni] was a rigging foreman for a ship repair facility and was transporting a rudder from a shipyard to a floating dry dock when his foot broke through a thin wooden sheet covering a hole in the deck of the platform. *See Southwest Marine, Inc. v. Gizoni,* 909 F.2d 385, 387 (9th Cir.1990). Gizoni alleged permanent injuries and disabilities. He sued his employer for LHWCA benefits, then later filed a suit under the Jones Act. *Id.* The district court entered summary judgment in favor of the employer, and the Sixth Circuit reversed, concluding that material issues of fact regarding Gizoni's "seaman" status were unresolved, including whether the platform on which he was riding was a vessel. *Id.* at 388–89. The Supreme Court affirmed, holding that "questions of fact existed regarding whether the floating platforms were vessels in navigation, and whether Gizoni had sufficient connection to the platforms to qualify for seaman status." 502 U.S. at ——, 112 S.Ct. at 494.

The Supreme Court in *Gizoni*, contrary to Ketzel's contention, did not change the *Wilander* standard that summary judgment is warranted when "the facts and the law will reasonably support only one conclusion." *See Wilander*, 498 U.S. at 356, 111 S.Ct. at 818. Indeed, *Gizoni* cited *Wilander* in setting forth the standard of review, i.e., whether reasonable jurors could differ "as to whether the employee was a [seaman]." *See* 502 U.S. at ——, 112 S.Ct. at 494.

As set forth below, the factors precluding summary judgment in *Gizoni* are clearly distinguishable from those in the instant case. As previously indicated, the platform on which the claimant was riding in Gizoni was actually being used to transport a rudder when the claimant was injured. Again, the caselaw is "heavily skewed" against finding nonvessel status for a craft whose primary mission is to transport "cargo, equipment or passengers over navigable waters." *See Gremillion*, 904 F.2d at 293. The result reached in Gizoni, i.e., that summary judgment was inappropriate, was therefore consistent with—rather than repugnant to—the guidelines set forth by *Gremillion*.

With regards to Ketzel's other contention, caselaw subsequent to *Gizoni* demonstrates that the test in *Gremillion* is not limited to work platforms and serves as a useful tool in determining nonvessel status for *any craft not involved in traditional navigation and commercial activities*. One such case, *Kathriner v. UNISEA, Inc.*, 975 F.2d 657 (9th Cir.1992), was decided by the Ninth Circuit. The claimant there was injured aboard the "Unisea," a boat converted into a floating shrimp processing plant. The claimant sought relief under the Jones Act. Vessel status was disputed, *inter alia*, because of the alterations made to the craft, including a large opening that had been cut into the hull "to allow for dock traffic." *Id.* at 660. The Ninth Circuit granted summary judgment in favor of Unisea, distinguishing its earlier decision in *Gizoni* as follows:

> ... [A]lthough the floating platform [in *Gizoni* had] no independent power, means of steering, navigation lights, navigation aids, or facilities for crew, [it] could nonetheless be a vessel in navigation for pur-

poses of the Jones Act. The platform at issue ... was moved about by tug boats and was powered by external sources. However, we concluded that summary judgment was inappropriate because a reasonable jury could conclude that the platform was a vessel. The facts in *Gizoni*, however, are distinguishable from the facts in the instant case. The platform at issue in *Gizoni* moved over the water and *often transported equipment and ship parts around a dock*. The *transportation function* of the platform made it much more like a vessel *in navigation* than the Unisea.

> While the general rule in Jones Act cases is that the question of whether or not a vessel is involved is typically a jury question, the present case presents a *clearcut answer*. Common sense counsels that we could not reasonably consider the Unisea a vessel under the Jones Act since she is unfit for offshore use ... When she put out to sea, she would surely sink. *Summary judgment is mandated where the facts and the law would support only one conclusion.*

*Id.* at 660 (citation and internal quotation omitted; emphasis added).

The Ninth Circuit, citing a district court case holding that the Unisea was a nonvessel, observed the following:

> Generally, floating structures are not classified as vessels in navigation if they are incapable of independent movement over water, are permanently moored to land, have no transportation function of any kind, and have no ability to navigate.

> · · · · ·

> The Unisea was converted from a "liberty ship," laid up, withdrawn from service, and relegated to the "mothball fleet." It was extensively modified to become an integral part of a seafoods processing operation. It is connected to shore by spring lines and anchor chains, permanent utility connections, and two access piers. It has not moved in almost three years and defendant has no intention of moving it. In short, the Unisea was neither designed for nor used for navigation or transportation.

It has no navigation or propulsion gear and is not used as a barge. It is nothing more than a floating factory whose only connection with navigation is that it rises and falls with the tide and that it is housed in a "liberty ship" hull.

*Id.* at 660–61 (citation omitted). The Ninth Circuit cited Fifth Circuit precedent, including *Ellender v. Kiva Constr. & Eng'g, Inc.*, 909 F.2d 803 (5th Cir.1990). *See Unisea*, 975 F.2d at 661. In *Ellender*, a platform case, the Fifth Circuit affirmed the district court's granting of summary judgment for the defendants, following the analysis for nonvessel status set forth by *Gremillion*. *See Ellender*, 909 F.2d at 806.

The *Unisea* court also cited the Fifth Circuit case, *Hayford v. Doussony*, 32 F.2d 605 (5th Cir.1929).[3] *See Unisea*, 975 F.2d at 661. In *Hayford*, the defendants converted the Marietta, a United States gunboat, into "The Pirate Ship," a floating dancing and amusement facility, secured to the dock by cables and clamps. *See* 32 F.2d at 605. The appellees filed suit under admiralty law against the owner for the recovery of wages, seeking to impose a "mariner's lien" on The Pirate Ship. *Id.* The owner challenged the court's jurisdiction under admiralty law. *Id.* The undisputed evidence included the following:

A permanent gangway was built ashore, with a house over it extending to the wharf, the gangplank being secured to the hull with seven or eight one-inch pins. Electric wires and water pipes connected the structure with the shore. The structure was intended by its owner to be used, and was used by him, only as a dance platform permanently secured to the dock at all times when so used, and *at no time was used or intended to be used for transporting freight or passengers*. None of the libelants were employed as mariners or in any way in the capacity of seaman. During the time in 1927 when the Mississippi river was high the Pirate Ship, on the order of the manager of the board of port

commissioners, and over the protest of the appellant, was towed to St. Andrews street wharf, and it was towed to the West End after the seizure in this case.

*Id.* (emphasis added). The trial judge entered a decree against the owner. The *Fifth* Circuit reversed and held as follows:

The Pirate Ship was not used, or intended to be used, to carry freight or passengers from one place to another, and was not an instrument of navigation or commerce, and *performed no function that might not have been performed as well by a floating barge or platform permanently attached to the land*. A result of it not being a vessel or instrument of navigation or commerce engaged in any maritime venture was that a maritime lien did not attach for the compensation for the services rendered by any of the libelants.

*Id.* (emphasis added). The result reached by the Ninth Circuit in *Unisea*, relying in part upon *Hayford* and other highly regarded Fifth Circuit authority, demonstrates that the factors applied in platform cases are relevant to the determination whether the characteristics of the Biloxi Belle fit the pattern of "certain floating structures [that] were not vessels in navigation for purposes of the Jones Act." *Unisea*, 975 F.2d at 662.[4] Further, both *Unisea* and *Hayford* demonstrate that the work platform cases are not distinguishable on the ground that only construction and marine repair was involved.

▮ Ketzel argues that, because the Biloxi Belle is floating and "capable of navigation," a reasonable inference is that it is a vessel under the Jones Act, being subject to the hazards of the sea. Ketzel offers as support the undisputed fact that the Biloxi Belle has been towed previously over navigational waters, that it was towed to a safer location during hurricane Andrew in 1992, and that the defendant has a current contract to move the Biloxi Belle should the need arise in the future. Ketzel's argument, grounded in part

---

**3.** The history of *Hayford* is set forth as follows: *The Pirate Ship*, 21 F.2d 231 (D.C.La.1927), reversed by, *Hayford v. Doussony*, 32 F.2d 605 (5th Cir.1929), aff'd, 42 F.2d 439 (1930).

**4.** It follows that, contrary to Ketzel's suggestion, the "family of nonvessels styled as floating work platforms," see *Gremillion*, 904 F.2d at 294, is not a closed class because other structures meeting the same functional attributes may be deemed "nonvessels" as a matter of law.

on nonbinding and nonpersuasive caselaw,[5] is meritless.

The mere fact that a structure is floating or "capab[le] of movement across navigational waters" does not grant "vessel" status. *See Michel v. Total Transp., Inc.,* 957 F.2d 186, 189 (5th Cir.1992); *Bernard v. Binnings Constr. Co.,* 741 F.2d 824, 828 n. 13, 829 (5th Cir.1984); *Blanchard v. Engine & Gas Compressor Servs., Inc.,* 575 F.2d 1140, 1143 (5th Cir.1978). A structure, by virtue of its flotation, is therefore not exposed to the hazards of the sea sufficient to grant "seaman" status. *Id.; see Unisea,* 975 F.2d at 660–61. That a floating structure may be moved periodically because of the dangers of inclement weather is not sufficient to convert its status to a vessel. *See Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.,* 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926) (cited by *Hayford, supra*) (that converted wharfboat—routinely used as an office and warehouse—was moved each winter to protect it from the ice not determinative of vessel status at time of sinking; addressing ruling on appellants' petition to limit liability under admiralty law).

In *Digiovanni, supra,* cited by *Unisea,* 975 F.2d at 661, the First Circuit, pointing essentially to Fifth Circuit caselaw, *see, e.g., Gremillion,* 904 F.2d at 293; *Hurst v. Pilings & Structures, Inc.,* 896 F.2d 504, 506–07 (11th Cir.1990) (relying on Fifth Circuit opinions); *Ducrepont,* 877 F.2d at 395–96, adopted the Fifth Circuit's "improved" standard that, if a

floating structure's "purpose or primary business is not navigation or commerce, then workers assigned thereto for its shore enterprises are to be considered seaman only when it is in actual navigation or transit." *Digiovanni,* 959 F.2d at 1123.[6] The rationale of such a test is as follows:

> A worker becomes a seaman not by reason of the *physical characteristics* of the structure to which he is attached, but because its being operational "in navigation" exposes him to "a seaman's hazards." He is not exposed by what the vessel did in the past, or by its future potential, and to give him these special benefits by *mechanical definitions* without the *exposure* is misplaced generosity ...

*Id.* (emphasis added). The foregoing "test" is an appropriate rendition of the guidelines set forth by *Gremillion. See* 904 F.2d at 293–94.

It is without dispute that, other than being afloat, the Biloxi Belle was stationary and secured to her regular operating location at the time of Ketzel's injury. In a recent case, *Pavone v. Mississippi Riverboat Amusement Corp.,* No. 93–3354, 1994 WL 97820 (E.D.La. March 21, 1994), the Eastern District of Louisiana essentially applied the currently-in-navigation test and concluded that the Biloxi Belle is not a "vessel" under the Jones Act.[7] With regards to its finding of nonvessel status, this Court concurs with the result reached by the *Pavone* court.

---

**5.** *See McCarthy v. The Bark Peking,* 716 F.2d 130 (2nd Cir.1983) (non-Jones Act case; based on claimant's action under the LHWCA for injuries received while painting the mainmast on ship converted to floating museum), *cert. denied,* 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984); *Luna v. Star of India,* 356 F.Supp. 59 (S.D.Cal.1973) (non-Jones Act case; tort claim invoking admiralty jurisdiction in connection with floating maritime museum); *The Showboat,* 47 F.2d 286 (D.Mass.1930) (non-Jones Act case involving attachment of maritime to five-masted schooner used as restaurant and dance hall). The basis for determining vessel status under the LHWCA is not as restrictive as the narrower inquiry under the Jones Act. *See, e.g., Ducrepont v. Baton Rouge Marine Enters., Inc.,* 877 F.2d 393, 395–96 (5th Cir.1989). Arguably, a finding that a craft is a nonvessel under the LHWCA necessarily includes a finding that it is a nonvessel for purposes of the Jones Act.

**6.** In *Digiovanni,* the First Circuit reversed the jury's finding that the claimant was a seaman under the Jones Act. *See id.* at 1124. The court remanded for retrial on the alternative ground whether the defendant committed simple negligence under the LHWCA. *Id.*

**7.** In *Pavone,* Judge Beer concluded as follows:

> Applying this test, the Biloxi Belle does not pass muster as a vessel. Perhaps the seriousness with which this matter needs now be addressed speaks most eloquently of how far the courts have unwittingly embolden[ed] and nurtured the myth of the vessel status. For the plain and unvarnished facts of this matter should, on their face, resolve the vessel status issue. Yet, the stilted, end justify the means applications that have wormed their way into the law now require this plodding address. *Id.*

Alternatively, Ketzel argues that, because gambling was once limited to "cruise vessels" that were "underway" pursuant to the pre-amendment version of Mississippi Code Annotated § 27–109–1 (West 1990), the defendant "should be bound by the requirements of the Gaming Control Act and the representations it made in obtaining its license under the Act." *See* Pl's. Exh. 6, 7. Ketzel cites no authority to demonstrate that, notwithstanding all other factors relevant to the inquiry, federal courts are empowered to adopt the requirements of a state's licensing statute as a short-cut to determining Jones Act "vessel" status. This Court will entertain no such fiction.

### Conclusion

Similar to the "floating factory" in *Unisea* and the "floating dance hall" in *Hayford,* the Biloxi Belle is nothing but a "floating casino." That the Biloxi Belle must be moved across navigational waters in the event of a hurricane is not determinative of the issue whether the structure is a vessel, and thus, whether Ketzel is a seaman under the Jones Act. Indeed, the moving of the structure in the event of a hurricane is incidental to and does not alter the Biloxi Belle's basic purpose as a casino. The physical attachments of the structure to the dock, including relatively permanent utility connections—although not conclusive—lend strong support to a *nonvessel* characterization of the structure.

That the Biloxi Belle *looks like* a ship engaged in transportation of cargo or passengers is not enough. The Biloxi Belle is not equipped, nor does it serve any transportation function whatever. To conclude otherwise would be absurd. Even assuming *arguendo* that the Biloxi Belle is a vessel, which the Court does not decide, it is undisputed that, other than shifting with the rise and fall of the gulf tide, the craft was not moving in navigable waters at the time of Ketzel's injury, nor did it expose Ketzel to the hazards of the sea as defined by the weight of relevant caselaw. This Court finds that, in light of the foregoing analysis, there is but one conclusion as a matter of law: The Biloxi Belle is not a "vessel" under the Jones Act. It follows that the only rational inference available from the undisputed facts is that Ketzel was not a seaman. For reasons set forth above, summary judgment should be granted in favor of the defendant.

Counsel for the defendant shall submit an order in conformity with and incorporating by reference the foregoing Memorandum Opinion within ten (10) days of the date of entry hereof. The parties shall bear their own costs.

**Hai Hai VUONG**

v.

**James A. COLLINS, Director, Texas Department of Criminal Justice.**

**Civ. A. No. 1:94–cv 0228.**

United States District Court, E.D. Texas, Beaumont Division.

Nov. 8, 1994.

Gary A. Winters, Mayer Brown & Platt, Washington DC, for petitioner.

William Charles Zapalac, Asst. Atty. Gen., Austin, TX, for respondent.

## MEMORANDUM OPINION

COBB, District Judge.

Petitioner Hai Hai Vuong, an inmate confined to the Ellis I Unit of the Texas Department of Criminal Justice, Institutional Division, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge a death sentence imposed by the Criminal District Court of Jefferson County, Texas.

*Factual and Procedural History*

On December 7, 1986, at approximately 6:00 p.m., petitioner was playing pool and drinking beer with Thien Huu Nguyen and Tuan Van Nguyen at the Game Room located in Port Arthur, Texas. The three left the game room to retrieve a Colt AR–15 or M–16 .223 caliber semi-automatic or automatic rifle from petitioner's home and a pistol.[1] Petitioner asserts he retrieved the weapon due to threats that had been made against him by gang members from New Orleans who were present in the Game Room, although the other witnesses did not hear any alleged threats or arguments. Petitioner returned to the Game Room approximately five to ten minutes after leaving and entered through the front door with the weapon. Nang Pham was playing pool at the first pool table in the game room. Nang Pham heard the first two shots from petitioner's weapon and lay down on the floor. The first two shots went into the rear wall of the Game Room. Petitioner told the patrons in the game room to remain where they were. The alleged gang members, according to petitioner, left through the back door after the first two shots. Petitioner shot Nang Pham in the shoulder. Nang Pham rolled under another pool table and left through the front door.

Petitioner begin to slowly walk to the back of the Game Room. Tien Van Nguyen was hiding behind one of the pool tables. Tien stood up and stated "Hai, it's me," in Vietnamese. Petitioner shot Tien in the face. Petitioner then shot Binh Nguyen in the arm when he tried to run. Luan Mien Do was shot in the back when petitioner first entered the Game Room. When petitioner walked to the rear of the game room he shot Do a second time in the arm.

Petitioner then entered a doorway that separated the Game Room from the adjoining cafe, which was part of the same business. Petitioner's friend, Thien Huu Nguyen, was standing at the door of the cafe with a pistol, attempting to block the exit of patrons. Petitioner walked towards a table where sixteen year old Hien Quang Tran was sitting, eating. Tran stood up and petitioner pointed his rifle at Tran and shot him in the chin, killing him. Petitioner took the telephone away from the owner of the Game Room and then left. In all, petitioner had fired at least eleven rounds of .223 ammunition in the Game Round and the adjoining cafe, killing two people and wounding three others.

When petitioner ran outside of the Game Room, he got into a blue Monte Carlo automobile which was waiting for him and Thien. The driver (Tuan Van Nguyen), Thien and petitioner then left the scene. The car was recovered later that night in Port Arthur but petitioner was not found. An arrest warrant was issued for the arrest of petitioner. Petitioner stayed in Port Arthur for a few days and then went to New Orleans, from where he traveled to California to work.

On March 26, 1987, a Jefferson County, Texas, Grand Jury indicted petitioner for the capital murder of Hien Quang Tran in the course of committing the additional murder of Tien Van Nguyen in violation of TEX.PE-NAL CODE § 19.03(a)(6)(A) (Vernons 1985), in Cause No. 48,489 styled *The State of Texas v. Hai Hai Vuong*.[2]

On July 4, 1987, Officer George Avina, California Highway Patrol, responded to a traffic accident near Salinas, California. When Officer Avina arrived, he noted petitioner and two other males with a vehicle in a field. Petitioner was severely intoxicated and stated his name was Nguyen Le. Petitioner was arrested for public intoxication. During the booking procedure, Officer Avina determined petitioner's true identity and checked his name for pending warrants. Petitioner was then extradited to Jefferson County to stand trial for the capital murder of Hien Quang Tran and Tien Van Nguyen.

On August 28, 1987, petitioner gave a statement that he had entered the Game Room and fired several shots but did not

---

1. Petitioner testified the weapon was an automatic. However, there was conflicting testimony and the weapon was not recovered.

2. TEX.PENAL CODE § 19.03(a)(6)(A) provides a person commits capital murder if "the person murders more than one person during the same criminal transaction." In 1993, the provision was renumbered to section 19.03(a)(7)(A).

remember hitting anyone. Petitioner was returned to Jefferson County, Texas. On September 8, 1987, Mr. James A. DeLee was appointed to represent petitioner.

On May 9, 1988, petitioner's trial began before a jury in the Criminal District Court of Jefferson County, Texas. Petitioner testified at the trial that he believed Tien Van Nguyen was going to pull a gun when he stood up and Hien Quang Tran pushed a table towards him. Petitioner asserted that the killing of Tien was in self-defense and the killing of Hien was accidental. The jury convicted petitioner of the capital murder of Hien, enhanced with the murder of Tien. After hearing further testimony, including that of Dr. James Grigson, the jury answered all three special issue questions of TEX.CODE OF CRIM.PROCEDURE art. 37.071 (Vernons 1985) affirmatively. The trial court sentenced petitioner to death by lethal injection.

The Texas Court of Criminal Appeals affirmed the conviction on direct appeal. *Vuong v. State,* 830 S.W.2d 929 (Tex.Crim. App.1992). The Supreme Court denied a petition for writ of certiorari. *Vuong v. State,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). The trial court then scheduled petitioner's execution on January 6, 1993.

Petitioner filed a petition for writ of habeas corpus in this court on January 5, 1993. *Vuong v. Director,* 1:93cv002. This court appointed counsel for petitioner, and allowed ninety days to file an amended petition. Subsequent to the amended petition, this court granted the respondent's motion to dismiss the petition to allow petitioner to exhaust the eight claims presented in the state courts.

The trial court scheduled petitioner's execution for April 26, 1994. Petitioner filed an application for writ of habeas corpus in the state court and a motion to recuse the state court trial judge. A visiting state court judge held a hearing on the motion to recuse the trial judge, and the motion was denied. The trial court ordered the parties to submit affidavits concerning the factual issues presented by the claims. The trial court entered factual findings. The Texas Court of Criminal Appeals denied the application based upon the trial court's findings on April 25, 1994. *Ex part Vuong,* No. 26,391–01. The petitioner submitted the current petition for writ of habeas corpus on April 25, 1994.[3] This court entered a stay of execution and ordered the state to respond to the current petition. The state filed a response on August 8, 1994. The petitioner responded to the state's answer on August 29, 1994, and submitted a motion for an evidentiary hearing.

### *The Petition*

Petitioner brings eight claims in the current petition. These are:

1. The jury was not provided a vehicle to consider the mitigating effect of the provocation of the second victim, Tien Van Nguyen.

2. The trial court deprived petitioner of his Sixth Amendment right to counsel when it gave an *ex parte* instruction to the jury on parole law during the punishment phase.

3. Appellate counsel was ineffective for failing to raise the alleged *ex parte* communication issue.

4. If counsel was aware of the *ex parte* communication, then petitioner received ineffective assistance of counsel for counsel's failure to object to the parole instruction.

5. The "key man" system of grand jury instruction employed in Jefferson County prior to 1991 deprived petitioner of equal protection and due process.

6. Dr. Grigson presented false testimony which the state knew to be false.

7. Even if the state was not aware that Dr. Grigson's testimony was false, the use of the perjured testimony amounted to cruel and unusual punishment in violation of the Eighth Amendment.

8. The trial court improperly excluded venire member Harold Gauthier for cause.

---

**3.** The petition presents the same claims presented in the first petition, all of which have been exhausted before the state courts.

## Analysis

### A. Need for an Evidentiary Hearing

Petitioner is entitled to an evidentiary hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice that resulted from that failure. *Keeney v. Tamayo–Reyes*, —— U.S. ——, ——, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992). In petitioner's case, the trial court, and the visiting state judge, held both a live hearing, and one by way of affidavits on the factual issues presented. These findings are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(d). A hearing by affidavit is sufficient to invoke the presumption of correctness. *Buxton v. Lynaugh*, 879 F.2d 140, 144 (5th Cir.), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990).

Having reviewed the trial court's factual findings and determined that the findings are fairly supported by the record, the court will deny petitioner's motion for an evidentiary hearing.

### B. Merits of the Claims

#### 1. SECOND VICTIM MITIGATION

At the time petitioner went to trial, TEX. CODE CRIM.PROC.ANN. art. 37.071(f) provided:

> If a defendant is convicted of an offense under section 19.03(a)(6), Penal Code, the court shall submit the three issues under Subsection (b) of this article only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment.

Thus, theoretically, the jury could consider in mitigation the provocation of only the first victim named in the indictment. The Texas Court of Criminal Appeals recognized the flaw of this scheme in *First v. State*, 846 S.W.2d 836 (Tex.Crim.App.1992). In *First* the defendant was convicted of capital murder after killing two people during the same criminal transaction. The evidence demonstrated that the victim named first in the indictment did not provoke the defendant. However, the remaining victim had beaten

the defendant rather severely shortly before he killed both victims. The Texas Court of Criminal Appeals held that this limitation on issues of mitigation violated the Eighth and Fourteenth Amendments. *Id.* 846 S.W.2d at 841.

Petitioner's argument is the same as that proffered in *First*. Petitioner claims that article 37.071(f) did not allow the jury to consider in mitigation the provocation by Tien Van Nguyen. However, petitioner's facts are inapposite those found in *First*. Petitioner asserts he was provoked by alleged gang members from New Orleans. These alleged gang members left through the back door after the first two shots, according to petitioner. This left petitioner with a game room and cafe packed with innocent persons who had done nothing to petitioner except call him a friend prior to the incident. When Tien stood up and said "Hai, it's me," he was shot in the face. Petitioner asserts Tien was reaching for a pistol which he allegedly always carried, although there was no other testimony to support this allegation. There was no pistol found and there was no testimony to support petitioner's trial version of the incident.[4] Thus, under the third punishment issue, the provocation was not raised by the evidence.

The Fifth Circuit has considered the absence of a specific instruction on victim provocation and found the jury would have three possible vehicles in considering provocation as mitigation without a specific instruction on victim provocation. *See White v. Collins*, 959 F.2d 1319 (5th Cir.1992). In *White*, the petitioner asserted the victim had sprayed him with mace shortly before he shot her. White did not request a special instruction on victim provocation and none was given. The Fifth Circuit found this issue was procedurally barred from review and without merit. Concerning the merits of the claim, the court held:

> If the jury believed White shot Mrs. Spinks as a reflex after she sprayed him with mace, the jury was able to give effect

---

4. Petitioner's written statement does not make any mention of this alleged provocation by either victim. The statement recites that petitioner shot at the walls and ceilings and did not think he had hit anyone.

1274

to the mitigating value of this perception. First, it could have given effect to provocation by finding that ordinarily, absent such provocation, White would be nonviolent. Such an understanding of the evidence would support a negative response to the second issue on future dangerousness. Also, if the jury believed White discharged the gun accidentally or by reflex action because he was suffering from the caustic effect of mace, as he now hypothesizes, the jury could have responded to this evidence in two additional ways. The jury could have answered "no" to the deliberateness inquiry of the first punishment issue. It could have also determined at the guilt-innocence phase of the trial that White had no intent to kill. In fact, White's defense attorney made this argument to the jury at the guilt-innocence phase of the trial. The special issues submitted to the jury thus provided an adequate vehicle for the jury to respond to the mitigating effect of the alleged provocation by the victim.

*Id.,* 959 F.2d at 1324. Thus, petitioner, absent any specific instruction on victim provocation, had an adequate vehicle through which the jury could give mitigating effect to the alleged provocation by Tien. Furthermore, the evidence does not support a special instruction on victim provocation.

2. *EX PARTE* COMMUNICATION

During punishment deliberation, the jury sent out a note to the trial court asking for three explanations. The jury asked for a portion of Dr. Grigson's testimony, a copy of the protective motion to prevent a psychiatric examination and information concerning parole eligibility. The trial court responded to the note with a written explanation of parole eligibility that allowed a person who was sentenced to life to be released after serving fifteen years in prison. The trial court then admonished the jury, "You are not to consider or discuss the extent to which the good conduct time or parole laws may be applied to this particular defendant." *Vuong v. State,* No. 48,489 Tr. at 167.

■ Petitioner's second claim concerns the parole eligibility explanation. Specifically, in the claim, petitioner asserts this explanation

was *ex parte* by the trial court and deprived petitioner of his Sixth Amendment right to confrontation and effective assistance of counsel and Fourteenth Amendment right to due process.

■ A defendant has a constitutional right to be present when the court presents supplemental instructions to the jury. *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985). Petitioner asserts his Sixth and Fourteenth Amendment rights were violated when the court made the parole response *ex parte* to the jury.

The trial court ordered the three persons who would have been present in formulating the court's response to the jury note, to submit affidavits, nearly six years after the note had been submitted. Warren Clark, petitioner's trial co-counsel, denied he had ever seen the note prior to being shown the note by petitioner's habeas counsel. However, Clark was aware of the other two items contained on the 5″ by 7″ note from the jury. James DeLee, petitioner's trial co-counsel and appellate counsel, asserted he did not recall the note due to the intervening years, but had never known a time that "this court answered a note without review by attorneys." *Ex parte Vuong,* No. 26,391–01 Tr. at 27. The state's prosecutor, David McWilliams, stated that his notes reflected a discussion concerning Dr. Grigson's testimony in relation to the jury note and that he felt "certain that all aspects of the Court's response including the parole response were discussed with defense counsel." *Id.,* Tr. at 15.

Based upon the affidavits, and the trial court's own recollection, the trial court stated:

There has been absolutely no showing by Petitioner that this Court engaged in an ex parte communication with the jury as alleged in Claim for Relief II. The affidavit of lead counsel, Mr. Jim DeLee and the lead prosecutor, Mr. Paul McWilliams, as well as this Court's personal recollections reflect that this Court has never answered a jury question without first presenting it to all counsel for suggestions and objections.

*Id.*, Tr. at 5. These factual findings are fairly supported by the affidavits and are entitled to a presumption of correctness. Based upon these factual findings, petitioner's claim has no merit.

### 3 & 4. INEFFECTIVE ASSISTANCE OF COUNSEL

Related to the alleged *ex parte* communication, petitioner makes two further arguments. First, petitioner asserts that appellate counsel was ineffective for not asserting the parole claim on appeal. Second, petitioner asserts that if trial counsel was aware of the parole instruction he was ineffective for not objecting to the court's instruction.

■ The Supreme Court has addressed the issue of what a petitioner must prove to demonstrate an actual ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to show that counsel was ineffective a petitioner must demonstrate:

> first ... that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings it cannot be said that the conviction or death sentence resulted in a breakdown of the adversarial process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. In order to demonstrate the second prong of the *Strickland* test, a petitioner must demonstrate that counsel's deficient performance so prejudiced the defense that petitioner was denied a fair and reliable trial. *Lockhart v. Fretwell*, — U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). A reviewing court "must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir.1992).

■ The burden of proof in a habeas corpus proceeding attacking the effectiveness of trial counsel is upon petitioner, who must demonstrate counsel's ineffectiveness by a preponderance of the evidence. *Martin v. Maggio*, 711 F.2d 1273 (5th Cir.1983). In determining the merits of an alleged Sixth Amendment violation, a court "must be highly deferential" to counsel's conduct. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

■ Although the ultimate question of whether counsel's performance is a mixed question of law and fact, state court findings of fact made in the course of deciding an ineffectiveness claim are entitled to a presumption of correctness under 28 U.S.C. § 2254(d) if supported by the record. *Loyd v. Smith*, 899 F.2d 1416, 1425 (5th Cir.1990). A hearing by affidavit is sufficient to invoke the presumption of correctness. *Buxton v. Lynaugh*, 879 F.2d 140, 144 (5th Cir.), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990).

■ With regard to the appeal, petitioner must meet the two-prong standard of *Strickland. Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Ineffective assistance of appellate counsel is not demonstrated due to a failure to assert every non-frivolous claim on appeal. *Ellis v. Lynaugh*, 873 F.2d 830 (5th Cir.), *cert. denied*, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 384 (1989).

#### a. trial counsel

■ Petitioner asserts his trial counsel was ineffective for not objecting to the parole instruction provided to the jury. In Texas, a jury for a capital defendant, once the defendant is found guilty, shall not be instructed on parole eligibility. *See* Tex. Code of Crim.Proc.Ann. art. 37.07 § 4; *Felder v. State*, 758 S.W.2d 760 (Tex.Crim.App. 1988).

■ The parole instruction provided by the trial court instructed the jury to not consider or discuss parole in regards to petitioner. A trial court's short explanation on the effect of parole coupled with an instruction to not consider parole does not amount to a *per se* violation of state law. *See Jackson v. State*, 822 S.W.2d 18, 27 (Tex.Crim.

App.1990), *cert. denied*, —— U.S. ——, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993).[5] This is because a juror is considered to have followed his oath to follow the law provided, which in this case demanded the jurors not discuss or consider parole. Thus, trial counsel's failure to object to the court's explanation to the jury does not amount to ineffective assistance of counsel. Petitioner has failed to demonstrate that he was denied a fair and reliable trial due to counsel's failure to object to the court's explanation.

### b. appellate counsel

 Petitioner asserts his appellate counsel was ineffective for not asserting the court's explanation on parole violated state law. However, the defendant in *Jackson* brought a similar claim on direct appeal and the Texas Court of Criminal Appeals found that they did not approve of the instruction but it did not amount to error when the juror had stated he would follow the law. Thus, the present claim would not likely be successful on direct appeal. Petitioner has failed to demonstrate he received ineffective assistance of appellate counsel.

### 5. "KEY MAN" GRAND JURY SYSTEM

 Petitioner notes that Jefferson County employed a "key man" system of selecting grand juries prior to 1991. This system allowed each district court to nominate five grand jury commissioners who would in turn nominate members of the grand jury. Petitioner's argument is that this process, as applied to Jefferson County, resulted in an under-representation of women and blacks to Jefferson County grand juries.

 "It is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury ... from which all person of his race or color have, solely because of that race or color, been excluded by the State...."

*Hernandez v. Texas,* 347 U.S. 475, 477, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954). To prevail on a claim that petitioner's grand jury was unconstitutionally composed, the petitioner must 1) establish that the excluded group is a recognizable, distinct class, singled out for different treatment under the law; 2) prove the degree of under representation of the group over a long period of time; and, 3) demonstrate that the selection procedure is susceptible of abuse or is not racially neutral. *Rose v. Mitchell,* 443 U.S. 545, 565, 99 S.Ct. 2993, 3005, 61 L.Ed.2d 739 (1979). Additionally, "in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial under-representation of his race or of the identifiable group to which he belongs." *Id., quoting, Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).

Petitioner has developed statistics which demonstrate historically an under-representation of women and blacks on Jefferson County grand juries. However, petitioner's argument fails for two reasons. First, petitioner is an Asian male. He does not assert there is any under-representation for his specific group on Jefferson County grand juries. Second, the grand jury which indicted petitioner was composed of five white males, one white female, three black males and three black females. Thus, despite statistical trends, petitioner's grand jury reflected a cross-section of Jefferson County as it was then composed. Petitioner has failed to demonstrate he was denied equal protection in the composition of his grand jury.

### 6 & 7. DR. GRIGSON'S TESTIMONY

Dr. James Grigson, a psychiatrist who often testifies in capital murder trials in Texas, testified at the punishment phase of the trial that of the one-hundred and fifty-six persons he had examined prior to petitioner, "about forty percent" of them were found to not be dangerous.

5. In *Jackson*, the trial court told a prospective juror, "There are some general guidelines that they talk about in that a person when he is sent to the penitentiary for any number of years, when he has served a third of his time or 20

years, calendar years, he is eligible for parole." *Id.* 822 S.W.2d at 26. This instruction accurately reflected the state law at the time and was coupled with an instruction to not consider the issue at punishment.

■ Petitioner has tracked the testimony of Dr. Grigson from 1978 until 1991 and noted the variation of Dr. Grigson's report of numbers of persons examined versus number of those found not to be dangerous. In 1991, during the trial of Jack Wade Clark, Dr. Grigson testified that the testimony he provided in Vuong's trial were "as accurate as I could think at that time, but the numbers were incorrect." Petitioner asserts the variation in the reported numbers and the admission that the numbers provided in petitioner's trial were incorrect amounts to perjury on the part of Dr. Grigson. Petitioner asserts the use of the alleged perjured testimony on the part of the state amounts to a denial of due process and cruel and unusual punishment.

■ The Due Process Clause of the Fourteenth Amendment forbids the knowing use by the state of perjured testimony. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The petitioner asserts the prosecution "knew or should have known" Dr. Grigson's testimony was perjured. Paul McWilliams, the prosecutor, submitted an affidavit in response to this allegation, stating he would never use perjured testimony, and does not believe Dr. Grigson committed perjury in petitioner's case. The trial court found that the state did not knowingly use perjured testimony. This finding is entitled to a presumption of correctness. Additionally, a review of the testimony, in relation to the varying numbers provided over thirteen years by Dr. Grigson, does not demonstrate any intentional deceit. Indeed, as the state notes, when the numbers were finally revealed to be inaccurate, the jury still found the accused defendant dangerous to society.

In capital sentencing, there is a mandate for a high degree of reliability in the information upon which the sentencing decision is based. Petitioner asserts Dr. Grigson's testimony fell so far below the reliability standard required that the introduction of this testimony violated the Eighth Amendment. In reviewing the testimony of Dr. Grigson, it is certain that in petitioner's trial, he was more conservative in his numbers than in other trials. If the jury placed great weight into this portion of the testimony, it would show less experience on the part of Dr. Grigson than he later testified he had gained. The petitioner has failed to demonstrate Dr. Grigson presented knowingly perjured testimony at his trial. Although this testimony was later demonstrated to be not accurate, any alleged error in reliability would be to the advantage of petitioner. This claim has no merit.

## 8. HAROLD GAUTHIER

■ Harold Gauthier was venireman number 17. On his jury questionnaire, Mr. Gauthier stated he did not believe in the death penalty and he did not believe he could serve on the jury due to his religious beliefs. Mr. Gauthier stated he was an Associate Minister at the West Beulah Baptist Church and did not believe one man could take another man's life. He stated he did not think there was any situation in which he could assess the death penalty. The state challenged Mr. Gauthier for cause due to his assertion that he could not impose the death penalty.

The defense attempted to rehabilitate Mr. Gauthier. Mr. Gauthier stated he could not answer the questions presented if it meant the death penalty. Mr. Gauthier, after further rehabilitation, stated he could possibly answer the questions presented affirmatively.

The state then returned to Mr. Gauthier. In response to a scenario of fifty persons dead by the action of another in the West Beulah Baptist Church, Mr. Gauthier stated he could not impose the death penalty, regardless of the crime. The defense, once again, after extensive questioning, got Mr. Gauthier to state he could answer the questions affirmatively. The trial court then asked Mr. Gauthier if he would answer the questions "yes," knowing it would result in the imposition of the death penalty. Mr. Gauthier stated he could not answer the questions affirmatively under those circumstances. The defense, once again, rehabilitated Mr. Gauthier into a response of, "I could. I____," to a question concerning affirmative responses before cutting off the response. The state then elicited from Mr. Gauthier that he would not answer the ques-

**1278**

tions affirmatively if the result was the death penalty.

The defense returned to Mr. Gauthier. Mr. Gauthier stated, "what I was saying is that I could, but I didn't really say that I would." The state then again challenged Mr. Gauthier for cause. Mr. Gauthier agreed with the state's summation of his testimony that "he could consider it, but he could never do it, and, ultimately, that is the question. When it came down to rendering any decision, he could not render it." The trial court granted the challenge for cause over petitioner's objection.

 A venire member is properly excused for cause in a capital case when his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wicker v. McCotter,* 783 F.2d 487, 493 (5th Cir.), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986) (*quoting Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)).

> It is a test to be applied primarily by the trial court, for determinations of juror bias depend in great degree on the trial judge's assessment of the potential juror's demeanor and credibility, and on his impressions about that venireman's state of mind. The trial court's determination that a prospective juror could not perform his statutory function faithfully and impartially is accorded a presumption of correctness under 28 U.S.C. § 2254(d).

*Id.* It is not the function of the federal habeas court to substitute its judgment for that of the state court on the issue of granting a motion to strike a potential juror for cause. *See Williams v. Collins,* 16 F.3d 626, 633 (5th Cir.1994).

It is clear from the record that Mr. Gauthier could not serve his statutory function as a juror in the punishment stage of a capital trial. The exclusion of Mr. Gauthier was proper.

### C. Conclusion

Having reviewed the factual and legal basis of the eight claims presented, this court finds the claims do not present any error of constitutional magnitude. The petition for writ of habeas corpus will be denied and the stay of execution will be vacated by separate order.

**GRYNBERG PRODUCTION CORP., et al., Plaintiffs,**

v.

**BRITISH GAS, P.L.C., et al., Defendants.**

**Nos. 94–CV–485, 94–CV–486.**

United States District Court,
E.D. Texas,
Beaumont Division.

Nov. 15, 1994.

Stephen D. Susman, H. Lee Godfrey, F. Eric Fryar, Neal S. Manne, Susman Godfrey L.L.P., Houston, TX, Thomas Walter Umphrey, Provost & Umphrey, Beaumont, TX, for plaintiff Grynberg Production Corp.

Stephen D. Susman, H. Lee Godfrey, F. Eric Fryar, Neal S. Manne, Susman Godfrey L.L.P., Houston, TX, for plaintiff Pricaspian Development Corp.

Frank G. Jones, Layne Edwin Kruse, Fulbright & Jaworski, Houston, TX, Gilbert Irvine Low, Orgain Bell & Tucker, Beaumont, TX, for defendants British Gas P.L.C., Jack L. Gregory.

David T. Harvin, Vinson & Elkins, Houston, TX, for defendant British Petroleum Exploration Operating Co. Ltd.

D. Allan Jones, Orgain Bell & Tucker, Beaumont, TX, for defendant Atlantic Richfield Co. Inc.

Gary W. Coker, Offerman Coker & Koniuszy, L.L.P., Beaumont, TX, for defendant Transworld Resources Corp.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION TO REMAND

SCHELL, Chief Judge.

Before this court is Plaintiffs' Motion to Remand, filed on September 8, 1994. After this court granted an agreed motion to seal the parties' exhibits, Defendants' response was timely filed on October 13, 1994.[1] A reply thereto was filed on November 3, 1994,

and a "counter-reply" was filed on November 14, 1994. Upon consideration of the motion, responses, and attached exhibits and memoranda of law, the court is of the opinion that the motion should be GRANTED.

## BACKGROUND

The case underlying this removal battle is an involved and complicated dispute between Western corporations over rights to develop mineral resources located in the Republic of Kazakhstan. The weapons in this removal fight are the mountains of briefs and affidavits. The ammunition includes fraudulent joinder, procedural hurdles for removal, Texas choice of law principles, Texas tort law, Kazakhi tort law (and translations thereof), federal question jurisdiction over state law claims presenting a federal issue, federal common law governing international relations, the "act of state doctrine," and the *Erie* doctrine. *Grynberg Production Corp. v. British Gas, P.L.C.*, 817 F.Supp. 1338, 1341–42 (E.D.Tex. 1993) (*First Grynberg*). The battle continues.

Plaintiffs, having lost the above-described skirmish, returned to the field shortly thereafter, with mixed results, in *Grynberg Production Corp. v. British Gas, P.L.C.*, 149 F.R.D. 135 (E.D.Tex.1993) (*Second Grynberg*). Again denied remand in that decision, Plaintiffs chose to voluntarily dismiss their complaint without prejudice. *Id.* at 139.

There was not much peace in the valley:

This court has received four *Grynberg* cases [in two sets,] all based on the same facts. 1:93–CV–159 and 1:93–CV–195 were remanded.[2] 1:92–CV–496 and 1:93–CV–169 were successfully removed. [*First Grynberg*]. 1:92–CV–496 was voluntarily dismissed. [*Second Grynberg*]. After seeking a series of continuances in 1:93–CV–169, the parties informed the court that they had settled that case. An agreed judgment ordering dismissal with preju-

---

1. Although only the attorneys for Defendant British Gas P.L.C. have signed these pleadings, the court may safely assume that the arguments are advanced on behalf of all Defendants.

2. On, respectively, June 9 and June 30, 1993.

dice was entered in 1:93–CV–169.[3] One week later, Plaintiffs amended their pleadings in the two state court actions (the former 1:93–CV–159 and 1:93–CV–195), disposing of the old claims and alleging in their place claims for breach of the settlement agreement.

The defendants removed again to this court. The alleged bases for removal jurisdiction are diversity jurisdiction and jurisdiction based on the court's "inherent power" to enforce the judgment entered in 1:93–CV–169.

February, 1994 Memorandum Opinion Granting Plaintiffs' Motion to Remand Cases 1:93–CV–561 and 1:93–CV–562, at 1–2 (*Third Grynberg*) (attached hereto as Appendix "A").

Like the proverbial "bad penny", this dispute once again turns up in this court as *Fourth Grynberg*. Though military only through metaphor, the similarities continue—for, as during the pendency of any protracted campaign, the passage of time has allowed the fabrication of different and more sophisticated weapons. Defendants' "heavy artillery" this time is the Convention on Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, *reprinted at* 9 U.S.C. § 201 *et seq.*

### FACTS

Critical to the so-called "settlement" which the parties announced in conjunction with 1:93–CV–169 is a certain six-page "settlement communication" dated July 19, 1993, and signed by Plaintiffs and British Gas ("BG"). Although the document has been placed under seal by this court, it may be fairly said that it is a multi-faceted agreement. Unlike some settlements—which consist of little more than a core promise to pay a sum certain buried within paragraphs of release-type legal boilerplate—the instant (single-spaced) agreement addresses a number of issues peculiar to the petroleum exploration and production industry.

The "settlement communication" is printed under Plaintiffs' letterhead,[4] and reads in part:

Please acknowledge that this correctly reflects our entire agreement with respect to the subject matter hereof by signing this letter in the space provided below and returning a signed copy. Of course, if there are any changes you wish to discuss, please call me [Jack Grynberg] immediately or have your attorneys call ours. Meanwhile, your attorneys should commence drafting the necessary additional documents and submit them to our counsel for comment as soon as possible. We are hopeful that all the necessary paperwork can be completed and signed within the next thirty days.

"Settlement Communication" at 5. This agreement was indeed signed by the parties, and it is not disputed that there is no mention whatsoever of arbitration therein.

The first reference to arbitration appears in an unsigned revised "settlement communication" sent by BG to Plaintiffs on July 24, 1993.[5] This proposal adds to the previously agreed-to terms a suggestion that the following sentence be included: "All disputes arising under this letter agreement or the Settlement Agreement shall be settled by a mutually acceptable expert or submitted to arbitration." Unsigned Proposed Revised Settlement Agreement dated July 24, 1993, at 6. In its response, Plaintiffs suggested that the parties concentrate on drafting a separate, global Final Settlement Agreement instead of attempting to amend the "settlement communication" in a piecemeal fashion. Plaintiffs also wrote that:

---

**3.** On October 22, 1993.

**4.** Although Grynberg Production Corporation and Pricaspian Development Corporation are the named Plaintiffs herein, they are functionally identical for the purposes of this motion. Jack Grynberg is the President of the two corporations; indeed, he signed the "settlement communication" on behalf of both.

**5.** It is indeed curious that this document is also on Grynberg letterhead; there is no doubt, however, of the fact that the changes indicated therein were proposed by BG. *See* July 26, 1993 Letter from Plaintiffs' counsel to BG counsel at 1 ("Subject to a few matters noted below, I have no problem with the revisions to the settlement letter set forth in your red-line version dated 24 July.").

The arbitration idea is very sensible, although we'll wish to explore venue and applicable rules in the definitive agreement drafting.

July 26, 1993 Letter from Plaintiffs' counsel to BG counsel at 3.

By September 22, 1993, there existed a 55–page proposed Settlement Agreement drafted by BG. Sections 10.02 and 10.04 of that agreement included a broad-form arbitration provision looking to UNCITRAL Arbitration Rules and envisioning a Stockholm, Sweden site and the use of Swedish substantive law.[6] Plaintiffs agreed to review the document and submit any proposed changes. During this time, however, notes of dissension began to ominously appear within the parties' communications.[7]

On December 10, 1993, BG finally received a five-page memorandum which begins: "Grynberg Production Corporation has the following thoughts in respect of the 22 September draft." Regarding the arbitration section, the letter reads as follows:

Section 10.02 We continue to believe that the appropriate governing law is the law of Texas.

Section 10.04 We continue to believe that the appropriate arbitration site is Texas.

December 10, 1993 Letter from Plaintiffs' counsel to Defendants' counsel, at 4.

Subsequent events relating to §§ 10.02 and 10.04 may be summarized as follows:

6. "UNCITRAL" is the United Nations Commission on International Trade Law.

7. See, e.g., November 3, 1993 letter from Jack Grynberg to Mike Alexander, Vice–President of BG:
 During the two and one half hour conference call we had three weeks ago, we could not obtain progress on even the smallest of my objections. It's true that I would like to give you additional comments and resolve the settlement agreement issues, and I will do my damndest to get my comments to you in writing before the 15th of November. The hang-up is not my additional comments, however, but instead the lack of progress upon any of my earlier comments.

8. A redacted copy of the letter reads as follows:

12/20/93: In a document entitled "Package Proposal", BG proposes a Bermuda forum at which English law would be applied.

1/21/94: In a suggested "package resolution", Plaintiffs propose a Calgary forum and Alberta law.

3/21/94: BG sends a 73–page draft Settlement Agreement which reflects a Calgary forum, Alberta law, and use in arbitration of the Model Law on International Commercial Arbitration as adopted by Alberta.

4/1/94: Plaintiffs send six pages of comments on the March 21 draft. None of the comments pertain to the arbitration provisions.

4/25/94: BG sends a 72–page draft Settlement Agreement. No change is made to the arbitration provisions.

5/3/94: Three pages of comments and proposed changes, unrelated to the arbitration provisions, sent by Plaintiffs.

5/4/94: Five pages of comments and proposed changes, unrelated to the arbitration provisions, sent by BG.

5/4/94: Plaintiffs' counsel FAXes a two-page letter to BG in anticipation of a final "hammering-out" session to have been held in London shortly thereafter. No mention is made of the arbitration provisions.[8]

Hopes of an amicable resolution quickly unraveled, however. Later during the day

Many thanks for your fax memorandum of May 4, which clears up a number of my misunderstandings. Based on your explanations, we can remove from the list:
 [Omitted].
This would leave, as London issues,
 [Omitted].
Jack [Grynberg] is leaving on Friday morning for London, so I'll be trying to get him a final issue list late Thursday afternoon. If there's anything you think should be added or subtracted to the foregoing, just let me know before Thursday afternoon.
Absent that, I wish you a good trip and resolution of all outstanding issues in a manner that makes all parties happy.

on May 4th, BG drafted and sent to Plaintiffs a one page letter—with copies of the Alberta Arbitration Act and the UNCITRAL Arbitration Rules attached—suggesting two essentially non-substantive revisions to Section 10.04.[9]

By the end of the month, the dispute over arbitrability appears to have taken center stage, with each side carefully staking out its positions.[10] Needless to say, the vigorously-negotiated "Final Settlement Agreement" never came to pass; no agreement was signed by the parties.

On July 19, 1994, Plaintiffs filed a motion in state court to enforce the "settlement communication", contesting arbitration and insisting on a hearing. On August 12, 1994, shortly before that hearing was to have been held, the instant Notices of Removal and Arbitration were filed.

## DISCUSSION

Defendants' argument is, essentially, as follows:

This is not a case without a "completed, underlying contract." Under well-settled contract law, parties may agree to additional terms after the signing of a contract, such as the 1993 Settlement Letter. The exchange of promises to arbitrate is sufficient independent consideration.

The separability doctrine is clearly established for domestic arbitration disputes.[11] An agreement to arbitrate [under

UNCITRAL] is broadly defined to include—as here—an agreement "contained in an exchange of letters or telegrams."

Opposition at 7–11. BG concludes that Grynberg, having "agreed to arbitration" during the negotiations, is now bound by that agreement as it attempts to prosecute its action for breach of the original signed "settlement communication" agreement.

Grynberg's reply neatly exposes the key flaw in BG's argument:

If this Court accepts BG's proposition, then the ultimate trap for the unwary in commercial negotiations will be created. When negotiations over fundamental issues bog down, one party may simply propose agreement on a minor matter[:] the inclusion of dispute resolution language providing for arbitration. If the other party does not immediately object, then the first party may shut down the negotiations and submit the remaining issues to an arbitrator.

Reply at 13.

The fallacy of BG's argument is that it fails to distinguish between two critically different situations. Both begin with the parties executing a contract, and both end with a disagreement over whether arbitration is appropriate as regards a subsequent dispute relating to the first (executed) contract. In the numerous cases cited by BG, however, the arbitration provisions are contained in the original executed contract—here, the arbitration provision is in the *unexecuted* agreement.

---

**9.** The revisions attempted to precisely clarify the interrelationship between Alberta substantive law, the UNCITRAL Model Law, and the UNCITRAL Arbitration Rules.

**10.** *See, e.g.:*

5/17/94 Letter/memo from Plaintiffs' counsel to BG ("My understanding is that BG and GPC agreed that the disputed points would be resolved by the court in Texas under some sort of submission agreement or motion prepared by the parties' litigation counsel. Mr. Grynberg indicates that the points GPC would like to have included in this judicial resolution are . . .");

5/18/94 FAX from BG to Plaintiffs' counsel ("I was surprised to read [the above excerpt],

as it reflects a fundamental misunderstanding . . .");

5/18/94 FAX from Plaintiffs' counsel to BG ("If these points are not secured, then GPC wishes to have all three issues considered by the court.");

5/20/94 FAX from BG to Plaintiffs' counsel ("Our records show that choice of law and arbitration provisions in the most recent drafts of the Definitive [Settlement] Agreement have long since been placed in the 'agreed upon' box.").

**11.** *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (claim that entire contract induced by fraud did not prevent arbitration).

This is best demonstrated by an examination of the conclusion of BG's brief, which claims that "Grynberg's argument is little different from the plaintiff's claim rejected in" *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245 (2d Cir.), *cert. dism'd*, 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991).

In 1987, the *Threlkeld* parties signed a preliminary agreement relating to the purchase and sale of certain metals forward contracts. As with the instant "settlement communication", the preliminary agreement contemplated a more formal agreement in the future. That signed preliminary agreement stated that the final agreement would be subject to arbitration under English law. *Id.* at 247. Moreover, subsequent written confirmations exchanged between the parties made specific reference to the rules and regulations—which included arbitration provisions—of the London Metal Exchange. *Id.* Based on these prior agreements, the Second Circuit ruled that a lawsuit brought regarding an agreement relating to the valuation of the forward metals contracts should be subject to arbitration even though the sued-on agreement was silent regarding arbitration.

In this case, however, the claimed arbitration agreement is derived only during the negotiations over the unexecuted Final Agreement. The preliminary "settlement communication" in this dispute makes no mention of arbitration, and the Final Agreement was never agreed to. Timing may not be everything in life—but it is decisive in this court's ultimate resolution of Plaintiff's motion.

BG's brief is littered with cases which follow the *Threlkeld* paradigm.[12] It has cited no Fifth Circuit authority which would compel denial of the motion, and this court is therefore free to disagree with those courts which have endorsed BG's argument.[13]

## CONCLUSION

This order disposes of the fourth generation of removed *Grynberg* causes, and it appears (for the time being) that this court will not be called on to address the merits— buried, fittingly, far below the layers of jurisdictional squabbles which have frequently occupied this court's time and attention. That is perhaps fortunate; the titanic battles over the mile-or-so which separates the Federal Building from the Jefferson County Courthouse hint at litigational resources so nearly unlimited that they threaten to overwhelm a mortal judge's docket.[14] The court further questions whether the perceived tactical benefits of these eleventh-hour removals and short-lived federal-suit-terminating settlements outweigh their costs.

Having found no "agreement to arbitrate" as required to invoke the provisions of 9 U.S.C. §§ 1 *et seq.* and 9 U.S.C. §§ 201 *et seq.*, Plaintiffs' Motion to Remand is hereby GRANTED. As this court has no subject-matter jurisdiction over these consolidated actions, they are ordered REMANDED pursuant to 28 U.S.C. § 1447(c) to the state district court from which they were removed.

---

**12.** *See, e.g., Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1406 (9th Cir.1989) (arbitration language included in document which, although stating "DRAFT" on front page, was signed by both parties and governed relationship immediately thereafter); *Sauer–Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348, 349 (7th Cir.1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984) (arbitration language included in distributorship agreement signed by both parties; lawsuit based on alleged repudiation of distributorship contract); *Oriental Commercial and Shipping v. Rosseel, N.V.*, 609 F.Supp. 75, 77 (S.D.N.Y.1985) (arbitration language included in telex containing terms of the agreement sued upon).

**13.** *See, e.g., Matter of Arbitration between Herlofson Mgt. A/S and Kingdom of Jordan*, 765 F.Supp. 78, 85 (S.D.N.Y.1991) ("Drafts of a contract, reflecting an agreement to arbitrate, can provide the requisite writing.") (citing *Marion Coal Co. v. Marc Rich & Co.*, 539 F.Supp. 903, 907 (S.D.N.Y. 1982)).

**14.** One can only conjecture, for instance, at the time, cost, and effort involved in rousing Howard M. Holtzmann—the U.S. delegate to the U.N. Commission which drafted the UNCITRAL Model Law—from his Midtown Manhattan doings to execute in London a sixteen-page opinion attached to BG's Opposition.

**1284**

## APPENDIX A

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF TEXAS

### BEAUMONT DIVISION

Grynberg Production Corp.,
et al., Plaintiffs,

vs.

British Gas, P.L.C., et al., Defendants.

1:93–CV–561

Grynberg Production Corp.,
et al., Plaintiffs,

vs.

British Gas, P.L.C., et al., Defendants.

1:93–CV–562

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION TO REMAND

Before the court is Plaintiffs' Motion to Remand. The court, after considering Plaintiffs' Motion to Remand, British Gas PLC and Jack L. Gregory's Opposition, BP Exploration Operating Company's Response, the evidence, and the law, is of the opinion that plaintiffs' motion should be GRANTED.

This court has received four *Grynberg* cases, all based on the same facts. 1:93–CV–159 and 1:93–CV–195 were remanded. 1:92–CV–496 and 1:93–CV–169 were successfully removed. 1:92–CV–496 was voluntarily dismissed. After seeking a series of continuances in 1:93–CV–169, the parties informed the court that they had settled that case. An agreed judgment ordering dismissal with prejudice was entered in 1:93–CV–169. One week later, Plaintiffs amended their pleadings in the two state court actions (the former 1:93–CV–159 and 1:93–CV–195), dropping the old claims and alleging in their place claims for breach of the settlement agreement.

The defendants removed again to this court. The alleged bases for removal jurisdiction are diversity jurisdiction and jurisdiction based on the court's "inherent power" to enforce the judgment entered in 1:93–CV–169.

### Diversity Jurisdiction

Defendants urge jurisdiction based on complete diversity of the parties. A prerequisite to such jurisdiction entails a finding that Jack Gregory, a nondiverse defendant, is fraudulently joined. Plaintiffs argue that Gregory is not fraudulently joined as there is a possibility of a cause of action against him under Texas[1] law. Specifically, plaintiffs argue that Gregory is a proper party to a judicial declaration that the settlement agreement which releases claims against him is effective, and that Gregory has no right to dismissal of claims until British Gas performs its obligations under the settlement agreement. Plaintiffs also argue that Gregory, as a third party beneficiary, could sue to enforce the settlement agreement which was made for his benefit as well as that of British Gas. Thus, they argue, he is a suitable party to a declaratory judgment action.

Defendants counter by pointing out that the judgment entered in 1:93–CV–169 is res judicata. They contend that Gregory did not sign the settlement agreement, has no obligations under it, and that the plaintiffs contractual promise to dismiss Gregory is executed, not executory. Their argument, boiled down to its essence, is that the settlement agreement is already effective as to Gregory, and despite any conflict over its terms, Gregory has already been dismissed. Therefore, while Gregory could have sued to enforce the contract, and may have been a proper party to a declaratory judgment action while the obligations to him were executory, all obligations to him have already been irrevocably fulfilled. Claiming that "no matter what interpretation this Court gives to

---

1. The court does not decide whether Texas or English law governs resolution of the contract. If a cause of action lies against a nondiverse defendant under any colorable body of law, then the defendant is not fraudulently joined because the choice-of-law question is itself an uncertainty of law resolved in favor of the plaintiff. *Grynberg Prod. Corp. v. British Gas P.L.C.*, 817 F.Supp. 1338, 1350 (E.D.Tex.1993).

the Settlement Agreement, Gregory's position cannot be affected or changed," Opp. of British Gas & Gregory at 8, Defendants conclude that Gregory is an unnecessary party to any declaratory judgment action.

The court is unable to pass on these arguments because the court does not have the settlement agreement before it. The court cannot say whether Gregory is a signatory. The court cannot say whether Gregory has continuing obligations under the contract. Wishing to maintain confidentiality, the parties have not submitted the settlement agreement to the court in this action.[2] Rather, they have rested on mere arguments and averments as to the terms of the contract. But this is insufficient; the contract must speak for itself.

A claim of fraudulent joinder must be supported by clear and convincing evidence. *Parks v. New York Times Co.,* 308 F.2d 474, 478 (5th Cir.1962), *cert. denied,* 376 U.S. 949, 84 S.Ct. 964, 11 L.Ed.2d 969 (1964). The defendants bear the burden of demonstrating fraudulent joinder. *B., Inc. v. Miller Brewing Co.,* 663 F.2d 545 (5th Cir.1981). In carrying this burden, a process similar to that used in determining summary judgment motions is used. *Id.* at 549 n. 9. Defendants "may submit affidavits and deposition transcripts; and in support of their motion for remand, the plaintiff may submit affidavits and deposition transcripts along with the factual allegations contained in the verified complaint." *Id.* at 549. The district court must then evaluate all contested issues of substantive fact and all uncertainties of controlling substantive law in favor of the plaintiff. *Id.* An evidentiary hearing is not required. *Id.* at 551. Here the defendants have not submitted appropriate evidence establishing that

Gregory has no obligations under or interest in the settlement agreement. Thus, the defendants have failed to carry their burden of establishing fraudulent joinder.

The court realizes that this technical application of the rules may put defendants to a hard choice. The lawyers for defendants may want and need to maintain the confidentiality of their clients' settlements to maintain competitiveness in the global oil market. However, this court is bound, too. If the defendants do not carry their burden, then the court must find that joinder is not fraudulent.

### Jurisdiction Based on the Court's Inherent Powers

Defendants alternatively urge the court to take jurisdiction based on the court's inherent power to enforce its judgments. However, no party has filed a Rule 60(b) motion to re-open 1:93–CV–169, the Grynberg case in which settlement was entered. Rather, British Gas and Gregory wish the court to take jurisdiction over the former 1:93–CV–159 and 1:93–CV–195, cases which were previously remanded by this court for lack of jurisdiction pursuant to 28 U.S.C. § 1447(c), based on a settlement agreement signed in a different action.

While the court clearly has inherent power to enforce settlement agreements made in *pending* cases, *White Farm Equip. v. Kuppcho,* 792 F.2d 526, 529 (5th Cir.1986), the inherent jurisdiction to enforce settlement agreements *after* a case is disposed of exists only in certain circumstances. *See* Adrian N. Roe, *The Jurisdictional Pitfalls of Settlement,* LITIGATION, Vol. 19, No. 4, at 31 (summarizing lines of authority). For the case at bar, the only relevant[3] application of these

---

2. The court knows that British Gas and Gregory moved the state court to place the settlement agreement under seal. However, Eastern District General Order 92–27 (12/4/92) requires that

 upon removal of a case from state court to the U.S. District Court, parties re-urge any [state-filed] motion(s) requiring the attention of the judicial officer assigned to the case.

 It is FURTHER ORDERED that the re-urging of such motions be in compliance with Article Four, "Motion Practice," of the Civil Justice Reform Act Plan (CJRA Plan) and its addendums.

 Absent re-urging, said motions are hereby held to be moot.

The parties have not submitted the settlement agreement to this court or re-urged their state-filed motion to place the contract under seal.

3. British Gas and Gregory tell the court that its order of dismissal "contemplates a continuing supervision" over the settlement agreement. Opp. British Gas & Gregory at 10. This is simply not true. If the court meant to maintain continuing jurisdiction over the settlement agreement, it would have said so clearly and defini-

rules comes from *Ho v. Martin Marietta Corp.*, 845 F.2d 545 (5th Cir.1988). That court held that if a court had jurisdiction in a case, then the court has jurisdiction to enforce and interpret any consent decree entered in the case even after that case is no longer pending. *Id.* at 548.

A settlement becomes a consent decree for purposes of *Martin Marietta* when the judgment or the record contains the essential terms of the settlement agreement. *Matison v. White,* 760 F.Supp. 109, 112 (S.D.Miss. 1991), *citing White Farm,* 792 F.2d at 529. This rule is gleaned from *Kupcho* and *Martin Marietta.* "A settlement agreement is a contract, but, when incorporated into a judgment, becomes a court decree." *Kupcho,* 792 F.2d at 529. "Once incorporated into a judgment, federal courts have inherent authority to enforce the judgment and to determine whether there is good reason to vacate or modify the judgment." *Id.* at 530. *Martin Marietta* contemplated this rule as well. The plaintiff appeared before the district court *to have the settlement agreement entered as a judgment. Martin Marietta,* 845 F.2d at 546; *see also id.* at 548 n. 4 ("judicially enforceable consent decree embod[ies] the settlement").

Further, in *Kupcho,* the court had given its imprimatur on the settlement and consent decree. "The court found that it had accepted the settlement agreement in resolution of the case, that the parties had agreed to all material elements, and that its judgment accurately reflected the substance of their agreement." *Kupcho,* 792 F.2d at 530. During trial, the parties in Kupcho orally dictated the agreement into the record before the court. *White Farm Equip. Co. v. Kupcho,* SA–84–CA–0695 (W.D.Tex. June 10, 1985) (final judgment). The court enforced the terms appearing in the record and incorporated those same obligations into its final judgment. *Id.*

Federal courts need to strike a balance between the obvious practical need for enforceable settlements and the dangers of improperly expanding federal court jurisdiction. A reasonable approach—supported by the decisions on collateral proceedings and inherent powers—would limit federal court enforcement of settlement agreements to instances where a breach of a settlement agreement challenges the institutional integrity or dignity of federal courts.

... A likely benchmark would be the degree to which the judge was involved in the settlement process. If the trial judge actually participated in settlement discussions or an action has been settled on the eve of trial, a federal court has a substantial institutional interest in assuring that the parties comply with the settlement agreement. In contrast, if a case was settled long before trial without court involvement the court has less interest in enforcing the settlement.

*Jurisdictional Pitfalls, supra* page 5, at 35.

Parties relying solely on the court's inherent powers to enforce a settlement agreement after dismissal must incorporate the essential terms of the settlement into the judgment or place the terms of the agreement into the record in some other manner which reflects the court's official sanction of the settlement agreement. As stated by the court in *Kupcho,* "a federal court may hold [the parties] to their word by incorporating the *terms* of their agreement into a final judgment." *Kupcho,* 792 F.2d at 530 (emphasis supplied).

Here, the *terms* of the settlement agreement in 1:93–CV–169 were not incorporated into the final judgment ordering dismissal with prejudice. While Gregory and British Gas moved for and received permission to place the settlement agreement under seal in 1:93–CV–169, *the parties never filed the agreement with the clerk of the court.* The court never was actively involved in the settlement process or otherwise gave its approval to the precise terms of settlement. The parties merely claimed that they had settled, had entered into a binding contract, and wished to dismiss the case. The court took them at their word. The pleadings in the cases removed from state court present a state law contract claim with no federal question.

tively. Thus, this case is not within the rule of *Kupcho.*

tion present. Further, as the court has previously held in several of the cause numbers involved in this barrage of *Grynberg* filings and removals, complete diversity is absent. Thus, the court lacks subject matter jurisdiction,[4] and remand is appropriate under 28 U.S.C. § 1447(c).

It is therefore ORDERED that Plaintiffs' Motion to Remand is GRANTED pursuant to 28 U.S.C. § 1447(c). The clerk of the court shall remand 1:93–CV–561 and 1:93–CV–562 to the 60th Judicial District Court of Texas in Beaumont, Texas.

Signed this 11th day of February, 1994.

/s/ Richard A. Schell
Richard A. Schell
United States District Judge

**Ricky Dan HASHOP, Cathy Hines–Torregano, Ubaldo Garcia, and James Spencer, Jr.**

v.

**ROCKWELL SPACE OPERATIONS COMPANY.**

Civ. A. No. G–94–111.

United States District Court,
S.D. Texas,
Galveston Division.

Nov. 9, 1994.

---

4. Defendants have also urged jurisdiction based on the All–Writs Act, 28 U.S.C. § 1651, and the Anti–Injunction Act, 28 U.S.C. § 2283. These acts are not independent sources of jurisdiction. *Matter of Mooney Aircraft, Inc.,* 730 F.2d 367 (5th Cir.1984) (Anti–Injunction Act not a basis for jurisdiction); *Brittingham v. Commissioner,* 451 F.2d 315 (5th Cir.1971) (All–Writs Act not basis for jurisdiction).

F. Eric Fryar, Susman Godfrey, Houston, TX, for plaintiffs.

Ernest E. Figari, Jr., Gary David Eisenstat, Figari & Davenport, Dallas, TX, for defendant.

### ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

KENT, District Judge.

This is an action brought by Plaintiffs Ricky Dan Hashop ("Hashop"), Cathy Hines–Torregano ("Hines–Torregano"), Ubaldo Garcia ("Garcia"), and James Spencer, Jr. ("Spencer") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* In addition, Plaintiff Hashop has also brought an FLSA retaliatory discharge claim against Defendant Rockwell Space Operations Company ("RSOC") pursuant to 29 U.S.C. § 215. Before the Court now are cross-motions for summary judgment brought by Plaintiffs and Defendant. Plaintiffs urge the Court to grant partial summary judgment against Defendant RSOC on the grounds that it does not have an affirmative defense of exemption under 29 U.S.C. § 213. By contrast, Defendant argues that the Court should grant summary judgment against all of Plaintiffs' claims on the grounds that (1) Plaintiffs are exempt from the overtime compensation provisions of the FLSA because they are exempt "professionals" under 29 U.S.C. § 213, (2) Plaintiffs' FLSA claims are barred by the appropriate statute of limitations, and (3) Plaintiff Hash-

op's retaliatory discharge claim is invalid. For the reasons stated below, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** and Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**

### 1. Factual Background

On January 13, 1993, Plaintiffs filed this purported class action, seeking recovery for uncompensated overtime and retaliation (Hashop only) under the FLSA. This Court denied class certification by an Order on April 6, 1994 and restricted Plaintiffs to their individual claims. Plaintiffs are Network Communication Systems ("NSS") Instructors, who train Space Shuttle ground control personnel during simulated missions. Plaintiffs simulate, and provide instruction on, all communications, data, tracking, and telemetry information that ordinarily flows between the Space Shuttle and the Johnson Space Center Mission Control Center ("Mission Control").[1]

Mission Control in Houston, Texas tracks, maintains contact with, and controls the Space Shuttle through a network of satellites, ground stations, the Goddard Space Flight Center in Maryland ("Goddard"), and the White Sands NASA Ground Terminal in New Mexico ("White Sands"). This network makes it possible for Mission Control to send or receive tracking data, telemetry, commands, and voice communications with the Space Shuttle. During simulations, Mission Control remains unchanged; the actual equipment and control personnel are the same for both simulated and real missions. The astronauts and flight crew are aboard the Shuttle Mission Simulator ("Simulator") instead of the actual Space Shuttle. The NSS Instructors provide the link between Mission Control and the shuttle mission Simulator during simulations. As NSS Instructors, Plaintiffs simulate all tracking data, commands, and voice communications between the Simulator and Mission Control. The NSS Instructors also simulate the activi-

---

1. Hashop joined RSOC in June, 1990; Hines in September, 1990; Spencer in October, 1990; and Garcia in October, 1990. Each Plaintiff was classified as an exempt professional by RSOC when originally hired.

ties that would ordinarily occur at Goddard, White Sands, and remote ground stations.

Plaintiffs' overall job goal as NSS Instructors is to train Mission Control personnel by simulating the foregoing systems in integrated simulations of Space Shuttle missions. This goal comprises four discrete activities: scripting, console work, post-console work, and support activities. The first of these, scripting, involves the development of the outline for simulated missions. Representatives from each group within RSOC's training division meet to develop mission scripts. RSOC's customer, the Simulation Supervisor ("Simsup"), moderates these meetings. Depending on their work schedules, each Plaintiff takes his or her turn serving as the NSS representative at script meetings unaccompanied by a supervisor.

Once the script is complete, Plaintiffs run the "console," from which they perform NSS functions during simulated missions. The console consists of nine computer screens, three keyboards, light pens, and voice communication interfaces. The console allows Plaintiffs to monitor and alter NSS functions to achieve mission objectives. Plaintiffs also make and receive voice calls with the Simsup, Simulator instructors, Mission Control, and the simulation control area adjacent to Mission Control. In addition, NSS Instructors are responsible for helping to "troubleshoot" problems that arise with the NSS equipment during simulations.

After the simulated mission is over, Plaintiffs take part in debriefing Mission Control. During debriefing, Plaintiffs tell Mission Control personnel whether or not they handled simulated NSS anomalies correctly. In addition, they try to determine if their simulated anomalies faithfully reproduce real ones; if a simulated anomaly is not as realistic as it can be, Plaintiffs attempt to change future simulations.

Finally, Plaintiffs also engage in various activities that support their goal of training Mission Control personnel for upcoming missions. These tasks involve writing workbooks and technical guides and travelling to sites to learn more about the network they simulate.

Plaintiff Hashop worked at RSOC from June, 1990 to November, 1993, when he was terminated. Hashop claims that he began voicing his concerns about uncompensated overtime over two years before he was discharged, primarily in the first half of 1991, when he called the RSOC ombudsman. He also confronted his supervisor, Roger Lawley, at a staff meeting in the same time period.

During the latter part of 1991, Hashop received a Performance Appraisal that stated he did not meet all of his job requirements, though the same report also praised him for other aspects of his job performance. He was consequently placed on a formal Performance Improvement Plan ("PIP"), which he successfully completed ahead of schedule by early 1992. This result was confirmed by an internal memo from Lawley that also warned Hashop to sustain his new level of performance.

Throughout 1992, Hashop managed to do just that, but beginning in 1993, his problems with follow-through on the job began to resurface. Jerry Angeley, the supervisor of RSOC's training support group, warned Hashop verbally and in writing about his problems on May 5, June 23, and July 29, 1993. On September 2, 1993, Hashop received a negative performance rating and was placed on a second PIP, which he successfully completed on October 6, 1993. Hashop complained that his performance was not being fairly evaluated, and he accused Angeley of lying about his performance. As a result, Hashop decided to secretly tape-record a conversation with Angeley in October, 1993.

In that same month, Hashop complained about his PIP and Angelely's alleged lying to RSOC's Human Resources Department member Melissa Vaughn. Notably, Hashop did not complain to Vaughn about overtime compensation. Vaughn investigated Hashop's complaint and listened to his secretly recorded audiotape of Angeley. When she learned that Hashop's recording violated both NASA and RSOC rules, Vaughn informed Lawley, who concluded that the accusations against Angeley were unfounded. Believing Hashop's conduct to be disruptive

to the employer-employee relationship, Lawley and Vaughn determined that Hashop should be terminated. On November 4, 1993, RSOC discharged Hashop.

### 2. Standard for Summary Judgment

■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. In other words, summary judgment should not be granted if the evidence indicates that a reasonable fact-finder could find in favor of the nonmoving party. Id. See also Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ In ruling on a Motion for Summary Judgment, the Court must accept the evidence of the nonmoving party and draw all justifiable inferences in his favor. Credibility determinations, weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. Anderson v. Liberty Lobby, supra, 477 U.S. at 255, 106 S.Ct. at 2513.

■ Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. Matsushi-

ta, supra, 475 U.S. at 585–87, 106 S.Ct. at 1355–56; Leonard v. Dixie Well Serv. & Supply, Inc., 828 F.2d 291, 294 (5th Cir. 1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita, supra, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original).

### 3. Analysis

### 1. The Statute of Limitations Claim

■ As an initial matter, RSOC argues that Plaintiffs' FLSA claims are barred by the applicable statute of limitations.[2] All FLSA actions are governed by a two-year statute of limitations unless the Defendant is found to have willfully violated the FLSA, in which case the appropriate time limitation is three years. 29 U.S.C. § 255(a). It is undisputed in this case that all four of the Plaintiffs were initially hired well in excess of either of these statutory time limits. Nevertheless, the Court finds that in this case Plaintiffs' claims are not time-barred.

■ The issue in an FLSA case such as the one now before the Court is whether the claim made by the Plaintiffs is a continuing violation of the Act or whether the alleged decision not to pay overtime compensation is a single violation of the statutory requirements. The Fifth Circuit has stated that the continuing violation theory encompasses two kinds of cases. The first includes cases in which the original violation occurs outside

2. The complex briefs and motions in this case contain a good deal of discussion as to whether the two-year or three-year statute of limitations should be applied. However, Defendant RSOC's Motion for Summary Judgment fails to request the Court to determine which of the two time periods should properly be applied in this case; it merely states that "Plaintiffs' claims for uncompensated overtime should be dismissed in their entirety because they are barred by the FLSA statute of limitations." (Defendants' Motion for Summary Judgment, Instrument # 16, at 18). This Court will not address questions not properly brought before it, and in deciding that Plaintiffs' claims are not time-barred, the Court does not decide which of the two limitation periods should apply in this case.

the statutory period but which is closely related to subsequent violations that are not time-barred. In this kind of case, a Plaintiff may recover for all violations on the theory that they constitute one continuing type of violation. *Hendrix v. Yazoo City,* 911 F.2d 1102, 1103–04 (5th Cir.1990). The second type of case involves an initial violation that also occurs outside the statutory period but which is repeated later. In this type of case, each subsequent violation begins a new statute of limitations period, and recovery may be had for those violations that occur within a period of limitations. *Id.*

By contrast, a single violation occurs where a facially neutral method of administering an initial act of discrimination merely gives effect to that original violation. For example, the discriminatory adoption of a facially neutral seniority system is a single violation that triggers the statute of limitations rather than a continuing violation renewed with each paycheck. *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). Likewise, when a city unilaterally reduces the base salary of its firefighters in direct violation of a Congressional order not to do so, it constitutes a single violation of the FLSA. *Hendrix, supra,* 911 F.2d at 1103.

In this case, the Court finds that if the FLSA has been violated at all, it is a continuing violation renewed with each paycheck rather than a single violation subsequently barred by the statute of limitations. The Fifth Circuit has found in a similar FLSA case that "[a] cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halferty v. Pulse Drug Co.,* 821 F.2d 261, 270, *mod. on other grounds,* 826 F.2d 2 (5th Cir.1987). In *Halferty,* an ambulance dispatcher was classified as an independent contractor rather than an employee as required by the FLSA, thereby allowing the employer to claim that the employee was exempt from the FLSA overtime provisions. *Id.* at 262–63. Likewise, the Circuit has also found that a violation of the Equal Pay Act, which is enforced through the FLSA, creates a separate cause of action

at each regular payday. *Hodgson v. Behrens Drug Company,* 475 F.2d 1041, 1050 (5th Cir.1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973). More recently, the Eleventh Circuit also found that where an employee claims to have been improperly classified as exempt from the FLSA's overtime provisions, "[e]ach failure to pay overtime constitutes a *new* violation of the FLSA." *Knight v. Columbus, Georgia,* 19 F.3d 579, 581 (11th Cir.), *cert. denied,* ––– U.S. ––––, 115 S.Ct. 318, 130 L.Ed.2d 280 (1994). In *Knight,* the Eleventh Circuit stated that it is not the employer's *rationale* for refusing to pay overtime compensation that creates the employee's cause of action, but the actual failure to receive overtime payments with each paycheck when they have accrued. *Id.* Because this case is squarely within the parameters set forth in *Halferty,* the Court finds that the claims brought by the Plaintiffs in this case constitute a continuing alleged violation of the FLSA renewed with each paycheck. Consequently, Defendant's Motion for Summary Judgment on the grounds that Plaintiffs' claims are time-barred is **DENIED.**

*2. Plaintiffs' Exempt Status as "Professionals"*

As a second ground for summary judgment, Defendant argues that Plaintiffs' claims for uncompensated overtime should be dismissed because Plaintiffs are exempt professionals under the FLSA. The FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity ..." 29 U.S.C. § 213(a)(1). The employer bears the burden of proving an employee's exempt status. *Paul v. Petroleum Equipment Tools Co.,* 708 F.2d 168, 169 (5th Cir.1983). As with all exemptions to the FLSA, the employer's claim of exemption must be construed narrowly and in favor of the employee. *See Brennan v. Greene's Propane Gas Service, Inc.,* 479 F.2d 1027, 1032 (5th Cir.1973).

Determination of professional status is guided by regulations issued by the Secretary of Labor and the Administrator of the Wage and Hour Division. When an employee earns more than a minimum weekly salary

of $250, these regulations allow an employer to use a "short test" to meet its burden of proving an employee's professional status. Under this test, the employer must show that the employee's "primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning, or work as a teacher in the activity of imparting knowledge ... which includes work requiring the consistent exercise of discretion and judgment." 29 C.F.R. §§ 541.3(e) & 541.315.[3]

Defendant RSOC first argues that Plaintiffs are exempt professionals under this "short test" because of their status as instructors whose primary duty is the scripting, console, post-console, and support work by which Plaintiffs train Mission Control personnel for the NASA Space Shuttle program. Defendant claims that this is an "activity of imparting knowledge" under 29 C.F.R. § 541.3(a)(3). (See Defendant's Motion for Summary Judgment, at 7).

The Court finds Defendant's argument on this point to be utterly without merit. 29 C.F.R. 541.301(g)(1) clearly states that a requisite for the teacher exemption is that the employee be engaged "in this activity as a teacher in the school system, or educational establishment or institution by which he is employed." It is patently clear that RSOC is not a "school system" or an "educational establishment"; instead, it is a large, for-profit corporation engaged in the aerospace industry. Although Defendant relies on Wilks v. District of Columbia, 721 F.Supp. 1383 (D.D.C.1989) as support for its position, that case is wholly inapposite to the facts at hand. In Wilks, teachers in a correctional institution were held to fall within the professional exemption because they were certified

by the District of Columbia Public Schools and were full-time, professional educators. In this case, however, there is no contention that any of the Plaintiffs are certified teachers. Thus, although Wilks suggests that courts may be willing to extend the teacher exemption beyond traditional schools under some circumstances, nothing in this case suggests that any of the Plaintiffs have ever been trained as teachers or can even arguably be said to fall within the guidelines of 29 C.F.R. 541.301(g)(1). See Wilks, supra, 721 F.Supp. at 1385 (stating that "[t]he ordinary meaning of the term 'educational institution' is 'school.' ").[4]

Nevertheless, the remaining two requirements of the professional exemption—the performance of work requiring knowledge of an advanced type and the consistent use of discretion in the performance of that work—present this Court with the difficult task of determining whether the duties and qualifications of the highly skilled aerospace personnel in this case make them technicians or "professionals" for FLSA purposes. Defendant claims that the Plaintiffs in this case are professionals because of their educational background and duties; Plaintiffs counter this assertion with the claim that they "are truly the assembly line workers of the Information Age." (Plaintiff's Motion for Partial Summary Judgment, Instrument # 19, at 3).

There are three elements of the "learned" professional requirement:

[1] the knowledge [must] be of an advanced type. Thus, generally speaking, it must be knowledge which cannot be attained at the high school level.

[2] it must be knowledge in a field of science or learning[, and]

---

**3.** 29 C.F.R. 541.3(e) requires that an employee qualifying for the professional exemption must be paid on a salary basis. Defendant has presented a detailed analysis of such a basis for Plaintiffs' salaries, and it is undisputed that the Plaintiffs are salaried employees. (See Defendant's Motion for Summary Judgment, at 2–3).

Defendant also points out that Plaintiff Hines' pay was reduced after an extended medical leave in March and April, 1994 pursuant to 29 C.F.R. § 541.118(a)(3), which allows deductions for absences for sickness or disability once an employee has exhausted his or her leave allowance

under the employer's compensation plan. Plaintiffs have made no response to this argument in any summary judgment response, and the Court therefore finds that Defendant has borne its summary judgment burden on this point.

**4.** Although C.F.R. § 541.301(g)(2) applies the teacher exemption to instructors in aircraft flight and automobile driving, it seems clear that such employment is assumed to take place in some organized "school-like" setting. This is manifestly different from the corporate, in-house training operation found in this case.

[3] [t]he requisite knowledge ... must be customarily acquired by a prolonged course of specialized intellectual instruction and study.

29 C.F.R. § 541.301(b), (c), (d). The Court is guided in its interpretation of this regulation by an attachment to a letter prepared by the Office of Personnel Management, the agency charged with the enforcement of the FLSA's overtime provisions against government agencies. The letter is meant to assist government agencies in classifying their employees for FLSA purposes. The FPM letter defines professional employees, at a 'minimum, as those who perform work that:

(a)(1) ... requires knowledge in a field of science or learning customarily and characteristically acquired through education or training that meets the requirements for a bachelor's or higher degree ... or [involves] work comparable to that performed by professional employees on the basis of specialized education or training and experience which has provided both theoretical and practical knowledge of the specialty, including knowledge of related disciplines and new developments in the field.

*Palardy v. Horner*, 711 F.Supp. 667, 670 (D.Mass.1989) (quoting Federal Personnel Manual System Letter No. 551–7).

■■■■ By their very terms, neither the C.F.R. regulation nor the FPM letter *requires* that employees have college degrees to qualify for professional status, despite Defendant's apparent assumption to the contrary; they may perform work *comparable* to that done by other professional employees. Nevertheless, professionals must acquire their advanced knowledge through a "prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.301(d). In the vast majority of cases, such a course of study must be a *prerequisite* to entry into the field in question. *Id.* Thus, broadcast journalists are not "professionals" for FLSA purposes because the study of journalism is not required to become a competent journalist. *Freeman v. Nat'l Broadcasting Co.*, 846 F.Supp. 1109, 1154–55 (S.D.N.Y.1993). Likewise, the academic requirement of a bachelor's degree in one of the social sciences to become a probation officer does not make such officers "professionals" because the study of the social sciences is a general, rather than a specialized, academic training. *Dybach v. Florida Dept. of Corrections*, 942 F.2d 1562, 1565 (11th Cir.1991).

■■■■ In this case, the record suggests that no specialized course of instruction prior to employment by RSOC was required by the Defendant for employees to be eligible for admission to the NSS Instructor training program. This is not, however, equivalent to the Plaintiffs' claim that no specialized course of study was required to become an actual NSS Instructor. It is undisputed that the Plaintiffs in this case did, in fact, have college degrees in fields such as electronic engineering and mathematics.[5] In addition, many of them studied physics, analog and digital circuits, computer programming, and radio frequency communications. (Defendant's Motion for Summary Judgment, at 4). Although the Court is genuinely impressed by the prodigious accomplishments of these Plaintiffs, its legal determination of their status is not determined by the credentials they brought to their jobs but rather by the qualifications required by their employer.

■■■■ All parties acknowledge that RSOC's employee requisition forms state that the prospective NSS Instructor must have a "BSEE, Electronics Eng. Technology, CS [computer science], Physics or Math degree or equivalent experience or knowledge of the NSS and/or MCC operations." (Plaintiffs' Motion for Partial Summary Judgment, at 15–16). Clearly, no specific course of study is required by this list; indeed, no degree in *any* subject is a prerequisite as long as the candidate has "equivalent experience" or "knowledge" of the operations. Deposition

---

5. Plaintiffs make much of the fact that three of them had B.S. degrees from DeVry Institute, a trade school that is not fully accredited. However, the Court does not find this a defining fact. Whatever its merits relative to traditional, fully-accredited colleges, a DeVry B.S. degree is clearly a degree beyond the high school level. Whether such a degree qualifies the Plaintiffs as engineers or not, it is clear that FLSA exemptions are based on the activities conducted in a job, not the job title itself. *See Brock v. National Health Corp.*, 667 F.Supp. 557, 563 (M.D.Tenn.1987).

testimony of Roger Lawley, RSOC's manager of the training department that includes NSS Instructors, makes this clear. Lawley stated that some of his exempt employees might have degrees in the life sciences like biology or paleontology or might have no degree at all. (Lawley Depo., Plaintiffs' Motion for Partial Summary Judgment, at 5–6). Although Lawley stated that an NSS Instructor candidate should have a background in "electronic concepts," he explicitly stated that an intelligent person with a degree in mathematics who had no training in electronics or physics would still be eligible. Id.

Nevertheless, NSS Instructors are not certified as Instructors merely on the basis of the qualifications they bring to the initial candidacy itself; they must also undergo an extensive and highly specialized in-house training program that may last up to one year. This curriculum includes subjects such as "Orbiter Communications Systems," "Ground Network Systems," "Space Network Systems," and "Console Pages and Loops." Plaintiffs were required to take a test on each topic and to achieve a score of at least 70% to obtain NSS Instructor certification. The tests involved questions relating to both the practical and theoretical aspects of the subjects involved, and Plaintiffs were required to provide written answers, descriptions, and diagrams. (See Defendant's Motion for Summary Judgment, at 4–5).

The Court believes that this specialized training program brings Plaintiffs within the specialized learning portion of the "professional" exemption. Plaintiffs object that RSOC's instruction is merely an "apprenticeship" or "on-the-job training" program, a form of training prohibited by 29 C.F.R. § 541.301(d). That regulation is meant to exclude "quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training." But, the program in question patently does *not* consist of an "on-the-job" training method where employees learn by doing. Indeed, it is inconceivable to this Court that anyone could learn to operate a simulation system for something as complex as the Space Shuttle program by "hands-on" training or an "ap-

prenticeship" program, both of which clearly refer to methods of instruction far more appropriate in journalism or the mechanical arts. *Cf. Palardy, supra,* 711 F.Supp. at 669–71 (finding that on the job training included teaching skills such as the repair, testing, and overhaul of naval ship equipment).

In deciding this issue, the Court is aware that the rapid development in technology may require that employees receive specialized training subsequent to their formal education to execute the complex jobs they are called on to perform. 29 C.F.R. § 541.301(e)(2) states that "[t]he areas in which professional exemptions may be available are expanding" as knowledge and technology develop. This is certainly true insofar as it relates to the learning required to perform the complex tasks undertaken by the Plaintiffs. To this Court's knowledge, there is no undergraduate degree program in Space Shuttle Operations which the Plaintiffs in this case could have taken to qualify them to be NSS Instructors. Thus, the extensive, highly specific course of study offered by RSOC, combined with the general technical background required for NSS Instructors, certainly brings the Plaintiffs out of a mere apprenticeship form of program into the knowledge of an advanced type required for the professional exemption.

 This does not, however, make Plaintiffs "professionals" for FLSA purposes. They must also consistently exercise discretion in their work to qualify. 29 C.F.R. § 531.305(a) requires that a professional employee "must perform work which requires the *consistent* exercise of discretion and judgment in its performance" (emphasis added). Professional work is thus characterized by the application of special knowledge "with discretion and judgment" and is not "[p]urely mechanical or routine work." 29 C.F.R. § 541.305(b). Based on these criteria, and narrowly construing the exemption in favor of the employees, the Court does not believe that the Plaintiffs in this case have exercised the kind of discretion and judgment neces-

sary to bring them within the professional employee exemption.[6]

 In deciding this issue, the Court recognizes that the professional exemption found in 29 C.F.R. § 541.301 *et seq.* does not contain an explanation or an elaboration of what is meant by the consistent use of discretion beyond the passages quoted above. However, the Court believes that, at a minimum, such discretion must involve the authority to make basic decisions that affect the fundamental operation of the enterprise in question without seeking guidance from superiors as a matter of course. In *Paul, supra,* 708 F.2d at 171, for example, the Fifth Circuit found that an airline pilot was an exempt professional because he had the ability to decide when weather conditions might make take-off impossible and to decide whether a plane was airworthy. Such decisions go to the very operation of an aircraft and suggest that discretion must involve more than the mere application of skills and techniques acquired through an employee's training; it must also have some fundamental, independent ability to effect the operation the employee is involved in to distinguish a "professional" from a highly trained technician. *Cf. Martin v. Penn Line Service, Inc.,* 416 F.Supp. 1387, 1390 (W.D.Pa.1976) (construing the broader, but similar, discretion requirement for the administrative exemption to demand more than a reliance on skills acquired by training).

It is undisputed that during the Simulation scripting process, one of the Plaintiffs is designated the NSS expert and attends a meeting unaccompanied by a supervisor. Defendant claims that during these meetings the Plaintiff-expert exercises discretion by providing technical guidance and advice to the Simsup. (See Defendant's Brief in Support of Motion for Summary Judgment, at 10). The Court fails to see how this goes beyond the duties of a highly trained technician. Jerry Angeley, the supervisor of RSOC's training support group, stated that all the inputs on the script are approved by the Simsup and that most of the proper responses to malfunctions are listed in a manual. (Angeley Depo., Plaintiffs' Motion for Partial Summary Judgment, at 43, 47). The parameters of each malfunction are dictated by the capabilities of the Simulators and by the script scenario, which the NSS Instructor does not create. (Plaintiffs' Motion for Partial Summary Judgment, at 7). Thus, the Plaintiffs certainly use their advanced training and experience to make decisions, but only within a well-defined framework that the Court finds inconsistent with "discretion and judgment." *Cf. Martin, supra,* 416 F.Supp. at 1390 (holding that helicopter pilots whose flight decisions were made within prescribed work assignments did not use discretion under the administrative exemption).

Defendant also argues that during the simulation itself, Plaintiffs are the expert on NSS operations and must use their discretion to make last-minute changes and to advise the Simsup on the technical feasibility of changes. Again, however, the Court finds no meaningful distinction between such activities and those that would be performed by a highly trained technician. Plaintiffs point out that the configuration procedures are mechanical tasks, and Plaintiff Hashop testified that most of the simulation activity is routine work. (Id. at 7–8). There is no evidence that NSS Instructors have the discretion to change how or when simulations

---

6. The Court notes that Plaintiffs have cited with alarming frequency the C.F.R. guidelines for "discretion" as it applies to the *administrative* exemption, 29 C.F.R. § 541.201 *et seq.,* as if it applied to the wholly separate and distinct C.F.R. category of professional exemption without further explanation. Similarly, Plaintiffs rely on *Dalheim v. KDFW–TV,* 706 F.Supp. 493 (N.D.Tex.1988), *aff'd.,* 918 F.2d 1220 (1990), without pointing out to the Court that that case never once addresses the issue of discretion as it relates to the *professional* exemption. 'Although Defendant has vigorously complained about this misstatement of the proper C.F.R. sections, it has also erred in this regard. (See Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment, at 10). For example, Defendant has urged the Court to be guided by *Donovan v. Flowers Marine, Inc.,* 545 F.Supp. 991 (E.D.La. 1982) without pointing out that *Donovan* was not concerned with the professional exemption at all.

This Court, which has one of the heaviest civil dockets in the country, is dismayed that both parties in this case have felt free to flood the Court with an unwarranted amount of deposition and affidavit testimony, but have not taken the time to make consistently clear and accurate statements of the law.

are operated or to use their discretion in any way other than to make technical recommendations within the parameters set out by the script or the Simsup.

■■■■■■ Finally, Defendant argues that Plaintiffs show discretion in the fact that during the debriefing, they tell Mission Control personnel whether or not the NSS anomalies were correctly handled.[7] In addition, Defendant claims that Plaintiffs also engage in discretionary activity by writing workbooks and by travelling to remote sites to gather information. The Court does not find this to be sufficient evidence of a consistent use of discretion to say that Plaintiffs are exempt professionals as a matter of law. When NSS Instructors provide feedback to Mission Control, they merely respond to Mission Control personnel based on responses received during the simulation. Plaintiff Hashop agreed to the suggestion that during the debriefing he would say: "'You did the right thing. You did the wrong thing; here's what we suggest you do next time if this occurs again,' things like that, in response to whatever the MCC person did." (Hashop Depo., Defendant's Motion for Summary Judgment, at 45). This is not so much an exercise of "discretion" as it is technical feedback based on the perceptions of a highly trained technician. Nothing suggests that the Plaintiffs are authorized to make any independent decisions effecting the operation of the debriefing or that they have any discretion to act outside the parameters of the carefully defined debriefing routine. Likewise, Hashop himself makes clear that any research done in relation to writing or revising manuals was heavily guided by the NSS Instructors' supervisor, who set up the guidelines within which the research was to be conducted. (*Id.* at 54).

The Court once again acknowledges the genuine accomplishments of these skilled Plaintiffs, who perform important and advanced work in a critical industry. However, it agrees with them that their actual duties as NSS Instructors do not rise to the level of professionals for FLSA purposes when the exemption is narrowly construed in their favor and against RSOC. Thus, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED,** and Defendant's Motion for Summary Judgment in regard to the exempt status of Plaintiffs is **DENIED.**

### 3. Plaintiff Hashop's Retaliatory Discharge Claim

■■■■■■ Plaintiff Hashop has also brought an individual claim against RSOC, claiming that he was discharged in violation of 29 U.S.C. § 215, which prohibits the discharge or discrimination against any employee for filing a complaint under the FLSA. In order to succeed on such a retaliatory discharge claim, Hashop must prove the same elements that would be required under a Title VII claim. *Strickland v. MICA Information Systems,* 800 F.Supp. 1320, 1323 (M.D.N.C. 1992) (citing *Brock v. Richardson,* 812 F.2d 121, 123 (3d Cir.1987)). A Title VII claim requires intentional discrimination, and under the familiar *McDonnel Douglas/Burdine* framework, the Court employs a three-part test designed to determine the motivation of the defendant in taking the challenged action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). First, the plaintiff is required to establish a prima facie case wherein he must establish the elements of the discrimination claim. If the plaintiff meets these requirements, a presumption of discrimination arises. *Bodenheimer v. PPG Industries, Inc.,* 5 F.3d 955 (5th Cir.1993).

■■■■■■ Second, the defendant may then rebut this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory action. *Olitsky v. Spencer Gifts, Inc.,* 964 F.2d 1471 (5th Cir. 1992). An employer meets this burden by proffering admissible evidence of an explana-

---

**7.** Defendant also points to the fact that Hashop considered himself the "ideas man" for NSS Instructors as evidence of "initiative and imagination." (Defendant's Motion for Summary Judgment, at 12). This argument fails on two counts. First, how Plaintiff subjectively perceived himself is irrelevant to his exercise of discretion. Secondly, nothing in § 541.301 *et seq.* suggests that "initiative and imagination" have anything to do with "discretion."

tion that would be legally sufficient to justify a judgment for the employer. *Guthrie v. Tifco Indus.,* 941 F.2d 374, 376 (5th Cir. 1991). The defendant need not *persuade* the trier of fact that there was no intentional discrimination; he need only produce evidence on that point. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 416 (1993).

▆▆▆▆ Third, once the employer satisfies this burden, the presumption of discrimination established by the employee's prima facie case dissolves. *Burdine, supra,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. The employee's burden of persuasion then arises, and the plaintiff must produce evidence that the employer's proffered reasons are mere pretexts, the real reason for the action having been based on an impermissible animus. *Id.* at 256, 101 S.Ct. at 1095; *Bodenheimer, supra,* 5 F.3d at 959.

▆▆▆▆ In this case, the Court finds that even where the record as a whole is looked at in the light most favorable to the nonmoving party, no reasonable fact finder could determine that the Plaintiff has made a prima facie case of retaliatory discrimination. A plaintiff must show three things to establish a prima facie case of retaliation: (1) he engaged in an activity protected by Title VII; (2) an adverse employment action followed; and (3) there was some causal connection between the activity and the adverse action. *Collins v. Baptist Memorial Geriatric Center,* 937 F.2d 190, 193 (5th Cir.1991). The plaintiff need not show that the protected activity was the sole factor motivating the adverse action, but he must show that "but for" the protected activity, he would not have been subjected to the action he claims is discriminatory. *Id.; Jones v. Flagship Int'l,* 793 F.2d 714, 724 (5th Cir.1986).

The parties in this case hotly contest the question of whether Hashop's internal—and informal—complaint bring him within an activity protected by the FLSA. Yet, assuming *arguendo* that such a showing has been made, and also assuming that an adverse employment action followed, Hashop's claim is still without merit as a matter of law. Plaintiff cannot show in this case that "but for" the protected activity he would not have

been terminated. *Jones, supra,* 793 F.2d at 724. The only evidence Plaintiff has produced on this point is supervisor Lawley's agreement that Hashop's secret tape-recording of Angeley was not "automatically grounds for discharge." (Lawley Depo., Plaintiffs' Motion for Partial Summary Judgment, at 47). It is obvious, however, that the fact that Hashop's actions were not necessarily automatic grounds for termination is *not* the same as saying that they were not sufficient grounds and that "but for" Hashop's informal complaints about overtime work he would not have been terminated.

Plaintiff Hashop has failed to point out that his own summary judgment evidence clearly shows that RSOC had ample grounds for dismissal. A March 15, 1992 company regulation clearly states that certain actions by employees "will be sufficient cause for and may result in corrective action up to and including discharge." Included among the list of prohibited acts are two rules Lawley listed as grounds for dismissal in his November 17, 1993 Internal Team Letter on Hashop's termination. These are: Rule 7, which prohibits the possession of recording devices on company property without authorization; and Rule 10, which forbids disruptive or unprofessional behavior. (See Plaintiffs' Motion for Partial Summary Judgment, PX15). In addition, a June 21, 1989 Management Instruction letter from NASA's General Counsel (which applies to NASA contractor employees) clearly states that no recording devices may be used in conversations. Id.

These regulations provide clear evidence that RSOC had the authority under its internal regulations to discharge Hashop for secretly tape-recording his conversation with Angeley. Indeed, there is no evidence in this case that Hashop was anything more than an "at will" employee of RSOC under the Texas state presumption that all employees are "at will" unless otherwise shown. *Sabine Pilot Service v. Hauck,* 687 S.W.2d 733, 735 (Tex. 1985). While Hashop's termination may have been within the discretion of RSOC management, that does not mean that it could not have served as an independent cause for his firing. Thus, there is absolutely no showing whatsoever in this case that

"but for" Hashop's complaints he would not have been discharged.

 Yet even if the Court assumes that Plaintiff has made out a prima facie case on these facts, Hashop's claim still fails as a matter of law. Plaintiff fails to point out that under *St. Mary's, supra,* —— U.S. at ——, 113 S.Ct. at 2742, 125 L.Ed.2d at 407, RSOC can rebut a presumption of discrimination by showing a legitimate, nondiscriminatory reason for Hashop's termination. Importantly, RSOC need not convince the trier of fact that its proffered reason was the *actual* motivation for its action; it need only show reasons which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. *Id.*

For the reasons stated above, the Court finds that RSOC has clearly shown such a reason. Not only did Hashop violate internal regulations of the company, he also conducted himself in a manner that RSOC found to be a breach of trust. (Defendant's Brief in Support of its Motion for Summary Judgment, at 17). As an "at will" employee, both of Hashop's violations are justifiable grounds for termination, and the Court finds that RSOC has demonstrated a nondiscriminatory reason for its action. This is an especially compelling conclusion in this case because RSOC has failed to take any adverse action against the remaining Plaintiffs in this case for their roles in this FLSA complaint. The Court therefore finds that Defendant RSOC has shown that Plaintiff Hashop's retaliatory discharge claim is invalid as a matter of law, and Defendant's Motion for Summary Judgment on the retaliation claim is **GRANTED.**

### 4. Conclusion

For the reasons stated above, the Court finds that Plaintiffs have demonstrated that Defendant RSOC does not have an affirmative defense that the Plaintiffs are exempt employees, and Plaintiffs' Motion for Partial Summary Judgment is **GRANTED.** Consequently, Defendant's Motion for Summary Judgment is **DENIED** insofar as it relates to the claim that Plaintiffs are exempt professionals for FLSA purposes. Defendant's Motion is also **DENIED** insofar as it argues that Plaintiffs' claims are barred by the stat-ute of limitations. Finally, Defendant's Motion for Summary Judgment against Plaintiff Hashop's retaliatory discharge claim is **GRANTED,** and Hashop's FLSA discharge claim is hereby **DISMISSED WITH PREJUDICE.**

Furthermore, all other relief not specifically granted herein is **DENIED.** Insofar as Defendant has made objections to, or motions to strike, affidavit and deposition testimony produced in this case, such motions are also **DENIED.** All parties are to bear their own costs. It is further **ORDERED** that the parties file no further pleadings on this issue in this Court, including motions to reconsider and the like. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**

**GARAGE SERVICES AND EQUIPMENT DEALERS LIABILITY ASSOCIATION OF AMERICA, INC., et al. Plaintiffs,**

v.

**Edward J. HOMES, in his official capacity as Secretary of the Public Protection and Regulation Cabinet, et al. Defendants.**

**Civ. A. No. 94–11.**

United States District Court, E.D. Kentucky, Frankfort.

Nov. 21, 1994.

Christopher M. Hill, McBrayer, McGinnis, Leslie & Kirkland, Frankfort, KY, for plaintiffs.

Dennis G. Howard, II, Atty. General's Office, Suetta W. Dickinson, Kentucky Dept. of Ins., Judith G. Walden, Kentucky Dept. of Housing, Buildings & Const., Frankfort, KY, for Edward J. Holmes.

Dennis G. Howard, II, Atty. General's Office, Judith G. Walden, Kentucky Dept. of Housing, Buildings & Const., Frankfort, KY, for Charles A. Cotton, Dennis L. Decker.

### MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This action is before the Court upon the parties' cross motions for summary judgment. [Record Nos. 15, 23]. The plaintiffs filed this petition for declaratory judgment seeking a determination that the Liability Risk Retention Act, 15 U.S.C. §§ 3901–3906, preempts and supersedes 815 KAR 30:010, § 1. This matter has been fully briefed and is ripe for consideration.[1]

### FACTUAL BACKGROUND

The plaintiff, Garage Services and Equipment Dealers Liability Association of America, Inc. [Garage Services], a risk purchasing group authorized and operating pursuant to the authorization of the Liability Risk Retention Act, 15 U.S.C. §§ 3901–3906, is an insurance purchasing group that provides liability insurance to propane dealers and others in forty eight (48) states, with the State of Kansas and the Commonwealth of Kentucky as the exceptions. The remaining plaintiffs are propane dealers in Kentucky who wish to purchase their liability insurance through Garage Services. The plaintiffs have brought the instant petition for declaratory judgment

---

1. The National Risk Retention Association has filed an amicus curiae brief in support of the plaintiff's motion for summary judgment. [Record No. 25].

against Edward J. Holmes, in his official capacity as Secretary of the Public Protection and Regulation Cabinet, Charles A. Cotton, in his official capacity as Commissioner of the Kentucky Department of Housing, Buildings and Construction and Dennis L. Decker, in his official capacity as Kentucky State Fire Marshal. The plaintiffs contend that the federal Liability Risk Retention Act preempts a recently promulgated Kentucky regulation—815 KAR 30:010, § 1—which provides that licensed propane dealers may only demonstrate financial responsibility for licensure purposes by means of liability insurance purchased from an insurance company authorized to do business in Kentucky. The term "authorized" insurer means one holding a certificate of authority issued by the Kentucky Insurance Commissioner to transact business in Kentucky. KRS 304.1-100(1).

Garage Services purchases insurance for its members from Homestead Insurance Company of Hoboken, New Jersey [Homestead]. Homestead is not an authorized carrier in the Commonwealth of Kentucky as defined in KRS 304.1-100(1). The plaintiffs contend that Homestead has capital and surplus in excess of Kentucky's requirements for an authorized carrier. Homestead is, however, qualified as a "surplus lines carrier" in Kentucky.

Kentucky has determined that insurance purchased through Garage Services is not acceptable as proof of financial responsibility because the insurance was not provided by an "authorized" carrier. The plaintiffs contend that as a result of this decision, propane dealers in Kentucky have been forced to purchase inferior insurance than that provided by Homestead and one dealer has been unable to obtain any liability insurance.

The plaintiffs argue that 815 KAR 30:010, § 1 is preempted by the federal Limited Liability Risk Retention Act which prohibits states from discriminating against purchasing groups pursuant to 15 U.S.C. § 3903(a)(8). The defendants, on the other hand, maintain that Kentucky may establish requirements as to financial responsibility for purchasing groups, pursuant to 15 U.S.C. § 3905(d). Additionally, the defendants contend they have not discriminated against Garage Services.

### DISCUSSION

The issue before the Court is whether 815 KAR 30:010, § 1, which specifies the manner by which propane dealers may provide financial responsibility, is preempted by the federal Liability Risk Retention Act, 15 U.S.C. § 3901–3906.

### A. History of the Liability Risk Retention Act.

In 1981, Congress enacted the Product Liability Risk Retention Act, Pub.L. No. 97–45, 95 Stat. 949 [1981 Act]. The 1981 Act was Congress' response to problems business had encountered in obtaining product liability coverage: dramatic increases in premiums and in some cases inability to obtain coverage at any price. The 1981 Act attempted to redress the crises by allowing businesses to purchase insurance at more favorable rates by either forming self-insurance pools called risk retention groups or purchasing groups[2]. Risk retention groups are formed for the purpose of self-insurance, while purchasing groups purchase liability insurance on a group basis from an existing insurer. Congress intended to reduce the cost and increase the availability of product liability insurance and to preempt certain state laws that prohibited or hindered the formation of these groups. *Swanco Ins. Co.—Arizona v. Hager,* 879 F.2d 353, 354 (8th Cir.1989).

The 1981 Act was amended by the Liability Risk Retention Act of 1986, Pub.L. No.

---

**2.** A purchasing group is defined under the Act as any group which:
 (A) has as one of its purposes the purchase of liability insurance on a group basis; (B) purchases such insurance only for its group members and only to cover their similar or related liability exposure, as described in sub-paragraph (C); (C) is composed of members whose businesses or activities are similar or related with respect to the liability to which members are exposed by virtue of any related, similar, or common business, trade, product, services, premises, or operations; and (D) is domiciled in any State.
 15 U.S.C. § 3901(a)(5).

99–563, 100 Stat. 3177 (1986) [the 1986 Amendments], to expand the scope of preemption to enable risk retention and purchasing groups to provide not only product liability insurance but all types of liability insurance. The 1986 Amendments also include provisions dealing with the permissible scope of state regulations of risk retention and purchasing groups. *Id.* The extent of the Act's preemption is the issue before this Court.

### B. *Preemption.*

■ The 1981 Act created two separate distinct alternatives for the self-insurance pools: risk retention groups and purchasing groups. *Swanco,* 879 F.2d at 357. Congress considered but rejected the creation of a comprehensive federal regulatory scheme for purchasing and risk retention groups. *Id.* (citing H.R.Rep. No. 190, 97th Cong., 1st Sess. 6–7, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1432, 1435; *Home Warranty Corp. v. Caldwell,* 777 F.2d 1455, 1471–72 (11th Cir.1985), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 118 (1986)). Instead, Congress created separate and distinct preemption schemes for the two groups. "These carefully drafted provisions were designed to provide a 'workable legal framework' balancing the traditional authority of the states and the need for purchasing groups to ameliorate the liability insurance crisis." *Id.* (quoting *Insurance Co. of State of Pennsylvania v. Corcoran,* 850 F.2d 88, 91 (2d Cir.1988) (citing H.R.Rep. No. 865, 99th Cong., 2nd Sess. at 21, 1986 U.S.Code Cong. & Admin.News 5303, 5318)).

The plaintiffs contend that Congress intended broad preemption for both risk retention and purchasing groups. At least two Courts, however, have determined that the scope of preemption differs for these two groups. *See id.* at 357–58 and *Corcoran,* 850 F.2d at 91.

With regard to risk retention groups, the Act broadly preempts "any State law, rule, regulation, or order to the extent that such law, rule, regulation or order would ... make unlawful, or regulate, directly or indirectly, the operation of a risk retention group...." Further subparagraphs then carved out specific exceptions to this broad preemption. *See* 15 U.S.C. § 3902(a)(1)(A–G). "The provision of the 1981 Act applicable to purchasing groups took the opposite approach and avoided sweeping preemption language in favor of designating specific categories of state law to be preempted." *Corcoran,* 850 F.2d at 91. *See also Fla. Dept. of Ins. v. Nat. Amuse. Purchasing,* 905 F.2d 361, 364 (11th Cir.1990) (holding that "both the language and the history of the Act suggest that Congress intended there to be limited preemption of state laws relative to purchasing groups"). The limited extent of the Act's preemption with regard to purchasing groups is set forth in § 3903(a)(1)–(8):

Except as provided in this section and section 3905 of this title, a purchasing group is exempt from any State law, rule, regulation, or order to the extent that such law or order would—

(1) prohibit the establishment of a purchasing group;

(2) make it unlawful for an insurer to provide or offer to provide insurance on a basis providing, to a purchasing group or its members, advantages, based on their loss and expense experience, not afforded to other persons with respect to rates, policy forms, coverages, or other matters;

(3) prohibit a purchasing group or its members from purchasing insurance on the group basis described in paragraph (2) of this subsection;

(4) prohibit a purchasing group from obtaining insurance on a group basis because the group has not been in existence for a minimum period of time or because any member has not belonged to the group for a minimum period of time;

(5) require that a purchasing group must have a minimum number of members, common ownership or affiliation, of a certain legal form;

(6) require that a certain percentage of a purchasing group must obtain insurance on a group basis;

(7) require that any insurance policy issued to a purchasing group or any mem-

bers of the group be countersigned by an insurance agent or broker residing in that State; or

(8) otherwise discriminate against a purchasing group or any of its members.

15 U.S.C. § 3903(a)(1)–(8). Thus, the 1981 Act did not provide for wholesale preemption of state laws that apply to purchasing groups; only those specifically enumerated laws were preempted.

The 1986 Amendments maintained the separate preemption schemes. Despite the Act's preemptory provisions, the 1986 Amendments, with regard to purchasing groups, provided that "[n]othing in this chapter shall be construed to affect the authority of any State to make use of any of its powers to enforce the laws of such State with respect to which a purchasing group is not exempt under this chapter." 15 U.S.C. § 3903(g). In addition, the 1986 Amendments specifically preserved the States' discretion and authority in specifying acceptable means of demonstrating financial responsibility as a condition for obtaining a license or permit to undertake specified activities:

Subject to the provisions of section 3902(a)(4) of this title relating to discrimination,[3] nothing in this chapter shall be construed to preempt the authority of a State to specify acceptable means of demonstrating financial responsibility where the State has required a demonstration of financial responsibility as a condition for obtaining a license or permit to undertake specified activities. Such means may include or exclude insurance coverage obtained from an admitted insurance company, an excess lines company, a risk retention group or any other source regardless of whether coverage is obtained directly from an insurance company or through a broker, agent purchasing group, or any other person.

15 U.S.C. § 3905(d).

The Kentucky Department of Housing, Buildings and Construction, the state agency charged with licensing propane dealers in Kentucky, has attempted to exercise its au-thority to establish acceptable means of establishing financial authority by promulgating 815 KAR 30:010, § 1. The plaintiffs argue that this regulation impermissibly discriminates against purchasing groups and therefore violates § 3903(a)(8). Thus, the plaintiffs contend that this regulation is invalid and should not be enforced.

The defendants, on the other hand, maintain that § 3905(d) gives the Department of Housing the authority to require propane gas dealers seeking an LP license to have evidence of financial responsibility from an authorized (i.e., "admitted") insurance company, regardless of whether the coverage is obtained from an insurance company or through a purchasing group. [Record No. 23, p. 8]. The Court agrees. Principles of statutory construction and the legislative history demand that Kentucky be permitted to regulate the financial responsibility standards for propane dealers who wish to purchase their liability insurance through purchasing groups pursuant to 15 U.S.C. § 3905(d).

The Court finds the instant action comparable to *Corcoran, Swanco,* and *National Amusement.* In *Corcoran,* a purchasing group, Nurse Practitioners Professional Liability Purchasing Group, wanted to provide insurance to nurse practitioners in the state of New York through the Insurance Company of the State of Pennsylvania [State of Penn], an insurer authorized to do business in the state of New York. The Superintendent of Insurance of the state of New York advised the purchasing group that it would be required to comply with New York law regarding the policy-form and rate-approval requirements. State of Penn filed an action for declaratory judgment and injunctive relief claiming that the New York laws on policy-form and rate-approval were preempted by the federal Liability Risk Retention Act.

The Second Circuit Court of Appeals rejected the plaintiffs' argument that the House and Senate Reports of the Act indi-

---

**3.** Section 3902(a)(4) sets forth the Act's preemption powers for risk retention groups when a state regulation would discriminate against a risk retention group. The Act provides a similar provision for purchasing groups in section 3903(a)(8).

cate that a whole preemptive effect was intended for purchasing groups. *Corcoran,* 850 F.2d at 92. The court held that "[t]he House and Senate Reports for the 1981 Act thus solidly support the conclusion that only those state laws and regulations specifically designated in [15 U.S.C. § 3903] are preempted." *Id.* The court further noted that nothing in the 1986 Amendments undermines that conclusion. *Id.*

Similarly, in *Swanco,* the Iowa Unauthorized Insurers Act required purchasing groups to be licensed only in the state where the purchasing group was domiciled. Swanco Insurance Company [Swanco], an insurer for the Ugly Duckling Purchasing Group, was not licensed to issue insurance in Iowa. Swanco filed a petition for declaratory judgment and injunctive relief arguing that the federal Liability Risk Retention Act preempted the Iowa Commissioner's authority to require an insurer providing coverage to purchasing groups members to comply with Iowa's licensing laws. The court examined the Act's distinction between purchasing groups and risk retention groups regarding preemption. The *Swanco* court, citing *Corcoran,* held that, except for the explicitly preempted laws set forth in § 3903(a), Iowa was free to apply its laws in a non-discriminatory manner.[4]

Finally, in *National Amusement,* the National Amusement Purchasing Group [National Amusement] was a Missouri corporation whose members included several Florida businesses. National Amusement purchased insurance for its members through the Bel–Aire Insurance Company [Bel–Aire], a Missouri insurer authorized by the Missouri Division of Insurance to sell insurance in Missouri.

The purchasing group wanted to provide insurance coverage, through the Bel–Aire policies, to business located in Florida. The Florida Department of Insurance instituted an action against the purchasing group arguing that Florida law required the purchasing group to purchase insurance through (1) a risk retention group certified in the United States; (2) an authorized insurer; or (3) an eligible surplus lines carrier. Bel–Aire met none of those qualifications. The purchasing group argued that the federal Liability Risk Retention Act preempted this Florida statute thereby exempting purchasing groups from said law.

Like the courts of appeal in *Corcoran* and *Swanco,* the Eleventh Circuit Court of Appeals compared the federal Liability Risk Retention Act's broad preemption provision for risk retention groups with the narrow preemption provision for purchasing groups. *National Amusement,* 905 F.2d at 363–64. The court rejected the purchasing group's argument that the federal Liability Risk Retention Act preempted state laws which attempted to regulate purchasing groups with regard to licensing requirements. The court held:

> [Section 3903(a)(2)] expressly preempts only those state laws that prohibit insurers from offering purchasing groups "advantages, based on their loss and expense experience." 15 U.S.C. § 3903(a)(2). [Section 3903(a)(3)] preempts only those state laws which prohibit purchasing groups from purchasing insurance which reflects such advantages. Neither section purports to exempt purchasing group insurers from being licensed or otherwise authorized in the state where a purchasing group member resides. While it may be correct to say that preemption of Florida's licensing law would enhance the ability of purchasing groups to operate, *there is not one section in the limited list of preempted laws that explicitly preempts a state's licensing laws as they apply to purchasing groups.* There is little doubt that a non-domiciliary state's licensing laws, if applicable to purchasing group insurers, would burden the ability of insurers to offer purchasing group advantages based on their loss and expense experience. Indeed, the same could be said of many other types of insurance regulations. *Congress did not*

---

4. This Court questions whether the anti-discrimination provision of § 3903(a)(8) applies with respect to financial responsibility laws as set forth in § 3905(d). Nonetheless, that determination is irrelevant for purposes of the instant action as there has been no discrimination against Garage Services. *See* section B. Discrimination, *infra.*

*include within its list of preempted laws, however, a section prohibiting laws and regulations which burden the ability of purchasing groups to operate. Congress clearly could have provided for such preemption. Instead, Congress chose to specifically preempt a limited number of state laws affecting purchasing groups, when it simultaneously and in the same Act preempted in broad terms all but a limited number of state laws affecting risk retention groups.* Given Congress's choice, this Court cannot accept the interpretation [the purchasing groups] ask this court to adopt.

*Id.* at 365.

In a very recent case, the Eleventh Circuit Court of Appeals determined that financial responsibility laws, such as 815 KAR 30:010, § 1, are the very type that Congress excepted from preemption in § 3905(d). In *Mears Trans. v. Florida,* 34 F.3d 1013 (1994), the Eleventh Circuit rejected similar preemption arguments made by risk retention groups with regard to a Florida statute which established financial responsibility requirements for for-hire transportation vehicles. The risk retention groups also argued that the Florida statute impermissibly discriminated against risk retention groups. The undersigned finds the analysis in *Mears* applicable to the instant action.

In *Mears,* two risk retention groups challenged amendments to a Florida statute requiring for-hire transportation vehicles to prove financial responsibility by maintaining insurance covering the first dollar of liability per accident up to $30,000 combined single limits. The statute required said insurance to be purchased from "an insurance carrier which is a member of the Florida Insurance Guaranty Association." *Id.* at 1015. The plaintiff risk retention groups argued that the statute violated the anti-discrimination policies of the federal Liability Risk Retention Act. The Eleventh Circuit, reversing the district court, determined that the Florida statute was precisely the type of state law Congress expressly exempted from the preemption provisions of the Liability Risk Retention Act. Further, the court found no evidence of discrimination. The undersigned likewise finds that like the Kentucky regula-

tion, KAR 30:010, § 1, is precisely the type of financial responsibility law that Congress expressly exempted from preemption in 15 U.S.C. § 3905(d); additionally, there is no evidence of discrimination against Garage Services or any other purchasing group.

In determining that the Florida statute was the type Congress expressly exempted in § 3905(d), the *Mears* court, after reviewing the purpose of the Act, determined that

Congress specifically excepted from the Act's preemptive provisions those state laws aimed at assuring the financial responsibility of entities subject to state, county, and city licensure laws. By so doing, Congress evidenced its intent to preserve for the states the authority to utilize financial responsibility laws to protect the public.

*Id.* at 1018. The specific language of § 3905(d) demands this conclusion.

Subsection 3905(d) specifically authorizes the state to "specify acceptable means of demonstrating financial responsibility" as a condition for obtaining a license or permit to undertake specified activities. The subsection further provides that "[s]uch means may *include* or *exclude* insurance coverage obtained from an admitted insurance company, ... a risk retention group, or any other source [regardless of whether coverage is obtained directly from an insurance company or through a broker, agent, purchasing group, or any other person.]" By amending Fla.Stat. ch. 324.031, the Florida legislature specified an acceptable means for owners and operators of for-hire passenger transportation vehicles to demonstrate financial responsibility; this means *includes* insurance coverage obtained from members of the FIGA and *excludes* the first $30,000 of insurance coverage obtained from non-members, including risk retention groups. Thus, Fla.Stat. ch. 324.031 as amended falls squarely within the language of § 3905(d).

*Id.* at 1018.

The undersigned likewise finds that 815 KAR 30:010, § 1, is the type of statute specifically exempted by Congress in § 3905(d). The Kentucky regulation specifies an acceptable means for propane dealers to demon-

strate financial responsibility; this means *includes* insurance coverage obtained from insurers authorized in the Commonwealth of Kentucky, and *excludes* coverage from those not authorized, including coverage provided through purchasing groups. The Act provides that such means may include or exclude such coverage *"regardless* of whether the coverage is obtained directly from an insurance company or through a ... purchasing group...." 15 U.S.C. § 3905(d).

### C. *Discrimination.*

■ The *Mears* court also rejected the risk retention groups' argument that the financial responsibility law impermissibly discriminated against risk retention groups in violation of § 3905(d). Garage Services similarly contends that 815 KAR 30:010, § 1, is invalid because it discriminates against purchasing groups which is prohibited by § 3903(a)(8).

The Court notes that the anti-discriminatory exception in § 3905(d) applies to risk retention groups, not purchasing groups. Nonetheless, given the anti-discriminatory provision for purchasing groups found in § 3903(a)(8), the Court will consider Garage Services' discrimination argument.

■ Garage Services, asserts that the financial responsibility regulation in question discriminates against purchasing groups because the regulation "has the effect, whether intended or not, of placing obstacles in front of Purchasing Groups, which [ ] are not shared by admitted carriers, [and] violates the anti-discrimination provisions of the [Act]." [Record No. 16, p. 21]. The undersigned finds no discrimination. The regulation does not single out purchasing groups for preclusion; the financial responsibility law applies equally to all insurers, purchasing groups and risk retention groups. The financial responsibility requirements are a legitimate and rational exercise of a state's traditional authority to act in the public interest; the requirements are designed to provide members of the public injured by propane accidents adequate protection. *See id.* at 1018. (finding no evidence of discrimination against risk retention groups in the Florida statute where the amendment did not single out risk retention groups for preclusion; the preclusion was narrow; and the financial responsibility requirements were a legitimate and rational exercise of the state's traditional authority to act in the public's best interest). Hence, the undersigned finds that 815 KAR 30:010, § 1, is aimed at protecting the public, not at discriminating against purchasing groups; therefore, it is exactly the type of state regulation that Congress had in mind when it added § 3905(d) to the federal Liability Risk Retention Act in 1986. If a state, as Florida did in *Mears,* may enact financial responsibility laws for risk retention groups which exclude coverage if the risk retention groups is not an authorized insurer within that state without violating the anti-discrimination principles of the Act, then by the same analysis, a state may, without engaging in prohibited discrimination establish financial responsibility laws which require that an insurer providing liability coverage to a specific category of insureds be licensed in that state, even where purchasing groups wish to purchase insurance for a particular groups of insureds, without engaging in prohibited discrimination.

### D. *Remaining claims.*

The plaintiffs contend that should the undersigned determine that the plaintiffs have failed to establish that 815 KAR 30:010, § 1 is preempted by the federal Liability Risk Retention Act or that the regulation is discriminatory, then the defendants' motion for summary judgment should nonetheless be overruled as Garage Services is entitled to prove that the state's action, as applied, violates 15 U.S.C. § 3903(a). As the undersigned determined above that financial responsibility laws are not the type of state laws preempted by § 3903(a), the plaintiffs' request must be denied.

### CONCLUSION

Having given due consideration to the parties' well-prepared briefs, along with brief of the amicus curiae, the Court finds that the financial responsibility licensing requirements found in 805 KAR 30:010, § 1, are not preempted by the federal Liability Risk Retention Act because licensing requirements

are not included in the list of preempted laws in § 3903(a) of the Act. Further, the Act specifically provides that a states' authority to specify acceptable means of demonstrating financial responsibility as a condition for obtaining a license are not preempted. 15 U.S.C. § 3905(d). Finally, the regulation does not discriminate against purchasing groups, but is aimed at protecting the public's welfare.

Accordingly,

**IT IS HEREBY ORDERED:**

(1) That the plaintiffs' motion for summary judgment [Record No. 15] be, and the same hereby is, **OVERRULED.**

(2) That the defendants' motion for summary judgment [Record No. 23] be, and the same hereby is, **GRANTED.**

(3) That this matter be, and the same hereby is, **DISMISSED AND STRICKEN FROM THE ACTIVE DOCKET.**

**Juanita R. PADILLA, as Personal Representative of the Estate of Joseph Angel Padilla, deceased, Plaintiff,**

v.

**CITY OF SAGINAW, Alex G. Perez, Chief of Police, and James Blondin, Defendants.**

No. 94–CV–10252–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Nov. 15, 1994.

Heidi L. Salter, Ann Arbor, MI, for plaintiff.

Kenneth G. Galica, Bay City, MI, for defendants.

## MEMORANDUM OPINION AND ORDER

CLELAND, District Judge.

### I. Introduction

Pending before the court is Plaintiff's motion to remand this case to Saginaw County Circuit Court (Document 3).[1]

---

1. The document is entitled "Plaintiff's Objection to Notice of Removal." However, since the plaintiff is seeking relief, i.e., remand, the court construes the document as a motion for remand.

This action arises out of the shooting death of Joseph Angel Padilla by police officer James Blondin on June 28, 1992. Plaintiff, the personal representative of the decedent's estate, filed her complaint against the City of Saginaw, Police Chief Alex G. Perez, and police officer James Blondin in Saginaw County Circuit Court on or about June 27, 1994. The complaint states eight counts: (I) assault and battery—Blondin; (II) tortious violation of ministerial duties—Blondin; (III) tortious violation of ministerial duties—Perez; (IV) tortious violation of duties—City of Saginaw; (V) intentional infliction of emotional distress—Blondin; (VI) violation of Michigan and federal civil rights—Blondin; (VII) violation of Michigan and federal civil rights—Perez; and (VIII) violation of Michigan and federal civil rights—City of Saginaw. Defendants removed the action on September 2, 1994, pursuant to 28 U.S.C. §§ 1331 and 1441.

Plaintiff moves the court to remand the entire case under 28 U.S.C. § 1441(c). At oral argument on November 10, 1994, the court held that 28 U.S.C. § 1441(c) is inapplicable to this case. Pursuant to 28 U.S.C. § 1367(c)(4), however, the court declines to exercise supplemental jurisdiction and remands the state law claims. The court issues this written opinion in order to elucidate the principles that govern this case.

## II. Background

Plaintiff's complaint alleges that on June 28, 1992, her decedent was walking completely naked at or near the 3100 block of Hess Street in Saginaw. At approximately 5:00 p.m., Defendant Blondin was summoned to that area. When he arrived, he observed the decedent with no clothes on, smoking a cigarette in the driveway. Plaintiff alleges that Defendant Blondin recognized the decedent, had known him for approximately four years, and knew that he suffered from a mental disability. Defendant Blondin allegedly asked the decedent to come with him, but he did not arrest the decedent, who was unarmed. A confrontation ensued, and Defendant Blondin fired four shots at the decedent,

three of which struck him. Decedent died the same day; he was 38.

## III. Discussion

Defendants timely filed their notice of removal of this case on September 2, 1994, alleging that removal is proper "pursuant to 28 U.S.C. [§§ ]1331 and 1441." Defendants did not specify which subsection of 28 U.S.C. § 1441 they wished to invoke, and it appears that this is where the confusion in this case arose.

### A. Removal Would Be Proper Under 28 U.S.C. § 1441(a) and (b).

■ Removal would be proper under 28 U.S.C. § 1441(a) and (b). 28 U.S.C. § 1441(a) provides, in pertinent part,

> [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(b) provides that where district courts have original jurisdiction founded on a federal question, a civil action is removable without regard to the citizenship or residence of the parties.

This court has original jurisdiction over Plaintiff's claims under its federal question jurisdiction, 28 U.S.C. § 1331, and under the doctrine of supplemental jurisdiction articulated in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and codified at 28 U.S.C. § 1367. 28 U.S.C. § 1331 provides that district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Counts VI, VII, and VIII invoke 42 U.S.C. § 1983, so the court has original jurisdiction over those claims. 28 U.S.C. § 1367(a) provides that in suits in which district courts have original jurisdiction, they "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article

III of the United States Constitution." Plaintiff's other claims fall under the court's supplemental jurisdiction because they and the federal law claims derive from a common nucleus of operative fact and, thus, form part of the same case or controversy under Article III. Plaintiff's complaint sets forth 25 "common allegations," which are expressly incorporated and re-alleged in each of the eight counts. Furthermore, all eight counts arise out of a single incident—the shooting of Plaintiff's decedent. Thus, the claims form a single case or controversy under Article III, and removal of the entire action was proper.

### B. Removal Would Not Be Proper Under 28 U.S.C. § 1441(c).

■ Plaintiff contends that the defendants removed the action under 28 U.S.C. § 1441(c), which provides

Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title [federal question jurisdiction] is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

Plaintiff moves the court to exercise its discretion under § 1441(c) to remand the entire case to state court on the ground that state law predominates in all of the claims. In short, Plaintiff contends that "the state law claims are separate and independent causes of action" (Plaintiff's Reply Brief in Support of Objection to Removal "Reply," 1), but yet "Plaintiff's adjunct federal claims alleged are factually tied to all of the state claims." (Plaintiff's Brief in Support of Objection to Removal, "Brief," 6).

The court holds that 28 U.S.C. § 1441(c) is not applicable because the plaintiff's claims are not separate and independent. Rather, the claims arise from a common nucleus of operative fact. In *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951), the United States Supreme Court construed the words "separate and independent claim or cause of action" in 28 U.S.C. § 1441(c), which Plaintiff now invokes. Although § 1441(c) has been amended since

*Finn*, the pertinent language of the section— "(c) Whenever a separate and independent claim or cause of action, ..., is joined with one or more otherwise nonremovable claims or causes of action, the entire case may be removed and the district court may determine all issues therein,"—became effective on September 1, 1948 and is the provision construed by *Finn*. The *Finn* court "conclude[d] that where there is a single wrong to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c). In making this determination, we look to the plaintiff's pleading, which controls." *Id.* at 14, 71 S.Ct. at 540. The Court noted that "the damage comes from a single incident" and that the allegations against one defendant "involve substantially the same facts and transactions as do the allegations in the first portion of the complaint ... It cannot be said that there are separate and independent claims for relief as § 1441(c) requires." *Id.* 16, 71 S.Ct. at 541.

The Court of Appeals for the Sixth Circuit applied this test in *Union Planters Nat'l Bank of Memphis v. CBS, Inc.*, 557 F.2d 84, 89 (6th Cir.1977). The underlying action in *Union Planters* arose from the default on loans made by the plaintiff to one defendant and guaranteed by two other defendants; the complaint also sought to recover from a fourth defendant, CBS, alleging that CBS committed tortious acts which destroyed the borrower's ability to repay the loan. Diversity of citizenship existed between the plaintiff and CBS, but not between the plaintiff and the other defendants. The action was filed in state court and involved no federal question. CBS filed for removal on the ground of diversity of citizenship and the existence of a "separate and independent claim or cause of action" within the meaning of 28 U.S.C. § 1441(c). The plaintiff then moved to remand the action to the state court on the ground that there was no jurisdiction under § 1441(c). The district court concluded that the case was removable and refused to remand it. It also exercised its discretion to retain the entire suit, including those actions against the other defendants having no diver-

sity of citizenship. The sole issue on appeal was whether Union Planters' complaint stated a separate and independent claim or cause of action against one defendant, CBS, so as to be removable to the district court pursuant to 28 U.S.C. § 1441(c). *Id.* at 88. Since *Union Planters* was decided, the statute was amended to permit removal under § 1441(c) only where the case involves a federal question. The language relevant to the present case, though, "separate and independent claim or cause of action," was not affected by the amendment, so the *Union Planters* interpretation of that phrase is still sound.

The Sixth Circuit rejected CBS's claims that the actionable wrongs against the other defendants were separate and distinct from the wrongs alleged against it and, accordingly, reversed the district court.

> The wrong asserted against the Tennessee defendants, CBS says, is a failure to pay debts; while the wrong which Union Planters asserts against CBS is a series of tortious acts. The fact that Union Planters utilized separate counts to plead different legal theories, one sounding in contract and the other in tort, does not automatically make them separate and independent. The complaint will be considered as a whole and the issue of removal determined on that basis. Multiple theories of recovery do not necessarily mean multiple causes of action where there is but one wrong.

*Id.* at 89. The case at bar is an easier one than *Union Planters*. In *Union Planters*, CBS argued that the cause of action against it not only differed in legal character from the action against the other defendants, but that it was based upon different events and transactions. *Id.* No such argument could be made in good faith here. Plaintiff's state law causes of action may differ in legal character from the federal law causes of action, if only because they are brought under different bodies of law. But the state law causes of action are not based upon different events and transactions. All Plaintiff's claims are based on the same event—the shooting of

her decedent and, possibly decisions or transactions very closely related to it. Plaintiff's argument that her state law claims are separate and independent from her federal law claims is weaker than CBS's argument in *Union Planters*, which the Sixth Circuit rejected.

Another district court in this circuit has recently applied *Finn* to a case like the one at bar. In *Kabealo v. Davis*, 829 F.Supp. 923 (S.D.Ohio 1993), the court noted, "Where there is a single injury to plaintiff for which relief is sought, arising from an interrelated series of events or transactions, there is no separate or independent claim or cause of action under § 1441(c)." *Id.* at 926. "The use of different counts to plead different legal theories or multiple theories of recovery does not automatically make those counts separate and independent." *Id.* The sense in which Plaintiff's state law claims are separate and independent from her federal law claims is that they are brought under different legal theories, and that is insufficient reason to invoke § 1441(c).

The complaint sets forth 25 common allegations, which lay out the relevant facts. Each count of the complaint then "incorporates and re-alleges paragraphs 1–25 of the Common Allegations as though completely stated herein." Plaintiff suffered a single injury—her decedent was shot and killed. This injury arose from a series of interrelated events or transactions. Thus, under *Finn*, *Union Planters*, and *Kabealo*, Plaintiff's state and federal claims are not separate and independent, and 28 U.S.C. § 1441(c) does not apply.

In her written submissions and at oral argument, Plaintiff relied heavily on one writer's commentary to the 1990 amendments to 28 U.S.C. §. 1441(c) and on *Moore v. DeBiase*, 766 F.Supp. 1311 (D.N.J.1991). Plaintiff cited David D. Siegel, "Commentary on 1988 and 1990 Revisions of Section 1441," for his statement, "It was left entirely to the federal judge to decide what if anything should stay in the federal court and what should go back to the state court." [2] Plaintiff

---

**2.** Plaintiff's citation to this comment gives the misleading impression that it was the Revision Notes or other official commentary. She cites

Siegel's article as "28 U.S.C. 1441 Comments, 'The 1990 Amendments of Subdivision (c).'" The court considers Siegel's comments but notes

takes this comment out of context. The sentences preceding and following the one quoted by the plaintiff are helpful in understanding § 1441(c) but actually militate against Plaintiff's position:

> Recognizing the liberal rules of joinder applicable in many state courts, however, which often support the joinder of **wholly unrelated** claims, subdivision (c) permitted the federal judge, after removal, to 're-mand all matters not otherwise within its [the federal district court's] original juris-diction'. That acted as a lever that the federal judge could pull to send back to the state court **claims having no relation-ship, or so little, to the federal-jurisdic-tion-supporting claim that they had no call on the attention of a federal judge.** The state court could not interfere in the process. It was left entirely to the federal judge to decide what if anything should stay in the federal court and what should go back to the state court. Giving the federal court this leverage may also have avoided constitutional issues in some in-stances by enabling the judge to remand to the state court **claims that could find no justification for federal subject matter jurisdiction** in any of the permissible cate-gories enumerated in § 2 of Article III of the U.S. Constitution, or **in any theory pronounced in the caselaw for offering at least some kind of implied jurisdic-tion to the other claims (like 'pendant' or 'ancillary' jurisdiction).** See 28 U.S.C.A. § 1367, above, and the Commen-tary on it. [emphasis supplied].

The situation of which Siegel speaks is clearly not the situation in this case. Plaintiff's state claims are not "wholly unrelated" to her federal claims. On the contrary, all Plain-tiff's claims derive from a single incident; they merely state different theories of recov-ery for the same wrong. It could not be fairly said that the state claims have no relationship, or so little, to the federal-juris-diction-supporting claims, i.e., the 42 U.S.C.

§ 1983 claims, that "they had no call on the attention of a federal judge." This court has jurisdiction of Plaintiff's state law claims un-der 28 U.S.C. § 1367, which codifies the doc-trine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Plaintiff's reliance on Siegel's com-ments is entirely misplaced.

Plaintiff also relies heavily on *Moore v. DeBiase*, 766 F.Supp. 1311 (D.N.J.1991), in which a district court remanded under § 1441(c). Plaintiff urges the court to follow *Moore*, stating that "it is on all fours with this case." (Reply, 2). Moore is similar to the case at bar, but it is not binding on this court. This court believes that *Moore* was wrongly decided. No other published deci-sion has followed *Moore*'s holding that re-mand is appropriate under § 1441(c) where the state and federal claims are premised upon the same nucleus of operative facts, and this court sees no reason to do so.

In *Moore*, a police officer brought suit in state court alleging that the police chief and other officials campaigned to discredit and terminate him in retaliation for filing a griev-ance. He filed a complaint with nineteen counts, only two of which invoked federal law, 42 U.S.C. § 1983.[3] As in the case at bar, the counts based on § 1983 also alleged violation of state constitutional rights. After a thorough review of the history of § 1441(c), the court—remarkably—stated, "Remand of the entire matter, including the section 1983 claims, is even more compelling in this case because the federal claims are factually tied to all of the state law claims." *Id.* In this court's opinion, the *Moore* court failed to appreciate that § 1441(c) does not apply where federal claims are factually tied to state law claims; it applies only where they are "separate and independent." Under *Finn*, if the state and federal claims are factually tied, they are not separate and inde-pendent, and § 1441(c) does not apply.

---

that they are not properly afforded any more weight than any other treatise on the issue.

**3.** The *Moore* court stated that "[s]ixteen of the nineteen Counts in the Complaint allege causes of action based purely on state law. The federal

law claims are found only in the Fourteenth and Fifteenth Counts." It is unclear what the re-maining count, ostensibly based neither purely on state law nor based in any part on federal law, was based on.

As this court interprets § 1441(c), that section applies only where the state and federal claims in a single suit do not derive from a common nucleus of operative fact and, thus, where the suit is not removable under §§ 1441(a) or (b) because the court lacks any basis for jurisdiction over the state law claims. While the class of cases to which § 1441(c) applies is small, it is not nonexistent. For example, in *Moralez v. Meat Cutters Local 539,* 778 F.Supp. 368 (E.D.Mich. 1991), Judge Zatkoff properly remanded a case under § 1441(c) because the state and federal claims were truly separate and independent. Moralez's federal claim was against a union for breach of a collective bargaining agreement; his state claims were intentional infliction of emotional distress and battery. The court noted that "plaintiff's state claims fall far short of the required origin" for pendent jurisdiction. *Id.* 370.

This Court finds that for virtually the same reasons plaintiff's state claims were not pendent, plaintiff's federal cause of action presents a separate and independent claim. That is, plaintiff's federal and state claims appear to seek separate relief for distinct wrongs.

*Id.* Where a plaintiff's federal and state claims seek separate relief for distinct wrongs, as in *Moralez,* a court properly invokes § 1441(c). But where, as here, the plaintiff seeks relief for a single injury, arising from an interrelated series of events or transactions, § 1441(c) does not apply.

### C. Pursuant to 28 U.S.C. § 1367(c), the Court Declines to Exercise Supplemental Jurisdiction.

Although § 1441(c) does not apply, 28 U.S.C. empowers a district court to remand state law claims over which it has supplemental jurisdiction.[4] 28 U.S.C. § 1367(c) provides that a district court may decline to exercise supplemental jurisdiction over a supplemental claim if

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The subsection applicable to the case at bar is subsection four—"other compelling reasons for declining jurisdiction."

The potential for jury confusion can be a sufficiently compelling reason for declining jurisdiction. The United States Supreme Court has cited jury confusion in cases brought under 42 U.S.C. § 1983 and state law as a proper reason for a district court to decline to exercise pendent jurisdiction. *Moor v. County of Alameda,* 411 U.S. 693, 716–17, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973). Wright, Miller & Cooper identify jury confusion as a sound reason for a district court to remand state law claims over which it has supplemental jurisdiction. "One example of this [exceptional circumstances under 28 U.S.C. § 1367(c)(4) ] might be the possibility of jury confusion, which was recognized in *Gibbs* as a reason for declining jurisdiction." Wright, Miller & Cooper, *Federal Practice & Procedure,* § 3567.1, n. 46.

The court finds that the potential for jury confusion in this case is great. The state claims and federal claims have different legal standards, rules of vicarious liability and immunity, and recoverable damages, and it would be very difficult for a jury to keep them straight.

---

**4.** The courts disagree over whether it is ever appropriate to remand a federal law claim under 28 U.S.C. § 1367(c). Some courts have found that remand of the federal claims along with the pendent state claims is appropriate. *See e.g., Administaff, Inc. v. Kaster,* 799 F.Supp. 685 (W.D.Tex.1992); *Bodenner v. Graves,* 828 F.Supp. 516 (W.D.Mich.1993). Others, however, disagree. See, e.g., *Kabealo v. Davis,* 829 F.Supp. 923, 927 (S.D.Ohio 1993). This court finds it unnecessary to enter this legal thicket. Remand is certainly not required, and Plaintiff's stated reason for requesting remand of the entire case—that the large amount of discovery and large number of potential witnesses makes the case unsuitable for federal court—is entirely unpersuasive. The court finds that it would not be in the interest of justice to remand the federal claims in this action, regardless whether it would be legally permissible to do so.

First, the applicable legal standards for Fourth Amendment violation and assault and battery are different. Use of force in accomplishing an arrest gives rise to a Fourth Amendment claim if the force used was not "objectively reasonable." *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The applicable standard in an action under Michigan law for assault in the excessive use of force by a peace officer was long ago defined as what "honestly appeared to him at the time to be reasonable and right." *Firestone v. Rice,* 71 Mich. 377, 38 N.W. 885 (1888); *Dickey v. Fluhart,* 146 Mich.App. 268, 277, 380 N.W.2d 76 (1985). In other words, the standard for the § 1983 suit is objective reasonableness, while the standard for the state assault and battery claim is subjective reasonableness. A jury could not be expected to understand and to apply the two different standards of reasonableness in the same case. The standards for warrantless arrest for a misdemeanor also differ. With only a few exceptions, under Michigan law a police officer may make a warrantless arrest for a misdemeanor only if it is committed in his presence, M.C.L. § 764.15, *Gallagher v. Michigan Secretary of State,* 59 Mich.App. 269, 229 N.W.2d 410 (1975), but such an arrest probably does not violate the Fourth Amendment if the officer had probable cause to make the arrest. *See* LaFave & Israel, *Criminal Procedure,* § 3.5, p. 242 (1984) ("It appears that the Fourth Amendment presents no barrier to abolition of the felony-misdemeanor distinction so as to permit warrantless arrests on probable cause in all cases.").

A second area of conflict involves the questions of vicarious liability. The law of municipal liability under § 1983 is governed by *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and its progeny. Under *Monell,* governmental entities may not be held liable under § 1983 based on *respondeat superior.* Rather, municipal liability depends upon whether the governmental entity "caused" the constitutional violation by promulgating a policy that sanctioned the misconduct. Municipal liability under state law, in contrast, is rooted in principles of *respondeat superior. See Ross v. Consumers Power Co.,* 420 Mich. 567, 624–25, 363 N.W.2d 641 (1984).

Third, the state and federal laws of immunity also differ. With the exception of judicial and prosecutorial decisions, immunity under federal law turns on the objective reasonableness of the officials' actions, *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and municipalities do not receive the benefit of any such immunity. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). In Michigan, however, immunity for lower level public officials depends on distinctions between discretionary and ministerial functions without regard to objective good faith, and does not extend to governmental entities. *Ross,* 420 Mich. at 632, 363 N.W.2d 641.

Fourth, recoverable damages are different under each system. Under federal law, a § 1983 plaintiff may recover punitive damages against individual defendants but not against municipalities. *City of Newport v. Fact Concerts, Inc.* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Under state law, a plaintiff ordinarily may not recover punitive damages. It would undoubtedly be difficult for jurors to segregate mentally the state claims from the federal claims and award appropriate damages; they might be tempted to award damages not recoverable under state law on theories not actionable under federal law.

The court has weighed the likelihood of jury confusion against the economy which might be achieved by resolving all counts in a single court, as required by *Moor v. County of Alameda,* 411 U.S. 693, 716, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973). There will be some duplication of effort required by the prosecution and defense of this case in two courts if the plaintiff decides to pursue her federal claims.[5] However, the court finds that the advantages to be gained by trying these claims together are outweighed by the

---

**5.** Plaintiff's counsel intimated at oral argument that Plaintiff might prefer to abandon her federal claims rather than pursue them in federal court.

potential for confusion of the issues by the jury. Thus, remand of all state law claims is appropriate.

### IV. Conclusion

Counts I through V are remanded to Saginaw County Circuit Court, along with the Michigan constitutional claims in Counts VI, VII, and VIII. The court retains jurisdiction over the claims under 42 U.S.C. § 1983 contained in Counts VI, VII, and VIII.

If Plaintiff wishes to pursue her federal claims in this court, she must file an amended complaint by December 2, 1994 and/or a motion for reconsideration within the period allowed by Local Rule 7.1(h)(1).

IT IS SO ORDERED.

**UNITED STATES of America, Plaintiff,**

v.

**Gregory SURRATT, Defendant.**

No. 1:92CR0353.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 27, 1994.

William R. Evans, Cleveland, OH, for U.S.

Edward A. Heffernan, Cleveland, OH, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The defendant, Gregory Surratt, has pled guilty to the federal indictment charging him with one count of knowingly receiving through the United States mail visual depictions of minors engaged in sexually explic-

it conduct, in violation of 18 U.S.C. § 2252(a)(2).[1] After hearing the parties' arguments on the issue of sentencing both in chambers and in open court, this Court sentences Surratt to imprisonment for a term of 24 months, to be served consecutive to the state sentence he currently is serving, to be followed by a three year period of supervised release. The Court recommends to the Bureau of Prisons that Surratt be permitted to serve his federal sentence at the Sexual Offender Treatment Program at the Federal Correctional Institution at Butner, North Carolina, or some other similarly oriented federal program.

The government has sought a number of enhancements and upward departures based on conduct by Surratt which it contends constitutes specific offense characteristics relating to the underlying federal offense. The Court finds that the conduct in question is no part of Surratt's offense of conviction, and in fact, most of the conduct offered by the government was the subject of the state prosecution as a result of which Surratt now is incarcerated in a state prison.

### I.

The facts underlying this case are not greatly disputed; the dispute centers on which facts are relevant for purposes of sentencing. Surratt responded to an advertisement for child pornography placed in a video magazine by postal inspectors. He wrote twice to the post office box listed in the advertisement indicating his definite interest in child pornography, and ordered magazines and videotapes, all of which depicted minors engaged in sexually explicit conduct.

Postal inspectors made a controlled delivery of the ordered material to Surratt's home on March 10, 1992, and shortly thereafter executed a search warrant there. They discovered, in addition to the recently delivered package, an enormous amount of adult pornography, sexual paraphernalia and videotapes, as well as pornographic photos of adult women over the faces of which Surratt had attached photos of his young daughter's face. When the videotapes were viewed, they revealed Surratt engaged in sexually explicit activities, up to and including sexual penetration, with his daughter, then approximately seven to nine years old.

On the strength of the conduct recorded in the videotapes confiscated from his home, Surratt was charged in state court in a 25 count indictment with multiple counts of attempted rape, attempted felonious sexual penetration, felonious sexual penetration and gross sexual imposition. Surratt pled guilty to one count of attempted rape and one count of attempted felonious sexual penetration on September 14, 1992, and was sentenced to eight to 15 years on each count, with the sentences to run consecutively, and eight years actual incarceration to be served on each count.[2] Under this sentencing scheme, Surratt will be in state custody for at least 16 years, up to a maximum of 30 years.

### II.

The base offense level applicable to a violation of 18 U.S.C. § 2252(a)(2) is 15, pursuant to U.S.S.G. § 2G2.2(a), entitled, in relevant part, "Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor." It is unquestionable that the sentencing level must be increased by two levels in this case on the basis of specific offense conduct, because the material Surratt received in the mail "involved a prepubescent minor or a minor un-

---

1. Section 2252(a)(2) provides for the punishment of one who:

 knowingly receives, or distributes any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, if—

 (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

 (B) such visual depiction is of such conduct.

2. Although defense counsel disputes whether the state court used "actual incarceration" language, the record before the Court reflects that language.

der the age of twelve years." *See* U.S.S.G. § 2G2.2(b)(1). In his letters asking for the material, Surratt specifically requested "preteen material," and at least one of the videos Surratt ordered from the postal service sting operation involved two twelve year old girls and an eleven year old boy. Surratt's sentencing level therefore is raised to 17.

■ The government seeks an additional increase pursuant to § 2G2.2(b)(4),[3] however, contending that Surratt's activities with his daughter and possibly other minors represent a pattern of activity. Brief of the United States Regarding Application of the Sentencing Guidelines at 6 (Brief of the United States). Even accepting this contention as true, the government gains nothing thereby.

Subsection (b)(4) provides that "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor," the offense level should be increased by five levels. The heading of subsection (b) is "Specific Offense Characteristics." In other words, enhancements included in subsection (b) are available when, *as part of the offense of conviction,* the defendant undertakes the actions listed therein.

The government argues that subsection (b)(4) is different from subsections (b)(1), (b)(2) or (b)(3) because it does not begin with the language "If the offense involved...." This argument is unavailing. The government appears to be suggesting that if the defendant *ever* engaged in such a pattern of behavior, whether as part of the charged offense or at a completely different time or place, subsection (b)(4) should apply. This Court cannot agree. If the Sentencing Commission had not intended for the language of subsection (b)(4) to be applied only to the specific offense of conviction, that language would not be included in subsection (b), entitled "Specific Offense Characteristics." The government has pointed to no persuasive authority to convince the Court that "specific offense characteristic" means anything other than characteristics specific to the offense of conviction.

It has not been alleged that Surratt engaged in a pattern of ordering child pornography through the mail, or any other pattern of behavior relevant to the offense of his federal conviction. The five level enhancement sought by the government therefore cannot be applied.

## III.

In deciding the criminal history category applicable to Surratt under § 4A1.1, this Court finds that Surratt appropriately is placed in criminal history category II.

Section 4A1.1(a) directs the sentencing court to add three points "for each prior sentence of imprisonment exceeding one year and one month." Section 4A1.2(a)(2) explains that "[p]rior sentences imposed in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b), and (c)." Consequently, Surratt's two sentences imposed in the state court in 1992 are treated, for purposes of § 4A1.1(a) as one sentence, resulting in an addition of three points to his criminal history category, thereby placing him in category II.

■ Surratt contends that the conduct for which he was sentenced in state court—attempted rape and attempted felonious sexual penetration—constitute part of the offense conduct here, and therefore cannot be used to raise his criminal history category. Surratt is in error. He offers no support, other than his own statement, for the proposition that his state convictions were in any way part of the instant offense. He does not allege—and the Court does not find—any temporal relationship between his state offenses and his federal offense, nor do the state offenses appear to be similar in kind to Surratt's federal offense. There is no relationship between the offenses at all, aside from the fact that the videotapes of Surratt committing the state offenses were obtained during a search resulting from his federal offense. The offenses for which Surratt was sentenced in state court were sufficiently separate from his federal offense for this

3. Section 2G2.2(b)(4) and application Note 5 to § 2G2.2, although not reflected in the November 1, 1991, Guidelines Manual, were part of a group of amendments which took effect on November 27, 1991, pursuant to section 632 of Public Law 102–141.

Court to find that they should be used to place Surratt in criminal history category II.

### IV.

■ The government argued in the sentencing hearing, relying on an unpublished Fourth Circuit case, that Surratt is not entitled to a reduction in his sentencing level for acceptance of responsibility.[4] *See United States v. Bowen,* No. 90–5823, 1991 WL 93065 (4th Cir. June 5, 1991). In *Bowen,* the defendant initially pled guilty to a one count information, then withdrew that plea, requiring the government to indict him. Although Bowen ultimately pled guilty to one count of the two count indictment, he did so on the very eve of trial, and when asked for a statement at sentencing, he offered the fourth in a meandering series of explanations for his criminal behavior, most of which admitted no culpability for his actions. The trial court gave Bowen a two level reduction for acceptance of responsibility, finding that "on balance" such a reduction was appropriate.

The Fourth Circuit reversed the trial court on this issue, finding that the statement Bowen made to the court evidenced no acceptance of responsibility, and further that Bowen's only statement that could be considered an acceptance of any responsibility was followed and superseded by Bowen's evasive statement in open court.

Here, by contrast, at the hearing on his change of plea and sentence, Surratt plainly said, "I ordered this material. I never did see the material, but I did order it." He further acknowledged that he knew that the material he ordered was child pornography. This represents a sufficient acceptance of responsibility for Surratt's behavior in receiving the sexually exploitive materials for this Court to deduct two levels from his offense level calculation therefor.

> Entry of a plea of guilty prior to the commencement of trial combined with truthful admission of involvement in the offense and related conduct will constitute

significant evidence of acceptance of responsibility for the purposes of this section. However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.

U.S.S.G. § 3E1.1, comment. (n. 3).

In this case, however, Surratt not only admitted to the factual basis for his plea, but expressed remorse for his actions and his intention to participate in a sexual offender treatment program as soon as he is eligible, and to assume the responsibility of being a productive member of society when he eventually is released from prison. Surratt is entitled to the reduction for acceptance of responsibility.

### V.

#### Upward Departure

■ The government seeks an upward departure from the applicable guideline range on the basis of Sentencing Guidelines Commentary, Application Note 5 to § 2G2.2.

> If the defendant sexually exploited or abused a minor at any time, whether or not such sexual abuse occurred during the course of the offense, an upward departure *may* be warranted. In determining the extent of such a departure, the court should take into consideration the offense levels provided in §§ 2A3.1, 2A3.2, and 2A3.4 most commensurate with the defendant's conduct, as well as whether the defendant has received an enhancement under subsection (b)(4) on account of such conduct.

*Id.* (emphasis added). Although the government erroneously states that "Note 5 expressly instructs sentencing courts that an u[ward [sic] departure *is* warranted . . .," the language of note five is clear. *See* Brief of the United States at 7 (emphasis added). This Court is under no obligation to depart upward in sentencing this defendant.

---

**4.** In its July 14, 1994, brief, the government argued that Surratt should be required to "admit his entire criminal conduct regarding his daughter, [and] his other child victims." Brief of the

United States at 9. The government explicitly abandoned this argument on the record in the conference in chambers before the plea and sentencing.

Note five is intended to address behavior not otherwise reached in sentencing, and does not explicitly discuss the relevance of any sanctions the defendant may have received from another court for the referenced behavior. It is appropriate, in determining whether a departure is warranted, to consider whether the defendant already has been punished for sexually exploiting or abusing a minor, such that a departure would constitute double counting.[5] Here, Surratt is serving a state prison sentence totalling 16 to 30 years for sexually exploiting and abusing his daughter. If this Court departed upward on the basis of that behavior, Surratt would in effect be serving two sentences for one offense. Consequently, the upward departure will not be taken.

■ To the extent that the government seeks to have the Court consider Surratt's allegedly improper behavior toward other minors, this Court cannot find that such behavior is appropriately sanctioned here. The purpose of the Commentary to the Sentencing Guidelines, as stated by the Sentencing Commission, is to provide "policy guidance for the courts." United States Sentencing Commission *Guidelines Manual* at 6 (Nov. 1991). This Court can conceive of no policy which would be served by sentencing this defendant, convicted in this court solely of receiving child pornography through the mail, on the basis of unrelated alleged sexual abuse of other minors.

**Real Offense Conduct**

■ The government further argues for an upward departure in sentencing Surratt, stating that the "[d]efendant's real offense conduct is the prolonged sexual exploitation of children—his daughter and two other minors." Brief of the United States at 10. This statement patently is untrue. Surratt's "real offense conduct," as far as this Court is concerned, is the receipt of child pornography through the mail. Even if what the

government is trying—albeit inartfully—to say is that Surratt's sexual abuse of his daughter is relevant conduct to be considered for sentencing purposes, this Court finds that the government is incorrect. This Court does not find any of Surratt's alleged sexual abuse "relevant" to the offense of conviction.

The government's misunderstanding of the term "relevant conduct" is clearly delineated in this excerpt from the government's brief.

> The Government urges this Court to review carefully the exact behavior that must be punished, including all the relevant conduct, and not rely on state punishment where defendant can be "shocked" out.[6] In light of the clear language and policies of the sentencing guidelines this Court must address defendant's repeated rapes of his child and cannot abdicate this responsibility to another forum. Congress intended and designed the Guidelines to assure that defendant's [sic] are punished for their real offenses. Stated otherwise, sentencing courts are not to be limited as they were under a charge offense system. *See* U.S.S.G. §§ 1B1.3, 1B1.4 (Relevant Conduct, Information to be Used in Imposing Sentence).

Brief of United States at 11–12.

■ Surratt's offense of conviction, receiving child pornography through the mail, consisted of at most three separate acts: writing one letter and one order requesting child pornography, and receiving the pornographic material from the mail. The defendant is not alleged to have abused his daughter or anyone else "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or ... otherwise ... in furtherance of that offense," *see* U.S.S.G. § 1B1.3(a)(1); instead, the government alleges that Surratt's "real offense conduct" is the sexual exploita-

---

5. *See, e.g., United States v. Ray*, No. 93–6022, 1993 WL 484713 (10th Cir. Nov. 24, 1993) (where defendant who made videotape of himself raping a minor and was convicted in federal court of possession of the tape, rape provided a proper basis for upward departure, as the defendant was not prosecuted in state court for that

offense and therefore was not already serving a sentence for it.)

6. This is a reference to shock probation, a creature of state law whereby the defendant potentially could be released on probation after serving a very small portion of his state sentence.

tion of his daughter and two other unidentified minors. A brief review of the elements of the offense of conviction reveals that this characterization is erroneous, and it cannot form the basis for an upward departure.

■ The government further cites to § 5K2.3 for the proposition that Surratt's "infliction of extreme psychological injuries on his daughter constitutes additional grounds warranting an upward departure." Brief of United States at 12. This Court need look no further than the first few words of that section to see that it does not apply in this case: "If a victim or victims suffered psychological injury...." U.S.S.G. § 5K2.3. Surratt's daughter is not the victim of his federal offense, and § 5K2.3 therefore does not apply to make an upward departure proper in this case.[7] The government's reliance on § 5K2.8, relating to unusually heinous, cruel, brutal, or degrading behavior likewise is unavailing because Surratt's daughter was not the victim of his federal offense.

■ The government contends that "[a]lthough defendant received a state penalty, this does not guarantee that the United States and the specific victims' interests have been vindicated. Anything short of the maximum sentence would shock the conscience of a civilized society." Brief of the United States at 13. The argument advanced by the government is indicative of a frightening trend in federal law enforcement: it is somehow perceived that the states are incapable of managing the conviction and incarceration of persons who have violated state laws and offended against their communities, and the federal courts are being encouraged to take over that function in the states' place. This Court is willing to sentence Surratt for the violation of 18 U.S.C. § 2252(a)(2) to which he has pled guilty in this Court, and this Court is fully prepared to consider, as the sentencing guidelines intend, the whole person rather than just his offense conduct. *See* U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.") This Court will not, however, additionally sentence this defendant for unrelated, irrelevant conduct already sanctioned by the state.

### Upward Departure from Criminal History Category

The government further draws this Court's attention to § 4A1.3 of the sentencing guidelines, asserting that this Court should sentence Surratt outside of the criminal history category originally determined to apply to him.

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

*Id.*

■ The government contends that in light of Surratt's past conduct against children, and in light of the need to protect children from Surratt's potential criminal conduct against them, Surratt should be incarcerated for as long as possible. The government is again reminded, however, that Surratt already is serving a lengthy state sentence as a result of some of his past conduct. Although it is true that while Surratt is in prison his opportunity to commit similar offenses will be greatly limited, it is also true that he will be in state custody for a minimum of 16 years and perhaps as long as 30 years before he begins serving his federal

---

7. In cases relating to convictions under 18 U.S.C. § 2252(a)(2), the victim has been variously identified as society, or as the child portrayed in the material which is the subject of the § 2252 conviction. *See United States v. Toler*, 901 F.2d 399 (4th Cir.1990) ("[T]he primary victim under section 2252(a) is society in general, with the minor a secondary victim."); *United States v.*

*Rugh*, 968 F.2d 750 (8th Cir.1992) ("[T]he primary victim under 18 U.S.C. § 2252(a)(2) is the exploited child."); *United States v. Smith*, 795 F.2d 841 (9th Cir.1986) (stating in dicta that the victims of the production of a child-pornography film were the children portrayed therein). In no instance has any other person been identified as a victim of a § 2252(a)(2) offense.

sentence. Surratt is 40 years old; he was 38 years old when sentenced in state court. He will be between 54 and 68 years old when he is released from state custody, and between 56 and 70 years old when he completes his 24 month federal sentence. Surratt will be on supervised release for three additional years, or until he is between 59 and 73 years old. It seems extremely improbable to this Court that after this lengthy incarceration, the imposition of eight years additional imprisonment—the maximum additional incarceration available under § 2252(a)(2)—will have a noticeable impact on Surratt's likelihood of recidivism.

Section 4A1.3 states that the sentencing court "may consider" departing from the applicable criminal history category; this Court has considered such a departure, and does not find that it is warranted. No such departure will be made.

## VI.

■ One of the questions raised in sentencing this defendant is whether Surratt's pedophilic activities are limited to his daughter or are evidence that he is a predatory pedophile, who obtains sexual gratification with children, and will seek them out for that purpose. If Surratt's predilections relate solely to his daughter, then her relatively advanced age at the time of Surratt's projected release from prison will make her continued victimization unlikely. If, however, Surratt is a predatory pedophile, he is likely to shift his focus to other children, and indeed may go looking for them to sate his desires.

After this Court's review of the report prepared by James K. Wolfson, M.D., staff psychiatrist at the Federal Medical Center at Springfield, Missouri, it appears that Surratt is a predatory pedophile. Although Dr. Wolfson's initial diagnosis was of "Pedophilia ... (apparently) limited to incest," he further noted that the intake staff at the Sexual Offender Treatment Program at the Federal Correctional Institution at Butner, North Carolina "construed his [Surratt's] behavior to be more of the 'predatory type' of pedophilia." Forensic Report at 19, 23. It appears that Surratt assaulted his daughter largely because she was available to him, rather than

because he was interested solely in her. While the government insists that the only way to address the likelihood of Surratt's potential for recidivism in predatory pedophilia is to sentence him to the statutory maximum sentence for his federal offense, this Court does not so find. The sentence determined by the Court adequately addresses the government's concerns while helping Surratt—through the Sexual Offenders Treatment Program—to avoid recidivism.

## VII.

■ The government has asked this Court to impose a three year period of supervised release after Surratt's completion of his federal prison sentence. This Court finds that supervised release is particularly suitable in this case.

Section 5D1.2(b)(2) of the Sentencing Guidelines provides that a defendant convicted of a Class C felony, such as a violation of 18 U.S.C. § 2252(a)(2), can be sentenced to a term of supervised release for two to three years after his incarceration. In Surratt's case, such a scheme is likely to operate to his benefit, in that the Court and the probation department can impose on him restrictions intended to enable him to function in society without posing a threat to children. The government has sought as a special condition that Surratt not be allowed to see his daughter during the term of his release. It is difficult for anyone to judge at this time whether such a condition will be proper at the time Surratt finally is released from incarceration. This Court will leave to the probation department, and its authority to request a modification of the terms of supervised release, the determination of whether such a special condition is warranted when Surratt begins serving his term of supervised release.

## VIII.

■ The government contends that the sentence imposed by this Court is insufficient, and out of line with other courts' sentencing decisions in comparable cases. This Court disagrees. *See, e.g., United States v. Kendrick,* No. 93–3865, 1994 WL 242323 (6th

Cir. June 3, 1994) (defendant who sought child pornography and mailed photocopies of photos of minors engaged in sexually explicit conduct to detective and who admitted prior molestation and intent to commit further molestations was charged with violating §§ 2252(a)(1) and 2252(a)(2); he pled guilty to violating § 2252(a)(1) and was sentenced to 21 months imprisonment and three years supervised release); and *United States v. Dodge*, No. 91–6481, 1993 WL 1295 (6th Cir. Jan. 5, 1993) (defendant who sought child pornography from several different undercover sources and received videotape depicting sex acts between eight year old boys and nine year old girls was convicted of one count of violating 18 U.S.C. § 2252(a)(2); he was sentenced to 21 months imprisonment and ordered to pay a fine of $4000). Although courts have imposed higher sentences for violations of 18 U.S.C. § 2252(a)(2), the facts of this case do not warrant a higher sentence here.

## IX.

For the reasons noted above, Surratt therefore is sentenced to 24 months incarceration, to be served consecutively to his present state sentences, and three years supervised release with conditions, all as set forth in this Court's Judgment and Commitment Order. This order is final and appealable.

IT IS SO ORDERED.

**UNIVERSITY OF CINCINNATI, d/b/a University Hospital, Plaintiff,**

**v.**

**Donna SHALALA, Defendant.**

No. C–1–93–841.

United States District Court, S.D. Ohio.

Nov. 8, 1994.

Peter Cassady, Cincinnati, OH, for plaintiff.

Donetta Wiethe, Cincinnati, OH, for defendant.

## ORDER

CARL B. RUBIN, District Judge.

This matter is before the Court upon plaintiff's June 3, 1994, motion for summary judgment (Doc. No. 9); defendant's July 15, 1994, cross-motion for summary judgment (Doc. No. 11); and plaintiff's August 31, 1994, reply to defendant's cross motion for summary judgment (Doc. 13). Pursuant to the parties' April 25, 1994, stipulation to resolve this matter through cross-motions for summary judgment (Doc. No. 8), and parties' October 31, 1994, amendment thereto (Doc. No. 14), this court, herein, enters its decision.

### Findings of Fact

1) Plaintiff, the University of Cincinnati, is a state university, located in Ohio, which provides medical and hospital services through its operation of University Hospital.[1] (Doc. Nos. 1 and 5). At all times relevant hereto, plaintiff has been a participant in the Medicare program, administered by the United States Department of Health and Human Services (hereinafter, HHS). *See* 42 U.S.C. § 1395 *et seq.* (Doc. Nos. 1 and 5).

2) Defendant, Donna Shalala, is the current Secretary of HHS. Through the Health Care Financing Administration (hereinafter, HCFA), an entity within HHS, defendant is responsible for providing Medicare reimbursements to providers, such as University Hospital for outpatient end-stage renal dialysis (hereinafter, ESRD) treatments performed on qualifying Medicare patients. (Doc. Nos. 1 and 5).

3) In 1989, HCFA reimbursed participating providers on a prospective payment basis at a composite rate of $129.33 per dialysis treatment (hereinafter, composite rate). (Doc. No. 5). In accordance with applicable Medicare program statutory authority described in 42 U.S.C. § 1395rr(b)(7) and regulatory authority at 42 C.F.R. §§ 413.170(f) and (g), HCFA has the authority to grant qualifying providers, such as plaintiff, an exception from the standard composite rate of reimbursement. (Doc. No. 11).

4) In accordance with the allowance for exceptions from the standard composite rate, during the fiscal year ending June 30, 1989, HCFA reimbursed plaintiff at an excepted rate of $192.06 per dialysis treatment. (Doc. Nos. 1 and 9).

5) Approval for exceptions to the composite rate, such as that extended to plaintiff, periodically expires. (Doc. No. 9). Providers who wish to be reimbursed at a rate other than the then-existing composite rate, thereafter, must apply for renewed exception status. (Doc. No. 9).

6) On November 16, 1989, HCFA advised plaintiff and other providers that all then-approved exception rates would expire on November 30, 1989, and the standard composite rate would take effect as of December 1, 1989. (Doc. No. 9). HCFA announced that on December 1, 1989, the exception process would be reopened, with providers having until May 29, 1990, to file a new exception request. (Doc. No. 9). Existing exceptions continued without interruption, as long as the exception request was filed on or before December 1, 1989, and subsequently approved. (Doc. No. 9).

7) On January 26, 1990, plaintiff filed an exception request with Community Mutual Insurance Company, defendant's duly-appointed fiscal intermediary (hereinafter, intermediary), seeking reimbursement at the rate of $280.40 per dialysis treatment. (Doc. No. 11). Plaintiff based its exception request on atypical services, pursuant to 42 C.F.R. § 413.170(g)(1). (Doc. No. 1).

8) On April 9, 1990, through the intermediary, HCFA rejected plaintiff's exception request, finding that plaintiff had failed to provide sufficient objective evidence as to the following points: 1) that its dialysis treatments met "atypical service intensity" criteria; 2) that its costs per treatment were reasonable; and 3) that its excess costs were attributable directly to the atypical service intensity required by the serious level of illness suffered by its dialysis patients. (Doc. No. 1).

---

1. Although the University of Cincinnati is the official named plaintiff in this matter, this court also refers to plaintiff as University Hospital or Hospital.

9) On May 1, 1990, plaintiff resubmitted its exception request, including additional data within such resubmission. (Doc. No. 1). On July 2, 1990, through the intermediary, HCFA advised plaintiff that its exception request was approved in the amount of $189.18 per dialysis treatment, a sum $59.85 more than the composite rate of $129.33. The exception request approval was made effective May 1, 1990, the date plaintiff submitted adequate supporting documentation. In arriving at the $189.18 amount, HCFA approved:

a) a total labor cost per treatment of $79.47 for registered nurses (hereinafter, nursing salary increase), $39.47 above the $40,00 included within the composite rate;

b) an exception in the amount of $13.00 per treatment for supplies; and

c) an exception in the amount $7.38 per treatment for nursing fringe benefits, as derived from HCFA's utilization of an employee benefits rate of 18.7 percent which defendant claimed to be the national average benefit rate for ESRD facilities included in the composite rate.[2]

10) Because HCFA did not entirely grant plaintiff's exception request, plaintiff, pursuant to 42 C.F.R. § 413.170(h), filed a timely appeal from HCFA's partial denial with the Provider Reimbursement Review Board (hereinafter, the PRRB). (Doc. No. 5, Attachment). In its appeal, plaintiff contended that HCFA improperly (1) established the effective date of plaintiff's renal exception rate; (2) denied a portion of the fringe benefits relating to nursing salaries for which plaintiff was granted an exception; (3) denied non-nursing salary costs relating to the plaintiff's renal dialysis exception request; and (4) denied excess medical director, laundry and linen, and social service overhead costs relating to the plaintiff's renal dialysis exception request. (Doc. No. 5, Attachment).

11) On August 25, 1992, the PRRB conducted an evidentiary hearing on plaintiff's appeal. (Doc. No. 5, Attachment 5). On August 5, 1993, the PRRB issued a decision affirming HCFA as to three of the appealed issues. (Doc. No. 5, Attachment). The

PRRB held that HCFA properly established the effective date of plaintiff's exception rate, properly denied non-nursing salary costs relating to the plaintiff's renal dialysis exception request, and properly denied overhead costs relating to the plaintiff's renal dialysis exception request. (Doc. No. 5, Attachment). However, the PRRB reversed HCFA's decision that denied plaintiff a portion of the fringe benefits relating to nursing salaries for which plaintiff was granted an exception. (Doc. No. 5, Attachment).

12) The intermediary, thereafter, asked the Administrator of HCFA to review the fringe benefit issue on which the PRRB had reversed HCFA's decision. (Doc. No. 5, Attachment). On October 1, 1993, the HCFA Administrator issued a decision reversing the PRRB on the fringe benefit issue, and affirmed the PRRB on all other issues. (Doc. No. 5, Attachment). With regard to the fringe benefits question, HCFA held that plaintiff failed to show that its fringe benefit costs, above the claimed national average, were directly attributable to its atypical ESRD patient mix. Rather, HCFA found that such excess fringe benefit costs were related to plaintiff's retirement and tuition remission programs.

13) On December 1, 1993, plaintiff timely filed its complaint in this court, appealing HCFA's decision with respect to the fringe benefits and overhead cost issues. In particular, plaintiff claimed that defendant's decision to limit the nursing fringe benefits exception request, as well as defendant's decision to deny the overhead cost exception request, were arbitrary, capricious, an abuse of discretion, not in accordance with the law, and unsupported by substantial evidence, all in violation of 5 U.S.C. § 706.

### Opinion

### *Standard of Review and Applicable Law*

 In an action for judicial review brought under 5 U.S.C. § 706, formerly the Administrative Procedure Act (APA), a court may set aside an agency action that is arbitrary, capricious, an abuse of discretion, or

---

**2.** In particular, HCFA applied the 18.7 percent to the $39.47 nursing salary increase to arrive at the exception amount of $7.38 for fringe benefits. (Doc. No. 11).

otherwise not in accordance with law, or which is unsupported by substantial evidence.[3] 5 U.S.C. § 706(2)(A) and (E). Under the arbitrary and capricious standard, the court must determine "whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). This standard of review is narrow. *See Id.* "The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), *on remand,* 335 F.Supp. 873 (W.D.Tenn.1972). Meanwhile, under the substantial evidence standard, the evidence relied upon by the agency in reaching its determination must be "something more than a mere scintilla.... [, meaning] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). The court is to consider only the bases upon which the agency actually relied in reaching its decision. *Volpe,* 401 U.S. at 420, 91 S.Ct. at 825. Moreover, an agency's interpretation of its own regulations is entitled to considerable deference. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), *reh'g denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), *reh'g denied,* 332 U.S. 783, 68 S.Ct. 26, 92 L.Ed. 367 (1947); *Shaker Medical Ctr. Hosp. v. Secretary of Health and Human Servs.,* 686 F.2d 1203, 1208 (6th Cir.1982). The Court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of the agency.

*Ohio Dep't of Mental Retardation and Developmental Disabilities v. Dep't of Health and Human Services,* 761 F.2d 1187, 1193 (6th Cir.1985). If the administrator's interpretation is reasonable, the court must uphold it even if the court would have reached a different interpretation had that issue first been presented to it. *Tallman,* 380 U.S. at 16, 85 S.Ct. at 801. However, the court must reject administrative constructions which are inconsistent with a statutory mandate or which frustrate congressional policy. *Federal Election Comm'n v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 29–33, 102 S.Ct. 38, 41–43, 70 L.Ed.2d 23 (1981).

It is the language set forth at 5 U.S.C. § 706(2)(A) and (E) that this court must apply to adjudge whether defendant properly denied plaintiff overhead exceptions request, as well as a portion of the fringe benefits relating to nursing salaries for which plaintiff was granted an exception. *See Shaker Medical Ctr. Hosp.,* 686 F.2d 1203; *Mercy Hosp. of Miami, Inc. v. Shalala,* Civ.A. No. 91–3268 (RLC), 1993 WL 475517, at *11 (D.D.C.1993).

The statutory and regulatory frame-work that this court must utilize to adjudge whether defendant violated 5 U.S.C. § 706(2)(A) or (E) is based on Medicare statutory provisions described at 42 U.S.C. § 1395rr(b)(7) and regulatory provisions set forth at 42 C.F.R. § 413.170(f) and (g).

Pursuant to the applicable statutory language, as described at 42 U.S.C. § 1395rr(b)(7):

The Secretary shall provide by regulation for a method (or methods) for determining prospectively the amounts of payments to be made for dialysis services furnished by providers of services and renal dialysis facilities ... *The Secretary shall provide for such exceptions to such methods as*

**3.** In pertinent part, 5 U.S.C. § 706 reads:
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] ...
(E) unsupported by substantial evidence in a case subject to §§ 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; ....
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

*may be warranted by unusual circumstances.*

(emphasis supplied). Second, as provided by 42 C.F.R. § 413.170(g)(1) (criteria for approval of exception requests):

> (g) HCFA may approve exceptions to an ESRD facility's prospective payment rate if the facility demonstrates with convincing objective evidence that its total per treatment costs are reasonable and allowable under [42 C.F.R.] § 413.174, and that its per treatment costs in excess of its payment rate are directly *attributable to any of the following criteria:*
>
> > *(1) Atypical service intensity (patient mix).* A substantial proportion of the facility's outpatient maintenance dialysis treatments involve atypicality intense dialysis services, special dialysis procedures or supplies that are medically necessary to meet special medical needs of the facility's patients. The facility is able to demonstrate clearly that these services, procedures or supplies and its per treatment costs are prudent and reasonable when compared to those of facilities with a similar patient mix....

(emphasis supplied). Third, and as further provided at 42 C.F.R. § 413.170(f)(5) and (6):

> (5) The facility is responsible for demonstrating to HCFA's satisfaction that the requirements of this section, including the criteria in ¶ (g) of this section, are met in full. That is, the burden of proof is on the facility to show that one or more of the criteria are met.... The burden of proof is not on HCFA to show that the criteria are not met, and that the facility's costs are not allowable.
>
> (6) .... [A] facility must submit to HCFA its most recently completed cost report ... and whatever statistics, data, and budgetary projections are determined by HCFA to be needed to determine if the exception is approvable.... The materials to HCFA must—
>
> > (i) Separately identify elements of cost contributing to costs per treatment in excess of the facility's payment rate;
> >
> > ....
> >
> > (iii) *Show that the elements of excessive cost are specifically attributable to one*

*or more conditions specified* by the criteria set forth in ¶ (g) of this section.

(emphasis supplied).

### *Overhead Costs*

■ This court first finds that defendant acted within the bounds of 5 U.S.C. § 706 in rendering its decision to deny plaintiff's overhead cost exception request. As enunciated at 42 C.F.R. § 413.170(g)(1), plaintiff had the burden to demonstrate "with convincing objective evidence" that its per treatment overhead costs in excess of its payment rate were directly attributable to its atypical service intensity. Plaintiff was required to demonstrate that its per treatment overhead costs were "prudent and reasonable when compared to those facilities with a similar patient mix." 42 C.F.R. § 413.170(g)(1). Clearly stated at 42 C.F.R. § 413.170(f)(5), the burden of proof was on the plaintiff, and the plaintiff only, to show that the excess overhead costs were directly attributable to the atypical patient mix.

However, in making its overhead cost exception request with regard to the items in question—the medical director's time, laundry and linen costs, and social service costs—plaintiff has spoken in base generality. In making its overhead cost exception request, plaintiff stated the following:

> ... [T]he medical directors are required to spend more time in the unit supervising the dialysis operation. The sicker patient population requires more frequent review of staffing patterns, medications, and supplies, especially dialyzers and concentrates. The physicians are also actively involved in the development and monitoring of operational policies and budgets.
>
> ... [L]aundry and linen costs are higher because many of the "sicker" patients require blankets. Blankets are bulky and expensive to clean. Blankets must also be cleaned for each dialysis.
>
> ... [S]ocial service costs are higher because of the frequent contacts and intervention. This patient mix required more interaction with staff, patients, and families to insure the patients made it to and from their dialysis treatments and were com-

fortably accommodated while dialyzing in the maintenance dialysis unit.

(Doc. No. 5, Attachment at 677–78). At the PRRB hearing, plaintiff's side testified that, other than the statements, *supra*, "[t]here wasn't anything else that specifically documented these areas." (Doc. No. 5, Attachment at 328). Based on such non-specific and abstract statements, this court concludes that it was reasonable for HCFA to conclude that plaintiff failed to meet its burden of proof in demonstrating that the excess overhead costs were directly attributable to the atypical patient mix.[4] *See* 42 C.F.R. § 413.170(f)(6)(i) and (iii).[5]

*Nursing Fringe Benefit Costs*

██ This court further finds that the defendant was not acting *contra* to the standards of 5 U.S.C. § 706(2)(A) when HCFA decided to only partially grant plaintiff's fringe benefits increase to reflect the national, benefits-to-salary, average for fringe benefits. Having approved a $39.47 per treatment increase to nursing salaries, it was not an abuse of discretion for the defendant to subsequently compute plaintiff's fringe benefit increase, as premised on the percentage to which nursing benefits are directly reflective of nursing fringe salaries. By so tying the fringe benefits increase to the nursing salary increase, the defendant, contrary to plaintiff's contentions, effectively put into practice the notion that one's fringe benefits are part and parcel of the labor cost for caring for an atypical patient mix.

Defendant also was acting within the bounds of 5 U.S.C. § 706 when HCFA determined that plaintiff's request for a fringe benefit increase, above national, benefit-to-salary, average, was not directly attributable to the plaintiff's atypical patient mix. Testimony, presented by plaintiff's side at the PRRB hearing, disclosed that retirement program and tuition remission costs were the chief reasons for the higher fringe benefit costs:

**BY MR. CASSIDY:**

Q. Mr. Dennis, HCFA has given the national average of 18.7 percent in terms of the benefit—in terms of the fringe benefit rate. Our rate is roughly 10 percent, or rather 10 points higher than that. My question to you is why are University Hospital's fringe benefit rate so much higher than the national average?

A. I think ours is so much higher because of, first of all, the retirement system that we have. Again, I'm not an expert on retirement systems, but it's my understanding, if you look at the cost of this, I mentioned it was 13.71 percent; however, it makes up a third of our fringe benefit package, and I suspect that's a great deal higher than at other hospitals. Also, the tuition remission is expensive, although in terms of total it only makes up 5 percent of the fringe benefit rate, but it is a cost that you would not incur at a non-teaching institution or an institution not affiliated with the university.

(Doc. No. 5, Attachment, at 225–26). Plaintiff in no way demonstrated or otherwise articulated that its atypical patient mix exacerbated its retirement or tuition costs. Therefore, this court finds that it was not arbitrary, capricious or otherwise violative of 5 U.S.C. § 706(2)(A) for the defendant to limit plaintiff's fringe benefits increase to the national, benefits-to-benefits, average.

██ Nonetheless, this court does find that defendant's automatic acceptance of 18.7 percent as the "appropriate national, bene-

---

4. Plaintiff contends that it sufficiently documented the attributability of such overhead costs to the atypicality of its patients, in light of the claimed non-availability of the exact cost components of the administrative and general costs built into the composite rate. (Doc. No. 13, at 5–6). This court fails to see how such "non-availability" of data would hinder the plaintiff in deriving its own precise figures on the attributability of medical director, linen/laundry and social service overhead costs to the atypicality of its patients. Furthermore, as explicitly proclaimed

at 42 C.F.R. § 413.170(f)(5), "[t]he burden of proof is not on HCFA to show that the criteria are not met, and that the facility's costs are not allowable." Rather, it is plaintiff's.

5. For, not only did plaintiff fail to statistically and computationally validate the existence of such overhead costs, but plaintiff, likewise, failed to statistically link the excess overhead to its atypical patient mix.

fits-to-salary, average" was arbitrary and capricious and, therefore, violative of 5 U.S.C. § 706. The record reveals that data used to configure the fringe benefits rate was collected as far back as 1979. (Doc. No. 5, Attachment at 3, 238–39 and 240). In view of the passage of more than 10 years, there is a question whether the 18.7 ratio is anymore valid than if HCFA were to pick a number out of a hat.[6] This is especially the case with regard to fringe benefits, which has seen a dramatic evolution as a labor cost over the years. Thomas J. Bergman, et al., How Important Are Employee Benefits to Public Sector Employees?, Public Personnel Management, Sept. 22, 1994, at 397 (growth of employee benefits as a labor cost has increased significantly over the past 60 years); Roger Thompson, Benefit Costs Surge Again, Feb. 1993, at 38 (overall benefit costs grew faster than wages in 1991). Simply put, it was arbitrary and capricious for HCFA to use and defendant to approve utilization of such a rate without any validating inquiry in the interim.[7] Such figure is, hereby, set aside. An evidentiary hearing will be held, at which time the parties may present evidence on this one issue.

### Conclusions of Law

1) This court has jurisdiction over this matter pursuant to statutory provisions described at 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1331.

2) HCFA has the authority, pursuant to statutory provisions described at 42 U.S.C. § 1395rr(b)(7) and regulatory provisions at 42 C.F.R. § 413.170(f) and (g), to grant ESRD composite rate exception requests to Medicare ESRD-providing facilities, such as plaintiff. Pursuant to these statutory and regulatory provisions:

a) The Secretary shall provide for such composite rate exceptions as may be warranted by unusual circumstances.

b) HCFA may approve exceptions if the facility in question demonstrates, with convincing objective evidence, that its per treatment costs in excess of its payment rate are directly attributable to a facility's atypical ESRD service intensity.

c) The facility is responsible for demonstrating to HCFA's satisfaction that the per treatment costs in excess of its composite rate are directly attributable to the facility's atypical patient mix. The burden of proof is not on HCFA.

3) In determining whether to approve ESRD composite rate exception requests, defendant is required to act pursuant to 5 U.S.C. § 706(2)(A) and (E), which requires this court to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, otherwise no in accordance with the law or that is unsupported by substantial evidence.

4) Pursuant to conclusions of law in ¶¶ 2 and 3, this court finds that defendant did not act *contra* to 5 U.S.C. § 706 in denying plaintiff's overhead cost exception request for the medical director's time, laundry and linen costs, and social service costs.

5) Pursuant to conclusions of law in ¶¶ 2 and 3, this court finds that defendant did not act in violation of 5 U.S.C. § 706 in basing plaintiff's nursing fringe benefits increase on the national, benefits-to-salary, average.

6) Pursuant to conclusions of law in ¶¶ 2 and 3, this court finds that defendant did act arbitrarily and capriciously, and, thus, not in accordance with 5 U.S.C. § 706, in adopting 18.7 percent as the appropriate national, ESRD nursing benefits-to-salary, average.

---

6. Defendant makes a suggestive attempt to justify the validity of the 18.7 fringe benefits rate based on the fact that it is one component of the composite rate, which defendant asserts Congress ordered frozen in 1986. (Doc. No. 11). While Congress might have frozen the bottom-line composite rate number, it did not disturb HCFA's obligation to make composite rate exceptions, as described by 42 U.S.C. § 1395rr(b)(7), in accordance with 5 U.S.C. § 706. That is, Congress may have ordered HCFA to uniformly apply a certain composite rate, even though the components of such composite rate might now be out-of-line with reality, but that does not give HCFA the right to justify using out-of-line-with-reality component numbers to make exception determinations.

7. And, put another way, unlike a fine wine, the validity of statistical data does not age very well over time.

7) In accordance with conclusions of law in ¶¶ 2 through 4, this court dismisses plaintiff's claim as to the overhead costs issue.

8) In accordance with conclusions of law in ¶¶ 2, 3 and 5, this court dismisses plaintiff's claim that its ESRD nursing fringe benefits should have been above the national, benefits-to-salary average.

9) Pursuant to the foregoing, the court will determine, after a hearing, an appropriate base for fringe benefit increases.

IT IS SO ORDERED.

SELFIX, INC. and Selfix Independent
Products Company, Inc.,
Plaintiffs,

v.

Leonard BISK and Continental Illinois
Bank and Trust Company, N.A.,
Defendants.

No. 94 C 972.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 18, 1994.

William E. Deitrick, Jeffrey C.B. Levine, Mayer, Brown & Platt, Chicago, IL, for Continental Ill. Bank and Trust Co., N.A.

### MEMORANDUM OPINION

GRADY, District Judge.

Plaintiffs Selfix, Inc. and Selfix Independent Products Company sued defendants Leonard Bisk and Continental Illinois Bank and Trust Company in an Illinois state court. Defendant Leonard Bisk removed the case to federal court pursuant to 28 U.S.C. §§ 1441 and 1332, basing jurisdiction on diversity of the parties. Plaintiffs now move to remand the case to the state court pursuant to 28 U.S.C. § 1447(c), arguing that the parties are not diverse. For the reasons explained below, the motion is denied.

### BACKGROUND

On February 1, 1994, Selfix, Inc. and Selfix Independent Products Company (collectively "Selfix") filed suit against Leonard Bisk and Continental Illinois Bank and Trust Company ("Continental") in an Illinois state court. The suit centered around several agreements that Selfix and Bisk entered into when Selfix purchased Independent Products Company. The agreements were secured by letters of credit issued by Continental, and provided that Bisk had the right to call the letters of credit upon default by Selfix.

In the state court suit, Selfix sought to be released from its obligations under the agreements. Selfix asked for two things: first, a declaration that Bisk had breached the agreements and that Selfix was therefore released from its obligations, and second, an injunction against Bisk from calling the letters of credit and against Continental from paying on those letters of credit if called.

On February 16, 1994, defendant Bisk removed the case to this court pursuant to 28 U.S.C. § 1441. Bisk claimed that the case fell within the court's diversity jurisdiction. 28 U.S.C. § 1332. He said that the amount in controversy exceeded $50,000 and made the following statements with regard to the citizenship of the parties: Bisk is a resident of Israel and of the state of Pennsylvania.[1] Defendant Continental is a national

Deborah S. Brussert, Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Chicago, IL, for Selfix Inc., Selfix Independent Products Co., Inc.

Constantine D. Kasson, Burditt & Radzius, Chicago, IL, for Leonard Bisk.

---

1. Bisk's statement is not a proper allegation of citizenship as required by 28 U.S.C. § 1332. The parties' citizenship, not residence, determines whether diversity exists. *Pollution Control In-*

banking association located in Chicago, Illinois, and is, therefore, a citizen of Illinois.[2] 28 U.S.C. § 1348. Plaintiffs Selfix, Inc. and Selfix Independent Products Company are both Delaware corporations with their principal places of business in Chicago, Illinois. Both plaintiffs are, therefore, citizens of Delaware and of Illinois. 28 U.S.C. § 1332(c)(1).

Even though the plaintiffs and one defendant, Continental, are Illinois citizens, Bisk argues that diversity jurisdiction is proper because either (1) Continental is a nominal party whose citizenship should be ignored for diversity purposes, or (2) Continental should be realigned as a plaintiff, since the action is actually an interpleader. Plaintiffs have moved to remand this action pursuant to 28 U.S.C. § 1447(c), arguing that Continental is not a nominal defendant, that it should not be realigned as a plaintiff, and that complete diversity therefore does not exist.

## DISCUSSION

█ When a case is removed to federal court from a state court, if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case must be remanded to the state court. 28 U.S.C. § 1447(c). Because there is no federal question involved in this case, jurisdiction is proper only if the case falls within the court's diversity jurisdiction. 28 U.S.C. § 1332. Diversity jurisdiction is proper only where there is complete diversity among the parties, that is, where no defendant is a citizen of the same state as any plaintiff. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Thus, the court must remand if complete diversity does not exist between the parties.

## I. *Nominal Party*

█ If a party to a suit is merely a nominal party, its presence in the suit will not defeat removal. A nominal party need not join in the removal petition. *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 369 (7th Cir.1993). Moreover, the addition to a lawsuit of a purely nominal party does not affect diversity jurisdiction. *Matchett v. Wold*, 818 F.2d 574, 576 (7th Cir.), *cert. denied*, 484 U.S. 897, 108 S.Ct. 230, 98 L.Ed.2d 189 (1987). If, therefore, Continental is a nominal party to this suit, the suit was properly removed even though Continental did not join the removal petition and even though its citizenship is the same as that of the plaintiffs.

█ In two cases decided not long ago, but cited by neither party, the Seventh Circuit explained the concept of a nominal defendant. A defendant is nominal "if there is no reasonable basis for predicting that it will be held liable" in the suit. *Shaw*, 994 F.2d at 369. A nominal defendant "has no ownership interest in the property which is the subject of litigation"; it "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991), *cert. denied*, 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992) (citations omitted). "Because the nominal defendant is a trustee, agent, or depositary who has possession of the funds which are the subject of litigation, he must often be joined purely as a means of facilitating collection." *Id.* When the dispute is resolved, "[t]he court needs to order the nominal defendant to turn over funds to the prevailing party." *Id.* A nominal defendant is not a real party in interest because it has no interest in the subject matter litigated. "His relation to the suit is merely incidental and it is of no moment to him whether the one or the other side in the

---

*dus. of America, Inc. v. Van Gundy*, 21 F.3d 152, 155 (7th Cir.1994); *Dausch v. Rykse*, 9 F.3d 1244, 1245 (7th Cir.1993) (per curiam). The party seeking removal bears the burden of establishing diversity jurisdiction. *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir.1993). Accordingly, for this court to retain jurisdiction, Bisk must amend his petition for removal to contain proper jurisdictional allegations.

2. On June 29, 1994, after Bisk filed the petition for removal, Continental converted from a national banking association to an Illinois state chartered bank. Answer of Defendant Continental Bank to Amended Complaint at 2. This does not affect the present motion for two reasons: first, the court looks at the parties' citizenship at the time that the suit is filed and when it is removed. *Kanzelberger v. Kanzelberger*, 782 F.2d 774, 776 (7th Cir.1986). Second, the conversion did not change Continental's Illinois citizenship.

**1336**

controversy succeeds." *Id.* Because of the disinterested status of the nominal defendant, "there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established." *Id.*

■ Moreover, a nominal defendant cannot be a "necessary" or "indispensable" party as those terms are used in Fed.R.Civ.P. 19. *Cherif,* 933 F.2d at 414 n. 13. A nominal defendant has no interest in the property that is the subject of the litigation. *Id.* In contrast, a necessary party is one who "claims an interest relating to the subject of the action." Fed.R.Civ.P. 19(a); *id.*

■ Under the Seventh Circuit's definition, Continental is a nominal party to the litigation between Bisk and Selfix. The essence of this case is a contract dispute between Bisk and Selfix. There is no reasonable basis for predicting that Continental will be held liable. *Shaw,* 994 F.2d at 369. If Selfix wins on its contract claim, it will be discharged from its obligations, and Bisk will be enjoined from calling the letters of credit. If Selfix loses, it will not be so discharged, and it will be bound by the contract. At most, Continental will have to pay on the letters of credit to Bisk and recover from its customer Selfix. Selfix has not shown that, under either outcome, Continental will be liable in the contract dispute.

Furthermore, Continental is disinterested in the Bisk–Selfix dispute. Continental "has no interest in the subject matter litigated"; it is of no moment to Continental whether Selfix or Bisk succeeds. *Cherif,* 933 F.2d at 414. As explained above, if Bisk calls the letters of credit, Continental will pay pursuant to the terms of the agreements and the letters of credit, and seek reimbursement from Selfix. If Bisk is enjoined from calling the letters of credit, Continental will not pay on them. Selfix has not shown that Continental will be materially affected by either outcome in the Bisk–Selfix dispute.

■ In addition, Continental is not a necessary party to the Bisk–Selfix lawsuit. As explained, Continental has no interest in the subject of the action. It is therefore not a necessary party under Fed.R.Civ.P. 19.

This case is similar to a case in which the Supreme Court held that the holder of funds was a nominal party to a dispute between the two parties who were claiming the funds. *Salem Trust Co. v. Manufacturers' Finance Co.,* 264 U.S. 182, 190, 44 S.Ct. 266, 267, 68 L.Ed. 628 (1924). The dispute in *Salem Trust* arose when a company assigned the same right to payment on a debt to two different entities, Salem and Manufacturers. The debtor paid part of the debt, and Salem and Manufacturers agreed to deposit the proceeds with International Trust Company until their respective rights were determined. When Salem and Manufacturers could not agree on the disposition of the funds, Salem, a Massachusetts corporation, sued Manufacturers, a Delaware corporation, and International Trust, a Massachusetts corporation, in state court. Manufacturers removed the case to federal court, arguing that complete diversity existed because International Trust was a mere nominal party. *Id.* at 187–88, 44 S.Ct. at 266–67.

The Court agreed. It held that the suit was really a controversy between Salem and Manufacturers and could be determined without affecting any interest of the International Trust Company. *Id.* at 190, 44 S.Ct. at 267. International Trust was a nominal party: it had no interest in the controversy; its only obligation was to pay over the amount deposited with it when it was ascertained which of the other parties was entitled to it. As an unnecessary and dispensable party, its citizenship was irrelevant to establishing jurisdiction. *Id.*

Selfix argues that Continental is not a nominal party because Continental has duties and obligations of its own which could be affected by the outcome of the Bisk–Selfix dispute. Selfix says that Continental has a direct obligation to pay on the letters of credit upon receiving notice of default, which creates a primary liability on the part of Continental. While it is true that the letter of credit arrangement creates a primary liability on Continental's part, see *Bank of North Carolina, N.A. v. Rock Island Bank,* 570 F.2d 202, 206 n. 7 (7th Cir.1978), Selfix does not explain why this makes Continental

directly interested in its contract dispute with Bisk.

Selfix also argues that it is possible that Bisk will call the letters of credit in violation of an injunction, that Continental will be bound to pay on them, and that Selfix will then have no recourse against Continental. Therefore, Selfix argues, an injunction against Continental from paying the letters of credit is necessary in addition to the injunction against Bisk from calling those letters of credit. But this does not make Continental a necessary party to this lawsuit. In the event that Bisk violated an injunction, Selfix would have recourse against Bisk.

Finally, in support of its position, Selfix cites several cases, none of which the court finds persuasive. In the first case, the dispute centered around the City of Seattle's payment of bonds and warrants that it had issued to fund its street railway system. *Von Herberg v. City of Seattle*, 27 F.2d 457 (9th Cir.), *cert. denied*, 278 U.S. 644, 49 S.Ct. 80, 73 L.Ed. 558 (1928). A warrant holder filed suit against the city, claiming priority over a bondholder to a city fund which held proceeds from operation of the railway. *Id.* at 457–58. The city then filed an interpleader action in state court against the warrant holder and the bondholder. The bondholder sought to remove the case to federal court, claiming that the city was a nominal party whose citizenship did not defeat diversity. *Id.* at 458–59.

The court held that the city was a necessary party to the suit, because the objective of the warrant holder's suit was to annul the contract between the city and the bondholder. As such, both parties to the contract were necessary. *Id.* at 461. As to the interpleader action, the court held that the city was not a mere stakeholder because it had aligned itself with the bondholder, and said that it would carry out its contract with the bondholder unless restrained from doing so by a court. *Id.* Such a position, the court held, was inconsistent with the posture of a mere stakeholder, who stands utterly indifferent between the parties. *Id.*

The reasoning of *Von Herberg* does not apply here. No party in this case is seeking to nullify Continental's arrangement with Selfix or Bisk, which would make Continental's presence necessary to protect its interest. Furthermore, Continental has not aligned itself with either Selfix or Bisk, as did the city in *Von Herberg*. Continental is, therefore, indifferent to the outcome between the parties, and properly called a nominal party.

Plaintiffs also cite *H.F. Vegter Excavation Co. v. Village of Oak Brook*, 790 F.Supp. 184 (N.D.Ill.1992). In that case, an Illinois subcontractor sued a Wisconsin general contractor, a Wisconsin surety, and the Village of Oak Brook, Illinois, for amounts it claimed were owed to it by the general contractor for "extras" on work performed for the Village of Oak Brook. The court held that Oak Brook was not a nominal party whose citizenship could be ignored for diversity purposes. *Id.* at 187. The court noted that the general contractor might seek to deflect the costs of the "extras" to Oak Brook. Given its economic interest in the litigation, Oak Brook was not a nominal party.

In *Vegter*, Oak Brook was not a nominal party because it was not disinterested in the outcome of the litigation between the general contractor and the subcontractor. Oak Brook might have been liable for the cost of the extras. *See Shaw*, 994 F.2d at 369; *Cherif*, 933 F.2d at 414. Because the subject of the litigation was who would pay for the "extras," and Oak Brook might have borne the cost, it could not be nominal. In contrast, as explained above, Continental will not incur any individual liability in the Selfix–Bisk dispute.

Finally, the plaintiffs cite two cases in which the courts held that the trustee of a trust was not a nominal party. *Gustafson v. Finn*, No. 90 C 06822, 1991 WL 32745, 1991 U.S.Dist.LEXIS 2671 (N.D.Ill. March 6, 1991); *Code Consultants, Inc. v. G.M. Hock Constr., Inc.*, 702 F.Supp. 766 (E.D.Mo.1989). The validity of these cases is now questionable, given the Seventh Circuit's later statement that a nominal defendant is a *"trustee, agent, or depositary."* *Cherif*, 933 F.2d at 414 (emphasis added).

## II. *Interpleader*

Having decided that Continental is a nominal party, the court need not decide whether this action is in the nature of an interpleader.

## *CONCLUSION*

Plaintiffs' motion to remand is denied. Defendant Bisk is given until November 7, 1994, to amend his petition for removal to allege diversity jurisdiction properly.

## In re BRAND NAME PRESCRIPTION DRUGS ANTITRUST LITIGATION.

### This Document Relates to All Cases.

No. 94 C 897.
No. MDL 997.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 24, 1994.

Catherine A. Sazdanoff, Abbott Laboratories, Abbott Park, IL, Frank Cicero, Jr., James Andrew Langan, Jeffrey A. Leon, Anne J. McClain, Jeffrey S. Cashdan, Kirkland & Ellis, Chicago, IL, for Abbott Laboratories.

H. Blair White, John W. Treece, Bruce Michael Zessar, Sidley & Austin, Chicago, IL, for G.D. Searle & Co.

Kael Behan Kennedy, James L. Komie, Schuyler, Roche & Zwirner, Chicago, IL, Marguerite S. Boyd, John W. Nields, Jr.,

Howrey & Simon, Salvatore A. Romano, Patricia A. Gaegler, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for Bindley Western Industries, Inc.

David E. Everson, Stinson, Mag & Fizzell, P.C., Kansas City, MO, Michael Lee Brooks, Gregory D. Hanley, Brooks, Cahill & Hanley, Chicago, IL, Richard Alan Arnold, Scott E. Perwin, James J. Kenny, William J. Blechman, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, P.A., Miami, FL, Richard W. Giauque, Stephen T. Hard, Douglas H. Patton, Giauque, Crockett, Bendinger & Peterson, Salt Lake City, UT, for Marion Merrell Dow, Inc.

Ruth F. Masters, Latham & Watkins, Ralph Joseph Gabric, Willian, Brinks, Olds, Hofer, Gilson & Lione, Ltd., Lee A. Freeman, Jr., John F. Kinney, James T. Malysiak, Freeman, Freeman & Salzman, Richard William Austin, Richard S. Wisner, Audrey A. Berish, Pretzel & Stouffer, Chtd., Thomas D. Rosenwein, Nancy Schaefer, David Stewart Fleming, Heather A. Libbey, Schaefer, Rosenwein & Fleming, George L. Saunders, Jr., Saunders & Monroe, Chicago, IL, William F. Cavanaugh, Jr., Patterson, Belknap, Webb & Tyler, Thomas F. Curnin, Laura Mezey, Cahill, Gordon & Reindel, New York City, Donald L. Flexner, Crowell & Moring, Jennifer A. Albert, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, Richard J. Holwell, Ronald W. Davis, Robert A. Milne, White & Case, New York City, Arthur Makadon, Mark S. Stewart, Leslie E. John, Daniel Schoor–Rube, Stephen J. Kastenberg, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, Herbert Dym, David L. Meyer, Jonathan R. Galst, Covington & Burling, Washington, DC, Robert E. Davy, Robert E. Davy, Jr. & Associates, Chicago, IL, Frederick P. Furth, Furth, Fahrner & Mason, Joseph L. Alioto, Joseph L. Alioto Law Offices, San Francisco, CA, Barbara Reeves, Morrison & Foerster, Los Angeles, CA, John Alexander Cochrane, Cochrane & Bresnahan, Charles Harley Johnson, Johnson Law Office, Joseph Andrew Kowalcik, Kowalcik Law Office, St. Paul, MN, for Burroughs Wellcome Co.

Craig Allen Varga, Peterson & Ross, Chicago, IL, Alan J. Weinschel, Bruce A. Col-bath, Weil, Gotshal & Manges, New York City, Steven P. Mandell, Davidson, Goldstein, Mandell & Menkes, Chicago, IL, for Foxmeyer Drug Co.

William J. Gibbons, Latham & Watkins, Chicago, IL, J. Thomas Rosch, McCutchen, Doyle, Brown & Enersen, Trevor J. Chaplick, Latham & Watkins, San Francisco, CA, for McKesson Corp.

Kenneth M. Sullivan, Illinois Atty. General's Office, Chicago, IL, Jerome I. Chapman, Kenneth A. Letzler, Deena R. Bernstein, Jill T. Feeney, Arnold & Porter, Washington, DC, for Glaxo, Inc.

Nathan P. Eimer, Sidley & Austin, Chicago, IL, Mary B. Cranston, Jeffrey S. Ross, Terrence A. Callan, Pillsbury, Madison and Sutro, San Francisco, CA, for Rhone–Poulenc Rorer, Inc.

Thomas F. Gardner, Deborah Platt Herman, Jones, Day, Reavis & Pogue, Alan H. Silberman, Sanford Mark Pastroff, Evan G.S. Siegel, Sonnenschein, Nath & Rosenthal, Chicago, IL, David Klingsberg, Michael Malina, David Copeland, Kaye, Scholer, Fierman, Hays & Handler, New York City, for Pfizer, Inc.

Daniel Richard Formeller, Andrea Ellen Kayne, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, Kenneth R. Logan, Richard C. Weisberg, Joseph F. Tringali, Kathryn A. Clokey, Peter G. Koclanes, Simpson, Thacher & Bartlett, New York City, for American Home Products Corp.

Jacqueline A. Criswell, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, Steven E. Bizar, Howard D. Scher, Stephen J. Levy, Montgomery, McCracken, Walker and Rhoads, Philadelphia, PA, for Alco Health Services Corp.

William M. Hannay, Linda K. Stevens, Schiff, Hardin & Waite, Chicago, IL, Robert K. Stanley, James H. Ham, III, Baker & Daniels, Indianapolis, IN, for Eli Lilly and Co.

Paul C. Saunders, Douglas D. Broadwater, Stephen S. Madsen, Cravath, Swaine & Moore, Kevin J. Arquit, Richard A. Cirillo, Rogers & Wells, New York City, Eric D.

Freed, Law Offices of Eric D. Freed, Los Angeles, CA, for Bristol–Myers Squibb Co.

Larry J. Saylor, James G. Vantine, Jr., B. Jay Yelton, III, Charles E. Ritter, Catherine M. Patterson, Miller, Canfield, Paddock & Stone, Detroit, MI, Martin J. Dubowsky, Martin J. Dubowsky, Ltd., Chicago, IL, for Upjohn Co.

William F. Cavanaugh, Jr., Thomas W. Pippert, Roosevelt N. Nesmith, Patterson, Belknap, Webb & Tyler, New York City, for Johnson & Johnson.

Michael M. Conway, Hopkins & Sutter, P.C., Scott M. Mendel, Michael Sennett, Matthew K. Phillips, Ellen S. Kornichuk, Michael J. Abernathy, Stephen H. Wenc, Carolyn Suzanne Palk, Bell, Boyd & Lloyd, Chicago, IL, John W. Nields, Jr., Marguerite S. Boyd, Howrey & Simon, Washington, DC, Jennifer A. Albert, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for Purdue Frederick Co.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter is before the Court on five Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

First, the Wholesaler Defendants [1] move for Summary Judgment on plaintiffs' claims against them in the Consolidated and Amended Complaint under § 1 of the Sherman Act, 15 U.S.C. § 1. According to the Wholesaler Defendants, the plaintiffs'

chargeback allegations find no support in either fact or law.

Next, the Manufacturer Defendants [2] move for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, or in the alternative for Summary Judgment, dismissing the indirect purchaser claims asserted against them in the Consolidated and Amended Complaint. As grounds for their motion, the Manufacturer Defendants maintain that the putative class plaintiffs, as indirect purchasers, lack standing under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Finally, Defendant Burroughs Wellcome, Co. ("Burroughs Wellcome") moves for Summary Judgment in its favor on certain [3] individual plaintiffs' Sherman Act claims for treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15. In support of its motion Burroughs Wellcome asserts that the plaintiffs in the various individual actions, with the exception of Plaintiff Albertson's Inc., have not purchased brand-name prescription drugs directly from Burroughs Wellcome. Accordingly, Burroughs Wellcome claims that under *Illinois Brick,* the plaintiffs who are indirect purchasers are barred from recovering treble damages under § 4 of the Clayton Act.[4]

Each motion will be addressed below. Before proceeding, however, we first examine the legal standard from which to judge a motion for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, answers to interrogatories, admis-

---

**1.** The Wholesaler Defendants are as follows: Alco Health Services Corporation; Bergen Brunswig Corp.; Bindley Western Corporation; Cardinal Distribution, Inc.; FoxMeyer Drug Company; McKesson Corporation; and Whitmire Distribution Corporation.

**2.** The Manufacturer Defendants named in the Consolidated and Amended Complaint are as follows: Abbott Laboratories; American Cyanamid Company; American Home Products Corporation; Knoll Pharmaceutical Company, Bristol–Myers Squibb Company; Burroughs Wellcome Company; Ciba–Geigy Corporation; The DuPont Merck Pharmaceutical Company; Eli Lilly and Company; Forest Laboratories, Inc.; G.D. Searle & Company; Glaxo, Inc.; Johnson & Johnson; Marion Merrell Dow, Inc.; Merck & Company, Inc.; Pfizer, Inc.; Rhone–Poulenc

Rorer, Inc.; Sandoz Pharmaceuticals Corporation; Schering–Plough Corporation; SmithKline Beecham Pharmaceuticals Company; The Upjohn Company; Warner–Lambert Company; and Zenca, Inc.

**3.** *See* Motion of Defendant Burroughs Wellcome Co. For Summary Judgment.

**4.** The following three defendants have filed separate motions for summary judgment incorporating by reference and adopting as their own the arguments asserted in Defendant Burroughs Wellcome's Motion for Summary Judgment: Defendant Merck & Co. ("Merck"); Defendant Rhone–Poulenc Rorer Pharmaceuticals ("RPR"), Inc.; and Defendant Schering–Plough Corporation ("Schering–Plough").

sions, affidavits and other material show "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment carries the initial burden of showing that no such issue of material fact exists. The moving party may discharge this burden by " 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Pursuant to Rule 56(e), when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue as to any material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

In making our determination, we are to draw inferences from the record in the light most favorable to the non-moving party. We are not required, however, to draw every conceivable inference, but rather, only those that are reasonable. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 313 (7th Cir.1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987). The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Howland v. Kilquist,* 833 F.2d 639, 642 (7th Cir.1987).

The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "In such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial". *Id.* at 322–23, 106 S.Ct. at 2552.

It is in consideration of these principles that we examine the various motions before us.

## DISCUSSION

### I. The Wholesaler Defendants' Motion for Summary Judgment

The Wholesaler Defendants move for summary judgment in their favor on the allegations asserted against them in plaintiffs' Consolidated and Amended Complaint. According to the Wholesaler Defendants, the plaintiffs' § 1 Sherman Act claims against them must fail as a matter of indisputable fact and law.

The Wholesaler Defendants contend that there is no triable issue on the question of whether they had conspired to "fix, raise, maintain and stabilize the prices of Prescription Brand Name Drugs sold to the plaintiffs and the [putative] class members at supracompetitive levels." Consolidated and Amended Class Action Complaint at ¶ 79. As the Wholesaler Defendants see it, the plaintiffs' conspiracy allegations, as they relate to the Wholesalers, are based *only* upon chargeback agreements entered into by each Wholesaler with the Manufacturer Defendants. The Wholesaler Defendants contend that as a matter of undisputable fact, the chargeback agreements[5] do not fix or restrict the prices at which the Wholesalers can sell the Manufacturers' products to plaintiffs. Thus, argue the Wholesalers, since these chargeback agreements are legal on their face and do not directly involve the plaintiffs, the plaintiffs' conspiracy allegations against the Wholesaler Defendants must fail. We do not agree with the Wholesaler Defendant's approach of fragmenting and compartmental-

---

5. Representative examples of these chargeback agreements, along with supporting Affidavits, have been submitted for our review. *See* Appen-

dix A to the Wholesaler Defendants' Motion for Summary Judgment.

izing the factual components of the plaintiffs' conspiracy claim.

First of all, in their Consolidated and Amended Complaint, the plaintiffs allege that the Manufacturer Defendants and the Wholesaler Defendants entered into and are engaging in "a continuing nationwide contract, combination and/or conspiracy in the unreasonable restraint of trade and commerce ... in violation of Section 1 of the Sherman Act." Consolidated and Amended Class Action Complaint at ¶ 78. The plaintiffs further allege that the substantial terms of this conspiracy were "to fix, raise, maintain and stabilize the prices of Prescription Brand Name Drugs sold to the plaintiffs and the class members at supra-competitive levels." *Id.* at ¶ 79. With respect to the Wholesaler Defendants' involvement in this scheme, the plaintiffs' allege that the Manufacturers and Wholesalers have implemented and have contracted to implement a "chargeback" system which has the effect of: (1) "fixing, raising, maintaining and stabilizing at above competitive levels prices charged to class members for Prescription Brand Name Drugs," *Id.* at ¶ 80(b); and (2) "preclud[ing] the wholesalers from reselling the Prescription Brand Name Drugs to Drug Stores at the much lower prices made available to Institutional Pharmacies," *Id.* at ¶ 80(d).

Plaintiffs contest the Wholesaler Defendants' motion essentially arguing that the Wholesaler Defendants have missed the mark. According to the plaintiffs they are not claiming that the chargeback agreements submitted by the Wholesaler Defendants standing alone and on their face are illegal. Rather, the plaintiffs are claiming that these chargeback agreements are simply *one* component of a single unitary scheme between and among the Manufacturer Defendants and the Wholesalers to artificially raise, fix, maintain and stabilize the price at which brand name prescription drugs are sold to plaintiffs and the putative class members. Thus, according to the plaintiffs, the content of the Manufacturer–Wholesaler agreements is insufficient to support entry of summary judgment.

■ We agree with the plaintiffs that summary judgment may not be entered at this time. Although the Wholesaler Defendants have sufficiently demonstrated that the chargeback agreements do not specifically deal with the prices the plaintiffs pay, the defendants have failed to establish that there is no issue of material fact as to plaintiffs allegations that the Wholesalers participated in an antitrust violation. In an attempt to dispose of this action at an early stage, the Wholesaler Defendants have fragmented and compartmentalized the plaintiffs' conspiracy allegations and have asked us to look at their conduct apart from the Manufacturer Defendants' alleged conduct, and apart from the other allegations of the complaint. The United States Supreme Court, however, has expressly admonished against such an approach:

> In [conspiracy anti-trust cases] plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. " ... The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *United States v. Patten,* 226 U.S. 525, 544 [33 S.Ct. 141, 145–46, 57 L.Ed. 333] (1913) ...; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it."

*Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 698–99, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) (quoting *American Tobacco Co. v. United States,* 147 F.2d 93, 106 (6th Cir.1944)).

Here, in their Amended and Consolidated Complaint, the plaintiffs are not alleging that the chargeback agreements, standing alone, constitute anti-trust violations. Rather, the plaintiffs specifically allege that the use of chargeback agreements between the Wholesaler Defendants and the Manufacturer Defendants was one form of concerted action which the defendants engaged in to fix prices. *See* Consolidated and Amended Complaint at ¶ 80(a)–(g). In light of the U.S. Supreme Court's cautionary warning in *Continental Ore,* we will not isolate the allegations against the Wholesaler Defendants and

rule on the propriety of their individual acts in the face of the larger scheme pled.

In their Reply Memorandum, the Wholesaler Defendants contend that summary judgment must be entered in their favor because the plaintiffs have not satisfied their burden of coming forward with evidence that " 'tends to exclude the possibility' that the alleged co-conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987) (quoting *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), and other cases cited therein). On the contrary, it is the Wholesaler Defendants, as the moving party, that have not satisfied its initial burden of showing that it is entitled to summary judgment. As the U.S. Supreme Court recently observed, *Matsushita*'s requirement that plaintiffs' claims make "economic sense" did not change the burden carried by a plaintiff facing summary judgment in an antitrust case:

> The [*Matsushita*] Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. (footnote omitted).

*Eastman Kodak Co. v. Image Technical Servs.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992). The Court in *Eastman Kodak* further observed that the moving party in an antitrust case bears "a substantial burden" in establishing that it is entitled to summary judgement. *Id.* Here, we find that the Wholesaler Defendants have failed to meet that burden. Although the chargeback agreements do not, as argued by the Wholesaler Defendants, specifically deal with the prices the plaintiffs pay, the plaintiffs have made a sufficient showing, at least at this point, that it is not unreasonable to conclude that these agreements are a part of an overall unitary chargeback scheme.

Essentially, whether the chargeback agreements are an element of an overall illegal scheme among the defendants is a disputed issue of material fact. Accordingly, mindful of the U.S. Supreme Court's admonition that summary judgment should be used sparingly in complex antitrust cases unless the record is clear that the antitrust claims cannot succeed, *Wigod v. Chicago Mercantile Exchange,* 981 F.2d 1510, 1514 (7th Cir.1992), we will not grant the Wholesaler Defendants' motion for summary judgement at this time.

## II. The Manufacturer Defendants' Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment

■ The Manufacturer Defendants move for judgment on the pleadings, or in the alternative, for summary judgment in their favor. After the close of pleadings, a Defendant may, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, move for judgment on the pleadings to dispose of the case on the basis of the underlying substantive merits. The appropriate standard for a judgment on the pleadings is that applicable to summary judgment, except that the court may consider only the contents of the pleadings. *Alexander v. City of Chicago,* 994 F.2d 333, 336 (7th Cir.1993). Thus, all well-pleaded allegations in the plaintiffs' pleadings are taken as true, and the facts and inferences to be drawn from those allegations are viewed in a light most favorable to the plaintiffs. *Id.* The granting of a Rule 12(c) motion will not be affirmed unless no genuine issues of material fact remain to be resolved and unless the [Defendant] is entitled to judgment as a matter of law. *Id.*

The Manufacturer Defendants assert that they are entitled to judgment as a matter of law because plaintiffs, as indirect purchasers, lack standing to bring their asserted claims against them. In support of their argument, the Manufacturer Defendants cite the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

In *Illinois Brick,* plaintiff, the State of Illinois, brought suit against the manufacturers and distributors of concrete blocks, alleg-

ing a conspiracy to fix prices in violation of the antitrust laws. The concrete blocks were sold by the manufacturers to masonry contractors who used them in masonry structures. General contractors then used these structures in buildings which were ultimately sold to the state. *Illinois Brick*, 431 U.S. at 726–27, 97 S.Ct. at 2064–65. The plaintiff claimed that the intermediaries in the chain of distribution, the masonry contractors and general contractors, "passed on"[6] the increased fixed prices to the plaintiffs. The Supreme Court denied the plaintiffs recovery, holding that as an indirect purchaser in the chain of distribution, the plaintiff was precluded from seeking damages for illegal overcharges passed on to the plaintiff by intermediaries in the distribution chain who purchased directly from the manufacturers.[7] *Id.*, 431 U.S. at 746, 97 S.Ct. at 2074–75.

The Defendant Manufacturers analogize their situation to that of the block manufacturer defendants in *Illinois Brick* and assert that, as in *Illinois Brick*, the plaintiffs, as indirect purchasers, are precluded from bringing suit against them. The plaintiffs, however, insist that *Illinois Brick* does not bar their suit against the Manufacturer Defendants. The plaintiffs argue that their claim against the Manufacturer Defendants is not for overcharges "passed on" by the wholesalers, such as the type that would be barred by *Illinois Brick*. On the contrary, the plaintiffs allege overcharges *directly* imposed on the plaintiffs by both the manufacturers and the wholesalers as a part of a price-fixing conspiracy in which all of the

Defendants were participants. *See* Consolidated and Amended Class Action Complaint at ¶ 80.

The issue before the Court, therefore, is whether *Illinois Brick* precludes the plaintiffs from maintaining a suit against the Manufacturer Defendants based on allegations of a vertical, two-tiered conspiracy between the wholesalers and the manufacturers. The Seventh Circuit entertained the issue in *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir.1980). In *Fontana*, an aircraft dealer, alleging a conspiracy between the aircraft manufacturer and the aircraft distributor, brought suit against the manufacturer charging antitrust violations. The Seventh Circuit held that *Illinois Brick* did not bar the plaintiff dealer's claim because the plaintiff did not seek damages for unlawful indirect overcharges passed on to it. *Id.* at 480. Rather, the plaintiff sued on the basis of a conspiracy consisting of a combination of acts designed to cause plaintiff competitive injury. *Id.* In its discussion of *Illinois Brick*'s applicability to the situation, the Seventh Circuit stated:

> We are not satisfied that the *Illinois Brick* rule directly applies in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer.

*Id.* at 481. Although the court's decision regarding the inapplicability of *Illinois Brick* ultimately rested on several factors (including the co-conspirator factor), the *Fontana*

---

6. "Pass-on" is a process by which an entity in a chain of distribution adjusts its price upward to compensate for an overcharge by a prior party in the chain. Comment, The Indirect Purchaser's Right to Sue Under Section 4 of the Clayton Act: Another Congressional Response to Illinois Brick, 32 Am.U.L.Rev. 1087, 1087 n. 2 (1983). Normally, this occurs when sellers pass on costs downward in the chain of distribution from the manufacturer to the ultimate purchaser. *Id.* However, the reverse can also occur. *Id.* Passing on costs spreads the effect of anticompetitive activity beyond the direct purchaser or seller to all buyers and sellers in the chain of distribution. *Id.* The result is that the ultimate buyer or seller often bears the cost of the overcharge. *See* Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 Cornell L.Rev. 309, 311 (1978).

7. In so holding, the Court relied upon its earlier decision in *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe*, the Court held that an antitrust violator could not defend a suit by a direct purchaser on the basis that the purchaser had not been injured because it had passed on an illegal overcharge to its own customers. *Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. at 2232. *Illinois Brick* involved the offensive use of this pass-on theory. The Court reasoned that symmetry required a bar of the offensive use of the pass-on rationale by indirect purchasers in the distribution chain. *Illinois Brick*, 431 U.S. at 736, 97 S.Ct. at 2069–70.

court seemed to indicate that the "co-conspiracy intermediary issue" was not within the realm of *Illinois Brick* and thus was no bar to the plaintiff's suit.

Four years later, the Ninth Circuit relied upon *Fontana* in deciding *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir.1984), *cert. denied*, 469 U.S. 1197, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985). In *Shamrock Foods*, the Ninth Circuit held that *Illinois Brick* did not bar plaintiff consumers from alleging that retail intermediates, i.e., grocery stores, were engaged in a conspiracy with dairy producers to fix the prices of dairy products at the retail level. *Id.* at 1211. The plaintiff asserted and the court agreed that because the damages were attributable to the fixed prices at the retail level, not at the wholesale level, there were no pass-on damages and *Illinois Brick* did not apply. *Id.*

Other courts have similarly concluded that, amidst allegations of sellers conspiring with intermediates in the distribution chain, *Illinois Brick* is no bar. *See e.g., In re Mid–Atlantic Toyota Antitrust Litigation*, 516 F.Supp. 1287 (D.Md.1981), *and aff'd*, 704 F.2d 125 (4th Cir.1983); *Reiter v. Sonotone Corp.*, 486 F.Supp. 115 (D.Minn.1980); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1246 (E.D.Pa.1980). Common among all of these cases is an examination of the policy objectives underlying *Illinois Brick* and an ultimate conclusion that, by permitting a plaintiff to maintain a suit against an otherwise indirect party who has been conspiring with an intermediate, those concerns would not be thwarted. When the reasons for applying a rule fail to apply, application of the rule becomes inappropriate.

■ In *Illinois Brick*, the Supreme Court articulated at least two major policy reasons for denying the plaintiff's recovery. First, the Court reasoned that if indirect purchasers were permitted to sue for overcharges passed on to them from indirect sellers, a substantial risk of duplicative recovery would be created. *See Illinois Brick*, 431 U.S. at 737, 97 S.Ct. at 2070. Under *Hanover Shoe*, a seller may not raise a passing-on defense in a suit brought by intermediates, thus the intermediates may recover from the sellers the whole of the proven overcharge. If the indirect purchasers were also permitted to recover damages for the passed-on overcharges, multiple recovery would occur. The seller would be fully liable to both the intermediates and the indirect purchasers. *Illinois Brick* seeks to avoid the unfairness of this result.

The risk of multiple liability is virtually eliminated, however, where the seller and intermediate are alleged to be co-conspirators. Under such circumstances, the seller and the intermediate are considered equal participants in the conspiracy, thus the intermediate may no longer recover in a suit against the seller. Because the seller and intermediate are equal, the "indirect" purchaser's injury likewise becomes "direct." This is so, because the harm suffered by the purchaser is directly caused by the co-conspirators, not passed indirectly through some distributional chain. Central to the concept is the assertion that the intermediates are engaging in knowing, illegal acts in concert with the manufacturers which gives rise to their status as co-wrongdoers. The situation in which an otherwise innocent party merely "passes on" the charges of its manufacturer inflated by the illegal price fixing conduct engaged in by those manufacturer sellers, is distinguishable factually and in terms of its legal effect from the plaintiffs' instant allegations.

The second policy notion with which *Illinois Brick* was concerned involved the complexities of tracing damages passed-on throughout the various stages of the chain of distribution. *Id.* The existence of the tracing issue derives from the difficulties encountered in attributing price increases, or any portion thereof, directly to the illegal overcharge as opposed to other forces which may affect the market (e.g., supply and demand). *Mid–Atlantic Toyota*, 516 F.Supp. at 1292–93. Thus, the concern in *Illinois Brick* focused upon the complexities of evaluating the injury which indirect purchasers sustain by illegal overcharges passed on through the distributional chain.

The tracing concern, like the risk of multiple liability, is greatly diminished amidst allegations of a conspiracy between the seller

and the intermediate. This is so, because with the existence of a conspiracy to fix prices, market forces are superseded. The prices paid by the indirect purchasers are almost by definition not determined by the influence of supply and demand. Without the interference of such market forces, the complexity of the damages calculation drops markedly.

Having articulated the policies underlying *Illinois Brick* and their general inapplicability to cases involving allegations of conspiracy, we turn now to the applicability of *Illinois Brick* to cases such as that presented here, where charges of vertical conspiracy have been alleged. The plaintiffs allege that the Manufacturer Defendants, together with the Wholesaler Defendants, entered into a price-fixing conspiracy whereby they "acted jointly and in concert to fix, raise, maintain and stabilize the prices which they charged retail pharmacies for Prescription Brand Name Drugs." Consolidated and Amended Class Action Complaint at ¶ 80(a). Taking, as we must, the plaintiffs' allegations as true, the question becomes whether *Illinois Brick* precludes the plaintiffs from bringing suit against the Manufacturer Defendants. We conclude that, for many of the reasons stated above, the policy concerns which guided the Court in *Illinois Brick* fail to pose significant problems in the allegations presented here. Unlike the plaintiffs in *Illinois Brick*, the plaintiffs here are not alleging that the illegal overcharges were passed on to them through the chain of distribution. Rather, the plaintiffs are alleging a massive conspiracy in which all of the defendants, wholesalers and manufacturers, were participants. We do not believe that *Illinois Brick* pertains to the factual circumstances as alleged by the plaintiffs. As such, we find that *Illinois Brick* does not apply.

The court recognizes that at least two circuits have expressly rejected the vertical conspiracy theory. *See Link v. Mercedes–Benz of North America, Inc.,* 788 F.2d 918, 931 (3d Cir.1986); *In re Midwest Milk Monopolization Litigation,* 730 F.2d 528, 531 (8th Cir.1984). In each of these cases, the plaintiffs' allegations of vertical conspiracy succumbed to *Illinois Brick* because the

plaintiffs had failed to join all of the intermediate co-conspirators, thereby increasing the risk of multiple liability. We refrain, however, from granting the Manufacturer Defendants' motion on these grounds. In the present case, the plaintiffs have named a large percentage of all possible Wholesaler Defendants. In light of that, we do not believe the plaintiffs should be so severely penalized for the failure to join every single Wholesaler Defendant. We conclude that *Illinois Brick* does not apply to the situation as alleged by the plaintiffs. As such, the Manufacturer Defendants' motion is denied.

### III. Burroughs Wellcome's Motion for Summary Judgment

Defendant Burroughs Wellcome, Co. ("Burroughs Wellcome") moves for Summary Judgment in its favor on certain individual plaintiffs' Sherman Act claims for treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15. Similar to the Manufacturer Defendants, Burroughs Wellcome asserts that because the plaintiffs in the various individual actions, with the exception of Plaintiff Albertson's Inc., have not purchased brand-name prescription drugs directly from Burroughs Wellcome, *Illinois Brick* bars the plaintiffs' claims as to Burroughs Wellcome. For the reasons stated above in the Manufacturer Defendants' portion of this opinion, we disagree. We conclude that where its policy concerns would not be significantly advanced, *Illinois Brick* has no application to cases involving allegations of vertical conspiracy. The defendant's motion is therefore denied.

### CONCLUSION

For the reasons stated above, each of the Defendants' motions is denied.

UNITED STATES of America,

v.

Steven C. GRIFFIN, Marvin M. Rux,
Andrae Scurlock, Defendants.

No. 91 CR 371.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 4, 1994.

Zaldwaynaka L. Scott, U.S. Attys. Office, Chicago, IL, for plaintiff.

George N. Leighton, Earl L. Neal & Assocs., David Carl Thomas, Chicago–Kent College of Law, Stanley L. Hill, Jennifer H. Lee, Stanley L. Hill & Assocs., Chicago, IL, for Marvin Rux.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This is a case of a defense counsel without much of a defense to money laundering/structuring charges who tried to follow the old maxim that when the facts and the law are against you, then attack the prosecution. The problem with this tactic is that, in its purest form, it is quite outside the law. A generation ago Justice Walter Schaefer once lamented the "increasing tendency in criminal cases to try some person other than the defendant and some issue other than his guilt." *Sears v. Romiti*, 50 Ill.2d 51, 277 N.E.2d 705 (1971). His observation holds true today.

On some occasions police and prosecutorial conduct is relevant to that issue, but often the only thrust of the defense is this: the prosecution was not nice or could have done it better and so the jury ought to acquit, whether or not guilt has been proved beyond reasonable doubt. One might excuse this tactic if a judge permits its use but, in this case, I did not and, in defiance of my rulings, Stanley Hill forged ahead, and at times sought to mislead the Court.[1] He was warned I would sanction him, and I do so in this order which adjudges him guilty of contempt of court.

The bill of particulars is this.[2]

### 1.

The government called Kevin Moss to testify as an expert about the secreting of cash from illegal transactions. The government did not, however, ask this witness to examine and reach conclusions about the particular transactions in this case. The government used a different witness to do that analysis. Mr. Hill wished to attack the government for its failure to ask Mr. Moss to do this work. What relevance this has to the one issue before the jury is quite unclear, and Mr. Hill

---

1. There are some judges who would permit some of Mr. Hill's tactics. So be it. The question here is not whether the rulings were right, it is whether Mr. Hill followed them and was truthful with the Court.

2. I leave to one side the misuse of opening statement to argue the case and to misstate law (R. at 68, 70, 71, 72, 73).

asked a series of questions on this point. I sustained the objections.

Q. Now, has the government asked you as a result of your expertise to look at the transactions involving Marvin Rux?

A. No.

Ms. Scott: Judge, we've been over this.

The Court: Objection is sustained.

Q. [Mr. Hill]: I mean, you have been involved in other cases where you've been asked to look at financial transactions to see whether they were legal or not, haven't you?

Ms. Scott: Objection, Judge.

The Court: Sustained.

Not much later, Mr. Hill asked virtually the same question to which the objection had been sustained.

Q. Let me just ask you this one last question. Have you been asked to review any transactions involving Marvin Rux, sir?

Ms. Scott: Judge, objection.

The Court: Are you including—

Mr. Hill: Last Question. Any transactions involving Marvin Rux, the defendant in this case.

The Court: Come to the side.

Mr. Hill: I'll withdraw the question.

I find that the asking of the question and its withdrawal was a deliberate attempt to evade the prior ruling and raise in the mind of the jury a question that they ought not to consider. It is not repaired by withdrawing the question.

The insincerity of the tactic is made clear by what happened at the side bar. I expressed my concern that what Mr. Hill was doing was of no use to his client because the prosecutor could respond by offering, in the presence of the jury, to have Mr. Moss conduct the examination of the Rux transactions. At the end of the conference, the colloquy was:

The Court: The government is not on trial here. Whether the government asks a witness to do something or doesn't ask a witness to do something doesn't amount to a hill of beans. We all come in here with the same subpoena power and the same

ability, at least in theory, to get in evidence, and I don't want lawyers standing up in closing argument and saying, well, if they thought it was so important why didn't they ask, and they respond to you by saying, if Mr. Hill thought it was so important why didn't Mr. Hill ask, and then we have a dispute over not the defendant's guilt but which lawyers the jury likes the most.

Mr. Hill: Judge, I'd like to make a request at this point.

The Court: Now you may make your statement.

Mr. Hill: I'd like to make a request at this point. I'd like to have him review the real estate transactions in this case and make a statement as to whether or not there's money laundering.

The Court: Your request is granted.

Mr. Hill: Thank you.

But the fact is Mr. Hill did not want Mr. Moss to make an examination of the Rux papers. At the end of Mr. Moss's examination, this occurred.

Mr. Hill: ... what I'd like to do ... is that I'd like to ask him, with all of this experience and all of these investigations he's been involved in and all of these reportings and reports that he's done ... why he wasn't requested to look at this transaction and give his opinion on that ... since he's the expert in the area....

Then Mr. Lopez (representing another defendant) said he was not joining in the request for Mr. Moss to examine documents because "I'm pretty sure what the outcome would be, I would move for a severance." Without dissent, Mr. Safer (the prosecutor) said, "I gather ... nobody at this point is asking Mr. Moss to examine ..." In fact, Mr. Hill never sought Mr. Moss's services because, like Mr. Lopez, he knew what the outcome would be. Mr. Hill never had any purpose other than to pursue a line to which objections had been sustained and, in fact, misrepresented to the Court that he did want Mr. Moss to examine records.

### 2.

The government called Roger Salter, a certified financial planner, who worked in an office with defendant Marvin Rux. Both Mr. Rux and Mr. Hill knew Roger Salter before trial. Mr. Hill wanted Mr. Salter to testify about photographs of various awards and placques given to Mr. Rux and displayed on Mr. Rux's office walls. Why this had to be done is not entirely clear since Mr. Rux testified on his own behalf. But the problem with Mr. Hill's conduct with respect to this matter was the insincerity of his justifications for the evidence. Rather than state his true purpose, Mr. Hill said that the state of the office displayed in photographs was relevant to the testimony of Terrence Ferguson, an accomplice who testified for the government. A witness's descriptions of a place where conversations occurred may be relevant. Mr. Hill made this point, "[S]ome of the conversations in which Ferguson claims he participated in happened in this very office.... it's the photograph of the facts." But a photograph of what the eye sees is of no relevance here. Mr. Hill knew as did everyone in the courtroom that Terrence Ferguson is and was sightless.

### 3.

The expert the government did call instead of Kevin Moss was one John Doe.[3] Mr. Hill wanted to impeach Mr. Doe who received poor grades in college (particularly in accounting) about twenty years ago. There is nothing unreasonable about what Mr. Hill wanted to do. It was within my discretion to admit the evidence or to refuse it. And the matter was considered over a period that consumed nine pages of transcript. The ruling, and its rationale, was stated in an oral opinion consuming another three pages of transcript. In part I said:

> The Court: If you wish to challenge whatever statement he made about the amount of time he had in college you may do so. If you wish to challenge what his grades were in various courses, you may not do so. And I'm cautioning you, Mr. Hill, that

I don't want you to ask a question which conveys any information about his grades.

Part of it has to do with the remoteness in time. We are talking about stuff that is more or less one generation in the past, and that makes a difference, but that would not in my mind suffice to keep it out in this particular case. What keeps it out in this particular case is that this is not, as I view his testimony, a case involving accounting principles in any respect....

What you have here is the rough equivalent of a police officer getting on a witness stand, as they used to do many, many years ago, and telling a jury how somebody ran a numbers bank; ... of a police officer talking about how narcotics importation operates.

It's quite clear that the only training this individual could have gotten in the field in which he is testifying already is the training he got in the course of working for his employer....

With respect to Ferguson, if all that is going to be said here ... is that Ferguson hoodwinked [Doe], I doubt very much that his academic performance would have anything to do with his ability to judge the credibility of Ferguson. And ... this jury heard Ferguson and will decide for itself whether Ferguson was telling the truth, and if Ferguson was lying, then they're going to have to throw out a lot of what [Doe] has to say anyway.

... The fact that [Doe] didn't do very well in his accounting courses is [no] indicia of how well he would do in buying a bill of goods from Ferguson.

I left open only the possibility that a defense expert (who was to be Mr. Rux) might show that academic excellence was relevant and, if that occurred, "then I would permit ... recall [of] Mr. [Doe] for ... further cross-examination."

What was Mr. Hill's response to this ruling?

Q. Was there a time when you had to matriculate at Wright Junior College, sir?[4]

---

3. A pseudonym.

4. This is a reference to the fact that the witness's academic performance years ago required him to depart DePaul.

A. That is correct.

Q. Would you tell the ladies and gentlemen of the jury why.

Mr. Safer: I object, your honor.

The Court: The objection is sustained.

Q. [Mr. Hill]: Have you taken any accounting courses, sir?

A. Yes.

Mr. Safer: Objection, Your Honor.

The Court: Mr. Hill come to the side.

Mr. Hill: I'm not getting into grades.

The Court: Mr. Hill, come to the side.

Ms. Scott: Judge—

The Court: Mr. Hill.

(Side bar conference:)

The Court: I find your comments, the asking of the question and your response to their objection to be in direct defiance of my ruling.

Mr. Hill: Judge, that was not my intent.

The Court: I don't care what your intent was, because it was in direct defiance. I also cannot believe it was not your intent because we went over this in great detail. What we are going to do is we are going to adjourn for a few moments and we are going to discuss your conduct.

(Before the jury:)

The Court: Take the jury out.[5]

(Jury excused.)

The Court: Come to the lectern. Tell me, Mr. Hill, what are you going to ask next?

Mr. Hill: I was specifically told that I could not ask him anything about his grades, and I didn't.

The Court: And you felt that—

Mr. Hill: I didn't ask him a word—

The Court: Mr. Hill.

Mr. Hill: —about his grades.

The Court: Mr. Hill, maybe one of the difficulties you have is that you begin talking before I finish and somehow perhaps you don't hear what I'm going to say. What you did is you said in the presence of the jury "I'm not asking him about his grades."

Mr. Hill: In response—

The Court: Mr. Hill—

Mr. Hill: —to their objection.

The Court: Mr. Hill, Mr. Hill, I'll tell you when you can talk.

Mr. Hill: Thank you, Your Honor.

The Court: That way we won't have any difficulty.

Mr. Hill: Judge, I'm not trying to be hostile, but I don't want to be intimidated, Judge.

The Court: Mr. Hill—

Mr. Hill: I don't want to be intimidated.

The Court: Mr. Hill, I'll tell you when you can speak.

Mr. Hill: Yes, sir.

The Court: Mr. Hill, remain at the lectern. You then said in the presence of the jury, "I'm not going to ask him about grades." There is no way that the jury could fail to draw an implication that you intended to ask questions or that you wanted to ask questions about grades. You conveyed to the jury at least the idea that there was some question about grades. And that I think was entirely inappropriate.

Moreover, I permitted you to ask a question which I thought was very close to the line, which is, "There came a time when you had to go to Wright Junior College," and the reason I permitted it is there could be a variety of reasons why a person would have to go to Wright Junior College rather than DePaul, one of which is, as I recall, the tuition at Wright Junior College is significantly less than the tuition at DePaul, because that question had no freight no negative freight to it.

The truth is you just did what you've done in a variety of cases in the course of this trial, which is to attempt to get by my rulings by stating this in the course of objections and responses to objections that convey to the jury information which I have told you you could not convey to them, I think that is wrong. I think it may very well be contemptuous of the

---

**5.** Hill's response says that his conduct caused only a sidebar interruption. In fact, the jury had to be excused to proceed with a lengthy colloquy.

Compare *United States v. Oliver*, 470 F.2d 10, 13 (7th Cir.1972).

Court, but I make no finding on the question of contempt because I would postpone any hearing with respect to that until the end of this trial.

Now, Mr. Hill, if you have something to say, this would be the time to say it.

Mr. Hill: Yes. Jim Tunick and I would like to withdraw from this case at this point because I think that by virtue of your ruling I'm being intimidated to the point of where I can't effectively represent my counsel—I mean my counsel who happens to be my client.

Judge, that response was clearly in response to both of these lawyers jumping up. I'm not going to get into the details of it. It didn't—we know, we know it had nothing to do with finances. It had nothing to do with it.

I was told 22 years ago that in a federal district court the job of lawyer was to make sure that the truth came out, whether it was the defense lawyer or the prosecutor. I was a former assistant state's attorney, in fact I think I worked while you were in the office back in state court, and I learned I think from you even, because you used to give the seminars about defending your clients and let the chips fall where they may.

I'm not here trying to malign Mr. [Doe]. It was a hard thing for me to look into that. Not all of us are A students when we start out, and along the way we can, you know, get it better. But to be able to limit us in a federal district court in this state, of the United States, it seems to me, Judge, that's something wrong with the Sixth Amendment if the Sixth Amendment doesn't allow—and the government knew about it. Jim Tunick called me yesterday because we wanted to verify whether or not this was the same individual. He asked Ms. Scott whether or not his middle initial was M. We had to call. There was some delay in terms of who this individual was. At the time of the voir dire, because we suspected something, I asked for the man's personnel file.

Now, Judge, you know, I don't know what you'd have me do. I'm trying to do the best I can. I ended up with the case because one of my lawyer friends got sick, Marianne Jackson, with all due respect to Mr. Rux, whom I've known also.

But, Judge, I mean the jury should be able to hear from [Doe]. I'm sure they all weren't A students either. I wasn't. That doesn't mean you don't turn out to be something and be able to do your job. But I don't think that when you're dealing with a man that's got up on the stand, for example, Judge, and talked about Griffin's available income and talked about the inferences that he's drawing from it, that the jury shouldn't be allowed to hear the whole man. It's not just a snapshot of a man's life that's on trial. They should hear the whole picture, which is what I attempted to do with Ferguson. I attempted to let the jury judge the man and what he's doing and whether or not he should be believed and is there anything in his life that might impact on it. And I just don't think that's right.

I mean are we packaging cases so that juries make decisions that—that are devoid of what objective reality is? Objective reality says the man got Fs, he got Ds. That doesn't make him a bad man. But the jury should have that information, Your Honor. We got into it with Mr. Ferguson. There was no objections. We talked about all of Ferguson's degrees. He was a B student. No objection. And then all of a sudden the government—their main person, the person that they rely upon for the underpinnings of their entire prosecution against my client. And all I want to do, Judge, is ask whether or not he learned along the way. They can make the argument. They don't lose it.

I would not disrespect this Court's ruling. I know this Court's background; I know that you are interested in the truth coming out; and I know you know that these prosecutors know how to deal with that information. All they got to do is get up on redirect and say it was 20 years ago. So let's talk about the ten degrees you got working for IRS. I asked for that, Judge. I asked for his personnel record.

Do you have a good faith basis? Yeah, I got a good faith basis. He got two Fs in

economics. That's a good faith basis to find out how all of a sudden he's able to come on and become this star witness in a financial crimes case, which is pivotal with respect to Mr. Rux.

The whole case that they play out against Mr. Rux is based upon the inferences that he would have drawn from this testimony. And I would respectfully and I would humbly, Your Honor, humbly, ask that you reconsider—that you reconsider it. They talk about ten awards he received. He got an award in this, an award in that.

And then, Your Honor, I want to ask, well, sir you're getting these awards. How did you do in econ? How did you do in math? How did you do in African–American history that he got an F in? And how did you do in Reflections on God and religion that he withdrew from? Maybe that explains why they objected to Matthew 16:18.

Look, this country cannot be devoid of what the reality is, if we start trying cases, Your Honor, in this courtroom or any courtroom where we are afraid to let the agent be subjected to cross examination. It might be one thing if you're dealing with an old lady or a man like Colbert in a wheelchair, but we're talking about a policeman. He put his reputation on the line. I should be able to explore it.

And the jury, these people understand. They understand that. If the evidence—if the evidence is strong against Griffin I'm sure they'll—or Scurlock or Rux, they'll convict them. But should we be so protective of [Doe] that I can't ask him how did he do at a school where he said he had attended and where the government opened it up?

If they didn't want to get into DePaul and what he was doing back in '70, they should have started when he became an FBI—became a G man. They've opened the door. I've been told that when the door is opened, you are allowed to cross-examine within the scope of what's been opened and what's been given to you.

Judge, I respectfully, on behalf of Marvin Rux, I respectfully request that you allow me to represent him. It's a tremendous responsibility when you got another lawyer to represent. I mean it's hard. He's checking me out.

Allow me to represent my guy, Judge, please. I ask you humbly. I'm not contemptuous. I'm not. And if it came that way, I am a fighter. I was taught that when Bernard Carey hired us, Agran and me and others back in '73 those 40 assistant state's attorneys that were going to come out and clean up corruption. They were going to call it like they saw it. They weren't going to make no excuses for their agents and their witnesses. They were going to call it like they saw it.

I said in opening statement, if you believe Ferguson, lock Rux up; if you don't, let him go.

And I respectfully request at this time Judge, that you allow us to do the thorough cross examination that's required. This jury is grown up enough to know that that was 20 years ago just like this Court knew. And I'm sure that all of them didn't get A's and B's and were honor roll students either. But it is some evidence and it is some evidence that I think [Doe] is strong enough to take and withstand.

We've got to protect FBI agents from cross-examination now? Please, Judge. I humbly request that you reconsider, and I hope that nothing that I have said has been meant to be contemptuous, because I'm saying it as humbly as I know how. Thank you.

The Court: Mr. Hill, the fact that you've reargued this motion, reargued this objection shows quite clearly to me that you're simply trying to get around the ruling. If you think my ruling is in error and your client is convicted, then you have a remedy.

Mr. Hill, I made my ruling. I want you to adhere to my ruling. I don't want to have to rule the same thing two or three times in a row. I don't want you to dance around the ruling and try to come close. I want you to adhere to the ruling. I want you to adhere to the ruling no matter how wrong you think the ruling is, because the system we have is based on the assumption

that the lawyer makes a motion, the judge grants it or denies it; the lawyer makes an objection, the judge sustains it or overrules it; and the lawyer must abide by that, no matter how wrong the lawyer thinks it is because the lawyer has another remedy. That remedy is if that lawyer's client loses the case, the lawyer can appeal and go to three judges who outrank the judge who has made the original ruling and say this was wrong; and if it is wrong, those judges will attempt to correct it; and if those judges make an error, you have a chance to go nine judges in Washington, D.C.

Now, the fact of the matter is it is a human system and it is possible that I could make an error here which would not be correct, but the truth is you simply have to obey my rulings, and there is no excuse not to obey my rulings.

And also the truth is that it's quite clear that you are from the form of your questions attempting to skirt the ruling. You must accept the ruling once it is made. And the truth is that nobody in any courtroom in the United States really advocates the position as you seem to have done in this case that the jury ought to hear everything.

As I recall, Mr. Hill, in this case and in other cases before me you've objected to evidence that was the truth because you thought for a variety of reasons it was—it was prejudicial or inadmissible. Every lawyer does that. We don't have a let-it-all-hang-out in the courtroom. We have a whole bunch of rules from which sometimes your client benefits and sometimes your client doesn't benefit. You must obey my ruling.

Now, if your position is that you cannot continue to represent Mr. Rux because you are intimidated by the fact that I will not permit you to disobey my rulings, Mr. Hill, I have two difficulties. First of all, I don't believe that you are intimidated; and, second of all, if I did believe that you were intimidated, you are telling me not that you are not competent to represent Mr.

Rux, you're telling me you're not competent to be a lawyer at all, because every time you go into court you are going to have objections and rulings that are against you, and a fair number of those times you are going to think that they're wrong and you're going to have to comply with those rulings.

If you can't comply with those rules, it's not representing Mr. Rux that's the problem here, it's representing anyone that's the problem here.

Now, I expect you to comply with my rulings and we will deal later with what has happened thus far with respect to this ruling. Comply with my rulings whether you like them or not. Don't try to dance close to the line. Deal with those subjects where I have permitted you, at least where I have not ruled against you. And I have ruled against you on this time—on this occasion and I made it very clear and I gave you as full a chance as I could to argue this.

The truth is that Mr. Hill was not, in the slightest, intimidated [6] and his statement to the Court that he was intimidated was a knowing falsehood. Apart from his unintimidated demeanor and my judgment of his credibility, he continued a pattern of asking questions that he knew, on the basis of prior rulings, were objectionable (R. at 2297, lines 17–25; R. at 2317, line 17 through R. at 2318, line 12; R. at 2318, line 23 through R. at 2319, line 2; R. at 2334, lines 18–24). Nor did he desist from offering insincere justifications for his interrogation. In one instance, Mr. Hill wanted Mr. Doe to opine that Mr. Rux's financial machinations did result in some good deeds, i.e., people who would have lost their homes did not do so or, at least, postponed the loss. Such opinions were beyond the scope of Mr. Doe's testimony, not really the subject of expert opinion evidence.

Mr. Hill: And as a result of the efforts of Mr. Rux she and her daughters continued to live there at least for five to six years longer than they would have?

Mr. Safer: Your Honor—

The Court: Mr. Hill, come to the side.

6. Indeed, the record cannot convey adequately the sly satisfaction in Mr. Hill's demeanor when he managed to say, clearly in the jury's hearing, "I'm not getting into grades."

(Side bar conference:)

The Court: Don't make your argument in questions. You're asking about stuff on which there is no—

Mr. Hill: But see—

The Court: I'm not done.

Mr. Hill: I'm sorry.

The Court: —on which there is no dispute.

Mr. Hill: But can't I question that—

The Court: No, you can't question stuff that's not in dispute. I'm not going to let you talk about stuff that's not in dispute.

Mr. Hill: Well, Judge—

The Court: She said what she said. You're asking—

Mr. Hill: Can I tell—

The Court: Not until I'm done. You're asking him to comment on what some other witness says because you want to make a point, and the point you want to make is that Mr. Rux is a great man because Mr. Colbert's still in his house and this person is still in her house. I know what you're doing and the jury knows what you're doing, and I don't understand why you're persisting in trying to tell me it's not what you're doing.

Mr. Hill: Judge, they indicated that they offered him not as a fact witness but as someone to provide opinions. Now, when they put somebody out on opinions, I'm allowed to get into his opinions.

The Court: Mr. Hill, it's difficult for me to believe you're offering that rationale in good faith.

Mr. Hill: That's what he said on his objection.

The Court: I'm sustaining the objection. And put that chart away, too.

Mr. Hill: Okay.

Nor was he deterred from trying to introduce evidence that other persons who might be guilty were not charged, evidence which, I believe, Mr. Hill knew to be inadmissible:

Q. That's 1120 corporate tax return. You recall, that's the one that was prepared by Cyrus Walker, correct?

A. The one for Caesar's Mini Mart?

Q. Yes.

A. Yes. What about—

Q. By the way, Mr. Walker was never indicted or given immunity was he?

Mr. Safer: Objection, Your Honor.

The Court: Mr. Hill, the cases of other defendants—

Mr. Hill: Okay.

The Court: —are simply—

Mr. Hill: He is not a defendant, Judge, Walker.

The Court: The question of other potential defendants in other possible cases is simply not before this jury.

Mr. Hill: Okay.

The defense to all this is, "I was just doing the best I can to represent my client, in the highest tradition of American advocacy." I actually doubt that refusing to follow rulings and being untruthful to the court is in the highest traditions. Maybe they are so widely accepted that the defense is colorable, to be made with a straight face. But I hold that they are not proper undertakings for an advocate. There is too much today of ignoring the law for the greater good, perhaps on both sides of criminal cases, and it ought to stop.

Mr. Hill's closing argument was sometimes based on nothing but speculation and he misstated evidence and the events of the trial. Some of this rehearsed what had gone on before and some of it was deliberate, but I do not pause to sort each item out because I judge in closing argument Mr. Hill's missteps were largely attributable to the emotional momentum of the closing argument process. His demeanor during closing argument bespoke more sincerity than his earlier demeanor which bespoke deliberate evasion.

■ I therefore find beyond a reasonable doubt that Mr. Hill has committed direct contempt of court with the specific intent to prejudice a fair and impartial proceeding in the following ways:

1. Refusing to abide by the rulings of the Court with respect to the admissibility of the fact that the government did not ask Kevin Moss to give certain expert testimony.

2. Misrepresenting to the Court that he did want Kevin Moss to examine records and

state opinions when Mr. Hill knew he wanted neither of these things.

3. Refusing to abide by the Court's ruling that William Doe's academic performance was inadmissible.

4. Misrepresenting to the Court that he was intimidated by the Court's rulings when he was not intimidated and he knew he was not intimidated.[7]

■ The question then is what is appropriate punishment. Money comes into mind, but this case took a lot of time and effort by Mr. Hill for which, as appointed counsel,[8] he will be inadequately paid. I do not want to assess a nominal fine because a nominal fine would imply that the conduct was not serious. So I issue this Opinion as a written condemnation of Mr. Hill's conduct and I order that the Opinion be published.